**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **TERANCE DAWSON**, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. **2:06-CV-1057-WKW-WC** |
| | ) |
| **CITY OF MONTGOMERY**, and | ) |
| **GUINN TIMMERMAN**, individually, | ) |
| Defendants. | ) |

**DEFENDANTS' BRIEF IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

COME NOW Defendants City of Montgomery and Guinn Timmerman, pursuant to Rule 56 of the Federal Rules of Civil Procedure and respectfully move this Court for summary judgment in favor of defendants and against Plaintiff Terance Dawson as to all issues in controversy alleged against them, and in support of this motion state that:

**I. INTRODUCTION**

1.    Plaintiff Dawson sued the City of Montgomery and Montgomery Police Department Detective Guinn Timmerman seeking damages for alleged violations of his constitutional rights and alleged injuries sustained on November 26, 2004, in a restaurant parking lot in the City of Montgomery, Alabama. The Complaint (Doc. 1) is attached hereto as Ex. A.

**II. PLAINTIFF'S CLAIMS**

2.    In his Complaint Plaintiff alleges six counts, asserting the following federal claims under 42 U.S.C. § 1983: Count I - Illegal Seizure, Imprisonment; and Count II – Denial of Substantive and Procedural Due Process. Plaintiff also asserts four state law claims: Count III – Conversion; Count IV – Invasion of Privacy; Count V –

Slander; and Count VI – Tort of Outrage/Intentional Infliction of Emotional Distress.

3.      As relief therefore, Plaintiff seeks: (A) declaratory relief holding that the defendants violated Plaintiff's due process rights; (B) compensatory damages against each defendant on each claim; (C) $500,000 in punitive damages against Defendant Timmerman; (D) legal costs, including attorney's fees; (E) compensatory and punitive damages on the state claims; and (F) other just and proper relief.

### III. FACTS

### A. UNCONTESTED FACTS

4.      Plaintiff is a college educated professional. (Ex. C, p. 8, ll. 1-7). Plaintiff has worked professionally for the State of Alabama since January 1983 (Ex. C, p. 7, ll. 5-9). Prior to that, Plaintiff did similar work for the United States Department of Defense. (Ex. C, p. 7, ll. 11-16). Plaintiff is a former Councilmember for the City of Montgomery. (Ex. C, p. 38, ll. 13-14; p. 60, l. 13; Ex. D, p. 13, l. 22 to p. 14, l. 2).

5.      On the evening of November 26, 2004, Plaintiff was driving alone in the vicinity of Ann Street and Mt. Meigs Road when an unmarked police vehicle pulled up alongside him. (Ex. A, p. 2, ll. 8-9; Affidavit of Detective Guinn Timmerman, attached as Ex. B, p. 1, ll. 3-6; Deposition of Terance Dawson, attached as Ex. C, p. 10, ll. 8-12, p. 11, ll. 8-9, p. 13, ll. 17-21, p. 17, ll. 9-12; Deposition of G.R. Timmerman, Ex. D, p. 11, ll. 18-22). The driver of the unmarked police vehicle was Defendant Guinn Timmerman, an un-uniformed Montgomery Police Department ("MPD") Detective. (Ex. A, p. 2, ll. 10; Ex. B, p. 2, ll. 3-6, p. 1, ll. 7-9; Ex. C, p. 10, ll. 10-11; Ex. D, p. 14, l. 23 to p. 15, ll. 1-5). Defendant Timmerman told Plaintiff to pull over and showed him his police badge. (Ex. A, p. 2, ll. 10-11, 15; Ex. B, p. 2, ll. 3-6; Ex. C, p. 19, ll. 3-12). Plaintiff complied and

pulled his vehicle into a restaurant parking lot. (Ex. A, p. 2, ll. 17-18; Ex. B, p. 2, ll. 6-7; Ex. C, p. 10, ll. 14-15).

      6.     Defendant Timmerman called for uniformed patrol officers to assist him. (Ex. A, p. 3, l. 9; Ex. B, p. 2, ll. 8-9; Ex. D, p. 8, l. 1; p. 14, ll. 19-22; p. 15, ll. 5-6; p. 17, ll. 1-3). Defendant Timmerman parked his vehicle and walked over to where Plaintiff had parked. (Ex. C, p. 31, l. 17 to p. 32, l. 22). Defendant Timmerman instructed Plaintiff to remain in his vehicle and asked him to place his hands on the steering wheel. (Ex. A, p. 2, ll. 20, 23-24; Ex. B, p. 2, ll. 8-9; Ex. C, p. 33, l. 19 to p. 34, l. 6; Ex. D, p. 9, ll. 13-16, p. 10, ll. 4-7). Plaintiff understands that Defendant Timmerman's requests that Plaintiff keep his hands on the wheel and not answer his phone were for the officer's safety.[1] (Ex. C, p. 34, ll. 12-15).

      7.     Two officers arrived at the scene to assist Defendant Timmerman. (Ex. A, p. 3, ll. 10; Ex. B, p. 2, ll. 9-10; Ex. D, p. 9, ll. 1-3). One of the patrol officers took an open Coca Cola container from Plaintiff's vehicle and smelled it, but indicated there was no alcohol in it. (Ex. C, p. 40, ll. 4-22). Then the patrol officers asked Plaintiff to get out of the vehicle (Ex. C, p. 41, ll. 1-2), asked to see Plaintiff's drivers' license (Ex. A, p. 2, ll. 17-18; Ex. B, p. 2, ll. 11-13; Ex. C, p. 41, ll3-4), and asked Plaintiff to walk to the back of his vehicle and place his hands on the trunk (Ex. C, p. 41, ll. 7-11). Plaintiff complied with all requests. The patrol officers then conducted a pat down search with Plaintiff's consent and examined the contents of Plaintiff's pockets. (Ex. C, p. 41, l. 12 to p. 42, l. 5, p. 43, ll. 11-15; p. 44, ll. 13-17). The patrol officers administered field sobriety tests to Plaintiff, which he passed. (Ex. A, p. 2, ll. 10; Ex. B, p. 2, ll. 4-6; Ex. C, p. 42, ll. 10-21;

---

[1] Plaintiff stated "…as an officer to keep my hands on the steering wheel to maintain his safety inasmuch as he stopped me in a traffic stop and didn't, you know, know me, so…" Ex. C, p. 34, ll. 12-15.

Ex. D, p. 10, l. 13; p. 23, ll. 1-8). The officers received permission to search Plaintiff's

vehicle. (Ex. A, p. 2, ll. 10; Ex. B, p. 2, ll. 4-6, p. 2, ll. 14-15; Ex. D, p. 17, ll. 4-6, p. 43,

ll. 18-20). In fact, Plaintiff testified:

> Q.  Did they ask you to do anything else?
> A.  No, they didn't. After the drug allegations, the white
> officer went and searched my vehicle to look for drugs after
> Detective Timmerman's allegations.
> Q.  Did you say anything to them about that?
> A.  I encouraged it.
> Q.  Okay.
> A.  They asked to search the vehicle. I gave them full
> permission. As a matter of fact, I said, check the hood,
> trunk, tires, rims, the vehicle.
> Q.  What about with the pat-down search? Did they ask you
> if that would be okay?
> A.  Yeah.
> Q.  And you said?
> A.  I did not object to anything.

(Ex. C, p. 42, l. 23 to p. 43, l. 15). Plaintiff again confirmed his consent to the searches of

his person and vehicle when he said

> Q.  And then there was a pat-down search?
> A.  Correct.
> Q.  And then you had said it would be fine, go ahead.
> A.  Yeah.
> Q.  They asked if they could please search your vehicle,
> and you said go ahead?
> A.  Yeah.

(Ex. C, p. 44, ll. 13-20). No alcohol or illegal drugs were found on Plaintiff's person or in

his vehicle. (Ex. B, p. 2, ll. 15-16; Ex. D, p. 17, ll. 11-13). Plaintiff's vehicle displayed

two license plates, one of which was a handicapped tag that Plaintiff admitted was not

his. (Ex. B, p. 2, ll. 20-22; Ex. C, p. 46, l. 2 to p. 47, l. 22). Plaintiff later testified that he

is not handicapped but was displaying the handicapped license plate that came with the

car. (Ex. C, p. 47, ll. 11-22).

8.      Detective Timmerman's involvement was limited to the initial stop. (Ex. C, p. 49, ll 1-8) ("Detective Timmerman did nothing basically after the two patrol officer in uniform came on the scene. Q. So you're saying that after the initial stop, everything that happened afterward was the -- by the other two officers, the uniformed officers? A. Correct."). Defendant Timmerman did not arrest, ticket or cite Plaintiff for driving while intoxicated. (Ex. D, p. 7, l. 9; p. 11, ll. 1-7). Plaintiff states nothing was seized from him during this stop. (Ex. C, p. 48, ll. 1-4) ("Q. Was anything seized from you -- A. No. -- Q. -- during this -- A. Absolutely not."); (Ex. C, p. 49, ll. 9-12) ("Q. So they did the field sobriety test? A. Yes. And then nothing was seized? A. No").

9.      At that point, the officers suggested that Plaintiff find another ride home, and Plaintiff agreed. (Ex. B, p. 3, ll. 4-5; Ex. C, p. 50, l. 7 to p. 51, l. 10; Ex. D, p. 11, ll. 6-7; p. 23, ll. 17-19). Plaintiff then apparently changed his mind and stated that he would rather walk home. (Ex. B, p. 3, ll. 5-6). Plaintiff had a cellular phone but chose not to call anyone for a ride. (Ex. C, p. 52, l. 15 to p. 53l, l. 2).

10.     Plaintiff acknowledges that driving under the influence is not limited to alcohol. (Ex. C, p. 36, ll. 16-20) (Q. So you're saying it's not always just alcohol? It's for other things that they test for? A. Oh, yeah, if you're under the influence -- you could be under the influence of anything."). Plaintiff later released a press release which resulted in a news story being printed about the arrest. (Ex. C, p. 73, l. 23 to p. 74, l. 19; Ex. D, p. 11, l. 16).

## B. CONTESTED FACTS

11.     Defendant Timmerman has been a sworn peace officer since 1999, when he retired as a Lieutenant Colonel in the United States Air Force. (Ex. D, p. 5, ll. 15-16;

p. 15, ll. 19-23). Defendant Timmerman has been a patrol officer, a juvenile detective and is presently a crime scene investigator. (Ex. D, p. 5, ll. 19-21). Defendant Timmerman has never been disciplined since he has been an employee with MPD. (Ex. D, p. 15, ll. 7-15). Defendant Timmerman is familiar with the Uniform Traffic Code of Alabama (Ex. D, p. 6, ll. 21-23) and is familiar with the difference between city traffic codes and Title 32 of the Alabama Code (Ex. D, p. 7, ll. 1-3).

12.    Defendant Timmerman first observed Plaintiff's vehicle at the intersection of Ann Street and Madison near Lee High School, waiting to turn. (Ex. D, p. 11, ll. 18-22). Defendant Timmerman had no idea who Plaintiff was, or that he was a former city councilman. (Ex. D, p. 14, ll. 13-14).

13.    Detective Timmerman was on his way back to MPD Headquarters in his City vehicle when he observed a champagne-colored Cadillac improperly turning off of Ann Street into the oncoming traffic lanes. (Ex. B, p. 1, ll. 7-9). Before stopping Plaintiff, he radioed the dispatcher and said he had a "possible 32," which is a possible drunk driver, because of the erratic manner in which Plaintiff was driving. (Ex. D, p. 14, l. 23 to p. 15, ll. 1-5; Ex. B, p. 1, ll. 9-10). Defendant Timmerman requested a patrol unit to back him up. (Ex. D, p. 8, l. 1; p. 14, ll. 19-22; p. 15, ll. 5-6; p. 17, ll. 1-3).

> Q.  What evidence did you rely upon to form your opinion of me when you accused me of being under the influence?
> A.  Well, as you'll recall, I hope, you were sitting at the intersection of Ann Street and Madison.  When you turned left onto Madison, you turned into oncoming traffic.  In other words, you turned into, I believe it was, the westbound lane of Madison Avenue with the median separating the east and westbound lanes on your right side, not on your left side; in other words, you were driving in the wrong lane of traffic.  You then turned left onto Mt. Meigs Road, again partially in the oncoming lane.  You were driving extremely slowly.  And the instant that you

> turned into the oncoming traffic on Madison is when I
> suspected I may have an impaired driver in front of me.  At
> that time, I called dispatch and requested a backup unit
> because I was going to attempt to stop you.

(Ex. D, p. 16, ll. 5-23 to p. 17, ll. 1-3; Ex. B, p. 1, ll. 12-14). Defendant Timmerman also

observed that "When he turned into Mt. Meigs Road off of Madison, again, he turned

partially into the oncoming lane. Then he was weaving just a little bit, but he was driving

awfully slow, very, very slow." (Ex. D, p. 26, ll. 8-12). Plaintiff was traveling at an

extremely slow rate of speed. (Ex. B, p. 1, ll. 11-12) In Defendant Timmerman's

experience as a law enforcement officer, the sort of driving that he observed Plaintiff

doing that night would be consistent with an impaired driver. (Ex. D, p. 26, ll. 13-17). At

this point Defendant Timmerman had probable cause to believe the driver of the Cadillac

might be under the influence or intoxicated somehow based on his observations of the

vehicle driving on the wrong side of the road, its erratic movements and the slow speed at

which it was going. (Ex. B, p. 2, ll. 1-3).

14.    After first checking to make sure there were no oncoming cars and that it

was safe, Defendant Timmerman pulled up next to the driver's side of the Cadillac,

identified himself as a police officer to the driver, displayed his badge and asked him to

pull over. (Ex. B, p. 2, ll. 3-6). The driver then pulled off the road into the parking lot of

Kentucky Fried Chicken. (Ex. B, p. 2, ll. 6-7).

15.    Defendant Timmerman again radioed for a patrol unit to respond to the

scene, and asked the driver to remain in his car with his hands on the steering wheel until

the patrol officers arrived. (Ex. B, p. 2, ll. 8-9). Patrol officers are trained to administer

field sobriety tests in their duties as patrol officers. (Ex. D, p. 8, ll. 6-8). When he asked

Plaintiff not to speak on his cellular phone during the stop, Defendant Timmerman

"relied on [his] discretion as a police officer not to allow an individual to use a cellular phone while [he is] in the middle of a traffic stop of that individual." (Ex. D, p. 9, ll. 13-16). For his own safety, Defendant Timmerman did not allow Plaintiff to get out of his vehicle when Plaintiff indicated he wanted to use the restroom. (Ex. D, p. 10, ll. 4-7).

16.    The patrol officers asked Plaintiff for permission to search his car and Plaintiff agreed. (Ex. B, p. 2, ll. 14-15). Plaintiff was cooperative with regard to the pat down search of his person and the search of his vehicle. (Ex. D, p. 17, ll. 4-6). As a result of the vehicle search, prescription medications were found in Plaintiff's vehicle. (Ex. D, p. 17, ll. 7-10, 20-23; p. 23, ll. 9-12; Ex. B, p. 2, ll. 15-17). No alcohol or illegal drugs were found on Plaintiff's person. (Ex. B, p. 2, ll. 15-16; Ex. D, p. 17, ll. 11-13). Defendant Timmerman does not recall any onlookers on the scene of the stop. (Ex. D, p. 7, ll. 13-14).

17.    Plaintiff told officers that he was in the area to pick up his girlfriend, Angler Trawick, and that he was driving erratically because he was arguing on his cell phone with Ms. Trawick and had made a driving mistake (Ex. B, p. 2, ll. 18-20), but in his deposition later Plaintiff unequivocally testified that he was not arguing with his girlfriend on the phone (Ex. C, p. 27, ll. 3-10). Plaintiff passed the field sobriety tests administered at the scene. (Ex. D, p. 10, l. 13; p. 23, ll. 1-8). At no point during the stop did Defendant Timmerman feel that he had made a mistake in his initial assessment that Plaintiff was under the influence of something. (Ex. D, p. 20, ll. 16-20).

> Q.    If Officers A and B determined that I wasn't intoxicated, why would you not think that I -- why would you think I was?
> A.    Mr. Dawson, I didn't necessarily think you were intoxicated. I felt that there was something affecting your ability to safely operate a vehicle.

(Ex. D, p. 21, ll. 13-19).

18.    Although he passed the field sobriety tests, because there were prescription bottles in the car and based on how he was driving before the stop, the officers felt that something was affecting Plaintiff's ability to drive and that he was not capable of safely driving home. (Ex. D, p. 7, l. 9; p. 11, ll. 1-7; Ex. B, p. 3, ll. 1-3). At that time, in Defendant Timmerman's professional opinion it was not safe for Plaintiff to operate a motor vehicle. (Ex. D, p. 26, ll. 18-21). The patrol officers offered Plaintiff a ride home, but he declined. (Ex. B, p. 3, ll. 7-8). Defendant Timmerman left the scene, where Plaintiff was still talking to the patrol officers. (Ex. B, p. 3, ll. 7-8).

19.    Defendant Timmerman did not arrest, ticket or cite Plaintiff for driving while intoxicated. (Ex. D, p. 7, l. 9; p. 11, ll. 1-7). Plaintiff could have been cited for reckless driving, improper tag or for driving on the wrong side of the road, but Defendant Timmerman exercised his discretionary authority and did not issue any citations to Plaintiff that night. (Ex. B, p. 3, ll. 9-10). At no point was Plaintiff physically restrained or handcuffed (Ex. B, p. 3, ll. 10-11), and Plaintiff was only detained long enough to investigate whether he was capable of safely driving a car, which he was not, in Defendant Timmerman's professional opinion. (Ex. D, p. 7, l. 9; p. 11, ll. 1-7; p. 26, ll. 18-21; Ex. B, p. 3, ll. 1-3; p. 3, ll. 11-12).

## V. MEMORANDUM OF POINTS AND AUTHORITIES

20.    To assist the Court in its deliberations, Defendants first set forth the appropriate standard of review. Defendants then address all claims and allegations against Defendant Guinn Timmerman, along with defenses and immunities thereto. Finally, Defendants separately address all claims and allegations made against Defendant City of

Montgomery, with corresponding defenses and immunities.

## A. STANDARD OF REVIEW

21.    Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

22.    The party requesting summary judgment bears the initial burden to inform the Court of the basis for its motion and to show the absence of genuine issue of material fact. Id. at 323. The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing the district court that the non-moving party has failed to present evidence in support of some element of the case on which it bears the ultimate burden of proof. Id. at 322-324.

23.    Once the non-moving party has met its burden, Rule 56(e) requires the non-moving party to present specific facts showing that there is a genuine issue for trial. Id. at 324. To avoid summary judgment, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

24.    Once the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc. Rule 56(c). Similarly, the moving party is entitled to summary judgment if the non-moving party has failed to prove the elements of her case or there is the absence of

evidence in the record to support a judgment for the non-moving party on the issue in question. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115-16 (11th Cir. 1993).

25.     Finally, conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. Fed. R. Civ. Proc. Rule 56 (c).

## B. CLAIMS AGAINST POLICE OFFICER TIMMERMAN

26.     Plaintiff avers that Defendant Timmerman deprived him of his rights to be free from (a) illegal searches and seizure of his persons and effects; and (b) unlawful detention and imprisonment. (Ex. A, pp. 4-5, ¶¶ 22-25). Plaintiff also claims Defendant Timmerman denied him his substantive and due process rights. (Ex. A, p. 5, ¶26).

27.     Plaintiff also claims, as pendant state law claims, that Defendant Timmerman (a) converted Plaintiff's vehicle; (b) invaded Plaintiff's privacy; (c) slandered Plaintiff; and (d) committed the tort of outrage.

28.     Defendant Timmerman is shielded from liability on all counts against him by qualified immunity and discretionary function immunity for the reasons below. Be that as it may, Defendant Timmerman is entitled to summary judgment because there is no genuine issue of material fact and he is entitled to judgment as a matter of law because he did not violate Plaintiff's rights under the Constitution, and is not liable to Plaintiff for the alleged torts.

## 1. QUALIFIED IMMUNITY

29.     Defendant Timmerman is entitled to qualified immunity. It is uncontested that at all times relevant to Plaintiff's claims, Defendant Timmerman was acting in the line and scope of his discretionary duties as a police officer for the City of Montgomery.

30.     Qualified immunity is an affirmative defense that shields governmental officials performing discretionary functions from civil liability if their conduct violates no clearly established statutory or constitutional right of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 817-19 (1982); Anderson v. Creighton, 483 U.S. 635 (1987).

31.     To be shielded from suit by qualified immunity, a public official must first show that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1303 (11th Cir. 2006). In assessing whether a defendant's challenged actions are within the scope of his discretionary authority, courts examine "whether the government employee was (a) pursuing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004).

32.     The discretionary authority criterion is clearly satisfied here. Defendant Timmerman was acting within the scope of his discretionary authority when apprehending Plaintiff Dawson. He stopped a driver he personally observed driving erratically. See Para. 13 above. Pulling over a driver who appears to be under the influence is a routine law enforcement function which is clearly a discretionary function for qualified immunity purposes.

33.     Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity. Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004). The plaintiff must show, first, facts establishing that a constitutional violation occurred,

and second, that the constitutional right was clearly established at the time of the violation. Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002); Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001); Harris v. Coweta County, Ga., 433 F.3d 807, 811 (11th Cir. 2005). The constitutional right must have been one of which a "reasonable government official would have been aware." Chesser v. Sparks, 248 F.3d 1117, 1122 (11th Cir. 2001).

34.    Timmerman did not violate Plaintiff's Constitutional rights. This inquiry is two-pronged, as a court must first ask whether, viewing the evidence in the light most favorable to the plaintiff, the official's conduct violated a constitutional right. If not, as here, the analysis ends and Defendants are entitled to qualified immunity.

### (a) NO CONSTITUTIONAL VIOLATION

35.    Plaintiff asserts two claims under 42 U.S.C. §1983, claiming violations of his Fourth and Fourteenth Amendment Rights. Title 42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress …

36.    Specifically, Plaintiff claims (a) he was subject to illegal seizure and imprisonment, and (b) that his substantive due process rights were denied. To support the latter claim, Plaintiff makes the conclusory statement that "Timmerman's action denied Plaintiff of his due process rights." (Doc. 1, ¶ 26).

37.     A summary judgment decision involving the defense of qualified immunity is reviewed somewhat differently from other summary judgment rulings; only if plaintiff establishes both elements of qualified immunity test, by showing violation of clearly established right, does defendant bear traditional burden of showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. Scull v. New Mexico, 236 F.3d 588 (10th Cir. 2000).

38.     Qualified immunity protects law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines. Short v. Smoot, 436 F.3d 422 (4th Cir. 2006).

39.     Under the objective standard, the district court should determine on summary judgment the currently applicable law as well as whether that law was clearly established at the time an action occurred. If the law was not clearly established when an official acted, the official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Additionally, the Court indicated a single standard should apply to all officials raising a qualified immunity defense. Id. Therefore, the Harlow standard of objective reasonableness, measured by reference to clearly established law, is the current standard for qualified immunity.

### (i) ILLEGAL SEIZURE, IMPRISONMENT

40.     **Count I – Illegal Seizure and Imprisonment**. The Fourth Amendment guarantees that individuals will be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Temporary

detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of this provision. Whren v. United States, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Therefore, an automobile stop is subject to the constitutional imperative that it not be unreasonable under the circumstances. Id. at 810, 116 S.Ct. at 1772. The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. Id. Alabama law prohibits individuals from operating motor vehicles if they are under the influence of alcohol. Code of Alabama § 32-5A-191(a) (1975).

41.    Traffic stops qualify as "seizures" under the Fourth Amendment. U.S. v. Perkins, 348 F.3d 965 (11th Cir. 2003). The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." But The Fourth Amendment is not a guarantee against all searches and seizures, but only against unreasonable searches and seizures. U.S. v. Smith, 201 F.3d 1317 (11th Cir. 2000). The totality of the circumstances surrounding an arrest must be evaluated to determine its reasonableness under the Fourth Amendment. Rodriguez v. Farrell, 280 F.3d 1341 (11th Cir. 2002).

42.    The degree of suspicion required to justify a police encounter with a citizen depends on type of encounter involved; no suspicion is necessary for a completely consensual encounter, reasonable suspicion of criminal activity is necessary to justify an investigatory stop, and probable cause is necessary to justify a full-scale arrest. U.S. v. Allison, 953 F.2d 1346 (11th Cir. 1992). The Fourth Amendment generally prohibits police from seizing or searching persons unless there is probable cause to believe that

person has committed crime, with one exception, the Terry stop, where, if police have reasonable suspicion, based on articulable facts, that the person has engaged in criminal activity, they may detain suspect briefly for purpose of questioning and, in doing so, may conduct brief frisk of suspect to protect themselves from concealed weapons. Timmons v. City of Montgomery, Ala., 658 F.Supp. 1086 (M.D. Ala. 1987).

43.    The seizure in this case was less intrusive than a traditional arrest; it was limited in duration to only the time it took to investigate Plaintiff's ability to drive safely, and at the end of the encounter Plaintiff was free to go. Therefore, the seizure in this case must be supported by at least reasonable suspicion. It is clear from the facts that it was. See Paragraph 13 above. In U.S. v. Woods, 216 Fed.Appx. 931, 933 (11th Cir. 2007), the Eleventh Circuit stated its criteria for deciding probable cause issues and found there was probable cause for a traffic stop where officers observed the defendant weave over the fog line at least three times, specifically holding that this weaving was sufficient to establish probable cause that a traffic violation occurred because weaving indicates that the driver may be under the influence of alcohol, which is a traffic violation in Alabama.

44.    In this case, Detective Timmerman personally observed Plaintiff driving into oncoming traffic, erratically and at an extremely slow rate of speed. This is objectively illegal and unusual behavior and clearly gave Detective Timmerman probable cause to pull Mr. Dawson over, under the totality of the circumstances.

45.    Even assuming there was not actual probable cause for this detainment, only arguable probable cause is required to protect a municipal official from liability under §1983.  See e.g. Rodriguez v. Farrell, 280 F.3d 1341 (11th Cir. 2002) (reasonable mistake in arresting plaintiff was not a constitutional violation).

46.     Even assuming arguendo that this case involves a full-scale arrest, Defendant Timmerman had probable cause for his actions which renders the seizure reasonable. Probable cause generally is considered a complete bar to claims of false arrest or false imprisonment. Rankin v. Evans, 133 F.3d 1425 (11th Cir. 1998), cert. denied, 119 S.Ct. 67, 142 L.Ed.2d 52 (1998). The burden is on the defendant to establish the existence of probable cause by showing that facts and circumstances known to the arresting officer were sufficient to cause a reasonably cautious person to believe that the suspect was guilty of committing a crime. Hernandez v. Metro-Dade County, 992 F.Supp. 1365 (S.D. Fla. 1997). Also, under Alabama law a police officer may arrest any person without warrant, on any day and at any time, for any public offense committed in his presence, and is not under any duty to inform the person arrested for an offense committed in his presence of the nature of the charge. Weeks v. State, 274 So.2d 646 (Ala. Cr. App. 1973).

47.     Defendants have met their burden to establish probable cause. The rule of reasonable or probable cause, as required for a warrantless arrest, is a practical, nontechnical conception, and the level of evidence needed for a finding of probable cause is low. U.S. v. Five Hundred Eleven Thousand Seven Hundred Eighty Dollars ($511,780) in U.S. Currency, 847 F.Supp. 908 (M.D. Ala. 1994). Plaintiff's driving, as described above in Paragraph 13, was clearly sufficient to cause a reasonably cautious person to believe that Plaintiff was guilty of committing a crime. In fact, Defendant Timmerman personally observed Plaintiff committing traffic violations and driving erratically, so it was reasonable for him to conclude Plaintiff might be under the influence of something. See e.g. U.S. v. Harris, 928 F.2d 1113 (11th Cir. 1991) (Continued detention of motorist

for purpose of securing his consent to search of automobile after he was given warning ticket for weaving was reasonable; officer was justified in stopping and detaining defendant to determine whether he was drunk or falling asleep at wheel.) Also, generally reasonable detention during a Terry search is proper. U.S. v. Clay, 483 F.3d 739 (11th Cir. 2007).

48.    Further, when Plaintiff "encouraged" officers to search him and the car, the encounter was converted to a consensual one, which should be considered in determining reasonableness. See e.g. U.S. v. Hernandez, 18 Fla. L. Weekly Fed. C 753 (11th Cir. 2005) (Vehicle occupants' voluntary consent to vehicle search, during course of conversation with officer that followed routine traffic stop, converted encounter to consensual one, re-starting clock for purposes of evaluating reasonableness of duration of intrusion under Fourth Amendment; reasonableness then depended on length of search.).

49.    Even if Plaintiff's consent is found to be somehow insufficient, searches of vehicles are an established exception to the requirement for a warrant, and the automobile exception allows officers to search any item or compartment in the car that might contain the object of the search without a warrant, as long as they have probable cause to believe that it holds evidence of a crime. United States v. Strickland, 902 F.2d 937, 942 (11th Cir.1990).

50.    Incidentally, the fact that Plaintiff was not cited for any offenses is not dispositive with regard to the validity of the seizure. See e.g. Marx v. Gumbinner, 905 F.2d 1503 (11th Cir. 1990) (That defendant is subsequently acquitted or charges are dropped against defendant is of no consequence in determining validity of arrest itself).

51.    Defendant Timmerman's actions in this case are supported by probable

cause, arguable probable cause, or at the very least reasonable suspicion. Therefore, there was no constitutional violation because the Fourth and Fourteenth Amendment permit reasonable searches and seizures.

**(ii) DENIAL OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS RIGHTS**

52.    **Count II – Denial of Substantive and Procedural Due Process Rights**. Plaintiff's Due Process claim is duplicitous. The constitutionality of arrests by state officials is governed by the Fourth Amendment rather than due process analysis. Fleming v. Dowdell, 434 F.Supp.2d 1138 (M.D. Ala. 2005). Besides, other than his Fourth Amendment claims above, Plaintiff has not made any claim that would trigger substantive due process analysis.

53.    As for procedural due process, Plaintiff may not seek relief under § 1983 for the alleged conversion of his vehicle by Defendant Timmerman telling Plaintiff to get a ride home. In Browning v. City of Wedowee, Ala., 883 F.Supp. 618, 623 (M.D. Ala. 1995), this Court held that no procedural due process violation occurs as long as some adequate post-deprivation remedy is available. Browning, 883 F.Supp at 623, citing Lindsey v. Storey, 936 F.2d 554, 561 (11th Cir.1991). Specifically, this Court held that because the Alabama legislature has created a providing a tort remedy for the unlawful deprivation or interference with an owner's possession of personalty under Code of Alabama § 6-5-260 (1975) aggrieved parties whose property had been seized and detained by police have adequate post-deprivation remedies and thus no procedural due process violation occurs. Here, not only does the Alabama conversion action exist, but Plaintiff has shown he is aware of the provision because he has, in fact invoked it. Therefore, neither substantive nor procedural due process actions may lie.

54.    Finally, if this Court concludes that there is no underlying constitutional violation, then <u>City of Los Angeles v. Heller</u>, 475 U.S. 796 (1986), would dictate no liability on the part of any defendant. Here, Defendant Timmerman did not violate Plaintiff's rights to be free from unreasonable searches and seizures as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. Therefore, neither defendant can be liable.

## (b) NO CLEARLY ESTABLISHED RIGHT

55.    In determining whether a right is clearly established, the "relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Bashir v. Rockdale County, Ga.</u>, 445 F.3d 1323, 1330 (11th Cir. 2006). A constitutional right is clearly established "if controlling precedent has recognized the right in a concrete and factually defined context." <u>Chesser v. Sparks</u>, 248 F.3d 1117, 1122 (11th Cir. 2001). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Bashir</u>, 445 F.3d at 1330.  There is no clearly established controlling precedent that a police officer cannot order a citizen to get another ride home where his personal observations and professional experience lead him to believe that the citizen cannot safely operate a motor vehicle.

56.    Under <u>Chesser</u>, there was no clearly established right for Plaintiff to drive himself home under the totality of these circumstances. Therefore, Defendant Timmerman is entitled to qualified immunity.

## 2. DISCRETIONARY FUNCTION IMMUNITY

57.    At all times relevant to Plaintiff's claims, Defendant Timmerman was

employed with the Montgomery Police Department and acting within the line and scope of his employment and a police officer. Again, when he stopped Plaintiff Dawson, Defendant Timmerman was exercising judgment in performing discretionary law enforcement functions and as such is entitled to discretionary function immunity as to Plaintiffs' state law claims.

58.    Code of Alabama § 6-5-338 (1975) grants law enforcement officers immunity from state law tort claims arising out of acts committed while performing discretionary functions within the scope of the officer's law enforcement duties.   In relevant part, Section 6-5-338(a) provides that:

> [E]very peace officer, … who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or a municipality thereof, … and whose duties … include the enforcement of, or the investigation or reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment or other lawful process with violations of, the criminal laws of this state shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in the performance of any discretionary function within the line and scope of his or her enforcement duties. (Emphasis added).

59.    In Ex parte Cranman, 792 So.2d 392 (Ala. 2000), the Alabama Supreme Court held:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's … (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; …

Here, Defendant Timmerman was "exercising judgment in the enforcement of the criminal laws of the State," namely traffic laws, and involved choosing what was just and proper under the circumstances. Id.  A state agent is not immune from personal civil liability where he acts "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." Id.

60.    Other than conclusory allegations, Plaintiff has not produced any evidence to show Defendant Timmerman acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law. Of these, Plaintiff avers only malice and willfulness, but simply using these words does not make it so.

61.    Willfulness is the "conscious doing of some act or omission of some duty under knowledge of existing conditions accompanied with a design or purpose to inflict injury." Alabama Pattern Jury Instruction, 29.01. Malice is "the intentional doing of a wrongful act without just cause or excuse with an intent to injure the person or property of another person … or under such circumstances that the law will imply an evil intent." Code of Alabama § 6-11-20 (1975). There is no evidence of the requisite intent of either willfulness or malice by Defendant Timmerman in the present case.

62.    Prior to November 26, 2004, Timmerman did not know Plaintiff Dawson. At the time Defendant Timmerman observed Plaintiff's vehicle driving erratically, he had no idea who Plaintiff was, let alone that he was a former city councilman. (Ex. D, p. 14, ll. 13-14). Defendant Timmerman had no reason or motive to willfully or maliciously commit tortious acts against Plaintiff.

63.    Timmerman observed a vehicle driving erratically and ordered the driver to pull over. For his own safety, Timmerman ordered the driver to stay in the vehicle with

his hands on the steering wheel. Even Plaintiff testifies that this is a reasonable request for officer safety. Plaintiff not only consented but "encouraged" officers to search his person and the vehicle. Plaintiff's only disagreement with Defendant Timmerman's exercises of judgment during the stop came at the end of the stop, when Timmerman felt it would be unsafe for Plaintiff to drive home and told Plaintiff to get a ride. It is true that Plaintiff did not appear to have ingested alcohol, but Plaintiff himself admits that "you can be under the influence of anything" and be impaired to drive.

64.     As a police officer, Defendant Timmerman must exercise judgment and discretion on a constant basis. The nature of his job dictates that he choose what is just and proper under the circumstances. Ex parte City of Gadsden, 781 So.2d 936, 938 (Ala. 2000). The burden now shifts to Plaintiff to prove that Defendant Timmerman acted in bad faith, with malice or willfulness. Sheth v. Webster, 145 F. 3d 1231 (11th Cir. 1998).

65.     There is no evidence that Timmerman acted in bad faith, with malice or willfulness with respect to Plaintiff because he did not. It is clear from the totality of the circumstances that Defendant Timmerman was acting within his discretionary authority as a law enforcement officer to protect himself and the public at large throughout the stop and at the end when he decided that Plaintiff was not safe to drive himself home.

## (a) STATE CLAIMS

66.     Notwithstanding the discretionary function immunity which shields Defendant Timmerman from state tort liability, on the facts before the Court, Plaintiff has not made prima facie cases, and thus Defendants are entitled to judgment as a matter of law. Plaintiff makes four state claims in his Complaint, namely (a) conversion; (b) invasion of privacy; (c) slander; and (d) outrage, intentional infliction of emotional

distress.

67.    **Count III – Conversion**. Code of Alabama § 6-5-260 establishes a cause of action for conversion, and states "The owner of personalty is entitled to possession thereof. Any unlawful deprivation of or interference with such possession is a tort for which an action lies." Plaintiff cannot prove that he owned the vehicle in question. Plaintiff has refused to comply with a request that Plaintiff produce a copy of the title and registration for this vehicle, stating that he is not in possession of such a document. See Plaintiff's sworn response to Request for Production of Documents No. 2, *Defendants' Discovery Requests and Plaintiff's Responses Thereto*, attached as Ex. G. Thus, Plaintiff cannot prove ownership and thus a conversion action cannot lie.

68.    **Count IV – Invasion of Privacy**. Under Alabama law, a plaintiff must prove the following elements to make a prima facie case of false light invasion of privacy:

> APJI 35.05 Violation of the Right of Privacy—False Light Invasion of Privacy
> Putting the plaintiff in a false position in the public eye is defined as giving unwarranted publicity to a matter that places the plaintiff before the public in a false light. The defendant may be liable for his conduct if the false light in which the plaintiff is placed would be highly offensive to a reasonable person, and the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed.

Alabama Pattern Jury Instruction 35.05. Plaintiff claims that "Defendant Timmerman invaded the privacy of the Plaintiff by publishing false information about the Plaintiff which he knew or should have known would have reached the general public. He called Plaintiff a drug addict and crack addict in the presence of several persons." Ex. A, ¶ 28.

69.    To make a prima facie case, Plaintiff must show that Defendant Timmerman inserted negative information about him into the public eye with knowledge or reckless disregard as to the falsity of the publicized matter.

70.    It was Plaintiff who prepared released a press release which resulted in a news story being printed about the arrest. (Ex. C, p. 73, l. 23 to p. 74, l. 19; Ex. D, p. 11, l. 16). Defendant Timmerman does not recall any onlookers on the scene of the stop. (Ex. D, p. 7, ll. 13-14). However, if there were onlookers, Plaintiff says Defendant Timmerman ordered onlookers to disband and leave the scene. (Ex. C, p. 7, ll 11-12). Thus, Plaintiff cannot show that Timmerman should be liable for invading his privacy.

71.    **Count V – Slander**. Under Alabama law, in an action for libel or slander, the plaintiff must prove, unless admitted by the defendant, that the alleged defamatory matter was published or spoken of the plaintiff. Code of Alabama § 6-5-182 (1975). Plaintiff claims Defendant Timmerman published statement that Plaintiff was a drug addict and crack addict. (Ex. A, p. 5, ¶29). Defendant Timmerman denies calling Plaintiff a drug addict, and, again, it was Plaintiff who prepared released a press release which resulted in a news story being printed about the arrest. (Ex. C, p. 73, l. 23 to p. 74, l. 19; Ex. D, p. 11, l. 16). Further details were released by Plaintiff in interviews with the Montgomery Advertiser. Plaintiff cannot maintain an action for slander against Timmerman, who did not publish the alleged defamatory matter, especially where all the publicity related to this case was created by Plaintiff himself.

72.    Furthermore, Plaintiff is a former Councilmember for the City of Montgomery. (Ex. C, p. 38, ll. 13-14; p. 60, l. 13; Ex. D, p. 13, l. 22 to p. 14, l. 2). Therefore, Plaintiff is a public figure.

> APJI 23.10 Fault (Public Figure/Official Plaintiff): Actual
> Malice
> Because the plaintiff is a public figure/official in regard to
> the statement that is complained of, the plaintiff must prove
> by clear and convincing evidence that the defendant
> published the statement that is complained of with actual
> malice—that is, with knowledge that the statement was
> false or with "reckless disregard.

There is no evidence to show that Defendant Timmerman acted with actual malice.

Defendant Timmerman did not know Plaintiff and had no motive to cause Plaintiff injury.

Notwithstanding, Plaintiff cannot make the case for slander.

73.     **Count VI – Outrage / Intentional Infliction of Emotional Distress**. In

Alabama, the law to be applied in a case involving the tort of outrage has been clearly

stated: the behavior of a defendant must be so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious

and utterly intolerable in a civilized community. Barrett v. Farmers & Merchants Bank of

Piedmont, 451 So.2d 257 (Ala.1984). On the facts here, as set forth above, it is

impossible for Plaintiff to make a case for Outrage.

74.     Alabama does not recognize a separate tort action for intentional infliction

of emotional distress, and the term is used interchangeably with outrage. Archie v.

Enterprise Hosp. and Nursing Home, 508 So.2d 693, 694-695 (Ala. 1987).

### C. CLAIMS AGAINST CITY OF MONTGOMERY

75.     The only claim Plaintiff makes against the City of Montgomery is that

> The above described actions by Timmerman was [sic]
> malicious and without reasonable or probable cause, and
> was [sic] instituted by Timmerman, and maintained and
> ratified by the City to cover up and justify defendant
> Timmerman's offensive and malicious acts and conduct in
> illegally arresting, seizing, imprisoning, punishing,
> harassing, annoying, and oppressing Plaintiff Dawson.

26

(Ex. A, p. 4, ¶21). Plaintiff does state that the City of Montgomery is Defendant Timmerman's employer and that "Timmerman performed all the acts complained of in the name of the City." (Ex. A, p. 2, ¶6).

## 1. § 1983 MUNICIPAL LIABILITY

76.    For liability pursuant to 42 U.S.C. § 1983 to attach to a municipality, it must be shown that the municipal official or employee caused the deprivation of one's statutory or constitutional rights by acting pursuant to official governmental policy.

77.    Plaintiff has alleged a § 1983 claim for violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution. The evidence, however, does not show an illegal search or seizure occurred. Defendant Timmerman was acting within the line and scope of his duties as a police officer carrying out law enforcement functions when he stopped a vehicle he personally observed driving erratically. Defendant Timmerman did not conduct the investigation at the scene, but even if this Court finds that he directed it be done, the searches were (by Plaintiff's admission) done by consent. Plaintiff states under oath that nothing was seized from him, and Defendant Timmerman exercised his discretion as a police officer in not issuing any citations but instead advising Plaintiff to get a ride home, for Plaintiff's safety and for the safety of the public at large.

78.    A governing entity cannot be held liable in an action brought pursuant to 42 U.S.C. § 1983 under a theory of respondeat superior. Monell v. Department of Social Services of New York City, 436 U.S. 658, 694 (1978). In Monell, the Supreme Court held that municipalities cannot be liable under §1983 on the theory of respondeat superior. Id. Absent unconstitutional or illegal policies or customs, municipalities and

their officials may not be sued for the acts of their employees. Id. Moreover, a plaintiff must show that the official policy caused the alleged constitutional deprivation. Id.

79.     In Byrd v. Clark, 783 F.2d 1002 (11th Cir. 1986), the Eleventh Circuit Court of Appeals concluded that in the absence of any evidence of a policy, practice or custom, either express or implied, which contributed to the alleged violation of plaintiff's constitutional rights when she was arrested, released and rearrested, the city was not liable to plaintiff under §1983. Similarly in this case, Plaintiff has not made the requisite showing and, therefore, the City of Montgomery is not liable under §1983.

80.     In the case at bar, Plaintiff has not alleged the existence of any illegal policy or custom of the City of Montgomery, or that any final policymaker of the City acted with an unconstitutional motive. The City of Montgomery has no custom or policy to "cover up and justify" illegal acts by its police officers or to illegally search of seize people without probable cause. To the contrary, the Montgomery Police Department has adopted the Law Enforcement Code of Ethics as the general standard of conduct for all members of the Department. It says inter alia:

> As a law enforcement officer, my fundamental duty is to serve mankind; to safeguard lives and property, to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the constitutional rights of all men to liberty, equality, and justice.

MPD Departmental Manual of Rules and Regulations § 1.320, attached as Ex. F.

81.     Plaintiff makes, seemingly in passing, a claim that the City has covered up Defendant Timmerman's actions. This is simply not true. Further, even if it were true, this claim alone cannot make a case against the City. Plaintiff's conclusory allegations made in an effort to make the City liable cannot interpose genuine issues of material fact

into the litigation so as to preclude entry of summary judgment. Fed. R. Civ. Proc. 56(c).

82.    Plaintiff's §1983 claims against the City must fail. There is genuine issue of material fact because conclusory allegations cannot be used to create one, and for the reasons stated above, the City of Montgomery is entitled to summary judgment on Plaintiff's claims of constitutional violations as a matter of law.

## 2. INTENTIONAL TORT IMMUNITY

83.    The City of Montgomery is not liable on Plaintiff's state tort law claims, which are all intentional torts. Under Alabama law, a tort action against a municipality may only lie for the "neglect, carelessness, or unskillfulness" of its agents. Ala. Code § 11-47-190 (1975). Here, there was no neglect, carelessness or unskillfulness of Defendant Timmerman, nor has any been alleged. In fact, Plaintiff states in his own Complaint repeatedly that Defendant Timmerman acted willfully, maliciously, and intentionally. (Ex. A, passim). Therefore, the City of Montgomery is entitled to statutory immunity and cannot be held liable.

## 3. DISCRETIONARY AUTHORITY

84.    The Alabama legislature has granted immunity not only to peace officers but also to the governments that appointed them. Code of Alabama § 6-5-338(b) (1975). The Alabama Supreme Court has held that municipalities have discretionary function immunity in actions arising out of the police officer's conduct in the performance of his discretionary function within the line and scope of his law-enforcement duties. City of Birmingham v. Sutherland, 2002 WL 475176 (Ala. 2002).

85.    Under § 6-5-338, liability will not attach unless a police officer acts willfully or maliciously. As explained above, there is no evidence, other than conclusory

allegations, of willful or malicious acts by Defendant Timmerman. Thus, he and the City are entitled to discretionary function immunity.

86.    Any liability of the City would be derivative, so "if a municipal police officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune." <u>City of Crossville v. Haynes</u>, 925 So.2d 944, 955 (Ala. 2005). Both defendants, therefore, are immune and are entitled to summary judgment on the pendant state law claims.

## IV. CONCLUSION

87.    On the facts and for the reasons stated above, both Defendants are entitled to discretionary function immunity and qualified immunity. The issues in this case are precisely those for which discretionary function immunity and qualified immunity were intended. Police officers, and the municipalities that employ them, are protected by these immunities so long as they are acting within the line and scope of their duties. Accordingly, Plaintiff's claims should be dismissed as barred by state and federal immunity.

88.    Further, Plaintiff cannot succeed on his search and seizure claims because the facts show probable cause, or arguable probable cause for his detainment. Any search and seizure conducted was reasonable under the totality of the circumstances.

89.    The City of Montgomery cannot be liable for intentional torts, nor can it be liable in a §1983 action under the theory of respondeat superior. Conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. Fed.Rules Civ.Proc. Rule 56 (c). Any such allegations made by Plaintiff should be disregarded.

90.    Summary Judgment in favor of Defendants City of Montgomery and Guinn Timmerman is proper and all claims against them should be dismissed.

WHEREFORE, premises considered, Defendants petition this Honorable Court to enter summary judgment in their favor and against Plaintiff as to all issues in controversy alleged against them.

Respectfully submitted this 18th day of January, 2008.

/s/ Allison H. Highley
Allison H. Highley (HIG024)
Attorney for Defendants

OF COUNSEL:
CITY OF MONTGOMERY
Legal Department
Post Office Box 1111
Montgomery, AL 36101-1111
(334) 241-2050 Telephone
(334) 241-2310 Facsimile

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2008, I sent a copy of the foregoing to the Plaintiff via U.S. mail, first-class postage pre-paid to: Terance Dawson, Post Office Box 6050, Montgomery, Alabama 36106.

/s/ Allison H. Highley
Allison H. Highley (HIG024)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **TERANCE DAWSON**, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. **2:06-CV-1057-WKW-WC** |
| | ) | |
| **CITY OF MONTGOMERY**, and | ) | |
| **GUINN TIMMERMAN**, individually, | ) | |
| Defendants. | ) | |

### APPENDIX OF AUTHORITY TO BRIEF
### IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW the above-named Defendants and submit this Appendix to their Brief in Support of Defendants' Motion for Summary Judgment:

### CITED AUTHORITY

1. 42 U.S.C. §1983

2. Rule 56, Federal Rules of Civil Procedure

3. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)

4. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)

5. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115-16 (11th Cir. 1993)

6. <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 817-19 (1982)

7. <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987)

8. <u>Gray ex rel. Alexander v. Bostic</u>, 458 F.3d 1295, 1303 (11th Cir. 2006)

9. <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1265 (11th Cir. 2004)

10. <u>Crosby v. Monroe County</u>, 394 F.3d 1328, 1332 (11th Cir. 2004)

11. <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002)

12. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)

13. <u>Harris v. Coweta County, Ga.</u>, 433 F.3d 807, 811 (11th Cir. 2005)

14. <u>Chesser v. Sparks,</u> 248 F.3d 1117, 1122 (11th Cir. 2001)

15. <u>Scull v. New Mexico</u>, 236 F.3d 588 (10th Cir. 2000)

16. <u>Short v. Smoot</u>, 436 F.3d 422 (4th Cir. 2006)

17. <u>Whren v. United States</u>, 517 U.S. 806, 809-10 (1996)

18. <u>U.S. v. Perkins</u>, 348 F.3d 965 (11th Cir. 2003)

19. <u>U.S. v. Smith</u>, 201 F.3d 1317 (11th Cir. 2000)

20. <u>Rodriguez v. Farrell</u>, 280 F.3d 1341 (11th Cir. 2002)

21. <u>U.S. v. Allison</u>, 953 F.2d 1346 (11th Cir. 1992)

22. <u>Timmons v. City of Montgomery, Ala.</u>, 658 F.Supp. 1086 (M.D. Ala. 1987)

23. <u>U.S. v. Woods</u>, 216 Fed.Appx. 931, 933 (11th Cir. 2007)

24. <u>Rodriguez v. Farrell</u>, 280 F.3d 1341 (11th Cir. 2002)

25. <u>Rankin v. Evans</u>, 133 F.3d 1425 (11th Cir. 1998)

26. <u>Hernandez v. Metro-Dade County</u>, 992 F.Supp. 1365 (S.D. Fla. 1997).

27. <u>Weeks v. State</u>, 274 So.2d 646 (Ala. Cr. App. 1973)

28. <u>U.S. v. Five Hundred Eleven Thousand Seven Hundred Eighty Dollars ($511,780) in U.S. Currency</u>, 847 F.Supp. 908 (M.D. Ala. 1994)

29. <u>U.S. v. Harris</u>, 928 F.2d 1113 (11th Cir. 1991)

30. <u>U.S. v. Clay</u>, 483 F.3d 739 (11th Cir. 2007).

31. <u>U.S. v. Hernandez</u>, 18 Fla. L. Weekly Fed. C 753 (11th Cir. 2005)

32. <u>U.S. v. Strickland</u>, 902 F.2d 937, 942 (11th Cir.1990)

33. <u>Marx v. Gumbinner</u>, 905 F.2d 1503 (11th Cir. 1990)

34. <u>Fleming v. Dowdell</u>, 434 F.Supp.2d 1138 (M.D. Ala. 2005)

35.  Browning v. City of Wedowee, Ala., 883 F.Supp. 618, 623 (M.D. Ala. 1995)

36.  Lindsey v. Storey, 936 F.2d 554, 561 (11th Cir.1991).

37.  City of Los Angeles v. Heller, 475 U.S. 796 (1986),

38.  Bashir v. Rockdale County, Ga., 445 F.3d 1323, 1330 (11th Cir. 2006)

39.  Ex parte Cranman, 792 So.2d 392 (Ala. 2000)

40.  Ex parte City of Gadsden, 781 So.2d 936, 938 (Ala. 2000)

41.  Sheth v. Webster, 145 F. 3d 1231 (11th Cir. 1998)

42.  Barrett v. Farmers & Merchants Bank of Piedmont, 451 So.2d 257 (Ala.1984)

43.  Archie v. Enterprise Hosp. and Nursing Home, 508 So.2d 693, 694-695 (Ala. 1987)

44.  Monell v. Department of Social Services of New York City, 436 U.S. 658, 694 (1978)

45.  Byrd v. Clark, 783 F.2d 1002 (11th Cir. 1986)

46.  City of Birmingham v. Sutherland, 2002 WL 475176 (Ala. 2002)

47.  City of Crossville v. Haynes, 925 So.2d 944, 955 (Ala. 2005)

Respectfully submitted this 18th day of January, 2008.


/s/ Allison H. Highley
Allison H. Highley (HIG024)
Attorney for Defendants


OF COUNSEL:
CITY OF MONTGOMERY
Legal Department
Post Office Box 1111
Montgomery, AL 36101-1111
(334) 241-2050 Telephone
(334) 241-2310 Facsimile

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 18, 2008, I sent a copy of the foregoing to the

Plaintiff via U.S. mail, first-class postage pre-paid to: Terance Dawson, Post Office Box

6050, Montgomery, Alabama 36106.

/s/ Allison H. Highley
Allison H. Highley (HIG024)

**42 U.S.C.A. § 1983. Civil action for deprivation of rights**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**Federal Rules of Civil Procedure Rule 56. Summary Judgment**

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

(c) Motion and Proceedings Thereon. The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

(d) Case Not Fully Adjudicated on Motion. If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

(f) When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

(g) Affidavits Made in Bad Faith. Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

106 S.Ct. 2548                                                                     Page 1

477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024

**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

Celotex Corp. v. Catrett
U.S.Dist.Col.,1986.

Supreme Court of the United States
CELOTEX CORPORATION, Petitioner
v.
Myrtle Nell CATRETT, Administratrix of the Es-
tate of Louis H. Catrett, Deceased.
**No. 85-198.**

Argued April 1, 1986.
Decided June 25, 1986.

Administratrix of estate of deceased worker
brought action against asbestos manufacturer. The
United States District Court for the District of
Columbia granted manufacturer's motion for sum-
mary judgment and administratrix appealed. The
Court of Appeals for the District of Columbia Cir-
cuit, 756 F.2d 181, reversed. The Supreme Court,
Justice Rehnquist, held that: (1) Rule 56(c) man-
dates the entry of summary judgment after adequate
time for discovery against a party who fails to make
a showing sufficient to establish the existence of an
element essential to that party's case as to which
that party will bear the burden of proof at trial; (2)
there is no requirement that moving party support
its motion with affidavits or other similar materials
negating the opponent's claim; and (3) nonmoving
party need not produce evidence in a form that
would be admissible at trial in order to avoid sum-
mary judgment.

Reversed and remanded.

Justice White filed an opinion concurring in the
Court's opinion and judgment.

Justice Brennan filed a dissenting opinion in which
Chief Justice Burger and Justice Blackmun joined.

Justice Stevens filed a dissenting opinion.

Opinion on remand, 826 F.2d 33.

West Headnotes

**[1] Federal Civil Procedure 170A ☞2466**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)1 In General
        170Ak2465 Matters Affecting Right to
Judgment
          170Ak2466 k. Lack of Cause of
Action or Defense. Most Cited Cases
Entry of summary judgment is mandated, after ad-
equate time for discovery and upon motion, against
a party who fails to make a showing sufficient to
establish that existence of an element essential to
that party's case and on which that party will bear
the burden of proof at trial. Fed.Rules
Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ☞2470**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)1 In General
        170Ak2465 Matters Affecting Right to
Judgment
          170Ak2470 k. Absence of Genuine
Issue of Fact in General. Most Cited Cases
Where party will have burden of proof on an ele-
ment essential to its case at trial and does not, after
adequate time for discovery, make a showing suffi-
cient to establish the existence of that element,
there can be no genuine issue as to any material fact
since a complete failure of proof concerning an es-
sential element of the nonmovant's case necessarily
renders all other facts immaterial. Fed.Rules
Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ☞2535**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2535 k. Presentation of Case in
General. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024

**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

Party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⟨⟩2536.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)3 Proceedings
         170Ak2536 Affidavits
           170Ak2536.1 k. In General. Most
Cited Cases
   (Formerly 170Ak2536)
There is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⟨⟩2536.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)3 Proceedings
         170Ak2536 Affidavits
           170Ak2536.1 k. In General. Most
Cited Cases
   (Formerly 170Ak2536)
Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may and should be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment set forth in Rule 56(c) is satisfied. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ⟨⟩2536.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment

        170AXVII(C)3 Proceedings
         170Ak2536 Affidavits
           170Ak2536.1 k. In General. Most
Cited Cases
   (Formerly 170Ak2536)
Where nonmoving party will bear burden of proof at trial on a dispositive issue, summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file and such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule" so that the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ⟨⟩2545**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)3 Proceedings
         170Ak2542 Evidence
           170Ak2545 k. Admissibility. Most
Cited Cases
Nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ⟨⟩2536.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)3 Proceedings
         170Ak2536 Affidavits
           170Ak2536.1 k. In General. Most
Cited Cases
   (Formerly 170Ak2536)

**Federal Civil Procedure 170A ⟨⟩2544**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)3 Proceedings
         170Ak2542 Evidence

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:06-cv-01057-WKW-WC   Document 30-2   Filed 01/18/2008   Page 10 of 618

Page 9

106 S.Ct. 2548
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

170Ak2544 k. Burden of Proof. Most Cited Cases

Last two sentences of Rule 56(e) precluding a non-moving party from resting on its pleadings to avoid summary judgment were added to disapprove a line of cases allowing a party opposing summary judgment to resist a properly made motion by reference only to its pleadings and were not intended to reduce the burden of the moving party or to add to that burden. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[9] Federal Civil Procedure 170A ⚖2461**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)1 In General
                170Ak2461 k. In General. Most Cited Cases

Summary judgment procedure is properly regarded not a disfavored procedural shortcut but, rather, as an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. Fed.Rules Civ.Proc.Rules 1, 56, 28 U.S.C.A.

**[10] Federal Civil Procedure 170A ⚖2461**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)1 In General
                170Ak2461 k. In General. Most Cited Cases

Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury but also for the rights of persons opposing such claims and defenses to demonstrate, in the manner provided by the Rule prior to trial, that the claims and defenses have no factual basis. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**\*\*2549 \*317 Syllabus** FN\*

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

In September 1980, respondent administratrix filed this wrongful-death action in Federal District Court, alleging that her husband's death in 1979 resulted from his exposure to asbestos products manufactured or distributed by the defendants, who included petitioner corporation. In September 1981, petitioner filed a motion for summary judgment, asserting that during discovery respondent failed to produce any evidence to support her allegation that the decedent had been exposed to petitioner's products. In response, respondent produced documents tending to show such exposure, but petitioner argued that the documents were inadmissible hearsay and thus could not be considered in opposition to the summary judgment motion. In July 1982, the court granted the motion because there was no showing of exposure to petitioner's products, but the Court of Appeals reversed, holding that summary judgment in petitioner's favor was precluded because of petitioner's failure to support its motion with evidence tending to *negate* such exposure, as required by Federal Rule 56(e) of Civil Procedure and the decision in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142.

*Held:*

1. The Court of Appeals' position is inconsistent with the standard for summary\*\*2550 judgment set forth in Rule 56(c), which provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pp. 2552-2559.

(a) The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 2548
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to **\*318** make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. Pp. 2552-2553.

(b) There is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, Rule 56(c), which refers to the affidavits, "if any," suggests the absence of such a requirement, and Rules 56(a) and (b) provide that claimants and defending parties may move for summary judgment "with or without supporting affidavits." Rule 56(e), which relates to the form and use of affidavits and other materials, does not require that the moving party's motion always be supported by affidavits to show initially the absence of a genuine issue for trial. *Adickes v. S.H. Kress & Co., supra,* explained. Pp. 2553-2554.

(c) No serious claim can be made that respondent was "railroaded" by a premature motion for summary judgment, since the motion was not filed until one year after the action was commenced and since the parties had conducted discovery. Moreover, any potential problem with such premature motions can be adequately dealt with under Rule 56(f). Pp. 2554-2555.

2. The questions whether an adequate showing of exposure to petitioner's products was in fact made by respondent in opposition to the motion, and whether such a showing, if reduced to admissible evidence, would be sufficient to carry respondent's burden of proof at trial, should be determined by the Court of Appeals in the first instance. P. 2555.

244 U.S.App.D.C. 160, 756 F.2d 181, reversed

and remanded.

REHNQUIST, J., delivered the opinion of the Court, in which WHITE, MARSHALL, POWELL, and O'CONNOR, JJ., joined. WHITE, J., filed a concurring opinion, *post,* p. ---. BRENNAN, J., filed a dissenting opinion, in which BURGER, C.J., and BLACKMUN, J., joined, *post,* p. ---. STEVENS, J., filed a dissenting opinion, *post,* p. ---.

*Leland S. Van Koten* argued the cause for petitioner. With him on the briefs were *H. Emslie Parks* and *Drake C. Zaharris.*
*Paul March Smith* argued the cause for respondent. With him on the brief were *Joseph N. Onek, Joel I. Klein, James F. Green,* and *Peter T. Enslein.\**
\* *Stephen M. Shapiro, Robert L. Stern, William H. Crabtree, Edward P. Good,* and *Paul B. Mator* filed a brief for the Motor Vehicle Manufacturers Association et al. as *amici curiae* urging reversal.
**\*319** Justice REHNQUIST delivered the opinion of the Court.

The United States District Court for the District of Columbia granted the motion of petitioner Celotex Corporation for summary judgment against respondent Catrett because the latter was unable to produce evidence in support of her allegation in her wrongful-death complaint that the decedent had been exposed to petitioner's asbestos products. A divided panel of the Court of Appeals for the District of Columbia Circuit reversed, however, holding that petitioner's failure to support its motion with evidence tending to *negate* such exposure precluded the entry of summary judgment in its favor. *Catrett v. Johns-Manville Sales Corp.,* 244 U.S.App.D.C. 160, 756 F.2d 181 (1985). This view conflicted with that of the Third Circuit in *In re Japanese* **\*\*2551** *Electronic Products,* 723 F.2d 238 (1983), rev'd on other grounds *sub nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).FN1 We granted certiorari to resolve the conflict, 474 U.S. 944, 106 S.Ct. 342, 88 L.Ed.2d 285 (1985), and now reverse the decision of the District of Columbia Circuit.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 2548
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

FN1. Since our grant of certiorari in this case, the Fifth Circuit has rendered a decision squarely rejecting the position adopted here by the District of Columbia Circuit. See *Fontenot v. Upjohn Co.,* 780 F.2d 1190 (1986).

Respondent commenced this lawsuit in September 1980, alleging that the death in 1979 of her husband, Louis H. Catrett, resulted from his exposure to products containing asbestos manufactured or distributed by 15 named corporations. Respondent's complaint sounded in negligence, breach of warranty, and strict liability. Two of the defendants filed motions challenging the District Court's *in personam* jurisdiction, and the remaining 13, including petitioner, filed motions for summary judgment. Petitioner's motion, which was first filed in September 1981, argued that summary judgment was proper because respondent had "failed to produce evidence that any [Celotex] product ... was the proximate cause of the injuries alleged within the jurisdictional*320 limits of [the District] Court." In particular, petitioner noted that respondent had failed to identify, in answering interrogatories specifically requesting such information, any witnesses who could testify about the decedent's exposure to petitioner's asbestos products. In response to petitioner's summary judgment motion, respondent then produced three documents which she claimed "demonstrate that there is a genuine material factual dispute" as to whether the decedent had ever been exposed to petitioner's asbestos products. The three documents included a transcript of a deposition of the decedent, a letter from an official of one of the decedent's former employers whom petitioner planned to call as a trial witness, and a letter from an insurance company to respondent's attorney, all tending to establish that the decedent had been exposed to petitioner's asbestos products in Chicago during 1970-1971. Petitioner, in turn, argued that the three documents were inadmissible hearsay and thus could not be considered in opposition to the summary judgment motion.

In July 1982, almost two years after the commencement of the lawsuit, the District Court gran-

ted all of the motions filed by the various defendants. The court explained that it was granting petitioner's summary judgment motion because "there [was] no showing that the plaintiff was exposed to the defendant Celotex's product in the District of Columbia or elsewhere within the statutory period." App. 217.FN2 Respondent*321 appealed only the grant of summary judgment in favor of petitioner, and a divided panel of the District of Columbia Circuit reversed. The majority of the Court of Appeals held that petitioner's **2552 summary judgment motion was rendered "fatally defective" by the fact that petitioner "made no effort to adduce *any* evidence, in the form of affidavits or otherwise, to support its motion." 244 U.S.App.D.C., at 163, 756 *322 F.2d, at 184 (emphasis in original). According to the majority, Rule 56(e) of the Federal Rules of Civil Procedure,FN3 and this Court's decision in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970), establish that "the party opposing the motion for summary judgment bears the burden of responding *only after* the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact." 244 U.S.App.D.C., at 163, 756 F.2d, at 184 (emphasis in original; footnote omitted). The majority therefore declined to consider petitioner's argument that none of the evidence produced by respondent in opposition to the motion for summary judgment would have been admissible at trial. *Ibid.* The dissenting judge argued that "[t]he majority errs in supposing that a party seeking summary judgment must always make an affirmative evidentiary showing, even in cases where there is not a triable, factual dispute." *Id.,* at 167, 756 F.2d, at 188 (Bork, J., dissenting). According to the dissenting judge, the majority's decision "undermines the traditional authority of trial judges to grant summary judgment in meritless cases." *Id.,* at 166, 756 F.2d, at 187.

FN2. Justice STEVENS, in dissent, argues that the District Court granted summary judgment only because respondent presented no evidence that the decedent was exposed to Celotex asbestos products *in the District of Columbia.* See *post,* at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

2560-2561. According to Justice STEVENS, we should affirm the decision of the Court of Appeals, reversing the District Court, on the "narrower ground" that respondent "made an adequate showing" that the decedent was exposed to Celotex asbestos products in Chicago during 1970-1971. See *Ibid.*

Justice STEVENS' position is factually incorrect. The District Court expressly stated that respondent had made no showing of exposure to Celotex asbestos products "in the District of Columbia *or elsewhere.*" App. 217 (emphasis added). Unlike Justice STEVENS, we assume that the District Court meant what it said. The majority of the Court of Appeals addressed the very issue raised by Justice STEVENS, and decided that "[t]he District Court's grant of summary judgment must therefore have been based on its conclusion that there was 'no showing that the plaintiff was exposed to defendant Celotex's product in the District of Columbia *or elsewhere* within the statutory period.' " *Catrett v. Johns-Manville Sales Corp.,* 244 U.S.App.D.C. 160, 162, n. 3, 756 F.2d 181, 183, n. 3 (1985) (emphasis in original). In other words, no judge involved in this case to date shares Justice STEVENS' view of the District Court's decision.

FN3. Rule 56(e) provides:

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

[1][2] We think that the position taken by the majority of the Court of Appeals is inconsistent with the standard for summary judgment set forth in Rule 56(c) of the Federal Rules of Civil Procedure.FN4 Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation,**323** there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. "[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. **2553** 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

FN4. Rule 56(c) provides:

"The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 2548
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

[3][4][5] Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. But unlike the Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, Rule 56(c), which refers to "the affidavits, *if any*" (emphasis added), suggests the absence of such a requirement. And if there were any doubt about the meaning of Rule 56(c) in this regard, such doubt is clearly removed by Rules 56(a) and (b), which provide that claimants and defendants, respectively, may move for summary judgment "*with or without supporting affidavits*" (emphasis added). The import of these subsections is that, regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied. One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported*324 claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose.FN5

> FN5. See Louis, Federal Summary Judgment Doctrine: A Critical Analysis, 83 Yale L.J. 745, 752 (1974); Currie, Thoughts on Directed Verdicts and Summary Judgments, 45 U.Chi.L.Rev. 72, 79 (1977).

[6] Respondent argues, however, that Rule 56(e), by its terms, places on the nonmoving party the burden of coming forward with rebuttal affidavits, or other specified kinds of materials, only in response to a motion for summary judgment "made and supported as provided in this rule." According to respondent's argument, since petitioner did not "support" its motion with affidavits, summary judg-

ment was improper in this case. But as we have already explained, a motion for summary judgment may be made pursuant to Rule 56 "with or without supporting affidavits." In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

[7] We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.

*325 The Court of Appeals in this case felt itself constrained, however, by language in our decision in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). There we held that summary judgment had been improperly entered in favor of the defendant restaurant in an action brought under 42 U.S.C. § 1983. In the course of its opinion, the *Adickes* Court said that "both the commentary on and the background of the 1963 amendment conclusively**2554 show that it was not intended to modify the burden of the moving party ... to show initially the absence of a genuine issue concerning any material fact." *Id.,* at 159, 90 S.Ct., at 1609. We think that this statement is accurate in a literal sense, since we fully agree with the *Adickes* Court that the 1963 amendment to Rule 56(e) was not designed to modify the burden of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 2548                                                                                                    Page 8
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

making the showing generally required by Rule 56(c). It also appears to us that, on the basis of the showing before the Court in *Adickes,* the motion for summary judgment in that case should have been denied. But we do not think the *Adickes* language quoted above should be construed to mean that the burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof. Instead, as we have explained, the burden on the moving party may be discharged by "showing"-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.

[8] The last two sentences of Rule 56(e) were added, as this Court indicated in *Adickes,* to disapprove a line of cases allowing a party opposing summary judgment to resist a properly made motion by reference only to its pleadings. While the *Adickes* Court was undoubtedly correct in concluding that these two sentences were not intended to *reduce* the burden of the moving party, it is also obvious that they were not adopted to *add to* that burden. Yet that is exactly the result which the reasoning of the Court of Appeals would produce; in effect, an amendment to Rule 56(e) designed to **\*326** *facilitate* the granting of motions for summary judgment would be interpreted to make it *more difficult* to grant such motions. Nothing in the two sentences themselves requires this result, for the reasons we have previously indicated, and we now put to rest any inference that they do so.

Our conclusion is bolstered by the fact that district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence. See 244 U.S.App.D.C., at 167-168, 756 F.2d, at 189 (Bork, J., dissenting); 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2720, pp. 28-29 (1983). It would surely defy common sense to hold that the District Court could have entered summary judgment *sua sponte* in favor of petitioner in the instant case, but that petitioner's filing of a

motion requesting such a disposition precluded the District Court from ordering it.

Respondent commenced this action in September 1980, and petitioner's motion was filed in September 1981. The parties had conducted discovery, and no serious claim can be made that respondent was in any sense "railroaded" by a premature motion for summary judgment. Any potential problem with such premature motions can be adequately dealt with under Rule 56(f),[FN6] which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery.

FN6. Rule 56(f) provides:
"Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

In this Court, respondent's brief and oral argument have been devoted as much to the proposition that an adequate showing of exposure to petitioner's asbestos products was **\*327** made as to the proposition that no such showing should have been required. But the Court of Appeals declined to address either the adequacy of the showing made by respondent in opposition to petitioner's motion for summary judgment, or the question whether such a showing, if **\*\*2555** reduced to admissible evidence, would be sufficient to carry respondent's burden of proof at trial. We think the Court of Appeals with its superior knowledge of local law is better suited than we are to make these determinations in the first instance.

[9][10] The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984). Before the shift to "notice pleading" accomplished by the Federal Rules, motions to dismiss a complaint or to strike a defense were the principal tools by which factually insufficient claims or defenses could be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources. But with the advent of "notice pleading," the motion to dismiss seldom fulfills this function any more, and its place has been taken by the motion for summary judgment. Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*328 The judgment of the Court of Appeals is accordingly reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice WHITE, concurring.

I agree that the Court of Appeals was wrong in holding that the moving defendant must always support his motion with evidence or affidavits showing the absence of a genuine dispute about a material fact. I also agree that the movant may rely on depositions, answers to interrogatories, and the like, to demonstrate that the plaintiff has no evidence to prove his case and hence that there can be no factual dispute. But the movant must discharge the burden the Rules place upon him: It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case.

A plaintiff need not initiate any discovery or reveal his witnesses or evidence unless required to do so under the discovery Rules or by court order. Of course, he must respond if required to do so; but he need not also depose his witnesses or obtain their affidavits to defeat a summary judgment motion asserting only that he has failed to produce any support for his case. It is the defendant's task to negate, if he can, the claimed basis for the suit.

Petitioner Celotex does not dispute that if respondent has named a witness to support her claim, summary judgment should not be granted without Celotex somehow showing that the named witness' possible testimony raises no genuine issue of material fact. Tr. of Oral Arg. 43, 45. It asserts, however, that respondent has failed on request to produce any basis for her case. Respondent, on the other hand, does not contend that she was not obligated to reveal her witnesses and evidence but insists that she has revealed enough to defeat the motion for summary judgment. Because the Court of Appeals found it unnecessary to address this aspect *329 of the case, I agree that the case should be remanded for further proceedings.

Justice BRENNAN, with whom THE CHIEF JUSTICE and Justice BLACKMUN join, dissenting.

This case requires the Court to determine whether Celotex satisfied its initial **2556 burden of production in moving for summary judgment on the ground that the plaintiff lacked evidence to establish an essential element of her case at trial. I do not disagree with the Court's legal analysis. The Court clearly rejects the ruling of the Court of Appeals that the defendant must provide affirmative evidence disproving the plaintiff's case. Beyond this, however, the Court has not clearly explained what is required of a moving party seeking summary judgment on the ground that the nonmoving party cannot prove its case.[FN1] This lack of clarity is unfortunate: district courts must routinely decide summary judgment motions, and the Court's opinion will very likely create confusion. For this reason, even if I agreed with the Court's result, I would have written separately to explain more clearly the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 2548

477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

law in this area. However, because I believe that Celotex did not meet its burden of production under Federal Rule of Civil Procedure 56, I respectfully dissent from the Court's judgment.

> FN1. It is also unclear what the Court of Appeals is supposed to do in this case on remand. Justice WHITE-who has provided the Court's fifth vote-plainly believes that the Court of Appeals should reevaluate whether the defendant met its initial burden of production. However, the decision to reverse rather than to vacate the judgment below implies that the Court of Appeals should assume that Celotex has met its initial burden of production and ask only whether the plaintiff responded adequately, and, if so, whether the defendant has met its ultimate burden of persuasion that no genuine issue exists for trial. Absent some clearer expression from the Court to the contrary, Justice WHITE's understanding would seem to be controlling. Cf. *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977).

**\*330** I

Summary judgment is appropriate where the Court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.Rule Civ.Proc. 56(c). The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727, p. 121 (2d ed. 1983) (hereinafter Wright) (citing cases); 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 56.15 [3] (2d ed. 1985) (hereinafter Moore) (citing cases). See also, *ante,* at 2551; *ante,* at 2553 (WHITE, J., concurring). This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party. See 10A Wright, Miller &

Kane § 2727. The court need not decide whether the moving party has satisfied its ultimate burden of persuasion [FN2] unless and until the Court finds that the moving party has discharged its initial **\*331** burden of production. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157-161, 90 S.Ct. 1598, 1608-10, 26 L.Ed.2d 142 (1970); 1963 Advisory Committee's Notes on Fed.Rule Civ.Proc. 56(e), 28 U.S.C.App., p. 626.

> FN2. The burden of persuasion imposed on a moving party by Rule 56 is a stringent one. 6 Moore ¶ 56.15[3], pp. 56-466; 10A Wright, Miller & Kane § 2727, p. 124. Summary judgment should not be granted unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, ----,91 L.Ed.2d 202 (1986), and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-159, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). In determining whether a moving party has met its burden of persuasion, the court is obliged to take account of the entire setting of the case and must consider all papers of record as well as any materials prepared for the motion. 10A Wright, Miller & Kane § 2721, p. 44; see, *e.g., Stepanischen v. Merchants Despatch Transportation Corp.,* 722 F.2d 922, 930 (CA1 1983); *Higgenbotham v. Ochsner Foundation Hospital,* 607 F.2d 653, 656 (CA5 1979). As explained by the Court of Appeals for the Third Circuit in *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238 (1983), rev'd on other grounds *sub nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "[i]f ... there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment...." 723 F.2d, at 258.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 2548
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

**2557 The burden of production imposed by Rule 56 requires the moving party to make a prima facie showing that it is entitled to summary judgment. 10A Wright, Miller & Kane § 2727. The manner in which this showing can be made depends upon which party will bear the burden of persuasion on the challenged claim at trial. If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence-using any of the materials specified in Rule 56(c)-that would entitle it to a directed verdict if not controverted at trial. *Ibid.* Such an affirmative showing shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial or to submit an affidavit requesting additional time for discovery. *Ibid.;* Fed.Rules Civ.Proc. 56(e), (f).

If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. See 10A Wright, Miller & Kane § 2727, pp. 130-131; Louis, Federal Summary Judgment Doctrine: A Critical Analysis, 83 Yale L.J. 745, 750 (1974) (hereinafter Louis). If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, ----,91 L.Ed.2d 202 (1986).

Where the moving party adopts this second option and seeks summary judgment on the ground that the nonmoving party-who will bear the burden of persuasion at trial-has *332 no evidence, the mechanics of discharging Rule 56's burden of production are somewhat trickier. Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. See *ante,* at 2551 (WHITE, J., concurring). Such a "burden" of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. See Louis 750-751. Rather, as the Court confirms, a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. *Ante,* at 2553. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories, and other exchanges between the parties that are in the record. Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.

If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied, and the Court need not consider whether the moving party has met its ultimate burden of persuasion. Accordingly, the nonmoving party may defeat a motion for summary judgment that asserts that the nonmoving party has no evidence by calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party. In that event, the moving party must respond by making an attempt to demonstrate the inadequacy of this evidence, for it is only by attacking all the record evidence allegedly supporting the nonmoving party that a party seeking summary judgment satisfies Rule 56's burden of production.FN3 Thus, if the record disclosed that the **2558 moving *333 party had overlooked a witness who would provide relevant testimony for the nonmoving party at trial, the Court could not find that the moving party had discharged its initial burden of production unless the moving party sought to demonstrate the inadequacy of this witness' testimony. Absent such a demonstration, summary judgment would have to be denied on the ground that the moving party had failed to meet its burden of production under Rule 56.

106 S.Ct. 2548
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

FN3. Once the moving party has attacked whatever record evidence-if any-the non-moving party purports to rely upon, the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f). See 10A Wright, Miller & Kane § 2727, pp. 138-143. Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial. See, *e.g., First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

The result in *Adickes v. S.H. Kress & Co., supra,* is fully consistent with these principles. In that case, petitioner was refused service in respondent's lunchroom and then was arrested for vagrancy by a local policeman as she left. Petitioner brought an action under 42 U.S.C. § 1983 claiming that the refusal of service and subsequent arrest were the product of a conspiracy between respondent and the police; as proof of this conspiracy, petitioner's complaint alleged that the arresting officer was in respondent's store at the time service was refused. Respondent subsequently moved for summary judgment on the ground that there was no actual evidence in the record from which a jury could draw an inference of conspiracy. In response, petitioner pointed to a statement from her own deposition and an unsworn statement by a Kress employee, both already in the record and both ignored by respondent, that the policeman who arrested petitioner was in the store at the time she was refused service. We agreed that "[i]f a policeman were present, ... it would be open to a jury, in light of the sequence that followed,*334 to infer from the circumstances

that the policeman and Kress employee had a 'meeting of the minds' and thus reached an understanding that petitioner should be refused service." 398 U.S., at 158, 90 S.Ct., at 1609. Consequently, we held that it was error to grant summary judgment "on the basis of this record" because respondent had "failed to fulfill its initial burden" of demonstrating that there was no evidence that there was a policeman in the store. *Id.,* at 157-158,98 S.Ct., at 1608-1609.

The opinion in *Adickes* has sometimes been read to hold that summary judgment was inappropriate because the respondent had not submitted affirmative evidence to negate the possibility that there was a policeman in the store. See Brief for Respondent 20, n. 30 (citing cases). The Court of Appeals apparently read *Adickes* this way and therefore required Celotex to submit evidence establishing that plaintiff's decedent had not been exposed to Celotex asbestos. I agree with the Court that this reading of *Adickes* was erroneous and that Celotex could seek summary judgment on the ground that plaintiff could not prove exposure to Celotex asbestos at trial. However, Celotex was still required to satisfy its initial burden of production.

## II

I do not read the Court's opinion to say anything inconsistent with or different than the preceding discussion. My disagreement with the Court concerns the application of these principles to the facts of this case.

Defendant Celotex sought summary judgment on the ground that plaintiff had "failed to produce" any evidence that her **2559 decedent had ever been exposed to Celotex asbestos.FN4 App. 170. Celotex supported this motion with a *335 two-page "Statement of Material Facts as to Which There is No Genuine Issue" and a three-page "Memorandum of Points and Authorities" which asserted that the plaintiff had failed to identify any evidence in responding to two sets of interrogatories propounded by Celotex and that therefore the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

record was "totally devoid" of evidence to support plaintiff's claim. See *id.,* at 171-176.

> FN4. Justice STEVENS asserts that the District Court granted summary judgment on the ground that the plaintiff had failed to show exposure in the District of Columbia. He contends that the judgment of the Court of Appeals reversing the District Court's judgment should be affirmed on the "narrow ground" that it was "palpably erroneous" to grant summary judgment on this basis. *Post,* at 2561 (dissenting). The Court replies that what the District Court said was that plaintiff had failed to show exposure in the District of Columbia "or elsewhere." *Ante,* at 2560, n. 2. In my view, it does not really matter which reading is correct in this case. For, contrary to Justice STEVENS' claim, deciding this case on the ground that Celotex failed to meet its burden of production under Rule 56 does not involve an "abstract exercise in Rule construction." *Post,* at 2560 (STEVENS, J., dissenting). To the contrary, the principles governing a movant's burden of proof are straightforward and well established, and deciding the case on this basis does not require a new construction of Rule 56 at all; it simply entails applying established law to the particular facts of this case. The choice to reverse because of "palpable erro[r]" with respect to the burden of a moving party under Rule 56 is thus no more "abstract" than the choice to reverse because of such error with respect to the elements of a tort claim. Indeed, given that the issue of the moving party's burden under Rule 56 was the basis of the Court of Appeals' decision, the question upon which certiorari was granted, and the issue briefed by the parties and argued to the Court, it would seem to be the preferable ground for deciding the case.

Approximately three months earlier, Celotex

had filed an essentially identical motion. Plaintiff responded to this earlier motion by producing three pieces of evidence which she claimed "[a]t the very least ... demonstrate that there is a genuine factual dispute for trial,"*id.,* at 143: (1) a letter from an insurance representative of another defendant describing asbestos products to which plaintiff's decedent had been exposed, *id.,* at 160; (2) a letter from T.R. Hoff, a former supervisor of decedent, describing asbestos products to which decedent had been exposed, *id.,* at 162; and (3) a copy of decedent's deposition from earlier workmen's compensation proceedings, *id.,* at 164. Plaintiff also apparently indicated**336** at that time that she intended to call Mr. Hoff as a witness at trial. Tr. of Oral Arg. 6-7, 27-29.

Celotex subsequently withdrew its first motion for summary judgment. See App. 167.[FN5] However, as a result of this motion, when Celotex filed its second summary judgment motion, the record *did* contain evidence-including at least one witness-supporting plaintiff's claim. Indeed, counsel for Celotex admitted to this Court at oral argument that Celotex was aware of this evidence and of plaintiff's intention to call Mr. Hoff as a witness at trial when the second summary judgment motion was filed. Tr. of Oral Arg. 5-7. Moreover, plaintiff's response to Celotex' second motion pointed to this evidence-noting that it had already been provided to counsel for Celotex in connection with the first motion-and argued that Celotex had failed to "meet its burden of proving that there is no genuine factual dispute for trial." App. 188.

> FN5. Celotex apparently withdrew this motion because, contrary to the assertion made in the first summary judgment motion, its second set of interrogatories had not been served on the plaintiff.

On these facts, there is simply no question that Celotex failed to discharge its initial burden of production. Having chosen to base its motion on the argument that there was no evidence in the record to support plaintiff's claim, Celotex was not free to ignore supporting evidence that the record clearly

477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

contained. Rather, Celotex was required, as an ini-
tial matter, to attack the adequacy of this evidence.
Celotex' failure to fulfill this simple requirement
constituted a failure to discharge its initial **2560**
burden of production under Rule 56, and thereby
rendered summary judgment improper.[FN6]

> FN6. If the plaintiff had answered Celotex'
> second set of interrogatories with the evid-
> ence in her response to the first summary
> judgment motion, and Celotex had ignored
> those interrogatories and based its second
> summary judgment motion on the first set
> of interrogatories only, Celotex obviously
> could not claim to have discharged its Rule
> 56 burden of production. This result should
> not be different simply because the evid-
> ence plaintiff relied upon to support her
> claim was acquired by Celotex other than
> in plaintiff's answers to interrogatories.

**\*337** This case is indistinguishable from
*Adickes.* Here, as there, the defendant moved for
summary judgment on the ground that the record
contained no evidence to support an essential ele-
ment of the plaintiff's claim. Here, as there, the
plaintiff responded by drawing the court's attention
to evidence that was already in the record and that
had been ignored by the moving party. Con-
sequently, here, as there, summary judgment should
be denied on the ground that the moving party
failed to satisfy its initial burden of production.[FN7]

> FN7. Although Justice WHITE agrees that
> "if [plaintiff] has named a witness to sup-
> port her claim, summary judgment should
> not be granted without Celotex somehow
> showing that the named witness' possible
> testimony raises no genuine issue of mater-
> ial fact," he would remand "[b]ecause the
> Court of Appeals found it unnecessary to
> address this aspect of the case." *Ante,* at
> 2555-2556 (concurring). However, Celotex
> has admitted that plaintiff had disclosed
> her intent to call Mr. Hoff as a witness at
> trial before Celotex filed its second motion
> for summary judgment. Tr. of Oral Arg.

6-7. Under the circumstances, then, re-
manding is a waste of time.Justice
STEVENS, dissenting.

As the Court points out, *ante,* at 2551, petition-
er's motion for summary judgment was based on the
proposition that respondent could not prevail unless
she proved that her deceased husband had been ex-
posed to petitioner's products "within the jurisdic-
tional limits" of the District of Columbia.[FN1] **\*338**
Respondent made an adequate showing-albeit pos-
sibly not in admissible form[FN2]-that her husband
had been exposed to petitioner's product in
Illinois.FN3 Although the basis of the motion and
the argument had been the lack of exposure *in the
District of Columbia,* the District Court stated at the
end of the argument: "The Court will grant the de-
fendant Celotex's motion for summary judgment
there being no showing that the plaintiff was ex-
posed to the defendant Celotex's product in the Dis-
trict of Columbia *or elsewhere* within the statutory
period." App. 217 (emphasis added). The District
Court offered no additional explanation and no
written**2561** opinion. The Court of Appeals re-
versed on the basis that Celotex had not met its bur-
den; the court noted the incongruity of the District
Court's opinion in the context of the motion and ar-
gument, but did not rest on that basis because of the
"or elsewhere" language.[FN4]

> FN1. See Motion of Defendant Celotex
> Corporation for Summary Judgment, App.
> 170 ("Defendant Celotex Corporation, pur-
> suant to Rule 56(b) of the Federal Rules of
> Civil Procedure moves this Court for an
> Order granting Summary Judgment on the
> ground that plaintiff has failed to produce
> evidence that any product designed, manu-
> factured or distributed by Celotex Corpora-
> tion was the proximate cause of the injur-
> ies alleged *within the jurisdictional limits
> of this Court*") (emphasis added); Memor-
> andum of Points and Authorities in Sup-
> port of Motion of Defendant Celotex Cor-
> poration for Summary Judgment, *id.,* at
> 175 (Plaintiff "must demonstrate some link
> between a Celotex Corporation product
> claimed to be the cause of the decedent's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 2548
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

illness and the decedent himself. The record is totally devoid of any such evidence *within the jurisdictional confines of this Court*") (emphasis added); Transcript of Argument in Support of Motion of Defendant Celotex Corporation for Summary Judgment, *id.,* at 211 ("Our position is ... there has been no product identification of any Celotex products ... that have been used *in the District of Columbia* to which the decedent was exposed") (emphasis added).

FN2. But cf. *ante,* at 2553 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment").

FN3. See App. 160 (letter from Aetna Life Insurance Co.) (referring to the "asbestos that Mr. Catrett came into contact with while working for Anning-Johnson Company" and noting that the "manufacturer of this product" was purchased by Celotex); *id.,* at 162 (letter from Anning-Johnson Co.) (confirming that Catrett worked for the company and supervised the installation of asbestos products by the company that Celotex ultimately purchased; *id.,* at 164, 164c (deposition of Catrett) (description of his work with asbestos "in Chicago").

FN4. See *Catrett v. Johns-Manville Sales Corp.,* 756 F.2d 181, 185, n. 14 (1985) ("[T]he discussion at the time the motion was granted actually spoke to venue. It was only the phrase 'or elsewhere,' appearing with no prior discussion, in the judge's oral ruling at the close of argument that made the grant of summary judgment even conceivably proper").

Taken in the context of the motion for summary judgment on the basis of no exposure in the District of Columbia, the **\*339** District Court's de-

cision to grant summary judgment was palpably erroneous. The court's bench reference to "or elsewhere" neither validated that decision nor raised the complex question addressed by this Court today. In light of the District Court's plain error, therefore, it is perfectly clear that, even after this Court's abstract exercise in Rule construction, we should nonetheless affirm the reversal of summary judgment on that narrow ground.[FN5]

FN5. Cf. n. 2, *supra.* The Court's statement that the case should be remanded because the Court of Appeals has a "superior knowledge of local law," *ante,* at 2555, is bewildering because there is no question of local law to be decided. Cf. *Bishop v. Wood,* 426 U.S. 341, 345-347, 96 S.Ct. 2074, 2077-2079, 48 L.Ed.2d 684 (1976).

The Court's decision to remand when a sufficient ground for affirmance is available does reveal, however, the Court's increasing tendency to adopt a presumption of reversal. See, *e.g., New York v. P.J. Video, Inc.,* 475 U.S. 868, 884, 106 S.Ct. 1610, 1619, 89 L.Ed.2d 871 (1986) (MARSHALL, J., dissenting); *Icicle Seafoods, Inc., v. Worthington,* 475 U.S. 709, 715, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986) (STEVENS, J., dissenting); *City of Los Angeles v. Heller,* 475 U.S. 796, 800, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (STEVENS, J., dissenting); *Pennsylvania v. Goldhammer,* 474 U.S. 28, 31, 106 S.Ct. 353, 88 L.Ed.2d 183 (1985) (STEVENS, J., dissenting). As a matter of efficient judicial administration and of respect for the state and federal courts, I believe the presumption should be precisely the opposite.

I respectfully dissent.

U.S.Dist.Col.,1986.
Celotex Corp. v. Catrett
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1348                                                                    Page 1

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio
Corp.
U.S.Pa.,1986.

Supreme Court of the United States
MATSUSHITA ELECTRIC INDUSTRIAL CO.,
LTD., et al., Petitioners
v.
ZENITH RADIO CORPORATION et al.
**No. 83-2004.**

Argued Nov. 12, 1985.
Decided March 26, 1986.

American manufacturers of television sets brought
suit against Japanese manufacturers alleging that
the Japanese manufacturers had illegally conspired
to drive the American manufacturers from the
American market by engaging in a scheme to fix
and maintain artificially high prices for television
sets sold by the Japanese manufacturers in Japan
and, at the same time, to fix and maintain low
prices for the sets exported to and sold in the
United States. The United States District Court for
the Eastern District of Pennsylvania, 513 F.Supp.
1100, granted summary judgment in favor of the Ja-
panese manufacturers. The United States Court of
Appeals for the Third Circuit, 723 F.2d 238, af-
firmed in part and reversed in part, and the Japan-
ese manufacturers petitioned for certiorari. The Su-
preme Court, Justice Powell, held that: (1) Americ-
an manufacturers could not recover anti-
trust damages against Japanese television manufac-
turers for any conspiracy by the Japanese manufac-
turers to charge higher than competitive prices in
the American market since such conduct could not
injure the American manufacturers who stood to
gain from any such conspiracy, and (2) in order to
survive a motion for summary judgment by Japan-
ese manufacturers, American manufacturers were
required to establish a material issue as to whether
the Japanese manufacturers entered into an illegal
conspiracy which caused the American manufactur-
ers to suffer cognizable injury; because the factual

context rendered the claims of the American manu-
facturers implausible, the American manufactures
were required to offer more persuasive evidence to
support their claims than would otherwise be neces-
sary.

Reversed and remanded.

Justice White filed a dissenting opinion in which
Justice Brennan, Justice Blackmun and Justice
Stevens joined.

West Headnotes

**[1] Antitrust and Trade Regulation 29T ⟜945**

29T Antitrust and Trade Regulation
    29TXVI Antitrust and Foreign Trade
        29Tk945 k. In General. Most Cited Cases
    (Formerly 265k12(7))
American television manufacturers could not recov-
er antitrust damages from Japanese television man-
ufacturers based solely on an alleged cartelization
of the Japanese market since American antitrust
laws do not regulate the competitive conditions of
other nations' economies.

**[2] Antitrust and Trade Regulation 29T ⟜
963(3)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and
Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons En-
titled to Sue; Standing; Parties
                29Tk963 Injury to Business or Prop-
erty
                    29Tk963(3) k. Particular Cases.
Most Cited Cases
    (Formerly 265k28(2))
American television manufacturers could not recov-
er antitrust damages against Japanese television
manufacturers for any conspiracy by the Japanese
manufacturers to charge higher than competitive
prices in the American market since such conduct

106 S.Ct. 1348                                                                                                      Page 2
475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

could not injure the American manufacturers who stood to gain from any such conspiracy; further-more, the American manufacturers could not recover for a conspiracy to impose nonprice restraints that had the effect of either raising market prices or limiting output.

**[3] Federal Civil Procedure 170A ⚖️2544**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                      170Ak2544 k. Burden of Proof.
Most Cited Cases
In order to survive a motion for summary judgment by Japanese manufacturers of television sets, American manufacturers were required to establish a material issue as to whether the Japanese manufacturers entered into an illegal conspiracy which caused the American manufacturers to suffer cognizable antitrust injury; because the factual context rendered implausible the claims of the American manufacturers that the Japanese manufacturers had conspired to increase prices in Japan while reducing them in the United States, the American manufacturers were required to offer more persuasive evidence to support their claims than would otherwise be necessary.

**[4] Federal Civil Procedure 170A ⚖️2544**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                      170Ak2544 k. Burden of Proof.
Most Cited Cases
To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 of the Sherman Act must present evidence that tends to exclude the possibility that the alleged conspirators acted independently. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**\*\*1349 \*574 Syllabus** [FN\*]

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287,50 L.Ed.2d 499.

Petitioners are 21 Japanese corporations or Japanese-controlled American corporations that manufacture and/or sell "consumer electronic products" (CEPs) (primarily television sets). Respondents are American corporations that manufacture and sell television sets. In 1974, respondents brought an action in Federal District Court, alleging that petitioners, over a 20-year period, had illegally conspired to drive American firms from the American CEP market by engaging in a scheme to fix and maintain artificially high prices for television sets sold by petitioners in Japan and, at the same time, to fix and maintain low prices for the sets exported to and sold in the United States. Respondents claim that various portions of this scheme violated, *inter alia,*§§ 1 and 2 of the Sherman Act, § 2(a) of the Robinson-Patman Act, and § 73 of the Wilson Tariff Act. After several years of discovery, petitioners moved for summary judgment on all claims. The District Court then directed the parties to file statements listing all the documentary evidence that would be offered if the case went to trial. After the statements were filed, the court found the bulk of the evidence on which respondents relied was inadmissible, that the admissible evidence did not raise a genuine issue of material fact as to the existence of the alleged conspiracy, and that any inference of conspiracy was unreasonable. Summary judgment therefore was granted in petitioners' favor. The Court of Appeals reversed. After determining that much of the evidence excluded by the District Court was admissible, the Court of Appeals held that the District Court erred in granting a summary judgment and that there was both direct and circumstantial evidence of a conspiracy. Based on inferences drawn from the evidence, the Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, which conspiracy was funded **\*\*1350** by excess

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

profits obtained in the Japanese market.

*Held:* The Court of Appeals did not apply proper standards in evaluating the District Court's decision to grant petitioners' motion for summary judgment. Pp. 1354-1362.

(a) The "direct evidence" on which the Court of Appeals relied-petitioners' alleged supracompetitive pricing in Japan, the "five company **\*575** rule" by which each Japanese producer was permitted to sell only to five American distributors, and the "check prices" (minimum prices fixed by agreement with the Japanese Government for CEPs exported to the United States) insofar as they established minimum prices in the United States-cannot by itself give respondents a cognizable claim against petitioners for antitrust damages. P. 1354.

(b) To survive petitioners' motion for a summary judgment, respondents must establish that there is a genuine issue of material fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury. If the factual context renders respondents' claims implausible, *i.e.,* claims that make no economic sense, respondents must offer more persuasive evidence to support their claims than would otherwise be necessary. To survive a motion for a summary judgment, a plaintiff seeking damages for a violation of § 1 of the Sherman Act must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. Thus, respondents here must show that the inference of a conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents. Pp. 1355-1357.

(c) Predatory pricing conspiracies are by nature speculative. They require the conspirators to sustain substantial losses in order to recover uncertain gains. The alleged conspiracy is therefore implausible. Moreover, the record discloses that the alleged conspiracy has not succeeded in over two decades of operation. This is strong evidence that the conspiracy does not in fact exist. The possibility that petitioners have obtained supracompetitive profits

in the Japanese market does not alter this assessment. Pp. 1357-1359.

(d) Mistaken inferences in cases such as this one are especially costly, because they chill the very conduct that the antitrust laws are designed to protect. There is little reason to be concerned that by granting summary judgment in cases where the evidence of conspiracy is speculative or ambiguous, courts will encourage conspiracies. P. 1360.

(e) The Court of Appeals erred in two respects: the "direct evidence" on which it relied had little, if any, relevance to the alleged predatory pricing conspiracy, and the court failed to consider the absence of a plausible motive to engage in predatory pricing. In the absence of any rational motive to conspire, neither petitioners' pricing practices, their conduct in the Japanese market, nor their agreements respecting prices and distributions in the American market sufficed to create a "genuine issue for trial" under Federal Rule of Civil Procedure 56(e). On remand, the Court of Appeals may consider whether there is other, unambiguous evidence of the alleged conspiracy. Pp. 1360-1362.

723 F.2d 238 (CA3 1983), reversed and remanded.

**\*576** POWELL, J., delivered the opinion of the Court, in which BURGER, C.J., and MARSHALL, REHNQUIST, and O'CONNOR, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, BLACKMUN, and STEVENS, JJ., joined, *post*, p. ---.

*Donald J. Zoeller* argued the cause for petitioners. With him on the briefs were *John L. Altieri, Jr., Harold G. Levison, Peter J. Gartland, James S. Morris, Kevin R. Keating, Charles F. Schirmeister, Ira M. Millstein, A. Paul Victor, Jeffrey L. Kessler, Carl W. Schwarz, Michael E. Friedlander, William H. Barrett, Donald F. Turner,* and *Henry T. Reath. Charles F. Rule* argued the cause *pro hac vice* for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Wallace, Charles S. Stark, Robert B. Nicholson, Edward T. Hand, Richard P. Larm, Abraham D.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368

**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

*Sofaer,* and *Elizabeth M. Teel.*

*Edwin P. Rome* argued the cause for respondents. With him on the brief were *William H. Roberts, Arnold I. Kalman, Philip J. Curtis,* and *John Borst, Jr.*

* Briefs of *amici curiae* urging reversal were filed for the Government of Japan by *Stephen M. Shapiro;* and for the American Association of Exporters and Importers et al. by *Robert Herzstein* and *Hadrian R. Katz.*

Briefs of *amici curiae* were filed for the Government of Australia et al. by *Mark R. Joelson* and *Joseph P. Griffin;* and for the Semiconductor Industry Association by *Joseph R. Creighton.*

Justice POWELL delivered the opinion of the Court.

This case requires that we again consider the standard district courts must apply **\*\*1351** when deciding whether to grant summary judgment in an antitrust conspiracy case.

I

Stating the facts of this case is a daunting task. The opinion of the Court of Appeals for the Third Circuit runs to 69 pages; the primary opinion of the District Court is more than three times as long. *In re Japanese Electronic Products \*577 Antitrust Litigation,* 723 F.2d 238 (CA3 1983); 513 F.Supp. 1100 (ED Pa.1981). Two respected District Judges each have authored a number of opinions in this case; the published ones alone would fill an entire volume of the Federal Supplement. In addition, the parties have filed a 40-volume appendix in this Court that is said to contain the essence of the evidence on which the District Court and the Court of Appeals based their respective decisions.

We will not repeat what these many opinions have stated and restated, or summarize the mass of documents that constitute the record on appeal. Since we review only the standard applied by the Court of Appeals in deciding this case, and not the weight assigned to particular pieces of evidence, we find it unnecessary to state the facts in great detail. What follows is a summary of this case's long history.

A

Petitioners, defendants below, are 21 corporations that manufacture or sell "consumer electronic products" (CEPs)-for the most part, television sets. Petitioners include both Japanese manufacturers of CEPs and American firms, controlled by Japanese parents, that sell the Japanese-manufactured products. Respondents, plaintiffs below, are Zenith Radio Corporation (Zenith) and National Union Electric Corporation (NUE). Zenith is an American firm that manufactures and sells television sets. NUE is the corporate successor to Emerson Radio Company, an American firm that manufactured and sold television sets until 1970, when it withdrew from the market after sustaining substantial losses. Zenith and NUE began this lawsuit in 1974,[FN1] claiming that petitioners had illegally conspired to drive **\*578** American firms from the American CEP market. According to respondents, the gist of this conspiracy was a " 'scheme to raise, fix and maintain artificially *high* prices for television receivers sold by [petitioners] in Japan and, at the same time, to fix and maintain *low* prices for television receivers exported to and sold in the United States.' " 723 F.2d, at 251 (quoting respondents' preliminary pretrial memorandum). These "low prices" were allegedly at levels that produced substantial losses for petitioners. 513 F.Supp., at 1125. The conspiracy allegedly began as early as 1953, and according to respondents was in full operation by sometime in the late 1960's. Respondents claimed that various portions of this scheme violated §§ 1 and 2 of the Sherman Act, § 2(a) of the Robinson-Patman Act, § 73 of the Wilson Tariff Act, and the Antidumping Act of 1916.

> FN1. NUE had filed its complaint four years earlier, in the District Court for the District of New Jersey. Zenith's complaint was filed separately in 1974, in the Eastern District of Pennsylvania. The two cases were consolidated in the Eastern District of Pennsylvania in 1974.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368

**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

After several years of detailed discovery, petitioners filed motions for summary judgment on all claims against them. The District Court directed the parties to file, with preclusive effect, "Final Pretrial Statements" listing all the documentary evidence that would be offered if the case proceeded to trial. Respondents filed such a statement, and petitioners responded with a series of motions challenging the admissibility of respondents' evidence. In three detailed opinions, the District Court found the bulk of the evidence on which Zenith and NUE relied inadmissible.[FN2]

> FN2. The inadmissible evidence included various government records and reports, *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp. 1125 (ED Pa.1980), business documents offered pursuant to various hearsay exceptions, *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp. 1190 (ED Pa.1980), and a large portion of the expert testimony that respondents proposed to introduce. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp. 1313 (ED Pa.1981).

**\*\*1352** The District Court then turned to petitioners' motions for summary judgment. In an opinion spanning 217 pages, the court found that the admissible evidence did not raise a genuine issue of material fact as to the existence of the alleged **\*579** conspiracy. At bottom, the court found, respondents' claims rested on the inferences that could be drawn from petitioners' parallel conduct in the Japanese and American markets, and from the effects of that conduct on petitioners' American competitors. 513 F.Supp., at 1125-1127. After reviewing the evidence both by category and *in toto,* the court found that any inference of conspiracy was unreasonable, because (i) some portions of the evidence suggested that petitioners conspired in ways that did not injure respondents, and (ii) the evidence that bore directly on the alleged price-cutting conspiracy did not rebut the more plausible inference that petitioners were cutting prices to compete in the American market and not to monopolize it.

Summary judgment therefore was granted on respondents' claims under § 1 of the Sherman Act and the Wilson Tariff Act. Because the Sherman Act § 2 claims, which alleged that petitioners had combined to monopolize the American CEP market, were functionally indistinguishable from the § 1 claims, the court dismissed them also. Finally, the court found that the Robinson-Patman Act claims depended on the same supposed conspiracy as the Sherman Act claims. Since the court had found no genuine issue of fact as to the conspiracy, it entered judgment in petitioners' favor on those claims as well.[FN3]

> FN3. The District Court ruled separately that petitioners were entitled to summary judgment on respondents' claims under the Antidumping Act of 1916. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 494 F.Supp. 1190 (ED Pa.1980). Respondents appealed this ruling, and the Court of Appeals reversed in a separate opinion issued the same day as the opinion concerning respondents' other claims. *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 319 (CA3 1983).

Petitioners ask us to review the Court of Appeals' Antidumping Act decision along with its decision on the rest of this mammoth case. The Antidumping Act claims were not, however, mentioned in the questions presented in the petition for certiorari, and they have not been independently argued by the parties. See this Court's Rule 21.1(a). We therefore decline the invitation to review the Court of Appeals' decision on those claims.

**\*580** B

The Court of Appeals for the Third Circuit reversed.[FN4] The court began by examining the District Court's evidentiary rulings, and determined that much of the evidence excluded by the District Court was in fact admissible. 723 F.2d, at 260-303. These evidentiary rulings are not before us. See 471 U.S. 1002, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985) (limiting grant of certiorari).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1348

Page 6

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368

**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

FN4. As to 3 of the 24 defendants, the Court of Appeals affirmed the entry of summary judgment. Petitioners are the 21 defendants who remain in the case.

On the merits, and based on the newly enlarged record, the court found that the District Court's summary judgment decision was improper. The court acknowledged that "there are legal limitations upon the inferences which may be drawn from circumstantial evidence,"723 F.2d, at 304, but it found that "the legal problem ... is different" when "there is direct evidence of concert of action." *Ibid.* Here, the court concluded, "there is both direct evidence of certain kinds of concert of action and circumstantial evidence having some tendency to suggest that other kinds of concert of action may have occurred." *Id.,* at 304-305. Thus, the court reasoned, cases concerning the limitations on inferring conspiracy from ambiguous evidence were not dispositive. *Id.,* at 305. Turning to the evidence, the court determined that a factfinder reasonably could draw the following conclusions:

1. The Japanese market for CEPs was characterized by oligopolistic behavior,**1353 with a small number of producers meeting regularly and exchanging information on price and other matters. *Id.,* at 307. This created the opportunity for a stable combination to raise both prices and profits in Japan. American firms could not attack such a combination because the Japanese Government imposed significant barriers to entry. *Ibid.*

2. Petitioners had relatively higher fixed costs than their American counterparts, and therefore needed to *581 operate at something approaching full capacity in order to make a profit. *Ibid.*

3. Petitioners' plant capacity exceeded the needs of the Japanese market. *Ibid.*

4. By formal agreements arranged in cooperation with Japan's Ministry of International Trade and Industry (MITI), petitioners fixed minimum prices for CEPs exported to the American market. *Id.,* at 310. The parties refer to these prices as the "check prices," and to the agreements that require them as the "check price agreements."

5. Petitioners agreed to distribute their products in the United States according to a "five company

rule": each Japanese producer was permitted to sell only to five American distributors. *Ibid.*

6. Petitioners undercut their own check prices by a variety of rebate schemes. *Id.,* at 311. Petitioners sought to conceal these rebate schemes both from the United States Customs Service and from MITI, the former to avoid various customs regulations as well as action under the antidumping laws, and the latter to cover up petitioners' violations of the check-price agreements.

Based on inferences from the foregoing conclusions,FN5 the Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, which conspiracy was funded by excess profits obtained in the Japanese market. The court apparently did not consider whether it was as plausible to conclude that petitioners' price-cutting behavior was independent and not conspiratorial.

FN5. In addition to these inferences, the court noted that there was expert opinion evidence that petitioners' export sales "generally were at prices which produced losses, often as high as twenty-five percent on sales." 723 F.2d, at 311. The court did not identify any direct evidence of below-cost pricing; nor did it place particularly heavy reliance on this aspect of the expert evidence. See n. 19, *infra.*

*582 The court found it unnecessary to address petitioners' claim that they could not be held liable under the antitrust laws for conduct that was compelled by a foreign sovereign. The claim, in essence, was that because MITI required petitioners to enter into the check-price agreements, liability could not be premised on those agreements. The court concluded that this case did not present any issue of sovereign compulsion, because the check-price agreements were being used as "evidence of a low export price conspiracy" and not as an independent basis for finding antitrust liability. The court also believed it was unclear that the check prices in fact were mandated by the Japanese Gov-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

ernment, notwithstanding a statement to that effect by MITI itself. *Id.,* at 315.

We granted certiorari to determine (i) whether the Court of Appeals applied the proper standards in evaluating the District Court's decision to grant petitioners' motion for summary judgment, and (ii) whether petitioners could be held liable under the antitrust laws for a conspiracy in part compelled by a foreign sovereign. 471 U.S. 1002, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985). We reverse on the first issue, but do not reach the second.

## II

[1][2] We begin by emphasizing what respondents' claim is *not.* Respondents cannot recover antitrust damages based solely on an alleged cartelization of the Japanese market, because American antitrust laws do not regulate the competitive conditions of other nations' economies. **\*\*1354** *United States v. Aluminum Co. of America,* 148 F.2d 416, 443 (CA2 1945) (L. Hand, J.); 1 P. Areeda & D. Turner, Antitrust Law ¶ 236d (1978).[FN6] Nor can respondents recover damages for **\*583** any conspiracy by petitioners to charge higher than competitive prices in the American market. Such conduct would indeed violate the Sherman Act, *United States v. Trenton Potteries Co.,* 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940), but it could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price in CEPs. Cf. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488-489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Finally, for the same reason, respondents cannot recover for a conspiracy to impose nonprice restraints that have the effect of either raising market price or limiting output. Such restrictions, though harmful to competition, actually *benefit* competitors by making supracompetitive pricing more attractive. Thus, neither petitioners' alleged supracompetitive pricing in Japan, nor the five-company rule that limited distribution in this country, nor the check prices inso-

far as they established minimum prices in this country, can by themselves give respondents a cognizable claim against petitioners for antitrust damages. The Court of Appeals therefore erred to the extent that it found evidence of these alleged conspiracies to be "direct evidence" of a conspiracy that injured respondents. See 723 F.2d, at 304-305.

> FN6. The Sherman Act does reach conduct outside our borders, but only when the conduct has an effect on American commerce. *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 704, 82 S.Ct. 1404, 1413, 8 L.Ed.2d 777 (1962) ("A conspiracy to monopolize or restrain the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries"). The effect on which respondents rely is the artificially depressed level of prices for CEPs in the United States.

Petitioners' alleged cartelization of the Japanese market could not have caused that effect over a period of some two decades. Once petitioners decided, as respondents allege, to reduce output and raise prices in the Japanese market, they had the option of either producing fewer goods or selling more goods in other markets. The most plausible conclusion is that petitioners chose the latter option because it would be more profitable than the former. That choice does not flow from the cartelization of the Japanese market. On the contrary, were the Japanese market perfectly competitive petitioners would still have to choose whether to sell goods overseas, and would still presumably make that choice based on their profit expectations. For this reason, respondents' theory of recovery depends on proof of the asserted price-cutting conspiracy in this country.

**\*584** Respondents nevertheless argue that these supposed conspiracies, if not themselves grounds for recovery of antitrust damages, are circumstantial evidence of another conspiracy that *is* cognizable: a conspiracy to monopolize the American

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 8

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

market by means of pricing below the market
level.FN7 The thrust of respondents' argument is
that petitioners used their monopoly profits from
the Japanese market to fund a concerted campaign
to price predatorily and thereby drive respondents
and other American manufacturers of CEPs out of
business. Once successful, according to respond-
ents, petitioners would cartelize the American CEP
market, restricting output and raising prices above
the level that fair competition would produce. The
resulting **1355 monopoly profits, respondents
contend, would more than compensate petitioners
for the losses they incurred through years of pricing
below market level.

> FN7. Respondents also argue that the
> check prices, the five company rule, and
> the price fixing in Japan are all part of one
> large conspiracy that includes monopoliza-
> tion of the American market through pred-
> atory pricing. The argument is mistaken.
> However one decides to describe the con-
> tours of the asserted conspiracy-whether
> there is one conspiracy or several-re-
> spondents must show that the conspiracy
> caused them an injury for which the anti-
> trust laws provide relief. *Associated Gen-
> eral Contractors of California, Inc. v. Car-
> penters,* 459 U.S. 519, 538-540, 103 S.Ct.
> 897, 908-909, 74 L.Ed.2d 723 (1983);
> *Brunswick Corp. v. Pueblo Bowl-O-Mat,
> Inc.,* 429 U.S. 477, 488-489, 97 S.Ct. 690,
> 697, 50 L.Ed.2d 701 (1977); see also Note,
> Antitrust Standing, Antitrust Injury, and
> the Per Se Standard, 93 Yale L.J. 1309
> (1984). That showing depends in turn on
> proof that petitioners conspired to price
> predatorily in the American market, since
> the other conduct involved in the alleged
> conspiracy cannot have caused such an in-
> jury.

The Court of Appeals found that respondents'
allegation of a horizontal conspiracy to engage in
predatory pricing,FN8 *585 if proved,FN9 would
be a *per se* violation of § 1 of the Sherman Act. 723
F.2d, at 306. Petitioners did not appeal from that

conclusion. The issue in this case thus becomes
whether respondents adduced sufficient evidence in
support of their theory to survive summary judg-
ment. We therefore examine the principles that
govern the summary judgment determination.

> FN8. Throughout this opinion, we refer to
> the asserted conspiracy as one to price
> "predatorily." This term has been used
> chiefly in cases in which a single firm,
> having a dominant share of the relevant
> market, cuts its prices in order to force
> competitors out of the market, or perhaps
> to deter potential entrants from coming in.
> *E.g., Southern Pacific Communications
> Co. v. American Telephone & Telegraph
> Co.,* 238 U.S.App.D.C. 309, 331-336, 740
> F.2d 980, 1002-1007 (1984), cert. denied,
> 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d
> 380 (1985). In such cases, "predatory pri-
> cing" means pricing below some appropri-
> ate measure of cost. *E.g., Barry Wright
> Corp. v. ITT Grinnell Corp.,* 724 F.2d 227,
> 232-235 (CA1 1983); see *Utah Pie Co. v.
> Continental Baking Co.,* 386 U.S. 685,
> 698, 701, 702, n. 14, 87 S.Ct. 1326, 1333,
> 1335, 1336, n. 14, 18 L.Ed.2d 406 (1967).

There is a good deal of debate, both in the
cases and in the law reviews, about what "cost" is
relevant in such cases. We need not resolve this de-
bate here, because unlike the cases cited above, this
is a Sherman Act § 1 case. For purposes of this
case, it is enough to note that respondents have not
suffered an antitrust injury unless petitioners con-
spired to drive respondents out of the relevant mar-
kets by (i) pricing below the level necessary to sell
their products, or (ii) pricing below some appropri-
ate measure of cost. An agreement without these
features would either leave respondents in the same
position as would market forces or would actually
benefit respondents by raising market prices. Re-
spondents therefore may not complain of conspir-
acies that, for example, set maximum prices above
market levels, or that set minimum prices at *any*
level.

> FN9. We do not consider whether recovery

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

should *ever* be available on a theory such as respondents' when the pricing in question is above some measure of incremental cost. See generally Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697, 709-718 (1975) (discussing cost-based test for use in § 2 cases). As a practical matter, it may be that only direct evidence of below-cost pricing is sufficient to overcome the strong inference that rational businesses would not enter into conspiracies such as this one. See Part IV-A, *infra.*

### III

[3] To survive petitioners' motion for summary judgment,[FN10] respondents must establish that there is a genuine issue of material fact *586 as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury. Fed.Rule Civ.Proc. 56(e);[FN11] *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). This showing has two components. First, respondents must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct. Respondents charge petitioners with a whole host of conspiracies in restraint of trade. *Supra,* at 1354. Except for the alleged conspiracy to monopolize the American market through predatory pricing, these alleged conspiracies could not have caused respondents to suffer an "antitrust injury," **1356 *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S., at 489, 97 S.Ct., at 697, because they actually tended to benefit respondents. *Supra,* at 1354. Therefore, unless, in context, evidence of these "other" conspiracies raises a genuine issue concerning the existence of a predatory pricing conspiracy, that evidence cannot defeat petitioners' summary judgment motion.

FN10. Respondents argued before the District Court that petitioners had failed to carry their initial burden under Federal

Rule of Civil Procedure 56(c) of demonstrating the absence of a genuine issue of material fact. See *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Cf. *Catrett v. Johns-Manville Sales Corp.,* 244 U.S.App.D.C. 160, 756 F.2d 181,cert. granted, 474 U.S. 944, 106 S.Ct. 342, 88 L.Ed.2d 285 (1985). That issue was resolved in petitioners' favor, and is not before us.

FN11. Rule 56(e) provides, in relevant part:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

Second, the issue of fact must be "genuine." Fed.Rules Civ.Proc. 56(c), (e). When the moving party has carried its burden under Rule 56(c),[FN12] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. See *DeLuca v. Atlantic Refining Co.,* 176 F.2d 421, 423 (CA2 1949) (L. Hand, J.), cert. denied, 338 U.S. 943, 70 S.Ct. 423, 94 L.Ed. 581 (1950); 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727 (1983); Clark, Special Problems**587 in Drafting and Interpreting Procedural Codes and Rules, 3 Vand.L.Rev. 493, 504-505 (1950). Cf. *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Fed.Rule Civ.Proc. 56(e) (emphasis added). See also Advisory Committee Note to 1963 Amendment of Fed.Rule Civ.Proc. 56(e), 28 U.S.C.App., p. 626 (purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for tri-

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

al"). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Cities Service, supra,* 391 U.S., at 289, 88 S.Ct., at 1592.

FN12. See n. 10, *supra.*

It follows from these settled principles that if the factual context renders respondents' claim implausible-if the claim is one that simply makes no economic sense-respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary. *Cities Service* is instructive. The issue in that case was whether proof of the defendant's refusal to deal with the plaintiff supported an inference that the defendant willingly had joined an illegal boycott. Economic factors strongly suggested that the defendant had no motive to join the alleged conspiracy. 391 U.S., at 278-279, 88 S.Ct., at 1587. The Court acknowledged that, in isolation, the defendant's refusal to deal might well have sufficed to create a triable issue. *Id.,* at 277, 88 S.Ct., at 1586. But the refusal to deal had to be evaluated in its factual context. Since the defendant lacked any rational motive to join the alleged boycott, and since its refusal to deal was consistent with the defendant's independent interest, the refusal to deal could not by itself support a finding of antitrust liability. *Id.,* at 280, 88 S.Ct., at 1588.

[4] Respondents correctly note that "[o]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 *588 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.,* at 764, 104 S.Ct., at 1470. See also *Cities Service, supra,* 391 U.S., at 280, 88 S.Ct., at

1588. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. 465 U.S., at 764, 104 S.Ct., at 1471. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that **1357 could not have harmed respondents. See *Cities Service, supra,* 391 U.S., at 280, 88 S.Ct., at 1588.

Petitioners argue that these principles apply fully to this case. According to petitioners, the alleged conspiracy is one that is economically irrational and practically infeasible. Consequently, petitioners contend, they had no motive to engage in the alleged predatory pricing conspiracy; indeed, they had a strong motive *not* to conspire in the manner respondents allege. Petitioners argue that, in light of the absence of any apparent motive and the ambiguous nature of the evidence of conspiracy, no trier of fact reasonably could find that the conspiracy with which petitioners are charged actually existed. This argument requires us to consider the nature of the alleged conspiracy and the practical obstacles to its implementation.

IV

A

A predatory pricing conspiracy is by nature speculative. Any agreement to price below the competitive level requires the conspirators to forgo profits that free competition would offer them. The forgone profits may be considered an investment in the future. For the investment to be rational, *589 the conspirators must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered. As then-Professor Bork, discussing predatory pricing by a single firm, explained:

"Any realistic theory of predation recognizes

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

that the predator as well as his victims will incur losses during the fighting, but such a theory supposes it may be a rational calculation for the predator to view the losses as an investment in future monopoly profits (where rivals are to be killed) or in future undisturbed profits (where rivals are to be disciplined). The future flow of profits, appropriately discounted, must then exceed the present size of the losses." R. Bork, The Antitrust Paradox 145 (1978).

See also McGee, Predatory Pricing Revisited, 23 J.Law & Econ. 289, 295-297 (1980). As this explanation shows, the success of such schemes is inherently uncertain: the short-run loss is definite, but the long-run gain depends on successfully neutralizing the competition. Moreover, it is not enough simply to achieve monopoly power, as monopoly pricing may breed quick entry by new competitors eager to share in the excess profits. The success of any predatory scheme depends on *maintaining* monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain. Absent some assurance that the hoped-for monopoly will materialize, *and* that it can be sustained for a significant period of time, "[t]he predator must make a substantial investment with no assurance that it will pay off." Easterbrook, Predatory Strategies and Counterstrategies, 48 U.Chi.L.Rev. 263, 268 (1981). For this reason, there is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful. See, *e.g.,* Bork, *supra,* at 149-155; Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697, 699 (1975); Easterbrook, *supra;* Koller, The Myth of Predatory Pricing-An Empirical Study, **\*590** 4 Antitrust Law & Econ.Rev. 105 (1971); McGee, Predatory Price Cutting: The *Standard Oil (N.J.) Case,* 1 J.Law & Econ. 137 (1958); McGee, Predatory Pricing Revisited, 23 J.Law & Econ., at 292-294. See also *Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76, 88 (CA2 1981) ("[N]owhere in the recent outpouring of literature on the subject do commentators suggest that [predatory] pricing is either common or likely to increase"), cert. denied,

455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982).

These observations apply even to predatory pricing by a *single firm* seeking monopoly power. In this case, respondents allege that a large number of firms have conspired over a period of many years to **\*\*1358** charge below-market prices in order to stifle competition. Such a conspiracy is incalculably more difficult to execute than an analogous plan undertaken by a single predator. The conspirators must allocate the losses to be sustained during the conspiracy's operation, and must also allocate any gains to be realized from its success. Precisely because success is speculative and depends on a willingness to endure losses for an indefinite period, each conspirator has a strong incentive to cheat, letting its partners suffer the losses necessary to destroy the competition while sharing in any gains if the conspiracy succeeds. The necessary allocation is therefore difficult to accomplish. Yet if conspirators cheat to any substantial extent, the conspiracy must fail, because its success depends on depressing the market price for *all* buyers of CEPs. If there are too few goods at the artificially low price to satisfy demand, the would-be victims of the conspiracy can continue to sell at the "real" market price, and the conspirators suffer losses to little purpose.

Finally, if predatory pricing conspiracies are generally unlikely to occur, they are especially so where, as here, the prospects of attaining monopoly power seem slight. In order to recoup their losses, petitioners must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits**\*591** what they earlier gave up in below-cost prices. See *Northeastern Telephone Co. v. American Telephone & Telegraph Co., supra,* at 89; Areeda & Turner, 88 Harv.L.Rev., at 698. Two decades after their conspiracy is alleged to have commenced,[FN13] petitioners appear to be far from achieving this goal: the two largest shares of the retail market in television sets are held by RCA and respondent Zenith, not by any of petitioners. 6 App. to Brief for Appellant in No. 81-2331 (CA3), pp. 2575a-2576a. Moreover, those shares, which to-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1348
475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

gether approximate 40% of sales, did not decline appreciably during the 1970's. *Ibid.* Petitioners' collective share rose rapidly during this period, from one-fifth or less of the relevant markets to close to 50%. 723 F.2d, at 316.[FN14] Neither the District Court nor the Court of Appeals found, however, that petitioners' share presently allows them to charge monopoly prices; to the contrary, respondents contend that the conspiracy is ongoing-that petitioners are still artificially *depressing* the market price in order to drive Zenith out of the market. The data in the record strongly suggest that that goal is yet far distant.[FN15]

> FN13. NUE's complaint alleges that petitioners' conspiracy began as early as 1960; the starting date used in Zenith's complaint is 1953. NUE Complaint ¶ 52; Zenith Complaint ¶ 39.

> FN14. During the same period, the number of American firms manufacturing television sets declined from 19 to 13. 5 App. to Brief for Appellant in No. 81-2331 (CA3), p. 1961a. This decline continued a trend that began at least by 1960, when petitioners' sales in the United States market were negligible. *Ibid.* See Zenith Complaint ¶¶ 35, 37.

> FN15. Respondents offer no reason to suppose that entry into the relevant market is especially difficult, yet without barriers to entry it would presumably be impossible to maintain supracompetitive prices for an extended time. Judge Easterbrook, commenting on this case in a law review article, offers the following sensible assessment:

"The plaintiffs [in this case] maintain that for the last fifteen years or more at least ten Japanese manufacturers have sold TV sets at less than cost in order to drive United States firms out of business. Such conduct cannot possibly produce profits by harming competition, however. If the Japanese firms drive some United States firms out of business, they could not recoup. Fifteen years of losses

could be made up only by very high prices for the indefinite future. (The losses are like investments, which must be recovered with compound interest.) If the defendants should try to raise prices to such a level, they would attract new competition. There are no barriers to entry into electronics, as the proliferation of computer and audio firms shows. The competition would come from resurgent United States firms, from other foreign firms (Korea and many other nations make TV sets), and from defendants themselves. In order to recoup, the Japanese firms would need to suppress competition among themselves. On plaintiffs' theory, the cartel would need to last at least thirty years, far longer than any in history, even when cartels were not illegal. None should be sanguine about the prospects of such a cartel, given each firm's incentive to shave price and expand its share of sales. The predation-recoupment story therefore does not make sense, and we are left with the more plausible inference that the Japanese firms did not sell below cost in the first place. They were just engaged in hard competition." Easterbrook, The Limits of Antitrust, 63 Texas L.Rev. 1, 26-27 (1984) (footnotes omitted).

**\*592 \*\*1359** The alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not in fact exist. Since the losses in such a conspiracy accrue before the gains, they must be "repaid" with interest. And because the alleged losses have accrued over the course of two decades, the conspirators could well require a correspondingly long time to recoup. Maintaining supracompetitive prices in turn depends on the continued cooperation of the conspirators, on the inability of other would-be competitors to enter the market, and (not incidentally) on the conspirators' ability to escape antitrust liability for their *minimum* price-fixing cartel.[FN16] Each of these factors weighs more heavily as the time needed to recoup losses grows. If the losses have been substantial-as would likely be necessary **\*593** in order to drive out the competition[FN17] -petitioners would most likely have to sustain their cartel for years simply to break even.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

FN16. The alleged predatory scheme makes sense only if petitioners can recoup their losses. In light of the large number of firms involved here, petitioners can achieve this only by engaging in some form of price fixing *after* they have succeeded in driving competitors from the market. Such price fixing would, of course, be an independent violation of § 1 of the Sherman Act. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

FN17. The predators' losses must actually *increase* as the conspiracy nears its objective: the greater the predators' market share, the more products the predators sell; but since every sale brings with it a loss, an increase in market share also means an increase in predatory losses.

Nor does the possibility that petitioners have obtained supracompetitive profits in the Japanese market change this calculation. Whether or not petitioners have the *means* to sustain substantial losses in this country over a long period of time, they have no *motive* to sustain such losses absent some strong likelihood that the alleged conspiracy in this country will eventually pay off. The courts below found no evidence of any such success, and-as indicated above-the facts actually are to the contrary: RCA and Zenith, not any of the petitioners, continue to hold the largest share of the American retail market in color television sets. More important, there is nothing to suggest any relationship between petitioners' profits in Japan and the amount petitioners could expect to gain from a conspiracy to monopolize the American market. In the absence of any such evidence, the possible existence of supracompetitive profits in Japan simply cannot overcome the economic obstacles to the ultimate success of this alleged predatory conspiracy.FN18

FN18. The same is true of any supposed excess production capacity that petitioners may have possessed. The existence of plant capacity that exceeds domestic de-

mand does tend to establish the ability to sell products abroad. It does not, however, provide a motive for selling at prices lower than necessary to obtain sales; nor does it explain why petitioners would be willing to *lose* money in the United States market without some reasonable prospect of recouping their investment.

B

In *Monsanto,* we emphasized that courts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct. *Monsanto,* 465 U.S., at 762-764, 104 S.Ct., at 1470. **\*594** Respondents, petitioners' competitors, seek to hold petitioners liable for **\*\*1360** damages caused by the alleged conspiracy to cut prices. Moreover, they seek to establish this conspiracy indirectly, through evidence of other combinations (such as the check-price agreements and the five company rule) whose natural tendency is to raise prices, and through evidence of rebates and other price-cutting activities that respondents argue tend to prove a combination to suppress prices.FN19 But cutting prices in order to increase business often is the very essence of competition. Thus, mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect. See *Monsanto, supra,* at 763-764, 104 S.Ct., at 1470. "[W]e must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition." *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 234 (CA1 1983).

FN19. Respondents also rely on an expert study suggesting that petitioners have sold their products in the American market at substantial losses. The relevant study is not based on actual cost data; rather, it consists of expert opinion based on a mathematical construction that in turn rests on assumptions about petitioners' costs. The District

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

Court analyzed those assumptions in some detail and found them both implausible and inconsistent with record evidence. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp., at 1356-1363. Although the Court of Appeals reversed the District Court's finding that the expert report was inadmissible, the court did not disturb the District Court's analysis of the factors that substantially undermine the probative value of that evidence. See 723 F.2d, at 277-282. We find the District Court's analysis persuasive. Accordingly, in our view the expert opinion evidence of below-cost pricing has little probative value in comparison with the economic factors, discussed in Part IV-A, *supra,* that suggest that such conduct is irrational.

In most cases, this concern must be balanced against the desire that illegal conspiracies be identified and punished. That balance is, however, unusually one-sided in cases such as this one. As we earlier explained, *supra,* at 1357-1359, predatory pricing schemes require conspirators to suffer losses in order eventually to realize their illegal gains; moreover, the *595 gains depend on a host of uncertainties, making such schemes more likely to fail than to succeed. These economic realities tend to make predatory pricing conspiracies self-deterring: unlike most other conduct that violates the antitrust laws, failed predatory pricing schemes are costly to the conspirators. See Easterbrook, The Limits of Antitrust, 63 Texas L.Rev. 1, 26 (1984). Finally, unlike predatory pricing by a single firm, *successful* predatory pricing conspiracies involving a large number of firms can be identified and punished once they succeed, since some form of minimum price-fixing agreement would be necessary in order to reap the benefits of predation. Thus, there is little reason to be concerned that by granting summary judgment in cases where the evidence of conspiracy is speculative or ambiguous, courts will encourage such conspiracies.

V

As our discussion in Part IV-A shows, petitioners had no motive to enter into the alleged conspiracy. To the contrary, as presumably rational businesses, petitioners had every incentive *not* to engage in the conduct with which they are charged, for its likely effect would be to generate losses for petitioners with no corresponding gains. Cf. *Cities Service,* 391 U.S., at 279, 88 S.Ct., at 1587. The Court of Appeals did not take account of the absence of a plausible motive to enter into the alleged predatory pricing conspiracy. It focused instead on whether there was "direct evidence of concert of action." 723 F.2d, at 304. The Court of Appeals erred in two respects: (i) the "direct evidence" on which the court relied had little, if any, relevance to the alleged predatory pricing conspiracy; and (ii) the court failed to consider the absence of a plausible motive to engage in predatory pricing.

**1361 The "direct evidence" on which the court relied was evidence of *other* combinations, not of a predatory pricing conspiracy. Evidence that petitioners conspired to raise prices in Japan provides little, if any, support for respondents' *596 claims: a conspiracy to increase profits in one market does not tend to show a conspiracy to sustain losses in another. Evidence that petitioners agreed to fix *minimum* prices (through the check-price agreements) for the American market actually works in petitioners' favor, because it suggests that petitioners were seeking to place a floor under prices rather than to lower them. The same is true of evidence that petitioners agreed to limit the number of distributors of their products in the American market-the so-called five company rule. That practice may have facilitated a horizontal territorial allocation, see *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), but its natural effect would be to raise market prices rather than reduce them.[FN20] Evidence that tends to support any of these collateral conspiracies thus says little, if anything, about the existence of a conspiracy to charge below-market prices in the American market over a period of two decades.

FN20. The Court of Appeals correctly

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

reasoned that the five company rule might tend to insulate petitioners from competition with each other. 723 F.2d, at 306. But this effect is irrelevant to a conspiracy to price predatorily. Petitioners have no incentive to underprice each other if they already are pricing *below* the level at which they could sell their goods. The far more plausible inference from a customer allocation agreement such as the five company rule is that petitioners were conspiring to *raise* prices, by limiting their ability to take sales away from each other. Respondents-petitioners' competitors-suffer no harm from a conspiracy to raise prices. *Supra,* at 1354. Moreover, it seems very unlikely that the five company rule had any significant effect of any kind, since the "rule" permitted petitioners to sell to their American subsidiaries, and did not limit the number of distributors to which the subsidiaries could resell. 513 F.Supp., at 1190.

That being the case, the absence of any plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of Rule 56(e). Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations,**597** the conduct does not give rise to an inference of conspiracy. See *Cities Service, supra,* 391 U.S., at 278-280, 88 S.Ct., at 1587-1588. Here, the conduct in question consists largely of (i) pricing at levels that succeeded in taking business away from respondents, and (ii) arrangements that may have limited petitioners' ability to compete with each other (and thus kept prices from going even lower). This conduct suggests either that petitioners behaved competitively, or that petitioners conspired to *raise* prices. Neither possibility is consistent with an agreement among 21 companies to price below-market levels. Moreover, the predatory pricing scheme that this conduct is said to prove is one that

makes no practical sense: it calls for petitioners to destroy companies larger and better established than themselves, a goal that remains far distant more than two decades after the conspiracy's birth. Even had they succeeded in obtaining their monopoly, there is nothing in the record to suggest that they could recover the losses they would need to sustain along the way. In sum, in light of the absence of any rational motive to conspire, neither petitioners' pricing practices, nor their conduct in the Japanese market, nor their agreements respecting prices and distribution in the American market, suffice to create a "genuine issue for trial." Fed.Rule Civ.Proc. 56(e).[FN21]

> FN21. We do not imply that, if petitioners had had a plausible reason to conspire, ambiguous conduct could suffice to create a triable issue of conspiracy. Our decision in *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), establishes that conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy. *Id.,* at 763-764, 104 S.Ct., at 1470. See *supra,* at 1356.

**\*\*1362** On remand, the Court of Appeals is free to consider whether there is other evidence that is sufficiently unambiguous to permit a trier of fact to find that petitioners conspired to price predatorily for two decades despite the absence of any apparent motive to do so. The evidence must "ten[d] to exclude the possibility" that petitioners underpriced respondents to compete for business rather than to implement an economically**598** senseless conspiracy. *Monsanto,* 465 U.S., at 764, 104 S.Ct., at 1471. In the absence of such evidence, there is no "genuine issue for trial" under Rule 56(e), and petitioners are entitled to have summary judgment reinstated.

## VI

Our decision makes it unnecessary to reach the sovereign compulsion issue. The heart of petition-

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

ers' argument on that issue is that MITI, an agency of the Government of Japan, required petitioners to fix minimum prices for export to the United States, and that petitioners are therefore immune from antitrust liability for any scheme of which those minimum prices were an integral part. As we discussed in Part II, *supra,* respondents could not have suffered a cognizable injury from any action that *raised* prices in the American CEP market. If liable at all, petitioners are liable for conduct that is distinct from the check-price agreements. The sovereign compulsion question that both petitioners and the Solicitor General urge us to decide thus is not presented here.

The decision of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice WHITE, with whom Justice BRENNAN, Justice BLACKMUN, and Justice STEVENS join, dissenting.

It is indeed remarkable that the Court, in the face of the long and careful opinion of the Court of Appeals, reaches the result it does. The Court of Appeals faithfully followed the relevant precedents, including *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), and *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and it kept firmly in mind the principle that proof of a conspiracy should not be fragmented, see *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962). After surveying the massive record, including very **\*599** significant evidence that the District Court erroneously had excluded, the Court of Appeals concluded that the evidence taken as a whole creates a genuine issue of fact whether petitioners engaged in a conspiracy in violation of §§ 1 and 2 of the Sherman Act and § 2(a) of the Robinson-Patman Act. In my view, the Court of Appeals' opinion more than adequately supports this judgment.

The Court's opinion today, far from identifying reversible error, only muddies the waters. In the first place, the Court makes confusing and inconsistent statements about the appropriate standard for granting summary judgment. Second, the Court makes a number of assumptions that invade the factfinder's province. Third, the Court faults the Third Circuit for nonexistent errors and remands the case although it is plain that respondents' evidence raises genuine issues of material fact.

I

The Court's initial discussion of summary judgment standards appears consistent with settled doctrine. I agree that **\*\*1363** "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Ante,* at 1356 (quoting *Cities Service, supra,* 391 U.S., at 289, 88 S.Ct., at 1592). I also agree that " '[o]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Ante,* at 1356 (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). But other language in the Court's opinion suggests a departure from traditional summary judgment doctrine. Thus, the Court gives the following critique of the Third Circuit's opinion:

"[T]he Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, which conspiracy was funded by excess profits obtained in the Japanese market. The court apparently did not consider whether it was as plausible to conclude **\*600** that petitioners' price-cutting behavior was independent and not conspiratorial." *Ante,* at 1353.

In a similar vein, the Court summarizes *Monsanto Co. v. Spray-Rite Service Corp., supra,* as holding that "courts should not permit factfinders to infer conspiracies when such inferences are implausible...." *Ante,* at 1360. Such language suggests that a judge hearing a defendant's motion for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

summary judgment in an antitrust case should go beyond the traditional summary judgment inquiry and decide for himself whether the weight of the evidence favors the plaintiff. *Cities Service* and *Monsanto* do not stand for any such proposition. Each of those cases simply held that a particular piece of evidence standing alone was insufficiently probative to justify sending a case to the jury.[FN1] These holdings in no way undermine**601** the doctrine that all evidence must be construed in the light most favorable to the party opposing summary judgment.

> FN1. The Court adequately summarizes the quite fact-specific holding in *Cities Service. Ante,* at 1356.

In *Monsanto,* the Court held that a manufacturer's termination of a price-cutting distributor after receiving a complaint from another distributor is not, *standing alone,* sufficient to create a jury question. 465 U.S., at 763-764, 104 S.Ct., at 1470. To understand this holding, it is important to realize that under *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), it is permissible for a manufacturer to announce retail prices in advance and terminate those who fail to comply, but that under *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), it is impermissible for the manufacturer and its distributors to agree on the price at which the distributors will sell the goods. Thus, a manufacturer's termination of a price-cutting distributor after receiving a complaint from another distributor is lawful under *Colgate, unless* the termination is pursuant to a shared understanding between the manufacturer and its distributors respecting enforcement of a resale price maintenance scheme. *Monsanto* holds that to establish liability under *Dr. Miles,* more is needed than evidence of behavior that is consistent with a distributor's exercise of its prerogatives under *Colgate.* Thus, "[t]here must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." 465 U.S., at 764, 104 S.Ct., at 1471. *Monsanto* does *not* hold that if a terminated dealer produces some further evidence of conspiracy beyond the bare fact of

postcomplaint termination, the judge hearing a motion for summary judgment should balance all the evidence pointing toward conspiracy against all the evidence pointing toward independent action.

If the Court intends to give every judge hearing a motion for summary judgment in an antitrust case the job of determining if the evidence makes the inference of conspiracy more probable than not, it is overturning settled law. If the Court does not intend such a pronouncement, it should refrain from using unnecessarily broad and confusing language.

II

In defining what respondents must show in order to recover, the Court makes assumptions**1364** that invade the factfinder's province. The Court states with very little discussion that respondents can recover under § 1 of the Sherman Act only if they prove that "petitioners conspired to drive respondents out of the relevant markets by (i) pricing below the level necessary to sell their products, or (ii) pricing below some appropriate measure of cost." *Ante,* at 1355, n. 8. This statement is premised on the assumption that "[a]n agreement without these features would either leave respondents in the same position as would market forces or would actually benefit respondents by raising market prices." *Ibid.* In making this assumption, the Court ignores the contrary conclusions of respondents' expert DePodwin, whose report in very relevant part was erroneously excluded by the District Court.

The DePodwin Report, on which the Court of Appeals relied along with other material, indicates that respondents were harmed in two ways that are independent of whether petitioners priced their products below "the level necessary to sell their products or ... some appropriate measure of cost." *Ibid.* First, the Report explains that the price-raising scheme in Japan resulted in lower consumption of petitioners' goods in that country and the exporting of more of petitioners' goods to this country than would have occurred had prices in Japan been at the competitive level. Increasing exports **602** to this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 18

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

country resulted in depressed prices here, which harmed respondents.[FN2] Second, the DePodwin Report indicates that petitioners exchanged confidential proprietary information and entered into agreements such as the five company rule with the goal of avoiding intragroup competition in the United States market. The Report explains that petitioners' restrictions on intragroup competition caused respondents to lose business that they would not have lost had petitioners competed with one another.[FN3]

> FN2. Dr. DePodwin summarizes his view of the harm caused by Japanese cartelization as follows:

"When we consider the injuries inflicted on United States producers, we must again look at the Japanese television manufacturers' export agreement as part of a generally collusive scheme embracing the Japanese domestic market as well. This scheme increased the supply of television receivers to the United States market while restricting supply in the Japanese market. If Japanese manufacturers had competed in both domestic and export markets, they would have sold more in the domestic market and less in the United States. A greater proportion of Japanese production capacity would have been devoted to domestic sales. Domestic prices would have been lower and export prices would have been higher. The size of the price differential between domestic and export markets would have diminished practically to the vanishing point. Consequently, competition among Japanese producers in both markets would have resulted in reducing exports to the United States and United States prices would have risen. In addition, investment by the United States industry would have increased. As it was, however, the influx of sets at depressed prices cut the rates of return on television receiver production facilities in the United States to so low a level as to make such investment uneconomic.

"We can therefore conclude that the American manufacturers of television receivers would have made larger sales at higher prices in the absence of the Japanese cartel agreements. Thus, the collusive behavior of Japanese television manufacturers resulted in a very severe injury to those American tele-

vision manufacturers, particularly to National Union Electric Corporation, which produced a preponderance of television sets with screen sizes of nineteen inches and lower, especially those in the lower range of prices." 5 App. to Brief for Appellants in No. 81-2331 (CA3), pp. 1629a-1630a.

> FN3. The DePodwin Report has this, among other things, to say in summarizing the harm to respondents caused by the five company rule, exchange of production data, price coordination, and other allegedly anti-competitive practices of petitioners:

"The impact of Japanese anti-competitive practices on United States manufacturers is evident when one considers the nature of competition. When a market is fully competitive, firms pit their resources against one another in an attempt to secure the business of individual customers. However, when firms collude, they violate a basic tenet of competitive behavior, i.e., that they act independently. United States firms were confronted with Japanese competitors who collusively were seeking to destroy their established customer relationships. Each Japanese company had targeted customers which it could service with reasonable assurance that its fellow Japanese cartel members would not become involved. But just as importantly, each Japanese firm would be assured that what was already a low price level for Japanese television receivers in the United States market would not be further depressed by the actions of its Japanese associates.

"The result was a phenomenal growth in exports, particularly to the United States. Concurrently, Japanese manufacturers, and the defendants in particular, made large investments in new plant and equipment and expanded production capacity. It is obvious, therefore, that the effect of the Japanese cartel's concerted actions was to generate a larger volume of investment in the Japanese television industry than would otherwise have been the case. This added capacity both enabled and encouraged the Japanese to penetrate the United States market more deeply than they would have had they competed lawfully." *Id.,* at 1628a-1629a.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1348
475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

For a more complete statement of DePodwin's explanation of how the alleged cartel operated, and the harms it caused respondents, see *id.,* at 1609a-1642a. This material is summarized in a chart found *id.,* at 1633a.

**\*603 \*\*1365** The DePodwin Report alone creates a genuine factual issue regarding the harm to respondents caused by Japanese cartelization and by agreements restricting competition among petitioners in this country. No doubt the Court prefers its own economic theorizing to Dr. DePodwin's, but that is not a reason to deny the factfinder an opportunity to consider Dr. DePodwin's views on how petitioners' alleged collusion harmed respondents.FN4

> FN4. In holding that Parts IV and V of the Report had been improperly excluded, the Court of Appeals said:
> "The trial court found that DePodwin did not use economic expertise in reaching the opinion that the defendants participated in a Japanese television cartel. 505 F.Supp. at 1342-46. We have examined the excluded portions of Parts IV and V in light of the admitted portions, and we conclude that this finding is clearly erroneous. As a result, the court also held the opinions to be unhelpful to the factfinder. What the court in effect did was to eliminate all parts of the report in which the expert economist, after describing the conditions in the respective markets, the opportunities for collusion, the evidence pointing to collusion, the terms of certain undisputed agreements, and the market behavior, expressed the opinion that there was concert of action consistent with plaintiffs' conspiracy theory. Considering the complexity of the economic issues involved, it simply cannot be said that such an opinion would not help the trier of fact to understand the evidence or determine that fact in issue." *In re Japanese Electronics Products Antitrust Litigation,* 723 F.2d 238, 280 (CA3 1983).

The Court of Appeals had similar views about Parts VI and VII.

**\*604** The Court, in discussing the unlikelihood of a predatory conspiracy, also consistently as-

sumes that petitioners valued profit-maximization over growth. See, *e.g., ante,* at 1360. In light of the evidence that petitioners sold their goods in this country at substantial losses over a long period of time, see Part III-B, *infra,* I believe that this is an assumption that should be argued to the factfinder, not decided by the Court.

### III

In reversing the Third Circuit's judgment, the Court identifies two alleged errors: "(i) [T]he 'direct evidence' on which the [Court of Appeals] relied had little, if any, relevance to the alleged predatory pricing conspiracy; and (ii) the court failed to consider the absence of a plausible motive to engage in predatory pricing." *Ante,* at 1361. The Court's position is without substance.

### A

The first claim of error is that the Third Circuit treated evidence regarding price fixing in Japan and the so-called five company rule and check prices as " 'direct evidence' of a conspiracy that injured respondents." *Ante,* at 1354 (citing *In re Japanese Electronics Products Antitrust Litigation,* 723 F.2d 238, 304-305 (CA3 1983)). The passage from the Third **\*605** Circuit's opinion in which the Court locates this alleged error makes what I consider to be a quite simple and correct observation, namely, that this case is distinguishable from traditional "conscious parallelism" cases, in that there is direct evidence of concert of action among petitioners. *Ibid.* The Third Circuit did not, as the Court implies, jump unthinkingly from this observation to the conclusion that evidence regarding the five company rule could support a finding of antitrust injury to respondents.FN5 The Third **\*\*1366** Circuit twice specifically noted that horizontal agreements allocating customers, though illegal, do not ordinarily injure competitors of the agreeing parties. *Id.,* at 306, 310-311. However, after reviewing evidence of cartel activity in Japan, collusive establishment of dumping prices in this country, and long-term, below-cost sales, the Third Circuit

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368

**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

held that a factfinder could reasonably conclude that the five company rule was not a simple price-raising device:

> FN5. I use the Third Circuit's analysis of the five company rule by way of example; the court did an equally careful analysis of the parts the cartel activity in Japan and the check prices could have played in an actionable conspiracy. See generally *id.,* at 303-311.

In discussing the five-company rule, I do not mean to imply any conclusion on the validity of petitioners' sovereign compulsion defense. Since the Court does not reach this issue, I see no need of my addressing it.

"[A] factfinder might reasonably infer that the allocation of customers in the United States, combined with price-fixing in Japan, was intended to permit concentration of the effects of dumping upon American competitors while eliminating competition among the Japanese manufacturers in either market." *Id.,* at 311.

I see nothing erroneous in this reasoning.

### B

The Court's second charge of error is that the Third Circuit was not sufficiently skeptical of respondents' allegation that petitioners engaged in predatory pricing conspiracy. But **\*606** the Third Circuit is not required to engage in academic discussions about predation; it is required to decide whether respondents' evidence creates a genuine issue of material fact. The Third Circuit did its job, and remanding the case so that it can do the same job again is simply pointless.

The Third Circuit indicated that it considers respondents' evidence sufficient to create a genuine factual issue regarding long-term, below-cost sales by petitioners. *Ibid.* The Court tries to whittle away at this conclusion by suggesting that the "expert opinion evidence of below-cost pricing has little probative value in comparison with the economic factors ... that suggest that such conduct is irration-

al." *Ante,* at 1360, n. 19. But the question is not whether the Court finds respondents' experts persuasive, or prefers the District Court's analysis; it is whether, viewing the evidence in the light most favorable to respondents, a jury or other factfinder could reasonably conclude that petitioners engaged in long-term, below-cost sales. I agree with the Third Circuit that the answer to this question is "yes."

It is misleading for the Court to state that the Court of Appeals "did not disturb the District Court's analysis of the factors that substantially undermine the probative value of [evidence in the DePodwin Report respecting below-cost sales]." *Ibid.* The Third Circuit held that the exclusion of the portion of the DePodwin Report regarding below-cost pricing was erroneous because "the trial court ignored DePodwin's uncontradicted affidavit that all data relied on in his report were of the type on which experts in his field would reasonably rely." 723 F.2d, at 282. In short, the Third Circuit found DePodwin's affidavit sufficient to create a genuine factual issue regarding the correctness of his conclusion that petitioners sold below cost over a long period of time. Having made this determination, the court saw no need-nor do I-to address the District Court's analysis point by point. The District Court's criticisms of DePodwin's**\*607** methods are arguments that a factfinder should consider.

### IV

Because I believe that the Third Circuit was correct in holding that respondents have demonstrated the existence of genuine issues of material fact, I would affirm **\*\*1367** the judgment below and remand this case for trial.

U.S.Pa.,1986.
Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.
475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112    Page 1

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187

**(Cite as: 2 F.3d 1112)**

Fitzpatrick v. City of Atlanta

C.A.11 (Ga.),1993.

United States Court of Appeals, Eleventh Circuit.
Walter FITZPATRICK, Wayne E. Hall, William J. Hutchinson, Thomas Jones, Darryl J. Levette, Miguelito Marcelli, Andre D. Mitchell, Dennis Bernard Thomas, Melvin Whitehead, Gregory Wilkinson, Alfonzo L. Williams, and Elton M. Worthy, Plaintiffs-Appellants,
v.
CITY OF ATLANTA, Defendant-Appellee.
**No. 92-8306.**

Sept. 27, 1993.

African-American fire fighters who suffered from bacterial disorder precluding their shaving their faces brought suit challenging fire department regulation requiring all fire fighters be clean shaven. Plaintiffs alleged that "no-beard" rule had a discriminatory disparate impact on African-Americans who suffer disproportionately from the disorder, and that rule was adopted for racially discriminatory reasons. Plaintiffs also asserted that rule discriminated against the handicapped in violation of the Rehabilitation Act. The United States District Court for the Northern District of Georgia, No. 1:89-cv-2917-RLV, Robert L. Vining, Jr., J., entered summary judgment in favor of city, and plaintiffs appealed. The Court of Appeals, Anderson, Circuit Judge, held that: (1) city's evidence concerning safe use of respirators established business necessity defense to claim that no-beard rule had disparate impact; (2) with respect to disparate treatment claim, plaintiffs failed to establish that safety justification for no-beard rule was a pretext for racial discrimination; and (3) city could not be held liable under the Rehabilitation Act in absence of evidence that an adequate reasonable accommodation was available.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ⌘1140**

78 Civil Rights
    78II Employment Practices
        78k1140 k. Disparate Impact. Most Cited Cases
    (Formerly 78k153)
In order to establish Title VII liability for employer's nondiscriminatory actions or practices that have discriminatory effects, plaintiff must first demonstrate that challenged employment action or practice has a disproportionate adverse impact on category of persons protected by statute; once prima facie case has been made out, employer must show that challenged action was demonstrably necessary to meeting goal of the sort that, as a matter of law, qualifies as an important business goal for Title VII purposes. Civil Rights Act of 1964, § 703, as amended, 42 U.S.C.A. § 2000e-2.

**[2] Civil Rights 78 ⌘1140**

78 Civil Rights
    78II Employment Practices
        78k1140 k. Disparate Impact. Most Cited Cases
    (Formerly 78k153)
Upon a showing of "business necessity" by employer in a Title VII action based on discriminatory effects of nondiscriminatory actions or practices, challenged action or practice is deemed justifiable, its regrettable discriminatory effects notwithstanding; however, even after such a showing, plaintiff may still overcome proffered business necessity defense by demonstrating that there exist alternative policies with lesser discriminatory effects that would be comparably as effective at serving employer's identified business needs. Civil Rights Act of 1964, § 703, as amended, 42 U.S.C.A. § 2000e-2.

**[3] Civil Rights 78 ⌘1544**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187

**(Cite as: 2 F.3d 1112)**

78k1543 Weight and Sufficiency of Evidence
78k1544 k. In General. Most Cited Cases
(Formerly 78k382.1)

Evidence presented by city established "business necessity" defense to claim by African-American fire fighters that regulation requiring that all male fire fighters be clean-shaved had discriminatory impact; city's allegation that safe use of respirators precluded facial hair that could interfere with forming a proper seal was supported by Occupational Safety and Health Administration (OSHA) regulation and by recommendations of three national organizations that set occupational safety and health standards. Civil Rights Act of 1964, § 703, as amended, 42 U.S.C.A. § 2000e-2.

**[4] Civil Rights 78 ☜1140**

78 Civil Rights
78II Employment Practices
78k1140 k. Disparate Impact. Most Cited Cases
(Formerly 78k153)

African-American fire fighters who brought suit alleging that fire department rule requiring fire fighters to be clean-shaven had discriminatory disparate impact on African-Americans in violation of Title VII failed to show availability of less discriminatory alternative that would satisfy safety concerns in connection with use of respirators; although plaintiffs, who suffered from bacterial disorder that precluded shaving, proposed allowing very short "shadow" beards, plaintiffs failed to establish that shadow beards were safe; plaintiffs also failed to show that partial shaving would be a viable and safe alternative. Civil Rights Act of 1964, § 703, as amended, 42 U.S.C.A. § 2000e-2.

**[5] Civil Rights 78 ☜1140**

78 Civil Rights
78II Employment Practices
78k1140 k. Disparate Impact. Most Cited Cases
(Formerly 78k153)

African-American fire fighters who brought Title VII disparate impact claim against city alleging that

fire department regulation requiring all fire fighters be clean-shaven was adopted for purpose of removing from fire department group of African-American men who suffered from bacterial disorder which precluded their shaving failed to establish that city's proffered safety justification was a pretext for racial discrimination, based on fact that "no-beard" rule required for safe wearing of respirators was underinclusive in not banning wearing of respirators by persons with other hazardous facial conditions. Civil Rights Act of 1964, § 703, as amended, 42 U.S.C.A. § 2000e-2.

**[6] Civil Rights 78 ☜1218(4)**

78 Civil Rights
78II Employment Practices
78k1215 Discrimination by Reason of Handicap, Disability, or Illness
78k1218 Who Is Disabled; What Is Disability
78k1218(4) k. Employment Qualifications, Requirements, or Tests. Most Cited Cases
(Formerly 78k173.1)

**Civil Rights 78 ☜1225(3)**

78 Civil Rights
78II Employment Practices
78k1215 Discrimination by Reason of Handicap, Disability, or Illness
78k1225 Accommodations
78k1225(3) k. Particular Cases. Most Cited Cases
(Formerly 78k173.1)

Fire fighters who suffered from bacterial disorder which precluded their shaving failed to establish that fire department regulation requiring all fire fighters be clean shaven for safe use of respirators violated the Rehabilitation Act; fire fighters did not present evidence that allowing short "shadow" beards or shaving only portions of their faces that would come into contact with respirator seals constituted reasonable accommodations. Rehabilitation Act of 1973, § 504, 29 U.S.C.A. § 794.

**\*1113** Michael Weinstock, Weinstock & Scavo, Atlanta, GA, for plaintiffs-appellants.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187

**(Cite as: 2 F.3d 1112)**

Miguelito Marcelli, pro se.
Overtis Hicks Brantley, City of Atlanta Law Dept., Atlanta, GA, for defendant-appellee.
Paul Bogas, EEOC, Washington, DC, Rosalind A. Rubens, Willie Jake Lovett, Jr., Atlanta, GA, for amicus EEOC.

Appeal from the United States District Court for the Northern District of Georgia.

Before FAY and ANDERSON, Circuit Judges, and RONEY, Senior Circuit Judge.

ANDERSON, Circuit Judge:

This suit was brought against the City of Atlanta ("the City") by several African-American firefighters employed by the Atlanta Department of Public Safety, Bureau of Fire Services ("the Fire Department") who suffer from a medical condition on account of which they cannot shave their faces. Plaintiffs challenge a fire department regulation that requires all firefighters to be clean-shaven. They allege (1) that this "no-beard" rule has a discriminatory disparate impact on African-Americans in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.;* (2) that the no-beard rule was adopted for racially discriminatory reasons in violation of Title VII; (3) that the rule discriminates against the handicapped in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a); and (4) that the rule infringes the firefighters' constitutional right to substantive due process of law.[FN1] The City defends the policy, contending that the **\*1114** respirator masks used by firefighters cannot safely be worn by bearded men. The district court granted summary judgment for the City and the firefighters have appealed. For the reasons set forth below, we affirm the judgment of the district court.

> FN1. In their summary judgment papers the firefighters also stated that they were asserting a cause of action for illegal retaliation under Title VII, § 704(a), 42 U.S.C. § 2000e-3(a). They alleged that the Fire Department had retaliated against the plaintiff firefighters for their having filed this EEO

action. *See* Firefighters' Memo Opposing Summary Judgment (R-33-27-31). Although the magistrate judge and district court neglected to address this claim, we need not consider it as the firefighters have abandoned the issue, having failed to raise it in their brief on appeal.

## I. FACTS AND PROCEDURAL HISTORY

In order to breathe in smoke-filled environments, firefighters must wear respirators, otherwise known as positive pressure self-contained breathing apparatuses ("SCBA's"). For the SCBA mask to operate properly and safely, its edges must be able to seal securely to the wearer's face. The parties do not dispute that a wearer's long facial hair can interfere with the forming of a proper seal. In an attempt to address the hazard posed by such hair, the City Fire Department until 1982 enforced a policy requiring all male firefighters to be completely clean-shaven. *See* Bureau of Fire Services Standard Operating Procedure 88.9.

The twelve plaintiff-appellant firefighters in this case are all African-American men who suffer from pseudofolliculitis barbae ("PFB"), a bacterial disorder which causes men's faces to become infected if they shave them. It is generally recognized that PFB disproportionately afflicts African-American men. At least one of the appellants, firefighter Darryl Levette, has been fighting with the City over its no-beard policy for more than ten years. Levette first challenged the requirement in 1982. In response to his complaints, the City modified its policy in order to accommodate firefighters with PFB. *See* Bureau of Fire Services Standard Operating Procedure 82.5 (R-31-Exhib. 1, Attach. B).

Under the modified policy, firefighters with PFB were permitted to participate in a program known as the "shaving clinic." Shaving clinic participants were allowed to wear very short "shadow" beards, which were not to exceed length limits specified by a dermatologist employed by the City. To enforce these limits, the Fire Department subjected

Page 4

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187

**(Cite as: 2 F.3d 1112)**

the participating firefighters to a series of periodic beard inspections. It was believed that so long as the shadow beards were kept very short, the SCBA masks would still be able to seal sufficiently well to enable the firefighters to use them safely.

In 1988, after one of the appellant firefighters, William Hutchinson, complained that he had been wrongly refused permission to participate in the shaving clinic, the City decided to reconsider the shadow beard policy. On the recommendation of Del Corbin, the City's then-Assistant Commissioner of Public Safety, the Fire Department decided that shadow beards would no longer be permitted, on the grounds that even shadow beards may interfere with the safe use of SCBA's.

On November 4, 1988, the Department of Public Safety issued Special Order 3.9, directing the Fire Department to resume enforcement of Bureau of Fire Services Standard Operating Procedure 88.9, the no-beard rule. Under the new policy, firefighters who cannot be clean-shaven must be removed from firefighting duty. Such persons may be transferred to non-firefighting positions within the Department, if suitable openings are available. They may also apply for other available positions with the City but are accorded no special priority and must compete on an equal basis with other eligible candidates. Under the new policy such persons are granted the right to be temporarily reassigned from firefighting duties for a one-time period of ninety days. Dep't of Pub. Safety, Special Order 3.9 (R-33-Exhib. A). Male firefighters who cannot shave and for whom non-firefighting positions are not available within the Department are terminated, once they have exhausted their ninety days of temporary reassignment.

Firefighter Hutchinson challenged the new policy by filing a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") on December 14, 1988. In March 1989, the EEOC certified the charge as a "class" charge on behalf of all city firefighters adversely affected by the policy change. Magistrate's Report (R-43-2-3). The appellant firefighters initiated this suit on December 29,

1989. The district court issued and then extended a restraining order prohibiting the City from changing the terms or conditions**\*1115** of the plaintiff firefighters' employment during the pendency of the litigation before the district court. (R-3; R-42). The City has kept the appellant firefighters on the payroll and has permitted them to continue reporting for work at their regular fire stations, but it has required them to perform various janitorial duties instead of their regular jobs. Magistrate's Report (R-43-2-5).

The City answered the complaint and moved for summary judgment. The district court referred that motion to a magistrate judge and on November 18, 1991, adopted the magistrate's recommendation that the motion be granted. District Court Order (R-53), *adopting* Magistrate's Report (R-43). This appeal followed.

## II. SUMMARY JUDGMENT STANDARD

A. Introduction

Under Fed.R.Civ.P. 56(c), a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his [or her] favor." *U.S. v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks and citations omitted).

In *Adickes v. Kress,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the Supreme Court instructed the federal courts to employ a two-part framework of shifting burdens to determine whether, as regards a given material fact, there exists a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187

**(Cite as: 2 F.3d 1112)**

genuine issue precluding summary judgment. The operation of this framework was modified significantly in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The current framework is set out below.

B. Movant's Initial Burden

The movant's initial burden consists of a "responsibility [to] inform [ ] the ... court of the basis for its motion and [to] identify[ ] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. at 2553. The nature of this responsibility varies, however, depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial.

1. For Issues on Which Movant Would Bear Burden of Proof at Trial

As interpreted by this court sitting en banc, *Celotex* requires that for issues on which the movant would bear the burden of proof at trial,

that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come [s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

*Four Parcels,* 941 F.2d at 1438 (citations and internal quotation marks omitted; emphasis in original).

2. For Issues on Which Non-Movant Would Bear

Burden of Proof at Trial

For issues, however, on which the non-movant would bear the burden of proof at trial,

the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim in order to discharge this initial responsibility.**\*1116** Instead, the moving party simply may show [ ]-that is, point[ ] out to the district court-that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

*Four Parcels,* 941 F.2d at 1437-38 (citations, footnote, and internal quotation marks omitted; emphasis in original).[FN2]

> FN2. In applying this rule, there has been some confusion among courts as to the nature of the showing required when the movant seeks to discharge the initial responsibility in the first of the two permitted manners-by demonstrating that there is an absence of evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608-09 n. 8 (11th Cir.1991) (noting confusion). Although this confusion has largely been resolved in this circuit by prior decisions of this court, *see Four Parcels,* 941 F.2d at 1438 & n. 19; *Coats & Clark,* 929 F.2d at 608; *see also Celotex,* 477 U.S. at 332, 106 S.Ct. at 2555 (White, J., concurring); Melissa L. Nelkin, *One Step Forward, Two Steps Back: Summary Judgment After Celotex,* 40 Hastings L.J. 53, 68-69 (1988), it is not necessary for us to rehearse this body of law in this opinion, for on none of the grounds on which we decide this case does the City attempt to carry its movant's initial summary judgment burden by showing that the firefighters would lack evidence to prove at trial a necessary element of their case.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

C. Non-Movant's Responsibility Once Movant Satisfies Initial Burden

If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made. *Coats & Clark,* 929 F.2d at 608. If, however, the movant carries the initial summary judgment burden in one of the ways discussed above, responsibility then devolves upon the non-movant to show the existence of a genuine issue as to the material fact.[FN3]

> FN3. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Where a non-moving party could with further discovery acquire evidence sufficient to carry his or her burden and avoid summary judgment, the party may move pursuant to Fed.R.Civ.P. 56(f) for a continuance to obtain further evidence.

1. For Issues on Which Movant Would Bear Burden of Proof at Trial

For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact. Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the two parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial-that is, such that no reasonable jury could find for the non-

movant-should the movant be permitted to prevail without a full trial on the issues. *Anderson,* 477 U.S. at 249-50, 106 S.Ct. at 2511.

2. For Issues on Which Non-Movant Would Bear Burden of Proof at Trial

For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. *Celotex,* 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). Second, he or she may **\*1117** come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See* Melissa L. Nelkin, *One Step Forward, Two Steps Back: Summary Judgment After* Celotex, 40 Hastings L.J. 53, 82-83 (1988).

III. STANDARD OF APPELLATE REVIEW

The court of appeals reviews grants of summary judgment de novo, applying the same legal standard employed by the district court in the first instance. *Browning v. Peyton,* 918 F.2d 1516, 1520 (11th Cir.1990). When reviewing a grant of summary judgment, the court of appeals may affirm if there exists any adequate ground for doing so, regardless of whether it is the one on which the district court relied. *Davis v. Liberty Mutual Ins. Co.,* 525 F.2d 1204, 1207 (5th Cir.1976)[FN4]; 10 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil* § 2716, at 658 (1983).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187

**(Cite as: 2 F.3d 1112)**

FN4. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

## IV. DISCUSSION OF ISSUES ON APPEAL

The district court granted summary judgment for the City on each of the firefighters' four claims. On appeal the firefighters challenge those rulings. As explained below, we affirm the judgment of the district court on all four claims.

A. Title VII Disparate Impact Claim

1. Elements of Claim

[1] Title VII of the Civil Rights Act of 1964 prohibits employers covered by the statute from taking actions or engaging in practices that discriminate against workers or job applicants on the basis of their race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2. This ban on employment discrimination extends, not just to actions taken or practices instituted for discriminatory reasons, but also to otherwise nondiscriminatory actions or practices that have discriminatory effects. *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). In order to establish Title VII liability under this effects-based definition of discrimination, a plaintiff must first demonstrate that a challenged employment action or practice has a disproportionate adverse impact on a category of persons protected by the statute. *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982); *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726-27, 53 L.Ed.2d 786 (1977). Once such a prima facie case has been made out, the defendant must show that the challenged action is demonstrably necessary to meeting a goal of a sort that, as a matter of law, qualifies as an important business goal for Title VII purposes.

The Supreme Court held in *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), that the defendant's bur-

den on the "business necessity" defense is only one of production; under *Wards Cove* the burden of persuasion remains at all times with the plaintiff. *Id.* at 659, 109 S.Ct. at 2126. Congress, however, statutorily reversed this ruling in the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071, which amended Title VII to provide that, once a plaintiff makes out a prima facie case, the full burden of proof shifts to the defendant who must demonstrate business necessity in order to avoid liability. *Id.* § 105(a), 105 Stat. at 1074-75 (codified at 42 U.S.C. §§ 2000e-2(k)(1)(A)).[FN5] In this case **\*1118** the district court entered summary judgment on November 21, 1991, one day before the President signed the 1991 Civil Rights Act into law. We shall assume *arguendo* that the burden allocation set out in the new statute applies retroactively to this case, for we conclude that defendant is entitled to summary judgment even under the 1991 Civil Rights Act standard-that is, the standard most favorable for plaintiffs. *See infra* Part IV.A.3.

FN5. Prior to 1989, the "business necessity" showing was an affirmative defense for which the defendant bore the burden of proof and risk of nonpersuasion. *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977); *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971); *Larkin v. Pullman-Standard Div., Pullman, Inc.,* 854 F.2d 1549, 1580 (11th Cir.1988), *vacated sub nom., Pullman-Standard, Inc. v. Swint,* 493 U.S. 929, 110 S.Ct. 316, 107 L.Ed.2d 307 (1989). In 1989, the Supreme Court in *Wards Cove* changed the law, holding that the defendant bore only the burden of coming forward with an alleged business-related justification for the challenged practice which the plaintiff would then have to disprove in order to prevail. *Wards Cove,* 490 U.S. at 659, 109 S.Ct. at 2126. The Court also broadened the scope of the necessity defense by holding that practices causing a disparate impact were permissible, even if they could not be shown to be absolutely

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

necessary, so long as they "served, in a significant way, the legitimate employment goals of the employer." *Id.* at 659, 109 S.Ct. at 2125-26. These changes were statutorily reversed by the Civil Rights Act of 1991, Pub.L. No. 102-166, § 105(a), 105 Stat. 1071, 1074-75 (codified at 42 U.S.C. §§ 2000e-2(k)(1)(A)).

[2] Upon a showing of "business necessity," the challenged action or practice is deemed justifiable, its regrettable discriminatory effects notwithstanding. However, even after such a showing, the plaintiff may still overcome a proffered business necessity defense by demonstrating that there exist alternative policies with lesser discriminatory effects that would be comparably as effective at serving the employer's identified business needs. Upon such a showing, Title VII liability is established. *Dothard,* 433 U.S. at 329, 97 S.Ct. at 2727.

## 2. Grounds for Summary Judgment Urged by the City

The City moved for summary judgment on the Title VII disparate impact claim, contending that it was entitled to prevail for two separate reasons. First, the City argued that the firefighters had failed to adduce statistics of the sort required under Title VII doctrine to show that PFB indeed afflicts African-Americans disproportionately and that, consequently, the firefighters had failed to show that the no-beard rule disproportionately excludes African-American men from firefighting jobs. Thus, the City claimed that the firefighters had failed even to create a genuine issue as to whether-let alone to prove as a fact that-the rule has a disparate racial impact. If it were in fact true that the firefighters lacked the evidence necessary to prove at trial that there is a disproportionate incidence of PFB among blacks, then the City would indeed be entitled to summary judgment, for where a Title VII disparate impact plaintiff fails to make out a prima facie case, the defendant is entitled to prevail. *Frazier v. Garrison Indep. Sch. Dist.,* 980 F.2d 1514, 1525 (5th Cir.1993).

Second, the City proffered an affirmative "business necessity" defense, asserting that the ban on shadow beards is necessary to meeting the goal of ensuring worker safety. Contending that ensuring worker safety constitutes an important business goal for Title VII purposes, and that there was no genuine issue that the no-beard rule was necessary to meeting that goal, the City maintained that it was therefore entitled to summary judgment. *See* City's Memo in Support of Summary Judgment Motion (R-31-6-8); City's Reply Memo in Support of Summary Judgment Motion (R-39-2-3).

## 3. Propriety of Summary Judgment

The district court granted summary judgment in favor of the City on the ground that there was an absence of evidence showing that the no-beard rule has a disparate impact. *See* Magistrates's Report (R-43-7-13). We, however, find it unnecessary to address that issue on appeal. Exercising our discretion to affirm grants of summary judgment on any adequate alternative ground fairly presented in the record, we uphold the court's order regarding the firefighters' Title VII disparate impact claim on the ground that appellants have failed to create a genuine issue as to the City's contention that the ban on shadow beards is necessitated by safety concerns.

In ruling on this ground, we assume *arguendo* that the firefighters have adequately alleged a prima facie case of disparate impact. Where a Title VII disparate impact challenge is mounted against a practice or action which admittedly causes a disparate impact, the defendant is entitled to prevail if (1) the defendant shows that the practice or action is necessary to meeting a goal that, as a matter of law, qualifies as an important business goal for Title VII purposes, and (2) *1119 the plaintiff fails to show the availability of less discriminatory alternative practice or action that would provide a comparably effective means of meeting that goal. Thus, in order for such a defendant to be entitled to summary judgment, the following must be true: (1) there must be no genuine issue that the practice or action is required to meet a goal that, as a matter of law,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187

**(Cite as: 2 F.3d 1112)**

qualifies as an important business goal under Title VII; and (2) there must be no genuine issue with respect to the existence of a comparably effective less discriminatory alternative.

### a. Business Necessity Defense

[3] The City defends its decision to ban shadow beards on the ground that the prohibition is required to protect the firefighters from health and safety risks. If true, these safety claims would afford the City an affirmative defense, for protecting employees from workplace hazards is a goal that, as a matter of law, has been found to qualify as an important business goal for Title VII purposes. *Hayes v. Shelby Memorial Hosp.,* 726 F.2d 1543, 1552 n. 14 (11th Cir.1984); *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 587 & n. 31, 99 S.Ct. 1355, 1366 & n. 31, 59 L.Ed.2d 587 (1979); *Dothard,* 433 U.S. at 331 n. 14, 97 S.Ct. at 2728 n. 14.[FN6] *But cf. International Union, U.A.W. v. Johnson Controls,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (employer desire to guard against birth defects in employees' potential offspring does not constitute bona fide occupational qualification justifying facially discriminatory employment policy). Measures demonstrably necessary to meeting the goal of ensuring worker safety are therefore deemed to be "required by business necessity" under Title VII.

> FN6. Though recognizing that measures necessary to protect employees or third parties from documented health or safety hazards are "required by business necessity," courts have stressed that merely asserting a safety rationale does not suffice to prove the defense. *See Maclennan v. American Airlines, Inc.,* 440 F.Supp. 466, 472 (E.D.Va.1977) ("[T]he incantation of a safety rationale is not an abracadabra to which [a] [c]ourt must defer judgment."). An employer's subjective belief that a practice is necessary, without any supporting evidence, is plainly insufficient to justify a discriminatory practice. *See Craig v.*

*County of Los Angeles,* 626 F.2d 659, 667 n. 8 (9th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1364, 67 L.Ed.2d 345 (1981); *United States v. Lee Way Motor Freight, Inc.,* 625 F.2d 918, 941-43 (10th Cir.1979). In order to establish a safety-based business necessity defense, employers have been required to present convincing expert testimony demonstrating that a challenged practice is in fact required to protect employees or third parties from documented hazards. *See Burwell v. Eastern Air Lines, Inc.,* 633 F.2d 361, 365-66 (4th Cir.1980) (plurality opinion), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981); *see also Harriss v. Pan Am. World Airways, Inc.,* 649 F.2d 670, 675 (9th Cir.1980); *Levin v. Delta Air Lines, Inc.,* 730 F.2d 994, 997 (5th Cir.1984). The sources of proof invoked by the City in this case to prove its safety defense meet this evidentiary standard. *See infra.*

Whether the no-beard rule is demonstrably necessary to meeting the acknowledged business goal of worker safety is a factual issue on which, for the purposes of this case, we have assumed that the City, the movant, would bear the burden of proof at trial. *See supra* Part IV.A.1. Thus, our analysis of whether there exists a genuine issue as to this material fact begins with an examination of whether the City has carried the initial burden imposed on parties moving for judgment on issues on which they would bear the burden of proof at trial. *See* discussion *supra* Part II.B.1. The City has supported its safety allegations with evidence in the form of an affidavit from an expert in the field of occupational safety and health and with a citation to a U.S. Occupational Safety and Health Administration ("OSHA") regulation concerning use of respirators by persons with facial hair. *See* City's Memo in Support of Summary Judgment Motion (R-31-6, 8) (citing R-31-Exhib. 2, and 29 C.F.R. § 1910.134(e)(5)(i)).

The City's expert, Kevin Downes, swore that,

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187

**(Cite as: 2 F.3d 1112)**

"Based upon my research and experience in training on the proper use of SCBA's, it is my opinion that the SCBA should not be worn with any amount of facial hair that contacts the sealing surface of the face piece." Affidavit of Kevin Downes (R-31-Exhib. 2-¶ 5). In the affidavit Downes detailed particular safety risks that he maintained were posed by use of SCBA's by men with facial hair. Such use would be dangerous, asserted Downes, because facial hair is likely to interfere with the forming of a **\*1120** proper seal between the SCBA mask and the wearer's face. An imperfect seal may permit air from the outside environment to leak into the mask-when this occurs the wearer is said to have "overbreathed"-thereby risking exposing the wearer to contaminants. *Id.* at ¶ 7.[FN7]

> FN7. Downes also described three other hazards that might be posed by use of an SCBA by a man with facial hair. However, none of these appear to be as important as the risk of overbreathing. First, Downes stated that an imperfect seal is likely to permit air from the wearer's tank supply to leak out around the sides of the mask, thereby causing the wearer to deplete his air supply more quickly than he otherwise would. *Id.* at ¶ 6. Second, Downes warned that "significant facial hair" might clog the exhalation valve of the SCBA, perhaps permitting contaminants to enter through it. *Id.* at ¶ 8. From Downes' description it does not appear that the very short shadow beards would necessarily pose this risk. Third, Downes stated that air leaking out of a mask due to an imperfect seal might create air turbulence which might then in turn force contaminated air back into the mask. *Id.* at ¶ 9. Downes conceded, however, that this concern "is theoretical at this point in time." *Id.*

As support for his opinion, Downes noted that three national organizations that set occupational safety and health standards-the American National Standards Institute ("ANSI"), the National Institute for Occupational Safety and Health ("NIOSH"),

and OSHA-all recommend that SCBA's should not be worn with facial hair which contacts the sealing surface of the face piece. *Id.* at ¶ 10. In addition to submitting the Downes affidavit, the City in its summary judgment memorandum also referred to the OSHA, NIOSH, and ANSI recommendations, and cited directly to the OSHA respirator standard. The OSHA regulation provides: "Respirators shall not be worn when conditions prevent a good face seal. Such conditions may be a growth of beard...." OSHA Occupational Safety and Health Standards, Respiratory Protection, 29 C.F.R. § 1910.134(e)(5)(i).[FN8]

> FN8. Although the City did not put into the record the recommendations of ANSI and NIOSH referred to in its memorandum and in the Downes affidavit, the firefighters attached documents detailing these organizations' respirator standards to their memorandum opposing summary judgment. The ANSI and NIOSH standards set out in those documents are as follows:

A respirator equipped with a facepiece shall not be worn if facial hair comes between the sealing periphery of the facepiece and the face....

ANSI Practices for Respirator Protection, Z88.2-1980, § 3.5.8 (R-33-Exhib. E).

Facial hair that lies along the sealing area of the respirator, such as beards, sideburns, moustaches, or even a few days growth of stubble should not be permitted on employees who are required to wear respirators that rely on a tight facepiece fit to achieve maximum protection. Facial hair between the wearer's skin and the sealing surfaces of the respirator will prevent a good seal.

NIOSH Guide to Industrial Respiratory Protection at 119 (Sept. 1, 1987) (R-33-Exhib. F).

We hold that this evidence that safety concerns necessitate the ban on shadow beards is "credible evidence ... that would entitle [the City] to a directed verdict if not controverted at trial." *Four Parcels,* 941 F.2d at 1438 (quoting *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553 (Brennan, J., dissenting)). The City has thus carried its movant's initial summary judgment burden on the business necessity is-

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

sue.

At this point, responsibility devolves upon the firefighters to come forward with evidence that, when considered together with the City's evidence, is sufficient to create a genuine issue as to the reality of the City's safety claims. The only real evidence invoked by the firefighters to counter the City's claims is the fact that for the six years between 1982 and 1988 the City permitted firefighters with PFB to wear their SCBA's over shadow beards. The firefighters argue that the fact that the shadow beard program was tested over this period, apparently without mishap or reported problems obtaining adequate seals, creates at least a genuine issue that shadow beards may in fact be safe. Firefighters' Brief on Appeal at 26; Firefighters' Memo Opposing Summary Judgment (R-33-26-27). We disagree. The firefighters have not adduced evidence showing how carefully the firefighters' seals were monitored over this period, or whether examinations were made that would have uncovered any resulting safety or health problems. The mere absence of unfortunate incidents is not sufficient to establish the safety of shadow beards; otherwise, safety measures could be instituted only once accidents had occurred**1121** rather than in order to avert accidents. Although the six-year history is not irrelevant to the question of whether it is unsafe to wear SCBA's over shadow beards, we hold that when considered in the context of the totality of the evidence, it would not be sufficient to prevent the City from obtaining a directed verdict at trial.

In reaching this conclusion we are swayed particularly by the recommendations of the occupational safety and health standards organizations. Although public employers such as the City are not required by law to comply with OSHA standards, *see* 29 U.S.C. § 652(5) (excluding states and their political subdivisions from definition of OSHA "employer"), such standards certainly provide a trustworthy bench mark for assessing safety-based business necessity claims. It is true that the OSHA and ANSI standards speak in somewhat general terms about "facial hair" and "growths of beard"

and do not specifically address the case of very short shadow beards; however, the NIOSH standard provides that "even a few days growth of stubble should not be permitted." *See supra* note 8. At least in the absence of any evidence showing that safety experts view shadow beards as a special case, we hold that the only reasonable inference supported by the OSHA, ANSI, and NIOSH standards is that shadow beards are encompassed by the prohibitions.

This is not to say that allegations that a challenged practice is required for safety are by any means unassailable. Expert testimony or results from adequately conducted field tests tending to show that shadow beards do not prevent SCBA's from sealing to the face would be sufficient to create a genuine issue as to the reality of the City's safety claims. However, the firefighters have come forward with no such evidence.[FN9] We thus hold that the firefighters have failed to carry their nonmovant's summary judgment rebuttal burden and that, therefore, there was in the record before the district court at the time of the summary judgment motion no evidence creating a genuine issue as to whether safety requires the ban on shadow beards.

> FN9. It is true that on appeal the firefighters referred to evidence that two of the plaintiff firefighters took and passed a firefighting skills examination, one component of which apparently tested use of a SCBA's. *See* Firefighters' Brief on Appeal at 30 & Exhib. A. However, appellate review of summary judgment rulings is conducted on the basis of the record presented to the district court and we ordinarily decline to take into account evidence referred to for the first time on appeal. Moreover, even if we were to consider it, we would deem this evidence insufficient to create a genuine issue as to the City's contention that shadow beards are unsafe.

The evidence adduced by the firefighters describing this test failed to specify the nature of the SCBA test, to note whether it focused on the adequacy of the seal, or to separate the results of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

segment of the test that rated SCBA use from those of the segments testing other skills. In light of these critical lapses and the fact that the examination was a one-time test of just two firefighters, this evidence, even if it had been presented to the district court, would not have been sufficient to call the City's safety claims into question.

The firefighters also call to our attention a factual finding made by the District of Columbia Superior Court in a case involving a similar challenge to a fire department no-beard rule by African-American firefighters suffering from PFB. The court in that case found that SCBA's can safely seal over shadow beards. *See Kennedy v. Dixon,* No. 2264-83, 1991 WL 489548 (D.C.Superior Court)(R-55),*quoted in* Firefighters' Brief on Appeal at 28. Appellants argue that this court should take judicial notice of this finding, and treat it as creating a genuine issue as to validity of the City's safety allegations.

It is true that where in civil rights cases the racially discriminatory nature of a particular policy or practice has been consistently recognized in other decisions, courts have absolved plaintiffs of responsibility for adducing evidence of their own to prove that such is indeed the case. Rather than force such plaintiffs to "reinvent the wheel," courts have taken judicial notice of the findings made by other courts in similar cases. *See United Steelworkers v. Weber,* 443 U.S. 193, 198 n. 1, 99 S.Ct. 2721, 2725 n. 1, 61 L.Ed.2d 480 (1979). However, appellants failed to call the *Kennedy* case to the attention of the district court during the summary judgment proceeding, and we believe that judicial notice of its findings is not appropriate in this appeal.

b. Less Discriminatory Alternative Issue

[4] As stated above, in order for the City to be entitled to summary judgment on the disparate impact claim, there must also be no genuine issue of fact with respect to whether a less discriminatory comparably effective alternative to the no-beard rule is available. The existence of a less discriminatory alternative**\*1122** is an issue on which the firefighters, the non-movants, would bear the burden of proof at trial. Thus, our analysis of whether there

exists a genuine issue as to this material fact begins with an examination of whether the City has carried the movant's initial burden applicable for issues on which the movant would not bear the burden of proof at trial.

In such circumstances, the movant may carry the initial burden by adducing evidence affirmatively negating the material fact at issue, or else by showing an absence of evidence on the part of the non-movant to prove the fact at trial. *See* discussion *supra* Part II.B.2. As discussed above, the City has cited the OSHA, ANSI, and NIOSH safety standards which advise that safety requires that SCBA-wearers be clean-shaven. *See supra* Part IV.A.3.a. We believe that this evidence affirmatively demonstrates, not only that being clean-shaven is a business necessity for firefighters, but also that any proposed less discriminatory alternatives to the no-beard rule that would not require firefighters to be clean-shaven would not be adequately safe. Thus the evidence is sufficient to satisfy the City's initial burden as the summary judgment movant on the less discriminatory alternative issue.

Responsibility then devolves upon the firefighters to adduce evidence creating a genuine issue as to the availability of a comparably safe, less discriminatory alternative. The firefighters have proposed two possible alternatives to the City's rule requiring firefighters to be clean-shaven. The first is simply reinstitution of the shadow beard shaving clinic. However, in order for the shadow beard program to constitute a legitimate less discriminatory alternative, shadow beards must adequately serve the Fire Department's acknowledged business need, namely, safety. As we have explained above in addressing the City's business necessity defense, the firefighters have failed to create a genuine issue that shadow beards are safe. Thus, for the same reason, they have also failed to create a genuine issue that the shaving clinic would be a comparably effective alternative to the shadow beard ban.

The second possible alternative suggested by the firefighters is shaving only the portion of the face where the SCBA seal would come into contact

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

with the skin. However, in the two sentences of their summary judgment papers in which they propose this alternative, the firefighters cite no evidence to show that partial shaving would be a viable and safe alternative.[FN10] Moreover, as a matter of common knowledge, it is apparent that partial shaving would pose the same PFB problems as full-face shaving, and thus it is doubtful that the firefighters could have adduced evidence that partial shaving constitutes a viable less discriminatory alternative. Thus, the firefighters have failed to carry their summary judgment rebuttal burden of creating a genuine issue as to the viability of either of the two less discriminatory alternatives they propose.[FN11] Having concluded (1) that the City has carried its initial summary judgment burdens on the business necessity and less discriminatory alternative issues, and (2) that the firefighters have failed to carry their summary judgment rebuttal burdens on either of these two points, we affirm **\*1123** the grant of summary judgment on the Title VII disparate impact claim.

> FN10. The following is their discussion of the partial shaving option in its entirety:
> Another reasonable accommodation might be shaving only the portion of the face where the seal would come into contact with the skin. However, this method has never been attempted or tested by the Defendant. (See Dep. of Chamberlain, p. 28).
> Firefighters' Memo Opposing Summary Judgment (R-31-26). Thus, the firefighters allege no more than that partial shaving "might" be a viable alternative and that the City has failed to explore the possibility.
> Indeed, the firefighters themselves do not appear particularly interested in pursuing the partial shaving alternative. Not only was the option proposed only in passing in a couple of lines of their summary judgment memorandum, but appellants' counsel, when questioned about possible alternative practices at oral argument before this court, made no mention of partial shaving.

> FN11. On appeal, appellants attempted to proffer for the first time evidence concerning the availability of a third less discrim-

inatory alternative practice: use of a different style of SCBA incorporating a larger mask that covers the whole of the front of the wearer's head. This alternative was not part of the record before the district court, and so cannot properly be considered by this court as we evaluate the propriety of the summary judgment grant.

B. Title VII Disparate Treatment Claim

1. Elements of Claim

[5] The firefighters also challenge the no-beard rule on the ground that it was allegedly adopted for racially discriminatory reasons in violation of Title VII. Where, as here, Title VII plaintiffs alleging intentional discrimination-commonly known as disparate treatment-lack direct evidence that an employment-related action was taken for discriminatory reasons, courts usually use the special evidentiary framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Commun. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), to determine whether the available circumstantial evidence is sufficient to prove that discrimination has occurred. *See Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1556 (11th Cir.1983), *cert. denied,*467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984).

Like the analytic framework used for disparate impact claims, the *McDonnell Douglas-Burdine* disparate treatment framework is composed of three stages. A prima facie case of discrimination is made out when a plaintiff adduces evidence tending to show that the challenged adverse employment action is not readily explainable by considerations of merit. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Upon such a showing, the burden of production then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment decision. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. If the employer succeeds in discharging this light burden, the plaintiff may prevail only by "demonstrat[ing] that the proffered

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320,
4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

reason was not the true reason for the employment decision. [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. *See also* B. Schlei & P. Grossman, *Employment Discrimination Law* 1314 (2d ed. 1983).

The *McDonnell Douglas-Burdine* framework has been used to analyze suits alleging a wide variety of different types of intentional discrimination. *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984) (discussing different variants of framework used to analyze cases alleging discrimination in hiring, firing, and application of disciplinary rules). As the leading treatise on the law of employment discrimination explains,

[T]he elements of a prima facie case are flexible and should be tailored, on a case-by-case basis, to differing factual circumstances. The central inquiry in evaluating whether the plaintiff has met his initial burden is whether the circumstantial evidence presented is sufficient to create an inference (*i.e.,* a rebuttable presumption) that the basis for an employment-related decision was an illegal criterion.

B. Schlei & P. Grossman, *Employment Discrimination Law* 476 (2d ed. 5-Year Cum.Supp.1989) (footnote omitted).

Because the firefighters allege disparate treatment but do not possess any direct evidence showing that the no-beard rule was instituted for discriminatory reasons, they are permitted to proceed under the *McDonnell Douglas-Burdine* framework using circumstantial evidence. However, the particular employment practice targeted by the firefighters is not of the sort typically challenged under disparate treatment theory. In most disparate treatment cases, a plaintiff alleges that an otherwise legitimate rule or policy is being invoked pretextually as an excuse for what is really discrimination. In this case, however, it is the employment policy itself-the no-beard rule-with which plaintiffs take issue. They charge that the rule was adopted for the purpose of removing from the Fire Department a group of African-American men: the plaintiff firefighters suffering from PFB. Such challenges are more typically brought as disparate impact claims and, of course, appellants have also chosen to proceed under that theory.

In light of this difference between the firefighters' challenge and the typical disparate**\*1124** treatment claim, it is not obvious what would constitute the elements of a prima facie case in this circumstance.[FN12] As it turns out, however, it is not necessary for us to resolve this question. The district court assumed *arguendo* that the firefighters had made out a prima facie case of disparate treatment under the *McDonnell Douglas-Burdine* framework and went on to grant summary judgment on other grounds. Magistrates's Report (R-43-15-19). We affirm for the same reasons.

> FN12. The nature of the showing required to make out a prima facie case of disparate treatment varies depending on the nature of the employment action at issue. As a general matter, a Title VII plaintiff need only show that he or she belongs to a protected group and that it appears from the circumstances that the adverse employment action is not readily explained by legitimate reasons. For example, in a suit charging that a job applicant has been denied a job for discriminatory reasons, a prima facie case is established once the plaintiff shows that:
>
> (i) that he belongs to a [protected group]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after the rejection, the position remained open and the employer continued to seek applica[tions] from persons of complainant's qualifications.
>
> *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. For a description of the elements of the prima facie case in suits challenging other types of discriminatory actions, see *Nix v. WLCY Radio/Ra-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

*hall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984).

2. Propriety of Summary Judgment

Where a plaintiff, lacking direct evidence of discrimination, proceeds under the *McDonnell Douglas-Burdine* framework, the defendant is entitled to prevail where (1) it has come forward with a legitimate, nondiscriminatory explanation for the challenged employment action, and (2) the plaintiff has failed to discredit the proffered justification or to show that a discriminatory reason more likely motivated the challenged action. Assuming *arguendo* that the firefighters have succeeded in making out a prima facie case of disparate treatment, the City has adduced evidence showing that at trial it would readily be able to carry its light burden of coming forward with a legitimate, nondiscriminatory reason-namely, safety-for its reinstitution of the shadow beard ban. *See* City's Memo in Support of Summary Judgment Motion (R-31-10-11) (citing Deposition of George Napper, Jr., former Commissioner, Atlanta Dep't of Public Safety). The City is therefore entitled to summary judgment on the disparate treatment claim if there is no genuine issue that its proffered safety justification is not a pretext for discrimination. *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1564 (11th Cir.1987) (genuine issue regarding pretext bars summary judgment).

As discussed above, the City has adduced evidence that safety considerations require firefighters to be clean-shaven, and plaintiffs have not adduced evidence sufficient to call that contention into question. *See supra* Part IV.A.3.a. We hold that this same evidence suffices to carry the City's movant's initial summary judgment burden with respect to the issue of absence of pretext. Thus, in order to avoid summary judgment, the firefighters must have adduced evidence that, when considered along with the City's evidence, creates a genuine issue that the proffered safety justification is, in fact, a pretext for discrimination.

The firefighters invoke only one piece of evidence in their attempt to undermine the credibility of the proffered safety justification: the fact that the same occupational safety standards organizations that recommend against the wearing of SCBA's over facial hair also warn that facial conditions such as acne, dentures, glasses, scars, deformities, and deep skin folds can interfere with the safe use of SCBA's. *See* Firefighters' Memo Opposing Summary Judgment (R-31-11-13).[FN13] Appellants contend that, because when the City reinstituted the no-**1125** beard rule it issued no regulations concerning these other conditions, this underinclusiveness shows that the City's claim that it was motivated by safety concerns is in fact pretextual. *Id.;* Firefighters' Brief on Appeal at 21.

> FN13. *See* NIOSH Guide to Industrial Respiratory Protection at 119-20 (Sept. 1, 1987) (R-33-Exhib. F) (noting that eye glasses, facial deformities such as scars, deep skin creases, prominent cheekbones, severe acne, and the lack of teeth or dentures can prevent SCBA from sealing properly); OSHA Occupational Safety and Health Standards, Respiratory Protection, 29 C.F.R. § 1910.134(e)(5)(i) (noting same about sideburns, skull caps that project under the face piece, temple pieces on glasses, and absence of one or both dentures).

We find this fact insufficient to create a genuine issue as to the sincerity of the City's claims that it reinstituted the no-beard rule out of concern for safety. Although the Fire Department did not ban the wearing of SCBA's by persons with other hazardous facial conditions when it first adopted the no-beard rule, the Department did not immediately begin enforcing the new prohibition. By the time the Department began actually enforcing the no-beard rule, it had also amended its policies to address problems caused by one of the other above-noted facial conditions: eyeglasses. *See* City's Reply Memo in Support of Summary Judgment Motion (R-39-5), *citing* Dep't of Pub. Safety Special Order 3.23 (R-31-Attach. 1, Exhib. E, ¶ 7.6.1).FN14 In light of the substantial evidence adduced by the City in support of its safety justifica-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

tion, we hold that no reasonable finder of fact could find the justification pretextual solely on the basis of the underinclusiveness of the City's SCBA safety rule. Accordingly, the City is entitled to summary judgment on the Title VII disparate treatment claim.

> FN14. Thus, when they actually took effect, the City's SCBA safety rules were not as underinclusive as the firefighters charge. Moreover, the record supports the inference that the City is addressing safety problems pursuant to a reasonable priority, and does not indicate that the City is using safety as a pretext for discrimination.

C. Claim Under § 504 of the Rehabilitation Act of 1973

1. Elements of Claim

[6] Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), provides that:

No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The appellant firefighters allege that, because they suffer from PFB, they qualify as handicapped individuals. They contend that the City's preventing them from working as firefighters on account of that condition constitutes illegal "exclu[sion] from ... [and/or] discrimination under a [ ] program ... receiving Federal financial assistance" in violation of § 504.FN15

> FN15. In their complaint the firefighters allege that the City Fire Department receives financial assistance from the federal government and therefore is subject to the non-discrimination duty that § 504 imposes on federal funds recipients. Complaint (R-1-8, ¶ 29). In its answer the City admits this fact. Answer (R-2-¶ 29).

The statute defines the term "handicapped individual" as including, inter alia,

any person who ... has a physical or mental impairment which substantially limits one or more of such person's major life activities....

29 U.S.C. § 706(8)(B)(i). U.S. Department of Health and Human Services ("HHS") regulations implementing § 504 FN16 define "major *1126 life activities" as including "working." 45 C.F.R. § 84.3(j)(2)(ii). The regulations define "physical or mental impairment" as including "any physiological disorder or condition, [or] cosmetic disfigurement, ... affecting ... [the] skin." 45 C.F.R. § 84.3(j)(2)(ii). PFB qualifies as a "physical ... impairment" as it is a "physiological disorder or condition ... affecting ... [the] skin." That impairment, and the firefighters' inability to shave that results from it, "substantially limit" the firefighters' ability to engage in the "major life activity" of work on account of the no-beard rule. Thus, under the HHS § 504 regulations and the 29 U.S.C. § 706(8)(B)(i) statutory definition, the appellant firefighters would seem to qualify as "handicapped individual[s]."

> FN16. The amended Rehabilitation Act instructs each federal agency distributing federal financial assistance to "promulgate such regulations as may be necessary to carry out" the purposes of § 504. 29 U.S.C. § 794(a). The firefighters cited to the district court, and the court accepted as controlling, regulations implementing § 504 that were promulgated by HHS. See Magistrates's Report (R-43-20) (citing 45 C.F.R. § 84.3(j)(2)). However, the § 504 duties of a recipient of federal financial assistance are defined by the implementing regulations issued by the particular agency from which the recipient secures its federal aid. Nowhere in the record do the parties specify from which federal agency or pursuant to what program the Fire Department receives federal funds. We thus have no way of knowing which agency's § 504 regulations ought properly to govern this case.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

However, it happens to be the case that for all of the definitional issues on which we consult agency regulations below, the regulations of all federal agencies are identical. *See, e.g.,*7 C.F.R. § 15b.3(i), (j)(1), (k) (Agriculture); 10 C.F.R. § 1040.62(c), (d)(1)(i), (d)(2) (Energy); 15 C.F.R. § 8b.3(g)(1)(i), (3)(i)(A), (3)(ii) (Commerce); 22 C.F.R. § 142.3(j)(1)(i), (2)(i)(A), (2)(ii) (State); 24 C.F.R. § 8.3 (HUD); 28 C.F.R. § 42.540(k)(1)(i), (2)(i)(A), (2)(ii) (Justice); 29 C.F.R. § 32.3 (Labor); 34 C.F.R. § 104.3(j)(1)(i), (2)(i)(A), (2)(ii) (Education); 38 C.F.R. § 18.403(j)(1)(i), (2)(i)(A), (2)(ii) (Veterans Affairs); 40 C.F.R. § 7.25 (EPA); 45 C.F.R. § 84.3(j)(1)(i), (2)(i)(A), (2)(ii) (HHS); 49 C.F.R. § 27.5 (Transportation). In view of this fact, there is no harm in treating as controlling the HHS regulations relied upon by the district court.

Section 504 has been construed as requiring federal funds recipients to refrain from engaging in several different sorts of discrimination against the handicapped. *See Prewitt v. U.S. Postal Service,* 662 F.2d 292, 305 n. 19 (5th Cir. Unit A Nov. 1981). One such non-discrimination duty is the affirmative obligation to provide "reasonable accommodations" where such accommodations would permit "otherwise qualified handicapped individual[s]" to participate in activities in which they would otherwise be unable to take part. *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987) (citing 45 C.F.R. § 84.12(c)); *Southeastern Community College v. Davis,* 442 U.S. 397, 412-13, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1979); B. Tucker & B. Goldstein, *Legal Rights of Persons with Disabilities* 5:1 (1991). The firefighters allege that the City has violated this duty.

Section 504 requires covered institutions to provide reasonable accommodations to handicapped persons only where such persons are "otherwise qualified" to participate in the activity at issue. 29 U.S.C. § 794(a). In the employment con-

text, a handicapped person is deemed "otherwise qualified" for a position if he or she "can perform 'the essential functions' of the job in question." *Arline,* 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17 (quoting 45 C.F.R. § 84(3)(k) (HHS)). Performing the essential functions of a job means, among other things, being able to perform those functions without risk of serious physical harm to oneself or others. *See* B. Tucker & B. Goldstein, *supra,* at 5:16-19.

2. Propriety of Summary Judgment

With respect to the § 504 claim, the district court appeared to rest its grant of summary judgment on two separate grounds. First, while conceding that work constitutes a "major life activity" for the purposes of 29 U.S.C. § 706(8)(B)(i), the court appeared to express some doubt about whether PFB qualifies as a "physical impairment" or whether PFB indeed precludes shaving, thereby "substantially limit[ing] ... [the] major life activit[y]" of working, on account of the no-beard rule. *See* Magistrates's Report (R-43-20-21). Second, the court found that the firefighters had failed to show the availability of a reasonable accommodation through which they might safely perform the essential functions of their job without having to be clean-shaven. *Id.* at 21. Although it appears probable to us that the district court erred insofar as it indicated that the firefighters do not qualify as "handicapped individual[s]" under 29 U.S.C. § 706(8)(B)(i), it is not necessary for us to rule on that issue. We find that the second ground for summary judgment relied on by the district court was correct and we therefore affirm the grant on that basis.

A § 504 employer defendant is entitled to prevail on a reasonable accommodation claim where there exists no reasonable accommodation by which the employee plaintiff would be able to perform the essential functions of the job. A defendant is thus entitled to summary judgment on a § 504 reasonable accommodation claim where there exists no genuine issue with respect to the availability of reasonable accommodation. As we have explained

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

above in the course of our discussion of the less discriminatory alternative inquiry under the Title VII disparate impact claim, the City has adduced evidence affirmatively showing that the no-beard rule is required for safety and that there exists no **\*1127** comparably safe, less discriminatory alternative to the ban. *See supra* Part IV.A.3.b. Because of the conceptual similarity between the Title VII less discriminatory alternative and the § 504 reasonable accommodation showings, this same evidence suffices to carry the City's initial burden of showing that there exists no reasonable accommodation that would permit the firefighters to perform the essential function of obtaining a safe seal on their SCBA's without being clean-shaven. In other words, we find, as we did with respect to the Title VII less discriminatory alternative issue, that the City's evidence showing that the no-beard rule is required by safety also constitutes an affirmative showing that there exists no reasonable accommodation by which the firefighters with PFB would be able to perform their jobs safely without being clean-shaven. *See supra* Part II.B.1.[FN17] *See also* City's Memo in Support of Summary Judgment Motion (R-31-17-18); City's Reply Memo in Support of Summary Judgment Motion (R-39-6-8).

> FN17. One distinction between the two showings is that while the plaintiff bears the burden of proof on the Title VII less discriminatory alternative, it is the defendant who does so on § 504 reasonable accommodation. *Treadwell v. Alexander,* 707 F.2d 473, 475 (11th Cir.1983); *Simon v. St. Louis County,* 735 F.2d 1082, 1084 (8th Cir.1984). However, this difference is not significant for present purposes. It is true that for issues on which the summary judgment movant would not bear the burden of proof at trial, the movant may take advantage of an additional means of carrying the initial burden-showing an absence of evidence on the part of the non-movant to prove the fact at trial-not available where the movant bears the burden of proof on the issue. *Compare supra* Part II.B.1 *with* Part II.B.2. However, in this case the City

carried its initial burden on the Title VII less discriminatory alternative by coming forward with affirmative evidence showing that the no-beard rule is necessary. *See supra* Part IV.A.3.a & b. Such an affirmative showing is also sufficient to carry a movant's initial burden on an issue, like § 504 reasonable accommodation, on which the movant would bear the burden of proof at trial. *See supra* Part II.B.1. Thus, in this case the fact that the City carried its movant's initial summary judgment burden on the Title VII less discriminatory alternative issue means that it has also done so on that of reasonable accommodation under § 504.

As also discussed above, the firefighters have proposed as reasonable accommodations two possible alternatives to the no-beard rule: reinstituting the shadow beard program, or requiring the firefighters to shave just the portions of their faces that come into contact with the SCBA seal. *See* Firefighters' Memo Opposing Summary Judgment (R-31-26). However, the firefighters have failed to come forward with any evidence showing that through either of these two means firefighters with PFB would be able to perform the essential function of obtaining adequate seals on their SCBA's. *See* discussion *supra* Part IV.A.3.b. In light of the City's substantial evidence that SCBA's cannot adequately seal over shadow beards and the unrebutted reasonable inference that partial shaving would not be viable and safe for men with PFB, the firefighters' evidence is insufficient to create a genuine issue as to the availability of an adequate reasonable accommodation. The City is thus entitled to summary judgment on the § 504 reasonable accommodation claim as well.

# V. CONCLUSION

For the foregoing reasons,[FN18] we affirm the ruling of the district court granting summary judgment for the City on each of the firefighters' claims.

> FN18. The firefighters also challenge the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187

**(Cite as: 2 F.3d 1112)**

no-beard rule relying on a constitutional substantive due process theory. However, even assuming *arguendo* that a substantive due process right would be implicated if the government were to reach out and require male citizens to shave, there would still be no constitutional violation on the facts of this case under the analyses prescribed by any of the cases cited by the firefighters, *see Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976), or by any remotely analogous case. Accordingly, we reject the firefighters' substantive due process argument without further discussion.

AFFIRMED.

C.A.11 (Ga.),1993.
Fitzpatrick v. City of Atlanta
2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

102 S.Ct. 2727                                                                                    Page 1
457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396
**(Cite as: 457 U.S. 800, 102 S.Ct. 2727)**

▷

Harlow v. Fitzgerald
U.S.Dist.Col.,1982.

Supreme Court of the United States
Bryce N. HARLOW and Alexander P. Butterfield,
Petitioners
v.
A. Ernest FITZGERALD.
**No. 80-945.**

Argued Nov. 30, 1981.
Decided June 24, 1982.

Plaintiff brought suit for damages based on his al-
legedly unlawful discharge from employment in
Department of Air Force. The United States District
Court for the District of Columbia denied defend-
ants' motions for summary judgment, holding, inter
alia, that presidential aides were not entitled to ab-
solute immunity, and such aides appealed. The
Court of Appeals for the District of Columbia Cir-
cuit dismissed appeal, and certiorari was granted.
The Supreme Court, Justice Powell, held that: (1)
presidential aides generally are entitled only to
qualified immunity; (2) aides failed to establish that
their official functions required absolute immunity;
(3) presidential aides are entitled to application of
qualified immunity standard that permits defeat of
insubstantial claims without resort to trial; and (4)
government officials performing discretionary
functions generally are shielded from liability for
civil damages insofar as their conduct does not vi-
olate clearly established statutory or constitutional
rights of which reasonable person would not have
known.

Vacated and remanded.

Justice Brennan filed a concurring opinion in which
Justices Marshall and Blackmun joined.

Justices Brennan, White, Marshall and Blackmun
filed a separate concurring statement.

Justice Rehnquist filed a concurring opinion.

Chief Justice Burger filed a dissenting opinion.

West Headnotes

**[1] Officers and Public Employees 283 ⬤⟳114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most
Cited Cases

**United States 393 ⬤⟳50.5(4)**

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for
Negligence or Misconduct
            393k50.5 Immunity or Privilege in Gener-
al
                393k50.5(4) k. Good Faith or Notice;
Motive or Purpose. Most Cited Cases
    (Formerly 393k50)
Government officials whose special functions or
constitutional status requires complete protection
from suits for damages, including certain officials
of executive branch, such as prosecutors, similar
officials and the president are entitled to defense of
absolute immunity; however, executive officials in
general are usually entitled to only qualified or
good-faith immunity.

**[2] United States 393 ⬤⟳50.5(2)**

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for
Negligence or Misconduct
            393k50.5 Immunity or Privilege in Gener-
al
                393k50.5(2) k. Absolute or Qualified
Immunity. Most Cited Cases
    (Formerly 393k50)
Federal officers seeking absolute immunity from
personal liability for unconstitutional conduct must
bear burden of showing that public policy requires
exemption of that scope.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

102 S.Ct. 2727
457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396
**(Cite as: 457 U.S. 800, 102 S.Ct. 2727)**

**[3] United States 393 ⟨⟩50.5(5)**

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for
Negligence or Misconduct
          393k50.5 Immunity or Privilege in General
            393k50.5(5) k. Rank or Office, Employment or Agency Relation. Most Cited Cases
    (Formerly 393k50)
Presidential aides generally are entitled only to qualified immunity.

**[4] Officers and Public Employees 283 ⟨⟩114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most
Cited Cases
Under "functional" approach to immunity law, immunity of government officials extends no further than its justification warrants.

**[5] United States 393 ⟨⟩50.5(5)**

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for
Negligence or Misconduct
          393k50.5 Immunity or Privilege in General
            393k50.5(5) k. Rank or Office, Employment or Agency Relation. Most Cited Cases
    (Formerly 393k50)
In order to establish entitlement to absolute immunity, presidential aide must first show that responsibilities of his office embraced function so sensitive as to require total shield from liability; he then must demonstrate that he was discharging protected function when performing act for which liability is asserted.

**[6] United States 393 ⟨⟩50.10(5)**

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for

Negligence or Misconduct
        393k50.10 Particular Acts or Claims
          393k50.10(5) k. Armed Services Members, Claims By. Most Cited Cases
    (Formerly 393k50)
In action based on alleged unlawful discharge from employment in Department of Air Force, presidential aides, claimed to have participated in alleged conspiracy to violate plaintiff's constitutional and statutory rights, failed to show that public policy required absolute immunity, and even assuming that they had function for which absolute immunity would be warranted, it could not be concluded that acts charged, if taken at all, would lie within protected area.

**[7] United States 393 ⟨⟩50.5(5)**

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for
Negligence or Misconduct
          393k50.5 Immunity or Privilege in General
            393k50.5(5) k. Rank or Office, Employment or Agency Relation. Most Cited Cases
    (Formerly 393k50)
Presidential aides are entitled to application of qualified immunity standard that permits defeat of insubstantial claims without resort to trial.

**[8] Federal Civil Procedure 170A ⟨⟩751**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(C) Answer
          170AVII(C)2 Affirmative Defense or
Avoidance
            170Ak751 k. In General. Most Cited
Cases
Qualified or "good faith" immunity is affirmative defense that must be pleaded by defendant official.

**[9] Officers and Public Employees 283 ⟨⟩114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396
**(Cite as: 457 U.S. 800, 102 S.Ct. 2727)**

Cited Cases
Government officials performing discretionary
functions generally are shielded from liability for
civil damages insofar as their conduct does not vi-
olate clearly established statutory or constitutional
rights of which reasonable person would have
known.

**[10] Federal Civil Procedure 170A ⟲2547.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2547 Hearing and Determina-
tion
              170Ak2547.1 k. In General. Most
Cited Cases
   (Formerly 170Ak2547)

**Officers and Public Employees 283 ⟲114**

283 Officers and Public Employees
   283III Rights, Powers, Duties, and Liabilities
      283k114 k. Liabilities for Official Acts. Most
Cited Cases
In determining whether government officials per-
forming discretionary functions are shielded from
liability, judge, on summary judgment, appropri-
ately may determine, not only currently applicable
law, but whether that law was clearly established at
time action occurred; if this threshold immunity
question is resolved, discovery should not be al-
lowed, and if law was clearly established, immunity
defense ordinarily should fail; nevertheless, if offi-
cial pleading defense claims extraordinary circum-
stances and can prove that he neither knew nor
should have known of relevant legal standard, de-
fense should be sustained.

**\*\*2728 Syllabus** FN*

FN* The syllabus constitutes no part of the
opinion of the Court but has been prepared
by the Reporter of Decisions for the con-
venience of the reader. See *United States v.
Detroit Lumber Co.*, 200 U.S. 321, 337, 26
S.Ct. 282, 287, 50 L.Ed. 499.

**\*800** In respondent's civil damages action in
Federal District Court based on his alleged unlaw-
ful discharge from employment in the Department
of the Air Force, petitioners, White House aides to
former President Nixon, were codefendants with
him and were claimed to have participated in the
same alleged conspiracy to violate respondent's
constitutional and statutory rights as was involved
in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct.
2690, 73 L.Ed.2d 349. After extensive pretrial dis-
covery, the District Court denied the motions of pe-
titioners and the former President for summary
judgment, holding, *inter alia*, that petitioners were
not entitled to absolute immunity from suit. Inde-
pendently of the former President, petitioners ap-
pealed the denial of their immunity defense, but the
Court of Appeals dismissed the appeal.

*Held:*

1. Government officials whose special func-
tions or constitutional status requires complete pro-
tection from suits for damages-including certain of-
ficials of the Executive Branch, such as prosecutors
and similar officials, see *Butz v. Economou*, 438
U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895, and the
President, *Nixon v. Fitzgerald*, 457 **\*\*2729** U.S.
731, 102 S.Ct. 2690, 73 L.Ed.2d 349 are entitled to
the defense of absolute immunity. However, exec-
utive officials in general are usually entitled to only
qualified or good-faith immunity. The recognition
of a qualified immunity defense for high executives
reflects an attempt to balance competing values: not
only the importance of a damages remedy to protect
the rights of citizens, but also the need to protect
officials who are required to exercise discretion and
the related public interest in encouraging the vigor-
ous exercise of official authority. *Scheuer v.
Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d
90. Federal officials seeking absolute immunity
from personal liability for unconstitutional conduct
must bear the burden of showing that public policy
requires an exemption of that scope. Pp.
2732-2733.

2. Public policy does not require a blanket re-
cognition of absolute immunity for Presidential

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

aides. Cf. *Butz, supra.* Pp. 2733-2736.

(a) The rationale of *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583-which held the Speech and Debate Clause derivately applicable to the "legislative acts" of a Senator's aide that would have been privileged if performed by the Senator himself-does not mandate "derivative" absolute **\*801** immunity for the President's chief aides. Under the "functional" approach to immunity law, immunity protection extends no further than its justification warrants. Pp. 2734-2735.

(b) While absolute immunity might be justified for aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy, a "special functions" rationale does not warrant a blanket recognition of absolute immunity for all Presidential aides in the performance of all their duties. To establish entitlement to absolute immunity, a Presidential aide first must show that the responsibilities of his office embraced a function so sensitive as to require a total shield from liability. He then must demonstrate that he was discharging the protected function when performing the act for which liability is asserted. Under the record in this case, neither petitioner has made the requisite showing for absolute immunity. However, the possibility that petitioners, on remand, can satisfy the proper standards is not foreclosed. Pp. 2735-2736.

3. Petitioners are entitled to application of the qualified immunity standard that permits the defeat of insubstantial claims without resort to trial. Pp. 2736-2740.

(a) The previously recognized "subjective" aspect of qualified or "good faith" immunity-whereby such immunity is not available if the official asserting the defense "took the action with the malicious intention to cause a deprivation of constitutional rights or other injury,"*Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214-frequently has proved incompatible with the principle that insubstantial claims should not proceed to trial. Henceforth, government officials performing discretionary functions generally are shiel-

ded from liability for civil damages insofar as their conduct does not violate "clearly established" statutory or constitutional rights of which a reasonable person would have known. Pp. 2736-2740.

(b) The case is remanded for the District Court's reconsideration of the question whether respondent's pretrial showings were insufficient to withstand petitioners' motion for summary judgment. Pp. 2739-2740.

Vacated and remanded.

Herbert J. Miller, Jr., Washington, D. C., for petitioner Nixon.
**\*802** Elliot L. Richardson, Washington, D. C., for petitioners Harlow and Butterfield.
John E. Nolan, Jr., Washington, D. C., for respondent.
Justice POWELL delivered the opinion of the Court.

The issue in this case is the scope of the immunity available to the senior aides and advisers of the President of the United **\*\*2730** States in a suit for damages based upon their official acts.

I

In this suit for civil damages petitioners Bryce Harlow and Alexander Butterfield are alleged to have participated in a conspiracy to violate the constitutional and statutory rights of the respondent A. Ernest Fitzgerald. Respondent avers that petitioners entered the conspiracy in their capacities as senior White House aides to former President Richard M. Nixon. As the alleged conspiracy is the same as that involved in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349, the facts need not be repeated in detail.

Respondent claims that Harlow joined the conspiracy in his role as the Presidential aide principally responsible for congressional relations.[FN1] At the conclusion of discovery the **\*803** supporting evidence remained inferential. As evidence of Harlow's conspiratorial activity respondent relies heavily on a series of conversations in which Harlow

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

discussed Fitzgerald's dismissal with Air Force Secretary Robert Seamans.[FN2] The other evidence most supportive of Fitzgerald's claims consists of a recorded conversation in which the President later voiced a tentative recollection that Harlow was "all for canning" Fitzgerald.[FN3]

> FN1. Harlow held this position from the beginning of the Nixon administration on January 20, 1969, through November 4, 1969. On the latter date he was designated as Counselor to the President, a position accorded Cabinet status. He served in that capacity until December 9, 1970, when he returned to private life. Harlow later resumed the duties of Counselor for the period from July 1, 1973, through April 14, 1974. Respondent appears to allege that Harlow continued in a conspiracy against him throughout the various changes of official assignment.

> FN2. The record reveals that Secretary Seamans called Harlow in May 1969 to inquire about likely congressional reaction to a draft reorganization plan that would cause Fitzgerald's dismissal. According to Seamans' testimony, "[W]e [the Air Force] didn't ask [Harlow] to pass judgment on the action itself. We just asked him what the impact would be in the relationship with the Congress." App. 153a, 164a-165a (deposition of Robert Seamans). Through an aide Harlow responded that "this was a very sensitive item on the Hill and that it would be [his] recommendation that [the Air Force] not proceed to make such a change at that time." *Id.*, at 152a. But the Air Force persisted. Seamans spoke to Harlow on at least one subsequent occasion during the spring of 1969. The record also establishes that Secretary Seamans called Harlow on November 4, 1969, shortly after the public announcement of Fitzgerald's impending dismissal, and again in December 1969. See *id.*, at 186a.

> FN3. See *id.*, at 284a. (transcript of a recorded conversation between Richard Nixon and Ronald Ziegler, February 26, 1973). In a conversation with the President on January 31, 1973, John Ehrlichman also recalled that Harlow had discussed the Fitzgerald case with the President. See *id.*, at 218a-221a. (transcript of recorded conversation between Richard Nixon and John Ehrlichman, January 31, 1973). In the same conversation the President himself asserted that he had spoken to Harlow about the Fitzgerald matter, see *id.*, at 218a, but the parties continue to dispute whether Mr. Nixon-at the most relevant moments in the discussion-was confusing Fitzgerald's case with that of another dismissed employee. The President explicitly stated at one point that he previously had been confused. See *id.*, at 220a.

Disputing Fitzgerald's contentions, Harlow argues that exhaustive discovery has adduced no direct evidence of his involvement **804** in any wrongful activity.[FN4] He avers that Secretary Seamans advised him that considerations of efficiency required Fitzgerald's removal by a reduction in force, despite anticipated adverse congressional reaction. Harlow asserts he had no reason to believe that a conspiracy existed. He contends that he took all his actions in good faith.[FN5]

> FN4. See Defendants Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment in Civ. No. 74-178 (DC), p. 7 (Feb. 12, 1980).

> FN5. In support of his version of events Harlow relies particularly on the deposition testimony of Air Force Secretary Seamans, who stated that he regarded abolition of Fitzgerald's position as necessary "to improve the efficiency" of the Financial Management Office of the Air Force and that he never received any White House instruction regarding the Fitzgerald case. App. 159a-160a. Harlow also dis-

457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396
**(Cite as: 457 U.S. 800, 102 S.Ct. 2727)**

putes the probative value of Richard Nixon's recorded remark that Harlow had supported Fitzgerald's firing. Harlow emphasizes the tentativeness of the President's statement. To the President's query whether Harlow was "all for canning [Fitzgerald], wasn't he?", White House Press Secretary Ronald Ziegler in fact gave a negative reply: "No, I think Bryce may have been the other way." *Id.*, at 284a. The President did not respond to Ziegler's comment.

**\*\*2731** Petitioner Butterfield also is alleged to have entered the conspiracy not later than May 1969. Employed as Deputy Assistant to the President and Deputy Chief of Staff to H. R. Haldeman,FN6 Butterfield circulated a White House memorandum in that month in which he claimed to have learned that Fitzgerald planned to "blow the whistle" on some "shoddy purchasing practices" by exposing these practices to public view.FN7 Fitzgerald characterizes this memorandum as evidence**\*805** that Butterfield had commenced efforts to secure Fitzgerald's retaliatory dismissal. As evidence that Butterfield participated in the conspiracy to conceal his unlawful discharge and prevent his reemployment, Fitzgerald cites communications between Butterfield and Haldeman in December 1969 and January 1970. After the President had promised at a press conference to inquire into Fitzgerald's dismissal, Haldeman solicited Butterfield's recommendations. In a subsequent memorandum emphasizing the importance of "loyalty," Butterfield counseled against offering Fitzgerald another job in the administration at that time.FN8

FN6. The record establishes that Butterfield worked from an office immediately adjacent to the oval office. He had almost daily contact with the President until March 1973, when he left the White House to become Administrator of the Federal Aviation Administration.

FN7. *Id.*, at 274a. Butterfield reported that

this information had been referred to the Federal Bureau of Investigation. In the memorandum Butterfield reported that he had received the information "by word of several mouths, but allegedly from a senior AFL-CIO official originally .... Evidently, Fitzgerald attended a recent meeting of the National Democratic Coalition and, while there, revealed his intentions to a labor representative who, fortunately for us, was unsympathetic." *Ibid.*

FN8. *Id.*, 99a-100a, 180a-181a. This memorandum, quoted in *Nixon v. Fitzgerald*, 457 U.S., at 735-736, 102 S.Ct., at 2694-2695, was not sent to the Defense Department.

For his part, Butterfield denies that he was involved in any decision concerning Fitzgerald's employment status until Haldeman sought his advice in December 1969-more than a month after Fitzgerald's termination had been scheduled and announced publicly by the Air Force. Butterfield states that he never communicated his views about Fitzgerald to any official of the Defense Department. He argues generally that nearly eight years of discovery have failed to turn up any evidence that he caused injury to Fitzgerald.FN9

FN9. See Memorandum in Support of Summary Judgment, *supra*, at 26. The history of Fitzgerald's litigation is recounted in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349. Butterfield was named as a defendant in the initial civil action filed by Fitzgerald in 1974. Harlow was named for the first time in respondent's second amended complaint of July 5, 1978.

Together with their codefendant Richard Nixon, petitioners Harlow and Butterfield moved for summary judgment on February 12, 1980. In denying the motion the District Court upheld the legal sufficiency of Fitzgerald's *Bivens* (*Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91

S.Ct. 1999, 29 L.Ed.2d 619 (1971)) claim under the First Amendment and his "inferred" statutory causes of action under 5 U.S.C. § 7211 (1976 ed., Supp.IV) and 18 U.S.C. § 1505.[FN10] The court **\*806** found that **\*\*2732** genuine issues of disputed fact remained for resolution at trial. It also ruled that petitioners were not entitled to absolute immunity. App. to Pet. for Cert. 1a-3a.

> FN10. The first of these statutes, 5 U.S.C. § 7211 (1976 ed., Supp.IV), provides generally that "[t]he right of employees ... to ... furnish information to either House of Congress, or to a committee or Member thereof, may not be interfered with or denied." The second, 18 U.S.C. § 1505, is a criminal statute making it a crime to obstruct congressional testimony. Neither expressly creates a private right to sue for damages. Petitioners argue that the District Court erred in finding that a private cause of action could be inferred under either statute, and that "special factors" present in the context of the federal employer-employee relationship preclude the recognition of respondent's *Bivens* action under the First Amendment. The legal sufficiency of respondent's asserted causes of action is not, however, a question that we view as properly presented for our decision in the present posture of this case. See n. 36, *infra.*

Independently of former President Nixon, petitioners invoked the collateral order doctrine and appealed the denial of their immunity defense to the Court of Appeals for the District of Columbia Circuit. The Court of Appeals dismissed the appeal without opinion. *Id.,* at 11a-12a. Never having determined the immunity available to the senior aides and advisers of the President of the United States, we granted certiorari. 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 969 (1981).[FN11]

> FN11. As in *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349, our jurisdiction has been challenged on the

basis that the District Court's order denying petitioners' claim of absolute immunity was not an appealable final order and that the Court of Appeals' dismissal of petitioners' appeal establishes that this case was never "in" the Court of Appeals within the meaning of 28 U.S.C. § 1254. As the discussion in *Nixon* establishes our jurisdiction in this case as well, we need not consider those challenges in this opinion.

II

As we reiterated today in *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349, our decisions consistently have held that government officials are entitled to some form of immunity from suits for damages. As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability.

[1] **\*807** Our decisions have recognized immunity defenses of two kinds. For officials whose special functions or constitutional status requires complete protection from suit, we have recognized the defense of "absolute immunity." The absolute immunity of legislators, in their legislative functions, see, *e.g., Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975), and of judges, in their judicial functions, see, *e.g., Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), now is well settled. Our decisions also have extended absolute immunity to certain officials of the Executive Branch. These include prosecutors and similar officials, see *Butz v. Economou,* 438 U.S. 478, 508-512, 98 S.Ct. 2894, 2911-2916, 57 L.Ed.2d 895 (1978), executive officers engaged in adjudicative functions, *id.,* at 513-517, 98 S.Ct., at 2914-2916, and the President of the United States, see *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349.

For executive officials in general, however, our cases make plain that qualified immunity represents the norm. In *Scheuer v. Rhodes,* 416 U.S. 232, 94

S.Ct. 1683, 40 L.Ed.2d 90 (1974), we acknowledged that high officials require greater protection than those with less complex discretionary responsibilities. Nonetheless, we held that a governor and his aides could receive the requisite protection from qualified or good-faith immunity. *Id.*, at 247-248, 94 S.Ct. at 1691-1692. In *Butz v. Economou, supra*, we extended the approach of *Scheuer* to high federal officials of the Executive Branch. Discussing in detail the considerations that also had underlain our decision in *Scheuer*, we explained that the recognition of a qualified immunity defense for high executives reflected an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, 438 U.S., at 504-505, 98 S.Ct., at 2909-2910, but also "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Id.*, at 506, 98 S.Ct., at 2910. Without discounting the adverse consequences of denying high officials an absolute immunity from private lawsuits alleging constitutional violations-consequences found sufficient in *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896), and *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 **\*808** 1959), to warrant extension to such officials of absolute immunity from suits at common **\*\*2733** law-we emphasized our expectation that insubstantial suits need not proceed to trial:

"Insubstantial lawsuits can be quickly terminated by federal courts alert to the possibilities of artful pleading. Unless the complaint states a compensable claim for relief ..., it should not survive a motion to dismiss. Moreover, the Court recognized in *Scheuer* that damages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of immunity.... In responding to such a motion, plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits." 438 U.S., at 507-508, 98 S.Ct., at 2911-2912 (citations omitted).

[2] *Butz* continued to acknowledge that the special functions of some officials might require absolute immunity. But the Court held that "federal officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Id.*, at 506, 98 S.Ct. at 2910. This we reaffirmed today in *Nixon v. Fitzgerald*, 457 U.S., at 747, 102 S.Ct., at 2700.

### III

#### A

Petitioners argue that they are entitled to a blanket protection of absolute immunity as an incident of their offices as Presidential aides. In deciding this claim we do not write on an empty page. In *Butz v. Economou, supra*, the Secretary of Agriculture-a Cabinet official directly accountable to the President-asserted a defense of absolute official immunity from suit for civil damages. We rejected his claim. In so doing we did not question the power or the importance of the Secretary's office. Nor did we doubt the importance to the **\*809** President of loyal and efficient subordinates in executing his duties of office. Yet we found these factors, alone, to be insufficient to justify absolute immunity. "[T]he greater power of [high] officials," we reasoned, "affords a greater potential for a regime of lawless conduct." 438 U.S., at 506, 98 S.Ct., at 2910. Damages actions against high officials were therefore "an important means of vindicating constitutional guarantees." *Ibid.* Moreover, we concluded that it would be "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under [42 U.S.C.] § 1983 and suits brought directly under the Constitution against federal officials." *Id.*, at 504, 98 S.Ct., at 2909.

[3] Having decided in *Butz* that Members of the Cabinet ordinarily enjoy only qualified immunity from suit, we conclude today that it would be equally untenable to hold absolute immunity an in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396
**(Cite as: 457 U.S. 800, 102 S.Ct. 2727)**

cident of the office of every Presidential subordinate based in the White House. Members of the Cabinet are direct subordinates of the President, frequently with greater responsibilities, both to the President and to the Nation, than White House staff. The considerations that supported our decision in *Butz* apply with equal force to this case. It is no disparagement of the offices held by petitioners to hold that Presidential aides, like Members of the Cabinet, generally are entitled only to a qualified immunity.

## B

In disputing the controlling authority of *Butz*, petitioners rely on the principles developed in *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972).[FN12] In *Gravel* we endorsed the view **2734 that "it is literally impossible ... for Members of Congress to perform**810 their legislative tasks without the help of aides and assistants" and that "the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos...." *Id.*, at 616-617, 92 S.Ct., at 2622-2623. Having done so, we held the Speech and Debate Clause derivatively applicable to the "legislative acts" of a Senator's aide that would have been privileged if performed by the Senator himself. *Id.*, at 621-622, 92 S.Ct., at 2625-2626.

> FN12. Petitioners also claim support from other cases that have followed *Gravel* in holding that congressional employees are derivatively entitled to the legislative immunity provided to United States Senators and Representatives under the Speech and Debate Clause. See *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973).

Petitioners contend that the rationale of *Gravel* mandates a similar "derivative" immunity for the chief aides of the President of the United States. Emphasizing that the President must delegate a

large measure of authority to execute the duties of his office, they argue that recognition of derivative absolute immunity is made essential by all the considerations that support absolute immunity for the President himself.

[4] Petitioners' argument is not without force. Ultimately, however, it sweeps too far. If the President's aides are derivatively immune because they are essential to the functioning of the Presidency, so should the Members of the Cabinet-Presidential subordinates some of whose essential roles are acknowledged by the Constitution itself[FN13]-be absolutely immune. Yet we implicitly rejected such derivative immunity in *Butz*.[FN14] Moreover, in general our cases have followed a "functional" approach to immunity law. We have recognized**811 that the judicial, prosecutorial, and legislative functions require absolute immunity. But this protection has extended no further than its justification would warrant. In *Gravel*, for example, we emphasized that Senators and their aides were absolutely immune only when performing "acts legislative in nature," and not when taking other acts even "in their official capacity." 408 U.S., at 625, 92 S.Ct., at 2627. See *Hutchinson v. Proxmire*, 443 U.S. 111, 125-133, 99 S.Ct. 2675, 2683-2687, 61 L.Ed.2d 411 (1979). Our cases involving judges[FN15] and prosecutors[FN16] have followed a similar line. The undifferentiated extension of absolute "derivative" immunity to the President's aides therefore could not be reconciled with the "functional" approach that has characterized the immunity decisions of this Court, indeed including *Gravel* itself.[FN17]

> FN13. See U.S.Const., Art. II, § 2 ("The President ... may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices....").

> FN14. The Chief Justice, *post*, at 2744, argues that senior Presidential aides work "more intimately with the President on a daily basis than does a Cabinet officer," and that *Butz* therefore is not controlling.

In recent years, however, such men as Henry Kissinger and James Schlesinger have served in both Presidential advisory and Cabinet positions. Kissinger held both posts simultaneously. In our view it is impossible to generalize about the role of "offices" in an individual President's administration without reference to the functions that particular officeholders are assigned by the President. *Butz v. Economou* cannot be distinguished on this basis.

FN15. See, *e.g., Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 731-737, 100 S.Ct. 1967, 1974-1977, 64 L.Ed.2d 641 (1980); *Stump v. Sparkman*, 435 U.S. 349, 362, 98 S.Ct. 1099, 1107, 55 L.Ed.2d 331 (1978). 438 U.S., at 362,98 S.Ct., at 1107.

FN16. In *Imbler v. Pachtman*, 424 U.S. 409, 430-431, 96 S.Ct. 984, 994-995, 47 L.Ed.2d 128 (1973), this Court reserved the question whether absolute immunity would extend to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer." Since that time the Courts of Appeals generally have ruled that prosecutors do not enjoy absolute immunity for acts taken in those capacities. See, *e.g., Mancini v. Lester*, 630 F.2d 990, 992 (CA3 1980); *Forsyth v. Kleindienst*, 599 F.2d 1203, 1213-1214 (CA3 1979). This Court at least implicitly has drawn the same distinction in extending absolute immunity to executive officials when they are engaged in quasi-prosecutorial functions. See *Butz v. Economou*, 438 U.S., at 515-517, 98 S.Ct., at 2915-2916.

FN17. Our decision today in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349, in no way abrogates this general rule. As we explained in that opinion, the recognition of absolute immunity for all of a President's acts in office derives in principal part from factors unique to his constitutional responsibilities and station. Suits against other officials-including Presidential aides-generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself.

**\*\*2735** C

Petitioners also assert an entitlement to immunity based on the "special functions" of White House aides. This form **\*812** of argument accords with the analytical approach of our cases. For aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy, absolute immunity might well be justified to protect the unhesitating performance of functions vital to the national interest.[FN18] But a "special functions" rationale does not warrant a blanket recognition of absolute immunity for all Presidential aides in the performance of all their duties. This conclusion too follows from our decision in *Butz*, which establishes that an executive official's claim to absolute immunity must be justified by reference to the public interest in the special functions of his office, not the mere fact of high station.[FN19]

FN18. Cf. *United States v. Nixon*, 418 U.S. 683, 710-711, 94 S.Ct. 3090, 3108-3109, 41 L.Ed.2d 1039 (1974) ("[C]ourts have traditionally shown the utmost deference to Presidential responsibilities" for foreign policy and military affairs, and claims of privilege in this area would receive a higher degree of deference than invocations of "a President's generalized interest in confidentiality"); *Katz v. United States*, 389 U.S. 347, 364, 88 S.Ct. 507, 518, 19 L.Ed.2d 576 (1967) (WHITE, J., concurring) ("We should not require the warrant procedure and the magistrate's judgment if the President of the United States *or his chief legal officer, the Attorney General*, has considered the requirements of national security and authorized electronic surveillance as reasonable") (emphasis ad-

ded).

FN19. *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), points to a similar conclusion. We fairly may assume that some aides are assigned to act as Presidential "alter egos," *id.*, at 616-617, 92 S.Ct., at 2622-2623, in the exercise of functions for which absolute immunity is "essential for the conduct of the public business,"*Butz, supra*, at 507, 98 S.Ct., at 2911. Cf. *Gravel, supra*, at 620, 92 S.Ct., at 2624 (derivative immunity extends only to acts within the "central role" of the Speech and Debate Clause in permitting free legislative speech and debate). By analogy to *Gravel*, a derivative claim to Presidential immunity would be strongest in such "central" Presidential domains as foreign policy and national security, in which the President could not discharge his singularly vital mandate without delegating functions nearly as sensitive as his own.

[5] *Butz* also identifies the location of the burden of proof. The burden of justifying absolute immunity rests on the official asserting the claim. 438 U.S., at 506, 98 S.Ct., at 2910. We have not of course had occasion to identify how a Presidential aide might carry this burden. But the general requisites are familiar in our cases. In order to establish entitlement to absolute immunity*813 a Presidential aide first must show that the responsibilities of his office embraced a function so sensitive as to require a total shield from liability.[FN20] He then must demonstrate that he was discharging the protected function when performing the act for which liability is asserted.[FN21]

FN20. Here as elsewhere the relevant judicial inquiries would encompass considerations of public policy, the importance of which should be confirmed either by reference to the common law or, more likely, our constitutional heritage and structure. See *Nixon v. Fitzgerald*, 457 U.S., at 747-748, 102 S.Ct., at 2700-2701.

FN21. The need for such an inquiry is implicit in *Butz v. Economou, supra*, at 508-517,98 S.Ct., at 2911-2916; see *Imbler v. Pachtman, supra*, at 430-431, 96 S.Ct., at 994-995. Cases involving immunity under the Speech and Debate Clause have inquired explicitly into whether particular acts and activities qualified for the protection of the Clause. See, *e.g., Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Gravel v. United States, supra.*

[6] Applying these standards to the claims advanced by petitioners Harlow and Butterfield, we cannot conclude on the record before us that either has shown that "public policy requires [for any of the functions of his office] an exemption of [absolute] scope." *Butz*, 438 U.S., at 506, 98 S.Ct., at 2910. Nor, assuming that petitioners did have functions for which absolute immunity would be warranted, could **2736 we now conclude that the acts charged in this lawsuit-if taken at all-would lie within the protected area. We do not, however, foreclose the possibility that petitioners, on remand, could satisfy the standards properly applicable to their claims.

IV

[7] Even if they cannot establish that their official functions require absolute immunity, petitioners assert that public policy at least mandates an application of the qualified immunity standard that would permit the defeat of insubstantial claims without resort to trial. We agree.

A

The resolution of immunity questions inherently requires a balance between the evils inevitable in any available alternative.*814 In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees. *Butz v. Economou, supra*, at 506,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct., at 2910; see *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S., at 410, 91 S.Ct., at 2011 ("For people in Bivens' shoes, it is damages or nothing"). It is this recognition that has required the denial of absolute immunity to most public officers. At the same time, however, it cannot be disputed seriously that claims frequently run against the innocent as well as the guilty-at a cost not only to the defendant officials, but to society as a whole.[FN22] These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties." *Gregoire v. Biddle*, 177 F.2d 579, 581 (CA2 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

> FN22. See generally Schuck, Suing Our Servants: The Court, Congress, and the Liability of Public Officials for Damages, 1980 S.Ct.Rev. 281, 324-327.

In identifying qualified immunity as the best attainable accommodation of competing values, in *Butz, supra*, 438 U.S., at 507-508, 98 S.Ct., 2911-2912, as in *Scheuer*, 416 U.S., at 245-248, 94 S.Ct., at 1691-1692, we relied on the assumption that this standard would permit "[i]nsubstantial lawsuits [to] be quickly terminated." 438 U.S., at 507-508, 98 S.Ct., at 2911-2912; see *Hanrahan v. Hampton*, 446 U.S. 754, 765, 100 S.Ct. 1987, 1993, 64 L.Ed.2d 670 (1980) (POWELL, J., concurring in part and dissenting in part).[FN23] Yet petitioners advance persuasive arguments that the dismissal of insubstantial lawsuits without trial-a factor presupposed in the balance of competing interests struck by **\*815** our prior cases-requires an adjustment of the "good faith" standard established by our decisions.

> FN23. The importance of this consideration hardly needs emphasis. This Court has noted the risk imposed upon political officials who must defend their actions and

motives before a jury. See *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 405, 99 S.Ct. 1171, 1179, 59 L.Ed.2d 401 (1979); *Tenney v. Brandhove*, 341 U.S. 367, 377-378, 71 S.Ct. 783, 788-789,95 L.Ed.2d 1019 (1951). As the Court observed in *Tenney*: "In times of political passion, dishonest or vindictive motives are readily attributed ... and as readily believed." *Id.*, at 378, 71 S.Ct., at 789.

### B

[8] Qualified or "good faith" immunity is an affirmative defense that must be pleaded by a defendant official. *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980).[FN24] Decisions of this Court have established that the "good faith" defense has both an "objective" and a "subjective" aspect. The objective element**\*\*2737** involves a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). The subjective component refers to "permissible intentions." *Ibid.* Characteristically the Court has defined these elements by identifying the circumstances in which qualified immunity would *not* be available. Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official "*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury...." *Ibid.*(emphasis added).[FN25]

> FN24. Although *Gomez* presented the question in the context of an action under 42 U.S.C. § 1983, the Court's analysis indicates that "immunity" must also be pleaded as a defense in actions under the Constitution and laws of the United States. See 446 U.S., at 640, 100 S.Ct., at 1924. *Gomez* did not decide which party bore the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

burden of proof on the issue of good faith. *Id.*, at 642, 100 S.Ct., 1924 (Rehnquist, J., concurring).

FN25. In *Wood* the Court explicitly limited its holding to the circumstances in which a school board member, "in the specific context of school discipline,"420 U.S., at 322, 95 S.Ct., 1001, would be stripped of claimed immunity in an action under § 1983. Subsequent cases, however, have quoted the *Wood* formulation as a general statement of the qualified immunity standard. See, *e.g., Procunier v. Navarette*, 434 U.S. 555, 562-563, 566, 98 S.Ct. 855, 859-860, 862, 55 L.Ed.2d 24 (1978), quoted in *Baker v. McCollan*, 443 U.S. 137, 139, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979).

The subjective element of the good-faith defense frequently has proved incompatible with our admonition in *Butz* **816** that insubstantial claims should not proceed to trial. Rule 56 of the Federal Rules of Civil Procedure provides that disputed questions of fact ordinarily may not be decided on motions for summary judgment.[FN26] And an official's subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by a jury.[FN27]

FN26. Rule 56(c) states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In determining whether summary judgment is proper, a court ordinarily must look at the record in the light most favorable to the party opposing the motion, drawing all inferences most favorable to that party. *E.g., Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

FN27. *E.g., Landrum v. Moats*, 576 F.2d 1320, 1329 (CA8 1978); *Duchesne v. Sugarman*, 566 F.2d 817, 832-833 (CA2 1977); cf. *Hutchinson v. Proxmire*, 443 U.S., at 120 n.9, 99 S.Ct., at 2680, n.9 (questioning whether the existence of "actual malice," as an issue of fact, may properly be decided on summary judgment in a suit alleging libel of a public figure).

In the context of *Butz*' attempted balancing of competing values, it now is clear that substantial costs attend the litigation of the subjective good faith of government officials. Not only are there the general costs of subjecting officials to the risks of trial-distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service. There are special costs to "subjective" inquiries of this kind. Immunity generally is available only to officials performing discretionary functions. In contrast with the thought processes accompanying "ministerial" tasks, the judgments surrounding discretionary action almost inevitably are influenced by the decisionmaker's experiences, values, and emotions. These variables explain in part why questions of subjective intent so rarely can be decided by summary judgment. Yet they also frame a background**817** in which there often is no clear end to the relevant evidence. Judicial inquiry into subjective motivation therefore may entail broad-ranging discovery and the deposing of numerous persons,[FN28] including an official's professional colleagues. Inquiries of this **2738** kind can be peculiarly disruptive of effective government.[FN29]

FN28. In suits against a President's closest aides, discovery of this kind frequently could implicate separation-of-powers concerns. As the Court recognized in *United States v. Nixon*, 418 U.S., at 708, 94 S.Ct., at 3107:

"A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These are the considerations justifying a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution."

> FN29. As Judge Gesell observed in his concurring opinion in *Halperin v. Kissinger*, 196 U.S.App.D.C. 285, 307, 606 F.2d 1192, 1214 (1979), aff'd in pertinent part by an equally divided Court, 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981):
>
> "We should not close our eyes to the fact that with increasing frequency in this jurisdiction and throughout the country plaintiffs are filing suits seeking damage awards against high government officials in their personal capacities based on alleged constitutional torts. Each such suit almost invariably results in these officials and their colleagues being subjected to extensive discovery into traditionally protected areas, such as their deliberations preparatory to the formulation of government policy and their intimate thought processes and communications at the presidential and cabinet levels. Such discover [*sic* ] is wide-ranging, time-consuming, and not without considerable cost to the officials involved. It is not difficult for ingenious plaintiff's counsel to create a material issue of fact on some element of the immunity defense where subtle questions of constitutional law and a decisionmaker's mental processes are involved. A sentence from a casual document or a difference in recollection with regard to a particular policy conversation held long ago would usually, under the normal summary judgment standards, be sufficient [to force a trial].... The effect of this development upon the willingness of individuals to serve their country is obvious."

[9] Consistently with the balance at which we aimed in *Butz*, we conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of **\*818** trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. See *Procunier v. Navarette*, 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978); *Wood v. Strickland*, 420 U.S., at 322, 95 S.Ct., at 1001.[FN30]

> FN30. This case involves no issue concerning the elements of the immunity available to state officials sued for constitutional violations under 42 U.S.C. § 1983. We have found previously, however, that it would be "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." *Butz v. Economou*, 438 U.S., at 504, 98 S.Ct., at 2909.

Our decision in no way diminishes the absolute immunity currently available to officials whose functions have been held to require a protection of this scope.

[10] Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law,[FN31] should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred.[FN32] If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily **\*819** should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily

on objective factors.

> FN31. This case involves no claim that Congress has expressed its intent to impose "no fault" tort liability on high federal officials for violations of particular statutes or the Constitution.

> FN32. As in *Procunier v. Navarette*, 434 U.S., at 565, 98 S.Ct., at 861, we need not define here the circumstances under which "the state of the law" should be "evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Court."

By defining the limits of qualified immunity essentially in objective terms, we provide**2739 no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action.FN33 But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967).FN34

> FN33. Cf. *Procunier v. Navarette, supra*, 434 U.S., at 565, 98 S.Ct., at 861, quoting *Wood v. Strickland*, 420 U.S., at 322, 95 S.Ct., at 1001 ("Because they could not reasonably have been expected to be aware of a constitutional right that had not yet been declared, petitioners did not act with such disregard for the established law that their conduct 'cannot reasonably be characterized as being in good faith' ").

> FN34. We emphasize that our decision applies only to suits for civil *damages* arising from actions within the scope of an offi-

cial's duties and in "objective" good faith. We express no view as to the conditions in which injunctive or declaratory relief might be available.

### C

In this case petitioners have asked us to hold that the respondent's pretrial showings were insufficient to survive their motion for summary judgment.FN35 We think it appropriate,*820 however, to remand the case to the District Court for its reconsideration of this issue in light of this opinion.FN36 The trial court is more familiar with the record so far developed and also is better situated to make any such further findings as may be necessary.

> FN35. In *Butz*, we admonished that "insubstantial" suits against high public officials should not be allowed to proceed to trial. 438 U.S., at 507, 98 S.Ct., at 2911. See Schuck, *supra* n.22, at 324-327. We reiterate this admonition. Insubstantial lawsuits undermine the effectiveness of government as contemplated by our constitutional structure, and "firm application of the Federal Rules of Civil Procedure" is fully warranted in such cases. 438 U.S., at 508, 98 S.Ct., at 2911.

> FN36. Petitioners also have urged us, prior to the remand, to rule on the legal sufficiency of respondent's "implied" causes of action under 5 U.S.C. § 7211 (1976 ed., Supp.IV) and 18 U.S.C. § 1505 and his *Bivens* claim under the First Amendment. We do not view petitioners' argument on the statutory question as insubstantial. Cf. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 4 U.S. 353, 377-378,102 S.Ct. 1825, 1838-1839, 72 L.Ed.2d 182 (1982) (controlling question in implication of statutory causes of action is whether Congress affirmatively intended to create a damages remedy); *Middlesex County Sewerage Auth. v. National Sea Clammers*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Assn.*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (same); *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 638-639, 101 S.Ct. 2061, 2065-2066, 68 L.Ed.2d 500 (1981) (same). Nor is the *Bivens* question. Cf. *Bush v. Lucas*, 647 F.2d 573, 576 (CA5 1981) (holding that the "unique relationship between the Federal Government and its civil service employees is a special consideration which counsels hesitation in inferring a *Bivens* remedy"). As in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349, however, we took jurisdiction of the case only to resolve the immunity question under the collateral order doctrine. We therefore think it appropriate to leave these questions for fuller consideration by the District Court and, if necessary, by the Court of Appeals.

V

The judgment of the Court of Appeals is vacated, and the case is remanded for further action consistent with this opinion.

*So ordered.*

Justice BRENNAN, with whom Justice MARSHALL, and Justice BLACKMUN join, concurring.

I agree with the substantive standard announced by the Court today, imposing liability when a public-official defendant**\*821** "knew or should have known" of the constitutionally violative effect of his actions. *Ante*, at 2737, 2739. This standard would not allow the official who *actually knows* that he was violating the law to escape liability for his actions, even if he could not "reasonably have been expected" to know what he actually did know. *Ante*, at 2739, **\*\*2740** n.33. Thus the clever and unusually well-informed violator of constitutional rights will not evade just punishment for his crimes. I also agree that this standard applies "across the board," to all "government officials performing discretionary functions." *Ante*, at 2738. I write separately only to note that given this stand-

ard, it seems inescapable to me that some measure of discovery may sometimes be required to determine exactly what a public-official defendant did "know" at the time of his actions. In this respect the issue before us is very similar to that addressed in *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), in which the Court observed that "[t]o erect an impenetrable barrier to the plaintiff's use of such evidence on his side of the case is a matter of some substance, particularly when defendants themselves are prone to assert their goo[d f]aith...." *Id.*, at 170, 99 S.Ct., at 1645. Of course, as the Court has already noted, *ante*, at 2739, summary judgment will be readily available to public-official defendants whenever the state of the law was so ambiguous at the time of the alleged violation that it could not have been "known" then, and thus liability could not ensue. In my view, summary judgment will also be readily available whenever the plaintiff cannot prove, as a threshold matter, that a violation of his constitutional rights actually occurred. I see no reason why discovery of defendants' "knowledge" should not be deferred by the trial judge pending decision of any motion of defendants for summary judgment on grounds such as these. Cf. *Herbert v. Lando, supra*, at 180, n.4, 99 S.Ct., at 1650, n.4 (POWELL, J., concurring).

Justice BRENNAN, Justice WHITE, Justice MARSHALL and Justice BLACKMUN, concurring.

We join the Court's opinion but, having dissented in *Nixon* **\*822** *v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349, we disassociate ourselves from any implication in the Court's opinion in the present case that *Nixon v. Fitzgerald* was correctly decided.

Justice REHNQUIST, concurring.

At such time as a majority of the Court is willing to re-examine our holding in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), I shall join in that undertaking with alacrity. But until that time comes, I agree that the Court's opinion in this case properly disposes of the issues presented, and I therefore join it.

Chief Justice BURGER, dissenting.

The Court today decides in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

what has been taken for granted for 190 years, that it is implicit in the Constitution that a President of the United States has absolute immunity from civil suits arising out of official acts as Chief Executive. I agree fully that absolute immunity for official acts of the President is, like executive privilege, "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974).[FN1]

> FN1. As I noted in *Nixon v. Fitzgerald*, Presidential immunity for official acts while in office has never been seriously questioned until very recently. At 758, n.1, 102 S.Ct., at 2706, n.1. (BURGER, C.J., concurring).

In this case the Court decides that senior aides of the President do not have derivative immunity from the President. I am at a loss, however, to reconcile this conclusion with our holding in *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). The Court reads *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), as resolving that question; I do not. *Butz* is clearly distinguishable.[FN2]

> FN2. If indeed there is an irreconcilable conflict between *Gravel*, and *Butz*, the Court has an obligation to try to harmonize its holdings-or at least tender a reasonable explanation. The Court has done neither.

**\*823 \*\*2741** In *Gravel* we held that it is implicit in the Constitution that aides of Members of Congress have absolute immunity for acts performed for Members in relation to their legislative function. We viewed the aides' immunity as deriving from the Speech or Debate Clause, which provides that "for any Speech or Debate *in either House*, [Senators and Representatives] shall not be questioned in any other Place." Art. I, § 6, cl. 1 (emphasis added). Read literally, the Clause would, of course, limit absolute immunity only to the Member and only to speech and debate within the Chamber. But we have read much more into this plain language. The Clause says nothing about "legislative acts" outside the Chambers, but we concluded that the Constitution grants absolute immunity for legislative acts not only "in either House" but in committees and conferences and in reports on legislative activities.

Nor does the Clause mention immunity for congressional aides. Yet, going far beyond any words found in the Constitution itself, we held that a Member's aides who implement policies and decisions of the Member are entitled to the same absolute immunity as a Member. It is hardly an overstatement to say that we thus avoided a "literalistic approach," *Gravel, supra*, at 617, 92 S.Ct. at 2623, and instead looked to the structure of the Constitution and the evolution of the function of the Legislative Branch. In short, we drew this immunity for legislative aides from a functional analysis of the legislative process in the context of the Constitution taken as a whole and in light of 20th-century realities. Neither Presidents nor Members of Congress can, as they once did, perform all their constitutional duties personally.[FN3]

> FN3. A Senator's allotment for staff varies significantly, but can range from as few as 17 to over 70 persons, in addition to committee staff aides who perform important legislative functions for Members. S.Doc.No. 97-19, pp. 27-106 (1981). House Members have roughly 18 to 26 assistants at any one time, in addition to committee staff aides. H.R.Doc.No. 97-113, pp. 28-174 (1981).

**\*824** We very properly recognized in *Gravel* that the central purpose of a Member's absolute immunity would be "diminished and frustrated" if the legislative aides were not also protected by the same broad immunity. Speaking for the Court in *Gravel*, Justice WHITE agreed with the Court of Appeals that

"it is literally impossible, in view of the complexities of the modern legislative process, with Congress almost constantly in session and matters

of legislative concern constantly proliferating, for Members of Congress to perform their legislative tasks *without the help of aides* and assistants; that the day-to-day work of such aides *is so critical to the Members' performance* that they must be treated as the latter's *alter egos*; and that if they are not so recognized, the central role of the Speech or Debate Clause-to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary ...-will inevitably be diminished and frustrated." 408 U.S., at 616-617, 92 S.Ct., at 2622-2623 (emphasis added).

I joined in that analysis and continue to agree with it, for without absolute immunity for these "elbow aides," who are indeed "alter egos," a Member could not effectively discharge all of the assigned constitutional functions of a modern legislator.

The Court has made this reality a matter of our constitutional jurisprudence. How can we conceivably hold that a President of the United States, who represents a vastly larger constituency than does any Member of Congress, should not have "alter egos" with comparable immunity? To perform the constitutional duties assigned to the Executive would be "literally impossible, in view of the complexities of the modern [Executive] process, ... without the help of *825 aides and assistants." FN4 *Id.*, at 616, 92 **2742 S.Ct., at 2623. These words reflect the precise analysis of *Gravel*, and this analysis applies with at least as much force to a President. The primary layer of senior aides of a President-like a Senator's "alter egos"-are literally at a President's elbow, with offices a few feet or at most a few hundred feet from his own desk. The President, like a Member of Congress, may see those personal aides many times in one day. They are indeed the President's "arms" and "fingers" to aid in performing his constitutional duty to see "that the laws [are] faithfully executed." Like a Member of Congress, but on a vastly greater scale, the President cannot personally implement a fraction of his own policies and day-to-day decisions. FN5

FN4. In the early years of the Republic,

Members of Congress and Presidents performed their duties without staffs of aides and assistants. Washington and Jefferson spent much of their time on their plantations. Congress did not even appropriate funds for a Presidential clerk until 1857. Lincoln opened his own mail, Cleveland answered the phone at the White House, and Wilson regularly typed his own speeches. S. Wayne, The Legislative Presidency 30 (1978). Whatever may have been the situation beginning under Washington, Adams, and Jefferson, we know today that the Presidency functions with a staff that exercises a wide spectrum of authority and discretion and directly assists the President in carrying out constitutional duties.

FN5. Justice WHITE's dissent in *Nixon v. Fitzgerald* today expresses great concern that a President may "cause serious injury to any number of citizens even though he knows his conduct violates a statute ...." At 764, 102 S.Ct., at 2709. What the dissent wholly overlooks, however, is the plain fact that the absolute immunity does not protect a President for acts *outside* the constitutional function of a President.

For some inexplicable reason the Court declines to recognize the realities in the workings of the Office of a President, despite the Court's cogent recognition in *Gravel* concerning the realities of the workings of 20th-century Members of Congress. Absent equal protection for a President's aides, how will Presidents be free from the risks of "intimidation ... by [Congress] and accountability before a possibly hostile *826 judiciary?" *Gravel*, 408 U.S., at 617, 92 S.Ct., at 2623. Under today's holding in this case the functioning of the Presidency will inevitably be "diminished and frustrated." *Ibid.*

Precisely the same public policy considerations on which the Court now relies in *Nixon v. Fitzgerald*, and that we relied on only recently in *Gravel*,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are fully applicable to senior Presidential aides. The Court's opinion in *Nixon v. Fitzgerald* correctly points out that if a President were subject to suit, awareness of personal vulnerability to suit "frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." At 753, 102 S.Ct., at 2703. This same negative incentive will permeate the inner workings of the Office of the President if the Chief Executive's "alter egos" are not protected derivatively from the immunity of the President. In addition, exposure to civil liability for official acts will result in constant judicial questioning, through judicial proceedings and pretrial discovery, into the inner workings of the Presidential Office beyond that necessary to maintain the traditional checks and balances of our constitutional structure.[FN6]

> FN6. The same remedies for checks on Presidential abuse also will check abuses by the comparatively small group of senior aides who act as "alter egos" of the President. The aides serve at the pleasure of the President and thus may be removed by the President. Congressional and public scrutiny maintain a constant and pervasive check on abuses, and such aides may be prosecuted criminally. See *Nixon*, 457 U.S., at 757, 102 S.Ct., at 2705-2706. However, a criminal prosecution cannot be commenced absent careful consideration by a grand jury at the request of a prosecutor; the same check is not present with respect to the commencement of civil suits in which advocates are subject to no realistic accountability.

I challenge the Court and the dissenters in *Nixon v. Fitzgerald* who join in the instant holding to say that the effectiveness of Presidential aides will not "inevitably be diminished and frustrated," *Gravel, supra,* 408 U.S., at 617, 92 S.Ct., at 2623, if they must weigh every act and decision in relation to the risks of future **\*827** lawsuits. The *Gravel* Court took note of the burdens on congressional aides: the stress of long **\*\*2743** hours, heavy re-

sponsibilities, constant exposure to harassment of the political arena. Is the Court suggesting the stresses are less for Presidential aides? By construing the Constitution to give only qualified immunity to senior Presidential aides we give those key "alter egos" only lawsuits, winable lawsuits perhaps, but lawsuits nonetheless, with stress and effort that will disperse and drain their energies and their purses.[FN7]

> FN7. The Executive Branch may as a matter of grace supply some legal assistance. The Department of Justice has a longstanding policy of representing federal officers in civil suits involving conduct performed within the scope of their employment. In addition, the Department provides for retention of private legal counsel when necessary. See Senate Subcommittee on Administrative Practice and Procedure of the Committee on the Judiciary, Justice Department Retention of Private Legal Counsel to Represent Federal Employees in Civil Lawsuits, 95th Cong., 2d Sess. (Comm.Print 1978). The Congress frequently pays the expenses of defending its Members even as to acts wholly outside the legislative function.

In this Court we witness the new filing of as many as 100 cases a week, many utterly frivolous and even bizarre. Yet the defending party in many of these cases may have spent or become liable for thousands of dollars in litigation expense. Hundreds of thousands of other cases are disposed of without reaching this Court. When we see the myriad irresponsible and frivolous cases regularly filed in American courts, the magnitude of the potential risks attending acceptance of public office emerges. Those potential risks inevitably will be a factor in discouraging able men and women from entering public service.

We-judges collectively-have held that the common law provides us with absolute immunity for ourselves with respect to judicial acts, however erroneous or ill-advised. See, *e.g., Stump v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). Are the lowest ranking of 27,000 or more judges, thousands of prosecutors, and thousands of congressional aides-an aggregate **\*828** of not less than 75,000 in all-entitled to greater protection than two senior aides of a President?

*Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), does not dictate that senior Presidential aides be given only qualified immunity. *Butz* held only that a Cabinet officer exercising discretion was not entitled to absolute immunity; we need not abandon that holding. A senior Presidential aide works more intimately with the President on a daily basis than does a Cabinet officer, directly implementing Presidential decisions literally from hour to hour.

In his dissent today in *Nixon v. Fitzgerald*, Justice WHITE states that the "Court now applies the dissenting view in *Butz* to the Office of the President." 457 U.S., at 764, 102 S.Ct., at 2709. However, this suggests that a President and his Cabinet officers, who serve only "during the pleasure of the President," are on the same plane constitutionally. It wholly fails to distinguish the role of a President or his "elbow aides" from the role of Cabinet officers, who are department heads rather than "alter egos." It would be in no sense inconsistent to hold that a President's personal aides have greater immunity than Cabinet officers.

The Court's analysis in *Gravel* demonstrates that the question of derivative immunity does not and should not depend on a person's rank or position in the hierarchy, but on the *function* performed by the person and the relationship of that person to the superior. Cabinet officers clearly outrank United States Attorneys, yet qualified immunity is accorded the former and absolute immunity the latter; rank is important only to the extent that the rank determines the function to be performed. The function of senior Presidential aides, as the "alter egos" of the President, is an integral, inseparable part of the function of the President.[FN8] Justice WHITE **\*829** was clearly **\*\*2744** correct in *Gravel*, stating that Members of Congress could not

"perform their legislative tasks without the help of aides and assistants; [and] that the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos ...." 408 U.S., at 616-617, 92 S.Ct., at 2623.

> FN8. This Court had no trouble reconciling *Gravel* with *Kilbourn v. Thompson*, 103 U.S. 168, 26 L.Ed. 377 (1881). In *Kilbourn* the Sergeant-at-Arms of the House of Representatives was held not to share the absolute immunity enjoyed by the Members of Congress who ordered that officer to act.

By ignoring *Gravel* and engaging in a wooden application of *Butz*, the Court significantly undermines the functioning of the Office of the President. Under the Court's opinion in *Nixon* today it is clear that Presidential immunity derives from the Constitution as much as congressional immunity comes from that source. Can there rationally be one rule for congressional aides and another for Presidential aides simply because the initial absolute immunity of each derives from different aspects of the Constitution? I find it inexplicable why the Court makes no effort to demonstrate why the Chief Executive of the Nation should not be assured that senior staff aides will have the same protection as the aides of Members of the House and Senate.

U.S.Dist.Col.,1982.
Harlow v. Fitzgerald
457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 S.Ct. 3034                                                                    Page 1
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

Anderson v. Creighton
U.S.,1987.

Supreme Court of the United States
Russell ANDERSON, Petitioner
v.
Robert E. CREIGHTON, Jr., et ux., et al.
No. 85-1520.

Argued Feb. 23, 1987.
Decided June 25, 1987.

Suit was brought against FBI agent seeking dam-
ages resulting from warrantless search of residents'
home. The United States District Court for the Dis-
trict of Minnesota, Diana E. Murphy, J., granted
summary judgment in favor of agent, and residents
appealed. The Court of Appeals for the Eighth Cir-
cuit, 766 F.2d 1269, reversed and remanded, certi-
orari was granted. The Supreme Court, Justice
Scalia, held that: (1) in determining whether agent
was protected by qualified immunity from civil li-
ability for conducting warrantless search of resid-
ence for fugitive, relevant question was whether
reasonable officer could have believed warrantless
search to be lawful, in light of clearly established
law and information agent possessed, and (2) no ex-
ception to general rule of qualified immunity from
civil liability exists in cases involving allegedly un-
lawful warrantless searches of innocent third
parties' homes for fugitives.

Judgment of Court of Appeals vacated and case re-
manded.

Justice Stevens filed dissenting opinion, in which
Justices Brennan and Marshall joined.

Opinion on remand, 724 F.Supp. 654.

West Headnotes

**[1] Officers and Public Employees 283 ⟬114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities

        283k114 k. Liabilities for Official Acts. Most
Cited Cases
Generally, government officials performing discre-
tionary functions have qualified immunity, shield-
ing them from civil damages liability as long as ac-
tions could reasonably have been thought consistent
with rights they are alleged to have violated.

**[2] Officers and Public Employees 283 ⟬114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most
Cited Cases
Whether official protected by qualified immunity
may be held personally liable for allegedly unlaw-
ful official actions generally turns on objective leg-
al reasonableness of action, assessed in light of leg-
al rules that were clearly established at time action
was taken.

**[3] Officers and Public Employees 283 ⟬114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most
Cited Cases
To avoid protection of qualified immunity on basis
that right which official allegedly violated is
"clearly established," contours of right must be suf-
ficiently clear that reasonable official would under-
stand that what he is doing violates that right;
standard does not require that official action be pro-
tected by qualified immunity unless very action has
previously been held unlawful, but merely requires
that, in light of preexisting law, unlawfulness must
be apparent.

**[4] Civil Rights 78 ⟬1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-
ficers

107 S.Ct. 3034                                                                                    Page 2

483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092

**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

(Formerly 78k214(2), 78k13.8(4))

In determining whether FBI agent's warrantless search of home for fugitive was protected by qualified immunity, court was required to consider whether it was not clearly established that circumstances with which agent was confronted at time of search did not constitute probable cause and exigent circumstances; it would not follow immediately from conclusion that warrantless search not supported by probable cause and exigent circumstances violates Fourth Amendment that agent's search was objectively legally unreasonable. U.S.C.A. Const.Amend. 4.

**[5] Civil Rights 78 ⟜1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

(Formerly 78k214(2), 78k13.8(4))

Determination of whether it was objectively legally reasonable to conclude that given search was supported by probable cause or exigent circumstances, so that officer conducting search is protected by qualified immunity from civil liability, will often require examination of information possessed by searching officer. U.S.C.A. Const.Amend. 4.

**[6] Civil Rights 78 ⟜1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive

and Intent, in General. Most Cited Cases

(Formerly 78k214(2), 78k13.8(4))

In determining whether FBI agent was protected by qualified immunity from civil liability for conducting warrantless search of residence for fugitive, relevant question was whether reasonable officer could have believed warrantless search to be lawful, in light of clearly established law and information searching officers possessed; subjective beliefs of agent conducting search about search were irrelevant.

**[7] States 360 ⟜79**

360 States
    360II Government and Officers
        360k79 k. Liabilities of Officers for Negligence or Misconduct. Most Cited Cases

**United States 393 ⟜50.10(3)**

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for Negligence or Misconduct
            393k50.10 Particular Acts or Claims
            393k50.10(3) k. Criminal Law Enforcement and Investigation; Prisoners' Claims. Most Cited Cases

State and federal law enforcement officers are protected by qualified immunity from civil liability for actions satisfying standard of objective legal reasonableness, assessed in light of legal rules clearly established at time action was taken.

**[8] Civil Rights 78 ⟜1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
            78k1376(1) k. In General. Most Cited Cases

(Formerly 78k214(1), 78k13.8(1))

Qualified immunity from civil liability may be extended to officials who conduct unlawful warrant-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

less searches.

**[9] Civil Rights 78 ☞1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(1) k. In General. Most Cited Cases
    (Formerly 78k214(1), 78k13.8(1))
No exception to general rule of qualified immunity from civil liability exists in cases involving allegedly unlawful warrantless searches of innocent third parties' homes for fugitives.

**[10] Officers and Public Employees 283 ☞114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases
General rule of qualified immunity from civil liability is intended to provide government officials with ability reasonably to anticipate when their conduct may give rise to liability; where rule is applicable, officials can know that they will no longer be held personally liable as long as their actions are reasonable in light of current American law.

**[11] Federal Civil Procedure 170A ☞1825**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1825 k. Motion and Proceedings Thereon. Most Cited Cases

**Federal Civil Procedure 170A ☞2532**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2532 k. Time for Motion. Most

Cited Cases
In ruling on FBI agent's claim of qualified immunity from civil liability for warrantless search of home for fugitive, district court was required first to determine whether actions residents' alleged that agent took were actions that reasonable officer could have believed lawful, in which case agent would be entitled to dismissal of residents *Bivens* claims prior to discovery, but if not, and if actions agent claimed to have taken were different from those alleged by residents, discovery might be necessary before ruling on agent's motion for summary judgment on qualified immunity grounds.

**\*\*3036 \*635 *Syllabus* FN\***

    FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

    Petitioner, a Federal Bureau of Investigation agent, participated with other law enforcement officers in a warrantless search of respondents' home. The search was conducted because petitioner believed that one Dixon, who was suspected of a bank robbery committed earlier that day, might be found there, but he was not. Respondents filed a state-court action against petitioner, asserting a claim for damages under the Fourth Amendment. Petitioner removed the suit to Federal District Court and then filed a motion for dismissal or summary judgment, arguing that the Fourth Amendment claim was barred by his qualified immunity from civil damages liability. Before any discovery occurred, the court granted summary judgment on the ground that the search was lawful. The Court of Appeals reversed, holding that the search's lawfulness could not be determined on summary judgment, because factual disputes precluded deciding as a matter of law that the search was supported by probable cause and exigent circumstances. The court also held that petitioner was not entitled to summary judgment on qualified immunity grounds, since the right he allegedly violated-the right of persons to be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 S.Ct. 3034                                                                                                      Page 4
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

protected from warrantless searches of their homes unless the searching officers have probable cause and there are exigent circumstances-was clearly established.

*Held:*

1. Petitioner is entitled to summary judgment on qualified immunity grounds if he can establish as a matter of law that a reasonable officer could have believed that the search comported with the Fourth Amendment even though it actually did not. Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time the action was taken. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396. In order to conclude that the right which the official **3037** allegedly violated is "clearly established," the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The Court of Appeals-which apparently considered only the fact that the right to be free from warrantless searches of one's home unless the searching officers have probable cause *636** and there are exigent circumstances was clearly established-erred by refusing to consider the argument that it was *not* clearly established that the circumstances with which petitioner was confronted did not constitute probable cause and exigent circumstances. The relevant question here is the objective question whether a reasonable officer could have believed petitioner's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. Petitioner's subjective beliefs about the search are irrelevant. Pp. 3038-3040.

2. There is no merit to respondents' argument that it is inappropriate to give officials alleged to have violated the Fourth Amendment-and thus necessarily to have *unreasonably* searched or seized-the protection of a qualified immunity intended only to protect *reasonable* official action. Such ar-

gument is foreclosed by the fact that this Court has previously extended qualified immunity to officials who were alleged to have violated the Fourth Amendment. Also without merit is respondents' suggestion that *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411, be overruled by holding that qualified immunity may never be extended to officials who conduct unlawful warrantless searches. Nor is there any merit to respondents' contention that no immunity should be provided to police officers who conduct unlawful warrantless searches of innocent third parties' homes in search of fugitives. Pp. 3040-3042.

766 F.2d 1269, vacated and remanded.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. ----.

*Andrew J. Pincus* argued the cause for petitioner. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Ayer, Barbara L. Herwig,* and *Richard A. Olderman.*
*John P. Sheehy* argued the cause *pro hac vice* for respondents. With him on the brief was *Ronald I. Meshbesher.*\*
\* *David Rudovsky, Jack D. Novik,* and *Michael Avery* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.
Justice SCALIA delivered the opinion of the Court.

The question presented is whether a federal law enforcement officer who participates in a search that violates the Fourth Amendment may be held personally liable for money *637** damages if a reasonable officer could have believed that the search comported with the Fourth Amendment.

I

Petitioner Russell Anderson is an agent of the Federal Bureau of Investigation. On November 11, 1983, Anderson and other state and federal law en-

483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

forcement officers conducted a warrantless search of the home of respondents, the Creighton family. The search was conducted because Anderson believed that Vadaain Dixon, a man suspected of a bank robbery committed earlier that day, might be found there. He was not.

The Creightons later filed suit against Anderson in a Minnesota state court, asserting among other things a claim for money damages under the Fourth Amendment, see *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).[FN1] After removing the suit to Federal District Court, Anderson filed a motion to dismiss or for **3038 summary judgment, arguing that the *Bivens* claim was barred by Anderson's qualified immunity from civil damages liability. See *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Before any discovery took place, the District Court granted summary judgment on the ground that the search was lawful, holding that the undisputed facts revealed that Anderson had had probable cause to search the Creighton's home and that his failure to obtain a warrant was justified by the presence of exigent circumstances. App. to Pet. for Cert. 23a-25a.

> FN1. The Creightons also named other defendants and advanced various other claims against both Anderson and the other defendants. Only the *Bivens* claim against Anderson remains at issue in this case, however.

The Creightons appealed to the Court of Appeals for the Eighth Circuit, which reversed. *Creighton v. St. Paul,* 766 F.2d 1269 (1985). The Court of Appeals held that the issue of the lawfulness of the search could not properly be decided on summary judgment, because unresolved factual disputes *638 made it impossible to determine as a matter of law that the warrantless search had been supported by probable cause and exigent circumstances. *Id.,* at 1272-1276. The Court of Appeals also held that Anderson was not entitled to summary judgment on qualified immunity grounds,

since the right Anderson was alleged to have violated-the right of persons to be protected from warrantless searches of their home unless the searching officers have probable cause and there are exigent circumstances-was clearly established. *Ibid.*

Anderson filed a petition for certiorari, arguing that the Court of Appeals erred by refusing to consider his argument that he was entitled to summary judgment on qualified immunity grounds if he could establish as a matter of law that a reasonable officer could have believed the search to be lawful. We granted the petition, 478 U.S. 1003, 106 S.Ct. 3292, 92 L.Ed.2d 708 (1986), to consider that important question.

## II

[1][2] When government officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald,* 457 U.S., at 814, 102 S.Ct., at 2736. On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. *Ibid.* Our cases have accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. See, *e.g., Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"); *id.,* at 344-345, 106 S.Ct., at 1097-1098 (police officers applying for warrants are immune if a *639 reasonable officer could have believed that there was probable cause to support the application); *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985) (officials are immune unless "the law clearly proscribed the actions" they took); *Davis v. Scherer,* 468 U.S. 183,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984); *id.,* at 198, 104 S.Ct., at 3021 (BRENNAN, J., concurring in part and dissenting in part); *Harlow v. Fitzgerald, supra,* 457 U.S., at 819, 102 S.Ct., at 2738. Cf., *e.g., Procunier v. Navarette,* 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action. *Harlow,* 457 U.S., at 819, 102 S.Ct., at 2739, assessed in light of the legal rules that were "clearly established" at the time it was taken, *id.,* at 818, 102 S.Ct., at 2738.

[3] The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal **3039** rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." *Davis,* **640** *supra,* 468 U.S., at 195, 104 S.Ct., at 3019.[FN2] It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The con-

tours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell, supra,* 472 U.S., at 535, n. 12, 105 S.Ct., at 2820, n. 12; but it is to say that in the light of pre-existing law the unlawfulness must be apparent. See, *e.g., Malley, supra,* 475 U.S., at 344-345, 106 S.Ct., at 1097-1098; *Mitchell, supra,* 472 U.S., at 528, 105 S.Ct., at 2816; *Davis, supra,* 468 U.S., at 191, 195, 104 S.Ct., at 3017, 3019.

> FN2. The dissent, which seemingly would adopt this approach, seeks to avoid the unqualified liability that would follow by advancing the suggestion that officials generally (though not law enforcement officials, see *post,* at 3046, 3051-3052, and officials accused of violating the Fourth Amendment, see *post,* at 3049-3053) be permitted to raise a defense of reasonable good faith, which apparently could be asserted and proved only at trial. See *post,* at 3046. But even when so modified (and even for the fortunate officials to whom the modification applies) the approach would totally abandon the concern-which was the driving force behind *Harlow's* substantial reformulation of qualified-immunity principles-that "insubstantial claims" against government officials be resolved prior to discovery and on summary judgment if possible. *Harlow,* 457 U.S., at 818-819, 102 S.Ct., at 2738. A passably clever plaintiff would always be able to identify an abstract clearly established right that the defendant could be alleged to have violated, and the good-faith defense envisioned by the dissent would be available only at trial.

[4] Anderson contends that the Court of Appeals misapplied these principles. We agree. The Court of Appeals' brief discussion of qualified immunity consisted of little more than an assertion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

that a general right Anderson was alleged to have violated-the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances-was clearly established. The Court of Appeals specifically refused to consider the argument that it was *not* clearly established that the circumstances with which Anderson was confronted did **\*641** not constitute probable cause and exigent circumstances. The previous discussion should make clear that this refusal was erroneous. It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that Anderson's search was objectively legally unreasonable. We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials**\*\*3040** -like other officials who act in ways they reasonably believe to be lawful-should not be held personally liable. See *Malley, supra,* 475 U.S., at 344-345, 106 S.Ct., at 1097-1098. The same is true of their conclusions regarding exigent circumstances.

[5][6] It follows from what we have said that the determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials. But contrary to the Creightons' assertion, this does not reintroduce into qualified immunity analysis the inquiry into officials' subjective intent that *Harlow* sought to minimize. See *Harlow, supra,* 457 U.S., at 815-820, 102 S.Ct., at 2736-2739. The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. Anderson's subjective beliefs about the search are irrelevant.

The principles of qualified immunity that we

reaffirm today require that Anderson be permitted to argue that he is entitled to summary judgment on the ground that, in light of the clearly established principles governing warrantless searches, he could, as a matter of law, reasonably have believed that the search of the Creightons' home was lawful.FN3

> FN3. The Creightons argue that the qualified immunity doctrine need not be expanded to apply to the circumstances of this case, because the Federal Government and various state governments have established programs through which they reimburse officials for expenses and liability incurred in suits challenging actions they have taken in their official capacities. Because our holding today does not extend official qualified immunity beyond the bounds articulated in *Harlow* and our subsequent cases, an argument as to why we should not do so is beside the point. Moreover, even assuming that conscientious officials care only about their personal liability and not the liability of the government they serve, the Creightons do not and could not reasonably contend that the programs to which they refer make reimbursement sufficiently certain and generally available to justify reconsideration of the balance struck in *Harlow* and subsequent cases. See 28 CFR § 50.15(c) (1987) (*permitting* reimbursement of Department of Justice employees when the Attorney General finds reimbursement appropriate); 5 F. Harper, F. James, & O. Gray, Law of Torts § 29.9, n. 20 (2nd ed. 1986) (listing various state programs).

**\*642** III

[7] In addition to relying on the reasoning of the Court of Appeals, the Creightons advance three alternative grounds for affirmance. All of these take the same form, *i.e.,* that even if Anderson is entitled to qualified immunity under the usual principles of qualified immunity law we have just described, an exception should be made to those principles in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:06-cv-01057-WKW-WC    Document 30-2    Filed 01/18/2008    Page 89 of 618

107 S.Ct. 3034                                                                                                Page 8
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

circumstances of this case. We note at the outset the heavy burden this argument must sustain to be successful. We have emphasized that the doctrine of qualified immunity reflects a balance that has been struck "across the board," *Harlow, supra,* 457 U.S., at 821, 102 S.Ct., at 2740 (BRENNAN, J., concurring). See also *Malley,* 475 U.S., at 340, 106 S.Ct., at 1096 (" 'For executive officers in general, ... qualified immunity represents the norm.' " (quoting *Harlow, supra,* 457 U.S., at 807, 102 S.Ct., at 2732)).[FN4] Although we have in narrow circumstances provided officials with an absolute immunity, see, **\*643** *e.g., Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), we have been unwilling to complicate qualified immunity analysis by making **\*\*3041** the scope or extent of immunity turn on the precise nature of various officials' duties or the precise character of the particular rights alleged to have been violated. An immunity that has as many variants as there are modes of official action and types of rights would not give conscientious officials that assurance of protection that it is the object of the doctrine to provide. With that observation in mind, we turn to the particular arguments advanced by the Creightons.

> FN4. These decisions demonstrate the emptiness of the dissent's assertion that "[t]oday this Court makes the fundamental error of simply assuming that *Harlow* immunity is just as appropriate for federal law enforcement officers ... as it is for high government officials." *Post,* at 3046 (footnote omitted). Just last Term the Court unanimously held that state and federal law enforcement officers were protected by the qualified immunity described in *Harlow. Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). We see no reason to overrule that holding.

First, and most broadly, the Creightons argue that it is inappropriate to give officials alleged to have violated the Fourth Amendment-and thus necessarily to have *unreasonably* searched or seized-the protection of a qualified immunity intended only to protect reasonable official action. It is not possible, that is, to say that one "reasonably" acted unreasonably. The short answer to this argument is that it is foreclosed by the fact that we have previously extended qualified immunity to officials who were alleged to have violated the Fourth Amendment. See *Malley, supra* (police officers alleged to have caused an unconstitutional arrest); *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (officials alleged to have conducted warrantless wiretaps). Even if that were not so, however, we would still find the argument unpersuasive. Its surface appeal is attributable to the circumstance that the Fourth Amendment's guarantees have been expressed in terms of "unreasonable" searches and seizures. Had an equally serviceable term, such as "undue" searches and seizures been employed, what might be termed the "reasonably unreasonable" argument against application of *Harlow* to the Fourth Amendment would not be available-just as it *would* be available against application of *Harlow* to the Fifth Amendment if the term "reasonable process of law" had been employed there. The fact is that, regardless of the terminology used, the precise content of most of the Constitution's **\*644** civil-liberties guarantees rests upon an assessment of what accommodation between governmental need and individual freedom is reasonable, so that the Creightons' objection, if it has any substance, applies to the application of *Harlow* generally. We have frequently observed, and our many cases on the point amply demonstrate, the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment. See, *e.g., Malley, supra,* 475 U.S., at 341, 106 S.Ct., at 1096. Law enforcement officers whose judgments in making these difficult determinations are objectively legally reasonable should no more be held personally liable in damages than should officials making analogous determinations in other areas of law.

[8] For the same reasons, we also reject the Creightons' narrower suggestion that we overrule *Mitchell, supra* (extending qualified immunity to officials who conducted warrantless wiretaps), by holding that qualified immunity may never be ex-

107 S.Ct. 3034
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

tended to officials who conduct unlawful warrant-
less searches.

[9] Finally, we reject the Creightons' narrowest
and most procrustean proposal: that no immunity
should be provided to police officers who conduct
unlawful warrantless searches of innocent third
parties' homes in search of fugitives. They rest this
proposal on the assertion that officers conducting
such searches were strictly liable at English com-
mon law if the fugitive was not present. See, *e.g.,
Entick v. Carrington,* 19 How.St.Tr. 1029, 95
Eng.Rep. 807 (K.B.1765). Although it is true that
we have observed that our determinations as to the
scope of official immunity are made in the light of
the "common-law tradition," FN5 *Malley, supra,* at
342, 106 S.Ct., at **3042** 1096, *645 we have nev-
er suggested that the precise contours of official im-
munity can and should be slavishly derived from
the often arcane rules of the common law. That no-
tion is plainly contradicted by *Harlow,* where the
Court completely reformulated qualified immunity
along principles not at all embodied in the common
law, replacing the inquiry into subjective malice so
frequently required at common law with an object-
ive inquiry into the legal reasonableness of the offi-
cial action. See *Harlow,* 457 U.S., at 815-820, 102
S.Ct., at 2736-2739. As we noted before, *Harlow*
clearly expressed the understanding that the general
principle of qualified immunity it established would
be applied "across the board."

> FN5. Of course, it is the American rather
> than the English common-law tradition
> that is relevant, cf. *Malley, supra,* at
> 340-342, 106 S.Ct., at 1095-1097; and the
> American rule appears to have been con-
> siderably less draconian than the English.
> See Restatement (Second) of Torts §§ 204,
> 206 (1965) (officers with an arrest warrant
> are privileged to enter a third party's house
> to effect arrest if they reasonably believe
> the fugitive to be there).

The approach suggested by the Creightons
would introduce into qualified immunity analysis a
complexity rivaling that which we found suffi-

ciently daunting to deter us from tailoring the doc-
trine to the nature of officials' duties or of the rights
allegedly violated. See *supra,* at 3040-3041. Just in
the field of unlawful arrests, for example, a cursory
examination of the Restatement (Second) of Torts
suggests that special exceptions from the general
rule of qualified immunity would have to be made
for arrests pursuant to a warrant but outside the jur-
isdiction of the issuing authority, §§ 122, 129(a),
arrests after the warrant had lapsed, §§ 122, 130(a),
and arrests without a warrant, § 121. Both the com-
plexity and the unsuitability of this approach are
betrayed by the fact that the Creightons' proposal it-
self does not actually apply the musty rule that is
purportedly its justification but instead suggests an
exception to qualified immunity for all fugitive
searches of third parties' dwellings, and not merely
(as the English rule appears to have provided) for
all *unsuccessful* fugitive searches of third parties'
dwellings. Moreover, from the sources cited by the
Creightons it appears to have been a corollary of
the English rule that where the search *was* success-
ful, no civil action would lie, whether or not prob-
able cause for the search existed. That also is (quite
prudently*646 but quite illogically) not urged upon
us in the Creightons' selective use of the common
law.

[10] The general rule of qualified immunity is
intended to provide government officials with the
ability "reasonably [to] anticipate when their con-
duct may give rise to liability for damages." *Davis,*
468 U.S., at 195, 104 S.Ct., at 3019. Where that
rule is applicable, officials can know that they will
not be held personally liable as long as their actions
are reasonable in light of current American law.
That security would be utterly defeated if officials
were unable to determine whether they were protec-
ted by the rule without entangling themselves in the
vagaries of the English and American common law.
We are unwilling to Balkanize the rule of qualified
immunity by carving exceptions at the level of de-
tail the Creightons propose. We therefore decline to
make an exception to the general rule of qualified
immunity for cases involving allegedly unlawful
warrantless searches of innocent third parties'
homes in search of fugitives.

483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

[11] For the reasons stated, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.FN6

> FN6. Noting that no discovery has yet taken place, the Creightons renew their argument that, whatever the appropriate qualified immunity standard, some discovery would be required before Anderson's summary judgment motion could be granted. We think the matter somewhat more complicated. One of the purposes of the *Harlow* qualified immunity standard is to protect public officials from the "broad-ranging discovery" that can be "peculiarly disruptive of effective government." 457 U.S., at 817, 102 S.Ct., at 2737-2738 (footnote omitted). For this reason, we have emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation. *Id.,* at 818, 102 S.Ct., at 2738. See also *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). Thus, on remand, it should first be determined whether the actions the Creightons allege Anderson to have taken are actions that a reasonable officer could have believed lawful. If they are, then Anderson is entitled to dismissal prior to discovery. Cf. *ibid.* If they are not, and if the actions Anderson claims he took are different from those the Creightons allege (and are actions that a reasonable officer could have believed lawful), then discovery may be necessary before Anderson's motion for summary judgment on qualified immunity grounds can be resolved. Of course, any such discovery should be tailored specifically to the question of Anderson's qualified immunity.

*It is so ordered.*

**3043 *647 Justice STEVENS, with whom Justice BRENNAN and Justice MARSHALL join, dissent-

ing.

This case is beguiling in its apparent simplicity. The Court accordingly represents its task as the clarification of the settled principles of qualified immunity that apply in damages suits brought against federal officials. Its opinion, however, announces a new rule of law that protects federal agents who make forcible nighttime entries into the homes of innocent citizens without probable cause, without a warrant, and without any valid emergency justification for their warrantless search. The Court stunningly restricts the constitutional accountability of the police by creating a false dichotomy between police entitlement to summary judgment on immunity grounds and damages liability for every police misstep, by responding to this dichotomy with an uncritical application of the precedents of qualified immunity that we have developed for a quite different group of high public office holders, and by displaying remarkably little fidelity to the countervailing principles of individual liberty and privacy that infuse the Fourth Amendment.FN1 Before I turn to the Court's opinion, it is appropriate to identify the issue confronted by the Court of Appeals. It is now apparent that it was correct in vacating the District Court's award of summary judgment to petitioner in advance of discovery.

FN1. The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

I

The Court of Appeals understood the principle of qualified immunity as implemented in *Harlow v. Fitzgerald,* 457 U.S. *648 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), to shield government officials performing discretionary functions from exposure to damages liability unless their conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 S.Ct. 3034
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

Applying this principle, the Court of Appeals held that respondents' Fourth Amendment rights and the "exigent circumstances" doctrine were "clearly established" at the time of the search. *Creighton v. St. Paul,* 766 F.2d 1269, 1277 (CA8 1985). Moreover, apparently referring to the "extraordinary circumstances" defense left open in *Harlow* for a defendant who "can prove that he neither knew nor should have known of the relevant legal standard,"457 U.S., at 819, 102 S.Ct., at 2738, the Court determined that petitioner could not reasonably have been unaware of these clearly established principles of law. Thus, in reviewing the Court of Appeals' judgment rejecting petitioner Anderson's claim to immunity, the first question to be decided is whether *Harlow v. Fitzgerald* requires immunity for a federal law enforcement agent who advances the fact-specific claim that a reasonable person in his position could have believed that his particular conduct would not violate rights that he concedes are clearly established. A negative answer to that question is required, both because *Harlow* provides an inappropriate measure of immunity when police acts that violate the Fourth Amendment are challenged, and also because petitioner cannot make the showing required for *Harlow* immunity. **3044 Second, apart from the particular requirements of the *Harlow* doctrine, a full review of the Court of Appeals' judgment raises the question whether this Court should approve a double standard of reasonableness-the constitutional standard already embodied in the Fourth Amendment and an even more generous standard that protects any officer who reasonably could have believed that his conduct was constitutionally reasonable. Because a careful analysis of the *Harlow*-related set of questions will be helpful in assessing the Court's continuing embrace of a double standard of reasonableness, I begin with *649 a discussion of petitioner's claim of entitlement to *Harlow* immunity.

## II

Accepting for the moment the Court's double standard of reasonableness, I would affirm the judgment of the Court of Appeals because it cor-

rectly concluded that petitioner has not satisfied the *Harlow* standard for immunity. The inquiry upon which the immunity determination hinges in this case illustrates an important limitation on the reach of the Court's opinion in *Harlow.* The defendants' claims to immunity at the summary judgment stage in *Harlow* and in *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), were bolstered by two policy concerns that are attenuated in suits against law enforcement agents in the field based on the Fourth Amendment. One was the substantial public interest in allowing government officials to devote their time and energy to the press of public business without the burden and distractions that invariably accompany the defense of a lawsuit. *Harlow,* 457 U.S., at 816-817, 102 S.Ct., at 2737; *Mitchell,* 472 U.S., at 524, 105 S.Ct., at 2814. The second underpinning of *Harlow* was the special unfairness associated with charging government officials with knowledge of a rule of law that had not yet been clearly recognized. *Harlow,* 457 U.S., at 818, 102 S.Ct., at 2738; *Mitchell,* 472 U.S., at 535, 105 S.Ct., at 2820.[FN2] Thus, if the *650 plaintiff's claim was **3045 predicated on a principle of law that was not clearly established at the time of the alleged wrong, both of those concerns would favor a determination of immunity not only in advance of trial, but of equal importance, before the time-consuming pretrial discovery process commenced. Concern for the depletion and diversion of public officials' energies led the Court in *Harlow* to abolish the doctrine that an official would be deprived of immunity on summary judgment if the plaintiff alleged that the official had acted with malicious intent to deprive his constitutional rights. See, *e.g., Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975).

FN2. This theme also pervades our pre-*Harlow* opinions construing the scope of official immunity in suits brought under 42 U.S.C. § 1983. Those precedents provide guidance for causes of action based directly on the Constitution, for "it would be 'untenable to draw a distinction for purposes of immunity law between suits brought against state officials under §

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 S.Ct. 3034
Page 13
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

1983 and suits brought directly under the Constitution against federal officials.' " *Harlow v. Fitzgerald,* 457 U.S., at 818, n. 30,102 S.Ct., at 2783, n. 30 (quoting *Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978)). Accord, *Malley v. Briggs,* 475 U.S. 335, 340, n. 2, 106 S.Ct. 1092, 1095, n. 2, 89 L.Ed.2d 271 (1986). While it is unfair to expect officials to anticipate changes in the law with a prescience that escapes even the most able scholars, lawyers, and judges, our precedents recognize that qualified immunity is entirely consistent with the requirement that federal officials act in a way that is consistent with an awareness of the fundamental constitutional rights enumerated in the Bill of Rights of the Constitution. In *Scheuer v. Rhodes,* 416 U.S. 232, 247-248, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974), we based the qualified immunity of high government officials for official acts upon "the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief." In *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975), we observed that a standard of "knowledge of the basic, unquestioned constitutional rights" of students "imposes neither an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system." In *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), we ruled that the immunity inquiry was, in relevant part, whether a state hospital superintendent charged with unconstitutionally confining a patient knew or reasonably should have known that his action would violate the patient's constitutional rights. And in *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978), the Court wrote:

"Because they could not reasonably have been expected to be aware of a constitutional right that had not yet been declared, petitioners did not act with such disregard for the established law that their conduct 'cannot reasonably be characterized as being in good faith.' *Wood v. Strickland,* 420 U.S., at 322 [95 S.Ct., at 1001]."

Thus, even the immunity of officials whose discretionary duties are broader than those of a law enforcement officer does not extend to conduct which they should have known was contrary to a constitutional norm. *Harlow* did not change this rule. See 457 U.S., at 819, 102 S.Ct., at 2738. Even if it were appropriate to apply this standard of immunity to law enforcement agents in the field, it should certainly provide no shield for a warrantless nighttime search of a private home that was unsupported by probable cause.

The Court's decision today, however, fails to recognize that *Harlow's* removal of one arrow from the plaintiff's arsenal at **\*651** the summary judgment stage did not also preclude the official from advancing a good-faith reasonableness claim at trial if *the character of his conduct* as established by the evidence warranted this strategy. The rule of the *Harlow* case, in contrast, focuses on *the character of the plaintiff's legal claim* and, when properly invoked, protects the government executive from spending his time in depositions, document review, and conferences about litigation strategy. Consistently with this overriding concern to avoid "the litigation of the subjective good faith of government officials,"457 U.S., at 816, 102 S.Ct., at 2737, *Harlow* does not allow discovery until the issue whether the official's alleged conduct violated a clearly established constitutional right has been determined on a motion for summary judgment. *Id.,* at 818, 102 S.Ct., at 2738. *Harlow* implicitly assumed that many immunity issues could be determined as a matter of law before the parties had exchanged depositions, answers to interrogatories, and admissions.FN3

FN3. "If the law at that time was not

107 S.Ct. 3034
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow,* 457 U.S., at 818, 102 S.Ct., at 2738. Logically, this reasoning does not extend to cases such as this one in which both the constitutional command and an exception to the rule for conduct that responds to a narrowly defined category of factual situations are clearly established, and the dispute is whether the situation that the officer confronted fits within the category.

The considerations underlying the formulation of the immunity rule in *Harlow* for Executive Branch officials, however, are quite distinct from those that led the Court to its prior recognition of immunity for federal law enforcement officials in suits against them founded on the Constitution. This observation is hardly surprising, for the question of immunity only acquires importance once a cause of action is created; the "practical consequences of a holding that no remedy has been authorized against a public official are essentially the same as those flowing from a conclusion that the official has absolute immunity." *Mitchell v. Forsyth,* 472 U.S., at 538, 105 S.Ct., at 2822 (STEVENS, J., concurring in judgment). Probing the **652** question of immunity raised in this case therefore must begin, not with a rote recitation of the *Harlow* standard, but with an examination of the cause of action that brought the immunity question now before us into play in the first instance.

As every student of federal jurisdiction quickly learns, the Court in *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 397, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971), held that Bivens had a cause of action against federal agents "to recover money damages for any injuries he has suffered as a result of the agents' violation of the [Fourth] Amendment." In addition to finding that no cause of action was available, the District Court in that case had relied on the alternative holding

that **3046** respondents were immune from liability because of their official position. Because the Court of Appeals for the Second Circuit had not passed on this immunity ruling, we did not consider it. *Id.,* at 397-398, 91 S.Ct., at 2005. On remand, in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 456 F.2d 1339, 1348 (1972), the Court of Appeals articulated a dual standard of reasonableness. As an initial matter, the Court rejected the agents' claim under *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), which had recognized immunity for an official who performs "discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority." *Id.,* at 575, 79 S.Ct., at 1341. The Second Circuit wisely noted that it "would be a sorry state of affairs if an officer had the 'discretion' to enter a dwelling at 6:30 A.M., without a warrant or probable cause...."456 F.2d, at 1346. That court nevertheless recognized the need to balance protection of the police from "the demands of every person who manages to escape from the toils of the criminal law" against the "right of citizens to be free from unlawful arrests and searches." *Id.,* at 1347. According to the Second Circuit, the officer "must not be held to act at his peril"; to obtain immunity he "need not allege and prove probable cause in the constitutional sense." *Id.,* at 1348. Instead, an agent *653 should prevail if he could prove "not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable." *Ibid.* Thus, an affirmative defense of reasonable good faith was available *at trial.*[FN4] In contrast, an immunity claim of the *Harlow* type[FN5] that would foreclose any trial at all was not available and, in my view, was not appropriate. The strength of the reasonable good-faith defense in any specific case would, of course, vary with the trial evidence about the facts upon which the officer had relied when he made the challenged search or arrest.[FN6]

> FN4. Cf. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980) (defendant has the burden of pleading good faith as an affirmative defense).

107 S.Ct. 3034
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

FN5. "Reliance on the objective reason-ableness of an official's conduct, as meas-ured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal develop-ments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is re-solved, discovery should not be allowed. If the law was clearly established, the im-munity defense ordinarily should fail, since a reasonably competent public offi-cial should know the law governing his conduct." *Harlow,* 457 U.S., at 818-819, 102 S.Ct., at 2738 (footnotes omitted).

FN6. The Court of Appeals in *Bivens* justi-fied the defense on the basis of the need to protect the officer from the hazards associ-ated with trying to predict whether a court would agree with his assessment that a par-ticular set of facts constituted probable cause. The court explained:

"The numerous dissents, concurrences and re-versals, especially in the last decade, indicate that even learned and experienced jurists have had diffi-culty in defining the rules that govern a determina-tion of probable cause, with or without a warrant. As he tries to find his way in this thicket, the police officer must not be held to act at his peril." *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 456 F.2d 1339, 1348 (CA2 1972) (citations omitted).

As the Court of Appeals recognized, assuring police officers the discretion to act in illegal ways would not be advantageous*654 to society. While

executives such as the Attorney General of the United States or a senior assistant to the President of the United States must have the latitude to take action in legally uncharted areas without constant exposure to damages suits, and are therefore en-titled to a rule of qualified immunity from many pretrial and trial proceedings, quite different con-siderations led the Second Circuit to recognize the affirmative defense of reasonable good **3047 faith in the *Bivens* case. Today this Court nevethe-less makes the fundamental error of simply assum-ing that *Harlow* immunity is just as appropriate for federal law enforcement officers such as petitioner FN7 as it is for high government officials.FN8 The doctrinal reach and precedential sweep of this mo-ment of forgetfulness are multiplied because of the interchangeability of immunity precedents between § 1983 suits against state officials and *Bivens* ac-tions against federal officials. Moreover, for the moment restricting my criticism of the Court's ana-lysis to the four corners of the *Harlow* framework, the Court errs by treating a denial of immunity for failure to satisfy the *Harlow* *655 standard as ne-cessarily tantamount to a ruling that the defendants are exposed to damages liability for their every vi-olation of the Fourth Amendment.FN9 Such a deni-al would not necessarily foreclose an affirmative defense based on the Second Circuit's thesis in *Bi-vens* that an officer may not be liable if his conduct complied with a lesser standard of reasonableness than the constitutional standard which it violated. The Court's failure to recognize that federal agents may retain a partial shield from damages liability, although not necessarily from pretrial and trial pro-ceedings, leads it to the erroneous conclusion that petitioner must have *Harlow* immunity or else none at all save the Fourth Amendment itself.FN10

FN7. "Is it not inferable that the point of the remand [to the Court of Appeals in *Bi-vens* ] was to ventilate the question of the possible existence of the kind of qualified privilege the Court of Appeals sustained, rather than the issue of immunity?" P. Bat-or, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 1421 (2d ed.

107 S.Ct. 3034
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

1973).

FN8. The Court asserts that this assumption merely reflects our holding last Term in *Malley v. Briggs,* 475 U.S., at 340, 106 S.Ct., at 1095. See *ante,* at 3040, n. 4. The *Malley* case, however, rejected a police officer's claim that he was entitled to absolute immunity because he had acted pursuant to an arrest warrant issued by a magistrate. We specifically declined to accept the petitioner's invitation "to expand what was a qualified immunity at common law into an absolute immunity." 475 U.S., at 342, 106 S.Ct., at 1097. We concluded that in "the case of the officer applying for a warrant" a rule of qualified immunity based on the *Harlow* standard would give "ample room for mistaken judgments." 475 U.S., at 343, 106 S.Ct., at 1097. Our opinion carefully avoided any comment on warrantless searches or the proper application of *Harlow* in cases in which the claim of "qualified immunity" could not be evaluated in advance of discovery.

FN9. "But if the test of 'clearly established law' were to be applied at this level of generality, ... [p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability...."*Ante,* at 3039.

FN10. The Court does not consider the possibility that the "objective reasonableness" of the officer's conduct may depend on the resolution of a factual dispute. Such a dispute may preclude the entry of summary judgment but, despite the Court's intimation to the contrary, see *ante,* at 3039, n. 2, should not necessarily prevent a jury from resolving the factual issues in the officer's favor and thereafter concluding that his conduct was objectively reasonable.

In Part III, I explain why the latter alternative is appropriate. For now, I assert the more limited

proposition that the Court of Appeals quite correctly rejected Anderson's claim that he is entitled to immunity under *Harlow. Harlow* does not speak to the extent, if any, of an official's insulation from monetary liability when the official concedes that the constitutional right he is charged with violating was deeply etched in our jurisprudence, but argues that he reasonably believed that *his* particular actions comported with the constitutional command. In this case the District Judge granted Anderson's motion for summary judgment because she was convinced that the agent had probable cause to enter the Creightons' home and that the absence of a search warrant was justified by exigent circumstances. In other words, the **\*656** District Judge concluded as a matter of law that there was no substantive constitutional violation. When respondents appealed, petitioner argued that even if the Constitution was violated, he was entitled to immunity because the law defining exigent **\*\*3048** circumstances was not clearly established when he searched the Creightons' home.[FN11] In setting aside the order granting summary judgment, the Court of Appeals concluded that many essential factual matters were sharply disputed and that if the Creightons' version of the incident were accepted, there was neither probable cause nor an exigent-circumstances justification for the search. It was therefore necessary to try the case to find out whether the Fourth Amendment had been violated. *Creighton v. St. Paul,* 766 F.2d, at 1277. The Court of Appeals' conclusion that summary judgment on the probable-cause and exigent-circumstances issues was not appropriate in advance of discovery was unquestionably correct.

FN11. He also made this argument in District Court. See Memorandum of Points and Authorities 29, 1 Record A-52.

The Court of Appeals also was correct in rejecting petitioner's argument based on the holding in *Harlow* that the qualified-immunity issue ought to be resolved on a motion for summary judgment before any discovery has taken place. 457 U.S., at 818-819, 102 S.Ct., at 2738.[FN12] The Court of Appeals rejected this **\*657** argument because it was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 S.Ct. 3034
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

convinced that the rule of law was clear. It also could have rejected the argument on an equally persuasive ground-namely, that the *Harlow* requirement concerning clearly established law applies to *the rule on which the plaintiff relies,* and that there was no doubt about the proposition that a warrantless entry into a home without probable cause is always unlawful.[FN13] The court does not even reach the exigent-circumstances inquiry unless and until the defendant has shown probable cause and is trying to establish that the search was legal notwithstanding the failure of the police to obtain a warrant. Thus, if we assume that the Court of Appeals was correct in its conclusion that probable cause had not been established, it was also correct in rejecting petitioner's claim to *Harlow* immunity, either because the exigent-circumstances exception to the warrant requirement was clearly established, or because a warrantless entry into a home without probable cause is always unlawful whether or not exigent circumstances are present.

> FN12. The *Harlow* standard of qualified immunity precludes a plaintiff from alleging the official's malice in order to defeat a qualified-immunity defense. By adopting a purely objective standard, however, *Harlow* may be inapplicable in at least two types of cases. In the first, the plaintiff can only obtain damages if the official's culpable state of mind is established. See, *e.g., Allen v. Scribner,* 812 F.2d 426, 436 (CA9 1987); Note, Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation, 95 Yale L.J. 126, 136-137 (1985). In the second, an official's conduct is not susceptible to a determination that it violated clearly established law because it is regulated by an extremely general and deeply entrenched norm, such as the command of due process or probable cause. The principle is clearly established, but whether it would brand the official's planned conduct as illegal often cannot be ascertained without reference to facts that may be in dispute. See *Reardon v. Wroan,*

811 F.2d 1025 (CA7 1987) (police officers denied qualified immunity on summary judgment because their conclusion of probable cause could be found objectively unreasonable when the facts are viewed in light most favorable to the plaintiffs); *Jasinski v. Adams,* 781 F.2d 843 (CA11 1986)*(per curiam)* (federal agent denied qualified immunity on summary judgment because of genuine issue of probable cause); *Deary v. Three Unnamed Police Officers,* 746 F.2d 185 (CA3 1984) (police officers denied qualified immunity on summary judgment because of genuine issue of probable cause).

> FN13. The Court's opinion reveals little, if any, interest in the facts of this case in which the complaint unquestionably alleged a violation of a clearly established rule of law. Instead, the Court focuses its attention on the hypothetical case in which a complaint drafted by a "passably clever plaintiff" is able to allege a "violation of extremely abstract rights." *Ante,* at 3039, and n. 2. I am more concerned with the average citizen who has alleged that law enforcement officers forced their way into his home without a warrant and without probable cause. The constitutional rule allegedly violated in this case is both concrete and clearly established.

   In this Court, Anderson has not argued that any relevant rule of law-whether the **\*\*3049** probable-cause requirement **\*658** or the exigent-circumstances exception to the warrant requirementwas not "clearly established" in November 1983. Rather, he argues that a competent officer might have concluded that the particular set of facts he faced did constitute "probable cause" and "exigent circumstances," and that his own reasonable belief that the conduct engaged in was within the law suffices to establish immunity. But the factual predicate for Anderson's argument is not found in the Creightons' complaint, but rather in the affidavits that he has filed in support of his motion for sum-

107 S.Ct. 3034
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

mary judgment. Obviously, the respondents must be given an opportunity to have discovery to test the accuracy and completeness of the factual basis for the immunity claim. Neither this Court,[FN14] nor petitioner,[FN15] disagrees with this proposition. It is therefore pellucidly clear that the Court of Appeals was correct in its conclusion that the record before it did not support the summary judgment.

> FN14. See *ante,* at 3042, n. 6.

> FN15. See Brief for Petitioner 33-34, n. 18.

The Court's decision today represents a departure from the view we expressed two years ago in *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). We held that petitioner was entitled to qualified immunity for authorizing an unconstitutional wiretap because it was not clearly established that warrantless domestic security wiretapping violated the Fourth Amendment. We added in a footnote:

> "We do not intend to suggest that an official is always immune from liability or suit for a warrantless search merely because the warrant requirement has never explicitly been held to apply to a search conducted in identical circumstances. But in cases where there is a legitimate question whether an exception to the warrant requirement exists, it cannot be said that a warrantless search violates clearly established law." *Id.,* at 535, n. 12, 105 S.Ct., at 2820, n. 12.

**\*659** Of course, the probable-cause requirement for an officer who faces the situation petitioner did was clearly established. In addition, an officer's belief that his particular warrantless search was justified (by exigent circumstances, in this case) is analytically no different from a situation in which the warrant requirement has not been explicitly held to apply to the particular search undertaken by the officer-the precise situation in which, as the Court recognized in *Mitchell v. Forsyth,* there would certainly be no immunity. The good-faith argument advanced by petitioner might support a judgment in his favor after there has been a

full examination of the facts, but it is not the kind of claim to immunity, based on the tentativeness or nonexistence of the constitutional rule allegedly violated by the officer, that we accepted in *Harlow* or in *Mitchell.*

### III

Although the question does not appear to have been argued in, or decided by, the Court of Appeals, this Court has decided to apply a double standard of reasonableness in damages actions against federal agents who are alleged to have violated an innocent citizen's Fourth Amendment rights. By double standard I mean a standard that affords a law enforcement official two layers of insulation from liability or other adverse consequence, such as suppression of evidence. Having already adopted such a double standard in applying the exclusionary rule to searches authorized by an invalid warrant, *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Court seems prepared and even anxious in this case to remove any requirement that the officer must obey the Fourth Amendment when entering a private home. I remain convinced that in a suit for damages as well as in a hearing on a motion to suppress evidence, "an official search and seizure cannot be both 'unreasonable' and 'reasonable' at the same time." *Id.,* at 960, 104 S.Ct., at 3445-3446 (STEVENS, J., dissenting).

**\*\*3050** A "federal official may not with impunity ignore the limitations which the controlling law has placed on his powers." **\*660** iButz v. Economou, *438 U.S. 478, 489, 98 S.Ct. 2894, 2902, 57 L.Ed.2d 895 (1978). The effect of the Court's (literally unwarranted) extension of qualified immunity, I fear, is that it allows federal agents to ignore the limitations of the probable-cause and warrant requirements with impunity. The Court does so in the name of avoiding interference with legitimate law enforcement activities even though the probable-cause requirement, which limits the police's exercise of coercive authority, is itself a form of immunity that frees them to exercise that power*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 S.Ct. 3034
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

*without fear of strict liability. See* Pierson v. Ray, *386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).*

The Court advances four arguments in support of the position that even though an entry into a private home is constitutionally unreasonable, it will not give rise to monetary liability if a reasonable officer could have believed it was reasonable: First, the probable-cause standard is so vague that it is unfair to expect law enforcement officers to comply with it; FN16 second, the reasons for not saddling high government officials with the burdens of litigation apply equally to law enforcement officers; FN17 third, there is nothing new in the Court's decision today because "we have previously extended qualified immunity to officials who were alleged to have violated the Fourth Amendment," *ante,* at 3041, and finally, holding police officers to the constitutional standard of reasonableness would "unduly inhibit officials in the discharge of their duties," *ante,* at 3038. None of these arguments on behalf of a double standard of reasonableness is persuasive to me.

> FN16. "We have frequently observed, and our many cases on the point amply demonstrate, the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment." *Ante,* at 3041.

> FN17. "Law enforcement officers whose judgments in making these difficult determinations are objectively legally reasonable should no more be held personally liable in damages than should officials making analogous determinations in other areas of law." *Ibid.*

Unquestionably, there is, and always has been, some uncertainty in the application of the probable-cause standard to particular cases. It is nevertheless a standard that has survived**661** the test of time both in England and in America. See 2 M. Hale, History of the Pleas of the Crown 150 (1847); J. Jolowicz & T. Lewis, Winfield on Tort 579-580

(8th ed. 1967); Weber, The Birth of Probable Cause, 11 Anglo-Am.L.Rev. 155, 166 (1982). Except in cases in which an officer relies on the fact that a magistrate has issued a warrant, there is no reason to believe that the Court's newly minted standard will provide any more certainty than the constitutional standard. Indeed, it is worth emphasizing that the probable-cause standard itself recognizes the fair leeway that law enforcement officers must have in carrying out their dangerous work. The concept of probable cause leaves room for mistakes, provided always that they are mistakes that could have been made by a reasonable officer. See 1 W. LaFave, Search and Seizure 567 (2d ed. 1987). I find nothing in this Court's new standard that provides the officer with any more guidance than the statement in our opinion in *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), almost four decades ago:

"These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best **3051** compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." *Id.,* at 176, 69 S.Ct., at 1311.

The suggestion that every law enforcement officer should be given the same measure of immunity as a Cabinet officer *662 or a senior aide to the President of the United States is not compelling. Testifying in court is a routine part of an officer's job; his or her participation in litigation does not occasion nearly as great a disruption of everyday duties as it would with those of a senior government official. Moreover, the political constraints

483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

that deter high government officials from violating the Constitution [FN18] have only slight, if any, application to police officers, and may actually lead to more, rather than less, vigorous enforcement activity. It is thus quite wrong simply to assume that the considerations that justified the decision in *Harlow v. Fitzgerald* also justify an equally broad rule of immunity for police officers. As we reasoned in *Scheuer v. Rhodes,* 416 U.S. 232, 245-247, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974):

> FN18. "Intense scrutiny, by the people, by the press, and by Congress, has been the traditional method for deterring violations of the Constitution by these high officers of the Executive Branch. Unless Congress authorizes other remedies, it presumably intends the retributions for any violations to be undertaken by political action. Congress is in the best position to decide whether the incremental deterrence added by a civil damages remedy outweighs the adverse effect that the exposure to personal liability may have on governmental decisionmaking. However the balance is struck, there surely is a national interest in enabling Cabinet officers with responsibilities in this area to perform their sensitive duties with decisiveness and without potentially ruinous hesitation." *Mitchell v. Forsyth,* 472 U.S. 511, 541, 105 S.Ct. 2806, 2823, 86 L.Ed.2d 411 (1985) (STEVENS, J., concurring in judgment).

"When a court evaluates police conduct relating to an arrest this guideline is 'good faith and probable cause.' ...In the case of higher officers of the executive branch, however, the inquiry is far more complex since the range of decisions and choices-whether the formulation of policy, of legislation, or budgets, or of day-to-day decisions-is virtually infinite.... [S]ince the options which a chief executive and his principal subordinates must consider are far broader and far more subtle than those made by officials with less responsibility, the range of discretion must be comparably broad."

**\*663** The Court supports its assertion that we have previously extended qualified immunity to officials who are alleged to have violated the Fourth Amendment, *ante,* at 3041, by reference to two cases: *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), which involved a search pursuant to a warrant, and *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), in which the plaintiff relied on a rule of law that was not clearly established at the time of the alleged wrong. Neither of these cases supports the proposition that a warrantless search should be evaluated under a standard less strict than the constitutional standard of reasonableness.[FN19] Despite its protestations to the contrary, the Court makes new law today.

> FN19. "The good-faith exception for searches conducted pursuant to warrants is not intended to signal our unwillingness strictly to enforce the requirements of the Fourth Amendment, and we do not believe that it will have this effect. As we have already suggested, the good-faith exception, turning as it does on objective reasonableness, should not be difficult to apply in practice. When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." *United States v. Leon,* 468 U.S. 897, 924, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984).

The argument that police officers need special immunity to encourage them to take vigorous enforcement action when they are uncertain about their right to make a forcible entry into a private home has already been accepted in our jurisprudence.**\*3052** We have held that the police act reasonably in entering a house when they have probable cause to believe a fugitive is in the house and exigent circumstances make it impracticable to obtain a warrant. This interpretation of the Fourth Amendment allows room for police intrusion, without a warrant, on the privacy of even innocent citizens. In *Pierson v. Ray,* 386 U.S., at 555, 87 S.Ct., at 1218,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

we held that police officers would not be liable in an action brought under 42 U.S.C. § 1983 "if they acted in good faith and with probable cause...." We explained: "Under the prevailing view in this country a peace officer who arrests someone with probable cause is not liable for false arrest simply because the innocence **\*664** of the suspect is later proved. Restatement, Second, Torts § 121 (1965); 1 Harper & James, The Law of Torts § 3.18, at 277-278 (1956); *Ward v. Fidelity & Deposit Co. of Maryland,* 179 F.2d 327 (CA 8th Cir.1950). A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." *Ibid.*

Thus, until now the Court has not found intolerable the use of a probable-cause standard to protect the police officer from exposure to liability simply because his reasonable conduct is subsequently shown to have been mistaken. Today, however, the Court counts the law enforcement interest twice [FN20] and the individual's privacy interest only once.

> FN20. "The question whether they had probable cause depends on what they reasonably believed with reference to the facts that confronted them, as the judge instructed in the passage we quoted earlier. To go on and instruct the jury further that even if the police acted without probable cause they should be exonerated if they reasonably (though erroneously) believed that they were acting reasonably is to confuse the jury and give the defendants two bites at the apple." *Llaguno v. Mingey,* 763 F.2d 1560, 1569 (CA7 1985) (Posner, J.) (en banc).

The Court's double-counting approach reflects understandable sympathy for the plight of the officer and an overriding interest in unfettered law enforcement. It ascribes a far lesser importance to the privacy interest of innocent citizens than did the Framers of the Fourth Amendment. The importance of that interest and the possible magnitude of its in-

vasion are both illustrated by the facts of this case. [FN21] The **\*665 \*\*3053** home of an innocent family was invaded by several officers without a warrant, without the owner's consent, with a substantial show of force, and with blunt expressions of disrespect for the law and for the rights of the family members. **\*666** As the case comes to us, we must assume that the intrusion violated the Fourth Amendment. See *Steagald v. United States,* 451 U.S. 204, 211, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981). Proceeding on that assumption, I see no reason why the family's interest in the security of its own home should be accorded a lesser weight than the Government's interest in carrying out an invasion that was unlawful. [FN22] Arguably, if the Government considers it important not to discourage such conduct, it should provide indemnity to its officers. Preferably, however, it should furnish the kind of training for its law enforcement agents that would entirely eliminate the necessity for the Court to distinguish between the conduct that a competent officer considers reasonable and the conduct that the Constitution deems reasonable. **\*667** 023

> FN21. The Court of Appeals described the search of respondents' home in some detail. Its opinion reads, in part, as follows:
>
> "Because the case was dismissed on Anderson's motion for summary judgment, we set out the facts in the light most favorable to the Creightons and draw all inferences from the underlying facts in their favor. *Adickes v. Kress & Co.,* 398 U.S. 144, 158-59 [90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142] (1970). On the night of November 11, 1983, Sarisse and Robert Creighton and their three young daughters were spending a quiet evening at their home when a spotlight suddenly flashed through their front window. Mr. Creighton opened the door and was confronted by several uniformed and plain clothes officers, many of them brandishing shotguns. All of the officers were white; the Creightons are black. Mr. Creighton claims that none of the officers responded when he asked what they wanted. Instead, by his account (as verified by a St. Paul police report), one of the officers told him to 'keep his hands in sight' while the other officers rushed through the door. When Mr. Creighton asked if they

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

had a search warrant, one of the officers told him, 'We don't have a search warrant [and] don't need [one]; you watch too much TV.'

"Mr. Creighton asked the officers to put their guns away because his children were frightened, but the officers refused. Mrs. Creighton awoke to the shrieking of her children, and was confronted by an officer who pointed a shotgun at her. She allegedly observed the officers yelling at her three daughters to 'sit their damn asses down and stop screaming.' She asked the officer, 'What the hell is going on?' The officer allegedly did not explain the situation and simply said to her, 'Why don't you make your damn kids sit on the couch and make them shut up.'

"One of the officers asked Mr. Creighton if he had a red and silver car. As Mr. Creighton led the officers downstairs to his garage, where his maroon Oldsmobile was parked, one of the officers punched him in the face, knocking him to the ground, and causing him to bleed from the mouth and the forehead. Mr. Creighton alleges that he was attempting to move past the officer to open the garage door when the officer panicked and hit him. The officer claims that Mr. Creighton attempted to grab his shotgun, even though Mr. Creighton was not a suspect in any crime and had no contraband in his home or on his person. Shaunda, the Creighton's ten-year-old daughter, witnessed the assault and screamed for her mother to come help. She claims that one of the officers then hit her.

"Mrs. Creighton phoned her mother, but an officer allegedly kicked and grabbed the phone and told her to 'hang up that damn phone.' She told her children to run to their neighbor's house for safety. The children ran out and a plain clothes officer chased them. The Creightons' neighbor allegedly told Mrs. Creighton that the officer ran into her house and grabbed Shaunda by the shoulders and shook her. The neighbor allegedly told the officer, 'Can't you see she's in shock; leave her alone and get out of my house.' Mrs. Creighton's mother later brought Shaunda to the emergency room at Children's Hospital for an arm injury caused by the officer's rough handling.

"During the melee, family members and friends began arriving at the Creighton's home. Mrs. Creighton claims that she was embarrassed in front of her family and friends by the invasion of their home and their rough treatment as if they were suspects in a major crime. At this time, she again asked Anderson for a search warrant. He allegedly replied, 'I don't need a damn search warrant when I'm looking for a fugitive.' The officers did not discover the allegedly unspecified 'fugitive' at the Creightons' home or any evidence whatsoever that he had been there or that the Creightons were involved in any type of criminal activity. Nonetheless, the officers then arrested and handcuffed Mr. Creighton for obstruction of justice and brought him to the police station where he was jailed overnight, then released without being charged." *Creighton v. St. Paul,* 766 F.2d 1269, 1270-1271 (CA8 1985) (footnote and citation omitted).

> FN22. Because this case involves the rule that should be applied to the conduct of a law enforcement officer employed by the Federal Government, Justice Jackson's dissenting opinion in *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302,93 L.Ed.2d 1879 (1949), is especially pertinent. He wrote, in part:

"These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." *Id.,* at 180, 69 S.Ct., at 1313.

> The Court's holding that a federal law enforcement officer is immune if a reasonable officer could have believed that the search was consistent with the Fourth Amendment raises the same difficulties in application as the Court's creation in *United States v. Leon* of a good-faith exception to the exclusionary rule when the police officer's reliance on an invalid warrant was objectively reasonable:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 S.Ct. 3034
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092
**(Cite as: 483 U.S. 635, 107 S.Ct. 3034)**

"Suppose, for example, that the challenge is to a search and seizure conducted by an FBI agent. The defendant shows that the agent was required to be aware of, and fully aware of, all relevant fourth amendment law. Would the reasonable reliance inquiry turn on whether a particular FBI agent's conduct lived up to the standards expected from someone who was apprised of, or should have been apprised of, relevant fourth amendment law? Or is it enough that the agent's conduct met the lower standard of the average well-trained police officer?... If th[e] individualized objective standard is to be the test under *Leon,* then motions to suppress may well require a far greater expenditure of judicial time than the Court seems to think should be devoted to protecting fourth amendment interests."Wasserstrom & Mertens, The Exclusionary Rule on the Scaffold: But Was It A Fair Trial?, 22 Am.Crim.L.Rev. 85, 120 (1984) (footnotes omitted).

IV

The Court was entirely faithful to the traditions that have been embedded in our law since the adoption of the Bill of Rights when it wrote:

"The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home-a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their **\*668** y(3)27 houses ... shall not be violated.' That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' *Silverman v. United States,* 365 U.S. 505, 511 [81 S.Ct. 679, 5 L.Ed.2d 734, (1961)]. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York,* 445 U.S. 573, 589-590, 100 S.Ct. 1371, 1381-1382, 63 L.Ed.2d 639 (1980). FN24

FN24. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Welsh v. Wisconsin,* 466 U.S. 740, 748, 104 S.Ct. 2091, 2096, 80 L.Ed.2d 732 (1984) (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)).

The warrant requirement safeguards this bedrock principle of the Fourth Amendment, while the immunity bestowed on a police officer who acts with probable cause permits him to do his job free of constant fear of monetary liability. The Court rests its doctrinally flawed opinion upon a double standard of reasonableness which unjustifiably and unnecessarily upsets the delicate balance between respect for individual privacy and protection of the public servants who enforce our laws.

I respectfully dissent.

U.S.,1987.
Anderson v. Creighton
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, 55 USLW 5092

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295                                                                                            Page 1

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894

**(Cite as: 458 F.3d 1295)**

H

Gray ex rel. Alexander v. Bostic
C.A.11 (Ala.),2006.

United States Court of Appeals,Eleventh Circuit.
Laquarius GRAY, a minor, by and through her
mother and next friend, Toniko L. ALEXANDER,
Plaintiff-Appellee,
v.
Antonio BOSTIC, individually and in his official
capacity as Deputy Sheriff for Tuscaloosa County,
AL, Edmund Sexton, individually and in his official
capacity as Principal of Holt Elementary School,
Tuscaloosa, AL, Defendants-Appellants,
Joyce Sellers, individually and in her official capa-
city as Superintendent of Tuscaloosa County, AL,
School System and/or Tuscaloosa County, AL,
Board of Education, et al., Defendants.
No. 06-10216
**Non-Argument Calendar.**

Aug. 7, 2006.

**Background:** Elementary school student
brought § 1983 action, by and through her mother,
against deputy sheriff who served as a school re-
source officer (SRO), county sheriff, and others,
arising from detention and handcuffing of student
during a physical education class. The United
States District Court for the Northern District of
Alabama dismissed action for failure to state a
claim, but the Court of Appeals reversed. On re-
mand, the District Court, No.
03-02989-CV-UWC-W,U.W. Clemon, Chief Judge,
denied defendants' motion for summary judgment
based on qualified immunity, and defendants took
interlocutory appeal.

**Holdings:** The Court of Appeals, Hull, Circuit
Judge, held that:

(1) deputy sheriff, acting as SRO, was acting
within scope of his discretionary authority when he
detained and handcuffed student;

(2) deputy acted reasonably in stopping student

to question her about her allegedly threatening con-
duct toward teacher;

(3) deputy's handcuffing of student violated her
Fourth Amendment rights;

(4) right violated by deputy was clearly estab-
lished, so he was not entitled to qualified immunity;
and

(5) sheriff could not be held personally liable
for deputy's violation of student's Fourth Amend-
ment rights.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Federal Courts 170B ⟪⟫574**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)2 Finality of Determination
                170Bk572 Interlocutory Orders Ap-
pealable
                    170Bk574 k. Other Particular Or-
ders. Most Cited Cases
Although the denial of summary judgment gener-
ally is not a final appealable order subject to imme-
diate appeal, an interlocutory appeal may be taken
where the district court denies the defense of quali-
fied immunity and the appeal involves a question of
law.

**[2] Federal Courts 170B ⟪⟫776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases

**Federal Courts 170B ⟪⟫802**

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894

**(Cite as: 458 F.3d 1295)**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
           170BVIII(K)3 Presumptions
                170Bk802 k. Summary Judgment.
Most Cited Cases
Court of Appeals reviews *de novo* a district court's denial of summary judgment based on qualified immunity, viewing the evidence in a light most favorable to the opposing party.

**[3] Civil Rights 78 ⛢1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
           78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
"Qualified immunity" offers a complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

**[4] Civil Rights 78 ⛢1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
           78k1376 Government Agencies and Officers
                78k1376(1) k. In General. Most Cited Cases

**Civil Rights 78 ⛢1407**

78 Civil Rights
    78III Federal Remedies in General
        78k1400 Presumptions, Inferences, and Burdens of Proof
           78k1407 k. Defenses; Immunity and Good Faith. Most Cited Cases
To be entitled to qualified immunity, a government official must prove that he was acting within the scope of his discretionary authority; once the defendants establish that they were acting within their discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate.

**[5] Civil Rights 78 ⛢1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
           78k1376 Government Agencies and Officers
                78k1376(1) k. In General. Most Cited Cases

**Civil Rights 78 ⛢1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
           78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
Under two-part test to evaluate whether an official is entitled to qualified immunity, Court of Appeals first addresses, as a threshold inquiry, whether the facts presented, taken in a light most favorable to the non-moving party, establish a constitutional violation; if Court answers this question in the affirmative, it then asks whether the right was clearly established.

**[6] Civil Rights 78 ⛢1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
           78k1376 Government Agencies and Officers
                78k1376(1) k. In General. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.2d 1295

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894

**(Cite as: 458 F.3d 1295)**

Page 5

To establish that a government official's challenged actions were within the scope of his discretionary authority, so as to support claim of qualified immunity, the official must show that those actions were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority; to that end, a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.

**[7] Civil Rights 78 ☞1376(6)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
         78k1376 Government Agencies and Officers
            78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Deputy sheriff who served as a school resource officer (SRO) at elementary school was acting within scope of his discretionary authority when he detained and handcuffed student who allegedly acted in disrespectful manner and threatened teacher during physical education class, thus supporting deputy's claim of qualified immunity in student's resulting § 1983 action alleging violation of her Fourth Amendment rights; deputy was charged with responsibility to investigate criminal activity that might be taking place at school and allegedly believed that student had committed a misdemeanor. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[8] Civil Rights 78 ☞1088(4)**

78 Civil Rights
   78I Rights Protected and Discrimination Prohibited in General
      78k1088 Police, Investigative, or Law Enforcement Activities
         78k1088(4) k. Arrest and Detention. Most Cited Cases
Elementary school student's excessive force claim against deputy sheriff who, while serving as school resource officer (SRO), detained and handcuffed

student after she allegedly acted in disrespectful manner and threatened teacher during physical education class was not an independent claim, but was subsumed within student's illegal seizure claim, in student's resulting § 1983 action, where student argued that deputy used excessive force in detaining her because he lacked a right to detain her at all. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[9] Schools 345 ☞169.5**

345 Schools
   345II Public Schools
      345II(L) Pupils
         345k169.5 k. Searches and Seizures. Most Cited Cases
The legality of a search of a student by a law enforcement officer should depend simply on the reasonableness, under all the circumstances, of the search. U.S.C.A. Const.Amend. 4.

**[10] Schools 345 ☞169.5**

345 Schools
   345II Public Schools
      345II(L) Pupils
         345k169.5 k. Searches and Seizures. Most Cited Cases
Under the reasonableness standard applicable to school seizures by law enforcement officers, the reasonableness of a search is evaluated using a two-step inquiry: first, one must consider whether the action was justified at its inception; second, one must determine whether the search as actually conducted was reasonably related in scope to the circumstances which justified interference in the first place. U.S.C.A. Const.Amend. 4.

**[11] Schools 345 ☞169**

345 Schools
   345II Public Schools
      345II(L) Pupils
         345k169 k. Control of Pupils and Discipline in General. Most Cited Cases
Deputy sheriff who served as a school resource officer (SRO) acted reasonably in stopping student to question her about her conduct, after witnessing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894

**(Cite as: 458 F.3d 1295)**

student threaten to do something physically to teacher in her physical education class, even if neither of two teachers that was present feared for their safety, in view of state statute providing that certain verbal threats would constitute misdemeanor of harassment. U.S.C.A. Const.Amend. 4; Ala.Code 1975, § 13A-11-8(a)(1-3).

**[12] Schools 345 🗝169**

345 Schools
    345II Public Schools
        345II(L) Pupils
            345k169 k. Control of Pupils and Discipline in General. Most Cited Cases
Conduct of deputy sheriff who, while serving as school resource officer (SRO), detained and handcuffed nine-year-old elementary school student after she allegedly acted in disrespectful manner and threatened teacher during physical education class was not reasonably related to scope of circumstances that justified deputy's initial investigatory stop of student, and thus deputy's conduct violated student's Fourth Amendment rights; handcuffing student was excessively intrusive given student's young age and fact that deputy acted not to protect anyone's safety, but to persuade student to get rid of her disrespectful attitude and to impress upon her the serious nature of committing crimes. U.S.C.A. Const.Amend. 4.

**[13] Schools 345 🗝169**

345 Schools
    345II Public Schools
        345II(L) Pupils
            345k169 k. Control of Pupils and Discipline in General. Most Cited Cases

**Schools 345 🗝169.5**

345 Schools
    345II Public Schools
        345II(L) Pupils
            345k169.5 k. Searches and Seizures. Most Cited Cases
A seizure by a law enforcement officer in a school setting will be permissible in its scope when the

measures adopted are reasonably related to the objectives of the seizure and not excessively intrusive in light of the age and sex of the student and the nature of the infraction. U.S.C.A. Const.Amend. 4.

**[14] Arrest 35 🗝63.5(9)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(9) k. Duration of Detention and Extent or Conduct of Investigation or Frisk. Most Cited Cases
An officer can handcuff a detainee during an investigatory stop when the officer reasonably believes that the detainee presents a potential threat to safety. U.S.C.A. Const.Amend. 4.

**[15] Civil Rights 78 🗝1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
            78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Fourth Amendment right of elementary school student that was violated by deputy sheriff who, while serving as school resource officer (SRO), detained and handcuffed student after she allegedly acted in disrespectful manner and threatened teacher during physical education class was clearly established, and thus deputy was not entitled to qualified immunity in student's resulting § 1983 action; even if there was no factually similar pre-existing caselaw to put deputy on notice this his conduct was objectively unreasonable, handcuffing of compliant nine-year-old girl, who posed no safety concerns, for sole purpose of punishing her was obvious violation of her Fourth Amendment rights. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[16] Civil Rights 78 🗝1376(2)**

78 Civil Rights

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894

**(Cite as: 458 F.3d 1295)**

78III Federal Remedies in General
  78k1372 Privilege or Immunity; Good Faith and Probable Cause
    78k1376 Government Agencies and Officers
      78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
Whether a constitutional right was clearly established at the time of a violation of that right, for purpose of qualified immunity analysis, turns on whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

**[17] Arrest 35 ☞63.5(9)**

35 Arrest
  35II On Criminal Charges
    35k63.5 Investigatory Stop or Stop-And-Frisk
      35k63.5(9) k. Duration of Detention and Extent or Conduct of Investigation or Frisk. Most Cited Cases
Under the Fourth Amendment, the scope of an investigative detention must be carefully tailored to its underlying justification, and the investigatory methods employed during a detention should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. U.S.C.A. Const.Amend. 4.

**[18] Civil Rights 78 ☞1376(2)**

78 Civil Rights
  78III Federal Remedies in General
    78k1372 Privilege or Immunity; Good Faith and Probable Cause
      78k1376 Government Agencies and Officers
        78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
Even in the absence of factually similar case law, an official can have fair warning that his conduct is unconstitutional, for purpose of qualified immunity analysis, when the constitutional violation is obvious.

**[19] Civil Rights 78 ☞1376(6)**

78 Civil Rights
  78III Federal Remedies in General
    78k1372 Privilege or Immunity; Good Faith and Probable Cause
      78k1376 Government Agencies and Officers
        78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
The Fourth Amendment's general proscription against unreasonable seizures seldom puts officers on notice that certain conduct is unlawful under precise circumstances, for purpose of determining whether right is clearly established under qualified immunity analysis. U.S.C.A. Const.Amend. 4.

**[20] Civil Rights 78 ☞1355**

78 Civil Rights
  78III Federal Remedies in General
    78k1353 Liability of Public Officials
      78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases
Supervisory officials cannot be held liable under § 1983 for the unconstitutional actions of their subordinates based on respondeat superior liability. 42 U.S.C.A. § 1983.

**[21] Civil Rights 78 ☞1358**

78 Civil Rights
  78III Federal Remedies in General
    78k1353 Liability of Public Officials
      78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases
Sheriff could not be held liable for deputy sheriff's violation of elementary school student's Fourth Amendment rights on ground that, under Alabama law, a deputy sheriff was the agent and alter ego of the sheriff, since such alter ego theory was equivalent of respondeat superior liability, which was not a permissible basis to support supervisory liability under § 1983. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.2d 1295
Page 60

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

**[22] Civil Rights 78 ⟲1355**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases
Supervisors can be held personally liable under § 1983 for unconstitutional actions of their subordinates when either (1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation. 42 U.S.C.A. § 1983.

**[23] Civil Rights 78 ⟲1355**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases
To hold supervisor personally liable under § 1983 for unconstitutional actions of their subordinates due to causal connection between the actions of the supervisor and the alleged constitutional violation, the causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. 42 U.S.C.A. § 1983.

**[24] Civil Rights 78 ⟲1355**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases
To be sufficient to notify a supervisor of a need to correct an alleged deprivation, as would support holding supervisor personally liable under § 1983 for unconstitutional actions of their subordinates due to causal connection between actions of supervisor and alleged constitutional violation, the

deprivations must not only be widespread, they also must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences. 42 U.S.C.A. § 1983.

**[25] Civil Rights 78 ⟲1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases
Sheriff did not have sufficient notice of possible constitutional deprivations, as would support holding sheriff personally liable, under § 1983, for deputy sheriff's violation of elementary school student's Fourth Amendment rights by handcuffing student following student's alleged making of physical threat toward teacher, absent evidence of widespread and obvious handcuffed detentions of students by the deputy involved or other deputy sheriffs. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[26] Civil Rights 78 ⟲1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases
Need for training deputy sheriffs as to detention of students was not so obvious that failure to do so constituted deliberate indifference to students' Fourth Amendment rights, as would warrant holding sheriff personally liable, under § 1983, for deputy sheriff's violation of elementary school student's Fourth Amendment rights by handcuffing student following student's alleged making of physical threat toward teacher. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[27] Civil Rights 78 ⟲1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

78k1376 Government Agencies and Officers

78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases

Any law that would require training of deputy sheriffs on how to detain students was not clearly established, such that reasonable person in sheriff's shoes would have known that failure to provide such training constituted deliberate indifference, for purpose of qualified immunity analysis in student's § 1983 action seeking to hold sheriff liable for deputy sheriff's deprivation of student's Fourth Amendment rights by handcuffing student following student's alleged making of physical threat toward teacher. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[28] Federal Courts 170B ⚖768.1**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
        170BVIII(K)1 In General
          170Bk768 Interlocutory, Collateral and Supplementary Proceedings and Questions
            170Bk768.1 k. In General. Most Cited Cases

Generally, the denial of summary judgment on a claim for injunctive relief is not a final appealable decision although, under the pendant appellate jurisdiction doctrine, Court of Appeals may address otherwise nonappealable orders if they are inextricably intertwined with an appealable decision.

**[29] Federal Courts 170B ⚖770**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
        170BVIII(K)1 In General
          170Bk768 Interlocutory, Collateral and Supplementary Proceedings and Questions
            170Bk770 k. On Separate Appeal from Interlocutory Judgment or Order. Most Cited Cases

Student's claim for injunctive relief against sheriff was inextricably intertwined with sheriff's argu-

ment that he was entitled to qualified immunity, in student's § 1983 action alleging violation of her Fourth Amendment rights by deputy sheriff who, while acting as school resource officer (SRO), handcuffed student following student's alleged making of physical threat toward teacher, and thus Court of Appeals reviewing denial of sheriff's motion for summary judgment based on qualified immunity, via interlocutory appeal, could also address district court's failure to grant summary judgment on student's claim for injunctive relief. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**\*1300** Travis Russell Wisdom, Robert McCollough Spence, Hubbard, Smith, McIlwain, Brakefield & Browder, P.C., Tuscaloosa, AL, for Defendants-Appellants.

Thomas Blake Liveoak, Collins, Liveoak & Boyles, P.C., Birmingham, AL, for Gray.

Appeal from the United States District Court for the Northern District of Alabama.

Before CARNES, HULL and PRYOR, Circuit Judges.

HULL, Circuit Judge:

This is the second appeal involving the detention and handcuffing of a nine-year-old student, Laquarius Gray, during her physical education class. The first time, we reversed the district court's Rule 12(b)(6) dismissal of this § 1983 action. *Gray v. Bostic,* 127 Fed.Appx. 472, 2004 WL 3112657 (11th Cir.2004). This time, the defendants appeal the district court's denial of their motions for summary judgment based on qualified immunity. After review, we affirm in part and reverse in part.

## I. BACKGROUND

### A. The Incident

Coach Lattuce Greer Williams believed that Gray was not doing "jumping jacks" along with the rest of the physical education class. Coach Williams told Gray she needed to do her exercises. When Gray failed to comply, Coach Williams told

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

GRAY v. Bostic
458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

Gray to "[c]ome to the wall" of the gym. Williams testified that as Gray walked to the wall, "[s]he told me that she would punch me or hit me, hit me in the face." A nearby teacher, Coach Tara Horton, witnessed the disagreement with Coach Williams. Coach Horton testified that Gray said, "I bust you in the head," which Coach Horton explained meant that "she was going to hit him in the head." Although Coach Williams and Coach Horton attribute slightly different language to Gray, the gist of their testimony is that Gray threatened to hit Coach Williams.

In contrast, Gray testified that she did not threaten to "bust" Coach Williams in the head. Although Gray could not remember what she said, she agreed that she threatened to "do something" to Coach Williams and that what she said was disrespectful, as follows:

Q: Then, [Coach Williams] told me that, at that point, you told him that you were going to bust him in his head; is that right?

A: No, sir.

Q: You didn't say that?

A: No, sir.

Q: Is Coach Williams lying to me?

MR. LIVEOAK: Objection

Q: (By Mr. Wisdom) You can answer. Is Coach Williams telling me a lie?

A: I guess he did. I don't remember what I said, but I didn't say that.

Q: You don't remember what you said?

A: (Witness shakes head.)

Q: You don't have any idea what you said?

MR. LIVEOAK: Is that no?

**\*1301** A: No.

Q: (By Mr. Wisdom) So, you don't know if you said that you might punch him; is that right: Did you say something to him that was disrespectful?

A: Yes, sir.

Q: What was that?

A: I don't remember.

Q: Did you tell him that you might do something to him?

A: Yes, sir.

....

Q: What did you tell him that you were going

to do to him?

A: I don't remember.[FN1]

> FN1. In the first appeal of the Rule 12(b)(6) dismissal, we reviewed the allegations in the complaint, which stated only that Gray made a "disrespectful comment" to Coach Williams. We noted that at the Rule 12(b)(6) juncture, there was no allegation of profanity or fighting words or that Gray was a danger to any teacher or student. *Gray,* No. 04-12240, slip op. at 14, 17, 2004 WL 3112657. Now, at the summary judgment juncture, we have deposition testimony as to what was said and the context in which it was said.

Because of the summary judgment posture of the case, we construe Gray's testimony as denying the coaches' version of what she said. However, Gray does not dispute that she threatened to "do something" physically to Coach Williams. Thus the precise nature of her physical threat-whether it was to hit him in the face, poke him in the eye or kick him in the shins-does not change our analysis.

After hearing Gray's threat to Coach Williams, Coach Horton instructed Gray to come over to her. Coach Williams then turned his attention back to his class.

Deputy Antonio Bostic also witnessed the exchange between Gray and Coach Williams. Deputy Bostic was employed as a Tuscaloosa County Sheriff's Deputy and served as a school resource officer ("SRO") for several schools, including Holt Elementary. Before Gray reached Coach Horton, Deputy Bostic intervened and told Coach Horton that he would talk to Gray. Coach Horton insisted that she would handle the matter. However, Deputy Bostic insisted that he would handle Gray and escorted Gray out the gym door into a lobby area.

Deputy Bostic told Gray to turn around, pulled her hands behind her back and put Gray in handcuffs. Deputy Bostic tightened the handcuffs to the point that they caused Gray pain. Deputy Bostic

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894

**(Cite as: 458 F.3d 1295)**

told Gray, "[T]his is how it feels when you break the law," and "[T]his is how it feels to be in jail." Gray began to cry. Gray stood with the handcuffs on for not less than five minutes, with Deputy Bostic standing behind her.[FN2]

> FN2. There is a factual dispute about how long Gray was in handcuffs. As to time, Gray testified that she did not know how long she stood in handcuffs. However, Gray was asked whether it was "less than five minutes," and replied "No, sir." When Coach Horton was asked how long Gray was in handcuffs, she responded, "I'm going to guestimate two minutes maybe." Deputy Bostic averred that he "detained [Gray] for less than 30 seconds ...." At the summary judgment stage, however, we must review the evidence in a light most favorable to Gray and assume that Gray was handcuffed for not less than five minutes.

In discovery responses, Deputy Bostic averred that he detained and handcuffed Gray "to impress upon her the serious nature of committing crimes that can lead to arrest, detention or incarceration" and "to help persuade her to rid herself of her disrespectful attitude." Deputy Bostic's discovery responses also stated that he *1302* "did not feel the need to apologize to LaQuarius Gray for telling her that she committed a misdemeanor in my presence and showing her what would happen if a less generous officer than I were to arrest her for her actions."[FN3] After Deputy Bostic took the handcuffs off, Gray went to the Coaches' Office until her next class.

> FN3. Deputy Bostic was never deposed and did not file a declaration in support of his motion for summary judgment. Therefore, the only sworn statement from Deputy Bostic relating to the events is contained in his interrogatory responses.

Neither Coach Horton nor Coach Williams was afraid of Gray or believed that Gray would actually

carry out her threat. When asked whether he was "ever afraid that [Gray] would commit an act of violence towards [him] or Ms. Horton," Coach Williams replied, "No, sir." Similarly, Coach Horton replied "No," when asked if she was "ever afraid that Ms. Gray would physically assault you or another student?" When asked, "[W]hen Ms. Gray told Coach Williams that she was going to bust him in the head she's not actually physically capable of doing that, is she," Coach Horton agreed. Coach Horton planned to talk with Gray about the incident and give her a warning. Coach Horton testified that she would not have been required to write Gray up, give Gray detention, or send her to the principal's office "because it wasn't that major."

*B. Court Proceedings*

On November 4, 2003, by and through her mother, Gray filed suit against Deputy Bostic and Tuscaloosa County Sheriff, Edmund Sexton in their official and individual capacities.[FN4] Gray's complaint contained eight counts, including claims: (1) under 42 U.S.C. § 1983 for violations of Gray's First, Fourth, Fifth, Eighth and Fourteenth Amendment rights (Count 1); (2) under 42 U.S.C. § 1981 for race discrimination (Count 2); and (3) under state law for invasion of privacy, assault and battery, false imprisonment, defamation and intentional infliction of emotional distress (Counts 4 through 8). Gray also sought declaratory and injunctive relief (Count 3). The defendants filed a motion to dismiss, which the district court granted.

> FN4. Gray's original complaint also alleged claims against Joyce Harris, Holt Elementary School's principal; Joyce Sellers, the Tuscaloosa County School Superintendent; and members of the Tuscaloosa County Board of Education. Gray subsequently dismissed these claims.

Gray appealed to this Court, challenging only the district court's dismissal of her Fourth Amendment claims against Deputy Bostic and Sheriff Sexton individually and the denial of her motion for leave to amend her complaint.[FN5] We reversed,

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

stating that on remand Gray was entitled to pursue her Fourth Amendment claims against defendants Deputy Bostic and Sheriff Sexton individually and to file an amended complaint. *Gray,* 127 Fed.Appx. 472. The district court ordered Gray to file an amended complaint asserting only the Fourth Amendment claims that remained following her appeal. Gray then amended her complaint, asserting claims of excessive use of force and unreasonable seizure against defendants Bostic and Sexton individually.

> FN5. In the prior appeal, Gray did not challenge the dismissal of her First, Fifth, Eighth and Fourteenth Amendment claims, her state law claims or her official capacity claims against Deputy Bostic and Sheriff Sexton.

Following discovery, the defendants moved for summary judgment based on **\*1303** qualified immunity. The district court denied the motion, prompting this interlocutory appeal.

## II. STANDARD OF REVIEW

[1][2] Although the denial of summary judgment generally is not a final appealable order subject to immediate appeal, an interlocutory appeal may be taken where the district court denies the defense of qualified immunity and the appeal involves a question of law. *McMillian v. Johnson,* 88 F.3d 1554, 1563, *amended on other grounds,* 101 F.3d 1363 (11th Cir.1996). We review *de novo* a district court's denial of summary judgment based on qualified immunity, viewing the evidence in a light most favorable to the opposing party. *Williams v. Consol. City of Jacksonville,* 341 F.3d 1261, 1266-67 (11th Cir.2003).

## III. DISCUSSION

### A. Qualified Immunity Principles

[3][4] "Qualified immunity offers a complete protection for government officials sued in their in-

dividual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). To be entitled to qualified immunity, the defendant must prove that he was acting within the scope of his discretionary authority. *Id.* "Once the defendants establish that they were acting within their discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate." *Lumley v. City of Dade City,* 327 F.3d 1186, 1194 (11th Cir.2003).

[5] The Supreme Court has established a two-part test to evaluate whether an official is entitled to qualified immunity. First, as a threshold inquiry, we address whether the facts presented, taken in a light most favorable to the non-moving party, establish a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). If we answer this question in the affirmative, then we "ask whether the right was clearly established." *Id.*

### B. Deputy Bostic's Discretionary Authority

[6] Gray argues that Deputy Bostic was not acting within the scope of his discretionary authority when he detained and handcuffed Gray. "To establish that the challenged actions were within the scope of his discretionary authority, a defendant must show that those actions were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Harbert Int'l v. James,* 157 F.3d 1271, 1282 (11th Cir.1998). To that end, "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Id.* (quotation marks omitted).

[7] Although our prior opinion concluding that Deputy Bostic was acting within his discretionary authority was at the Rule 12(b)(6) stage and was based on merely the allegations in the complaint,

there is no evidence at the summary judgment stage that changes our conclusion. Deputy Bostic as an SRO, was charged with the responsibility to investigate criminal activity that might be taking place at Holt Elementary School. As part of that responsibility, Deputy Bostic's duties included, under the right circumstances, detaining and questioning students and possibly arresting**\*1304** and handcuffing them. The fact that the right circumstances (for detention or handcuffing) may not have been present in this case is irrelevant to our inquiry. *See id.*(explaining that the "inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act" because "[f]ramed that way, the inquiry is no more than an 'untenable' tautology").

Gray stresses that SROs were not supposed to discipline students and that Deputy Bostic admitted in his interrogatory responses that his reasons for detaining and handcuffing Gray were to "impress upon her the serious nature of committing crimes that can lead to arrest, detention or incarceration" and "to help persuade her to rid herself of her disrespectful attitude." We note, however, that it is also clear from Deputy Bostic's interrogatory responses that he believed Gray had committed a misdemeanor when she threatened her teacher and that Deputy Bostic detained her to discuss the incident with her. Therefore, we conclude that Deputy Bostic's actions were within his discretionary duties and turn to whether his actions were unconstitutional.

### C. Constitutional Violations

[8] Gray argues that Deputy Bostic used excessive force in detaining her because he lacked a right to detain her at all. Therefore, her excessive force claim is not an independent claim, but rather is subsumed in her illegal seizure claim. *See Bashir v. Rockdale County,* 445 F.3d 1323, 1331 (11th Cir.2006) (stating that "[u]nder this Circuit's law ... a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim" (quotation marks omitted)).[FN6] Thus, our inquiry focuses on Deputy Bostic's seizure of Gray.

> FN6. Although Gray alleges that Deputy Bostic tightened the handcuffs enough to cause her pain, she has not argued that the handcuffing constituted excessive force even if Deputy Bostic's stop was supported by reasonable suspicion.

[9][10] As stated in Gray's earlier appeal, we apply the reasonableness standard articulated in *New Jersey v. T.L.O.,* 469 U.S. 325, 341-42, 105 S.Ct. 733, 742-43, 83 L.Ed.2d 720 (1985), to school seizures by law enforcement officers. *See Gray,* No. 04-12240, slip op. at 14, 2004 WL 3112657. In *T.L.O.*, the Supreme Court recognized that the substantial need to maintain discipline in the classroom and foster a positive learning environment "requires some modification of the level of suspicion of illicit activity needed to justify a search" in the public school setting. *T.L.O.* 469 U.S. at 340, 105 S.Ct. at 742. To that end, the Supreme Court concluded that "the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause." *Id.* at 341, 105 S.Ct. at 742. Instead, under *T.L.O.*'s reasonableness standard, "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* Under the *T.L.O.* standard, the reasonableness of the search is evaluated using a two-step inquiry: "first, one must consider 'whether the ... action was justified at its inception'; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified interference in the first place.' " *Id.* at 341, 105 S.Ct. at 742-43**\*1305** (citations omitted). The *T.L.O.* standard mirrors the standard announced in *Terry v. Ohio* governing the reasonableness of investigatory stops. *See Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

[11] Under *T.L.O.*'s first prong, we examine whether Deputy Bostic has a reasonable basis for

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

calling Gray over to him, i.e., stopping her, and asking her questions. It is undisputed that Deputy Bostic witnessed Gray threaten to do something physically to her teacher. Under Alabama Code § 13A-11-8, a verbal threat, "made with the intent to carry out the threat, that would cause a reasonable person who is the target of the threat to fear for his or her safety," constitutes the crime of harassment, which is a Class C misdemeanor. *See* Ala.Code § 13A-11-8(a)(1)-(3). Gray stresses neither Coach Williams nor Coach Horton feared for their safety and that Deputy Bostic had no probable cause or arguable probable cause to arrest her. However, under *T.L.O.,* the level of suspicion in a school setting needed to justify a search or an investigatory stop is only reasonableness under the circumstances. Given his having witnessed Gray's threat in a school setting, Deputy Bostic's stopping Gray to question her about her conduct was reasonable. FN7

> FN7. Although defendants claim Deputy Bostic had probable cause, the conduct in § 13A-11-8 cases has been generally more egregious and has involved a credible threat. *See, e.g., B.B. v. State,* 863 So.2d 132, 135-36 (Ala.Crim.App.2003) (holding that a disruptive seventh grade student who threatened to kill his teacher violated § 13A-11-8 where the student was very angry during the incident, uttered the threat through clenched teeth and threw a desk across the room while stating, "I hate that teacher, I hate that teacher," and the teacher and another witness both testified that they feared the student would harm the teacher); *Fallin v. City of Huntsville,* 865 So.2d 473, 477 (Ala.Crim.App.2003) (concluding that defendant violated § 13A-11-8 where defendant, a large man, was yelling threats to his daughter's cheerleading coach while approaching her with waving arms and pointing fingers and the coach and other witnesses testified that they were afraid for their safety).

However, because *T.L.O.* does not require probable cause in a school setting, we need not reach the issue of whether Deputy Bostic had prob-

able cause or arguable probable cause. *See Durruthy v. Pastor,* 351 F.3d 1080, 1089 (11th Cir.2003) (explaining that a showing of only arguable probable cause is required to establish that an officer is entitled to qualified immunity).

[12][13] Turning to *T.L.O.*'s second prong, we must consider whether Deputy Bostic's subsequent handcuffing of Gray "was reasonably related to the scope of the circumstances which justified the interference in the first place." *T.L.O.* 469 U.S. at 341, 105 S.Ct. at 743 (quotation marks omitted and emphasis supplied). "[A seizure] will be permissible in its scope when the measures adopted are reasonably related to the objectives of the [seizure] and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342, 105 S.Ct. at 743. After stopping Gray, Deputy Bostic not only questioned her, but also handcuffed her for not less than five minutes. Thus, the question under the second prong is whether the handcuffing of nine-year-old Gray was reasonably related to the scope of the circumstances which justified Deputy Bostic's initial interference and was not excessively intrusive.

[14] By his own admission, Deputy Bostic did not handcuff Gray to effect an arrest of Gray. Rather, his handcuffing of Gray was during an investigatory stop. Nonetheless, during an investigatory stop, an officer can still handcuff a detainee when the officer reasonably believes that the detainee presents a potential threat to **\*1306** safety. *See United States v. Hastamorir,* 881 F.2d 1551, 1557 (11th Cir.1989); *United States v. Blackman,* 66 F.3d 1572, 1576-77 (11th Cir.1995); *United States v. Kapperman,* 764 F.2d 786, 790-91 & n. 4 (11th Cir.1985).

The problem in this case for Deputy Bostic is that, at the time Deputy Bostic handcuffed Gray, there was no indication of a potential threat to anyone's safety. The incident was over, and Gray, after making the comment, had promptly complied with her teachers' instructions, coming to the gym wall and then to Coach Horton when told to do so. There is no evidence that Gray was gesturing or engaging

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

in any further disruptive behavior. Rather, Gray had cooperated with her teachers and did not pose a threat to anyone's safety. In fact, Coach Horton had insisted that she would handle the matter, but Deputy Bostic still intervened. Deputy Bostic does not even claim that he handcuffed Gray to protect his or anyone's safety. Rather, Deputy Bostic candidly admitted that he handcuffed Gray to persuade her to get rid of her disrespectful attitude and to impress upon her the serious nature of committing crimes. In effect, Deputy Bostic's handcuffing of Gray was his attempt to punish Gray in order to change her behavior in the future.

Thus, Deputy Bostic's handcuffing Gray was not reasonably related to the scope of the circumstances that justified the initial investigatory stop. Rather, the handcuffing was excessively intrusive given Gray's young age and the fact that it was not done to protect anyone's safety. Therefore, the handcuffing of Gray violated Gray's Fourth Amendment rights.

### D. Clearly Established Law

[15][16] Whether a constitutional right was "clearly established" at the time of the violation turns on " 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Bashir,* 445 F.3d at 1330 (quoting *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156). We focus on the status of the law in March 2003 when Deputy Bostic detained and handcuffed Gray.

[17] It is well settled that, under the Fourth Amendment, "[t]he scope of a detention must be carefully tailored to its underlying justification" and that the "investigatory methods employed [during a detention] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325-26, 75 L.Ed.2d 229 (1983). As we have already discussed, this Court has long concluded that it is reasonable for officers to use handcuffs to protect themselves during an investigative deten-

tion. *See Hastamorir,* 881 F.2d at 1556-57; *Kapperman,* 764 F.2d at 790 n. 4. However, Gray does not cite and we cannot locate a case addressing before today when it may be reasonable to use handcuffs in an investigatory stop absent a safety rationale. Thus, no factually similar pre-existing case law put Deputy Bostic on notice that his use of handcuffs to discipline Gray was objectively unreasonable for Fourth Amendment purposes.

[18] However, our inquiry does not end here. Even in the absence of factually similar case law, an official can have fair warning that his conduct is unconstitutional when the constitutional violation is obvious, sometimes referred to as "obvious clarity" cases. *See United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997) ("[A] general constitutional**1307** rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] been previously held unlawful."(quotation marks omitted)); *Vinyard v. Wilson,* 311 F.3d 1340, 1350-51 (11th Cir.2002).

[19] The Fourth Amendment's general proscription against "unreasonable" seizures seldom puts officers on notice that certain conduct is unlawful under precise circumstances. *Evans v. Stephens,* 407 F.3d 1272, 1283 (11th Cir.2005) (en banc). Nonetheless, on rare occasion we have concluded that general Fourth Amendment principles make the constitutional violation obvious. *See, e.g., Id.* at 1283 (concluding that the constitutional violation was obvious where an officer conducted body cavity searches in a degrading and forceful manner and when there was no need for immediate action); *Vinyard,* 311 F.3d at 1355 (concluding that the constitutional violation was obvious where the officer grabbed the arrestee by the hair and arm and applied pepper spray after she had been handcuffed and secured in the back of the patrol car); *Lee v. Ferraro,* 284 F.3d 1188, 1198-99 (11th Cir.2002) (concluding that the constitutional violation was readily apparent where an officer slammed the arrestee's head against the trunk after she was handcuffed, secured and any risk of danger or flight had

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894

**(Cite as: 458 F.3d 1295)**

passed); *Priester v. City of Riviera Beach,* 208 F.3d 919, 927 (11th Cir.2000) (concluding that the constitutional violation was obvious where an officer permitted his dog to attack a handcuffed, compliant arrestee for two minutes and then threatened to kill the arrestee when he kicked the dog in an effort to resist the attack). In these cases, the officer's conduct at issue lay "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [him] notwithstanding the lack of [fact-specific] case law." *Lee,* 284 F.3d at 1199 (internal quotation marks omitted). Put another way, the officer's conduct in these cases was "well beyond the 'hazy border' that sometimes separates lawful conduct from unlawful conduct," such that every objectively reasonable officer would have known that the conduct was unlawful. *Evans,* 407 F.3d at 1283.

We likewise conclude that Deputy Bostic's conduct in handcuffing Gray, a compliant, nine-year-old girl for the sole purpose of punishing her was an obvious violation of Gray's Fourth Amendment rights. After making the comment, Gray had complied with her teachers' and Deputy Bostic's instructions. Indeed, one of the teachers had informed Deputy Bostic that she would handle the matter. In addition, Deputy Bostic's purpose in handcuffing Gray was not to pursue an investigation to confirm or dispel his suspicions that Gray had committed a misdemeanor. Rather, Deputy Bostic's purpose in handcuffing Gray was simply to punish her and teach her a lesson. Every reasonable officer would have known that handcuffing a compliant nine-year-old child for purely punitive purposes is unreasonable. We emphasize that the Court is not saying that the use of handcuffs during an investigatory stop of a nine-year-old child is always unreasonable, but just unreasonable under the particular facts of this case.

Therefore, Deputy Bostic is not entitled to qualified immunity, and the district court properly denied summary judgment in his favor.

*E. Sheriff Sexton*

Gray alleges that Sheriff Sexton failed to train and supervise adequately Deputy **\*1308** Bostic on the proper use of force in this elementary school setting. The district court dismissed Gray's official capacity claim against Sheriff Sexton without challenge. Thus, all that remains is her individual capacity claim against Sheriff Sexton as Deputy Bostic's supervisor.

[20][21][22] Supervisory officials cannot be held liable under § 1983 for the unconstitutional actions of their subordinates based on respondeat superior liability. *Hartley v. Parnell,* 193 F.3d 1263, 1269 (11th Cir.1999).[FN8] Instead, supervisors can be held personally liable when either (1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation. *Id.* Gray does not allege that Sheriff Sexton personally participated in her handcuffed detention. Thus, Gray attempts to use the second method.

> FN8. For this reason, we reject Gray's argument that Sheriff Sexton can be held liable because, under Alabama law, a deputy sheriff is the agent and alter ego of the sheriff. To hold Sheriff Sexton liable for Deputy Bostic's alleged constitutional violation under an alter ego theory would amount to respondeat superior liability.

[23][24] Under the second method, "[t]he causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Id.* (quoting *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990)). Furthermore, to be sufficient to notify the supervisor, the deprivations must not only be widespread, they also "must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Id.* (quoting *Brown,* 906 F.2d at 671).

[25] There is no evidence in the record of widespread and obvious handcuffed detentions of students by Deputy Bostic or other deputy sheriffs.

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

There was some vague, arguably hearsay testimony by Coach Horton that she had heard that Deputy Bostic once placed another Holt Elementary student in handcuffs. However, there is no evidence that Sheriff Sexton was aware of this alleged incident. Furthermore, this one isolated incident, of which there are no details, is not sufficient to put Sheriff Sexton on notice that Deputy Bostic needed additional training or supervision on the use of force when detaining minors.

We also recognize that Gray alleges that Sheriff Sexton instituted a policy instructing deputies to detain, handcuff, arrest and incarcerate individuals who were not suspected of committing a crime. There is no evidence in the record, however, that Sheriff Sexton instituted such a policy or any other policy that would have led Deputy Bostic to believe that he could detain a student in handcuffs absent safety concerns.

Finally, Gray emphasizes that Deputy Bostic received no training specifically addressing the detention of students. She contends that Sheriff Sexton should have foreseen that unwarranted handcuffed detentions of students were "bound to happen" without such training. Thus, Gray is arguing that the need to train was "so obvious" that the failure to do so constituted deliberate indifference without prior notice. *See Gold v. City of Miami,* 151 F.3d 1346, 1352 (11th Cir.1998) (addressing municipal liability for failure to train).

The Supreme Court has "hypothesized that, in a narrow range of circumstances, a **\*1309** violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.* (quoting *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 409, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997)). However, the Supreme Court's only example of an obvious training need was the use of deadly force when police officers are given firearms. We have already determined that the need for training regarding the proper use of handcuffs is " '[u]nlike the risk from a particular glaring omission in a training regimen,' " and is in-

stead a risk from a "possible imperfection[ ], ... in ... training and supervision" that is " 'not obvious in the abstract.' " *Id.* at 1352 (quoting in part *Brown,* 520 U.S. at 409, 117 S.Ct. at 1391).

[26][27] We similarly conclude that the need for training regarding the detention of students specifically is not obvious in the abstract and that a lack of such training is a "possible imperfection," but not a "glaring omission" from a training regimen. Deputy Bostic received training, at both the police academy and the Tuscaloosa County Sheriff's Department, on the proper use of force and the principles of probable cause. The failure to provide *specific* training regarding the detention of students, in addition to general training regarding use of force during detention and arrest, was not "so likely" to result in the violation of students' Fourth Amendment rights that Sheriff Sexton reasonably can be said to have been deliberately indifferent to the need for this particularized training without any prior notice. *See City of Canton v. Harris,* 489 U.S. 378, 390-92, 109 S.Ct. 1197, 1205-07, 103 L.Ed.2d 412 (1989) (finding no obvious need to train jail supervisors regarding when to provide medical treatment beyond first aid); *Gold,* 151 F.3d at 1352; *Young v. City of Augusta,* 59 F.3d 1160, 1172 (11th Cir.1995) (finding no obvious need to train jailers regarding medical treatment for mental illnesses and dispensing of prescribed medication).[FN9] Accordingly, Sheriff Sexton was entitled to summary judgment in his individual capacity.

> FN9. Gray cites no case law or statute that required Sheriff Sexton to train SROs, such as Deputy Bostic, on how to detain students. Therefore, the law was not "clearly established" for purposes of qualified immunity such that a reasonable official in Sheriff Sexton's shoes would have known that the failure to provide such training constituted deliberate indifference. *See Riley v. Newton,* 94 F.3d 632, 637 (11th Cir.1996) (concluding that sheriff was entitled to qualified immunity on failure-to-train claim where plaintiffs failed to cite case law or constitutional provision re-

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

quiring sheriff to provide training on how to use Army personnel and rejecting plaintiffs' argument that *City of Canton*'s general standard of liability in failure to train cases clearly established the right).

*F. Injunctive Relief*

[28][29] Defendants also argue that the district court erred in failing to grant summary judgment on Gray's claim for injunctive relief against Sheriff Sexton.[FN10] Specifically, Gray's injunctive relief claim seeks a declaration that Sheriff Sexton's custom or policy of failing to train deputies on the detention of students is unconstitutional *1310 and seeks to enjoin Sheriff Sexton from continuing to implement that custom or policy. However, there is no evidence of an unconstitutional policy or custom implemented by Sheriff Sexton. Therefore, Gray's claim for injunctive relief against Sheriff Sexton also necessarily fails. Accordingly, Sheriff Sexton is entitled to summary judgment on Gray's claim for injunctive relief.

FN10. Generally, the denial of summary judgment on a claim for injunctive relief is not a final appealable decision. *Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc.,* 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed.2d 23 (1966). However, "[u]nder the pendant appellate jurisdiction doctrine, we may address [otherwise] nonappealable orders if they are 'inextricably intertwined' with an appealable decision." *Hudson v. Hall,* 231 F.3d 1289, 1294 (11th Cir.2000) (quotation marks omitted). Here, Gray's claim for injunctive relief and Sheriff Sexton's argument that he is entitled to qualified immunity are inextricably intertwined because both turn on whether Sheriff Sexton has implemented an unconstitutional policy or custom. *See Moniz v. City of Fort Lauderdale,* 145 F.3d 1278, 1281 n. 3 (11th Cir.1998) (concluding that the issues are inextricably intertwined when the court, in resolving the qualified immunity

issue, also reaches the merits of the pendant claim).

IV. CONCLUSION

For the forgoing reasons, we affirm the district court's denial of summary judgment on Gray's illegal seizure claim against Deputy Bostic in his individual capacity, reverse the district court's denial of summary judgment on Gray's claims against Sheriff Sexton and on her separate excessive force claim against Deputy Bostic, and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART AND REMANDED.

C.A.11 (Ala.),2006.
Gray ex rel. Alexander v. Bostic
458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252                                                                                                      Page 1
370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

▷

Holloman ex rel. Holloman v. Harland
C.A.11 (Ala.),2004.

United States Court of Appeals,Eleventh Circuit.
Michael HOLLOMAN, on behalf of and as Next
Friend of his son, Michael HOLLOMAN, Plaintiff-
Appellant,
v.
George HARLAND, Fawn Allred, Defendants-Ap-
pellees.
Michael Holloman, Jr., Plaintiff-Appellant,
v.
Walker County Board of Education, Defendant-Ap-
pellee.
**Nos. 01-13864, 01-15094.**

May 28, 2004.

**Background:** Former Alabama public high
school student filed § 1983 action against econom-
ics and government teacher, school principal, and
county board of education, claiming that his rights
under First Amendment's Speech Clause were viol-
ated when teacher and principal punished him, with
paddling in lieu of detention that would have
delayed his graduation, for silently raising his fist
during daily flag salute instead of reciting Pledge of
Allegiance with rest of class, and that his Establish-
ment Clause rights were violated by teacher's daily
"ritual" of conducting silent moment of prayer. The
United States District Court for the Northern Dis-
trict of Alabama, No. 00-01855-CV-AR-J,William
M. Acker, Jr., J., granted summary judgment on
both claims to teacher and principal on qualified
immunity grounds, and in separate opinion granted
summary judgment to school board. Student ap-
pealed both rulings.

**Holdings:** The Court of Appeals, Tjoflat, Cir-
cuit Judge, held that:

(1) for purposes of determining their entitle-
ment to qualified immunity, both teacher and prin-
cipal were engaged in discretionary function at time
they disciplined student in connection with flag sa-

lute incident;

(2) genuine issue of material fact existed as to
whether teacher and principal punished student for
failing to say Pledge of Allegiance, in violation of
his clearly established right to be free from com-
pelled speech;

(3) genuine issue of material fact existed as to
whether teacher and principal punished student for
raising his fist in the air in violation of his clearly
established right to engage in affirmative expres-
sion;

(4) even if student's expression was not protec-
ted, genuine issue of material fact existed as to
whether teacher and principal were motivated by
unlawful desire to suppress student's viewpoint;

(5) teacher was not engaged in discretionary
function when she led class in moment of silent
prayer;

(6) teacher's practice of soliciting prayer re-
quests from her students and enforcing moment of
silence violated Establishment Clause;

(7) student had successfully articulated Speech
Clause claims against school board, under either
"official policy" or delegation to final policymaker
theories; and

(8) student had successfully articulated Estab-
lishment Clause claim against school board under
either "official policy" or "official custom" theory.

Reversed and remanded.

Wilson, Circuit Judge, filed opinion concurring in
part and dissenting in part.

West Headnotes

**[1] Civil Rights 78 ⟜1335**

78 Civil Rights

78III Federal Remedies in General
    78k1334 Persons Liable in General
        78k1335 k. In General. Most Cited Cases

**Civil Rights 78 ☞1355**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases
Under § 1983, individual may be sued for his own personal actions on theory of "direct liability," or, under certain limited circumstances, for actions of his subordinates on theory of "supervisoral liability." 42 U.S.C.A. § 1983.

**[2] Federal Civil Procedure 170A ☞1752.1**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
           170AXI(B)2 Grounds in General
               170Ak1752 Affirmative Defenses, Raising by Motion to Dismiss
                  170Ak1752.1 k. In General. Most Cited Cases

**Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
           170AXVII(C)2 Particular Cases
              170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
When government official is sued under § 1983 under theory of direct liability, he may seek summary judgment on qualified immunity grounds; government official may also seek to have complaint dismissed on qualified immunity grounds prior to discovery, based solely on allegations in pleadings. Fed.Rules Civ.Proc.Rules 12(b)(6), 56, 28 U.S.C.A.; 42 U.S.C.A. § 1983.

**[3] Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
           170AXVII(C)2 Particular Cases
              170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
To even be potentially eligible for summary judgment due to qualified immunity, government official must have been engaged in discretionary function when he performed acts of which plaintiff complains; it is governmental official's burden to make this showing, and official who is able to do so may not receive summary judgment on qualified immunity grounds. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.; 42 U.S.C.A. § 1983.

**[4] Civil Rights 78 ☞1407**

78 Civil Rights
    78III Federal Remedies in General
        78k1400 Presumptions, Inferences, and Burdens of Proof
           78k1407 k. Defenses; Immunity and Good Faith. Most Cited Cases
If, interpreting evidence in light most favorable to § 1983 plaintiff, court concludes that government official was engaged in discretionary function, then burden shifts to plaintiff to show that official is not entitled to qualified immunity. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ☞1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
           78k1376 Government Agencies and Officers
              78k1376(1) k. In General. Most Cited Cases

**Civil Rights 78 ☞1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
           78k1376 Government Agencies and Of-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ficers

78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

To overcome qualified immunity, § 1983 plaintiff must satisfy two prong test; he must show that (1) government official violated constitutional right, and (2) this right was clearly established at time of alleged violation. 42 U.S.C.A. § 1983.

**[6] Constitutional Law 92 ⚖══1490**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(A) In General
            92XVIII(A)1 In General
                92k1490 k. In General. Most Cited Cases
    (Formerly 92k90(1))

**Constitutional Law 92 ⚖══1564**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(A) In General
            92XVIII(A)3 Particular Issues and Applications in General
                92k1564 k. Compelled or Forced Speech, Support, or Participation. Most Cited Cases
    (Formerly 92k90(1))

Speech Clause of First Amendment protects at least two separate, yet related, rights, the right to engage in affirmative expression and the right to be free from compelled expression. U.S.C.A. Const.Amend. 1.

**[7] Officers and Public Employees 283 ⚖══114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases
    (Formerly 78k1376(1))

In many areas other than qualified immunity, "discretionary function" is defined as activity requiring exercise of independent judgment, and is opposite of ministerial task; this dichotomy has been abandoned in qualified immunity context. 42 U.S.C.A. § 1983.

**[8] Officers and Public Employees 283 ⚖══114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases
    (Formerly 78k1376(1))

Instead of focusing on whether challenged acts of government employee seeking qualified immunity involved exercise of actual discretion, court assesses whether they were of type that fell within the employee's job responsibilities, and inquiry is twofold; court asks whether government employee was (a) performing legitimate job-related function, i.e., pursuing job-related goal, (b) through means that were within his power to utilize. 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 ⚖══1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(1) k. In General. Most Cited Cases

To pass first step of discretionary function test for qualified immunity, government official must have been performing function that, but for the alleged constitutional infirmity, would have fallen with his legitimate job description. 42 U.S.C.A. § 1983.

**[10] Officers and Public Employees 283 ⚖══114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases
    (Formerly 78k1376(1))

After determining that government official is engaged in legitimate job-related function, it is then necessary to turn to second prong of discretionary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

function test for qualified immunity and determine whether official is executing that job-related function, i.e., pursuing his job-related goals, in authorized manner. 42 U.S.C.A. § 1983.

**[11] Civil Rights 78 ⟶1376(5)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(5) k. Schools. Most Cited Cases
Alabama public high school economics and government teacher's acts in relation to punishing graduating student for silently raising his fist during daily flag salute instead of reciting Pledge of Allegiance with rest of class were discretionary acts for which she could seek qualified immunity under § 1983. 42 U.S.C.A. § 1983.

**[12] Civil Rights 78 ⟶1376(5)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(5) k. Schools. Most Cited Cases
Alabama public high school principal who "paddled" student for silently raising his fist during daily flag salute instead of reciting Pledge of Allegiance with rest of class, in lieu of three-day detention that would have delayed student's graduation, was engaged in legitimate discretionary function for purposes of determining his entitlement to qualified immunity against student's Speech Clause claims; disciplining students was such a function, and in state of Alabama spanking students was legitimate part of principal's arsenal for enforcing such discipline. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[13] Federal Civil Procedure 170A ⟶2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
To show that government official is not entitled to summary judgment on qualified immunity grounds, § 1983 plaintiff must demonstrate that reasonable jury could interpret evidence in record as showing that official violated constitutional right that was clearly established at time of acts in question. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.; 42 U.S.C.A. § 1983.

**[14] Constitutional Law 92 ⟶1151**

92 Constitutional Law
    92X First Amendment in General
        92X(A) In General
            92k1151 k. Applicability to Governmental or Private Action; State Action. Most Cited Cases
    (Formerly 92k82(5))

**Constitutional Law 92 ⟶3935**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(D) Applicability to Governmental or Private Conduct; State Action
        92k3935 k. In General. Most Cited Cases
    (Formerly 92k254(1))

**Constitutional Law 92 ⟶3937**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(D) Applicability to Governmental or Private Conduct; State Action
        92k3937 k. State Government. Most Cited Cases
    (Formerly 92k254(2))
First Amendment, as incorporated through Due Process Clause of Fourteenth Amendment, applies to state and municipal governments, state-created entities, and state and municipal employees. U.S.C.A. Const.Amends. 1, 14.

370 F.3d 1255
370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

**[15] Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
       170Ak2491.5 k. Civil Rights Cases in
General. Most Cited Cases
Genuine issue of material fact, as to whether
Alabama public high school student who silently
raised his fist during daily flag salute instead of re-
citing Pledge of Allegiance was disciplined for fail-
ing to recite Pledge, in violation of his constitution-
al right to be free from compelled speech, pre-
cluded summary judgment for teacher and school
principal on that § 1983 claim on qualified im-
munity grounds. U.S.C.A. Const.Amend. 1;
Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.; 42
U.S.C.A. § 1983.

**[16] Civil Rights 78 ☞1376(5)**

78 Civil Rights
   78III Federal Remedies in General
     78k1372 Privilege or Immunity; Good Faith
and Probable Cause
      78k1376 Government Agencies and Of-
ficers
       78k1376(5) k. Schools. Most Cited
Cases
For purposes of determining whether Alabama pub-
lic high school teacher and principal were entitled
to qualified immunity in student's § 1983 action,
student's constitutional right to be free from com-
pelled speech was clearly established in May 2000,
when student was disciplined for silently raising his
fist during daily flag salute instead of reciting
Pledge of Allegiance with rest of class; any reason-
able person would have known that disciplining
student for refusing to recite pledge impermissibly
chilled his First Amendment rights. U.S.C.A.
Const.Amend. 1; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment

      170AXVII(C)2 Particular Cases
       170Ak2491.5 k. Civil Rights Cases in
General. Most Cited Cases
Genuine issue of material fact, as to whether
Alabama public high school student who silently
raised his fist during daily flag salute to protest an-
other student's discipline for remaining silent with
his hands in his pockets during flag salute the day
before was punished for raising his fist in the air
during recitation rather than for merely refusing to
recite Pledge of Allegiance, precluded summary
judgment on qualified immunity grounds for teach-
er and principal on § 1983 claim based on violation
of student's First Amendment right to engage in af-
firmative expression. U.S.C.A. Const.Amend. 1;
Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.; 42
U.S.C.A. § 1983.

**[18] Constitutional Law 92 ☞1497**

92 Constitutional Law
   92XVIII Freedom of Speech, Expression, and
Press
     92XVIII(A) In General
     92XVIII(A)1 In General
      92k1497 k. Conduct, Protection Of.
Most Cited Cases
   (Formerly 92k90(1))

**Constitutional Law 92 ☞1976**

92 Constitutional Law
   92XVIII Freedom of Speech, Expression, and
Press
     92XVIII(Q) Education
     92XVIII(Q)1 In General
      92k1975 Student Speech or Conduct
       92k1976 k. In General. Most Cited
Cases
   (Formerly 92k90(1), 92k90.1(1.4))
First Amendment guarantees students, and all
people, the right to engage not only in pure speech,
but "expressive conduct" as well; in determining
whether conduct was "expressive conduct," court
must ask whether reasonable person would interpret
it as some sort of message, not whether observer
would necessarily infer specific message. U.S.C.A.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Const.Amend. 1.

**[19] Constitutional Law 92 &#9901;1965**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and
Press
        92XVIII(Q) Education
            92XVIII(Q)1 In General
                92k1965 k. In General. Most Cited
Cases
    (Formerly 92k90.1(1.4))
Eleventh Circuit applies the same test in assessing
school restrictions on both pure speech and express-
ive conduct. U.S.C.A. Const.Amend. 1.

**[20] Constitutional Law 92 &#9901;1976**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and
Press
        92XVIII(Q) Education
            92XVIII(Q)1 In General
                92k1975 Student Speech or Conduct
                    92k1976 k. In General. Most Cited
Cases
    (Formerly 92k90.1(1.4))

**Constitutional Law 92 &#9901;1979**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and
Press
        92XVIII(Q) Education
            92XVIII(Q)1 In General
                92k1975 Student Speech or Conduct
                    92k1979 k. Threats or Violence.
Most Cited Cases
    (Formerly 92k90.1(1.4))
Public educational institutions have right to adopt
and enforce reasonable, nondiscriminatory regula-
tions as to time, place and manner of student ex-
pressions    and    demonstrations.    U.S.C.A.
Const.Amend. 1.

**[21] Constitutional Law 92 &#9901;1978**

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and
Press
        92XVIII(Q) Education
            92XVIII(Q)1 In General
                92k1975 Student Speech or Conduct
                    92k1978 k. Disruption, Disturb-
ance, or Interference in General. Most Cited Cases
    (Formerly 92k90.1(1.4))
Student expression must cause, or be likely to
cause, material and substantial disruption and more
than brief, easily overlooked, de minimum impact,
before it may be curtailed. U.S.C.A. Const.Amend.
1.

**[22] Schools 345 &#9901;169**

345 Schools
    345II Public Schools
        345II(L) Pupils
            345k169 k. Control of Pupils and Discip-
line in General. Most Cited Cases
Conduct that may be constitutionally protected in
one school or under one set of circumstances may
tend to incite disruption or disorder, and so be con-
stitutionally proscribable, in others.

**[23] Constitutional Law 92 &#9901;1978**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and
Press
        92XVIII(Q) Education
            92XVIII(Q)1 In General
                92k1975 Student Speech or Conduct
                    92k1978 k. Disruption, Disturb-
ance, or Interference in General. Most Cited Cases
    (Formerly 92k90.1(1.4))
Where students' expressive activity does not materi-
ally interfere with school's vital educational mis-
sion, and does not raise realistic chance of doing so,
it may not be prohibited simply because it conceiv-
ably might have such an effect. U.S.C.A.
Const.Amend. 1.

**[24] Constitutional Law 92 &#9901;1977**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Press
    92XVIII(Q) Education
      92XVIII(Q)1 In General
        92k1975 Student Speech or Conduct
          92k1977 k. Discipline in General.
Most Cited Cases
    (Formerly 92k90.1(1.4))

**Schools 345 ⇐169**

345 Schools
    345II Public Schools
      345II(L) Pupils
        345k169 k. Control of Pupils and Discipline in General. Most Cited Cases
Fact that other students were disturbed by student's silent raising of fist during flag salute instead of reciting Pledge of Allegiance with rest of class, as evidenced by fact number of students came up to teacher after class and told her that what he did wasn't "right," and teacher's concern that student's behavior would lead to further disruptions by other students, was irrelevant to analysis of whether discipline of student for that incident violated his First Amendment right to freedom of expression. U.S.C.A. Const.Amend. 1.

**[25] Constitutional Law 92 ⇐1490**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
      92XVIII(A) In General
        92XVIII(A)1 In General
          92k1490 k. In General. Most Cited Cases
    (Formerly 92k90(1))
Protections of the First Amendment do not extend solely to speech which is well-mannered and attentive to the preferences of others. U.S.C.A. Const.Amend. 1.

**[26] Civil Rights 78 ⇐1376(2)**

78 Civil Rights
    78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause

        78k1376 Government Agencies and Officers

          78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
While government officials must have fair warning that their acts are unconstitutional, there need not be case on all fours, with materially identical facts, before Court will deny officials qualified immunity and allow suits against them; principle of constitutional law can be "clearly established" even if there are notable factual distinctions between precedents relied on and cases then before Court, so long as prior decisions gave reasonable warning that conduct at issue violated constitutional rights. 42 U.S.C.A. § 1983.

**[27] Civil Rights 78 ⇐1376(5)**

78 Civil Rights
    78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause

        78k1376 Government Agencies and Officers

          78k1376(5) k. Schools. Most Cited Cases
For purposes of determining whether Alabama public high school teacher and principal were entitled to qualified immunity in § 1983 action, student's First Amendment right to raise his fist during flag salute instead of reciting Pledge of Allegiance with rest of class was clearly established as of May 16, 2000. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[28] Constitutional Law 92 ⇐1976**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
      92XVIII(Q) Education
        92XVIII(Q)1 In General
          92k1975 Student Speech or Conduct
            92k1976 k. In General. Most Cited Cases
    (Formerly 92k90.1(1.4))

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

**Constitutional Law 92 ☞1978**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(Q) Education
        92XVIII(Q)1 In General
           92k1975 Student Speech or Conduct
              92k1978 k. Disruption, Disturbance, or Interference in General. Most Cited Cases
    (Formerly 92k90.1(1.4))
*Tinker-Burnside* test calls for teachers to assess two factors: (1) whether student is engaged in expression, either pure speech or expressive conduct, and (2) whether expression is having non-negligible disruptive effect, or is likely to have such effect, on classroom order or educational process. U.S.C.A. Const.Amend. 1.

**[29] Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
           170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
Genuine issue of material fact, as to whether Alabama public high school teacher and principal who punished student who silently raised his fist during daily flag salute were motivated by desire to suppress student's supposedly unpatriotic viewpoint, precluded summary judgment on that Speech Clause claim against them on qualified immunity grounds. U.S.C.A. Const.Amend. 1; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.; 42 U.S.C.A. § 1983.

**[30] Constitutional Law 92 ☞1507**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(A) In General
        92XVIII(A)1 In General
           92k1507 k. Viewpoint or Idea Discrimination. Most Cited Cases
    (Formerly 92k90(3))

Government actors may not discriminate against speakers based on viewpoint, even in places or under circumstances where people do not have constitutional right to speak in the first place. U.S.C.A. Const.Amend. 1.

**[31] Civil Rights 78 ☞1376(5)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
          78k1376 Government Agencies and Officers
           78k1376(5) k. Schools. Most Cited Cases
Alabama public high school economics and government teacher was not engaged in discretionary function when she led class in moment of silent prayer and thus was not entitled to qualified immunity on Establishment Clause-based § 1983 claim; assuming she was attempting to pursue legitimate job-related function of fostering her students' character education by teaching compassion, she was not doing so through legitimate means that fell within her powers. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983; Ala.Code 1975, § 16-6B-2(h).

**[32] Constitutional Law 92 ☞3851**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(A) In General
           92k3848 Relationship to Other Constitutional Provisions; Incorporation
              92k3851 k. First Amendment. Most Cited Cases
    (Formerly 92k274(3.1))
Establishment Clause has been made applicable to states, as well as state-created entities and their employees, through Due Process Clause of the Fourteenth Amendment. U.S.C.A. Const.Amends. 1, 14.

**[33] Constitutional Law 92 ☞1295**

92 Constitutional Law
    92XIII Freedom of Religion and Conscience
        92XIII(A) In General

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

92k1294 Establishment of Religion
      92k1295 k. In General. Most Cited Cases
   (Formerly 92k84.1)

**Constitutional Law 92 &#128;1342**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
      92XIII(B) Particular Issues and Applications
         92k1341 Public Education
            92k1342 k. In General. Most Cited Cases
   (Formerly 92k84.5(3))

**Constitutional Law 92 &#128;1344**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
      92XIII(B) Particular Issues and Applications
         92k1341 Public Education
            92k1344 k. Employees in General. Most Cited Cases
   (Formerly 92k84.5(3), 92k84.1)
Establishment Clause applies not only to state statutes, but acts and decisions of individual governmental actors, such as teachers and school administrators. U.S.C.A. Const.Amend. 1.

**[34] Constitutional Law 92 &#128;1295**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
      92XIII(A) In General
         92k1294 Establishment of Religion
            92k1295 k. In General. Most Cited Cases
   (Formerly 92k84.1)
Under *Lemon-Agostini* test for assessing permissibility of statutes under Establishment Clause, (1) statute must have secular legislative purpose, (2) statute's principal or primary effect must be one that neither advances nor inhibits religion, and (3) statute must not foster excessive government entanglement with religion. U.S.C.A. Const.Amend. 1.

**[35] Constitutional Law 92 &#128;1350**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
      92XIII(B) Particular Issues and Applications
         92k1341 Public Education
            92k1350 k. Prayer or Silence in General. Most Cited Cases
   (Formerly 92k84.5(3))

**Schools 345 &#128;165**

345 Schools
   345II Public Schools
      345II(L) Pupils
         345k165 k. Religious Instruction and Reading of Scriptures. Most Cited Cases
Alabama public high school economics and government teacher's practice of soliciting prayer requests from her students and enforcing moment of silence violated Establishment Clause; teacher's explanation that ritual was intended to teach students compassion pursuant to character education plan mandated by state legislature did not represent valid secular legislative purpose because her acts were motivated at least in part by desire to inculcate religiosity, and effect of teacher's behavior was to promote praying, a religious activity. U.S.C.A. Const.Amend. 1; Ala.Code 1975, § 16-6B-2.

**[36] Constitutional Law 92 &#128;1350**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
      92XIII(B) Particular Issues and Applications
         92k1341 Public Education
            92k1350 k. Prayer or Silence in General. Most Cited Cases
   (Formerly 92k84.5(3))
Public school prayer is not student-initiated, and hence constitutional under Establishment Clause, simply because initial idea for prayer was student's; true test of constitutionality is whether school encouraged, facilitated, or in any way conducted the prayer. U.S.C.A. Const.Amend. 1.

**[37] Constitutional Law 92 &#128;1350**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

92XIII(B) Particular Issues and Applications
92k1341 Public Education
92k1350 k. Prayer or Silence in General. Most Cited Cases
(Formerly 92k84.5(3))

**Schools 345 ☞165**

345 Schools
345II Public Schools
345II(L) Pupils
345k165 k. Religious Instruction and Reading of Scriptures. Most Cited Cases
Fact that Alabama public high school students were not actually forced to pray during moment of silence, and may have been free to leave the room, did not alleviate constitutional infirmities of economics and government teacher's moment of silence under Establishment Clause, nor did moment's nondenominational nature or brevity. U.S.C.A. Const.Amend. 1.

**[38] Civil Rights 78 ☞1376(5)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(5) k. Schools. Most Cited Cases
Alabama public high school student's rights under Establishment Clause, were clearly established in May, 2000 when economics and government teacher implemented infringing daily "ritual" of conducting silent moment of prayer and soliciting prayer requests from students. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[39] Civil Rights 78 ☞1346**

78 Civil Rights
78III Federal Remedies in General
78k1342 Liability of Municipalities and Other Governmental Bodies
78k1346 k. Education. Most Cited Cases
Alabama public school board could not be held li-

able under § 1983 for unconstitutional acts of high school principal and teacher, its employees, under respondeat superior theory. 42 U.S.C.A. § 1983.

**[40] Civil Rights 78 ☞1351(2)**

78 Civil Rights
78III Federal Remedies in General
78k1342 Liability of Municipalities and Other Governmental Bodies
78k1351 Governmental Ordinance, Policy, Practice, or Custom
78k1351(2) k. Education. Most Cited Cases
Alabama public school board could be held liable for student's compelled speech First Amendment claim based on official policy directive requiring each school system to incorporate "Character Education Plan" including Pledge of Allegiance; directive lacked language of state statute making recitation of Pledge voluntary and indicated that each day included Pledge, rather than opportunity to recite it. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983; Ala.Code 1975, § 16-43-5.

**[41] Civil Rights 78 ☞1351(2)**

78 Civil Rights
78III Federal Remedies in General
78k1342 Liability of Municipalities and Other Governmental Bodies
78k1351 Governmental Ordinance, Policy, Practice, or Custom
78k1351(2) k. Education. Most Cited Cases
Alabama public school board could be held liable under Establishment Clause claim for high school economics and government teacher's daily moment of silent prayer under "official policy" theory, based on teacher's uncontroverted deposition testimony that her practice of asking for prayer requests was actually included in "compassion" requirement of "Character Education Plan" that board required each school system to implement and fact each high school's plan had to be approved by school district before being forwarded on to State Department of Education. U.S.C.A. Const.Amend. 1; 42 U.S.C.A.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

§ 1983; Ala.Code 1975, § 16-6B-2(h).

**[42] Civil Rights 78 ☞1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases
Municipal governing body may be held liable under § 1983 for acts or policies of individuals to whom it delegated final decisionmaking authority in particular area. 42 U.S.C.A. § 1983.

**[43] Civil Rights 78 ☞1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases
For purposes of determining governing body's liability under § 1983 for acts or policies of individuals, member or employee of governing body is "final policy maker" only if his decisions have legal effect without further action by governing body. 42 U.S.C.A. § 1983.

**[44] Civil Rights 78 ☞1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases
To determine if someone is final policy maker for § 1983 purposes, Court looks not only to state and local positive law, but also custom and usage having force of law. 42 U.S.C.A. § 1983.

**[45] Federal Courts 170B ☞776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most Cited Cases
Court of Appeals reviews *de novo* district court's ruling about whether individual is final policy maker for § 1983 purposes. 42 U.S.C.A. § 1983.

**[46] Civil Rights 78 ☞1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases
In assessing whether governmental decision maker is "final policy maker" for § 1983 purposes, Court looks to whether there is actual opportunity for meaningful review. 42 U.S.C.A. § 1983.

**[47] Civil Rights 78 ☞1351(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(2) k. Education. Most Cited Cases
Alabama high school principal who "paddled" student in lieu of detention that would have delayed his graduation, as punishment for student's act of silently raising his fist during daily flag salute instead of reciting Pledge of Allegiance along with rest of class acted as "final policymaker" in that instance, for purposes of determining whether school board could be held liable under § 1983; while student handbook set out formal multi-step appellate process that was theoretically available, there was no opportunity for meaningful review by school board,

and "Corporal Punishment" section of student handbook could be interpreted as delegation to principal of final decisionmaking authority regarding administration of same. 42 U.S.C.A. § 1983.

**[48] Civil Rights 78 ☞1351(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
            78k1351(2) k. Education. Most Cited Cases
Alabama public high school principal was not "final policy maker" for purposes of § 1983 Establishment Clause challenge to teacher's practice of soliciting prayer requests from her students and enforcing moment of silence; prayers were recited as part of character education program, which was expressly subject to school board approval. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983; Ala.Code 1975, § 16-6B-2(h).

**[49] Civil Rights 78 ☞1351(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
            78k1351(2) k. Education. Most Cited Cases
Alabama public high school student who was disciplined for silently raising his fist during daily flag salute instead of reciting Pledge of Allegiance with rest of class, in protest of disciplining of another student for remaining silent with his hands in his pockets during flag salute the day before, could not pursue his § 1983 Speech Clause claim against school board under theory that custom or practice existed in school district of disciplining students for failing to recite Pledge, or for engaging in nondisruptive protest during recitation thereof. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[50] Civil Rights 78 ☞1351(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
            78k1351(2) k. Education. Most Cited Cases
Alabama public high school teacher's practice or "ritual" of conducting daily moment for silent prayer was sufficiently systematic to be considered pattern or custom for which school board may be held accountable in Establishment Clause challenge under § 1983. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[51] Civil Rights 78 ☞1355**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases
When civil rights are systematically violated on near-daily basis, such abuses are sufficiently egregious to warrant supervisory liability, even if it is single "bad apple" engaging in repeated pattern of unconstitutional behavior. 42 U.S.C.A. § 1983.

**\*1259** Charles Clyde Tatum, Jr., Jasper, AL, for Holloman.
Phillip A. Laird, Laird & Robertson, P.C., Russell Brown Robertson, Laird & Wiley, P.C., Jasper, AL, for Defendants-Appellees.

Appeals from the United States District Court for the Northern District of Alabama.

Before TJOFLAT, WILSON and COWEN [FN*], Circuit Judges.

        FN* Honorable Robert E. Cowen, United States Circuit Judge for the Third Circuit, sitting by designation.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TJOFLAT, Circuit Judge:

## I.

Michael Holloman, a former student at Parrish High School in Walker County, Alabama, filed a § 1983 suit against Fawn Allred, his economics and government teacher; George Harland, the school principal; and the Walker County Board of Education ("School Board"), which oversaw the school. He claimed that his rights under the First Amendment's Speech Clause were violated when Allred and Harland punished him for silently raising his fist during the daily flag salute instead of reciting the Pledge of Allegiance with the rest of his class. He further claims *1260 that his Establishment Clause rights were violated by Allred's daily "ritual" of conducting a silent moment of prayer. He sought both legal and equitable relief.

The district court granted summary judgment on both claims to Allred and Harland on qualified immunity grounds. In a separate opinion, it granted summary judgment to the School Board, concluding that Holloman failed to articulate a violation of his constitutional rights or demonstrate a way in which the Board (as a municipal governing entity) could be held liable for the acts at issue here. Holloman appeals both rulings.

Subpart A of this Part examines the facts supporting Holloman's Speech Clause claim. Subpart B explains his Establishment Clause allegations. Subpart C sets forth the framework of state statutes and School Board regulations implicated by Holloman's claims, and Subpart D delves into the procedural history of this case in greater detail. Throughout this discussion, because we are reviewing grants of summary judgment to the defendants, we view the evidence in the light most favorable to the plaintiff. *See Johnson v. Governor of Florida,* 353 F.3d 1287, 1292 (11th Cir.2003).

## A.

Holloman contends that Allred and Harland violated his First Amendment right to free speech (as incorporated against the states through the Fourteenth Amendment's Due Process Clause) by treating him adversely because he silently raised his fist during the flag salute instead of reciting the Pledge of Allegiance.[FN1] To understand what happened, it is necessary to consider their treatment of another student, John Michael Hutto, the day before their confrontation with Holloman.

> FN1. We use the terms "Pledge of Allegiance" and "flag salute" interchangeably.

### 1.

Allred taught her Economics and Government class in the first period of each day, during which time the Pledge of Allegiance was recited over the school intercom system. It was customary for students to stand by their desks, with their hands over their hearts, and recite the pledge.

During the flag salute on May 16, 2000, Hutto remained silent with his hands in his pockets, without causing a disturbance. When Allred asked him why he was not participating in the flag salute, Hutto responded that he "didn't want to say it, he didn't have to say it, and he hadn't said it for a month." Allred stated, "You don't want to say the pledge and the United States Air Force Academy has given you a scholarship?," then continued class.

At lunch that day, Allred told Harland of Hutto's refusal to say the pledge. Harland became very angry and met with Allred, Hutto, and Vice Principal Jason Adkins in his office. Harland told Hutto that he was disappointed in Hutto's refusal to salute the flag, and threatened to report the incident to both Hutto's recruiter at the Air Force Academy as well as the Congressman who had recommended Hutto to the Academy. Harland also ordered Hutto to apologize to Allred and her class for refusing to salute the flag.

Later that day, Harland went to Hutto's physics class (in which Holloman was a student) and declared that "anyone who joined in [Hutto's] protest and refused to say the pledge or committed similar action would be punished." The following day,

376 F.3d 1055
370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

Hutto recited the Pledge of Allegiance with the rest of the class, and the day after that he apologized to Allred and her students.

## *1261 2.

During the flag salute on the day after the Hutto incident, Holloman stood with the other students in Allred's class, but did not recite the Pledge of Allegiance. Instead, he silently raised his fist in the air while the rest of the class recited the pledge; once the pledge was over, he sat down like everyone else. He did not say anything, touch any other students, disrupt the class, or obstruct anyone's view of the flag. Allred, however, immediately chastised him in front of the class, saying that he had acted inappropriately and "disrespectful[ly]," and that she was "disappointed." She then started class in her normal fashion.

Later that day, Allred informed Harland of what happened, and Harland summoned Allred and Holloman into the principal's office. Holloman explained that he had raised his fist "in protest of what happened to [Hutto]." Harland told Holloman "how disappointed he was, and that he felt that he had failed teaching Michael Holloman responsibility, morals and values." He also informed Holloman that he would have to serve three days' detention and could not receive his diploma until after he completed his punishment. In addition, Harland required Holloman to apologize to Allred's class. When Holloman left Harland's office, Harland called Holloman's mother, explaining "that he was too mad and upset to punish Michael at the time because he may hurt Michael."

Since graduation was that Friday, there was not enough time left in the school year for Holloman to serve his detentions while still being able to receive his diploma on graduation day. Harland consequently offered Holloman the opportunity to receive a paddling instead. Holloman agreed and, with Allred watching, was paddled by Harland.

## B.

Allred began her Economics and Government class almost every day by asking, "Does anyone have any prayer requests?" After her students offered various dedications, Allred would hold a moment of silence. Allred frequently opened this moment of silence by saying "Let us pray," and often ended it by saying "Amen." Allred explicitly states that over the 1999-2000 school year, this practice became a daily "ritual." She never told her students that they were free to leave the room during either her prayer requests or the subsequent moment of silent prayer.

One day, Vice Principal Adkins sat in on her class and personally observed this phenomenon. When Allred attempted to begin her economics lesson, one of her students raised her hand and reminded Allred that she had forgotten to elicit her customary prayer requests. At that point, Allred took prayer requests from the class, then commenced a moment of silence by saying, "Let us pray." On another occasion, at the conclusion of the moment of silence, Allred permitted one of her students to read aloud a passage from the Bible.

## C.

The events in this case did not occur in a vacuum. In 1995, the Alabama state legislature enacted a statute which required the State Board of Education and all local school boards to

develop and implement ... a comprehensive character education program for all grades to consist of not less than ten minutes of instruction per day focusing upon the students' development of the following character traits: courage, patriotism, citizenship, honesty, fairness, respect for others, kindness, cooperation, self-respect, self-control, courtesy, compassion, tolerance, diligence,*1262 generosity, punctuality, cleanliness, cheerfulness, school pride, respect for the environment, patience, creativity, sportsmanship, loyalty, and perseverance. Each plan of instruction shall include the Pledge of Allegiance to the American flag.

Ala.Code § 16-6B-2(h). This law made daily recitation of the Pledge of Allegiance a part of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

character education program the Legislature required local school boards to implement. A separate statute, however, emphasized that students should not be forced to recite the pledge. *See* Ala.Code § 16-43-5 ("The State Board of Education shall afford all students attending public kindergarten, primary and secondary schools the *opportunity* each school day to *voluntarily* recite the pledge of allegiance to the United States flag."(emphasis added)).

To implement these requirements, Larry Banks, the Superintendent of the Walker County School District, sent a letter on behalf of the Walker County Board of Education to all the principals in the district, stating, "[E]ach school system must incorporate a Character Education Plan which will consist of 10 minutes of instruction per day in various areas, such as, the Pledge of Allegiance.... Each day must include the Pledge of Allegiance and then other areas as mentioned as you determine at your school."

Banks also sent each principal a form to complete to specify how each school intended to incorporate into its curriculum the character-education requirements set forth above. The memo directed, "Please begin to make plans and be prepared to submit your local Character Education Plan [to the county school board] which must be forwarded to the State Superintendent's Office." The County School Board apparently had to either review or approve each school's character education plan before it was forwarded to the State. Allred contends that her daily moment of silent prayer was conducted in partial fulfillment of these character education requirements-it was intended to teach compassion.

### D.

On July 3, 2000, Holloman and Hutto filed a class action suit under 42 U.S.C. § 1983 in the Northern District of Alabama against the Walker County Board of Education, Harland, Adkins, and Allred. They alleged that their First Amendment rights had been violated because they had been chastised, threatened, and punished for refusing to say the Pledge of Allegiance. They also claimed

that Allred's practice of soliciting prayer requests and setting aside a moment of silence for prayer violated the Establishment Clause. The complaint sought compensatory and punitive damages, as well as declaratory and injunctive relief.

A few months later, an amended complaint was filed; it was substantially identical to the original except Hutto was no longer a party. The district court dismissed Jason Adkins as a defendant (with Holloman's consent), and declined to certify the class action. Holloman does not appeal either of these rulings.

In their answer to Holloman's amended complaint, Allred and Harland cited qualified immunity as an affirmative defense. They later moved the court for summary judgment on qualified immunity grounds. The court granted their motion and dismissed them from the case. It concluded that Holloman's Speech Clause allegations did not constitute a First Amendment violation, and certainly not a violation of a right that was "clearly established" at the time of the incidents. The court also rejected Holloman's Establishment Clause claims, stating there was no Eleventh Circuit **\*1263** precedent during the 1999-2000 school year that "clearly established" a moment of silence for prayer as being unconstitutional. Holloman appealed the court's decision to grant Allred and Harland summary judgment on qualified immunity grounds.[FN2]

> FN2. The court's opinion dismissed all of Holloman's constitutional claims against both defendants with prejudice. It entered a final judgment in favor of Allred and Harland pursuant to Fed.R.Civ.P. 54(b), rendering its order immediately appealable. The appeal was docketed in this court as No. 01-13864.

Following the district court's dismissal of Holloman's claims against Allred and Harland, the Board of Education also sought summary judgment. The court granted the Board's motion, concluding that Holloman had not alleged facts sufficient to hold the Board liable under § 1983. Holloman ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

peals this ruling as well, arguing that he stated valid claims against the School Board.[FN3]

> FN3. This appeal was docketed as No. 01-15094.

In these consolidated appeals, we review the district court orders granting the defendants summary judgment. Part II of this opinion explains why the district court erred in granting Allred and Harland summary judgment on qualified immunity grounds against Holloman's Speech Clause claims. Part III shows that Allred is not even potentially entitled to summary judgment on qualified immunity grounds against Holloman's Establishment Clause claims because she has not established as a matter of law that, in holding her daily moment of silent prayer, she was engaged in a discretionary function of her job. Part IV assesses Holloman's underlying Establishment Clause claim, concluding that he has introduced evidence sufficient to support a determination that a clearly established right has been violated.[FN4] Part V discusses how Holloman has successfully articulated several theories under which the School Board may be held liable for the Speech and Establishment Clause violations, while Part VI briefly concludes.

> FN4. We include this discussion because a legal determination that his constitutional rights were violated is a necessary predicate to allowing his suit against the School Board to proceed.

## II.

[1] Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law [or] suit in equity....

42 U.S.C. § 1983. There are two ways in which an individual may be held liable under § 1983-he may be sued for his own personal actions ("direct

liability"), or, under certain limited circumstances, for the actions of his subordinates ("supervisoral liability"), *see, e.g., Lewis v. Smith,* 855 F.2d 736, 738 (11th Cir.1988).[FN5]

> FN5. A supervisor, of course, may be held responsible under either or both theories. *See Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990) ("Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation [direct liability] or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation [supervisoral liability].").

[2][3] When a government official is sued under a theory of direct liability, he may seek summary judgment on qualified immunity grounds.[FN6] To even be potentially **\*1264** eligible for summary judgment due to qualified immunity, the official must have been engaged in a "discretionary function" when he performed the acts of which the plaintiff complains. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (holding that qualified immunity extends to "government officials performing discretionary functions"). It is the burden of the governmental official to make this showing. *Storck v. City of Coral Springs,* 354 F.3d 1307, 1314 (2003) ("Under qualified immunity analysis, *the public official* must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place."(emphasis added)). A defendant unable to meet this burden may not receive summary judgment on qualified immunity grounds. *Lumley v. City of Dade City,* 327 F.3d 1186, 1194 (11th Cir.2003) ("If the defendants were not acting within their discretionary authority, they are ineligible for the benefit of qualified immunity."); *see also Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir.2002). While a number of our cases omit this step of the analysis, *see, e.g., Denno v. Sch. Bd.,* 218 F.3d 1267 (11th Cir.2000); *Hall v. Talladega City Bd. of Educ.,* 115 F.3d 821 (11th Cir.1997), binding Supreme Court and Eleventh Circuit pre-

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

cedents require us to consider expressly this critical threshold matter. We explain this "discretionary function" test in greater detail in Subpart II.A.

> FN6. The government official may also seek to have the complaint dismissed on qualified immunity grounds prior to discovery, based solely on the allegations in the pleadings.

[4][5] If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity. *Cottone v. Jenne,* 326 F.3d 1352, 1358 (11th Cir.2003) ("Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity."). To overcome qualified immunity, the plaintiff must satisfy a two prong test; he must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation.[FN7] *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) ("A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.") (quotations and citations omitted). If the plaintiff prevails on both prongs of this test, then the defendant is unable to obtain summary judgment on qualified immunity grounds.

> FN7. Our rulings on these two questions are legal conclusions that are binding law of the case and may not be revisited in later proceedings. Consequently, once we deny defendants summary judgment on qualified immunity grounds because the plaintiff has alleged violations of clearly established rights, the defendants may not later attempt to re-assert qualified immunity against those claims on purely legal

bases (e.g. by arguing that the rights do not exist or are not clearly established). The only remaining issues are questions of fact-i.e., whether the plaintiff can actually prove at trial that the alleged violations occurred.

[6] Applying this test, the district court awarded Allred and Harland summary judgment against Holloman's Speech Clause claims. The Speech Clause of the First Amendment protects at least two separate, yet related, rights: (1) the right to freedom of expression, and (2) the right to be free from compelled expression. *United States v. United Foods, Inc.,* 533 U.S. 405, 410, 121 S.Ct. 2334, 2338, 150 L.Ed.2d 438 (2001). These rights unquestionably exist in public schools. *See Tinker*1265 *v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969).

Holloman argues that Allred and Harland are directly liable for violating both constitutional rights guaranteed by the Speech Clause. First, he maintains, they violated his right to be free from compelled expression by chastising, threatening, and ultimately punishing him for failing to recite the Pledge of Allegiance. Second, to the extent that he was punished for silently raising his fist in the air during the Pledge of Allegiance (rather than for simply failing to recite the pledge), Holloman contends that Allred and Harland violated his right to engage in affirmative expression. Finally, regardless of whether Holloman's expression was constitutionally protected in itself, he has the First Amendment right to be free of viewpoint-based discrimination and punishment.

We conclude that neither Allred nor Harland are not entitled to summary judgment on qualified immunity grounds against any of these First Amendment claims. In Subpart II.A, we conclude that both Allred and Harland were engaged in a discretionary function at the time they disciplined Holloman in connection with the flag salute incident, and so are potentially entitled to summary judgment on qualified immunity grounds. In Subpart II.B, we

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

discuss how the evidence-interpreted in the light most favorable to Holloman-supports the conclusion that his clearly-established right to be free from compelled speech was violated. Subpart II.C makes a similar finding regarding his right to engage in affirmative expression. Subpart II.D concludes that, even if-as the dissent contends-Holloman's expression was not itself constitutionally protected, Allred's behavior nevertheless violated the First Amendment because she punished him for expressing a viewpoint she found repugnant, rather than for any disruption he purportedly caused (which, interpreting the evidence in his favor, was entirely negligible). Consequently, Holloman has made the necessary showings with regard to his three Speech Clause claims to overcome Allred's and Harland's assertions of qualified immunity at this stage.

A.

[7] In many areas other than qualified immunity, a "discretionary function" is defined as an activity requiring the exercise of independent judgment, and is the opposite of a "ministerial task." *See, e.g., Williams v. Wood,* 612 F.2d 982, 985 (5th Cir.1980).[FN8] In the qualified immunity context, however, we appear to have abandoned this "discretionary function/ministerial task" dichotomy. In *McCoy v. Webster,* 47 F.3d 404, 407 (11th Cir.1995), we interpreted "the term 'discretionary authority' to include actions that do not necessarily involve an element of choice," and emphasized that, for purposes of qualified immunity, a governmental actor engaged in purely ministerial activities can nevertheless be performing a discretionary function.

> FN8. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[8] Instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities. Our inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize. *See \*1266 Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1185 n. 17 (11th Cir.1994) ("A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties *and* within the scope of this authority."(emphasis added)).

One might reasonably believe that violating someone's constitutional rights is never a legitimate job-related function or within the scope of a government official's authority or power. As we explained in *Harbert Int'l, Inc. v. James,* 157 F.3d 1271, 1282 (11th Cir.1998) (quotation marks and citation omitted), however, "the inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology." In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.

[9] Consider the first prong of the test-whether the official is engaged in a legitimate job-related function. In *Sims v. Metropolitan Dade County,* 972 F.2d 1230 (11th Cir.1992), "we did not ask whether it was within the defendant's authority to suspend an employee for an improper reason; instead, we asked whether [the defendant's] discretionary duties included the administration of discipline." *Harbert,* 157 F.3d at 1282. Similarly, in assessing whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in *unconstitutional* searches and seizures, but whether engaging in searches and seizures *in general* is a part of his job-related powers and responsibilities. *See, e.g., Madiwale v. Savaiko,* 117 F.3d 1321, 1324 (11th Cir.1997). Put another way, to pass the first step of

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

the discretionary function test for qualified immunity, the defendant must have been performing a function that, *but for* the alleged constitutional infirmity, would have fallen with his legitimate job description.

Of course, we must be sure not to characterize and assess the defendant's act at too high a level of generality. Nearly every act performed by a government employee can be described, in general terms, as ostensibly "furthering the public interest." If we jump to such a high level of abstraction, it becomes impossible to determine whether the employee was truly acting within the proper scope of his job-related activities. Consequently, we consider a government official's actions at the minimum level of generality necessary to remove the constitutional taint. In considering whether an act of allegedly excessive force fell within a police officer's duties, for example, we do not ask whether police have the right to use *excessive* force. We also do not immediately jump to a high level of generality and ask whether police are responsible for enforcing the law or promoting the public interest. We instead ask whether they have the power to attempt to effectuate arrests. *See, e.g., Ferraro,* 284 F.3d at 1194 (holding, in an excessive force suit, "there can be no doubt that [the police officer defendant] was acting in his discretionary capacity when he arrested [plaintiff]").

[10] After determining that an official is engaged in a legitimate job-related function, it is then necessary to turn to the second prong of the test and determine whether he is executing that job-related function-that is, pursuing his job-related goals-in an authorized manner. The primary purpose of the qualified immunity *1267 doctrine is to allow government employees to enjoy a degree of protection only when exercising powers that legitimately form a part of their jobs. *See, e.g., Harlow,* 457 U.S. at 819 & n. 34, 102 S.Ct. at 2739 & n. 34 (limiting the availability of qualified immunity to situations where "an official's duties legitimately require action" and to "actions within the scope of an official's duties"). Each government employee is given only a certain "arsenal" of powers with which to ac-

complish her goals. For example, it is not within a teacher's official powers to sign her students up for the Army to promote patriotism or civic virtue, or to compel them to bring their property to school to redistribute their wealth to the poor so that they can have firsthand experience with altruism.

Employment by a local, county, state, or federal government is not a *carte blanche* invitation to push the envelope and tackle matters far beyond one's job description or achieve one's official goals through unauthorized means. Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity.

[11] Under this standard, Allred-as a matter of law-was undoubtedly engaged in a discretionary function in chastising Holloman for raising his fist during the Pledge of Allegiance and later referring him to Harland for punishment. Though Allred is not empowered to violate constitutional rights as part of her official duties, she did have the responsibility of maintaining decorum in the classroom. The fact that she may have attempted to keep order in the classroom in an unconstitutional manner does not change the fact that she was fulfilling a legitimate job-related function. Moreover, the ways in which she attempted to pursue this job-related goal (chastising Holloman and reporting him to the principal)-examined on a general level rather than in this specific application-were legitimate prerogatives of her job. From an alternate perspective, putting aside Holloman's First Amendment claim, Allred's actions would undoubtedly be considered part of her duties and legitimate exercises of her authority. Consequently, under the two-prong test articulated above, her activities in relation to the flag salute incident were discretionary acts for which she may seek qualified immunity.

[12] For similar reasons, Harland is also potentially entitled to qualified immunity against Holloman's Speech Clause claims. Disciplining students is a legitimate discretionary function performed by principals. *See Kirkland v. Greene County Bd. of Educ.,* 347 F.3d 903, 903 n. 1 (11th Cir.2003), and

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

in the State of Alabama, spanking students is a legitimate part of a principal's "arsenal" for enforcing such discipline. Consequently, the burden shifts to Holloman to demonstrate that Allred and Harland are not entitled to summary judgment on qualified immunity grounds.

B.

[13] As discussed earlier, once a defendant establishes that he was engaged in a discretionary function at the time of the acts in question, the burden shifts to the plaintiff to show that the defendant is *not* entitled to summary judgment on qualified immunity grounds. To do so, the plaintiff must demonstrate that a reasonable jury could interpret the evidence in the record as showing that the defendant violated a constitutional right that was clearly established at the time of the acts in question.

We begin by examining Holloman's claim that Allred and Harland violated his First Amendment right to be free from compelled speech. Section 1 considers **\*1268** whether Holloman has successfully articulated a violation of a constitutional right, while Section 2 analyzes whether such a right was clearly established at the time of the incidents. Based on these discussions, we conclude that, interpreting the evidence in the light most favorable to Holloman, both Allred and Harland engaged in acts amounting to violations of Holloman's right to be free from compelled speech. Consequently, neither defendant is entitled to summary judgment on qualified immunity grounds against this Speech Clause claim.

1.

[14] The Speech Clause of the First Amendment states, "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. The First Amendment, as incorporated through the Due Process Clause of the Fourteenth Amendment, *Near v. Minnesota,* 283 U.S. 697, 707, 51 S.Ct. 625, 628, 75 L.Ed. 1357 (1931), applies to state and municipal governments, state-created entities, and state and municipal employees, *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).

[15] In *Barnette,* the Court held that the right to be free from compelled speech protects public school students from being forced to participate in the flag salute. It stated, "[T]he action of the local authorities in compelling the flag salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.* at 642, 63 S.Ct. at 1187.

Several pieces of evidence in the record support Holloman's contention that he was disciplined for failing to recite the Pledge of Allegiance. First, the day before the Holloman incident, John Michael Hutto was chastised in front of the class, sent to the Principal's office, threatened that his recommendation to the Air Force Academy would be revoked, and forced to apologize to his teacher and classmates, simply because he remained silent during the Pledge of Allegiance (without engaging in any affirmatively expressive activity). Second, Allred's deposition is replete with references to her "patriotism" and desire to see the American flag saluted in the "proper" or "normal" way; she was deeply offended by the notion of Americans not wanting to salute the flag.

Third, according to Holloman's affidavit, Harland interrupted Holloman's physics class to explicitly threaten that any students who refused to say the Pledge of Allegiance would be punished. Fourth, the affidavits of both Holloman and his mother state that he was told he was being punished for failing to salute the flag. Indeed, Harland told Holloman's mother during their phone conversation that he had to wait before disciplining Holloman because he was afraid that he (Harland) would hurt him. Consequently, there is more than enough evidence in the record to allow a reasonable jury to adopt this interpretation of events.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Allred's acts (if proven at trial), as a matter of law, violated Holloman's constitutional rights. First, according to Allred's own testimony, she instructed him that there were only two "permissible" ways of saying the pledge, and that any other way of doing so was prohibited. Second, she verbally chastised him in front of the class for his constitutionally protected actions (either failing to salute the flag or expressing his opinion in a non-disruptive fashion).

Verbal censure is a form of punishment, albeit a mild one. The intent behind this act was to dissuade him from exercising a **\*1269** constitutional right. She singled out Holloman in front of his entire class, subjecting him to embarrassment and humiliation. Given the gross disparity in power between a teacher and a student, such comments-particularly in front of the student's peers-coming from an authority figure with tremendous discretionary authority, whose words carry a presumption of legitimacy, cannot help but have a tremendous chilling effect on the exercise of First Amendment rights. *See Riley v. Nat'l Fed'n of the Blind,* 487 U.S. 781, 794, 108 S.Ct. 2667, 2676, 101 L.Ed.2d 669 (1988) (invaliding a "scheme" that "must necessarily chill speech in direct contravention of the First Amendment's dictates"); *Dickerson v. United States,* 530 U.S. 428, 459, 120 S.Ct. 2326, 2344, 147 L.Ed.2d 405 (2000) (Scalia, J., dissenting) ("[T]he Court has viewed the importation of 'chill' as *itself* a violation of the First Amendment.") (emphasis in original). As in the Establishment Clause context, such "public pressure ... can be as real as any overt compulsion," particularly in a "classroom setting, where ... the risk of compulsion is especially high"; such measures may not be used to deter, even if "subtl[y] or indirect[ly]," the exercise of constitutional rights. *Lee v. Weisman,* 505 U.S. 577, 593, 596, 112 S.Ct. 2649, 2658, 2660, 120 L.Ed.2d 467 (1992).

Finally, Allred played a major role in the administration of Holloman's more formal punishment, his paddling. She reported the incident to the principal with the intent and hope that Holloman be disciplined, was present during Holloman's questioning by Harland, did not object or attempt to dissuade Harland in any way, was present for the paddling, and manifested her approval of it throughout the entire process. For similar reasons, Holloman has also adduced sufficient evidence to support his claim against Harland, the one who actually spanked him.

Having demonstrated that the record amply supports Holloman's contention that the defendants violated his constitutional right to be free from compelled speech, we now consider whether this right was clearly established at the time of the events in question.

2.

[16] *Barnette,* 319 U.S. at 642, 63 S.Ct. at 1187, clearly and specifically established that schoolchildren have the right to refuse to say the Pledge of Allegiance. Under *Barnette,* any "reasonable person would have known" that disciplining Holloman for refusing to recite the pledge impermissibly chills his First Amendment rights. *Thomas v. Roberts,* 261 F.3d 1160, 1170 (11th Cir.2001) (citation omitted). Consequently, on these alleged facts, Allred and Harland are not entitled to qualified immunity against Holloman's claims related to compelled speech. We reverse the district court's holding to the contrary.

Having assessed the viability of Holloman's First Amendment claim to be free from compelled speech, we now turn to Holloman's First Amendment claim to engage in affirmative expression.

C.

[17] One of Holloman's alternate bases for recovery under the First Amendment is that the defendants punished him for engaging in constitutionally protected speech. He maintains, in other words, that even if the defendants punished him for silently raising his fist during the Pledge of Allegiance-rather than for merely remaining silent during the pledge-his rights under the Speech Clause were still violated. The district court dedicated the over-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

whelming majority of its opinion regarding Allred and Harland to this argument, concluding that **\*1270** "[n]o jury could reasonably conclude that 'every like-situated, reasonable' teacher or principal would necessarily know that punishing Holloman for his unorthodox and deliberately provocative and disruptive gesture violated federal law...." (Mem. Op., June 4, 2001, at 10).

We are again forced to reverse. Section 1 shows that the evidence (interpreted in Holloman's favor) demonstrates the existence of a limited constitutional right to engage in non-disruptive expression in a classroom environment, while Section 2 demonstrates that this right was clearly established when the defendants chastised and punished him. Consequently, Allred and Harland are not entitled to summary judgment on qualified immunity grounds against Holloman's Speech Clause claim regarding his right to express himself.

### 1.

[18] The Constitution guarantees students (and all people) the right to engage not only in "pure speech," but "expressive conduct," as well. *See United States v. O'Brien,* 391 U.S. 367, 376-77, 88 S.Ct. 1673, 1678-79, 20 L.Ed.2d 672 (1968). In *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), the Supreme Court held that, to determine whether a particular act counts as expressive conduct, a court must determine whether "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Id.* at 410-11, 94 S.Ct. at 2730. The Court later liberalized this test, however, emphasizing that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schonberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish-Am., Gay, Lesbian & Bisexual Group of Boston, etc.,* 515 U.S. 557, 569, 115 S.Ct. 2338, 2345, 132 L.Ed.2d

487 (1995). Thus, in determining whether conduct is expressive, we ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message.

At the very least, Holloman's gesture was expressive conduct. It is quite reasonable to infer that at least some students would have recognized his act for what it was-a protest over Allred's treatment of Hutto. Even if students were not aware of the specific message Holloman was attempting to convey, his fist clearly expressed a generalized message of disagreement or protest directed toward Allred, the school, or the country in general.

It is quite possible, however, that Holloman's act constituted "pure speech." As the Court suggested in *O'Brien,* 391 U.S. at 376, 88 S.Ct. at 1678, expressive conduct is an act with significant " 'non-speech' elements," that is being used in a particular situation to convey a message. Holloman's act does not contain any of the substantive "non-speech" elements that are necessary to remove something from the realm of "pure speech" into the realm of expressive conduct. It seems as purely communicative as a sign-language gesture or the act of holding up a sign, and in this respect is similar to the wearing of a black armband, which the *Tinker* Court found to be a "primary First Amendment right[ ] akin to 'pure speech.' " 393 U.S. at 508, 89 S.Ct. at 737.

[19] It does not ultimately matter whether Holloman's act is characterized as "pure speech" or "expressive conduct" because this circuit appears to apply the same test in assessing school restrictions on either kind of expression. This Section **\*1271** summarizes these principles and applies them to the instant case.

#### a.

[20] As with all rights, the scope of the First Amendment has boundaries. On many occasions, we have affirmed the right of public educational institutions "to adopt and enforce reasonable, non-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

discriminatory regulations as to the time, place and manner of student expressions and demonstrations." *Bayless v. Martine,* 430 F.2d 873, 878 (5th Cir.1970). This "reasonableness" test is not the anemic simulacrum of a constraint on governmental power found in the Due Process Clause's "rational basis" test, *see, e.g., Williamson v. Lee Optical,* 348 U.S. 483, 487-88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955), but rather a more robust notion of "reasonableness" such as that applied in the Fourth Amendment context, *see U.S. Const.* amend. IV (prohibiting "unreasonable searches and seizures").

In *Burnside v. Byars,* we articulated the way to determine whether a public school regulation that curtailed expression was reasonable:

[S]chool officials cannot ignore expressions of feelings with which they do not wish to contend. They cannot infringe on their students' right to free and unrestricted expression as guaranteed to them under the First Amendment to the Constitution, where the exercise of such rights in the school buildings and schoolrooms do[es] not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.

363 F.2d at 749. Under the *Burnside* standard, student expression may unquestionably be regulated when doing so "contributes to the maintenance of order and decorum within the educational system." *Id.* at 748; *accord Tinker,* 393 U.S. at 514, 89 S.Ct. at 740 (holding that a school may not prohibit expressive activity unless there are "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities"); *Shanley,* 462 F.2d at 969 ("The test for curtailing in-school exercise of expression is whether or not the expression or its method of exercise 'materially and substantially' interferes with the activities or discipline of the school."). This doctrine allows school authorities to prohibit, among other things, "lewd, indecent, or offensive speech.... The First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as respondent's would undermine the school's basic edu-

cational mission." *Bethel Sch. Dist. v. Fraser,* 478 U.S. 675, 683, 685, 106 S.Ct. 3159, 3164-65, 92 L.Ed.2d 549 (1986); *see also Healy v. James,* 408 U.S. 169, 189, 92 S.Ct. 2338, 2350, 33 L.Ed.2d 266 (1972) ("[First Amendment] [a]ssociational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education.").

However, in assessing the reasonableness of regulations that tread upon expression, we cannot simply defer to the specter of disruption or the mere theoretical possibility of discord, or even some *de minimis,* insubstantial impact on classroom decorum. Particularly given the fact that young people are required by law to spend a substantial portion of their lives in classrooms, student expression may not be suppressed simply because it gives rise to some slight, easily overlooked disruption, including but not limited to "a showing of mild curiosity" by other students, *see Burnside,* 363 F.2d at 748, "discussion and comment" among students, *Reineke v. Cobb Cty. Sch. Dist.,* 484 F.Supp. 1252, **1272 1261 (N.D.Ga.1980), or even some "hostile remarks" or "discussion outside of the classrooms" by other students, *Tinker,* 393 U.S. at 508, 514, 89 S.Ct. at 737, 740. For example, one district court correctly found that a teacher was unjustified in censoring an article in the school newspaper because it was "inconceivable that the use of the word 'damn' one time in the newspaper would have caused material and substantial interference with school activities." *Reineke,* 484 F.Supp. at 1258.

[21] The dissent concludes that Holloman's gesture was unprotected because "[t]he students' comments [to Allred after class] demonstrate that they at least focused their attention during a portion of the recitation of the Pledge on Holloman's fist ... rather than on the planned curriculum of saying the Pledge." This approach appears to ignore the principle discussed above that student expression must cause (or be likely to cause) a "material[] and substantial[]" disruption, *Burnside,* 363 F.2d at 749, and more than a brief, easily overlooked, *de minimis* impact, before it may be curtailed. The dissent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

argues that Holloman's act was "meant to compete for students' attention." The same can be said of any of the forms of student expression that have been found to be protected, including the wearing of armbands or buttons in class. A student expressing himself in those ways clearly intends to attract the other students' attention and have them consider, however briefly, the meaning behind the symbolism. Indeed, if a student's attention is never focused, if even for a moment, on the expression, it becomes pointless. Under the dissent's approach, where schools may prohibit any speech or acts that do anything to distract a student's mind-however briefly or insubstantially-from the planned curriculum, constitutional protection for student expression by definition would be eliminated.

This point was made quite clearly in *Parducci v. Rutland,* 316 F.Supp. 352 (M.D.Ala.1970), where a teacher was terminated because she assigned a short story that school administrators found offensive. The district court recognized that First Amendment freedoms in public schools, including a teacher's right to academic freedom, could be constitutionally abridged under *Tinker* and *Burnside* only if there was a realistic threat that the conduct at issue would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id.* at 355. The court, correctly applying our precedents, held:

> Rather than there being a threatened or actual substantial disruption to the educational processes of the school, the evidence reflects that the assigning of the story was greeted with apathy by most of the students. Only three of plaintiff's students asked to be excused from the assignment. On this question of whether there was a material and substantial threat of disruption, the Principal testified at the School Board hearing that there was no indication that any of plaintiff's other 87 students were planning to disrupt the normal routine of the school. This Court now specifically finds and concludes that the conduct for which plaintiff was dismissed was not such that "would materially and substantially interfere with" reasonable requirements of discipline in the school.

*Id.* at 356. There is no evidence in the record to suggest that Holloman's gesture caused any more disturbance or unrest than Parducci's assignment. By focusing entirely on whether students may have been momentarily "distracted," rather than on whether the distraction or disruption**\*1273** was "material" or "substantial," the dissent gives insufficient protection to students' First Amendment rights and incorrectly applies our precedents.

While certain types of expression unquestionably cause enough of a threat of disruption to warrant suppression even before negative consequences occur, "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression," even in schools. *Tinker,* 393 U.S. at 508, 89 S.Ct. at 737. "[T]here must be demonstrable factors that would give rise to any reasonable forecast by the school administration of 'substantial and material' disruption of school activities before expression may be constitutionally restrained." *Shanley,* 462 F.2d at 974; *accord Center for Participant Ed. v. Marshall,* 337 F.Supp. 126, 135 (N.D.Fla.1972) (suggesting that a "speculative fear" is insufficient to justify restrictions on student expression, but a "real and immediate fear of conduct potentially disruptive of the university routine" is enough).

We recognize that this test is more restrictive than the parsimonious interpretation of students' First Amendment freedoms offered in *Ferrell v. Dallas Indep. Sch. Dist.,* 392 F.2d 697 (5th Cir.1968). In *Ferrell,* a high school principal suspended students in a rock-and-roll band for growing their hair too long. This court upheld the principal's regulation because the principal felt "that the length and style of the boys' hair would cause commotion, trouble, distraction, and a disturbance in the school...." *Id.* at 699. To the degree this ruling is based on the principal's abstract concerns, it is patently inconsistent with the principle articulated in *Tinker, Burnside,* and numerous other cases discussed throughout this Subsection, that there must be a real or substantial threat of actual disorder, as opposed to the mere possibility of one. We are bound to follow *Burnside* rather than *Ferrell* be-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cause it is the earlier case. *See Local Union 48 Sheet Metal Workers v. S.L. Pappas & Co.,* 106 F.3d 970, 975 (11th Cir.1997). Similarly, we must follow *Tinker* rather than *Ferrell* because it is an intervening, inconsistent Supreme Court decision. *See Lufkin v. McCallum,* 956 F.2d 1104, 1107 (11th Cir.1992). Consequently, we apply the *Tinker-Burnside* doctrine in this case.

This *Tinker-Burnside* standard we reaffirm today was applied in *Banks v. Bd. of Public Instr.,* 314 F.Supp. 285 (S.D.Fla.1970), *vacated by*401 U.S. 988, 91 S.Ct. 1223, 28 L.Ed.2d 526 (1971), *reinstated without published opinion by dist. ct. and aff'd,*450 F.2d 1103 (5th Cir.1971), a case similar to this one, where a student was suspended for failing to stand during the Pledge of Allegiance. The district court held, "The conduct of Andrew Banks in refusing to stand during the pledge ceremony constituted an expression of his religious beliefs and political opinions. His refusal to stand was no less a form of expression than the wearing of the black armband was to Mary Beth Tinker. He was exercising a right 'akin to pure speech.' " *Id.* at 295. While at first glance it might seem like Banks's right to be free from compelled speech was at issue in that case, the above quote from the district court makes clear that its ruling was not based on Banks's First Amendment right to remain silent, but his First Amendment right to affirmatively express himself. Both the school administration and the court in that case perceived Banks's act of remaining seated while everyone else was standing as an expressive act, rather than a mere refusal to speak. In upholding his right to act in such a way, the district court observed, "The unrefuted testimony clearly reflects that the plaintiff's refusal to stand has not caused any disruption in the educational process." **\*1274** *Id.*; cf. *Jenkins v. Louisiana State Bd. of Educ.,* 506 F.2d 992 (5th Cir.1975) (upholding restrictions on college students' activities because "[t]he actions of appellants resulted in a material disruption of the campus and of the rights of others. They were not protected by the First Amendment."). We therefore find *Banks* to be fully consistent with the approach mandated by *Burnside* and *Tinker,* and conclude that Holloman's gesture

was sufficiently akin to Banks's refusal to stand (in that neither had any real impact on class discipline) as to be entitled to First Amendment protection.

Our cases involving "freedom buttons" are perhaps even more instructive. In *Blackwell v. Issaquena Cty. Bd. of Educ.,* 363 F.2d 749 (5th Cir.1966), black elementary school students wore "freedom buttons" to class in support of the civil rights movement.

[S]ome of these students were creating a disturbance by noisily talking in the hall when they were scheduled to be in class.... [Some students] accosted other students by pinning the buttons on them even though they did not ask for one. One of the students tried to put a button on a younger child who began crying. This activity created a state of confusion, disrupted class instruction, and resulted in a general breakdown of orderly discipline.

*Id.* at 750-52 (footnote omitted). We held that the principal did not violate the students' constitutional rights by punishing them for their behavior and, *under those circumstances,* banning the buttons from the school. Such a restriction on student expression was justified, notwithstanding the First Amendment, because the "students conducted themselves in a disorderly manner, disrupted classroom procedure, interfered with the proper decorum and discipline of the school and disturbed other students who did not wish to participate in the wearing of the buttons." *Id.* at 753.

[22][23] In *Burnside,* however, the same panel of this court, on the same day, emphasized that the mere *possibility* of such consequences did *not* justify a different school in banning freedom buttons. 363 F.2d at 748 (overturning school's ban on freedom buttons because "affidavits and testimony before the District Court reveal no interference with educational activity and do not support a conclusion that there was a commotion or that the buttons tended to distract the minds of the students away from their teachers") (emphasis omitted). The *Burnside-Blackwell* dyad demonstrates that the permissibility of a restriction on student expression cannot be determined in the abstract, but must be

assessed with at least one eye toward the actual or likely (not merely potential) impact of that expression on the learning environment. Conduct that may be constitutionally protected in one school or under one set of circumstances may tend to incite disruption or disorder-and so be constitutionally proscribable-in others. Where students' expressive activity does not materially interfere with a school's vital educational mission, and does not raise a realistic chance of doing so, it may not be prohibited simply because it conceivably *might* have such an effect.

b.

[24] Allred maintains that it was appropriate for her to discipline Holloman because the other students were disturbed by his demonstration. She claims a number of them came up to her after class and told her that what he did wasn't "right." She also expressed concern that his behavior would lead to further disruptions by other students.

The fact that other students may have disagreed with either Holloman's act or **\*1275** the message it conveyed is irrelevant to our analysis. *See Tinker*, 393 U.S. at 509, 89 S.Ct. at 738 ("In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."); *Near v. Minnesota*, 283 U.S. 697, 722, 51 S.Ct. 625, 633, 75 L.Ed. 1357 (1931) ("If the township may prevent the circulation of a newspaper for no reason other than that some of its inhabitants may violently disagree with it, and resent its circulation by resorting to physical violence, there is no limit to what may be prohibited.") (quotation and citation omitted).

Nor is Holloman's expression removed from the realm of constitutional protection simply because the students cloaked their disagreement in the guise of offense or disgust. Holloman's behavior was not directed "toward" anyone or any group and could not be construed by a reasonable person (including a high school student) as a personal offense or insult.

*Ferrell v. Dallas Indep. Sch. Dist.* arguably supports Allred's position. In *Ferrell*, this court held that a school could prohibit students from wearing long hair simply because their choice of hairstyle "provoked" other students into breaking school rules and the law by responding violently. The court justified the hair-length regulation by pointing to such considerations:

On one occasion a group of boys in his school had decided that a classmate's hair was too long and that they were going to take the matter in their own hands and trim it themselves. Mr. Lanham stated that boys with long hair were subjected to substantial harassment. Obscene language had been used by some students in reference to others with long hair and girls had come to his office complaining about the language being used. The long hair boys had also been challenged to a fight by other boys who did not like long hair. Also, long hair boys had been told by others that the girl's restroom was right down the hall.

392 F.2d at 700-01.

Allowing a school to curtail a student's freedom of expression based on such factors turns reason on its head. If certain bullies are likely to act violently when a student wears long hair, it is unquestionably easy for a principal to preclude the outburst by preventing the student from wearing long hair. To do so, however, is to sacrifice freedom upon the alter of order, and allow the scope of our liberty to be dictated by the inclinations of the unlawful mob. If bullies disrupted classes and beat up a student who refused to join the football team, the proper solution would not be to force the student to join the football team, but to protect the student and punish the bullies. If bullies disrupted classes and beat up a student because he wasn't wearing fancy enough clothes, the proper solution would not be to force the student to wear Abercrombie & Fitch or J. Crew attire, but to protect the student and punish the bullies. The same analysis applies to a student with long hair, who is doing nothing that the reasonable person would conclude is objectively wrong

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

or directly offensive to anyone. The fact that other students might take such a hairstyle as an incitement to violence is an indictment of those other students, not long hair.

Such reasoning is part of the basis for *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 1365, 22 L.Ed.2d 572 (1969), where the Supreme Court held that "the possible tendency of appellant's words to provoke violent retaliation" is not a basis **\*1276** for banning those words unless they are "fighting words." Street's conviction was reversed because "[t]hough it is conceivable that some listeners might have been moved to retaliate upon hearing appellant's disrespectful words, we cannot say that appellant's remarks were so inherently inflammatory as to come within that small class of 'fighting words' which are 'likely to provoke the average person to retaliation, and thereby cause a breach of the peace.' " *Id.* (*quoting Chaplinsky v. New Hampshire,* 315 U.S. 568, 574, 62 S.Ct. 766, 770, 86 L.Ed. 1031 (1942)); *see also Cantwell v. Connecticut,* 310 U.S. 296, 308-10, 60 S.Ct. 900, 905-06, 84 L.Ed. 1213 (1940) (reversing conviction for breaching the peace in a case where there was "no assault or threatening of bodily harm, no truculent bearing, no intentional discourtesy, no personal abuse").

While the same constitutional standards do not always apply in public schools as on public streets, we cannot afford students less constitutional protection simply because their peers might illegally express disagreement through violence instead of reason. If the people, acting through a legislative assembly, may not proscribe certain speech, neither may they do so acting individually as criminals. Principals have the duty to maintain order in public schools, but they may not do so while turning a blind eye to basic notions of right and wrong.

Thus, under the *Tinker-Burnside* doctrine, we are required to reject this portion of *Ferrell,* as well. Even if Allred were correct in fearing that other students may react inappropriately or illegally, such reactions do not justify suppression of Holloman's expression. Holloman's expression was constitutionally protected because the record reveals no way in which he "materially and substantially interfere[d] with the requirements of appropriate discipline in the operation of the school." *Burnside,* 363 F.2d at 749.

c.

On appeal, Allred repeatedly emphasizes that Holloman was punished not for his act, but for disobeying directions from her and Harland as to the only permissible ways to salute the flag. By raising his fist in the air the next day, Holloman contravened these instructions. Consequently, Allred argues, Holloman was punished for insubordination for violating these orders, rather than for exercising a First Amendment right.

[25] Although Holloman failed to salute the flag in a manner amenable to Allred, "the protections of the First Amendment do not extend solely to speech which is well-mannered and attentive to the preferences of others." *Sabel v. Stynchcombe,* 746 F.2d 728, 731 (11th Cir.1984). As discussed throughout this Subsection, Holloman had the constitutional right to raise his fist during the Pledge of Allegiance so long as he did not disrupt the educational process or the class in any real way.

Allred could not prevent Holloman from exercising a constitutional right simply by telling him not to do so. School officials may not punish indirectly, through the guise of insubordination, what they may not punish directly. *See Rutland,* 316 F.Supp. at 358 (ordering reinstatement of public high school teacher who was dismissed in violation of the First Amendment for assigning a short story administrators found objectionable because "plaintiff's 'insubordination' was not insubordination in any sense and was not, in reality, a reason for the School Board's action"); *Dickey v. Alabama State Bd. of Educ.,* 273 F.Supp. 613, 618 (M.D.Ala.1967) ("The attempt to characterize Dickey's conduct, and the basis for their action **\*1277** in expelling him, as 'insubordination' requiring rather severe disciplinary action, does not disguise the basic fact that Dickey was expelled from

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

Troy State College for exercising his constitution-ally guaranteed right of academic and/or political expression."), *vacated as moot sub nom. Troy State Univ. v. Dickey,* 402 F.2d 515 (5th Cir.1968). Allred lacked the right to proscribe his behavior in the first place; neither she nor Harland could punish Holloman for violating a directive that was a constitutional nullity.

Consequently, we have no choice but to conclude as a matter of law that Holloman successfully articulated a violation of his First Amendment right to freedom of expression by Harland and Allred. We now must assess whether these rights were "clearly established" at the time of the incidents.

### 2.

This circuit was recently chastised by the Supreme Court for taking an unwarrantedly narrow view of the circumstances in which public officials can be held responsible for their constitutional violations. *See Vaughan v. Cox,* 343 F.3d 1323, 1332 (11th Cir.2003) ("[T]he Supreme Court in *Hope* cautioned that we should not be unduly rigid in requiring factual similarity between prior cases and the case under consideration."). The law of this circuit used to be that a government actor could be denied qualified immunity only for acts that are "so obviously wrong, in light of the pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." *Lassiter v. Alabama A. & M. Univ.,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc). The Supreme Court, specifically citing *Lassiter* (along with a handful of other Eleventh Circuit cases), held that "[t]his rigid gloss in the qualified immunity standard ... is not consistent with [the Supreme Court's] cases." *Hope v. Pelzer,* 536 U.S. 730, 739 & n. 9, 122 S.Ct. 2508, 2515 & n. 9, 153 L.Ed.2d 666 (2002).

[26] While officials must have fair warning that their acts are unconstitutional, there need not be a case "on all fours," with materially identical facts, before we will allow suits against them. A principle of constitutional law can be "clearly es-

tablished" even if there are "notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." *United States v. Lanier,* 520 U.S. 259, 269, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997); *Hope,* 536 U.S. at 741, 122 S.Ct. at 2516 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier,* we expressly rejected a requirement that previous cases be 'fundamentally similar.' ").

In our pre-*Hope* jurisprudence, we held that

[g]eneral rules, propositions, or abstractions ... do not determine qualified immunity. Instead, the circumstances that confronted the government actor must have been materially similar to prior precedent to constitute clearly established law because public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases. For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.

*Wood v. City of Lakeland,* 203 F.3d 1288, 1291-92 (11th Cir.2000) (citations and quotations omitted).

**\*1278** As discussed above, *Hope* reminds us that we need no longer focus on whether the facts of a case are "materially similar to prior precedent." Moreover, *Hope* emphasized that "general statements of the law are not inherently incapable of giving fair and clear warning ... [A] constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." 536 U.S. at 741, 122 S.Ct. at 2516 (quotations omitted). Thus, we do not just compare the facts of an instant case to prior cases to determine if a right is "clearly established;" we also assess whether the facts of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

instant case fall within statements of general principle from our precedents. *See Vinyard v. Wilson,* 311 F.3d 1340, 1351 (11th Cir.2002) ("When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts.").

*Hope* seems to have abrogated many of the other standards articulated in *Wood,* as well. For example, *Wood*'s requirement that a particular conclusion must be "dictate[d], that is, truly compel[led]" intimates a level of absolute crystal-clear certainty about precedent that forms no part of *Hope*'s requirements. To the degree there exists a conflict between *Hope* and our earlier cases, we are, of course, bound to follow the Supreme Court's intervening ruling. *See Lufkin v. McCallum,* 956 F.2d 1104, 1107 (11th Cir.1992). Since *Hope,* many of our cases have applied its standard to the exclusion of our earlier, more rigorous doctrinal tests. *See, e.g., Holmes v. Kucynda,* 321 F.3d 1069, 1077-78 (11th Cir.2003); *Dahl v. Holley,* 312 F.3d 1228, 1233 (11th Cir.2002); *Weaver v. Bonner,* 309 F.3d 1312, 1324 (11th Cir.2002). *Hope* emphasizes that, notwithstanding more stringent standards articulated in some of our earlier cases, "the salient question ... is whether the state of the law [at the time of the events in question] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." 536 U.S. at 741, 122 S.Ct. at 2516.

[27] Turning to Holloman's claims, we find that, as of May 16, 2000, the *Tinker-Burnside* standard was clearly established and sufficiently specific as to give the defendants "fair warning" that their conduct was constitutionally prohibited. We do not find it unreasonable to expect the defendants-who holds themselves out as educators-to be able to apply such a standard, notwithstanding the lack of a case with material factual similarities. While we have not traditionally called upon government officials to be "creative or imaginative" in determining the scope of constitutional rights, *see Adams v. St. Lucie Cty. Sheriff's Dep't,* 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dis-

senting), neither are they free of the responsibility to put forth at least some mental effort in applying a reasonably well-defined doctrinal test to a particular situation. Our precedents would be of little value if government officials were free to disregard fairly specific statements of principle they contain and focus their attention solely on the particular factual scenarios in which they arose.

[28] The *Tinker-Burnside* test calls for teachers to assess two factors: (1) whether a student is engaged in expression (either pure speech or expressive conduct) and (2) whether the expression is having a non-negligible disruptive effect, or is likely to have such an effect, on classroom order or the educational process. The first factor is quite easy to apply; the test for determining whether an act constitutes expressive conduct is whether the "reasonable person" would perceive it as such. *See *1279 Spence,* 418 U.S. at 410-11, 94 S.Ct. at 2730. Consequently, a teacher or principal should have no problem determining whether a student is engaged in expression. Indeed, given the myriad forms of expression, we should be hesitant about requiring that a means of expression be the subject of a previous case before offering the speaker full § 1983 protection.

The second factor should also be quite effortless for an educator to apply. A teacher or principal should be able to instantly recognize whether a student is disrupting class, and it should not be too hard to determine whether a student's activities are likely to have such an effect. Consequently, we do not find the *Tinker-Burnside* test to be of such an unreasonable level of generality that Allred and Harland could not have been expected to apply it in this case. *Cf. Thomas v. Roberts,* 323 F.3d 950 (11th Cir.2003) ("[W]here the applicable legal standard is a highly general one, such as 'reasonableness,' preexisting caselaw that has applied general law to specific circumstances will almost always be necessary to draw a line that is capable of giving fair and clear notice that an official's conduct will violate federal law."). Because this standard is "clearly established," is not at an unreasonable high level of generality, and when ap-

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

plied to the facts of Holloman's case yields a fairly determinate result that should have been clear, Allred and Harland are not entitled to summary judgment on qualified immunity grounds against Holloman's Speech Clause claim concerning his right to affirmative expression. The *Tinker-Burnside* principle gave them "clear notice" that their conduct violated Holloman's constitutional rights; unlike the dissent, we believe that teachers are well equipped to "readily determine what conduct falls within" the *Tinker-Burnside* standard.

Indeed, Holloman's right to silently raise his fist during the Pledge of Allegiance would even be considered "clearly established" under *Barnette.* As discussed earlier, he clearly had the right to remain silent during the Pledge of Allegiance; we would be very reluctant to conclude that Holloman somehow shed the protection of the First Amendment simply by lifting his fist into the air while exercising this right. Allred and Harland are essentially asking us to distinguish, on constitutional grounds, between a student with his hands in his pockets or at his sides (like Hutto) and a student with his hand in the air. This is a hair we will not split; First Amendment protections are not lost that easily.

### D.

[29] The dissent takes issue with the analysis in Subpart C, contending that Holloman's expression is unprotected because it "is the sort of activity that competes with the teacher for the students' attention." For the reasons discussed in the previous Subpart, we do not believe that Holloman's activity, which had virtually no impact on the class, was sufficient under *Tinker* and *Burnside* to fall outside the realm of constitutional protection. However, even if we (or a jury, based on the facts as they unfold at trial) were to find that Holloman's expression did "materially and substantially interfere with the requirements of appropriate discipline," Holloman would still be able to articulate a violation of his First Amendment rights.

[30] One of the most egregious types of First Amendment violations is viewpoint-based discrim-

ination. *See Chandler v. James,* 180 F.3d 1254, 1265 (11th Cir.1999) (noting that "viewpoint discrimination[ ][is] the most egregious form of content-based censorship"); *Searcey v. Harris,* 888 F.2d 1314, 1324 (11th Cir.1989)**\*1280** ("The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis."). Government actors may not discriminate against speakers based on viewpoint, even in places or under circumstances where people do not have a constitutional right to speak in the first place. *See Uptown Pawn & Jewelry, Inc. v. City of Hollywood,* 337 F.3d 1275, 1277 (11th Cir.2003) ("[R]estrictions on nonpublic forums need only be reasonable and not viewpoint discriminatory."); *Adler v. Duval County Sch. Bd.,* 206 F.3d 1070, 1081 (11th Cir.2000) ("The Supreme Court has consistently held that in nonpublic fora the government may not engage in viewpoint discrimination."). We have expressly recognized that this fundamental prohibition against viewpoint-based discrimination extends to public schoolchildren, as well, stating, "[W]e do not believe [that Supreme Court precedent] offers any justification for allowing educators to discriminate based on viewpoint.... Without more explicit direction, we will continue to require school officials to make decisions relating to speech which are viewpoint neutral." *Searcey,* 888 F.2d at 1325. Consequently, even if Holloman did not have the right to express himself in the manner he did, his rights were still violated if he was punished because Allred disagreed or was offended by what he said.

This theory was most clearly applied in *R.A.V. v. St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). That case involved an ordinance which made it a crime to place a "burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." *Id.* at 380, 112 S.Ct. at 2541. The Supreme Court accepted the Minnesota Supreme Court's construction of the statute as prohibiting only "fighting words," a constitutionally proscribable category of expression. *Id.* at 380-81, 112 S.Ct. at 2541. The Court nevertheless invalidated the statute because, in the course of prohibiting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

conduct the state had the right to criminalize, it made a viewpoint-based distinction.

The Court acknowledged that people do not have the First Amendment right to use fighting words. *Id.* at 382, 112 S.Ct. at 2542-43. The Court emphasized, however, "What [that] means is that these areas of speech can, consistently with the First Amendment, be regulated because of their constitutionally proscribable content (obscenity, defamation, etc.)-not ... that they can be made the vehicles for content discrimination unrelated to their distinctively proscribable content." *Id.* at 383, 112 S.Ct. at 2543. Thus,

a particular instance of speech can be proscribable on the basis of one feature (e.g. obscenity) but not on the basis of another (e.g. opposition to the city government).... [Moreover,] the power to proscribe particular speech on the basis of a noncontent element (e.g. noise) does not entail the power to proscribe the same speech on the basis of a content element....

*Id.* at 385-86, 112 S.Ct. at 2544. Applying this standard, the Court held that the ordinance was unconstitutional because "[d]isplays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics." *Id.* at 391, 112 S.Ct. at 2547. Moreover, the ordinance went beyond general content discrimination "to actual viewpoint discrimination.... '[F]ighting words' that do not themselves invoke race, color, creed, religion, or gender ... would seemingly be usable ad libitum in the placards of those arguing in favor of racial, color, etc., tolerance and equality, but could not be used by **\*1281** those speakers' opponents." *Id.* at 391, 112 S.Ct. at 2547-48.

Thus, even though Minneapolis had the unquestioned power to prohibit fighting words, it could not draw viewpoint based distinctions by targeting certain fighting words because of the repugnant message they conveyed. Applying this principle to the instant case, it becomes clear why Allred may potentially be held liable under the First Amendment even if Holloman was not engaging in

constitutionally protected speech. Although Allred has the authority under the *Tinker-Burnside* standard to proscribe student expression that materially and substantially disrupts the class, she may not punish such expression based on the fact that she disagrees with it. Even when engaging in speech that is not directly constitutionally protected, Holloman still has the First Amendment right to be free from viewpoint discrimination.

The record, interpreted in the light most favorable to Holloman, more than amply supports his argument that he was punished for the substance of his unpatriotic views rather than an alleged disruption of class. Allred admitted in her deposition that when Hutto simply refused to recite the pledge of allegiance, she was "hurt" and "[v]ery disappointed in him" because "[h]e was a leader of the class .... [and] looked up to a great deal." Moreover, she because of "the freedoms we enjoy in this country," she couldn't understand how he wouldn't want to pledge. She emphasized, "It broke my heart, you know." Given that Hutto was chastised and ultimately forced by Harland to apologize simply for remaining silent during the flag salute, a jury could reasonably conclude that Allred's punishment of Holloman was based on similar motivations.

When Holloman allegedly asked Allred about the ways in which students were permitted to salute the flag, she told him that he could either do so with his hand over his heart or in a military-type salute. She explained, "In our country, the normal way is putting your hand over your heart. That's the way you see everyone do it, the ball players on TV." Any other way is prohibited because it "is not the normal acceptance [sic] of saying the pledge in our country." She considered what he did "disrespectful" because "[i]t's going against the normal procedure behavior [sic] of pledging to our American flag." Holloman's gesture is "not an acceptable behavior in this country." She emphasized, "You just salute the way Americans salute and pledge. That's a given." Although she maintained that this disrespect to the flag wasn't the reason she actually punished Holloman, these statements would allow a jury to conclude that her actions

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

were motivated by her disagreement with and offense at the unpatriotic views expressed by Holloman's gesture.

Harland expressed a similar attitude. According to Vice Principal Jason Adkins, Harland was "angry and disappointed and upset" that Hutto declined to salute the American flag. Harland threatened to rescind his recommendation of Hutto to the Air Force Academy. Again, such views toward the Pledge of Allegiance support Holloman's claim that he was punished for the offensive viewpoint he expressed.

Especially when considered in light of the virtually nonexistent evidence that Holloman disrupted the class in any way (discussed in the previous Subpart), the record virtually compels the conclusion (for summary judgment purposes) that both the fact and extent of his punishment stemmed from the fact that Allred and Harland found his ostensibly unpatriotic views repugnant and offensive. Indeed, many of our cases have used evidence such as this to support a finding that a particular governmental act was motivated by **\*1282** unconstitutional viewpoint discrimination. *See, e.g., Chandler v. Georgia Public Telecomm. Comm'n,* 917 F.2d 486, 491-92 (11th Cir.1990) ("The transcript of the evidentiary hearing held by the district court is replete with statements by Dr. Cooper, the executive director of [the state agency], that [the agency] decided that the viewpoints of the Libertarians were less valuable than those of the Democrats and Republicans.").

As emphasized earlier, the evidence at trial may prove that Allred did not discipline Holloman because of his viewpoint, but for a legitimate reason. Interpreting the evidence in Holloman's favor for summary judgment purposes, however, we must conclude that her motive was discriminatory. Because Holloman had the right to be free from viewpoint discrimination, and that right was clearly established (both in general as well as in the public school context) under the precedents discussed above, we must deny Allred qualified immunity at this stage. As Justice Blackmun reminds us, "[I]f educators intentionally may eliminate all diversity

of thought, the school will strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Bd. of Educ. v. Pico,* 457 U.S. 853, 879, 102 S.Ct. 2799, 2814, 73 L.Ed.2d 435 (1982) (Blackmun, J., concurring in part). Consequently, even if the dissent's contention (that Holloman's conduct is not protected under the Tinker-Burnside standard) is correct, Holloman's punishment would still have violated the First Amendment. Viewpoint discrimination is another First-Amendment avenue for recovery that Holloman is entitled to pursue at trial.

Having concluded that Allred and Harland are not entitled to summary judgment on qualified immunity grounds against any of the three ways in which Holloman can articulate Speech Clause claims against them, we now turn to his Establishment Clause claim against them.

### III.

Holloman claims that his rights under the Establishment Clause were violated by Allred's daily moment of silent prayer. The district court granted both Allred and Harland summary judgment against this claim. While Holloman's brief on appeal vigorously contests this ruling as it applies to Allred, it does not even mention whether Harland was entitled to qualified immunity on this claim. Consequently, we are forced to conclude that Holloman has abandoned his appeal regarding Harland's summary judgment on qualified immunity grounds against Holloman's Establishment Clause claim.FN9 We reverse the district court's grant of summary judgment on this claim to Allred, however.

> FN9. Based on the record before us, it appears as if Holloman would be able to articulate a number of ways in which Harland could be held liable under a supervisoral theory of liability. As discussed earlier, qualified immunity is not a defense to a § 1983 suit premised on supervisorial liability. Because Holloman failed to articulate such a cause of action at any point

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

before the district court, we need not consider the viability of such claims here.

As noted in Part II, the first step in assessing the viability of a qualified immunity defense is to determine whether the government official defendant was engaged in a "discretionary function" in performing the acts of which the plaintiff complains. This entails a two-step analysis: we begin by ascertaining whether the defendant was pursuing a job-related goal, and then examine whether the type of action in which she was engaging to further this goal was authorized.

**\*1283** [31] We are willing to assume that Allred satisfies the first prong of this test because she was attempting to pursue the legitimate job-related function of fostering her students' character education by teaching compassion. She nevertheless fails the second prong of the "discretionary function" test because she was not pursuing this job-related goal through legitimate means that fell within her powers. While fostering character development and moral education were undoubtedly parts of Allred's official responsibilities, this does not automatically empower her to do anything within her judgment that furthers those goals; she cannot educate students at all costs.

Praying goes sufficiently beyond the range of activities normally performed by high school teachers and commonly accepted as part of their job as to fall outside the scope of Allred's official duties, even if she were using prayer as a means of achieving a job-related goal. It is not within the range of tools among which teachers are empowered to select in furtherance of their pedagogical duties.[FN10] Prayer is a relatively *sui generis* activity. Put another way, even ignoring Holloman's Establishment Clause claims, praying *still* would not be part of a public school teacher's responsibilities or duties.

> FN10. We emphasize that students were not studying the Bible as part of a course on literature, or singing a religious hymn in a music class, or analyzing a prayer as a poem, but instead were actually encouraged to pray. *Cf. Stone v. Graham,* 449 U.S. 39, 42, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980) ("This is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like.").

We emphasize that, at this juncture, we are not denying Allred summary judgment on qualified immunity grounds against this claim because we feel her acts violated the Establishment Clause. Instead, we are holding her ineligible for qualified immunity as a matter of law because she failed to establish that her act-this type of act-fell within her duties or powers as a teacher. The fact that Allred is a teacher does not mean that anything she says or does in front of a classroom necessarily constitutes an exercise of her discretionary powers or is a job-related function. Prayer is distinct from the type of civil virtue and secular moralism Alabama sought to promote through its character education program. Consequently, Allred is not even potentially entitled to summary judgment on qualified immunity grounds against Holloman's Establishment Clause claim.

The dissent takes issue with this conclusion, concluding that school prayer is a type of act that falls within the scope of a public school teacher's discretionary authority. It argues, "It was certainly within the scope of a public high school teacher's authority to lead students in prayer prior to 1962, when the Court ruled that teacher led prayer in public schools is a violation of the Establishment Clause." This analysis is beside the point. In determining whether a public official is authorized to perform a certain type of act (abstracting away from its unconstitutional aspects), we look to the scope of their authority as it exists today, and do not inquire as to what the forty-year old root causes of the present-day situation may have been. Prayer is not a type of act that falls within a reasonably specific category of actions that teachers are authorized to perform; there is no easy way of abstracting away its unconstitutional aspects to arrive at a type of behavior that falls within teachers' dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cretionary authority.

**\*1284** Moreover, we decline to embark on a sociological inquiry-one for which this court is singularly unequipped-in which we weigh Supreme Court rulings against other important stimuli that has led to the gradual secularization of this country over the past half century to determine why prayer is not a type of act that public school teachers are empowered to perform. Consequently, Allred acted outside her discretionary authority, and is not even potentially eligible to invoke qualified immunity against Holloman's Establishment Clause claims.

IV.

The district court granted Allred summary judgment on qualified immunity grounds against Holloman's Establishment Clause claims because it concluded that her daily moment of silent prayer did not violate Holloman's constitutional rights, and that even if it did, those rights were not clearly established at the time of the incident. In Part III, we reversed the court's grant of qualified immunity because Allred had failed to establish that she had been performing a discretionary function in conducting this moment of silent prayer. In this Part, we conclude that Holloman demonstrated sufficient evidence to support the conclusion that Allred had violated clearly established rights under the Establishment Clause. We include this discussion as a preface to Part V, where we assess the liability of the School Board. Logically enough, the only way Holloman can maintain his Establishment Clause suit against the School Board is if he demonstrates, as a threshold matter, that his Establishment Clause rights were violated.FN11

> FN11. We also note that, even putting aside questions of qualified immunity, the district court's legal conclusion-that Holloman's rights under the Establishment Clause had not been violated-would have required that the court dismiss his § 1983 claims under the Establishment Clause for failure to state a claim. Given that the issue has been thoroughly briefed and argued by

both sides before us, we need not wait for a subsequent appeal from this legally inevitable ruling to consider this matter.

A.

[32][33] The Establishment Clause of the First Amendment states, "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. This restriction has been made applicable to states, as well as state-created entities and their employees, through the Due Process Clause of the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The Establishment Clause applies not only to state statutes, but acts and decisions of individual governmental actors, such as teachers and school administrators. *Lee v. Weisman,* 505 U.S. 577, 587, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992).

[34] In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court set forth its famous three-prong test for assessing the permissibility of statutes under the Establishment Clause. "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." *Id.* at 612-13, 91 S.Ct. at 2111 (internal citations and quotations omitted). *Agostini v. Felton,* 521 U.S. 203, 233, 117 S.Ct. 1997, 2015, 138 L.Ed.2d 391 (1997), however, refined this test, stating, "[T]he factors we use to assess whether an entanglement is 'excessive' are similar to the factors we use to examine 'effect.' ...[I]t **\*1285** is simplest to recognize why entanglement is significant and treat it ... as an aspect of the inquiry into a statute's effect." Thus, while the Court has folded its traditional "excessive entanglement" inquiry into its "primary effect" analysis, the substance of its Establishment Clause jurisprudence remains fundamentally unaltered. *See, e.g., Zelman v. Simmons-Harris,* 536 U.S. 639, 648-49, 122 S.Ct. 2460, 2465, 153 L.Ed.2d 604 (2002). This Section demonstrates that Allred's practice of soliciting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 35

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

prayer requests from her students and enforcing a moment of silence runs afoul of the *Lemon-Agostini* standard. Subsection (a) looks to the purpose of her acts, while Subsection (b) examines their primary effect.

### 1.

A government official violates the Establishment Clause if she lacks a "secular legislative purpose" for her actions. *Comm. for Pub. Educ. & Religious Liberty v. Regan,* 444 U.S. 646, 652, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980). Allred attempts to defend her daily moment of silent prayer by arguing that it was intended to teach students compassion,[FN12] pursuant to the character education plan mandated by the State Legislature. *See supra* Section I.C; *see also Ala.Code* § 16-6B-2.

> FN12. Compassion was not the only character trait Allred attempted to instill in her students. She testified, "If you are talking about cleanliness, we talk about litter. You know, and I have discussed that with students, being fined if you throw out litter. Cleanliness as far as personal hygiene, I have actually mentioned that when I had a problem in class. You know, 'Everybody don't forget to, you know, bathe.' "

[35] This explanation does not constitute a valid secular legislative purpose for Allred's actions. First, Allred's most basic intent unquestionably was to offer her students an opportunity to pray in a public school during the school day, and effectively encourage them to do so. By collecting prayer requests, and using the phrases "let us pray" and "amen," she gave the practice of praying during the moment of silence her implicit imprimatur.

While she may also have had a higher-order ultimate goal of promoting compassion, we look not only to the ultimate goal or objective of the behavior, but also the more immediate, tangible, or lower-order consequences a government actor intends to bring about. Allred's mere "testimonial avowal of secular ... purpose is not sufficient to avoid conflict

with the Establishment Clause." *Karen B. v. Treen,* 653 F.2d 897, 900 (5th Cir.1981).

This reasoning closely follows that employed by the Supreme Court in *Stone v. Graham,* wherein it held that, notwithstanding supposedly secular justifications offered by the school district, "[t]he preeminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposedly secular purpose can blind us to that fact." 449 U.S. 39, 41, 101 S.Ct. 1560, 194, 66 L.Ed.2d 199 (1980). Because prayer is "a primary religious activity in itself,"*see Treen,* 653 F.2d at 901, a teacher or administrator's intent to facilitate or encourage prayer in a public school is *per se* an unconstitutional intent to further a religious goal.

Second, even accepting Allred's testimony that she hoped to use prayer as a way of teaching compassion, our analysis does not end there. While promoting compassion may be a valid secular purpose, teaching students that praying is necessary or **\*1286** helpful to promoting compassion is not.[FN13] As we held in *Treen,*

> FN13. It is instructive, though by no means necessary to our holding, that Allred also considered readings from the Bible to be part of her students' character education.

Even if the avowed objective of the legislature and school board is not itself strictly religious, it is sought to be achieved through the observance of an intrinsically religious practice. The unmistakable message of the Supreme Court's teachings is that the state cannot employ a religious means to serve otherwise legitimate secular interests.
*Id.* at 901.

The Supreme Court was faced with similar facts in *School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), wherein it refused to conclude that daily readings from the Bible in public schools had a valid secular purpose. The State argued that the purposes of the statute re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

quiring the Bible readings were "the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature." *Id.* at 223, 83 S.Ct. at 1572. The Court struck down the statute, asserting that "even if its purpose is not strictly religious, [its purpose] is sought to be accomplished through readings, without comment, from the Bible. Surely the place of the Bible as an instrument of religion cannot be gainsaid...." *Id.* at 224, 83 S.Ct. at 1572. Elsewhere, this court has emphasized, "Recognizing that prayer is the quintessential religious practice implies that no secular purpose can be satisfied...." *Jaffree v. Wallace,* 705 F.2d 1526, 1534-35 (11th Cir.1983) [*Jaffree I* ], *aff'd sub nom. Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) [*Jaffree II* ].

Under these precedents, a person attempting to further an ostensibly secular purpose through avowedly religious means is considered to have a constitutionally impermissible purpose. *See Jager v. Douglas Cty. Sch. Dist.,* 862 F.2d 824, 830 (11th Cir.1989) ("[A]n intrinsically religious practice cannot meet the secular purpose prong of the *Lemon* test...."). The point of Allred's daily "ritual" was to show that praying is a compassionate act; such an endorsement of an intrinsically religious activity is inconsistent with the Establishment Clause. For these reasons, we find that Allred violated the Establishment Clause because her acts were motivated, at least in part, by a desire to inculcate "religiosity."

### 2.

Allred's behavior also fails the "effects" prong of the *Lemon-Agostini* test because the effect of her behavior was clearly to promote praying, a religious activity. Praying is perhaps the "quintessential religious practice," *see Treen,* 653 F.2d at 901, and to explicitly call for prayer requests, invoke a moment of silence for prayer with the phrase "let us pray," actually hold such a moment of silence, and sometimes conclude with "Amen" has the effect of both endorsing religious

activity, as well as encouraging or facilitating its practice.

This behavior is clearly the type of "invocation of God's blessings" of which the Supreme Court disapproved in *Engel v. Vitale,* 370 U.S. 421, 422, 82 S.Ct. 1261, 1262, 8 L.Ed.2d 601 (1962). Allred's use of the concept of silent prayer could quite reasonably appear to be an "endorsement [of religion that] is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion." *Jaffree II,* 472 U.S. at 60, 105 S.Ct. at 2491 (holding that a statute allowing public school teachers to expressly dedicate a moment of silence to **\*1287** prayer violates the Establishment Clause); *see also Schempp,* 374 U.S. at 225, 83 S.Ct. at 1573 ("[T]he Government [must] maintain strict neutrality, neither aiding nor opposing religion."). While Allred did not promote any particular prayer, or even compel prayer in general, her policy undeniably "encourage[d] recitation of ... prayer." *Engel,* 370 U.S. at 424, 82 S.Ct. at 1263. Consequently, we conclude that Allred's acts violated the Establishment Clause.

Allred argues that her behavior does not have the effect of furthering religion because her students frequently asked her to hold the moments of silence. We held in *Chandler v. Siegelman,* "So long as the prayer is *genuinely student-initiated,* and not the product of any school policy which actively or surreptitiously encourages it, the speech is private and it is protected." 230 F.3d 1313, 1317 (11th Cir.2000)(*Chandler II* ). Allred takes an exceedingly broad view of the phrase "student-initiated," interpreting it to be woefully inconsistent with the rest of our opinion in that case.

[36] Under *Chandler II,* read as a whole, a prayer is not "student-initiated," and hence constitutional, simply because the initial idea for the prayer was a student's. For example, the fact that a student may come up with the idea of having the Lord's Prayer recited over his school's loudspeakers each day does not mean the prayer is "student-initiated," and so constitutional, under *Chandler II.* Indeed, in the Supreme Court's *Santa Fe* ruling

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

(which *Chandler II* applied), the student body had conducted an election and affirmatively voted to have prayers recited at football games, but the Court nevertheless invalidated the practice. School personnel may not facilitate prayer simply because a student requests or leads it.

The true test of constitutionality is whether the school encouraged, facilitated, or in any way conducted the prayer. *Chandler II* used the phrase "student-initiated" to mean "independently student organized and conducted," as opposed to "school sponsored" or "school conducted." In fact, in the actual holding of the case, we upheld a portion of an injunction enjoining the school district from " 'aiding, abetting, commanding, counseling, inducing, ordering, or procuring' school organized or officially sanctioned religious activity." *Id.* at 1317. While purely private prayer by students is constitutionally protected, prayer that is led, encouraged, or facilitated by school personnel is constitutionally prohibited. "[E]ven genuinely student-initiated speech may constitute state action if the State participates in or supervises the speech.... [S]tudent religious speech must be without oversight, without supervision, subject only to the same reasonable time, place, and manner restrictions as all other student speech in school." *Chandler v. James* [*Chandler I* ], 180 F.3d 1254, 1264-65 (11th Cir.1999). In this case, the prayer requests and moments of silence for prayer cannot be considered purely student speech because they were coordinated and conducted by a teacher (in a classroom during school hours, no less).

[37] That students were not actually forced to pray during the moment of silence, and may have been free to leave the room, does not alleviate the constitutional infirmities of Allred's moment of silence. The *Engel* Court declared, "[T]he fact that the program ... does not require all pupils to recite the prayer but permits those who wish to do so to remain silent or be excused from the room, ignores the essential nature of the program's constitutional defects." 370 U.S. at 430, 82 S.Ct. at 1266. The Court further explained, "The Establishment Clause, unlike the Free Exercise *1288 Clause,

does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not." *Id.,* 82 S.Ct. at 1267. The *Schempp* Court later reaffirmed that the unconstitutionality of school-sponsored prayer is not "mitigated by the fact that individual students may absent themselves upon parental request, for that fact furnishes no defense to a claim of unconstitutionality under the Establishment Clause." *Schempp,* 374 U.S. at 223, 83 S.Ct. at 1572.

The "nondenominational" nature of the moment of silence is similarly of no avail. *Weisman,* 505 U.S. at 594, 112 S.Ct. at 2659 (stating that the nonsectarian nature of a school-sponsored prayer "does not lessen the offense or isolation to the objectors. At best it narrows their number, at worst increases their sense of isolation and affront."). "[G]overnment is required to be a neutral among religions *and between religion and nonreligion.*" *Mitchell v. Helms,* 530 U.S. 793, 878, 120 S.Ct. 2530, 2578, 147 L.Ed.2d 660 (2000) (emphasis added) (quotation and citation omitted). "It is now firmly established that a law may be one 'respecting an establishment of religion' even though its consequence is not to promote a 'state religion' and even though it does not aid one religion more than another but merely benefits all religions alike." *Comm. for Pub. Educ. v. Nyquist,* 413 U.S. 756, 771, 93 S.Ct. 2955, 2964-65, 37 L.Ed.2d 948 (1973). Encouraging or facilitating any prayer clearly fosters and endorses religion over nonreligion, and so runs afoul of the First Amendment.

The brevity of Allred's moment of silent prayer does not alleviate her constitutional violation, either. It is "no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment." *Schempp,* 374 U.S. at 225, 83 S.Ct. at 1573. Our own precedents clearly state that "[t]he Establishment Clause does not focus on the amount of time an activity takes, but rather examines the religious character of the activity." *Jager,* 862 F.2d at 832.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

It is instructive to compare the case before us with another moment-of-silence case in which we found that the Establishment Clause was not violated. In *Bown v. Gwinnett County School District,* 112 F.3d 1464 (11th Cir.1997), we held that a Georgia statute requiring public school teachers to observe a moment of silence each day in their classrooms did not violate the *Lemon* test. The statute had a secular purpose because it expressly declared that the "moment of quiet reflection ... is not intended to be and shall not be conducted as a religious service or exercise but shall be conducted as an opportunity for a moment of silent reflection on the anticipated activities of the day." *Id.* at 1469 (*quoting* O.C.G.A. § 20-2-1050(b)). Moreover, the statute's sponsor stated that he "viewed the Act not as providing for school prayer, but rather as providing for a moment for students to collect their thoughts, focus on the upcoming day, and begin to develop self-respect and discipline." *Id.* at 1471.

Because the statute, as actually implemented, did not have the effect of promoting or inhibiting religion, it also satisfied the second prong of the *Lemon* test. The announcement made over the school loudspeaker that commenced the moment of silence each day "indicated only that there would be a moment of silence to reflect on the day's activities .... [and] in no way suggested that students should or should not pray silently during the moment of quiet reflection...." *Id.* at 1472. Moreover, "[t]he Administrative Bulletin circulated to all school principals instructed **\*1289** that teachers should not suggest that students use the moment of quiet reflection for prayer," and we found no indication "that any teacher encouraged prayer in violation of the guidelines stated in the Administrative Bulletin." *Id.*

The instant case is easily distinguishable from *Bown* in that Allred, far from taking steps to ensure that her moment of silence was not regarded as a religious activity, affirmatively and repeatedly labeled it as such. Her characterization of the moment of silence is important; in *Adler v. Duval Cty. Sch. Bd.,* 250 F.3d 1330, 1342 (11th Cir.2001), we upheld a school's policy of having student gradu-

ation speakers in part because of "the complete absence ... of code words such as 'invocation' unequivocally connoting religion." The district court in this case was willing to overlook the fact that Allred would frequently " 'slip[ ] up' by using the word 'pray' instead of the words 'moment of silence,' ... and by indicating the end of the moment of silence by voicing the word 'amen', a poor substitute, perhaps, for the words 'let's get to work.' " (Mem. Op. June 4, 2001, at 6). Such labels, however, are quite important in determining not only the purpose behind the actions at issue (discussed in the prior Subsection), but also their nature, likely effects, and the degree to which they are likely to be perceived as state endorsement, facilitation, or promotion of religion.

For these reasons, we have no trouble in concluding that these facts amount to blatant and repeated violations of the Establishment Clause.

### B.

[38] Having established that Allred infringed Holloman's rights under the Establishment Clause, we now must assess whether these rights were "clearly established" at the time of her actions. The district court held, without explanation, that "[n]o jury could reasonably conclude that 'every like-situated, reasonable' teacher or principal would necessarily know ... that using the word 'prayer' as a euphemism for 'moment of silence,' violated freedom of religion or freedom from religion." (Mem. Op., June 4, 2001, at 10). We are again forced to disagree.

By now it should go without saying that it is unconstitutional for a teacher or administrator (or someone acting at their behest) to lead students aloud in voluntary prayer. *See Engel,* 370 U.S. at 422, 82 S.Ct. at 1262 (prohibiting recitation of nondenominational prayer); *Schempp,* 374 U.S. at 216, 83 S.Ct. at 1568 (invalidating school board practice of reciting the Lord's Prayer over the school loudspeakers each day).

In *Jaffree II,* another case from Alabama in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

volving unconstitutional Establishment Clause practices, the Supreme Court went a step further and condemned the use of a moment of silence when one of the purposes for which it was expressly instituted was prayer. 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29. The Alabama state legislature had enacted a statute, *Ala.Code* § 16-1-20, requiring that public school teachers in the first through sixth grades establish a daily moment of silence "for meditation." *Id.* at 40,105 S.Ct. at 2481. Three years later, it enacted § 16-1-20.1, which permitted (though not required) all public school teachers to hold a moment of silence "for meditation or voluntary prayer." The parties agreed that the original statute, providing only for a moment of silence for meditation, was constitutionally permissible. The Court held that the later enactment, which expressly specified "voluntary prayer" as an additional purpose for, or permissible activity to perform during, the moment of silence, was unconstitutional. It found that the enactment of § 16-1-20.1 "was not motivated by any **\*1290** clearly secular purpose-indeed, the statute had no secular purpose." *Id.* at 56, 105 S.Ct. at 2489-90. It further noted that, notwithstanding the general permissibility of a moment of silence, expressly designating it as an opportunity for prayer "convey[s] a message of state endorsement and promotion of prayer." *Id.* at 59, 105 S.Ct. at 2491. The Court concluded, "Such an endorsement is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion." *Id.* at 60, 105 S.Ct. at 2491.

We see no way of distinguishing *Jaffree II* from the instant case. If a law that allowed teachers to institute a moment of silence expressly for prayer is unconstitutional, then it surely also unconstitutional for a teacher to actually institute a moment of silence expressly for prayer. The law cannot get much more "clearly established" than that.

Having concluded that Holloman successfully alleged a violation of the Establishment Clause, we now turn to the viability of both his Speech and Establishment Clause claims against the School Board.

## V.

[39] The School Board may not be held liable for the unconstitutional acts of its employees under a *respondeat superior* theory. In cases such as *Monell v. Department of Social Services,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978), the Supreme Court articulated the circumstances in which "local governing bodies" are subject to § 1983 liability. This Part examines each of the ways in which Holloman contends that the School Board may be sued.

## A.

[40] *Monell* states that "when execution of a government's policy ... inflicts the injury ... [then] the government as an entity is responsible under § 1983." *Id.* at 694,98 S.Ct. at 2037-38. To hold the School Board liable for Holloman's Speech Clause claim under this theory, we must locate some affirmative official policy that a reasonable jury could understand as calling upon teachers to compel students to salute the flag. Ala.Code § 16-43-5 provides, "The State Board of Education shall afford all students attending public kindergarten, primary and secondary schools the *opportunity* each school day to *voluntarily* recite the pledge of allegiance to the United States flag."(emphasis added). State law clearly does not allow students to be forced to salute the flag. The Superintendent of the Walker County Public School System issued a memorandum on the Board of Education's letterhead, stating, "[E]ach school system must incorporate a Character Education Plan which will consist of ten minutes of instruction per day in various areas, such as, the Pledge of Allegiance.... Each day must include the Pledge of Allegiance, and then other areas mentioned as you determine at your school." This official policy directive lacks the language of voluntariness found in the statute. It also mandates that each day *include* the pledge, rather than include *the opportunity* to recite the pledge. A reasonable jury could conclude that this memorandum required teachers to ensure that their students actually recited the pledge.[FN14] **\*1291** Con-

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

sequently, the Board may be held liable for Holloman's compelled-speech First Amendment claim.

> FN14. In his deposition, Harland briefly discussed the memo. He testified, "We [have] a memo from when Mr. Larry Banks was the superintendent. I think the Pledge of Allegiance was spelled out as being one of the things that took place in the morning.... [The] Pledge of Allegiance was part of the character education, and the teachers did various things in there to teach character and promote good citizenship, but the pledge was part of it."

[41] To hold the Board liable under the Establishment Clause claim for Allred's daily moment of silent prayer under an "official policy" theory, we must find a policy mandating, authorizing, or permitting teachers to take prayer requests or hold moments of silence for prayer. The only testimony in the record concerning whether or not these prayers were conducted pursuant to School Board policy came from Allred. She testified during her deposition that her practice of asking for prayer requests was "actually included in compassion in the character education plan. For me to refuse students to express compassion for someone else would be contrary to our character education plan that we implement through our curriculum." Based on the uncontroverted testimony from the teacher charged with implementing School Board policies (including the character education plan the Board required schools in the district to implement) that her unconstitutional acts were required by a Board policy, we cannot help but conclude that Holloman has introduced sufficient evidence to show that the Board can be held liable because Allred was acting pursuant to a Board policy.

In further support of this theory, we also note that each high school's character education plan had to be approved by the School District before being forwarded onto the State Department of Education. For reasons that are unclear to us, it appears that neither party actually entered Parrish High School's character education plan into the record. Con-

sequently, we can only attempt to determine what inferences a reasonable jury could make. We know that the plan had to be approved by the School Board, and that Allred claims that her daily prayer ritual was part of it. It is also noteworthy that Vice Principal Adkins was aware of Allred's practice, having experienced it firsthand during his visit to her classroom; based on his lack of surprise or disapproval, a jury could infer that Adkins knew that prayer was part of Allred's contribution to the character development plan. Interpreting these facts in the light most favorable to Holloman, a reasonable jury could draw the inference that prayer was included in the written plan approved by the School Board, forming another, more direct way in which the Board may be held liable as having promulgated an unconstitutional policy.FN15

> FN15. Earlier, we held that (based on the facts before us interpreted in the light most favorable to the plaintiff) Allred had failed to establish as a matter of law that she was engaged in a discretionary function of her job when she held her daily moment of silent prayer. If a jury were to make this determination based on the evidence at trial, it would be impossible for the jury to likewise conclude that she was acting pursuant to an official board policy. Even under those circumstances, however, the Board could still be held liable under any of the other theories discussed in this Part.

### B.

[42][43][44][45] A municipal governing body may be held liable for acts or policies of individuals to whom it delegated final decisionmaking authority in a particular area. *Matthews v. Columbia Cty.,* 294 F.3d 1294, 1297 (11th Cir.2002) ("Local government liability can exist when someone with final policymaking authority delegates that authority to someone else. But, the delegation must be such that the decision is not subject to review by the policymaking authority."); *Gattis v. Brice,* 136 F.3d 724, 725 (11th Cir.1998) ("If a county official **\*1292** holds final policymaking authority for the county in

the subject area of the alleged constitutional violation, that official's decisions may constitute county policy."). A member or employee of a governing body is a final policy maker only if his decisions have legal effect without further action by the governing body, *see Matthews,* 294 F.3d at 1297 ("[E]ven if [member of governing entity] was given the power to select which positions would be eliminated ... his selections still had to be accepted by a majority of the board. As such, [that member] never possessed final policymaking power himself ...."), and if the governing body lacks the power to reverse the member or employee's decision, *see Quinn v. Monroe Cty.,* 330 F.3d 1320, 1326 (11th Cir.2003) ("Because the [governmental entity] has the power to reverse any termination decision made by [individual government official], he is not a final policymaker with regard to termination decisions at the library."). To determine if someone is a final policy maker, we look not only to "state and local positive law," but also "custom and usage having the force of law." *McMillian v. Johnson,* 88 F.3d 1573, 1577 (11th Cir.1996); *see also Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989) (holding that an individual can be a "final policymaker" either by operation of "state and local positive law" or by "custom or usage having the force of law"). We review *de novo* a district court's ruling about whether an individual is a final policy maker. *Scala v. City of Winter Park,* 116 F.3d 1396, 1401 (11th Cir.1997).

In *Denno v. School Bd.,* 218 F.3d 1267, 1277 (11th Cir.2000), we held that the existence of a three-step process allowing parents to appeal a principal's decision to an area assistant superintendent and ultimately to the School Board was sufficient to strip the principal of final policymaking authority. While the principal's decisions clearly had immediate legal effect, the fact that at least two other entities could reverse those decisions was inconsistent with the notion that the principal was a final decision maker.

The School Board would have us rest this case on *Denno* because the Parrish High School student handbook specifies that students have "the right and

the responsibility to express school-related concerns and grievances to the teachers and school administrator(s).... [I]n the event that the grievance cannot be settled by this procedure, then the student ... may pursue the grievance to the Superintendent of Schools and then to the Board." In *Denno,* however, the student was suspended, and we found that, under the circumstances, the policies outlined in the student handbook "allowed for meaningful review of Denno's suspension." *Denno,* 218 F.3d at 1277.

[46] Our ruling in *Denno* was based on a theme reiterated through much of our caselaw in assessing whether a governmental decision maker is a final policy maker, we look to whether there is an actual "opportunity" for "meaningful" review. *See Oladeinde v. City of Birmingham,* 230 F.3d 1275, 1295 (11th Cir.2000) (emphasizing that there must be an actual "opportunity" for "meaningful administrative review" before we conclude that a governmental decision maker lacks final policymaking authority); *Scala,* 116 F.3d at 1401 ("Final policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to *meaningful* administrative review.") (emphasis added); *see also Grech v. Clayton Cty.,* 335 F.3d 1326, 1351 (11th Cir.2003) (Barkett, J., concurring) ("An official must have discretion in a particular area of law in order to exercise final **\*1293** policymaking authority in that area and may not be subject to *significant* review.") (emphasis added); *Bowen v. Watkins,* 669 F.2d 979 (5th Cir.1982) ("If a higher official has the power to overrule a decision but as a practical matter never does so, the decision maker may represent the effective final authority on the question.").

[47] In the instant case, there was no opportunity for meaningful review by the School Board. While the student handbook set out an formal multi-step appellate process that was theoretically available on paper, Holloman could not, as a practical matter, take advantage of it. Graduation was barely a few days away, and Harland did not offer to "stay" Holloman's punishment while he sought Board review. Indeed, the record is silent as to

whether there would even be an intervening meeting of the Board or other opportunity to invoke its oversight. Even if the School Board were to engage in an *ex post* review of the punishment, the fact remains that the paddling could not be undone. Due to the impending end of the school year, the punishment-unlike the suspension in *Denno*-could not be postponed to potentially allow for Board review; Harland had made it clear that if Holloman did not submit to punishment, he would not receive his diploma on graduation day. *Cf. Weisman,* 505 U.S. at 595, 112 S.Ct. at 2659 ("Everyone knows that in our society and in our culture high school graduation is one of life's most significant occasions.").

Needless to say, our holding that Harland acted as a final decision maker in this context does not mean that he always acts as such. As we noted in *McMillian,* "[a]n official or entity may be a final policymaker with respect to some actions but not others." 88 F.3d at 1578. On other occasions, where there is a meaningful opportunity for substantive Board review, or where a punishment is not a *fait accompli* or otherwise irreversible, the "appellate" procedures outlined in the student handbook may be pursued, and Harland would act as merely the initial-rather than final-policy maker.

We could also interpret the "Corporal Punishment" section of the student handbook as a delegation to Harland of final decisionmaking authority regarding the administration of corporal punishment. It reads:

In order to establish and maintain an educational climate conducive to learning, the Board permits reasonable corporal punishment of students in the schools of the School District. If such punishment is required, it shall be administered with care, tact, and caution by the principal or his/her designee in accordance with Board policies.

Vice Principal Adkins testified in his deposition that there were no other Board policies regarding corporal punishment.

A student's pain and humiliation from this act of physical violence cannot be undone; Holloman

cannot be un-spanked. In the absence of any meaningful Board oversight mechanism prior to the administration of corporal punishment, we cannot help but conclude that Harland had been delegated final policymaking authority in determining when to spank a student. In granting him this power without integrating itself into the pre-spanking review process, the Board necessarily bound itself to his decisions. Thus, the School Board's delegation of effectively unreviewable corporal punishment authority constitutes a related yet alternate basis upon which we find that Harland was a final decision maker. Consequently, depending on how the facts ultimately develop at trial, the Board may be held liable under the First Amendment for either his decision to punish Holloman for engaging in constitutionally protected expression, or to punish Holloman **\*1294** for engaging in unprotected expression on impermissible viewpoint-based grounds.

[48] Regarding the Establishment Clause issue, we find that Allred was not a final policy maker. The prayers were recited as part of the character education program, which as discussed earlier was expressly subject to School Board approval. Consequently, Allred could not have been the final policy maker in this area, and Holloman's Establishment Clause claims against the School Board cannot be supported on this basis.

### C.

[49] The Supreme Court has recognized that municipal governing entities may be held liable for unconstitutional acts of employees that occur pursuant to a municipal "custom." *See Monell,* 436 U.S. at 690-91, 98 S.Ct. at 2036. We are unable to conclude, based on the incidents involving Holloman and Hutto, that a "custom" or "practice" of disciplining students for failing to recite the Pledge of Allegiance (or for engaging in a non-disruptive protest during the pledge) existed in the school district. Consequently, Holloman may not pursue his Speech Clause claim against the Board under this theory.

[50][51] In contrast, Allred's practice of con-

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

ducting a daily moment for silent prayer-which she actually referred to as a "ritual"-was sufficiently systematic to be considered a pattern or custom for which the Board may be held accountable. Our precedents are clear that, for constitutional violations to be sufficiently "widespread" for a governmental supervisor to be held liable, they need occur with frequency, *see Brown,* 906 F.2d at 671 (holding that violations must be "obvious, flagrant, rampant, and of continued duration" to hold a supervisor liable); *see also Greason v. Kemp,* 891 F.2d 829, 837 (11th Cir.1990) (noting that the "situation of municipal liability" is "analogous" to the question of supervisoral liability), and need not necessarily be committed by several people within a department or agency. When rights are systematically violated on a near-daily basis, such abuses are sufficiently egregious to warrant supervisory liability, even if it is a single "bad apple" engaging in the repeated pattern of unconstitutional behavior. *See St. Louis v. Praprotnik,* 485 U.S. 112, 130, 108 S.Ct. 915, 928, 99 L.Ed.2d 107 (1988) (noting that vicarious liability under § 1983 is appropriate "if a series of decisions by *a* subordinate official [singular] manifested a 'custom or usage' of which the supervisor must have been aware") (emphasis added). Consequently, based on the systematic frequency of these violations, a jury could conclude that the Board knew of the practice yet nevertheless permitted it to fester unabated.

### VI.

Allred is not entitled to summary judgment on qualified immunity grounds against Holloman's Speech Clause claim to be free from compelled speech, his Speech Clause claim to affirmative freedom of expression, his Speech Clause claim to be free of viewpoint discrimination, or his Establishment Clause claim.

Harland is not entitled to summary judgment on qualified immunity grounds against Holloman's Speech Clause claim to be free from compelled speech, his Speech Clause claim to affirmative freedom of expression, or his Speech Clause claim to

be free from viewpoint discrimination. We do not consider the question of Harland's entitlement to summary judgment against Holloman's Establishment Clause claim because Holloman abandoned this issue on appeal.

Holloman has successfully articulated claims against the School Board for violations**\*1295** of his Speech Clause right to be free from compelled speech (under an "official policy" theory), his Speech Clause right to engage in affirmative expression (under a "delegation to a final policymaker" theory), his Speech Clause claim to be free from viewpoint discrimination (also under a "delegation to a final policymaker" theory), and his Establishment Clause rights (under either an "official policy" or a "custom" theory). We reverse the district court's grant of summary judgment, and reinstate Holloman's claims against the Board.

### REVERSED AND REMANDED.
WILSON, Circuit Judge, concurring in part and dissenting in part:

I join Parts I, II-A, and II-B of the majority's opinion, which hold that there is an issue of material fact as to whether Holloman was punished for failing to say the Pledge of Allegiance ("the Pledge"), which if true, would violate Holloman's clearly established constitutional right not to say the Pledge. However, I respectfully dissent from Part II-C. In Part II-C, the majority holds that even if Holloman was in fact punished for raising his fist in the air during the recitation of the Pledge rather than for merely failing to say the Pledge, then there is an issue of material fact as to whether his First Amendment right was violated. In addition, the majority holds that such a First Amendment right is clearly established in our case law. I disagree. I contend, rather, that Holloman does not have a First Amendment right to raise his clenched fist in the air during the school's recitation of the Pledge any more than he would have a First Amendment right to raise his fist in the air during math class. Such an act is inherently disruptive, and a teacher has every right to prevent such conduct in his or her classroom in order to prevent any potential disruption.[FN1] I also believe that even if Holloman had a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

First Amendment right to raise his fist in the air during the recitation of the Pledge, such a right certainly was not clearly established in our case law.

> FN1. We are not called upon to decide the propriety of the type of punishment inflicted here.

I agree with the majority's conclusion, though, with respect to Part II-D of its opinion. While Holloman's expression was not constitutionally protected in the classroom because it is inherently disruptive, he still has a clearly established First Amendment right to not be discriminated against on the basis of the viewpoint he is communicating. *See Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 812, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("While we accept the validity and reasonableness of the justifications offered by petitioner for excluding [the relevant speech], those justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view."). There is a genuine issue of material fact as to whether Allred and Harland were motivated by a desire to suppress Holloman's apparent unpatriotic viewpoint, which if true, would violate Holloman's First Amendment right. Thus, I concur with the majority's conclusion with respect to Part II-D of its opinion.

In addition, I join Part IV of the majority's opinion, which holds that there is an issue of material fact as to whether Allred violated clearly established rights under the Establishment Clause by leading her class in a prayerful moment of silence. However, while I concur in the result of Part III (for the reasons stated in Part IV of the majority's opinion), I cannot join the majority's holding that Allred did not act within her "discretionary function" when she led the class in a moment of silent prayer. I would hold, rather, that Allred acted within her discretionary function **\*1296** when leading her class in silent prayer, but that she violated the Establishment Clause by so doing.

Finally, I also join Part V of the majority's opinion only to the extent that it holds that there is

an issue of material fact as to whether the School Board may be liable for punishing Holloman for remaining silent during the Pledge (if the factfinder finds that is the reason for his punishment) and for Allred's practice of leading the class in a prayerful moment of silence.

### I.

The majority not only holds that the evidence, reviewed in Holloman's favor, demonstrates that Holloman had a First Amendment right to raise his clenched fist in the air during the recitation of the Pledge in school, but also that such a right was clearly established. Because the majority's holding in this regard is neither consistent with Supreme Court precedent nor Eleventh Circuit case law, I respectfully dissent. I would hold that the First Amendment does not give a student in Holloman's circumstances the right to actively partake in conduct that is inherently disruptive during the curriculum portion of the school day. Yet, even if the First Amendment does grant such a right, that right certainly was not clearly established for qualified immunity purposes.

### A.

I agree with the majority that Holloman's act of raising his fist in the air during the Pledge is a form of expression, or indeed, may very well be "pure speech." It is an act that is, as the majority puts it, "purely communicative as a sign-language gesture or the act of holding up a sign...." Majority Opinion at 1270. I agree that Holloman's First Amendment right to Free Speech is implicated, but we must be mindful that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. v. Fraser,* 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). "It is always within the province of school authorities to provide by regulation the prohibition and punishment of acts calculated to undermine the school routine." *Blackwell v. Issaquena County Bd. of Educ.,* 363 F.2d 749, 753 (5th Cir.1966).[FN2] When balancing the First

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

Amendment right of students at school, we must not forget that the state's interest to maintain "an orderly program of classroom learning" is a "compelling" one. *Burnside v. Byars,* 363 F.2d 744, 748 (5th Cir.1966). Thus, public schools have a "wide latitude of discretion" to formulate regulations "pertaining to the discipline of school children." *Id.*

> FN2. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Public schools are allowed "to adopt and enforce reasonable, non-discriminatory regulations as to the time, place and manner of student expressions and demonstrations." *Bayless v. Martine,* 430 F.2d 873, 878 (5th Cir.1970). Such a regulation may infringe upon a student's right to free speech only "where the exercise of such rights in the school buildings and schoolrooms do[es] not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Burnside,* 363 F.2d at 749. Keeping in mind that schools are given a "wide latitude of discretion," the critical issue in this case becomes whether Holloman's act of holding his clenched fist in the air during the recitation of the Pledge "materially and substantially interfere[d] *1297 with the requirements of appropriate discipline...." *Id.* at 748, 749.

The majority cites several cases supporting its view that Holloman's act was not a sufficient interference to justify a punishment. Yet, some of these cases involve student expression occurring *outside* the classroom. *See, e.g., Shanley v. Northeast Indep. Sch. Dist.,* 462 F.2d 960, 964 (5th Cir.1972) (involving the distribution of newspapers before and after school hours); *Reineke v. Cobb County Sch. Dist.,* 484 F.Supp. 1252 (N.D.Ga.1980) (involving the censorship of a student newspaper). Certainly, the type and amount of expression occurring outside class that would "interfere with the requirements of appropriate discipline,"*Burnside,* 363

F.2d at 749, will be different than the type and amount of expression that interferes with appropriate discipline in the classroom. The school has a more compelling interest to establish order and discipline in the classroom because that is where the curriculum portion of the school day occurs.

In addition, those cases cited by the majority that protect student expression within the classroom are easily distinguishable from Holloman's expression. For instance, the majority relies on *Burnside,* which held that students wearing "freedom buttons" to class did not cause a sufficient interruption to justify prohibiting students from wearing the buttons at school. *Id.* We based our holding in *Burnside* on the lack of evidence demonstrating that "the buttons tended to *distract* the minds of the students away from their teachers." *Id.* at 748 (emphasis added). We held that "[w]earing buttons on collars or shirt fronts is certainly not in the class of those activities which *inherently distract* students and break down the regimentation of the classroom such as carrying banners, scattering leaflets, and speech making, all of which are protected methods of expressions, but all of which have no place in an orderly classroom." *Id.* (emphasis added). In addition, we said,

Regulations which are essential in maintaining order and discipline on school property are reasonable. Thus school rules which assign students to a particular class, forbid unnecessary discussion in the classroom and prohibit the exchange of conversation between students are reasonable even though these regulations infringe on such basic rights as freedom of speech and association, because they are necessary for the orderly presentation of classroom activities.

*Id.* Our inquiry should focus upon, therefore, whether a student holding his fist in the air during a curriculum portion of the school day is more akin to a student "carrying banners" and "exchang[ing] conversation" during class, rather than wearing a button on the front of one's shirt. *Id.*

Activity that can be regulated by a public school, like "unnecessary discussion in the

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

classroom," "the exchange of conversation between students," "carrying banners," "scattering leaflets," and "speech making," all have in common the fact that they inherently compete with the teacher for the other students' attention. Wearing a button on the front of one's shirt, though, does not compete with the teacher for the students' attention anymore than a student wearing a shirt advertising a particular sports team. Thus, we must determine whether a student raising his fist in the air during class inherently is the sort of activity that competes with the teacher for the students' attention, or whether it is a more passive expression like a wearing a shirt or a button conveying a particular message.

I think it is quite clear that a student raising his clenched fist in the air during a curriculum portion of the school day is the sort of activity that inherently competes with the teacher for the other students' *1298 attention and thus can be prohibited by the school authorities. Holloman's act of holding his fist in the air during the recitation of the Pledge is, as the majority says, akin to "the act of holding up a sign." Majority Opinion at 1270. Such expression, unlike a button pinned to one's shirt, is meant to compete for students' attention, and thus *inherently* distracts students from a legitimate portion of the curriculum. Holding one's fist in the air is more like "carrying banners" which "inherently distract[s] students," *Burnside,* 363 F.2d at 748, than wearing a button on a shirt. Would a student have a right to hold up a sign during the recitation of the Pledge, as long as the student does not obstruct others' view of the flag? The answer to that question is plainly "no." Holding one's fist in the air is the same sort of communication as holding up a sign, as the majority even admits. It is meant to compete for students' attention and unnecessarily distract students from the recitation of the Pledge. It is not a passive expression, like wearing a button on the front of one's shirt. Like holding up a sign, it inherently is the sort of activity that distracts students during class. While a student may have more freedom to express himself outside of class, students in the classroom are limited to passive expressions that do not inherently distract students. A public school teacher is well within his or her authority to prohibit activity,

like a student holding his fist in the air during class, that inherently distracts students.

Even if we were to assume, though, that a student holding his fist in the air during class is not activity that inherently distracts students, there is evidence on the record that Holloman in fact distracted students with his gesture, which would further distinguish the instant action from *Burnside.* After Holloman's act of raising his fist during the Pledge, students approached their teacher to complain that Holloman's expression was not "right." The majority reasons that this fact alone is not sufficient to show a material disruption. While the majority is correct that schools cannot prohibit expression on the basis that others may disagree with the content of the expression, the students' comments not only demonstrate disagreement with the content of Holloman's expression, but also that Holloman's gesture "distract [ed] the[ir] minds" during a curriculum portion of the school day. *Id.* The students' comments demonstrate that they at least focused their attention during a portion of the recitation of the Pledge on Holloman's fist-which precisely is what is intended by such expression-rather than on the planned curriculum of saying the Pledge.[FN3]

> FN3. The majority claims that this approach "appears to ignore the principle ... that student expression must cause (or be likely to cause) a 'material and substantial' disruption ... before it may be curtailed." Majority Opinion at 1272. I do not ignore this principle, but rather disagree with the majority by what we meant in *Burnside* when we said that public schools can only infringe on a student's speech when it "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school." *Burnside,* 363 F.2d at 749. One of the "requirements of appropriate discipline" is preventing students from competing with the teacher or with the curriculum for other students' attention. For instance, we said in *Burnside* that a school may prohibit "the exchange of conversation between stu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

dents" during class. *Id.* at 748. Thus, a teacher may prohibit and punish a student for whispering to his classmate during class, even if it causes a "brief, easily overlooked, *de minimum* impact." Majority Opinion at 1272. One student whispering to another student during class competes with the teacher for the attention of other students, and thus "materially and substantially interfere[s]" with one of the fundamental "requirements of appropriate discipline." *Burnside,* 363 F.2d at 749.

Similarly, Holloman's act of raising his fist in the air during the Pledge competed for the students' attention during a legitimate curriculum portion of the school day. Indeed, some of the students' reaction after class indicated that he successfully distracted students from the recitation of the Pledge. Thus, Holloman's act "substantially and materially interfere [d] with the requirements of appropriate discipline" because it "tended to distract the minds of the students away from" the recitation Pledge. *Id.* at 749, 748.

**\*1299** If we do not interpret the students' comments as evidence of distraction, we necessitate absurd results in similar student expressions in the future. The majority's holding would imply, for example, that a student would be justified in holding up his fist in protest of the Vietnam conflict during a history lesson about Vietnam. Assume that the only evidence of disruption, like in the instant action, is that of students complaining that such a gesture during a class about the Vietnam conflict is not "right." Does such a circumstance necessarily indicate that the teacher does not have enough evidence of a disturbance to prohibit the student from holding his clenched fist in the air during history class? It would be difficult to conclude otherwise following the reasoning of the majority's opinion. Such a conclusion, though, would plainly go well beyond what was intended by the First Amendment right to Free Speech as it applies to students in the classroom.

A public school is given "wide latitude" in disciplining its students. *Id.* The defendants in the in-

stant case had every right to prevent Holloman from distracting the students during a legitimate, curriculum portion of the school day because a student holding his fist in the air is the sort of activity that "inherently distract[s] the minds of students," and that is exactly what Holloman did here. *Id.* In the very least, such activity is distinguishable from a student wearing a button on his shirt during class. The result in *Burnside* does not demand the same result here.

The majority also relies on *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), which held that students had a constitutional right to wear a black arm band during class in protest of the Vietnam conflict. *Id.* at 514, 89 S.Ct. 733. The Court in *Tinker,* relying heavily on our reasoning in *Burnside,* said that wearing an arm band was not "disruptive action," nor was there any evidence of "interference, actual or nascent, with the school's work." *Id.* at 508,89 S.Ct. 733.

The instant case is distinguishable from *Tinker* for the same reason it is distinguishable from *Burnside.* Wearing a button or an arm band is passive activity that does not inherently distract students during the curriculum portion of the school day, unlike raising one's fist in the air. Also, in *Tinker* there was no evidence of any interference or distraction during class. In the instant case, however, we have evidence of students, at the very least, being distracted for a portion of the Pledge due to Holloman's gesture. I fail to see how it follows that a right to wear a button or an arm band during class means that a student has a right to raise his fist during class. The result in *Tinker,* like *Burnside,* is inapposite to the instant action.

Finally, the district court relies on the reasoning and holding of *Banks v. Bd. of Pub. Instruction,* 314 F.Supp. 285 (S.D.Fla.1970), *vacated by*401 U.S. 988, 91 S.Ct. 1223, 28 L.Ed.2d 526 (1971), *reinstated without published opinion by dist. ct. and aff'd,*450 F.2d 1103 (5th Cir.1971). In *Banks,* the Southern District of Florida held that a student has a constitutional right to remain seated during the re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

citation of the Pledge in class. The district **\*1300** court in *Banks,* according to the majority's interpretation, held that refusing to stand was a form of expression that was protected by the First Amendment, and that the "district court makes clear that its ruling was not based on Banks's First Amendment right to remain silent." Majority Opinion at 1273. The majority concludes that the expression of remaining seated during the Pledge is akin to Holloman's holding his fist in the air during the Pledge, and thus Holloman's expression is entitled to First Amendment protection.

In addition to the fact that a district court holding is not binding authority on this Court, it is not at all "clear that [the district court's] ruling was not based on Banks's First Amendment right to remain silent." Majority Opinion at 1273. The court in *Banks* discussed extensively the reasoning of *West Virginia St. Bd. of Educ. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), which held that a public school cannot compel a student to participate in the Pledge. After discussing *Barnette,* the district court in *Banks* said,

Without more *Barnette* would be dispositive of this matter for [the plaintiff] was suspended for his refusal to act in accordance with a regulation, the operation of which prevented him from exercising his First Amendment rights.

*Banks,* 314 F.Supp. at 295. The court continued later in the opinion,Here, as in *Barnette,* the regulation required the individual to communicate, by standing, his acceptance of and respect for all that for which our flag is but a symbol.

*Id.* at 296. In other words, the district court's holding was based on the reasoning of *Barnette.* The school's policy of forcing a student to stand during the Pledge violated the student's First Amendment right *not* to be compelled to speak or express a particular belief. Any discussion by the district court in addition to this more limited holding is arguably dictum.

As the majority points out, the court in *Banks* also said that remaining seated during the Pledge

"was no less a form of expression than the wearing of the black arm-band was to Mary Beth Tinker. He was exercising a right 'akin to pure speech.' " *Id.* at 295. I agree that a student may intend to express himself by remaining seated-yet I do not agree that it follows that the *Tinker-Burnside* standard applies to a student who merely remains seated during the Pledge. Remaining seated during the Pledge is a way for a student *not* to participate in the Pledge. Thus, such a decision is afforded the more absolute protection of *Barnette,* in which the Supreme Court said,

If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or *act* their faith therein.

*Barnette,* 319 U.S. at 642, 63 S.Ct. 1178 (emphasis added). Forcing a student to stand during the Pledge would be compelling that student to "confess by ...*act* [his] faith" in the content of the Pledge and all that it symbolizes. *Id.* (emphasis added). Such a regulation would violate the central principle of *Barnette. See Lipp v. Morris,* 579 F.2d 834, 836 (3rd Cir.1978) (per curiam) (holding that forcing a student to stand is unconstitutional because it requires a student "to engage in what amounts to implicit expression by standing at respectful attention while the flag salute is being administered").

While it is true that remaining seated during the Pledge may also be construed as a way of speaking, remaining seated is already in the class of those activities that are afforded the more absolute protections **\*1301** of *Barnette*-i.e., the right not to participate in the Pledge. To hold that the *Tinker-Burnside* standard applies to a student who remains seated during the Pledge would limit a student's right *not* to participate in the Pledge. If it can be shown that a student, or a group of students, who do not participate in the Pledge by remaining seated causes a material disruption, we would be forced to defer to the school's decision to *compel* students to stand during the Pledge. Such a ruling would allow

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

a public official to "force citizens to confess by ... act their faith" in the content of the Pledge and all it symbolizes. *Barnette,* 319 U.S. at 642, 63 S.Ct. 1178. As a result, the "fixed star in our constitutional constellation" would become contingent upon the degree of disruption judges decide is too much in a particular classroom. Limiting the central right of being free to abstain from participating in the Pledge should not be limited by applying the *Tinker-Burnside* standard to a decision more absolutely protected by *Barnette.*

A student may decide not to participate in the recitation of the Pledge by remaining silent and seated. In such circumstances, the holding in *Barnette* applies. On the other hand, raising one's fist in the air during the Pledge is not a way in which a student abstains from participating in the Pledge. It can only be construed as expression. Thus, *Barnette* and *Banks* are not applicable to Holloman's act, but rather *Tinker* and *Burnside* apply. As I indicated above, I believe Holloman's act of raising his fist in the air during class is easily distinguished from the act of wearing a button or an arm band during class because raising one's fist in the air during the curriculum portion of the school day inherently distracts students, and thus materially disrupts the requirements of appropriate discipline.

Reciting the Pledge of Allegiance during the school day is a legitimate activity of the curriculum, just as legitimate as conducting math or history class. While a student is not required to participate in the Pledge, a student cannot engage in expressive conduct that inherently distracts the minds of the students from a legitimate portion of the school day. I would hold that there is no issue of material fact as to whether the school was justified in punishing Holloman, *if* that punishment was based on his act of raising his fist in the air during the recitation of the Pledge of Allegiance and was not motivated by a desire to suppress Holloman's point of view.

B.

Even if Holloman has a First Amendment right to hold his fist in the air during the recitation of the Pledge in class, such a right was not "clearly established." *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In order for a right to be clearly established, the public official must be given "fair warning" that his or her conduct violates a statutory or constitutional right. *See id.* at 741, 122 S.Ct. 2508. Recently, the Supreme Court in *Hope* held that we improperly used a "rigid gloss" when demanding that the facts of previous cases be "materially similar" to the facts of the applicable case in order for the law to be clearly established. *Id.* at 739, 122 S.Ct. 2508. There are other ways, though, besides comparing the facts of the instant case with the facts of previous cases, to determine if a public official was given "fair warning" that a certain act violated a statutory or constitutional provision. There are some cases in which the law provides "obvious clarity," even in the absence of instances in which courts have applied a general principle to particular **\*1302** facts. *See Vinyard v. Wilson,* 311 F.3d 1340, 1351 (11th Cir.2002). The majority holds that Holloman's constitutional right to put his fist in the air during the recitation of the Pledge is clearly established because the *Tinker-Burnside* standard was "sufficiently specific" to give the defendants fair warning. *See* Majority Opinion at 1278-79. I respectfully disagree with both the majority's analysis and conclusion.

There are three ways in which we can find that the law is clearly established so as to give public officials fair warning that a particular act violates a statutory or constitutional right. First, the words of a statute or constitutional provision can be specific enough to clearly establish the law applicable to particular conduct and circumstances, even in the absence of any case law. *Vinyard,* 311 F.3d at 1350. No one alleges that such a case is present here. Second, sometimes "broad statements of principle in case law [that] are not tied to particularized facts ... can clearly establish law applicable in the future to different sets of detailed facts." *Id.* at 1351. The majority believes that such a case is present here,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

while I do not. I will address my disagreement below. Finally, and this is true in the vast majority of our qualified immunity cases, we inquire whether fact-specific precedents are "fairly distinguishable" from the facts facing a government official. *Id.* at 1352. I think this is the proper inquiry in the instant case. Using this inquiry, I would conclude that the precedent is fairly distinguishable from the circumstances in this case, and thus the defendants were not given fair warning that disciplining a student for raising his fist in the air during the Pledge was unconstitutional.

The majority considers whether the test, *by itself,* articulated in *Tinker* and *Burnside* clearly establishes that Holloman's act was constitutionally protected. The *Tinker-Burnside* test is whether the student expression "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school." *Burnside,* 363 F.2d at 749. The majority claims this test is "sufficiently specific" to give the defendants fair warning that Holloman's expression was constitutionally protected because it is reasonable "to expect the defendants-who hold themselves out as educators-to be able to apply such a standard, notwithstanding the lack of a case with material factual similarities." Majority Opinion at 1278. In addition, the majority says applying this test would be "effortless," as "[a] teacher or principal should be able to instantly recognize whether a student is disrupting class, and it should not be too hard to determine whether a student's activities are likely to have such an effect." Majority Opinion at 1279.

These reasons articulated by the majority are irrelevant to our analysis. The defendants thought that Holloman's act was *not* constitutionally protected-that is, they believed that his act "materially and substantially interfere[d] with the requirement of appropriate discipline." *Burnside,* 363 F.2d at 749. It simply does not follow that because it is "not too hard" for teachers to determine when a student disrupts class, that it is then *obvious* to every reasonable teacher that a certain disruption will survive judicial scrutiny. In other words, teachers cannot be expected to readily determine what conduct

falls within the Court's definition of "material and substantial interference with appropriate discipline." *Id.* Reasonable people certainly can disagree about how the Court will apply such a general standard, especially to the facts of the instant action. *See Vinyard,* 311 F.3d at 1351 ("[I]f a broad principle in case law is to establish clearly the law applicable to a specific set **\*1303** of facts facing a governmental official, it must do so 'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.").

I do not think that the balancing test we use in our Free Speech cases established with "obvious clarity" that a student can raise his fist in the air during the curriculum portion of the school day. We define our broad standard of "materially and substantially interfer[ing] with the requirements of appropriate discipline" as including "those activities which inherently distract students" during class. *Burnside,* 363 F.2d at 749, 748. A reasonable teacher could conclude that a student raising his fist in the air during a curriculum portion of the school day is the sort of activity that "inherently distract[s] students." *Id.* at 748. Thus, the defendants were not given fair warning by our case law that they were prohibited from punishing Holloman for his expressive act.

In the alternative, the majority states that Holloman's right to raise his fist in the air during the Pledge is clearly established under *Barnette.* In *Barnette,* the Supreme Court held that a public school cannot compel a student to participate in the Pledge. 319 U.S. at 642, 63 S.Ct. 1178. The majority says that it is "very reluctant" to conclude that Holloman shed his First Amendment protection to remain silent during the Pledge by simply lifting his fist into the air. Majority Opinion at 1279. "This is a hair we will not split," according to the majority because, I assume, "First Amendment protections are not not lost that easily." Majority Opinion at 1279.

Yet, this is precisely the "hair" the majority "split" earlier in its own opinion. For instance, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

majority in Part II-B-1 persuasively establishes that there is an issue of material fact as to whether Holloman was punished for failing to say the Pledge or for raising his fist in the air. This was a proper distinction to make, because the answer to that question determines whether *Barnette* applies or whether *Burnside* and *Tinker* apply. *Barnette* prohibits a school from *compelling* a student to say the Pledge. *Burnside* and *Tinker* prohibits a school from preventing a student from *voluntarily* engaging in expression, as long as that expression does not sufficiently interfere with proper discipline in the classroom. Holloman's act of raising his fist in the air, as the majority aptly pointed out, is what made his act *expression,* rather than just a failure to participate in the Pledge. In other words, Holloman's act of raising his fist is exactly what allows us to apply *Burnside* and *Tinker.* To conclude later, when considering whether *Barnette* clearly establishes Holloman's right to raise his fist, that it is no longer legally significant that Holloman raised his fist, is inconsistent.

*Barnette* holds that a student cannot be *compelled* to speak. *Barnette* says nothing about a student's *right* to speak. Holloman "spoke" by raising his fist. Thus, *Barnette* is not relevant to this inquiry.

For the reasons that I articulated above for why I believe Holloman's expression is distinguishable from the expression in *Tinker* and *Burnside,* I would hold that the law was not clearly established that Holloman had a right to raise his fist in the air during the recitation of the Pledge in class.

## II.

I agree with the majority's conclusion that Allred is not entitled to qualified immunity for leading the class in a moment of silent prayer. Such action, as aptly pointed out in Part IV of the majority's **\*1304** opinion, violates the Establishment Clause. *See Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). Thus, I join Part IV of the majority's opinion. However, the majority also held, in Part III, that Allred is not even potentially

entitled to summary judgment on qualified immunity grounds against Holloman's Establishment Clause claim because leading the class in a moment of prayerful silence is not within her "discretionary function." I think that such an interpretation stretches our inquiry of "discretionary function" beyond what is articulated in our case law. Thus, I would find that (1) Allred's act of leading her class in a prayerful moment of silence was within her discretionary authority, but (2) such an act was unconstitutional under the Supreme Court's interpretation of the Establishment Clause.

A government official acts within his discretionary authority when his actions "were undertaken pursuant to the performance of his duties and within the scope of his authority." *Sims v. Metro. Dade County,* 972 F.2d 1230, 1236 (11th Cir.1992) (internal quotations omitted). We must keep in mind that our "inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology." *Harbert Int'l, Inc. v. James,* 157 F.3d 1271, 1282 (11th Cir.1998) (internal quotation omitted). Thus, just because a defendant's act may be unconstitutional does not mean that the act was not within the defendant's discretionary authority.

In the instant action, the Alabama state legislature enacted a statute requiring local school boards to "implement ... a comprehensive character education program ... focusing upon the students' development of ... compassion." ALA.CODE § 16-6B-2(h). Allred claims she promoted compassion by asking the students for prayer requests before observing a moment of silence. While such an act would not pass muster under the Supreme Court's interpretation of the Establishment Clause, it is a legitimate way to promote compassion. Asking students to offer prayers for other people may habituate students to think of others by praying for them. Thus, I agree with the majority that Allred's act was pursuant to her job related goal of promoting compassion.

The majority believes, though, that while

Allred's act of leading her class in a prayerful moment of silence was pursuant to a job related function, it was not within the scope of her authority. The majority states that "[p]raying goes sufficiently beyond the range of activities normally performed by high school teachers," because "[p]rayer is a relatively *sui generis* activity." Majority Opinion at 1283. Yet, the "*sui generis* activity" of praying in public schools *was* "normally performed" prior to the Supreme Court's decision in *Engel.* Indeed, even today, many teachers in private high schools throughout America, whether they be religious or secular, lead their students in prayer. Public school teachers no longer have the authority to lead their classes in prayer by virtue of the fact that the Supreme Court ruled it unconstitutional. It was certainly within the scope of a public high school teacher's authority to lead students in prayer prior to 1962, when the Court ruled that teacher led prayer in public schools is a violation of the Establishment Clause. The fact that a particular act may now be deemed unconstitutional does not mean that such an act is outside the scope of a public official's discretionary authority. *See Harbert,* 157 F.3d at 1282. There must be some other reason, besides the fact that a particular activity is unconstitutional, for that activity not to be within a public authority's scope of authority. I do not see an additional reason, besides the unconstitutionality of **\*1305** school prayer, in the majority's opinion giving me reason to believe that Allred's act was not within her discretionary authority. And neither can I think of one. Thus, I cannot join Part III of the majority's opinion. Its application of the "discretionary authority" requirement to Allred's act of leading her class in silent prayer is too stringent. However, I agree that Allred is nonetheless not entitled to qualified immunity for the reasons the majority states in Part IV of its opinion.

### III.

A student raising his fist in the air during a curriculum portion of the school day engages in an act that inherently distracts student during class. A teacher, therefore, may prohibit a student from en-

gaging in such activity. Thus, I cannot join Part II-C of the majority opinion's in which it holds that there is an issue of material fact as to whether Holloman's First Amendment right to free speech was violated if he was punished for holding his fist in the air during the recitation of the Pledge and if that punishment was not motivated by a desire to suppress a particular viewpoint. I also dissent from the majority's holding that Holloman's right to hold his fist in the air was clearly established for qualified immunity purposes.

In addition, while I agree with the majority's conclusion that there is an issue of material fact as to whether Allred violated Holloman's clearly established right under the Establishment Clause when Allred led the class in a moment of silent prayer, I cannot join Part III of the majority's opinion. In my view, Allred acted within her discretionary function when leading her class in prayer.

Finally, I join Part V of the majority's opinion, but only to the extent that it holds that the School Board may be held liable if Holloman was punished for remaining silent during the Pledge and for Allred's act of leading her students in silent prayer. Thus, I concur in part and dissent in part with the majority's opinion.

C.A.11 (Ala.),2004.
Holloman ex rel. Holloman v. Harland
370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

END OF DOCUMENT

394 F.3d 1328                                                                                        Page 1
394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127
**(Cite as: 394 F.3d 1328)**

**C**

Crosby v. Monroe County
C.A.11 (Ala.),2004.

United States Court of Appeals,Eleventh Circuit.
William J. CROSBY, Plaintiff-Appellant,
v.
MONROE COUNTY, Jason Terry, Defendants-Appellees.
William J. Crosby, Plaintiff-Appellant,
v.
Jason Terry, Defendant-Appellee.
**Nos. 03-13716, 03-14310.**

Dec. 28, 2004.

**Background:** Arrestee brought suit in state court, alleging section 1983 claims of unlawful arrest, use of excessive force, and denial of medical care while in custody. Following removal, the United States District Court for the Southern District of Alabama, No. 01-00888-CV-1-BH-S,William B. Hand, J., dismissed all claims except federal law claims against officer in his individual capacity, and granted officer summary judgment on that claim based on qualified immunity. Arrestee appealed.

**Holdings:** The Court of Appeals, Carnes, Circuit Judge, held that:

(1) officer was entitled to qualified immunity from unlawful arrest claim;

(2) officer was entitled to qualified immunity from excessive force claim; and

(3) arrestee was not denied medical care in violation of his right to due process.

Affirmed.

West Headnotes

**[1] Bankruptcy 51 ⚖2395**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction and Stay
     51IV(B) Automatic Stay
       51k2394 Proceedings, Acts, or Persons Affected
        51k2395 k. Judicial Proceedings in General. Most Cited Cases
Plaintiff's bankruptcy filing and automatic stay did not preclude adjudication of merits of his appeal of assessment of fees and costs against him upon dismissal of his civil rights claims. Bankr.Code, 11 U.S.C.A. § 362; 42 U.S.C.A. § 1988.

**[2] Bankruptcy 51 ⚖2154.1**

51 Bankruptcy
   51II Courts; Proceedings in General
     51II(B) Actions and Proceedings in General
       51k2154 Rights of Action by or on Behalf of Trustee or Debtor
        51k2154.1 k. In General. Most Cited Cases
Chapter 13 debtor retained standing to pursue legal claims on behalf of the estate. Bankr.Code, 11 U.S.C.A. § 1303; Fed.Rules Bankr.Proc.Rule 6009, 11 U.S.C.A.

**[3] Civil Rights 78 ⚖1376(1)**

78 Civil Rights
   78III Federal Remedies in General
     78k1372 Privilege or Immunity; Good Faith and Probable Cause
       78k1376 Government Agencies and Officers
        78k1376(1) k. In General. Most Cited Cases
To be eligible for qualified immunity under § 1983, official must first establish that he was performing discretionary function at time alleged violation of federal law occurred. 42 U.S.C.A. § 1983.

**[4] Civil Rights 78 ⚖1407**

78 Civil Rights

394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127

**(Cite as: 394 F.3d 1328)**

78III Federal Remedies in General

78k1400 Presumptions, Inferences, and Burdens of Proof

78k1407 k. Defenses; Immunity and Good Faith. Most Cited Cases

Once official asserting qualified immunity under § 1983 has established that he was engaged in discretionary function, burden shifts to plaintiff to show: (1) that defendant has committed constitutional violation and (2) that constitutional right defendant violated was "clearly established" at time he did it. 42 U.S.C.A. § 1983.

**[5] Officers and Public Employees 283 ⬬114**

283 Officers and Public Employees

283III Rights, Powers, Duties, and Liabilities

283k114 k. Liabilities for Official Acts. Most Cited Cases

To determine whether official asserting qualified immunity was engaged in discretionary function, court considers whether acts the official undertook are of a type that fell within employee's job responsibilities.

**[6] Civil Rights 78 ⬬1376(6)**

78 Civil Rights

78III Federal Remedies in General

78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers

78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases

Sheriff's deputy was performing discretionary function, as required to support his assertion of qualified immunity under § 1983, when he arrested plaintiff, since making arrest was within his official responsibilities. 42 U.S.C.A. § 1983.

**[7] Arrest 35 ⬬63.4(2)**

35 Arrest

35II On Criminal Charges

35k63 Officers and Assistants, Arrest Without Warrant

35k63.4 Probable or Reasonable Cause

35k63.4(2) k. What Constitutes Such Cause in General. Most Cited Cases

Probable cause for arrest is defined in terms of facts and circumstances sufficient to warrant prudent man in believing that suspect had committed or was committing an offense. U.S.C.A. Const.Amend. 4.

**[8] Civil Rights 78 ⬬1376(6)**

78 Civil Rights

78III Federal Remedies in General

78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers

78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases

Arresting officer is protected by qualified immunity under § 1983 when there was arguable probable cause for arrest even if actual probable cause did not exist; arguable probable cause exists if, under all of the facts and circumstances, officer reasonably could, not necessarily would, have believed that probable cause was present. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 ⬬1376(6)**

78 Civil Rights

78III Federal Remedies in General

78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers

78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases

Officer who had responded to report of gunshots fired toward a home was entitled to qualified immunity from arrestee's § 1983 claim that his arrest was unlawful; officer had arguable probable cause to make arrest for reckless endangerment after hearing shot from direction of arrestee's home, seeing arrestee carrying shotgun and hearing sound of him ejecting shell from the weapon. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983; Ala.Code 1975, § 13A-6-24.

**[10] Arrest 35 ⬬63.4(5)**

35 Arrest
    35II On Criminal Charges
            35k63 Officers and Assistants, Arrest Without Warrant
                35k63.4 Probable or Reasonable Cause
                    35k63.4(5) k. Nature of Offense; Felony or Misdemeanor. Most Cited Cases
Under Alabama law, warrantless arrest for misdemeanor does not require that offense have occurred in officer's presence. Ala.Code 1975, § 13A-6-24(b).

**[11] Arrest 35 ⟐⟐68(2)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases
Fourth Amendment encompasses right to be free from use of excessive force during arrest. U.S.C.A. Const.Amend. 4.

**[12] Arrest 35 ⟐⟐68(2)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases
Reasonableness inquiry in suit alleging use of excessive force in violation of Fourth Amendment is objective one; question is whether officer's actions are objectively reasonable in light of facts and circumstances confronting him, without regard to his underlying intent or motivation. U.S.C.A. Const.Amend. 4.

**[13] Arrest 35 ⟐⟐68(2)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases
In determining whether officer used excessive force during arrest, in violation of Fourth Amendment, court must view situation through eyes of officer on scene who is hampered by incomplete information and forced to make split-second decision between action and inaction in circumstances where inaction could prove fatal. U.S.C.A. Const.Amend. 4.

**[14] Civil Rights 78 ⟐⟐1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Officer who had responded to report of gunshots fired toward a home was entitled to qualified immunity from arrestee's § 1983 claim that officer used excessive force, in violation of Fourth Amendment, particularly in putting his foot on arrestee's face when arrestee was down on the ground; reasonable officer could have believed that force applied was reasonably necessary after multiple shots had been fired and arrestee was not docile as he lay face down on the pavement, and force applied, while undignified in its placement, was not severe in amount. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[15] Constitutional Law 92 ⟐⟐4545(2)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)3 Law Enforcement
                92k4543 Custody and Confinement of Suspects; Pretrial Detention
                    92k4545 Conditions
                        92k4545(2) k. Medical Treatment. Most Cited Cases
    (Formerly 92k262)
Officer violates detainee's Fourteenth Amendment right to due process if he acts with deliberate indifference to serious medical needs of detainee; officer acts with "deliberate indifference" when he knows that detainee is in serious need of medical care and does not obtain medical care for that de-

394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127
**(Cite as: 394 F.3d 1328)**

tainee. U.S.C.A. Const.Amend. 14.

**[16] Constitutional Law 92 ⊜⇒4537**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)3 Law Enforcement
                92k4533 Stop and Arrest
                      92k4537 k. Conduct. Most Cited
Cases
    (Formerly 92k262)

**Prisons 310 ⊜⇒17(2)**

310 Prisons
    310k17 Maintenance and Care of Prisoners
        310k17(2) k. Medical and Mental Care. Most
Cited Cases
There was no evidence that detainee was in need of medical care, much less evidence that arresting officer was aware of his need and refused to obtain care for him, as required to support detainee's claim that he was denied medical care in violation of his right to due process. U.S.C.A. Const.Amend. 14.

**\*1330** William Maurice Pompey, Pompey & Pompey, P.C., Camden, AL, for Crosby.
Ashley Hawkins Freeman, Kendrick Emerson Webb, Bart Gregory Harmon, Webb & Eley, P.C., Montgomery, AL, for Defendants-Appellees.

Appeals from the United States District Court for the Southern District of Alabama.

Before ANDERSON, CARNES and RONEY, Circuit Judges.

CARNES, Circuit Judge:

    Willie J. Crosby appeals the district court's grant of summary judgment in favor of former Monroe County Sheriff's Deputy Jason Terry based upon the court's decision that Terry was entitled to qualified immunity.

**I.**

    On November 11, 1999 at 8:48 p.m., Willie Scott called 911 to report that someone was trying to kill him.[FN1] Gunshots could be heard in the background. Jason Terry, then a Monroe County Sheriff's Deputy, listened to a recording of Scott's call and then responded immediately with other officers. When the officers arrived at Scott's home in Beatrice, Alabama, he told them that the shooter was in the woods near his home. The officers saw a person but were unable to apprehend him.

> FN1. Because we are required to view the facts in the light most favorable to the non-moving party, *Skrtich v. Thornton,* 280 F.3d 1295, 1299 (11th Cir.2002), we recite the facts in the light most favorable to Crosby.

    As the officers walked back to Scott's house after failing to apprehend the shooter, they heard another gunshot. The sound came from the direction of Willie J. Crosby's house, which is located across a wooded area from Scott's house. Upon investigating, the officers spotted Crosby carrying a shotgun. At the time the officers approached Crosby, he was returning the shotgun to his garage. (Crosby admits that earlier he had fired a "warning shot" at an individual he had spotted in his backyard.)

    On his way to the garage, Crosby "racked" the shotgun, ejecting a spent shell. The officers heard this distinctive and threatening sound as they approached Crosby's home. The officers drew their weapons and ordered Crosby to "drop" the shotgun and lie face down on the ground. Crosby did not immediately comply but instead continued placing the shotgun inside the garage door. Crosby then lay on the ground as the officers had ordered him to do.

    Two of the officers got on top of Crosby, putting their knees in his back, and began to handcuff him. Crosby raised his head and asked why he was being arrested. Deputy Terry then placed his foot on the side of Crosby's face and neck and applied pressure. In response, Crosby jerked one hand away from the officers who were attempting to handcuff him, shoved Terry's foot off his face, cursed at

394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127
**(Cite as: 394 F.3d 1328)**

Terry, and asked Terry if he were crazy.

Crosby was then handcuffed and arrested. When the officers searched him, he was found to be carrying a .38 handgun. He was initially charged with reckless endangerment, and days later with resisting arrest. He was confined to jail on the reckless endangerment charge for approximately ten hours before being released.

At the time of his arrest, Crosby complained to Deputy Terry that he was handcuffed too tightly. At no time while he was in jail did Crosby display any symptoms indicating that he needed medical treatment, nor did he request medical attention. After being released on the morning of November 12, Crosby waited **\*1331** several days before visiting a doctor. The doctor he eventually saw merely re-filled a prescription that Crosby had previously received for back pain and gave him some other pain medication for arthritis. On or about January 5, 2000, Crosby was diagnosed with congestive heart failure.

Crosby was tried in the state district court for reckless endangerment and resisting arrest. He was found not guilty of reckless endangerment but guilty of resisting arrest. He appealed the conviction for resisting arrest to the Circuit Court of Monroe County where he received a jury trial, and he was again found guilty. The court then granted Crosby's motion for a new trial on the resisting arrest charge. (The grounds on which the motion was granted are not clear in the record.) As of the time of oral argument in this case, Crosby had not been retried.

## II.

Crosby filed a lawsuit in Alabama state court against Monroe County, various other Monroe County entities, and Deputy Terry. Terry was named both in his individual capacity and in his official capacity as a Monroe County sheriff's deputy. In addition to various state law claims, Crosby's complaint alleged unlawful arrest, use of excessive force, and denial of medical care while in custody,

all asserted as 42 U.S.C. § 1983 claims.

[1][2] The case was removed to federal court by the defendants. The district court dismissed: all claims against Monroe County and its various entities; all the state law claims against Deputy Terry; and all the federal law claims against Terry in his official capacity. That action left standing only the federal law claims against Terry in his individual capacity. When the district court dealt with those claims, it decided Terry was entitled to qualified immunity, and accordingly granted summary judgment in his favor on all of them. This is Crosby's appeal from the grant of summary judgment in favor of Terry on the three federal law claims against him in his individual capacity.[FN2]

> FN2. Crosby also appealed the district court's order that he pay Deputy Terry's attorney's fees and costs, pursuant to 42 U.S.C. § 1988. After filing his appeal with this Court, Crosby filed for bankruptcy. The parties then agreed that the portion of the appeal dealing with attorney's fees and costs was moot because Crosby has no assets with which to satisfy an award.

Crosby's bankruptcy filing does not prevent us from adjudicating the merits of this appeal. The automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362, does not extend to lawsuits initiated by the debtor. *See* 11 U.S.C. § 362; *Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n,* 892 F.2d 575, 577 (7th Cir.1989) (the automatic stay is inapplicable to suits by the debtor); *Carley Capital Group v. Fireman's Fund Ins. Co.,* 889 F.2d 1126, 1127 (D.C.Cir.1989) (same); *see also Victor Foods, Inc. v. Crossroads Econ. Dev. of St. Charles County, Inc.,* 977 F.2d 1224, 1227 (8th Cir.1992); *Trans Caribbean Lines, Inc. v. Tracor Marine, Inc.,* 49 B.R. 360, 362 (S.D.Fla.1985) (stating that the automatic stay provision only applies to proceedings against the debtor).

Additionally, because Crosby filed under Chapter 13 of the Bankruptcy Code, he retains standing to pursue legal claims on behalf of the estate. *See* 11 U.S.C. § 1303; Fed. R. Bankr.P. 6009; *In re Mosley,* 260 B.R. 590, 595

394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127
**(Cite as: 394 F.3d 1328)**

(Bankr.S.D.Ga.2000) ("In Chapter 13 cases where the debtor is the party plaintiff, courts recognize that the Chapter 13 debtor may sue and be sued, and that the debtor controls the litigation as well as the terms of the settlement."); *see also Cable v. Ivy Tech State Coll.,* 200 F.3d 467, 474 (7th Cir.1999); *Olick v. Parker & Parsley Petroleum Co.,* 145 F.3d 513, 515 (2d Cir.1998); *Mar. Elec. Co. v. United Jersey Bank,* 959 F.2d 1194, 1210 n. 2 (3d Cir.1991).

### III.

This Court reviews *de novo* the district court's grant of summary judgment, applying***1332** the same legal standards as did the district court. *Skrtich v. Thornton,* 280 F.3d 1295, 1299 (11th Cir.2002). Summary judgment is proper only when the evidence before the court establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Skrtich,* 280 F.3d at 1299. All evidence must be viewed in the light most favorable to the nonmoving party. *Skrtich,* 280 F.3d at 1299.

### IV.

[3][4] A government official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity. *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1263 (11th Cir.2004). To be eligible for qualified immunity, the official must first establish that he was performing a "discretionary function" at the time the alleged violation of federal law occurred. *Id.* at 1263-64. Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity. *Id.* at 1264. In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things: (1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was "clearly established" at the time he did it. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150

L.Ed.2d 272 (2001); *Holloman,* 370 F.3d at 1264.

### A.

[5][6] To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook "are of a type that fell within the employee's job responsibilities." *Holloman,* 370 F.3d at 1265. That is easy here. Because making an arrest is within the official responsibilities of a sheriff's deputy, Terry was performing a discretionary function when he arrested Crosby.

### B.

We turn now to the question of whether the doctrine of qualified immunity entitled Deputy Terry to summary judgment insofar as the three constitutional claims Crosby brought against him are concerned. Those three claims assert unlawful arrest, use of excessive force, and denial of medical care while in custody, and that is the order in which we will take up the claims.

[7] As to the unlawful arrest claim, Crosby asserts that there was no probable cause for his arrest. The Fourth Amendment's guarantee against unreasonable searches and seizures encompasses the right to be free from arrest without probable cause. *See, e.g., Von Stein v. Brescher,* 904 F.2d 572, 579 (11th Cir.1990). Probable cause is "defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975) (internal marks and citations omitted).

[8] The issue here, however, is not whether probable cause existed but instead whether there was arguable probable cause. Qualified immunity applies when there was arguable probable cause for an arrest even if actual probable cause did not exist. *Jones v. Cannon,* 174 F.3d 1271, 1283 n. 3 (11th Cir.1999) ("Arguable probable cause, not the high-

394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127

**(Cite as: 394 F.3d 1328)**

er standard of actual probable cause, governs the qualified immunity inquiry."). Arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could-not necessarily would-have believed that probable cause was present. *Durruthy v. Pastor,* 351 F.3d 1080, 1089 **\*1333** (11th Cir.2003) ("Arguable probable cause exists when an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed."(internal marks and citation omitted)); *Montoute v. Carr,* 114 F.3d 181, 184 (11th Cir.1997) ("In order to be entitled to qualified immunity from a Fourth Amendment claim, an officer need not have actual probable cause but only 'arguable probable cause,' i.e., the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed.").

Whether a particular set of facts gives rise to probable cause or arguable probable cause to justify an arrest for a particular crime depends, of course, on the elements of the crime. Under Alabama law, "A person commits the crime of reckless endangerment if he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." Ala.Code § 13A-6-24. That is one of the crimes for which Crosby was arrested.

[9] It is undisputed that, in the events leading up to the arrest, Deputy Terry was responding to a report of gunshots fired toward the home of Crosby's neighbor, Scott, shortly before the officers arrived. The officers knew that Scott, who had been there when the shots were fired, was in fear for his life. While on the scene, they heard a shot from the direction of Crosby's home. As they approached that area, the officers saw Crosby carrying a shotgun and heard the sound of him ejecting a shell from the weapon. Given these facts, an officer in Terry's position reasonably could have believed that Crosby had fired multiple shots in the direction of his neighbor's house, including the shots they had heard while the neighbor was on the phone calling the sheriff's office for help, and that he had fired another shot after they arrived. Because an officer in that position reasonably could have believed that

Crosby had "create[d] a substantial risk of serious physical injury to another person," there was arguable probable cause to arrest Crosby for reckless endangerment as defined in Ala.Code § 13A-6-24.

[10] Crosby argues that, even if there was probable cause, his arrest was still a violation of the Fourth Amendment. He points out that reckless endangerment is a misdemeanor, *see*Ala.Code § 13A-6-24(b), and Alabama law does not permit a warrantless arrest for a misdemeanor unless it occurred in the officer's presence, *see Telfare v. City of Huntsville,* 841 So.2d 1222, 1228-29 (Ala.2002). We rejected a materially identical contention in *Knight v. Jacobson,* 300 F.3d 1272, 1275-76 (11th Cir.2002), and that decision requires that we do the same here.

Crosby's second federal claim is that Deputy Terry used excessive force in arresting him. Although not happy about the way in which the officers held him down, Crosby's primary focus in making this claim is that at one point Terry put his foot on Crosby's face. Except for that fact, this would be an easy case.

[11][12] The Fourth Amendment encompasses the right to be free from the use of excessive force during an arrest. *See Vinyard v. Wilson,* 311 F.3d 1340, 1347 (11th Cir.2002). As we have recently said, "[t]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Kesinger ex rel. Estate of Kesinger v. Herrington,* 381 F.3d 1243, 1248 (11th Cir.2004).

[13] In making an excessive force inquiry, we are not to view the matter as judges from the comfort and safety of our **\*1334** chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts. We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127

**(Cite as: 394 F.3d 1328)**

make a split-second decision between action and in-action in circumstances where inaction could prove fatal. *See Graham v. Connor,* 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); *Kesinger,* 381 F.3d at 1248-50; *Garrett v. Athens-Clarke County,* 378 F.3d 1274, 1279 (11th Cir.2004).

[14] From that perspective, a reasonable officer could have believed that the force applied was reasonably necessary in the situation Deputy Terry found himself in that night. The circumstances were fraught with danger for the officers. Multiple shots had been fired, Crosby's neighbor was in fear for his life, and after the officers arrived on the scene a shot was fired from the direction of Crosby's house. As they approached, the officers saw Crosby carrying a shotgun and heard the sound of him ejecting a shell from the weapon. As Crosby himself described that "racking" sound in his deposition: "It makes a heart-wrenching sound if you're on the wrong side of the fence." Around this time, the officers began running and yelling, "He's got a shotgun!" Then one or more of the officers, with pistol drawn, ordered Crosby to drop the shotgun, but he did not do so. Instead, he continued placing the shotgun in the garage.

Thereafter Crosby did lie face down on the pavement, as the officers had ordered, but he was not docile. While the officers were trying to hold him down and handcuff him, Crosby raised his head and asked why he was being arrested. It was then that Deputy Terry put his foot on Crosby's face and pushed his head back down. In response, Crosby jerked his hand away from the handcuffing attempt, shoved Terry's foot off, cursed at Terry, and asked him if he were crazy. Terry did not put his foot back on Crosby's face or otherwise respond to the cursing. Eventually, the officers got Crosby handcuffed. At no time did Terry or any other officer kick or punch Crosby. Crosby did not cry out in pain. Other than being indignant about having a foot on his face, Crosby did not say then-and so far as the record reveals he has not testified since-that it was painful.

The Supreme Court "has long recognized that the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 397, 109 S.Ct. at 1872-73; *accord Garrett,* 378 F.3d 1274 (hit with baton, tackled, pepper-sprayed, and tied up); *Draper v. Reynolds,* 369 F.3d 1270 (11th Cir.2004) (taser gun); *Durruthy,* 351 F.3d 1080 (knee in back). Furthermore, the purpose of the qualified immunity doctrine is to give meaning to the proposition that "[g]overnment officials are not required to err on the side of caution" when it comes to avoiding constitutional violations. *Marsh v. Butler County,* 268 F.3d 1014, 1030 n. 8 (11th Cir.2001) (en banc).

Though Crosby was on the ground at the time Deputy Terry put his foot on Crosby's face, he had not yet been handcuffed. For all the officers knew, Crosby had other weapons concealed on his person-as it turned out, he actually did have another weapon on him-and raising his head to ask why he was being arrested could have been an attempt by Crosby to distract Terry and a prelude to actual resistance. Given the circumstances and the risks inherent in apprehending any suspect, an officer in Terry's position reasonably could have concluded that it was imperative to keep Crosby, who had not been **\*1335** entirely cooperative, completely flat and immobile until he had been successfully handcuffed. The fact that Crosby was able to wrestle his hand loose and push Terry's foot away indicates that he had not been subdued.

There is also the fact that the force about which Crosby complains, while undignified in its placement, was not severe in amount. *See Durruthy,* 351 F.3d at 1094 (stating that " 'the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment' " (quoting *Nolin v. Isbell,* 207 F.3d 1253, 1257 (11th Cir.2000))); *Lee v. Ferraro,* 284 F.3d 1188, 1198 (11th Cir.2002) (noting that one factor to be considered in evaluating excessive force claims is "the relationship between the need and amount of force used" (internal citation omitted)). Before us there is no evidence-as distin-

guished from bare allegations-that Deputy Terry's foot on Crosby's face caused him any physical injury. Crosby did say in his affidavit that being handcuffed hurt, and he testified in his deposition that he thinks having the two officers on his back-Terry was not one of them-aggravated his preexisting back condition. However, he did not say in any affidavit or deposition testimony in the record before us that the foot on his face was physically painful.

[15] Crosby's final claim is that Deputy Terry denied him medical care while he was incarcerated. An officer violates a detainee's "Fourteenth Amendment right to due process if he acts with deliberate indifference to the serious medical needs of the detainee." *Lancaster v. Monroe County,* 116 F.3d 1419, 1425 (11th Cir.1997). An officer acts with "deliberate indifference" when he knows that a detainee is in "serious need of medical care" and does not obtain medical care for that detainee. *Id.*

[16] Crosby has presented no evidence that he was in need of medical care, much less evidence that Deputy Terry was aware of his need and refused to obtain care for him. In his deposition, Crosby admits that he did not request medical care while in jail. In fact, he did not seek medical treatment until several days after his release. He says that he went to see a doctor "whenever [he] could get around to it." Crosby's behavior upon being released is inconsistent with his argument that, while in jail, he had such serious medical needs that it should have been obvious to Terry. Besides, Crosby has not even presented any evidence that Terry observed him while he was incarcerated.

## C.

The district court's grant of summary judgment to Deputy Terry on grounds of qualified immunity is AFFIRMED.

C.A.11 (Ala.),2004.
Crosby v. Monroe County
394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Hope v. Pelzer
U.S.,2002.

Supreme Court of the United States
Larry HOPE, Petitioner,
v.
Mark PELZER et al.
**No. 01-309.**

Argued April 17, 2002.
Decided June 27, 2002.

Inmate brought suit against prison guards, alleging that his Eighth and Fourteenth Amendment rights were violated when he was handcuffed to hitching post on two occasions, one of which lasted for seven hours without regular water or bathroom breaks. The United States District Court for the Northern District of Alabama, No. 96-02968-CV-BU-S,H. Dean Buttram, Jr., J., granted summary judgment for guards on ground of qualified immunity, and inmate appealed. The Court of Appeals for the Eleventh Circuit, 240 F.3d 975, affirmed. Inmate petitioned for writ of certiorari which was granted. The Supreme Court, Justice Stevens, held that: (1) inmate was subjected to cruel and unusual punishment in violation of the Eighth Amendment when prison guards handcuffed him to hitching post for disruptive behavior, despite his having already been subdued; (2) for purposes of qualified immunity, officials can still be on notice that their conduct violates established law even in novel factual circumstances; and (3) Alabama prison guards were not entitled to qualified immunity from inmate's claim, in light of binding Eleventh Circuit precedent, an Alabama Department of Corrections (ADOC) regulation, and a Department of Justice (DOJ) report informing the ADOC of constitutional infirmity in its use of hitching post.

Reversed.

Justice Thomas filed dissenting opinion in which Chief Justice Rehnquist and Justice Scalia joined.

West Headnotes

**[1] Civil Rights 78 🔗1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(1) k. In General. Most Cited Cases
    (Formerly 78k214(1))
The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation.

**[2] Sentencing and Punishment 350H 🔗1439**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(A) In General
            350Hk1434 Scope of Prohibition
                350Hk1439 k. Cruelty and Unnecessary Infliction of Pain. Most Cited Cases
The unnecessary and wanton infliction of pain constitutes "cruel and unusual punishment" forbidden by the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[3] Sentencing and Punishment 350H 🔗1439**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(A) In General
            350Hk1434 Scope of Prohibition
                350Hk1439 k. Cruelty and Unnecessary Infliction of Pain. Most Cited Cases
Among unnecessary and wanton inflictions of pain constituting cruel and unusual punishment forbidden by the Eighth Amendment are those that are totally without penological justification. U.S.C.A. Const.Amend. 8.

122 S.Ct. 2508

536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

**[4] Sentencing and Punishment 350H ⬅1533**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
         350Hk1533 k. Deliberate Indifference in General. Most Cited Cases
Determination whether punishment is cruel or unusual is made in the context of prison conditions by ascertaining whether the prison officials involved acted with deliberate indifference to the inmates' health or safety. U.S.C.A. Const.Amend. 8.

**[5] Prisons 310 ⬅13(4)**

310 Prisons
    310k13 Custody and Control of Prisoners
       310k13(4) k. Particular Violations, Punishments, and Deprivations; Use of Force. Most Cited Cases

**Sentencing and Punishment 350H ⬅1549**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
         350Hk1549 k. Physical Restraints. Most Cited Cases

**Sentencing and Punishment 350H ⬅1550**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
         350Hk1550 k. Prison Discipline. Most Cited Cases
Inmate was subjected to cruel and unusual punishment in violation of the Eighth Amendment when prison guards handcuffed him to hitching post for disruptive behavior, despite his having already been subdued, where guards knowingly subjected him to a substantial risk of physical harm, to unnecessary pain caused by the handcuffs and restricted position of confinement for a seven-hour period, to unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation. U.S.C.A. Const.Amend. 8.

**[6] Civil Rights 78 ⬅1376(2)**

78 Civil Rights
    78III Federal Remedies in General
       78k1372 Privilege or Immunity; Good Faith and Probable Cause
         78k1376 Government Agencies and Officers
           78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
    (Formerly 78k214(2))
Despite their participation in this constitutionally impermissible conduct, officials may nevertheless be shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

**[7] Civil Rights 78 ⬅1376(2)**

78 Civil Rights
    78III Federal Remedies in General
       78k1372 Privilege or Immunity; Good Faith and Probable Cause
         78k1376 Government Agencies and Officers
           78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
    (Formerly 78k214(2))

**Officers and Public Employees 283 ⬅116**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
       283k115 Liabilities for Negligence or Misconduct
         283k116 k. In General. Most Cited Cases
Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

**[8] Civil Rights 78 ⟲⟲1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
    (Formerly 78k214(2))
For a constitutional right to be clearly established for purposes of qualified immunity, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right; this is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

**[9] Civil Rights 78 ⟲⟲1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
    (Formerly 78k214(2))
Officers sued in a civil action for damages under § 1983 have the same right to fair notice as do defendants charged with the criminal offense defined in statute making it a crime for a state official to act "willfully" and under color of law to deprive a person of rights protected by the Constitution. 18 U.S.C.A. § 242; 42 U.S.C.A. § 1983.

**[10] Civil Rights 78 ⟲⟲1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
    (Formerly 78k214(2))
For purposes of qualified immunity, officials can still be on notice that their conduct violates established law even in novel factual circumstances, as notice does not require that facts of previous cases be materially or fundamentally similar to situation in question; rather, salient question is whether the state of the law at the time gives officials fair warning that their conduct is unconstitutional.

**[11] Civil Rights 78 ⟲⟲1376(7)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases
    (Formerly 78k214(7))
Alabama prison guards were not entitled to qualified immunity from inmate's claim he was subjected to cruel and unusual punishment in violation of the Eighth Amendment when he was handcuffed to hitching post, in light of binding Eleventh Circuit precedent, an Alabama Department of Corrections (ADOC) regulation, and a Department of Justice (DOJ) report informing the ADOC of constitutional infirmity in its use of hitching post. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

      **\*\*2510 \*730** *Syllabus* [FN\*]

    FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

    In 1995, petitioner Hope, then an Alabama

122 S.Ct. 2508
536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
(Cite as: 536 U.S. 730, 122 S.Ct. 2508)

prison inmate, was twice handcuffed to a hitching post for disruptive conduct. During a 2-hour period in May, he was offered drinking water and a bathroom break every 15 minutes, and his responses were recorded on an activity log. He was handcuffed above shoulder height, and when he tried moving his arms to improve circulation, the handcuffs cut into his wrists, causing pain and discomfort. After an altercation with a guard at his chain gang's worksite in June, Hope was subdued, handcuffed, placed in leg irons, and transported back to the prison, where he was ordered to take off his shirt, thus exposing himself to the sun, and spent seven hours on the hitching post. While there, he was given one or two water breaks but no bathroom breaks, and a guard taunted him about his thirst. Hope filed a 42 U.S.C. § 1983 suit against three guards. Without deciding whether placing Hope on the hitching post as punishment violated the Eighth Amendment, the Magistrate Judge found that the guards were entitled to qualified immunity. The District Court entered summary judgment for respondents, and the Eleventh Circuit affirmed. The latter court answered the constitutional question, finding that the hitching post's use for punitive purposes violated the Eighth Amendment. In finding the guards nevertheless entitled to qualified immunity, it concluded that Hope could not show, as required by Circuit precedent, that the federal law by which the guards' conduct should be evaluated was established by cases that were "materially similar" to the facts in his own case.

*Held:* The defense of qualified immunity was precluded at the summary judgment phase. Pp. 2513-2519.

(a) Hope's allegations, if true, establish an Eighth Amendment violation. Among the " 'unnecessary and wanton' inflictions of pain [constituting cruel and unusual punishment forbidden by the Amendment] are those that are 'totally without penological justification.' " *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59. This determination is made in the context of prison conditions by ascertaining whether an official acted with "deliberate indifference" to the

inmates' health or safety, *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156, a state of mind that can be inferred from the fact that the risk of harm is obvious, *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811. **\*731** The Eighth Amendment violation here is obvious on the facts alleged. Any safety concerns had long since abated by the time Hope was handcuffed to the hitching post, because he had already been subdued, handcuffed, placed in leg irons, and transported back to prison. He was separated from his work squad and not given the opportunity to return. Despite the clear lack of emergency, respondents knowingly subjected him to a substantial risk of physical harm, unnecessary pain, unnecessary exposure to the sun, prolonged thirst and taunting, and a deprivation of bathroom breaks that created a risk of particular **\*\*2511** discomfort and humiliation. Pp. 2513-2515.

(b) Respondents may nevertheless be shielded from liability for their constitutionally impermissible conduct if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396. In its assessment, the Eleventh Circuit erred in requiring that the facts of previous cases and Hope's case be "materially similar." Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful. Officers sued in a § 1983 civil action have the same fair notice right as do defendants charged under 18 U.S.C. § 242, which makes it a crime for a state official to act willfully and under color of law to deprive a person of constitutional rights. This Court's opinion in *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432, a § 242 case, makes clear that officials can be on notice that their conduct violates established law even in novel factual situations. Indeed, the Court expressly rejected a requirement that previous cases be "fundamentally similar." Accordingly, the salient question that the Eleventh Circuit should have asked is whether the state of the law in 1995 gave respondents fair warning that Hope's alleged treatment was unconstitutional. Pp.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 S.Ct. 2508
536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

2515-2516.

(c) A reasonable officer would have known that using a hitching post as Hope alleged was unlawful. The obvious cruelty inherent in the practice should have provided respondents with some notice that their conduct was unconstitutional. In addition, binding Circuit precedent should have given them notice. *Gates v. Collier,* 501 F.2d 1291, found several forms of corporal punishment impermissible, including handcuffing inmates to fences or cells for long periods, and *Ort v. White,* 813 F.2d 318, 324, warned that "physical abuse directed at [a] prisoner *after* he terminate[s] his resistance to authority would constitute an actionable eighth amendment violation." Relevant to the question whether *Ort* provided fair notice is a subsequent Alabama Department of Corrections (ADOC) regulation specifying procedures for using a hitching post, which included allowing an inmate to rejoin his squad when he tells an officer that he is ready to work. If regularly observed, that provision *732 would have made Hope's case less like the kind of punishment *Ort* described as impermissible. But conduct showing that the provision was a sham, or that respondents could ignore it with impunity, provides equally strong support for the conclusion that they were fully aware of their wrongful conduct. The conclusion here is also buttressed by the fact that the Justice Department specifically advised the ADOC of the constitutional infirmity of its practices before the incidents in this case took place. Pp. 2516-2518.

240 F.3d 975, reversed.

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C.J., and SCALIA, J., joined, *post,* p. 2519.

Craig T. Jones, for petitioner.
Austin C. Schlick, Washington, DC, for the United States as amicus curiae, by special leave of the Court, supporting the petitioner.
Nathan A. Forrester, for respondents.

Gene C. Schaerr, Washington, DC, for Missouri, et al., as amici curiae, by special leave of the Court, supporting the respondents.For U.S. Supreme Court briefs, see:2002 WL 313546 (Pet.Brief)2002 WL 481135 (Resp.Brief)2002 WL 538049 (Reply.Brief)
**2512 *733 Justice STEVENS delivered the opinion of the Court.

The Court of Appeals for the Eleventh Circuit concluded that petitioner Larry Hope, a former prison inmate at the Limestone Prison in Alabama, was subjected to cruel and unusual punishment when prison guards twice handcuffed him to a hitching post to sanction him for disruptive conduct. Because that conclusion was not supported by earlier cases with "materially similar" facts, the court held that the respondents were entitled to qualified immunity, and therefore affirmed summary judgment in their favor. We granted certiorari to determine whether the Court of Appeals' qualified immunity holding comports with our decision in *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).

I

In 1995, Alabama was the only State that followed the practice of chaining inmates to one another in work squads. It was also the only State that handcuffed prisoners to "hitching posts" if they either refused to work or otherwise disrupted work squads.[FN1] Hope was handcuffed to a hitching *734 post on two occasions. On May 11, 1995, while Hope was working in a chain gang near an interstate highway, he got into an argument with another inmate. Both men were taken back to the Limestone prison and handcuffed to a hitching post. Hope was released two hours later, after the guard captain determined that the altercation had been caused by the other inmate. During his two hours on the post, Hope was offered drinking water and a bathroom break every 15 minutes, and his responses to these offers were recorded on an activity log. Because he was only slightly taller than the hitching post, his arms were above shoulder height and grew tired from being handcuffed so high. Whenever he tried moving his arms to improve his

122 S.Ct. 2508                                                                                    Page 18
536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

circulation, the handcuffs cut into his wrists, causing pain and discomfort.

> FN1. In its review of the summary judgment, the Court of Appeals viewed the facts in the light most favorable to Hope, the nonmoving party. 240 F.3d 975, 977 (C.A.11 2001) (case below). We do the same. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The Court of Appeals also referenced facts established in *Austin v. Hopper,* 15 F.Supp.2d 1210 (M.D.Ala.1998). 240 F.3d, at 978, n. 6. This was appropriate because *Austin* is a class-action suit brought by Alabama prisoners, including Hope, and the District Court opinion in that case discusses Hope's allegations at some length. 15 F.Supp.2d, at 1247-1248. In their summary judgment papers, both Hope and respondents referenced the findings in *Austin,* and thus those findings are part of the record in this case. See, *e.g.,* Plaintiff's Preliminary Response to Defendants' Special Report, Record 30; Defendants' Response to Court Order, App. 61. Accordingly, for purposes of our review of the grant of summary judgment, the *Austin* findings may also be assumed true, and we reference them when appropriate.

As *Austin* explained, the hitching post is a horizontal bar " 'made of sturdy, nonflexible material,' " placed between 45 and 57 inches from the ground. Inmates are handcuffed to the hitching post in a standing position and remain standing the entire time they are placed on the post. Most inmates are shackled to the hitching post with their two hands relatively close together and at face level. 15 F.Supp.2d, at 1241-1242.

On June 7, 1995, Hope was punished more severely. He took a nap during the morning bus ride to the chain gang's worksite, and when it arrived he was less than prompt in responding to an order to get off the bus. An exchange of vulgar remarks led to a wrestling match with a guard. Four other guards intervened, subdued Hope, handcuffed him,

placed him in leg irons and transported him back to the prison where he was put on the hitching post. The guards made him take off his shirt, and he remained shirtless all *735 day while the sun burned his skin.<sup>FN2</sup> He **2513 remained attached to the post for approximately seven hours. During this 7-hour period, he was given water only once or twice and was given no bathroom breaks.<sup>FN3</sup> At one point, a guard taunted Hope about his thirst. According to Hope's affidavit: "[The guard] first gave water to some dogs, then brought the water cooler closer to me, removed its lid, and kicked the cooler over, spilling the water onto the ground." App. 11.

> FN2. "The most repeated complaint of the hitching post, however, was the strain it produced on inmates' muscles by forcing them to remain in a standing position with their arms raised in a stationary position for a long period of time. In addition to their exposure to sunburn, dehydration, and muscle aches, the inmates are also placed in substantial pain when the sun heats the handcuffs that shackle them to the hitching post, or heats the hitching post itself. Several of the inmates described the way in which the handcuffs burned and chafed their skin during their placement on the post." *Id.,* at 1248.

> FN3. The Court of Appeals noted that respondents had not produced any activity log for this incident, despite the policy that required that such a log be maintained. 240 F.3d, at 977, n. 1.

Hope filed suit under Rev. Stat. § 1979, 42 U.S.C. § 1983, in the United States District Court for the Northern District of Alabama against three guards involved in the May incident, one of whom also handcuffed him to the hitching post in June. The case was referred to a Magistrate Judge who treated the responsive affidavits filed by the defendants as a motion for summary judgment. Without deciding whether "the very act of placing him on a restraining bar for a period of hours as a

122 S.Ct. 2508
536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

form of punishment" had violated the Eighth Amendment, the Magistrate concluded that the guards were entitled to qualified immunity.[FN4] Supplemental App. to Pet. for Cert. 21. The District Court agreed, and entered judgment for respondents.

> FN4. Supplemental App. to Pet. for Cert. 21-27.

The United States Court of Appeals for the Eleventh Circuit affirmed. 240 F.3d 975 (2001) Before reaching the *736 qualified immunity issue, however, it answered the constitutional question that the District Court had bypassed. The court found that the use of the hitching post for punitive purposes violated the Eighth Amendment. Nevertheless, applying Circuit precedent concerning qualified immunity, the court stated that " 'the federal law by which the government official's conduct should be evaluated must be preexisting, obvious and mandatory,' " and established, not by " 'abstractions,' " but by cases that are " 'materially similar' " to the facts in the case in front of us. *Id.,* at 981. The court then concluded that the facts in the two precedents on which Hope primarily relied-*Ort v. White,* 813 F.2d 318 (C.A.11 1987), and *Gates v. Collier,* 501 F.2d 1291 (C.A.5 1974)-"[t]hough analogous," were not " 'materially similar' to Hope's situation.' " 240 F.3d, at 981. We granted certiorari to review the Eleventh Circuit's qualified immunity holding. 534 U.S. 1073, 122 S.Ct. 802, 151 L.Ed.2d 688 (2002).

## II

[1] The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The Court of Appeals held that "the policy and practice of cuffing an inmate to a hitching post or similar stationary object for a period of time that surpasses that necessary to quell a threat or restore order is a violation of the Eighth Amendment." 240 F.3d, at 980-981. The court rejected respondents' submis-

sion that Hope could have ended his shackling by offering to return to work, finding instead that the purpose of the practice was punitive,[FN5] and that the circumstances**2514 of his confinement created *737 a substantial risk of harm of which the officers were aware. Moreover, the court relied on Circuit precedent condemning similar practices FN6 and the results of a United States Department of Justice (DOJ) report that found Alabama's systematic use of the hitching post to be improper corporal punishment.[FN7] We agree with the Court of Appeals that the attachment of Hope to the hitching post under the circumstances alleged in this case violated the Eighth Amendment.

> FN5. In reaching this conclusion, the Court of Appeals stated: "While the DOC claims that Hope would have been released from the hitching post had he asked to return to work, the evidence suggests this is not the case. First, Hope never refused to work. During the May incident, he was the victim in an altercation on the work site, but he never refused to do his job. During the June incident, Hope was involved in an altercation with prison guards. There is nothing in the record, however, claiming that he refused to work or encouraged other inmates to refuse to work. Therefore, it is not clear that the solution to his hitching post problem was to ask to return to work. Second, Hope was placed in a car and driven back to Limestone to be cuffed to the hitching post on both occasions. Given the facts, it is improbable that had Hope said, 'I want to go back to work,' a prison guard would have left his post at Limestone to drive Hope back to the work site. It is more likely that the guards left Hope on the post until his work detail returned to teach the other inmates a lesson." 240 F.3d, at 980.
>
> FN6. "Since abolishing the pillory over a century ago, our system of justice has consistently moved away from forms of punishment similar to hitching posts in pris-

122 S.Ct. 2508
536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

ons. In *Gates v. Collier,* 501 F.2d 1291 (5th Cir.1974), in regard to 'handcuffing inmates to the fence and to cells for long periods of time' and other such punishments, we stated that '[w]e have no difficulty in reaching the conclusion that these forms of corporal punishment run afoul of the Eighth Amendment, offend contemporary concepts of decency, human dignity, and precepts of civilization which we profess to possess.' *Gates,* 501 F.2d at 1306." *Id.,* at 979.

FN7. The DOJ report apparently was not before the District Court in this case, but the Court of Appeals took judicial notice of the report and referenced it throughout the decision below. *Id.,* at 979, n. 8.

[2][3][4] " '[T]he unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.' " *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (some internal quotation marks omitted). We have said that "[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.' " *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). In making this determination in the context of prison conditions,\*738 we must ascertain whether the officials involved acted with "deliberate indifference" to the inmates' health or safety. *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious. *Farmer v. Brennan,* 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

[5] As the facts are alleged by Hope, the Eighth Amendment violation is obvious. Any safety concerns had long since abated by the time petitioner was handcuffed to the hitching post because Hope had already been subdued, handcuffed, placed in leg irons, and transported back to the prison. He was separated from his work squad and not given the opportunity to return to work. Despite the clear lack of an emergency situation, the respondents knowingly subjected him to a substantial risk of physical harm, to unnecessary pain caused by the handcuffs and the restricted position of confinement for a 7-hour period, to unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation.FN8 The use of the hitching post under these circumstances violated **2515 the "basic concept underlying the Eighth Amendment[, which] is nothing less than the dignity of man." *Trop v. Dulles,* 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). This punitive treatment amounts to gratuitous infliction of "wanton and unnecessary" pain that our precedent clearly prohibits.

FN8. The awareness of the risk of harm attributable to any individual respondent may be evaluated in part by considering the pattern of treatment that inmates generally received when attached to the hitching post. In *Austin v. Hopper,* the District Court cited examples of humiliating incidents resulting from the denial of bathroom breaks. One inmate "was not permitted to use the restroom or to change his clothing for four and one-half hours after he had defecated on himself." 15 F.Supp.2d, at 1246. "Moreover, certain corrections officers not only ignored or denied inmates' requests for water or access to toilet facilities, but taunted them while they were clearly suffering from dehydration...." *Id.,* at 1247.

**\*739** III

[6] Despite their participation in this constitutionally impermissible conduct, respondents may nevertheless be shielded from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In assessing whether the Eighth Amendment violation here met the *Harlow*

122 S.Ct. 2508
536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

test, the Court of Appeals required that the facts of previous cases be " 'materially similar' to Hope's situation." 240 F.3d, at 981. This rigid gloss on the qualified immunity standard, though supported by Circuit precedent,[FN9] is not consistent with our cases.

> FN9. See, *e.g., Suissa v. Fulton County,* 74 F.3d 266-270 (C.A.11 1996); *Lassiter v. Alabama A & M Univ. Bd. of Trustees,* 28 F.3d 1146, 1150 (C.A.11 1994); *Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1185 (C.A.11 1994).

[7][8] As we have explained, qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz,* 533 U.S., at 206, 121 S.Ct. 2151. For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell* [v. *Forsyth,* 472 U.S. 511,] 535, n. 12, 105 S.Ct. 2806, 86 L.Ed.2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

[9] Officers sued in a civil action for damages under 42 U.S.C. § 1983 have the same right to fair notice as do defendants charged with the criminal offense defined in 18 U.S.C. § 242. Section 242 makes it a crime for a state official to act "willfully" and under color of law to deprive a person of rights protected by the Constitution. In *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), we held that the defendant was entitled **\*740** to "fair warning" that his conduct deprived his victim of a constitutional right, and that the standard for determining the adequacy of that warning was the same as the standard for determining whether a constitutional right was "clearly established" in civil litigation under § 1983.[FN10]

> FN10. "[T]he object of the 'clearly established' immunity standard is not different from that of 'fair warning' as it relates to law 'made specific' for the purpose of validly applying § 242. The fact that one has a civil and the other a criminal law role is of no significance; both serve the same objective, and in effect the qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes. To require something clearer than 'clearly established' would, then, call for something beyond 'fair warning.' " 520 U.S., at 270-271, 117 S.Ct. 1219.

In *Lanier,* the Court of Appeals had held that the indictment did not charge an offense under § 242 because the constitutional right allegedly violated had not been identified in any earlier case involving a factual situation " 'fundamentally similar' " to the one in issue. *Id.,* at 263, 117 S.Ct. 1219 (citing *United States v. Lanier,* 73 F.3d 1380, 1393 (C.A.6 1996)). The Court of Appeals had assumed that the defendant in a criminal case was entitled to a degree of notice " 'substantially higher than the "clearly established" standard used to judge qualified immunity' " in civil **\*\*2516** cases under § 1983. 520 U.S., at 263, 117 S.Ct. 1219. We reversed, explaining that the "fair warning" requirement is identical under § 242 and the qualified immunity standard. We pointed out that we had "upheld convictions under § 241 or § 242 despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.,* at 269, 117 S.Ct. 1219. We explained:

"This is not to say, of course, that the single warning standard points to a single level of specificity sufficient in every instance. In some circumstances, as when an **\*741** earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high de-

122 S.Ct. 2508
536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

gree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful,'*Anderson, supra,* at 640, 107 S.Ct. 3034." *Id.,* at 270-271, 117 S.Ct. 1219 (citation omitted).

[10] Our opinion in *Lanier* thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier,* we expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts. Accordingly, pursuant to *Lanier,* the salient question that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional. It is to this question that we now turn.

IV

[11] The use of the hitching post as alleged by Hope "unnecessar[ily] and wanton[ly] inflicted pain,"*Whitley,* 475 U.S., at 319, 106 S.Ct. 1078 (internal quotation marks omitted), and thus was a clear violation of the Eighth Amendment. See Part II, *supra.* Arguably, the violation was so obvious that our own Eighth Amendment cases gave respondents fair warning that their conduct violated the Constitution. Regardless, in light of binding Eleventh Circuit precedent, an Alabama Department of Corrections (ADOC) regulation, and a DOJ report *742 informing the ADOC of the constitutional infirmity in its use of the hitching post, we readily conclude that the respondents' conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have

known." *Harlow,* 457 U.S., at 818, 102 S.Ct. 2727.

Cases decided by the Court of Appeals for the Fifth Circuit before 1981 are binding precedent in the Eleventh Circuit today. See *Bonner v. Prichard,* 661 F.2d 1206 (C.A.11 1981). In one of those cases, decided in 1974, the Court of Appeals reviewed a District Court decision finding a number of constitutional violations in the administration of Mississippi's prisons. *Gates v. Collier,* 501 F.2d 1291. That opinion squarely held that several of those "forms of corporal punishment run afoul of the Eighth Amendment [and] offend contemporary concepts of decency, human dignity, and precepts of civilization which we profess to possess." *Id.,* at 1306. Among those forms of punishment were "handcuffing inmates to the fence and to cells for long periods of time, ... and forcing inmates to stand, sit or lie on crates, stumps, or otherwise maintain awkward positions for prolonged periods." *Ibid.* The fact that *Gates* found several forms of punishment impermissible does **2517 not, as respondents suggest, lessen the force of its holding with respect to handcuffing inmates to cells or fences for long periods of time. Nor, for the purpose of providing fair notice to reasonable officers administering punishment for past misconduct, is there any reason to draw a constitutional distinction between a practice of handcuffing an inmate to a fence for prolonged periods and handcuffing him to a hitching post for seven hours. The Court of Appeals' conclusion to the contrary exposes the danger of a rigid, overreliance on factual similarity. As the Government submits in its brief *amicus curiae:* "No reasonable officer could have concluded that the constitutional holding of *Gates* turned on the fact that inmates were handcuffed to fences or the bars of cells, rather than a specially designed metal bar designated for shackling. If anything, the use of *743 a designated hitching post highlights the constitutional problem." Brief for United States as *Amicus Curiae* 22. In light of *Gates,* the unlawfulness of the alleged conduct should have been apparent to the respondents.

The reasoning, though not the holding, in a case decided by the Eleventh Circuit in 1987 sent

122 S.Ct. 2508                                                                                                                                                                                                  Page 11
536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

the same message to reasonable officers in that Circuit. In *Ort v. White,* 813 F.2d 318, the Court of Appeals held that an officer's temporary denials of drinking water to an inmate who repeatedly refused to do his share of the work assigned to a farm squad "should not be viewed as punishment in the strict sense, but instead as necessary coercive measures undertaken to obtain compliance with a reasonable prison rule, *i.e.,* the requirement that all inmates perform their assigned farm squad duties." *Id.,* at 325. "The officer's clear motive was to encourage Ort to comply with the rules and to do the work required of him, after which he would receive the water like everyone else." *Ibid.* The court cautioned, however, that a constitutional violation might have been present "if later, once back at the prison, officials had decided to deny [Ort] water as punishment for his refusal to work." *Id.,* at 326. So too would a violation have occurred if the method of coercion reached a point of severity such that the recalcitrant prisoner's health was at risk. *Ibid.* Although the facts of the case are not identical, *Ort's* premise is that "physical abuse directed at [a] prisoner *after* he terminate[s] his resistance to authority would constitute an actionable eighth amendment violation." *Id.,* at 324. This premise has clear applicability in this case. Hope was not restrained at the worksite until he was willing to return to work. Rather, he was removed back to the prison and placed under conditions that threatened his health. *Ort* therefore gave fair warning to respondents that their conduct crossed the line of what is constitutionally permissible.

Relevant to the question whether *Ort* provided fair warning to respondents that their conduct violated the Constitution*744 is a regulation promulgated by ADOC in 1993.FN11 The regulation authorizes the use of the hitching post when an inmate refuses to work or is otherwise disruptive to a work squad. It provides that an activity log should be completed for each such inmate, detailing his responses to offers of water and bathroom breaks every 15 minutes. Such a log was completed and maintained for petitioner's shackling in May, but the record contains no such log for the 7-hour shackling in June and the record indicates that the

periodic offers contemplated by the regulation were not made. App. 43-48. The regulation also states that an inmate "will be allowed to join his assigned squad" whenever he tells an officer "that he is ready to go to work." *Id.,* at 103. The findings in *Austin v. Hopper,* 15 F.Supp.2d 1210, 1244-1246 (M.D.Ala.1998), as well as the record in this case, indicate that this important provision of the regulation was frequently ignored by **2518 corrections officers. If regularly observed, a requirement that would effectively give the inmate the keys to the handcuffs that attached him to the hitching post would have made this case more analogous to the practice upheld in *Ort,* rather than the kind of punishment *Ort* described as impermissible. A course of conduct that tends to prove that the requirement was merely a sham, or that respondents could ignore it with impunity, provides equally strong support for the conclusion that they were fully aware of the wrongful character of their conduct.

> FN11. The regulation was not provided to the District Court, but it was added to the record at the request of the Court of Appeals. See App. 100-106.

Respondents violated clearly established law. Our conclusion that "a reasonable person would have known,"*Harlow,* 457 U.S., at 818, 102 S.Ct. 2727, of the violation is buttressed by the fact that the DOJ specifically advised the ADOC of the unconstitutionality of its practices before the incidents in this case took place. The DOJ had conducted a study in 1994 of Alabama's use of the hitching post. 240 F.3d, at 979. *745 Among other findings, the DOJ report noted that ADOC's officers consistently failed to comply with the policy of immediately releasing any inmate from the hitching post who agrees to return to work. The DOJ concluded that the systematic use of the restraining bar in Alabama constituted improper corporal punishment. *Ibid.* Accordingly, the DOJ advised the ADOC to cease use of the hitching post in order to meet constitutional standards. The ADOC replied that it thought the post could permissibly be used " 'to preserve prison security and discipline.' " *Ibid.* In response, the DOJ informed the ADOC that, " '[a]lthough an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 S.Ct. 2508
536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

Page 12

emergency situation may warrant drastic action by corrections staff, our experts found that the "rail" is being used systematically as an improper punishment for relatively trivial offenses. Therefore, we have concluded that the use of the "rail" is without penological justification.' " *Ibid.* Although there is nothing in the record indicating that the DOJ's views were communicated to respondents, this exchange lends support to the view that reasonable officials in the ADOC should have realized that the use of the hitching post under the circumstances alleged by Hope violated the Eighth Amendment prohibition against cruel and unusual punishment.

The obvious cruelty inherent in this practice should have provided respondents with some notice that their alleged conduct violated Hope's constitutional protection against cruel and unusual punishment. Hope was treated in a way antithetical to human dignity-he was hitched to a post for an extended period of time in a position that was painful, and under circumstances that were both degrading and dangerous. This wanton treatment was not done of necessity, but as punishment for prior conduct. Even if there might once have been a question regarding the constitutionality of this practice, the Eleventh Circuit precedent of *Gates* and *Ort,* as well as the DOJ report condemning the practice, put a reasonable officer on notice that the use of the hitching **\*746** post under the circumstances alleged by Hope was unlawful. The "fair and clear warning," *Lanier,* 520 U.S., at 271, 117 S.Ct. 1219, that these cases provided was sufficient to preclude the defense of qualified immunity at the summary judgment stage.

V

In response to Justice THOMAS' thoughtful dissent, we make the following three observations. The first is that in granting certiorari to review the summary judgment entered in favor of the officers, we did not take any question about the sufficiency of pleadings and affidavits to raise a genuine possibility that the three named officers were responsible for the punitive acts of shackling alleged. All

questions raised by petitioner (the plaintiff against whom summary judgment was entered) go to the application of the standard that no immunity is available for official acts when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v.* **\*\*2519** *Katz,* 533 U.S., at 202, 121 S.Ct. 2151. The officers' brief in opposition to certiorari likewise addressed only the legal standard of what is clearly established. The resulting focus in the case was the Eleventh Circuit's position that a violation is not clearly established unless it is the subject of a prior case of liability on facts " 'materially similar' " to those charged. 240 F.3d, at 981. We did not take, and do not pass upon, the questions whether or to what extent the three named officers may be held responsible for the acts charged, if proved. Nothing in our decision forecloses any defense other than qualified immunity on the ground relied upon by the Court of Appeals.

Second, we may address the immunity question on the assumption that the act of field discipline charged on each occasion was handcuffing Hope to a hitching post for an extended period apparently to inflict gratuitous pain or discomfort, with no justification in threatened harm or a continuing refusal to work. *Id.,* at 980 (on neither occasion did Hope "refus[e] to work or encourag[e] other inmates to refuse to **\*747** work"). The Court of Appeals clearly held the act of cuffing petitioner to the hitching post itself to suffice as an unconstitutional act: "We find that cuffing an inmate to a hitching post for a period of time extending past that required to address an immediate danger or threat is a violation of the Eighth Amendment." *Ibid.* Although the court continued that "[t]his violation is exacerbated by the lack of proper clothing, water, or bathroom breaks," *ibid.,* this embellishment was not the basis of its decision, and our own decision adequately rests on the same assumption that sufficed for the Court of Appeals.

Third, in applying the objective immunity test of what a reasonable officer would understand, the significance of federal judicial precedent is a function in part of the Judiciary's structure. The unre-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

ported District Court opinions cited by the officers are distinguishable on their own terms.[FN12] But regardless, they would be no match for the Circuit precedents [FN13] in *Gates v. Collier,* 501 F.2d, at 1306, which held that "handcuffing inmates to the fence and to cells for long periods of time" was unconstitutional, and *Ort v. White,* 813 F.2d, at 326, which suggested that it would be unconstitutional to inflict gratuitous pain on an inmate (by refusing him water) when punishment was unnecessary to enforce *748 on-the-spot discipline. The vitality of *Gates* and *Ort* could not seriously be questioned in light of our own decisions holding that gratuitous infliction of punishment is unconstitutional, even in the prison context, see *supra,* at 2514 (citing *Whitley v. Albers,* 475 U.S., at 319, 106 S.Ct. 1078; *Rhodes v. Chapman,* 452 U.S., at 346, 101 S.Ct. 2392).

> FN12. In three of the decisions, the inmates were given the choice between working or being restrained. See *Whitson v. Gillikin,* No. CV-93-H-1517-NE (ND Ala., Jan. 24, 1994), p. 4, App. 84; *Dale v. Murphy,* No. CV-85-1091-H-S (SD Ala., Feb. 4, 1986), p. 2; *Ashby v. Dees,* No. CV-94-U-0605-NE (ND Ala., Dec. 27, 1994), p. 6. In others, the inmates were offered regular water and bathroom breaks. See *Lane v. Findley,* No. CV-93-C-1741-S (ND Ala., Aug. 4, 1994), p. 9; *Williamson v. Anderson,* No. CV-92-H-675-N (MD Ala., Aug. 18, 1993), p. 2; *Hollis v. Folsom,* No. CV-94-T-0052-N (MD Ala., Nov. 4, 1994), p. 9. Finally, in *Vinson v. Thompson,* No. CV-94-A-268-N (MD Ala., Dec. 9, 1994), the inmate was restrained for approximately 45 minutes. *Id.,* at 2.

> FN13. There are apparently no decisions on similar facts from other Circuits, presumably because Alabama is the only State to authorize the use of the hitching post in its prison system.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

Justice THOMAS, with whom THE CHIEF JUSTICE and Justice SCALIA join, dissenting.

The Court today subjects three prison guards to suit based on facts not alleged, law not clearly established, and its own **2520 subjective views on appropriate methods of prison discipline. Qualified immunity jurisprudence has been turned on its head.

I

Petitioner Larry Hope did not file this action against the State of Alabama. Nor did he sue all of the Alabama prison guards responsible for looking after him in the two instances that he was handcuffed to the restraining bar.[FN1] He chose instead to maintain this lawsuit against only three prison guards: Officer Gene McClaran, Sergeant Mark Pelzer, and Lieutenant Jim Gates. See 240 F.3d 975, 977, n. 2 (C.A.11 2001).[FN2] It is therefore strange that in the course of deciding that none of the three respondents is entitled to qualified *749 immunity the Court does not even bother to mention the nature of petitioner's specific allegations against McClaran, Pelzer, and Gates. The omission is both glaring and telling. When one examines the alleged conduct of the prison guards who are parties to this action, as opposed to the alleged conduct of *other* guards, who are *not* parties to this action, petitioner's case becomes far less compelling.

> FN1. Despite the Court's consistent use of the term "hitching post," the apparatus to which petitioner was handcuffed is a "restraining bar." See Ala. Dept. of Corrections Admin. Reg. No. 429, p. 1 (Oct. 26, 1993), reprinted in App. 102.

> FN2. While petitioner also sued five other guards in connection with the fight that occurred before he was affixed to the restraining bar on June 17, 1995, he later withdrew his claims against them and asked that they be dismissed from the case. See 240 F.3d, at 977, n. 2; Plaintiff's Spe-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 S.Ct. 2508
536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

cial Report and Brief in Response to Defendants' Motion for Summary Judgment (ND Ala.), pp. 1-2, 5-6, Record, Doc. No. 33.

The Court's imprecise account of the facts requires that the specific nature of petitioner's allegations against the three respondents be recounted. Petitioner claims that: (1) on May 11, 1995, Officer McClaran ordered that petitioner be affixed to the restraining bar;[FN3] (2) Sergeant Pelzer, on that same date, affixed him to the restraining bar;[FN4] and (3) Lieutenant Gates, on May 11 and June 7, 1995, affixed petitioner to the bar.[FN5] That is the sum and substance of petitioner's allegations against respondents.[FN6]

FN3. See Second Affidavit of Larry Hope (ND Ala.), at 2-3, Record, Doc. No. 32.

FN4. *Id.,* at 3.

FN5. *Id.,* at 3-4.

FN6. There is some confusion as to who actually affixed petitioner to the restraining bar on May 11. While petitioner "believe[s]" that Sergeant Pelzer did so, *id.,* at 3, the "Institutional Incident Report" produced by respondents and written by Officer McClaran indicates that Officers Keith Gates and Mark Dempsey placed petitioner on the bar, see *id.,* Exh. 2. Petitioner acknowledged that fact and attached the report to his second affidavit. See *id.,* at 3. Consequently, interpreting petitioner's pleadings in the light most favorable to him, I will assume that petitioner has alleged that Pelzer, Gates, and Dempsey cuffed him to the bar on May 11. Additionally, I will assume that the "Officer Keith Gates" mentioned in Officer McClaran's report is the same person as the Lieutenant Jim Gates who is a respondent in this case. It is worth noting, however, that respondents vigorously dispute petitioner's assertion that Lieutenant Jim Gates and Officer Keith Gates are one and the same, see

Brief for Respondents i, and petitioner has yet to produce any evidence to support this somewhat incredible claim.

With respect to McClaran and Pelzer, petitioner has *never* alleged that they participated in the June 7 incident that so **\*750** appalls the Court.[FN7] And with respect to Lieutenant Gates, petitioner has never alleged that Gates either participated in or was responsible for any of the June 7 events recounted by the Court other than **\*\*2521** attaching petitioner to the bar. Petitioner has never contended that Gates looked after or otherwise supervised him while he was on the bar. See Second Affidavit of Larry Hope (ND Ala.), Record, Doc. No. 32. Nor has petitioner ever claimed that Gates was responsible for keeping him on the bar for seven hours, removing his shirt,[FN8] denying him water, taunting him about his thirst, or giving water to dogs in petitioner's plain view. See *ibid.* The relevance of these facts, repeatedly referenced by the Court during the course of its legal analysis, see, *e.g., ante,* at 2514-2515, 2517-2518, therefore escapes me.

FN7. See, *e.g.,* Plaintiff's Special Report and Brief in Response to Defendant's Motion for Summary Judgment 1-2, Record, Doc. No. 33 ("[T]he only remaining claims are those against Defendants McClaran, Pelzer, and Gates in connection with the May 11, 1997 hitching post incident, and Defendant Gates in connection with the June 7 hitching post incident"); Second Affidavit of Larry Hope, Record, Doc. No. 32.

FN8. It is important to note that petitioner has never maintained that Gates placed him on the bar without a shirt. Rather, petitioner's first affidavit, see Affidavit of Larry Hope 2, Record, Doc. No. 1, as well as photographs appended as exhibits to petitioner's second affidavit, see Second Affidavit of Larry Hope, Exhs. 3-5, Record, Doc. No. 32, which were verified by petitioner as "taken while [he] was on the hitching post on June 7,"*id.,* at 5, indicate

122 S.Ct. 2508

536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

that petitioner's shirt was removed, if at all, after he was attached to the bar.

Then there are the events referenced in the Court's opinion that cannot even arguably be gleaned from the record. For instance, while the Court claims that on June 7 petitioner "was given no bathroom breaks," *ante,* at 2513, during his time on the bar, petitioner has never alleged that Gates or any other prison guard refused him bathroom breaks on that date. See Second Affidavit of Larry Hope, Record, Doc. No. 32. As a matter of fact, the District Court expressly found below that petitioner "was not denied restroom *751 breaks." Supplemental App. to Pet. for Cert. 2. In addition, photographs taken of petitioner attached to the restraining bar on June 7 show him wearing a t-shirt, revealing at a minimum that petitioner was not shirtless "all day." See Second Affidavit of Larry Hope, Exhs. 3-5, Record, Doc. No. 32; *id.,* at 5 (verifying that the photographs were "taken while [he] was on the hitching post on June 7").

Once one understands petitioner's specific allegations against respondents, the Eighth Amendment violation in this case is far from "obvious." *Ante,* at 2514. What is "obvious," however, is that the Court's explanation of how respondents violated the Eighth Amendment is woefully incomplete. The Court merely recounts petitioner's allegations regarding the events of June 7 and concludes that "[t]he use of the hitching post under these circumstances violated the 'basic concept underlying the Eighth Amendment[,] [which] is nothing less than the dignity of man.' " *Ante,* at 2514-2515 (quoting *Trop v. Dulles,* 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). The Court, however, fails to explain how respondents McClaran and Pelzer violated the Eighth Amendment, given that they had no involvement whatsoever in affixing petitioner to the restraining bar on June 7. The Court's reasoning as applied to respondent Gates is similarly inadequate since petitioner has never alleged that Gates bore any responsibility for most of the conduct on June 7 that supposedly renders the Eighth Amendment violation "obvious." FN9

FN9. In an effort to rehabilitate the Court's opinion, Justice STEVENS argues that the specific nature of respondents' connection to the events of May 11 and June 7 falls outside the scope of the questions presented. See *ante,* at 2518-2519. In conducting qualified immunity analysis, however, courts do not merely ask whether, taking the plaintiff's allegations as true, the plaintiff's clearly established rights were violated. Rather, courts must consider as well whether each defendant's alleged conduct violated the plaintiff's clearly established rights. For instance, an allegation that Defendant A violated a plaintiff's clearly established rights does nothing to overcome Defendant B's assertion of qualified immunity, absent some allegation that Defendant B was responsible for Defendant A's conduct. Similarly here, in the absence of any allegation by petitioner that respondents were in any way responsible for the behavior of other prison guards on May 11 and June 7, the conduct of those other guards should not be considered in analyzing whether respondents are entitled to qualified immunity.

*752 II

Once petitioner's allegations regarding respondents' conduct are separated from **2522 his other grievances and the mistreatment invented by the Court, this case presents one simple question: Was it clearly established in 1995 that the mere act of cuffing petitioner to the restraining bar (or, in the case of Officer McClaran, ordering petitioner's attachment to the restraining bar) violated the Eighth Amendment? The answer to this question is also simple: Obviously not.

A

The Court correctly states that respondents are entitled to qualified immunity unless their conduct violated " 'clearly established statutory or constitutional rights of which a reasonable person would

122 S.Ct. 2508
536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

have known.' " *Ante,* at 2515 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). But the Court then fails either to discuss or to apply the following important principles. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). If "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," then qualified immunity does not apply. *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). But if, on the other hand, "officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." *Malley, supra,* at 341, 106 S.Ct. 1092.

In evaluating whether it was clearly established in 1995 that respondents' conduct violated the Eighth Amendment, the Court of Appeals properly noted that "[i]t is important to analyze the facts in [the prior cases relied upon by petitioner where courts found Eighth Amendment violations], **\*753** and determine if they are materially similar to the facts in the case in front of us." 240 F.3d, at 981 (internal quotation marks omitted). The right not to suffer from "cruel and unusual punishments," U.S. Const., Amdt. 8, is an extremely abstract and general right. In the vast majority of cases, the text of the Eighth Amendment does not, in and of itself, give a government official sufficient notice of the clearly established Eighth Amendment law applicable to a particular situation.[FN10] Rather, one must look to case law to see whether "the right the official is alleged to have violated [has] been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

> FN10. Cf. *Saucier v. Katz,* 533 U.S. 194, 201-202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (discounting as too general the principle that a police officer's use of force violates the Fourth Amendment if it is ex-

cessive under objective standards of reasonableness).

In conducting this inquiry, it is crucial to look at precedent applying the relevant legal rule in similar factual circumstances. Such cases give government officials the best indication of what conduct is unlawful in a given situation. If, for instance, "various courts have agreed that certain conduct [constitutes an Eighth Amendment violation] under facts not distinguishable in a fair way from the facts presented in the case at hand,"*Saucier, supra,* at 202, 121 S.Ct. 2151, then a plaintiff would have a compelling argument that a defendant is not entitled to qualified immunity.

That is not to say, of course, that conduct can be "clearly established" as unlawful only if a court has already passed on the legality of that behavior under materially similar circumstances. Certain actions so obviously run afoul of the law that an assertion of qualified immunity may be overcome even though court decisions have yet to address "materially similar" conduct. Or, as the Court puts it, "officials can still **\*754** be on notice that their conduct violates established law even in novel factual circumstances." *Ante,* at 2516.

**\*\*2523** Although the Court argues that the Court of Appeals has improperly imposed a "rigid gloss on the qualified immunity standard,"*ante,* at 2515, and n. 9, requiring that the facts of a previous case be materially similar to a plaintiff's circumstances for qualified immunity to be overcome, this suggestion is plainly wrong. Rather, this Court of Appeals has repeatedly made clear that it imposes no such requirement on plaintiffs seeking to defeat an assertion of qualified immunity. See, *e.g., Priester v. Riviera Beach,* 208 F.3d 919, 926 (C.A.11 2000) (stating that qualified immunity does not apply if an official's conduct "was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without case law on point" (internal quotation marks omitted)); *Smith v. Mattox,* 127 F.3d 1416, 1419 (C.A.11 1997) (noting that a plaintiff can overcome an assertion of quali-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 S.Ct. 2508

536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

fied immunity by demonstrating "that the official's conduct lies so obviously at the very core of what the [Constitution] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw"); *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1150, n. 4 (C.A.11 1994) ("[O]ccasionally the words of a federal statute or federal constitutional provision will be specific enough to establish the law applicable to particular circumstances clearly and to overcome qualified immunity even in the absence of case law").

Similarly, it is unfair to read the Court of Appeals' decision as adopting such a "rigid gloss" here. Nowhere did the Court of Appeals state that petitioner, in order to overcome respondents' assertion of qualified immunity, was required to produce precedent addressing "materially similar" facts. Rather, the Court of Appeals merely (and sensibly) evaluated the cases relied upon by petitioner to determine whether they involved facts "materially similar" to those **\*755** present in this case. See 240 F.3d, at 981 ("It is important to analyze the facts in these cases, and determine if they are 'materially similar' to the facts in the case in front of us").

To be sure, the Court of Appeals did not also ask whether respondents' conduct so obviously violated the Eighth Amendment that respondents' assertion of qualified immunity could be overcome in the absence of case law involving "materially similar" facts. The majority must believe that the Court of Appeals, therefore, has implicitly abandoned its prior qualified immunity jurisprudence. I, on the other hand, believe it is far more likely that the Court of Appeals omitted such a discussion from its opinion for a much simpler reason: Given petitioner's allegations, it thought that the argument was so weak, and the alleged actions of respondents so far removed from " 'the hazy border between excessive and acceptable force,' "*Priester, supra,* at 926 (quoting *Smith, supra,* at 1419), that it was not worth mentioning.

B

Turning to the merits of respondents' assertion that they are entitled to qualified immunity, the relevant question is whether it should have been clear to McClaran, Pelzer, and Gates in 1995 that attaching petitioner to a restraining bar violated the Eighth Amendment. As the Court notes, at that time Alabama was the only State that used this particular disciplinary method when prisoners refused to work or disrupted work squads. See *ante,* at 2512.Previous litigation over Alabama's use of the restraining bar, however, did nothing to warn reasonable Alabama prison guards that attaching a prisoner to a restraining bar was unlawful, let alone that the illegality of such conduct was clearly established. In fact, the outcome of those cases effectively forecloses petitioner's claim that it should have been clear to respondents in 1995 that handcuffing petitioner to a restraining bar violated the Eighth Amendment.

**\*\*2524 \*756** For example, a year before the conduct at issue in this case took place, the United States District Court for the Northern District of Alabama rejected the Eighth Amendment claim of an Alabama prisoner who was attached to a restraining bar for five hours after he refused to work and scuffled with guards. See *Lane v. Findley,* No. CV-93-C-1741-S (Aug. 4, 1994). The District Court reasoned that attaching the prisoner to a restraining bar "was a measured response to a potentially volatile situation and a clear warning to other inmates that refusal to work would result in immediate discipline subjecting the offending inmate to similar conditions experienced by work detail inmates rather than a return to inside the institution." *Id.,* at 9. The District Court therefore concluded that there was a "substantial penological justification" for attaching the plaintiff to the restraining bar. *Ibid.*

Both the Court and petitioner attempt to distinguish this case from *Lane* on the grounds that the prisoner in *Lane* was "offered regular water and bathroom breaks" while on the restraining bar. See *ante,* at 2519, n. 12; Reply Brief for Petitioner 16, n. 5. But this argument fails for two reasons: (1) Respondents McClaran and Pelzer were involved

536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

only in the May 11 incident, and it is undisputed that petitioner was offered water and a bathroom break every 15 minutes during his 2 hours on the bar that day; and (2) petitioner, as previously mentioned, has never alleged that respondent Gates was responsible for denying him water or bathroom breaks on June 7.

The same year that it decided *Lane,* the United States District Court for the Northern District of Alabama dismissed another complaint filed by an Alabama prisoner who was handcuffed to a restraining bar. In that case, the prisoner, after refusing to leave prison grounds with his work squad, was handcuffed to a restraining bar for eight hours. Temperatures allegedly reached 95 degrees while the prisoner was attached to the bar, and he was allegedly denied **\*757** food, water, and any opportunities to use bathroom facilities. See *Whitson v. Gillikin,* No. CV-93-H-1517-NE (Jan. 24, 1994), p. 7, App. 81. As a result of being handcuffed to the bar, the prisoner "suffered lacerations, pain, and swelling in his arms." *Id.,* at 85. The District Court, without deciding whether the defendants' conduct violated the Eighth Amendment, held that "there was no clearly established law identifying [their behavior] as unconstitutional." *Id.,* at 88.

Federal District Courts in five other Alabama cases decided before 1995 similarly rejected claims that handcuffing a prisoner to a restraining bar or other stationary object violated the Eighth Amendment. See, *e.g., Ashby v. Dees,* No. CV-94-U-0605-NE (ND Ala., Dec. 27, 1994) (fence); *Vinson v. Thompson,* No. CV-94-A-268-N (MD Ala., Dec. 9, 1994) (restraining bar); *Hollis v. Folsom,* No. CV-94-T-0052-N (MD Ala., Nov. 4, 1994) (fence); *Williamson v. Anderson,* No. CV-92-H-675-N (MD Ala., Aug. 18, 1993) (fence); *Dale v. Murphy,* No. CV-85-1091-H-S (SD Ala., Feb. 4, 1986) (light pole).[FN11] By **\*\*2525** contrast, petitioner is unable to point to any Alabama decision issued before respondents **\*758** affixed him to the restraining bar holding that a prison guard engaging in such conduct violated the Eighth Amendment.

FN11. The Court's attempt to distinguish away all of these decisions only serves to undermine further its qualified immunity analysis. The Court appears to suggest that affixing a prisoner to a restraining bar is not clearly unlawful so long as (1) guards provide the prisoner with water and regular bathroom breaks, or (2) the prisoner is placed on the restraining bar as a result of his refusal to work. See *ante,* at 2519, n. 12. But as previously explained, see *supra,* at 2524, petitioner was offered water and bathroom breaks every 15 minutes during his May 11 stay on the bar, and there has never been any allegation either that respondents McClaran and Pelzer were involved at all in the June 7 incident or that respondent Gates was responsible for denying petitioner water or bathroom breaks on that date. As a result, even under the Court's own view of the law, respondents are entitled to qualified immunity. Moreover, the Court nowhere explains how respondents were supposed to figure out in 1995 that it was permissible to affix prisoners to a restraining bar if they refused to work but it was unlawful to do so if they were disruptive while on work duty. The claim that such a distinction was clearly established in Eighth Amendment jurisprudence at that time is nothing short of incredible.

In the face of these decisions, and the absence of contrary authority, I find it impossible to conclude that respondents either were "plainly incompetent" or "knowingly violat[ing] the law" when they affixed petitioner to the restraining bar. *Malley,* 475 U.S., at 341, 106 S.Ct. 1092. A reasonably competent prison guard attempting to obey the law is not only entitled to look at how courts have recently evaluated his colleagues' prior conduct, such judicial decisions are often the only place that a guard can look for guidance, especially in a situation where a State stands alone in adopting a particular policy.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 S.Ct. 2508

536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

### C

In concluding that respondents are not entitled to qualified immunity, the Court is understandably unwilling to hold that our Eighth Amendment jurisprudence clearly established in 1995 that attaching petitioner to a restraining bar violated the Eighth Amendment.[FN12] *Ante,* at 2516. It is far from "obvious," *ante,* at 2514, 2516, that respondents, by attaching petitioner to a restraining bar, acted with "deliberate indifference" to his health and safety. *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Petitioner's allegations do not come close to suggesting that respondents knew that the mere act of attaching**759** petitioner to the restraining bar imposed "a substantial risk of serious harm" upon him. See *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). If, for instance, attaching petitioner to a restraining bar amounted to the "gratuitous infliction of 'wanton and unnecessary' pain,"*ante,* at 2515, it is curious that petitioner, while handcuffed to the bar on May 11, chose to decline most of the bathroom breaks offered to him. Respondents also affixed petitioner to the restraining bar for a legitimate penological purpose: encouraging his compliance with prison rules while out on work duty.

> FN12. I continue to believe that "[c]onditions of confinement are not punishment in any recognized sense of the term, unless imposed as part of a sentence." *Farmer v. Brennan,* 511 U.S. 825, 859, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (THOMAS, J., concurring in judgment). As a result, I do not think, as an original matter, that attaching petitioner to the restraining bar constituted "punishment" under the Eighth Amendment. See *ibid.* Nevertheless, I recognize that this Court has embraced the opposite view-that the Eighth Amendment does regulate prison conditions not imposed as part of a sentence, see, *e.g., Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)-so I will apply that jurisprudence in evaluating whether respondents' conduct

violated clearly established law. I note, however, that I remain open to overruling our dubious expansion of the Eighth Amendment in an appropriate case. See *Farmer, supra,* at 861-862, 114 S.Ct. 1970 (THOMAS, J., concurring in judgment).

Moreover, if the application of this Court's general Eighth Amendment jurisprudence to the use of a restraining bar was as "obvious" as the Court claims, *ante,* at 2514, 2516, one wonders how Federal District Courts in Alabama could have repeatedly arrived at the opposite conclusion, and how respondents, in turn, were to realize that these courts had failed to grasp the "obvious."

### D

Unable to base its holding that respondents' conduct violated " 'clearly established ... rights of which a reasonable person would have known,' " *ante,* at 2516 (quoting *Harlow,* 457 U.S., at 818, 102 S.Ct. 2727), on this Court's precedents, the Court instead relies upon "binding Eleventh Circuit precedent, an Alabama Department of Corrections (ADOC) regulation,**2526** and a [Department of Justice] report informing the ADOC of the constitutional infirmity in its use of the hitching post,"*ante,* at 2516. I will address these sources in reverse order.

The Department of Justice report referenced by the Court does nothing to demonstrate that it should have been clear to respondents that attaching petitioner to a restraining bar violated his Eighth Amendment rights. To begin with, the Court concedes that there is no indication the Justice Department's recommendation that the ADOC stop using the restraining bar was ever communicated to respondents, prison guards in the small town of Capshaw, Alabama. See *760 ante,* at 2518. In any event, an extraordinarily well-informed prison guard in 1995, who had read both the Justice Department's report and Federal District Court decisions addressing the use of the restraining bar, could have concluded only that there was a dispute as to whether handcuffing a prisoner to a restrain-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

ing bar constituted an Eighth Amendment violation, not that such a practice was clearly unconstitutional.

The ADOC regulation relied upon by the Court not only fails to provide support for its holding today; the regulation weighs in respondents' favor because it expressly authorized prison guards to affix prisoners to a restraining bar when they were "disruptive to the work squad." App. 102. Alabama prison guards were entitled to rely on the validity of a duly promulgated state regulation instructing them to attach prisoners to a restraining bar under specified circumstances. See *Wilson v. Layne,* 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (crediting officer's reliance on Marshals Service policy as "important" to the conclusion that qualified immunity was warranted in an area where the state of the law "was at best undeveloped"). And, as the Court recounts, petitioner was placed on the restraining bar after entering into an argument with another inmate while on work duty (May 11) and a wrestling match with a guard when arriving at his work site (June 7). *Ante,* at 2512.

The Court argues that respondents must have been "aware of the wrongful character of their conduct" because they did not precisely abide by the policy set forth in the ADOC regulation. *Ante,* at 2518. Even taking petitioner's allegations as true, however, I am at a loss to understand how respondents failed to comply with the regulation. With respect to respondents McClaran and Pelzer, who were involved only in the May 11 incident, the Court concedes that the required activity log was filled out on that date, and petitioner was offered water and bathroom breaks every 15 minutes. *Ante,* at 2512, 2517. With respect to respondent Gates, the Court complains that no such log exists for petitioner's **\*761** June 7 stay on the bar and the record suggests that the periodic water and bathroom-break offers contemplated by the regulation were not made. Petitioner, however, has never alleged that Gates was responsible for supervising or looking after him once he was handcuffed to the post. He has only alleged that Gates placed him there.

While the Court also observes that the regulation provides that an inmate " 'will be allowed to join his assigned squad' " whenever he tells an officer " 'that he is ready to go to work,' " *ante,* at 2517 (quoting App. 103), the Court again does not explain how any of the respondents in this case failed to observe this requirement. Petitioner has never alleged that he informed respondents or any other prison guard while he was on the bar that he was ready to go to work.

Finally, the "binding Eleventh Circuit precedent" relied upon by the Court, *ante,* at 2516-2517, was plainly insufficient to give respondents fair warning that their alleged conduct ran afoul of petitioner's Eighth Amendment rights. The Court of Appeals held in *Ort v. White,* 813 F.2d 318 (C.A.11 1987), that a prison guard did not **\*\*2527** violate an inmate's Eighth Amendment rights by denying him water when he refused to work, and the Court admits that this holding provides no support for petitioner. Instead, it claims that the "reasoning" in *Ort* "gave fair warning to respondents that their conduct crossed the line of what is constitutionally permissible." *Ante,* at 2517. But *Ort* provides at least as much support to respondents as it does to petitioner. For instance, *Ort* makes it abundantly clear that prison guards "have the authority to use that amount of force or those coercive measures reasonably necessary to enforce an inmate's compliance with valid prison rules" so long as such measures are not undertaken "maliciously or sadistically." 813 F.2d, at 325.

To be sure, the Court correctly notes that the Court of Appeals in *Ort* suggested that it "might have reached a different decision" had the prison officer denied the inmate **\*762** water after he had returned to the prison instead of while he was out with the work squad. *Id.,* at 326. But the suggestion in dicta that a guard might have violated a prisoner's Eighth Amendment rights by denying him water once he returned from work duty does not come close to clearly establishing the unconstitutionality of attaching a disruptive inmate to a restraining bar after he is removed from his work squad and back within prison walls.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**

Admittedly, the other case upon which the Court relies, *Gates v. Collier,* 501 F.2d 1291 (C.A.5 1974), is more on point. Nevertheless, *Gates* is also inadequate to establish clearly the unlawfulness of respondents' alleged conduct. In *Gates,* the Court of Appeals listed "handcuffing inmates to [a] fence and to cells for long periods of time" as one of many unacceptable forms of "physical brutality and abuse" present at a Mississippi prison. *Id.,* at 1306. Others included administering milk of magnesia as a form of punishment, depriving inmates of mattresses, hygienic materials, and adequate food, and shooting at and around inmates to keep them standing or moving. See *ibid.* The Court of Appeals had "no difficulty in reaching the conclusion that these forms of corporal punishment run afoul of the Eighth Amendment." *Ibid.*

It is not reasonable, however, to read *Gates* as establishing a bright-line rule forbidding the attachment of prisoners to a restraining bar. For example, in referring to the fact that prisoners were handcuffed to a fence and cells "for long periods of time," the Court of Appeals did not indicate whether it considered a "long period of time" to be 1 hour, 5 hours, or 25 hours. The Court of Appeals also provided no explanation of the circumstances surrounding these incidents. The opinion does not indicate whether the handcuffed prisoners were given water and suitable restroom breaks or whether they were handcuffed in a bid to induce them to comply with prison rules. In the intervening 21 years between *Gates* and the time respondents affixed petitioner to **\*763** the restraining bar, there were no further decisions clarifying the contours of the law in this area. Therefore, as another court interpreting *Gates* has noted: "There is no blanket prohibition against the use of punishment such as the hitching post in *Gates* which would signal to the Commissioner of Corrections [let alone ordinary corrections officers] that the mere use of the hitching post would be a constitutional violation." *Fountain v. Talley,* 104 F.Supp.2d 1345, 1354 (M.D.Ala.2000).

Moreover, Eighth Amendment law has not stood still since *Gates* was decided. In *Farmer v.*

*Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), this Court elucidated the proper test for measuring whether a prison official's state of mind is one of "deliberate indifference," holding that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate **\*\*2528** health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.,* at 837, 114 S.Ct. 1970. Because the Court of Appeals in *Gates* did not consider this subjective element, *Gates* alone could not have clearly established that affixing prisoners to a restraining bar was clearly unconstitutional in 1995. Also, in the face of recent Federal District Court decisions specifically rejecting prisoners' claims that Alabama prison guards violated their Eighth Amendment rights by attaching them to a restraining bar as well as a state regulation authorizing such conduct, it seems contrary to the purpose of qualified immunity to hold that one vague sentence plucked out of a 21-year-old Court of Appeals opinion provided clear notice to respondents in 1995 that their conduct was unlawful.

\* \* \*

It is most unfortunate that the Court holds that Officer McClaran, Sergeant Pelzer, and Lieutenant Gates are not **\*764** entitled to qualified immunity. It was not at all clear in 1995 that respondents' conduct violated the Eighth Amendment, and they certainly could not have anticipated that this Court or any other would rule against them on the basis of nonexistent allegations or allegations involving the behavior of other prison guards. For the foregoing reasons, I would affirm the judgment of the Court of Appeals. I respectfully dissent.

U.S.,2002.
Hope v. Pelzer
536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666, 70 USLW 4710, 02 Cal. Daily Op. Serv. 5768, 2002 Daily Journal
D.A.R. 7285, 15 Fla. L. Weekly Fed. S 511
**(Cite as: 536 U.S. 730, 122 S.Ct. 2508)**


Daily Journal D.A.R. 7285, 15 Fla. L. Weekly Fed.
S 511

END OF DOCUMENT

121 S.Ct. 2151                                                          Page 1

533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal
D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361
**(Cite as: 533 U.S. 194, 121 S.Ct. 2151)**

▷

Saucier v. Katz
U.S.,2001.

Supreme Court of the United States
Donald SAUCIER, Petitioner,
v.
Elliot M. KATZ and In Defense of Animals.
No. 99-1977.

Argued March 20, 2001.
Decided June 18, 2001.

Demonstrator who had been arrested by military police officer after he attempted to unfurl banner at public event where Vice President of the United States was speaking brought *Bivens* action, alleging violations of numerous rights. Officer moved for summary judgment on basis of qualified immunity with respect to demonstrator's claim that officer used excessive force in violation of Fourth Amendment. The United States District Court for the Northern District of California, D. Lowell Jensen, J., denied motion. Officer appealed. The United States Court of Appeals for the Ninth Circuit, 194 F.3d 962, affirmed. Certiorari was granted. The Supreme Court, Justice Kennedy, held that: (1) inquiry as to whether officers are entitled to qualified immunity for the use of excessive force is distinct from inquiry on the merits of the excessive force claim, and (2) officer was entitled to qualified immunity.

Reversed and remanded.

Justice Ginsburg filed concurring opinion in which Justices Stevens and Breyer joined.

Justice Souter filed opinion concurring in part and dissenting in part.

West Headnotes

**[1] Civil Rights 78 ⟜1376(1)**

78 Civil Rights
    78III Federal Remedies in General

        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(1) k. In General. Most Cited Cases
    (Formerly 78k214(1))
Where a government official seeks qualified immunity from a civil rights action, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.

**[2] Civil Rights 78 ⟜1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(1) k. In General. Most Cited Cases
    (Formerly 78k214(1))
"Qualified immunity" from a civil rights action is an entitlement not to stand trial or face the other burdens of litigation.

**[3] Officers and Public Employees 283 ⟜114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases
The privilege of "qualified immunity" is an immunity from suit rather than a mere defense to liability.

**[4] Civil Rights 78 ⟜1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers

533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal
D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361
**(Cite as: 533 U.S. 194, 121 S.Ct. 2151)**

78k1376(1) k. In General. Most Cited
Cases
(Formerly 78k214(1))
Like absolute immunity, qualified immunity from a
civil rights action is effectively lost if a case is erro-
neously permitted to go to trial.

**[5] Civil Rights 78 ⟳1376(1)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith
and Probable Cause
         78k1376 Government Agencies and Of-
ficers
           78k1376(1) k. In General. Most Cited
Cases
     (Formerly 78k214(1))
A court required to rule upon qualified immunity of
a government official in a civil rights action must
consider, as its initial inquiry, whether the facts al-
leged, taken in the light most favorable to the party
asserting the injury, show that the official's conduct
violated a constitutional right.

**[6] Civil Rights 78 ⟳1376(2)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith
and Probable Cause
         78k1376 Government Agencies and Of-
ficers
           78k1376(2) k. Good Faith and Reason-
ableness; Knowledge and Clarity of Law; Motive
and Intent, in General. Most Cited Cases
     (Formerly 78k214(2))
If a court determines, in ruling on a qualified im-
munity issue in a civil rights action against a gov-
ernment official, that a favorable view of plaintiff's
alleged facts show that official's conduct violated a
constitutional right, court's next step is to ask
whether such right was clearly established; this in-
quiry must be undertaken in light of the specific
context of the case, not as a broad general proposi-
tion.

**[7] Civil Rights 78 ⟳1376(2)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith
and Probable Cause
         78k1376 Government Agencies and Of-
ficers
           78k1376(2) k. Good Faith and Reason-
ableness; Knowledge and Clarity of Law; Motive
and Intent, in General. Most Cited Cases
     (Formerly 78k214(2))
In determining whether a constitutional right is
"clearly established," as required for plaintiff to de-
feat government official's claim of qualified im-
munity in civil rights action, the relevant, disposit-
ive inquiry is whether it would be clear to a reason-
able official that his conduct was unlawful in the
situation he confronted.

**[8] Federal Civil Procedure 170A ⟳2491.5**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
       170AXVII(C)2 Particular Cases
         170Ak2491.5 k. Civil Rights Cases in
General. Most Cited Cases
For purposes of determining if a government offi-
cial is entitled to qualified immunity from a civil
rights action, if the law did not put the official on
notice that his conduct would be clearly unlawful,
summary judgment based on qualified immunity is
appropriate.

**[9] Civil Rights 78 ⟳1376(6)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith
and Probable Cause
         78k1376 Government Agencies and Of-
ficers
           78k1376(6) k. Sheriffs, Police, and
Other Peace Officers. Most Cited Cases
     (Formerly 78k214(6))
Inquiry as to whether officers are entitled to quali-
fied immunity for the use of excessive force is dis-
tinct from inquiry on the merits of the excessive

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal
D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361
**(Cite as: 533 U.S. 194, 121 S.Ct. 2151)**

force claim; if an officer is mistaken regarding amount of force that is legal, but such mistake is reasonable, officer is entitled to immunity defense. U.S.C.A. Const.Amend. 4.

**[10] United States 393 €==50.10(3)**

393 United States
   393I Government in General
      393k50 Liabilities of Officers or Agents for Negligence or Misconduct
         393k50.10 Particular Acts or Claims
            393k50.10(3) k. Criminal Law Enforcement and Investigation; Prisoners' Claims. Most Cited Cases

Military police officer who arrested demonstrator at public event where Vice President of the United States was speaking and allegedly shoved him into van, after demonstrator attempted to unfurl banner and place it on barrier separating public from area designated for speakers, was entitled to qualified immunity from demonstrator's *Bivens* claim alleging excessive force; a reasonable officer could have believed that hurrying demonstrator away from the scene was within the bounds of appropriate police responses. U.S.C.A. Const.Amend. 4.

**\*\*2152** *Syllabus* FN\*

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**\*194** Respondent Katz, president of respondent In Defense of Animals, filed a suit pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619, against, *inter alios,* petitioner Saucier, a military policeman. Katz alleged, among other things, that Saucier had violated his Fourth Amendment rights by using excessive force in arresting him while he protested during Vice President Gore's speech at a San Francisco army base. The District Court declined to grant Saucier summary judgment on qualified immunity grounds. In affirming, the Ninth Circuit

made a two-part qualified immunity inquiry. First, it found that the law governing Saucier's conduct was clearly established when the incident occurred. It therefore moved to a second step: to determine if a reasonable officer could have believed, in light of the clearly established law, that his conduct was lawful. The court concluded that this step and the merits of a Fourth Amendment excessive force claim are identical, since both concern the objective reasonableness of the officer's conduct in light of the circumstances the officer faced at the scene. Thus, it found, summary judgment based on qualified immunity was inappropriate.

*Held:*

1. A qualified immunity ruling requires an analysis not susceptible of fusion with the question whether unreasonable force was used in making the arrest. The Ninth Circuit's approach cannot be reconciled with *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523. A qualified immunity defense must be considered in proper sequence. A ruling should be made early in the proceedings so that the cost and expenses of trial are avoided where the defense is dispositive. Such immunity is an entitlement not to stand trial, not a defense from liability. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411. The initial inquiry is whether a constitutional right would have been violated on the facts alleged, for if no right would have been violated, there is no need for further inquiry into immunity. However, if a violation **\*\*2153** could be made out on a favorable view of the parties' submissions, the next, sequential step is whether the right was clearly established. This inquiry must be undertaken in light of the case's specific context, not as a broad general proposition. The relevant, dispositive inquiry is whether it would be clear to a reasonable**\*195** officer that the conduct was unlawful in the situation he confronted. See *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818. The Ninth Circuit's approach-to deny summary judgment if a material issue of fact remains on the excessive force claim-could undermine the goal of qualified immunity to avoid excessive disruption of government and per-

533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361
**(Cite as: 533 U.S. 194, 121 S.Ct. 2151)**

mit the resolution of many insubstantial claims on summary judgment. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396. If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. The Ninth Circuit concluded that qualified immunity is duplicative in an excessive force case, thus eliminating the need for the second step. In holding that qualified immunity applied in the Fourth Amendment context just as it would for any other official misconduct claim, the *Anderson* Court rejected the argument that there is no distinction between the reasonableness standard for warrantless searches and the qualified immunity inquiry. In an attempt to distinguish *Anderson,* Katz claims that the subsequent *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443, decision set forth an excessive force analysis indistinguishable from qualified immunity, thus rendering the separate immunity inquiry superfluous and inappropriate in such cases. Contrary to his arguments, the immunity and excessive force inquiries remain distinct after *Graham. Graham* sets forth factors relevant to the merits of a constitutional excessive force claim, which include the severity of the crime, whether the suspect poses a threat to the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.,* at 396, 109 S.Ct. 1865. If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed. The qualified immunity inquiry's concern, on the other hand, is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. An officer might correctly perceive all of the relevant facts, but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. Pp. 2155-2159.

2. Petitioner was entitled to qualified immunity. Assuming that a constitutional violation occurred under the facts alleged, the question is whether this general prohibition was the source for clearly established law that was contravened in the circumstances. In the circumstances presented to

petitioner, which included the duty to protect the Vice President's safety and security from persons unknown in number, there was no clearly established rule prohibiting him from acting as he did. This conclusion is confirmed by the uncontested fact that the force used-dragging Katz from the area and shoving him while placing **\*196** him into a van-was not so excessive that Katz suffered hurt or injury. Pp. 2159-2160.

194 F.3d 962, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and O'CONNOR, SCALIA, and THOMAS, JJ., joined, and in which SOUTER, J., joined as to Parts I and II. GINSBURG, J., filed an opinion concurring in the judgment, in which STEVENS and BREYER, JJ., joined, *post,* p. 2160. SOUTER, J., filed an opinion concurring in part and dissenting in part, *post,* p. 2164.

Paul D. Clement, Washington, DC, for petitioner.
John K. Boyd, Del City, OK, for respondents.**\*\*2154** For U.S. Supreme Court briefs, see:2001 WL 40985 (Pet.Brief)2001 WL 173527 (Resp.Brief)2001 WL 253137 (Reply.Brief)
**\*197** Justice KENNEDY delivered the opinion of the Court.

In this case a citizen alleged excessive force was used to arrest him. The arresting officer asserted the defense of qualified immunity. The matter we address is whether the requisite analysis to determine qualified immunity is so intertwined with the question whether the officer used excessive force in making the arrest that qualified immunity and constitutional violation issues should be treated as one question, to be decided by the trier of fact. The Court of Appeals held the inquiries do merge into a single question. We now reverse and hold that the ruling on qualified immunity requires an analysis not susceptible of fusion with the question whether unreasonable force was used in making the arrest.

I

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2151
533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal
D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361
**(Cite as: 533 U.S. 194, 121 S.Ct. 2151)**

In autumn of 1994, the Presidio Army Base in San Francisco was the site of an event to celebrate conversion of the base to a national park. Among the speakers was Vice President Albert Gore, Jr., who attracted several hundred observers from the military and the general public. Some in attendance were not on hand to celebrate, however. Respondent Elliot Katz was concerned that the Army's Letterman Hospital would be used for conducting experiments on animals. (Katz was president of a group called In Defense of Animals. Although both he and the group are respondents here, the issues we discuss center upon Katz, and we refer to him as "respondent.") To voice opposition to the possibility that the hospital might be used for experiments, respondent brought with him a cloth banner, approximately 4 by 3 feet, that read "Please Keep Animal Torture Out of Our National Parks." In the past, as respondent was aware, members of the public had been asked to leave the military base when they engaged in certain activities, such as distributing handbills; and he kept the banner concealed under his jacket as he walked through the base.

**\*198** The area designated for the speakers contained seating for the general public, separated from the stage by a waist-high fence. Respondent sat in the front row of the public seating area. At about the time Vice President Gore began speaking, respondent removed the banner from his jacket, started to unfold it, and walked toward the fence and speakers' platform.

Petitioner Donald Saucier is a military police officer who was on duty that day. He had been warned by his superiors of the possibility of demonstrations, and respondent had been identified as a potential protester. Petitioner and Sergeant Steven Parker-also a military police officer, but not a party to the suit-recognized respondent and moved to intercept him as he walked toward the fence. As he reached the barrier and began placing the banner on the other side, the officers grabbed respondent from behind, took the banner, and rushed him out of the area. Each officer had one of respondent's arms, half-walking, half-dragging him, with his feet "barely touching the ground." App. 24.

Respondent was wearing a visible, knee-high leg brace, although petitioner later testified he did not remember noticing it at the time. Saucier and Parker took respondent to a nearby military van, where, respondent claims, he was shoved or thrown inside. *Id.,* at 25. The reason for the shove remains unclear. It seems agreed that respondent placed his feet somewhere on the outside of the van, perhaps the bumper, but there is a dispute whether he did so to resist. As a result of the shove, respondent claims, he fell to the floor of the van, where he caught himself just in time to avoid any injury. The officers drove respondent to a military police station, held him for a brief time, and then released him. Though the details are **\*\*2155** not clear, it appears that at least one other protester was also placed into the van and detained for a brief time. *Id.,* at 27.

Respondent brought this action in the United States District Court for the Northern District of California against **\*199** petitioner and other officials pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), alleging, *inter alia,* that defendants had violated respondent's Fourth Amendment rights by using excessive force to arrest him. The District Court granted the defendants' motions for summary judgment on the grounds of qualified immunity on all claims other than the excessive force claim against Saucier. It held a dispute on a material fact existed concerning whether excessive force was used to remove respondent from the crowd and place him into the van. App. to Pet. for Cert. 27a. The District Court held that the law governing excessive force claims was clearly established at the time of the arrest, and that "[i]n the Fourth Amendment context, the qualified immunity inquiry is the same as the inquiry made on the merits." *Id.,* at 29a-30a. As a result, it ruled, petitioner was not entitled to summary judgment. *Id.,* at 30a.

In the United States Court of Appeals for the Ninth Circuit petitioner filed an interlocutory appeal from the denial of qualified immunity. 194 F.3d 962 (1999). The Court of Appeals affirmed, noting at the outset its two-part analysis for qualified immunity questions. First, the Court of Ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361
**(Cite as: 533 U.S. 194, 121 S.Ct. 2151)**

peals considers "whether the law governing the official's conduct was clearly established." *Id.,* at 967. If it was not, that ends the matter, and the official is entitled to immunity. If, however, the law was clearly established when the conduct occurred, the Court of Appeals' second step is to determine if a reasonable officer could have believed, in light of the clearly established law, that his conduct was lawful. *Ibid.* As to the first step of its analysis, the court observed that *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), sets forth the objective reasonableness test for evaluating excessive force claims, a principle the Court of Appeals concluded was clearly established for qualified immunity purposes. The court then concluded that the second step of the qualified immunity inquiry and the merits of the Fourth *200 Amendment excessive force claim are identical, since both concern the objective reasonableness of the officer's conduct in light of the circumstances the officer faced on the scene. 194 F.3d, at 968. On this reasoning, summary judgment based on qualified immunity was held inappropriate. *Id.,* at 968-969.

Saucier, represented by the Government of the United States, sought review here, arguing the Court of Appeals erred in its view that the qualified immunity inquiry is the same as the constitutional inquiry and so becomes superfluous or duplicative when excessive force is alleged. We granted certiorari, 531 U.S. 991, 121 S.Ct. 480, 148 L.Ed.2d 454 (2000).

II

The Court of Appeals ruled first that the right was clearly established; and second that the reasonableness inquiry into excessive force meant that it need not consider aspects of qualified immunity, leaving the whole matter to the jury. 194 F.3d, at 967. This approach cannot be reconciled with *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), however, and was in error in two respects. As we shall explain, the first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, as-

suming the violation is established, the question whether the right was clearly established must be considered on a more specific level than recognized by the Court of Appeals.

[1][2][3][4] In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. Where the defendant seeks qualified**2156 immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The privilege is "an *immunity from suit* rather than a mere defense to liability;*201 and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Ibid.*As a result, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)*(per curiam).*

[5] A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361
**(Cite as: 533 U.S. 194, 121 S.Ct. 2151)**

[6] If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.

[7] In this litigation, for instance, there is no doubt that *Graham v. Connor, supra,* clearly establishes the general *202 proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough. Rather, we emphasized in *Anderson* "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." 483 U.S., at 640, 107 S.Ct. 3034. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. See *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ("[A]s we explained in *Anderson,* the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established").

[8] The approach the Court of Appeals adopted-to deny summary judgment any time a material issue of fact remains on the excessive force claim-could undermine the goal of qualified immunity to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity**2157

is appropriate. See *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

This is not to say that the formulation of a general rule is beside the point, nor is it to insist the courts must have agreed upon the precise formulation of the standard. Assuming, for instance, that various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts *203 had not agreed on one verbal formulation of the controlling standard.

The Court of Appeals concluded that qualified immunity is merely duplicative in an excessive force case, eliminating the need for the second step where a constitutional violation could be found based on the allegations. In *Anderson,* a warrantless search case, we rejected the argument that there is no distinction between the reasonableness standard for warrantless searches and the qualified immunity inquiry. We acknowledged there was some "surface appeal" to the argument that, because the Fourth Amendment's guarantee was a right to be free from "unreasonable" searches and seizures, it would be inconsistent to conclude that an officer who acted unreasonably under the constitutional standard nevertheless was entitled to immunity because he " 'reasonably' acted unreasonably." 483 U.S., at 643, 107 S.Ct. 3034. This superficial similarity, however, could not overcome either our history of applying qualified immunity analysis to Fourth Amendment claims against officers or the justifications for applying the doctrine in an area where officers perform their duties with considerable uncertainty as to "whether particular searches or seizures comport with the Fourth Amendment." *Id.,* at 644, 107 S.Ct. 3034. With respect, moreover, to the argument made in *Anderson* that an exception should be made for Fourth Amendment cases, we observed "the heavy burden this argument must sustain to be successful," since "the doctrine of qualified im-

121 S.Ct. 2151

533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal
D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361
**(Cite as: 533 U.S. 194, 121 S.Ct. 2151)**

munity reflects a balance that has been struck 'across the board.' "*Id.,* at 642, 107 S.Ct. 3034 (quoting *Harlow v. Fitzgerald, supra,* at 821, 102 S.Ct. 2727). We held that qualified immunity applied in the Fourth Amendment context just as it would for any other claim of official misconduct. 483 U.S., at 644, 107 S.Ct. 3034.

Faced, then, with the heavy burden of distinguishing *Anderson* and of carving out an exception to the typical qualified immunity analysis applied in other Fourth Amendment contexts, the primary submission by respondent in defense **\*204** of the Court of Appeals' decision is that our decision in *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), somehow changes matters. *Graham,* in respondent's view, sets forth an excessive force analysis indistinguishable from qualified immunity, rendering the separate immunity inquiry superfluous and inappropriate. Respondent asserts that, like the qualified immunity analysis applicable in other contexts, the excessive force test already affords officers latitude for mistaken beliefs as to the amount of force necessary, so that "*Graham* has addressed for the excessive force area most of the concerns expressed in *Anderson.*" Brief for Respondents 7. Respondent points out that *Graham* did not address the interaction of excessive force claims and qualified immunity, since the issue was not raised, see 490 U.S., at 399, n. 12, 109 S.Ct. 1865; and respondent seeks to distinguish *Anderson* on the theory that the issue of probable cause implicates evolving legal standards and resulting legal uncertainty, a subject raising recurrent questions of qualified immunity. By contrast, respondent says, excessive force is governed by the standard established in *Graham,* a standard providing ample guidance for particular situations. Finally, respondent adopts the suggestion made by one Court of Appeals that **\*\*2158** the relevant distinction is that probable cause is an *ex post* inquiry, whereas excessive force, like qualified immunity, should be evaluated from an *ex ante* perspective. See *Finnegan v. Fountain,* 915 F.2d 817, 824, n. 11 (C.A.2 1990).

[9] These arguments or attempted distinctions

cannot bear the weight respondent seeks to place upon them. *Graham* did not change the qualified immunity framework explained in *Anderson.* The inquiries for qualified immunity and excessive force remain distinct, even after *Graham.*

In *Graham,* we held that claims of excessive force in the context of arrests or investigatory stops should be analyzed under the Fourth Amendment's "objective reasonableness standard," not under substantive due process principles. **\*205** 490 U.S., at 388, 394, 109 S.Ct. 1865. Because "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation,"*id.,* at 397, 109 S.Ct. 1865, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective, *id.,* at 396, 109 S.Ct. 1865. We set out a test that cautioned against the "20/20 vision of hindsight" in favor of deference to the judgment of reasonable officers on the scene. *Id.,* at 393, 396, 109 S.Ct. 1865. *Graham* sets forth a list of factors relevant to the merits of the constitutional excessive force claim, "requir [ing] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.,* at 396, 109 S.Ct. 1865. If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.

The qualified immunity inquiry, on the other hand, has a further dimension. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If

121 S.Ct. 2151
533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal
D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361
**(Cite as: 533 U.S. 194, 121 S.Ct. 2151)**

the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Graham* does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts. This is the nature of a test which must accommodate limitless factual circumstances. This reality serves **\*206** to refute respondent's claimed distinction between excessive force and other Fourth Amendment contexts; in both spheres the law must be elaborated from case to case. Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes "hazy border between excessive and acceptable force,"*Priester v. Riviera Beach,* 208 F.3d 919, 926-927 (C.A.11 2000), and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.

*Graham* and *Anderson* refute the excessive force/probable cause distinction on which much of respondent's position seems to depend. The deference owed officers facing suits for alleged excessive force is not different in some qualitative respect from the probable-cause inquiry in *Anderson.* Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution. Yet, even if a court were to hold that the officer **\*\*2159** violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions. The same analysis is applicable in excessive force cases, where in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable.

The temporal perspective of the inquiry, whether labeled as *ex ante* or *ex post,* offers no meaningful distinction between excessive force and other Fourth Amendment suits. *Graham* recognized as much, reviewing several of our probable-cause and search warrant cases, then stating that "[w]ith re-

spect to a claim of excessive force, the same standard of reasonableness at the moment applies." 490 U.S., at 396, 109 S.Ct. 1865 (discussing use of force under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); probable cause to arrest under *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971); and search warrant requirements under **\*207** *Maryland v. Garrison,* 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987)); see also *Hunter v. Bryant,* 502 U.S., at 228, 112 S.Ct. 534 ("Probable cause existed if 'at the moment the arrest was made ... the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' " a crime had been committed (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964))). Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred.

### III

The case was presented to the Court of Appeals on the assumption that respondent's seizure and brief detention did not violate clearly established First Amendment privileges and did not violate the Fourth Amendment right to be free from arrest without probable cause, as distinct from the force used to detain. The sole question, then, is whether the force used violated a clearly established Fourth Amendment protection so that petitioner was not entitled to immunity.

Our instruction to the district courts and courts of appeals to concentrate at the outset on the definition of the constitutional right and to determine whether, on the facts alleged, a constitutional violation could be found is important. As we have said, the procedure permits courts in appropriate cases to elaborate the constitutional right with greater degrees of specificity. Because we granted certiorari only to determine whether qualified immunity was appropriate, however, and because of the limits imposed upon us by the questions on which we gran-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2151
533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal
D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361
**(Cite as: 533 U.S. 194, 121 S.Ct. 2151)**

ted review, we will assume a constitutional viola-
tion could have occurred under the facts alleged
based simply on the general rule prohibiting excess-
ive force, then proceed to the question whether this
general prohibition against excessive force was the
source for clearly established law that was contra-
vened **\*208** in the circumstances this officer faced.
There was no contravention under this standard.
Though it is doubtful that the force used was ex-
cessive, we need not rest our conclusion on that de-
termination. The question is what the officer reas-
onably understood his powers and responsibilities
to be, when he acted, under clearly established
standards.

Respondent's excessive force claim for the
most part depends upon the "gratuitously violent
shove" allegedly received when he was placed into
the van, although respondent notes as well that the
alleged violation resulted from the "totality of the
circumstances," including the way he was removed
from the speaking area. See Brief for Respondents
3, n. 2.

[10] These circumstances, however, disclose
substantial grounds for the officer to have con-
cluded he had legitimate justification**\*2160** under
the law for acting as he did. In *Graham* we noted
that "[o]ur Fourth Amendment jurisprudence has
long recognized that the right to make an arrest or
investigatory stop necessarily carries with it the
right to use some degree of physical coercion or
threat thereof to effect it." 490 U.S., at 396, 109
S.Ct. 1865. A reasonable officer in petitioner's pos-
ition could have believed that hurrying respondent
away from the scene, where the Vice President was
speaking and respondent had just approached the
fence designed to separate the public from the
speakers, was within the bounds of appropriate po-
lice responses.

Petitioner did not know the full extent of the
threat respondent posed or how many other persons
there might be who, in concert with respondent,
posed a threat to the security of the Vice President.
There were other potential protesters in the crowd,
and at least one other individual was arrested and

placed into the van with respondent. In carrying out
the detention, as it has been assumed the officers
had the right to do, petitioner was required to re-
cognize the necessity to protect the Vice President
by securing respondent and restoring order to the
scene. It cannot be said **\*209** there was a clearly es-
tablished rule that would prohibit using the force
petitioner did to place respondent into the van to
accomplish these objectives.

As for the shove respondent received when he
was placed into the van, those same circumstances
show some degree of urgency. We have approved
the observation that "[n]ot every push or shove,
even if it may later seem unnecessary in the peace
of a judge's chambers, violates the Fourth Amend-
ment." *Ibid.* (citations omitted). Pushes and shoves,
like other police conduct, must be judged under the
Fourth Amendment standard of reasonableness.

In the circumstances presented to this officer,
which included the duty to protect the safety and
security of the Vice President of the United States
from persons unknown in number, neither respond-
ent nor the Court of Appeals has identified any case
demonstrating a clearly established rule prohibiting
the officer from acting as he did, nor are we aware
of any such rule. Our conclusion is confirmed by
the uncontested fact that the force was not so ex-
cessive that respondent suffered hurt or injury. On
these premises, petitioner was entitled to qualified
immunity, and the suit should have been dismissed
at an early stage in the proceedings.

The judgment of the Court of Appeals is re-
versed, and the case is remanded for further pro-
ceedings consistent with this opinion.

*It is so ordered.*

Justice GINSBURG, with whom Justice STEVENS
and Justice BREYER join, concurring in the judg-
ment.

In *Graham v. Connor,* 490 U.S. 386, 109 S.Ct.
1865, 104 L.Ed.2d 443 (1989), the Court an-
nounced and described an "objective reasonable-
ness" standard to govern all claims that law en-
forcement officers, in violation of the Fourth

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2151

533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal
D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361
**(Cite as: 533 U.S. 194, 121 S.Ct. 2151)**

Amendment, used excessive force in the course of an arrest. Measuring material facts of this case that are not subject to genuine dispute against the *Graham* \*210 standard, I conclude that officer Saucier's motion for summary judgment should have been granted. I therefore concur in the Court's judgment. However, I would not travel the complex route the Court lays out for lower courts.

Application of the *Graham* objective reasonableness standard is both necessary, under currently governing precedent, and, in my view, sufficient to resolve cases of this genre. The Court today tacks on to a *Graham* inquiry a second, overlapping objective reasonableness inquiry purportedly demanded by qualified immunity doctrine. The two-part test today's decision imposes holds large potential to confuse. Endeavors to bring the Court's abstract instructions down to earth, I suspect, will bear \*\*2161 out what lower courts have already observed-paradigmatically, the determination of police misconduct in excessive force cases and the availability of qualified immunity both hinge on the same question: Taking into account the particular circumstances confronting the defendant officer, could a reasonable officer, identically situated, have believed the force employed was lawful? See, *e.g.,Roy v. Inhabitants of Lewiston,* 42 F.3d 691, 695 (C.A.1 1994); *Rowland v. Perry,* 41 F.3d 167, 173 (C.A.4 1994). Nothing more and nothing else need be answered in this case.

I

All claims that law enforcement officers have used excessive force in the course of an arrest, *Graham* made explicit, are to be judged "under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S., at 395, 109 S.Ct. 1865. Underlying intent or motive are not relevant to the inquiry; rather, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.,* at 397, 109 S.Ct. 1865. The proper perspective in judging an excessive force claim, *Graham* ex-

plained, is that of "a reasonable officer on the scene" and "at the moment" force was employed. *Id.,* at 396, 109 S.Ct. 1865. "Not every push or shove," the \*211 Court cautioned, "even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Ibid.* (citation omitted). "The calculus of reasonableness" must allow for the reality that "police officers are often forced to make split-second judgments" about the force a particular situation warrants "in circumstances that are tense, uncertain, and rapidly evolving." *Id.,* at 396-397, 109 S.Ct. 1865.

Under *Graham's* instructions, the question in this case is whether officer Saucier, in light of the facts and circumstances confronting him, could have reasonably believed he acted lawfully. Here, as in the mine run of excessive force cases, no inquiry more complex than that is warranted.

Inspecting this case under *Graham's* lens, and without doubling the "objectively reasonable" inquiry, I agree that Katz's submissions were too slim to put officer Saucier to the burden of trial. As the Court points out, it is not genuinely in doubt that "[a] reasonable officer in [Saucier's] position could have believed that hurrying [Katz] away from the scene ... was within the bounds of appropriate police responses." *Ante,* at 2160. Katz's excessive force claim thus depended on the "gratuitously violent shove" he allegedly received. *Ante,* at 2159; see Brief for Respondents 3, n. 2 (conceding that "the gratuitous violent shove" was essential to Katz's excessive force claim).

Yet Katz failed to proffer proof, after pretrial discovery, that Saucier, as distinguished from his fellow officer Parker,[FN1] had a hand in the allegedly violent shove.[FN2] Saucier, in his \*212 deposition, denied participating in any shove, see App. 39-40, while Katz, in his deposition, said, without elaborating: "They [Parker and Saucier] pretty much threw me in. Just shoved me in,"*id.,* at 25. But critically, at no point did Katz say, specifically, that Saucier himself, and not only Parker, pushed or shoved.

121 S.Ct. 2151

533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361

**(Cite as: 533 U.S. 194, 121 S.Ct. 2151)**

FN1. Though named as a defendant, Parker was never served with the complaint, and therefore did not become a party to this litigation. See Brief for Petitioner 3, n. 4.

FN2. See Fed. Rule Civ. Proc. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial.").

Katz's reluctance directly to charge Saucier with pushing or shoving is understandable in view of a television news videotape of the episode Katz presented as an exhibit to his complaint. See App. to Pet. **2162 for Cert. 27a. The videotape shows that the shove, described by Katz as gratuitously violent, came from the officer on the right side of the police van, not from the officer positioned on the left side. It is undisputed that the officer on the right is Parker, the officer on the left, Saucier. See Pet. for Cert. 27-28, and n. 19; Brief for Petitioner 50, n. 26. Mindful of *Graham* 's cautionary observation that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment,"490 U.S., at 396, 109 S.Ct. 1865 (citation omitted), and in view of Katz's failure to deny that the shove alleged to establish excessive force came from Parker alone, not from Saucier, I am persuaded that Katz tendered no triable excessive force claim against Saucier.FN3

FN3. As the Court observes, there is a dispute whether Katz was resisting arrest at the time he was placed in the van. *Ante,* at 2154.That dispute is irrelevant, however, in view of the absence of any indication that Saucier employed excessive force in removing Katz from the site of the celebration and placing him in the van. See *Rowland v. Perry,* 41 F.3d 167, 174 (C.A.4 1994) ("[d]isputed versions of the facts

alone are not enough to warrant denial of summary judgment").

II

In the Court's opinion, *Graham* is inadequate to control adjudication of excessive force cases. *Graham* must be overlaid, the Court maintains, by a sequential qualified immunity inquiry. *Ante,* at 2156.The Court instructs lower courts first to undertake what appears to be an unadorned *213 Graham* inquiry, *i.e.,* to consider initially whether the parties' submissions, viewed favorably to the plaintiff, could show that the officer's conduct violated the Fourth Amendment. *Ante,* at 2156. If the plaintiff prevails on that "threshold question," *ibid.,* the trial court is then to proceed to the "dispositive [qualified immunity] inquiry," asking "whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted,"*ibid.*FN4

FN4. The Court's observation that "neither respondent nor the Court of Appeals ha[s] identified any case demonstrating a clearly established rule prohibiting the officer from acting as he did,"*ante,* at 2160, must be read in light of our previous caution that "the very action in question [need not have] previously been held unlawful" for a plaintiff to defeat qualified immunity, *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

In the instant case, however, the Court finds that procedural impediments stop it from considering first "whether a constitutional right would have been violated on the facts alleged." *Ante,* at 2156, 2159. The Court therefore "assume[s] a constitutional violation could have occurred,"*ante,* at 2159-*i.e.,* it supposes a trier could have found that officer Saucier used force excessive under *Graham* 's definition. Even so, the Court reasons, qualified immunity would shield Saucier because he could have "concluded he had legitimate justification under the law for acting as he did." *Ante,* at 2159-2160.

121 S.Ct. 2151

533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361

**(Cite as: 533 U.S. 194, 121 S.Ct. 2151)**

Skipping ahead of the basic *Graham* (constitutional violation) inquiry it admonished lower courts to undertake at the outset, the Court failed to home in on the duplication inherent in its two-step scheme. As lower courts dealing with excessive force cases on the ground have recognized, however, this Court's decisions invoke "the same 'objectively reasonable' standard in describing both the constitutional test of liability [citing *Graham,* 490 U.S., at 397, 109 S.Ct. 1865], and the ... standard for qualified immunity [citing *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ]." *Roy,* 42 F.3d, at *214 695; see *Street v. Parham,* 929 F.2d 537, 540 (C.A.10 1991) (describing excessive force case as one "where the determination of liability and the availability of qualified immunity depend on the same findings"). In other words, an officer who uses force that is objectively reasonable**2163 "in light of the facts and circumstances confronting [him],"*Graham,* 490 U.S., at 397, 109 S.Ct. 1865, simultaneously meets the standard for qualified immunity, see *ante,* at 2156, and the standard the Court set in *Graham* for a decision on the merits in his favor. Conversely, an officer whose conduct is objectively unreasonable under *Graham* should find no shelter under a sequential qualified immunity test.

Double counting "objective reasonableness," the Court appears to suggest, *ante,* at 2155, is demanded by *Anderson,* which twice restated that qualified immunity shields the conduct of officialdom "across the board." 483 U.S., at 642, 645, 107 S.Ct. 3034 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 821, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (BRENNAN, J., concurring)); see also *Anderson,* 483 U.S., at 643, 107 S.Ct. 3034 ("we have been unwilling to complicate qualified immunity analysis by making the scope or extent of immunity turn on the precise nature of various officials' duties or the precise character of the particular rights alleged to have been violated"). As I see it, however, excessive force cases are not meet for *Anderson's* two-part test.

*Anderson* presented the question whether the particular search conducted without a warrant was supported by probable cause and exigent circumstances. The answer to such a question is often far from clear.FN5 Law in the area is constantly evolving and, correspondingly, variously interpreted. As aptly observed by the Second Circuit, "even learned and experienced jurists have had difficulty in defining*215 the rules that govern a determination of probable cause .... As he tries to find his way in this thicket, the police officer must not be held to act at his peril." *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 456 F.2d 1339, 1348 (1972) (on remand). In this light, *Anderson*reasoned: "Law enforcement officers whose judgments in making these difficult determinations [whether particular searches or seizures comport with the Fourth Amendment] are objectively legally reasonable should no more be held personally liable in damages than should officials making *analogous determinations* in other areas of law." 483 U.S., at 644, 107 S.Ct. 3034 (emphasis added).

> FN5. *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), is a prototypical case. There, the Court accorded qualified immunity to police who permitted the media to accompany them on a search of a house. The constitutionality of the ride-along practice was unsettled at the time of the incident-in-suit in *Wilson,* and remained so until this Court spoke.

As the foregoing discussion indicates, however, "excessive force" typically is not an "analogous determination." The constitutional issue whether an officer's use of force was reasonable in given circumstances routinely can be answered simply by following *Graham* 's directions. In inquiring, under *Graham,* whether an officer's use of force was within a range of reasonable options, the decisionmaker is also (and necessarily) answering the question whether a reasonable officer "could have believed" his use of force "to be lawful," *Anderson,* 483 U.S., at 638, 107 S.Ct. 3034. See *Street,* 929 F.2d, at 541, n. 2 (because of difficulty of deciding probable-cause issues, the conduct of an officer may be ob-

533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361
**(Cite as: 533 U.S. 194, 121 S.Ct. 2151)**

jectively reasonable even if cause did not exist, but "in excessive force cases, once a factfinder has determined that the force used was unnecessary under the circumstances, any question of objective reasonableness has also been foreclosed").

The Court fears that dispensing with the duplicative qualified immunity inquiry will mean "leaving the whole matter to the jury." *Ante,* at 2155.Again, experience teaches otherwise. Lower courts, armed with *Graham* 's directions, have not shied away from granting summary judgment to defendant officials in Fourth Amendment excessive force cases where the challenged conduct is objectively reasonable based on relevant, undisputed facts. See, *e.g.,Wilson***2164 v. *216 Spain,* 209 F.3d 713, 716 (C.A.8 2000) ("address[ing] in one fell swoop both [defendant's] qualified immunity and the merits of [plaintiff's] Fourth Amendment [excessive force] claim" and concluding officer's conduct was objectively reasonable in the circumstances, so summary judgment for officer was proper); *Roy,* 42 F.3d, at 695 (under single objective reasonableness test, District Court properly granted summary judgment for defendant);[FN6] *Wardlaw v. Pickett,* 1 F.3d 1297, 1303-1304 (C.A.D.C.1993) (same). Indeed, this very case, as I earlier explained, see *supra,* at 2160-2162, fits the summary judgment bill. Of course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official. And that is as it should be. When a plaintiff proffers evidence that the official subdued her with a chokehold even though she complied at all times with his orders, while the official proffers evidence that he used only stern words, a trial must be had. In such a case, the Court's two-step procedure is altogether inutile.

> FN6. Upholding summary judgment for a police officer who shot an armed, intoxicated, belligerently behaving arrestee, the First Circuit in *Roy* elaborated: "[T]he Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide

zone of protection in close cases. Decisions from this circuit and other circuits are consistent with that view. And in close cases, a jury does not automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently." 42 F.3d, at 695 (footnote omitted).

* * *

For the reasons stated, I concur in the Court's judgment, but not in the two-step inquiry the Court has ordered. Once it has been determined that an officer violated the Fourth Amendment by using "objectively unreasonable" force as *217 that term is explained in *Graham v. Connor,* there is simply no work for a qualified immunity inquiry to do.

Justice SOUTER, concurring in part and dissenting in part.

I join Parts I and II of the Court's opinion, but would remand the case for application of the qualified immunity standard.

U.S.,2001.
Saucier v. Katz
533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, 69 USLW 4481, 01 Cal. Daily Op. Serv. 5000, 2001 Daily Journal D.A.R. 6137, 14 Fla. L. Weekly Fed. S 361

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 807                                                                                           Page 1
433 F.3d 807
**(Cite as: 433 F.3d 807)**

▶

Harris v. Coweta County, Ga.
C.A.11 (Ga.),2005.

United States Court of Appeals,Eleventh Circuit.
Victor HARRIS, Plaintiff-Appellee,
v.
COWETA COUNTY, GEORGIA, et al., Defendants,
Mark Fenninger, Sgt., Timothy C. Scott, Deputy,
Defendants-Appellants.
**No. 03-15094.**

Dec. 23, 2005.

**Background:** Motorist brought § 1983 action against county and its law enforcement officers, alleging use of excessive force in violation of his Fourth Amendment rights, in connection with a high-speed chase. The United States District Court for the Northern District of Georgia, No. 01-00148-CV-WBH-3,Willis B. Hunt, Jr., J., denied officers' motions for summary judgment based upon qualified immunity. Officers appealed.

**Holdings:** The Court of Appeals, Barkett, Circuit Judge, held that:

(1) fact issue existed as to whether pursuing officer violated motorist's constitutional rights;

(2) supervising officer did not authorize use of deadly force; and

(3) law was sufficiently well established to give reasonable officer notice of conditions under which deadly force could be used to stop fleeing motorist.

Affirmed in part and reversed in part.

Prior opinion, 406 F.3d 1307, vacated.

West Headnotes

**[1] Federal Courts 170B ⚖️776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
        170BVIII(K)1 In General
            170Bk776 k. Trial De Novo. Most
Cited Cases
Section 1983 defendant's entitlement to qualified immunity is question of law, reviewed *de novo*. 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 ⚖️1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
"Qualified immunity" offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which reasonable person would have known. 42 U.S.C.A. § 1983.

**[3] Officers and Public Employees 283 ⚖️114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases
In order to receive protections of qualified immunity, government official must first prove that he was acting within scope of his discretionary authority when allegedly wrongful acts occurred.

**[4] Civil Rights 78 ⚖️1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Of-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 807
**(Cite as: 433 F.3d 807)**

ficers

78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases

Law enforcement officer in pursuit of fleeing motorist and his supervising officer were acting within scope of their discretionary authority when supervising officer authorized use of precision intervention technique (PIT) maneuver to stop vehicle, and when pursuing officer consequently rammed motorist's vehicle, for purpose of determining officers' eligibility for qualified immunity from § 1983 claim based on use of excessive force. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ☞1407**

78 Civil Rights
   78III Federal Remedies in General
      78k1400 Presumptions, Inferences, and Burdens of Proof
         78k1407 k. Defenses; Immunity and Good Faith. Most Cited Cases

After § 1983 defendants establish their eligibility for qualified immunity, burden then shifts to plaintiff to show that qualified immunity is not appropriate. 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 ☞1376(1)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
         78k1376 Government Agencies and Officers
            78k1376(1) k. In General. Most Cited Cases

In determining whether qualified immunity is appropriate defense in § 1983 action, court asks whether, taken in light most favorable to party asserting injury, facts alleged show government official's conduct violated constitutional right. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ☞1376(2)**

78 Civil Rights
   78III Federal Remedies in General

      78k1372 Privilege or Immunity; Good Faith and Probable Cause
         78k1376 Government Agencies and Officers
            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

If constitutional violation can be made out on § 1983 plaintiff's facts, court deciding availability of qualified immunity defense must determine whether, at time of incident, every objectively reasonable government official would have realized acts violated already clearly established federal law. 42 U.S.C.A. § 1983.

**[8] Arrest 35 ☞68(2)**

35 Arrest
   35II On Criminal Charges
      35k68 Mode of Making Arrest
         35k68(2) k. Use of Force. Most Cited Cases

To establish excessive force claim, arrestee must show first that he was subjected to "seizure" within meaning of Fourth Amendment. U.S.C.A. Const.Amend. 4.

**[9] Arrest 35 ☞68(4)**

35 Arrest
   35II On Criminal Charges
      35k68 Mode of Making Arrest
         35k68(4) k. What Constitutes Seizure. Most Cited Cases

Officer's use of his vehicle to ram fleeing suspect's vehicle, causing suspect to lose control and crash, constituted "seizure," within meaning of Fourth Amendment. U.S.C.A. Const.Amend. 4.

**[10] Arrest 35 ☞68(2)**

35 Arrest
   35II On Criminal Charges
      35k68 Mode of Making Arrest
         35k68(2) k. Use of Force. Most Cited Cases

In determining whether force used by a law enforcement officer in effectuating seizure is reason-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

able, court must take perspective of reasonable officer on scene, rather than with 20/20 vision of hindsight. U.S.C.A. Const.Amend. 4.

**[11] Arrest 35 ☞68(2)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases
In resolving claim of excessive force in making arrest, reasonableness inquiry is objective one: question is whether law enforcement officers' actions are objectively reasonable in light of facts and circumstances confronting them, without regard to their underlying intent or motivation. U.S.C.A. Const.Amend. 4.

**[12] Arrest 35 ☞68(2)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases
The use of deadly force to apprehend fleeing suspect is unreasonable, for Fourth Amendment purposes, unless (1) law enforcement officer has probable cause to believe that suspect poses threat of serious physical harm, either to officer or to others, suspect threatens officer with weapon, or there is probable cause to believe that he had committed a crime involving infliction or threatened infliction of serious physical harm, and (2) if deadly force is necessary to prevent escape, and, (3) if feasible, some warning has been given. U.S.C.A. Const.Amend. 4.

**[13] Arrest 35 ☞68(2)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases
"Deadly force," for purpose of determining reasonableness of force used to seize fleeing suspect, is force that creates substantial risk of causing death

or serious bodily injury. U.S.C.A. Const.Amend. 4.

**[14] Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
Issues of material fact as to whether law enforcement officer used deadly force when he rammed his vehicle into fleeing motorist's vehicle, and whether motorist's driving posed substantial threat of imminent physical harm to others and thus justified use of such force, precluded summary judgment on question of whether motorist's Fourth Amendment right to be free from use of excessive force was violated, for purpose of determining officer's entitlement to qualified immunity from § 1983 liability. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[15] Automobiles 48A ☞349(14.1)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
            48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
                48Ak349(14) Conduct of Arrest, Stop, or Inquiry
                    48Ak349(14.1) k. In General. Most Cited Cases
High-speed chase of suspect fleeing after traffic infraction does not amount to "substantial threat" of imminent physical harm that is required before deadly force can be used to effect stop.

**[16] Arrest 35 ☞68(1)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
        35k68(1) k. In General. Most Cited Cases
Suspect does not, by continuing to flee, absolve pursuing police officer of any possible liability for all ensuing actions during chase.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 807
(Cite as: 433 F.3d 807)

**[17] Civil Rights 78 ⚖1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Supervising officer's authorization of precision intervention technique (PIT) maneuver by pursuing officer to stop fleeing motorist's vehicle did not sanction use of deadly force, such as would raise question as to supervising officer's entitlement to qualified immunity in motorist's § 1983 excessive force action; PIT maneuver was driving technique used to stop motorist safely and quickly by striking vehicle at specific point, but pursuing officer chose not to execute PIT. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[18] Automobiles 48A ⚖349(14.1)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
            48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
                48Ak349(14) Conduct of Arrest, Stop, or Inquiry
                48Ak349(14.1) k. In General. Most Cited Cases
Law was sufficiently well established to give reasonable officer notice of conditions under which deadly force could be used to stop fleeing motorist, for purpose of determining whether officer who allegedly used such force was entitled to qualified immunity in motorist's § 1983 excessive force action. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[19] Searches and Seizures 349 ⚖23**

349 Searches and Seizures
    349I In General
        349k23 k. Fourth Amendment and Reasonableness in General. Most Cited Cases

To determine constitutionality of seizure, court must balance nature and quality of intrusion on individual's Fourth Amendment interests against importance of governmental interests alleged to justify intrusion. U.S.C.A. Const.Amend. 4.

**\*809** Philip Wade Savrin, Sun S. Choy, Freeman, Mathis & Gary, LLP, Atlanta, GA, for Defendants-Appellants.
Andrew C. Clarke, Memphis, TN, Craig Thomas Jones, Edmond & Jones, LLP, Atlanta, GA, for Harris.

Appeal from the United States District Court for the Northern District of Georgia.
*ON PETITION FOR REHEARING*

Before BIRCH, BARKETT and COX, Circuit Judges.

BARKETT, Circuit Judge:

    We *sua sponte* grant rehearing in this case, vacating our prior opinion, 406 F.3d **\*810** 1307 (11th Cir.2005), in its entirety and substituting the following in its place.

    Coweta County Deputy Timothy Scott ("Scott") and Coweta County Sergeant Mark Fenninger ("Fenninger") appeal from the denial of summary judgment on their claims of qualified immunity on Victor Harris' ("Harris") 42 U.S.C. § 1983 action based on Harris' allegations that Scott violated his Fourth Amendment rights by using excessive force during a high-speed car chase, and that Fenninger violated his Fourth Amendment rights by authorizing that use of force.

**I. BACKGROUND**

    Viewed in the light most favorable to the nonmovant, Harris, the facts pertaining to the chase that covered approximately nine miles and lasted approximately six minutes are as follows. Between 10:30 and 11:00 pm on March 29, 2001, a Coweta County deputy clocked Harris' vehicle at 73 miles per hour in a 55 mile-per-hour zone. The vehicle that Harris was driving was registered in Harris'

433 F.3d 807
**(Cite as: 433 F.3d 807)**

name and at his proper address. Although the deputy flashed his blue lights, Harris continued driving. The deputy pursued, and in attempting to flee, Harris drove in excess of the speed limit, at speeds between 70 and 90 miles per hour, passed vehicles on double yellow traffic control lanes, and ran through two red lights. Harris stayed in control of his vehicle, utilizing his blinkers while passing or making turning movements.

After Harris refused to stop, the deputy radioed dispatch and reported that he was pursuing a fleeing vehicle, and broadcast its license plate number. He did not relay that the underlying charge was speeding. Scott heard the radio communication and joined the pursuit, as it proceeded toward the county line into Fayette County, Georgia.

After crossing into Peachtree City in Fayette County, Harris slowed down, activated his blinker, and turned into a drugstore parking lot located in a shopping complex, where two Peachtree City police vehicles were already stationed. Scott proceeded around the opposite side of the complex in an attempt to prevent Harris from leaving the parking lot and getting onto Highway 74, driving his vehicle directly into Harris' path. Harris attempted to turn to the left to avoid hitting Scott's car, but the two vehicles came into contact with each other, causing minor damage to Scott's cruiser.[FN1] Harris then entered Highway 74 and continued to flee southward at a high speed.

> FN1. Scott disputes this version of events. For purposes of summary judgment, we accept Harris' version.

Through Peachtree City, Scott took over as the lead vehicle in the chase. After getting on Highway 74, Scott radioed a general request for "Permission to PIT him." A "PIT" ("Precision Intervention Technique") maneuver is a driving technique designed to stop a fleeing motorist safely and quickly by hitting the fleeing car at a *specific* point on the vehicle, which throws the car into a spin and brings it to a stop.[FN2] Harris' expert's report attests that "national law enforcement standards require than

[sic] an officer be trained in all deadly force applications before being permitted to use those applications." R. 24, at 9-10. Scott had not been trained in executing this maneuver. He and the other**811 Coweta officers did not undergo a training on PITs until *after* the incident.

> FN2. At the time of the chase, the Coweta County Sheriff's Department had a vehicle pursuit policy, which stated that "[d]eliberate physical contact between vehicles at anytime may be justified to terminate the pursuit upon the approval of the supervisor." R. 48, Ex. 11, at 93.

Fenninger was the supervisor who responded to Scott's radio call and granted Scott permission to employ the PIT, telling him to: "Go ahead and take him out. Take him out." Fenninger-who tuned into the transmissions about the pursuit late-did not know how the pursuit originated, the speeds of the vehicles, the numbers of motorists or pedestrians on the roadways, or how dangerously Harris was driving. Fenninger also did not request further details about the pursuit prior to authorizing the PIT.

After receiving approval, Scott determined that he could not perform the PIT maneuver because he was going too fast. Instead, however, he rammed his cruiser directly into Harris' vehicle, causing Harris to lose control, leave the roadway, run down an embankment, and crash. As a result, Harris was rendered a quadriplegic.

## II. STANDARD OF REVIEW

We review the denial of summary judgment *de novo. Cagle v. Sutherland,* 334 F.3d 980, 985 (11th Cir.2003). In conducting our review, we apply the same legal standards as the district court. *Vaughan v. Cox,* 343 F.3d 1323, 1328 (11th Cir.2003). Thus, we view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. *Id.* Summary judgment is not appropriate unless the evidence demonstrates that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 807
433 F.3d 807
**(Cite as: 433 F.3d 807)**

of law." Fed. R. Civ.P. 56(c).

[1] A defendant's entitlement to qualified immunity is a question of law, also to be reviewed *de novo. Cagle,* 334 F.3d at 985.

### III. DISCUSSION[FN3]

> FN3. We reject Harris' first argument that we are without jurisdiction over this interlocutory appeal. This appeal goes beyond the evidentiary sufficiency of the district court's decision.

[2][3][4] As we have often stated, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro,* 284 F.3d 1188, 1193-94 (11th Cir.2002) (internal citations and quotation marks omitted). This immunity "allow[s] government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation[.]" *Id.*(citing *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Thus, in order to receive its protections, the government official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Kesinger v. Herrington,* 381 F.3d 1243, 1248 (11th Cir.2004) (citing *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir.2002)). In this case, there is no dispute that when Scott rammed Harris's vehicle during the high-speed pursuit on March 29, 2001, he did so as part of his discretionary functions as deputy of the Coweta County Sheriff's Department (CCSD). It is likewise clear (and uncontested) that Fenninger's authorization of Scott's use of a PIT maneuver was a decision made in his capacity as supervisor to Scott and sergeant of the CCSD.

[5][6][7] The defendants having established their eligibility for qualified immunity, the burden then shifts to the plaintiff to show that qualified immunity is not appropriate.**\*812** *Lee,* 284 F.3d at 1194. This next step consists of a two-part inquiry, set forth in *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). First we ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* If, assuming the plaintiff's allegations were true, no such right would have been violated, the analysis is complete. However, if a constitutional violation can be made out on the plaintiff's facts, we then must determine "whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law." *Garrett v. Athens-Clarke County,* 378 F.3d 1274, 1278-79 (11th Cir.2004) (citing *Saucier,* 533 U.S. at 201-02, 121 S.Ct. 2151, 150 L.Ed.2d 272). We address these questions in turn.

### A. Did Scott and Fenninger Violate Harris' Constitutional Right To Be Free From An Unreasonable Seizure?

[8] Harris alleges that Scott violated his Fourth Amendment right to be "free from the use of excessive force in the course of an investigatory stop or other 'seizure' of the person." *Kesinger,* 381 F.3d at 1248 (citing *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). To establish an excessive force claim, Harris must show first that he was subjected to a "seizure" within the meaning of the Fourth Amendment. *Vaughan,* 343 F.3d at 1328.

[9] The district court concluded, and Scott does not contest, that Harris was seized by Scott when the latter rammed his vehicle, causing him to lose control and crash. Pursuant to *Brower v. County of Inyo,* 489 U.S. 593, 596-99, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), using a vehicle to stop and apprehend a suspect is a seizure. In *Brower,* the Supreme Court held that a fleeing suspect who fatally crashed into a so-called "deadman" roadblock[FN4] during a high-speed chase had been "seized" by the police who set up the roadblock.[FN5] The Court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 807
433 F.3d 807
**(Cite as: 433 F.3d 807)**

defined a seizure as "a governmental termination of freedom of movement through means intentionally applied." *Brower,* 489 U.S. at 597, 109 S.Ct. 1378, 103 L.Ed.2d 628 (emphasis omitted). The Court reasoned that "it [is] enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result ... Brower was meant to be stopped by the physical obstacle of the roadblock-and ... was so stopped." *Id.* at 599, 109 S.Ct. 1378, 103 L.Ed.2d 628. The Court noted that if "the police cruiser had pulled alongside the fleeing car and sideswiped it, produ-cing**\*813** the crash, then the termination of the sus-pect's freedom of movement would have been a seizure." *Id.* at 597, 109 S.Ct. 1378, 103 L.Ed.2d 628. *See also Hernandez v. Jarman,* 340 F.3d 617, 623 (8th Cir.2003) ("As we have held, a Fourth Amendment seizure occurs as a result of a car colli-sion only where the police officer intended the col-lision to be the result."); *Donovan v. City of Mil-waukee,* 17 F.3d 944, 949 (7th Cir.1994) (finding a Fourth Amendment "seizure" where officer inten-tionally backed up squad car into the path of a flee-ing motorcycle and provoked collision, sending both driver and passenger airborne).

> FN4. A deadman or "blind" roadblock is an obstacle (usually a police car or truck) placed on the road in a manner that pre-vents an oncoming driver who is being pursued by the police from knowing the road is blocked.

> FN5. This court held in *Adams v. St. Lucie County Sheriff's Dept.,* 998 F.2d 923, 923 (11th Cir.1993) (*en banc*) that as of 1985 it was not "clearly established" that striking a car during a police chase constituted a seizure. That case was decided before *Sau-cier* and did not decide the first question which must be answered in a qualified im-munity case pursuant to *Saucier:* whether a constitutional right had been violated. *See Adams,* 962 F.2d at 1577-78 ("To resolve the question of qualified immunity, we need not decide today whether the Fourth Amendment was violated."). In addition,

the question in *Adams*-whether the striking of a car during a police chase constituted a seizure-has been unequivocally answered in the affirmative by the Supreme Court in *Brower. See Brower,* 109 S.Ct. at 1381. Moreover, the fact that striking the car dur-ing the police chase constituted a seizure is not in dispute in this case, as the officer who rammed Harris does not, and could not under the circumstances of this case, contest that he seized Harris.

[10][11] Having determined that Harris was seized, we turn to the question of whether the force used by Scott to effectuate the seizure was reason-able, in light of the facts according to Harris.[FN6] In *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Supreme Court made clear that the reasonableness of a seizure "depends on not only when a seizure is made, but also how it is car-ried out." In *Garner,* as in this case, the Court con-sidered a suit for damages under 42 U.S.C. § 1983 on the grounds that the manner of the seizure viol-ated Garner's constitutional rights. The police ar-gued that because Garner was a fleeing felon, *any* force necessary to capture him was permissible. The Supreme Court held that the use of deadly force may not be used to seize a fleeing felon "unless it is necessary to prevent the escape *and* the officer has probable cause to believe that the sus-pect poses a significant threat of death or serious physical injury to the officer or others." *Id.* at 3, 105 S.Ct. 1694 (emphasis supplied). The Court con-cluded that:

> FN6. In applying the test, we must take "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The reasonableness inquiry is an objective one: "the question is whether the officers' actions are 'objectively reas-onable' in light of the facts and circum-stances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. 1865, 104 L.Ed.2d

433 F.2d 807
433 F.3d 807
**(Cite as: 433 F.3d 807)**

443.

[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.

*Id.* at 11, 105 S.Ct. 1694.

[12] The Court recognized that limited circumstances might justify the use of deadly force, to wit: (1) "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," or "if the suspect threatens the officer with a weapon or there is probable cause to believe that he had committed a crime involving the infliction or threatened infliction of serious physical harm,"*and* (2) if deadly force is "necessary to prevent escape," *and,* (3) "if, where feasible, some warning has been given."*Id.* 471 U.S. at 11-12, 105 S.Ct. 1694. *See also Vaughan,* 343 F.3d at 1329-30. Without meeting all of these conditions, the use of deadly force is constitutionally unreasonable.

*814 [13] "Deadly force" is force that creates "a substantial risk of causing death or serious bodily injury." *Pruitt v. City of Montgomery,* 771 F.2d 1475, 1479 n. 10 (11th Cir.1985) (citing Model Penal Code (MPC) § 3.11(2) (1962)).[FN7] The Coweta County Sheriff Department's Use of Force Policy provides an analogous definition-"[f]orce which, under the circumstances in which it is used, is readily capable of causing death or other serious injury." R. 48 at Ex. 12, at 82. In *Pruitt,* we found that shooting a suspect in the legs to stop him was a "use of deadly force" in the constitutional sense, even though the officer did not necessarily shoot to kill. We reasoned that the MPC and Alabama Code

definitions of deadly force "clearly encompass[ed]" the force used in that case because "[the officer], at the least, purposely fired his shots at Pruitt's legs, and in doing so used force capable of causing serious physical injury." 771 F.2d at 1479 n. 10.

> FN7. In *Pruitt* we also looked to the Alabama Code, which defined "deadly force" as "[f]orce which, under the circumstances in which it is used, is readily capable of causing death or serious physical injury." 771 F.2d at 1479 n. 10.

Like other instrumentalities, the use of an automobile cannot be construed in every circumstance as deadly force. However, an automobile, like a gun, can be used deliberately to cause death or serious bodily injury. *See Pace v. Capobianco,* 283 F.3d 1275, 1282 (11th Cir.2002) (suspect "used the automobile in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon with which [suspect] was armed"); *United States v. Gualdado,* 794 F.2d 1533, 1535 (11th Cir.1986) ("Almost any object which as used or attempted to be used may endanger life or inflict great bodily harm, or which is likely to produce death or great bodily injury, can in some circumstances be a 'dangerous weapon.' ... An automobile has been held to constitute a deadly weapon when used to run down a law enforcement officer. Likewise, in this instance appellants' boat, used in an attempt to ram the vessel of Customs officials, also could properly be considered a deadly weapon.") (internal citations omitted). *See also Hernandez,* 340 F.3d at 624 (officer had probable cause to shoot suspect where suspect "posed an imminent threat of serious physical harm to himself and to others as evidenced by [suspect's] driving head-on into [the officer's] vehicle"); *Ludwig v. Anderson,* 54 F.3d 465, 473 (8th Cir.1995) (an attempt to hit an individual (not in a vehicle) with a moving squad car "is an attempt to apprehend by use of deadly force"); *Donovan,* 17 F.3d at 949-50 (backing up of a squad car into path of a fleeing motorcycle was an application of deadly force); *Smith v. Freland,* 954 F.2d 343, 347 (6th Cir.1992) (citing *United States v. Sanchez,* 914 F.2d 1355 (9th

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 807
433 F.3d 807
(Cite as: 433 F.3d 807)

Cir.1990)) ("even unarmed, [the plaintiff] was not harmless; a car can be a deadly weapon."). *Cf. Brower v. County of Inyo,* 884 F.2d 1316, 1317-18 (9th Cir.1989) (assuming without deciding that deadman roadblock to stop a fleeing vehicle during a high-speed chase was an application of "deadly force" and applying *Garner* analysis).

[14] Under an objective view of the facts of this case, there is little dispute that the ramming of Harris' car could constitute a use of "deadly force" and that a jury could so reasonably conclude.[FN8] *See*\*815 *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The judge's inquiry [at the summary judgment stage], therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict."). Moreover, none of the limited circumstances identified in *Garner* that might render this use of deadly force constitutional are present here. Scott did not have probable cause to believe that Harris had committed a crime involving the infliction or threatened infliction of serious physical harm, nor did Harris, prior to the chase, pose an imminent threat of serious physical harm to Scott or others.

> FN8. *See also* Scott's Depo., R. 48 at 157-58 (testifying that ramming Harris' vehicle at high speeds constituted a use of deadly force under the CCSD Deadly Force Policy); Fenninger's Depo., R. 50 at 62-63 (testifying that he gave authorization to make contact with the understanding that he was authorizing the use of deadly force). *See also* testimony of other Coweta County and Peachtree City officers stating that they considered that ramming a vehicle at 90 mph could constitute a use of "deadly force." Reynold's Depo., R.49 at 118-119; Yeager's Depo., R. 54 at 59; Kinsey's Depo., R. 51 at 44; Ercole's Depo., R. 47 at 37-40.

[15] None of the antecedent conditions for the use of deadly force existed in this case. Harris' infraction was speeding (73 mph in a 55 mph zone).

There were no warrants out for his arrest for anything, much less for the requisite "crime involving the infliction or threatened infliction of serious physical harm." *Garner,* 471 U.S. at 11-12, 105 S.Ct. 1694. Indeed, neither Scott nor Fenninger had any idea why Harris was being pursued. The use of deadly force is not "reasonable" in a high-speed chase based only on a speeding violation and traffic infractions where there was little, if any, actual threat to pedestrians or other motorists, as the roads were mostly empty and Harris remained in control of his vehicle, and there is no question that there were alternatives for a later arrest. *Vaughan,* 343 F.3d at 1330. The *Garner* Court specifically recognized that it would be an anomaly to transform "every fleeing misdemeanant into a fleeing felon ... solely by virtue of his flight." 471 U.S. at 10 n. 9, 105 S.Ct. 1694.[FN9] A high-speed chase of a suspect fleeing after a traffic infraction does not amount to the "substantial threat" of imminent physical harm that *Garner* requires before deadly force can be used. *Garner* made clear that "[i]t is not better that all ... suspects die than that they escape." 471 U.S. at 11, 105 S.Ct. 1694.[FN10]

> FN9. As recognized in *Vaughan:*
>
> Under *Garner,* a police officer can use deadly force to prevent the escape of a fleeing non-violent felony suspect only when the suspect poses an immediate threat of serious harm to police officers or others. In this case, the danger presented by [the suspects'] continued flight was the risk of an accident during the pursuit. Applying *Garner* in a common-sense way, a reasonable officer would have known that [ramming a car when both automobiles were] traveling at approximately 80 miles per hour ... would transform the risk of an accident on the highway into a virtual certainty.
>
> 343 F.3d at 1332-33.

> FN10. We recognize that whether or not Harris would have escaped has no bearing on the excessive force analysis, as *Garner* specifically based its holding on the assumption that a fleeing suspect *would* escape. 471 U.S. at 11, 105 S.Ct. 1694. We note, however, as did the district court, that

433 F.3d 807
433 F.3d 807
(Cite as: 433 F.3d 807)

there were other means to track Harris down as the pursuing officers had a description of the vehicle as well as the license plate number. We also note that absolutely no warning was given that Scott intended to use deadly force.

We reject the defendants' argument that Harris' driving must, as a matter of law, be considered sufficiently reckless to give Scott probable cause to believe that he posed a substantial threat of imminent physical harm to motorists and pedestrians. This is a disputed issue to be resolved by a jury. As noted by the district court judge, taking the facts from the non-movant's viewpoint, Harris remained in **816 control of his vehicle, slowed for turns and intersections, and typically used his indicators for turns. He did not run any motorists off the road. *Cf. Pace,* 283 F.3d at 1282 (officer had probable cause to believe that car had become a deadly weapon with which defendant was armed where suspect drove through residential neighborhood at 50 to 60 mph, swerved at oncoming police cars, nearly hit elderly motorist head-on when driving on wrong side of road, and accelerated towards police car roadblock forcing officer off of the road to avoid collision); *Cole v. Bone,* 993 F.2d 1328, 1331-34 (8th Cir.1993) (deadly force was reasonable to stop high-speed chase where truck forced more than one hundred cars off the road or out of the truck's way and endangered the lives of many other motorists during the pursuit, chase lasted 50 miles, and officers attempted to slow the vehicle using several types of roadblocks). Nor was he a threat to pedestrians in the shopping center parking lot, which was free from pedestrian and vehicular traffic as the center was closed. Significantly, by the time the parties were back on the highway and Scott rammed Harris, the motorway had been cleared of motorists and pedestrians allegedly because of police blockades of the nearby intersections.[FN11]

FN11. Nor does the evidence show that Scott or the other officers were in immediate danger or threatened with imminent harm. Accepting Harris' version of events, Harris did not attempt to ram, run over,

side-swipe, or swerve into any of the officers (which might have put their lives in danger in the parking lot), nor did he attempt any such conduct once he was back on the highway immediately before the seizure. *Cf. Hernandez,* 340 F.3d at 623 (evidence of plaintiff's attempts to intentionally drive his car directly into officer's vehicle supported finding that officer's use of deadly force was reasonable); *Smith,* 954 F.2d at 347 (use of deadly force not unreasonable where suspect "posed a major threat" to officers manning roadblock by driving directly into them on a residential dead-end street and "had proven he would do almost anything to avoid capture").

[16] Nor can we countenance the argument that by continuing to flee, a suspect absolves a pursuing police officer of any possible liability for all ensuing actions during the chase. The Supreme Court rejected such an argument in *Brower,* where it was suggested that the plaintiff in that case "had a number of opportunities to stop his automobile prior to the impact" and thus, could have avoided his own injuries. *Brower,* 109 S.Ct. at 1380-81 (citation omitted). Justice Scalia noted that essentially the same thing could have been said about the suspect in *Garner,* that is, the plaintiff's "independent decision to continue the chase can no more eliminate respondents' responsibility for the termination of his movement effected by the roadblock than Garner's independent decision to flee eliminated the Memphis police officer's responsibility for the termination of his movement effected by the bullet." *Id.* at 1381.

We conclude that ramming Harris' vehicle under the facts alleged here, if believed by a jury, would violate Harris' constitutional right to be free from excessive force during a seizure. Accordingly, a reasonable jury could find that Scott violated Harris' Fourth Amendment rights.

[17] With respect to Fenninger, however, we cannot come to the same conclusion. Although the

433 F.3d 807
**(Cite as: 433 F.3d 807)**

use of deadly force cannot be authorized under *Garner* without knowing that the *Garner* conditions have been met, the facts of this case do not establish that Fenninger authorized deadly force. Rather, the evidence shows that Fenninger authorized a PIT-defined by the district court as "a driving technique designed to stop a fleeing motorist safely and quickly by hitting the fleeing car at a specific point on the vehicle, which throws **\*817** the car into a spin and brings it to a stop." This definition assumes that the maneuver will be executed at lower speeds by properly trained officers, and therefore can terminate a flight "safely." *See, e.g.,* Geoffrey Alpert's Expert Report, R. 24 at 5 (stating that the PIT requires a set of defined circumstances in order for it to be performed safely (i.e., at low speeds on wide straightaways, on dry pavement by a properly trained driver)); National Law Enforcement and Corrections Technology Center Bulletin, U.S. Department of Justice, October 1996, at 4-5 (stating that the PIT "is not applicable in every situation, the key to its effective use is to carefully choose a favorable spot before attempting PIT and to first consider the possible effects on other traffic and pedestrians"); National San Diego Police Department Use of Force Task Force Recommendations, Executive Summary at 37 ("Utilized at speeds of 35 mph or less, the PIT maneuver improves officer and public safety by removing the threat of pursuit as quickly and safely as possible."). Scott, however, chose not to execute a PIT at all, but rather to ram the car at a very high speed from behind. Because this ramming was not authorized by Fenninger, we cannot say that Fenninger's conduct-authorization of a safe PIT that was not executed-violated Harris' constitutional rights. Thus, since Fenninger is not liable for a constitutional violation, summary judgment should be granted in his favor. The district court's ruling as to Fenninger is therefore reversed.

*B. Is Scott entitled to qualified immunity?*

[18] Having determined that a jury could have reasonably found the violation of a constitutional right by Scott, we now ask whether the law as it existed on March 29, 2001, was sufficiently clear to give reasonable law enforcement officers "fair notice" that ramming a vehicle under these circumstances was unlawful. *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "The essence of qualified immunity is notice." *Holmes v. Kucynda,* 321 F.3d 1069, 1077 (11th Cir.2003) (citing *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

For at least twenty years, since *Garner* was decided, officers have been on notice that they may not use *deadly force* to seize a fleeing suspect unless the suspect poses a significant threat of death or serious physical injury. *See Garner,* 471 U.S. at 11-12, 105 S.Ct. 1694; *see also Garner,* 471 U.S. at 10-11, 105 S.Ct. 1694 ("[t]he fact is that a majority of police departments in this country have forbidden the use of deadly force against nonviolent suspects."). Moreover, prior to the incident in question the law was clearly established that an automobile, like a gun, could be used as a deadly instrument. *See also Pace v. Capobianco,* 283 F.3d 1275, 1282 (11th Cir.2002) (concluding that fleeing felon in 1998 had used car in a way that made it a "deadly weapon"); *United States v. Gualdado,* 794 F.2d 1533, 1535 (11th Cir.1986) ("Almost any object which as used or attempted to be used may endanger life or inflict great bodily harm, or which is likely to produce death or great bodily injury, can in some circumstances be a 'dangerous weapon' concluding that appellants' boat, used in an attempt to ram the vessel of Customs officials, [could] ... properly be considered a deadly weapon.") (internal citations omitted).[FN12]

> FN12. *See also Hawkins v. City of Farmington,* 189 F.3d 695, 703 (8th Cir.1999); *Ludwig,* 54 F.3d at 473 (an attempt to hit an individual (not in a vehicle) with a moving squad car "is an attempt to apprehend by use of deadly force"); *Donovan,* 17 F.3d at 949-50 (backing up a squad car into path of a fleeing motorcycle was an application of deadly force); *Sturges v. Matthews,* 53 F.3d 659, 661 n. 1 (4th

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 807

**(Cite as: 433 F.3d 807)**

Cir.1995); *Smith,* 954 F.2d at 347 (citing *Sanchez,* 914 F.2d 1355) ("even unarmed, [the plaintiff] was not harmless; a car can be a deadly weapon.").

**\*818** [19] It was also clearly established at the time of the instant circumstances that the Fourth Amendment requires a seizure of a fleeing suspect to be reasonable and that deadly force cannot be employed in a situation that requires less-than-lethal force. *Garner,* 471 U.S. at 8, 11-12, 105 S.Ct. 1694 (holding that "[t]he use of deadly force to prevent the escape of all *felony* suspects, whatever the circumstances, is constitutionally unreasonable .... A police officer may not seize an unarmed, nondangerous suspect by shooting him dead"; "it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out") (emphasis added); *Brower v. County of Inyo,* 489 U.S. 593, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989). *See Terry v. Ohio,* 392 U.S. 1, 19-20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (requiring reasonableness of seizure based on the circumstances, including scope and intensity of seizure); *United States v. Ortiz,* 422 U.S. 891, 895, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975) (same); *Evans v. Hightower,* 117 F.3d 1318, 1320 (11th Cir.1997) (holding Fourth Amendment violated if seizure occurred and force used to effect the seizure was unreasonable); *see generally Mercado v. City of Orlando,* 407 F.3d 1152, 1160 (11th Cir.2005) (holding that in 2002 there was a "clearly established principle that deadly force cannot be used in non-deadly situations.").[FN13]

FN13. To determine the constitutionality of a seizure "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Garner,* 471 U.S. at 8, 105 S.Ct. 1694 (citing *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *United States v. Mar-*

tinez-Fuerte, 428 U.S. 543, 555, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976)).

Impacting our review of reasonableness is a "careful attention to the facts and circumstances of each particular case, *including the severity of the crime at issue.*" *Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (emphasis added); *Lee v. Ferraro,* 284 F.3d 1188, 1197-98 (11th Cir.2002) (denying qualified immunity to officer on excessive force claim partially because of low level of plaintiff's offense; "*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime ...."); *Jackson v. Sauls,* 206 F.3d 1156, 1170 n. 18 (11th Cir.2000) ( "A court may also factor in 'the severity of the crime ....' ") (quoting *Gold v. City of Miami,* 121 F.3d 1442, 1446 (11th Cir.1997); *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1559 (11th Cir.1993) (same); *see generally United States v. Kaplan,* 286 F. 963, 974 (D.C.Ga.1923) (holding that "in the case of a misdemeanor, the general rule that an officer has no right, except in self-defense, to kill the offender to effect his arrest, and that the 'killing of a fleeing person under such circumstances would amount to murder.' "); *King v. State,* 91 Ga.App. 825, 828, 87 S.E.2d 434 (Ga.App.1955) ("no arresting officer has any right to kill a person for trying to escape in the commission of a misdemeanor")).

Thus, by 2001 the law was clearly established that a seizure must be reasonable under the circumstances, which include a review of the offense charged; that an **\*819** automobile can be used as deadly force; and that deadly force cannot be used in the absence of the *Garner* preconditions.

The establishment of these principles distinguishes this case from *Brosseau v. Haugen.* 125 S.Ct. 596 (2004). In *Brosseau,* the Supreme Court reversed the denial of qualified immunity to an officer sued for Fourth Amendment violations under § 1983 for shooting a suspected felon as he attempted to flee in a vehicle, where the officer had arguable probable cause to believe that the suspect

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 807
433 F.3d 807
**(Cite as: 433 F.3d 807)**

posed an imminent threat of serious physical harm to several officers and citizens in the immediate surrounding area.[FN14] Unlike Harris, Haugen, the suspect in *Brosseau,* was a suspected felon with a no-bail warrant out for his arrest, with whom Brosseau, the officer, had a violent physical encounter prior to the shooting. Believing that Haugen had entered a Jeep to retrieve a gun, Brosseau broke the windowpane of the Jeep, and attempted to stop Haugen by hitting him over the head with the butt and barrel of her gun. Haugen was undeterred, however, and began to take off out of the driveway, without regard for the safety of those in his immediate vicinity-the three officers on foot (Haugen at his immediate left and two others with a K-9 somewhere nearby), a woman and her 3-year-old child in a small vehicle parked directly in front of the Jeep and 4 feet away, and two men in a parked vehicle 20 to 30 feet away. In addition, prior to shooting, Brosseau warned Haugen that she would shoot by pointing her gun at the suspect while commanding him to get out of the car, and then using the gun to shatter the glass of the car window and hit Haugen in an attempt to get the keys.

> FN14. These facts are not comparable to those in *Harris.* In the light most favorable to Harris, there is no comparable evidence that Scott had arguable probable cause to believe that Harris posed an *immediate* risk of death or serious danger to Scott, other officers, or nearby citizens. Harris was being chased for a traffic violation, not a "crime involving the infliction or threatened infliction of serious physical harm." *Garner,* 471 U.S. at 11, 105 S.Ct. 1694. Unlike the situation in *Brosseau,* the parties were not in close physical proximity nor had they had a one-on-one struggle. In fact, Scott and the other pursuing officers were following Harris from *behind in their squad cars.* At the time of the ramming, apart from speeding and running two red lights, Harris was driving in a non-aggressive fashion (i.e., without trying to ram or run into the officers). Moreover, unlike Haugen, who was surrounded by of-

ficers on foot, with other cars in very close proximity in a *residential* neighborhood, Scott's path on the open highway was largely clear. The videos introduced into evidence show little to no vehicular (or pedestrian) traffic, allegedly because of the late hour and the police blockade of the nearby intersections. Finally, Scott issued absolutely no warning (e.g., over the loudspeaker or otherwise) prior to using deadly force.

Looking to *Garner,* the *Brosseau* Court recognized that its clearly established deadly force rule (i.e., that "it is unreasonable for an officer to 'seize an unarmed non dangerous suspect by shooting him dead' ") was limited by the Court's further instruction that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Brosseau,* 125 S.Ct. at 598 (quoting *Garner,* 471 U.S. at 11, 105 S.Ct. 1694, 85 L.Ed.2d 1). Thus, the *Brosseau* Court held that *Garner* did not provide a reasonable officer with fair notice of a Fourth Amendment violation in "the situation [Brosseau] confronted: whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, *when persons in the immediate area are at risk from that flight.*" *Id.* at 600 (emphasis supplied).[FN15]

> FN15. We also note that the Court in *Brosseau* acknowledged that the standard in *Garner* can "clearly establish" whether or not the use of deadly force is unconstitutional in an "obvious case." *Brower,* 489 U.S. at 599, 109 S.Ct. 1378; *United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) ("general constitutional rule already identified in the decisional law ... appl[ied] with obvious clarity to [his conduct]."). It is well-established that "general statements of the law" are perfectly capable of giving clear and fair warning to officers even where " 'the very action in question has [not] previ-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ously been held unlawful.' " *Lanier,* 520 U.S. at 271, 117 S.Ct. 1219 (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034, 97 L.Ed.2d 523); *Vinyard,* 311 F.3d at 1350-51. While we need not conclude that the facts in *Harris* present just such an "obvious" case to deny Scott qualified immunity, this case may present such circumstances, since the evidence shows that Scott lacked the sufficient probable cause to warrant the use of deadly force. In this way, *Harris* is more like *Vaughan* than *Brosseau* or the cases cited therein. *See Vaughan,* 343 F.3d at 1333 ("appl[ying] *Garner* in a common-sense way" to hold that a reasonable officer would have known that it was unconstitutional to use deadly force during a high-speed pursuit *where the suspect posed no immediate threat of harm to police officers or others*). In the cases relied upon in *Brosseau,* the officer had arguable probable cause to believe that the suspects presented an immediate risk of danger to the officers or others. *See Brosseau,* 125 S.Ct. at 600 (citing *Cole v. Bone,* 993 F.2d 1328 (8th Cir.1993) and *Smith,* 954 F.2d 343). Without the existence of an immediate threat of harm to the officers or others that could justify the officer's probable cause, the *Garner* rule prohibiting deadly force may apply with "obvious clarity."

**\*820** Scott also argues that *Garner* does not apply because in that case, the officer applied the deadly force with a gun. Scott relies on our holding in *Adams* that in 1985, the caselaw was insufficiently developed to give notice to every objectively reasonable officer that a police car ramming another car during a high-speed pursuit would constitute an unreasonable seizure. However, the facts in *Adams* occurred before *Brower* was decided, and thus, at a time before the Supreme Court made clear that the intentional use of a vehicle to apprehend a suspect was a Fourth Amendment seizure. That principle is now settled. *Garner* made clear that the use of deadly force against an unarmed and nondan-

gerous fleeing felony suspect was unlawful and set out the specific criteria necessary before the application of deadly force is warranted. This law clearly applied to the use of a vehicle to seize a suspect at the time of the incident in this case.

We are satisfied that, under *Hope,* the requirement that the officers have "fair warning" that their conduct violates a constitutional right through a general constitutional rule, "even though the very action in question has [not] previously been held unlawful," has been satisfied. 536 U.S. at 740-41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (internal quotation marks and citations omitted). A reasonable police officer would have known in 2001 that a vehicle could be used to apply deadly force,[FN16] could be used to effectuate a seizure,[FN17] and that deadly force could not be used to apprehend a fleeing suspect unless the conditions set out in *Garner* existed. *Garner,* 471 U.S. at 11-12, 105 S.Ct. 1694. *See also Vaughan,* 343 F.3d at 1329-30. The *Garner* Court used the term "deadly force," not "handgun," in enunciating its rule. *Garner,* 471 U.S. at 11-12, 105 S.Ct. 1694 ("Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, *deadly force* may be used ...") (emphasis supplied). Moreover, the opinion recognizes the obvious principle that "deadly force" can be inflicted through other means. *Id.* at 14, **\*821** 105 S.Ct. 1694 (observing that in times when weapons were rudimentary, "[d]eadly force could be inflicted almost solely in a hand-to-hand struggle ..."). *See Vaughan,* 343 F.3d at 1332 ("the Supreme Court in *Hope* cautioned that we should not be unduly rigid in requiring factual similarity between prior cases and the case under consideration"). *See also Gutierrez v. City of San Antonio,* 139 F.3d 441, 446 (5th Cir.1998) (applying *Garner* "deadly force" rule to determine whether officers were qualifiedly immune for hog-tying suspect).

FN16. *See* citations on pages 813 - 814, *supra.*

FN17. *Brower,* 489 U.S. at 596-99, 109

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S.Ct. 1378, 103 L.Ed.2d 628.

By 2001, it was well-established in this circuit that "deadly force" means force that creates a substantial risk of causing death or serious bodily injury. *Pruitt,* 771 F.2d at 1479 n. 10. The CCSD policy in 2001 employed a near-identical definition. Moreover, by 1986, we had recognized the potentially lethal nature of an automobile. *See Gualdado,* 794 F.2d at 1535, and other cases cited on pages 813 - 814, *supra.*

We are also satisfied that common sense would inform any reasonable officer that there would be substantial risks of death or bodily harm if he used his vehicle to ram another vehicle at high speeds in the manner employed in this case. *See* CCSD Use of Force Policy, R. 48, Ex. 12 at 82 (restricting the use of deadly force to "[w]hen the Deputy reasonably believes it is necessary to defend their [sic] own life or the life of another or to prevent grave bodily injury to themselves [sic] or another, and all other available means of defense have failed or would be inadequate or dangerous," or "[w]hen necessary to prevent the commission of ... any felony which involves the use or threat of physical force or violence against any person."). *See also* Ga.Code Ann., § 17-4-20(b) ("Sheriffs and peace officers ... may use deadly force to apprehend a suspected felon only when the officer reasonably believes that the suspect possesses a deadly weapon or any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury; when the officer reasonably believes that the suspect poses an immediate threat of physical violence to the officer or others; or when there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm."); *Garner,* 471 U.S. at 10-11, 105 S.Ct. 1694 ("The fact is that a majority of police departments in this country have forbidden the use of deadly force against nonviolent suspects."). *Cf.* CCSD Pursuit Policy, R. 48, Ex. 11, at 94 (categorizing roadway barricades as the use of deadly force and limiting their use "only by order of a supervisor and then only as a last resort when

the person pursued has proven by his method of flight a total disregard for the lives and safety of the public"). *See Vaughan,* 343 F.3d at 1332-33 ("Applying *Garner* in a common-sense way, a reasonable officer would have known that firing into the cabin of a pickup truck, traveling at approximately 80 miles per hour on Interstate 85 in the morning, would transform the risk of an accident on the highway into a virtual certainty. The facts of this case bear out these foreseeable consequences. Thus, Deputy Cox is not entitled to ... qualified immunity grounds, regarding Vaughan's § 1983 claim predicated on the Fourth Amendment.").

For the foregoing reasons, a jury could conclude that Scott unreasonably used deadly force to seize Harris by ramming him off the road under the instant circumstances, and we find no reversible error in the denial of qualified immunity to Scott at this stage in this case.[FN18]

> FN18. Scott is not foreclosed from seeking to assert a qualified immunity defense at trial if the facts proven at trial differ from those we consider here for summary judgment purposes.

**\*822** Consistent with the above conclusions, the district court opinion is

REVERSED IN PART and AFFIRMED IN PART.

C.A.11 (Ga.),2005.
Harris v. Coweta County, Ga.
433 F.3d 807

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 F.3d 1117                                                           Page 1
248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly
Fed. C 643
**(Cite as: 248 F.3d 1117)**

C

Chesser v. Sparks
C.A.11 (Ga.),2001.

United States Court of Appeals,Eleventh Circuit.
Angie CHESSER, a.k.a. Angie Kimball, Plaintiff-
Appellee,
v.
Amos SPARKS, individually and in his official ca-
pacity as Haralson County Commissioner, Defend-
ant-Appellant.
**No. 99-14594.**

April 18, 2001.

Employee terminated from her county clerk posi-
tion brought § 1983 action against county commis-
sioner, alleging violation of her First Amendment
rights of free speech and freedom of association.
Commissioner moved to dismiss on qualified im-
munity grounds. The United States District Court
for the Northern District of Georgia, No.
99-00023-CV-JTC-3,Jack T. Camp, J., denied mo-
tion. Commissioner appealed. The Court of Ap-
peals, Tjoflat, Circuit Judge, held that commission-
er was entitled to qualified immunity.

Reversed.

West Headnotes

**[1] Federal Courts 170B ☞579**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)2 Finality of Determination
                170Bk576 Particular Actions, Inter-
locutory Orders Appealable
                    170Bk579 k. Civil Rights Cases.
Most Cited Cases
Federal Court of Appeals has jurisdiction to review
the district court's denial of the defense of qualified
immunity in a civil rights action pursuant to statute
allowing interlocutory appeals. 28 U.S.C.A. § 1291.

**[2] Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil Rights Cases in
General. Most Cited Cases
While qualified immunity defense to a §1983 action
is typically addressed at the summary judgment
stage of the case, the defense may be raised and
considered on a motion to dismiss; the motion will
be granted if the complaint fails to allege the viola-
tion of a clearly established constitutional right. 42
U.S.C.A. § 1983.

**[3] Federal Courts 170B ☞776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases

**Federal Courts 170B ☞797**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk797 k. Dismissal. Most Cited
Cases
On review of district court's denial of motion to dis-
miss §1983 action on qualified immunity grounds,
court of appeals reviews de novo issue of whether
complaint alleges a clearly established constitution-
al right, accepting the facts alleged in the complaint
as true and drawing all reasonable inferences there-
from in the plaintiff's favor. 42 U.S.C.A. § 1983.

**[4] Civil Rights 78 ☞1376(1)**

78 Civil Rights
    78III Federal Remedies in General
            78k1372 Privilege or Immunity; Good Faith

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643

**(Cite as: 248 F.3d 1117)**

and Probable Cause

        78k1376 Government Agencies and Officers

          78k1376(1) k. In General. Most Cited Cases

    (Formerly 78k214(1))

"Qualified immunity" protects government actors performing discretionary functions from being sued for civil rights violations in their individual capacities.

**[5] Civil Rights 78 €‐‐1376(2)**

78 Civil Rights

    78III Federal Remedies in General

        78k1372 Privilege or Immunity; Good Faith and Probable Cause

          78k1376 Government Agencies and Officers

            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

    (Formerly 78k214(2))

"Qualified immunity" doctrine shields government officials from liability in civil rights actions to the extent that their conduct does not violate clearly established constitutional rights of which a reasonable person would have known.

**[6] Civil Rights 78 €‐‐1376(1)**

78 Civil Rights

    78III Federal Remedies in General

        78k1372 Privilege or Immunity; Good Faith and Probable Cause

          78k1376 Government Agencies and Officers

          78k1376(1) k. In General. Most Cited Cases

    (Formerly 78k214(1))

"Qualified immunity" doctrine protects government officials from always erring on the side of caution by shielding them both from liability in civil rights actions and the other burdens of litigation, including discovery.

**[7] Civil Rights 78 €‐‐1376(2)**

78 Civil Rights

    78III Federal Remedies in General

        78k1372 Privilege or Immunity; Good Faith and Probable Cause

          78k1376 Government Agencies and Officers

            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

    (Formerly 78k214(2))

Evaluating the defense of qualified immunity raised by a government official in a federal civil rights action involves a two step inquiry: first, whether the official's conduct violated a clearly established constitutional right; and second, whether a reasonable government official would have been aware of that fact.

**[8] Civil Rights 78 €‐‐1376(2)**

78 Civil Rights

    78III Federal Remedies in General

        78k1372 Privilege or Immunity; Good Faith and Probable Cause

          78k1376 Government Agencies and Officers

            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

    (Formerly 78k214(2))

A constitutional right is "clearly established," precluding defense of qualified immunity in a federal civil rights action, if controlling precedent has recognized the right in a concrete and factually defined context.

**[9] Civil Rights 78 €‐‐1376(2)**

78 Civil Rights

    78III Federal Remedies in General

        78k1372 Privilege or Immunity; Good Faith and Probable Cause

          78k1376 Government Agencies and Officers

            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643

**(Cite as: 248 F.3d 1117)**

(Formerly 78k214(2))

A § 1983 plaintiff cannot prove existence of a "clearly established right," as required to avoid the qualified immunity defense, by referring to general rules and to the violation of abstract rights. 42 U.S.C.A. § 1983.

**[10] Constitutional Law 92 ☞1946**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1946 k. Demotion. Most Cited Cases
    (Formerly 92k90.1(7.2))

**Constitutional Law 92 ☞1947**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1947 k. Discharge. Most Cited Cases
    (Formerly 92k90.1(7.2))

A state may not demote or discharge a public employee in retaliation for protected speech. U.S.C.A. Const.Amend. 1.

**[11] Constitutional Law 92 ☞1925**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1925 k. In General. Most Cited Cases
    (Formerly 92k90.1(7.2))

A public employee's right to freedom of speech is not absolute. U.S.C.A. Const.Amend. 1.

**[12] Constitutional Law 92 ☞1929**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1929 k. Public or Private Concern. Most Cited Cases
    (Formerly 92k90.1(7.2))

**Constitutional Law 92 ☞1934**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1934 k. Efficiency of Public Services. Most Cited Cases
    (Formerly 92k90.1(7.2))

To determine whether a government official has retaliated against an employee because of the employee's protected speech, as would violate the First Amendment, court considers first whether employee's speech is fairly characterized as constituting speech on a matter of public concern; if it is, court applies *Pickering* balancing test, which weighs the employee's free speech interest against the interest of the government, as an employer, in promoting the efficiency of the public services it performs. U.S.C.A. Const.Amend. 1.

**[13] Civil Rights 78 ☞1421**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1421 k. Employment Practices. Most Cited Cases
    (Formerly 78k242(3))

**Constitutional Law 92 ☞1947**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1947 k. Discharge. Most Cited Cases
    (Formerly 92k90.1(7.2))

If a public employee's speech involves a matter of public concern, and the employee's interests outweigh those of the government as an employer under *Pickering* test, court, in determining whether First Amendment violation occurred, asks whether the speech played a substantial part in the government's decision to discharge the employee; if it did, court examines whether the government has shown by a preponderance of the evidence that it would have discharged the employee regardless of the pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643
**(Cite as: 248 F.3d 1117)**

tected conduct. U.S.C.A. Const.Amend. 1.

**[14] Constitutional Law 92 ⟜1929**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1929 k. Public or Private Concern. Most Cited Cases
    (Formerly 92k90.1(7.2))
For purposes of determining whether government's alleged retaliation against employee for his speech violated the First Amendment, employee's speech addresses a "matter of public concern" if it relates to any matter of political, social, or other concern to the community. U.S.C.A. Const.Amend. 1.

**[15] Constitutional Law 92 ⟜1929**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1929 k. Public or Private Concern. Most Cited Cases
    (Formerly 92k90.1(7.2))
In determining whether a public employee's speech involved a "matter of public concern," as required to establish First Amendment retaliation claim, court examines the content, form, and context of the employee's speech. U.S.C.A. Const.Amend. 1.

**[16] Civil Rights 78 ⟜1376(10)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(10) k. Employment Practices. Most Cited Cases
    (Formerly 78k214(4))
County commissioner was entitled to qualified immunity from county employee's §1983 claim, which alleged that she was discharged in violation of the First Amendment for informing commissioner that

county's failure to pay wages for overtime would violate the Fair Labor Standards Act (FLSA); precedent did not clearly establish that such statement involved a "matter of public concern." U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983; Fair Labor Standards Act of 1938, § 7(a, *o*), 29 U.S.C.A. § 207(a, *o*).

**[17] Constitutional Law 92 ⟜1929**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1929 k. Public or Private Concern. Most Cited Cases
    (Formerly 92k90.1(7.2))

**Constitutional Law 92 ⟜1934**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1934 k. Efficiency of Public Services. Most Cited Cases
    (Formerly 92k90.1(7.2))
In determining whether a public employee's First Amendment right to engage in speech on a matter of public concern outweighs government's interest in promoting efficiency of public services it performs, court must consider three factors: (1) whether the speech at issue impedes the government's ability to perform its duties efficiently; (2) the manner, time and place of the speech; and (3) the context within which the speech was made. U.S.C.A. Const.Amend. 1.

**[18] Constitutional Law 92 ⟜1947**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1947 k. Discharge. Most Cited Cases
    (Formerly 92k90.1(7.2))

**Counties 104 ⟜67**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643
**(Cite as: 248 F.3d 1117)**

104 Counties
    104III Officers and Agents
        104k67 k. Removal. Most Cited Cases
County employee who was allegedly terminated for informing county commissioner that county's failure to pay overtime wages violated the Fair Labor Standards Act (FLSA) could not establish First Amendment retaliation claim, even if such speech involved a "matter of public concern"; commissioner's interest in maintaining loyalty, discipline and good working relationships among his employees outweighed employee's free speech interest. U.S.C.A. Const.Amend. 1; Fair Labor Standards Act of 1938, § 7(a, *o*), 29 U.S.C.A. § 207(a, *o*).

**[19] Officers and Public Employees 283 ⟳66**

283 Officers and Public Employees
    283I Appointment, Qualification, and Tenure
        283I(G) Resignation, Suspension, or Removal
            283k66 k. Grounds for Removal. Most Cited Cases
        (Formerly 92k82(11))
For public employee to establish that employer took action affecting his or her job in way that impermissibly burdened a constitutional right, employee must first demonstrate that asserted right is protected by the Constitution and that he or she suffered "adverse employment action" for exercising the right.

**[20] Civil Rights 78 ⟳1376(10)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(10) k. Employment Practices. Most Cited Cases
        (Formerly 78k214(4))
County commissioner was entitled to qualified immunity from county employee's claim that commissioner terminated her in violation of her First Amendment right to association because she was

married to sheriff, who was political enemy of commissioner; employee also alleged that she was terminated in part for insubordination and lack of cooperation, and precedent did not clearly establish that such a termination violated the First Amendment. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[21] Constitutional Law 92 ⟳1442**

92 Constitutional Law
    92XVI Freedom of Association
        92k1442 k. Intimate Association; Dating Relationships in General. Most Cited Cases
        (Formerly 92k82(10))
At a minimum, the right of intimate association under the First Amendment encompasses the personal relationships that attend the creation and sustenance of a family, specifically marriage. U.S.C.A. Const.Amend. 1.

**\*1120** Benton J. Mathis, Jr.,Freeman Mathis & Gary, LLP, Atlanta, GA, for Defendant-Appellant.
Susan Marie Garrett, Decatur, GA, for Plaintiff-Appellee.

Appeal from the United States District Court for the Northern District of Georgia.

Before TJOFLAT, HULL and PROPST [FN*], Circuit Judges.

> FN* Honorable Robert B. Propst, U.S. District Judge for the Northern District of Alabama, sitting by designation.

TJOFLAT, Circuit Judge:

    The sole issue in this interlocutory appeal is whether the defendant county Commissioner, who is being sued for money damages in his individual capacity under 42 U.S.C. § 1983, is entitled to qualified immunity with respect to the plaintiff's claims that he terminated her employment in violation of her First Amendment rights of free speech and freedom of association. The district court denied the Commissioner's motion to dismiss, holding that the plaintiff's complaint alleged facts sufficient to de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643
**(Cite as: 248 F.3d 1117)**

feat the defense of qualified immunity. We reverse.

### I.

### A.

According to the allegations of her complaint, plaintiff Angie Chesser began working in the clerk's office in Haralson County, Georgia, in 1985. At the time of her discharge in February 1997, she held the position of Assistant County Clerk. Her responsibilities included the preparation of the payroll for the County's several departments, including the sheriff's office.

Haralson County is governed by a one-person commission. In the November 1996 general election, defendant Amos Sparks was elected Commissioner and Chesser's then-husband, Ronnie Kimball, was elected Sheriff; both took office on January 1, 1997. Sparks and Kimball were political enemies. So, in an effort to avoid what might appear to be a conflict of interest, Chesser arranged for a co-worker to prepare the payroll for the sheriff's department.

On February 6, 1997, Sparks issued a memorandum to all county departments which stated that, due to budget concerns, overtime would not be reimbursed in the form of wages. Notwithstanding this instruction, overtime wages were paid to sheriff's department employees. Calling her attention to his memorandum, Sparks asked Chesser why overtime had been paid. After disclaiming knowledge of the memorandum, Chesser said that the County's failure to compensate overtime in the form of wages would violate the Fair Labor Standards Act.FN1 Sparks terminated Chesser's employment on February 20, 1997;FN2 his stated reason for the termination was that she was insubordinate and demonstrated a "lack of cooperation."

FN1. Pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq., a public employee working overtime has the choice to be reimbursed either in the form of wages

or compensatory time. 29 U.S.C. §§ 207(a) and (o). A public employer may only substitute compensatory compensation for overtime pay pursuant to a collective bargaining agreement or agreement between the employer and employee if there is no applicable collective bargaining agreement. 29 U.S.C. § 207(o)(2).

FN2. Although the complaint makes no mention of the terms of her employment, we assume that Chesser was an at-will employee and that Sparks had the authority to terminate her employment.

### B.

Chesser responded to her discharge by filing a two count complaint in the Northern**1121** District of Georgia against Haralson County and Sparks, in both his official and individual capacities. Count One, brought under the Fair Labor Standards Act ("FLSA"), alleged that her discharge constituted retaliatory conduct proscribed by the FLSA.FN3 Count Two, brought under 42 U.S.C. § 1983,FN4 alleged that Sparks's termination of Chesser's employment infringed her First Amendment rights of free speech and of freedom of association (her marriage to the Sheriff).FN5

FN3. The FLSA makes it unlawful for an employer to:

discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3) (1994).

FN4. 42 U.S.C. § 1983 provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643
**(Cite as: 248 F.3d 1117)**

thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ....

> FN5. Although Chesser's complaint does not mention the Fourteenth Amendment, which is the constitutional provision that makes the First Amendment applicable to state and local governments, *see Wallace v. Jaffree,* 472 U.S. 38, 49 n. 34, 105 S.Ct. 2479, 2486, 86 L.Ed.2d 29 (1985) (collecting cases), we treat the complaint as alleging violations of the Fourteenth Amendment.

Both defendants moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, contending that neither count stated a claim for relief. Sparks, in addition, contended that he was entitled to qualified immunity on the Count Two claims asserted against him in his individual capacity. The district court granted the defendants' motions as to Count One, but denied them as to Count Two. The court also found the allegations of the complaint sufficient to overcome Sparks's qualified immunity defense. The court stated that it would reconsider the defense if Sparks moved for summary judgment following the completion of discovery. After the court made these rulings, Sparks lodged this appeal.

## II.

### A.

[1][2][3] We have jurisdiction to review the denial of the defense of qualified immunity pursuant to 28 U.S.C. § 1291. *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). While qualified immunity is typically addressed at the summary judgment stage of the case, the defense may be raised and considered on a motion to dismiss; the motion will be granted if the "complaint fails to allege the viola-

tion of a clearly established constitutional right." *Williams v. Ala. State Univ.,* 102 F.3d 1179, 1182 (11th Cir.1997). Whether the complaint alleges such a violation is a question of law which we review *de novo,* accepting the facts alleged in the complaint as true and drawing all reasonable inferences therefrom in the plaintiff's favor. *Id.*

### B.

[4][5][6] Qualified immunity protects government actors performing discretionary functions from being sued in their individual capacities. *Williams,* 102 F.3d at 1182; *Lassiter v. Ala. A & M Univ., Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994)*1122 (en banc). The doctrine shields government officials from liability to the extent that "their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 817-18, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The doctrine protects government officials from always "err[ing] on the side of caution" by shielding them both from liability "and the other burdens of litigation, including discovery." *Lassiter,* 28 F.3d at 1149.

[7] Evaluating the defense of qualified immunity involves a two step inquiry: first, whether the defendant's conduct violated a clearly established constitutional right; and, second, whether a reasonable government official would have been aware of that fact. *See Tindal v. Montgomery County Comm'n,* 32 F.3d 1535, 1539 (11th Cir.1994). This two-step inquiry is designed to "provide[ ] ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

[8][9] A constitutional right is clearly established if controlling precedent has recognized the right in a "concrete and factually defined context." *Lassiter,* 28 F.3d at 1149; *see also Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993) ("If case law, in factual terms, has not staked out a bright line, qualified immunity almost

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643
**(Cite as: 248 F.3d 1117)**

always protects the defendant."). A plaintiff cannot avoid the qualified immunity defense "by referring to general rules and to the violation of abstract 'rights.' " *Lassiter,* 28 F.3d at 1150. If the constitutional right has been clearly established, the plaintiff must demonstrate that a reasonable government actor would have known that what he was doing infringed that right. *See Williams,* 102 F.3d at 1182. With this two step inquiry in mind, we turn to the question of whether Sparks's decision to terminate Chesser's employment violated either of the First Amendment rights involved here-freedom of speech or freedom of association-in such a manner that a reasonable government official would have known.

### III.

### A.

[10][11] "It is axiomatic that '[a] state may not demote or discharge a public employee in retaliation for protected speech.' " *Tindal v. Montgomery County Comm'n,* 32 F.3d 1535, 1539 (11th Cir.1994) (quoting *Morgan v. Ford,* 6 F.3d 750, 753-54 (11th Cir.1993)); *see Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). A public employee's right to freedom of speech, however, is not absolute. *Bryson v. City of Waycross,* 888 F.2d 1562, 1565 (11th Cir.1989). To determine whether a state actor has retaliated against an employee because of the employee's protected speech, we have used a four-pronged test based on the Supreme Court's decision in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See Rice-Lamar v. City of Fort Lauderdale,* 232 F.3d 836, 841 (11th Cir.2000).

[12][13] First, we consider whether the employee's speech is " 'fairly characterized as constituting speech on a matter of public concern.' " *Bryson,* 888 F.2d at 1565 (quoting *Rankin,* 483 U.S. at 384, 107 S.Ct. at 2896-97). If it is, we apply the *Pickering* balancing test, which weighs the employ-

ee's free speech interest against "the interest of the state, as an employer, in promoting the efficiency of the public services it performs." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734-35. If the employee's interests outweigh those of the state as an employer, we turn to the third **\*1123** prong: whether the speech "played a 'substantial part' in the government's decision to discharge the employee." *Fikes v. City of Daphne,* 79 F.3d 1079, 1084 (11th Cir.1996). If it did, we must address the fourth prong, which is whether the government has shown by a preponderance of the evidence that it would have discharged the employee regardless of the protected conduct. *Id.* at 1085.

### 1.

[14][15] Speech addresses a matter of public concern, and thus establishes *Pickering* 's first prong, if it relates "to any matter of political, social, or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). In making this determination, we examine the content, form, and context of the employee's speech. *Bryson,* 888 F.2d at 1565.

[16] The speech at issue here is Chesser's statement to Sparks that the County's failure to pay wages for overtime would violate the FLSA. In focusing on the content, form, and context of the speech, we consider whether the employee is speaking as a citizen on behalf of the public or "as an employee upon matters only of personal interest." *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. Chesser's statement may not have been "only of personal interest," *id.,* but she was certainly speaking as an employee when, as Assistant County Clerk in charge of payroll, she told Sparks, in his capacity as County Commissioner, that the County could not lawfully refuse to pay overtime wages. Chesser cites no case, and our independent research has uncovered none, holding that a statement such as Chesser's, made in the same or similar context, satisfies the first prong of the *Pickering* test. [FN6] Because "case law, in factual terms, has not staked out a bright line," *Post v. City of Fort Lauderdale,* 7

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly
Fed. C 643
**(Cite as: 248 F.3d 1117)**

F.3d 1552, 1557 (11th Cir.1993), indicating that Chesser's speech was a matter of public concern, a reasonable government official in Sparks's position would have had no reason to believe that the Constitution protected Chesser's statement that the County's refusal to pay overtime wages would violate the FLSA.

> FN6. Chesser contends that *Martinez v. City of Opa-Locka,* 971 F.2d 708 (11th Cir.1992), and *Gonzalez v. Lee County Housing Authority,* 161 F.3d 1290 (11th Cir.1998), support her claim that the First Amendment clearly protected her statement to Sparks. Neither case is on point. In *Gonzalez* we reversed the district court's denial of qualified immunity on the plaintiff's free speech claim. We affirmed the district court's denial of qualified immunity only on the plaintiff's claim that the defendant terminated her employment in violation of a provision of the Fair Housing Act, 42 U.S.C. § 3617. *Gonzalez,* 161 F.3d at 1298, 1305.

In *Martinez,* the plaintiff alleged that she was discharged for testifying before a Board of Inquiry that the defendant, the city manager, had violated bid procedures in purchasing furniture for the city hall. *Martinez,* 971 F.2d at 710-11. We affirmed the denial of qualified immunity, finding that the plaintiff's speech was protected under the first prong of the *Pickering* test, *id.* at 712; the plaintiff's statements were made before a Board of Inquiry and provided information concerning the expenditure of public funds. *Id.* We further noted that the form of the speech was testimony and that the context was an examination into the activities of city personnel which was being conducted by officials having investigatory powers. *Id.* None of these factors exist in the instant case. Here, Chesser spoke directly to Sparks about paying overtime wages; there was no official investigation and the speech was not made to inform a third party.

### 2.

[17] Even if we were to find that binding pre-

cedent [FN7] clearly established a constitutional**1124** right to inform one's supervisor of the requirements of the law, Chesser cannot satisfy the second prong of the *Pickering* test. That prong requires us to consider three factors: "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Bryson,* 888 F.2d at 1567 (internal quotations omitted). "Because no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful." *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1323 (11th Cir.1989).

> FN7. Binding precedent in this circuit consists of Supreme Court and Eleventh Circuit decisions (including Fifth Circuit cases handed down prior to October 1, 1981). *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

[18] "We need not decide the precise result of applying the ... balancing test to this case. We must decide only whether the result would be such that a reasonable official in [the defendant's] place would know that the termination of [the plaintiff] under these circumstances violated [the plaintiff's] constitutional rights." *Id.* at 1324. Here, Sparks certainly had an interest in maintaining "loyalty, discipline and good working relationships among those he supervises." *Id.* Regardless of whether Chesser's interpretation of the FLSA was correct, Sparks may reasonably have believed that Chesser was being insubordinate and disruptive, and hence that he was justified in discharging her.[FN8] In sum, Chesser cannot satisfy the second prong of the test; consequently, we need not move to the third and fourth prongs. The district court erred in not granting Sparks qualified immunity with respect to the free speech component of Count Two.

> FN8. The complaint, in fact, specifically

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643
(Cite as: 248 F.3d 1117)

alleges that Sparks claimed that Chesser was being insubordinate.

### B.

[19] The second theory of recovery in County Two is that Chesser's employment was terminated because of her association with her then-husband, Ronnie Kimball. To prevail on this theory, the plaintiff must demonstrate that she had a constitutional right and that she suffered "adverse employment action for exercising the right." *McCabe v. Sharrett,* 12 F.3d 1558, 1562 (11th Cir.1994) (quotation omitted). If the plaintiff has established both elements, we use the *Pickering* balancing test to determine whether the adverse employment action was permissible. *See Ross v. Clayton County,* 173 F.3d 1305, 1310-11 (11th Cir.1999); *cf. Shahar v. Bowers,* 114 F.3d 1097, 1106-07 (11th Cir.1997) (en banc) (employing the *Pickering* balancing test in the context of a same-sex marriage).

[20][21] Count Two contains the two elements set out above. First, it asserts the constitutional right of free association, which in this case is an intimate association. "At a minimum, the right of intimate association encompasses the personal relationships that attend the creation and sustenance of a family-[specifically] marriage ...."*McCabe,* 12 F.3d at 1563. Second, Count Two alleges that, because of her relationship with her husband, Chesser suffered an adverse employment action (termination). Count Two goes on to state, however, that her employment was terminated for insubordination and lack of cooperation.

**\*1125** As an employer, Haralson County certainly has an interest in having employees who are not insubordinate.[FN9] We can find no concrete and factually defined case that has held unconstitutional an employer's decision to discharge an employee due in part to insubordination.[FN10] A reasonable government actor in Sparks's position would have no reason to believe that such a decision would violate the law. The district court erred in not granting qualified immunity to Sparks on this Count Two claim.

FN9. As we have said:

The more a public employee's transfer or discharge is necessary to the effective functioning of the office, the more the transfer or discharge becomes justifiable, and thus the more likely it is that a court will find the transfer or discharge constitutionally permissible by finding the employer's interest in the *Pickering* balance.

*McCabe,* 12 F.3d at 1570.

> FN10. The district court based its denial of the motion to dismiss on our decision in *Wilson v. Taylor,* 733 F.2d 1539, 1544 (11th Cir.1984). *Wilson* involved a claim by a police officer that his employment was terminated for dating the adopted daughter of "a convicted felon reputed to be a key figure in organized crime in central Florida." *Id.* at 1540. We stated that "[a] state violates the [F]ourteenth [A]mendment when it seeks to interfere with the social relationship of two or more people." *Id.* at 1544. While that statement holds true today, we expressly recognized in *Wilson* that it was "a narrow holding." *Id.* at 1544 n. 3.

In this case, the [defendant] made the argument that dating was not protected under the [F]irst [A]mendment freedom of speech provision. The [defendant] did not make the argument that even if dating were protected under the freedom of association provision of the [F]irst [A]mendment, a[n employee's] rights under that provision could be curtailed due to the nature of [the employment].

*Id.*Because *Wilson* did not employ the *Pickering* balancing test, the decision would not have informed a reasonable government actor standing in Sparks's shoes that he would infringe Chesser's constitutional right of intimate association if he terminated her employment.

### IV.

For the foregoing reasons, the decision of the district court denying Sparks's qualified immunity on Chesser's Count Two claims is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643

**(Cite as: 248 F.3d 1117)**

    REVERSED.

C.A.11 (Ga.),2001.
Chesser v. Sparks
248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Scull v. New Mexico
C.A.10 (N.M.),2000.

United States Court of Appeals,Tenth Circuit.
Nancy SCULL, as Personal Representative of Little
Rock Reed, also known as Timothy Reed, Plaintiff-
Appellant,
v.
State of NEW MEXICO; County of Bernalillo; Mi-
chael Sisneros, individually and in his capacity as
Director of the Bernalillo County Detention Center;
City of Albuquerque; Robert Schwartz, Individually
and in his Capacity as District Attorney of Berna-
lillo County; Tom Udall, Attorney General State of
New Mexico, Individually and in his Capacity as
Attorney General; Does I through X, Defendants,
andAnthony Tupler, individually and in his Capa-
city as Assistant Attorney General State of New
Mexico; Kathryn Marquez; Phillip Cheves; Kathy
Silva; Allan Rackstraw, Defendants-Appellees.
Nancy Scull, as Personal Representative of Little
Rock Reed, also known as Timothy Reed, Plaintiff-
Appellant,
v.
State of New Mexico; County of Bernalillo; Robert
Schwartz, Individually and in his Capacity as Dis-
trict Attorney of Bernalillo County; Tom Udall, At-
torney General State of New Mexico, Individually
and in his Capacity as Attorney General; Anthony
Tupler, Individually and in his Capacity as Assist-
ant Attorney General State of New Mexico; Does I
through X, Defendants,
andMichael Sisneros, Individually and in his capa-
city as Director of the Bernalillo County Detention
Center; City of Albuquerque; Joe Gutierrez; David
Sherman, Defendants-Appellees.
Nos. 99-2215, 99-2216.

Dec. 22, 2000.

Detainee sued state and local officials under federal
civil rights statutes and New Mexico Tort Claims
Act, alleging that he was unlawfully detained for 30
days without initiation of extradition proceedings.

Certain defendants moved for summary judgment.
The United States District Court for the District of
New Mexico granted motions and sua sponte gran-
ted summary judgment for remaining defendants.
Detainee appealed. The Court of Appeals, Henry,
Circuit Judge, held that: (1) detainee had no right to
specific extradition procedures; (2) officials re-
sponsible for initiating extradition procedures were
entitled to qualified immunity; (3) officials at
county detention center were protected by qualified
immunity; (4) detention center officials were not
required to investigate detainee's claim that he was
entitled to be released; (5) detention center officials
were not liable for false imprisonment under New
Mexico law; (6) detention center officials were not
liable for alleged one-hour delay in detainee's re-
lease; and (7) sua sponte summary judgment was
not reversible error.

Affirmed.

West Headnotes

[1] Federal Courts 170B ☞766

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
        170BVIII(K)1 In General
            170Bk763 Extent of Review Depend-
ent on Nature of Decision Appealed from
                170Bk766 k. Summary Judgment.
Most Cited Cases
A summary judgment decision involving the de-
fense of qualified immunity is reviewed somewhat
differently from other summary judgment rulings;
only if plaintiff establishes both elements of quali-
fied immunity test, by showing violation of clearly
established right, does defendant bear traditional
burden of showing that there are no genuine issues
of material fact and that he or she is entitled to
judgment as a matter of law.

[2] Civil Rights 78 ☞1376(1)

78 Civil Rights

78III Federal Remedies in General
    78k1372 Privilege or Immunity; Good Faith and Probable Cause
        78k1376 Government Agencies and Officers
            78k1376(1) k. In General. Most Cited Cases
    (Formerly 78k214(1))

**Civil Rights 78 ☞1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
    (Formerly 78k214(2))

When defendant raises issue of qualified immunity on motion for summary judgment, plaintiff must satisfy a two-part test, demonstrating that defendant's actions violated constitutional or statutory right, and showing that constitutional or statutory right defendant allegedly violated was clearly established at the time of conduct at issue.

**[3] Civil Rights 78 ☞1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
    (Formerly 78k214(2))

For purposes of qualified immunity, right is "clearly established" only if there is United States Supreme Court or controlling circuit decision on point, or the clearly established weight of authority from other courts has found the law to be as the plaintiff maintains.

**[4] Civil Rights 78 ☞1376(9)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
            78k1376(9) k. Attorney General and Prosecuting Attorneys. Most Cited Cases
    (Formerly 78k214(9))

**Extradition and Detainers 166 ☞60**

166 Extradition and Detainers
    166II Detainers
        166k60 k. Effect of Delay or Failure to Prosecute; Waiver; Determination. Most Cited Cases
Detainee who had previously signed waiver of extradition as condition of parole in Ohio had no constitutional or statutory right to specific extradition procedures, and therefore state and local prosecutors in New Mexico were entitled to qualified immunity against detainee's claim based on officials' failure to initiate extradition procedures. U.S.C.A. Const. Art. 4, § 2, cl. 2; 18 U.S.C.A. § 3182; NMSA 1978, §§ 31-4-10, 31-4-14.

**[5] Civil Rights 78 ☞1376(9)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
            78k1376(9) k. Attorney General and Prosecuting Attorneys. Most Cited Cases
    (Formerly 78k214(9))

Even if waiver of extradition that detainee had previously signed as condition of parole in Ohio was invalid because coerced, state and local prosecutors in New Mexico had no reason to know that waiver was signed involuntarily; it was therefore objectively reasonable for prosecutors to rely on waiver, and qualified immunity protected them from detainee's § 1983 claim for failure to initiate extradition procedures. U.S.C.A. Const. Art. 4, § 2, cl. 2; 18

236 F.3d 588, 2001 CJ C.A.R. 43

**(Cite as: 236 F.3d 588)**

U.S.C.A. § 3182; 42 U.S.C.A. § 1983; NMSA 1978, §§ 31-4-10, 31-4-14.

**[6] Civil Rights 78 🗝1376(7)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases
    (Formerly 78k214(7))
Officials at county detention center were protected by qualified immunity from detainee's § 1983 claim alleging that officials should have released him on basis of order requiring detainee's release from detention facility in another county; detainee did not have constitutional or statutory right to be released from county detention center based on order, and, even if he did, it was not clearly established at time of detention that order was valid as to county detention center, even though center was not named therein. 42 U.S.C.A. § 1983; NMSA 1978, § 33-3-12(A).

**[7] Civil Rights 78 🗝1376(7)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases
    (Formerly 78k214(7))

**Prisons 310 🗝9**

310 Prisons
    310k5 Officers and Employees
        310k9 k. Powers and Duties. Most Cited Cases
Officials at county detention center were not re-

quired by federal constitution or statute to investigate independently detainee's claim that he was entitled to be released pursuant to order issued by judge in another county, despite knowledge of order, and therefore qualified immunity applied to preclude officials' liability on detainee's § 1983 claim based on failure to release him from detention. 42 U.S.C.A. § 1983.

**[8] False Imprisonment 168 🗝13**

168 False Imprisonment
    168I Civil Liability
        168I(A) Acts Constituting False Imprisonment and Liability Therefor
            168k9 Defenses
                168k13 k. Probable Cause. Most Cited Cases
Officials at county detention center believed that they had lawful authority to imprison detainee, based on "hit" on National Crime Information Center (NCIC) inquiry indicating existence of outstanding warrant for detainee's arrest in Ohio for alleged parole violation, and notwithstanding knowledge of order requiring detainee's release from detention facility in another county, and therefore officials could not be held liable for false imprisonment under New Mexico law.

**[9] False Imprisonment 168 🗝2**

168 False Imprisonment
    168I Civil Liability
        168I(A) Acts Constituting False Imprisonment and Liability Therefor
            168k1 Nature and Elements of False Imprisonment
                168k2 k. In General. Most Cited Cases
To prove a claim of false imprisonment under New Mexico law, detainee was required to show that (1) officials at county detention center intentionally confined or restrained him without his consent, and (2) officials knew that they had no lawful authority to do so.

**[10] Civil Rights 78 🗝1358**

78 Civil Rights

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

78III Federal Remedies in General
   78k1353 Liability of Public Officials
      78k1358 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
   (Formerly 78k207(1))
Officials at county detention center could not be held liable under § 1983 for county employee's alleged one-hour delay in releasing detainee for being "sniffler" when officials were not involved in such delay. 42 U.S.C.A. § 1983.

**[11] False Imprisonment 168 ☞15(1)**

168 False Imprisonment
   168I Civil Liability
      168I(A) Acts Constituting False Imprisonment and Liability Therefor
         168k15 Persons Liable
            168k15(1) k. In General. Most Cited Cases
Under New Mexico law, officials for county detention center who were not involved in alleged one-hour delay in detainee's release could not be held liable for false imprisonment.

**[12] False Imprisonment 168 ☞15(3)**

168 False Imprisonment
   168I Civil Liability
      168I(A) Acts Constituting False Imprisonment and Liability Therefor
         168k15 Persons Liable
            168k15(3) k. Liability of Principal for Acts of Agent. Most Cited Cases
Under New Mexico law, director for county detention center could not be held vicariously liable for alleged false imprisonment by center employee, which was based on employee's purported one-hour delay in releasing detainee for being "sniffler"; nothing in the record disclosed nature of relationship between director and employee, and director's supervisory position did not, by itself, establish him as principal/master and employee as agent/servant.

**[13] Labor and Employment 231H ☞3026**

231H Labor and Employment
   231HXVIII Rights and Liabilities as to Third Parties
      231HXVIII(B) Acts of Employee
      231HXVIII(B)1 In General
         231Hk3026 k. Nature of Liability in General. Most Cited Cases
   (Formerly 255k300 Master and Servant)

**Principal and Agent 308 ☞159(1)**

308 Principal and Agent
   308III Rights and Liabilities as to Third Persons
      308III(C) Unauthorized and Wrongful Acts
         308k159 Negligence or Wrongful Acts of Agent
            308k159(1) k. Rights and Liabilities of Principal. Most Cited Cases
Pursuant to principles of agency and respondeat superior, vicarious liability may be imposed on a principal or employer under New Mexico law for the acts of an agent or employee. Restatement (Second) of Agency § 2.

**[14] Federal Courts 170B ☞914**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)6 Harmless Error
         170Bk914 k. Judgment and Relief; Summary Judgment. Most Cited Cases
Detainee was not prejudiced, as required for reversal, when, in addition to granting summary judgment motions of certain state and local officials in detainee's § 1983 action, district court granted summary judgment sua sponte for remaining officials, even though detainee did not receive prior notice of court's intent to do so; the record already established actions taken by nonmoving officials, who were entitled to qualified immunity.

**[15] Federal Civil Procedure 170A ☞2533.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
         170Ak2533 Motion
            170Ak2533.1 k. In General. Most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

236 F.3d 588, 2001 CJ C.A.R. 43
**(Cite as: 236 F.3d 588)**

Cited Cases
Practice of granting summary judgment sua sponte
is not favored.

**\*590** Submitted on the briefs: FN* Steven Douglas
Looney, Crider, Bingham & Hurst, P.C., Al-
buquerque, NM, for the Plaintiff-Appellant.

> FN* After examining the briefs and appel-
> late record, this panel has determined un-
> animously that oral argument would not
> materially assist in the determination of
> this appeal. *See* Fed.R.App.P. 34(a)(2);
> 10th Cir. R. 34.1(G). The cause is there-
> fore ordered submitted without oral argu-
> ment.

Joan M. Waters, Attorney at Law, and Jeffery L.
Baker, Baker Law Firm, Albuquerque, NM, for the
Defendants-Appellees.

Before SEYMOUR, Chief Judge, EBEL, and
HENRY, Circuit Judges.

HENRY, Circuit Judge.

Appellant Timothy "Little Rock" Reed, now
deceased and personally represented by Nancy
Scull, brought suit against the State of New Mex-
ico, the County of Bernalillo, the City of Al-
buquerque, and various state and local officials pur-
suant to 42 U.S.C. §§ 1983, 1985, and 1986 and the
**\*591** New Mexico Tort Claims Act. The essence of
Mr. Reed's claims is that the Appellees unlawfully
detained him for thirty days without initiating ex-
tradition proceedings. During the proceedings be-
low, the district court held that the Appellees were
entitled to summary judgment. We affirm the grant
of summary judgment, concluding that the Ap-
pellees were immune from the § 1983 claims and
that Mr. Reed failed to establish a genuine issue of
material fact with respect to his tort claims.

### I. PROCEDURE

On January 30, 1998, Mr. Reed filed a com-
plaint, alleging unlawful detention against the fol-
lowing defendants: the State of New Mexico; the

County of Bernalillo; the City of Albuquerque;
Tom Udall, the Attorney General of New Mexico;
Anthony Tupler, an Assistant Attorney General of
New Mexico; Robert Schwartz, the District Attor-
ney for Bernalillo County; and Michael Sisneros,
the Director of the Bernalillo County Detention
Center ("BCDC").

Approximately a year later, the City of Al-
buquerque and Mr. Sisneros filed a joint motion for
summary judgment; Mr. Udall, Mr. Tupler, and Mr.
Schwartz did the same. In his response, Mr. Reed
stipulated to the dismissal of the City of Al-
buquerque. *See* Aplt's Br. at 3 (No. 99-2216). He
also stipulated to the dismissal of Mr. Udall and
Mr. Schwartz. *See* Aplt's Br. at 3 (No. 99-2215).
Bernalillo County had been dismissed several
months earlier.

On February 16, 1999, Mr. Reed filed a motion
to amend the complaint, seeking to join as defend-
ants Alan Rackstraw, Deputy District Attorney for
Bernalillo County; Katherine Marquez, Extradition
Coordinator for the Bernalillo County District At-
torney's office; Kathy Silva, assistant to Ms. Mar-
quez; Joe Gutierrez, a major at BCDC; and David
Sherman, a BCDC caseworker. In the alternative,
Mr. Reed sought to consolidate the case already
filed against these defendants.

On June 1, 1999, the district court granted Mr.
Reed's motion to amend. The next day, it issued an
order granting summary judgment to Mr. Tupler,
Mr. Rackstraw, Mr. Cheves, Ms. Marquez, and Ms.
Silva (collectively "Prosecutor Appellees"). With
respect to the § 1983 claims, the district court found
that the Prosecutor Appellees' actions were protec-
ted by absolute immunity or, in the alternative,
qualified immunity. With respect to the §§ 1985
and 1986 claims, the district court determined that
they had been withdrawn by Mr. Reed. Finally,
with respect to the various state tort claims, the dis-
trict court concluded that there had been no waiver
of immunity under the New Mexico Tort Claims
Act and that the waiver for law enforcement did not
apply.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In a separate order, also issued on June 2, 1999, the district court granted summary judgment to Mr. Sisneros, Mr. Gutierrez, and Mr. Sherman (collectively "BCDC Appellees"). With respect to the § 1983 claims, the district court found that the BCDC Appellees were not liable because they had not acted unlawfully. With respect to the §§ 1985 and 1986 claims, the district court determined that they had been withdrawn by Mr. Reed and that, in any event, Mr. Reed had not demonstrated membership in a protected class. Finally, with respect to the claim of false imprisonment under the New Mexico Tort Claims Act, the district court concluded that Mr. Reed could not establish that the BCDC Appellees knew they had no lawful authority to confine or restrain him.

On August 13, 1999, the district court clarified that Mr. Reed had voluntarily withdrawn his claims against the State of New Mexico. *See* Aplt's App. vol. III, doc. 19, at 000665 (district court order, filed Aug. 13, 1999).

## II. BACKGROUND

For ten years, Mr. Reed was incarcerated in Ohio on one charge of theft of drugs and two charges of aggravated robbery. In May 1992, he was released on parole. **\*592** As a condition of parole, Mr. Reed signed a waiver of extradition which provided, in part, the following:

[S]hould I leave the State of Ohio without such written permission, I will be considered to be a fugitive from justice as that term is defined in the Uniform Extradition Act and should I be found in another state, I hereby waive extradition and do hereby waive all of my rights to demand the issuance and service of a warrant of extradition and to apply for writ of habeas corpus and waive the issuance and service of all extradition proceedings and I will voluntarily return to the state of Ohio.

Aplt's App. vol. I, doc. 6, at 000213 (waiver of extradition).

A year later, Mr. Reed's parole officer told him to report to the parole office in Ohio to be arrested.

(Mr. Reed had been charged with "terroristic threatening" in violation of Kentucky law.) *See Reed v. State ex rel. Ortiz,* 124 N.M. 129, 947 P.2d 86, 91 (1997) [hereinafter *Ortiz II* ], *rev'd,* 524 U.S. 151, 118 S.Ct. 1860, 141 L.Ed.2d 131 (1998). Mr. Reed, however, did not appear at the appointed time. "Claiming he was forced to choose between violating parole and being beaten or killed at Lucasville [the Ohio correctional facility], he fled Ohio" and eventually ended up in Taos, New Mexico. *Id.* at 93. Ohio's Adult Parole Authority subsequently issued a state warrant for Reed's arrest. *See* Aplt's App. vol. II, doc. 8, at 000326 (state warrant).

On October 26, 1994, Mr. Reed was arrested in Taos as a fugitive from justice pursuant to a warrant issued on behalf of the governor of Ohio by the governor of New Mexico. After Mr. Reed's arrest, a fugitive complaint was filed by the Taos County District Attorney, and extradition proceedings were thereby initiated: Mr. Reed was arraigned in state court and given leave to file a petition for a writ of habeas corpus. *See Ortiz II,* 947 P.2d at 94. Mr. Reed did file a petition and, several months later, state Judge Peggy Nelson granted it. Judge Nelson held that Mr. Reed was not a fugitive because he had left Ohio "under duress and under a reasonable fear for his safety and his life"; she thus ordered that he be released from custody. *Reed v. Ortiz,* No. 94-1 CR, 1995 WL 118952, at *7 (N.M.Dist.Ct. Jan. 20, 1995) [hereinafter *Ortiz I* ], *rev'd,* 524 U.S. 151, 118 S.Ct. 1860, 141 L.Ed.2d 131 (1998).

The state later appealed Judge Nelson's order. Assistant Attorney General Anthony Tupler represented the state on appeal, and Sue Herrmann represented Mr. Reed. While the Taos County case was on appeal, Mr. Reed was involved in a minor car accident in Albuquerque, New Mexico. When the police arrived at the scene, they learned via a National Crime Information Center ("NCIC") "hit" that he had an outstanding warrant in Ohio for an alleged parole violation. Unbeknownst to the police, the outstanding warrant was the same as that at issue in the Taos County appeal. Mr. Reed was arrested and taken to the BCDC.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Mr. Reed was incarcerated in the BCDC from November 17 to December 16, 1996, for a total of thirty days. Upon first being detained, Mr. Reed was allowed one phone call. He called an attorney, Richard Weiner, who promptly came to the jail. Mr. Weiner brought with him a copy of Judge Nelson's order, which he showed to several BCDC employees. Notably, Judge Nelson's ordered specified that Mr. Reed be released from the Taos County Adult Detention Center ("TCADC"), not the BCDC. *See Ortiz I,* 1995 WL 118952, at *8 ("It is therefore ordered ... [t]hat petitioner be released immediately from the Taos County [Adult] Detention Center.").

Soon after Mr. Reed was taken to the BCDC, Katherine Marquez learned of Mr. Reed's detention. Ms. Marquez is the Extradition Coordinator for the Bernalillo County District Attorney's office. As Extradition Coordinator, she is largely responsible for the initiation of extradition **\*593** proceedings. Kathy Silva is her part-time assistant, and Assistant District Attorney Phillip Cheves her immediate supervisor. "Following usual procedures ..., a teletype was sent [by Ms. Marquez] to the Ohio Department of Corrections, advising subject [Mr. Reed] was in custody, and [asking] if a Pre-Signed Waiver, photo [,] and fingerprints were available to determine if fugitive was same subject as wanted by Ohio DOC. Ohio responded immediately with request." Aplt's App. vol. II, doc. 7, at 000308 (interoffice memo written by Ms. Marquez).

On or about the same day, Ms. Herrmann-Mr. Reed's attorney on the Taos County appeal-contacted Ms. Marquez. She told Ms. Marquez about Judge Nelson's order and demanded that Mr. Reed immediately be released. Ms. Herrmann also informed Ms. Marquez that Mr. Reed was contesting his extradition, that the matter was pending in Taos County, and that Mr. Reed could not be extradited. Finally, Ms. Herrmann sent to Ms. Marquez a letter and a copy of Judge Nelson's order.

Ms. Marquez subsequently contacted Mr. Tupler, as Ms. Herrmann had told her that he was in charge of the Taos County appeal. Ms. Marquez asked Mr. Tupler if he was aware of Judge Nelson's

order; Mr. Tupler responded that he was. Ms. Marquez then informed Mr. Tupler of her conversation with Ms. Herrmann. Mr. Tupler told Ms. Marquez to proceed as normal-i.e., to initiate extradition proceedings by filing a fugitive complaint-because the Bernalillo County matter was different from the Taos County matter. Ms. Marquez, however, did not do so because of later events as discussed below.

On November 19, 1996, Ms. Marquez faxed to Mr. Tupler a copy of the presigned waiver of extradition, which had been sent to her by Ohio. (Mr. Tupler did not know that there was such a waiver when Judge Nelson ruled on the Taos County matter. Apparently, Ohio did not realize it had a waiver in its possession until after Mr. Reed was arrested in Bernalillo County.) During his deposition, Mr. Tupler explained his belief that, if there is a "certified or an indisputably authentic presigned waiver, ... [t]here is no judicial requirement for any kind of proceeding before a court or any other tribunal before that person can be remanded over to the authorities of the demanding state." Aplt's. App. vol. I, doc. 6, at 000178 (Mr. Tupler's deposition testimony).

On or about November 20, 1996, Mr. Tupler and Ms. Herrmann spoke. The two arrived at some sort of agreement on how to deal with Mr. Reed's situation, though the terms of the agreement are in dispute. According to Mr. Tupler, the agreement was that

I myself would not make any effort to have Mr. Reed extradited back to Ohio, period, and that I would speak with the District Attorney's office and advise-request of them, not advise-request of them that they also honor the same agreement that I had made, and give Ms. Herrmann until Friday to get something filed.... I assumed she'd pick up the phone, call a local PD down here [in Bernalillo County] and say, 'Get a writ filed with some district judge down here'....

Aplt's App. vol. I, doc. 6, at 000159 (Mr. Tupler's deposition testimony). According to Ms. Herrmann, "[t]he only 'agreement' ... was that Reed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

236 F.3d 588, 2001 CJ C.A.R. 43

**(Cite as: 236 F.3d 588)**

would not be released to Ohio authorities until the New Mexico Supreme Court ruled on the petition for Reed's release or for stay of extradition." Aplt's App. vol. II, doc. 10, at 000448-49 (Ms. Herrmann's affidavit).

After coming to the agreement with Ms. Herrmann, Mr. Tupler contacted Ms. Marquez and informed her of the arrangement. According to Ms. Marquez, Mr. Tupler advised her that "the extradition would wait pending the decision [of the New Mexico Supreme Court]." Aplt's App. vol. I, doc. 6, at 000131 (Ms. Marquez's deposition**594** testimony). Ms. Marquez thus did not initiate extradition proceedings by filing a fugitive complaint.

On November 22, 1996, Mr. Tupler received a letter from Ms. Herrmann that outlined the terms of the agreement as she understood them. According to Mr. Tupler, he later contacted Ms. Herrmann and told her that she had misinterpreted the agreement. He also told Ms. Marquez, several months later, that Ms. Herrmann's understanding of the agreement was overbroad.

Also on November 22, 1996, Ms. Herrmann sent a letter to the BCDC. The letter, which was addressed to Joe Gutierrez and Will Bell (both BCDC employees), instructed that Mr. Reed was not to be released to Ohio: "[Mr.] Tupler ... has agreed with me that *no proceedings will be initiated* to return Mr. Reed to Ohio pending resolution of the current petition before the Supreme Court.... Mr. Reed has *not waived* his formal right to extradition and does not consent to his return to Ohio." Aplt's App. vol. II, doc. 9, at 000390 (letter, dated Nov. 22, 1996) (emphasis added).

Meanwhile, Mr. Reed, while in jail, proceeded to send letters to several of the Prosecutor and BCDC Appellees. In the letters, Mr. Reed stated that Ms. Herrmann was representing him on the Taos County matter, that he had no counsel for the Bernalillo County matter, and that he wanted to appear before a judge. The Appellees-with the exception of Michael Sisneros, the Director of the BCDC-deny or do not recall receiving any letters.

According to Mr. Sisneros, he relayed the letter he received to Mr. Gutierrez because "he was the one that could best handle this. He used to be the court liaison person for the jail." Aplt's App. vol. II, doc. 9, at 000474 (Mr. Sisneros's deposition testimony).

On December 3, 1996, Mr. Reed learned that he had a BCDC caseworker, David Sherman. Mr. Reed wrote to Mr. Sherman immediately, making the same claims as in his other letters, but received no response until two weeks later, at which time he was allowed to call an attorney.

On December 6, 1996, a "decision" was made to return Mr. Reed to Ohio based on the waiver of extradition that Mr. Reed had signed as a condition of parole in 1992. *See* Aplt's App. vol. II, doc. 10, at 000489 (facsimile from Ms. Marquez to Ohio, dated Dec. 12, 1996). The Prosecutor Appellees deny or do not recall participating in a decision to return Mr. Reed on the waiver. A few days later, Ms. Marquez faxed a message to Mr. Tupler, informing him that Ohio was proceeding with the extradition of Mr. Reed. The facsimile included a copy of the letter that Ms. Herrmann had sent to the BCDC.

On December 12, 1996, the New Mexico Supreme Court granted a stay of any extradition proceedings until it decided the Taos County appeal. A few days later, state Judge Albert "Pat" Murdoch held a hearing on the Bernalillo County matter. Mr. Cheves represented the state on the matter, and Ray Twohig represented Mr. Reed. Judge Murdoch concluded that he was bound by Judge Nelson's ruling and ordered that Mr. Reed be released from custody. Mr. Reed was released from the BCDC later that day.

On September 9, 1997, the New Mexico Supreme Court affirmed Judge Nelson's order, holding that Mr. Reed was entitled to a writ of habeas corpus because he was not a fugitive. *See Ortiz II,* 947 P.2d at 105-12. Almost a year later, the United States Supreme Court reversed the state supreme court's decision in a per curiam decision. *See generally New Mexico ex rel. Ortiz v. Reed,* 524 U.S.

236 F.3d 588, 2001 CJ C.A.R. 43
**(Cite as: 236 F.3d 588)**

151, 118 S.Ct. 1860, 141 L.Ed.2d 131 (1998)
[hereinafter *Ortiz III* ].

### III. DISCUSSION

A. Summary Judgment for Prosecutor Appellees

With respect to the Prosecutor Appellees, Mr. Reed contests only the district court's ruling **\*595** on his § 1983 claims. As noted above, the district court held that the Prosecutor Appellees were entitled to summary judgment on these claims because they were protected by absolute immunity or, in the alternative, qualified immunity. We need not address the district court's decision on absolute immunity because the matter may be resolved on the basis of qualified immunity alone.

*1. Standard of Review*

We review a grant of summary judgment de novo, applying the same legal standard employed by the district court. *See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1326 (10th Cir.1999). Summary judgment is proper if the moving party shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms,* 165 F.3d at 1326.

[1][2][3] A summary judgment decision involving the defense of qualified immunity is reviewed "somewhat differently" from other summary judgment rulings. *Romero v. Fay,* 45 F.3d 1472, 1475 (10th Cir.1995) (internal quotation marks omitted). When a defendant raises the issue of qualified immunity, the plaintiff must satisfy a two-part test. *See Nelson v. McMullen,* 207 F.3d 1202, 1206 (10th Cir.2000). "First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right. Second, the plaintiff must show that the constitutional or stat-

utory right[ ] the defendant allegedly violated [was] clearly established at the time of the conduct at issue." *Albright v. Rodriguez,* 51 F.3d 1531, 1534-35 (10th Cir.1995) (citations omitted). A right is clearly established only if there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains." *Id.* at 1535 (internal quotation marks omitted). Only if the plaintiff establishes both elements of the test does the defendant bear the traditional burden of showing "that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted).

*2. Clearly Established Constitutional or Statutory Right*

[4] Mr. Reed concedes that the Prosecutor Appellees ordinarily have qualified immunity. He contends, however, that they cannot assert this defense in the instant case because, at the time of his incarceration, it was clearly established, under the Extradition Clause of the Constitution, U.S. Const., art. IV, § 2, cl. 2; the federal extradition statute, 18 U.S.C. § 3182; and the New Mexico Extradition Act,[FN1] N.M. **\*596** Stat. §§ 31-4-10, 31-4-14; that he had a right to certain extradition procedures, such as the filing of a fugitive complaint and an arraignment. He also argues that it was clearly established, under the Equal Protection Clause, that his case should not have been "the only [one] in the [district attorney's] office in which no fugitive complaint was filed and no arraignment was held." Aplt's Br. at 8 (No. 99-2215).

> FN1. The majority of states, including New Mexico, have adopted the Uniform Criminal Extradition Act ("UCEA"), *see Cuyler v. Adams,* 449 U.S. 433, 436 n. 1, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), and a number of circuit courts, including this one, have held that a violation of the UCEA can provide a basis for a § 1983 claim on the ground that the state extradi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

236 F.3d 588, 2001 CJ C.A.R. 43
**(Cite as: 236 F.3d 588)**

tion statutes are derivative of or are implementing federal law (i.e., the Extradition Clause and the federal extradition statute). *See Sanders v. Conine,* 506 F.2d 530, 532 (10th Cir.1974) ("A complaint which charges abuse of the extradition power by noncompliance with applicable [federal and state] law states a claim under 42 U.S.C. § 1983 and may not be dismissed summarily as frivolous."); *Ortega v. City of Kansas City,* 875 F.2d 1497, 1500 (10th Cir.1989) ("[T]here is ample circuit court authority for the proposition that failure to comply with the provisions of the Uniform Extradition Act as enacted by the detaining state can support recovery on § 1983 claims."); *see also Draper v. Coombs,* 792 F.2d 915, 921 (9th Cir.1986) ("[A] violation of state extradition law can serve as the basis of a section 1983 action where the violation of state law causes the deprivation of rights protected by the Constitution and statutes of the United States.") (internal quotation marks omitted); *Ross v. Meagan,* 638 F.2d 646, 649-50 & n. 4 (3d Cir.1981) ("[Appellants] may be entitled to relief under § 1983 [if appellees violated the UCEA]."); *Crumley v. Snead,* 620 F.2d 481, 483 n. 9 (5th Cir.1980) ("A failure to comply with extradition procedures is actionable under Section 1983."); *Brown v. Nutsch,* 619 F.2d 758, 764 & n. 8 (8th Cir.1980) ("We hold that section 1983 provides a remedy for improper extradition in violation of the extradition clause and statute [including some state statutes]."); *McBride v. Soos,* 594 F.2d 610, 613 (7th Cir.1979) ("[W]here plaintiff has alleged violation of rights protected by federal law, and violation of rights protected by state law derived from federal law, we hold that a complaint which charges abuse of the extradition power by noncompliance with applicable law states a cause of action under 42 U.S.C. § 1983."); *Wirth v. Surles,* 562 F.2d 319, 322 (4th Cir.1977) ( "Where the violation of state law causes the deprivation of rights protected by the Constitution and statutes of the United States, a cause of action is stated under 42 U.S.C. § 1983."). *But see Barton v. Norrod,* 106 F.3d 1289, 1295-96 & n. 6 (holding that the extradition procedures are a matter of state law); *see also id.* at 1296 n. 6 (listing district courts that have reached the same holding).

We reject these arguments and hold that, because Mr. Reed had previously signed a waiver of extradition as a condition of parole, he had neither a constitutional nor a statutory right to specific extradition procedures. Mr. Reed, in essence, admits that he signed the waiver. *See* Aplt's App. vol. I, doc. 6, at 000199 (Mr. Reed's deposition testimony) (stating that the signature on the waiver "appear[ed]" to be his). His contention is that he did not sign the waiver voluntarily and therefore the waiver was invalid. *See, e.g., Pierson v. Grant,* 527 F.2d 161, 164-65 (8th Cir.1975) (requiring a voluntary and knowing waiver); *Hinton v. Moritz,* 11 F.Supp.2d 272, 275 (W.D.N.Y.1998) (noting that plaintiff did not allege his signing of the waiver was not knowing and voluntary). In his deposition testimony, Mr. Reed explained that he agreed to sign the parole "contract" only because "they were going to leave me in solitary confinement for 15 more years if I didn't put my name on [the waiver]." Aplt's App. vol. I, doc. 6, at 000200 (Mr. Reed's deposition testimony).

[5] We are doubtful that Mr. Reed's statement, by itself, establishes coercion. *See Forester v. California Adult Authority,* 510 F.2d 58, 61 (8th Cir.1975) (holding that the conditioning of parole on the execution of an extradition waiver is not per se coercion); *see also Pierson,* 527 F.2d at 164 ("[P]arole is an act of grace and ... boards of parole have wide discretion to impose reasonable conditions in connection with parole.... [There must be a] *specific showing* of how such a condition was coercive as applied in the particular case.") (emphasis added). Mr. Reed argues, however, that there was a coercive element in the execution of the waiver giv-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

236 F.3d 588, 2001 CJ C.A.R. 43
**(Cite as: 236 F.3d 588)**

en his rocky relationship with the Ohio prison officials. *See generally Ortiz II,* 947 P.2d at 86 (discussing Mr. Reed's reputation as an advocate for prisoners' rights and the resentment expressed by Ohio prison officials). But even if we assume that there was coercion, there is no evidence in the record-indeed, Mr. Reed does not even allege-that the Prosecutor Appellees had or should have had any reason to know that the waiver was signed involuntarily.[FN2] Because the waiver was facially valid, it was objectively reasonable for the Prosecutor Appellees to rely on the waiver.[FN3] *Cf.* **\*597** *United States v. Leon,* 468 U.S. 897, 919-20, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (holding that the Fourth Amendment exclusionary rule should not bar the use of evidence obtained by police officers acting in good faith and with reasonable reliance on a facially valid search warrant).

> FN2. Ms. Marquez and Mr. Tupler, evidently, did see Ms. Herrmann's letter to the BCDC, in which she claimed that Mr. Reed had not waived his formal right to extradition. *See* Aplt's App. vol. II, doc. 9, at 000390 (letter, dated Nov. 22, 1996). However, Ms. Herrmann never clarified in the letter that Mr. Reed did not waive his right because he had signed the waiver of extradition *involuntarily.*

> FN3. Even if Mr. Reed could overcome the qualified immunity defense, he still might not recover damages because, arguably, he was not prejudiced by the failure of the Prosecutor Appellees to afford him the full extradition process. *See Kennon v. Hill,* 44 F.3d 904, 907 (10th Cir.1995) (in a habeas corpus appeal, agreeing with the conclusion that the plaintiff was not prejudiced by the noncompliance with the UCEA because "he had previously received such a hearing ... and henceforth has been represented by counsel and has been fully aware of the charges against him").

**B. Summary Judgment for BCDC Appellees**

With respect to the BCDC Appellees, Mr. Reed appeals the district court's decision on both his § 1983 and false imprisonment claims.

*1. Thirty-Day Imprisonment*

*a. Section 1983*

[6] Mr. Reed explains in his brief that "[t]his lawsuit [against the BCDC Appellees] is not ... about conditions at [the prison]." Aplt's Br. at 21 (No. 00-2216). Rather, the suit is about "[Mr.] Sisneros and his staff at BCDC intentionally ignor[ing] Judge Nelson's Order [for thirty days] and intentionally ignor[ing][his] written and verbal requests ... for an attorney and for a hearing." Aplt's Br. at 22-23 (No. 00-2216). As noted above, we review the district court's order of summary judgment de novo, and we hold, as we did above, that Mr. Reed's claims fail because the BCDC Appellees were protected by qualified immunity.

We address first the significance of Judge Nelson's order. Under New Mexico law, a prisoner may be released upon the issuance of a court order:

> Every public officer who has power to order the imprisonment of any person for violation of law shall, on making such order, transmit to the sheriff, jail administrator[,] or independent contractor of his respective county a true copy of the order so that the person imprisoned may be considered under his custody until expiration of the commitment or until further steps, as provided by law, are taken to obtain the prisoner's liberty, of which he shall, in due time, notify the sheriff, jail administrator[,] or independent contractor in writing.

N.M. Stat. § 33-3-12(A). As Mr. Reed points out, Judge Nelson's order did grant him a writ of habeas corpus, thereby freeing him from imprisonment; however, the order only instructed that Mr. Reed be released from the TCADC, not the BCDC. *See Ortiz I,* 1995 WL 118952, at \*8 ("It is therefore ordered ... [t]hat petitioner be released immediately from the Taos County [Adult] Detention Center.").

Given the terms of Judge Nelson's order, we

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

236 F.3d 588
236 F.3d 588, 2001 CJ C.A.R. 43
**(Cite as: 236 F.3d 588)**

fail to see how Mr. Reed had either a constitutional or statutory right to be released from the BCDC. Mr. Reed is, in essence, arguing that the BCDC Appellees should have released him on the basis of Judge Nelson's *reasoning* rather than the strict terms of the order. Because Mr. Reed cannot establish a constitutional or statutory right, he cannot overcome the BCDC Appellees' qualified immunity. We note that, even if Mr. Reed had a constitutional or statutory right to be released on the basis of Judge Nelson's order, it was not clearly established, at the time of Mr. Reed's incarceration, that the order was valid as to the BCDC Appellees when it did not specify the BCDC by name.

[7] Mr. Reed suggests, however, that knowledge of the order should, at the very least, have prompted the BCDC Appellees to investigate the matter-for example, by contacting Judge Nelson. *See* Aplt's App. vol. II, doc. 9, at 000475-476 (Mr. Sisneros's deposition testimony) ("[W]e wouldn't release this person because obviously this isn't an order to the BCDC in the Second Judicial District. We would probably hold **\*598** on to it and either contact the Court and ask them for direction as to what they wanted to do with this-we have a release order, but it's not a valid one."). While we do not endorse the BCDC Appellees' failure to pursue the matter-a simple phone call might have expedited resolution of Mr. Reed's case-we conclude that the BCDC Appellees were not required by either the Constitution or statute to investigate independently Mr. Reed's claim that he should be released within this time frame. *See Thompson v. Duke,* 882 F.2d 1180, 1186 (7th Cir.1989) ("On the basis of [*Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) ], Hardiman and Patrick, as mere jailers, only had a duty to determine the facial validity of the warrant under which [defendant] was held; they had no independent duty to investigate [defendant's] claims of innocence ."); *see also Baker,* 443 U.S. at 145-46, 99 S.Ct. 2689 (1979) ( "[W]e do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. Nor is the of-

ficial charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim."). Thus, once again, the BCDC Appellees are protected by qualified immunity.

We next address Mr. Reed's allegation that the BCDC Appellees intentionally ignored his requests for an attorney [FN4] and a hearing. Mr. Reed's claim here is, in essence, a reiteration of his claim against the Prosecutor Appellees: By failing to initiate extradition proceedings-which would provide for appointment of counsel (if Mr. Reed qualified as indigent) and an arraignment-the BCDC Appellees violated his right to extradition process. The problem with this argument is that the authority to initiate extradition proceedings lies not with the BCDC Appellees but rather with the District Attorney's office. Mr. Reed, however, suggests that the BCDC Appellees should have taken some sort of action in response to his requests, such as contacting the District Attorney's office so that it would be informed as to his situation. He stresses, in particular, Mr. Sherman's failure to communicate with the District Attorney's office, or even the court, as such communications seemed to fall within his job responsibility as caseworker. *See* Aplt's App. vol. II, doc. 10, at 000473 (Mr. Sisneros's deposition testimony) ("It's just a multiquasi-type [sic], counselor-type individual that would hand problems and facilitate communication or items for that inmate to the courts, to the DA, public defender, on and on.") This argument is, in effect, that the BCDC Appellees should have conducted an investigation based on Mr. Reed's requests, but, as we have already established, such action is not required of the BCDC Appellees by either the Constitution or statute, at least within this time frame. *See Thompson,* 882 F.2d at 1186 (holding that jailers had no independent duty to investigate). Therefore, the BCDC Appellees cannot be held liable because of qualified immunity.

FN4. Mr. Reed was able to contact several attorneys while incarcerated. Even if we exclude Ms. Herrmann on the basis that she represented Mr. Reed on the Taos

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

236 F.3d 588, 2001 CJ C.A.R. 43
**(Cite as: 236 F.3d 588)**

County matter only, Mr. Reed spoke to at least three other attorneys during his time at the BCDC. *See* Aplt's App., vol. II, doc. 9, at 000377 (Mr. Reed's deposition testimony) (naming Mr. Weiner, Peter Cubra, and Sue Morrison).

### b. False Imprisonment

Under the New Mexico Tort Claims Act, "[a] governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived." N.M. Stat. § 41-4-4(A). The immunity granted, however, does not apply to false imprisonment when caused by law enforcement officers while acting within the scope of their duties.[FN5] *See* N.M. Stat. § 41-4-12. Because **\*599** immunity principles do not resolve this issue, we apply the "traditional" standard of review for summary judgment, in which the moving party bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Mitchell v. City of Moore,* 218 F.3d 1190, 1197 (10th Cir.2000). "[A] material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN5. "Law enforcement officer" is defined as "any full-time salaried public employee of a governmental entity whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order[,] or to make arrests for crimes, or members of the national guard when called to active duty by the governor." N.M. Stat. § 41-4-3.

If the movant carries this initial burden, the burden shifts to the nonmovant "to go beyond the pleadings and set forth specific facts" from which a rational trier of fact could find for the nonmovant. *Mitchell,* 218 F.3d at 1197. If the nonmovant fails to establish a genuine issue of material fact, then

"we determine whether the substantive law was applied correctly, and in so doing we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir.2000).

[8][9] We determine that summary judgment was properly awarded to the BCDC Appellees because Mr. Reed failed to set forth specific facts from which a rational trier of fact could find in his favor. To prove a claim of false imprisonment, Mr. Reed was required to show that (1) the BCDC Appellees intentionally confined or restrained him without his consent and (2) the BCDC Appellees knew that they had no lawful authority to do so. *See Diaz v. Lockheed Electronics,* 95 N.M. 28, 618 P.2d 372, 376 (Ct.App.1980). Mr. Reed cannot satisfy the second element. The BCDC Appellees believed they had the lawful authority to imprison Mr. Reed based on the NCIC hit, *cf. United States v. Hines,* 564 F.2d 925, 927 (10th Cir.1977) (noting that information received from the NCIC computer bank has been routinely accepted in establishing probable cause for a valid arrest), and, as discussed above, nothing-including Judge Nelson's order-affected this belief. The BCDC Appellees' knowledge of Judge Nelson's order cannot, as Mr. Reed would have it, be equated with a knowledge of an unlawful detention.

### 2. One-Hour Delay in Release

[10] Mr. Reed also suggests he has claims pursuant to § 1983 and the New Mexico Tort Claims Act because, after Judge Murdoch ordered his release, a BCDC employee detained him one hour longer than the other prisoners for being a "sniffler." As a preliminary matter, we note that none of the BCDC Appellees was involved in the delay. Consequently, Mr. Reed has no § 1983 claims against the BCDC Appellees, regardless of the lawfulness of the detention. *See Foote v. Spiegel,* 118 F.3d 1416, 1423 (10th Cir.1997) (holding that "[i]ndividual liability under § 1983 must be based on personal involvement in the al-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

leged constitutional violation").

[11][12][13] As for claims of false imprisonment, neither Mr. Gutierrez nor Mr. Sherman can be held liable because, once again, neither was involved in the prolonged detention of Mr. Reed. As for Mr. Sisneros, the situation might be different due to his position as Director of the BCDC. The question we must address is whether Mr. Sisneros, as the Director of the BCDC, can be held vicariously liable for the purported intentional tort committed by the BCDC employee.

The definition of vicarious liability is indirect legal responsibility.... Vicarious liability is based on a relationship between the parties, irrespective of participation,**\*600** either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of the other. Its true basis is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another.

*Kinetics, Inc. v. El Paso Prods. Co.,* 99 N.M. 22, 653 P.2d 522, 527 (Ct.App.1982) (citations omitted). Under the principles of agency and respondeat superior, vicarious liability may be imposed on a principal or employer for the acts of an agent or employee. *See Silva v. State,* 106 N.M. 472, 745 P.2d 380, 385 (1987) (noting that doctrine of respondeat superior applies under Tort Claims Act); *see also* Restatement (Second) of Agency § 2 (naming respondeat superior as a type of agency relationship).

We determine that, under the circumstances, Mr. Sisneros cannot be held vicariously liable: Nothing in the record discloses the nature of the relationship between Mr. Sisneros and the BCDC employee; furthermore, Mr. Sisneros's supervisory position does not, by itself, establish him as principal/master and the BCDC employee as agent/servant. *See, e.g., Yorston v. Pennell,* 397 Pa. 28, 153 A.2d 255, 259-60 (1959) ("In determining whether a person is the servant of another it is necessary that he not only be subject to the latter's control or right of

control with regard to the work to be done and the manner of performing it but that this work is to be performed on the business of the master or for his benefit.... On the other hand, the right to supervise, even as to the work and the manner of performance, is not sufficient; otherwise a supervisory employee would be liable for the negligent act of another employee though he would not be the superior or master of that employee in the sense the law means it."); *Connell v. Hayden,* 83 A.D.2d 30, 443 N.Y.S.2d 383, 397 (1981) ("The doctrine of respondeat superior does not apply to impose vicarious liability upon supervisors.... This does not mean that a supervisor may not be liable for the injuries caused by the conduct of one of his subordinates. It does mean that his liability is not vicarious, that is, without fault on his part.") (citations omitted).

C. Sua Sponte Summary Judgment

[14] Mr. Reed's last argument on appeal is that the district court erred in granting summary judgment to Prosecutor Appellees Mr. Rackstraw, Ms. Marquez, and Ms. Silva and BCDC Appellees Mr. Gutierrez and Mr. Sherman. These Appellees were not a part of the original lawsuit filed on January 30, 1998. Rather, Mr. Reed asked the court, on February 16, 1999, to permit him to join these Appellees as defendants, and, on June 1, 1999, the district court granted his request. The very next day, the district court responded to the summary judgment motions filed by (1) Mr. Udall, Mr. Tupler, and Mr. Schwartz and (2) the City of Albuquerque and Mr. Sisneros. Not only did the district court, in its orders, hold in their favor, but it also held, sua sponte, in favor of the newly joined Appellees.

We have held that "[a] court may grant summary judgment sua sponte so long as the losing party was on notice that [it] had to come forward with all of [its] evidence." *Sports Racing Servs., Inc. v. Sports Car Club of America, Inc.,* 131 F.3d 874, 892 (10th Cir.1997) (internal quotation marks omitted). Here, it is undisputed that Mr. Reed was not given notice of the district court's intent to enter summary judgment in favor of the additional Ap-

236 F.3d 588, 2001 CJ C.A.R. 43

**(Cite as: 236 F.3d 588)**

pellees. *See* Aples' Br. at 28 (No. 00-2215); Aples' Br. at 26 (No. 00-2216).

[15] While the practice of granting summary judgment sua sponte is not favored, *see Bridgeway Corp. v. Citibank,* 201 F.3d 134, 139 (2d Cir.2000) ( "The provision of ... notice requires relatively little time or effort ...."), we hold that the **\*601** lack of notice was not prejudicial to Mr. Reed and therefore do not reverse. *See Mannesman Demag Corp. v. M/V Concert Express,* 225 F.3d 587, 595 (5th Cir.2000) (applying harmless error review); *Bridgeway,* 201 F.3d at 140 (same); *Nuclear Transport & Storage, Inc. v. United States,* 890 F.2d 1348, 1351 (6th Cir.1989) (same). While Mr. Reed might have been surprised by the district court's action, the "surprise [did not] result[ ] in [his] failure to present evidence in support of his position." *Bridgeway,* 201 F.3d at 139. The record already established the actions taken by the "sua sponte" Appellees, and we fail to see what additional evidence Mr. Reed might have offered that would change the resolution of his case. Mr. Rackstraw, Ms. Marquez, and Ms. Silva would still have qualified immunity because Mr. Reed was not entitled to extradition process given the facially valid presigned waiver; Mr. Gutierrez and Mr. Sherman would still have qualified immunity because neither had a duty under the Constitution or statute to investigate Mr. Reed's claim. Though somewhat of an oversimplification, we simply see no real difference between the Appellees who filed motions for summary judgment and the "sua sponte" Appellees.

### IV. CONCLUSION

Mr. Reed cannot assert § 1983 claims against the Prosecutor and BCDC Appellees because they are protected by qualified immunity; nor can he assert false imprisonment claims against the BCDC Appellees because they did not know they had no lawful authority to confine him. Because of these reasons, and because Mr. Reed was not prejudiced by the district court's grant of summary judgment sua sponte, we AFFIRM the district court's order.

C.A.10 (N.M.),2000.

Scull v. New Mexico
236 F.3d 588, 2001 CJ C.A.R. 43

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 F.3d 422                                                                                            Page 1

436 F.3d 422

**(Cite as: 436 F.3d 422)**

Short v. Smoot
C.A.4 (Va.),2006.

United States Court of Appeals,Fourth Circuit.
Mary SHORT, Individually and as the Administrat-
rix of the Estate of Thomas Lee Short, Sr., De-
ceased, Plaintiff-Appellee,
v.
William SMOOT, Deputy; Michael Beatty, Deputy;
Troy Oakes, Deputy; George Lewis, Deputy; Harry
Ferguson, Deputy, Defendants-Appellants,
andDaniel T. McEathron, Sheriff; Kurt Kensy,
Deputy; Jeremy Seal, Deputy, Defendants.
**No. 05-1284.**

Argued Dec. 1, 2005.
Decided Feb. 2, 2006.

**Background:** Wife and administrator of estate
of detainee who committed suicide in jail brought §
1983 action against county and sheriff's deputies al-
leging deliberate indifference to substantial risk
that detainee would commit suicide. The United
States District Court for the Western District of
Virginia, Samuel G. Wilson, J., 2005 WL 562483,
denied defendants' motion for summary judgment
on qualified immunity grounds. Defendants ap-
pealed.

**Holdings:** The Court of Appeals, Wilkins, Cir-
cuit Judge, held that:

(1) jailers who placed detainee in cell under
video surveillance were entitled to qualified im-
munity, but

(2) jailer who observed detainee in cell by
video surveillance was not entitled to qualified im-
munity.

Affirmed in part, reversed in part, and remanded.

Gregory, Circuit Judge, dissented in part, concurred
in part, and filed opinion.

West Headnotes

**[1] Federal Courts 170B ⟶802**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk802 k. Summary Judgment.
Most Cited Cases
In reviewing an order denying summary judgment
based on qualified immunity, the Court of Appeals
accepts as true the facts that the district court con-
cluded may be reasonably inferred from the record
when viewed in the light most favorable to the
plaintiff.

**[2] Civil Rights 78 ⟶1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-
ficers
                78k1376(2) k. Good Faith and Reason-
ableness; Knowledge and Clarity of Law; Motive
and Intent, in General. Most Cited Cases
Qualified immunity protects all but the plainly in-
competent or those who knowingly violate the law.

**[3] Civil Rights 78 ⟶1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-
ficers
                78k1376(6) k. Sheriffs, Police, and
Other Peace Officers. Most Cited Cases
Qualified immunity protects law enforcement of-
ficers from bad guesses in gray areas and ensures
that they are liable only for transgressing bright
lines.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 F.3d 422
**(Cite as: 436 F.3d 422)**

**[4] Civil Rights 78 ☞1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

**[5] Civil Rights 78 ☞1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(1) k. In General. Most Cited Cases
In analyzing an appeal from the rejection of a qualified immunity defense, the first task of the Court of Appeals is to identify, at the appropriate level of specificity, the right that the plaintiff asserts was infringed by the challenged conduct.

**[6] Civil Rights 78 ☞1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
In analyzing an appeal from the rejection of a qualified immunity defense, the Court of Appeals considers whether, at the time of the claimed violation,

the right alleged to be violated was clearly established, meaning that a reasonable official would understand that what he is doing violates the right in question.

**[7] Civil Rights 78 ☞1376(7)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

**Sentencing and Punishment 350H ☞1547**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1547 k. Psychological and Psychiatric Treatment. Most Cited Cases
Jailers who placed detainee who posed risk of suicide in cell under video surveillance were entitled to qualified immunity in § 1983 action alleging deliberate indifference to substantial risk that detainee would commit suicide, even though jailers did not remove detainee's clothing and shoelaces; detainee did not have right to have his jailers take precautions against his suicide beyond placing him in cell under video surveillance. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[8] Sentencing and Punishment 350H ☞1533**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate Indifference in General. Most Cited Cases
A constitutional violation of deliberate indifference to a detainee can occur only when the deprivation alleged is objectively, sufficiently serious and the prison official has a sufficiently culpable state of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mind. U.S.C.A. Const.Amend. 8.

**[9] Sentencing and Punishment 350H ⊜1533**

350H Sentencing and Punishment
  350HVII Cruel and Unusual Punishment in General
    350HVII(H) Conditions of Confinement
      350Hk1533 k. Deliberate Indifference in General. Most Cited Cases

Deliberate indifference entails something more than mere negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result; it requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. U.S.C.A. Const.Amend. 8.

**[10] Sentencing and Punishment 350H ⊜1536**

350H Sentencing and Punishment
  350HVII Cruel and Unusual Punishment in General
    350HVII(H) Conditions of Confinement
      350Hk1536 k. Hazardous and Unhealthful Conditions. Most Cited Cases

A prison official who actually knows of a substantial risk to inmate health or safety may be found free from liability for deliberate indifference if he responded reasonably to the risk, even if the harm ultimately was not averted. U.S.C.A. Const.Amend. 8.

**[11] Civil Rights 78 ⊜1376(7)**

78 Civil Rights
  78III Federal Remedies in General
    78k1372 Privilege or Immunity; Good Faith and Probable Cause
      78k1376 Government Agencies and Officers
        78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

Jailer who observed detainee in cell by video surveillance was not entitled to qualified immunity in action alleging deliberate indifference to substantial risk that detainee would commit suicide; jailer observed detainee remove shoelaces, tie them to bar, place noose around neck, and test weight of rope. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

***423** ARGUED: Brian Keith Brake, Keeler Obenshain, P.C., Harrisonburg, Virginia, for Appellants. Blair Duncan Howard, Howard, Morrison & Howard, Warrenton, Virginia, for Appellee. **ON BRIEF:** Patrick C. Asplin, Keeler Obenshain, P.C., Harrisonburg, Virginia, for Appellants. Christopher T. Whelan, Paul A. Morrison, Howard, Morrison & Howard, Warrenton, Virginia, for Appellee.

***424** Before WILKINS, Chief Judge, GREGORY, Circuit Judge, and WALTER D. KELLEY, JR., United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed in part, reversed in part, and remanded by published opinion. Chief Judge WILKINS wrote the majority opinion, in which Judge KELLEY joined. Judge GREGORY wrote an opinion concurring in part and dissenting in part.

## OPINION

WILKINS, Chief Judge.

Warren County, Virginia Sheriff's Deputies William Smoot, Michael Beatty, Troy Oakes, George Lewis, and Harry Ferguson (collectively, "Appellants") appeal a district court order denying their motion for summary judgment on qualified immunity grounds in an action brought by Mary Short, individually and as a representative of the estate of her husband, Thomas Lee Short. Mrs. Short's action alleges that Appellants acted with deliberate indifference to a substantial risk that Mr. Short would commit suicide while detained in the Warren County Jail. We affirm in part, reverse in part, and remand for further proceedings.

### I.

[1] In reviewing an order denying summary judgment based on qualified immunity, we accept as true the facts that the district court concluded

436 F.3d 422
436 F.3d 422
(Cite as: 436 F.3d 422)

may be reasonably inferred from the record when viewed in the light most favorable to the plaintiff. *See Gray-Hopkins v. Prince George's County,* 309 F.3d 224, 229 (4th Cir.2002). Thus, for purposes of resolving this appeal, we assume the following facts:

[O]n January 8, 2004, ... Thomas Lee Short was arrested and jailed for assault and battery of his wife, in violation of a September 2003 protective order that prohibited Mr. Short from having any contact with her, from committing acts of family abuse, and from drinking alcoholic beverages. After his release on January 11, 2004, Short went to the Blue Ridge Motel in Front Royal, Virginia, and began drinking heavily. Around 9:30 p.m., Short called his wife, Mary Short, and told her that he was planning to kill himself. Mrs. Short, concerned that her husband would carry out his threat, called the Warren County Sheriff's office to request that they check the local bridges. That office advised her to call the Front Royal Town Police, which she did.

Soon after calling his wife, Mr. Short also called his daughter, Linda Good, to tell her that he "wanted to die," and to ask if she could come pick him up. When she arrived at the motel, Good found her father so drunk that she decided it would be better to let him sleep and return the next morning. Mr. Short called his wife again at 4:30 a.m. and repeated his threat to kill himself. He also called his daughter, who told him she would pick him up at noon the next day.

Before she returned to the hotel, Good spoke with Mrs. Short, and they decided to have Mr. Short arrested again for violating the September 2003 protective order, believing that this course of action would keep him from harming himself. Mrs. Short went to the Magistrate's Office to file a criminal complaint and the Magistrate issued a warrant for Mr. Short's arrest. The Magistrate then contacted the Front Royal Town Police and told the officer that Mr. Short was "basically a drunk," that he was intoxicated, and that he had called his wife threatening to kill himself. The officer, Sergeant Clint Keller, went to **\*425** the Short residence, arrested Mr. Short, and transported him to the Warren County Jail.

Sergeant Keller took Mr. Short before the Magistrate, who issued an order remanding Mr. Short to custody until he could appear in Warren County General District Court the next day. Sergeant Keller then turned Mr. Short over to the deputies on duty at the jail. Defendants Smoot, Beatty, Oakes, and Lewis were in the jail's monitor room, where Sergeant Keller advised them that Mr. Short had been arrested for violation of a protective order, that he was drunk, and that he had been calling his wife threatening to kill himself.

The Warren County Jail Policy and Procedures manual, in effect on January 12, 2004, addressed proper treatment of potentially suicidal inmates. The manual required custodial officers to remove all potential tools such as sheets, blankets, and shoelaces, to conduct inmate checks at random intervals, at least twice per hour, and to make reports of any unusual occurrences. The defendant deputies also received training in treatment of potentially suicidal inmates. If the deputies were aware that the inmate was suicidal, they were instructed to remove his clothing, place him in a suicide "smock," call mental health services, and conduct checks at fifteen-minute intervals.

When an intoxicated inmate was brought to the jail, deputies would attempt to process him. If the inmate was unable to give a medical history, then the typical practice was to place the intoxicated inmate in the jail's sick cell, separate from the general population, to sober up, and also to remove all items that could be used for "self-destructive purposes."

Despite Sergeant Keller's statement that Short had threatened to kill himself, the deputies never removed Short's clothing and shoelaces or called for a mental health evaluation. Sergeant Smoot took him from the booking area to the bathroom and then to the sick cell, where he removed Short's belt. Several hours later, Smoot heard banging coming from the sick room. He asked Short if he was all right, and Short responded that he was fine. He did not apprise the other deputies of the disturbance, nor did he make a report of an unusual occurrence. Deputy Lewis checked on Short twice, at approxim-

ately 5:30 and 6:30 p.m.; both times Short was lying in bed with a sheet over him and appeared to be asleep. Deputy Oakes also checked on Short around 5:00 p.m., and observed that he was asleep.

Sergeant Smoot and Deputies Lewis, Oakes, and Beatty's shifts ended at 7:00 p.m. and defendants Deputies Ferguson, Kensy, and Seal arrived. No one in the departing shift informed the incoming deputies that Short had threatened to kill himself; the incoming deputies were only aware that an intoxicated detainee had been brought in and placed in the sick room.

The Warren County Jail used surveillance cameras to monitor inmate activity. There were a number of twelve-inch television screens that displayed images from these cameras in the jail's monitor room. During the evening shift, Deputy Ferguson, the officer-in-charge, was in the monitor room from approximately 7:00 to 8:30 p.m., and was responsible for observing monitors as well as answering the telephone and admitting any visitors. He acknowledged that he was aware that an inmate was in the sick cell on the evening of January 12, 2004, and that he observed the monitor showing **426 activity in the sick cell. He left the monitor room for a short time at approximately 8:24 p.m. to respond to an inmate waving a towel at the camera. Deputy Seal was not working in the monitor room. He made rounds of the cells at approximately 7:15 p.m., and again between 8:00 and 8:30 p.m. Seal did not check on the sick cell where Short was housed, believing that it was unoccupied. Deputy Kensy was in the jail records room filing from 7:00 to 8:30 p.m. He passed through the monitor room for a few minutes, but was not present at the jail between 8:35 and 9:00.

The court has reviewed the videotape taken from the surveillance camera that recorded Short's activity in the sick room on January 12, 2004. Between approximately 7:00 and 7:30 p.m., Short removed the laces from his shoes, tied them together, and climbed from his bed to the bars of his cell. He tied the shoelaces to the bars and tested their strength. He then tied the laces around his neck. Short repeated this process a number of times, alternating between climbing on the bars and sitting

on his bed for several minutes at a time. At approximately 7:36 p.m., Short again climbed from his bed to the bars of his cell, placed the noose around his neck, and hung himself. It was not until approximately 9:00 p.m., when Deputy Seal escorted a new detainee to the sick room, that the deputies discovered Short's body.

J.A.1931-35 (footnotes omitted).

Mrs. Short subsequently brought this action against Appellants, Deputies Kensy and Seal, and Warren County Sheriff Daniel T. McEathron, pursuant to 42 U.S.C.A. § 1983 (West 2003), contending that the officers violated her husband's rights under the Cruel and Unusual Punishments Clause of the Eighth Amendment by exhibiting deliberate indifference to the substantial risk that he would commit suicide. After the district court dismissed Sheriff McEathron from the action, all remaining defendants moved for summary judgment. The district court denied the motion as to Deputies Smoot, Beatty, Oakes, and Lewis (the first-shift officers), concluding that the forecasted evidence permitted the reasonable inference that the conduct of the first-shift officers constituted deliberate indifference because the officers all were aware of the risk that Short would commit suicide yet failed to follow jail procedure or even "take the simple precaution of warning the next shift that Short was at risk." J.A.1939. The court also denied the motion as to Deputy Ferguson, concluding that the forecasted evidence supported the inference that he exhibited deliberate indifference because he actually witnessed Ferguson's suicide in progress, understood what was happening, and yet made no attempt to intervene.[FN1]

FN1. The district court granted summary judgment to Deputies Kensy and Seal.

## II.

Appellants first argue that the district court erred in denying summary judgment to the first-shift officers. We agree.

[2][3][4] Qualified immunity protects "all but

the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). It protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir.1992). Thus, government officials performing discretionary functions are entitled to qualified immunity from liability **\*427** for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

[5][6] In analyzing an appeal from the rejection of a qualified immunity defense, our first task is to identify, "at the appropriate level of specificity,"*Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), the right that the plaintiff asserts was infringed by the challenged conduct. *See Taylor v. Waters,* 81 F.3d 429, 433 (4th Cir.1996). We then ask whether the facts, viewed in the light most favorable to the plaintiff, demonstrate a violation of that right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If they do, we consider whether, at the time of the claimed violation, the right alleged to be violated was clearly established-meaning that "a reasonable official would understand that what he is doing violates" the right in question. *Id.* at 202, 121 S.Ct. 2151 (internal quotation marks omitted).

[7] The right in question here, defined at the appropriate level of specificity, is the right of a detainee, whose jailers know that he is suicidal, to have his jailers take precautions against his suicide beyond merely placing him in a cell under video surveillance. We hold that *Brown v. Harris,* 240 F.3d 383 (4th Cir.2001), demonstrates that no such right derives from the Eighth Amendment.

[8][9] The appropriate framework for evaluating constitutional claims arising from a prison official's "deliberate indifference" to "a substantial risk

of serious harm to an inmate" is set out in *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). *Farmer,* 511 U.S. at 828, 114 S.Ct. 1970 (internal quotation marks omitted). First, a constitutional violation can occur only when the deprivation alleged is "objectively, sufficiently serious." *Id.* at 834, 114 S.Ct. 1970 (internal quotation marks omitted). A substantial risk of suicide is sufficient to satisfy this condition. *See Brown,* 240 F.3d at 389. Second, the prison official must have "a sufficiently culpable state of mind." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970 (internal quotation marks omitted). The subjective component of an Eighth Amendment claim challenging the conditions of confinement is satisfied by a showing of deliberate indifference by prison officials. *See id.*"[D]eliberate indifference entails something more than mere negligence ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835, 114 S.Ct. 1970. It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. *See id.* at 837, 114 S.Ct. 1970; *Shakka v. Smith,* 71 F.3d 162, 166 (4th Cir.1995).

[10] Importantly, a prison official "who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer,* 511 U.S. at 844, 114 S.Ct. 1970; *see Brown,* 240 F.3d at 389. Although it is unclear whether the reasonableness of the response is part of the state of mind requirement or rather derives from the duty to "ensure reasonable safety," *Farmer* holds that "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer,* 511 U.S. at 844-45, 114 S.Ct. 1970 (internal quotation marks omitted); *see Brown,* 240 F.3d at 389.

**\*428** *Brown* demonstrates that the first-shift officers' response to Short's risk of suicide was objectively reasonable and therefore sufficient to prevent liability under the Eighth Amendment. As is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 F.3d 422
**(Cite as: 436 F.3d 422)**

relevant here, *Brown,* like the case at bar, was an action alleging deliberate indifference by the defendants to a suicide risk of their detainee. There, Robert Brown was arrested by a probation officer (Svec), who had learned that Brown was taking 8-10 pills a day and had attempted suicide the prior week by overdosing on pills. *See Brown,* 240 F.3d at 385. Pursuant to subsequent searches, Svec found pills in Brown's bedroom and car, as well as on his person. *See id.* Svec then delivered Brown to the Virginia Beach General Jail for processing on a probation violation. *See id.*

At trial, the evidence was conflicting regarding what information Svec shared with the jail supervisor (Ogden). Svec testified that she told Ogden that Brown was suicidal, psychotic, and volatile. *See id.* On the other hand, Ogden testified that Svec informed him only that Brown had violent episodes and did not tell him that Brown was suicidal. *See id.* Ogden placed Brown on "medical watch," which established continuous video surveillance of Brown's cell. *Id.* (internal quotation marks omitted). Nevertheless, Brown hanged himself three days after his arrival at the jail and eventually died as a result. *See id.* at 385-86.

We affirmed a district court order granting judgment as a matter of law to both Svec and Ogden. Regarding Ogden, viewing the evidence in the light most favorable to Brown, we assumed that Ogden had been informed of Brown's suicidal tendencies. *See id.* at 390.We nevertheless held that, as a matter of law, placement of a detainee in a cell under video surveillance constituted an objectively reasonable response by Ogden to the risk that Brown would kill himself. *See id.* We further concluded that the reasonableness of the response was not affected by the fact that there were additional precautions, such as placing Brown in a paper gown or having him examined by a medical professional, that Ogden also could have taken. *See id.* (explaining that even if Ogden "took action than he ... should have ... [t]hat does not ... negate the reasonableness of his response"); *accord Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 309 (4th Cir.2004) (opinion of Williams, Circuit Judge)

(citing *Brown* for the proposition that "the question in deliberate indifference cases is not whether the officials could have taken additional precautions").

Here, the first-shift officers' response to the risk that Short would kill himself was the same as Ogden's response in *Brown:* they placed the detainee in a cell under video surveillance. Thus, under *Brown,* this response was sufficient under the Cruel and Unusual Punishments Clause regardless of whether additional precautions might also have been advisable.

Our dissenting colleague concludes that the officers' response was different from Ogden's in that the officers here "never observed Mr. Short on the video monitor." *Post,* at 12 (emphasis omitted). Initially, it is important to point out that it hardly seems unusual that none of the first-shift officers would have remembered observing Short on one of the many video monitors in their video monitor bank when the videotape of his time in the cell reveals that he was not doing anything out of the ordinary during their shift except for a couple of times when he banged his shoe against the cell bars or the sink. In fact, he spent most of the time in his bed covered with a sheet. In any event, it is unclear why our colleague considers the fact that the first-shift officers did not actually observe Short on the video monitors to be a difference **\*429** between the two cases because there is no indication in our opinion in *Brown* that any officer, including Ogden, ever observed Brown on the video monitor until he had already hanged himself. *See Brown,* 240 F.3d at 385. The critical point is that despite the actual failure of the officers' measures to prevent the detainees' suicides, and despite possible inattentiveness of the officers whose duty it was at the time of the suicides to watch the monitors, in both *Brown* and the present case the officers placed their detainees in video-monitored cells, knowing that someone would be responsible for watching the monitors. *See id.* (stating that there was an officer responsible for viewing the video monitors); J.A. 507-09, 557 (Smoot's deposition testimony that during his shift, after a brief power outage, "[t]here was always someone" with the responsibility of watching the

video monitors); *id.* at 805-07 (Ferguson's deposition testimony that he was responsible for watching the video monitors from 7:00 p.m. until after the time Short hanged himself).

In its order, the district court provides only a cursory mention of *Brown,* stating that the first-shift officers "did not take 'less action than they could have,' [as was the case in *Brown,*] rather, they did virtually nothing." J.A.1939. This characterization does not satisfactorily distinguish *Brown,* however, because Ogden's response there was essentially identical to that of the first-shift officers here. Although the district court observed that the first-shift officers did not even so much as notify any second-shift officers of the risk that Short would commit suicide, a similar criticism could be leveled against Ogden, who apparently also did not share information about Brown's suicide risk with anyone (and indeed denied he ever received such information). In any event, the availability of additional precautions was immaterial to our decision in *Brown,* as we have explained.[FN2]

> FN2. Our affirmance in *Brown* of the grant of judgment as a matter of law to Svec also supports our ruling in favor of the first-shift officers here. Because we viewed the evidence in *Brown* in the light least favorable to Svec in reviewing the grant of judgment as a matter of law in her favor, we assumed that she did not inform Ogden of Brown's suicidal tendencies. *See Brown,* 240 F.3d at 391. We nevertheless ruled as a matter of law that her removal of the pills from Brown's person, bedroom, and car was a reasonable response to Brown's suicide risk, especially since Svec knew Brown would be placed under video surveillance while in jail. *See id.* We therefore held that "[w]hile Svec could have taken the extra step of informing Ogden about Brown's suicidal tendencies," her response, as a matter of law, did not constitute deliberate indifference. *Id.*

III.

[11] Appellants next argue that the district court erred in denying summary judgment to Deputy Ferguson. We hold that the district court correctly denied summary judgment.

The district court concluded that the forecasted evidence supported the reasonable inference that Ferguson observed Short "removing the laces from his shoes and, over a period of twenty to thirty minutes, climbing on the bars of his cell, tying his shoelaces to the bar, placing a noose around his neck, and testing the weight of the rope." *Id.* at 1940. On this basis, the district court concluded that the record permitted a reasonable inference that Ferguson knew Short was attempting to commit suicide. *See id.* & n. 10. The court ruled that failure to make any effort to stop the ongoing suicide attempt, under such circumstances, would constitute deliberate indifference. *See id.* at 1940-41.

Appellants do not dispute that it was clearly established on the day of Short's **\*430** death that the conscious failure by a jailer to make any attempt to stop an ongoing suicide attempt by one of his detainees would constitute deliberate indifference. Rather, they maintain only that the forecasted evidence was not sufficient to support a reasonable inference that Ferguson knew Short was attempting suicide. We must reject this argument, however, as we are not at liberty during an interlocutory appeal of a denial of summary judgment to question the conclusions of the district court regarding what reasonable inferences the forecasted evidence supports. *See Gray-Hopkins,* 309 F.3d at 229. We therefore affirm the district court order to the extent that it denies summary judgment to Deputy Ferguson.

IV.

In sum, we reverse the denial of summary judgment to Deputies Smoot, Beatty, Oakes, and Lewis but affirm the denial with regard to Deputy Ferguson, and remand to the district court for further proceedings.

*AFFIRMED IN PART, REVERSED IN PART,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 F.3d 422
**(Cite as: 436 F.3d 422)**

*AND REMANDED*

GREGORY, Circuit Judge, concurring in part and dissenting in part:

I fully agree with the majority's holding that the district court properly denied qualified immunity to Deputy Ferguson. Because I cannot agree with the majority's conclusion that "Ogden's response [in *Brown*] was essentially identical to that of the first-shift officers here,"*ante* at 429, I would also affirm the district court's denial of qualified immunity to those officers.

As the majority accurately notes, Ogden, the jail supervisor in *Brown,* had knowledge that the inmate presented a suicide risk. 240 F.3d at 390. In addition, Ogden was concerned that Brown might become volatile due to symptoms of drug withdrawal. *Id.* Because of his concerns, Ogden made the decision to place Brown on "medical watch" as a precautionary measure. *Id.* Accordingly, the guards "established constant video surveillance" of Brown's cell over the next three days. *Id.*

The majority concludes today that because the first-shift officers placed Short in a sick cell with a video camera, their actions were constitutionally sufficient under *Brown.* I disagree with this conclusion, because it is based on a dubious assumption-specifically, that an officer establishes constant video surveillance of an inmate by placing him in a cell with a video camera. Webster's Third New International Dictionary defines surveillance as a "close watch kept over one or more persons" or "continuous observation of a person or area." Webster's Third Int'l Dictionary 2302 (1981). Sergeant Smoot, Deputy Beatty, Deputy Lewis, and Deputy Oakes each testified that he *never observed* Mr. Short on the video monitor. J.A. 1312, 1407, 1747, 1844. Thus, even though the first shift officers placed Mr. Short in a cell with a video camera, they never established or maintained video surveillance. I, therefore, agree with the district court's conclusion that the first shift officers "did not take less action than they could have, rather, they did virtually nothing." J.A.1939 (internal quotation marks omitted). Accordingly, I would also affirm the district court's denial of qualified immunity as to the first

shift officers.

C.A.4 (Va.),2006.
Short v. Smoot
436 F.3d 422

END OF DOCUMENT

116 S.Ct. 1769                                                                                    Page 1
517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, 64 USLW 4409, 96 Cal. Daily Op. Serv. 4123, 96 Daily Journal
D.A.R. 6635
**(Cite as: 517 U.S. 806, 116 S.Ct. 1769)**

Whren v. U.S.
U.S.Dist.Col.,1996.

Supreme Court of the United States
Michael A. WHREN and James L. Brown, Petition-
ers,
v.
UNITED STATES.
No. 95-5841.

Argued April 17, 1996.
Decided June 10, 1996.

Defendants were convicted in the United States
District Court for the District of Columbia, Norma
Holloway Johnson, J., of drug offenses, and they
appealed. The Court of Appeals affirmed, 53 F.3d
371, and certiorari was granted. The Supreme
Court, Justice Scalia, held that: (1) constitutional
reasonableness of traffic stops does not depend on
the actual motivations of the individual officers in-
volved; (2) temporary detention of motorist who the
police have probable cause to believe has commit-
ted civil traffic violation is consistent with Fourth
Amendment's prohibition against unreasonable
seizures regardless of whether "reasonable officer"
would have been motivated to stop the automobile
by a desire to enforce the traffic laws; and (3) bal-
ancing inherent in Fourth Amendment inquiry does
not require court to weigh governmental and indi-
vidual interests implicated in a traffic stop.

Affirmed.

West Headnotes

**[1] Arrest 35 ⚖68(4)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(4) k. What Constitutes Seizure.
Most Cited Cases
Temporary detention of individuals during the stop
of an automobile by the police, even if only for a

brief period and for a limited purpose, constitutes
"seizure" of persons within the meaning of Fourth
Amendment. U.S.C.A. Const.Amend. 4.

**[2] Arrest 35 ⚖63.5(6)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-
And-Frisk
            35k63.5(6) k. Motor Vehicles, Stopping.
Most Cited Cases

**Automobiles 48A ⚖349(2.1)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
            48Ak349 Arrest, Stop, or Inquiry; Bail or
Deposit
                48Ak349(2) Grounds
                    48Ak349(2.1) k. In General. Most
Cited Cases
Automobile stop is subject to constitutional imper-
ative that it not be unreasonable under the circum-
stances; as a general matter, decision to stop auto-
mobile is reasonable where police have probable
cause to believe that traffic violation has occurred.
U.S.C.A. Const.Amend. 4.

**[3] Searches and Seizures 349 ⚖58**

349 Searches and Seizures
    349I In General
        349k58 k. Inventory or Booking Search.
Most Cited Cases
"Inventory search" is the search of property law-
fully seized and detained, in order to ensure that it
is harmless, to secure valuable items, and to protect
against false claims of loss or damage. U.S.C.A.
Const.Amend. 4.

**[4] Searches and Seizures 349 ⚖79**

349 Searches and Seizures
    349I In General

517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, 64 USLW 4409, 96 Cal. Daily Op. Serv. 4123, 96 Daily Journal D.A.R. 6635

**(Cite as: 517 U.S. 806, 116 S.Ct. 1769)**

349k79 k. Administrative Inspections and Searches; Regulated Businesses. Most Cited Cases "Administrative inspection" is the inspection of business premises conducted by authorities responsible for enforcing a pervasive regulatory scheme.

**[5] Searches and Seizures 349 🗝58**

349 Searches and Seizures
   349I In General
      349k58 k. Inventory or Booking Search. Most Cited Cases

**Searches and Seizures 349 🗝79**

349 Searches and Seizures
   349I In General
      349k79 k. Administrative Inspections and Searches; Regulated Businesses. Most Cited Cases
Exemption from need for probable cause and warrant that is accorded to searches made for the purpose of inventory or administrative regulation is not accorded to searches that are not made for those purposes. U.S.C.A. Const.Amend. 4.

**[6] Automobiles 48A 🗝349(2.1)**

48A Automobiles
   48AVII Offenses
      48AVII(B) Prosecution
         48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
            48Ak349(2) Grounds
               48Ak349(2.1) k. In General. Most Cited Cases

**Automobiles 48A 🗝349.5(3)**

48A Automobiles
   48AVII Offenses
      48AVII(B) Prosecution
         48Ak349.5 Search or Seizure Consequent to Arrest, Stop or Inquiry
            48Ak349.5(3) k. Stop or Arrest as Pretext or Ruse, in General. Most Cited Cases
Constitutional reasonableness of traffic stops does not depend on the actual motivations of the indi-

vidual officers involved. U.S.C.A. Const.Amend. 4.

**[7] Constitutional Law 92 🗝3045**

92 Constitutional Law
   92XXVI Equal Protection
      92XXVI(A) In General
         92XXVI(A)5 Scope of Doctrine in General
            92k3045 k. Enforcement, Application, or Administration in General. Most Cited Cases
   (Formerly 92k215, 92k211(3))

**Constitutional Law 92 🗝3250**

92 Constitutional Law
   92XXVI Equal Protection
      92XXVI(B) Particular Classes
         92XXVI(B)8 Race, National Origin, or Ethnicity
            92k3250 k. In General. Most Cited Cases
   (Formerly 92k215)
Constitution prohibits selective enforcement of the law based on considerations such as race.

**[8] Automobiles 48A 🗝349(2.1)**

48A Automobiles
   48AVII Offenses
      48AVII(B) Prosecution
         48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
            48Ak349(2) Grounds
               48Ak349(2.1) k. In General. Most Cited Cases

**Automobiles 48A 🗝349(17)**

48A Automobiles
   48AVII Offenses
      48AVII(B) Prosecution
         48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
            48Ak349(14) Conduct of Arrest, Stop, or Inquiry
               48Ak349(17) k. Detention, and Length and Character Thereof. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, 64 USLW 4409, 96 Cal. Daily Op. Serv. 4123, 96 Daily Journal
D.A.R. 6635

**(Cite as: 517 U.S. 806, 116 S.Ct. 1769)**

**Automobiles 48A** ⬤═349.5(3)

48A Automobiles
   48AVII Offenses
      48AVII(B) Prosecution
         48Ak349.5 Search or Seizure Consequent
to Arrest, Stop or Inquiry
         48Ak349.5(3) k. Stop or Arrest as Pre-
text or Ruse, in General. Most Cited Cases
Temporary detention of motorist who the police
have probable cause to believe has committed civil
traffic violation is consistent with Fourth Amend-
ment's prohibition against unreasonable seizures re-
gardless of whether "reasonable officer" would
have been motivated to stop the automobile by a
desire to enforce the traffic laws. U.S.C.A.
Const.Amend. 4.

**[9] Automobiles 48A** ⬤═349(2.1)

48A Automobiles
   48AVII Offenses
      48AVII(B) Prosecution
         48Ak349 Arrest, Stop, or Inquiry; Bail or
Deposit
         48Ak349(2) Grounds
            48Ak349(2.1) k. In General. Most
Cited Cases
Balancing inherent in Fourth Amendment inquiry
does not require court to weigh governmental and
individual interests implicated in a traffic stop.
U.S.C.A. Const.Amend. 4.

**[10] Searches and Seizures 349** ⬤═40.1

349 Searches and Seizures
   349I In General
      349k40 Probable Cause
         349k40.1 k. In General. Most Cited Cases
Probable cause justifies a search and seizure.
U.S.C.A. Const.Amend. 4.

       **1770 *806** *Syllabus* [FN*]

FN* The syllabus constitutes no part of the
opinion of the Court but has been prepared
by the Reporter of Decisions for the con-
venience of the reader. See *United States v.*

*Detroit Lumber Co.,* 200 U.S. 321, 337, 26
S.Ct. 282, 287, 50 L.Ed. 499.

   Plainclothes policemen patrolling a "high drug
area" in an unmarked vehicle observed a truck driv-
en by petitioner Brown waiting at a stop sign at an
intersection for an unusually long time; the truck
then turned suddenly, without signaling, and sped
off at an "unreasonable" speed. The officers
stopped the vehicle, assertedly to warn the driver
about **1771** traffic violations, and upon approach-
ing the truck observed plastic bags of crack cocaine
in petitioner Whren's hands. Petitioners were arres-
ted. Prior to trial on federal drug charges, they
moved for suppression of the evidence, arguing that
the stop had not been justified by either a reason-
able suspicion or probable cause to believe petition-
ers were engaged in illegal drug-dealing activity,
and that the officers' traffic-violation ground for ap-
proaching the truck was pretextual. The motion to
suppress was denied, petitioners were convicted,
and the Court of Appeals affirmed.

   *Held:* The temporary detention of a motorist
upon probable cause to believe that he has violated
the traffic laws does not violate the Fourth Amend-
ment's prohibition against unreasonable seizures,
even if a reasonable officer would not have stopped
the motorist absent some additional law enforce-
ment objective. Pp. 1772-1777.

   (a) Detention of a motorist is reasonable where
probable cause exists to believe that a traffic viola-
tion has occurred. See, *e.g., Delaware v. Prouse,*
440 U.S. 648, 659, 99 S.Ct. 1391, 1399, 59 L.Ed.2d
660. Petitioners claim that, because the police may
be tempted to use commonly occurring traffic viol-
ations as means of investigating violations of other
laws, the Fourth Amendment test for traffic stops
should be whether a reasonable officer would have
stopped the car for the purpose of enforcing the
traffic violation at issue. However, this Court's
cases foreclose the argument that ulterior motives
can invalidate police conduct justified on the basis
of probable cause. See, *e.g., United States v. Robin-
son,* 414 U.S. 218, 221, n. 1, 236, 94 S.Ct. 467,
470, n. 1, 477, 38 L.Ed.2d 427. Subjective inten-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, 64 USLW 4409, 96 Cal. Daily Op. Serv. 4123, 96 Daily Journal
D.A.R. 6635

**(Cite as: 517 U.S. 806, 116 S.Ct. 1769)**

tions play no role in ordinary, probable-cause
Fourth Amendment analysis. Pp. 1772-1774.

(b) Although framed as an empirical question-
whether the officer's conduct deviated materially
from standard police practices-petitioners' proposed
test is plainly designed to combat the perceived
danger of pretextual stops. It is thus inconsistent
with this Court's cases, which **\*807** make clear that
the Fourth Amendment's concern with
"reasonableness" allows certain actions to be taken
in certain circumstances, *whatever* the subjective
intent. See, *e.g., Robinson, supra,* at 236, 94 S.Ct.
at 477. Nor can the Fourth Amendment's protec-
tions be thought to vary from place to place and
from time to time, which would be the consequence
of assessing the reasonableness of police conduct in
light of local law enforcement practices. Pp.
1774-1776.

(c) Also rejected is petitioners' argument that
the balancing of interests inherent in Fourth
Amendment inquiries does not support enforcement
of minor traffic laws by plainclothes police in un-
marked vehicles, since that practice only minimally
advances the government's interest in traffic safety
while subjecting motorists to inconvenience, confu-
sion, and anxiety. Where probable cause exists, this
Court has found it necessary to engage in balancing
only in cases involving searches or seizures con-
ducted in a manner unusually harmful to the indi-
vidual. See, *e.g., Tennessee v. Garner,* 471 U.S. 1,
105 S.Ct. 1694, 85 L.Ed.2d 1. The making of a
traffic stop out of uniform does not remotely quali-
fy as such an extreme practice. Pp. 1776-1777.

53 F.3d 371 (C.A.D.C.1995), affirmed.

SCALIA, J., delivered the opinion for a unan-
imous Court.

Lisa Burget Wright, Washington, DC, for Petition-
ers.
James A. Feldman, Washington, DC, for Respond-
ent.For U.S. Supreme Court briefs, see:1996 WL
75758    (Pet.Brief)1996    WL    115816
(Resp.Brief)1996 WL 164375 (Reply Brief)
**\*808** Justice SCALIA delivered the opinion of the

Court.

In this case we decide whether the temporary
detention of a motorist who the police have prob-
able cause to believe has committed a civil traffic
violation is inconsistent with the Fourth Amend-
ment's prohibition against unreasonable seizures
unless a reasonable officer**\*1772** would have been
motivated to stop the car by a desire to enforce the
traffic laws.

I

On the evening of June 10, 1993, plainclothes
vice-squad officers of the District of Columbia
Metropolitan Police Department were patrolling a
"high drug area" of the city in an unmarked car.
Their suspicions were aroused when they passed a
dark Pathfinder truck with temporary license plates
and youthful occupants waiting at a stop sign, the
driver looking down into the lap of the passenger at
his right. The truck remained stopped at the inter-
section for what seemed an unusually long time-
more than 20 seconds. When the police car ex-
ecuted a U-turn in order to head back toward the
truck, the Pathfinder turned suddenly to its right,
without signaling, and sped off at an
"unreasonable" speed. The policemen followed,
and in a short while overtook the Pathfinder when it
stopped behind other traffic at a red light. They
pulled up alongside, and Officer Ephraim Soto
stepped out and approached the driver's door,
identifying himself as a police officer and directing
the driver, petitioner Brown, to put the vehicle in
park. When Soto drew up to the driver's **\*809** win-
dow, he immediately observed two large plastic
bags of what appeared to be crack cocaine in peti-
tioner Whren's hands. Petitioners were arrested, and
quantities of several types of illegal drugs were re-
trieved from the vehicle.

Petitioners were charged in a four-count indict-
ment with violating various federal drug laws, in-
cluding 21 U.S.C. §§ 844(a) and 860(a). At a pretri-
al suppression hearing, they challenged the legality
of the stop and the resulting seizure of the drugs.
They argued that the stop had not been justified by

116 S.Ct. 1769                                                                                      Page 5
517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, 64 USLW 4409, 96 Cal. Daily Op. Serv. 4123, 96 Daily Journal
D.A.R. 6635
**(Cite as: 517 U.S. 806, 116 S.Ct. 1769)**

probable cause to believe, or even reasonable suspicion, that petitioners were engaged in illegal drug-dealing activity; and that Officer Soto's asserted ground for approaching the vehicle-to give the driver a warning concerning traffic violations-was pretextual. The District Court denied the suppression motion, concluding that "the facts of the stop were not controverted," and "[t]here was nothing to really demonstrate that the actions of the officers were contrary to a normal traffic stop." App. 5.

Petitioners were convicted of the counts at issue here. The Court of Appeals affirmed the convictions, holding with respect to the suppression issue that, "regardless of whether a police officer subjectively believes that the occupants of an automobile may be engaging in some other illegal behavior, a traffic stop is permissible as long as a reasonable officer in the same circumstances *could have* stopped the car for the suspected traffic violation." 53 F.3d 371, 374-375 (C.A.D.C.1995). We granted certiorari. 516 U.S. 1036, 116 S.Ct. 690, 133 L.Ed.2d 595 (1996).

## II

[1][2] The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the **\*810** meaning of this provision. See *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979); *United States v. Martinez-Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. See *Prouse, supra,* at 659, 99

S.Ct., at 1399; *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977)(*per curiam*).

Petitioners accept that Officer Soto had probable cause to believe that various provisions of the District of Columbia traffic code had been violated. See 18 D.C. Mun. Regs. §§ 2213.4 (1995) ("An operator shall ... give full time and attention to the operation of the vehicle"); 2204.3 ("No person shall turn any vehicle ... without giving an appropriate signal"); 2200.3 ("No person shall drive a **\*1773** vehicle ... at a speed greater than is reasonable and prudent under the conditions"). They argue, however, that "in the unique context of civil traffic regulations" probable cause is not enough. Since, they contend, the use of automobiles is so heavily and minutely regulated that total compliance with traffic and safety rules is nearly impossible, a police officer will almost invariably be able to catch any given motorist in a technical violation. This creates the temptation to use traffic stops as a means of investigating other law violations, as to which no probable cause or even articulable suspicion exists. Petitioners, who are both black, further contend that police officers might decide which motorists to stop based on decidedly impermissible factors, such as the race of the car's occupants. To avoid this danger, they say, the Fourth Amendment test for traffic stops should be, not the normal one (applied by the Court of Appeals) of whether probable cause existed to justify the stop; but rather, whether a police officer, acting reasonably, would have made the stop for the reason given.

### *811 A

[3][4][5] Petitioners contend that the standard they propose is consistent with our past cases' disapproval of police attempts to use valid bases of action against citizens as pretexts for pursuing other investigatory agendas. We are reminded that in *Florida v. Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990), we stated that "an inventory search"[FN1] must not be a ruse for a general rummaging in order to discover incriminating

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, 64 USLW 4409, 96 Cal. Daily Op. Serv. 4123, 96 Daily Journal
D.A.R. 6635

**(Cite as: 517 U.S. 806, 116 S.Ct. 1769)**

evidence"; that in *Colorado v. Bertine,* 479 U.S. 367, 372, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987), in approving an inventory search, we apparently thought it significant that there had been "no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation"; and that in *New York v. Burger,* 482 U.S. 691, 716-717, n. 27, 107 S.Ct. 2636, 2651, n. 27, 96 L.Ed.2d 601 (1987), we observed, in upholding the constitutionality of a warrantless administrative inspection,FN2 that the search did not appear to be "a 'pretext' for obtaining evidence of ... violation of ... penal laws." But only an undiscerning reader would regard these cases as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred. In each case we were addressing the validity of a search conducted in the *absence* of probable cause. Our quoted statements simply explain that the exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative **\*812** regulation, is not accorded to searches that are *not* made for those purposes. See *Bertine, supra,* at 371-372, 107 S.Ct., at 740-741; *Burger, supra,* at 702-703, 107 S.Ct., at 2643-2644.

> FN1. An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage. See *South Dakota v. Opperman,* 428 U.S. 364, 369, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000 (1976).

> FN2. An administrative inspection is the inspection of business premises conducted by authorities responsible for enforcing a pervasive regulatory scheme-for example, unannounced inspection of a mine for compliance with health and safety standards. See *Donovan v. Dewey,* 452 U.S. 594, 599-605, 101 S.Ct. 2534, 2538-2542, 69 L.Ed.2d 262 (1981).

Petitioners also rely upon *Colorado v. Bannister,* 449 U.S. 1, 101 S.Ct. 42, 66 L.Ed.2d 1 (1980)*(per curiam),* a case which, like this one, involved a traffic stop as the prelude to a plain-view sighting and arrest on charges wholly unrelated to the basis for the stop. Petitioners point to our statement that "[t]here was no evidence whatsoever that the officer's presence to issue a traffic citation was a pretext to confirm any other previous suspicion about the occupants" of the car. *Id.,* at 4, n. 4, 101 S.Ct., at 44, n. 4. That dictum *at most* demonstrates that the Court in *Bannister* found no need to inquire into the question now under discussion; not that it was certain of the answer. And it may demonstrate even less than that: If by "pretext" the Court meant that the officer really had not seen the car speeding, the statement would mean only that there was no reason to doubt probable cause for the traffic stop.

**\*\*1774** It would, moreover, be anomalous, to say the least, to treat a statement in a footnote in the *per curiam Bannister* opinion as indicating a reversal of our prior law. Petitioners' difficulty is not simply a lack of affirmative support for their position. Not only have we never held, outside the context of inventory search or administrative inspection (discussed above), that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary. In *United States v. Villamonte-Marquez,* 462 U.S. 579, 584, n. 3, 103 S.Ct. 2573, 2577, n. 3, 77 L.Ed.2d 22 (1983), we held that an otherwise valid warrantless boarding of a vessel by customs officials was not rendered invalid "because the customs officers were accompanied by a Louisiana state policeman, and were following an informant's tip that a vessel in the ship channel was thought to be carrying marihuana." We flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal justification. In *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), we held that **\*813** a traffic-violation arrest (of the sort here) would not be rendered invalid by the fact that it was "a mere pretext for a narcotics search," *id.,* at 221, n. 1, 94 S.Ct., at 470, n. 1; and that a lawful postarrest search of the person would not be rendered invalid

517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, 64 USLW 4409, 96 Cal. Daily Op. Serv. 4123, 96 Daily Journal D.A.R. 6635

**(Cite as: 517 U.S. 806, 116 S.Ct. 1769)**

by the fact that it was not motivated by the officer-safety concern that justifies such searches, see *id.,* at 236, 94 S.Ct., at 477. See also *Gustafson v. Florida,* 414 U.S. 260, 266, 94 S.Ct. 488, 492, 38 L.Ed.2d 456 (1973). And in *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978), in rejecting the contention that wiretap evidence was subject to exclusion because the agents conducting the tap had failed to make any effort to comply with the statutory requirement that unauthorized acquisitions be minimized, we said that "[s]ubjective intent alone ... does not make otherwise lawful conduct illegal or unconstitutional." We described *Robinson* as having established that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." 436 U.S., at 136, 138, 98 S.Ct., at 1723.

[6][7] We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

B

[8] Recognizing that we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers, petitioners disavow any intention to make the individual officer's subjective good faith the touchstone of "reasonableness." They insist that the standard they **\*814** have put forward-whether the officer's conduct deviated materially from usual police practices, so that a reasonable officer in the same circumstances would not have made the stop for the reasons given-is an "objective" one.

But although framed in empirical terms, this approach is plainly and indisputably driven by subjective considerations. Its whole purpose is to prevent the police from doing under the guise of enforcing the traffic code what they would like to do for different reasons. Petitioners' proposed standard may not use the word "pretext," but it is designed to combat nothing other than the perceived "danger" of the pretextual stop, albeit only indirectly and over the run of cases. Instead of asking whether the individual officer had the proper state of mind, the petitioners would have us ask, in effect, whether (based on general police practices) it is plausible to believe that the officer had the proper state of mind.

Why one would frame a test designed to combat pretext in such fashion that the court **\*\*1775** cannot take into account *actual and admitted pretext* is a curiosity that can only be explained by the fact that our cases have foreclosed the more sensible option. If those cases were based only upon the evidentiary difficulty of establishing subjective intent, petitioners' attempt to root out subjective vices through objective means might make sense. But they were not based only upon that, or indeed even principally upon that. Their principal basis-which applies equally to attempts to reach subjective intent through ostensibly objective means-is simply that the Fourth Amendment's concern with "reasonableness" allows certain actions to be taken in certain circumstances, *whatever* the subjective intent. See, *e.g., Robinson, supra,* at 236, 94 S.Ct., at 477 ("Since it is the fact of custodial arrest which gives rise to the authority to search, it is of no moment that [the officer] did not indicate any subjective fear of the [arrestee] or that he did not himself suspect that [the arrestee] was armed") (footnotes omitted); *Gustafson, supra,* at 266, 94 S.Ct., at 492 (same). But even if our concern had been only an evidentiary one, **\*815** petitioners' proposal would by no means assuage it. Indeed, it seems to us somewhat easier to figure out the intent of an individual officer than to plumb the collective consciousness of law enforcement in order to determ-

116 S.Ct. 1769

Page 8

517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, 64 USLW 4409, 96 Cal. Daily Op. Serv. 4123, 96 Daily Journal D.A.R. 6635

**(Cite as: 517 U.S. 806, 116 S.Ct. 1769)**

ine whether a "reasonable officer" would have been moved to act upon the traffic violation. While police manuals and standard procedures may sometimes provide objective assistance, ordinarily one would be reduced to speculating about the hypothetical reaction of a hypothetical constable-an exercise that might be called virtual subjectivity.

Moreover, police enforcement practices, even if they could be practicably assessed by a judge, vary from place to place and from time to time. We cannot accept that the search and seizure protections of the Fourth Amendment are so variable, cf. *Gustafson, supra,* at 265, 94 S.Ct., at 491; *United States v. Caceres,* 440 U.S. 741, 755-756, 99 S.Ct. 1465, 1473-1474, 59 L.Ed.2d 733 (1979), and can be made to turn upon such trivialities. The difficulty is illustrated by petitioners' arguments in this case. Their claim that a reasonable officer would not have made this stop is based largely on District of Columbia police regulations which permit plain-clothes officers in unmarked vehicles to enforce traffic laws "only in the case of a violation that is so grave as to pose an *immediate threat* to the safety of others." Metropolitan Police Department, Washington, D.C., General Order 303.1, pt. 1, Objectives and Policies (A)(2)(4) (Apr. 30, 1992), reprinted as Addendum to Brief for Petitioners. This basis of invalidation would not apply in jurisdictions that had a different practice. And it would not have applied even in the District of Columbia, if Officer Soto had been wearing a uniform or patrolling in a marked police cruiser.

Petitioners argue that our cases support insistence upon police adherence to standard practices as an objective means of rooting out pretext. They cite no holding to that effect, and dicta in only two cases. In *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), the petitioner had been arrested by the Immigration and Naturalization Service (INS), on the basis of **\*816** an administrative warrant that, he claimed, had been issued on pretextual grounds in order to enable the Federal Bureau of Investigation (FBI) to search his room after his arrest. We regarded this as an allegation of "serious misconduct," but rejected Abel's claims on

the ground that "[a] finding of bad faith is ... not open to us on th[e] record" in light of the findings below, including the finding that " 'the proceedings taken by the [INS] differed in no respect from what would have been done in the case of an individual concerning whom [there was no pending FBI investigation],' " *id.,* at 226-227, 80 S.Ct., at 690-691. But it is a long leap from the proposition that following regular procedures is some evidence of lack of pretext to the proposition that failure to follow regular procedures *proves* (or is an operational substitute for) pretext. *Abel,* moreover, did not involve the assertion that pretext could invalidate a search or seizure for which there was probable cause-and even what it said about pretext in other contexts is plainly inconsistent with the views we later stated in *Robinson, Gustafson, Scott,* and *Villamonte-Marquez.* In the other case claimed to contain **\*\*1776** supportive dicta, *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), in approving a search incident to an arrest for driving without a license, we noted that the arrest was "not a departure from established police department practice." *Id.,* at 221, n. 1, 94 S.Ct., at 470, n. 1. That was followed, however, by the statement that "[w]e leave for another day questions which would arise on facts different from these." *Ibid.* This is not even a dictum that purports to provide an answer, but merely one that leaves the question open.

### III

[9] In what would appear to be an elaboration on the "reasonable officer" test, petitioners argue that the balancing inherent in any Fourth Amendment inquiry requires us to weigh the governmental and individual interests implicated in a traffic stop such as we have here. That balancing, petitioners claim, does not support investigation of minor traffic infractions**\*817** by plainclothes police in unmarked vehicles; such investigation only minimally advances the government's interest in traffic safety, and may indeed retard it by producing motorist confusion and alarm-a view said to be supported by the Metropolitan Police Department's own regulations generally prohibiting this practice. And as for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 S.Ct. 1769    Page 9
517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, 64 USLW 4409, 96 Cal. Daily Op. Serv. 4123, 96 Daily Journal D.A.R. 6635
**(Cite as: 517 U.S. 806, 116 S.Ct. 1769)**

the Fourth Amendment interests of the individuals concerned, petitioners point out that our cases acknowledge that even ordinary traffic stops entail "a possibly unsettling show of authority"; that they at best "interfere with freedom of movement, are inconvenient, and consume time" and at worst "may create substantial anxiety," *Prouse,* 440 U.S., at 657, 99 S.Ct., at 1398. That anxiety is likely to be even more pronounced when the stop is conducted by plainclothes officers in unmarked cars.

It is of course true that in principle every Fourth Amendment case, since it turns upon a "reasonableness" determination, involves a balancing of all relevant factors. With rare exceptions not applicable here, however, the result of that balancing is not in doubt where the search or seizure is based upon probable cause. That is why petitioners must rely upon cases like *Prouse* to provide examples of actual "balancing" analysis. There, the police action in question was a random traffic stop for the purpose of checking a motorist's license and vehicle registration, a practice that-like the practices at issue in the inventory search and administrative inspection cases upon which petitioners rely in making their "pretext" claim-involves police intrusion *without the probable cause that is its traditional justification.* Our opinion in *Prouse* expressly distinguished the case from a stop based on precisely what is at issue here: "probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations." *Id.,* at 661, 99 S.Ct., at 1400. It noted approvingly that "[t]he foremost method of enforcing traffic and vehicle safety regulations ... is acting upon observed violations,"*id.,* at 659, 99 S.Ct., at 1399, which afford the " 'quantum of individualized suspicion' " necessary to ensure that police *818 discretion is sufficiently constrained, *id.,* at 654-655, 99 S.Ct., at 1396 (quoting *United States v. Martinez-Fuerte,* 428 U.S., at 560, 96 S.Ct., at 3084). What is true of *Prouse* is also true of other cases that engaged in detailed "balancing" to decide the constitutionality of automobile stops, such as *Martinez-Fuerte,* which upheld checkpoint stops, see 428 U.S., at 556-562, 96 S.Ct., at 3082-3085, and *Brignoni-Ponce,* which disallowed so-called "roving patrol" stops, see 422 U.S., at 882-884, 95 S.Ct., at 2580-2582: The detailed "balancing" analysis was necessary because they involved seizures without probable cause.

Where probable cause has existed, the only cases in which we have found it necessary actually to perform the "balancing" analysis involved searches or seizures conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests-such as, for example, seizure by means of deadly force, see *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), unannounced entry into a home, see *Wilson v. Arkansas,* 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), entry into a home without a warrant, see *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), or physical penetration of the body, **1777 see *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). The making of a traffic stop out of uniform does not remotely qualify as such an extreme practice, and so is governed by the usual rule that probable cause to believe the law has been broken "outbalances" private interest in avoiding police contact.

Petitioners urge as an extraordinary factor in this case that the "multitude of applicable traffic and equipment regulations" is so large and so difficult to obey perfectly that virtually everyone is guilty of violation, permitting the police to single out almost whomever they wish for a stop. But we are aware of no principle that would allow us to decide at what point a code of law becomes so expansive and so commonly violated that infraction itself can no longer be the ordinary measure of the lawfulness of enforcement. And even if we could identify such exorbitant codes, we do not know by what standard (or what right) we would decide, as *819 petitioners would have us do, which particular provisions are sufficiently important to merit enforcement.

[10] For the run-of-the-mine case, which this surely is, we think there is no realistic alternative to the traditional common-law rule that probable

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 S.Ct. 1769

Page 10

517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, 64 USLW 4409, 96 Cal. Daily Op. Serv. 4123, 96 Daily Journal D.A.R. 6635

**(Cite as: 517 U.S. 806, 116 S.Ct. 1769)**

cause justifies a search and seizure.

* * *

Here the District Court found that the officers had probable cause to believe that petitioners had violated the traffic code. That rendered the stop reasonable under the Fourth Amendment, the evidence thereby discovered admissible, and the upholding of the convictions by the Court of Appeals for the District of Columbia Circuit correct. The judgment is

*Affirmed.*

U.S.Dist.Col.,1996.
Whren v. U.S.
517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, 64 USLW 4409, 96 Cal. Daily Op. Serv. 4123, 96 Daily Journal D.A.R. 6635

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

348 F.3d 965                                                                              Page 1
348 F.3d 965, 16 Fla. L. Weekly Fed. C 1227
**(Cite as: 348 F.3d 965)**

⚑

U.S. v. Perkins
C.A.11 (Ala.),2003.

United States Court of Appeals,Eleventh Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Jessie Jerome PERKINS, Jr., Johnny Lewis Scott,
Defendants-Appellees.
**No. 02-15891.**

Oct. 22, 2003.

Motorists moved to suppress evidence discovered during vehicle search. The United States District Court for the Middle District of Alabama, No. 02-00143-CR-N,Ira De Ment, J., granted motion, and federal government appealed. The Court of Appeals, Barkett, Circuit Judge, held that, while duration of traffic stop was not itself violative of Fourth Amendment, driver's nervousness and driver's and passenger's differing, but not inconsistent statements did not provide requisite reasonable suspicion to justify continuation of stop after warning ticket was issued.

Affirmed.

West Headnotes

**[1] Criminal Law 110 ⚖1139**

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General
            110k1139 k. Additional Proofs and Trial De Novo. Most Cited Cases

**Criminal Law 110 ⚖1158(4)**

110 Criminal Law
    110XXIV Review
        110XXIV(O) Questions of Fact and Findings
            110k1158 In General
                110k1158(4) k. Reception of Evidence. Most Cited Cases
Grant or denial of motion to suppress evidence is

reviewed on appeal as mixed question of law and fact: Court of Appeals assesses district court's findings of fact under "clear error" standard and reviews its application of law to the facts *de novo*.

**[2] Criminal Law 110 ⚖1144.12**

110 Criminal Law
    110XXIV Review
        110XXIV(M) Presumptions
            110k1144 Facts or Proceedings Not Shown by Record
                110k1144.12 k. Reception of Evidence. Most Cited Cases
On appeal from district court's suppression ruling, Court of Appeals construes facts in favor of party that prevailed below.

**[3] Arrest 35 ⚖68(4)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(4) k. What Constitutes Seizure. Most Cited Cases
"Seizure" takes place, within meaning of the Fourth Amendment, whenever police officer accosts individual and restrains his freedom to walk away. U.S.C.A. Const.Amend. 4.

**[4] Automobiles 48A ⚖349(10)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
            48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
                48Ak349(10) k. What Is Arrest or Seizure; Stop Distinguished. Most Cited Cases
Traffic stops qualify as "seizures" under the Fourth Amendment. U.S.C.A. Const.Amend. 4.

**[5] Automobiles 48A ⚖349(14.1)**

48A Automobiles
    48AVII Offenses

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

48AVII(B) Prosecution
48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
48Ak349(14) Conduct of Arrest, Stop, or Inquiry
48Ak349(14.1) k. In General. Most Cited Cases

**Automobiles 48A ⟨⟩349(17)**

48A Automobiles
48AVII Offenses
48AVII(B) Prosecution
48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
48Ak349(14) Conduct of Arrest, Stop, or Inquiry
48Ak349(17) k. Detention, and Length and Character Thereof. Most Cited Cases
Traffic stop must be reasonably related in scope to the circumstances which justified it, and may last no longer than is necessary to process the traffic violation unless officer has articulable suspicion of other illegal activity. U.S.C.A. Const.Amend. 4.

**[6] Criminal Law 110 ⟨⟩394.1(1)**

110 Criminal Law
110XVII Evidence
110XVII(I) Competency in General
110k394 Evidence Wrongfully Obtained
110k394.1 In General
110k394.1(1) k. In General. Most Cited Cases

**Criminal Law 110 ⟨⟩394.1(3)**

110 Criminal Law
110XVII Evidence
110XVII(I) Competency in General
110k394 Evidence Wrongfully Obtained
110k394.1 In General
110k394.1(3) k. Effect of Illegal Conduct on Other Evidence. Most Cited Cases
Under exclusionary rule, evidence obtained in encounter that is in violation of Fourth Amendment, including direct products of police misconduct and evidence derived from illegal conduct, cannot be used in criminal trial against victim of illegal search and seizure. U.S.C.A. Const.Amend. 4.

**[7] Automobiles 48A ⟨⟩349(17)**

48A Automobiles
48AVII Offenses
48AVII(B) Prosecution
48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
48Ak349(14) Conduct of Arrest, Stop, or Inquiry
48Ak349(17) k. Detention, and Length and Character Thereof. Most Cited Cases

**Automobiles 48A ⟨⟩349(18)**

48A Automobiles
48AVII Offenses
48AVII(B) Prosecution
48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
48Ak349(14) Conduct of Arrest, Stop, or Inquiry
48Ak349(18) k. Inquiry; License, Registration, or Warrant Checks. Most Cited Cases
Although duration of traffic stop that patrol officer initiated after observing out-of-state vehicle veer onto shoulder of highway, while officer inspected the driver's driving license and insurance information, questioned driver, requested license check, questioned passenger, issued warning citation, and ultimately, based upon driver's nervousness and differing responses that he received from driver and passenger as to purpose of trip, radioed for drug dog and conducted search of vehicle, was not itself violative of Fourth Amendment, driver's nervousness and driver's and passenger's differing, but not inconsistent statements did not provide requisite reasonable suspicion to justify continuation of stop after warning ticket was issued. U.S.C.A. Const.Amend. 4.

**[8] Automobiles 48A ⟨⟩349(17)**

48A Automobiles
48AVII Offenses
48AVII(B) Prosecution

348 F.3d 965, 16 Fla. L. Weekly Fed. C 1227

**(Cite as: 348 F.3d 965)**

48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit

48Ak349(14) Conduct of Arrest, Stop, or Inquiry

48Ak349(17) k. Detention, and Length and Character Thereof. Most Cited Cases

Traffic stop may be prolonged where officer is able to articulate a reasonable suspicion of other illegal activity beyond traffic offense. U.S.C.A. Const.Amend. 4.

**[9] Arrest 35 ☞63.5(4)**

35 Arrest

35II On Criminal Charges

35k63.5 Investigatory Stop or Stop-And-Frisk

35k63.5(3) Grounds for Stop or Investigation

35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases

While the "reasonable suspicion" required to justify *Terry* stop is less demanding standard than "probable cause," and requires a showing considerably less than preponderance of evidence, Fourth Amendment requires at least some minimal level of objective justification. U.S.C.A. Const.Amend. 4.

**[10] Arrest 35 ☞63.5(4)**

35 Arrest

35II On Criminal Charges

35k63.5 Investigatory Stop or Stop-And-Frisk

35k63.5(3) Grounds for Stop or Investigation

35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases

In deciding whether officer had requisite "reasonable suspicion" of criminal activity, as required for *Terry* stop, court must look at totality of circumstances of each case to see whether officer had a particularized and objective basis for suspecting legal wrongdoing. U.S.C.A. Const.Amend. 4.

**[11] Arrest 35 ☞63.5(4)**

35 Arrest

35II On Criminal Charges

35k63.5 Investigatory Stop or Stop-And-Frisk

35k63.5(3) Grounds for Stop or Investigation

35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases

Inchoate and unparticularized suspicion, or hunch, of criminal activity is not enough to justify *Terry* stop. U.S.C.A. Const.Amend. 4.

**[12] Searches and Seizures 349 ☞184**

349 Searches and Seizures

349V Waiver and Consent

349k179 Validity of Consent

349k184 k. Custody, Restraint, or Detention Issues. Most Cited Cases

Where motorist's consent to search of car was product of unlawful detention, motorist's consent was tainted by the illegality and was ineffective to justify search. U.S.C.A. Const.Amend. 4.

**[13] Automobiles 48A ☞349(17)**

48A Automobiles

48AVII Offenses

48AVII(B) Prosecution

48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit

48Ak349(14) Conduct of Arrest, Stop, or Inquiry

48Ak349(17) k. Detention, and Length and Character Thereof. Most Cited Cases

Mere fact that narcotics discovered during vehicle search proved the correctness of highway patrol officer's hunch, based upon driver's nervousness and on differing responses that he had received from driver and passenger regarding purpose of trip, that they were illegally transporting drugs was irrelevant to determination of whether officer's prolongation of traffic stop, after warning ticket had been issued, violated the Fourth Amendment. U.S.C.A. Const.Amend. 4.

**\*967** Stephen P. Feaga, Montgomery, AL, for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

348 F.2d 965
348 F.3d 965, 16 Fla. L. Weekly Fed. C 1227
**(Cite as: 348 F.3d 965)**

Plaintiff-Appellant.

Jennifer Anne Hart, Christine A. Freeman and Kevin L. Butler, Federal Public Defenders, Jeffery C. Duffey (Court-Appointed), Montgomery, AL, for Defendants-Appellees.

Appeal from the United States District Court for the Middle District of Alabama.

Before DUBINA, BARKETT and HILL, Circuit Judges.

BARKETT, Circuit Judge:

The United States appeals from the trial court's order granting the motions of Jesse Jerome Perkins Jr. and Johnny Lewis Scott to suppress all statements made and physical evidence obtained during a traffic stop for the issuance of a traffic warning citation. Following an evidentiary hearing, the Magistrate Judge recommended that the motions be granted. The district court accepted the Magistrate Judge's recommendation, and we affirm these decisions.

## I. BACKGROUND

The essential facts of this case are not in dispute and are fully stated in the Magistrate Judge's recommendation. Officer Colston of the Alabama Highway Patrol was patrolling the interstate when he observed a maroon Plymouth automobile with a Florida license plate cross the white fault line and veer onto the shoulder of the highway. Fearing that the driver was falling asleep or under the influence of drugs or alcohol, Colston initiated a traffic stop and approached the passenger side of the vehicle where Scott was seated, explaining to both defendants that he stopped them to ensure that Perkins, who was driving, was not asleep or under the influence of drugs or alcohol. After inspecting Perkins' driver's license and insurance information, Colston asked Perkins to get out of the car so he could give Perkins a warning ticket for a lane violation, assuring him that, after the issuance of the warning citation, he would be free to leave. Scott remained in the vehicle.

After briefly searching Perkins for weapons, Colston then directed him to sit in the patrol car while he completed the warning ticket. Noticing the Tampa address on Perkins' Florida driver's license, Colston asked Perkins if Tampa was his **\*968** ultimate destination. Perkins' negative response prompted Colston to ask him a series of questions about his residency, employment, and destination. Perkins explained that he had once lived in Tampa but had since relocated to Montgomery, Alabama, where he was employed at Rhodes Furniture. In response to Colston's questions about his destination, Perkins indicated that he was headed to Greenville, Alabama. According to Colston, Perkins was extremely nervous, breathed rapidly, and repeated Colston's questions before answering them. Perkins was not free to leave during this questioning.

Colston then radioed the dispatch officer to conduct a driver's license check. While waiting for the response, Colston asked Perkins if Scott lived in Tampa or Montgomery. Colston also asked Perkins more detailed questions about how long he had lived in Montgomery, when he was going to get an Alabama driver's license, and whom he was going to visit in Greenville. Perkins told Colston that he was going to visit his cousin, Shantay. After the driver's license check revealed that Perkins' license was valid and that he had no outstanding criminal warrants, Colston gave the completed warning ticket to Perkins for his signature. Colston testified that, after completing the warning citation, he was finished with that portion of his investigation relating to the traffic stop. However, Colston continued to detain Perkins because of his nervousness; what he perceived as Perkins' evasive behavior in response to his questions; and his hunch that Perkins was being untruthful about his destination. Colston subsequently decided to question Scott about his destination.

Colston asked Scott to identify himself and questioned him about his destination. Scott explained that he and Perkins were going to Greenville. When Colston asked whom he would be visiting in Greenville, Scott told him he would be visiting a girl named Quinn. Colston also asked Scott if

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the car contained any contraband or other illegal substances. Scott disavowed any knowledge of any narcotics or other contraband. Colston testified that Scott was not free to leave during this questioning.

Without further inquiry, Colston returned to his patrol car, retrieved the signed warning citation from Perkins, and asked whether the vehicle contained any contraband or other illegal substances. When Perkins said no, Colston asked for Perkins' permission to search the vehicle. Perkins refused to consent, and Colston then called the dispatch officer and requested a drug-sniffing dog. When the canine unit arrived, Colston removed Scott from the vehicle, conducted a brief pat-down search for weapons, and placed him in the backseat of the patrol car. Colston left the defendants in the car while he conferred with the canine unit officer. Unaware that their conversation was being taped, Scott disavowed any knowledge of the existence of narcotics, and both defendants debated about whether the dog would be able to find drugs. After concluding his conversation with the canine unit officer, Colston joined Perkins and Scott in the patrol car and again asked if any narcotics, contraband, or other weapons were in the vehicle. When Perkins said no, Colston rephrased the question, asking Perkins if he had any narcotics for personal use. Again, Perkins denied the presence of narcotics. Undaunted, Colston asked Perkins to tell him the exact amount of narcotics that he had hidden in the car. Perkins finally acquiesced, admitted that narcotics were in the car, and offered to show Colston where they were hidden. Perkins was escorted to the vehicle where he informed Colston that the **\*969** drugs were in the center console, where Colston then found them.

## II. STANDARD OF REVIEW

[1][2] The grant or denial of a motion to suppress evidence is reviewed in this Court as a mixed question of law and fact. *United States v. Holloway,* 290 F.3d 1331, 1334 (11th Cir.2002). We assess the district court's findings of fact under the clearly erroneous standard and review the application of the

law to the facts *de novo. Id.* The facts are construed in favor of the party that prevailed below which in this case is Perkins and Scott. *United States v. Wilson,* 894 F.2d 1245, 1254 (11th Cir.1990).

## III. DISCUSSION

[3][4] The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures. U.S. Const. amend. IV. A seizure takes place "whenever a police officer accosts an individual and restrains his freedom to walk away." *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Traffic stops qualify as seizures under the Fourth Amendment. *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

The Supreme Court has identified at least three separate categories of police-citizen encounters in determining which level of Fourth Amendment scrutiny to apply: (1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny, *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny, *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

[5] As the Magistrate Judge recognized:

At issue in this case is the second type of encounter, commonly referred to as a *Terry* stop. *United States v. Purcell,* 236 F.3d 1274, 1277 (11th Cir.2001).... *Terry* requires that an officer have an objective, reasonable suspicion of criminal activity. Pursuant to this standard, a traffic stop must be "reasonably related in *scope* to the circumstances which justified the interference in the first place," *Purcell,* 236 F.3d at 1277 (citing *Terry,* 392 U.S. at 20, 88 S.Ct. 1868)..., and may not last "any longer than necessary to process the traffic viola-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

348 F.3d 965, 16 Fla. L. Weekly Fed. C 1227

**(Cite as: 348 F.3d 965)**

tion" unless there is articulable suspicion of other illegal activity. *Id.* (citing *United States v. Holloman,* 113 F.3d 192, 196 (11th Cir.1997)).

*Rec. of Magis. Judge,* (Oct. 3, 2002) at 9.

[6] Under the exclusionary rule, evidence obtained in an encounter that is in violation of the Fourth Amendment, including the direct products of police misconduct and evidence derived from the illegal conduct, or "fruit of the poisonous tree," cannot be used in a criminal trial against the victim of the illegal search and seizure. *United States v. Terzado-Madruga,* 897 F.2d 1099, 1112 (11th Cir.1990). *See also Weeks v. United States,* 232 U.S. 383, 391-93, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

[7] Perkins and Scott initially argue that the duration of their traffic stop itself was unconstitutional under *Terry.* Even construing the facts in favor of Perkins and Scott, we agree with the Magistrate Judge that in this case the duration of the **\*970** traffic stop was not unreasonable. *See Purcell,* 236 F.3d 1274, 1278 (finding that a traffic stop totaling fourteen minutes is not unreasonable on its face); *United States v. Hardy,* 855 F.2d 753, 761 (11th Cir.1988) (holding that an investigative stop of 50-minute duration is not unreasonable). *Cf. United States v. Place,* 462 U.S. 696, 709, 710, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (holding that a 90-minute stop is probably too long for a *Terry* stop); *United States v. Codd,* 956 F.2d 1109, 1111 (11th Cir.1992) (finding that a two-and-a-half hour investigative detention is too long for a *Terry* stop).

[8][9][10][11] However, we conclude that the circumstances here do not give rise to the requisite reasonable suspicion justifying continued detention of Perkins and Scott after the warning ticket had been issued. A traffic stop may be prolonged where an officer is able to articulate a reasonable suspicion of other illegal activity beyond the traffic offense. *Purcell,* 236 F.3d at 1277. "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the

Fourth Amendment requires at least a minimal level of objective justification." *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (quoting *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). When making a determination of "reasonable suspicion," we must "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting *United States v. Cortez,* 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). It is clear that "an 'inchoate and unparticularized suspicion' or 'hunch' of criminal activity" is not enough to satisfy the minimum level of objectivity required. *Wardlow,* 528 U.S. at 124, 120 S.Ct. 673 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868).

The Government argues that the totality of the following circumstances gave rise to a reasonable suspicion of drug trafficking: (1) Perkins' nervousness; (2) the "odd behavior" of Perkins in repeating the questions Colston asked him; (3) Perkins' possession of a Florida driver's license while claiming to live in Montgomery, Alabama; and (4) the "inconsistent" statements from Perkins and Scott with regard to whom they were going to see in Greenville, Alabama.[FN1] We find that these circumstances, separately or cumulatively, cannot support a legitimate inference of further illegal activity that rises to the level of objective, reasonable suspicion required under the Fourth Amendment.

FN1. Perkins and Scott argue that the Magistrate Judge correctly determined that:

The government cannot rely on an inconsistent statement acquired *after* an officer has already begun investigating matters unrelated to the traffic stop as evidence of a reasonable suspicion of criminal activity.... Colston's testimony establishes that any investigation related to the lane violation ended when he completed the warning citation and gave it to Perkins for his signature.

*Rec. of Magis. Judge* at 11.

We need not address this argument because we

find that even with this "fact," reasonable suspicion does not exist here.

First, the Supreme Court has noted that a traffic stop is an "unsettling show of authority" that may "create substantial anxiety." *Delaware,* 440 U.S. at 657, 99 S.Ct. 1391. There is no reason why Colston should have reasonably suspected that Perkins' nervousness was tied to anything other than the fact that he was being momentarily detained by an authority figure with police power over him. On cross **\*971** examination, Colston admitted that a nervous driver is not in itself suspicious. *Rec. of Magis. Judge* at 15 n. 49. Furthermore, repeating the questions of a police officer hardly constitutes "odd behavior"; it is easily a common symptom of "substantial anxiety" that many habitually lapse into when experiencing fear. Indeed, it is a common occurrence at oral arguments before this Court by even the most seasoned lawyers. Likewise, one cannot reasonably assume that a nervous person claiming to be an in-state resident while in possession of an out-of-state license is lying about where he or she is from and is thus a drug trafficker. There are many reasons one may have failed to change the license including lack of time because of a recent move, cost, inconvenience, carelessness, or simple laziness. Finally, the answers given by Perkins and Scott as to whom they were going to see in Greenville, Alabama, do not support reasonable suspicion. Perkins told the officer that he was going to visit his cousin Shantay in Greenville. Scott told Colston that he was going to Greenville to visit a girl named Quinn. Scott's answer did not contradict Perkins' answer in any way. Perkins and Scott could have intended to see both persons during their visit, or Perkins could have intended to visit Shantay while Scott visited Quinn.

In this Circuit, we have required more than the innocuous characteristics of nervousness, a habit of repeating questions, and an out-of-state license for giving rise to reasonable suspicion. *See United States v. Pruitt,* 174 F.3d 1215, 1221 (11th Cir.1999) (holding that the fact that the driver was Hispanic and had an out-of-state license plate was not enough to detain him beyond the issuance of the

speeding ticket); *United States v. Tapia,* 912 F.2d 1367, 1371 (11th Cir.1990) ("[B]eing Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates (not yet a crime in Alabama) ... fail to suggest that appellant ... [was] engaged in any criminal activity other than speeding on the highway.").

[12][13] As Colston testified, following issuance of the traffic citation to Perkins, he merely had a "hunch" based upon the totality of the circumstances that Perkins was lying to him about his destination. This "hunch" led him to initiate a new investigation of other criminal activity after the purpose of the traffic stop had ended. Thus, the continued detention of Perkins and Scott beyond the issuance of the traffic citation, during which Colston repeatedly asked if there were drugs in the car and called in a drug dog, was unlawful. Since Perkins' consent to the search of the car was the product of an unlawful detention, "the consent was tainted by the illegality and was ineffective to justify the search." *Florida v. Royer,* 460 U.S. 491, 507-08, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion). Therefore, any statements made and evidence seized during the unlawful detention are to be excluded. Finally, we emphasize that "the fact that [Colston's] hunch ultimately turned out to be correct-*i.e.* that [Perkins and Scott] *were* illegally transporting [drugs] is irrelevant for purposes of the Fourth Amendment. To hold otherwise would open the door to patently illegal searches by government officials, who would attempt to justify the legality of their conduct after-the-fact." *Pruitt,* 174 F.3d at 1221 n. 4.

### IV. CONCLUSION

Based on the foregoing, we conclude that Colston's prolonged detention of Perkins and Scott beyond the issuance of the traffic citation was unconstitutional. Colston's**\*972** inference from the totality of the circumstances that he observed was merely an unparticularized hunch that failed to rise to the level of reasonable suspicion of other crimin-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

348 F.3d 965, 16 Fla. L. Weekly Fed. C 1227
**(Cite as: 348 F.3d 965)**

al activity. We thus AFFIRM the district court's grant of Perkins and Scott's motions to suppress.

C.A.11 (Ala.),2003.
U.S. v. Perkins
348 F.3d 965, 16 Fla. L. Weekly Fed. C 1227

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

201 F.3d 1317                                                                Page 1
201 F.3d 1317, 13 Fla. L. Weekly Fed. C 365
**(Cite as: 201 F.3d 1317)**

**C**

U.S. v. Smith
C.A.11 (Fla.),2000.

United States Court of Appeals,Eleventh Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ruvel Alfred SMITH, Jr., a.k.a. Rube Smith, etc.,
Defendant-Appellant.
**No. 98-2100.**

Jan. 27, 2000.

Defendant was convicted of conspiring to distribute cocaine and possessing cocaine with intent to distribute by the United States District Court for the Middle District of Florida, No. 97-00120-CR-J-21B,Ralph W. Nimmons, Jr. J., and he appealed from denial of his motion to suppress evidence seized following allegedly improper bus check. The Court of Appeals, Edmondson, Circuit Judge, held that: (1) bus check which was conducted by border patrol officer and drug enforcement agent, when they boarded bus, identified themselves as federal agents conducting a routine safety check, and, moving from back to front of bus, asked each passenger for his/her bus ticket and photographic identification, without ever informing passengers that their cooperation was voluntary, rose to level of "seizure" under the Fourth Amendment; (2) bus check was mere investigative detention and not full-blown arrest; and (3) detention was supported by requisite "reasonable suspicion" of criminal activity.

Affirmed.

West Headnotes

**[1] Arrest 35 ⚖68(4)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(4) k. What Constitutes Seizure.
Most Cited Cases

"Seizure" does not occur, within meaning of Fourth Amendment, just because police officer approaches a person and asks the person a few questions. U.S.C.A. Const.Amend. 4.

**[2] Arrest 35 ⚖68(4)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(4) k. What Constitutes Seizure.
Most Cited Cases
Bus check, when government agents board a bus and ask questions of passengers, is not necessarily a Fourth Amendment "seizure"; crucial question is whether, taking into account all circumstances surrounding the encounter, agents' conduct would have communicated to reasonable person that he/she was not at liberty to ignore agents' presence and go about his/her business. U.S.C.A. Const.Amend. 4.

**[3] Arrest 35 ⚖68(4)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(4) k. What Constitutes Seizure.
Most Cited Cases
Bus check which was conducted by border patrol officer and drug enforcement agent, when they boarded same bus as persons whom they suspected of having just participated in narcotics transaction, identified themselves as federal agents conducting a routine safety check, and, moving from back to front of bus, asked each passenger for his/her bus ticket and photographic identification, without ever informing passengers that their cooperation was voluntary, rose to level of "seizure" under the Fourth Amendment, which had to be supported by at least reasonable suspicion of criminal activity. U.S.C.A. Const.Amend. 4.

**[4] Courts 106 ⚖90(2)**

106 Courts
    106II Establishment, Organization, and Proced-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ure

106II(G) Rules of Decision

106k88 Previous Decisions as Controlling or as Precedents

106k90 Decisions of Same Court or Co-Ordinate Court

106k90(2) k. Number of Judges Concurring in Opinion, and Opinion by Divided Court. Most Cited Cases

Each succeeding panel of the Eleventh Circuit Court of Appeals is bound by the holding of first panel to address issue of law, unless and until that holding is overruled en banc, or by the Supreme Court.

**[5] Arrest 35 ☞68(4)**

35 Arrest

35II On Criminal Charges

35k68 Mode of Making Arrest

35k68(4) k. What Constitutes Seizure. Most Cited Cases

Not all bus checks, when government agents board bus and ask questions of passengers, is necessarily a Fourth Amendment "seizure"; whether a bus check is "seizure" is very fact-sensitive inquiry. U.S.C.A. Const.Amend. 4.

**[6] Searches and Seizures 349 ☞23**

349 Searches and Seizures

349I In General

349k23 k. Fourth Amendment and Reasonableness in General. Most Cited Cases

Fourth Amendment is not a guarantee against all searches and seizures, but only against unreasonable searches and seizures. U.S.C.A. Const.Amend. 4.

**[7] Arrest 35 ☞63.5(7)**

35 Arrest

35II On Criminal Charges

35k63.5 Investigatory Stop or Stop-And-Frisk

35k63.5(7) k. Mode of Stop; Warnings; Arrest Distinguished. Most Cited Cases

**Arrest 35 ☞68(3)**

35 Arrest

35II On Criminal Charges

35k68 Mode of Making Arrest

35k68(3) k. What Constitutes Arrest. Most Cited Cases

Bus check which was conducted by border patrol officer and drug enforcement agent, when they boarded same bus as persons whom they suspected of having just participated in narcotics transaction, identified themselves as federal agents conducting a routine safety check, and, moving from back to front of bus, asked each passenger for his/her bus ticket and photographic identification, without ever informing passengers that their cooperation was voluntary, was mere temporary, "investigative detention," rather than full-blown "arrest," and had to be supported only by reasonable suspicion of criminal activity. U.S.C.A. Const.Amend. 4.

**[8] Arrest 35 ☞63.5(4)**

35 Arrest

35II On Criminal Charges

35k63.5 Investigatory Stop or Stop-And-Frisk

35k63.5(3) Grounds for Stop or Investigation

35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases

Temporary, investigative detention of person is constitutionally permissible if there exists, at time of detention, a reasonable suspicion that the person detained has been, is, or is about to be involved in criminal activity. U.S.C.A. Const.Amend. 4.

**[9] Arrest 35 ☞63.5(4)**

35 Arrest

35II On Criminal Charges

35k63.5 Investigatory Stop or Stop-And-Frisk

35k63.5(3) Grounds for Stop or Investigation

35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited

201 F.3d 1317, 13 Fla. L. Weekly Fed. C 365
**(Cite as: 201 F.3d 1317)**

Cases

"Reasonable suspicion," of kind required to support investigatory stop, must be more than mere hunch. U.S.C.A. Const.Amend. 4.

**[10] Arrest 35 ⬤━━63.5(4)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(3) Grounds for Stop or Investigation
                35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases
While "reasonable suspicion," of kind required to support investigatory stop, must be more than mere hunch, requisite level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. U.S.C.A. Const.Amend. 4.

**[11] Arrest 35 ⬤━━63.5(4)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(3) Grounds for Stop or Investigation
                35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases
In deciding whether detaining officers had "reasonable suspicion" of criminal activity, of kind required to support investigative stop, court looks at totality of circumstances known to the detaining officers at time of detention. U.S.C.A. Const.Amend. 4.

**[12] Arrest 35 ⬤━━63.5(4)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(3) Grounds for Stop or Investigation
                35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases
In examining totality of circumstances to decide whether detaining officers had "reasonable suspicion" of criminal activity, of kind required to support investigative stop, court must view totality of circumstances in light of officers' special training and experience, and must bear in mind that behavior, seemingly innocuous to the ordinary citizen, may appear suspect to one familiar with practices of narcotics couriers. U.S.C.A. Const.Amend. 4.

**[13] Arrest 35 ⬤━━63.5(5)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(3) Grounds for Stop or Investigation
                35k63.5(5) k. Particular Cases. Most Cited Cases
Investigative detention conducted by border patrol officer and drug enforcement agent, when they boarded same bus as persons whom they suspected of having participated in narcotics transaction, identified themselves as federal agents conducting a routine safety check, and, moving from back to front of bus, asked each passenger for his/her bus ticket and photographic identification, was supported by "reasonable suspicion" of criminal activity, where suspects had appeared nervous in bus station, where they had engaged in whispered conversation and exchanged suitcase in station, yet sat in separate locations while awaiting the boarding call in apparent attempt to conceal their association, where one of the suspects scanned and surveilled the terminal and watched every person who passed by him in station, and where luggage originated in known source city for narcotics. U.S.C.A. Const.Amend. 4.

**\*1319** Gerald S. Bettman, Jacksonville, FL, for Smith.
Susan Humes Raab, Jacksonville, FL, Tamra Phipps, Tampa, FL, for United States.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

201 F.3d 1317, 13 Fla. L. Weekly Fed. C 365

**(Cite as: 201 F.3d 1317)**

Appeal from the United States District Court for the Middle District of Florida.

Before EDMONDSON and MARCUS, Circuit Judges, and STROM[FN*], Senior District Judge.

> FN* Honorable Lyle E. Strom, Senior U.S. District Judge for the District of Nebraska, sitting by designation.

EDMONDSON, Circuit Judge:

Defendant, Ruvel Alfred Smith, Jr., appeals his convictions for conspiring to distribute cocaine and possessing cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841 and 846. Defendant asserts that the district court erred in denying Defendant's motion to suppress. We affirm.

*BACKGROUND*

This case arises from a bus check at a Jacksonville, Florida, bus station. On 5 May 1997, DEA Special Agent Bruce Savell and Border Patrol Agent James Perkins were conducting narcotics-interdiction surveillance at the bus station. Savell, inside the bus terminal, noticed Defendant's co-indictee, Joseph Tee Bruton. According to Savell, Bruton constantly changed seats, walked around, and scanned the terminal. Bruton watched every passenger who walked through the terminal. Bruton appeared nervous. Savell also noticed two new, hard-sided suitcases sitting unattended in the terminal. The suitcases appeared to be expensive. Savell observed Bruton and the suitcases for approximately forty minutes.

At some point, Bruton met with Defendant inside the terminal. The two men engaged in a quick, whispered conversation. Defendant and Bruton then turned away from each other and walked in opposite directions. After this exchange, Savell began to observe Defendant. Savell noted **\*1320** that Defendant also walked around the terminal, switched seats, and went in and out of the terminal.

Soon thereafter, Bruton sat down with the previously unattended suitcases between his legs. A boarding announcement was made for a northbound bus, and Bruton picked up the suitcases and walked toward the boarding gate. As he approached the gate, Bruton slid one suitcase across the terminal floor to Defendant. Bruton and Defendant each carried one suitcase through the gate.

Agent Savell waited for about four minutes and then went through the boarding gate. Savell saw the two suitcases in the undercarriage of the bus. He checked the baggage tags attached to the suitcases; the tags revealed that the suitcases belonged to a "Mr. Pender" and had originated in Miami, Florida.

At that point, based on his training and experience,[FN1] Savell suspected that Defendant and Bruton were carrying drugs in the suitcases.[FN2] Savell requested and obtained the bus driver's permission to board the bus and to conduct a bus check. Savell and Perkins, although dressed in plainclothes, displayed their badges as they boarded the bus. The agents' firearms were concealed. Perkins announced to the passengers:

> FN1. At the time of this incident, Savell had been a DEA agent for six years. During those six years, Savell had conducted surveillance and searches at bus stations on hundreds of occasions.

> FN2. Savell testified that his suspicion was based on several considerations, including Bruton's scanning the terminal and other bus passengers, Defendant and Bruton's nervous behavior, their whispered conversation, and their leaving the suitcases unattended for more than half an hour in the terminal. Savell testified that, in his experience conducting drug-interdiction at the bus station, drug couriers frequently leave their narcotics-laden luggage unattended until immediately before boarding.

Good morning, ladies and gentlemen, my partner and I are both federal agents of the United States Department of Justice. Nobody is under arrest or anything like that, we're just conducting a routine public transportation safety check. When

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

201 F.3d 1317, 13 Fla. L. Weekly Fed. C 365
**(Cite as: 201 F.3d 1317)**

we get to you, if you would please show us your bus ticket, some photo identification, if you have some with you, please. And, most importantly, if you would identify which bags are yours on the bus, we'd appreciate it, and we'll be out of your way real quick.

Neither Savell nor Perkins expressly informed the passengers that their cooperation was voluntary. The agents then, beginning in the back of the bus and making their way forward, spoke individually with each passenger. The agents, in addition to inspecting each passenger's ticket and identification, asked each passenger whether the passenger was carrying weapons, drugs, or large amounts of money. The agents stood behind each passenger and did not block the aisle of (or exit from) the bus as they conducted their bus check. The check of passengers failed to reveal a "Mr. Pender" aboard the bus.

When approached by the agents, Defendant offered a one-way ticket from Miami to Charleston, South Carolina, and a driver's license for the agents' inspection. Bruton also displayed a ticket from Miami to Charleston; Bruton said that he was carrying no identification. Defendant and Bruton each denied that he was carrying drugs or weapons, that he had checked luggage, and that he was traveling with anyone. Defendant and Bruton permitted the agents to search their carry-on luggage. The agents frisked Defendant and Bruton, but they found no weapons.

After the agents completed their survey of the passengers, Savell retrieved the two pertinent suitcases from the undercarriage and brought them aboard the bus. Savell asked whether a passenger claimed ownership of the suitcases. No passenger claimed to own the suitcases. Savell then directly asked Defendant and Bruton, individually, whether they owned the suitcases.**\*1321** Both Defendant and Bruton denied ownership of the suitcases.

Savell and Perkins, assisted by two Florida Highway Patrolmen, then opened the suitcases. The agents discovered eleven kilograms of cocaine in the suitcases. Defendant and Bruton were

FN3 After making the arrests, the agents discovered a bus ticket in the name of "Pender" concealed in a seat near Defendant and Bruton.

> FN3. Bruton pled guilty and later testified against Defendant at trial.

Defendant moved the district court to suppress certain evidence, including the cocaine found in the suitcases, the Pender ticket, and various statements made by Defendant. Defendant argued that the discovery of all of this evidence flowed from the agents' check of bus passengers. Defendant asserted that the bus check was an unlawful seizure of the bus passengers in violation of the Fourth Amendment. Thus, Defendant contended, the evidence should be suppressed as "fruits of the poisonous tree." The district court disagreed, however, concluding that the bus check did not amount to a "seizure." The district court accordingly denied Defendant's motion to suppress. Defendant was tried by jury and convicted. Defendant appeals.

*DISCUSSION*

Defendant contends that the district court erred in denying his motion to suppress because: (1) the bus check was a "seizure" within the meaning of the Fourth Amendment; (2) the seizure was not reasonable and violated the Fourth Amendment; and (3) the fruits of the seizure, therefore, must be suppressed. We accept Defendant's first contention: Circuit precedent mandates the conclusion that the bus check was a "seizure." We, however, conclude that the agents' seizure of Defendant aboard the bus was reasonable under the Fourth Amendment.FN4 The district court, therefore, did not err in denying Defendant's motion to suppress.

> FN4. Because we conclude that the bus check was reasonable under the Fourth Amendment, we need not consider the Government's alternative contention that, even if the bus check was an unreasonable seizure, the fruits of the bus check are nonetheless admissible under the inevitable discovery doctrine. *See generally, Nix v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

201 F.3d 1317, 13 Fla. L. Weekly Fed. C 365
**(Cite as: 201 F.3d 1317)**

*Williams,* 467 U.S. 431, 443-45, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984) (adopting inevitable discovery exception to exclusionary rule).

## 1. WHETHER THE BUS CHECK WAS A "SEIZURE"

[1][2] A well-established principle of Fourth Amendment jurisprudence is that a seizure does not occur just because a police officer approaches a person and asks the person a few questions. *Florida v. Royer,* 460 U.S. 491, 497-99, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). The Supreme Court, accordingly, has said that a bus check, where government agents board a bus and ask questions of the passengers, is not necessarily a seizure. *Florida v. Bostick,* 501 U.S. 429, 435-39, 111 S.Ct. 2382, 2387-88, 115 L.Ed.2d 389 (1991). Instead, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Id.* at 437, 111 S.Ct. at 2387.

[3] In *United States v. Washington,* 151 F.3d 1354 (11th Cir.1998), this court considered the propriety of a bus check conducted in a manner nearly identical to the bus check in this case (and, involving the same officers). In that case, the two officers, casually dressed and with their weapons concealed, boarded a bus at the Jacksonville bus station. The officers displayed their badges and announced:

Good morning, ladies and gentlemen. My partner and I are both federal agents with the United States Department of Justice. No one is under arrest or anything like that, we're just conducting a routine bus check. When we get to you, if we could please see your bus **\*1322** ticket, some photo identification if you have some with you, please, and if you would please identify which bag [ ] is yours on the bus we'd appreciate it and we'll be out of your way just as quick as we can.

*Id.* at 1355. The officers went to the rear of the

bus and began working their way forward, speaking individually with each passenger and asking them if they were carrying "drugs, weapons, large sums of money, or firearms." *Id.* The officers stood behind each passenger as they spoke and did not block the passenger's access to the aisle of the bus. Neither officer told the passengers that their cooperation was voluntary. *Id.* at 1355-56. The court decided that, under those particular circumstances, the bus check constituted a "seizure." *Id.* at 1357.

[4][5] We see no important distinction between the conduct of the bus check in this case and the conduct of the bus check in *Washington.* "[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court." *United States v. Hogan,* 986 F.2d 1364, 1369 (11th Cir.1993). Given the virtual identity of the essential facts, we, therefore, are bound by the *Washington* court's decision on the question of seizure.[FN5] Overcome by precedent, we must conclude that the bus check in this case amounted to a "seizure" within the meaning of the Fourth Amendment.

> FN5. That *Washington* controls our determination that this bus check is a seizure does not mean that every bus check in this Circuit is a seizure. As the Supreme Court has acknowledged, whether a bus check constitutes a seizure is a very fact-sensitive inquiry; for this very reason, the Supreme Court has rejected per se rules governing bus checks. *Bostick,* 501 U.S. at 439, 111 S.Ct. at 2389. But, because we find the facts of legal significance in this case identical to those in *Washington,* we conclude that *Washington* controls the seizure issue in this case. *See generally, New Port Largo, Inc. v. Monroe County,* 985 F.2d 1488, 1500 n. 7 (11th Cir.1993) (Edmondson, J., specially concurring) (discussing precedential value of prior panel decisions).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

201 F.3d 1317, 13 Fla. L. Weekly Fed. C 365
**(Cite as: 201 F.3d 1317)**

## 2. WHETHER THE SEIZURE VIOLATED THE FOURTH AMENDMENT

[6][7][8] Our conclusion that this bus check constitutes a seizure does not end our inquiry, however.[FN6]  Instead, we must now examine whether the seizure was reasonable under the Fourth Amendment.[FN7]  The temporary, investigative detention of a person is constitutionally permissible if there exists, at the time of the detention, a reasonable suspicion that the person detained has been, is, or is about to be involved in criminal activity.[FN8]  *United States v. Blackman,* 66 F.3d 1572, 1576 *1323 (11th Cir.1995). Because we conclude that such a reasonable suspicion existed, at the time of the bus check, the district court did not err in denying Defendant's motion to suppress.

FN6. "The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985) (emphasis in original).

FN7. Although *Washington* resolves the question of whether this bus check was a "seizure," it is wholly inapposite to the second step of our inquiry: given that a seizure occurred, whether the seizure was a reasonable one under the Fourth Amendment. In *Washington,* it does not appear that the Government contended that (or that the court addressed whether), even if the bus check was a seizure, the seizure was nonetheless reasonable: that is, the seizure was properly based upon the officers' reasonable suspicion or probable cause. *See Washington,* 151 F.3d at 1357. In this case, the Government, however, vigorously asserts that, even if the bus check was a seizure, it was a constitutionally valid seizure.

FN8. In general, a seizure is constitutionally infirm unless the seizing officer has

probable cause. *Lindsey v. Storey,* 936 F.2d 554, 558 (11th Cir.1991). Where, however, the seizure is brief and minimally intrusive-a temporary, investigative detention-the seizing officer only need have "a reasonable articulable suspicion based on objective facts that the person has engaged in criminal activity." *United States v. Blackman,* 66 F.3d 1572, 1576 (11th Cir.1995). Given the minimal degree of intrusiveness involved in the bus check in this case, we treat the bus check as a temporary, investigative detention, requiring only a reasonable suspicion. *See id.* at 1576-77.

[9][10][11][12] Although reasonable suspicion "requires more than a hunch," *id.,*"the requisite level of suspicion to make an investigative stop is 'considerably less than proof of wrongdoing by a preponderance of the evidence.' " *United States v. Glover,* 957 F.2d 1004, 1009 (2d Cir.1992) (quoting *United States v. Villegas,* 928 F.2d 512, 516 (2d Cir.1991)). In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention. *United States v. Mikell,* 102 F.3d 470, 475 (11th Cir.1996); *United States v. Cruz,* 909 F.2d 422, 424 (11th Cir.1989). And, we view the totality of the circumstances in the light of the officers' special training and experience. *United States v. Brignoni-Ponce,* 422 U.S. 873, 884-86, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975); *see also United States v. Cortez,* 449 U.S. 411, 417-19, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *United States v. Bowles,* 625 F.2d 526, 533-34 (5th Cir.1980). We also bear in mind that behavior, seemingly innocuous to the ordinary citizen, may "appear suspect to one familiar with the practices of narcotics couriers." *Glover,* 957 F.2d at 1010; *see also United States v. Mendenhall,* 446 U.S. 544, 562-65, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980) (Powell, J., concurring); *United States v. Gonzalez,* 969 F.2d 999, 1004 (11th Cir.1992).

[13] In this case, given Agent Savell's training and experience, we conclude that the totality of the

circumstances created a reasonable suspicion that Defendant and Bruton were engaged in criminal activity. Defendant and Bruton both appeared nervous in the bus terminal. *See United States v. Cruz-Hernandez,* 62 F.3d 1353, 1356 n. 2 (11th Cir.1995) (considering suspect's nervousness as factor contributing to reasonable suspicion). Defendant and Bruton's whispered conversation in the bus terminal and their joint transportation of the suitcases made apparent that they were traveling together; yet, they waited separately in the bus terminal, before the boarding call, apparently attempting to conceal their association. *See Bowles,* 625 F.2d at 534-35 (considering suspects' "efforts to hide association" in airport terminal as factor contributing to reasonable suspicion). Defendant and Bruton left their new, expensive suitcases unattended until immediately before boarding; Agent Savell testified that this is a common practice among drug couriers. *See Brignoni-Ponce,* 422 U.S. at 885, 95 S.Ct. at 2582 ("In all situations, the officer is entitled to assess the facts in light of his experience in detecting [narcotics trafficking]."). The suitcases originated in Miami, a known "source city" for narcotics on the East Coast. *See Bowles,* 625 F.2d at 534 (finding fact that suspect was traveling from known drug source city "not an insignificant factor"). And, Bruton scanned and surveilled the terminal, watching every person who passed by him in the bus station. *See Mendenhall,* 446 U.S. at 564, 100 S.Ct. at 1882 (Powell, J., concurring) (noting as factor in reasonable suspicion analysis that suspect "scanned the entire gate area"); *see also United States v. Puglisi,* 723 F.2d 779, 789 (11th Cir.1984); *Bowles,* 625 F.2d at 535; *United States v. Barnard,* 553 F.2d 389, 391-92 (5th Cir.1977).

We conclude that, at the time of the bus check, ample facts existed to give rise to a reasonable suspicion that Defendant and Bruton were involved in criminal activity. The temporary, investigative detention of Defendant aboard the bus, consequently, was reasonable under the Fourth Amendment. The district court, therefore, properly denied Defendant's motion to suppress. Defendant's convictions and sentence are AFFIRMED.

AFFIRMED.

C.A.11 (Fla.),2000.
U.S. v. Smith
201 F.3d 1317, 13 Fla. L. Weekly Fed. C 365

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 F.3d 1341             Page 1

280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280

**(Cite as: 280 F.3d 1341)**

Rodriguez v. Farrell

C.A.11 (Fla.),2002.

United States Court of Appeals,Eleventh Circuit.
Joe John RODRIGUEZ, Plaintiff-Appellee,

v.

Wayne W. FARRELL, Lois Szczepanski, Defendants-
Appellants.

**No. 00-13147.**

Jan. 30, 2002.

Suspect brought § 1983 action against police officers, alleging that they violated his Fourth Amendment rights in making arrest. Officers moved for summary judgment on qualified immunity grounds. The United States District Court for the Middle District of Florida, No. 98-00997-CV-ORL-19A,Patricia C. Fawsett, J., denied motion. Officers appealed. The Court of Appeals, Edmondson, Circuit Judge, held that: (1) arrest of suspect pursuant to execution of valid warrant for person other than suspect was reasonable mistake, and thus did not violate Fourth Amendment; (2) even if officers violated Fourth Amendment, they were qualifiedly immune; and (3) officer's alleged actions in handcuffing defendant did not constitute excessive force.

Reversed and remanded.

West Headnotes

**[1] Arrest 35 ☞63.4(2)**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest Without Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(2) k. What Constitutes Such Cause in General. Most Cited Cases

**Civil Rights 78 ☞1088(4)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General

        78k1088 Police, Investigative, or Law Enforcement Activities
            78k1088(4) k. Arrest and Detention. Most Cited Cases
    (Formerly 78k133)
The "reasonable mistake" standard for determining whether there is probable cause to make an arrest applies (1) in the context of a § 1983 action and (2) when the police have a valid warrant, as opposed to just probable cause, to arrest someone, but mistakenly arrest someone else due to a misidentification. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[2] Arrest 35 ☞65**

35 Arrest
    35II On Criminal Charges
        35k65 k. Authority Under Warrant. Most Cited Cases
Arrest of suspect, pursuant to execution in field of valid arrest warrant for person other than suspect, was reasonable mistake, and thus did not violate Fourth Amendment, even though suspect said he was 5'11" tall while warrant listed height as 5'6", where suspect and person named in warrant had same name, sex, age, and race, they had similar Social Security numbers, they had addresses in neighboring towns, they were born in same state, suspect had no fewer tattoos than person named in warrant, and many of the tattoos were in same locations. U.S.C.A. Const.Amend. 4.

**[3] Arrest 35 ☞63.1**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest Without Warrant
        35k63.1 k. In General. Most Cited Cases
The Court of Appeals must evaluate the totality of the circumstances surrounding an arrest to determine its reasonableness under the Fourth Amendment. U.S.C.A. Const.Amend. 4.

**[4] Arrest 35 ☞65**

35 Arrest

35II On Criminal Charges
      35k65 k. Authority Under Warrant. Most Cited Cases
The variability of eye color, given contact lenses, of scars, given cosmetic surgery, and of weight lessens the importance of differences in these characteristics for purposes of determining if an arrest of a suspect in the field pursuant to a warrant for someone other than the suspect is reasonable. U.S.C.A. Const.Amend. 4.

**[5] Arrest 35 ☞65**

35 Arrest
   35II On Criminal Charges
      35k65 k. Authority Under Warrant. Most Cited Cases
Not every discrepancy in such things as height would demand that a policeman refrain from executing an arrest warrant. U.S.C.A. Const.Amend. 4.

**[6] Arrest 35 ☞65**

35 Arrest
   35II On Criminal Charges
      35k65 k. Authority Under Warrant. Most Cited Cases
There are limits on how much independent investigating an officer must make before executing an arrest warrant, even when the arrested person is asserting a claim of mistaken identity. U.S.C.A. Const.Amend. 4.

**[7] Arrest 35 ☞63.5(4)**

35 Arrest
   35II On Criminal Charges
     35k63.5 Investigatory Stop or Stop-And-Frisk
       35k63.5(3) Grounds for Stop or Investigation
         35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases
The circumstances that justify a lawful arrest also justify a brief detention incident to the arrest. U.S.C.A. Const.Amend. 4.

**[8] Civil Rights 78 ☞1376(6)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
      78k1376 Government Agencies and Officers
        78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
   (Formerly 78k214(6))
Even assuming that police officers violated suspect's Fourth Amendment rights by arresting him in the field pursuant to valid arrest warrant for person other than suspect, where suspect and person named in warrant shared many common characteristics but differed in height by five inches, such constitutional violation was not clearly established in Florida in 1995 when arrest occurred, and officers thus were qualifiedly immune from suspect's § 1983 claim; no Eleventh Circuit, United States Supreme Court, or Florida Supreme Court case could be found holding an officer liable for misidentifying arrestee when executing valid arrest warrant. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[9] Arrest 35 ☞68(2)**

35 Arrest
   35II On Criminal Charges
     35k68 Mode of Making Arrest
      35k68(2) k. Use of Force. Most Cited Cases
Police officer's alleged actions of grabbing arrestee's arm, twisting it around his back, jerking it up high to shoulder and then handcuffing suspect as suspect fell to his knees screaming that officer was hurting him, placing him in rear of patrol car, and removing handcuffs minutes after arrival at police department, with alleged resulting complications of 25 surgeries and amputation of arm below elbow, did not constitute excessive force in violation of Fourth Amendment, absent evidence that officer knew of suspect's recent elbow surgery or that handcuffing him would seriously aggravate his preexisting condition. U.S.C.A. Const.Amend. 4.

**[10] Arrest 35 ☞68(2)**

35 Arrest
   35II On Criminal Charges
     35k68 Mode of Making Arrest
      35k68(2) k. Use of Force. Most Cited Cases
The use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment. U.S.C.A. Const.Amend. 4.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280
**(Cite as: 280 F.3d 1341)**

**[11] Arrest 35 ⬠68(2)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases
The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. U.S.C.A. Const.Amend. 4.

**[12] Arrest 35 ⬠68(2)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases
The Court of Appeals recognizes, for purposes of determining whether an arrest involves excessive force in violation of the Fourth Amendment, that the typical arrest involves some force and injury. U.S.C.A. Const.Amend. 4.

**[13] Arrest 35 ⬠68(2)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases
Painful handcuffing in the course of arrest, without more, is not excessive force in cases where the resulting injuries are minimal. U.S.C.A. Const.Amend. 4.

**[14] Municipal Corporations 268 ⬠747(3)**

268 Municipal Corporations
    268XII Torts
        268XII(B) Acts or Omissions of Officers or Agents
        268k747 Particular Officers and Official Acts
            268k747(3) k. Police and Fire. Most Cited Cases
Court of Appeals does not use hindsight to judge the acts of police officers for purposes of qualified immunity; it looks at what they knew or reasonably should have known at the time of the act.

**[15] Arrest 35 ⬠68(2)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases
What would ordinarily be considered reasonable force in making an arrest does not become excessive force when the force aggravates, however severely, a pre-existing condition the extent of which was unknown to the officer at the time. U.S.C.A. Const.Amend. 4.

**\*1342** Jeffrey Arthur Rynor, Loren H. Cohen, Mitrani, Rynor & Gallegos, P.A., Miami, FL, for Defendants-Appellants.
**\*1343** Jon H. Gutmacher, Orlando, FL, for Plaintiff-Appellee.

Appeal from the United States District Court for the Middle District of Florida.

Before EDMONDSON and RONEY, Circuit Judges, and JORDAN[FN*], District Judge.

    FN* Honorable Adalberto J. Jordan, U.S. District Judge for the Southern District of Florida, sitting by designation.

EDMONDSON, Circuit Judge:

    This appeal is about an arrest, the Fourth Amendment, and mistaken identity. Joe John Rodriguez sued Sergeant Wayne Farrell ("Sgt.Farrell") and Officer Lorri Szczepanski ("Officer Szczepanski"), under 42 U.S.C. § 1983, alleging that the police officers violated the Constitution when they mistakenly arrested him pursuant to a valid arrest warrant for another person. Sgt. Farrell and Officer Szczepanski, in their personal capacities, appeal the district court's denial of qualified immunity. We reverse.

FACTS[FN1]

    FN1. Because this appeal is from the denial of summary judgment, we must view the evidence in the light most favorable to the plaintiff. *Hudson v. Hall,* 231 F.3d 1289, 1292 n. 2 (11th Cir.2000). "But, we stress that the 'facts' set out in this opinion-the 'facts' that we must as-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 F.3d 1341
280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280
**(Cite as: 280 F.3d 1341)**

sume for the purposes of this appeal-may turn out not to be the actual facts of this case." Id.

On 8 September 1995 at 12:10 a.m., Officer Szczepanski pulled over a vehicle driven by Patricia Foulkes ("Ms.Foulkes"): the vehicle had a broken tag light. Rodriguez was the only passenger in Ms. Foulkes's car. Shortly after the initial traffic stop, Sgt. Farrell arrived to provide backup.

Officer Szczepanski told Ms. Foulkes to get out of the car and then asked for her driver's license. After Ms. Foulkes said that her driver's license was in her purse which was in her car, Officer Szczepanski returned to the car and asked Rodriguez, who was seated in the car with his arm in a sling and resting on a pillow,[FN2] to hand her Ms. Foulkes's purse. After Rodriguez handed her Ms. Foulkes's purse, Officer Szczepanski directed Rodriguez to get out of the vehicle. Rodriguez complied and walked around freely beside the vehicle. But, before Rodriguez got out of the vehicle, he removed his sling. Because Rodriguez was wearing a long-sleeve shirt (after he had removed his sling), nothing outwardly indicated that Rodriguez's arm was injured.

> FN2. Rodriguez had severely injured his arm in a motorcycle accident.

Officer Szczepanski returned to Ms. Foulkes, found unlawful drugs (methamphetamine, as well as others) in her purse, and arrested her. Officer Szczepanski thereafter began to search Ms. Foulkes's car. Then, Sgt. Farrell-who, to this point, had only been observing the situation from a position behind Ms. Foulkes's car[FN3]-approached Rodriguez.

> FN3. Rodriguez testified at his deposition that Sgt. Farrell was behind the car and that he could see the Sergeant in one of the car mirrors. Rodriguez also testified that the interior of the car was "dark."

Sgt. Farrell asked Rodriguez for identification. Rodriguez directed Sgt. Farrell's attention to a duffle bag, which contained more than ten pieces of identification, including Rodriguez's Florida driver's license, birth certificate, military discharge papers, social security card, credit card, and V.A. patient data card.[FN4]

Sgt. Farrell, **\*1344** after obtaining consent from Rodriguez, searched the duffle bag and removed the driver's license from the organizer that contained Rodriguez's identifications. During the search, Sgt. Farrell noticed several prescription-drug bottles and questioned Rodriguez about their purpose. Rodriguez told the Sergeant that he had just gotten out of the hospital after a motorcycle wreck. Sgt. Farrell also briefly looked at a collection of hospital records[FN5] that were in the duffle bag.

> FN4. Rodriguez had this extraordinary collection of identifications with him to apply for benefits.

> FN5. Rodriguez testified at his deposition that he did not know the extent of these records. But, he believed that they were fewer than 100 pages, covered the motorcycle accident, and were for the purpose of applying for disability benefits.

Sgt. Farrell called dispatch over his radio and ran a check on Rodriguez's driver's license information. The dispatcher responded, "no wants or warrants." Sgt. Farrell continued to talk with the dispatcher when a "name hit" was obtained on Rodriguez's name. Teletype communications to the dispatcher indicated that three warrants existed for a Victor Heredia who used the alias "Joe Rodriguez."[FN6] Heredia was wanted by the St. Johns County, Florida Sheriff's Department for several charges, including possession of cocaine.[FN7] The dispatcher relayed descriptive information from the warrant to Sgt. Farrell.

> FN6. The warrant for Heredia was almost six years old.

> FN7. The other two charges were for unlawful use of a driver's license and driving with a license that was suspended or revoked.

The following chart lists relevant descriptive information from the warrant that was available and the corresponding information for Rodriguez:

| | Victor Manuel Heredia a/k/a Joe Rodriguez | Joe John Rodriguez |
|---|---|---|
| Name: | | |
| Sex: | Male | Male |
| Race: | White | White |
| Date/Birth: | ████ 7/2/53; 6/23/53(multiple) | ████ |
| Place/Birth: | New York | New York |
| SSN: | █████ █████ █████ (multiple) | █████ |
| Tattoos | 4 tattoos: right forearm, left arm, right arm, back | 6 tattoos: both biceps, both shoulder blades; both ankles (none on right forearm) |
| Height: | 5'6" | 5'11" |
| Weight: | 139 lbs. | 180 lbs. |
| Hair Color: | Brown | Brown |
| Eye Color: | Green | Brown |
| Scar | Scar: forehead | No scar |
| Residence: | St. Augustine, Florida | Apopka, Florida |

280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280
**(Cite as: 280 F.3d 1341)**

-----

After Sgt. Farrell received identifying information from the dispatcher, Sgt. Farrell**1345** approached Rodriguez and questioned him about two of his physical characteristics: height and tattoos. Sgt. Farrell first asked Rodriguez his height. Rodriguez responded by claiming he was 5'11". Sgt. Farrell disagreed, stating: "No way, I'm 5'11", you're shorter than me." Rodriguez claims that Sgt. Farrell was standing on a curb when Farrell made this statement. Sgt. Farrell then focused on Rodriguez's tattoos. Convinced by the fact that Rodriguez had at least four tattoos (he had six) and that the locations of the first two identified by Rodriguez were in the locations listed in the warrant, Sgt. Farrell arrested Rodriguez on the Heredia warrant.

When Sgt. Farrell arrested Rodriguez, Sgt. Farrell grabbed Rodriguez's left arm, twisted it behind Rodriguez's back, and forced it up to just below the shoulder-blade. Rodriguez fell to the ground screaming in pain, telling Sgt. Farrell that he was hurting his arm.FN8 Sgt. Farrell ignored Rodriguez's screams, completed the cuffing, and took Rodriguez to the station. After arriving at the station roughly 10 minutes later, Rodriguez was placed in a holding cell and his cuffs were removed.

FN8. Rodriguez testified at his deposition that he, before the arrest began, did not tell Sgt. Farrell that his arm was injured.

DISCUSSION

"Qualified immunity protects government officials performing discretionary functions ... from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Lassiter v. Alabama A&M Univ., Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc).

"Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." *Id.* Whether a defendant official has violated a constitutional right at all is, of course, "a 'necessary concomitant' to the question of qualified immunity: if a defendant has not violated the law at all, he certainly has not violated clearly established law." *Hudson v. Hall,* 231 F.3d 1289, 1294 (11th Cir.2000) (quoting *GJR Investments, Inc. v. County of Escambia,* 132 F.3d 1359, 1366-67 (11th Cir.1998)).

A. The Arrest

1. Constitutional Violation

"A warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim." *Ortega v. Christian,* 85 F.3d 1521, 1525 (11th Cir.1996). We conclude that no violation occurred in this case. In reaching this conclusion, the Supreme Court's opinion in *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), and various cases from the Seventh Circuit (as well as other circuits) guide our determination.

In *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), the Supreme Court determined, in a criminal case, whether the mistaken arrest of one person (for whom no probable cause to arrest existed) based upon the misidentification of that person as a second person (for whom probable cause to arrest existed) violated the Constitution. The Court concluded "no," writing that "[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the **1346** arrest of the second party is a valid arrest." *Id.* at 802, 91 S.Ct. 1106 (alteration in original).

[1][2] The same "reasonable mistake" standard applies (1) in the context of a section 1983 action and (2) when the police have a valid warrant-as opposed to just probable cause-to arrest someone, but mistakenly arrest someone else due to a misidentification. *E.g., White v. Olig,* 56 F.3d 817, 820 (7th Cir.1995) (using *Hill* "reasonable mistake" standard in section 1983 case and determining that mistaken arrest pursuant to valid war-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280
**(Cite as: 280 F.3d 1341)**

rant was reasonable); *cf. Rodriguez v. Jones,* 473 F.2d 599, 605-06 (5th Cir.1973) (concluding plaintiff could not recover, under section 1983, against officers who forcibly entered plaintiff's residence pursuant to mistaken belief that two fugitives named in arrest warrants were in residence because officers' mistaken belief was reasonable under the circumstances). *See generally* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated.") (emphasis added). We must, therefore, determine as a legal matter whether Sgt. Farrell and Officer Szczepanski's mistaken arrest of Rodriguez-pursuant to the execution, in the field, of a valid arrest warrant for Heredia-was outside the scope of "reasonable mistakes."

The Eleventh Circuit has no precedents for what constitutes an unreasonable seizure due to a mistaken identification and arrest under a valid warrant in the field. The Seventh Circuit, however, has addressed this problem in several opinions: their discussions guide us today.[FN9] In *Johnson v. Miller,* 680 F.2d 39, 42 (7th Cir.1982), the court concluded, as a matter of law, that a police officer's misidentification arrest of a white woman pursuant to an arrest warrant for a black woman did not violate the Constitution. In *Patton v. Przybylski,* 822 F.2d 697, 698-99 (7th Cir.1987), the court concluded that a police officer's misidentification arrest of the plaintiff-a black man with the same name as a black man listed in an arrest warrant-was, as a matter of law, a reasonable mistake that did not violate the Constitution, although plaintiff's driver's license was from a different state, listed an address different from the one in the arrest warrant, and listed plaintiff's date of birth as different from the one in the arrest warrant. In *Brown v. Patterson,* 823 F.2d 167, 169 (7th Cir.1987), the court concluded that a police officer's misidentification arrest of the plaintiff-a black man with the same name as the alias[FN10] of a black man listed in an arrest warrant-was, as a matter of law, a reasonable mistake that did not violate the Constitution, although the plaintiff's driver's license listed an address different (in a different city) from the one in the arrest warrant and listed plaintiff's date of birth as different (by 12 days) from the one in the arrest warrant.

FN9. The Seventh Circuit's views on the subject are consistent with other circuits. *See Brady v. Dill,* 187 F.3d 104, 114 (1st Cir.1999) (citing, among others, Seventh Circuit opinion concluding that mistakenly arresting person of different race not unreasonable and stating that "courts have concluded with some regularity that relatively minor discrepancies in physical features or other data do not render unreasonable an arrest pursuant to a facially valid warrant").

FN10. The alias was a very common name with 15 identical listings in the local phone book.

[3] According to a district court in the Seventh Circuit, these three cases stand for this proposition: "In the Seventh Circuit's view, a police officer acts reasonably if he arrests a person after determining that the person's name matches the name *1347 listed on an outstanding arrest warrant." *Bruce v. Perkins,* 701 F.Supp. 163, 164 (N.D.Ill.1988). We, however, need not adopt this broad rule to decide today's case. To the contrary, as the Seventh Circuit itself has recognized, we must evaluate the totality of the circumstances surrounding the arrest to determine its reasonableness. *See Patton,* 822 F.2d at 699-700 (examining totality of the circumstances); *see also United States v. Glover,* 725 F.2d 120, 122 (D.C.Cir.1984) ("The reasonableness of the arresting officers' conduct must be determined by considering the totality of the circumstances surrounding the arrest."); *cf. United States v. Gonzalez,* 969 F.2d 999, 1006 (11th Cir.1992) (concluding that: "A policeman's mistaken belief of fact can properly contribute to a probable cause determination and can count just as much as a correct belief as long as the mistaken belief was reasonable in the light of all the circumstances.").

[4][5][6][7] Rodriguez's identifying information was identical to the information listed in Heredia's warrant in four critical aspects: same name, same sex, same age,[FN11] and same race. Significant other information was similar: (1) they had similar Social Security numbers;[FN12] (2) they had addresses in neighboring towns;[FN13] and, (3) they were born in the same state. Rodriguez (4) also had no fewer tattoos than Heredia, and many of the tattoos were in the same locations.

280 F.3d 1341                                                                                     Page 8
280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280
**(Cite as: 280 F.3d 1341)**

Against all of these similarities is one material [FN14] difference: Rodriguez says he is 5'11" tall, and the warrant listed Heredia as 5'6". [FN15] A reasonable *1348 mistake cannot, however, be transformed into an unreasonable mistake over such a small difference, given all the circumstances.

> FN11. According to the warrant, Heredia used multiple birth dates. Heredia's various birthdays all occurred in 1953, the same year Rodriguez was born.

> FN12. According to the warrant, Heredia used multiple Social Security numbers. Heredia's various Social Security numbers were all similar to each other and similar to Rodriguez's.

> FN13. *See Brown,* 823 F.2d at 169 (relying on following when determining that arrest was reasonable: "If like many criminals [the person listed in the warrant] has an alias-and there is no suggestion that he does not, in fact, use the alias of 'Anthony Brown'-it would not be surprising if he also has a false address and birthdate.... Harvey, where [the plaintiff] was arrested, surrounds Phoenix, where he lives, and is near Chicago, where [the person listed in the warrant] lives (or lived when the warrant was issued-he presumably decamped shortly afterward, or he would have been arrested).").

> FN14. We do not consider the other differences of much importance. Eye color (given contact lens), scars (given cosmetic surgery), and weight are all easily variable, especially over six years. This variability lessens the importance of differences in these characteristics. *See Brady,* 187 F.3d at 112 (discussing false arrest cases in context of false imprisonment case and stating that "we live in an age where altering physical features may be accomplished with facility"); *Blackwell v. Barton,* 34 F.3d 298, 304 (5th Cir.1994) (stating, in context of mistaken arrest case, "discrepancies in hair and eye color or skin tone are not determinative in this day when use of hair dyes, cosmetic contact lenses, and tanning salons is relatively common"). Not

every change in a fugitive's appearance can properly prevent arrest by police officers.

> FN15. Arresting police officers need not act as judges determining ultimate facts. Trials of guilt or innocence cannot be undertaken by police officers on the side of the road in the middle of the night before an officer can effect a lawful arrest pursuant to a valid warrant. In this case, the arresting officer said, on the spot, he did not believe plaintiff was as tall as plaintiff claimed to be. The officer was not obligated to accept plaintiff's statements as true. *See Marx v. Gumbinner,* 905 F.2d 1503, 1507 n. 6 (11th Cir.1990). Moreover, even if the arresting officer was fully aware that plaintiff was some inches taller than the 5'6" set out in the warrant, not every discrepancy (as we have already said) in height and so forth would demand that the policeman refrain from executing the warrant. *See Thompson v. Prince William County,* 753 F.2d 363, 365 (4th Cir.1985). Other strong indicators in the warrant matched plaintiff. There are limits on how much independent investigating an officer must make before executing an arrest warrant, even when the arrested person is asserting a claim of mistaken identity. *See Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). The question is not whether the police could have done more; but whether they did just enough. Furthermore, the circumstances that justify a lawful arrest also justify a brief detention incident to the arrest. *See Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975). Plaintiff was released within minutes of having been fingerprinted at the jail when it was realized that plaintiff was not the person who was the true subject of the arrest warrant.

In other words, in the context of this case, a mistaken estimate of no more than five inches does not equal a constitutional violation. After all, Sgt. Farrell and Officer Szczepanski were in the field, not in a police station. *Cf. Cannon v. Macon County,* 1 F.3d 1558 (11th Cir.1993) (reinstating jury verdict against official

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280
**(Cite as: 280 F.3d 1341)**

who worked at police station after concluding that official's failure, when under no time pressure over seven-day period at police station, to investigate discrepancies between descriptive information contained in arrest warrant and description of person arrested pursuant to that warrant amounted to constitutional violation), *modified,*15 F.3d 1022 (11th Cir.1994). They-after midnight, on a dark street, immediately after finding unlawful drugs in a container in the vehicle in which Rodriguez was one of only two occupants-were trying to determine whether Rodriguez was the person described in the warrant, a warrant charging the listed person with drug possession. *See Patton,* 822 F.2d at 699-700 (relying on fact that arrestee "was in an automobile rather than at home; if [the officer] had let him go it might have taken a long time to catch up with him again (if he was the 'real' [person listed in the warrant] )" and "the edginess all policemen feel in confronting a criminal suspect at night on a highway" when concluding that no finder of fact could conclude that officer acted unreasonably in arresting wrong person for arrest warrant despite discrepancies).

Time was short in the situation facing Sgt. Farrell and Officer Szczepanski: a nighttime traffic stop. The officers had minutes to make their determination, not months or even days: Rodriguez soon had to be either arrested or let go. *Cf. Tillman v. Coley,* 886 F.2d 317, 321 (11th Cir.1989) (concluding that sheriff's failure to investigate discrepancies in identity of person against whom he sought arrest warrant-discrepancies of which he was aware *three months* before seeking the warrant-could constitute constitutional violation sufficient to form foundation of section 1983 constitutional false arrest claim); *Cannon,* 1 F.3d at 1558 (*seven day* detention period). Given all the circumstances, the Constitution's guarantee against "unreasonable" seizures was not violated by an estimate of height that was accurate within 5 inches.[FN16]

> FN16. We can find only one circuit court opinion-Rodriguez cites none-actually holding an officer potentially liable for the mistaken arrest of someone pursuant to a valid arrest warrant for another. See *Watts v. County of Sacramento,* 256 F.3d 886 (9th Cir.2001). But, *Watts* is very different from our case. Most important,

*Watts* involved the entry into and an arrest in a home and, even more worrisome, a home that was not known to be the dwelling place of the person listed in the warrant.

Under the circumstances of this case, defining "reasonable mistake" to exclude the acts of Sgt. Farrell and Officer Szczepanski-thereby creating a cause of action against them and subjecting them personally to possible monetary liability-would likely deter future officers too much from making arrests in public places on valid warrants about which they do not have first-hand knowledge: the risk of error in identification, and then a lawsuit, would simply be too great. As a result, persons sought for crimes would, therefore, find it easier to evade capture. *See Johnson,* 680 F.2d at 41 ("If an officer executing an arrest warrant must do so at peril of damage liability under section 1983 if there is any discrepancy between the description in the warrant and the appearance of the person to be arrested, many a criminal will slip away while the officer anxiously compares the description in the warrant with the appearance of the person named in it and radios back any discrepancies to his headquarters for instructions.").

**\*1349** Put differently, we-given the facts as Rodriguez presents them-conclude, as a matter of law, that Sgt. Farrell and Officer Szczepanski made a "reasonable mistake" when they arrested Rodriguez pursuant to Heredia's warrant and, thus, committed no constitutional violation upon which to base a section 1983 constitutional false-arrest claim.[FN17]

> FN17. Sgt. Farrell and Officer Szczepanski have not argued in this appeal that the pertinent arrest was consistent with the Federal Constitution because probable cause (even if no warrant had been involved) existed for the arrest, given that plaintiff was one of only two occupants of an automobile in which the police had just found unlawful drugs in a container that was also in the automobile. So, we do not address that issue. But for background, see *United States v. Buckner,* 179 F.3d 834 (9th Cir.1999); *Fernandez v. Perez,* 937 F.2d 368 (7th Cir.1991).

We, however, do treat the fact that plaintiff was riding in an automobile in which unlawful drugs had been

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280
**(Cite as: 280 F.3d 1341)**

found in a container to which plaintiff had access and had handled as a significant part of the totality of the circumstances of plaintiff's arrest. Plaintiff was not just walking down the street and stopped because passing police officers thought he might fit some outstanding warrant. He was in a car that was carrying drugs, and he (to say the least) was of the same name, sex, race, and age as a person for whom a warrant for a drug crime was outstanding. It is the arrest in these circumstances that is before us. The warrant did not have to justify this arrest in a vacuum; something, at least, approaching (if not reaching) probable cause to arrest was established by plaintiff's having been in the car where drugs were being carried. So, the warrant-with its substantial similarities between plaintiff and the person for whom the warrant was issued-need not (and should not) be viewed alone: abstract and pure.

2. Clearly Established Law

In the alternative, we conclude that, given the law at the time of arrest, the unlawfulness of the arrest was not already clearly established. "A government-officer defendant is entitled to qualified immunity unless, at the time of the incident, the 'preexisting law dictates, that is, truly compel[s],' the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances." *Marsh v. Butler County,* 268 F.3d 1014, 1030-31 (11th Cir.2001) (en banc) (quoting *Lassiter,* 28 F.3d at 1150). Furthermore, because Fourth Amendment qualified-immunity determinations turn on the reasonableness of an officer's acts in a certain set of facts, the Supreme Court recently stressed that the determination of whether a legal right was already clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).

[8] Assuming, *arguendo,* that Sgt. Farrell and Officer Szczepanski's mistaken arrest of Rodriguez was unreasonable in the constitutional sense and that Rodriguez, thus, has stated a claim for unconstitutional arrest, the constitutional violation-at the time of the arrest-was not already clearly established: Rodriguez cited to no case (nor can we find one) in this Circuit or

from the United States Supreme Court *1350 or Florida Supreme Court that has ever held an officer, under any set of circumstances, liable for misidentifying an arrestee when *executing* a *valid* arrest warrant.

The cases that are factually closest to the instant case (and that conclude that an officer is, or may be, liable under section 1983) are *Cannon v. Macon County,* 1 F.3d 1558 (11th Cir.1993), and *Tillman v. Coley,* 886 F.2d 317 (11th Cir.1989). Both of these cases are, however, materially different from this case.

*Cannon* and *Tillman* share a fundamental distinction from our case: neither case involves an on-the-spot decision to arrest by an officer in the field. *Cannon* concluded that an official *at a police station* was liable for failing to identify correctly the plaintiff during *seven days of incarceration* under the official's care. *Cannon,* 1 F.3d at 1562-63. *Cannon* did not conclude that the officer, who executed the warrant (the validity of which was not challenged) in the field, was liable. *Id.* at 1561. *Tillman* deals with the *application* for an arrest warrant that the court concluded was insufficient because the affidavit submitted to the magistrate lacked probable cause; *Tillman* decides nothing about the execution of a valid arrest warrant in the field. *Tillman,* 886 F.2d at 320-21. Thus, *Cannon* and *Tillman* are not like this case: they do not address situations involving an officer's *execution* of a *valid* arrest warrant in the field. Given the circumstances of the case at hand, the precedents cannot have clearly established the applicable law for the purposes of the qualified immunity defense. *See generally Marsh,* 268 F.3d at 1031-34 (explaining use of precedents to determine clearly established law).

Public officers need not err on the side of caution. *Id.* at 1030 n. 8. And, "[p]ublic officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." *Adams v. St. Lucie County Sheriff's Dep't,* 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), *approved en banc,*998 F.2d 923 (11th Cir.1993). At the time of the pertinent arrest, no precedent had decided that an officer committed a constitutional violation by mistakenly *executing a valid arrest* warrant against the wrong person. Closer to the point, no precedent had decided that the nighttime arrest, in conjunction with a traffic stop, of a

person-who had been riding in an automobile in which unlawful drugs were being carried, and who was admittedly within five inches of the height of a fugitive for which a valid warrant for arrest (for offenses including a drug offense) was in existence and known to the arresting officers-violated the Federal Constitution when the arrested person shared with the fugitive (1) similar birth dates, social security numbers, addresses, birth places and tattoos as well as (2) the identical name, sex, race and age.[FN18] Therefore, we conclude that, if Sgt. Farrell's and Officer Szczepanski's mistake in arresting Rodriguez was not, as a matter of law, a "reasonable" one, it was, at least, an arguably reasonable one in the light of the unsettled, preexisting law. *See Marsh,* 268 F.3d at 1030 n. 8, 1031 n. 9. We must, therefore, reverse the district court's denial*1351 of qualified immunity to Sgt. Farrell and Officer Szczepanski.

> FN18. We very occasionally encounter the exceptional case in which a defendant officer's acts are so egregious that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable (by which we, in the qualified immunity context, always mean every objectively reasonable) officer that what the defendant officer was doing must be "unreasonable" within the meaning of the Fourth Amendment. *See Priester v. City of Riviera Beach,* 208 F.3d 919 (11th Cir.2000). *See generally Marsh,* 268 F.3d at 1031 n. 9 (discussing means by which officers can be fairly and clearly warned). But the case now before us is not one like that.

B. Excessive Force During the Arrest

[9][10][11][12] We conclude that the force used by Sgt. Farrell during his arrest of Rodriguez did not violate the Constitution. The use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment. *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). But, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396, 109 S.Ct. 1865. In the Eleventh Circuit, we recognize that the typical arrest involves some force and injury. *See*

*Nolin v. Isbell,* 207 F.3d 1253, 1257-58 (11th Cir.2000).

The evidence, in the light most favorable to plaintiff, shows that Sgt. Farrell grabbed plaintiff's arm, twisted it around plaintiff's back, jerking it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that Farrell was hurting him. Plaintiff was placed in the rear of Sgt. Farrell's patrol car, kept handcuffed behind his back and transported to the police station. The handcuffs were removed minutes after arrival at the police department. The handcuffing technique used by Sgt. Farrell is a relatively common and ordinarily accepted non-excessive way to detain an arrestee.

Plaintiff's orthopedic surgeon testified that the handcuffing was a "very serious, painful event," that resulted in the loosening of the internal surgical hardware, and caused the displacement of a key bone fragment. The resulting complications included more than twenty-five subsequent surgeries and ultimately amputation of the arm below the elbow.[FN19]

> FN19. Given the loss of an arm, we are presented with the proverbial "hard case," that is, one in which one's natural sympathies are aroused by the plaintiff's plight. We recall Justice Jackson's warning to judges: "We agree that this is a hard case, but we cannot agree that it should be allowed to make bad law." *FCC v. WOKO, Inc.,* 329 U.S. 223, 229, 67 S.Ct. 213, 216, 91 L.Ed. 204 (1946).

[13] Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal. *See Nolin,* 207 F.3d at 1257-58 (concluding, as a matter of law, that force used during arrest, including handcuffing, was not excessive when force and resulting injury were minimal); *Brissett v. Paul,* 141 F.3d 1157 (4th Cir.1998) (table) (concluding, as matter of law, that painful handcuffing with minimal injury not constitutional violation); *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1082 (8th Cir.1990) (same); *see also Martin v. Gentile,* 849 F.2d 863, 869-70 (4th Cir.1988) (concluding that force used, as a matter of law, was not excessive); *Silverman v. Ballantine,* 694 F.2d 1091, 1096-97 (7th Cir.1982) (same).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[14][15] This case is different from *Nolin* because Rodriguez's earlier surgery made what otherwise would be a common non-excessive handcuffing technique (that ordinarily would be painful but cause minimal injury) a maneuver that caused severe injury and tragic results. This distinction, however, is not important legally and does not preclude a conclusion that Rodriguez has shown no constitutional violation: no evidence has been presented that Sgt. Farrell knew of plaintiff's recent elbow surgery or, more important, knew that handcuffing plaintiff would seriously aggravate plaintiff's preexisting condition.[FN20] We do *1353 not use hindsight to judge the acts of police officers; we look at what they knew (or reasonably should have known) at the time of the act. What would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time. *See Silverman*, 694 F.2d at 1096-97 (concluding that force used was not, as a matter of law, excessive even though arrestee died of heart attack during arrest). Under the circumstances of this case, Sgt. Farrell's acts cannot rise to the level of a constitutional violation. FN21

> FN20. Rodriguez admits that he did not tell Sgt. Farrell that he had an injured arm before his arrest, and nothing outwardly indicated that Rodriguez's arm was injured after Rodriguez was outside the car. But, Rodriguez asks us to infer from the evidence he presented that Sgt. Farrell knew or should have known that Rodriguez's arm was already injured and required special treatment during the arrest. Rodriguez specifically argues that the evidence shows that, before Sgt. Farrell arrested him: (1) Rodriguez told Sgt. Farrell that he had just gotten out of the hospital because he (Rodriguez) had been in a motorcycle accident; (2) Sgt. Farrell looked through Rodriguez's hospital records; and, (3) Sgt. Farrell was standing behind Ms. Foulkes's car when Rodriguez was in the car and still had his arm in a sling. From these three circumstances, Rodriguez says that one can reasonably infer that Sgt. Farrell knew about Rodriguez's injured arm and that the arm demanded special treatment. We disagree.

Sgt. Farrell testified flatly that he did not see Rodriguez's arm in a sling. And, the circumstances to which Rodriguez points are not inconsistent with Sgt. Farrell's sworn testimony. Rodriguez admits that the interior of Ms. Foulkes's car-area into which Sgt. Farrell, from his position behind the car, would have needed to have seen Rodriguez in his sling-was "dark." Never does Rodriguez tell us how far behind the pertinent car Sgt. Farrell was standing. Never does Rodriguez say that he saw Farrell focus on him while Rodriguez was in the car wearing a sling.

Given the evidence in this record, Rodriguez relies on conjecture that the sling could have, and would have, been observed by a reasonable officer. *See Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1324 (11th Cir.1982) ("[A]n inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation."). Rodriguez cannot overcome contradictory direct evidence-Sgt. Farrell's sworn testimony that he did not see the sling-and raise a genuine issue of fact. We decline to accept Rodriguez's contended-for double inference (that the sling was observable *and* that Sgt. Farrell made, or a reasonable officer would have made, that observation in the context of what was occurring generally in the nighttime traffic stop and arrest of Ms. Foulkes) to prove that Sgt. Farrell saw, or should have seen, Rodriguez's arm in the sling. *See generally Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1355 (11th Cir.1999) (concluding that inference that one person told a second person about a specific fact regarding a topic, based upon evidence that the first and second persons met and talked and evidence that the second person knew about the topic generally, was unreasonable speculation in the light of an affirmative denial of knowledge of the specific fact by the second person); *Burrell v. Board of Trs. of Georgia Military Coll.,* 970 F.2d 785, 791 n. 15 (11th Cir.1992) ("Considering that Burrell cannot offer evidence of the contents of Baugh's and Baggarly's meeting, that Baugh and Baggarly provide a reasonable and consistent explanation for their meeting, that Baugh and Baggarly flatly deny having discussed Burrell, only one fact can be inferred from their meeting: that the meeting took place. Any conclusion about the content of their discussion in contradiction to their testimony would qualify as speculation, not infer-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ence."); *Daniels,* 692 F.2d at 1326 (concluding jury could not reasonably draw inference that nursing home's negligent act of allowing patient to wander away from home was proximate cause of patient's death because inference was only supported by mere scintilla of evidence and conflicted with uncontradicted facts). *See also Pennsylvania R.R. v. Chamberlain,* 288 U.S. 333, 340-41, 53 S.Ct. 391, 77 L.Ed. 819 (1933) ("And the desired inference is precluded for the further reason that respondent's right of recovery depends upon the existence of a particular fact which must be inferred from proven facts, and this is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses consistent with the facts actually proved, from which testimony it affirmatively appears that the fact sought to be inferred did not exist."). Thus, the evidence is insufficient to support a finding that Sgt. Farrell knew, or should have known, about Rodriguez's injured arm (and that the arm demanded special treatment) because Rodriguez had the arm in a sling at a time before his arrest.

Nor does Rodriguez's testimony that Sgt. Farrell briefly "looked" at Rodriguez's hospital records raise an inference that Sgt. Farrell knew, or should have known, about Rodriguez's injured arm and that the arm demanded special treatment. Rodriguez specifically testified that Sgt. Farrell "looked" at the records; he admits that Farrell did not "read" them. Rodriguez also provides no evidence tending to show specifically what the content of these hospital records would have been. Under the circumstances, this evidence, even combined with evidence that Rodriguez told Sgt. Farrell that he had just gotten out of the hospital after a motorcycle accident, is not enough to support an inference that Sgt. Farrell knew, or should have known, specifically that Rodriguez's arm was injured and that the arm demanded special care. *Cf. Clover,* 176 F.3d at 1355.

> FN21. In the alternative, we conclude that Sgt. Farrell is entitled to qualified immunity on the excessive force claim.

REVERSED and REMANDED for further proceedings consistent with this opinion.

C.A.11 (Fla.),2002.
Rodriguez v. Farrell

280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

953 F.2d 1346
**(Cite as: 953 F.2d 1346)**

**C**

U.S. v. Allison
C.A.11 (Ala.),1992.

United States Court of Appeals,Eleventh Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Raymond Brann ALLISON, Defendant-Appellee.
**No. 91-7039.**

Feb. 19, 1992.

Indictment charged defendant with conspiracy to
manufacture and attempt to manufacture
phenylacetone and methamphetamine. The United
States District Court for the Southern District of
Alabama, No. CR-90-00078-BH,William Brevard
Hand, J., granted defendant's suppression motion
and denied Government's motion to reconsider.
Government appealed. The Court of Appeals, Du-
bina, Circuit Judge, held that all evidence available
to officers prior to arrest established probable cause
sufficient to justify warrantless arrest.

Reversed and remanded.

West Headnotes

**[1] Criminal Law 110 ⟲1139**

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General
            110k1139 k. Additional Proofs and Trial
De Novo. Most Cited Cases

**Criminal Law 110 ⟲1158(4)**

110 Criminal Law
    110XXIV Review
        110XXIV(O) Questions of Fact and Findings
            110k1158 In General
                110k1158(4) k. Reception of Evidence.
Most Cited Cases
Review of district court's ruling on motion to sup-
press evidence is mixed question of law and fact;
findings of fact are reviewed under clearly erro-

neous standard, whereas district court's application
of law to those facts is subject to de novo review.

**[2] Arrest 35 ⟲63.4(1)**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest
Without Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(1) k. Grounds for Warrantless
Arrest in General. Most Cited Cases
When constitutional validity of arrest is challenged,
it is function of court to determine whether facts
available to arresting officer at moment of arrest
support finding of probable cause. U.S.C.A.
Const.Amend. 4.

**[3] Arrest 35 ⟲63.4(2)**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest
Without Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(2) k. What Constitutes Such
Cause in General. Most Cited Cases
"Probable cause" for arrest exists where facts and
circumstances within officer's knowledge and of
which officer had reasonably trustworthy informa-
tion are sufficient to warrant person of reasonable
caution in belief that offense has been or is being
committed by person to be arrested. U.S.C.A.
Const.Amend. 4.

**[4] Arrest 35 ⟲63.4(11)**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest
Without Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(7) Information from Others
                    35k63.4(11) k. Other Officers or
Official Information. Most Cited Cases
Where there is at least minimal communication

between different officers, collective knowledge of officers determines probable cause to arrest.

## [5] Criminal Law 110 ⬯1134(3)

110 Criminal Law
  110XXIV Review
    110XXIV(L) Scope of Review in General
      110k1134 Scope and Extent in General
        110k1134(3) k. Questions Considered in General. Most Cited Cases
Question of what amounts to probable cause is purely question of law and is subject to plenary review by Court of Appeals. U.S.C.A. Const.Amend. 4.

## [6] Arrest 35 ⬯63.4(15)

35 Arrest
  35II On Criminal Charges
    35k63 Officers and Assistants, Arrest Without Warrant
      35k63.4 Probable or Reasonable Cause
        35k63.4(15) k. Appearance, Acts, and Statements of Persons Arrested. Most Cited Cases
Probable cause justifying warrantless arrest for conspiring to manufacture controlled substance existed where officers believed that three of four chemicals necessary to manufacture phenylacetone and methamphetamine had been ordered under bogus name, that defendant arrived in rental car with Texas license plates and displayed Texas identification, paid for chemicals with money order, stated he was interested in purchasing additional chemicals without required paperwork, and was concerned about law enforcement surveillance. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846; U.S.C.A. Const.Amend. 4.

## [7] Arrest 35 ⬯63.4(2)

35 Arrest
  35II On Criminal Charges
    35k63 Officers and Assistants, Arrest Without Warrant
      35k63.4 Probable or Reasonable Cause
        35k63.4(2) k. What Constitutes Such

Cause in General. Most Cited Cases
Probable cause exists for warrantless arrest when, under totality of circumstances, there is fair probability that contraband or evidence of crime will be found in particular place. U.S.C.A. Const.Amend. 4.

**\*1347** J.B. Sessions, III, U.S. Atty., Richard H. Loftin, Asst. U.S. Atty., Mobile, Ala., for plaintiff-appellant.

James M. Byrd, Mobile, Ala., for defendant-appellee.

Appeal from the United States District Court for the Southern District of Alabama.

Before ANDERSON and DUBINA, Circuit Judges, and ESCHBACH [FN*], Senior Circuit Judge.

> FN* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit sitting by designation.

DUBINA, Circuit Judge:

    The United States of America (the "Government") appeals the district court's order granting Raymond Brann Allison's ("Allison") motion to suppress. The district court granted Allison's motion on the ground that there was insufficient evidence to warrant a finding of probable cause to justify his warrantless arrest and warrantless search of his car. For the reasons which follow, we reverse.

### I. BACKGROUND

#### A. *Facts*

    On June 21, 1990, Drug Enforcement Administration ("DEA") agents were conducting an undercover operation at the AWC Chemical Company ("AWC") in Eight Mile, Alabama. The decision to conduct **\*1348** the surveillance operation was based on information received by the DEA that certain individuals from Texas had placed an order for all of the essential chemicals needed to manufacture

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

phenylacetone ("P2P"), an amphetamine. While posing as an employee of AWC, one of the undercover DEA agents, Douglas Lamplugh ("Lamplugh"), discovered a second suspicious order for chemicals that could be used to manufacture P2P and methamphetamine. That order was placed under the name of Joel Chandler ("Chandler").

Approximately 10:15 a.m. that same day, Allison arrived to pick up the Chandler order and Lamplugh arranged to load the chemicals into Allison's car. Since Allison was only purchasing two of the four chemicals needed to manufacture methamphetamine, Lamplugh asked Allison if he would like to purchase other chemicals from the warehouse without going through the front office or filling out paperwork or invoices. When Allison stated that he would like to purchase another case of acidic anhydride, Lamplugh informed him that there was another case available, but that he could not sell it to him at that time because there were other people in the warehouse. Instead, Lamplugh told Allison that if he was interested, he could call Lamplugh on his beeper. Allison also requested a supply catalog for laboratory equipment and inquired about purchasing glass stoppers that would fit a triple neck flask and a vacuum tube. Prior to leaving, Allison asked whether AWC was under law enforcement surveillance. When Lamplugh assured him that it was not, Allison remarked that he had heard as much and that was the reason he had chosen to purchase the chemicals from AWC. Following that exchange, Allison left AWC.

Local Task Force agents followed Allison in their cars and arrested him. Allison told the agents that he wanted to cooperate. The agents instructed Allison not to speak until after he was *Mirandized.*FN1 After being read his *Miranda* rights, Allison told the agents that in return for picking up the chemicals from AWC he had been given $200.00 and approximately one gram of methamphetamine from an individual known as Willie Cook. Allison also told the agents that he understood the chemicals were to be used to manufacture methamphetamine, a portion of which he believed would be given to him in return for his ser-

vices.

> FN1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Allison was then taken to DEA headquarters, where he was again read his *Miranda* rights. He reiterated his previous statement, except that he denied he was to receive any drugs as payment for his services.

A search of Allison's car revealed two syringes containing a liquid solution, a plastic envelope with a white powder residue, and a spoon with residue. Allison admitted that all of the items belonged to him. He stated that the residue was the remainder of the methamphetamine that he had been given prior to driving from Texas to Alabama.

B. *Procedural History*

On July 2, 1990, an indictment was returned against Allison, charging him with conspiracy to manufacture and attempt to manufacture P2P and methamphetamine, in violation of 21 U.S.C. § 846(a); with possession of methamphetamine, in violation of 21 U.S.C. § 844(a); with interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952(a); and with use of a telephone to facilitate the commission of a felony, in violation of 21 U.S.C. § 843(b).

Allison filed a motion to suppress all physical evidence seized from him or his automobile at the time of his arrest and all statements made by him at or about the time of his arrest. The district court conducted an evidentiary hearing and then granted Allison's motion.

The Government filed a motion to reconsider that ruling, which was denied. This appeal followed. Allison is currently incarcerated pending this appeal.FN2

> FN2. Allison had initially been released on bond pending trial despite the Government's motion for detention; however, he tested positive for the presence of amphet-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

amine and methamphetamine in urine samples taken from him on July 16, 1990, August 8, 1990, and March 19, 1991. Allison also tested positive for the presence of THC metabolite in a sample taken on March 19, 1991. Based on the results of these tests, the United States magistrate judge granted the Government's motion to revoke Allison's bond.

**\*1349 II. STANDARD OF REVIEW**

[1] The review of a district court's ruling on a motion to suppress evidence is a mixed question of law and fact. The district court's findings of fact are reviewed under the clearly erroneous standard, whereas its application of the law to those facts is subject to *de novo* review. *United States v. Tobin,* 923 F.2d 1506, 1510 (11th Cir.1991) (en banc). In reviewing the district court's ruling, we must construe the facts in the light most favorable to the party prevailing below. *Id.*

**III. DISCUSSION**

The Government asserts that there was probable cause to justify Allison's arrest and that the evidence discovered and the statements made subsequent to the arrest were not the product of an illegal search and seizure. The Government argues that the district court erred because it analyzed the probable cause factors separately and found an innocent explanation for each factor rather than considering the totality of the circumstances as required by *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

The Government cites *United States v. Tasto,* 586 F.2d 1068 (5th Cir.1978) as analogous to the present case. In *Tasto,* the Fifth Circuit held that the critical element in determining whether there was probable cause was not how many precursors to the manufacture of PCP the defendant possessed, but whether those ingredients were significant for the manufacture of the drug. The Government argues that the analysis set forth in *Tasto* should apply to this case because Allison was in possession of one

of the three chemicals needed to make P2P and two of the four chemicals used to manufacture methamphetamine.[FN3]

> FN3. Lamplugh testified at the suppression hearing that Allison had purchased two of the three essential precursor chemicals used to manufacture methamphetamine-acetic anhydride and methylamine; however, as in *Tasto,* that statement was incorrect because four chemicals are actually required in the manufacturing process. Phenylacetic acid, acetic anhydride, and sodium acetate are essential to manufacture P2P. When this mixture is combined with one additional chemical, methylamine, P2P is converted to methamphetamine.

Allison counters the Government by arguing that the DEA agents lacked probable cause to arrest him and that any evidence seized at the time of the arrest as well as any inculpatory statements were tainted by the illegal arrest. He contends that because the arrest was illegal, the district was correct when it granted his motion to suppress the incriminating evidence.

Additionally, Allison argues that he was under arrest at the moment he was stopped by the Task Force agents because he was not free to leave. The record demonstrates that Allison's automobile was stopped and partially blocked from further movement by the arresting agents' automobiles. Allison was ordered out of his car by one agent who approached Allison with his firearm drawn and held by his side.

In its brief, the Government does not directly address Allison's argument that the initial stop was an arrest, but argues that Allison's inquiry regarding the police surveillance at AWC and his interest in purchasing the chemicals without following the proper procedures were sufficient to justify, at a minimum, a *Terry*[FN4] stop. The Government contends that the above information, coupled with all of the other information known to the agents, supplied ample evidence to support a finding of prob-

able cause to justify Allison's arrest.[FN5]

FN4. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

FN5. In its order, the district court found that Allison was under arrest. We agree with that finding.

[2][3][4][5] When the constitutional validity of an arrest is challenged, it is the function of the court to determine whether the facts available to the arresting officers at the **\*1350** moment of the arrest support a finding of probable cause. *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested. *United States v. Waksal,* 709 F.2d 653, 658, n. 8 (11th Cir.1983). Where there is at least minimal communication between different officers, the collective knowledge of the officers determines probable cause. *United States v. Astling,* 733 F.2d 1446, 1460 (11th Cir.1984). While probable cause requires only a probability or substantial chance of criminal activity, mere suspicion is not enough. *United States v. Ingrao,* 897 F.2d 860, 862 (7th Cir.1990). The question of what amounts to probable cause is purely a question of law and hence is subject to plenary review by this court. *United States v. Tobin,* 923 F.2d at 1510.

[6] In the present case, the district court held that the Government failed to produce any evidence that Allison was breaking the law by purchasing the chemicals because none of the chemicals were controlled substances and because there existed legitimate uses for the chemicals other than illegal drug manufacturing.[FN6] The district court further held that the Government failed to present evidence that the agents had any knowledge that Allison was a known dealer, user, or manufacturer of methamphetamine. The district court rejected the Government's argument that Allison's picking up an

order that had been placed under a name other than his own was unusual. Additionally, the district court was unpersuaded that Allison's arrival in a rental car with Texas plates or his Texas identification was significant because it found that the agents "did not know that the defendant was from the State of Texas," but rather simply supposed that to be a fact, which in itself did not lead to a conclusion that Allison was breaking the law. The district court stated that the most incriminating factor pointing to Allison's alleged illegal activity was his interest in purchasing chemicals through the "backdoor" of AWC, which, coupled with his concern about law enforcement surveillance, could reasonably have aroused the agent's suspicions. However, the district court stated that more than suspicion was required to "support the intrusion of a full blown arrest." The district court concluded that Allison's arrest was without probable cause and suppressed the evidence seized as a result of that arrest. We disagree with the district court's conclusion.

FN6. For example, Lamplugh testified that he was aware that methylamine could be used in the process of tanning hides by taxidermists.

[7] Probable cause exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates,* 462 U.S. at 238, 103 S.Ct. at 2332. An arrest without a warrant is constitutionally valid if, at the moment the arrest was made, the officer had probable cause to make such an arrest. *Beck v. Ohio,* 379 U.S. at 91, 85 S.Ct. at 225.

In *United States v. Preston,* 608 F.2d 626 (5th Cir.1979), we affirmed the district court's finding that law enforcement officials had probable cause to arrest the defendant on charges of bank robbery. The factors cited in that case were as follows: (1) the defendant had arrived at a house located near to the last known whereabouts of the robbers shortly after the offense was committed; (2) the defendant changed his appearance following his encounter with the investigating officer; (3) the defendant had

953 F.2d 1346
953 F.2d 1346
(Cite as: 953 F.2d 1346)

allegedly walked to the house without a coat or hat, on what was described as a cold day; later two windbreakers, believed to have been discarded by the robbers, were found in the vicinity; and (4) the defendant later gave inconsistent statements about where he worked and lived. In upholding the finding of probable cause and, subsequently, the admission of the defendant's inculpatory remarks made after his arrest, we held that the facts known to the officers were, when taken as a whole, sufficient for the officers to have **1351** reasonably believed that the defendant was a participant in the crime. *Id.* at 632.

In *United States v. Tomaszewski,* 833 F.2d 1532 (11th Cir.1987), the defendant's motion to suppress was denied based upon the arresting officer's observations of the following: (1) the defendant had arrived from West Palm Beach, an alleged source city for cocaine; (2) the officer observed the defendant walking through the airport with a suspicious bulge in his pants; and (3) the defendant appeared to be nervous and tried to avoid the officers.

While *Preston* and *Tomaszewski* are factually distinguishable from the case before us, we find the reasoning in those cases persuasive. In each of those cases, the total of all of the evidence available to the officers prior to the arrest was analyzed by the court to determine whether probable cause existed. See also, *United States v. Bell,* 833 F.2d 272 (11th Cir.1987) (existence of many circumstances, which taken together, were sufficient to establish probable cause).

In the present case, the agents were aware of the following facts at the time of Allison's arrest: (1) that an order for four gallons of ether, four gallons acetic anhydride and four gallons of methylamine had been placed in the name of Joel Chandler, a bogus name; (2) that those chemicals were necessary to manufacture P2P and methamphetamine; (3) that Allison had arrived in a rental car with Texas license plates [FN7] and that Allison had displayed Texas identification; (4) that Allison had paid for the chemicals with a money order, which is often used to avoid identification; (5) that in response to agent Lamplugh's suggestion, Allison told Lamplugh he was interested in purchasing additional chemicals and glass stoppers that would fit a triple-neck flask and a vacuum tube, without filling out the required paperwork; and (6) that Allison was concerned about law enforcement surveillance because Allison specifically asked if AWC was being watched and stated that he had chosen to buy his chemical supplies there because he had heard that it was not under surveillance.

> FN7. Lamplugh testified that based on his experience in clandestine drug operations the majority of methamphetamine cases originated in Texas. He stated initially that he believed Allison was working in concert with other individuals under surveillance at the plant suspected of manufacturing controlled substances; however, he later learned that Allison had no connection with this other group.

It is clear that the foregoing facts, when considered together, were sufficient to form a reasonable belief that Allison was conspiring to manufacture a controlled substance. Thus, we are persuaded that there was sufficient evidence to warrant a finding of probable cause and, therefore, justify Allison's warrantless arrest.

### IV. CONCLUSION

When we consider the totality of the circumstances known to the arresting agents, we conclude that Allison's arrest was constitutionally valid and not in violation of his Fourth Amendment rights. Thus, the district court erred in granting Allison's motion to suppress. Accordingly, we reverse the district court's order and remand this case for further proceedings consistent with this opinion.

REVERSED and REMANDED.

C.A.11 (Ala.),1992.
U.S. v. Allison
953 F.2d 1346

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

953 F.2d 1346
**(Cite as: 953 F.2d 1346)**

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

658 F.Supp. 1086                                                                 Page 1
658 F.Supp. 1086
**(Cite as: 658 F.Supp. 1086)**

C

Timmons v. City of Montgomery, Ala.
M.D.Ala.,1987.

United States District Court, M.D. Alabama, North-
ern Division.
Michael TIMMONS, Plaintiff,
v.
CITY OF MONTGOMERY, ALABAMA, etc., et
al., Defendants.
**Civ. A. No. 86-T-709-N.**

March 17, 1987.

Individual arrested under city vagrancy ordinance
brought action against city challenging constitu-
tionality of ordinance. The District Court, Myron
H. Thompson, J., held that vagrancy ordinance of
city was unconstitutionally vague in violation of
due process clause of Fourteenth Amendment, and
violated Fourth Amendment.

Order accordingly.

West Headnotes

**[1] Arrest 35 €═68(4)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(4) k. What Constitutes Seizure.
Most Cited Cases
In attempting to arrest plaintiff, two officers de-
tained him, though briefly, so as to effect seizure of
plaintiff, and that seizure was subject to proscrip-
tions of Constitution, and thus if detention of
plaintiff, though only a brief attempt to arrest, did
not meet requirements of Constitution, it was illeg-
al.

**[2] Constitutional Law 92 €═4506**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)2 Nature and Elements of
Crime
                92k4502 Creation and Definition of
Offense
                    92k4506 k. Vagueness. Most Cited
Cases
    (Formerly 92k258(2))
Void-for-vagueness doctrine, as embodied in due
process clause, requires that criminal statute meet
two requirements: statute must define criminal of-
fense, first, with sufficient definiteness that ordin-
ary people can understand what conduct is prohib-
ited and, second, in such manner that does not en-
courage arbitrary and discriminatory enforcement.
U.S.C.A. Const.Amend. 14.

**[3] Constitutional Law 92 €═4509(8)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)2 Nature and Elements of
Crime
                92k4502 Creation and Definition of
Offense
                    92k4509 Particular Offenses
                        92k4509(8) k. Disorderly Con-
duct and Breach of the Peace. Most Cited Cases
    (Formerly 92k258(3.1), 92k258(3))

**Disorderly Conduct 129 €═1**

129 Disorderly Conduct
    129k1 k. Nature and Elements of Offenses. Most
Cited Cases
    (Formerly 92k258(3.1), 92k258(3))
City vagrancy law which provided that person who
loiters or wanders upon streets or from place to
place without apparent reason or business and who
refuses to identify himself and to account for his
presence, if surrounding circumstances are such as
to indicate to a reasonable man that public safety
demands such identification, was guilty of misde-
meanor, was unconstitutionally vague in violation
of due process clause of Fourteenth Amendment in
that law contained no standard by which city law

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

658 F.Supp. 1086
**(Cite as: 658 F.Supp. 1086)**

enforcement officers could determine when it had been violated, and placed virtually complete discretion in hands of police. U.S.C.A. Const.Amend. 14.

**[4] Arrest 35 ⟶63.4(1)**

35 Arrest
   35II On Criminal Charges
         35k63 Officers and Assistants, Arrest Without Warrant
            35k63.4 Probable or Reasonable Cause
            35k63.4(1) k. Grounds for Warrantless Arrest in General. Most Cited Cases

**Arrest 35 ⟶63.5(4)**

35 Arrest
   35II On Criminal Charges
         35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(3) Grounds for Stop or Investigation
            35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases

**Searches and Seizures 349 ⟶40.1**

349 Searches and Seizures
   349I In General
     349k40 Probable Cause
       349k40.1 k. In General. Most Cited Cases
   (Formerly 349k40)
Fourth Amendment generally prohibits police from seizing or searching person unless there is probable cause to believe that person has committed crime, with but one exception, the *Terry* stop, where, if police have reasonable suspicion, based on articulable facts, that person has engaged in criminal activity, they may detain suspect briefly for purpose of questioning and, in doing so, may conduct brief frisk of suspect to protect themselves from concealed weapons. U.S.C.A.. Const.Amend. 4.

**[5] Arrest 35 ⟶63.5(3.1)**

35 Arrest
   35II On Criminal Charges
         35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(3) Grounds for Stop or Investigation
            35k63.5(3.1) k. In General. Most Cited Cases
   (Formerly 35k63.5(3))
City's vagrancy law providing that person who loiters or wanders upon streets or from place to place without apparent authority or business and refuses to identify himself and to account for his presence, if surrounding circumstances are such as to indicate to reasonable man that public safety demands such identification, was guilty of misdemeanor, authorized arrest and conviction for conduct that was at most suspicious, and authorized police to compel person to identify himself even in absence of circumstances that would justify *Terry* stop in violation of Fourth Amendment. U.S.C.A. Const.Amend. 4.

**\*1087** Julian McPhillips, Janie Baker Clarke, Montgomery, Ala., for plaintiff.
J. Bernard Brannan, Jr., Montgomery, Ala., for all defendants.

MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

   This lawsuit is, in part, a constitutional challenge to the vagrancy ordinance of the City of Montgomery, Alabama. Plaintiff Michael Timmons, a black man, has brought this lawsuit claiming that an attempt by two city police officers to arrest him under the law was illegal. He has sued and seeks damages from the City of Montgomery and the two officers who attempted to arrest him.

   This cause, which is soon to be tried before a jury, is now before the court on Timmons's motion for partial summary judgment. By the motion, Timmons contends that the vagrancy law is unconstitutional and that, as a result, the officers' attempt to arrest him under the law was also unconstitutional. For reasons that follow, the court concludes that the motion should be granted.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

658 F.Supp. 1086
658 F.Supp. 1086
**(Cite as: 658 F.Supp. 1086)**

## I. BACKGROUND

The undisputed facts are as follows. On the evening of October 22, 1985, two police officers patrolling in a police car noticed that a black man was bent over a parked car; they suspected that he might be trying to burglarize the car. When the two officers pulled up behind the parked car to investigate, the man ran away with a "bundle" in his hand. The officers then checked the parked car and found no signs of forced entry; they also radioed the car's tag and vehicle identification numbers to police headquarters and learned that the car belonged to Patricia Timmons. During this time, a woman came out of a nearby residence and identified herself as Patricia Timmons, the car's owner. As she spoke, the officers saw the man whom they had just seen, enter the residence. One of the officers indicated to Ms. Timmons that the man was the person whom they suspected had attempted to burglarize her car. She informed the officers that man was in fact her brother who had been waiting at the car for her.

Although the officers no longer had reason to believe that a car burglary was in progress, they insisted upon speaking with Ms. Timmons's brother. At the request of the officers, Ms. Timmons then went into the house to ask her brother to speak to the officers. When her brother came out, the officers ordered him to identify himself. He refused to talk to them, and the officers then attempted to arrest him for "failing to identify himself." A brief struggle then ensued, with Patricia Timmons and her sister Rosa Timmons joining in the fray to help their brother. The officers eventually broke away from the struggle and radioed for police backup. When the backup arrived, the two officers, on the advice of a superior officer, returned to police headquarters to obtain arrest warrants. No arrests were made at that time.

One of the officers thought he heard Patricia Timmons identify her brother as "Lindsey." Those later arrested were therefore Lindsey Timmons, Patricia Timmons and Rosa Timmons. Lindsey Timmons was charged with failing to identify himself, in violation of § 29-15(a)(6) of the city's vagrancy

ordinance; he was also charged with "harassment" and refusing to obey a police officer. His sisters were charged with interfering with a police officer. The Timmonses went through a series of trials and retrials, the last of which ended in a hung jury for all of them.

The plaintiff in this lawsuit, Michael Timmons, alleges that he, not his brother Lindsey Timmons, was the subject of the attempted arrest; he contends that the later arrest of his brother Lindsey Timmons was a mistake. He says that he ran away from **\*1088** the police officers when they pulled up behind his sister's car, because he had a beer can in a bag and was afraid the police might "hassle" him because of it. He has now brought this lawsuit claiming that the attempt to arrest him was unconstitutional.

## II. THE LAW

Two of the many issues that will be before the court and jury at the outset of trial are: first, whether the man whom the two police officers attempted to arrest was Michael Timmons rather than his brother; and, second, if so, whether the attempted arrest of Michael Timmons was constitutionally impermissible. By his motion for partial summary judgment, Timmons asks the court to assume that he was the subject of the attempted arrest and to resolve the second issue before trial.

[1] Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Partial summary judgment is appropriate here because the resolution of the constitutionality of the attempted arrest will not require the resolution of any disputed facts and is, therefore, purely an issue of law. Moreover, it is particularly appropriate and desirable that the parties be informed at this time, before trial, of the court's understanding of how the constitutionality issue should and will be resolved; the resolution is likely to be crucial to the effective prosecution and defense of this case and in general to its orderly disposition. The court will therefore pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ceed to resolve the issue of whether the attempted arrest was constitutional. Also, because whether Michael Timmons was the subject of the attempted arrest is a disputed fact which only a jury may resolve, in resolving the constitutional issue the court will merely assume that it was Michael Timmons whom the officers attempted to arrest.[FN1]

> FN1. To be sure, the two police officers only *attempted* to arrest Michael Timmons; they never actually arrested him. However, in attempting to arrest Timmons, the two officers still detained him, though briefly. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person,"*Brown v. Texas,* 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979), *quoting Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968), and the seizure is subject to the proscriptions of the Constitution. Therefore, if the detention of Timmons, though only a brief attempted arrest, did not meet the requirements of the Constitution, it was illegal.

The vagrancy law under which the attempt to arrest Timmons was made is § 29-15(a)(6) of the City Code, which is as follows:

(a) Every person who commits any of the following acts shall be guilty of disorderly conduct, a misdemeanor:

(6) Who loiters or wanders upon the streets or from place to place without apparent reason or business and who refuses to identify himself and to account for his presence when requested by any peace officer to do so, if the surrounding circumstances are such as to indicate to a reasonable man that the public safety demands such identification.

As already stated, Timmons's contention that his attempted arrest under this law was illegal is premised on his contention that the law itself is unconstitutional. The court agrees that if the law is indeed invalid then the attempted arrest based on it would also be illegal. The court therefore turns to

the pivotal issue of whether § 29-15(a)(6) is unconstitutional.

Timmons makes essentially two challenges to the law, one based on the fourteenth amendment to the U.S. Constitution and the other on the fourth amendment.

A. Fourteenth Amendment Challenge

Timmons contends that § 29-15(a)(6) is vague, in violation of the due process clause of the fourteenth amendment. The court agrees.

[2] The void-for-vagueness doctrine, as embodied in the due process clause, requires that a criminal statute meet two requirements: the statute must define the *1089 criminal offense, first, with sufficient definiteness that ordinary people can understand what conduct is prohibited and, second, in such a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). The latter requirement-that a penal law establish minimal guidelines for those who are to enforce it-is considered to be the most important. *Id.*

The vagueness doctrine is premised on the notion that, because the "Constitution is designed to maximize individual freedoms within a framework of ordered liberty,"*id.,* laws which seek to limit freedoms must be examined for not only their "substantive authority and content," *id.,* but also for their "definiteness or certainty of expression." *Id.* When a legislative body enacts a law that fails to provide minimal guidelines, it has in effect authorized police officers, prosecutors, judges, and jurors to limit another's freedoms according to their own personal prejudices and predilections, *id.;* it has authorized rule by whim rather than law.

[3] Section 29-15(a)(6) appears to have, at least, three elements: (1) a person's "loiter[ing] or wander[ing] upon the streets or from place to place without apparent reason or business"; (2) the person's "refus[al] to identify himself and to account

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

658 F.Supp. 1086
658 F.Supp. 1086
(Cite as: 658 F.Supp. 1086)

for his presence"; and (3) "surrounding circumstances ... such as to indicate to a reasonable man that the public safety demands such identification." It is apparent that these three elements are extremely imprecise and that, as a result, the law contains no standard by which city law enforcement officers may determine when it has been violated.

How does one initially determine when a person is loitering or wandering without 'apparent' reason or business? Is it by the person's gait, posture or countenance? Or is it by the person's dress or apparent wealth or poverty-or race or nationality? FN2 What is 'apparent' idle conduct will vary depending upon the personal experiences and prejudices of the person viewing the conduct; in other words, what conduct is "without apparent reason or business" can only be in the "eye of the beholder." FN3 Moreover, assuming the phrase "identify himself" is clear enough, how much information is sufficient to 'account' for one's presence? And what if the 'accounting' is not believed by the police officer or what if the police officer does not like the accounting? Has one then not accounted for one's self? And finally, tying the law to "public safety demands" does not save the law from constitutional censure. It is not without significance that the City of Montgomery has not provided the court with any guidelines for determining when public safety demands identification.

> FN2. For instance, is the law triggered by a poor black youth walking through a wealthy all white neighborhood-even if his 'unapparent' reason is to study with one of his white classmates? And can anyone say with certainty that a black youth standing on a street corner is no more likely to be viewed as loitering or wandering "without apparent reason or business" than, say, a white lady out for a morning walk?

In light of the recent and pervasive past history of racial discrimination in and by the City of Montgomery, as documented in the records of this court, *see Buskey v. Oliver,* 565 F.Supp. 1473, 1475 (M.D.Ala.1983), and the numerous cases cited therein, this court would have to shut its eyes to

reality not to recognize the substantial likelihood of unequal and discriminatory application of the law in Montgomery. *See Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) (one of the most disturbing attributes of vagrancy laws is their potential for unequal, discriminatory application).

> FN3. The subjectivity of the ordinance is apparent from the facts here. Clearly, few persons would seriously characterize "running away from the police" as "loitering or wandering." Moreover, such conduct cannot be seriously considered to be "without apparent reason or business," for the reason is clear and unmistakable: to get away from the police. Without question, the real concern of the officers was not that Timmons was wandering or loitering, or even running; their concern was that he ran *away from the police.*

Section 29-15(a)(6) therefore "vests virtually complete discretion in the hands of the police to determine whether the suspect *1090 has satisfied the statute and must be permitted to go on his way in the absence of probable cause to arrest." *Kolender,* 461 U.S. at 358, 103 S.Ct. at 1858. Under the imprecise terms of the law, the right of any individual to walk the streets of Montgomery is left to the whims and prejudices of the police of this city and those who control the police. FN4 The court therefore concludes that § 29-15(a)(6) violates the fourteenth amendment.

> FN4. Indeed, the facts here dramatically demonstrate the chameleonic characteristics of the conduct proscribed by § 29-15(a)(6). The officers were not concerned with the fact that Timmons was simply running; rather, as they testified in pretrial depositions and other earlier proceedings, their concern was that he ran *away from the police. See* Note 3, *supra.* Section 29-15(a)(6) was therefore used by the officers, at their discretion, to condemn the following conduct as criminal and war-

ranting arrest and conviction: the refusal of a person, who has initially run away from the police, to identify himself when caught by the police.

In reaching this conclusion, the court has not been insensitive to the demands of law enforcement. To be sure, combating the present epidemic of crime is a weighty concern, *see Papachristou v. City of Jacksonville,* 405 U.S. 156, 171, 92 S.Ct. 839, 848, 31 L.Ed.2d 110 (1972); and, most certainly, broadly worded vagrancy laws could be useful to law enforcement in this war. But, in concluding in this instance that the requirements for definiteness and clarity outweigh the present heavy demands of law enforcement, the court follows well established precedent and does not make new law.

One of the earliest successful challenges to a vagrancy statute was to the State of Alabama's own vagrancy law, 1940 Code of Alabama, Title 14, §§ 437-439 (1958 rev.), which, though not identical to § 29-15(a)(6), used some of the same imprecise terminology; in 1969, in *Broughton v. Brewer,* 298 F.Supp. 260 (S.D.Ala.1969), a three-judge court found the state law to be unconstitutionally vague.FN5 Later, in *Powell v. Stone,* 507 F.2d 93 (9th Cir.1974), *rev'd on other grounds,*428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Ninth Circuit Court of Appeals found a local vagrancy ordinance from Henderson, Nevada to be void for vagueness; the ordinance was identical to the one at issue here. And more recently, in *Kolender v. Lawson, supra,* the Supreme Court struck down, as void for vagueness, a California statute **1091** identical to the one challenged here, though, admittedly, the basis for the Court's action was not the facial wording of the statute but how the statute had been interpreted by the state courts. Other cases that have reached the same conclusion, but which have involved vagrancy laws with wording somewhat different from that in § 29-15(a)(6), include *Papachristou, supra,* and *United States ex rel. Newsome v. Malcolm,* 492 F.2d 1166 (2nd Cir.1974), *aff'd sub nom.Lefkowitz, Attorney General of New York v. Newsome,* 420 U.S. 283, 95 S.Ct. 886, 43 L.Ed.2d 196 (1975).

FN5. In response to *Broughton,* the state passed a new vagrancy statute, 1975 Code of Alabama, §§ 13A-11-6 through 13A-11-10, which, according to the commentary that accompanies the new law, attempted "to punish identifiable conduct rather than status." Thus, an effort was made to make the law less subject to arbitrary and discriminatory enforcement. For example, § 13A-11-9 provides:

(a) A person commits the crime of loitering if he:

(1) Loiters, remains or wanders about in a public place for the purpose of begging; or

(2) Loiters or remains in a public place for the purpose of gambling; or

(3) Loiters or remains in a public place for the purpose of engaging or soliciting another person to engage in prostitution or deviate sexual intercourse; or

(4) Being masked, loiters, remains or congregates in a public place; or

(5) Loiters or remains in or about a school, college or university building or grounds after having been told to leave by any authorized official of such school, college or university, and not having any reason or relationship involving custody of or responsibility for a pupil or any other specific, legitimate reason for being there, and not having written permission from a school, college or university administrator; or

(6) Loiters or remains in any transportation facility, unless specifically authorized to do so, for the purpose of soliciting or engaging in any business, trade or commercial transactions involving the sale of merchandise or services; or

(7) Loiters or remains in any place with one or more persons for purpose of unlawfully using or possessing a dangerous drug.

(b) A person does not commit a crime under subdivision (a)(4) of this section if he is going to or from or staying at a masquerade party, or is participating in a public parade or presentation of an educational, religious, or historical character or in an event as defined in subdivision (1) of section 13A-11-140.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(c) "Deviate sexual intercourse" in subdivision (a)(3) of this section is defined as in subdivision (2) of section 13A-6-60.

(d) "Dangerous drug" in subdivision (a)(7) of this section means any narcotic, drug or controlled substance as defined in chapter 2 of Title 20 of this Code and any schedule incorporated therein.

(e) Loitering is a violation.

In condemning vagrancy laws that lack governing standards, these courts recognized that these laws "furnish a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.' " *Papachristou,* 405 U.S. at 170, 92 S.Ct. at 847,*quoting Thornhill v. Alabama,* 310 U.S. 88, 97-98, 60 S.Ct. 736, 742, 84 L.Ed.2d 1093 (1940). They further recognized that the right to wander, and even loiter, are not minor amenities. As Justice William O. Douglas, explained in *Papachristou,*

Persons "wandering or strolling" from place to place have been extolled by Walt Whitman and Vachel Lindsay.

... [T]hese activities are historically part of the amenities of life as we have known them. They are not mentioned in the Constitution or in the Bill of Rights. These unwritten amenities have been in part responsible for giving our people the feeling of independence and self-confidence, the feeling of creativity. These amenities have dignified the right of dissent and have honored the right to be nonconformists and the right to defy submissiveness. They have encouraged lives of high spirits rather than hushed, suffocating silence.

They are embedded in Walt Whitman's writings, especially in his "Song of the Open Road." They are reflected too, in the spirit of Vachel Lindsay's "I Want to Go Wandering," and by Henry D. Thoreau.

*Id.,* 405 U.S. at 164, 92 S.Ct. at 844 (footnotes omitted). These courts concluded, as has this court, that in light of these concerns the balance must be struck in favor of these amenities and away from the threat of rule by caprice.

B. Fourth Amendment Challenge

[4] Timmons contends that § 29-15(a)(6) also violates the fourth amendment. With but one exception, the fourth amendment generally prohibits the police from seizing or searching a person unless there is 'probable cause' to believe that the person has committed a crime. *Papachristou,* 405 U.S. at 169, 92 S.Ct. at 847. The one exception, commonly called a '*Terry* stop,' is that, where the police have a reasonable suspicion, based on articulable facts, that a person has engaged in criminal activity, they may detain the suspect briefly for the purpose of questioning and, in so doing, may conduct a brief frisk of the suspect to protect themselves from concealed weapons. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In other words, the police may arrest a person only where there is probable cause of criminal activity, and they may conduct a *Terry* stop only where there is reasonable suspicion, based on objective facts, of criminal activity.

[5] Timmons contends that the attempt to arrest him violated the fourth amendment in at least two ways. The court agrees. First, by authorizing arrest and conviction for conduct that is at most suspicious, § 29-15(a)(6) subverts the constitutional requirement that an arrest must be predicated on probable cause. As the Ninth Circuit explained in *Powell v. Stone,*

It authorizes arrest and conviction for conduct that is no more than suspicious. A legislature could not reduce the standard for arrest from probable cause to suspicion; and it may not accomplish the **\*1092** same result indirectly by making suspicious conduct a substantive offense. Vagrancy statutes do just that, for they authorize arrest and conviction for the vagrancy offense if there are reasonable grounds to suspect that the accused may have committed, or if left at large will commit, a more serious offense. Police are duty-bound to investigate suspicious conduct, and founded suspicion will support an investigative stop and inquiry. But more is required to justify arrest.

507 F.2d at 96 (citations omitted); *see also*

658 F.Supp. 1086
658 F.Supp. 1086
**(Cite as: 658 F.Supp. 1086)**

*United States ex rel. Newsome v. Malcolm,* 492 F.2d at 1172.

Second, the identification requirement in § 29-15(a)(6) is particularly offensive under the fourth amendment. The section authorizes police to compel a person to identify himself or herself even in the absence of circumstances that would justify a *Terry* stop-that is, even in the absence of a reasonable suspicion, based on objective facts, of criminal conduct. Indeed, this is just what happened here. The circumstances surrounding the two police officers' effort to compel Timmons to identify himself were not sufficient to justify even a *Terry* stop; for, when the two officers attempted to arrest Timmons because he refused to identify himself, they had already learned that Timmons was not engaged in a burglary as they had originally suspected.[FN6]

> FN6. It is clear from the record that the two officers disliked the fact that Timmons ran when they arrived. In *Terry,* the Supreme Court expressed a particular sensitivity to police misuse of field interrogations in black and other minority communities. The Court explained that the all too common friction between police and minority groups is severely exacerbated "where the 'stop and frisk' of youths or minority group members is motivated by the officers' perceived need to maintain the power image of the beat officer, an aim sometimes accomplished by humiliating anyone who attempts to undermine police control of the streets.' " 392 U.S. at 14 n. 11, 88 S.Ct. at 1876 n. 11,*quoting* L. Tiffany, D. McIntyre & D. Rotenberg, Detection of Crime: Stopping and Questioning, Search and Seizure, Encouragement and Entrapment (1967), 47-48.

In *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Supreme Court expressly condemned such police conduct as violative of the fourth amendment. The Court held that "to detain appellant and require him to identify himself violated the Fourth Amendment because the officers lacked any reasonable suspicion to believe appellant was engaged or had engaged in criminal conduct." *Id.,* at 52, 99 S.Ct. at 2641. The Court explained that

The Texas statute under which appellant was stopped and required to identify himself is designed to advance a weighty social objective in large metropolitan centers: prevention of crime. But even assuming that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it. When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits.

*Id.* The Court, however, reserved reaching whether a person may be punished for refusing to identify himself in the context of a justified *Terry* stop.

In *Lawson v. Kolender,* the Ninth Circuit did reach this issue, and found that a person may not be punished in such circumstances. 658 F.2d 1362, 1367-69 (9th Cir.1981). And, on Supreme Court review of the Ninth Circuit decision, Justice William J. Brennan, Jr. in a concurring opinion agreed with the Ninth Circuit. 461 U.S. at 363-69, 103 S.Ct. at 1860-64. As he explained, the scope of seizure permitted by *Terry* is "strictly circumscribed," *id.,* at 365, 103 S.Ct. at 1862; the "encounters must be brief; the suspect must not be moved or asked to move more than a short distance; physical searches are permitted only to the extent necessary to protect the police officers involved during the encounter;**\*1093** and, most importantly, the suspect must be free to leave after a short time and *to decline to answer the questions put to him.*" *Id.* (emphasis added). He then concluded that a government may not subvert these *Terry* restrictions "by making it a crime to refuse to answer police questions during a *Terry* encounter, any more than it could abridge the protections of the Fifth and Sixth Amendments by making it a crime to refuse to answer police questions once a suspect has been taken into custody." *Id.,* at 366-67, 103 S.Ct. at 1863.

658 F.Supp. 1086
**(Cite as: 658 F.Supp. 1086)**

This court agrees with Justice Brennan and the Ninth Circuit. Therefore, even if circumstances justified the two Montgomery police officers conducting a *Terry*-type stop, their attempt to arrest Timmons and to compel him to identify himself would still be unconstitutional.[FN7]

> FN7. Also, to the extent § 29-15(a)(6) criminalizes a person's failure to identify himself, fifth amendment concerns are implicated. *Kolender,* 461 U.S. at 360 n. 9, 103 S.Ct. 1859 n. 9. "It is a 'settled principle that while the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes they have no right to compel them to answer.' " *Id. quoting Davis v. Mississippi,* 394 U.S. 721, 727, n. 6, 89 S.Ct. 1394, 1397, n. 6, 22 L.Ed.2d 676 (1969). However, Timmons does not raise, and this court need not reach, such concerns.

### III.

In conclusion, the court holds that § 29-15(a)(6) is unconstitutional. The court further holds that the October 22, 1985, attempt to arrest Michael Timmons was also unconstitutional. An appropriate order will be entered.

M.D.Ala.,1987.
Timmons v. City of Montgomery, Ala.
658 F.Supp. 1086

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:06-cv-01057-WKW-WC    Document 30-2    Filed 01/18/2008    Page 322 of 618

**C**

U.S. v. Woods

C.A.11 (Ala.),2007.

This case was not selected for publication in the Federal Reporter.Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Eleventh Circuit Rules 36-2, 36-3. (Find CTA11 Rule 36-2 and Find CTA11 Rule 36-3)

United States Court of Appeals,Eleventh Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Claude Lee WOODS, Defendant-Appellant.

**No. 05-15999**

**Non-Argument Calendar.**

Feb. 9, 2007.

**Background:** Defendant was convicted in a jury trial in the United States District Court for the Middle District of Alabama of possession with intent to distribute 50 grams or more of methamphetamine. Defendant appealed.

**Holdings:** The Court of Appeals held that:

(1) traffic stop was lawful;

(2) officer had probable cause to support search of vehicle;

(3) evidence was sufficient to support conviction;

(4) that district court made drug quantity finding did not violate defendant's jury trial rights;

(5) defendant's prior convictions were properly counted separately for sentencing purposes;

(6) defendant was not eligible for reduced sentence for acceptance of responsibility; and

(7) sentence was not unreasonable.

Affirmed.

West Headnotes

**[1] Automobiles 48A ⧂349(6)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
            48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
                48Ak349(2) Grounds
                    48Ak349(6) k. Intoxication. Most Cited Cases

**Automobiles 48A ⧂349.5(3)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
            48Ak349.5 Search or Seizure Consequent to Arrest, Stop or Inquiry
                48Ak349.5(3) k. Stop or Arrest as Pretext or Ruse, in General. Most Cited Cases

Traffic stop was not pretextual but instead supported upon officers' probable cause to believe that a traffic violation had occurred, after observing defendant's vehicle weave over the fog line at least three times, indicating that the driver may have been under the influence of alcohol. U.S.C.A. Const.Amend. 4.

**[2] Automobiles 48A ⧂349.5(7)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
            48Ak349.5 Search or Seizure Consequent to Arrest, Stop or Inquiry
                48Ak349.5(5) Object, Product, Scope, and Conduct of Search or Inspection
                48Ak349.5(7) k. Drugs and Narcotics. Most Cited Cases

Police officers had probable cause to believe that contraband would be found in defendant's car during lawful traffic stop, thus supporting search of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

vehicle; both officers observed that defendant had an opened alcoholic beverage in his lap while driving, both officers observed rolling papers in the driver's side door that are commonly used to make marijuana cigarettes, and both officers smelled the faint odor of burnt marijuana. U.S.C.A. Const.Amend. 4.

**[3] Controlled Substances 96H ⬅81**

96H Controlled Substances
   96HIII Prosecutions
      96Hk70 Weight and Sufficiency of Evidence
         96Hk81 k. Possession for Sale or Distribution. Most Cited Cases
Evidence was sufficient to support conviction for possession with intent to distribute 50 grams or more of methamphetamine; the large amount of methamphetamine in defendant's possession, over 149 grams, and defendant's possession of materials related to drug distribution, including electronic scales, sandwich bags, and a large number of rolled $100 bills, supported a finding that defendant intended to distribute the methamphetamine. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), 21 U.S.C.A. § 841(a)(1).

**[4] Jury 230 ⬅34(8)**

230 Jury
   230II Right to Trial by Jury
      230k30 Denial or Infringement of Right
         230k34 Restriction or Invasion of Functions of Jury
         230k34(5) Sentencing Matters
           230k34(8) k. Drug Offenses. Most Cited Cases
That district court rather than jury made drug quantity finding for sentencing purposes did not violate *Booker* nor otherwise infringe upon defendant's jury trial rights, since district court did not consider the Guidelines mandatory when imposing the sentence. U.S.C.A. Const.Amend. 6; Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), 21 U.S.C.A. § 841(a)(1).

**[5] Sentencing and Punishment 350H ⬅796**

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
      350HIV(E) Prior or Subsequent Misconduct
         350Hk796 k. Number. Most Cited Cases
Defendant's prior convictions were properly counted separately rather than consolidated for purposes of determining his criminal history score for sentencing on instant drug trafficking conviction, as they were separated by intervening arrests. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), 21 U.S.C.A. § 841(a)(1); U.S.S.G. § 4A1.2(a)(2), 18 U.S.C.A.

**[6] Sentencing and Punishment 350H ⬅765**

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
      350HIV(C) Adjustments
         350HIV(C)3 Factors Decreasing Offense Level
           350Hk765 k. Acceptance of Responsibility. Most Cited Cases
Defendant did not accept responsibility for drug trafficking offense such that reduced sentence was warranted, as he went to trial and denied that he intended to distribute the methamphetamine. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), 21 U.S.C.A. § 841(a)(1); U.S.S.G. § 3E1.1, 18 U.S.C.A.

**[7] Controlled Substances 96H ⬅100(2)**

96H Controlled Substances
   96HIII Prosecutions
      96Hk100 Sentence and Punishment
         96Hk100(2) k. Extent of Punishment. Most Cited Cases

**Sentencing and Punishment 350H ⬅373**

350H Sentencing and Punishment
   350HII Sentencing Proceedings in General
      350HII(G) Hearing
         350Hk369 Findings and Statement of Reasons
         350Hk373 k. Sufficiency. Most Cited Cases

216 Fed.Appx. 931, 2007 WL 431156 (C.A.11 (Ala.))
**(Cite as: 216 Fed.Appx. 931)**

**Sentencing and Punishment 350H ⬤━651**

350H Sentencing and Punishment
    350HIV Sentencing Guidelines
       350HIV(A) In General
          350Hk651 k. Operation and Effect of Guidelines in General. Most Cited Cases
Imposition of 262-month sentence for drug trafficking conviction was not unreasonable; district court properly calculated defendant's guideline range, district court not only stated that it had considered the statutory sentencing factors, but specifically listed the ones it found most important in defendant's case, district court stated that a lower sentence would have been insufficient to accomplish the goals of the factors, and district court sentenced defendant within the guideline range. 18 U.S.C.A. § 3553(a); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), 21 U.S.C.A. § 841(a)(1).

**[8] Criminal Law 110 ⬤━577.10(9)**

110 Criminal Law
    110XVIII Time of Trial
       110XVIII(B) Decisions Subsequent to 1966
          110k577.10 Factors Affecting Application of Requirements in General
            110k577.10(9) k. Consent to or Waiver of Delay. Most Cited Cases
Defendant waived any right to have drug trafficking prosecution dismissed for violation of Speedy Trial Act, as he did not move for dismissal until the sentencing hearing, after his trial and conviction. 18 U.S.C.A. § 3162(a)(2); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), 21 U.S.C.A. § 841(a)(1).

**[9] Double Jeopardy 135H ⬤━25**

135H Double Jeopardy
    135HII Proceedings, Offenses, Punishments, and Persons Involved or Affected
      135Hk25 k. Fines, Penalties, and Forfeitures. Most Cited Cases

**Double Jeopardy 135H ⬤━186**

135H Double Jeopardy
    135HV Offenses, Elements, and Issues Foreclosed
      135HV(C) Identity of Parties
        135Hk183 Offenses Against Different Sovereignties or Governmental Units
          135Hk186 k. Offenses Against United States and a State or Territory. Most Cited Cases
That defendant was subject to civil forfeiture by the state and drug trafficking prosecution by the federal government as result of same criminal conduct did not violate his right of protection against double jeopardy, as civil forfeiture was not punishment, and civil forfeiture was done by the city whereas criminal case was prosecuted by the federal government, and the state and federal government were separate sovereigns. U.S.C.A. Const.Amend. 5; Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), 21 U.S.C.A. § 841(a)(1).

**\*932** Susan Graham James, The Law Office of Susan G. James, Montgomery, AL, for Defendant-Appellant.
Susan Redmond, Montgomery, AL, for Plaintiff-Appellee.

**\*933** Appeal from the United States District Court for the Middle District of Alabama. D.C. Docket No. 04-00012-CR-F-S.

Before ANDERSON, DUBINA and BARKETT, Circuit Judges.

PER CURIAM:

  **\*\*1** Appellant Claude Lee Woods appeals the district court's order denying his motion to suppress evidence discovered during a search of his car. He also appeals his conviction and 262-month sentence, imposed after a jury found him guilty of possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Finally, Woods appeals the district court's order denying his motion to dismiss for violation of his speedy trial and double jeopardy rights.

  This case involved a warrantless search of Woods's car, during which police officers found

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

more than 149 grams of methamphetamine and other drug paraphernalia. Woods argues that there was no probable cause for the police officers to stop him or to perform a search of his car. Woods also argues that there is insufficient evidence to support a finding that he intended to distribute methamphetamine. Further, he contends that the district court erred in calculating his guideline sentence range and imposed an unreasonable sentence. Finally, Woods alleges that the district court erred in denying his motion to dismiss for violation of his speedy trial rights because too much time passed between his indictment and trial, and for violation of his double jeopardy rights because, he alleges, the state civil forfeiture of his property should have barred the federal prosecution.

### I. Motion to Suppress

[1][2] In reviewing a district court's denial of a motion to suppress, we employ a mixed standard of review. *United States v. Simms,* 385 F.3d 1347, 1356 (11th Cir.2004). We review the district court's findings of fact for clear error, and the district court's application of the law to those facts *de novo. Id.*"[W]hen considering a ruling on a motion to suppress, all facts are construed in the light most favorable to the party prevailing in the district court," which is the government in this case. *United States v. Hromada,* 49 F.3d 685, 688 (11th Cir.1995).

The Fourth Amendment guarantees that individuals will be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States,* 517 U.S. 806, 809-10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Therefore, an automobile stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.* at 810, 116 S.Ct. at 1772. The "decision to stop an automobile is reasonable where the police have probable cause to believe

that a traffic violation has occurred." *Id.* Alabama law prohibits individuals from operating motor vehicles if they are under the influence of alcohol. ALA.CODE § 32-5A-191(a).

Regarding the scope of a law enforcement officer's ability to search a suspect, his possessions, or his residence, "[t]he Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson,* 527 U.S. 465, 466, 119 S.Ct. 2013, 2014, 144 L.Ed.2d 442 (1999). Searches of vehicles, however, are an established exception to the requirement for a warrant. *Id.* The automobile**934** exception allows officers to search any item or compartment in the car that might contain the object of the search without a warrant, as long as they have probable cause to believe that it holds evidence of a crime. *United States v. Strickland,* 902 F.2d 937, 942 (11th Cir.1990). The automobile exception does not contain a separate exigency requirement. *Dyson,* 527 U.S. at 466-67, 119 S.Ct. at 2014. "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more." *Id.* at 467, 119 S.Ct. at 2014 (quotation omitted). "[T]he requirement of exigent circumstances is satisfied by the 'ready mobility' *inherent* in all automobiles that reasonably appear to be capable of functioning." *United States v. Nixon,* 918 F.2d 895, 903 (11th Cir.1990).

**\*\*2** We decide probable cause issues on an objective basis, without regard to the law enforcement officers' subjective beliefs. *Craig v. Singletary,* 127 F.3d 1030, 1042 (11th Cir.1997). "Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Magluta,* 418 F.3d 1166, 1182 (11th Cir.2005) (quotations omitted), *cert. denied,*--- U.S. ----, 126 S.Ct. 2966, 165 L.Ed.2d 949 (2006).

Here, we conclude from the record that the district court correctly denied Woods's motion to suppress because there was probable cause for the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:06-cv-01057-WKW-WC    Document 30-2    Filed 01/18/2008    Page 326 of 618

traffic stop and probable cause for the search of Woods's car. First, construing the evidence in the light most favorable to the government, the traffic stop was not pretextual because the officers observed Woods weave over the fog line at least three times. This weaving was sufficient to establish probable cause that a traffic violation occurred because weaving indicates that the driver may be under the influence of alcohol, which is a traffic violation in Alabama. *See Strickland,* 902 F.2d at 939-41; ALA.CODE § 32-5A-191(a).

Second, the officers had probable cause to search Woods's car, making the search lawful. *See Magluta,* 418 F.3d at 1182. Both police officers observed that Woods had an opened alcoholic beverage in his lap while driving. They also observed rolling papers in the driver's side door that are commonly used to make marijuana cigarettes. Both officers smelled the faint odor of burnt marijuana. Given all of these observations, the officers had probable cause to believe that contraband would be found in the car. We conclude that the district court properly denied Woods's motion to suppress because the warrantless search was legal under the automobile exception.

## II. Sufficiency of the Evidence

[3] We review "challenges to the sufficiency of the evidence *de novo,* viewing the evidence in the light most favorable to the government." *United States v. Futrell,* 209 F.3d 1286, 1288 (11th Cir.2000). "A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." *United States v. Chastain,* 198 F.3d 1338, 1351 (11th Cir.1999). We do not consider the sufficiency of the evidence to prove elements that are not challenged on appeal. *See United States v. Starrett,* 55 F.3d 1525, 1541-42 (11th Cir.1995).

Section 841(a)(1) of Title 21of the U.S.Code defines the offense of which Woods was convicted and states that "it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufac-

ture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). **\*935** In order to convict a defendant of possession with the intent to distribute methamphetamine, the government must establish three elements: "(1) knowledge; (2) possession; and (3) intent to distribute." *United States v. Gamboa,* 166 F.3d 1327, 1331 (11th Cir.1999) (quotation omitted). The intent to distribute may be inferred from the amount of drugs involved. *United States v. Hernandez,* 433 F.3d 1328, 1333 (11th Cir.2005), *cert. denied,*547 U.S. 1047, 126 S.Ct. 1635, 164 L.Ed.2d 346 (2006).

**\*\*3** In the present case, Woods only challenges whether the evidence is sufficient to show that he intended to distribute the methamphetamine and does not dispute any other element of the offense. Woods's argument that insufficient evidence supports the conviction because the government did not show evidence of drug sales, but only of possession of a large amount of drugs, fails. Viewing the evidence in the light most favorable to the government, the large amount of methamphetamine in Woods's possession, over 149 grams, and Woods's possession of materials related to drug distribution, including electronic scales, sandwich bags, and a large number of rolled $ 100 bills, support a finding that Woods intended to distribute the methamphetamine. Therefore, we affirm Woods's conviction.

## III. Sentencing Guidelines

### A. Calculation of Guidelines Range

Although the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), rendered the Guidelines advisory and established a reasonableness standard for reviewing the ultimate sentence imposed on a defendant, the district court still is obligated to consult the Guidelines and "calculate *correctly* the sentencing range prescribed by the Guidelines." *United States v. Crawford,* 407 F.3d 1174, 1178 (11th Cir.2005). In this appeal, Woods challenges whether the district court correctly calculated his guidelines range because he argues the

216 Fed.Appx. 931, 2007 WL 431156 (C.A.11 (Ala.))

**(Cite as: 216 Fed.Appx. 931)**

court made factual findings in violation of the Sixth Amendment, based its calculation on prior convictions that had been consolidated for sentencing, and failed to give a two-level decrease for acceptance of responsibility.

### 1. *Enhancements Not Found By the Jury*

[4] Woods argues that his Sixth Amendment right to a trial by jury was violated by judicial fact-finding at the sentencing hearing. The Sixth Amendment right to trial by jury is violated where, under a mandatory guidelines system, a sentence is increased because of an enhancement based on facts found by the judge that were neither admitted by the defendant nor found by the jury. *See Booker,* 543 U.S. at 249-53, 125 S.Ct. at 759-61. However, a constitutional error only occurs where the sentencing judge applies the Guidelines as if they are mandatory after using extra-verdict enhancements to reach a guidelines range. *See United States v. Rodriguez,* 398 F.3d 1291, 1301 (11th Cir.), *cert. denied,* 545 U.S. 1127, 125 S.Ct. 2935, 162 L.Ed.2d 866 (2005).

Here, Woods's argument presumably refers to the enhancement for the drug quantity involved in the offense. Although the district court had to determine the amount of drugs involved in order to set the base offense level, it did not consider the Guidelines mandatory when imposing the sentence. *See Rodriguez,* 398 F.3d at 1301. Therefore, Woods's argument that his Sixth Amendment rights were violated by judicial fact-finding fails.

### *936 2. *Criminal History*

[5] Woods argues that several of his prior convictions should not have been counted separately when determining his criminal history score because the convictions had been consolidated for sentencing purposes. Section 4A1.2 of the Guidelines provides, "Prior sentences imposed in unrelated cases are to be counted separately." U.S.S.G. § 4A1.2(a)(2). Unrelated cases are those where an intervening arrest occurred between of-

fenses. *Id.,* comment. (n.3). If there was no intervening arrest and the offenses were consolidated for sentencing purposes, the cases are considered related. *Id.*

**\*\*4** After reviewing the record, we conclude that Woods's prior convictions were properly counted separately when determining his criminal history score because they were separated by intervening arrests. Therefore, Woods's criminal history score was calculated correctly.

### 3. *U.S.S.G. § 3E1.1*

[6] Woods argues that the district court should have given him a downward adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1. We review the district court's decision whether to adjust a sentence for acceptance of responsibility only for clear error. *United States v. Brenson,* 104 F.3d 1267, 1288 (11th Cir.1997). Section 3E1.1(a) of the Guidelines states, "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." U.S.S.G. § 3E1.1(a). The commentary to § 3E1.1 provides,

This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for [the acceptance of responsibility] reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur ... where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt.... [H]owever, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

*Id.,* comment. (n.2). Applying this commentary, we have held that where a defendant denied an essential element of the crime at trial and where the decision to proceed to trial was not to challenge the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

applicability or constitutionality of the statute, the trial court's decision to deny an acceptance of responsibility reduction was not clear error. *See Brenson,* 104 F.3d at 1289.

The record demonstrates that Woods went to trial and denied that he intended to distribute the methamphetamine. Intent to distribute was an element of the crime for which he was indicted. *See Gamboa,* 166 F.3d at 1331. Because Woods disputed an element of the crime at trial, we conclude that the district court did not clearly err in finding that he failed to qualify for an acceptance of responsibility reduction. *See*U.S.S.G. § 3E1.1, comment. (n.2).

### B. Reasonableness of Sentence

[7] We review final sentences for reasonableness, and the defendant has the burden of establishing that the sentence is unreasonable. *United States v. Talley,* 431 F.3d 784, 788 (11th Cir.2005). "Review for reasonableness is deferential." *Id.* Following *Booker,* we held that, in imposing a sentence, the district court **\*937** must first accurately calculate the defendant's guideline range and, second, consider the factors set forth in 18 U.S.C. § 3553(a) to determine a reasonable sentence. *Id.* at 786. The § 3553(a) factors include:

**\*\*5** (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims.

*Id.* (citing 18 U.S.C. § 3553(a)). However, "nothing in Booker or elsewhere requires the district court to state on the record that it has explicitly considered each of the 3553(a) factors or to discuss

each of the 3553(a) factors." *United States v. Scott,* 426 F.3d 1324, 1329 (11th Cir.2005). Rather it is sufficient, under *Booker,* for the district court to acknowledge that "it has considered the defendant's arguments and the factors in section 3553(a)." Talley, 431 F.3d at 786. In addition, while a sentence within the guidelines range is not per se reasonable, it is expected to be reasonable. *Id.* at 788.

Woods's sentence is reasonable. First, as discussed above, the district court properly calculated Woods's guideline range. Second, the district court not only stated that it had considered the 18 U.S.C. § 3553(a) factors, but specifically listed the ones it found most important in Woods's case. Third, the district court stated that a lower sentence would have been insufficient to accomplish the goals of the § 3553(a) factors. Fourth, the district court sentenced Woods within the guideline range. Because the district court properly calculated the guidelines range and imposed a reasonable sentence, we affirm Woods's sentence.

### IV. Motion to Dismiss

### A. Speedy Trial

[8] Woods does not indicate whether his motion to dismiss for violation of his speedy trial rights relies on the Speedy Trial Act or the Speedy Trial Clause of the Constitution. However, Woods's arguments before the sentencing court concerning a specific number of days allowed between phases of a criminal prosecution indicates that he relied on the Speedy Trial Act.[FN1] We review a claim under the Speedy Trial Act *de novo. United States v. Dunn,* 345 F.3d 1285, 1288 (11th Cir.2003). The Speedy Trial Act provides, in pertinent part, that "[f]ailure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section." 18 U.S.C. § 3162(a)(2); *United States v. Miles,* 290 F.3d 1341, 1349 n. 5 (11th Cir.2002).

FN1. Although we address Woods's argu-

ment under the Speedy Trial Act, Woods's argument would also fail under the Speedy Trial Clause because he caused any delay that existed between his indictment and trial, given that he was in state prison after the indictment and filed two written and signed speedy trial waivers before his trial commenced. *See United States v. Clark,* 83 F.3d 1350, 1353 (11th Cir.1996); *United States v. Twitty,* 107 F.3d 1482, 1490 (11th Cir.1997).

The record demonstrates that Woods did not move for dismissal until the sentencing hearing, after his trial and conviction.**938** Therefore, Woods waived any right to have the case dismissed for violation of the Speedy Trial Act, *see* 18 U.S.C. § 3162(a)(2); *Miles,* 290 F.3d at 1349 n. 5, and we affirm the district court's denial of his motion to dismiss for violation of speedy trial rights.

### B. Double Jeopardy

**\*\*6** [9] We review *de novo* a district court's ruling on double jeopardy. *United States v. Baptista-Rodriguez,* 17 F.3d 1354, 1360 (11th Cir.1994). The Double Jeopardy Clause provides that "[n]o person shall ... be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. This constitutional safeguard is founded on the principle that

the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187-88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957). The Double Jeopardy Clause protects defendants in three situations: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense. *Jones v. Thomas,* 491

U.S. 376, 380-81, 109 S.Ct. 2522, 2525, 105 L.Ed.2d 322 (1989).

The Double Jeopardy Clause applies to proceedings that are "essentially criminal," as well as to criminal proceedings. *See Helvering v. Mitchell,* 303 U.S. 391, 398-99, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938). The Double Jeopardy Clause does not apply in several contexts. For example, because they are *in rem* proceedings in which the government proceeds against property, civil forfeiture proceedings are not criminal proceedings against the defendant. *Waterloo Distilling Corp. v. United States,* 282 U.S. 577, 581, 51 S.Ct. 282, 284, 75 L.Ed. 558 (1931).

Double Jeopardy issues also may arise when more than one sovereign prosecutes the defendant. Convictions on identical offenses with identical elements do not violate the Double Jeopardy Clause when the charges arose in two separate sovereigns. *United States v. 817 N.E. 29th Drive, Wilton Manors, Fla.,* 175 F.3d 1304, 1311 (11th Cir.1999). This is based upon the common law concept that a crime is an offense against the sovereignty of a government. *Heath v. Alabama,* 474 U.S. 82, 88, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985). Thus, the Double Jeopardy Clause does not bar successive prosecutions by a state and the federal government. *817 N.E. 29th Drive,* 175 F.3d at 1311.

Woods argues that the federal prosecution violated his double jeopardy rights because the state had already civilly forfeited his property, and the two proceedings constituted two punishments for the same crime. Woods's arguments are without merit. First, civil forfeitures are not punishment under the Double Jeopardy Clause and, therefore, the federal prosecution and punishment was not a second jeopardy. *See Waterloo Distilling Corp.,* 282 U.S. at 581, 51 S.Ct. at 284. Second, the civil forfeiture was done by the City of Dothan in the State of Alabama, whereas this case was prosecuted by the federal government. The State of Alabama and the federal government are separate sovereigns, and each may prosecute Woods for his violation of each sovereign's laws. *See 817 N.E. 29th Drive,* 175

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

216 Fed.Appx. 931, 2007 WL 431156 (C.A.11 (Ala.))
**(Cite as: 216 Fed.Appx. 931)**

F.3d at 1311. Therefore, we conclude that the district court did not violate Woods's double jeopardy**939** rights, and we affirm the district court's denial of Woods's motion to dismiss.

### V. Conclusion

**\*\*7** For the above-stated reasons, we affirm the district court's orders denying Woods's motion to suppress and his motion to dismiss. We also affirm Woods's conviction and sentence.

**AFFIRMED.**

C.A.11 (Ala.),2007.
U.S. v. Woods
216 Fed.Appx. 931, 2007 WL 431156 (C.A.11 (Ala.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 F.3d 1341                                                                                         Page 1
280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280
**(Cite as: 280 F.3d 1341)**


Rodriguez v. Farrell
C.A.11 (Fla.),2002.

United States Court of Appeals,Eleventh Circuit.
Joe John RODRIGUEZ, Plaintiff-Appellee,
v.
Wayne W. FARRELL, Lois Szczepanski, Defendants-
Appellants.
**No. 00-13147.**

Jan. 30, 2002.

Suspect brought § 1983 action against police officers,
alleging that they violated his Fourth Amendment rights
in making arrest. Officers moved for summary judg-
ment on qualified immunity grounds. The United States
District Court for the Middle District of Florida, No.
98-00997-CV-ORL-19A,Patricia C. Fawsett, J., denied
motion. Officers appealed. The Court of Appeals, Ed-
mondson, Circuit Judge, held that: (1) arrest of suspect
pursuant to execution of valid warrant for person other
than suspect was reasonable mistake, and thus did not
violate Fourth Amendment; (2) even if officers violated
Fourth Amendment, they were qualifiedly immune; and
(3) officer's alleged actions in handcuffing defendant
did not constitute excessive force.

Reversed and remanded.

West Headnotes

**[1] Arrest 35 €═63.4(2)**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest Without
Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(2) k. What Constitutes Such Cause
in General. Most Cited Cases

**Civil Rights 78 €═1088(4)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited
in General

        78k1088 Police, Investigative, or Law Enforce-
ment Activities
            78k1088(4) k. Arrest and Detention. Most
Cited Cases
    (Formerly 78k133)
The "reasonable mistake" standard for determining
whether there is probable cause to make an arrest ap-
plies (1) in the context of a § 1983 action and (2) when
the police have a valid warrant, as opposed to just prob-
able cause, to arrest someone, but mistakenly arrest
someone else due to a misidentification. U.S.C.A.
Const.Amend. 4; 42 U.S.C.A. § 1983.

**[2] Arrest 35 €═65**

35 Arrest
    35II On Criminal Charges
        35k65 k. Authority Under Warrant. Most Cited
Cases
Arrest of suspect, pursuant to execution in field of valid
arrest warrant for person other than suspect, was reason-
able mistake, and thus did not violate Fourth Amend-
ment, even though suspect said he was 5'11" tall while
warrant listed height as 5'6", where suspect and person
named in warrant had same name, sex, age, and race,
they had similar Social Security numbers, they had ad-
dresses in neighboring towns, they were born in same
state, suspect had no fewer tattoos than person named in
warrant, and many of the tattoos were in same locations.
U.S.C.A. Const.Amend. 4.

**[3] Arrest 35 €═63.1**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest Without
Warrant
            35k63.1 k. In General. Most Cited Cases
The Court of Appeals must evaluate the totality of the
circumstances surrounding an arrest to determine its
reasonableness under the Fourth Amendment. U.S.C.A.
Const.Amend. 4.

**[4] Arrest 35 €═65**

35 Arrest

280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280
**(Cite as: 280 F.3d 1341)**

35II On Criminal Charges
    35k65 k. Authority Under Warrant. Most Cited Cases
The variability of eye color, given contact lenses, of scars, given cosmetic surgery, and of weight lessens the importance of differences in these characteristics for purposes of determining if an arrest of a suspect in the field pursuant to a warrant for someone other than the suspect is reasonable. U.S.C.A. Const.Amend. 4.

**[5] Arrest 35 ⬡65**

35 Arrest
    35II On Criminal Charges
       35k65 k. Authority Under Warrant. Most Cited Cases
Not every discrepancy in such things as height would demand that a policeman refrain from executing an arrest warrant. U.S.C.A. Const.Amend. 4.

**[6] Arrest 35 ⬡65**

35 Arrest
    35II On Criminal Charges
       35k65 k. Authority Under Warrant. Most Cited Cases
There are limits on how much independent investigating an officer must make before executing an arrest warrant, even when the arrested person is asserting a claim of mistaken identity. U.S.C.A. Const.Amend. 4.

**[7] Arrest 35 ⬡63.5(4)**

35 Arrest
    35II On Criminal Charges
      35k63.5 Investigatory Stop or Stop-And-Frisk
        35k63.5(3) Grounds for Stop or Investigation
          35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases
The circumstances that justify a lawful arrest also justify a brief detention incident to the arrest. U.S.C.A. Const.Amend. 4.

**[8] Civil Rights 78 ⬡1376(6)**

78 Civil Rights
    78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
        78k1376 Government Agencies and Officers
          78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
    (Formerly 78k214(6))
Even assuming that police officers violated suspect's Fourth Amendment rights by arresting him in the field pursuant to valid arrest warrant for person other than suspect, where suspect and person named in warrant shared many common characteristics but differed in height by five inches, such constitutional violation was not clearly established in Florida in 1995 when arrest occurred, and officers thus were qualifiedly immune from suspect's § 1983 claim; no Eleventh Circuit, United States Supreme Court, or Florida Supreme Court case could be found holding an officer liable for misidentifying arrestee when executing valid arrest warrant. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[9] Arrest 35 ⬡68(2)**

35 Arrest
    35II On Criminal Charges
      35k68 Mode of Making Arrest
        35k68(2) k. Use of Force. Most Cited Cases
Police officer's alleged actions of grabbing arrestee's arm, twisting it around his back, jerking it up high to shoulder and then handcuffing suspect as suspect fell to his knees screaming that officer was hurting him, placing him in rear of patrol car, and removing handcuffs minutes after arrival at police department, with alleged resulting complications of 25 surgeries and amputation of arm below elbow, did not constitute excessive force in violation of Fourth Amendment, absent evidence that officer knew of suspect's recent elbow surgery or that handcuffing him would seriously aggravate his preexisting condition. U.S.C.A. Const.Amend. 4.

**[10] Arrest 35 ⬡68(2)**

35 Arrest
    35II On Criminal Charges
      35k68 Mode of Making Arrest
        35k68(2) k. Use of Force. Most Cited Cases
The use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment. U.S.C.A. Const.Amend. 4.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280
**(Cite as: 280 F.3d 1341)**

**[11] Arrest 35 ⚖68(2)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases
The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. U.S.C.A. Const.Amend. 4.

**[12] Arrest 35 ⚖68(2)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases
The Court of Appeals recognizes, for purposes of determining whether an arrest involves excessive force in violation of the Fourth Amendment, that the typical arrest involves some force and injury. U.S.C.A. Const.Amend. 4.

**[13] Arrest 35 ⚖68(2)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases
Painful handcuffing in the course of arrest, without more, is not excessive force in cases where the resulting injuries are minimal. U.S.C.A. Const.Amend. 4.

**[14] Municipal Corporations 268 ⚖747(3)**

268 Municipal Corporations
    268XII Torts
        268XII(B) Acts or Omissions of Officers or Agents
        268k747 Particular Officers and Official Acts
            268k747(3) k. Police and Fire. Most Cited Cases
Court of Appeals does not use hindsight to judge the acts of police officers for purposes of qualified immunity; it looks at what they knew or reasonably should have known at the time of the act.

**[15] Arrest 35 ⚖68(2)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases
What would ordinarily be considered reasonable force in making an arrest does not become excessive force when the force aggravates, however severely, a pre-existing condition the extent of which was unknown to the officer at the time. U.S.C.A. Const.Amend. 4.

**\*1342** Jeffrey Arthur Rynor, Loren H. Cohen, Mitrani, Rynor & Gallegos, P.A., Miami, FL, for Defendants-Appellants.
**\*1343** Jon H. Gutmacher, Orlando, FL, for Plaintiff-Appellee.

Appeal from the United States District Court for the Middle District of Florida.

Before EDMONDSON and RONEY, Circuit Judges, and JORDAN[FN*], District Judge.

        FN* Honorable Adalberto J. Jordan, U.S. District Judge for the Southern District of Florida, sitting by designation.

EDMONDSON, Circuit Judge:

    This appeal is about an arrest, the Fourth Amendment, and mistaken identity. Joe John Rodriguez sued Sergeant Wayne Farrell ("Sgt.Farrell") and Officer Lorri Szczepanski ("Officer Szczepanski"), under 42 U.S.C. § 1983, alleging that the police officers violated the Constitution when they mistakenly arrested him pursuant to a valid arrest warrant for another person. Sgt. Farrell and Officer Szczepanski, in their personal capacities, appeal the district court's denial of qualified immunity. We reverse.

FACTS[FN1]

    FN1. Because this appeal is from the denial of summary judgment, we must view the evidence in the light most favorable to the plaintiff. *Hudson v. Hall,* 231 F.3d 1289, 1292 n. 2 (11th Cir.2000). "But, we stress that the 'facts' set out in this opinion-the 'facts' that we must as-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sume for the purposes of this appeal-may turn out not to be the actual facts of this case." *Id.*

On 8 September 1995 at 12:10 a.m., Officer Szczepanski pulled over a vehicle driven by Patricia Foulkes ("Ms.Foulkes"): the vehicle had a broken tag light. Rodriguez was the only passenger in Ms. Foulkes's car. Shortly after the initial traffic stop, Sgt. Farrell arrived to provide backup.

Officer Szczepanski told Ms. Foulkes to get out of the car and then asked for her driver's license. After Ms. Foulkes said that her driver's license was in her purse which was in her car, Officer Szczepanski returned to the car and asked Rodriguez, who was seated in the car with his arm in a sling and resting on a pillow,[FN2] to hand her Ms. Foulkes's purse. After Rodriguez handed her Ms. Foulkes's purse, Officer Szczepanski directed Rodriguez to get out of the vehicle. Rodriguez complied and walked around freely beside the vehicle. But, before Rodriguez got out of the vehicle, he removed his sling. Because Rodriguez was wearing a long-sleeve shirt (after he had removed his sling), nothing outwardly indicated that Rodriguez's arm was injured.

> FN2. Rodriguez had severely injured his arm in a motorcycle accident.

Officer Szczepanski returned to Ms. Foulkes, found unlawful drugs (methamphetamine, as well as others) in her purse, and arrested her. Officer Szczepanski thereafter began to search Ms. Foulkes's car. Then, Sgt. Farrell-who, to this point, had only been observing the situation from a position behind Ms. Foulkes's car[FN3]-approached Rodriguez.

> FN3. Rodriguez testified at his deposition that Sgt. Farrell was behind the car and that he could see the Sergeant in one of the car mirrors. Rodriguez also testified that the interior of the car was "dark."

Sgt. Farrell asked Rodriguez for identification. Rodriguez directed Sgt. Farrell's attention to a duffle bag, which contained more than ten pieces of identification, including Rodriguez's Florida driver's license, birth certificate, military discharge papers, social security card, credit card, and V.A. patient data card.[FN4]

Sgt. Farrell, *1344 after obtaining consent from Rodriguez, searched the duffle bag and removed the driver's license from the organizer that contained Rodriguez's identifications. During the search, Sgt. Farrell noticed several prescription-drug bottles and questioned Rodriguez about their purpose. Rodriguez told the Sergeant that he had just gotten out of the hospital after a motorcycle wreck. Sgt. Farrell also briefly looked at a collection of hospital records[FN5] that were in the duffle bag.

> FN4. Rodriguez had this extraordinary collection of identifications with him to apply for benefits.

> FN5. Rodriguez testified at his deposition that he did not know the extent of these records. But, he believed that they were fewer than 100 pages, covered the motorcycle accident, and were for the purpose of applying for disability benefits.

Sgt. Farrell called dispatch over his radio and ran a check on Rodriguez's driver's license information. The dispatcher responded, "no wants or warrants." Sgt. Farrell continued to talk with the dispatcher when a "name hit" was obtained on Rodriguez's name. Teletype communications to the dispatcher indicated that three warrants existed for a Victor Heredia who used the alias "Joe Rodriguez."[FN6] Heredia was wanted by the St. Johns County, Florida Sheriff's Department for several charges, including possession of cocaine.[FN7] The dispatcher relayed descriptive information from the warrant to Sgt. Farrell.

> FN6. The warrant for Heredia was almost six years old.

> FN7. The other two charges were for unlawful use of a driver's license and driving with a license that was suspended or revoked.

The following chart lists relevant descriptive information from the warrant that was available and the corresponding information for Rodriguez:

280 F.3d 1406
280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280
**(Cite as: 280 F.3d 1341)**

| Name: | Victor Manuel Heredia | Joe John Rodriguez |
|---|---|---|
| | a/k/a Joe Rodriguez | |
| Sex: | Male | Male |
| Race: | White | White |
| Date/Birth: | ███████ | ██████ |
| | 7/2/53; 6/23/53(multiple) | |
| Place/Birth: | New York | New York |
| SSN: | ██████████ ██████████ ██████████ (multiple) | ████████████ |
| Tattoos | 4 tattoos: right forearm, left arm, right arm, back | 6 tattoos: both biceps, both shoulder blades; both ankles (none on right forearm) |
| Height: | 5'6" | 5'11" |
| Weight: | 139 lbs. | 180 lbs. |
| Hair Color: | Brown | Brown |
| Eye Color: | Green | Brown |
| Scar | Scar: forehead | No scar |
| Residence: | St. Augustine, Florida | Apopka, Florida |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280
**(Cite as: 280 F.3d 1341)**

-----

After Sgt. Farrell received identifying information from the dispatcher, Sgt. Farrell**\*1345** approached Rodriguez and questioned him about two of his physical characteristics: height and tattoos. Sgt. Farrell first asked Rodriguez his height. Rodriguez responded by claiming he was 5'11". Sgt. Farrell disagreed, stating: "No way, I'm 5'11", you're shorter than me." Rodriguez claims that Sgt. Farrell was standing on a curb when Farrell made this statement. Sgt. Farrell then focused on Rodriguez's tattoos. Convinced by the fact that Rodriguez had at least four tattoos (he had six) and that the locations of the first two identified by Rodriguez were in the locations listed in the warrant, Sgt. Farrell arrested Rodriguez on the Heredia warrant.

When Sgt. Farrell arrested Rodriguez, Sgt. Farrell grabbed Rodriguez's left arm, twisted it behind Rodriguez's back, and forced it up to just below the shoulderblade. Rodriguez fell to the ground screaming in pain, telling Sgt. Farrell that he was hurting his arm.FN8 Sgt. Farrell ignored Rodriguez's screams, completed the cuffing, and took Rodriguez to the station. After arriving at the station roughly 10 minutes later, Rodriguez was placed in a holding cell and his cuffs were removed.

> FN8. Rodriguez testified at his deposition that he, before the arrest began, did not tell Sgt. Farrell that his arm was injured.

### DISCUSSION

"Qualified immunity protects government officials performing discretionary functions ... from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Lassiter v. Alabama A&M Univ., Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc).

"Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." *Id.* Whether a defendant official has violated a constitutional right at all is, of course, "a 'necessary concomitant' to the question of qualified immunity: if a defendant has not violated the law at all, he certainly has not violated clearly established law." *Hudson v. Hall,* 231 F.3d 1289, 1294 (11th Cir.2000) (quoting *GJR Investments, Inc. v. County of Escambia,* 132 F.3d 1359, 1366-67 (11th Cir.1998)).

### A. The Arrest

#### 1. Constitutional Violation

"A warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim." *Ortega v. Christian,* 85 F.3d 1521, 1525 (11th Cir.1996). We conclude that no violation occurred in this case. In reaching this conclusion, the Supreme Court's opinion in *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), and various cases from the Seventh Circuit (as well as other circuits) guide our determination.

In *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), the Supreme Court determined, in a criminal case, whether the mistaken arrest of one person (for whom no probable cause to arrest existed) based upon the misidentification of that person as a second person (for whom probable cause to arrest existed) violated the Constitution. The Court concluded "no," writing that "[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the **\*1346** arrest of the second party is a valid arrest." *Id.* at 802, 91 S.Ct. 1106 (alteration in original).

[1][2] The same "reasonable mistake" standard applies (1) in the context of a section 1983 action and (2) when the police have a valid warrant-as opposed to just probable cause-to arrest someone, but mistakenly arrest someone else due to a misidentification. *E.g., White v. Olig,* 56 F.3d 817, 820 (7th Cir.1995) (using *Hill* "reasonable mistake" standard in section 1983 case and determining that mistaken arrest pursuant to valid war-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280
**(Cite as: 280 F.3d 1341)**

rant was reasonable); *cf. Rodriguez v. Jones,* 473 F.2d 599, 605-06 (5th Cir.1973) (concluding plaintiff could not recover, under section 1983, against officers who forcibly entered plaintiff's residence pursuant to mistaken belief that two fugitives named in arrest warrants were in residence because officers' mistaken belief was reasonable under the circumstances). *See generally* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated.") (emphasis added). We must, therefore, determine as a legal matter whether Sgt. Farrell and Officer Szczepanski's mistaken arrest of Rodriguez-pursuant to the execution, in the field, of a valid arrest warrant for Heredia-was outside the scope of "reasonable mistakes."

The Eleventh Circuit has no precedents for what constitutes an unreasonable seizure due to a mistaken identification and arrest under a valid warrant in the field. The Seventh Circuit, however, has addressed this problem in several opinions: their discussions guide us today.[FN9] In *Johnson v. Miller,* 680 F.2d 39, 42 (7th Cir.1982), the court concluded, as a matter of law, that a police officer's misidentification arrest of a white woman pursuant to an arrest warrant for a black woman did not violate the Constitution. In *Patton v. Przybylski,* 822 F.2d 697, 698-99 (7th Cir.1987), the court concluded that a police officer's misidentification arrest of the plaintiff-a black man with the same name as a black man listed in an arrest warrant-was, as a matter of law, a reasonable mistake that did not violate the Constitution, although plaintiff's driver's license was from a different state, listed an address different from the one in the arrest warrant, and listed plaintiff's date of birth as different from the one in the arrest warrant. In *Brown v. Patterson,* 823 F.2d 167, 169 (7th Cir.1987), the court concluded that a police officer's misidentification arrest of the plaintiff-a black man with the same name as the alias[FN10] of a black man listed in an arrest warrant-was, as a matter of law, a reasonable mistake that did not violate the Constitution, although the plaintiff's driver's license listed an address different (in a different city) from the one in the arrest warrant and listed plaintiff's date of birth as different (by 12 days) from the one in the arrest warrant.

FN9. The Seventh Circuit's views on the subject are consistent with other circuits. *See Brady v. Dill,* 187 F.3d 104, 114 (1st Cir.1999) (citing, among others, Seventh Circuit opinion concluding that mistakenly arresting person of different race not unreasonable and stating that "courts have concluded with some regularity that relatively minor discrepancies in physical features or other data do not render unreasonable an arrest pursuant to a facially valid warrant").

FN10. The alias was a very common name with 15 identical listings in the local phone book.

[3] According to a district court in the Seventh Circuit, these three cases stand for this proposition: "In the Seventh Circuit's view, a police officer acts reasonably if he arrests a person after determining that the person's name matches the name **\*1347** listed on an outstanding arrest warrant." *Bruce v. Perkins,* 701 F.Supp. 163, 164 (N.D.Ill.1988). We, however, need not adopt this broad rule to decide today's case. To the contrary, as the Seventh Circuit itself has recognized, we must evaluate the totality of the circumstances surrounding the arrest to determine its reasonableness. *See Patton,* 822 F.2d at 699-700 (examining totality of the circumstances); *see also United States v. Glover,* 725 F.2d 120, 122 (D.C.Cir.1984) ("The reasonableness of the arresting officers' conduct must be determined by considering the totality of the circumstances surrounding the arrest."); *cf. United States v. Gonzalez,* 969 F.2d 999, 1006 (11th Cir.1992) (concluding that: "A policeman's mistaken belief of fact can properly contribute to a probable cause determination and can count just as much as a correct belief as long as the mistaken belief was reasonable in the light of all the circumstances.").

[4][5][6][7] Rodriguez's identifying information was identical to the information listed in Heredia's warrant in four critical aspects: same name, same sex, same age,[FN11] and same race. Significant other information was similar: (1) they had similar Social Security numbers;[FN12] (2) they had addresses in neighboring towns;[FN13] and, (3) they were born in the same state. Rodriguez (4) also had no fewer tattoos than Heredia, and many of the tattoos were in the same locations.

Against all of these similarities is one material<sup>FN14</sup> difference: Rodriguez says he is 5'11" tall, and the warrant listed Heredia as 5'6".<sup>FN15</sup> A reasonable **\*1348** mistake cannot, however, be transformed into an unreasonable mistake over such a small difference, given all the circumstances.

> FN11. According to the warrant, Heredia used multiple birth dates. Heredia's various birthdays all occurred in 1953, the same year Rodriguez was born.

> FN12. According to the warrant, Heredia used multiple Social Security numbers. Heredia's various Social Security numbers were all similar to each other and similar to Rodriguez's.

> FN13. *See Brown,* 823 F.2d at 169 (relying on following when determining that arrest was reasonable: "If like many criminals [the person listed in the warrant] has an alias-and there is no suggestion that he does not, in fact, use the alias of 'Anthony Brown'-it would not be surprising if he also has a false address and birthdate.... Harvey, where [the plaintiff] was arrested, surrounds Phoenix, where he lives, and is near Chicago, where [the person listed in the warrant] lives (or lived when the warrant was issued-he presumably decamped shortly afterward, or he would have been arrested).").

> FN14. We do not consider the other differences of much importance. Eye color (given contact lens), scars (given cosmetic surgery), and weight are all easily variable, especially over six years. This variability lessens the importance of differences in these characteristics. *See Brady,* 187 F.3d at 112 (discussing false arrest cases in context of false imprisonment case and stating that "we live in an age where altering physical features may be accomplished with facility"); *Blackwell v. Barton,* 34 F.3d 298, 304 (5th Cir.1994) (stating, in context of mistaken arrest case, "discrepancies in hair and eye color or skin tone are not determinative in this day when use of hair dyes, cosmetic contact lenses, and tanning salons is relatively common"). Not

every change in a fugitive's appearance can properly prevent arrest by police officers.

> FN15. Arresting police officers need not act as judges determining ultimate facts. Trials of guilt or innocence cannot be undertaken by police officers on the side of the road in the middle of the night before an officer can effect a lawful arrest pursuant to a valid warrant. In this case, the arresting officer said, on the spot, he did not believe plaintiff was as tall as plaintiff claimed to be. The officer was not obligated to accept plaintiff's statements as true. *See Marx v. Gumbinner,* 905 F.2d 1503, 1507 n. 6 (11th Cir.1990). Moreover, even if the arresting officer was fully aware that plaintiff was some inches taller than the 5'6" set out in the warrant, not every discrepancy (as we have already said) in height and so forth would demand that the policeman refrain from executing the warrant. *See Thompson v. Prince William County,* 753 F.2d 363, 365 (4th Cir.1985). Other strong indicators in the warrant matched plaintiff. There are limits on how much independent investigating an officer must make before executing an arrest warrant, even when the arrested person is asserting a claim of mistaken identity. *See Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). The question is not whether the police could have done more; but whether they did just enough. Furthermore, the circumstances that justify a lawful arrest also justify a brief detention incident to the arrest. *See Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975). Plaintiff was released within minutes of having been fingerprinted at the jail when it was realized that plaintiff was not the person who was the true subject of the arrest warrant.

In other words, in the context of this case, a mistaken estimate of no more than five inches does not equal a constitutional violation. After all, Sgt. Farrell and Officer Szczepanski were in the field, not in a police station. *Cf. Cannon v. Macon County,* 1 F.3d 1558 (11th Cir.1993) (reinstating jury verdict against official

280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280
**(Cite as: 280 F.3d 1341)**

who worked at police station after concluding that official's failure, when under no time pressure over seven-day period at police station, to investigate discrepancies between descriptive information contained in arrest warrant and description of person arrested pursuant to that warrant amounted to constitutional violation), *modified,* 15 F.3d 1022 (11th Cir.1994). They-after midnight, on a dark night, immediately after finding unlawful drugs in a container in the vehicle in which Rodriguez was one of only two occupants-were trying to determine whether Rodriguez was the person described in the warrant, a warrant charging the listed person with drug possession. *See Patton,* 822 F.2d at 699-700 (relying on fact that arrestee "was in an automobile rather than at home; if [the officer] had let him go it might have taken a long time to catch up with him again (if he was the 'real' [person listed in the warrant] )" and "the edginess all policemen feel in confronting a criminal suspect at night on a highway" when concluding that no finder of fact could conclude that officer acted unreasonably in arresting wrong person for arrest warrant despite discrepancies).

Time was short in the situation facing Sgt. Farrell and Officer Szczepanski: a nighttime traffic stop. The officers had minutes to make their determination, not months or even days: Rodriguez soon had to be either arrested or let go. *Cf. Tillman v. Coley,* 886 F.2d 317, 321 (11th Cir.1989) (concluding that sheriff's failure to investigate discrepancies in identity of person against whom he sought arrest warrant-discrepancies of which he was aware *three months* before seeking the warrant-could constitute constitutional violation sufficient to form foundation of section 1983 constitutional false arrest claim); *Cannon,* 1 F.3d at 1558 (*seven day* detention period). Given all the circumstances, the Constitution's guarantee against "unreasonable" seizures was not violated by an estimate of height that was accurate within 5 inches.[FN16]

> FN16. We can find only one circuit court opinion-Rodriguez cites none-actually holding an officer potentially liable for the mistaken arrest of someone pursuant to a valid arrest warrant for another. See *Watts v. County of Sacramento,* 256 F.3d 886 (9th Cir.2001). But, *Watts* is very different from our case. Most important,

*Watts* involved the entry into and an arrest in a home and, even more worrisome, a home that was not known to be the dwelling place of the person listed in the warrant.

Under the circumstances of this case, defining "reasonable mistake" to exclude the acts of Sgt. Farrell and Officer Szczepanski-thereby creating a cause of action against them and subjecting them personally to possible monetary liability-would likely deter future officers too much from making arrests in public places on valid warrants about which they do not have first-hand knowledge: the risk of error in identification, and then a lawsuit, would simply be too great. As a result, persons sought for crimes would, therefore, find it easier to evade capture. *See Johnson,* 680 F.2d at 41 ("If an officer executing an arrest warrant must do so at peril of damage liability under section 1983 if there is any discrepancy between the description in the warrant and the appearance of the person to be arrested, many a criminal will slip away while the officer anxiously compares the description in the warrant with the appearance of the person named in it and radios back any discrepancies to his headquarters for instructions.").

**\*1349** Put differently, we-given the facts as Rodriguez presents them-conclude, as a matter of law, that Sgt. Farrell and Officer Szczepanski made a "reasonable mistake" when they arrested Rodriguez pursuant to Heredia's warrant and, thus, committed no constitutional violation upon which to base a section 1983 constitutional false-arrest claim.[FN17]

> FN17. Sgt. Farrell and Officer Szczepanski have not argued in this appeal that the pertinent arrest was consistent with the Federal Constitution because probable cause (even if no warrant had been involved) existed for the arrest, given that plaintiff was one of only two occupants of an automobile in which the police had just found unlawful drugs in a container that was also in the automobile. So, we do not address that issue. But for background, see *United States v. Buckner,* 179 F.3d 834 (9th Cir.1999); *Fernandez v. Perez,* 937 F.2d 368 (7th Cir.1991).

We, however, do treat the fact that plaintiff was riding in an automobile in which unlawful drugs had been

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

found in a container to which plaintiff had access and had handled as a significant part of the totality of the circumstances of plaintiff's arrest. Plaintiff was not just walking down the street and stopped because passing police officers thought he might fit some outstanding warrant. He was in a car that was carrying drugs, and he (to say the least) was of the same name, sex, race, and age as a person for whom a warrant for a drug crime was outstanding. It is the arrest in these circumstances that is before us. The warrant did not have to justify this arrest in a vacuum; something, at least, approaching (if not reaching) probable cause to arrest was established by plaintiff's having been in the car where drugs were being carried. So, the warrant-with its substantial similarities between plaintiff and the person for whom the warrant was issued-need not (and should not) be viewed alone: abstract and pure.

2. Clearly Established Law

In the alternative, we conclude that, given the law at the time of arrest, the unlawfulness of the arrest was not already clearly established. "A government-officer defendant is entitled to qualified immunity unless, at the time of the incident, the 'preexisting law dictates, that is, truly compel[s],' the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances." *Marsh v. Butler County,* 268 F.3d 1014, 1030-31 (11th Cir.2001) (en banc) (quoting *Lassiter,* 28 F.3d at 1150). Furthermore, because Fourth Amendment qualified-immunity determinations turn on the reasonableness of an officer's acts in a certain set of facts, the Supreme Court recently stressed that the determination of whether a legal right was already clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).

[8] Assuming, *arguendo,* that Sgt. Farrell and Officer Szczepanski's mistaken arrest of Rodriguez was unreasonable in the constitutional sense and that Rodriguez, thus, has stated a claim for unconstitutional arrest, the constitutional violation-at the time of the arrest-was not already clearly established: Rodriguez cited to no case (nor can we find one) in this Circuit or

from the United States Supreme Court *1350 or Florida Supreme Court that has ever held an officer, under any set of circumstances, liable for misidentifying an arrestee when *executing* a *valid* arrest warrant.

The cases that are factually closest to the instant case (and that conclude that an officer is, or may be, liable under section 1983) are *Cannon v. Macon County,* 1 F.3d 1558 (11th Cir.1993), and *Tillman v. Coley,* 886 F.2d 317 (11th Cir.1989). Both of these cases are, however, materially different from this case.

*Cannon* and *Tillman* share a fundamental distinction from our case: neither case involves an on-the-spot decision to arrest by an officer in the field. *Cannon* concluded that an official *at a police station* was liable for failing to identify correctly the plaintiff during *seven days of incarceration* under the official's care. *Cannon,* 1 F.3d at 1562-63. *Cannon* did not conclude that the officer, who executed the warrant (the validity of which was not challenged) in the field, was liable. *Id.* at 1561. *Tillman* deals with the *application* for an arrest warrant that the court concluded was insufficient because the affidavit submitted to the magistrate lacked probable cause; *Tillman* decides nothing about the execution of a valid arrest warrant in the field. *Tillman,* 886 F.2d at 320-21. Thus, *Cannon* and *Tillman* are not like this case: they do not address situations involving an officer's *execution* of a *valid* arrest warrant in the field. Given the circumstances of the case at hand, the precedents cannot have clearly established the applicable law for the purposes of the qualified immunity defense. *See generally Marsh,* 268 F.3d at 1031-34 (explaining use of precedents to determine clearly established law).

Public officers need not err on the side of caution. *Id.* at 1030 n. 8. And, "[p]ublic officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." *Adams v. St. Lucie County Sheriff's Dep't,* 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), *approved en banc,*998 F.2d 923 (11th Cir.1993). At the time of the pertinent arrest, no precedent had decided that an officer committed a constitutional violation by mistakenly *executing a valid arrest* warrant against the wrong person. Closer to the point, no precedent had decided that the nighttime arrest, in conjunction with a traffic stop, of a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

person-who had been riding in an automobile in which unlawful drugs were being carried, and who was admittedly within five inches of the height of a fugitive for which a valid warrant for arrest (for offenses including a drug offense) was in existence and known to the arresting officers-violated the Federal Constitution when the arrested person shared with the fugitive (1) similar birth dates, social security numbers, addresses, birth places and tattoos as well as (2) the identical name, sex, race and age.[FN18] Therefore, we conclude that, if Sgt. Farrell's and Officer Szczepanski's mistake in arresting Rodriguez was not, as a matter of law, a "reasonable" one, it was, at least, an arguably reasonable one in the light of the unsettled, preexisting law. *See Marsh,* 268 F.3d at 1030 n. 8, 1031 n. 9. We must, therefore, reverse the district court's denial*1351 of qualified immunity to Sgt. Farrell and Officer Szczepanski.

> FN18. We very occasionally encounter the exceptional case in which a defendant officer's acts are so egregious that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable (by which we, in the qualified immunity context, always mean every objectively reasonable) officer that what the defendant officer was doing must be "unreasonable" within the meaning of the Fourth Amendment. *See Priester v. City of Riviera Beach,* 208 F.3d 919 (11th Cir.2000). *See generally Marsh,* 268 F.3d at 1031 n. 9 (discussing means by which officers can be fairly and clearly warned). But the case now before us is not one like that.

B. Excessive Force During the Arrest

[9][10][11][12] We conclude that the force used by Sgt. Farrell during his arrest of Rodriguez did not violate the Constitution. The use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment. *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). But, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396, 109 S.Ct. 1865. In the Eleventh Circuit, we recognize that the typical arrest involves some force and injury. *See*

*Nolin v. Isbell,* 207 F.3d 1253, 1257-58 (11th Cir.2000).

The evidence, in the light most favorable to plaintiff, shows that Sgt. Farrell grabbed plaintiff's arm, twisted it around plaintiff's back, jerking it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that Farrell was hurting him. Plaintiff was placed in the rear of Sgt. Farrell's patrol car, kept handcuffed behind his back and transported to the police station. The handcuffs were removed minutes after arrival at the police department. The handcuffing technique used by Sgt. Farrell is a relatively common and ordinarily accepted non-excessive way to detain an arrestee.

Plaintiff's orthopedic surgeon testified that the handcuffing was a "very serious, painful event," that resulted in the loosening of the internal surgical hardware, and caused the displacement of a key bone fragment. The resulting complications included more than twenty-five subsequent surgeries and ultimately amputation of the arm below the elbow.[FN19]

> FN19. Given the loss of an arm, we are presented with the proverbial "hard case," that is, one in which one's natural sympathies are aroused by the plaintiff's plight. We recall Justice Jackson's warning to judges: "We agree that this is a hard case, but we cannot agree that it should be allowed to make bad law." *FCC v. WOKO, Inc.,* 329 U.S. 223, 229, 67 S.Ct. 213, 216, 91 L.Ed. 204 (1946).

[13] Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal. *See Nolin,* 207 F.3d at 1257-58 (concluding, as a matter of law, that force used during arrest, including handcuffing, was not excessive when force and resulting injury were minimal); *Brissett v. Paul,* 141 F.3d 1157 (4th Cir.1998) (table) (concluding, as matter of law, that painful handcuffing with minimal injury not constitutional violation); *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1082 (8th Cir.1990) (same); *see also Martin v. Gentile,* 849 F.2d 863, 869-70 (4th Cir.1988) (concluding that force used, as a matter of law, was not excessive); *Silverman v. Ballantine,* 694 F.2d 1091, 1096-97 (7th Cir.1982) (same).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[14][15] This case is different from *Nolin* because Rodriguez's earlier surgery made what otherwise would be a common non-excessive handcuffing technique (that ordinarily would be painful but cause minimal injury) a maneuver that caused severe injury and tragic results. This distinction, however, is not important legally and does not preclude a conclusion that Rodriguez has shown no constitutional violation: no evidence has been presented that Sgt. Farrell knew of plaintiff's recent elbow surgery or, more important, knew that handcuffing plaintiff would seriously aggravate plaintiff's preexisting condition.[FN20] We do *1353 not use hindsight to judge the acts of police officers; we look at what they knew (or reasonably should have known) at the time of the act. What would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time. *See Silverman,* 694 F.2d at 1096-97 (concluding that force used was not, as a matter of law, excessive even though arrestee died of heart attack during arrest). Under the circumstances of this case, Sgt. Farrell's acts cannot rise to the level of a constitutional violation. FN21

FN20. Rodriguez admits that he did not tell Sgt. Farrell that he had an injured arm before his arrest, and nothing outwardly indicated that Rodriguez's arm was injured after Rodriguez was outside the car. But, Rodriguez asks us to infer from the evidence he presented that Sgt. Farrell knew or should have known that Rodriguez's arm was already injured and required special treatment during the arrest. Rodriguez specifically argues that the evidence shows that, before Sgt. Farrell arrested him: (1) Rodriguez told Sgt. Farrell that he had just gotten out of the hospital because he (Rodriguez) had been in a motorcycle accident; (2) Sgt. Farrell briefly looked through Rodriguez's hospital records; and, (3) Sgt. Farrell was standing behind Ms. Foulkes's car when Rodriguez was in the car and still had his arm in a sling. From these three circumstances, Rodriguez says that one can reasonably infer that Sgt. Farrell knew about Rodriguez's injured arm and that the arm demanded special treatment. We disagree.

Sgt. Farrell testified flatly that he did not see Rodriguez's arm in a sling. And, the circumstances to which Rodriguez points are not inconsistent with Sgt. Farrell's sworn testimony. Rodriguez admits that the interior of Ms. Foulkes's car-the area into which Sgt. Farrell, from his position behind the car, would have needed to have seen Rodriguez in his sling-was "dark." Never does Rodriguez tell us how far behind the pertinent car Sgt. Farrell was standing. Never does Rodriguez say that he saw Farrell focus on him while Rodriguez was in the car wearing a sling.

Given the evidence in this record, Rodriguez relies on conjecture that the sling could have, and would have, been observed by a reasonable officer. *See Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1324 (11th Cir.1982) ("[A]n inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation."). Rodriguez cannot overcome contradictory direct evidence-Sgt. Farrell's sworn testimony that he did not see the sling-and raise a genuine issue of fact. We decline to accept Rodriguez's contended-for double inference (that the sling was observable *and* that Sgt. Farrell made, or a reasonable officer would have made, that observation in the context of what was occurring generally in the nighttime traffic stop and arrest of Ms. Foulkes) to prove that Sgt. Farrell saw, or should have seen, Rodriguez's arm in the sling. *See generally Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1355 (11th Cir.1999) (concluding that inference that one person told a second person about a specific fact regarding a topic, based upon evidence that the first and second persons met and talked and evidence that the second person knew about the topic generally, was unreasonable speculation in the light of an affirmative denial of knowledge of the specific fact by the second person); *Burrell v. Board of Trs. of Georgia Military Coll.,* 970 F.2d 785, 791 n. 15 (11th Cir.1992) ("Considering that Burrell cannot offer evidence of the contents of Baugh's and Baggarly's meeting, that Baugh and Baggarly provide a reasonable and consistent explanation for their meeting, that Baugh and Baggarly flatly deny having discussed Burrell, only one fact can be inferred from their meeting: that the meeting took place. Any conclusion about the content of their discussion in contradiction to their testimony would qualify as speculation, not infer-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280

**(Cite as: 280 F.3d 1341)**

ence."); *Daniels,* 692 F.2d at 1326 (concluding jury could not reasonably draw inference that nursing home's negligent act of allowing patient to wander away from home was proximate cause of patient's death because inference was only supported by mere scintilla of evidence and conflicted with uncontradicted facts). *See also Pennsylvania R.R. v. Chamberlain,* 288 U.S. 333, 340-41, 53 S.Ct. 391, 77 L.Ed. 819 (1933) ("And the desired inference is precluded for the further reason that respondent's right of recovery depends upon the existence of a particular fact which must be inferred from proven facts, and this is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses consistent with the facts actually proved, from which testimony it affirmatively appears that the fact sought to be inferred did not exist."). Thus, the evidence is insufficient to support a finding that Sgt. Farrell knew, or should have known, about Rodriguez's injured arm (and that the arm demanded special treatment) because Rodriguez had the arm in a sling at a time before his arrest.

Nor does Rodriguez's testimony that Sgt. Farrell briefly "looked" at Rodriguez's hospital records raise an inference that Sgt. Farrell knew, or should have known, about Rodriguez's injured arm and that the arm demanded special treatment. Rodriguez specifically testified that Sgt. Farrell "looked" at the records; he admits that Farrell did not "read" them. Rodriguez also provides no evidence tending to show specifically what the content of these hospital records would have been. Under the circumstances, this evidence, even combined with evidence that Rodriguez told Sgt. Farrell that he had just gotten out of the hospital after a motorcycle accident, is not enough to support an inference that Sgt. Farrell knew, or should have known, specifically that Rodriguez's arm was injured and that the arm demanded special care. *Cf. Clover,* 176 F.3d at 1355.

> FN21. In the alternative, we conclude that Sgt. Farrell is entitled to qualified immunity on the excessive force claim.

REVERSED and REMANDED for further proceedings consistent with this opinion.

C.A.11 (Fla.),2002.
Rodriguez v. Farrell

280 F.3d 1341, 15 Fla. L. Weekly Fed. C 280

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033
**(Cite as: 133 F.3d 1425)**

Rankin v. Evans
C.A.11 (Fla.),1998.

United States Court of Appeals,Eleventh Circuit.
Doug RANKIN, Victoria Rankin, Plaintiffs-Appellants, Cross-Appellees,
v.
Mark EVANS, Richard Willie, Sheriff of Palm Beach County, Palm Beach County Sheriff's Department, Defendants-Appellees, Cross-Appellants.
**No. 95-4744.**

Jan. 29, 1998.

Pre-school employee who was arrested without warrant for sexual abuse of child under age of twelve, and whom grand jury found "completely innocent" of that charge, filed § 1983 and false arrest action against arresting officer and sheriff's department, alleging that arrest occurred without probable cause in violation of Fourth and Fourteenth Amendments. After defendants' motions for directed verdict were denied, jury returned verdict for plaintiff, and defendants moved for judgement notwithstanding verdict (JNOV). The United States District Court for the Southern District of Florida, No. 91-8012-CIV-JAG, Jose A. Gonzalez, J., granted motion. Plaintiff appealed. The Court of Appeals, Harris, Senior District Judge, sitting by designation, held that: (1) defendants' motions for directed verdict were sufficient to support their subsequent motion for JNOV, and (2) officer had probable cause to arrest.

Affirmed.

West Headnotes

**[1] False Imprisonment 168 ⇐16**

168 False Imprisonment
   168I Civil Liability
     168I(B) Actions
        168k16 k. Nature and Form of Remedy.
Most Cited Cases

Under Florida law, false arrest and false imprisonment are different labels for same cause of action.

**[2] Federal Civil Procedure 170A ⇐2602**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(E) Notwithstanding Verdict
        170Ak2602 k. Necessity for Motion for
Directed Verdict. Most Cited Cases
Party moving for judgment notwithstanding verdict (JNOV) must have made timely and proper motion for directed verdict. Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ⇐2602**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(E) Notwithstanding Verdict
        170Ak2602 k. Necessity for Motion for
Directed Verdict. Most Cited Cases
Defendants' motions for directed verdict in § 1983 false arrest case were sufficient to support their subsequent motion for judgment notwithstanding verdict (JNOV), which alleged existence of probable cause to arrest, even though defendants failed to state specifically any ground for their directed verdict motions; trial court and plaintiffs' counsel were aware that asserted existence of probable cause formed basis of defendants' directed verdict motions, as that issue was central question in case, defendants submitted trial memorandum on that issue on day prior to making their motions for directed verdict, and trial judge referred to that memorandum, and more specifically to particular probable cause case, in making his rulings on defendants' motions for directed verdict. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⇐2602**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(E) Notwithstanding Verdict
        170Ak2602 k. Necessity for Motion for

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033
**(Cite as: 133 F.3d 1425)**

Directed Verdict. Most Cited Cases
Requiring motion for directed verdict prior to sub-
mitting case to jury, which motion must specify law
and facts on which moving party is entitled to judg-
ment, ensures that court and opposing party will be
alerted to any sufficiency problems at stage when
such deficiencies might be remedied; thus, where
trial court and all parties actually are aware of
grounds upon which motion is made, strict enforce-
ment of specificity requirement is unnecessary to
serve purpose of rule. Fed.Rules Civ.Proc.Rule
50(a)(2), (b), 28 U.S.C.A.

**[5] Arrest 35 ☜63.4(2)**

35 Arrest
   35II On Criminal Charges
      35k63 Officers and Assistants, Arrest
Without Warrant
        35k63.4 Probable or Reasonable Cause
          35k63.4(2) k. What Constitutes Such
Cause in General. Most Cited Cases
Neither Florida nor federal law requires arresting
officer to believe subjectively in guilt of arrestee in
order to have probable cause for arrest. 42 U.S.C.A.
§ 1983.

**[6] Arrest 35 ☜63.4(2)**

35 Arrest
   35II On Criminal Charges
      35k63 Officers and Assistants, Arrest
Without Warrant
        35k63.4 Probable or Reasonable Cause
          35k63.4(2) k. What Constitutes Such
Cause in General. Most Cited Cases
Standard for determining existence of probable
cause to arrest is same under both Florida and fed-
eral law-whether reasonable man would have be-
lieved probable cause existed had he known all
facts known by officer. 42 U.S.C.A. § 1983.

**[7] Federal Courts 170B ☜765**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
       170BVIII(K)1 In General

        170Bk763 Extent of Review Depend-
ent on Nature of Decision Appealed from
         170Bk765 k. Judgment Notwith-
standing Verdict. Most Cited Cases

**Federal Courts 170B ☜801**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)3 Presumptions
        170Bk801 k. Judgment N. O. v. Most
Cited Cases
In determining whether judgement notwithstanding
verdict (JNOV) was properly granted, Court of Ap-
peals applies same standard as district court; resolv-
ing all factual disputes and drawing all logical in-
ferences in favor of nonmoving party, court must
determine whether these facts and inferences so
strongly favor one party that reasonable people, in
exercise of impartial judgment, could not arrive at
contrary verdict; if so, motion was properly gran-
ted.

**[8] Federal Civil Procedure 170A ☜2608.1**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(E) Notwithstanding Verdict
      170Ak2608 Evidence
        170Ak2608.1 k. In General. Most
Cited Cases
For purposes of judgment notwithstanding verdict
(JNOV), mere scintilla of evidence does not create
jury question; there must be substantial conflict in
evidence to create jury question.

**[9] Civil Rights 78 ☜1088(4)**

78 Civil Rights
   78I Rights Protected and Discrimination Prohib-
ited in General
     78k1088 Police, Investigative, or Law En-
forcement Activities
      78k1088(4) k. Arrest and Detention. Most
Cited Cases
   (Formerly 78k133)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033

**(Cite as: 133 F.3d 1425)**

**False Imprisonment 168 ⟨⟩13**

168 False Imprisonment
   168I Civil Liability
       168I(A) Acts Constituting False Imprison-
ment and Liability Therefor
       168k9 Defenses
         168k13 k. Probable Cause. Most Cited
Cases
Probable cause constitutes absolute bar to claims
under Florida law and under § 1983 alleging false
arrest. 42 U.S.C.A. § 1983.

**[10] Arrest 35 ⟨⟩63.4(2)**

35 Arrest
   35II On Criminal Charges
       35k63 Officers and Assistants, Arrest
Without Warrant
       35k63.4 Probable or Reasonable Cause
         35k63.4(2) k. What Constitutes Such
Cause in General. Most Cited Cases
Probable cause to arrest exists under both Florida
and federal law when facts and circumstances with-
in officer's knowledge, of which he or she has reas-
onably trustworthy information, would cause
prudent person to believe, under circumstances
shown, that suspect has committed, is committing,
or is about to commit offense. 42 U.S.C.A. § 1983.

**[11] Arrest 35 ⟨⟩63.4(3)**

35 Arrest
   35II On Criminal Charges
       35k63 Officers and Assistants, Arrest
Without Warrant
       35k63.4 Probable or Reasonable Cause
         35k63.4(3) k. Suspicion or Rumor.
Most Cited Cases
Under both Florida and federal law, probable cause
to arrest requires more than mere suspicion, but
does not require convincing proof.

**[12] Arrest 35 ⟨⟩63.4(2)**

35 Arrest
   35II On Criminal Charges
       35k63 Officers and Assistants, Arrest

Without Warrant
       35k63.4 Probable or Reasonable Cause
         35k63.4(2) k. What Constitutes Such
Cause in General. Most Cited Cases
In determining whether probable cause to arrest ex-
ists under Florida and federal law, court deals with
probabilities which are factual and practical consid-
erations of everyday life on which reasonable and
prudent men, not legal technicians, act.

**[13] Arrest 35 ⟨⟩63.4(2)**

35 Arrest
   35II On Criminal Charges
       35k63 Officers and Assistants, Arrest
Without Warrant
       35k63.4 Probable or Reasonable Cause
         35k63.4(2) k. What Constitutes Such
Cause in General. Most Cited Cases
Arresting officer is required to conduct reasonable
investigation to establish probable cause; officer,
however, need not take every conceivable step at
whatever cost to eliminate possibility of convicting
innocent person.

**[14] Arrest 35 ⟨⟩63.4(.5)**

35 Arrest
   35II On Criminal Charges
       35k63 Officers and Assistants, Arrest
Without Warrant
       35k63.4 Probable or Reasonable Cause
         35k63.4(.5) k. In General. Most Cited
Cases
   (Formerly 35k63.4(2))
Once officer makes arrest based upon probable
cause, he need not investigate independently every
claim of innocence.

**[15] Arrest 35 ⟨⟩63.4(2)**

35 Arrest
   35II On Criminal Charges
       35k63 Officers and Assistants, Arrest
Without Warrant
       35k63.4 Probable or Reasonable Cause
         35k63.4(2) k. What Constitutes Such
Cause in General. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033

**(Cite as: 133 F.3d 1425)**

Probable cause to arrest is judged not with clinical detachment but with common sense view to realities of normal life.

**[16] False Imprisonment 168 ☜13**

168 False Imprisonment
    168I Civil Liability
        168I(A) Acts Constituting False Imprisonment and Liability Therefor
            168k9 Defenses
                168k13 k. Probable Cause. Most Cited Cases
Existence of probable cause constitutes affirmative defense to claims of false arrest and imprisonment under Florida law.

**[17] Civil Rights 78 ☜1404**

78 Civil Rights
    78III Federal Remedies in General
        78k1400 Presumptions, Inferences, and Burdens of Proof
            78k1404 k. Criminal Law Enforcement; Prisons. Most Cited Cases
    (Formerly 78k240(4))
Where § 1983 plaintiff asserts that he was arrested without probable cause, he has burden of demonstrating absence of probable cause. 42 U.S.C.A. § 1983.

**[18] Arrest 35 ☜63.4(2)**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest Without Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(2) k. What Constitutes Such Cause in General. Most Cited Cases
Arresting officer's knowledge of medical evidence indicating that alleged sexual abuse of child occurred before plaintiff pre-school employee's first contact with her did not preclude finding that officer had probable cause under both Florida and federal law to arrest plaintiff for sexual abuse of child under age of twelve; because child's statements and medical evidence both suggested that more than one instance of abuse occurred, prudent officer reasonably could have concluded that single individual, rather than two separate individuals, was responsible for alleged abuse, and that plaintiff was that individual. 42 U.S.C.A. § 1983.

**[19] Arrest 35 ☜63.4(2)**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest Without Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(2) k. What Constitutes Such Cause in General. Most Cited Cases
Plaintiff pre-school employee's alleged lack of access to sexually abused child did not preclude finding that police officer had probable cause to arrest plaintiff for such abuse; officer knew that plaintiff was present at school during relevant time frame, that he moved freely throughout school, and that child's mother had observed what she perceived to be lack of adequate supervision of children, and teachers whom plaintiff argued that officer should have interviewed were employed by plaintiff and thus would have been of questionable credibility.

**[20] Arrest 35 ☜63.4(2)**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest Without Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(2) k. What Constitutes Such Cause in General. Most Cited Cases
Plaintiff pre-school employee's asserted physical inability to gain access to playground equipment on which he allegedly sexually abused child did not preclude finding of probable cause to arrest plaintiff for that offense; cautious officer reasonably could have believed that, even if child's story were inaccurate as to precise location of abuse, core of her story regarding abuse and identity of abuser was trustworthy and reliable, especially in light of medical and other evidence corroborating her story. 42 U.S.C.A. § 1983.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425
133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033
(Cite as: 133 F.3d 1425)

**[21] Arrest 35** ⬯63.4(7.1)

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest Without Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(7) Information from Others
                    35k63.4(7.1) k. In General. Most Cited Cases
Police officer was entitled to rely to meaningful degree on statements by three-and-a-half-year-old sexual abuse victim in determining that probable cause existed to arrest plaintiff pre-school employee for that abuse; child's mother indicated to officer that mother and school staff were only people with access to child during two-week period covering both potential incidents of abuse, further information provided by mother suggested that plaintiff was guilty party, and, despite inconsistencies in child's statements, those statements-considered along with other supporting evidence-were sufficiently reliable and trustworthy at their core to form basis for probable cause. 42 U.S.C.A. § 1983.

**[22] Arrest 35** ⬯63.4(7.1)

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest Without Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(7) Information from Others
                    35k63.4(7.1) k. In General. Most Cited Cases
Generally, officer is entitled to rely on victim's criminal complaint as support for probable cause to arrest.

**[23] Civil Rights 78** ⬯1088(4)

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities
            78k1088(4) k. Arrest and Detention. Most Cited Cases

(Formerly 78k133)
Fact that child sexual abuse victim never explicitly stated that plaintiff pre-school employee abused her, but instead, merely referred to her abuser as "Ba Ba Blue," did not preclude finding in § 1983 case that police officer had probable cause to arrest plaintiff; officer knew at time of arrest both that plaintiff was referred to by children as "Baba Loo," and that child in question called him "Ba Ba Blue," which was her pronunciation of "Baba Loo." 42 U.S.C.A. § 1983.

**[24] Civil Rights 78** ⬯1088(4)

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities
            78k1088(4) k. Arrest and Detention. Most Cited Cases

(Formerly 78k133)
Fact that three-and-a-half-year-old sexual abuse victim stated during videotaped interview that she had been abused "today," (which was date of interview) but not on day before (which was date on which she reported incidents to her mother and on which mother told arresting officer that child had indicated abuse had occurred), did not, for purposes of § 1983 case, preclude officer from relying on child's statements to meaningful degree in determining that probable cause existed to arrest plaintiff for that abuse. 42 U.S.C.A. § 1983.

**\*1428** Robert L. Hinkle, Radey Hinkle Thomas, Tallahassee, FL, Donald M. Hinkle, Fonvielle, FL, for Plaintiffs-Appellants, Cross-Appellees.
Marjorie Gadarian Graham, Palm Beach Gardens, FL, Monroe A. Coogler, Jr., West Palm Beach, FL, David J. Glatthorne, West Palm Beach, Fl, for Defendants-Appellees, Cross-Appellants.

Appeal from the United States District Court for the Southern District of Florida.

Before BARKETT, Circuit Judge, KRAVITCH, Senior Circuit Judge, and HARRIS [FN*], Senior District Judge.

133 F.3d 1425

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033
**(Cite as: 133 F.3d 1425)**

FN* Honorable Stanley S. Harris, Senior U.S. District Judge for the District of Columbia, sitting by designation.

HARRIS, Senior District Judge:

This case, like some others involving allegations of sexual abuse of a child, inevitably evokes feelings of compassion for all of the participants involved in the long-running dispute. However, obviously the issues must be resolved dispassionately.

Plaintiff-appellant Doug Rankin was arrested in late November of 1988 and charged with the sexual abuse of a child under the age of twelve. Thereafter, not only did a grand jury not indict him; it affirmatively found that he was "completely innocent." He and his wife, plaintiff-appellant Victoria Rankin, brought an action against the arresting officer, Deputy Sheriff Mark Evans, and the Palm Beach County Sheriff's Department under 42 U.S.C. § 1983, and also made a state claim for false arrest.

At the conclusion of the evidentiary portion of the civil trial, the district judge denied defendants' motion for a directed verdict and permitted the case to go to the jury, which returned a substantial verdict for plaintiffs. Thereafter, upon defendants' motion, the district court set aside the verdict on the ground that probable cause for Doug Rankin's arrest and detention had existed as a matter of law. That ruling is before us, as is defendants' cross-appeal of the district court's conditional denial of their motion for a new trial and its denial of their motions for remittitur and to alter or amend the judgment on the state count. We affirm the district court's grant of a JNOV and dismiss the cross-appeal as moot. (In light of the cross-appeal, for clarity we often refer to the parties as plaintiffs and defendants).

I. Factual History [FN1]

FN1. In analyzing the factual history, we have viewed all facts in the light most favorable to plaintiffs and have drawn all reasonable inferences in their favor. *See Bailey v. Board of County Comm'rs of Alachua County,* 956 F.2d 1112, 1119 (11th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 58 (1992). However, this presumption in favor of plaintiffs does not apply where no jury could reasonably conclude that the evidence supported a certain factual finding or inference, despite minor conflicts in the record. *Id.* (stating that a "mere scintilla of evidence does not create a jury question; there must be a substantial conflict in evidence to create a jury question").

Plaintiffs Doug and Victoria Rankin owned and operated the Sugar Plum School House, a preschool program located in Lake Worth, Florida. Dr. Martha Brake's three-and-a-half-year-old daughter Amber began attending Sugar Plum on November 7, 1988. On November 21, 1988, Amber made a statement to her mother, who is a child psychologist, indicating that she had been sexually abused. Dr. Brake then made an audio tape of her daughter's statement in which the child again indicated that she had been abused. That evening, Dr. Brake took her daughter to a pediatrician, Dr. Drummond, to be examined for possible evidence of abuse. During the examination, Dr. Drummond found physical signs which were consistent with sexual abuse. The next morning, Dr. Brake went to Amber's prior school-Victory Baptist-and played the tape in an attempt to get Amber readmitted to that school. At approximately nine o'clock that morning, Dr. Brake called the sheriff's department to inform it that she had proof *1429 that her daughter had been sexually molested. Deputy Mark Evans, who was assigned to the case, called Dr. Brake and scheduled an interview with her and Amber for that morning.

Deputy Evans and a representative from the Florida Department of Health and Rehabilitation Services and Victim's Services (HRS) interviewed Dr. Brake while another officer observed Amber. Dr. Brake informed Evans that: (1) Amber had made a spontaneous statement to her which indicated that she had been molested by a person named Ba Ba Blue; (2) she had heard Amber refer to Doug Rankin as Ba Ba Blue on several occasions and had

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033
**(Cite as: 133 F.3d 1425)**

never heard her refer to anyone else by that name; (3) a teacher had informed her that children frequently called Doug Rankin Baba Loo;[FN2] (4) Doug Rankin worked at the school, Sugar Plum, which Amber attended; (5) the only men who had had access to Amber in the recent past were Rankin and one of Dr. Brake's coworkers; (6) she had seen Rankin on the playground with the children; (7) Amber had attended Sugar Plum for about two weeks; (8) Amber started exhibiting behavioral changes starting at the end of her first week at the school;[FN3] (9) Amber had used the age-inappropriate term "boobies" in reference to her chest after starting school at Sugar Plum; (10) Dr. Brake was so disturbed by Amber's behavioral changes that she tried to get her re-enrolled at her prior school, Victory Baptist; (11) Dr. Brake saw Rankin pick Amber up, and Amber hit him in response, on the day that Amber made her initial statement indicating sexual abuse; (12) it was unusual for Amber to strike an adult; (13) Dr. Brake had had an argument with Rankin regarding what she considered to be insufficient supervision of the children; (14) she had taken Amber to be examined by Dr. Drummond (their pediatrician) the day Amber made her initial statement, and he told Dr. Brake that there was physical evidence consistent with abuse; and (15) a colleague of hers who was also a child psychologist, Dr. Decharme, had seen Amber on the evening of November 21, 1988, and told Dr. Brake that Amber had indicated that she had been abused.

> FN2. It is uncontested that Baba Loo was a nickname used for Rankin by the children, and that Amber pronounced this name as Ba Ba Brue or Ba Ba Blue. Accordingly, we use the term "Ba Ba Blue" whenever we refer to Amber's statements regarding Baba Loo. When referring to another party's independent use of the term, we use the term "Baba Loo."

> FN3. Dr. Brake testified that she told Evans that Amber initially enjoyed school, but that her behavior had changed significantly by the end of the first week. She told

Evans that Amber had become more withdrawn, had indicated that she did not want to go to school, had become more clingy, and had begun having nightmares.

Dr. Brake also informed Evans that she had made an audiotape of Amber's recounting of her previous statement. Evans listened to that tape. On it, Amber stated that Ba Ba Blue had made "a hole in [her] bottom" and that he put "his fingers in [her] bottom and it pinched and it feels bad." She also indicated that, after Ba Ba Blue was finished with her, he sent her to the playground.

Officer Honholz, who had been with Amber during Evans's interview of her mother, informed Evans and Dr. Brake that Amber made a statement to him regarding the abuse.

Deputy Evans then conducted a videotaped interview with Amber in which she again indicated that a man at school named Ba Ba Blue had abused her. Prior to identifying Ba Ba Blue as her abuser, Amber named two cartoon characters in response to police questioning regarding the identity of her abuser. Baba Loo is the name of a cartoon character from a video the children watched in school. Rankin used the term as a general nickname to refer to the children. The children, including Amber, also referred to Rankin by this nickname.

Amber also made several improbable or inconsistent statements regarding the timing of the abuse. She indicated that the abuser had used both his hand and a spoon, taken pictures of her, touched her with his genitalia, and had been naked. She also indicated that the abuse had happened both inside the school and outside on some steps.

Deputy Evans telephoned Dr. Drummond regarding Amber's physical examination. Dr. Drummond told Evans that there were several physical symptoms that could be the result of sexual abuse: (1) a fresh abrasion; **\*1430** (2) an enlarged hymenal opening; and (3) a healed notch on the hymen. Dr. Drummond indicated that the first symptom could be consistent with improper sexual conduct such as rubbing, but that there were other possible causes.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033

**(Cite as: 133 F.3d 1425)**

Dr. Drummond stated that the hymenal notch and the enlargement of the area suggested some form of limited penetration-possibly digital. Dr. Drummond also noted that the notch to the hymen was at least two to three weeks old.

On the morning of November 23, 1988, with the authorization of his superiors, Evans went to Sugar Plum to arrest Doug Rankin for sexual battery on a child under the age of twelve. Rankin was not there. Evans did not inform anyone at the school of the purpose of his visit, nor did he interview anyone at the school regarding the alleged abuse. Instead, he returned several hours later, when he had been informed Rankin would be present, at which time he arrested Rankin.

During his subsequent interview with police, Rankin repeatedly proclaimed his innocence and informed Evans that he had never been alone with Amber (a fact that he asserted the teachers could corroborate), that he was physically unable to fit on or reach into the playground equipment on which the police stated that the abuse occurred, that Baba Loo was the name of a cartoon character, that he was not the only person at the school who was called Baba Loo, and that Amber had attended the school for only two weeks.

During his interview, Rankin also conceded that he was the only male who worked at the school, that the children referred to him as Baba Loo, that he had access to the entire schoolhouse, and that he had been at school on November 21, 1988. He also made numerous specific comments regarding Amber's personality and behavior during the two weeks she had been at school, even though he stated that there were 120 students at the school and that he had relatively little contact with the children. Furthermore, he made progressively more critical comments regarding Dr. Brake as the interview proceeded.

Following the interrogation, Rankin formally was charged with sexual battery of a child under the age of twelve pursuant to Fla. Stat. 794.011(2). He subsequently was released on bond with no opposi-

tion from Deputy Evans. A grand jury later exonerated Rankin, specifically stating that he was "completely innocent."

II. Procedural History

[1] Following those events, plaintiffs Doug Rankin and his wife Victoria filed a complaint asserting both state and federal claims. The claims resolved by the jury at trial were as follows.[FN4] Count I stated a claim pursuant to 42 U.S.C. § 1983 alleging that defendant Mark Evans, as a Deputy Sheriff of Palm Beach County, while acting under the color of state law, arrested and seized plaintiff Doug Rankin without a warrant or probable cause in violation of the Fourth and Fourteenth Amendments of the United States Constitution. Count II alleged that defendant Richard Wille, as Sheriff of the Palm Beach County Sheriff's Department, acting through its agents and employees, falsely arrested and imprisoned plaintiff Doug Rankin.[FN5] At trial, defendants made a motion for a directed verdict both at the close of plaintiffs' case and at the close of all evidence.[FN6] At neither time did defendants **1431** specifically state their grounds for the motion for a directed verdict. The trial court denied both motions, and the case went to the jury, which found defendants liable on both counts.[FN7]

FN4. It should be noted that Sheriff Richard Wille was originally named as a defendant in Count I, but was dismissed prior to trial. The Sheriff's Department was named as a defendant in both Counts I and II. However, summary judgment was entered in the Department's favor on Count I, and thus it remained as a defendant only in Count II. Richard Wille subsequently was substituted for the Palm Beach County Sheriff's Department in Count II. Accordingly, at trial, Deputy Mark Evans was the defendant in Count I and Richard Wille, as the Sheriff, was the defendant in Count II.

FN5. Although Count II alleges both false arrest and false imprisonment, we refer to the claim as one for false arrest because

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033

**(Cite as: 133 F.3d 1425)**

under Florida law "false arrest and false imprisonment are different labels for the same cause of action." *Weissman v. K-Mart Corp.,* 396 So.2d 1164, 1164 n. 1 (Fla. 3d DCA 1981).

FN6. We note that the 1991 Amendments to Rule 50 of the Federal Rules of Civil Procedure changed the terminology used to describe the relevant actions taken. Instead of using the term "directed verdict" for a motion for a judgment as a matter of law when the motion is made prior to the verdict, and the term "judgment notwithstanding the verdict" when the motion is made after the verdict is returned, Rule 50 now refers to both motions as motions for a judgment as a matter of law. However, since one issue on appeal turns on the timing of the motion for the judgment as a matter of law, we use the older terms "directed verdict" and "judgment notwithstanding the verdict" for convenience and clarity.

FN7. The jury awarded Doug Rankin $1,000,000 for intangible damages, damage to personal reputation, and loss of past income and earning potential. Victoria Rankin was awarded $500,000 as damages for loss of consortium. The Rankins also were awarded $500,000 as business damages.

On January 4, 1995, defendants filed motions for a judgment notwithstanding the verdict, for remittitur, to alter or amend the judgment on the state count, and alternatively for a new trial. Defendants based their motion for a JNOV on the asserted existence of probable cause for the arrest.[FN8] The motion also asserted that defendants were entitled to a JNOV on the § 1983 claim because plaintiffs failed to demonstrate that Deputy Evans acted with deliberate or callous indifference to Doug Rankin's constitutional rights, as required to support a § 1983 claim. On May 15, 1995, the district court granted defendants' motion for a JNOV on both the

state and federal claims on the ground that probable cause for Rankin's arrest and detention existed and constitutes an absolute bar to plaintiffs' claims. The Order also conditionally denied defendants' motion for a new trial and denied their other motions as moot.

FN8. Plaintiffs contend that defendants failed properly to raise probable cause as the ground for a JNOV on the § 1983 claim because they did not assert that ground until their reply to plaintiffs' opposition to the motion for a JNOV. We reject this argument.

On January 4, 1995-the date on which defendants' motions for a JNOV, for remittitur, to alter and amend the judgment on the state claim, and for a new trial were filed-defendants also filed a motion for an extension of time in which to file addenda to those motions. Confusion as to the district court's position regarding this request for an extension of time prompted the district court to treat defendants' February 28, 1995, reply to plaintiffs' opposition as an addendum to defendants' original motion for a JNOV. *See* March 16, 1995, Order (detailing the procedural history regarding this matter). The Order explicitly stated that plaintiffs were entitled to respond pursuant to the Local Rules to defendants' February 28, 1995, submission. Certainly, it was well within the district court's discretion to treat defendants' reply as an addendum to its original motion in an attempt to remedy any procedural confusion resulting from its Orders. Accordingly, we reject the assertion by plaintiffs that probable cause was not raised in defendants' motion for a JNOV as a ground for relief.

Plaintiffs appeal the grant of a JNOV in favor of defendants on both counts. Defendants appeal the conditional denial of the motion for a new trial and the denial of their other motions as moot.

III. Analysis

A. The Grant of a JNOV Was Not Procedurally Barred

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033

**(Cite as: 133 F.3d 1425)**

[2][3] The first question we decide is whether the district court's grant of a JNOV in favor of defendants was procedurally barred. The Rankins correctly assert that Federal Rule of Civil Procedure 50(b) requires that a party moving for a JNOV first must have made a timely and proper motion for a directed verdict. *See Wilson v. Attaway,* 757 F.2d 1227, 1237 (11th Cir.1985). Federal Rule of Civil Procedure 50(a)(2) states that such a motion "shall specify ... the law and the facts on which the moving party is entitled to the judgment." *See also National Indus., Inc. v. Sharon Steel Corp.,* 781 F.2d 1545, 1548 (11th Cir.1986). The Rankins note that defendants failed to state specifically any ground for their motions for a directed verdict-much less the ground on which the Court later granted a JNOV, *i.e.,* the existence of probable cause. Therefore, the Rankins contend that defendants' motions for a directed verdict did not satisfy the specificity requirement of Rule 50(a)(2), and that defendants' motion for a JNOV should have been denied as technically deficient. *See, e.g., Piesco v. Koch,* 12 F.3d 332, 340-41 (2d Cir.1993) (defendant's motion for a directed verdict failed to specify any grounds and thus was not sufficiently informative to preserve defendant's right to move for a JNOV); *Purcell v. Seguin State Bank & *1432 Trust Co.,* 999 F.2d 950, 956-57 (5th Cir.1993) (issue raised in a JNOV motion that was not specifically raised in motion for a directed verdict at close of evidence held waived); *McCarty v. Pheasant Run, Inc.,* 826 F.2d 1554, 1555-56 (7th Cir.1987) (same).

Defendants argue that a rigid application of Rules 50(b) and 50(a)(2) is inappropriate where motions for a directed verdict were timely made and the judge and opposing counsel were aware of the legal and factual bases of the motion despite the moving party's failure to state them explicitly. *See, e.g., Stewart v. Thigpen,* 730 F.2d 1002, 1006-07 n. 2 (5th Cir.1984) (stating that plaintiff's failure to specifically identify the grounds for his motion for a directed verdict did not preclude a JNOV in his favor where the trial court and defendants had actual notice of the basis of the motion); *Clarke v. O'Connor,* 435 F.2d 104, 113 n. 15 (D.C.Cir.1970) (concluding that although defendant's motion for a directed verdict did not explicitly assert the applicability of the statutory provision on which a JNOV later was based, it provided the court and opposing counsel with sufficient notice to satisfy Rule 50). Defendants assert that the trial court and opposing counsel were aware that defendants' motions for a directed verdict were based upon the ground that probable cause for Rankin's arrest existed as a matter of law and constituted an absolute defense to plaintiffs' claims.

In support of this contention, defendants stress that it was obvious throughout trial that the existence of probable cause was the central issue in the case. Defendants note that on the day before they made their motions for a directed verdict, they submitted a trial memorandum briefing the issue of probable cause. The trial judge referred to this memorandum and specifically alluded to a probable cause case that was discussed therein in denying defendants' motion for a directed verdict at the close of plaintiffs' case. The trial judge subsequently denied defendants' motion for a directed verdict at the close of all evidence "on the basis previously announced at the close of the plaintiffs' case in chief." Accordingly, defendants argue, since it was apparent to all involved that the existence of probable cause was the basis for its motions for a directed verdict, the district court did not err in granting defendants' motion for a JNOV on that ground.

[4] This Circuit has looked to the purpose of Rule 50(b) in determining what constitutes a motion for a directed verdict sufficient thereafter to support a JNOV. *See National Indus.,* 781 F.2d at 1549-50 (noting that where Rule 50(b)'s purpose-providing notice to the court and opposing counsel of any deficiencies in the opposing party's case prior to sending it to the jury-has been met, the Circuit "ha[s] taken a liberal view of what constitutes a motion for directed verdict").[FN9] *See also Scottish Heritable Trust v. Peat Marwick Main & Co.,* 81 F.3d 606, 610 (5th Cir.) (stating that "[t]echnical noncompliance with Rule 50(b) may be excused in situations in which the purposes of the rule are satisfied"), *cert. denied,*519 U.S. 869, 117 S.Ct. 182,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033
**(Cite as: 133 F.3d 1425)**

136 L.Ed.2d 121 (1996); *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 691 (3rd Cir.1993) (concluding that defendants' motions for a directed verdict were sufficient to support a JNOV where the court and opposing counsel had actual notice of the basis of the motion even though it was only implicitly raised by defendants' motions). A party is obliged to make a motion for a directed verdict at the close of the evidence as a prerequisite to a motion for JNOV to ensure that neither the court nor the opposing party is "lulled into complacency" concerning the sufficiency of the evidence. *National Indus.,* 781 F.2d at 1549. *See also Scottish Heritable,* 81 F.3d at 610 (stating that "the two basic purposes of [Rule 50(b) ] *1433 are 'to enable the trial court to re-examine the question of evidentiary sufficiency as a matter of law if the jury returns a verdict contrary to the movant, and to alert the opposing party to the insufficiency before the case is submitted to the jury' ") (internal citation omitted). Requiring a motion for a directed verdict prior to submitting the case to the jury ensures that the court and the opposing party will be alerted to any sufficiency problems at a stage when such deficiencies might be remedied.

> FN9. The Rankins cite *Austin-Westshore Constr. Co. v. Federated Dep't Stores, Inc.,* 934 F.2d 1217, 1222-23 (11th Cir.1991), in support of their contention that Rules 50(b) and 50(a)(2) should be strictly applied to bar the grant of a JNOV in this case. In *Austin,* however, the ground on which the motion for a JNOV was based had never been raised at trial. Thus, the trial court could not rely upon the standard articulated in *National Industries* in support of a grant of a JNOV because opposing counsel and the trial court did not have actual notice as to any "flaw" in the case prior to sending it to the jury. Unlike in *Austin,* the grant of a JNOV in this case is justified by the fact that the moving parties substantially complied with the requirements of Rules 50(a)(2) and (b) because the court and opposing counsel unquestionably had actual notice at trial of the ground upon

which the JNOV ultimately was granted.

The same purpose underlies the specificity requirement of Rule 50(a)(2). Accordingly, where the trial court and all parties actually are aware of the grounds upon which the motion is made, strict enforcement of the specificity requirement of Rule 50(a)(2) is unnecessary to serve the purpose of the rule.

The record shows that the trial court and plaintiffs' counsel were aware that the asserted existence of probable cause formed the basis of defendants' motions for a directed verdict. That issue was the central question in the case; defendants submitted a trial memorandum on that issue on the day prior to making their motions for a directed verdict; and the trial judge referred to that memorandum, and more specifically to a particular probable cause case, in making his rulings on defendants' motions for a directed verdict. Accordingly, we conclude that defendants' motions for a directed verdict were sufficient to support their subsequent motion for a JNOV.

B. Probable Cause as the Ground for the Entry of a JNOV

1. The Relevance of the Arresting Officer's Subjective Belief in the Arrestee's Guilt to the Existence of Probable Cause

[5] We now turn to plaintiffs' argument that Florida law requires an arresting officer to believe subjectively in the guilt of an arrestee in order to have probable cause for the arrest. Under this view of the law, the Rankins contend that a reasonable jury could have concluded that Deputy Evans did not subjectively believe in Rankin's guilt and, thus, that he did not have probable cause to arrest Rankin. They further argue that such an arrest would have exceeded state authority, thus violating Rankin's Fourth Amendment rights and rendering defendants liable for that violation pursuant to 42 U.S.C. § 1983. Defendants counter that no such subjective belief requirement exists under Florida

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033
**(Cite as: 133 F.3d 1425)**

law. We conclude that neither Florida nor federal law requires that a police officer actually have a subjective belief in the guilt of the person arrested.

[6] This Circuit has concluded that the standard for determining the existence of probable cause is the same under both Florida and federal law-whether " 'a reasonable man would have believed [probable cause existed] had he known all of the facts known by the officer.' " *United States v. Ullrich,* 580 F.2d 765, 769 (5th Cir.1978) (quoting *State v. Outten,* 206 So.2d 392, 397 (Fla.1968)).FN10 *See also United States v. McDonald,* 606 F.2d 552, 553 n. 1 (5th Cir.1979) (*per curiam* ) (stating that "Florida's standard of probable cause for a lawful arrest is the same as that required by the Fourth Amendment"); *Wright v. State,* 418 So.2d 1087, 1094 (Fla. 1st DCA 1982) (concluding that the Florida standard for probable cause is no more restrictive than the federal standard and is in effect a mirror image of that standard). Furthermore, prior to its adoption of the proposition that the state and federal probable cause standards are identical, this Circuit explicitly rejected the idea that the subjective belief of the arresting officer is relevant to the determination of whether probable cause exists. *See United States v. Clark,* 559 F.2d 420, 425 (5th Cir.) (stating that "even if the officers felt that probable cause was lacking, an objective standard would still be applicable"), *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977); *United States v. Resnick,* 455 F.2d 1127, 1132 (5th Cir.1972) (concluding that probable cause existed and "the scope of the Fourth Amendment is not determined by the subjective conclusion of the law enforcement officer").FN11 Finally, relying on its own **\*1434** precedent dating back to 1973, the Supreme Court recently stated: "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." FN12 *Whren v. United States,* 517 U.S. 806, ----, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996). Thus, when this Circuit concluded that state and federal probable cause standards are identical, it was clearly established under federal law that there was no subjective belief requirement. No subjective belief requirement exists under either state or federal

law.FN13

FN10. All decisions issued by the former Fifth Circuit prior to October 1, 1981, have been adopted as binding precedent for the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ).

FN11. We here address plaintiffs' citation of several decisions which they contend establish that an officer must subjectively believe that a crime has been committed and that the suspect committed it in order for probable cause to exist. *See Spicy v. City of Miami,* 280 So.2d 419, 421 (Fla.1973) (stating that an officer "must have ... 'substantial reason' and must 'believe' from observation and evidence at the point of arrest" that the person was guilty); *Osborne v. State,* 87 Fla. 418, 100 So. 365, 366 (1924) (officer has probable cause to arrest "any person whom such officer has reasonable ground to believe, and does believe, has committed any felony"); *City of Hialeah v. Rehm,* 455 So.2d 458, 461 (Fla. 3d DCA 1984) (reversing a directed verdict in favor of defendant on false arrest and imprisonment claims, because "jury issues were presented as to a) whether, when he placed [the suspect] under arrest, [the arresting officer] in fact himself believed that the offense ... had been committed ...; and b) whether, if so, there was a reasonable basis for that belief in the circumstances he observed"); *Donner v. Hetherington,* 399 So.2d 1011, 1012 (Fla. 3d DCA 1981) (same).

We note that *Osborne* and *Spicy* were decided prior to the Eleventh Circuit authority described in the text above which rejects the proposition that there is a subjective element to a probable cause analysis. We must therefore presume that this Circuit considered *Osborne* and *Spicy* in the decisions which collectively rejected that proposition. We are bound by this precedent because "a prior decision of the circuit (panel or en banc) [cannot] be over-

133 F.3d 1425

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033
**(Cite as: 133 F.3d 1425)**

ruled by a panel but only by the court sitting en banc." *Bonner,* 661 F.2d at 1209.

Both *Donner* and *Rehm,* which are state appellate-level decisions decided after the referenced Eleventh Circuit authority, cite *Spicy* as their sole authority for the proposition that there is a subjective element to the state probable cause analysis. *Donner,* 399 So.2d at 1012; *Rehm,* 455 So.2d at 461. As noted, this Circuit has concluded that *Spicy* does not stand for the proposition for which plaintiffs cite it.

However, even if we were not so bound, we would not conclude that the cases cited by plaintiffs establish that there is a subjective element to the probable cause analysis under Florida law. Our research indicates that no other Florida appellate jurisdiction has joined the Third District's adoption of an explicit two-part probable cause analysis requiring an officer subjectively to believe that probable cause exists and have a reasonable basis for that subjective belief. The other jurisdictions appear to rely on an objective standard: probable cause exists when "the totality of the facts and circumstances within the officer's knowledge would cause a reasonable person to believe that an offense has been committed and that the defendant is the one who committed it." *Revels v. State,* 666 So.2d 213, 215 (Fla. 2d DCA 1995); *see also Florida Game and Freshwater Fish Comm'n v. Dockery,* 676 So.2d 471, 474 (Fla. 1st DCA 1996); *Millets v. State,* 660 So.2d 789, 791 (Fla. 4th DCA 1995); *LeGrand v. Dean,* 564 So.2d 510, 512 (Fla. 5th DCA 1990). *But see LeGrand,* 564 So.2d at 513 (Griffin, J., specially concurring) (citing *Donner* and *Spicy* for the proposition that an officer must "actually have a belief that a crime was committed and that the people he proposes to arrest perpetrated the crime"). Finally, the Florida Supreme Court again defined the test for probable cause in objective terms after *Donner. See Blanco v. State,* 452 So.2d 520, 523 (Fla.1984) ("The probable cause standard for a law enforcement officer to make a legal arrest is whether the officer has reasonable grounds to believe the person has committed a felony."), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 953 (1985). Thus, *Donner* and *Rehm* do not represent any signi-

ficant shift in Florida law that would affect this Circuit's conclusion that the subjective belief of the arresting officer plays no role in a probable cause analysis under either Florida or federal law.

FN12. The Court also stated: "Not only have we never held, outside the context of inventory search or administrative inspection ..., that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary." *Whren,* 517 U.S. at ----, 116 S.Ct. at 1774; *see also United States v. Villamonte-Marquez,* 462 U.S. 579, 584 n. 3, 103 S.Ct. 2573, 2577 n. 3, 77 L.Ed.2d 22 (1983) (rejecting the contention that an ulterior motive might strip officers of their legal justification for an otherwise lawful warrantless boarding of a ship); *Scott v. United States,* 436 U.S. 128, 136-38, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978) (rejecting the contention that the Fourth Amendment required the exclusion of certain wiretap evidence and accepting the government's position that "[s]ubjective intent alone ... does not make otherwise lawful conduct illegal or unconstitutional"); *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (characterized by *Scott,* 436 U.S. at 136-38, 98 S.Ct. at 1723, as holding that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action").

FN13. Plaintiffs also cite *Tillman v. Coley,* 886 F.2d 317, 321 (11th Cir.1989), as providing support for the existence of a subjective element to the probable cause analysis. In that case we concluded that a reasonable officer would investigate serious doubts regarding the identity of a sus-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033

**(Cite as: 133 F.3d 1425)**

pect prior to arrest, and held that no "reasonable law enforcement officer may conclude that ... an arrest [may be] made for the sole purpose of identifying a suspect." *Id.* Plaintiffs' use of this limited holding in support of a subjective belief requirement is unpersuasive in light of Eleventh Circuit and Supreme Court precedent.

**\*1435** 2. The Existence of Probable Cause

The Rankins assert that the trial court erred in granting a JNOV in favor of defendants because a reasonable jury could have concluded that the arresting officer, Deputy Evans, did not have probable cause to arrest or detain Doug Rankin. Defendants contend that the trial court was correct in ruling that Evans had probable cause to arrest Rankin as a matter of law. We conclude that probable cause to arrest Rankin existed as a matter of law, and, accordingly, we affirm the trial court's grant of a JNOV in favor of defendants.

[7][8] In determining whether a JNOV was properly granted, we apply the same standard as the district court. *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989). Resolving all the factual disputes and drawing all logical inferences in favor of the nonmoving party, we determine whether these facts and inferences so strongly favor one party "that reasonable people, in the exercise of impartial judgment, could not arrive at a contrary verdict." *Bailey v. Board of County Comm'rs of Alachua County,* 956 F.2d 1112, 1119 (11th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 58 (1992). If so, the motion was properly granted. We must also keep in mind, however, that a "mere scintilla of evidence does not create a jury question; there must be a substantial conflict in evidence to create a jury question." *Id.*

[9] As noted, the trial court granted a JNOV in favor of defendants on the ground that the arresting officer had probable cause to arrest Rankin as a matter of law. Since probable cause constitutes an absolute bar to both state and § 1983 claims alleging false arrest, the remaining question for us to

address is whether the trial court correctly concluded that probable cause did exist as a matter of law. *Ortega v. Christian,* 85 F.3d 1521, 1525 (11th Cir.1996) (probable cause constitutes an absolute bar to a § 1983 claim alleging false arrest); *Bolanos v. Metropolitan Dade County,* 677 So.2d 1005, 1005 (Fla. 3d DCA 1996) ("[P]robable cause is a complete bar to an action for false arrest and false imprisonment.") (*per curiam* ). Accordingly, "we ... must evaluate [the] facts and inferences according to the legal standard for probable cause." *Bailey,* 956 F.2d. at 1119.

[10][11][12] As has been discussed, the standard for determining whether probable cause exists is the same under Florida and federal law. *McDonald,* 606 F.2d at 553 n. 1. In order for probable cause to exist, "an arrest [must] be objectively reasonable under the totality of the circumstances." *Bailey,* 956 F.2d at 1119; *see also State v. Scott,* 641 So.2d 517, 519 (Fla. 3d DCA 1994). This standard is met when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Williamson v. Mills,* 65 F.3d 155, 158 (11th Cir.1995); *see also Elliott v. State,* 597 So.2d 916, 918 (Fla. 4th DCA 1992). "Probable cause requires more than mere suspicion, but does not require convincing proof." *Bailey,* 956 F.2d at 1120; *see also Scott,* 641 So.2d at 519 ("[T]he facts necessary to establish probable cause need not reach the standard of conclusiveness and probability as the facts necessary to support a conviction."). In determining whether probable cause exists, " 'we deal with probabilities ... [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Revels,* 666 So.2d at 215 (quoting *Illinois v. Gates,* 462 U.S. 213, 229-31, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983)).

[13][14][15] An arresting officer is required to conduct a reasonable investigation to establish probable cause. *See Tillman,* 886 F.2d at 321; *see*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033

**(Cite as: 133 F.3d 1425)**

also *Harris v. Lewis State Bank,* 482 So.2d 1378, 1382 (Fla. 1st DCA 1986) ("Where it would appear to a 'cautious man' that further investigation is justified **\*1436** before instituting a proceeding, liability may attach for failure to do so, especially where the information is readily obtainable, or where the accused points out the sources of the information."). An officer, however, need not take "every conceivable step ... at whatever cost, to eliminate the possibility of convicting an innocent person." *Tillman,* 886 F.2d at 321; *see also State v. Riehl,* 504 So.2d 798, 800 (Fla. 2d DCA 1987) ("In order to establish the probable cause necessary to make a valid arrest, ... it is not necessary to eliminate all possible defenses."). Furthermore, once an officer makes an arrest based upon probable cause, he "need not 'investigate independently every claim of innocence.' " *Tillman,* 886 F.2d at 321 (internal citation omitted). Probable cause is "judged not with clinical detachment but with a common sense view to the realities of normal life." *Marx v. Gumbinner,* 905 F.2d 1503, 1506 (11th Cir.1990) (internal citation omitted); *see also Revels,* 666 So.2d at 215.

[16][17] The only difference in the probable cause analysis applicable to the state and federal claims at issue here is which party carried the burden of proving whether probable cause existed. The existence of probable cause constitutes an affirmative defense to the claims of false arrest and imprisonment under Florida law. *See Bolanos,* 677 So.2d at 1005 (probable cause bars a state claim for false arrest or false imprisonment); *DeMarie v. Jefferson Stores, Inc.,* 442 So.2d 1014, 1016 n. 1 (Fla. 3d DCA 1983) ("[T]he existence of probable cause is a part of the defense to a false arrest action which must be shown by the defendant."). Accordingly, defendants had the burden of demonstrating the existence of probable cause as a defense to the state claim. However, plaintiffs had the burden of demonstrating the absence of probable cause in order to succeed in their § 1983 claim. *Evans v. Hightower,* 117 F.3d 1318, 1320 (11th Cir.1997) ("In order to establish a Fourth Amendment violation, [plaintiff] must demonstrate that a seizure occurred and that it was unreasonable."); *see also*

*Rivas v. Freeman,* 940 F.2d 1491, 1496 (11th Cir.1991) ("To successfully litigate a lawsuit for deprivation of constitutional rights under 42 U.S.C. section 1983, a plaintiff must show violation of a constitutionally protected liberty or property interest and deliberate indifference to constitutional rights."). We conclude that probable cause existed as a matter of law and that the existence of such probable cause defeats both the federal and state claims.

The Rankins first assert that the evidence on which Deputy Evans relied in making the arrest either exonerated Doug Rankin or was not sufficiently trustworthy or reliable to support a finding of probable cause. They assert that the medical evidence of which Evans was aware compelled the conclusion that Rankin was not Amber's abuser because it suggested that the charged conduct had occurred prior to Rankin's first contact with the child. They also contend that the physical evidence exonerated Rankin because he could not physically have committed the acts of which he was accused in the location identified by the victim. Additionally, the Rankins contend that Rankin's lack of access to Amber defeated probable cause for his arrest, especially in light of the fact that Evans knew that another male, one of Dr. Brake's coworkers, had had access to Amber during a time frame consistent with the medical evidence suggesting penetration.

The Rankins also contend that Evans should not have relied on Amber's or Dr. Brake's statements about possible abuse when determining probable cause. They claim that Amber's statements regarding abuse were unreliable because of: (1) her age; (2) inconsistencies regarding the identity of the abuser, the number of times the abuse occurred, and the location and timing of the abuse; (3) the possibility that Dr. Brake, a child psychologist, concocted the story that Amber spontaneously told her about the abuse and that Dr. Brake's coaching resulted in Amber's subsequent statements; and (4) the possibility that the police officers' questions during their interview with Amber led her into making statements that she would not otherwise have made. They further contend that Evans should have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 16

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033
**(Cite as: 133 F.3d 1425)**

viewed Dr. Brake's statements with considerable skepticism because he should have known that Dr. Brake was biased against Rankin due to their argument regarding the school's supervision of the children under its care. They also seem to suggest that Evans *1437 should have considered the possibility that either Dr. Brake or somebody she was protecting committed the abuse. Accordingly, they conclude that Evans should have placed little weight on Dr. Brake's comments regarding Amber's behavior and statements.

Finally, the Rankins argue that, at the very least, the information available to Evans at the time of the arrest should have created doubts as to the existence of probable cause and should have prompted further investigation. The Rankins claim that Evans should have examined the playground equipment to determine whether Rankin could have abused Amber on the steps of that equipment as her statements indicated. They also argue that Evans should have interviewed the teachers regarding Amber's behavior at school and Rankin's degree of access to Amber. Although the Rankins contend that this investigation should have been done prior to arresting Rankin, they further assert that it certainly should have been done after Rankin raised concerns regarding these issues during his interview with the police. Plaintiffs contend that such additional investigation was especially important here because time was not of the essence in making an arrest since the school was going to be closed over the Thanksgiving holidays, limiting Rankin's access to the children.

Defendants counter that Evans's conclusion that probable cause existed to arrest Rankin was well-supported by the evidence available to him at the time of Rankin's arrest and detention. Defendants note that Evans interviewed Amber, Dr. Brake, and Dr. Drummond, all of whom provided information supporting the conclusion that Rankin had abused Amber.

Defendants also contend that Evans's interviews with Amber and her mother, his conversation with Dr. Drummond, and his interrogation of Rankin in which Rankin made several damaging statements constituted a reasonable investigation and provided trustworthy and reliable information from which he could conclude that probable cause existed both at the time of arrest and during Rankin's subsequent detention. They further contest plaintiffs' assertion that time was not of the essence in making the arrest. They note that had Rankin not been arrested on the morning of November 23, he would have had access to the children at the school for the entire day.

We conclude that the investigation conducted by Evans was reasonable and that the evidence on which he based his decision to arrest Rankin was sufficient to create probable cause as a matter of law. We also conclude that the statements made by Rankin after his arrest did not defeat the existence of probable cause or necessitate immediate further investigation.

### a. The Medical Evidence

[18] We now address plaintiffs' assertion that the medical evidence available to Evans precluded the existence of probable cause to arrest Rankin for the crime with which he was charged. The Rankins note that penetration is an element of the crime of sexual abuse of a child under twelve. *See* § 794.011 Fla. Stat. (1987). Resolving all factual disputes in favor of the plaintiffs, we must conclude that Evans knew that the injury suggesting such penetration had been incurred at least two weeks before the date of Dr. Drummond's examination and that Evans knew that Amber had attended Sugar Plum for just two weeks. We also must conclude that Dr. Brake told Evans that Amber had told her that abusive behavior had occurred on November 21, 1988, a date which seemingly conflicts with the medical evidence that penetration (if only partial) had occurred at least two weeks prior to that date.[FN14] Accordingly, the question to be answered is whether a prudent person faced with such information could reasonably have believed that Rankin committed the offense.

FN14. The parties disputed this at trial.

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033

**(Cite as: 133 F.3d 1425)**

Evans testified that Dr. Brake told him that the date on which Amber told her about the incident with Ba Ba Blue was November 21, but that Dr. Brake gave him a time frame of November 7 to November 21 during which the actual incident or incidents of abuse could have occurred. Plaintiffs confronted Evans at trial with his arguably conflicting deposition testimony in which he indicated that Dr. Brake told him that Amber said that the abuse occurred on November 21, 1988. In light of this conflicting evidence, we must accept plaintiffs' assertion as true.

**\*1438** In addition to that information, however, Deputy Evans also knew that Amber had sustained a fresh abrasion within 24 hours of the November 21, 1988, medical examination which could have been caused by a fingering of the genital area. During her videotaped interview, Amber indicated that abusive incidents occurred on more than one occasion. Thus, Amber's statements and the medical evidence both suggested that more than one instance of abuse occurred, and a prudent officer reasonably could have concluded that a single individual, rather than two separate individuals, was responsible for the alleged abuse. Furthermore, an officer reasonably could have concluded that Rankin was that individual.

Evans knew that Amber consistently had called her alleged abuser Ba Ba Blue and repeatedly linked the alleged abuse to the school. He knew that Rankin was the only person whom Amber called by that name. Amber repeatedly referred to her abuser as a "he," and Dr. Brake told Evans that Rankin was the only male who had access to Amber during the approximately two-week period which was consistent with all of the medical evidence.[FN15] Dr. Brake also informed Deputy Evans that, after Amber started school at Sugar Plum, her behavior and language had changed in ways which Evans knew to be consistent with sexual abuse.

FN15. Amber attended Sugar Plum for two weeks, and Dr. Drummond indicated that the injury suggesting penetration was at least two weeks old. Thus, accepting as true that Evans knew of Dr. Drummond's time line, an overlap of approximately a day existed during which a cautious officer reasonably could have concluded that Rankin could have committed the charged offense. We further note that an officer reasonably could have concluded that the time frame given by the doctor was an estimate and not necessarily a strict cut-off point, thus possibly expanding the window of opportunity by a reasonable period of time.

Plaintiffs assert that even if the abuse could have occurred on the first day on which Amber attended Sugar Plum, which would have placed the incident involving penetration within a time frame consistent with Rankin's guilt, Evans knew that Amber had stated that abuse had occurred on November 21, 1988, which was clearly inconsistent with the medical time frame for the act of penetration. However, the relevant question is whether a prudent officer reasonably could have believed that Rankin committed the offense in light of the medical evidence suggesting that any penetration had to have happened significantly before November 21, 1988, and Dr. Brake's statement that Amber indicated that the abuse occurred on November 21, 1988.

In light of the evidence suggesting multiple incidents of abuse, a prudent officer reasonably could have believed that, in recounting her story to her mother, Amber might not have distinguished between penetration and simple fingering or rubbing. Thus, in recounting the abuse she could have conflated the incidents or confused the dates, or, in talking to her mother, she could have been referring to the conduct which may have resulted in the abrasion. A cautious officer, therefore, reasonably could have believed that multiple incidents of abuse occurred and that the abuse with which Rankin was charged occurred within the first few days of school-which was within the medically permissible time frame. Accordingly, a reasonable jury could not have concluded that the medical evidence de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425
133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033
(Cite as: 133 F.3d 1425)

feated probable cause to arrest Rankin.

### b. Access

[19] The Rankins next assert that, even if the medical evidence does not conclusively defeat probable cause, Rankin's lack of access to Amber while she was at school does. They contend that, had Evans interviewed any of the teachers before arresting Rankin, he would have realized that Rankin was never alone with Amber and, thus, could not have abused her. Plaintiffs further note that it is uncontested that Rankin informed Evans of his lack of access to Amber during questioning after he was arrested. They thus contend that Evans knew or should have known that Rankin was never alone with Amber and that he therefore lacked the opportunity to have committed the crime charged.

Defendants counter that Deputy Evans knew that Rankin was present at the school during the relevant time frame and that he moved freely throughout the school. Evans *1439 also knew that Dr. Brake had observed what she perceived to be a lack of adequate supervision of the children. Finally, defendants contend that a reasonable officer could have concluded that the abuse-partial penetration by a finger and rubbing of Amber's genitalia-could have occurred with others in the room if the abuser had his body between any other adult and the child and he simply slipped his hand down the front of Amber's pants or skirt.[FN16]

> FN16. The Rankins note that, in Amber's videotaped interview, she indicated that Ba Ba Blue touched her with both a finger and a plastic spoon. The Rankins assert that a reasonable officer could not possibly believe that Rankin could penetrate Amber with a spoon with other adults in the same room, since such an action undoubtedly would have been painful and caused Amber to make some sort of outcry. However, a cautious officer could have reasonably concluded that the facts available to him at the point of arrest supported at least Amber's contention that Rankin digitally pen-

etrated her. Although further investigation may have been required in order to determine whether the spoon incident could be verified, a reasonable officer could conclude that he had sufficient evidence to proceed on the digital penetration allegation and that time was of the essence considering Rankin's position as the owner of a day care center. Furthermore, a prudent officer could reasonably conclude that Amber's statements regarding digital penetration-which she made on several separate occasions and stated in her own words-were more reliable than her single reference to possible penetration by a spoon-which she referred to only in response to a question by Evans.

Additionally, the teachers whom Rankin argues that Evans should have interviewed were employed by Rankin and thus would have been of questionable credibility.[FN17] A cautious officer certainly could have reasonably concluded that, even if the teachers were to have stated that Rankin had no access to Amber, such testimony would be so undercut by the witnesses' bias in favor of their employer and their own self-interest in asserting that they were always aware of Amber's movements-such supervision being one of their job responsibilities-that it would not defeat the existence of probable cause in light of the other evidence suggesting Rankin's guilt. Finally, interviewing those witnesses prior to picking up Rankin might have alerted him to his possible arrest and, conceivably, precipitated his flight. In light of all of these considerations, a reasonable jury could not have concluded that a prudent officer could not have reasonably believed that Rankin had sufficient access to Amber to have committed the crime charged.

> FN17. Rankin also asserts that one of the teachers would have told Evans that she saw Amber rubbing her vagina on November 21. However, we note that a prudent officer who had such information reasonably could have believed that a child would not have rubbed herself so hard as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033
**(Cite as: 133 F.3d 1425)**

to cause an abrasion. Thus, such information, even had it been credible and had Evans known it, would not have defeated the existence of probable cause.

[20] The Rankins further assert that the physical evidence contradicted Amber's account of events and that those contradictions defeated probable cause. The Rankins argue that Amber's contention that she was abused by Ba Ba Blue on the steps of playground equipment at the school simply could not have been true because Rankin physically could not have performed the actions she described at that location. They contend that a reasonable jury could have concluded that the playground equipment steps were too small for a man of Rankin's size to enter and that the slats on the sides of the equipment were too narrow to permit him to reach into the equipment from the outside. The Rankins also assert that a reasonable jury could have determined that Evans did not examine the playground equipment to determine whether Amber's account of the abuse was consistent with the physical evidence. Assuming this to have been true, the question is whether a prudent officer reasonably could have believed, in light of all the evidence known to him, that Rankin was guilty of sexually abusing Amber.

We conclude that a cautious officer reasonably could have believed that, even if Amber's story was inaccurate as to the precise location of the abuse, the core of her story regarding the abuse and the identity of the abuser was trustworthy and reliable, especially in light of the medical and other evidence corroborating her story. *See Easton v. City of Boulder,* 776 F.2d 1441, 1449-50 (10th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986).

Furthermore, a prudent person reasonably could have believed that the abuse happened *1440 in the approximate area of the playground equipment, if not actually on it. Amber stated on the audiotape that, after Ba Ba Blue made "a hole in [her] bottom," he put her "back on the playground." In the videotaped interview, she said that the abuse took place outside the school. In response to a question from Evans asking whether it was on the playground, she said "yeah." In response to the question of whether it was on a piece of a toy, she said "no." She said that the incident took place on the steps. Interpreting the physical evidence in light of the statements by the victim, it would not be unreasonable for a prudent person to conclude that a three-and-a-half-year-old might either unclearly articulate the location of the abuse or conflate the idea of being put back on the playground after being abused with the idea of where the abuse actually occurred. Additionally, since Amber did not actually state that the abuse occurred on the steps of the playground equipment, there is no reason why a reasonable officer would have to have concluded that Rankin's inability to commit the alleged act on the playground equipment obviated probable cause. Finally, we note that Amber stated that the abuse occurred both inside and outside the schoolhouse, so the fact that Rankin apparently could not have abused Amber on the playground equipment does not affect the possibility that he abused her in the schoolhouse. In light of all of the evidence, we conclude that a reasonable jury could not have concluded that Rankin's alleged lack of access to Amber defeated probable cause.

### c. The Victim's Statements

[21] Next, we address the Rankins' contentions that the only information available to Deputy Evans suggesting that Rankin was the perpetrator of any abuse ultimately was based upon statements made by Amber, and that those statements were not sufficiently reliable and trustworthy to support the existence of probable cause. Defendants contend not only that Amber's statements were sufficiently reliable and trustworthy to support probable cause, but also that Evans was prohibited from simply disregarding such statements based upon the age of the victim. We conclude that evidence other than Amber's statements supported the conclusion that Rankin likely was the perpetrator of the charged conduct. We also conclude that Evans was entitled to rely to a meaningful degree on Amber's statements in determining the existence of probable

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 20

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033
**(Cite as: 133 F.3d 1425)**

cause, and that those statements supported probable cause.

As noted, Amber's statements did not constitute the only evidence suggesting that Rankin was the person who had abused her. The medical evidence was consistent with two separate episodes of abuse-partial penetration which dated back at least two weeks prior to November 21, and either rubbing or fingering of the genitalia which occurred within 24 hours of Dr. Drummond's examination of Amber. Dr. Brake indicated to Evans that she and the school staff were the only people with access to Amber during the two-week period covering both potential incidents of abuse.

Furthermore, a cautious person reasonably could have believed that Dr. Brake was unlikely either to have been the abuser or to have been protecting someone else whom she knew to be the abuser since she-at a point at which no one else knew that any abuse might have occurred-told a friend that she thought that Amber had been abused, took her to a pediatrician to have her examined for abuse, and promptly informed the police of the suspected abuse. A prudent person reasonably could have concluded that one who was guilty of, or complicit in, abusive conduct would not spontaneously decide aggressively to volunteer information to people in a position to take prosecutorial action regarding potential abuse and insist that such action be taken.

Thus, having concluded that Dr. Brake was unlikely to have been responsible for the alleged abusive incidents, a cautious person reasonably could have believed that the perpetrator was someone at the school.[FN18] This conclusion was further supported by Dr. **1441** Brake's statement that Amber started exhibiting behavioral changes within a week of beginning her attendance at Sugar Plum. These behavioral changes included unusual clinginess, an abnormal aversion to attending school, and atypical shyness. A seasoned officer reasonably could have concluded that these behavioral changes were consistent with sexual abuse and linked that abuse to the school.[FN19]

FN18. Although Evans knew that a male coworker of Dr. Brake's had had access to Amber approximately three weeks prior to the medical examination, that person had not had access to her during the two-week period potentially covering the occurrences resulting in both the damage to the hymen and the fresh abrasion.

FN19. The Rankins contend that if Evans had interviewed the teachers, they would have told him that Amber exhibited no behavioral changes, appeared to be happy at school, and even started to misbehave at the end of the day when she had to leave school. However, a cautious officer reasonably could have concluded that any potential statements by the teachers regarding Amber's behavior would not have been particularly probative considering their limited experience with Amber, particularly in light of the fact that her mother, who clearly knew her very well, indicated that such changes had occurred.

The Rankins also contend that Evans knew that Amber and her family had just moved, that she had been repeatedly moved to new preschools, and that her mother had been paying a lot of attention to Amber's younger brother because of his severe illness. They argue that-knowing about those family circumstances-a cautious officer would not have given significant weight to any behavioral changes. However, we conclude that a cautious officer reasonably could have believed, in light of the knowledge that Amber had frequently moved to new preschools and that her brother's health problems were apparently chronic, that Amber had faced such strains before and that her mother was presumably aware of her child's typical reactions to such ongoing problems. Dr. Brake, however, had nonetheless concluded that Amber's behavior was unusual and reported that conclusion to Evans. A reasonable officer acting cautiously could have given significant weight to her evaluation of her child's behavior.

Having narrowed the class of likely suspects to the school house, information provided by Dr.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033

**(Cite as: 133 F.3d 1425)**

Brake suggested that Rankin was the guilty party. Dr. Brake told Evans that, on the day Amber informed her of the abuse, she saw Rankin pick up Amber and that Amber hit him. A prudent officer reasonably could have found this information to be relevant to the probable cause determination in two ways: (1) as Evans testified, an abuser often shows a special interest in a child whom he is abusing, and Rankin's particular attention to Amber in a class of approximately 120 might indicate such a special interest; and (2) the hostility Amber demonstrated towards Rankin by striking him was not typical of her behavior towards adults, as indicated by her mother, suggesting that Rankin had done something to prompt such a reaction.

In addition to this independent evidence linking Rankin to the abuse, Evans relied on Amber's statements to both her mother and the police in determining that probable cause existed to arrest Rankin. As noted above, the essential question regarding Amber's statements is whether they were sufficiently reliable and trustworthy to support a determination of probable cause. We conclude as a matter of law that a prudent person reasonably could have believed that the fundamental information provided by Amber's statements was sufficiently reliable and trustworthy to consider in determining the existence of probable cause.

[22] Generally, an officer is entitled to rely on a victim's criminal complaint as support for probable cause. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996). The Rankins assert that Evans was not entitled to so rely here because the victim's age and inconsistencies rendered her statements unreliable. We conclude that, although a child victim's statements must be evaluated in light of her age, Amber's statements-considered along with the other supporting evidence-were sufficiently reliable and trustworthy at their core to form the basis for probable cause to arrest Rankin. *See Marx,* 905 F.2d at 1506 (indicating that, although a four-year-old's age affected the weight due her statements, the arresting officer could not simply disregard her statements in de-

termining whether probable cause existed); *Myers v. Morris,* 810 F.2d 1437, 1456-57 (8th Cir.), *cert. denied,* 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987); *Easton,* 776 F.2d at 1450-51.

[23] Next, we address the Rankins' contention that Amber never explicitly stated that Rankin or Mr. Doug abused her. Instead, they note that she merely referred to her abuser as Ba Ba Blue. However, they do **\*1442** not dispute that Evans knew at the time of Rankin's arrest that Rankin was referred to by the children as Baba Loo. They also do not contest that Amber in particular called Rankin Ba Ba Blue, which was her pronunciation of Baba Loo. Amber identified Ba Ba Blue as the culprit in both her first statement regarding the abuse made to her mother and the subsequent audiotaped statement. Dr. Brake told Evans that Amber also had identified her alleged abuser as Ba Ba Blue to Dr. Drummond. Furthermore, in the videotaped interview of Amber, she ultimately responded "Ba Ba Blue" to questions regarding the identity of her abuser.[FN20] In addition, Amber consistently referred to her abuser as "he," indicating that the offending individual was a male. As noted above, the only people beside Amber's mother who appeared to have access to her were the staff at Sugar Plum. In addition, Amber indicated that all of her teachers were female, suggesting that Rankin was the only male at Sugar Plum (a fact which Rankin subsequently conceded during questioning). Accordingly, we conclude that Amber's statements provided sufficient information for a cautious person reasonably to believe that Amber was abused by someone called Ba Ba Blue, and that other evidence indicated that Ba Ba Blue was Rankin.

> FN20. The Rankins assert that the videotaped statement in which Amber identified "Ba Ba Blue" as her abuser demonstrates the unreliability of her statements because she initially answered "Donald Duck" and "Pluto" in response to the question of who did the things to her which she described. The Rankins assert that her identification of two cartoon characters, followed immediately by her identification of Ba Ba Blue

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.3d 1425
133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033
**(Cite as: 133 F.3d 1425)**

as her abuser, precluded Evans from relying on her statements for probable cause to arrest Rankin. However, a prudent officer reasonably could conclude that Amber was merely playing when she answered "Donald Duck" and "Pluto," but was being serious when she ultimately responded Ba Ba Blue because: (1) she had repeatedly identified Ba Ba Blue as the abuser in past statements and had never before mentioned the first two characters; (2) she actually knew someone who was referred to as Ba Ba Blue, unlike the other characters; (3) she repeatedly referred to the person who abused her as "he" and the person referred to as Ba Ba Blue was a male; and (4) other corroborating evidence was consistent with abuse by the individual identified as Ba Ba Blue. Thus, a cautious officer reasonably could have concluded that Amber, when referring to Ba Ba Blue, was referring to a real person as opposed to a cartoon character. In light of the other evidence, such an officer also reasonably could have concluded that Rankin was Ba Ba Blue.

[24] The Rankins also assert that inconsistencies in Amber's videotaped statement indicated that her statements as a whole were unreliable. For instance, they note that when Amber was questioned regarding the timing of any abusive incidents, she stated that she had been abused "today"-the date of the interview-but not on the day before, the date on which she reported the incidents to her mother and on which Dr. Brake told Evans that Amber had indicated the abuse had occurred.[FN21] However, an officer as seasoned in the field of child abuse as Deputy Evans reasonably could have discounted Amber's statements regarding the timing of the abuse because of the fact that young children do not have a particularly strong grasp of the concept of time, although they are able to articulate more concrete concepts such as events that have occurred or things that have happened to them.[FN22]

FN21. The Rankins also note the varying times which Amber gave Dr. Drummond

for the dates of the abuse as evidence that Evans should not have relied on Amber's statements. The Rankins, however, have pointed to no evidence indicating that Dr. Drummond relayed that information to Evans.

FN22. For example, Dr. Drummond testified that, in his experience, children who were unable to fully grasp temporal concepts were able accurately to describe more concrete events such as physical pain. A police officer such as Evans, with formal training and extensive practical experience in child abuse cases, would be aware of children's difficulties with time, and reasonably could have discounted those inconsistencies.

The Rankins also point to several other comments by Amber which they assert fatally undermine the reliability of her statements.[FN23] Although we acknowledge that a stronger statement by the victim would be preferable prior to arrest, we cannot conclude**1443** that a prudent officer could not have reasonably relied on the fundamental allegation consistently made by Amber: that a male named Ba Ba Blue made a hole in her bottom at school.[FN24] She made statements to this effect on at least four separate occasions of which Evans was aware: to her mother, to Dr. Drummond, on audiotape, and to him during the videotaped interview.[FN25] In light of the medical evidence supporting the conclusion that abuse had occurred, Dr. Brake's observations regarding Amber's behavioral changes, and her statements regarding the limited number of people who had access to Amber during the relevant time period, we conclude that Evans properly relied on Amber's statements in establishing the existence of probable cause to arrest Rankin.[FN26] *See Marx,* 905 F.2d at 1506; *Myers,* 810 F.2d at 1456-57.

FN23. For instance, they note that Amber stated in the videotaped interview that Dr. Drummond stuck a thermometer in her bottom and that the testimony at trial

133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033
**(Cite as: 133 F.3d 1425)**

showed that he did not do so. However, the Rankins point to no evidence indicating that Evans knew or should have known of this inconsistency at the time of the arrest.

FN24. The Rankins contend that Amber's assertion that the abuser had stuck a finger in her bottom undercut the reliability of her statement regarding the abuse because it was inconsistent with the medical evidence which showed vaginal penetration, but no anal contact. However, we note that, in the videotaped interview, Amber referred to her genitals as her bottom. We also note that it is not surprising that a three-year-old would not have separate words for her vagina and bottom. Accordingly, a reasonable officer could conclude that Amber intended to refer to her vagina.

FN25. Defendants assert that Amber also made such statements to Officer Honholz and Dr. Decharme. Plaintiffs assert that a reasonable jury could have concluded that such statements were never made to these individuals. We conclude that a prudent officer reasonably could have relied upon Dr. Brake's assertion that Amber had made such a statement to Dr. Decharme and on Officer's Honholz's representation to Evans and Dr. Brake that Amber had made such a statement to him in evaluating the existence of probable cause. However, even disregarding these additional statements, probable cause existed as a matter of law.

FN26. We note that under Fla. Stat. 794.022(1) (West Supp.1990), "[t]he testimony of the victim need not be corroborated in a prosecution under s. 794.011 [commission of a sexual battery of a child under twelve]." However, we do not need to address the question of how this statutory section would apply when the victim is a young child and the statement is merely being used to establish probable cause, rather than as the sole basis for a

conviction, because Evans had evidence in addition to Amber's statements which incriminated Rankin at the time of arrest.

*Conclusion*

In sum, we conclude that the trial court was not procedurally barred by Federal Rule of Civil Procedure 50 from granting a JNOV in favor of defendants on the ground that probable cause existed. Although we note with regret the undoubted hardship caused to plaintiffs by Doug Rankin's arrest and detention, especially in light of his subsequent complete exoneration by the grand jury, we conclude that the district court correctly determined that probable cause existed as a matter of law. Accordingly, we affirm the district court's grant of a JNOV in favor of defendants and dismiss the cross-appeal as moot.

AFFIRMED.

C.A.11 (Fla.),1998.
Rankin v. Evans
133 F.3d 1425, 39 Fed.R.Serv.3d 1139, 11 Fla. L. Weekly Fed. C 1033

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

992 F.Supp. 1365                                                                                    Page 1
992 F.Supp. 1365, 11 Fla. L. Weekly Fed. D 509
**(Cite as: 992 F.Supp. 1365)**

**C**

Hernandez v. Metro-Dade County
S.D.Fla.,1997.

United States District Court,S.D. Florida.
Ismael HERNANDEZ, Plaintiff,
v.
METRO-DADE COUNTY et al., Defendants.
**No. 96-3636-CIV.**

May 7, 1997.

Individual who had been arrested and detained by police, due to mistaken belief that he was individual with similar name who was subject to arrest warrant in Texas, sued city, county, and city police officer. City and officer moved to dismiss, and the District Court, James Lawrence King, J., held that: (1) allegations were sufficient to state claim against city under § 1983; (2) whether probable cause established affirmative defense to false arrest and imprisonment claims was jury issue; (3) negligence claims were subsumed within claims for false arrest and false imprisonment; and (4) allegations of willful, wanton, and reckless disregard of plaintiff's rights were sufficient to bring claims against officer within exception to immunity statute.

Motion granted in part and denied in part.

West Headnotes

**[1] Civil Rights 78 ⚖1379**

78 Civil Rights
   78III Federal Remedies in General
      78k1378 Time to Sue
         78k1379 k. In General. Most Cited Cases
   (Formerly 78k210)
Statute of limitations applicable to claim under § 1983 is statute of limitations for tort prescribed by state in which action arose. 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 ⚖1088(4)**

78 Civil Rights
   78I Rights Protected and Discrimination Prohib-
ited in General
      78k1088 Police, Investigative, or Law Enforcement Activities
         78k1088(4) k. Arrest and Detention. Most Cited Cases
   (Formerly 78k133)
Claims by individual, who had been arrested pursuant to out-of-state warrant and detained due to case of mistaken identity, that police officers had arrested him without taking adequate steps to verify his identity because of policy devoid of procedures designed to prevent arrest and detention of innocent persons based on out-of-state warrants, and that city had showed deliberate indifference to his constitutional rights by failing to take steps to verify his identity despite his protestations, were sufficient to allege constitutional violation as result of city policy sufficient to state claim under § 1983. U.S.C.A. Const.Amends. 4, 5, 14; 42 U.S.C.A. § 1983.

**[3] False Imprisonment 168 ⚖39**

168 False Imprisonment
   168I Civil Liability
      168I(B) Actions
         168k37 Trial
            168k39 k. Questions for Jury. Most Cited Cases
Issue of whether police officers had probable cause to arrest and detain individual whose name was very similar to that of fugitive from arrest warrant in Texas, as would establish affirmative defense to claims for false arrest and false imprisonment asserted against city by individual under Florida law, was for jury.

**[4] False Imprisonment 168 ⚖2**

168 False Imprisonment
   168I Civil Liability
      168I(A) Acts Constituting False Imprisonment and Liability Therefor
         168k1 Nature and Elements of False Imprisonment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

992 F.Supp. 1365
992 F.Supp. 1365, 11 Fla. L. Weekly Fed. D 509
**(Cite as: 992 F.Supp. 1365)**

168k2 k. In General. Most Cited Cases
Under Florida law, false imprisonment and false arrest are different labels for same cause of action.

**[5] False Imprisonment 168 ⟨⟩13**

168 False Imprisonment
    168I Civil Liability
        168I(A) Acts Constituting False Imprisonment and Liability Therefor
        168k9 Defenses
        168k13 k. Probable Cause. Most Cited Cases

**False Imprisonment 168 ⟨⟩22**

168 False Imprisonment
    168I Civil Liability
        168I(B) Actions
        168k21 Evidence
        168k22 k. Presumptions and Burden of Proof. Most Cited Cases
Although probable cause is defense under Florida law to claims of false arrest and false imprisonment, it is an affirmative defense, so that burden is on defendant to establish existence of probable cause by showing that facts and circumstances known to arresting officer were sufficient to cause reasonably cautious person to believe that suspect was guilty of committing a crime.

**[6] False Imprisonment 168 ⟨⟩39**

168 False Imprisonment
    168I Civil Liability
        168I(B) Actions
        168k37 Trial
        168k39 k. Questions for Jury. Most Cited Cases
Under Florida law, defense of probable cause must be submitted to jury in action for false arrest or false imprisonment where there is material controversy as to facts upon which police officer relied in making arrest.

**[7] False Imprisonment 168 ⟨⟩2**

168 False Imprisonment

168I Civil Liability
        168I(A) Acts Constituting False Imprisonment and Liability Therefor
        168k1 Nature and Elements of False Imprisonment
        168k2 k. In General. Most Cited Cases
Under Florida law, "false imprisonment" is the unlawful restraint of person against his will, with requirement that restraint must be unreasonable and unwarranted under circumstances.

**[8] False Imprisonment 168 ⟨⟩4**

168 False Imprisonment
    168I Civil Liability
        168I(A) Acts Constituting False Imprisonment and Liability Therefor
        168k1 Nature and Elements of False Imprisonment
        168k4 k. Intent and Malice. Most Cited Cases
To constitute false imprisonment under Florida law, defendant must either intend to cause confinement, or have knowledge to substantial certainty that confinement will result from his actions.

**[9] False Imprisonment 168 ⟨⟩2**

168 False Imprisonment
    168I Civil Liability
        168I(A) Acts Constituting False Imprisonment and Liability Therefor
        168k1 Nature and Elements of False Imprisonment
        168k2 k. In General. Most Cited Cases
Under Florida law, negligence stemming from arrest and/or imprisonment is subsumed conceptually within tort of false arrest/false imprisonment.

**[10] False Imprisonment 168 ⟨⟩20(1)**

168 False Imprisonment
    168I Civil Liability
        168I(B) Actions
        168k20 Pleading
        168k20(1) k. Declaration, Complaint, or Petition. Most Cited Cases
Under Florida law, claim for negligent arrest and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

992 F.Supp. 1365, 11 Fla. L. Weekly Fed. D 509

**(Cite as: 992 F.Supp. 1365)**

detention which was asserted against city by individual who was detained in case of mistaken identity was subsumed within individual's false arrest and false imprisonment claims, so that individual was not required to plead claims in the alternative.

**[11] False Imprisonment 168 €⇒15(1)**

168 False Imprisonment
    168I Civil Liability
        168I(A) Acts Constituting False Imprisonment and Liability Therefor
            168k15 Persons Liable
                168k15(1) k. In General. Most Cited Cases

Allegations by individual who had been arrested and detained in case of mistaken identity that actions of arresting officer were in willful, wanton, and reckless disregard of individual's rights, were sufficient to bring individual's false arrest and false imprisonment claims against officer within exception to Florida statute granting immunity to governmental employees, even though individual had conceded that officer was acting within scope of his employment. West's F.S.A. § 768.28(9)(a).

**\*1366** Charles Baron, North Miami Beach, FL, for Plaintiff.
Thomas A. Tucker Ronzetti, Dade County Attorney's Office, Miami, FL, Richard McDuff, Ft. Lauderdale, FL, Russell A. Friemel, Fort Worth, TX, Hugh Koerner, Ft. Lauderdale, FL, for Defendants.

### ORDER GRANTING IN PART, DENYING IN PART MOTION TO DISMISS OF DEFENDANTS CITY OF MIAMI SPRINGS AND JESUS RODRIGUEZ

JAMES LAWRENCE KING, District Judge.

THIS CAUSE, arising out of allegations of an arrest and detention based on mistaken identity, comes before the Court upon a Motion To Dismiss Or, In The Alternative, For Summary Judgment filed by Defendants City of Miami Springs (the "City") and Jesus Rodriguez, a City police officer, on April 1, 1997. Plaintiff, Ismael Hernandez, filed a Response in opposition on April 22, 1997. De-

fendants filed a Reply on April 28, 1997.

### I. FACTUAL BACKGROUND

[1] The Court herein summarizes the allegations contained in Plaintiff's lawsuit, filed December 19, 1996. Plaintiff alleges that on December 20, 1992,[FN1] he was pulled over while driving in the City of Miami Springs. Officer Rodriguez, who had arrived at the scene, decided to arrest Plaintiff because a background check showed that one "Izmael M. Hernandez" was wanted by Tarrant County, Texas, on kidnapping charges. "The arrest affidavit stated that 'ID' was based on 'FPC' (meaning fingerprint classification) based on 'NCIC HIT, TELETYPE.' " (Pl.'s Compl. ¶ 21.) Plaintiff showed Officer Rodriguez his identification and social security number and protested his innocence. He was arrested nonetheless and transferred to the Dade County Jail. In jail, Plaintiff informed an **\*1367** unspecified number of John Does (Defendants working for Metro-Dade whose names are unknown to Plaintiff) that he was not Izmael M. Hernandez and had never been to Texas. (*Id.* ¶ 25.)

> FN1. The statute of limitations has not run in this case. The statute of limitations applicable to a claim brought under 42 U.S.C. § 1983 is the statute of limitations for the tort prescribed by the state in which the action arose. *See Farmer v. City of Fort Lauderdale,* 814 F.Supp. 1101, 1102 (S.D.Fla.1993) (citing *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)). The statute of limitations applicable to Plaintiff's tort actions against City is four years. Fla.Stat.Ann. § 768(13) (West Supp.1997). Four years is also the limitation period for the claim against Officer Rodriguez, Fla.Stat.Ann. § 95.11(3)(*o*) (West Supp.1997).

The next day, at his first court appearance, Plaintiff repeated his assertions to a Dade Circuit judge. The Judge told Plaintiff, through an interpreter, that
if he did not accept extradition, he would be

992 F.Supp. 1365
992 F.Supp. 1365, 11 Fla. L. Weekly Fed. D 509
(Cite as: 992 F.Supp. 1365)

held in METRO-DADE custody for up to ninety (90) days and would then have a hearing to determine whether he would be extradited; however, if he would accept extradition, he would be held for a maximum of ten (10) days in METRO-DADE custody before someone from Texas would come for him.

(*Id.* ¶ 27.) He chose extradition, which occurred on December 29, 1992, when Tarrant County Sheriff's Deputy Alvin Melman picked him up, walked him in handcuffs through two airports, and flew with him back to Texas. (*Id.* ¶ 33.) Plaintiff repeated his assertions to Deputy Melman.

Because the instant Motion addresses only the claims against Defendants City and Officer Rodriguez, the Court further condenses the facts in stating that, once in Tarrant County, officials there discovered that Plaintiff was not the fugitive they were seeking. This discovery resulted from looking at actual photographs and fingerprints of the fugitive, (*id.* ¶ 34), and from determining that a wrong fingerprint classification had been entered into the computer and that the correct classification was "completely different" from Plaintiff's classification, (*id.* ¶ 35). Plaintiff was released on December 30, 1992, and he arrived back in Miami the next day. Plaintiff states:As a result of his detention, Plaintiff spent the Christmas holiday in jail rather than with his family as planned.... Plaintiff lost his job as a roofer, as his employer replaced him and would not hire him back. Plaintiff could not get another job for approximately two months.

(*Id.*¶¶ 38-39.) Plaintiff asserts that the Defendants, including City and Officer Rodriguez, should have had procedures to verify that he was not the fugitive. He lists numerous "major differences" between himself and the fugitive: facial, hair, and body appearances; fingerprints; names (in addition to the spelling of the first name, Plaintiff has no middle name or initial); home addresses; country of origin (Plaintiff immigrated from Cuba on May 19, 1991, whereas the fugitive, of Mexican origin, was arrested in Tarrant County on August 19, 1990, before Plaintiff's arrival in the United States); social security numbers; wives' names; and driver's li-

censes. (*Id.* ¶ 22.)

## II. LEGAL STANDARD

The Court treats Defendants' Motion as seeking dismissal, not as one for summary judgment, as the Defendant has not presented any evidence of the sort referred to in Rule 56 of the Federal Rules of Civil Procedure.

A motion to dismiss will be granted where it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. "[D]ismissal is justified only when the allegations of the complaint itself clearly demonstrate that plaintiff does not have a claim." 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (1990 & Supp.1996); *see also Bradberry v. Pinellas County,* 789 F.2d 1513, 1515 (11th Cir.1986). For purposes of a motion to dismiss, the complaint is construed in the light most favorable to the plaintiff, and all facts alleged by the plaintiff are accepted as true. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The issue is not whether the plaintiff will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

## III. DISCUSSION

The instant Motion relates only to Counts V-VII, brought against City of Miami Springs; and Count VIII, brought against Officer Rodriguez in his individual capacity. The Court considers each count, though not in numerical order for a reason to be explained.

### *1368 A. Section 1983 claim against the City

In Count V, Plaintiff alleges the City violated his constitutional rights under the Fourth, Fifth and Fourteenth Amendments, and he seeks damages pursuant to 42 U.S.C. § 1983. (Pl.'s Compl.¶¶ 73-78.) He alleges that the City arrested and de-

992 F.Supp. 1365, 11 Fla. L. Weekly Fed. D 509
**(Cite as: 992 F.Supp. 1365)**

tained him without taking adequate steps to verify his identity because of a policy devoid of procedures designed to prevent the arrest and detention of innocent persons based on out-of-state warrants. By failing to take steps to verify his identity, despite his protestations, the City showed deliberate indifference to violation of his constitutional rights.

[2] Defendant, in moving for dismissal of this claim, cites two Seventh Circuit cases, *Brown v. Patterson,* 823 F.2d 167 (7th Cir.1987) and *White v. Olig,* 56 F.3d 817 (7th Cir.1995). Neither case is controlling and, in any event, both support Plaintiff, *see* 823 F.2d at 169 (upholding dismissal where plaintiff's complaint contained "no suggestion that the city ... has a custom or policy" of not making an effort to rule out mistaken identity of arrestees who protest their innocence on that basis); 56 F.3d at 820 (holding that, where plaintiff does not allege violation of a liberty interest, defendants' alleged violations of state law were irrelevant to determination of § 1983 liability).

By contrast, *Rivas v. Freeman,* 940 F.2d 1491 (11th Cir.1991), which Plaintiff cites and which is controlling, clearly holds that "liability may be imposed due to the existence of an improper policy or from the absence of a policy,"*id.* at 1495, provided that a plaintiff pleads and proves "deliberate indifference to his constitutional rights as a result of ... missing policies and procedures,"*id.* at 1496. Plaintiff in the instant case sufficiently alleges that his rights were violated due to City actions, which actions amounted to deliberate indifference and were based on City policy. He also sufficiently alleges supporting facts-e.g., that the City through its officers took no action to discover the numerous differences between himself and the real fugitive. *See Cannon v. Macon County,* 1 F.3d 1558, 1565 (11th Cir.1993) (upholding dismissal where plaintiff failed to allege "any facts whatsoever to indicate that the alleged violation was a result of a County policy or practice").

**B. False arrest/false imprisonment claim against City**

In Count VII, Plaintiff alleges that City is vicariously liable for causing him to be arrested and detained for an unreasonable length of time.

[3] Defendant argues that, based on the outstanding warrant for the real fugitive, Officer Rodriguez had probable cause to arrest Plaintiff and that "probable cause is an absolute defense to a claim for false arrest or false imprisonment." (Def.'s Mot. to Dismiss at 8.)

[4][5][6][7] Although probable cause is a defense to false arrest and false imprisonment,[FN2] it is an affirmative defense, *see, e.g., Miller v. City of Jacksonville,* 603 So.2d 1310, 1311 (Fla. 1st Dist.Ct.App.1992). As an affirmative defense,

> FN2. There is no need for the Court, at least at this juncture of the case, to distinguish between the arrest and the imprisonment of Plaintiff. "False imprisonment and false arrest are different labels for the same cause of action." 24A Fla.Jur.2d *False Imprisonment and Malicious Prosecution* § 1, at 406 (1995 & Supp. Feb. 1997).

[T]he burden is upon the defendant to establish the existence of probable cause in order to successfully assert this defense. The defendant must show that the facts and circumstances known to the arresting officer were sufficient to cause a reasonably cautious person to believe that the suspect was guilty of committing a crime.... [T]he defense of probable cause must be submitted to the jury where there is material controversy as to the facts upon which the officer relied in making the arrest.

*Id.* (citations omitted). Thus, where Plaintiff, as here, has stated a prima facie case of false arrest/ false imprisonment, dismissal would be improper.FN3

> FN3. *Kanner v. First National Bank of South Miami,* 287 So.2d 715, 717 (Fla.3d Dist.Ct.App.1974) is often cited for the elements of false imprisonment: "False imprisonment is the unlawful restraint of a person against his will" and "the restraint must be unreasonable and unwarranted un-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

992 F.Supp. 1365
992 F.Supp. 1365, 11 Fla. L. Weekly Fed. D 509
**(Cite as: 992 F.Supp. 1365)**

der the circumstances." (quoting 14 Fla.Jur. *False Imprisonment* §§ 2-3 (1957).)

**\*1369 C. Negligence claim against City**

In Count VI, Plaintiff alleges that the City was negligent, in failing to take steps to find out Plaintiff's true identity, especially in light of the fact that Plaintiff's name is one of the most common in the Miami area. Plaintiff seems to allege that City was not only vicariously liable based upon Officer Rodriguez's negligence, but also directly negligent. (Pl.'s Compl.¶¶ 79-87.) Because Plaintiff's Response, however, predicates negligence only on vicarious liability, (*id.* at 11), the Court reads Count VI in line with this narrower interpretation.

Defendant, relying on *Carpenter v. City of St. Petersburg,* 547 So.2d 339 (Fla. 2d Dist.Ct.App.), *rev. denied,*554 So.2d 1167 (1989) argues that the doctrine of sovereign immunity protects it from liability for "negligent arrest."

[8][9][10] The Court finds that Count VI should be dismissed, though not for the reason cited by Defendant. As stated *supra,* Plaintiff has stated a claim for false arrest/false imprisonment. "To constitute false imprisonment, the defendant must either intend to cause confinement or have knowledge that confinement to a substantial certainty will result from his actions." 24A Fla.Jur.2d *False Imprisonment and Malicious Prosecution* § 1, at 406 (1995 & Supp. Feb. 1997) (citing *Johnson v. Weiner,* 155 Fla. 169, 19 So.2d 699, 700 (1944)). Conceptually, then, negligence stemming from an arrest and/or imprisonment is subsumed by the tort of false arrest/false imprisonment.[FN4] Thus Plaintiff need not plead in the alternative, as he appears to be doing.

> FN4. The Court's research on this point turns up no evidence in Florida, or in any other state, of a cause of action for negligence stemming from an arrest or imprisonment.

**D. False arrest/false imprisonment against Officer Rodriguez**

In Count VIII, Plaintiff alleges that Officer Hernandez's actions constituted false arrest/false imprisonment.

[11] Defendants move to dismiss this count based on Florida Statute § 768.28(9)(a):

No officer, employee, or agent of the state or any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of his employment or function, unless such officer, employee, or agent acted in *bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.*

Fla.Stat.Ann. § 768.28(9)(a) (West Supp.1997) (emphasis added). Defendants state that, because Plaintiff, in paragraph 9 of his Complaint, alleges that Officer Rodriguez was acting within the scope of his employment, "there is no allegation that Defendant RODRIGUEZ acted in bad faith or with malice." (Defs.' Mot. to Dismiss at 7.)

Although Plaintiff did indeed plead in paragraph 9 that Officer Rodriguez was acting within the scope of his employment, Plaintiff also pleads within Count VIII itself that "[t]he actions of said Defendant ... were in willful, wanton and reckless disregard of Plaintiff's rights." (Pl.'s Compl. ¶ 100.) As such, the allegation satisfies the emphasized portion of the above-quoted § 768.28(9)(a).

**IV. SUMMARY OF ORDERS**

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that Defendants' Motion To Dismiss Or, In The Alternative, For Summary Judgment be and is hereby DENIED as to Counts V, VII, and VIII; and GRANTED as to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

992 F.Supp. 1365
992 F.Supp. 1365, 11 Fla. L. Weekly Fed. D 509
**(Cite as: 992 F.Supp. 1365)**

Count VI. Count VI is DISMISSED.

DONE and ORDERED in chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 6th day of May 1997.

S.D.Fla.,1997.
Hernandez v. Metro-Dade County
992 F.Supp. 1365, 11 Fla. L. Weekly Fed. D 509

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

274 So.2d 646                                                                                      Page 1

49 Ala.App. 618, 274 So.2d 646

**(Cite as: 49 Ala.App. 618, 274 So.2d 646)**

C

Weeks v. State,

Ala.Cr.App. 1973.

Court of Criminal Appeals of Alabama.

Eddie WEEKS, alias

v.

STATE.

**5 Div. 90.**

March 13, 1973.

Defendant was convicted before the Circuit Court, Lee County, L. J. Tyner, J., of resisting lawful arrest and he appealed. The Court of Criminal Appeals, Harris, J., held that where officers were in 'hot pursuit' of defendant, defendant had made two attempts to run the officers down with his vehicle a few minutes prior to the arrest, defendant tussled with first officer and, during the struggle, the second officer observed that first officer's pistol was not in its holster, the second officer had right to assume that the pistol was in the possession of defendant and the second officer did not use excessive force to complete the arrest by striking defendant on the head while he was struggling with the first officer.

Affirmed.

West Headnotes

**[1] Arrest 35 ☞63.3**

35 Arrest

    35II On Criminal Charges

        35k63 Officers and Assistants, Arrest Without Warrant

        35k63.3 k. Presence Of, or Fresh Pursuit By, Officer. Most Cited Cases

**Arrest 35 ☞67**

35 Arrest

    35II On Criminal Charges

        35k67 k. Time for Arrest. Most Cited Cases

**Arrest 35 ☞68(1)**

35 Arrest

    35II On Criminal Charges

        35k68 Mode of Making Arrest

           35k68(1) k. In General. Most Cited Cases

    (Formerly 35k68)

An officer may arrest any person without warrant, on any day and at any time, for any public offense committed in his presence, and is not under any duty to inform the person arrested for an offense committed in his presence of the nature of the charge.

**[2] Arrest 35 ☞68(2)**

35 Arrest

    35II On Criminal Charges

        35k68 Mode of Making Arrest

           35k68(2) k. Use of Force. Most Cited Cases

    (Formerly 35k68)

In all cases of attempted legal arrest, officer is under duty to act aggressively and go forward in perfecting the arrest; he may repel force with force and need not give back.

**[3] Arrest 35 ☞68(2)**

35 Arrest

    35II On Criminal Charges

        35k68 Mode of Making Arrest

           35k68(2) k. Use of Force. Most Cited Cases

    (Formerly 35k68)

Where officers were in "hot pursuit" of defendant, defendant had made two attempts to run the officers down with his vehicle a few minutes prior to the arrest, defendant tussled with first officer and, during the struggle, the second officer observed that first officer's pistol was not in its holster, the second officer had right to assume that the pistol was in the possession of defendant and the second officer did not use excessive force to complete the arrest by striking defendant on the head while he was struggling with the other officer.

274 So.2d 646
49 Ala.App. 618, 274 So.2d 646
**(Cite as: 49 Ala.App. 618, 274 So.2d 646)**

**[4] Obstructing Justice 282 ⟊17.2**

282 Obstructing Justice
   282k17 Trial
      282k17.2 k. Questions for Jury. Most Cited Cases
   (Formerly 282k171/2)
Whether defendant knew he was being chased by officers of the law and whether he was driving in excess of the speed limit prior to his being stopped by the officers were questions for the jury in prosecution for resisting lawful arrest.

**[5] Criminal Law 110 ⟊1035(8.1)**

110 Criminal Law
   110XXIV Review
      110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
         110XXIV(E)1 In General
            110k1035 Proceedings at Trial in General
               110k1035(8) Remarks and Conduct of Judge
                  110k1035(8.1) k. In General. Most Cited Cases
   (Formerly 110k1035(8))

**Criminal Law 110 ⟊1053**

110 Criminal Law
   110XXIV Review
      110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
         110XXIV(E)2 Exceptions
            110k1053 k. Review of Proceedings at Trial in General. Most Cited Cases
In view of lack of objection or exception to action of the trial court, defendant was not entitled to raise on appeal contention that trial court's rebuke of defense counsel in the presence of the jury was reversible error.

**\*618 \*\*647** Maye & Melton, Opelika, for appellant.
William J. Baxley, Atty. Gen., and J. Mason Davis, Birmingham, Special Asst. Atty. Gen., for the State.
HARRIS, Judge.

Appellant was convicted of resisting a lawful arrest. The jury assessed a fine of $450.00, and the trial judge in addition thereto sentenced appellant to hard labor for Lee County for six (6) months. He was also sentenced to one hundred and forty (140) days hard labor in lieu of the fine and an additional term of twenty-four (24) days for non payment of the court costs at the rate of three dollars ($3.00) per day, making a total of eleven (11) months and fourteen (14) days servitude. Sentence was suspended pending appeal and the appeal bond was fixed at five thousand dollars**\*619** ($5,000.00) and he is now free on bond.

After midnight on June 13, 1971, Ernest G. Gilmore, a police officer of Phenix City, Alabama, and his partner, Jerry Wayne Sharpe, were on patrol on Highway 431 between Phenix City and Opelika when a 1959 Pontiac automobile passed them traveling at a very high rate of speed going in the direction of Opelika. The officers immediately gave chase with the siren on and blue light working. They got up to a speed of 110 miles per hour in an attempt to overtake the fleeing Pontiac. When they got to Smith's Station, being then in Lee County, the Pontiac attempted to make a right turn on to another paved road and the car stalled. The officers pulled their car partially in front of the stalled car being within three (3) feet of the front end, got out and started to the Pontiac. They were dressed in uniform and their car was a marked car with the insignia on the doors on both sides. Their blue light was still on. As they approached the car they observed a male and female in the front seat. Appellant was identified as the driver. Just before they got to the car appellant cranked the Pontiac and drove directly at the officers in an attempt to run them down. The officers jumped out of the way and shouted, 'Halt, Stop, Police'. Appellant put the car in reverse and after backing a short distance again drove forward toward the officers.**\*\*648** The officers again jumped to safety and were still shouting 'Halt, Police'. Appellant turned his car around and headed in the direction of Phenix City. One of the officers pulled his revolver and shot the two left tires and two other shots struck the left fender and another part of the vehicle. The officers got in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

49 Ala.App. 618, 274 So.2d 646
**(Cite as: 49 Ala.App. 618, 274 So.2d 646)**

patrol car and again gave chase with siren on and blue light revolving. They noticed that the two shot tires were flat, the tires came off and appellant drove on the rims emitting sparks on down the highway. After a mile and a half, appellant lost control and the car came to a stop.

Officer Sharpe got out and approached the driver's side of the Pontiac. Appellant opened the door and reached for the officer bringing his hands up both sides of the officer from his knees to his shoulders and they began to tussle. During the tussle, Gilmore saw Sharpe's holster was empty and told him his pistol was missing and while they were still tussling, Gilmore pulled his pistol and struck appellant on the head, knocking him to his knees. While in this subdued position, other officers from the Lee County Sheriff's Department arrived and found Sharpe's pistol on the ground about three feet from appellant.

An ambulance was summoned and carried appellant to the hospital in Phenix City. After he was treated the officers carried him to jail and charged him with driving while intoxicated having smelled strongly the odor of alcohol on appellant.

We are urged to reverse this case because of the excessive brutal-force used by the officers in arresting appellant for a misdemeanor, and the actions and conduct of the trial court in 'heckling' appellant's counsel in the presence of the jury and threatening to put him in jail for contempt.

[1][2] An officer may arrest any person without a warrant, on any day and at any time, for any public offense committed in his presence, and is not under any duty to inform the person arrested for an offense committed in his presence of the nature of the charge.Lakey v. State, 24 Ala.App. 273, 134 So. 455;Williams v. State, 33 Ala.App. 304, 35 So.2d 562. In all cases of attempted legal arrest, an officer is under a duty to act aggressively and go forward in perfecting the arrest. He may repel force with force and need not give back.

[3] This was a 'hot pursuit' case, and the events took place so rapidly and under such circumstances

that the officers did not have time to do more than to say 'Halt, Police, Stop', and jump to safety. When appellant's car was finally stopped and the officer approached his car, he had *620 the right to act on the appearances of things taken in the light of appellant's attempt to 'run them down' with his vehicle on two occasions just a few minutes prior to the arrest. The officer who struck appellant on the head while he was struggling with the other officer had a right to take immediate action to subdue appellant armed with the knowledge that this officer's pistol was not in his holster. He had a right to issue the pistol was in the possession of appellant and the slightest delay on his part could have been disastrous. The officer's pistol was found on the ground within three feet of appellant after he was subdued and handcuffed. The force used to perfect the arrest was not disproportionate to the exigencies of the moment.

[4] Appellant claims he did not know that he was being chased by officers of the law, did not hear a siren and did not see the blue flashing light on the patrol car, and did not observe the officers were in uniform or in an official police car. He claimed he was not driving in excess of fifty (50) miles per hour being the lawful speed for nighttime driving. His version of the occasion strains credulity in the light of the testimony of the officers. The jury chose to believe the officers and this they had every right to do.Tarwater v. State, 16 Ala.App. 140, 75 So. 816.

**649 The officers testified that they had no intention to shoot appellant in order to stop him and did not shoot at his automobile for that purpose. The two bullet holes found on the car tend to bear this out. If, however, appellant had been killed the homicide might have been murder.

'Generally speaking, in misdemeanor arrests it would be murder to kill the accused when he is fleeing from arrest, even though he cannot be otherwise taken.'Shine v. State, 44 Ala.App. 171, 204 So.2d 817;Holcomb v. State, 35 Ala.App. 528, 50 So.2d 165.

This brings us to a consideration of the second

274 So.2d 646
49 Ala.App. 618, 274 So.2d 646
**(Cite as: 49 Ala.App. 618, 274 So.2d 646)**

contention of appellant that should work a reversal of the case. This occurred during the cross-examination of Officer Sharpe, a witness for the prosecution. From the record:

'Q. All right. Now, I'm not talking about that time. I'm talking about the occasion that you had occasion to face Mr. Weeks after he got out of his car the second time his car was brought to a halt.

'A. Yes, sir. This is the incident when he-

'Q. All right. Just answer my questions, please, sir.

'MR. WRIGHT: He's trying to-

'THE COURT: Mr. Melton, he's been over that a dozen times.

'MR. MELTON: No, sir, he has not.

'THE COURT: All right. Go ahead, then. Don't call me a liar now.

'MR. MELTON: Judge, I'm asking-

'THE COURT: You have not. If you call me a liar, I'll put you in jail.

'MR. MELTON: No, sir, I'm not calling you a liar, I just want to get the facts straight-

'THE COURT: Well I think he's been over it a half a dozen times or several times and you said he has not.

'MR. MELTON: Just this particular point, Judge.

'THE COURT: All right. Go ahead. Go ahead, but you better watch your step. Call me a liar and you'll wind up in jail down here for a week or so.

'MR. MELTON: Yes, sir.

'THE COURT: All right.'

The principles controlling in matters of this kind were best expressed by Judge Bricken in Dennison v. State, 17 Ala.App. 674, 88 So. 211, wherein it is stated:

'The trial judge, as a natural consequence of his position and the many duties devolving upon him, is necessarily vested with much discretion in the conduct**621** of the trial of causes, and, unless it clearly appears that there has been an abuse of this discretion, appellate courts will not interfere to control such discretion, but will presume that one occupying so important a position as that of circuit judge will accord to all litigants in his court the fair and impartial trial provided for in the Constitution of this State. That a trial judge wields a great influence upon the jury cannot be questioned, for it is their duty to follow his instructions as to the law. So, whenever he expresses an opinion on any disputed fact, or of the character of a witness, or compliments one attorney at the expense of another, or uses language which tends to bring an attorney into contempt before the jury, or uses any language or makes any intimation which tends to prejudice them, he commits an error of law, which would, of necessity, effect a reversal of the judgment and a remandment of the cause. * * *'

[5] In the above colloquy, the trial judge used the word 'liar' three times and threatened to put counsel for appellant in jail 'for a week or so'. We do not perceive from the record that appellant's counsel's statements called for such a stinging rebuke by the trial court. He was **650** only attempting to get the facts straight before the jury. However, we are forbidden to further treat this contention of error for the reason that there was no objection or exception reserved to the action of the court.Woodard v. State, 253 Ala. 259, 44 So.2d 241;Neal v. State, 36 Ala.App. 156, 54 So.2d 613;Hamilton v. State, 270 Ala. 184, 116 So.2d 906.

This case is due to be and is hereby affirmed.

Affirmed.

ALMON, TYSON and DeCARLO, JJ., concur.
CATES, P.J., concurs in result.
Ala.Cr.App. 1973.
Weeks v. State
49 Ala.App. 618, 274 So.2d 646

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

847 F.Supp. 908                                                    Page 1
847 F.Supp. 908
**(Cite as: 847 F.Supp. 908)**

⚑

U.S. v. Five Hundred Eleven Thousand Seven Hun-
dred Eighty Dollars ($511,780) in U.S. Currency
M.D.Ala.,1994.

United States District Court, M.D. Alabama, South-
ern Division.
UNITED STATES of America, Plaintiff,
v.
FIVE HUNDRED ELEVEN THOUSAND SEVEN
HUNDRED EIGHTY DOLLARS ($511,780) IN
UNITED STATES CURRENCY, Defendant.
**Civ. A. No. 93-T-858-S.**

March 2, 1994.

In forfeiture proceedings, the District Court, Myron
H. Thompson, Chief Judge, held that: (1) claimants
lacked standing to contest forfeiture of money
found in rental truck they were driving; (2) substan-
tial connection existed between illegal exchange of
controlled substances and money which smelled of
marijuana; and (3) no Fourth Amendment violation
occurred in connection with stop and search of rent-
al truck.

Judgment for government.

West Headnotes

**[1] Forfeitures 180 ⚖5**

180 Forfeitures
        180k5 k. Proceedings for Enforcement. Most
Cited Cases
Threshold issue in forfeiture proceeding is whether
claimant has standing to contest forfeiture. Compre-
hensive Drug Abuse Prevention and Control Act of
1970, § 511(a)(6), 21 U.S.C.A. § 881(a)(6).

**[2] Forfeitures 180 ⚖5**

180 Forfeitures
        180k5 k. Proceedings for Enforcement. Most
Cited Cases
Driver and passenger of rental truck lacked stand-
ing to contest forfeiture proceedings against

$511,780 found in mattress among personal belong-
ings driver and passenger claimed to be transport-
ing for cousin, absent showing that cousin was bail-
or of personal belongings and that he authorized
driver and passenger to make claim. Comprehens-
ive Drug Abuse Prevention and Control Act of
1970, § 511(a)(6), 21 U.S.C.A. § 881(a)(6).

**[3] Forfeitures 180 ⚖5**

180 Forfeitures
        180k5 k. Proceedings for Enforcement. Most
Cited Cases
There are two different kinds of standing in forfeit-
ure cases: Article III standing and statutory stand-
ing. U.S.C.A. Const. Art. 3, § 1 et seq.; Compre-
hensive Drug Abuse Prevention and Control Act of
1970, § 511(a)(6), 21 U.S.C.A. § 881(a)(6).

**[4] Forfeitures 180 ⚖5**

180 Forfeitures
        180k5 k. Proceedings for Enforcement. Most
Cited Cases
Claimant must have interest in defendant property
in order to have Article III standing to contest for-
feiture proceedings and must also show that he has
statutory standing; however, property interest less
than ownership, such as possessory interest of
bailee, will suffice to confer Article III standing.
U.S.C.A. Const. Art. 3, § 1 et seq.; Comprehensive
Drug Abuse Prevention and Control Act of 1970, §
511(a)(6), 21 U.S.C.A. § 881(a)(6).

**[5] Controlled Substances 96H ⚖170**

96H Controlled Substances
        96HV Forfeitures
                96Hk168 Grounds
                        96Hk170 k. Probable or Reasonable
Cause; Substantial Connection. Most Cited Cases
        (Formerly 138k190 Drugs and Narcotics)

**Controlled Substances 96H ⚖184**

96H Controlled Substances

96HV Forfeitures
    96Hk176 Proceedings
        96Hk184 k. Evidence. Most Cited Cases
    (Formerly 138k195 Drugs and Narcotics)
In forfeiture proceedings, government bears initial burden of showing that probable cause exists by demonstrating substantial connection between property to be forfeited and illegal exchange of controlled substance; "probable cause" means reasonable ground for belief supported by less than prima facie proof but more than mere suspicion and is same standard used to determine legality of arrests and searches. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 511(a)(6), 21 U.S.C.A. § 881(a)(6).

**[6] Controlled Substances 96H ⇐174**

96H Controlled Substances
    96HV Forfeitures
      96Hk172 Defenses
        96Hk174 k. Lack of Knowledge or Consent. Most Cited Cases
    (Formerly 138k192 Drugs and Narcotics)

**Controlled Substances 96H ⇐184**

96H Controlled Substances
    96HV Forfeitures
      96Hk176 Proceedings
        96Hk184 k. Evidence. Most Cited Cases
    (Formerly 138k195 Drugs and Narcotics)
If government establishes probable cause for forfeiture, burden shifts to claimant to prove, by preponderance of evidence, that property is not subject to forfeiture, and claimants may do this either by rebutting government's evidence of probable cause or by showing that they are innocent owners unaware of property's connection to drug transactions. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 511(a)(6), 21 U.S.C.A. § 881(a)(6).

**[7] Controlled Substances 96H ⇐171**

96H Controlled Substances
    96HV Forfeitures
      96Hk168 Grounds

        96Hk171 k. Particular Cases. Most Cited Cases
    (Formerly 138k190 Drugs and Narcotics)
Probable cause existed for forfeiture of $511,780 found in mattress which driver and passenger of rental truck claimed to be transporting, along with other personal belongings, for a cousin; money smelled of marijuana, truck smelled of marijuana, marijuana residue was found on covers of furniture, mattress was hidden behind dummy packing boxes and haphazard mixture of furniture, and driver and passenger did not take most economical route for rental truck. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 511(a)(6), 21 U.S.C.A. § 881(a)(6).

**[8] Controlled Substances 96H ⇐174**

96H Controlled Substances
    96HV Forfeitures
      96Hk172 Defenses
        96Hk174 k. Lack of Knowledge or Consent. Most Cited Cases
    (Formerly 138k192 Drugs and Narcotics)
Driver and passenger of rental truck were not innocent owners of $511,780 found in mattress which driver and passenger claimed to be transporting, along with other personal belongings, for a cousin; money smelled of marijuana, truck smelled of marijuana, marijuana residue was found on covers of furniture, mattress was hidden behind dummy packing boxes and haphazard mixture of furniture, and driver and passenger did not take most economical route for rental truck. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 511(a)(6), 21 U.S.C.A. § 881(a)(6).

**[9] Controlled Substances 96H ⇐171**

96H Controlled Substances
    96HV Forfeitures
      96Hk168 Grounds
        96Hk171 k. Particular Cases. Most Cited Cases
    (Formerly 138k190 Drugs and Narcotics)
Substantial connection existed between illegal exchange of controlled substances and $511,780 in

mattress which driver and passenger of rental truck claimed to be transporting, along with other personal belongings, for a cousin; money smelled of marijuana, truck smelled of marijuana, marijuana residue was found on covers of furniture, mattress was hidden behind dummy packing boxes and haphazard mixture of furniture, and driver and passenger did not take most economical route for rental truck. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 511(a)(6), 21 U.S.C.A. § 881(a)(6).

**[10] Controlled Substances 96H ⟸184**

96H Controlled Substances
    96HV Forfeitures
        96Hk176 Proceedings
            96Hk184 k. Evidence. Most Cited Cases
    (Formerly 138k195 Drugs and Narcotics)
Assuming exclusionary rule applied in civil forfeiture proceedings, stop and search of rental truck, in which $511,780 which smelled of marijuana was discovered, did not violate Fourth Amendment, where truck traffic stop was not pretextual, officer developed particularized suspicion that driver and passenger might be engaged in criminal activity based on fact that they were not taking most economical route for rental truck, and driver and passenger voluntarily cooperated with investigation and consented to search of truck. U.S.C.A. Const.Amend. 4; Comprehensive Drug Abuse Prevention and Control Act of 1970, § 511(a)(6), 21 U.S.C.A. § 881(a)(6).

**[11] Automobiles 48A ⟸349.5(3)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
            48Ak349.5 Search or Seizure Consequent to Arrest, Stop or Inquiry
                48Ak349.5(3) k. Stop or Arrest as Pretext or Ruse, in General. Most Cited Cases
Court applies objective standard to determine whether traffic stop is pretextual; test is whether reasonable officer would have made stop in absence of illegitimate motive. U.S.C.A. Const.Amend. 4.

**[12] Arrest 35 ⟸63.4(1)**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest Without Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(1) k. Grounds for Warrantless Arrest in General. Most Cited Cases

**Arrest 35 ⟸63.5(4)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(3) Grounds for Stop or Investigation
                35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases

**Criminal Law 110 ⟸1224(1)**

110 Criminal Law
    110XXVII Prevention of Crime
        110k1222 Prevention and Investigation of Crime
            110k1224 Intervention of Public Officers
                110k1224(1) k. In General. Most Cited Cases
Degree of suspicion required to justify police encounter with citizen depends on type of encounter involved; no suspicion is necessary for completely consensual encounter, reasonable suspicion of criminal activity is necessary to justify investigatory stop, and probable cause is necessary to justify full scale arrest. U.S.C.A. Const.Amend. 4.

**[13] Automobiles 48A ⟸349(17)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
            48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
                48Ak349(14) Conduct of Arrest, Stop, or Inquiry

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

48Ak349(17) k. Detention, and Length and Character Thereof. Most Cited Cases

Driver and passenger of rental truck were not "in custody" after officer who stopped them for speeding completed his traffic investigation, even though they were placed in police car while waiting to talk to another officer; driver and passenger were voluntarily cooperating with police, and they got into police car either because traffic investigation was being completed, or because it was hot that day and police car was air-conditioned, or both. U.S.C.A. Const.Amend. 4.

**[14] Automobiles 48A ⟳349(18)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
           48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
                48Ak349(14) Conduct of Arrest, Stop, or Inquiry
                48Ak349(18) k. Inquiry; License, Registration, or Warrant Checks. Most Cited Cases

Police officer did not "seize" driver during traffic stop by taking driver's license. U.S.C.A. Const.Amend. 4.

**[15] Arrest 35 ⟳63.5(4)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
           35k63.5(3) Grounds for Stop or Investigation
                35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases

Validity of investigatory stop turns on whether officer's action was justified at its inception and whether it was reasonably related in scope to circumstances which justified the interference in the first place. U.S.C.A. Const.Amend. 4.

**[16] Arrest 35 ⟳63.5(4)**

35 Arrest

35II On Criminal Charges
    35k63.5 Investigatory Stop or Stop-And-Frisk
        35k63.5(3) Grounds for Stop or Investigation
           35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases

Officer is justified in stopping someone if officer has reasonable suspicion that person detained has committed or is about to commit a crime, but term "reasonable suspicion" is not self-defining; instead, stop is legal only if officer, at time of stop, had specific and articulable facts which, taken together with natural inferences from those facts, reasonably warranted the stop. U.S.C.A. Const.Amend. 4.

**[17] Arrest 35 ⟳68(3)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
           35k68(3) k. What Constitutes Arrest. Most Cited Cases

Investigatory stop which lasts too long becomes "de facto arrest." U.S.C.A. Const.Amend. 4.

**[18] Arrest 35 ⟳63.5(9)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
           35k63.5(9) k. Duration of Detention and Extent or Conduct of Investigation or Frisk. Most Cited Cases

Delay of 15 to 30 minutes while detainees waited for arrival of second police officer and of 15 or so minutes while second officer obtained one detainee's consent to search of rental truck they were driving did not convert investigatory stop into de facto arrest. U.S.C.A. Const.Amend. 4.

**[19] Searches and Seizures 349 ⟳181**

349 Searches and Seizures
    349V Waiver and Consent
        349k179 Validity of Consent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

349k181 k. Particular Concrete Applications. Most Cited Cases

Driver voluntarily consented to search of rental truck in which $511,780.00 which smelled of marijuana was discovered; consent to search form signed by driver stated that he understood that he had a right to refuse consent and that he had not been subjected to any kind of coercion. U.S.C.A. Const.Amend. 4.

**[20] Searches and Seizures 349 ☞194**

349 Searches and Seizures
    349VI Judicial Review or Determination
        349k192 Presumptions and Burden of Proof
            349k194 k. Consent, and Validity Thereof. Most Cited Cases

Government has burden to prove that consent to search was voluntary. U.S.C.A. Const.Amend. 4.

**\*911** John T. Harmon, James Eldon Wilson, U.S. Attorney's Office, Montgomery, AL, for U.S.

Debbie Lindsey Jared, Elba, AL, Paul A. Young, Jr., Enterprise, AL, J. Michael Jared, Sr., Elba, AL, for Santos Gomez and Lonnie M. Gomez.

*MEMORANDUM OPINION*

MYRON H. THOMPSON, Chief Judge.

The United States of America has brought this *in rem* civil proceeding under 21 U.S.C.A. § 881(a)(6) (West 1981), seeking forfeiture of $511,780.00 in United States Currency.[FN1] An Alabama State Trooper found the money hidden in a mattress in a rental truck, which was transporting the mattress and some other furniture. Two claimants have come forward to challenge the forfeiture: Santos Gomez, the driver of the truck, and Lonnie M. Gomez, a passenger. The claimants contend that, although they were unaware of the money in the mattress, the money is still theirs. The jurisdiction of the court has been properly invoked based on 28 U.S.C.A. §§ 1345 (West 1993), 1355 (West 1993). Based upon the evidence presented at a nonjury trial on January 31, 1994, the court holds that the money should be forfeited to the government.

FN1. Section 881(a)(6) provides as follows:

"The following shall be subject to forfeiture to the United States and no property right shall exist in them:

    . . . . .

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner."

I. BACKGROUND

On the afternoon of July 5, 1993, Alabama State Trooper Ronnie Whitworth was patrolling the southeastern portion of the state when a patrol dispatcher advised him to be on the lookout for a Ryder Rental Truck which had stopped in Dothan, Alabama. The dispatcher advised that the truck's two occupants had stopped because the truck's air conditioner was not working; that, although the day was unusually hot and the air conditioner could not be repaired, they had refused an offer for a substitute vehicle; that the two occupants were acting in a suspicious manner; and that they were traveling from Florida to Texas but were taking a circuitous out-of-the-way route. Interstate 10 would have been the most direct route between Florida and Texas and thus the most economical path for a rental-truck trip, but the **\*912** highway was also closely watched by law enforcement officers.

After receiving the dispatch, Whitworth approached a vehicle which he clocked at 65 miles an hour in a 55-mile-an-hour zone. He turned around and, after radioing the dispatcher for a further description of the vehicle described earlier, realized that this was the same vehicle. He turned on his

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

flashing light and telephoned the patrol dispatcher for backup. The truck was slow to stop but eventually pulled over.

The occupants of the truck were two cousins, Santos and Lonnie Gomez, who were traveling from central Florida to Houston, Texas. They were carrying over one-half million dollars in cash secreted in a mattress in the truck. They were transporting the money for another cousin, Emodesto Gomez. Emodesto had rented the truck for them and had arranged for it to be filled with various furniture items, including the mattress containing the cash. All the items in the truck, including the cash, belonged to Emodesto.

Whitworth informed Santos, the driver, that he had been stopped for speeding. He asked to see Santos's driver's license, and instructed Santos to join him in the patrol car. Whitworth checked to see if Santos had any warrants outstanding and questioned him about his destination and occupation. Whitworth's background check on Santos revealed nothing. Whitworth radioed for more trooper help from a "felony stop officer"; he asked Santos if he would mind waiting and talking to another trooper and Santos agreed. In the meantime, a local officer from the Elba Police Department arrived to assist Whitworth. Whitworth then asked Lonnie Gomez to join him in the air-conditioned patrol car because it was so hot outside. Whitworth ran a similar background check on Lonnie and found nothing.

A few minutes later, State Trooper Teddy Lee Fain arrived in response to Whitworth's request for more trooper help. Fain also questioned Santos. Santos told Fain that he and Lonnie had decided not to take the direct route because they wanted to look at the country side and had relatives in the areas, although none were named. Santos further told Fain that Emodesto had rented the van, that the furniture inside belonged to Emodesto, and the they were transporting the furniture from Florida to Texas for Emodesto.

Fain asked Santos if he could search the van, and Santos agreed and signed a consent-to-search

form. Fain first searched the cab of the truck and found nothing. When he raised the gate on the back of the truck, he saw a number of household items and noticed a strong odor of marijuana. He immediately dropped the back gate and asked Whitworth to look inside. Whitworth raised the gate and also smelled marijuana. Fain then began to unload the back of the truck. In addition to a haphazard mixture of furniture items, the truck contained a number of cardboard boxes which were completely sealed. Fain cut open some of these boxes and found that they were either empty or had just a pillow or other similar item in them. As he worked his way from the gate at the back of the truck toward the passenger cabin in the front of the truck, he discovered a mattress in a storage area over the cabin. He tried to pick up the mattress and found that it was excessively heavy. He felt it and found that "it did not feel right on the bottom edge." He cut a hole in the mattress and pulled out $20.00. He cut a bigger hole in the mattress and found more money. Lonnie later said to Fain that, if he had covered up the mattress he, Lonnie, would have "made it worth his while later."

The Gomezes were arrested for possession of marijuana. The truck and the items in it were taken to a Dothan trooper station. It was later determined that the mattress contained $511,780.00. The money was in various denominations from $5 to $100, and was rolled up in separate bundles of $1,000 each. The officers who unpacked the money found that it reeked of the smell of marijuana.

## II. DISCUSSION

[1] Under § 881(a)(6), "the United States may obtain forfeiture of all moneys furnished or intended to be furnished in exchange for a controlled substance in violation of Title 21 of the United States Code, as well as all proceeds traceable to, and all moneys used or **\*913** intended to be used to facilitate, such an exchange." *United States v. $38,000 in United States Currency,* 816 F.2d 1538, 1540 (11th Cir.1987). In determining whether the government is entitled to forfeiture, the court must

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

apply a number of shifting burdens to the parties. The first and threshold issue is whether the claimant to the property has standing. *Id.* at 1543-47.

### A. Standing

[2][3][4] The court agrees with the government that claimants Santos and Lonnie Gomez lack the necessary standing. There are two different forms of standing in a forfeiture case: Article III standing and statutory standing. *$38,000 in United States Currency,* 816 F.2d at 1543. "It is well established that in order to contest a forfeiture, a claimant first must demonstrate a sufficient interest in the property to give him Article III standing; otherwise, there is no 'case or controversy,' in the constitutional sense, capable of adjudication in the federal courts." *Id.* A claimant need not own the property in order to have Article III standing; a lesser property interest, such as the possessory interest of a bailee, is sufficient for standing.[FN2] *Id.* at 1544.

> FN2. The Gomezes contend that they have Article III standing merely because they had possession, albeit unknowing, of the money; they argue that they need not make any additional showing that they were bailees or otherwise knew of the money. In *Mercado v. United States Customs Service,* 873 F.2d 641 (2d Cir.1989), an airline passenger argued that he had standing to recover $181,590, which was seized from his carry-on bag and checked luggage and of which he was unaware. The Second Circuit Court of Appeals rejected the passenger's claim, writing that:

"a naked claim of possession, as in the instant case, is not enough. There must be some indication that the claimant is in fact a possessor, not a simple, perhaps unknowing custodian, some indicia of reliability or substance to reduce the likelihood of a false or frivolous claim."

*Id.* at 645. The court explained that:

" '[T]here is no word more ambiguous in its meaning than Possession.' *National Safe Deposit*

*Co. v. Stead,* 232 U.S. 58, 67, 34 S.Ct. 209, 211, 58 L.Ed. 504 (1914). As former Judge Frank of this Court wrote, 'The word "possession" drips with ambiguity.' *City of New York v. Hall,* 139 F.2d 935, 936 (2d Cir.1944). The conclusory and factually unsupported statement of Mercado's attorney that Mercado was 'in possession' of the money does not suffice to give Mercado standing.

" 'Possession, as generally construed, means more than mere custody.' *United States v. One OX-5 American Eagle Airplane,* 38 F.2d 106, 108 (W.D.Wash.1930); *Rivers v. State,* 46 Ga.App. 778, 780, 169 S.E. 260, 261 (1933). 'Possession' denotes custody plus a right or interest of proprietorship, i.e., a domination or supremacy of authority over the property in question. *Craig v. Gudim,* 488 P.2d 316, 319 (Wyo.1971); *Monroe County Motor Co. v. Tennessee Odin Ins. Co.,* 33 Tenn.App. 223, 231 S.W.2d 386, 395 (1950) (quoting *Gibson v. St. Paul F. & M. Ins. Co.,* 117 W.Va. 156, 159, 184 S.E. 562, 563 (1936)); *Hancock v. Finch,* 126 Conn. 121, 123, 9 A.2d 811, 812 (1939) (also quoting *Gibson v. St. Paul F. & M. Ins. Co., supra*). 'Possession' requires a knowledge of presence and an intent to control. *United States v. Wells,* 721 F.2d 1160, 1162 (8th Cir.1983); *United States v. Nitti,* 444 F.2d 1056, 1060 (7th Cir.1971). If 'possession' is defined in these terms, we agree with those courts which hold that possession is sufficient to establish standing."

*Id.* at 644-45.

However, "In addition to establishing Article III standing, claimants also must satisfy applicable statutory standing requirements." *Id.* The statutory provisions governing standing include Rule C(6) of the Supplemental Rules for Certain Admiralty and Maritime Claims (West 1992). *United States v. $260,242 United States Currency,* 919 F.2d 686 (11th Cir.1990) (per curiam); *$38,000 in United States Currency,* 816 F.2d at 1544-45. Rule C(6) provides, in relevant part, that "If the claim is made on behalf of the person entitled to possession by an agent, bailee, or attorney, it shall state that the agent, bailee, or attorney is duly authorized to make the claim." The "plain language of this rule," therefore, "does not permit [a claimant] simply to state

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

847 F.Supp. 908
847 F.Supp. 908
**(Cite as: 847 F.Supp. 908)**

Page 6

that he is a bailee; he must state that he is 'duly authorized to make the claim.' " *$260,242 United States Currency,* 919 F.2d at 688. And, as part of this obligation, "one claiming to have been acting as a bailee or assignee in a forfeiture action must identify the owner of the property." *Id.*

Here, Santos and Lonnie Gomez contend that Rule C's standing requirement does not apply to them because they were actual owners and not mere bailees of the money. They testified at trial that the mattress was given to them by a friend, Florencio Rodrigues,**914** and that, although at the time of the gift they were unaware that the mattress contained money, the money is still theirs because it was in the mattress. The court rejects the Gomezes' gift theory. First, the court finds that the Gomezes' trial testimony about Rodrigues is not credible. The court instead credits Santos's earlier statement to Trooper Fain that all the furniture in the truck belonged to Emodesto Gomez and that they were transporting the furniture for him. The mattress therefore belonged to Emodesto and not to Santos and Lonnie. Second, the court is convinced that Santos and Lonnie were fully aware that the mattress contained money. The mattress was unusually heavy and did not, in the words of Trooper Fain, "feel right on the bottom edge"; the Gomezes must surely have been aware that the mattress contained something alien when they were lifting it into the truck. Furthermore, that they stored the mattress behind dummy packing boxes far inside the truck in the storage area over the passenger cabin reflects that the Gomezes were trying to hide the mattress. But finally and most tellingly, Lonnie's attempted bribe of Trooper Fain-that if Fain had covered up the mattress Lonnie would have "made it worth his while later"-indicates that Lonnie not only knew what was in the mattress but that money belonged to Emodesto and been placed in the mattress with the intent to hide it for some illegal purpose.

The court therefore finds that Santos and Lonnie were not owners of the mattress and the money in it but were instead merely bailees transporting the mattress and the money for Emodesto. They were, therefore, required by Rule C(6) to have iden-

tified in their claim that Emodesto was the bailor and that Emodesto had duly authorized them to make the claim. *$260,242 in United States Currency,* 919 F.2d at 688. Because Santos and Lonnie failed to comply with Rule C(6), they lack the necessary statutory standing to assert any claim in this forfeiture proceeding. *See, e.g., id.*

### B. The Merits

[5] Only if the claimant establishes standing need the court reach the merits of the case. Nevertheless, because the court has now heard all of the evidence, it would be in the best interest of the parties as well as the court, should there be an appeal, for the court to go ahead and reach the merits. The government bears the initial burden of establishing "probable cause" by demonstrating that a substantial connection exists between the property to be forfeited and an illegal exchange of a controlled substance. *United States v. Four Parcels of Real Property in Greene & Tuscaloosa Counties,* 941 F.2d 1428, 1440 (11th Cir.1991) (en banc). Probable cause means a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion. It is the same standard used to determine the legality of arrests and searches and seizes in criminal law. The government need not actually prove by a preponderance of the evidence a substantial connection to drug dealing; instead, the government need only show *probable cause for belief* that such a connection exists. In addition, the existence of probable cause is judged not with clinical detachment but with a common sense view of everyday life. The government may use both circumstantial and hearsay evidence. The government also need not show a relationship between the property and a particular drug transaction. *Id.*

[6] If the government surmounts this hurdle, the burden then shifts to the claimants to prove, by a preponderance of the evidence, that the property is not subject to forfeiture, either by rebutting the government's evidence that the property has a substantial connection to an illegal exchange of con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

trolled substances or by showing that they are inno-
cent owners unaware of the property's connection to
drug transactions. *United States v. One Single Fam-
ily Residence Located at 15603 85th Ave. North,*
933 F.2d 976, 979 (11th Cir.1991).

[7] The following evidence convinces the court
that the government has established probable cause
of an illegal exchange between the money and a
drug transaction. Most significantly, the money it-
self reeked of the smell of marijuana, the truck
smelled of marijuana, and marijuana residue was
found on the covers of the furniture. In addition,
**\*915** in order to give the appearance, albeit a false
one, that the truck contained only furniture and was
being used only to transport furniture, the money
was hidden in a mattress which was in turn hidden
behind dummy packing boxes and a haphazard mix-
ture of furniture; and, in order to avoid law enforce-
ment, the Gomezes took an out-of-the-way route,
away from Interstate 10, which was the most direct
route between Florida and Texas, which would
have been most economical for a rental truck, but
which was watched most closely by law enforce-
ment.

[8][9] Finally, for the same reasons that the
government has established probable cause, the
court is also convinced that the Gomezes have
failed to carry their burden of proving that the prop-
erty did not have a substantial connection to an il-
legal exchange of controlled substances or that they
were innocent owners.

*C. Fourth Amendment Defenses*

[10] The Gomezes argue that much, if not all,
of the evidence presented by the government in
support of forfeiture was seized in violation of their
rights under the fourth amendment to the United
States Constitution and thus should be suppressed.
The government responds that, because the
Gomezes failed to raise their fourth amendment de-
fense before trial with a formal motion, the defense
comes too late. The government argues that, be-
cause drug forfeiture proceedings are akin to crim-
inal proceedings and because the exclusionary rule

is essentially a creature of criminal law, Rule
12(b)(3) of the Federal Rules of Criminal Procedure
should govern. Rule 12(b)(3) provides that "The
following must be raised prior to trial: ... Motions
to suppress evidence."

The Eleventh Circuit has held, however, that
the Supplemental Rules for Certain Admiralty and
Maritime Claims (West 1992) apply to civil forfeit-
ure proceedings under § 881. *$38,000 in United
States Currency,* 816 F.2d at 1544-45. Rule A of
the Supplemental Rules provides that "The general
Rules of Civil Procedure for the United States Dis-
trict Courts are ... applicable ... except to the extent
that they are inconsistent with the Supplemental
Rules." It would thus appear that the Rules of Civil
Procedure, rather than the Rules of Criminal Pro-
cedure, govern civil forfeiture proceedings. The
court, however, need not reach this issue because,
as explained below, the Gomezes' fourth amend-
ment defense is without merit.FN3

> FN3. Indeed, the Eleventh Circuit has not
> directly confronted whether evidence
> seized in violation of the fourth amend-
> ment must be excluded and whether, under
> *United States v. Leon,* 468 U.S. 897, 104
> S.Ct. 3405, 82 L.Ed.2d 677 (1984), there is
> a "good faith" exception to such exclusion.
> The court, however, has suggested that the
> exclusionary rule applies to civil forfeiture
> proceedings. *See United States v. El-
> gersma,* 929 F.2d 1538, 1548 n. 21 (11th
> Cir.) ("The Supreme Court had declared
> that ... the exclusionary rule .. does apply
> to forfeiture proceedings"), *vacated,*938
> F.2d 179 (11th Cir.1991), *opinion en
> banc,*971 F.2d 690 (11th Cir.1992)
> (original panel opinion rejected on other
> grounds); *United States v. $41,305 in Cur-
> rency,* 802 F.2d 1339, 1342-43 (11th
> Cir.1986) (court assumed that exclusionary
> rule applied to civil forfeiture proceedings
> under § 881(a)(6)); *United States v. One
> 1972 44' Striker, Bonanza,* 753 F.2d 867,
> 868 (11th Cir.1985) (per curiam) (in for-
> feiture actions under 49 U.S.C.A. § 782

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and 19 U.S.C.A. § 1595(a), "the proof presented must not be tainted"). It is noted, in contrast, that "criminal" forfeiture proceedings, 21 U.S.C.A. § 853 (West 1993), are considered part of the sentencing process, *United States v. Elgersma,* 971 F.2d 690 (11th Cir.1992) (en banc), and, as a general proposition, the exclusionary rule does not apply to sentencing. *United States v. Lynch,* 934 F.2d 1226, 1235-36 (11th Cir.1991), *cert. denied,* 502 U.S. 1037, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992).

### i. The Stop Was Not Pretextual

[11] The Gomezes first contend that Trooper Whitworth's stop of their truck was pretextual. Whether a traffic stop is pretextual turns on an objective test: whether a reasonable officer *would* have-not *could* have-made the stop in the absence of an illegitimate motivation. *United States v. Hardy,* 855 F.2d 753, 756 (11th Cir.1988), *cert. denied,* 489 U.S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989); *United States v. Smith,* 799 F.2d 704, 708 (11th Cir.1986). The evidence convinces the court that Whitworth stopped the Gomezes' vehicle because they were speeding. Although Whitworth realized prior to the stop that this vehicle was the same as the one which had stopped in Dothan, a reasonable person would still have stopped the vehicle in the absence of *916 this realization; in other words, Whitworth acted as a reasonable office would have in the absence of any prior information about the vehicle.[FN4]

> FN4. Under a subjective test, the conclusion would still be the same. Whitworth stopped the Gomezes' vehicle only because he believed it was speeding. He was not motivated by any other reason.

### ii. Trooper Whitworth Did Not Violate *Terry v. State of Ohio*

[12] Second, the Gomezes contend that Trooper Whitworth improperly detained them beyond the need for the initial traffic stop. Admittedly, prior to the arrival of Trooper Fain, Whitworth had com-

pleted his investigation of the traffic offense. The Gomezes contend that, after completing the traffic-offense investigation, Whitworth and later both Whitworth and Fain, illegally held them under arrest without probable cause. There are generally three types of police-citizen encounters: (1) a consensual encounter involving no coercion or detention, which requires no degree of suspicion by the police; (2) a brief or temporary detention, also known as an investigative stop, which requires the police to have a "reasonable suspicion" that the person detained has committed or is about to commit a crime; and (3) a full-scaled detention or arrest which requires the police to have "probable cause" that the person has committed or is about to commit a crime. *United States v. Espinosa-Guerra,* 805 F.2d 1502, 1506 (11th Cir.1986).

[13][14] First, the court cannot agree that the Gomezes were in any type of custody. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [the court] conclude that a 'seizure' has occurred." *Hardy,* 855 F.2d at 757 n. 7 (quoting *Terry v. State of Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)). Here, the Gomezes were voluntarily cooperating with the officers-that is, after Whitworth had completed his traffic investigation, the Gomezes voluntarily agreed to wait and talk to another trooper, and, after Trooper Fain had arrived, the Gomezes voluntarily continued to cooperate with him. The Gomezes point out that Whitworth questioned them in his police car and that, in particular, Lonnie Gomez was placed in the back of the car where there were no inside handles and he could not exit without assistance. But the court is more persuaded that Whitworth and Fain asked the Gomezes to join them in their police cars either because Whitworth was completing his traffic-offense investigation or because it was hot that day and the police car was air conditioned, or both. Santos Gomez further argues that he could not leave because Whitworth had not returned his license. However, Whitworth kept Santos's license not to precluded his departure and maintain custody, but as a part of the continuing inquiry with which Santos had agreed. *See, e.g.,*

*Hardy,* 855 F.2d at 757 at n. 7 (officer's attempt to secure defendant's consent to search after officer had complete traffic investigation was noncoercive and thus noncustodial).

[15][16] Second, to the extent that the Gomezes were in custody, their custody was proper pursuant to *Terry v. State of Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry,* the Supreme Court held that the police may briefly or temporarily detain someone in order to investigate a matter. Whether the detention is legal turns on two issues: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20, 88 S.Ct. at 1879. An officer is justified in stopping someone if he has a "reasonable suspicion" that the person detained has committed or is about to commit a crime. The term "reasonable suspicion" is not self-defining, however. Instead, the stopping of a person is legal only if the government can show that the officer, at the time of the stop, had "specific and articulable facts which, taken together with rational inferences from those fact, reasonably warrant[ed]" the stop. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. The stop may not be justified on an "unparticularized suspicion or 'hunch.' " *United States v. Smith,* 799 F.2d 704, 707 (11th Cir.1986) (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883.) In determining **\*917** whether the required test has been met, the court must take into account the totality of the circumstances. *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

Here, Whitworth had particularized reasons for believing that the Gomezes might be engaged in criminal activity: the Gomezes were traveling from Florida to Texas but were substantially off their route; because the Gomezes were traveling in a rental truck, it was not economically feasible for them to take such an indirect route; the air conditioner in the Gomezes' truck had broken down and the day was unusually hot but they were unwilling to trade it for a new truck; and when Whitworth attempted to pull them aside for speeding, they were

slow to stop. *See, e.g., Hardy,* 855 F.2d at 758.

[17] The court is also convinced that the detention of the Gomezes after the traffic-offense investigation, assuming there was a detention, was reasonably related to the circumstances which justified it in the first place. When an investigative stop last too long it becomes a *de facto* arrest requiring probable cause instead of reasonable suspicion. *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). As a result, the "the brevity of the invasion of the individual's Fourth Amendment interest is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable or reasonably suspicious." *Id.* (quoting *United States v. Place,* 462 U.S. 696, 709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983)). The Supreme Court has specifically refused to adopt a *per se* time limit on investigative stops, *id.,* and has, instead, set forth certain criteria that are to be examined in determining whether an investigative detention or stop has ripened into an arrest. Although, an investigative detention is not confined to momentary detentions, *id.* at 688,105 S.Ct. at 1576, it "must be temporary and last no longer than it is necessary to effectuate the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion). In determining whether the investigative stop has lasted only so long as to require reasonable suspicion, a court should "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575. In doing this, however, the court must be careful not to engage in unrealistic second-guessing, *id.;* just because "protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable." *Id.* at 687, 105 S.Ct. at 1576 (quoting *Cady v. Dombrowski,* 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973)).

[18] Here, the Gomezes and Trooper Whitworth remained at the scene awaiting the arrival of Trooper Fain. After Fain arrived he asked the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Gomezes some questions and then was able to secure their consent to search the truck. All in all, Whitworth and the Gomezes had to wait only 15 to 30 minutes for the arrival of Fain, and Fain took only 15 or so minutes to obtain permission to search the truck. Whitworth and Fain pursued in a diligent manner means which were likely to confirm or dispel their suspicions quickly. Furthermore, the scope and intensity of the intrusion was limited. The Gomezes were not removed to a law enforcement office or police station, a factor that the Supreme Court and the Eleventh Circuit have found significant in distinguishing *Terry* stops for custodial arrest. *See Royer,* 460 U.S. at 502, 103 S.Ct. at 1326-27; *Hardy,* 855 F.2d at 760. As the court has indicated, the Gomezes and Whitworth spent much of their time informally waiting for Fain, and, when Fain arrived, he informally questioned them.

### iii. Santos's Consent to Search Was Voluntary

[19][20] Finally, the Gomezes contend Santos's consent to the search of the truck was not voluntary. When the government relies on consent to validate a search it has the burden of proving that the search was voluntary. *United States v. Mendenhall,* 446 U.S. 544, 558-59, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980). Specifically, the government must show that, under the totality of the circumstances, the consent was essentially**918** a free and unconstrained choice in that the person's will was not overborne and his capacity for self determination was not critically impaired. *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). The government is not required to prove that the subject of the search knew that he had a right to refuse consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 234, 93 S.Ct. 2041, 2051, 36 L.Ed.2d 854 (1973). However, the Eleventh Circuit has held that, in reviewing the totality of the circumstances, a court must consider the "voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with the police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and ... the defendant's belief that no incriminating evidence will be found." *Tukes v. Dugger,* 911 F.2d 508, 517 (11th Cir.1990) (quoting *United States v. Phillips,* 664 F.2d 971, 1023-24 (5th Cir.Unit B 1981), *cert. denied,*457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982)), *cert. denied,*--- U.S. ----, 112 S.Ct. 273, 116 L.Ed.2d 225 (1991).

Here, there was no coercion or intimidation exerted upon Santos to persuade him to consent to the search; nor was Santos in custody. Furthermore, the consent-to-search form he signed provided that "I understand that I have the right to refuse to consent to the search ... and to refuse to sign this form" and that "I further state that no promises, threats, force, or physical or mental coercion of any kind whatsoever have been used against me to obtain my consent to the search ... or to sign this form." Santos fully understood what the form said and was not coerced in any way into signing it. Taken as a whole, therefore, the evidence indicates that Santos's consent to the search of the truck was voluntary.

An appropriate judgment will be entered.

### JUDGMENT

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment is entered in favor of plaintiff United States of America and against claimants Santos Gomez and Lonnie M. Gomez; and

(2) That defendant $511,780.00 is forfeited to plaintiff United States of America and that no right, title, or interest in the defendant property shall exist in claimants Santos Gomez and Lonnie M. Gomez or any other party.

It is further ORDERED that costs are taxed against claimants Santos Gomez and Lonnie M. Gomez, for which execution may issue.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

847 F.Supp. 908
**(Cite as: 847 F.Supp. 908)**

M.D.Ala.,1994.
U.S. v. Five Hundred Eleven Thousand Seven Hundred Eighty Dollars ($511,780) in U.S. Currency
847 F.Supp. 908

END OF DOCUMENT

928 F.2d 1113                                                                                   Page 1
928 F.2d 1113
**(Cite as: 928 F.2d 1113)**


▷
U.S. v. Harris
C.A.11 (Ga.),1991.

United States Court of Appeals,Eleventh Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Reginald Bernard HARRIS, a/k/a "Reggie", De-
fendant-Appellant.
**No. 89-8586.**

April 18, 1991.

Narcotics defendant moved to suppress evidence.
The United States District Court for the Middle
District of Georgia, No. CR89-37-MAC-DF,Duross
Fitzpatrick, J., 716 F.Supp. 1470, denied the mo-
tion. Defendant appealed. The Court of Appeals,
Hatchett, Circuit Judge, held that: (1) officer was
justified in stopping defendant's vehicle; (2) of-
ficer's continued detention of defendant was reason-
able; and (3) scope of search did not exceed scope
of defendant's consent.

Affirmed.


West Headnotes

**[1] Criminal Law 110 ⟐1158(4)**

110 Criminal Law
    110XXIV Review
        110XXIV(O) Questions of Fact and Findings
            110k1158 In General
                110k1158(4) k. Reception of Evidence.
Most Cited Cases
Court of Appeals will review district court's denial
of defendant's motion to suppress evidence as
mixed question of law and fact.


**[2] Automobiles 48A ⟐349(6)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
            48Ak349 Arrest, Stop, or Inquiry; Bail or
Deposit

                48Ak349(2) Grounds
                    48Ak349(6) k. Intoxication. Most
Cited Cases
Officer was justified in stopping vehicle after ob-
serving it weave into emergency lane on two separ-
ate occasions; officer testified he routinely stopped
automobiles where driver was weaving, and district
court found that reasonable officer would have con-
cluded that defendant was either driving under in-
fluence of alcohol or falling asleep at wheel.
U.S.C.A. Const.Amend. 4.


**[3] Automobiles 48A ⟐349(17)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
            48Ak349 Arrest, Stop, or Inquiry; Bail or
Deposit
                48Ak349(14) Conduct of Arrest, Stop,
or Inquiry
                    48Ak349(17) k. Detention, and
Length and Character Thereof. Most Cited Cases
Continued detention of motorist for purpose of se-
curing his consent to search of automobile after he
was given warning ticket for weaving was reason-
able; officer was justified in stopping and detaining
defendant to determine whether he was drunk or
falling asleep at wheel. U.S.C.A. Const.Amend. 4.


**[4] Searches and Seizures 349 ⟐171**

349 Searches and Seizures
    349V Waiver and Consent
        349k171 k. In General. Most Cited Cases
Search conducted pursuant to consent is exception
to requirements of probable cause and search war-
rant. U.S.C.A. Const.Amend. 4.


**[5] Searches and Seizures 349 ⟐186**

349 Searches and Seizures
    349V Waiver and Consent
        349k186 k. Scope and Duration of Consent;
Withdrawal. Most Cited Cases
Officer's search of luggage in trunk did not exceed

928 F.2d 1113
(Cite as: 928 F.2d 1113)

scope of motorist's consent; motorist was physically present while officer searched automobile and had ample opportunity to limit scope of search, or request that it be discontinued, which he did not do, motorist knew that officer was looking for drugs and thus would reasonably interpret consent as constituting consent to search in places where narcotics would reasonably be hidden. U.S.C.A. Const.Amend. 4.

**\*1114** Sonja J. Salo, Atlanta, Ga., for defendant-appellant.

Deborah A. Griffin, Michael T. Solis, Asst. U.S. Attys., Macon, Ga., for plaintiff-appellee.

Appeal from the United States District Court for the Middle District of Georgia.

Before HATCHETT and ANDERSON, Circuit Judges, and GODBOLD, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this case, we affirm the district court's denial of a motion to suppress evidence seized during the roadside search of a vehicle whose driver law enforcement officers suspected of violating traffic laws. 716 F.Supp. 1470 (1989).

## FACTS

On March 26, 1989, Dooly County, Georgia, Deputy Sheriff Craig Peavy parked his patrol car (facing north) under the Exit 36 bridge on Interstate 75 in Dooly County to perform stationary radar surveillance on southbound traffic. At approximately 10:55 a.m., Peavy noticed a 1989 Dodge Dynasty travelling north on Interstate 75, "run off the edge of the road" into the emergency lane. Peavy followed the car. While following the car, Peavy saw the car again weave over the edge of the emergency lane. Concerned that the driver of the car might be drunk or falling asleep, Peavy stopped the car.

Reginald Harris, driver of the Dodge Dynasty, and the appellant in this case, walked to the back of the car and gave Peavy his driver's license. Peavy explained to Harris the reason for stopping him, and

asked whether he had been drinking alcohol. Harris said he had not been drinking, and Peavy did not smell any alcohol on his breath. Peavy then asked Harris if he had run off the road because he was tired, or because he had looked back at Peavy. Harris responded that "he was both tired and was also watching [Peavy]." When asked whether he owned the car, Harris answered that he had rented it. The rental agreement listed Harris as the primary driver and a "Fred Williamson" as an additional driver. When asked whether he had come from Florida, Peavy thought that Harris "said something which sounded like yes." Peavy then asked Harris what part of Florida, and Harris said that he "dropped a friend off in Valdosta," Georgia, and had not been to Florida.

According to Peavy, Harris was "shaking" and seemed "extremely nervous." Because a red stamp on Harris's driver's license stated "Limited Permit," Peavy told Harris that he was going to run a computer check on the license. Peavy then requested that Harris sit in the Dodge Dynasty **\*1115** (since his knee was hurting) while Peavy ran a check on Harris's license.

While in his car, Peavy radioed Georgia State Patrol Trooper Steve Strickland for assistance. Peavy also radioed the Georgia State Patrol in Cordele, Georgia, and requested a check on Harris's license. In the meantime, Peavy wrote a warning ticket, which he intended to give to Harris, for driving on the edge of the emergency lane. Shortly thereafter, the Georgia State Patrol advised Peavy that Harris had a restricted driver's license which Harris could only use legally for work purposes.

Peavy gave Harris the warning ticket and informed him that his license was restricted for work purposes only. Since it was Easter Sunday, however, Peavy told Harris that he would show him some consideration. Immediately thereafter, Peavy asked Harris if he could look in the car to make sure everything was "okay." Harris responded, "No sir, I don't want you to look." Peavy then asked Harris why he would not show a little cooperation since Peavy had shown him "consideration on his

license." When Harris asked Deputy Peavy why the officer wanted to look in the car, Peavy told him to "make sure there wasn't any illegal drugs, a weapon or any contraband in the car." Harris then said, "Go ahead and look." Trooper Strickland, who was also present when consent was given, confirmed that when asked by Harris why Peavy wished to search the car, Peavy "advised illegal contraband."

With Harris standing beside Trooper Strickland, Peavy searched the interior of the car. Peavy then took the keys out of the ignition and opened the trunk. In the trunk, Peavy found four pieces of luggage including a red bag and a black nylon zipper bag. Peavy unzipped the red bag and found ten kilograms of cocaine. Peavy and Strickland then searched Harris and placed him in the back seat of Strickland's patrol car. Subsequently, Peavy opened the black nylon zipper bag and found nine kilograms of cocaine.

### PROCEDURAL HISTORY

A grand jury charged Harris, along with Fredel Williamson, in a three-count indictment with conspiracy to possess with intent to distribute nineteen kilograms of cocaine, possession with intent to distribute nineteen kilograms of cocaine, and interstate transportation and concealment of nineteen kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and 18 U.S.C. §§ 1952 and 2. The district court severed Williamson's case from Harris's case.

Harris filed a motion to suppress all physical evidence. After an evidentiary hearing, the district court denied the motion to suppress. On July 19, 1989, following a non-jury trial, the district court convicted Harris on all counts.

### CONTENTIONS

Harris contends that the district court erred when it denied his motion to suppress. According to Harris, reasonable suspicion did not exist to support the stop and the investigatory detention was not

sufficiently limited in scope and duration. Further, Harris contends that the search of the car exceeded the bounds of his consent.

In response, the government contends that the district court properly denied Harris's motion to suppress. The government maintains (a) that the stop was reasonable under the circumstances, (b) that the investigative detention was for a short time and based on reasonable suspicion that criminal activity may have been afoot, and (c) that the search did not exceed the bounds of the consent.

### ISSUES

We address the following issues:

(1) whether the district court erred when it found the stop to be valid;

(2) whether the district court properly found Harris's detention to be lawful; and

(3) whether the district court erred when it concluded that the search did not exceed the bounds of the consent.

### DISCUSSION

#### I. Standard of Review

[1] We review the district court's denial of Harris's motion to suppress evidence as **\*1116** a mixed question of law and fact. *United States v. Wilson,* 894 F.2d 1245, 1254 (11th Cir.1990). "The district court's findings of fact are viewed under the clearly erroneous standard; its application of the law to those facts is subject to de novo review." *Wilson,* 894 F.2d at 1254.

#### II. The Stop

[2] A law enforcement officer "may conduct a brief investigative stop of a vehicle, analogous to a *Terry* -stop, if the seizure is justified by specific articulable facts sufficient to give rise to a reasonable

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

suspicion of criminal conduct." *United States v. Strickland,* 902 F.2d 937, 940 (11th Cir.1990). An investigatory stop which is solely based upon "inarticulate hunches" or "unparticularized suspicion" is invalid. *Terry v. Ohio,* 392 U.S. 1, 22, 27, 88 S.Ct. 1868, 1880, 1883, 20 L.Ed.2d 889 (1968). Further, "investigatory stops are invalid as pretextual unless 'a reasonable officer *would* have made the seizure in the absence of illegitimate motivation.' " *Strickland,* 902 F.2d at 940 (quoting *United States v. Smith,* 799 F.2d 704, 708 (11th Cir.1986)) (emphasis in original).

In denying Harris's motion to suppress, the district court concluded:

After considering the evidence presented here, the court is persuaded that a reasonable officer would have made this stop absent an illegitimate motive. The testimony showed that Harris weaved into the emergency lane on two separate occasions during a one-mile stretch on Interstate 75. Deputy Peavy did not make the stop until Harris weaved the second time. A reasonable officer would have concluded that Harris was either driving under the influence in violation of state law, or falling asleep at the wheel. Since the stop would have been justified under either conclusion, it was not unconstitutional.

Relying upon our decision in *Smith,* Harris argues that the district court erred when it upheld the validity of the stop. In *Smith,* we found an investigative stop, based upon a "drug courier profile," to be supported by only an "inarticulate hunch" and, therefore, insufficient to justify a seizure under the fourth amendment. *Smith,* 799 F.2d at 707. Further, we held that Smith's weaving once into the emergency lane, when considered in the context of other objective evidence, provided only a pretextual basis for the stop. *Smith,* 799 F.2d at 709-11. In reaching this conclusion, however, we carefully noted that we were not holding that an officer could "not consistently with the fourth amendment stop a vehicle under similar circumstances to investigate for drunk driving." *Smith,* 799 F.2d at 711 n. 10.

*Smith* is distinguishable from this case. In

*Smith,* the law enforcement officer who made the stop (1) began pursuit before he observed any weaving, (2) made no attempt to investigate the possibility of intoxication after he stopped the car, and (3) described the car as being driven with an "abundance of caution ... indicat[ing] that the stop was unrelated to any possible concern with traffic safety." *Smith,* 799 F.2d at 710-11. Further, Smith only crossed into the emergency lane once. Finally, the district court expressly found that "the weaving of the car was a pretext for the stop." *Smith,* 799 F.2d at 706 n. 2.

No such facts are present in this case. First, Harris weaved across the emergency lane twice, once before Peavy decided to follow the car and again after Peavy began following the car. Second, when Peavy stopped Harris he investigated whether Harris was intoxicated or falling asleep. Third, Peavy testified that he routinely stops cars where the driver is weaving. Finally, the district court found that a reasonable officer would have concluded that Harris was either driving under the influence of alcohol, in violation of state law or falling asleep at the wheel. Because we find (1) that reasonable suspicion supported Peavy's decision to stop Harris, and (2) that a reasonable officer would have stopped Harris in the absence of an invalid purpose, we hold that the district court did not err when it found the stop to be valid.

### III. The Detention

[3] In *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 **\*1117** (1989), the Supreme Court, following *Terry,* held that a police officer "can ... briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United*

928 F.2d 1113
**(Cite as: 928 F.2d 1113)**

States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). "*Sharpe* teaches that in distinguishing a true investigative stop from a *de facto* arrest, we must not adhere to 'rigid time limitations' or 'bright line rules,' but must use 'common sense and ordinary human experience.' " *United States v. Hardy,* 855 F.2d 753, 759 (11th Cir.1988) (quoting *Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1575),*cert. denied,*489 U.S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989).

Harris contends that the district court erroneously upheld the constitutionality of his detention. According to Harris, the investigatory detention was not sufficiently limited in duration because he should have been allowed to leave after Peavy gave him the warning ticket for weaving. The district court found that "the detention was for a very short time" and that "reasonable suspicion" existed that criminal activity may have been afoot.

We hold that the district court did not err when it denied Harris's motion to suppress on this basis. Peavy was justified in stopping and detaining Harris to determine whether he was drunk or falling asleep at the wheel. Further, Peavy did not act unreasonably by detaining Harris to ascertain the validity of his driver's license. Where, as here, " 'the initial stop was legal, the [officer] had the duty to investigate suspicious circumstances that then came to his attention.' " *Hardy,* 855 F.2d at 757 (quoting *United States v. Cruz,* 581 F.2d 535, 539 (5th Cir.1978) (en banc)). Similarly, we cannot say that Peavy acted unreasonably by momentarily detaining Harris, after giving him the warning ticket, to request his consent to search the car. Harris was: (1) driving a rental car with a restricted license; (2) "shaking" and acting "extremely nervous"; and (3) gave conflicting responses as to where he had been. Under these circumstances, where Peavy acted on reasonable suspicion and only detained Harris for a short period of time (prior to his arrest when Peavy found the cocaine), we hold that Harris's detention did not violate the fourth amendment's prohibition against unreasonable seizures.

**IV. The Search of the Car**

[4] A search conducted pursuant to consent is a recognized exception to the requirements of probable cause and a search warrant. *United States v. Baldwin,* 644 F.2d 381, 383 (5th Cir.1981). "When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless. Rather it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." *Strickland,* 902 F.2d at 941.

[5] Harris contends that the district court erred when it found that Peavy did not exceed the scope of the consent when he entered the trunk and searched the luggage. In reaching its conclusion, the district court found:

First, there was no evidence to rebut the officers' testimony that Harris verbally agreed to the search.

\* \* \* \* \* \*

He made no attempt to limit the search before it began. Moreover, he did not attempt to prohibit Deputy Peavy from searching the trunk or from opening the travel bags.

We hold that Peavy reasonably interpreted the scope of Harris's consent. Peavy offered uncontradicted testimony that Harris did not specifically limit the area that he could search. More importantly, Harris was physically present while Peavy searched the car, and had ample opportunity to limit the scope of the search, or **\*1118** request that it be discontinued. No evidence exists to the contrary.

In this case it is also significant that Harris knew that Peavy was looking for drugs. Because Harris knew Peavy was looking for drugs, this case is controlled by *United States v. Kapperman,* 764 F.2d 786 (11th Cir.1985). In this case and in *Kapperman,* the defendant knew the officer was looking for drugs; therefore, both defendant and the officer would reasonably interpret the consent as constituting consent to search in places where narcotics would reasonably be hidden. In both cases, no evidence indicated that the defendants intended

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to limit the scope of the search.

Following oral argument in this case, the Supreme Court issued its decision in *Florida v. Wells,* 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990). In that case, a Florida Highway Patrol trooper arrested Wells for driving under the influence of alcohol. After the trooper informed Wells that his car would be impounded, Wells gave the trooper permission to open the trunk. Under the trooper's direction, employees at the impoundment facility opened a locked suitcase, which was in the trunk of the car, and found a considerable amount of marijuana.

The Supreme Court, in affirming the Florida Supreme Court, held that this inventory search "was not sufficiently regulated to satisfy the Fourth Amendment" because "the Florida Highway Patrol had no policy whatever with respect to the opening of closed containers encountered during an inventory search." *Wells,* 110 S.Ct. at 1634. The Court based this conclusion on the following reasoning:

an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.'

*Wells,* 110 S.Ct. at 1633-34 (quoting *Colorado v. Bertine,* 479 U.S. 367, 376, 107 S.Ct. 738, 743, 93 L.Ed.2d 739 (1987) (Blackmun, J., concurring)).

*Wells* has no application to this case. First, Harris's car was not impounded at the time of the search, and Peavy did not search the car for the purpose of producing an inventory (to either protect himself or Harris's possessions). Second, Harris, as previously noted, was present when Peavy opened the trunk and searched his luggage, and could have stopped Peavy at any time, thereby averting the possibility of "general rummaging in order to discover incriminating evidence." *Wells,* 110 S.Ct. at 1634.

CONCLUSION

In sum, we hold that the district court properly denied Harris's motion to suppress. Accordingly, Harris's conviction and sentence are affirmed.

AFFIRMED.

C.A.11 (Ga.),1991.
U.S. v. Harris
928 F.2d 1113

END OF DOCUMENT

483 F.3d 739                                                                                    Page 1

483 F.3d 739, 20 Fla. L. Weekly Fed. C 467

**(Cite as: 483 F.3d 739)**

**C**

U.S. v. Clay

C.A.11 (Ala.),2007.

United States Court of Appeals,Eleventh Circuit.
UNITED STATES of America, Plaintiff-Appellee,
Cross-Appellant,

v.

John Windell CLAY, Defendant-Appellant, Cross-
Appellee.

**No. 06-10088.**

April 3, 2007.

**Background:** Defendant was convicted in the
United States District Court for the Southern Dis-
trict of Alabama, No. 05-00154-CR-6,Callie V.S.
Granade, Chief Judge, of possessing methamphet-
amine precursors, and was sentenced to 60 months
in prison. Defendant appealed, and government
cross-appealed, challenging the sentence as unreas-
onable.

**Holdings:** The Court of Appeals, Pryor, Circuit
Judge, held that:

(1) officer obtained reasonable suspicion to
conduct a pat-down search of defendant's person;

(2) search of trunk of defendant's car was reas-
onable;

(3) use of acquitted conduct was proper in im-
posing increased sentence; and

(4) imposition of sentence below the applicable
Sentencing Guidelines range was reasonable.

Affirmed.

West Headnotes

**[1] Criminal Law 110 ⬅➤1134(3)**

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General

110k1134 Scope and Extent in General
    110k1134(3) k. Questions Considered
in General. Most Cited Cases
The Court of Appeals reviews under a mixed stand-
ard of review the denial of a motion to suppress,
and the application of the Sentencing Guidelines.
U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[2] Criminal Law 110 ⬅➤1139**

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General
            110k1139 k. Additional Proofs and Trial
De Novo. Most Cited Cases

**Criminal Law 110 ⬅➤1158(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(O) Questions of Fact and Findings
            110k1158 In General
                110k1158(1) k. In General. Most Cited
Cases
In reviewing a sentence, the Court of Appeals re-
views the factual findings of the district court for
clear error and the application of the law to the
facts *de novo*.

**[3] Criminal Law 110 ⬅➤1141(2)**

110 Criminal Law
    110XXIV Review
        110XXIV(M) Presumptions
            110k1141 In General
                110k1141(2) k. Burden of Showing Er-
ror. Most Cited Cases

**Criminal Law 110 ⬅➤1147**

110 Criminal Law
    110XXIV Review
        110XXIV(N) Discretion of Lower Court
            110k1147 k. In General. Most Cited Cases
Appellate review of a sentence for reasonableness
is deferential, and the party challenging the sen-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tence has the burden of establishing unreasonable-ness.

**[4] Criminal Law 110 ⟨⟩1181.5(8)**

110 Criminal Law
    110XXIV Review
        110XXIV(U) Determination and Disposition of Cause
            110k1181.5 Remand in General; Vacation
            110k1181.5(3) Remand for Determination or Reconsideration of Particular Matters
                110k1181.5(8) k. Sentence. Most Cited Cases

**Sentencing and Punishment 350H ⟨⟩58**

350H Sentencing and Punishment
    350HI Punishment in General
        350HI(C) Factors or Purposes in General
        350Hk58 k. Manner and Effect of Weighing or Considering Factors. Most Cited Cases
The weight to be accorded any given statutory sentencing factor is a matter committed to the sound discretion of the district court, but the appellate court will remand for resentencing if it is left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the sentencing factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case. 18 U.S.C.A. § 3553(a).

**[5] Automobiles 48A ⟨⟩349.5(10)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
        48Ak349.5 Search or Seizure Consequent to Arrest, Stop or Inquiry
            48Ak349.5(5) Object, Product, Scope, and Conduct of Search or Inspection
                48Ak349.5(10) k. Weapons; Protective Searches; Pat-Down. Most Cited Cases
Police officer had reasonable suspicion to conduct a pat-down search of defendant's person after conducting valid traffic stop during which he saw a shotgun inside the defendant's car in plain view,

which created reason to believe that he was dealing with an armed and dangerous individual. U.S.C.A. Const.Amend. 4.

**[6] Arrest 35 ⟨⟩63.5(9)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(9) k. Duration of Detention and Extent or Conduct of Investigation or Frisk. Most Cited Cases
A *Terry* search may continue when an officer feels a concealed object that he reasonably believes may be a weapon. U.S.C.A. Const.Amend. 4.

**[7] Searches and Seizures 349 ⟨⟩184**

349 Searches and Seizures
    349V Waiver and Consent
        349k179 Validity of Consent
            349k184 k. Custody, Restraint, or Detention Issues. Most Cited Cases
Police officer's search of trunk of defendant's car was reasonable, where defendant gave voluntary consent for search of trunk, and defendant did not argue that the consent was rendered involuntary by an unreasonable detention.

**[8] Arrest 35 ⟨⟩63.5(9)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(9) k. Duration of Detention and Extent or Conduct of Investigation or Frisk. Most Cited Cases
Reasonable detention during a *Terry* search is proper. U.S.C.A. Const.Amend. 4.

**[9] Sentencing and Punishment 350H ⟨⟩979**

350H Sentencing and Punishment
    350HIV Sentencing Guidelines
        350HIV(H) Proceedings
            350HIV(H)2 Evidence

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

350Hk974 Sufficiency

350Hk979 k. Quantity of Drugs. Most Cited Cases

Use of acquitted conduct involving the distribution of 1.5 kilograms of methamphetamine to increase sentence was reasonable for defendant convicted of possession of methamphetamine precursors; coconspirators testified to defendant's involvement with the methamphetamine distribution, and use of acquitted conduct did not cause extraordinary increase in the Sentencing Guidelines range. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[10] Criminal Law 110 ⟨⟩1158(1)**

110 Criminal Law

110XXIV Review

110XXIV(O) Questions of Fact and Findings

110k1158 In General

110k1158(1) k. In General. Most Cited Cases

In reviewing a sentence, the Court of Appeals affords substantial deference to the factfinder, in reaching credibility determinations with respect to witness testimony.

**[11] Controlled Substances 96H ⟨⟩100(2)**

96H Controlled Substances

96HIII Prosecutions

96Hk100 Sentence and Punishment

96Hk100(2) k. Extent of Punishment. Most Cited Cases

**Sentencing and Punishment 350H ⟨⟩112**

350H Sentencing and Punishment

350HI Punishment in General

350HI(E) Factors Related to Offender

350Hk112 k. Actual or Potential Rehabilitation. Most Cited Cases

Imposition of 60-month prison sentence, which was less than one-third of the low end of the advisory Sentencing Guidelines range, was not unreasonable for defendant convicted of possession of methamphetamine precursors; sentencing court considered defendant's postoffense rehabilitation, the seriousness of the offense, and the need for just

punishment, and reasonably determined that his postoffense rehabilitation was extraordinary, based on testimony from defendant's employer that defendant worked second job on weekends, and testimony from other witnesses that he attended drug counseling meetings and inspired fellow addicts to overcome his addictions through his example, and that the changes that defendant experienced were more than a jailhouse conversion. 18 U.S.C.A. § 3553(a); U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[12] Sentencing and Punishment 350H ⟨⟩59**

350H Sentencing and Punishment

350HI Punishment in General

350HI(C) Factors or Purposes in General

350Hk59 k. Effect of Applying Invalid Factor. Most Cited Cases

A sentence can be unreasonable, regardless of length, if it was substantially affected by the consideration of impermissible factors. 18 U.S.C.A. § 3553(a).

**[13] Sentencing and Punishment 350H ⟨⟩651**

350H Sentencing and Punishment

350HIV Sentencing Guidelines

350HIV(A) In General

350Hk651 k. Operation and Effect of Guidelines in General. Most Cited Cases

When imposing a sentence falling far outside of the Sentencing Guidelines range, based on the statutory sentencing factors, an extraordinary reduction must be supported by extraordinary circumstances. 18 U.S.C.A. § 3553(a); U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**\*741** Neil L. Hanley (Court-Appointed), Mobile, AL, for Clay.

Donna Barrow Dobbins, David Andrew Sigler, Asst. U.S. Atty., Mobile, AL, Thomas M. Gannon, U.S. Dept. of Justice/App. Sec./Crim. Div., Washington, DC, for U.S.

Appeals from the United States District Court for the Southern District of Alabama.

Before CARNES, PRYOR and FARRIS,[FN*] Cir-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

483 F.3d 739, 20 Fla. L. Weekly Fed. C 467

**(Cite as: 483 F.3d 739)**

cuit Judges.

> FN* Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

PRYOR, Circuit Judge:

The main question presented in these cross-appeals is the contention of the government that John Windell Clay's 60-month sentence for possessing methamphetamine precursors is unreasonably lenient, when the advisory Guidelines range was 188 to 235 months and the variance was based primarily on Clay's postoffense rehabilitation. Several witnesses, including drug counselors and corrections workers, testified at Clay's sentencing hearing that Clay's rehabilitation was extraordinary, and the district court credited their testimony. In his appeal, Clay argues that the district court erred when it denied his motion to suppress evidence and when it enhanced his sentence based on acquitted conduct. We affirm Clay's conviction and sentence.

## I. BACKGROUND

On October 10, 2004, Sergeant James Eissler stopped Clay's car because only one headlight was operating. While Clay looked for his insurance card, Sergeant Eissler saw a shotgun between the driver's seat and the door. Sergeant Eissler asked Clay to get out of the car and conducted a pat-down search of Clay's person before placing him in the squad car.

Sergeant Eissler's search of Clay's pants pocket revealed an empty barrel from a ball-point pen, which is often used as a device for ingesting narcotics. Sergeant Eissler removed the item from Clay's pocket because he could not tell by feel whether it was a weapon; he thought it might be a screwdriver. Sergeant Eissler advised Clay of his *Miranda* rights.

Clay, who did not appear impaired, consented to a search of his car. Sergeant Eissler left the window of the squad car open so that Clay could stop the search at any time. Sergeant Eissler discovered in the trunk of the vehicle ten unopened boxes of cold and allergy medication containing pseudoephedrine and arrested Clay. At the police station, after waiving his *Miranda* rights, Clay told police that he had purchased the pseudoephedrine pills for a man he occasionally supplied with such pills and admitted involvement with methamphetamine manufacturing and distribution.

Six months later, Clay was indicted with five others on charges of conspiracy to manufacture and possess with intent to distribute more than 500 grams of methamphetamine, 21 U.S.C. §§ 846, 841(a)(1), and possession of pseudoephedrine with reasonable cause to believe that it would be used to manufacture a controlled substance, *id.* § 841(c)(2). Before trial, Clay moved to suppress the evidence seized from his car and his statements to the police on October 10, 2004. The district court denied the motions, on the ground that the search of Clay's car was reasonable and his statements were voluntary.

**\*742** At trial, the government presented evidence, including testimony by the five cooperating codefendants, that Clay had been involved in the manufacture of methamphetamine since 2000. Clay would supply manufacturers with precursor chemicals and supplies in exchange for methamphetamine. By 2004, Clay was participating directly in the manufacture and helped to produce about an ounce of methamphetamine two or three times a week for three to five months. The jury acquitted Clay of the conspiracy charges and convicted him of possession of pseudoephedrine.

Under the advisory Sentencing Guidelines, the base offense level for the offense of conviction was 22. United States Sentencing Guidelines § 2D1.11(d)(9) (Nov.2005). At sentencing, the court found by a preponderance of the evidence that Clay was responsible for the manufacture of at least 1.5 kilograms of methamphetamine, which enhanced the offense level to 34. *Id.* §§ 1B1.3(a), 2D1.1(c)(3). The district court also found that Clay possessed a firearm during the offense, which enhanced the offense level by 2 levels. *Id.* §

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

483 F.3d 739, 20 Fla. L. Weekly Fed. C 467
**(Cite as: 483 F.3d 739)**

2D1.11(b)(1). Clay's criminal history category was I, and the advisory sentencing range was 188 to 235 months' imprisonment.

At the sentencing hearing, eight witnesses testified about the religious conversion and life changes that Clay had experienced before his arrest in October 2004 and continuing until his conviction in August 2005. A leader of Clay's drug and alcohol rehabilitation program, Alan Cobb, testified that Clay was rehabilitated, obtained employment, and was a good employee. Another program leader, who worked in corrections, testified that Clay was living a "different life" since his involvement in the program. A minister at Clay's church who had worked in corrections for ten years testified that he had "seen a lot of inmates, so to speak, play a game" but the change in Clay's life was real. John and Rachael Leno had met Clay through the rehabilitation program and testified that they had overcome their drug addictions because of Clay's example and encouragement. Clay and his family members testified that, following his conversion, Clay had stopped using drugs and alcohol, rededicated himself to his family, and began regularly attending rehabilitation meetings and visiting a juvenile detention center.

The court found that Clay's postoffense rehabilitation was extraordinary:

Well, I have considered the statutory purposes of sentencing in this case and I have considered the sentencing guidelines. I am sentencing under the guidelines scheme. But I find, Mr. Clay, that in your case a downward departure for post-offense rehabilitation is appropriate.

But I also agree with [the government] that one of the primary purposes of sentencing as set out in 3553 is punishment. And I have to take into account the fact that, although your motivation for participation in the manufacture of methamphetamine was so that you could use it, the others who were participating in it with you were also doing it and providing it at the same time as to you to many other people, and your help in that manufacture was in essence helping other people get hooked on drugs themselves. And I can't just ignore that.

Your guidelines, the low end of them, is 188 months. That's in excess of 15 years. I'm going to give you a substantial reduction, and you and your family still will think that it is too long to spend in jail. But it is a more substantial reduction than I have given to anybody **\*743** for this reason that I'm going to give it to you.

I do believe that your change is real. And with God's help, you will continue on the same path that you are currently on.

The court imposed a sentence of 60 months' imprisonment. Clay appealed, and the government cross-appealed.

## II. STANDARDS OF REVIEW

[1][2][3][4] Several different standards of review govern this appeal. We review under a mixed standard of review the denial of a motion to suppress, *United States v. Zapata,* 180 F.3d 1237, 1240 (11th Cir.1999), and the application of the Sentencing Guidelines, *United States v. Miranda,* 348 F.3d 1322, 1330 (11th Cir.2003). In reviewing Clay's sentence, we review the factual findings of the district court for clear error and the application of the law to the facts *de novo. Id.* We review *de novo* whether a sentencing factor is impermissible. *United States v. Williams,* 456 F.3d 1353, 1361 (11th Cir.2006), *petition for cert. filed* (U.S. Oct. 19, 2006) (No. 06-7352). We review a sentence for reasonableness. *Id.* at 1363. Our review for reasonableness is deferential, and the party challenging the sentence has the burden of establishing unreasonableness. *United States v. Talley,* 431 F.3d 784, 788 (11th Cir.2005). "The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court," but "we will remand for resentencing if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Williams,* 456 F.3d at 1363.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## III. DISCUSSION

We must first review Clay's appeal and then the cross-appeal by the government. Clay argues that the district court erred when it denied his motion to suppress the evidence seized from his car and when it enhanced his sentence based on acquitted conduct. The government argues that Clay's sentence was unreasonable. We discuss each issue in turn and conclude that the district court committed no reversible error.

### A. Clay's Motion to Suppress Was Properly Denied.

[5] Clay argues that the boxes of pseudoephedrine pills seized from the trunk of his car should have been suppressed because they were the fruit of an unreasonable search, but we disagree. Sergeant Eissler obtained reasonable suspicion to conduct a pat-down search of Clay's person when he saw the shotgun in plain view, which created reason to believe that he was "dealing with an armed and dangerous individual." *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). This case is unlike *Minnesota v. Dickerson,* 508 U.S. 366, 378, 113 S.Ct. 2130, 2138-39, 124 L.Ed.2d 334 (1993), in which a *Terry* search was held unreasonable when it extended to a pocket that the officer believed contained drugs. Sergeant Eissler continued his search only because he thought the long, thin object in Clay's pocket might be a screwdriver or something similar that could be used as a weapon.

[6] We join our sister circuits in affirming that a *Terry* search may continue when an officer feels a concealed object that he reasonably believes may be a weapon. *See, e.g., United States v. Hartz,* 458 F.3d 1011, 1018 (9th Cir.2006); *United States v. Hanlon,* 401 F.3d 926, 930 (8th Cir.2005); *United States v. Holmes,* 385 **\*744** F.3d 786, 789-91 (D.C.Cir.2004); *United States v. Majors,* 328 F.3d 791, 795 (5th Cir.2003); *United States v. Harris,* 313 F.3d 1228, 1237-38 (10th Cir.2002); *United States v. Rahman,* 189 F.3d 88, 120 (2d Cir.1999); *United States v. Swann,* 149 F.3d 271, 275-77 (4th Cir.1998). Under *Terry,* a search does not exceed

"that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby" if the officer has an objective, reasonable belief that "his safety or that of others is in danger." *Terry,* 392 U.S. at 26-27, 88 S.Ct. at 1882-83. Sergeant Eissler was entitled to ensure his safety by searching Clay's pocket after his initial pat-down supplied reason to believe that the item concealed might be a weapon.

[7][8] We find no basis for Clay's contention that the search of the trunk of his car was unreasonable. Clay gave voluntary consent to the search of the trunk and does not argue that his consent was involuntary or invalid. Reasonable detention during a *Terry* search is proper, *see Michigan v. Long,* 463 U.S. 1032, 1051, 103 S.Ct. 3469, 3482, 77 L.Ed.2d 1201 (1983), and Clay does not argue that his detention was unreasonable or rendered his consent involuntary. Because Clay consented to the search that led to the discovery of the pseudoephedrine pills, that search was not unreasonable and Clay's motion to suppress was properly denied.

### B. The District Court Did Not Err When It Used Acquitted Conduct to Enhance Clay's Sentence.

[9][10] Clay argues that the involvement of 1.5 kilograms of methamphetamine, of which the jury acquitted him, was not proved by a preponderance of the evidence, but again we disagree. Clay argues that the trial testimony that established the quantity of drugs was incredible and inconsistent, but "[w]e afford substantial deference to the factfinder, in this case, the district court, in reaching credibility determinations with respect to witness testimony." *United States v. Pham,* 463 F.3d 1239, 1244 (11th Cir.2006) (internal quotation marks omitted). The testimony of Clay's co-conspirators was largely consistent, and it was corroborated by Clay's own admissions. In the absence of any record evidence that undermines this finding by the district court, we cannot say the district court clearly erred.

Clay also erroneously argues that the acquitted conduct enhancement increased his sentence so much as to violate due process. The Supreme Court

483 F.3d 739, 20 Fla. L. Weekly Fed. C 467

**(Cite as: 483 F.3d 739)**

has hinted at the possibility of this problem, *see United States v. Watts,* 519 U.S. 148, 156-57, 117 S.Ct. 633, 637-38, 136 L.Ed.2d 554 (1997), but has never identified a case in which those extreme circumstances exist, and neither has this Court. We are convinced that this Guidelines enhancement is not extraordinary. Clay did not face a mandatory-minimum life sentence, *cf. United States v. Lombard,* 72 F.3d 170, 177, 186 (1st Cir.1995), or a twelve-fold increase in his sentence, *cf. United States v. Kikumura,* 918 F.2d 1084, 1100-01 (3d Cir.1990). Clay's enhancement raised the bottom of the Guidelines range by a factor of 3.7 and the top of the range was still less than the 20-year maximum authorized by the jury verdict, *see* 21 U.S.C. § 841(c). The enhancement did not violate due process.

### C. Clay's Sentence Was Not Unreasonable.

[11] In its cross-appeal, the government argues that Clay's 60-month sentence, which was less than one-third of the low end of the Guidelines range, was unreasonable for these reasons. The government contends that Clay's religion is an **\*745** impermissible factor, the district court gave too much weight to postoffense rehabilitation and insufficient weight to the other sentencing factors, and the district court did not adequately explain the substantial variance. Each argument fails, as we discuss in turn.

[12] First, the district court did not rely on religion as a sentencing factor. Religion is an impermissible factor, U.S.S.G. § 5H1.10, and a sentence can be unreasonable, regardless of length, if it was substantially affected by the consideration of impermissible factors, *Williams,* 456 F.3d at 1361. The district court did not consider Clay's religious belief; the court credited testimony at the sentencing hearing about changes in Clay's life that followed his religious conversion. These considerations of postoffense rehabilitation are appropriate when a district court evaluates the history and characteristics of the defendant and the need to protect the public from further crimes of the defendant.

18 U.S.C. § 3553(a)(1), (a)(2)(C).

Second, we do not believe the district court abused its discretion when it weighed the sentencing factors of section 3553(a). The government argues that the court relied too heavily on postoffense rehabilitation in fashioning Clay's sentence, but the district court observed that the sentencing factors cut both ways for Clay. Although his history and the circumstances of his rehabilitation suggested that a sentence below the Guidelines range was appropriate, the seriousness of Clay's offense and the need for just punishment required a sentence much longer than Clay had urged. The government argues about sentencing disparities among Clay's codefendants, but that argument is irrelevant because none of the codefendants had yet been sentenced at the time of Clay's hearing. The codefendants have since received terms of 35, 36, 48, and 60 months after being convicted of the conspiracy offense, and the leader of the conspiracy received a 146-month sentence. If Clay's sentence were unreasonably disparate, we would expect it to be considerably lower than those of the codefendants more culpable than Clay but less culpable than the organizer.

Finally, we conclude that Clay's 60-month sentence was reasonable. One of the purposes of our sentencing system is to impose "the punishment that most effectively lessens the likelihood of future crime, either by deterring others or incapacitating the defendant." U.S.S.G. ch. 1, pt. A, introductory cmt. 3. Both the Guidelines calculations and the sentencing factors of section 3553(a) require a judge to consider characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend.

This record reflects that the sentencing judge engaged in precisely this kind of objective risk assessment and then entered a sentence "sufficient but not greater than necessary" to satisfy the purposes of section 3553(a). The enhancements for the firearm and the acquitted conduct reflect that, unlike some other defendants who possess ten boxes of cold medicine, Clay had been involved in the drug trade for years, was armed during the offense, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

required longer incapacitation to protect the community and provide just punishment. The departure for postoffense rehabilitation reflects that, unlike some other defendants, Clay has fundamentally changed since his offense, poses a lesser risk to the community, and does not require incapacitation for too long.

Clay observes that his sentence is within the advisory Guidelines range (51 to 63 months) that would have applied without the enhancement for acquitted conduct, but this observation attempts to prove too much. It would have been unreasonable for the district court to ignore a finding of **746** responsibility for acquitted conduct under the Guidelines, and nothing in the record suggests that the district court fashioned the sentence to avoid taking acquitted conduct into account. The district court found by a preponderance that Clay committed these offenses, and the district court correctly calculated Clay's enhanced range under the Guidelines.

[13] "[W]hen imposing a sentence falling far outside of the Guidelines range, based on the § 3553(a) factors, an extraordinary reduction must be supported by extraordinary circumstances." *United States v. McVay,* 447 F.3d 1348, 1357 (11th Cir.2006) (internal quotation marks omitted). This record presents extraordinary circumstances. According to the district judge, those circumstances compelled the largest variance for postoffense rehabilitation that she had ever given.

It is true that some of Clay's postoffense behavior was not extraordinary. Among the conditions of Clay's pretrial release were maintaining or actively seeking employment, refraining from use or possession of controlled substances, and participating in substance abuse treatment. If Clay had not attended a drug program, stayed clean, and found a job, his bail could have been revoked.

But Clay went beyond minimal compliance with his bail conditions. Clay's former employer testified that Clay worked a second job for him on the weekends, and stated that he would hire him again "tomorrow" if he could. The Lenos testified that, beyond merely attending drug counseling meetings, Clay invited fellow addicts into his home and inspired them to overcome their addictions through his example. On his own initiative, Clay also visited a juvenile detention center regularly for over a year and encouraged young people to change their lives. The confidence of people who did not know Clay before his arrest-people who had nothing to gain by lying about his transformation and plenty to lose if his transformation was phony-helps to demonstrate the extraordinariness of Clay's rehabilitation.

Clay's family, his lawyer, and witnesses who worked in corrections emphasized that Clay's experience was not a "jailhouse conversion." Six months elapsed between Clay's arrest for misdemeanor possession and his indictment on federal charges. That the changes in Clay's life occurred before Clay had any inkling that he would face a prison sentence further evidences that the measure of his rehabilitation was extraordinary.

We defer to the finding of the sentencing judge that the testimony about Clay's rehabilitation was credible, *see Pham,* 463 F.3d at 1244, and the sentencing judge's exercise of discretion based on that finding. The district court was not required, of course, to believe any of the evidence of Clay's rehabilitation, and we are not holding that a district court must vary downward in sentencing when it finds that there has been postoffense rehabilitation. When we review a decision of a district court for abuse of discretion, there are some cases where we will affirm the district court whichever way it decided the matter. *See, e.g., United States v. Kelly,* 888 F.2d 732, 745 (11th Cir.1989) ("The abuse of discretion standard has been described as allowing a range of choice for the district court, so long as that choice does not constitute a clear error of judgment."); *In re Rasbury,* 24 F.3d 159, 168 (11th Cir.1994) ("[U]nder the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call.").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

483 F.3d 739, 20 Fla. L. Weekly Fed. C 467
**(Cite as: 483 F.3d 739)**

The government argues that the district court should have provided a more thorough**\*747** analysis of the sentencing factors, but we have not required district courts to discuss each factor exhaustively. *United States v. Scott,* 426 F.3d 1324, 1329 (11th Cir.2005). The analysis of the district court provides enough reasoning for us to review meaningfully, and we are not "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Williams,* 456 F.3d at 1363.

### IV. CONCLUSION

Clay's conviction and sentence are

AFFIRMED.

C.A.11 (Ala.),2007.
U.S. v. Clay
483 F.3d 739, 20 Fla. L. Weekly Fed. C 467

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.3d 1206                                                                        Page 1
418 F.3d 1206, 18 Fla. L. Weekly Fed. C 753
**(Cite as: 418 F.3d 1206)**

**H**

U.S. v. Hernandez
C.A.11 (Ala.),2005.

United States Court of Appeals,Eleventh Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Joanna HERNANDEZ, Defendant-Appellee.
No. 04-11776.

July 29, 2005.

**Background:** Defendant, passenger in car trav-
eling on interstate highway, was indicted for nar-
cotics trafficking after highway patrol officers con-
ducted routine stop for moving violation followed
by search that revealed contraband. The United
States District Court for the Middle District of
Alabama, No. 03-00142-CR-F-N,Mark E. Fuller,
Chief Judge, granted defendant's motions to sup-
press evidence and to dismiss, and government ap-
pealed.

**Holdings:** The Court of Appeals, Edmondson,
Chief Judge, held that:

(1) once defendant and driver consented to
vehicle search, clock re-started for purposes of
evaluating reasonableness of duration of intrusion,
and

(2) 17-minute-long detention and questioning
following stop and preceding consent to search con-
stituted lawful detention, given reasonable suspi-
cion that arose during that period.

Reversed and remanded.

West Headnotes

**[1] Arrest 35 ⚖═63.5(9)**

35 Arrest
   35II On Criminal Charges
       35k63.5 Investigatory Stop or Stop-
And-Frisk

       35k63.5(9) k. Duration of Detention and
Extent or Conduct of Investigation or Frisk. Most
Cited Cases
Unreasonable extensions of duration of detention,
not scope of conversation, can render an otherwise
justified detention unreasonable for Fourth Amend-
ment purposes. U.S.C.A. Const.Amend. 4.

**[2] Automobiles 48A ⚖═349(17)**

48A Automobiles
   48AVII Offenses
      48AVII(B) Prosecution
         48Ak349 Arrest, Stop, or Inquiry; Bail or
Deposit
           48Ak349(14) Conduct of Arrest, Stop,
or Inquiry
           48Ak349(17) k. Detention, and
Length and Character Thereof. Most Cited Cases
Vehicle occupants' voluntary consent to vehicle
search, during course of conversation with officer
that followed routine traffic stop, converted en-
counter to consensual one, re-starting clock for pur-
poses of evaluating reasonableness of duration of
intrusion under Fourth Amendment; reasonableness
then depended on length of search. U.S.C.A.
Const.Amends. 4, 14.

**[3] Automobiles 48A ⚖═349(17)**

48A Automobiles
   48AVII Offenses
      48AVII(B) Prosecution
         48Ak349 Arrest, Stop, or Inquiry; Bail or
Deposit
           48Ak349(14) Conduct of Arrest, Stop,
or Inquiry
           48Ak349(17) k. Detention, and
Length and Character Thereof. Most Cited Cases

**Automobiles 48A ⚖═349(18)**

48A Automobiles
   48AVII Offenses
      48AVII(B) Prosecution
          48Ak349 Arrest, Stop, or Inquiry; Bail or

418 F.3d 1206
418 F.3d 1206, 18 Fla. L. Weekly Fed. C 753
**(Cite as: 418 F.3d 1206)**

Page 2

Deposit

       48Ak349(14) Conduct of Arrest, Stop, or Inquiry

       48Ak349(18) k. Inquiry; License, Registration, or Warrant Checks. Most Cited Cases

Detention and questioning of driver and passenger for 17 minutes following routine traffic stop, at end of which both parties voluntarily consented to vehicle search, constituted lawful detention under Fourth Amendment, given reasonable suspicion that arose during that period; officers observed suspicious behavior from first minute of stop, including nonstop travel at night in bad weather, food containers on long trip which indicated unwillingness to leave vehicle, small amount of luggage for purported week-long stay, implausible excuse for speeding, inconsistent and discrepant statements, nervousness, lack of knowledge about destination, and travel between two narcotics source cities. U.S.C.A. Const.Amends. 4, 14.

**\*1206** Todd A. Brown, Montgomery, AL, and Leura Garrett Canary, U.S. Attorney for the Middle District of Alabama, for U.S.
Ruben Ramirez, Law Office of Ruben Ramirez, McAllen, TX, for Hernandez.

Appeal from the United States District Court for the Middle District of Alabama.

Before EDMONDSON, Chief Judge, and DUBINA and HULL, Circuit Judges.

**\*1207** EDMONDSON, Chief Judge:

    In this criminal case, the government appeals the district court's order granting Defendant's motion to dismiss and motion to suppress evidence seized from her pick-up truck during a traffic stop. The government argues that the police officer-very soon after the stop began-had reasonable suspicion that the passengers were engaged in other criminal activity justifying the detention that led to the pertinent search. We conclude that the search and seizure did not violate Defendant's Fourth Amendment rights.

*Background*

    Alabama State Trooper Jessie Peoples observed a pick-up truck traveling 78 miles-per-hour in a 70 mile-per-hour zone. At approximately 3:02 a.m.FN1 on a Monday, Trooper Peoples pulled the truck over. The Trooper approached the passenger side of the truck and requested the driver to exit. A female passenger, Defendant, sat in the front seat. The Trooper noticed several food containers in the rear floor area.

        FN1. The time is inferred from a videotape of the traffic stop that was recorded from the patrol car.

    The driver provided the Trooper with a Texas driver's license. As an excuse for speeding, the driver stated that Defendant had diarrhea and needed to go to the bathroom. The Trooper pointed out that the lighted previous exit had bathrooms. The Trooper asked the driver about where he was headed and the purpose and length of the trip. The driver responded that he was driving to Atlanta to see Defendant's relative for the weekend but quickly changed his response to the whole week.

    At 3:03 a.m., the Trooper escorted the driver to the front passenger seat of the patrol car. As the Trooper began writing the citation, the Trooper asked the driver about the weather in Houston upon his departure, whether he owned the truck, whether this visit was his first time to Atlanta, whether the trip had been planned or was spontaneous, his employment, and the name of the passenger. The driver responded that a severe storm was in Houston when they left. He stated that Defendant owned the truck and that it was his, but not her, first time to Atlanta.

    Just before 3:06 a.m., the Trooper returned to the pick-up truck to talk with Defendant. He asked whether she owned the truck and requested the registration and some identification. He asked her what kind of work she did. To verify the driver's story, the Trooper then asked Defendant how long she planned to be in Atlanta. She said that she was visiting a sick aunt and would stay probably until Wednesday, depending on her aunt's condition. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Trooper asked where Defendant's aunt resided in Atlanta. Defendant had difficulty answering where the aunt lived, noting that she thought it started with a "G" or "Gaines." In response to the Trooper's question about whether it was "Gwinnett," she stated "yes." The Trooper questioned Defendant about whether the two small bags that he viewed in the back seat of the truck were the only luggage that they had brought for the trip. She responded affirmatively.

Around 3:08 a.m., the Trooper returned to the patrol car and again asked the driver about the purpose of the trip and whether they were driving all night. The driver responded that they-on their trip from Houston to Atlanta-had been traveling non-stop. After the driver made no mention of Defendant's sick aunt, the Trooper further questioned whether they **\*1208** were visiting a sick relative; the driver responded "no."

With the driver still in the patrol car, just before 3:09 a.m., the Trooper contacted United States Customs to check the license validation, the vehicle registration, whether warrants existed for the driver or Defendant, and whether the vehicle had crossed national borders. The Trooper testified that he contacts Customs in over two-thirds of his stops and that, as a general practice, he does not conclude a traffic stop until receiving a response from the agency. Around 3:12 a.m., the Trooper informed the driver that the Trooper would be issuing a warning. The warning was close to, if not fully, written at this time. But the Trooper testified that he did not consider the traffic stop to have ended because he had not heard back from Customs; he did not deliver the written warning to the driver at this time.

The Trooper then walked to the truck to return Defendant's license and registration. The Trooper observed that Defendant seemed unusually nervous.

The Trooper testified that he, after his conversations with the driver and Defendant, decided to call Chris Brown, a State Trooper who works with a narcotics canine.[FN2] Trooper Peoples testified that based on the following observations, he decided to

ask for consent to search the vehicle: (1) the driver's excuse for the speeding-that Defendant suffered diarrhea-despite the availability of restroom facilities at the previous exit; (2) empty food containers in the vehicle; (3) discrepancies in the driver's and Defendant's stories about the trip's length and purpose; (4) a level of nervousness exhibited in both the driver and Defendant that-in the Trooper's experience-was higher than that of the normal motoring public; (5) the decision to begin travel during severe weather in Houston and to continue at night without stopping; (6) Defendant's lack of knowledge about the trip's destination; (7) travel between two main source cities for narcotics; and (8) minimal luggage carried for a supposed week-long trip.

> FN2. Trooper Peoples called Trooper Brown just before obtaining consent to search the truck. Trooper Brown arrived on the scene shortly thereafter.

Trooper Peoples then returned to the police car and asked the driver whether they were transporting anything illegal. The driver responded negatively. The Trooper asked the driver for consent to search the truck. The driver agreed and signed a consent form. At 3:18 a.m., the Trooper asked Defendant for permission to search; she also signed the consent form.

Around 3:19 a.m., Trooper Peoples began a search of the truck that lasted approximately twenty minutes. Around 3:28 a.m., Trooper Brown positioned his dog on the passenger side of the truck; the dog gave a positive response to the presence of narcotics. Trooper Peoples then located vacuum-sealed packages behind a concealed trap door; the packages, upon testing, were determined to hold cocaine. By the time that the driver and Defendant were arrested for the cocaine (around 3:38 a.m.), the Trooper still had not heard back from Customs. During the course of the search, the Troopers offered to take Defendant to the exit with the restroom facilities; she declined the offer.

Defendant filed a motion to dismiss and a mo-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.3d 1206, 18 Fla. L. Weekly Fed. C 753

**(Cite as: 418 F.3d 1206)**

tion to suppress the evidence. The district court granted the motions. The Government now appeals.

*Discussion*

I. *District Court Decision*

[1] The district court concluded that the Trooper's interrogation of Defendant **\*1209** and the driver went beyond what that court understood to be the strict limits of questions allowed at a traffic stop. The judge then concluded that, either because such questions were asked at all or because asking the questions prolonged the duration and enlarged the scope of Defendant's detention, the traffic stop was unconstitutional before Defendant consented to the search. To be more specific, the district court seemed to think that, because the Trooper-before he began to write the citation or to call for a computer check-asked the driver and Defendant questions that the district court saw as unrelated to either officer safety, the speeding offense, or processing the citation, the seizure must be unconstitutional.[FN3]

> FN3. The district court tried to sort out some of our, and other circuits', earlier decisions on traffic stops. After the district court issued its opinion, the Supreme Court concluded that it is unreasonable extensions of the duration-not the scope of conversation-that could render an otherwise justified detention unreasonable for Fourth Amendment purposes. "[M]ere police questioning does not constitute a seizure,"-even if such questioning is about a topic unrelated to the initial purpose of the search or seizure-so long as it does not "prolong[ ] ... the time reasonably required to complete that [initial] mission." *Muehler v. Mena*, --- U.S. ----, 125 S.Ct. 1465, 1471, 161 L.Ed.2d 299 (2005) (internal quotations and citations omitted) (holding that no independent reasonable suspicion was required for officers to question person about immigration status while being detained during search for weapons

and evidence of gang membership). Although the seizure in *Muehler* was conducted pursuant to a search warrant, we believe that the focus on duration (and not scope of questioning) is just as applicable to a lawful traffic stop.

Therefore, arguments that the Trooper asked questions unrelated to either officer safety, the speeding offense, or processing the citation are not determinative of our evaluation of the constitutionality of the seizure here. We are to look only at the duration of the seizure given all the circumstances: was it for an unreasonable time? And, of course, a traffic stop will inherently take some time. When an officer is, for instance, looking at a driver's license or waiting for a computer check of registration, he lawfully can at about the same time also ask questions-even questions not strictly related to the traffic stop.

Stressing the resultant delay, the district court also observed that the questions "necessarily prolonged" the detainment and stated that "this is true even though the total time between the beginning of the stop and the consent to search does not run afoul of the cases setting an outside limit for the total length of a detention for a traffic stop." Memorandum Opinion and Order, *United States v. Hernandez*, CR No. 03-142-N (M.D.Ala. March 22, 2004), at 28. The district court reasoned that, because the seizure-seemingly from when the first question was asked that was not strictly necessary for the traffic offense-already "violated the parameters set out in *Terry*," all of the evidence obtained from the encounter (including the search) had to be suppressed as "fruit of the poisonous tree." *Id.* at 24, 28-29.

We disagree. We conclude that objective reasonable suspicion existed that Defendant was engaged in other criminal activity and that reasonable suspicion justified the detention up to the point Defendant consented to the search.

II. *Analysis*

[2] We stress that no one contends that this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stop was an unlawful stop at its inception: Defendant does not dispute that the Trooper observed the vehicle violate the speed limit. We also observe that Defendant does not contest that she, in fact, consented to the search.[FN4] Once Defendant*1210 gave her consent, the clock re-started for purposes of evaluating the reasonableness of the duration of the intrusion. *See United States v. Pruitt,* 174 F.3d 1215, 1220 (11th Cir.1999) (stating that "further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter"). No contention is made that the *search* here lasted an unreasonably long time. Therefore, it is only the intermediate period of seventeen minutes of detention leading up to the consent to search that we must evaluate for constitutional reasonableness. *See United States v. Purcell,* 236 F.3d 1274, 1279 (11th Cir.2001) (considering only portion of stop before lawful consent to search as relevant to inquiry of whether duration was unconstitutional). Because Defendant was lawfully detained when she consented, her consent validated the search.

> FN4. Although Defendant argues that the consent was tainted by the illegal detention, she makes no argument that the consent-in and of itself-was illegally obtained (for example, that it was coerced or fraudulently obtained). Because we conclude that Defendant was legally detained when she consented to the search, we cannot agree that the consent was invalid as fruit of the poisonous tree. *Cf. Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) ("Because we affirm the ... conclusion that [defendant] was being illegally detained when he consented to the search of his luggage, we agree that the consent was tainted by the illegality and was ineffective to justify the search.")

We also reject Defendant's argument that because the Trooper, since the date of the pertinent stop, has testified that he intended to search the vehicle regardless of consent, we should analyze this search as if there were no consent at all. An officer's "subjective intentions" are not relevant for Fourth Amendment analysis. *See Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996).

[3] From the first minute of the stop, the driver and Defendant demonstrated suspicious behavior that could warrant an objectively reasonable policeman to believe that Defendant might be involved in other criminal activity. Defendant was traveling at three o'clock in the morning, and the Trooper was able to observe the food containers and small amount of luggage when he first approached the pick-up truck. He testified that he considered the food containers suspicious because people transporting contraband often drive long distances without leaving their vehicles, because they fear leaving the contraband unattended. In fact, the Trooper had received drug interdiction training which instructed that the presence of food containers was a factor that may raise reasonable suspicion in a traffic stop situation.

The Trooper doubtlessly had the right to inquire into why the vehicle was speeding. Later at a hearing, in response to a question asking when he became suspicious, the Trooper stated "[t]he one factor was the restroom issue." The implausibility that the truck was speeding because Defendant was suffering from diarrhea-after they had just passed a lighted exit with restroom facilities in rural Alabama at 3 a.m. (where rest stops were few and far between)-combined with the Trooper's observation of the food containers and minimal luggage, creates a more suspicious set of circumstances than a mere demonstration of nervousness, use of an out-of-state license, or habit of repeating questions before answering. *Cf. United States v. Perkins,* 348 F.3d 965, 970 (11th Cir.2003) (concluding nervousness, repetition of questions, possession of out-of-state license, and inconsistent statements regarding destination alone insufficient for reasonable suspicion).

And unlike the defendant in *United States v. Boyce,* 351 F.3d 1102, 1109 (11th Cir.2003), the driver here never provided an explanation for the implausible speeding excuse upon further question-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing. *See id.*(noting that officer's suspicions that driver would not travel such long distance for ex-girlfriend "virtually evaporated and **\*1211** any justification ... for further investigation [based on this inconsistency] dissipated" once driver explained he was not sure of current status of relationship (internal quotation marks omitted) (brackets in original)). Therefore, right from the start, the Trooper had reason to suspect that he was not dealing with just a speeding case and, thus, reason to detain Defendant longer than perhaps a traffic stop, in itself, would allow.

Once the Trooper developed this reasonable suspicion, he had a duty to investigate more. *United States v. Harris,* 928 F.2d 1113, 1117 (11th Cir.1991) ("Where ... the initial stop was legal, the [officer] had the duty to investigate suspicious circumstances that then came to his attention."(internal quotation marks omitted) (brackets in original)). We note that as each answer to the Trooper's investigative questions failed to allay his concerns, the Trooper's reasonable suspicion was bolstered, thus justifying his continuing to detain Defendant, his call for the dog,[FN5] and his request to search the truck. By the time the Trooper sought permission to search the truck, at least these circumstances provided a reasonable officer with a "minimal, particularized basis," *Pruitt,* 174 F.3d at 1221, for reasonable suspicion: (1) the implausible excuse for speeding; (2) empty food containers in the vehicle; (3) discrepancies in stories about the trip's length and purpose; (4) abnormal nervousness in both detainees; (5) nonstop travel at night in severe weather; (6) lack of knowledge on the trip's destination; (7) travel between two main source cities for narcotics; and (8) minimal luggage.[FN6]

> FN5. We have concluded that a "canine sniff ... is the kind of brief, minimally intrusive investigation technique that may justify a *Terry* stop." *United States v. Hardy,* 855 F.2d 753, 759 (11th Cir.1988).

> FN6. Again, several of these factors were highlighted in the Trooper's drug interdiction training as circumstances that might

raise suspicion in a traffic stop. The Trooper testified that he was instructed that travel at night during inclement weather, nonstop travel, the presence of food containers, inconsistent answers on the trip's length and purpose, confusion about destination and length of stay, unusual nervousness, and travel between source cities, are all characteristic of drug courier transport.

From the start and thereafter with additional revelations, the circumstances-taken together-gave rise to a more worrisome set of circumstances than the cases where we have concluded that no basis for reasonable suspicion existed. *Cf. Boyce,* 351 F.3d at 1109 (concluding that driving rental car on known drug corridor and planning to return car two days late was insufficient for reasonable suspicion); *United States v. Tapia,* 912 F.2d 1367, 1371 (11th Cir.1990) (concluding that "being Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates" was insufficient for reasonable suspicion). Even *if* the duration of the pre-consensual detention in this case did extend beyond what might have been reasonable for just a routine traffic stop, the facts that came to light from the beginning of the stop-facts giving rise to reasonable suspicion that an additional crime was being committed-were more than sufficient to justify this detention of no more than seventeen minutes.

### *Conclusion*

For the foregoing reasons, we conclude that the detention and search were constitutional. Therefore, the district court's orders granting Defendant's motion to dismiss and motion to suppress are REVERSED and the case is REMANDED **\*1212** for further proceedings consistent with this opinion. FN7

> FN7. We have decided this case on the basis of the argument made to us: that, apart from the Trooper's looking into the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.3d 1206, 18 Fla. L. Weekly Fed. C 753

**(Cite as: 418 F.3d 1206)**

traffic violation itself, additional circumstances continued to arise and to confront the Trooper that signaled another crime and justified prolonging the stop. But something else seems worth pointing out. Where at its inception a traffic stop is a valid one for a violation of the law, we doubt that a resultant seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short. By the way, no appellate decision has been called to our attention that has held such a short detention-linked to a legitimate traffic stop-to be an unreasonable seizure under the Fourth Amendment on account of the stop's duration.

A traffic stop for speeding can doubtlessly last long enough for the police to ask questions about the reasons for speeding and to conduct a variety of checks about licenses, registration, insurance and so on. We underline that the police are not constitutionally required to move at top speed or as fast as possible. *See, e.g., United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985) ("While it is clear that the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion, we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes."(internal quotations and citation omitted)). For the police to be vigilant about crimes is, at least broadly speaking, a good thing. And at a traffic stop, the police can occasionally pause for a moment to take a breath, to think about what they have seen and heard, and to ask a question or so. The police are authorized to detain traffic violators for a *reasonable* amount of time. No one has contended that the detention here was done in an abusive manner. No evidence in the record shows that seventeen minutes is significantly longer than the range of normal for a traffic stop for a moving violation. Even *if* seventeen minutes is some minutes longer

than the norm, we question whether the Fourth Amendment's prohibition of unreasonable seizures is concerned with such trifling amounts of time, when the seizure was caused at the outset by an apparent violation of the law. Of trifles the law does not concern itself: *De minimis non curat lex.* This ancient legal maxim seems especially pertinent when it is the Constitution that we are being asked to apply.

C.A.11 (Ala.),2005.

U.S. v. Hernandez

418 F.3d 1206, 18 Fla. L. Weekly Fed. C 753

END OF DOCUMENT

902 F.2d 937                                                                    Page 1
902 F.2d 937
**(Cite as: 902 F.2d 937)**

▷

U.S. v. Strickland
C.A.11 (Ga.),1990.

United States Court of Appeals,Eleventh Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Walter George STRICKLAND, Jr., Defendant-Appellant.
**No. 89-8856**
**Non-Argument Calendar.**

June 5, 1990.

Defendant entered a conditional guilty plea in the United States District Court for the Middle District of Georgia, No. CR-89-33-MAC,Wilbur D. Owens, Jr., Chief Judge, to charge of possession with intent to distribute approximately 10 kilograms of cocaine and possession of an unregistered machine gun. Defendant appealed the denial of motion to suppress evidence. The Court of Appeals, Kravitch, Circuit Judge, held that: (1) officer's stop of defendant's vehicle was not pretextual, and (2) although defendant's consent to search of entire vehicle did not include permission to slash his spare tire to investigate its contents, information gathered by officer during portion of search that was within scope of consent provided probable cause to support search of tire cavity without consent.

Affirmed.

West Headnotes

**[1] Searches and Seizures 349 ⟨⟩80.1**

349 Searches and Seizures
   349I In General
     349k80 Effect of Illegal Conduct; Trespass
      349k80.1 k. In General. Most Cited Cases
    (Formerly 349k80)
Search of person or vehicle is improper if initial seizure of person or vehicle was unlawful. U.S.C.A. Const.Amend. 4.

**[2] Arrest 35 ⟨⟩63.5(6)**

35 Arrest
   35II On Criminal Charges
     35k63.5 Investigatory Stop or Stop-And-Frisk
      35k63.5(6) k. Motor Vehicles, Stopping. Most Cited Cases
Officer may conduct brief investigative stop of vehicle, analogous to *Terry*-stop, if seizure is justified by specific articulable facts sufficient to give rise to reasonable suspicion of criminal conduct. U.S.C.A. Const.Amend. 4.

**[3] Arrest 35 ⟨⟩63.5(3.1)**

35 Arrest
   35II On Criminal Charges
     35k63.5 Investigatory Stop or Stop-And-Frisk
      35k63.5(3) Grounds for Stop or Investigation
       35k63.5(3.1) k. In General. Most Cited Cases
    (Formerly 35k63.5(3))
Investigatory stops are invalid if they are solely based on "unparticularized suspicion" or "inarticulate hunches." U.S.C.A. Const.Amend. 4.

**[4] Arrest 35 ⟨⟩63.5(1)**

35 Arrest
   35II On Criminal Charges
     35k63.5 Investigatory Stop or Stop-And-Frisk
      35k63.5(1) k. In General. Most Cited Cases
Investigatory stops are invalid as pretextual unless reasonable officer would have made seizure in the absence of illegitimate motivation. U.S.C.A. Const.Amend. 4.

**[5] Automobiles 48A ⟨⟩349(2.1)**

48A Automobiles
   48AVII Offenses

Page 2

48AVII(B) Prosecution
48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
48Ak349(2) Grounds
48Ak349(2.1) k. In General. Most Cited Cases
(Formerly 48Ak349(2))

**Automobiles 48A ⬤══349(5)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
            48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
                48Ak349(2) Grounds
                    48Ak349(5) k. Equipment or Inspection Offenses. Most Cited Cases
Police officer may stop vehicle when there is probable cause to believe that driver is violating any one of multitude of applicable traffic and equipment regulations relating to operation of motor vehicles. U.S.C.A. Const.Amend. 4.

**[6] Automobiles 48A ⬤══349.5(3)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
            48Ak349.5 Search or Seizure Consequent to Arrest, Stop or Inquiry
                48Ak349.5(3) k. Stop or Arrest as Pretext or Ruse, in General. Most Cited Cases
Police officer's stop of vehicle which he observed crossing over divider lane several times was not a pretextual stop; officer testified that he stopped every vehicle that he observed doing what defendant's vehicle was doing. U.S.C.A. Const.Amend. 4.

**[7] Automobiles 48A ⬤══349.5(7)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
            48Ak349.5 Search or Seizure Consequent to Arrest, Stop or Inquiry
                48Ak349.5(5) Object, Product, Scope, and Conduct of Search or Inspection

48Ak349.5(7) k. Drugs and Narcotics. Most Cited Cases
Although defendant's consent to search of his vehicle, including his trunk and luggage, did not include permission to slash his spare tire to investigate its contents, information gathered by police officer during search that was within scope of consent provided probable cause to support search of tire cavity without consent; tire's bent rim, extreme weight, and flopping sound provided officer with at least probable cause to believe that something had been secreted in tire, and his knowledge of drug smuggling techniques and anomalous presence of items in spare tire firmly established probable cause to believe that items in tire were contraband. U.S.C.A. Const.Amend. 4.

**[8] Searches and Seizures 349 ⬤══186**

349 Searches and Seizures
    349V Waiver and Consent
        349k186 k. Scope and Duration of Consent; Withdrawal. Most Cited Cases
Consensual search is confined to terms of its authorization. U.S.C.A. Const.Amend. 4.

**[9] Searches and Seizures 349 ⬤══186**

349 Searches and Seizures
    349V Waiver and Consent
        349k186 k. Scope and Duration of Consent; Withdrawal. Most Cited Cases
Scope of actual consent to search restricts permissible boundaries of search in same manner as specifications in warrant. U.S.C.A. Const.Amend. 4.

**[10] Searches and Seizures 349 ⬤══186**

349 Searches and Seizures
    349V Waiver and Consent
        349k186 k. Scope and Duration of Consent; Withdrawal. Most Cited Cases
If Government does not conform to limitations placed upon right granted to search, search is impermissible. U.S.C.A. Const.Amend. 4.

**[11] Searches and Seizures 349 ⬤══194**

Page 5

349 Searches and Seizures
    349VI Judicial Review or Determination
        349k192 Presumptions and Burden of Proof
            349k194 k. Consent, and Validity Thereof. Most Cited Cases

In justifying consensual search, Government bears burden of establishing that search was conducted within purview of consent received. U.S.C.A. Const.Amend. 4.

**[12] Searches and Seizures 349 ⟲186**

349 Searches and Seizures
    349V Waiver and Consent
        349k186 k. Scope and Duration of Consent; Withdrawal. Most Cited Cases

When person gives general statement of consent to search without express limitations, scope of permissible search is not limitless; rather, it is constrained by bounds of reasonableness: what police officer could reasonably interpret consent to encompass. U.S.C.A. Const.Amend. 4.

**[13] Searches and Seizures 349 ⟲62**

349 Searches and Seizures
    349I In General
        349k60 Motor Vehicles
            349k62 k. Probable or Reasonable Cause. Most Cited Cases

**Searches and Seizures 349 ⟲64**

349 Searches and Seizures
    349I In General
        349k60 Motor Vehicles
            349k64 k. Emergencies or Exigencies. Most Cited Cases

Vehicle may be searched without either permission or warrant if there is probable cause to believe that it contained contraband or other evidence which is subject to seizure under law and exigent circumstances necessitate search or seizure. U.S.C.A. Const.Amend. 4.

**[14] Searches and Seizures 349 ⟲65**

349 Searches and Seizures

349I In General
    349k60 Motor Vehicles
        349k65 k. Scope; Trunk, Compartments, Containers, and Luggage. Most Cited Cases

Vehicle search conducted pursuant to probable cause may include any item and compartment in vehicle that might contain object of search. U.S.C.A. Const.Amend. 4.

**[15] Searches and Seizures 349 ⟲60.1**

349 Searches and Seizures
    349I In General
        349k60 Motor Vehicles
        349k60.1 k. In General. Most Cited Cases
    (Formerly 349k60)

Vehicle search conducted pursuant to probable cause may include some injury to vehicle or items within vehicle if damage is reasonably necessary to gain access to specific location where officers have probable cause to believe that object of their search is located. U.S.C.A. Const.Amend. 4.

**[16] Searches and Seizures 349 ⟲68**

349 Searches and Seizures
    349I In General
        349k67 Weapons; Protective Searches
        349k68 k. Vehicle Searches. Most Cited Cases

Probable cause for vehicle search exists when facts and circumstances would lead reasonably prudent person to believe that vehicle contains contraband. U.S.C.A. Const.Amend. 4.

**[17] Searches and Seizures 349 ⟲40.1**

349 Searches and Seizures
    349I In General
        349k40 Probable Cause
        349k40.1 k. In General. Most Cited Cases
    (Formerly 349k40)

Facts and circumstances upon which finding of probable cause for search is based include sum total and synthesis of what police have heard, what they know, and what they observe as trained officers. U.S.C.A. Const.Amend. 4.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*938** Edward T.M. Garland, Atlanta, Ga., for defendant-appellant.

Deborah A. Griffin, Asst. U.S. Atty., Macon, Ga., for plaintiff-appellee.

Appeal from the United States District Court for the Middle District of Georgia.

Before KRAVITCH and CLARK, Circuit Judges, and HENDERSON, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Appellant, Walter G. Strickland, entered a conditional guilty plea to possession with the intent to distribute approximately ten kilograms of cocaine in violation of 21 U.S.C. §§ 846 & 841(a)(1), and possession of an unregistered firearm in violation of 26 U.S.C. §§ 5861(d) & 5871. Pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, Strickland reserved the right to appeal the district court's denial of his motion to suppress evidence discovered during a search of his automobile. Because we find that information gained by the officer during a valid consensual search of the vehicle provided probable cause to sustain the validity of a continuation of that search beyond the scope of consent, we affirm the district court.

## FACTS

On February 23, 1989, at approximately 1:10 a.m. on Interstate 75, Georgia State Trooper David Brack observed a 1989 Mercury **\*939** Marquis LS driven by appellant travelling over the dotted white markers between the two lanes of travel. According to Officer Brack's uncontroverted testimony at the suppression hearing, he began to follow the vehicle and observed that the driver was "continually over or straddled the divider lane and then went back into his lane and came back over the divider lane once more...." Brack testified that he routinely stopped every vehicle being driven in this manner. When he stopped the Mercury he told appellant "the reason I stopped you, you were weaving. I was concerned that you might have been tired or sleepy or the possibility you might have been drinking. I wanted to stop and check and make sure you're all

right." Strickland produced the necessary documentation for the vehicle and satisfied Brack that he was not intoxicated. Officer Brack testified that at that point, Strickland was free to leave.

Nevertheless, Officer Brack then told Strickland: "We have a lot of trouble with people couriering narcotics, weapons, unusually large amounts of money, other types of contraband." According to the officer's undisputed testimony, when the subject of a search was mentioned, Strickland responded "I don't have any objections at all ... let me get the key and open the trunk." Strickland opened the trunk to the vehicle and then asked the officer whether he could sit in the police vehicle because it was cold outside. Before proceeding with the search Brack explained to Strickland, "I want you to understand that I would like to search the entire contents of your automobile ... if you want to sit down, that's fine with me, to get out of the cold but I want you to understand that I would like to search the entire contents of your car." Strickland responded "That's fine." FN1

> FN1. In response to Strickland's request, Officer Brack directed appellant to sit in the back seat of the police vehicle. This area is separated from the front seat area by a Plexiglas shield. Additionally, the doors of the back seat area cannot be opened from the inside. Appellant relies on these facts to suggest that his consent to search the Mercury was the product of an illegal detention in the police vehicle. This contention is absurd because Strickland initiated the request to sit in the police vehicle and there is no evidence that he would have been kept in the car, up until the point of his arrest, had he indicated that he wished to get out.

Officer Brack testified at the suppression hearing that he immediately directed his search to the spare tire in the trunk of the Mercury. Brack explained that the spare tire seemed uncharacteristically large for that type of automobile, that the placement of the tire seemed unusual, and that its

Page 5

cover did not seem to fit properly over it. After removing the cover, he discovered further suspicious discrepancies with respect to the tire:

OFFICER BRACK: [I] noticed that it was a Sears tire and I thought that initially to be kind of unusual. I noticed the rim and it was rusted on the tire and bent somewhat and I knew that was definitely out of place. I looked at the tires on the car and they were Firestone tires and I undid the bolt that holds the tire down and as I pulled the tire out, I knew that it was very obvious that something was inside the tire.

MR. SOLIS [Asst. U.S. Atty.]: Why was it so obvious?

OFFICER BRACK: The tire was extremely heavy, weighted with something and when the tire was removed from the trunk and it was rolled, you could hear what was inside just flumping, you know, as it would roll, it would flmp, flmp.

Officer Brack then instructed a deputy who had arrived at the scene to cut open the tire. Inside the tire was an automatic weapon, a silencer, a thirty round ammunition clip, and ten kilograms of cocaine.

### ISSUES

Appellant contends that the district court erred in refusing to suppress the evidence found during Officer Brack's search. Appellant first argues that the search of his vehicle was impermissible because it was conducted after an improper pretextual stop. Second, appellant urges that even if the stop was appropriate, the cutting open of the tire was impermissible because it exceeded the scope of consent.

### *940 PRETEXTUAL STOP

[1][2][3][4] A search of an individual or a vehicle is improper if the initial seizure of the person or vehicle was unlawful. *See United States v. Miller,* 821 F.2d 546, 547 (11th Cir.1987). An officer may conduct a brief investigative stop of a vehicle, analogous to a *Terry* -stop, if the seizure is justified by specific articulable facts sufficient to

give rise to a reasonable suspicion of criminal conduct. *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *United States v. Smith,* 799 F.2d 704, 707 (11th Cir.1986); *see Delaware v. Prouse,* 440 U.S. 648, 655-56, 661, 663, 99 S.Ct. 1391, 1397, 1400-01, 59 L.Ed.2d 660 (1979); *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889, 909 (1968); *see, e.g., United States v. Brignoni-Ponce,* 422 U.S. 873, 885, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975) (permitting border patrol officers to stop vehicles upon reasonable suspicion that they contain illegal aliens). Investigatory stops are invalid if they are solely based on "unparticularized suspicion" or "inarticulate hunches." *Terry,* 392 U.S. at 22, 27, 88 S.Ct. at 1880, 1883; *Smith,* 799 F.2d at 707; *see Prouse,* 440 U.S. at 661, 99 S.Ct. at 1400. Likewise, investigatory stops are invalid as pretextual unless "a reasonable officer *would* have made the seizure in the absence of illegitimate motivation." *Smith,* 799 F.2d at 708 (emphasis original). The government does not suggest, nor could we find, a reasonable suspicion of criminal activity sufficient to justify an investigatory stop in this case. *Cf. Sharpe,* 470 U.S. at 682 & n. 3, 105 S.Ct. at 1573 & n. 3 (delineating facts supporting reasonable suspicion of narcotics trafficking that justified investigative stop of vehicle).

[5][6] Alternatively, a police officer may stop a vehicle "[w]hen there is ... probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations" relating to the operation of motor vehicles. *Prouse,* 440 U.S. at 661, 99 S.Ct. at 1400; *see United States v. Bates,* 840 F.2d 858, 860 (11th Cir.1988); *Smith,* 799 F.2d at 709; *see, e.g., United States v. Hollman,* 541 F.2d 196, 198 (8th Cir.1976) (police had probable cause to stop vehicle because its taillights were defective). It remains an open question whether a stop for probable cause might nevertheless be invalid as pretextual if a reasonable officer would not have made the seizure in the absence of an illegitimate motivation. *Smith,* 799 F.2d at 709; *see United States v. Robinson,* 414 U.S. 218, 221 n. 1, 94 S.Ct. 467, 470 n. 1, 38 L.Ed.2d 427 (1973). We need not address this issue today

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

because the district court found that the stop was not pretextual. Based upon Officer Brack's testimony that he "stop[s] every car that ... [he] observe[s] doing what Mr. Strickland's car was doing," we cannot hold that the district court's finding was erroneous.[FN2]  *See Bates,* 840 F.2d at 860; *see also United States v. Rivera,* 867 F.2d 1261, 1263-64 (10th Cir.1989) (stop not pretextual if police routinely stop individuals who drive in manner of defendant).

> FN2. Strickland was stopped for weaving pursuant to Georgia's Uniform Rules of the Road, which require vehicles to be driven within one lane of traffic. O.C.G.A. § 40-6-48(1). The applicable regulation provides that "a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." *Id.*

Strickland relies heavily on this court's opinion in *United States v. Smith* to support his contention that the stop was pretextual and, therefore, that the evidence discovered during the search of his car should be suppressed. This reliance is misplaced, and ignores the important distinction in *Smith* between pretextual investigative stops and nonpretextual stops based upon probable cause of a traffic violation. In *Smith,* we accepted the district court's finding that there was no probable cause for a traffic violation to warrant a stop of the vehicle. 799 F.2d at 708. Additionally, we found that the police officer lacked reasonable suspicion of criminal activity to make an investigatory stop of the vehicle. 799 F.2d at 708. Under those circumstances we held that a subsequent search of the vehicle was invalid because the police officer**\*941** would not have made the initial stop absent an illegitimate motivation. *Id.* Strickland's seizure, in contrast, was nonpretextual and based upon probable cause of a traffic violation. *See United States v. Pino,* 855 F.2d 357, 361 (6th Cir.1988) (similarly distinguishing *Smith* ),*opinion amended,*866 F.2d 147 (6th Cir.1989), *cert. denied,*493 U.S. 1090, 110

S.Ct. 1160, 107 L.Ed.2d 1063 (1990).

## SCOPE OF CONSENT

[7] Strickland next argues that, even if the seizure was valid, the subsequent search was impermissible because it went beyond the scope of consent given to the officer.[FN3]  Appellant concedes that he consented to a search of his entire car, including his trunk and luggage. Nevertheless, he contends that this consent did not include permission to slash his spare tire to investigate its contents. We agree, but do not reverse because the information gathered by Officer Brack during that portion of the search that was within the scope of consent provided the probable cause to support a search of the tire cavity without consent.

> FN3. The record is unclear as to whether Officer Brack initially requested permission to search the vehicle or whether Strickland volunteered to have his vehicle searched after the officer brought up the subject of drug couriers. In either case, the legal effect of a statement of consent, whether requested or volunteered, is the same. Nothing in the Constitution prohibits a police officer who permissibly has stopped an individual from *requesting* permission to conduct a search even if he has no basis for suspecting that the individual is carrying any contraband. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Bates,* 840 F.2d at 861; *see, e.g., United States v. Maragh,* 894 F.2d 415, 416 (D.C.Cir.1990) (reversing trial court's suppression of evidence although police detective apparently lacked reasonable suspicion that defendant was carrying contraband when he requested permission to search defendant's bag). Obviously, the absence of reasonable suspicion that the individual is carrying contraband will render the stop itself impermissible unless there is an independent ground justifying the stop. *See Terry,* 392

U.S. at 30, 33, 88 S.Ct. at 1884, 1885-86.

[8][9][10][11] A consensual search is confined to the terms of its authorization. *United States v. Blake,* 888 F.2d 795, 798 (11th Cir.1989); *United States v. Rackley,* 742 F.2d 1266, 1271 (11th Cir.1984). The scope of the actual consent restricts the permissible boundaries of a search in the same manner as the specifications in a warrant. *Blake,* 888 F.2d at 798; *United States v. McBean,* 861 F.2d 1570, 1573 (11th Cir.1988); *United States v. Milian-Rodriguez,* 759 F.2d 1558, 1563 (11th Cir.), *cert. denied,* 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 112 (1985). If the government does not conform to the limitations placed upon the right granted to search, the search is impermissible. *Blake,* 888 F.2d at 800; *Mason v. Pulliam,* 557 F.2d 426, 429 (5th Cir.1977).[FN4] In justifying a consensual search, the government bears the burden of establishing that the search was conducted within the purview of the consent received. *Blake,* 888 F.2d at 800.

> FN4. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[12] When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless. Rather it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass. *See id.* at 800-01. In *Blake,* we recently affirmed a district court's ruling that "the consent given by the defendants allowing the officers to search their 'person' could not, under the circumstances, be construed as authorization for the officers to touch their genitals in the middle of a public area...." 888 F.2d at 800, *aff'g,* 718 F.Supp. 925 (S.D.Fla.1988). We explained, "it cannot be said that a reasonable individual would understand that a search of one's person would entail an officer touching his or her genitals." *Blake,* 888 F.2d at 800-01.

Similarly, under the circumstances of this case, a police officer could not reasonably interpret a general statement of consent to search an individual's vehicle to include the intentional infliction of damage *942 to the vehicle or the property contained within it. Although an individual consenting to a vehicle search should expect that search to be thorough, he need not anticipate that the search will involve the destruction of his vehicle, its parts or contents. Indeed, it is difficult to conceive of any circumstance in which an individual would voluntarily consent to have the spare tire of their automobile slashed. Unless an individual specifically consents to police conduct that exceeds the reasonable bounds of a general statement of consent, that portion of the search is impermissible. *See id.* at 800.

[13][14][15] The absence of Strickland's consent to the mutilation of his spare tire does not necessitate the suppression of the evidence derived from the tire search, however, if there is another valid basis justifying the intrusion. It is well settled that a vehicle may be searched without either permission or a warrant if there is probable cause to believe that it contains contraband or other evidence which is subject to seizure under law and exigent circumstances necessitate the search or seizure. *United States v. Wilson,* 894 F.2d 1245, 1254 (11th Cir.1990); *United States v. Alexander,* 835 F.2d 1406, 1408-09 (11th Cir.1988); *United States v. Clark,* 559 F.2d 420, 424 (5th Cir.), *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977); *see United States v. Ross,* 456 U.S. 798, 807-10, 102 S.Ct. 2157, 2164-65, 72 L.Ed.2d 572 (1982). A vehicle search conducted pursuant to probable cause may include any item and compartment in the car that might contain the object of the search. *Colorado v. Bertine,* 479 U.S. 367, 375, 107 S.Ct. 738, 743, 93 L.Ed.2d 739 (1987); *United States v. Johns,* 469 U.S. 478, 484, 105 S.Ct. 881, 885, 83 L.Ed.2d 890 (1985); *Ross,* 456 U.S. at 821 & n. 28, 822, 825, 102 S.Ct. at 2171 & n. 28, 2173; *see California v. Carney,* 471 U.S. 386, 391-92, 105 S.Ct. 2066, 2069, 85 L.Ed.2d 406 (1985) (delineating compartment searches the Court has upheld); *see, e.g., Chambers v. Maroney,* 399 U.S.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42, 44, 90 S.Ct. 1975, 1977, 26 L.Ed.2d 419 (1970) (search of vehicle included opening concealed compartment under dashboard). Moreover, such a search may include some injury to the vehicle or the items within the vehicle, if the damage is reasonably necessary to gain access to a specific location where the officers have probable cause to believe that the object of their search is located. *See Ross,* 456 U.S. at 817-19, 823, 102 S.Ct. at 2169, 2172; *see, e.g., Carroll v. United States,* 267 U.S. 132, 136, 172-73, 45 S.Ct. 280, 281, 292, 69 L.Ed. 543 (1925) (search of vehicle included tearing open upholstery); *see also Maryland v. Garrison,* 480 U.S. 79, 84-85, 107 S.Ct. 1013, 1017, 94 L.Ed.2d 72 (1987) (scope of lawful search is defined by object of search and places in which there is probable cause to believe that object will be found).

There is no dispute that Officer Brack lacked probable cause to search the vehicle when he initiated his consensual search. The proper scope of his search, therefore, was constrained by a reasonable interpretation of Strickland's statement of consent. Acting reasonably within the scope of consent to search the "entire vehicle," Officer Brack examined the spare tire in the trunk, examined the other four tires of the vehicle, removed the tire to search around the spare tire compartment and facilitate his investigation of the tire, and rolled the spare tire on the pavement. From this consensual search, Officer Brack discovered that the spare had a rusty and bent rim, was made by a different manufacturer from the other four tires of the late model vehicle, seemed an incorrect size for the vehicle, was worn differently from the treads on the other tires, was extremely heavy for a spare tire, and contained something inside it that flopped around when the tire was moved.

[16][17] Probable cause for a vehicle search exists when the facts and circumstances would lead a reasonably prudent person to believe that the vehicle contains contraband. *Wilson,* 894 F.2d at 1254; *Alexander,* 835 F.2d at 1409; *Clark,* 559 F.2d at 424. The facts and circumstances upon which a finding of probable cause is based include "the sum total ... and the synthesis of what the police have

heard, what they know, and what they observe as *943 trained officers." *Wilson,* 894 F.2d at 1254-55; *Clark,* 599 F.2d at 424.

Here, the totality of the information garnered by Officer Brack while he was engaged in a permissible consensual search readily provided the probable cause necessary to extend the search beyond the scope of consent. *Cf. Michigan v. Thomas,* 458 U.S. 259, 260-62 & n. 1, 102 S.Ct. 3079, 3080-81 & n. 1, 73 L.Ed.2d 750 (1982) (per curiam) (information gathered during inventory search of vehicle may provide probable cause for full search of vehicle cavities and compartments); *Blake,* 888 F.2d at 800 n. 12 (suggesting that probable cause for search could have been provided by evidence found in search of companion); *United States v. Roy,* 869 F.2d 1427, 1431-33 (11th Cir.) (probable cause for second search of same boat provided by information discovered during first search), *cert. denied,*493 U.S. 818, 110 S.Ct. 72, 107 L.Ed.2d 38 (1989). The incongruity of a worn, oddly sized tire from a different manufacturer than the other tires of a late model sedan provided the officer with suspicion as to the circumstances of the tire. The tire's bent rim, extreme weight, and flopping sound, provided the officer with at least probable cause to believe that something had been secreted in the tire. The officer's knowledge of drug smuggling techniques and the anomalous presence of items in a spare tire firmly established the probable cause to believe that the items in the tire were contraband. This probable cause, coupled with the obvious exigency that the vehicle could disappear with the contraband if it was not searched immediately, made the warrantless search of the spare tire permissible. *See Wilson,* 894 F.2d at 1255.

CONCLUSION

The district court properly found that there was probable cause of a traffic violation justifying the stop of appellant's vehicle. Once the vehicle was stopped, appellant's statement of consent provided the officer with permission to conduct a thorough search of the vehicle. The information gathered

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

902 F.2d 937

**(Cite as: 902 F.2d 937)**

while the officer was acting within the scope of the consensual search provided the probable cause to conduct a search of the spare tire that exceeded the scope of consent. The judgment of the district court denying appellant's motion to suppress the evidence obtained during the search of his vehicle is, therefore, AFFIRMED.

C.A.11 (Ga.),1990.
U.S. v. Strickland
902 F.2d 937

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

905 F.2d 1503                                                                            Page 1
905 F.2d 1503
**(Cite as: 905 F.2d 1503)**

Marx v. Gumbinner
C.A.11 (Fla.),1990.

United States Court of Appeals,Eleventh Circuit.
Richard MARX, individually, and Kristina Marx, a
minor, Plaintiffs-Appellants,
v.
Glenn H. GUMBINNER, Robert Timmann and
Kelly Vaughn, Defendants-Appellees,
Martin County Sheriff's Dept., et al., Defendants.
**No. 89-5594.**

July 13, 1990.

Arrestee brought civil rights action against police
officers based on allegedly wrongful arrest. The
United States District Court for the Southern Dis-
trict of Florida, No. 86-8403-CIV-EPS,Eugene P.
Spellman, J., 716 F.Supp. 1434, granted officers'
motion for summary judgment, and arrestee ap-
pealed. The Court of Appeals, Edmondson, Circuit
Judge, held that statement made by arrestee's four-
year-old daughter after she was raped, that "Daddy
did this to me," together with arrestee's incriminat-
ing statement and failure of polygraph examination,
gave officers probable cause to make arrest.

Affirmed.

West Headnotes

**[1] Civil Rights 78 €══1088(4)**

78 Civil Rights
   78I Rights Protected and Discrimination Prohib-
ited in General
        78k1088 Police, Investigative, or Law En-
forcement Activities
         78k1088(4) k. Arrest and Detention. Most
Cited Cases
   (Formerly 78k133)
Warrantless arrest without probable cause violates
the Constitution and forms basis for § 1983 claim.
42 U.S.C.A. § 1983.

**[2] Civil Rights 78 €══1088(4)**

78 Civil Rights
   78I Rights Protected and Discrimination Prohib-
ited in General
        78k1088 Police, Investigative, or Law En-
forcement Activities
         78k1088(4) k. Arrest and Detention. Most
Cited Cases
   (Formerly 78k133)
Existence of probable cause is absolute bar to §
1983 action for false arrest. 42 U.S.C.A. § 1983.

**[3] Civil Rights 78 €══1420**

78 Civil Rights
   78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
         78k1420 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
   (Formerly 78k242(5))
In § 1983 action for false arrest, probable cause
does not require overwhelmingly convincing evid-
ence, but only reasonably trustworthy information,
and must be judged not with clinical detachment
but with common-sense view to realities of normal
life. 42 U.S.C.A. § 1983.

**[4] False Imprisonment 168 €══39**

168 False Imprisonment
   168I Civil Liability
      168I(B) Actions
         168k37 Trial
            168k39 k. Questions for Jury. Most
Cited Cases

**Federal Civil Procedure 170A €══2491.5**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil Rights Cases in
General. Most Cited Cases
When facts are not in dispute, whether probable

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cause to arrest existed is question of law, and summary judgment is appropriate in § 1983 action for false arrest. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ⊂⊃1088(4)**

78 Civil Rights
   78I Rights Protected and Discrimination Prohibited in General
       78k1088 Police, Investigative, or Law Enforcement Activities
        78k1088(4) k. Arrest and Detention. Most Cited Cases
   (Formerly 78k133)
Statement made by arrestee's four-year-old daughter after she was raped, that "Daddy did this to me," together with arrestee's incriminating statement and failure of polygraph examination, gave police officers probable cause to make arrest, precluding officers from being held liable in civil rights action after blood test proved that arrestee was not the rapist. 42 U.S.C.A. § 1983.

**[6] Arrest 35 ⊂⊃58**

35 Arrest
   35II On Criminal Charges
       35k58 k. Grounds and Purpose in General. Most Cited Cases
That defendant is subsequently acquitted or charges are dropped against defendant is of no consequence in determining validity of arrest itself. U.S.C.A. Const.Amend. 4.

**\*1504** Richard J. Troy, Chicago, Ill., for plaintiffs-appellants.
Keith C. Tischler, Julius F. Parker, Jr., Parker, Skelding Labasky & Corry, Tallahassee, Fla., for defendants-appellees.

Appeal from the United States District Court for the Southern District of Florida.

Before CLARK and EDMONDSON, Circuit Judges, and RUBIN [FN*], Senior Circuit Judge.

    FN* Honorable Alvin B. Rubin, U.S. Circuit Judge for the Fifth Circuit Court of

Appeals, sitting by designation.

EDMONDSON, Circuit Judge:

This is the second appeal involving a lawsuit filed by Richard Marx against two Florida state attorneys and three deputies of the Martin County, Florida, Sheriff's Department. Defendant deputies, after discussing the existence of probable cause with a state attorney, arrested Marx for allegedly sexually assaulting his then four-year-old daughter, Kristina. About a month after the arrest, blood tests proved that Marx was not the rapist; and the state attorney's office dropped the charges. Marx brought a section 1983 [FN1] action on behalf of himself and Kristina, claiming that his arrest was wrongful and illegal under the fourth and fourteenth amendments and that defendants willfully and maliciously violated his constitutional rights.

    FN1. 42 U.S.C. § 1983 (1988), says in pertinent part:
    Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The district court denied the state attorneys' motions for dismissal and for summary judgment. On interlocutory appeal, this court dismissed some of Marx's claims against the state attorneys and remanded. *Marx v. Gumbinner,* 855 F.2d 783 (11th Cir.1988). Marx settled the claims outstanding against the attorneys.

The defendant deputies then renewed their motion for summary judgment, which had been deferred pending resolution of the interlocutory appeal involving the state attorneys. The district court granted the deputies' motion on the grounds that the officers had probable cause to arrest Marx and, even if probable cause did not exist, the officers were protected from damages claims by the doctrine of qualified immunity. 716 F.Supp. 1434. We

affirm the grant of summary judgment on the ground that defendants had probable cause to arrest Marx and to take him into custody for questioning.FN2

> FN2. Because this appeal involves only claims against the three law enforcement officers, references hereinafter to "defendants" refers to only those individuals. Also, because we affirm summary judgment for all three officers, we make no distinctions between the officers when discussing the events of Marx's arrest.

### FACTS

Marx and Kristina were spending the night at the home of Marx's girlfriend, Claire Leonard. Marx found Kristina around 5:00 in the morning standing outside the back door of Leonard's home. Kristina had been raped and was covered with blood and mud. Marx began to clean Kristina while Leonard called the police and for an ambulance to take Marx and Kristina to the hospital.

Investigators at the Leonard home discovered several items of Leonard's personal property along with a child's underpants in a muddy ravine about fifty yards from the patio door. Leonard said the items had **\*1505** been in the bedroom where Kristina had been sleeping. The officers found no evidence of forced entry into the house; and, because the screen door opening onto the patio would not lock, officers assumed that an intruder would have entered through that door. A police dog located the crime scene and appeared to follow a scent between the crime scene, the house, and a road in back of Leonard's house; but the scent evidence was not strong.

Meanwhile, emergency room personnel treated Kristina. She was severely injured, and detectives at the hospital were prevented from interviewing her immediately. The doctor who first treated Kristina told detectives after making an initial examination that, when asked how she got mud in her mouth, Kristina said "Daddy did this to me," and "Daddy left me outside to sleep outside in my

nightgown, and he did this to me." Marx, who was not allowed in the treatment room, telephoned a friend, Ann Allen Sarno, who was a nurse. She came to the hospital and offered to talk to Kristina. Detectives told Sarno to report to them only what Kristina volunteered. After talking to Kristina, Sarno told detectives that Kristina said "a bad man took me outside." When detectives told Sarno about Kristina's statements implicating Marx, Sarno said she was not surprised. Sarno told detectives that Marx frequented topless bars and that he had alcohol abuse problems and financial difficulties.

While at the hospital, detectives interviewed Marx. Marx told them that he was generally a light sleeper and awoke whenever he heard noises from Kristina's room. Marx said that, on the night of the assault, he and Leonard were sleeping on the living room floor about ten feet from the patio door, suggesting that an intruder would have had to walk almost directly over them to reach Kristina's bedroom. Marx also told detectives that when he found Kristina she said, "Daddy, why did you leave me to sleep outside all night." Detectives then, about 8:00 a.m., asked Marx to accompany them to the sheriff's office for further questioning.

At the sheriff's office, Marx received a *Miranda* warning and gave defendants a statement. When asked why Kristina apparently identified Marx as the rapist, Marx said: "Well whoever left her probably got up and left. Maybe she knew I left her and came back in the house and left her out there." Marx also said that he hoped Kristina would not remember the incident.

Defendants then spoke with a state attorney who, after discussing the case with her supervisor, advised defendants to question Kristina and to ask Marx to take a polygraph exam before deciding whether to arrest Marx. After talking to his attorney, Marx volunteered to take the polygraph test. The polygraph examiner concluded that Marx probably was untruthful in his responses to questions about the rape and about taking Leonard's personal items. After learning of the test results, but without personally interviewing Kristina-who was then un-

dergoing surgery-defendants again talked with the prosecutor. The state attorney advised defendants that they had probable cause to arrest Marx, and defendants formally arrested Marx at about 5:00 p.m. The next day, the state court held a probable cause hearing and concluded that probable cause existed for Marx's arrest. On the advice of counsel, Marx refused to submit to blood and saliva tests. Several weeks later, in compliance with a court order, Marx submitted to a blood test which showed that he could not have been the rapist. The state then dropped all charges against Marx.

### DISCUSSION

[1][2][3][4] A warrantless arrest without probable cause violates the Constitution and forms the basis for a section 1983 claim. *See Herren v. Bowyer,* 850 F.2d 1543, 1547 (11th Cir.1988); *Reeves v. City of Jackson, Miss.,* 608 F.2d 644, 651 (5th Cir.1979).[FN3] The existence of probable **\*1506** cause, however, is an absolute bar to a section 1983 action for false arrest. *Howell v. Tanner,* 650 F.2d 610, 614 (5th Cir. Unit B 1981);[FN4] *Williams v. Kobel,* 789 F.2d 463, 470 (7th Cir.1986). "Probable cause [to arrest] exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175-76, 69 S.Ct. 1302, 1310-11, 93 L.Ed. 1879 (1949) (brackets in original) (citing *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925); *Wilson v. Attaway,* 757 F.2d 1227, 1235 (11th Cir.1985). Probable cause does not require overwhelmingly convincing evidence, but only "reasonably trustworthy information," *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964), and probable cause "must be judged not with clinical detachment but with a common sense view to the realities of normal life." *Wilson,* 757 F.2d at 1235. When the facts are not in dispute, whether probable cause existed is a question of law, and summary judgment is appropriate.

*See White v. Pierce County,* 797 F.2d 812, 815 (9th Cir.1986); *Wille v. Raymond,* 487 So.2d 1211, 1214 (Fla.App.1986).

FN3. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (*en banc*), this court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

FN4. In *Stein v. Reynolds, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), this court adopted as precedent all decisions of Unit B of the former Fifth Circuit.

[5] Marx argues that probable cause did not exist either when defendants took him to the sheriff's department for questioning at 8:00 a.m. or when defendants formally arrested him at 5:00 p.m. Assuming that the 8:00 a.m. detention for questioning required probable cause to arrest,[FN5] we hold that probable cause existed at 8:00 a.m. and was even stronger by 5:00 p.m. when defendants formally arrested Marx.

FN5. Although we need not decide the point, we recognize that something less than probable cause to arrest might legally justify the detention for questioning. For background, see *Barts v. Joyner,* 865 F.2d 1187 (11th Cir.), *cert. denied,* 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989).

When defendants detained Marx, they knew that Kristina, the victim, had said "Daddy did this to me," and "Daddy left me outside to sleep outside in my nightgown, and he did this to me." Even though these statements were made by an injured and likely traumatized four-year-old, defendants acted properly in placing a reasonable amount of trust in the truth of Kristina's statements. In *Easton v. City of Boulder, Colo.,* 776 F.2d 1441, 1449 (10th Cir.1985), the Tenth Circuit said that considering the statements of child sexual abuse victims to be inherently suspect is "an entirely unacceptable point of view." In *Easton,* the court upheld a finding of probable cause to arrest a suspected child molester solely on the basis of statements made by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the alleged victims, one younger than six years old and the other younger than four, even where all charges of molestation were eventually dropped. We need not go as far as the *Easton* court, and we will not say that Kristina's statements should not have been viewed with some-perhaps a great deal of-skepticism, given her age, her injuries, and her likely state of mind. But we believe that Kristina's statements could not be disregarded and that her statements supported defendants' conclusion that probable cause existed. *Accord Myers v. Morris,* 810 F.2d 1437, 1456-57 (8th Cir.1987) (in determining existence of probable cause, officers entitled to rely on statements made by children aged five to twelve as well as statements made by adults).

Under Florida law, defendants may have had no legal obligation to corroborate Kristina's statements. Marx was charged with violating Fla.Stat. § 794.011(2) (West 1976), which makes it a felony to commit a sexual battery upon a person less than twelve years old. In addition, "[t]he testimony of the victim need not be corroborated in a prosecution under s. 794.011." Fla.Stat. § 794.022(1) (West Supp.1990). *See also Myers,* 810 F.2d at 1456 (discussing similar Minnesota statute). We find no **1507** Florida case applying section 794.022(1) to similar facts, but we need not decide whether the uncorroborated statements of a four-year-old rape victim would constitute probable cause: when defendants detained Marx, they had other significant evidence tending to incriminate him.

Because defendants found no signs of forced entry into the Leonard house, they concluded that, if an intruder entered the house that night, entry was made through an unsecured screen door which opened into the room where Marx and Leonard were sleeping. Coupled with Marx's statement that he was a light sleeper, this fact presented defendants with the implausible theory that an intruder would have had to walk almost directly over Marx to get to Kristina. In addition, the police dog was unable to follow a scent away from the crime scene conclusively. By the time defendants formally arrested Marx, they also knew that Marx's polygraph test results showed that Marx probably was untruth-

ful when he denied raping Kristina, and defendants had Marx's statement-made in response to questioning about why Kristina would implicate him-that Kristina "knew [he] left her and came back in the house and left her out there." [FN6]

> FN6. Although Leonard's report that her home had been burglarized and defendants' finding some stolen items at the crime scene could indicate that someone other than Marx was the rapist, defendants were under no obligation to give credence to this theory. *See Criss v. City of Kent,* 867 F.2d 259, 263 (6th Cir.1988). Defendants also were not required to forego arresting Marx based on initially discovered facts showing probable cause simply because Marx offered a different explanation. *See id.*

In response to defendants' motion for summary judgment, Marx offered the affidavit of an expert in police procedure who opined that defendants arrested Marx without probable cause. Opinion evidence about legal conclusions, however, does not create an issue of fact sufficient to defeat summary judgment. *See Wille,* 487 So.2d at 1214 ("what facts and circumstances amount to probable cause is a pure question of law, while whether they exist in a given case is a question of a fact"). The facts in this case are not disputed. Thus, the district court knew what defendants did; and the court had a duty to decide, based on the facts and drawing any necessary inferences in favor of Marx, whether probable cause existed.

[6] That a defendant is subsequently acquitted or charges are dropped against the defendant is of no consequence in determining the validity of the arrest itself. *See Trivette v. State,* 244 So.2d 173, 175 (Fla.App.1971); *Brown v. State,* 91 So.2d 175, 177 (Fla.1956); *see also Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979) ("The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted-indeed, for every suspect released."). As Judge Learned Hand wrote, "the 'reasonable cause' necessary to support an arrest cannot demand the

same strictness of proof as the accused's guilt upon a trial, unless the powers of peace officers are to be so cut down that they cannot possibly perform their duties." *United States v. Heitner,* 149 F.2d 105, 106 (2d Cir.1945) (quoted in *Draper v. United States,* 358 U.S. 307, 311 n. 4, 79 S.Ct. 329, 332 n. 4, 3 L.Ed.2d 327 (1959)).

"Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Brinegar,* 338 U.S. at 176, 69 S.Ct. at 1311. "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 175, 69 S.Ct. at 1310. We hold that, based on the information known to defendants at the pertinent times, probable cause existed to detain Marx for questioning and to arrest Marx.

AFFIRMED.

C.A.11 (Fla.),1990.
Marx v. Gumbinner
905 F.2d 1503

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

434 F.Supp.2d 1138                                                                 Page 1
434 F.Supp.2d 1138
**(Cite as: 434 F.Supp.2d 1138)**

**H**

Fleming v. Dowdell
M.D.Ala.,2005.

United States District Court,M.D.
Alabama,Northern Division.
Herbert FLEMING, Plaintiff,
v.
Eddie DOWDELL, et al., Defendants.
**Civil Action No. 2:03cv1246-D.**

March 29, 2005.

**Background:** Parolee brought action under §
1983 and state law against Alabama Board of Par-
dons and Paroles (BOPP) employees and assistant
state attorney general, seeking damages for his con-
tinuation on parole and subsequent incarceration on
parole violations after writ of habeas corpus had
been granted, and his underlying judgment of con-
viction vacated by a federal court. defendants filed
motion for summary judgment.

**Holdings:** The District Court, Ira DeMent,
Senior Judge, held that:

(1) BOPP defendants' lack of knowledge that
parolee's underlying judgment of conviction had
been vacated by federal court negated their liability
for substantive due process violation;

(2) members of BOPP were not policymakers
for purposes of § 1983 claim;

(3) BOPP members entitled to absolute quasi-
judicial immunity on parolee's § 1983 constitutional
claims;

(4) equitable tolling of parolee's § 1983 claims
was not warranted;

(5) BOPP members were entitled to State-agent
immunity under Alabama law on parolee's false im-
prisonment claims; and

(6) assistant state attorney general, who repres-
ented the state in parolee's federal habeas proceed-

ing, was entitled to prosecutorial immunity on pa-
rolee's § 1983 claims against her based on her fail-
ure to notify an "appropriate" state official that fed-
eral habeas court had vacated parolee's underlying
judgment of conviction.

Motion granted.

Affirmed, 182 Fed.Appx. 946, 2006 WL 1490140.

West Headnotes

**[1] Civil Rights 78 ⚖1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
Alabama Board of Pardons and Paroles defendants'
lack of knowledge that parolee's underlying judg-
ment of conviction had been vacated by federal
habeas court negated their § 1983 liability for sub-
stantive due process violation for causing parolee to
be unlawfully incarcerated on parole violations des-
pite absence of a valid underlying judgment of con-
viction; defendants' lack of knowledge of the feder-
al court's order or any reason to investigate to valid-
ity of the conviction demonstrated that they did not
act with deliberate indifference as required to state
a claim under the Fourteenth Amendment for their
personal participation. U.S.C.A. Const.Amend. 14;
42 U.S.C.A. § 1983.

**[2] Federal Civil Procedure 170A ⚖851**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak851 k. Form and Sufficiency of
Amendment. Most Cited Cases
A complaint may not be amended by briefs in op-
position to a motion to dismiss or motion for sum-
mary judgment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[3] Civil Rights 78 ⚏1352(1)**

78 Civil Rights
   78III Federal Remedies in General
     78k1342 Liability of Municipalities and Other Governmental Bodies
      78k1352 Lack of Control, Training, or Supervision; Knowledge and Inaction
       78k1352(1) k. In General. Most Cited Cases
Liability for Fourteenth Amendment due process violation may arise from the absence of a policy when a constitutional injury occurs and when the failure to adopt a policy rises to the level of deliberate indifference to the need for such policy. U.S.C.A. Const.Amend. 14.

**[4] Federal Courts 170B ⚏411**

170B Federal Courts
   170BVI State Laws as Rules of Decision
     170BVI(C) Application to Particular Matters
      170Bk411 k. Constitutional and Civil Rights in General; Waiver. Most Cited Cases
Whether a government official is a policymaker for purposes of § 1983 is a question of state law, and the court may not assume that final policymaking authority lies in some entity other than that in which state law places it. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ⚏1351(4)**

78 Civil Rights
   78III Federal Remedies in General
     78k1342 Liability of Municipalities and Other Governmental Bodies
      78k1351 Governmental Ordinance, Policy, Practice, or Custom
       78k1351(4) k. Criminal Law Enforcement; Prisons. Most Cited Cases
Members of Alabama Board of Pardons and Paroles were not policymakers for purposes of prisoner's § 1983 claim where they did not have legal custody over prisoner, and there was no evidence that they had any control or authority over a warden who was employed by the Department of Corrections. 42 U.S.C.A. § 1983.

**[6] Arrest 35 ⚏63.1**

35 Arrest
   35II On Criminal Charges
     35k63 Officers and Assistants, Arrest Without Warrant
      35k63.1 k. In General. Most Cited Cases

**Constitutional Law 92 ⚏4534**

92 Constitutional Law
   92XXVII Due Process
     92XXVII(H) Criminal Law
      92XXVII(H)3 Law Enforcement
       92k4533 Stop and Arrest
        92k4534 k. In General. Most Cited Cases
   (Formerly 92k262)
Constitutionality of arrests by state officials is governed by the Fourth Amendment rather than due process analysis. U.S.C.A. Const.Amends. 4, 14.

**[7] Civil Rights 78 ⚏1358**

78 Civil Rights
   78III Federal Remedies in General
     78k1353 Liability of Public Officials
      78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases
Parole officer's lack of knowledge that parolee's underlying judgment of conviction had been invalidated by a federal court on a writ of habeas corpus precluded a finding that he acted deliberately or intentionally in arresting parolee for parole violation, and therefore parole officer could not be held liable under § 1983 for a Fourth Amendment violation. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[8] Judges 227 ⚏36**

227 Judges
   227III Rights, Powers, Duties, and Liabilities
     227k36 k. Liabilities for Official Acts. Most Cited Cases
Because judicial immunity is an immunity from suit, not just immunity from damages liability, a judge will not be deprived of immunity because the action he took was in error, was done maliciously,

434 F.Supp.2d 1138
**(Cite as: 434 F.Supp.2d 1138)**

or was in excess of his authority; judge loses immunity for actions not taken in the judge's judicial capacity, and a judge is not immune, even when he or she performs judicial actions, if he or she has acted in the clear absence of all jurisdiction.

**[9] Pardon and Parole 284 ⇐⇒56**

284 Pardon and Parole
    284II Parole
       284k55 Parole Boards or Officers
        284k56 k. Liabilities. Most Cited Cases
Parole board members are entitled to judicial immunity when they perform adjudicatory functions in connection with granting, denying or revoking parole.

**[10] Civil Rights 78 ⇐⇒1376(7)**

78 Civil Rights
    78III Federal Remedies in General
       78k1372 Privilege or Immunity; Good Faith and Probable Cause
        78k1376 Government Agencies and Officers
         78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

**Civil Rights 78 ⇐⇒1376(8)**

78 Civil Rights
    78III Federal Remedies in General
       78k1372 Privilege or Immunity; Good Faith and Probable Cause
        78k1376 Government Agencies and Officers
         78k1376(8) k. Judges, Courts, and Judicial Officers. Most Cited Cases
Although Alabama Board of Pardons and Paroles did not have authority over parolee's person when they acted, Board members, who were unaware of fact that parolee's conviction had been invalidated by federal court and who had received no information placing on them a duty to investigate the judgment's validity, acted within their general subject matter jurisdiction in revoking parolee's parole, and they were therefore entitled to absolute quasi-ju-

dicial immunity on parolee's § 1983 constitutional claims. 42 U.S.C.A. § 1983.

**[11] Civil Rights 78 ⇐⇒1376(7)**

78 Civil Rights
    78III Federal Remedies in General
       78k1372 Privilege or Immunity; Good Faith and Probable Cause
        78k1376 Government Agencies and Officers
         78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

**Civil Rights 78 ⇐⇒1376(8)**

78 Civil Rights
    78III Federal Remedies in General
       78k1372 Privilege or Immunity; Good Faith and Probable Cause
        78k1376 Government Agencies and Officers
         78k1376(8) k. Judges, Courts, and Judicial Officers. Most Cited Cases
Alabama Board of Pardons and Paroles employee's issuance of a parole violation warrant was a judicial act for which employee was immune from suit under doctrine of absolute quasi-judicial immunity; employee was statutorily authorized to make "reasonable cause" determinations concerning violations of parole, and therefore acted within his general subject matter jurisdiction, and his lack of actual or constructive knowledge that parolee's conviction had been invalidated by federal court, precluded a finding that he acted in the clear absence of all jurisdiction. 42 U.S.C.A. § 1983; Ala.Code 1975, § 15-22-31(a).

**[12] Civil Rights 78 ⇐⇒1376(7)**

78 Civil Rights
    78III Federal Remedies in General
       78k1372 Privilege or Immunity; Good Faith and Probable Cause
        78k1376 Government Agencies and Officers
         78k1376(7) k. Prisons, Jails, and Their

434 F.Supp.2d 1138
**(Cite as: 434 F.Supp.2d 1138)**

Officers; Parole and Probation Officers. Most Cited Cases

Parameters of the law were not sufficiently defined during the relevant time period so as to provide "fair warning" to parole officer, who arrested parolee for parole violations, that he had an obligation to verify the validity of parolee's underlying judgment of conviction where he was unaware of the federal court's order vacating parolee's underlying judgment of conviction or that parolee had even challenged the validity of the judgment of conviction in a habeas corpus proceeding; thus, parole officer was entitled to qualified immunity on parolee's § 1983 claims. 42 U.S.C.A. § 1983.

**[13] Civil Rights 78 ☞1379**

78 Civil Rights
    78III Federal Remedies in General
        78k1378 Time to Sue
            78k1379 k. In General. Most Cited Cases

Statute of limitations for a § 1983 claim arising out of events occurring in Alabama is two years. 42 U.S.C.A. § 1983.

**[14] Limitation of Actions 241 ☞104.5**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(G) Pendency of Legal Proceedings, Injunction, Stay, or War
            241k104.5 k. Suspension or Stay in General; Equitable Tolling. Most Cited Cases

Although parolee did not have actual notice of the federal court's judgment vacating his judgment of conviction, he was charged with constructive knowledge of the district court's final judgment because he was a party to those proceedings; thus, limitations period on § 1983 claims based on his unlawful incarceration for parole violations was not equitably tolled until he learned that state was without any lawful authority to detain him. 42 U.S.C.A. § 1983.

**[15] Limitation of Actions 241 ☞104.5**

241 Limitation of Actions
    241II Computation of Period of Limitation

241II(G) Pendency of Legal Proceedings, Injunction, Stay, or War
        241k104.5 k. Suspension or Stay in General; Equitable Tolling. Most Cited Cases

Equitable tolling is not warranted in cases where the plaintiff has constructive notice.

**[16] Limitation of Actions 241 ☞104.5**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(G) Pendency of Legal Proceedings, Injunction, Stay, or War
            241k104.5 k. Suspension or Stay in General; Equitable Tolling. Most Cited Cases

Parolee's lack of knowledge of federal habeas court's judgment vacating his judgment of conviction did not provide grounds for equitable tolling of his § 1983 claims based on his unlawful detention for parole violations since parolee did not act diligently in ascertaining the status of his habeas corpus case; parolee did not keep the federal court apprised of his current address, and there was a six-year lapse between contacts with the court. 42 U.S.C.A. § 1983.

**[17] Pardon and Parole 284 ☞56**

284 Pardon and Parole
    284II Parole
        284k55 Parole Boards or Officers
            284k56 k. Liabilities. Most Cited Cases

Absent any showing that members of Alabama Board of Pardons and Paroles were on notice that parolee's facially-valid judgment of conviction may have been invalid, and absent any statute, rule or regulation which required them to inquire, Board members did not act beyond their authority in revoking parole for parole violations despite invalidity of parolee's underlying judgment of conviction, and thus were entitled to State-agent immunity under Alabama law on parolee's false imprisonment claims.

**[18] States 360 ☞78**

360 States
    360II Government and Officers

434 F.Supp.2d 1138

434 F.Supp.2d 1138
**(Cite as: 434 F.Supp.2d 1138)**

360k78 k. Liabilities for Official Acts. Most Cited Cases

Under Alabama's "beyond his or her authority" exception to State-agent immunity, a state official acts "beyond his or her authority" when there exists a binding rule, regulation, or statute which contains unambiguous and specific directives with which a state official must comply.

**[19] Civil Rights 78 ☞1376(9)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
         78k1376 Government Agencies and Officers
            78k1376(9) k. Attorney General and Prosecuting Attorneys. Most Cited Cases

A prosecutor enjoys absolute immunity from § 1983 suits for damages when he acts within the scope of his prosecutorial duties. 42 U.S.C.A. § 1983.

**[20] District and Prosecuting Attorneys 131 ☞10**

131 District and Prosecuting Attorneys
   131k10 k. Liabilities for Official Acts, Negligence, or Misconduct. Most Cited Cases

Absolute prosecutorial immunity extends to a prosecutor's advocacy role in the post-conviction case, and is not defeated by a showing that a prosecutor acted wrongfully or even maliciously.

**[21] District and Prosecuting Attorneys 131 ☞10**

131 District and Prosecuting Attorneys
   131k10 k. Liabilities for Official Acts, Negligence, or Misconduct. Most Cited Cases

Absolute immunity does not extend to a prosecutor engaged in essentially investigative or administrative functions; when a prosecutor functions as an administrator rather than as an officer of the court, the prosecutor is only entitled to qualified immunity.

**[22] Civil Rights 78 ☞1376(9)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
         78k1376 Government Agencies and Officers
            78k1376(9) k. Attorney General and Prosecuting Attorneys. Most Cited Cases

Assistant state attorney general, who represented the state in parolee's federal habeas proceeding, was entitled to prosecutorial immunity on parolee's § 1983 claims against her based on her failure to notify an "appropriate" state official that federal habeas court had vacated parolee's underlying judgment of conviction; even if her failure to notify an "appropriate" state official breached her duties as an attorney for the State of Alabama or even violated a state rule or regulation, assistant state attorney general's alleged misconduct was inextricably intertwined with her prosecutorial role in the post-conviction proceedings and, in particular, with her assessment of whether to appeal, and, therefore could not be characterized as merely an administrative act. 42 U.S.C.A. § 1983.

**[23] District and Prosecuting Attorneys 131 ☞10**

131 District and Prosecuting Attorneys
   131k10 k. Liabilities for Official Acts, Negligence, or Misconduct. Most Cited Cases

Immunity for prosecutors under Alabama law is at least as broad as the immunity under a § 1983 action. 42 U.S.C.A. § 1983.

**\*1141** Robert F. Lewis, Robert F. Lewis PC, Birmingham, AL, Jon E. Lewis, G. Griffin Sikes, Jr., Montgomery, AL, for Plaintiff.

Greg Griffin, Chief Counsel, Hugh Davis, Principal Litigation Counsel, Steve Simmons, Litigation Counsel, State of Alabama Board of Pardons and Paroles, Montgomery, AL, for Eddie Dowdell.

Alyce S. Robertson, Office of the Attorney General, Montgomery, AL, for Defendants.

### MEMORANDUM OPINION AND ORDER

IRA DeMENT, Senior District Judge.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

434 F.Supp.2d 1138

**(Cite as: 434 F.Supp.2d 1138)**

## I. INTRODUCTION

Before the court is a motion for summary judgment (Doc. No. 57) filed by Defendants Eddie Dowdell, Johnnie Johnson, Donald Parker, Gladys Riddle and Martha White. Accompanying said motion are a memorandum brief and an evidentiary submission. (Doc. Nos.58-59.) Plaintiff Herbert Fleming filed a brief in opposition and an evidentiary submission. (Doc. Nos.68-69.)

Also before the court is a motion for summary judgment (Doc. No. 52) filed by Defendant Beth Poe. Poe filed a brief in support of her motion and an evidentiary submission. (Doc. Nos.53-54.) A response, reply and surreply followed. (Doc. Nos.63, 66, 67.)

Fleming commenced this lawsuit, seeking money damages for deprivations of rights in violation of 42 U.S.C. § 1983 and state law when he was continued on parole and, ultimately, incarcerated on parole violations, despite the fact that Fleming's writ of habeas corpus had been granted, and his underlying judgment of conviction vacated, by a federal court. Dowdell, Johnson, Parker, Riddle and White are employees of the Alabama Board of Pardons and Paroles who played a role in Fleming's parole supervision and parole violation proceedings, and Poe is the assistant state attorney general who opposed Fleming's writ of habeas corpus. There is no dispute that Fleming suffered a substantial deprivation of liberty in this case, as he remained under parole supervision and was incarcerated on parole violations for approximately five years longer than he was legally required. There also is no dispute that neither Fleming, Dowdell, Johnson, Parker, Riddle nor White was aware of the federal court's order.

Although what happened to Fleming is grievous, having carefully considered the arguments of counsel, the relevant law and the record as a whole, the court finds the **\*1142** above Defendants cannot be held liable for the liberty deprivations under either § 1983 or state law. The court, therefore, finds that the motions for summary judgment are due to be granted.

## II. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331 for all claims arising under federal law. The court also has original jurisdiction over claims based upon violations of civil rights. *See* 28 U.S.C. § 1343. Pursuant to 28 U.S.C. § 1367, the court has supplemental jurisdiction over the state law claim. The parties do not contest personal jurisdiction or venue.

## III. STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). This determination involves applying substantive law to the substantive facts that have been developed. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence developed. *See id.* at 248, 106 S.Ct. 2505; *Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the non-moving party who "must do more than simply show that there is some metaphysical doubt as to the material

434 F.Supp.2d 1138

**(Cite as: 434 F.Supp.2d 1138)**

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *See id.* at 587, 106 S.Ct. 1348.

## IV. BACKGROUND

In January 1991, Plaintiff Herbert Fleming was convicted upon a plea of guilty and sentenced in the Circuit Court of Etowah County, Alabama, on a reduced charge for receiving stolen property. (2nd Am. Compl. ¶ 7 (Doc. No. 23).) Because Fleming was a habitual offender, he was sentenced to life imprisonment and was committed to the custody of the Alabama Department of Corrections. (*Id.*)

While confined in a state penitentiary, Fleming filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Northern District of Alabama. (*Id.* ¶ 8.) He named as respondents "Warden Thomas" and the Attorney General of the State of Alabama and sought relief from the 1991 judgment and sentence of the Circuit Court of Etowah County. Defendant Beth Poe, an assistant attorney general, represented the respondents in the habeas corpus proceedings.[FN1] (Pl. Habeas *1143 Corpus Pet. (Doc. No. 65, Ex. 1); Resp'ts Answer to Pl. Habeas Corpus Pet. (Doc. No. 65, Ex. 2).)

> FN1. Poe has served as an assistant attorney general for 20 years. In that position, Poe has worked almost exclusively in the criminal appeals division of the attorney general's office and routinely has handled petitions for writs of habeas corpus. (Poe Dep. at 11-13, 25-26 (Doc. No. 65).)

On January 26, 1998, during the pendency of his habeas corpus proceedings, Fleming was released to parole supervision, subject to conditions and restrictions. (Certificate of Parole (Doc. No. 54, Ex. 4).) Defendant Eddie Dowdell, a parole officer employed by the Alabama Board of Pardons and Paroles ("BOPP"), supervised Fleming while

he was on parole. (2nd Am.Compl.¶¶ 2, 11.) The restrictions of Fleming's parole included, in part, a requirement that Fleming "periodically meet with or otherwise report to" Dowdell. (*Id.*)

On May 5, 1998, while Fleming was serving his term of parole, the late Honorable Edwin L. Nelson, United States District Judge for the Northern District of Alabama, adopted the recommendation of the magistrate judge and entered a final judgment granting Fleming's habeas corpus petition. (*Id.* ¶ 13; Final Judgment (Doc. No. 59, Ex. 4).)[FN2] As grounds, the district court found that, because the offense to which Fleming pleaded guilty was not a lesser included offense of the original charge in the indictment, Fleming's judgment of conviction was obtained without due process of law, in violation of the Fifth and Fourteenth amendments. (Doc. No. 54, Ex. 5.) In the final judgment, the district court "ordered that any retrial of petitioner must commence within 120 days" of the date of entry of the final judgment. (2nd Am. Compl. ¶ 13; Final Judgment (Doc. No. 59, Ex. 4).)

> FN2. While the parties have filed as exhibits the pertinent portions of the court records in Fleming's habeas corpus proceedings, the court also may take judicial notice of the official court records in that case. *See* Fed.R.Evid. 201; *Zimmerman v. Spears,* 565 F.2d 310, 312 (5th Cir.1977) (judicial notice taken of earlier habeas proceedings in different court).

The district court's final judgment also contained a footnote indicating that a copy of the magistrate judge's recommendation had been served on Fleming, but had been returned to the clerk of the court, marked "return to sender."[FN3] (Final Judgment (Doc. No. 59, Ex. 4).) In the same footnote, the district court stated that it independently had attempted to ascertain Fleming's current mailing address through the Central Records Division of the Alabama Department of Corrections. (*Id.*) As further noted, the Central Records Division advised that Fleming had been paroled and that the only address in its records for Fleming was 1200 Kentucky

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

434 F.Supp.2d 1138
434 F.Supp.2d 1138
**(Cite as: 434 F.Supp.2d 1138)**

Avenue, Gadsden, Alabama. The district court, thus, directed the clerk of the court to mail the final judgment, vacating Fleming's conviction, to the Gadsden address.[FN4] (*Id.*) The court records also reflect that copies of the May 5, 1998 final judgment **\*1144** were mailed to Poe and the Attorney General of the State of Alabama. (*Id.*)

> FN3. Fleming failed to keep the federal district court apprized of his current address. The last notice of a change of address the district court received from Fleming was on March 4, 1997, when he was transferred to the Childersburg Work Release Center. (Pl. Dep. at 29-31 (Doc. No. 54, Ex. 10); Pl. Not. Change of Address (Doc. No. 54, Ex. 3).) Although Plaintiff asserts that he notified the court of his change of address when he was paroled (Pl. Dep. at 31 (Doc. No. 54)), he provides no evidentiary support for this assertion.

> FN4. The court notes that the district court in the Northern District of Alabama followed the federal procedural rules for service by mailing the pleadings to Fleming's last known address. *See* Fed.R.Civ.P. 5(b)(2)(B) & 77(d); Rule 11 of the Rules Governing Habeas Corpus Cases.

Upon receipt of the magistrate judge's recommendation, Poe discussed the case with her supervisor, after which Poe conducted research to determine whether to file an objection to the recommendation and, ultimately, whether to appeal any unfavorable judgment. (Poe Dep. at 31-34 (Doc. No. 65).) Poe also engaged in several communications, by telephone and letter, with the district attorney who prosecuted Fleming on the underlying criminal charges and provided him (the district attorney) a copy of the magistrate judge's recommendation. (*Id.* at 41-42; Letters (Doc. No. 54, Exs.6, 8).) Poe advised the district attorney that, based on her research, she believed that the magistrate judge's findings were correct and that, therefore, unless the district attorney proffered a reasonable argument, she would not file an objection to

the recommendation. (Letter (Doc. No. 54, Ex. 6).) The district attorney advised Poe that the State of Alabama intended to retry Fleming on the original charges. (Poe Dep. at 42.) Poe, at that point, had no further involvement in Fleming's case. (*Id.* at 51-53.)

Ultimately, for reasons not in the record, the State of Alabama did not retry Fleming. (2nd Am.Compl.¶ 15.) At the latest then, after the expiration of the 120-day time frame for retrial, Fleming was released from all attendants of his state court judgment of conviction based on the district court's final judgment granting habeas relief to Fleming.

On January 12, 2000, some two years and eight months after the district court in the Northern District of Alabama entered its final judgment in Fleming's habeas corpus lawsuit, Dowdell arrested Fleming for parole violations based on a positive drug test for marijuana and a failure to pay restitution. (Dowdell Dep. at 21, 28 (Doc. No. 59, Ex. 7); Report of Parole Violation (Doc. No. 46, Ex. 4).) It is undisputed that Dowdell, like Fleming, did not know that Fleming's judgment of conviction from which the parole violations stemmed had been set aside. (Dowdell Dep. at 37-38 (Ex. to Doc. No. 59); 2nd Am. Compl. ¶ 16.)

Defendant Donald Parker ("Parker"), now retired, formerly served as the executive director of the BOPP. (Parker Aff. at 1 (Ex. to Doc. No. 37).) After reviewing Dowdell's report charging Fleming with violating conditions of his parole, Parker determined that the charges were supported by "reasonable cause." (*Id.*) Parker, thus, "authoriz[ed]" the Department of Corrections to issue a fugitive warrant for the retaking and detaining of Fleming. (*Id.*); *see* Ala.Code § 15-22-31(a) (1975). Fleming, thus, was held in custody on the fugitive warrant issued by the Department of Corrections at the behest of Parker. Parker also was unaware that Fleming's judgment of conviction had been set aside. (2nd Am. Compl. ¶ 16; Parker Aff. at 2 (Ex. to Doc. No. 37).)

Thereafter, on January 26, 2000, Defendant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Martha White, acting as a parole court hearing officer, *see* Ala.Code § 15-22-32 (1975), conducted a fact-finding hearing on the parole violation charges. (*See* form titled, "Action of the Board Subsequent to Parole Court" (Doc. No. 59, Ex. 10); White Dep. at 77-79, 89-90 (Ex. to Doc. No. 59).) Based on Fleming's admission of guilt on the charges, (*see* form titled "Finding of Guilt Upon Guilty Plea" (Doc. No. 46, Ex. 9)), White found that Fleming was guilty of violating his parole. (*Id.*) White recommended to the Board that Fleming's parole be revoked. (*Id.; see also* Doc. No. 59, Ex. 10.) Acting on White's recommendation, Defendants Gladys Riddle and Johnnie Johnson Jr., **1145** members of the BOPP, revoked Fleming's parole on March 8, 2000.(*Id.*) Fleming was returned to prison for a minimum term of two years. (Report of Parole Violation (Doc. No. 46, Ex. 4); 2nd Am. Compl. ¶ 19.)

It is undisputed that Johnson, Riddle and White did not know that a federal court had vacated Fleming's judgment of conviction. (2nd Am. Compl. ¶ 16; White Dep. at 33-35, 79 (Ex. to Doc. No. 59).) It also is undisputed that neither Johnson, Riddle nor White independently inquired into the validity of the underlying judgment of conviction. (White Dep. at 90 (Ex. to Doc. No. 59).) White says, though, that had Fleming informed her that he had filed a habeas corpus writ challenging the validity of the underlying judgment of conviction, she would have checked on the status of that case. (White Dep. at 34-35 (Doc. No. 54, Ex. 13); Riddle Dep. at 45 (Doc. No. 54, Ex. 14).) White says, however, that she is unaware of any procedure in place requiring the BOPP to verify the validity of a facially-valid judgment of conviction. (White Dep. at 90 (Ex. to Doc. No. 59).)

More than three years passed, and, finally, on July 27, 2003, while incarcerated on the parole violations, Fleming wrote the United States District Court for the Northern District of Alabama, inquiring about the status of his habeas corpus petition. (Pl. Letter (Ex. 9 to Doc. No. 54); 2nd Am. Compl. ¶ 22.) In response to Fleming's letter, on August 12, 2003, the district court entered an order, directing

that Fleming "be RELEASED FORTHWITH from incarceration." (2nd Am. Compl. ¶ 24; Aug. 12, 2003 Order at 1 (Ex. to Compl.).) The order provided that "[t]he State of Alabama may not retry [Fleming] on the vacated conviction, nor may the vacated conviction be used to incarcerate [Fleming] in the future or enhance the penalty for any subsequent conviction [Fleming] may receive." (Aug. 12, 2003 Order at 1 (Ex. to Compl.).) Fleming was released on August 13, 2003, after serving "3 years, 7 months and [1] day" in the state prison system on parole violations which stemmed from a vacated judgment of conviction. (2nd Am. Compl. ¶ 21.)

Seeking monetary damages under 42 U.S.C. § 1983 and state law for injuries resulting from the foregoing events, Fleming commenced this lawsuit on November 24, 2003, alleging § 1983 constitutional claims under the Eighth and Fourteenth amendments to the United States Constitution. The Second Amended Complaint contains four counts. In Count 1, Fleming alleges that he was deprived of "liberty without due process of law," in violation of the Fourteenth Amendment, and was subjected to cruel and unusual punishment, in contravention of the Eighth Amendment. (*Id.* ¶ 26.) In this count, he sues, among others, Dowdell, Johnson, Parker, Poe, Riddle and White.[FN5]

> FN5. Also named are two employees of the Central Records Office of the Alabama Department of Corrections. (2nd Am.Compl.¶ 3.) Fleming's claims against these defendants are not before the court at this time.

In Count 2, Fleming asserts that Dowdell, Johnson, Parker, Poe, Riddle and White are liable to him for false imprisonment as defined by state law. (*Id.* ¶ ¶ 27-30.) As grounds, Fleming avers that, during the time frame he was under parole supervision after which his underlying judgment of conviction had been vacated, and from January 12, 2000, to August 13, 2003 (i.e., the time period during which Fleming was incarcerated on parole violations), each Defendant "unlawfully and without

434 F.Supp.2d 1138
**(Cite as: 434 F.Supp.2d 1138)**

authority exerted compulsory control**\*1146** over and interfered with [ ] Fleming's movements and liberty."(*Id.* ¶ 28.)

Count 3 is lodged only against Johnson and Riddle. Fleming alleges that, in violation of the Eighth and Fourteenth amendments, these two Defendants unlawfully revoked Fleming's parole and "without proper authority ordered and directed that [ ] Fleming be arrested and confined at a state penitentiary pursuant to his invalidated conviction and sentence." (*Id.* ¶¶ 31-34.)

Finally, Count 4 asserts a state law claim for false imprisonment against Johnson and Riddle predicated on allegations that, "in excess of their lawful authority," they "revoked the parole granted [ ] Fleming from the sentence imposed pursuant to his invalidated conviction and sentence and directed that [he] be arrested and confined at a state penitentiary pursuant to his invalidated conviction and sentence." (*Id.* ¶ 37.) On each count in the Second Amended Complaint, Fleming seeks $5,000,000 in compensatory damages and $5,000,000 in punitive damages.FN6 (*Id.* at 7, 9.)

> FN6. Although the Second Amended Complaint is silent as to whether Fleming is suing Defendants in their individual capacities, official capacities, or both, the court concludes that Fleming intended an individual-capacity lawsuit for two reasons. First, Fleming seeks punitive damages from the various government officials. In § 1983 actions, punitive damages are only available from government officials when sued in their individual capacities. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 268-70, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Because Fleming may not obtain punitive damages from the government officials in their official capacities, the logical inference is that Fleming seeks punitive damages from them individually. Second, Defendants have raised the affirmative defense of qualified immunity. Raising and arguing the defense of

qualified immunity is sufficient to create a presumption that a lawsuit is filed against a defendant in his or her individual capacity. *See Fitzgerald v. McDaniel,* 833 F.2d 1516 (11th Cir.1987).

## V. DISCUSSION

Defendants move for summary judgment, asserting that they are entitled to absolute and qualified immunities on the 42 U.S.C. § 1983 claims and State-agent immunity on the state law claims for false imprisonment. Moreover, Defendants contend that the statute of limitations has run on the § 1983 claims. Fleming opposes each ground for summary judgment.

First, the court addresses the motion for summary judgment filed by the employees of the BOPP, i.e., Dowdell, Johnson, Parker, Riddle and White. Second, the court examines Poe's motion for summary judgment.

### A. *Dowdell, Johnson, Parker, Riddle and White*

#### 1. *42 U.S.C. § 1983 constitutional claims*

Dowdell, Johnson, Parker, Riddle and White contend that, in their individual capacities, they are absolutely immune from liability in damages under 42 U.S.C. § 1983 on the basis of quasi-judicial immunity. Alternatively, Dowdell contends that he is protected from individual liability under the doctrine of qualified immunity.

Before proceeding to the immunity analyses, the court addresses two preliminary issues. First, it is important to ascertain what constitutional rights Fleming deems these Defendants to have violated, particularly given that Fleming's Second Amended Complaint and his pleadings filed in response to the summary judgment motion are not wholly congruous as to the constitutional**\*1147** theories of liability. *See Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) ("The first step in any [§ 1983] claim is to identify the specific con-

stitutional right allegedly infringed."); *see also Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Second, the court examines the threshold question of whether a constitutional violation has occurred in the first place because the absence of a constitutional violation obviates the need to analyze the immunity defense. *Cf. Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("The initial inquiry is whether a constitutional right would have been violated on the facts alleged, for if no right would have been violated, there is no need for further inquiry into [qualified] immunity.").

(a) Identifying the Specific Constitutional Right Allegedly Infringed

In the Second Amended Complaint, Fleming alleges that Dowdell, Johnson, Parker, Riddle and White deprived him of liberty without due process of law in violation of the Fourteenth Amendment "and/or" violated the Eighth Amendment's prohibition against cruel and unusual punishment.[FN7] (2nd Am. Compl. ¶ 26 (Doc. No. 23).) Fleming, however, has abandoned the Eighth Amendment claim as to all of the BOPP Defendants, except Parker.[FN8] As to Johnson, Riddle and White, Fleming states: "The legal basis for the § 1983 claim against these defendants is that by their actions in revoking the parole from a non-existent and invalidated conviction and sentence, these defendants unlawfully deprived Fleming of his Fourth and/or Fourteenth Amendment rights by causing his detention within a penal institution of the State of Alabama without any lawful authority to do so." (Doc. No. 30 at 2-3.) Also abandoning reliance on the Eighth Amendment, Fleming states that "[t]he legal basis for the § 1983 claim against [Dowdell] is the violation of the Fourth and/or Fourteenth Amendment[s] by Dowdell that occurred when Dowdell unlawfully and without authority seized and arrested [Fleming] and took him into custody, restrained and interfered with his liberty without any lawful authority to do so." (Doc. No. 19 at 2.)

FN7. For ease of reference, the court refers collectively to these defendants as the "BOPP Defendants."

FN8. The brief which Fleming submitted in response to the joint motion for summary judgment filed by Dowdell, Johnson, Parker, Riddle and White contains no discussion of the issues raised by Parker. (*See* Doc. No. 68.) Fleming's omission constitutes an abandonment of his claims against Parker. *See Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir.1995) (abandoned claims) Notwithstanding Fleming's abandonment, the foregoing discussion applies equally to Fleming's claims against Parker.

Moreover, responding to the BOPP Defendants' motion for summary judgment, Fleming proposes a new basis for holding Johnson and Riddle liable under § 1983 for a Fourteenth Amendment violation. Fleming contends that, not only are they liable for their personal participation, but Johnson and Riddle, as policymakers (Doc. No. 68 at 5 & n. 2, citing Johnson Dep. at 17-18), are liable for "their failure ... to establish reasonable policies and procedures to help ensure that the [BOPP] did not unlawfully imprison or interfere with the liberty of those over whom the [BOPP] had no authority to exercise any such authority." (*Id.* at 5.) Fleming submits that "a state agency which operates without a policy that so requires is being deliberately indifferent to the rights of the state's citizens."(*Id.* at 7.)

**\*1148** (b) Ascertaining Whether a Constitutional Violation Has Occurred

(i) Fourteenth Amendment due process claim predicated on Dowdell, Johnson, Parker, Riddle and White's personal participation in the alleged violation

[1] There is no dispute that, for more than five years, Fleming was held in state custody without any lawful authority. Dowdell, Johnson, Parker,

Riddle and White, though, assert that their lack of knowledge that Fleming's underlying judgment of conviction had been vacated negates their liability under the Fourteenth Amendment. For the reasons to follow, the court agrees with Defendants and finds that their lack of knowledge of the federal court's order demonstrates that they did not act with deliberate indifference as is required to state a claim under the Fourteenth Amendment for their personal participation.

Fleming correctly cites *Cannon v. Macon County,* for the proposition that prisoners have a "constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release." 1 F.3d 1558, 1563 (11th Cir.1993). In *Cannon,* where the § 1983 plaintiff was arrested and incarcerated due to a misidentification, the Eleventh Circuit cited cases from the Fifth and Seventh circuits which also expressly recognized this constitutional right. *Id.* (citing *Sivard v. Pulaski County,* 959 F.2d 662 (7th Cir.1992) (continued detention where sheriff knew it was wrongful states claim under § 1983 for due process violation), modification on rehearing on other grounds, 15 F.3d 1022 (11th Cir.1994) (per curiam); *Sanders v. English,* 950 F.2d 1152 (5th Cir.1992) (failure to release after officer knew or should have known that plaintiff had been misidentified gives rise to cause of action under § 1983)).

[2] Fleming's § 1983 claim predicated on allegations that Dowdell, Johnson, Parker, Riddle and White caused him to be unlawfully incarcerated on parole violations, by virtue of the fact that there no longer existed a valid underlying judgment of conviction, properly is analyzed under the Fourteenth Amendment, not the Fourth Amendment. *See id.* Such a claim, as in *Cannon,* basically is one of "false imprisonment rising to the level of a liberty deprivation," in violation of the Fourteenth Amendment's substantive due process guarantee. *Id.* at 1561-62; *see also Ortega v. Christian,* 85 F.3d 1521, 1526 (11th Cir.1996) (arresting officer liable in § 1983 lawsuit under Fourteenth Amendment for subsequent false imprisonment of plaintiff); *Douthit v. Jones,* 619 F.2d 527, 532 (5th Cir.1980) (finding

claim based on continued confinement without valid judicial order was cognizable under § 1983 as a deprivation of due process). Summary judgment, therefore, is due to be entered in favor of the BOPP Defendants on a Fourth Amendment claim premised on the unlawful detention.[FN9]

> FN9. Additionally, dismissal of the Fourth Amendment claim is proper because the Fourth Amendment is nowhere mentioned in the Second Amended Complaint. A complaint may not be amended by briefs in opposition to a motion to dismiss or motion for summary judgment which, in effect, is what Fleming has attempted to do. *See Gilmour v. Gates, McDonald and Co.,* 382 F.3d 1312, 1315 (11th Cir.2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *see also Thomason v. Nachtrieb,* 888 F.2d 1202, 1205 (7th Cir.1989) ("It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss[.]").

For the reasons to follow, the court finds that the evidence against Dowdell, Parker, **\*1149** Johnson, Riddle, and White is insufficient as a matter of law to establish a transgression of the Fourteenth Amendment's due process guarantee because none of the Defendants possessed the requisite culpable state of mind. In *Cannon,* the court observed:

The defendant's state of mind is ... relevant to a § 1983 claim for substantive due process violations. The Supreme Court has stated that negligent conduct does not give rise to § 1983 liability for resulting unintended loss of or injury to life, liberty, or property. *Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 677, 88 L.Ed.2d 662 (1986). Neither the *Davidson* nor the *Daniels* decision, however, articulated the precise level of culpability necessary to give rise to § 1983 liability for deprivations of due process rights.

This court has, in cases dealing with prisoners and other persons in state custody, held that a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

showing of deliberate indifference is required to establish a violation of substantive due process rights protected by the fourteenth amendment. The deliberate indifference requirement was adopted based on analogies to eighth amendment situations where the defendant's state of mind was relevant to the issue of whether a constitutional violation has occurred in the first place. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (deliberate indifference to prisoner's serious illness or injury violates eighth amendment prohibition against cruel and unusual punishment); *Edwards v. Gilbert,* 867 F.2d 1271 (11th Cir.1989) (deliberate indifference showing necessary in prisoner suicide case alleging § 1983 cause of action for violation of substantive rights protected by eighth and fourteenth amendments); *Taylor v. Ledbetter,* 818 F.2d 791 (11th Cir.1987)... (child abused by foster care parent must show deliberate indifference or gross negligence to establish § 1983 liability in action brought against state officials for violation of substantive due process rights protected by fourteenth amendment). *See also Baker v. McCollan,* 443 U.S. 137, 140 n. 1, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (discussing state of mind necessary to establish certain constitutional violations as separate and distinct from the state of mind sometimes necessary to establish § 1983 liability).

*Id.* at 1563.

Pursuant to *Cannon,* the court finds that "deliberate indifference" is the standard which must guide the court. "[D]eliberate indifference entails something more than mere negligence, ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

As stated, it is undisputed that the BOPP Defendants did not have actual knowledge that a federal court had vacated Fleming's underlying judgment of conviction. The BOPP Defendants also were not parties to the habeas corpus litigation so as to be charged with constructive knowledge of the

federal court's orders. *See Salahuddin v. Coughlin,* 781 F.2d 24, 27 (2d Cir.1986) (parties to lawsuit are charged with constructive knowledge of court orders).

**\*1150** Moreover, there is no evidence that the BOPP Defendants obtained information casting doubt on the validity of the underlying judgment of conviction which should have prompted them to investigate or rectify the situation. For example, this is not a case where the BOPP Defendants ignored repeated protests by Fleming that the arrest and parole revocation proceedings were not supported by a valid judgment of conviction. Indeed, Fleming himself had no knowledge that his judgment of conviction had been vacated. *See Cannon,* 1 F.3d 1558 (noting that "continued detention in the face of repeated protests will deprive the accused of liberty without due process"); *Alexander v. Perrill,* 916 F.2d 1392, 1398 (9th Cir.1990) (holding that prison officials cannot "stand by idly after an inmate has raised the prospect that he is being unlawfully incarcerated and has provided documentary evidence in support of his claim"). There also is no evidence that Fleming apprized any of the BOPP Defendants that he had filed a post-conviction lawsuit or that the BOPP Defendants otherwise were aware of the existence of Fleming's post-conviction proceedings. There is, thus, no evidence which could support an inference that the BOPP Defendants acted with deliberate, reckless indifference, by turning a blind eye to facts before them. *Cf. Jones v. City of Chicago,* 856 F.2d 985, 992-93 (7th Cir.1988) (in order to be personally liable under § 1983, a defendant supervisor must "act either knowingly or with deliberate, reckless indifference," the latter of which includes "turn [ing] a blind eye for fear of what [he] might see").

Undisputedly, the BOPP Defendants were mistaken in their belief that Fleming was a parolee, but, under the facts of this case, their mistaken belief does not rise to the level of deliberate indifference, absent evidence of actual or constructive knowledge of the federal court's judgment or of other facts triggering a duty to investigate. At most, the BOPP Defendants acted with negligence, result-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing in an unintended loss of liberty to Fleming.

Because there is no evidence that either Dowdell, Johnson, Parker, Riddle or White intended to deprive Fleming of his constitutional rights under the Fourteenth Amendment's guarantee of due process of law, the court finds that Fleming cannot establish that these Defendants deprived him of a constitutionally protected liberty interest. The Fourteenth Amendment substantive due process claim, therefore, fails.

(ii) Fourteenth Amendment due process claim predicated on Johnson and Riddle's alleged liability as policymakers

[3] Fleming is correct that "liability may be imposed ... from the absence of a policy,"*Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir.1991), when a constitutional injury occurs and when the failure to adopt a policy rises to the level of deliberate indifference to the need for such policy. *See City of Canton v. Harris,* 489 U.S. 378, 388-89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (municipal liability)[FN10]; *Armstrong v. Squadrito,* 152 F.3d 564, 581 (7th Cir.1998) (observing that, "if the supervisor personally devised a deliberately indifferent policy that caused a constitutional injury, then individual liability might flow from that act").

> FN10. *See Southard v. Texas Bd. of Criminal Justice,* 114 F.3d 539, 550 (5th Cir.1997) (cases involving § 1983 municipality liability are instructive because "[t]he legal elements of an individual's supervisory liability and a political subdivision's liability ... are similar enough that the same standards of fault and causation should govern").

The record establishes that the BOPP does not have a policy in place which requires*1151 it to independently investigate the validity of underlying judgments of conviction of state parolees, at least where the BOPP has not been informed of facts which call into doubt the facial validity of said judgments. The evidence further suggests that the

BOPP relies on the Department of Corrections for information pertaining to a parolee's release date, including the issuance of court orders directing a parolee's release.[FN11] (Parker Aff. at 2 (Ex. to Doc. No. 37).) Fleming contends that Johnson and Riddle are policymakers for the BOPP (Doc. No. 68 at 5 & n. 2, citing Johnson Dep. at 17-18), and that, as such, they are liable for "their failure ... to establish reasonable policies and procedures to help ensure that the [BOPP] did not unlawfully imprison or interfere with the liberty of those over whom the [BOPP] had no authority to exercise any such authority." (*Id.* at 5.)

> FN11. The court understands that the BOPP also faults Fleming for not knowing that his federal habeas writ had been granted, but certainly the BOPP Defendants are not saying that the state system relies completely on the detainee to communicate to the appropriate state officials court orders which require his or her release.

The court, though, finds that this new claim of § 1983 supervisory liability is not properly before the court. Fleming raises it for the first time in his response to the pending motion for summary judgment, *see supra* footnote 9, and Johnson and Riddle have not had an opportunity to address this claim. The allegations in the Second Amended Complaint do not put Riddle and Johnson on notice that they may be subject to § 1983 Fourteenth Amendment liability because they failed to implement a policy which resulted in the deliberate indifference to Fleming's right not to be unlawfully detained. Fleming has not pleaded, by either direct or inferential allegations, that there was an absence of policy under circumstances that allegedly required one, that the absence of policy was the moving force behind the violation, or that Johnson and Riddle had final policymaking authority to implement such a policy, but failed to do so. Rather, Fleming's claims focus solely on the personal participation of the individual BOPP Defendants in revoking Fleming's parole, not on the presence or absence of policies which allegedly resulted in Fleming's deprivation of liberty.

434 F.Supp.2d 1138

**(Cite as: 434 F.Supp.2d 1138)**

The court finds that requiring Fleming to identify the policy which he contends should have been implemented by a policymaking official and to plead that the absence of the policy was the moving force behind the alleged constitutional violation is in no way inconsistent with notice pleading. *See Cottone v. Jenne,* 326 F.3d 1352, 1362 & n. 7 (11th Cir.2003) (complaint did not allege the requisite "causal connection" to state a claim for § 1983 supervisory liability where, among other deficiencies, plaintiff did not allege that a policy formulated by a policymaking defendant caused a role in detainee's death); *Cannon,* 1 F.3d at 1565 (upholding dismissal where plaintiff failed to allege "any facts whatsoever to indicate that the alleged violation was a result of a County policy or practice"). The court, therefore, finds that Fleming has failed to set forth a "short and plain statement" as required by Rule 8(a) of the Federal Rules of Civil Procedure.

[4] In any event, it does not appear that a § 1983 policymaking claim against Johnson and Riddle would be viable. Whether a government official is a policymaker is a question of state law, *see City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), *\*1152 and the court "may not assume that final policymaking authority lies in some entity other than that in which state law places it." *McMillian v. Johnson,* 88 F.3d 1573, 1578 (1996). By state statute, the warden of the prison from which the prisoner was paroled, not the BOPP, retains legal custody of the prisoner while the prisoner serves his or her term of parole. *See*Ala.Code § 15-22-26 (1975); *see also Williams v. City of Birmingham,* 41 Ala.App. 208, 133 So.2d 713, 715 (1961) ("a State convict on parole is yet, under the provisions of our pardon and parole statute, in the legal custody of the warden of the prison until the expiration of the term specified in his sentence, and is in effect serving his sentence outside of prison walls"); *cf. Ex parte Powell,* 73 Ala. 517 (Ala.1883) (holding that delivery of pardon to warden (who failed to deliver pardon to his prisoner being held in a county jail) was the same as delivery to the prisoner; "[t]he prisoner was not, it is true, confined in the walls of the penitentiary, but he was in the constructive custody of the warden"); (*see also* Doc. No. 70 at 14.) In the cases cited in the margin, the individual or entity with legal custody of the detainee was the one ultimately held to be accountable under § 1983 for failing to establish policies and procedures adequate to prevent detainees from being held without reason.FN12 Neither party has cited any different authority.

FN12. *See, e.g., Luck v. Rovenstine,* 168 F.3d 323 (7th Cir.1999) (Indiana statute provided that "sheriff is the custodian of the persons incarcerated in the jail"; sheriff was "answerable for the legality of their custody" and failure to have procedures in place to verify the identity of prisoners); *Brown v. Byer,* 870 F.2d 975, 980 (5th Cir.1989) (sheriff, as "keeper" of county jail and its prisoners, was required to "adopt reasonable internal procedures to ensure that only those persons are incarcerated for whom the sheriff, or the deputy to whom he delegates such responsibilities, has a good faith belief based upon objective circumstances"); *Williams v. Heard,* 533 F.Supp. 1153, 1160 (S.D.Tex.1982) (failure to release prisoner after return of no-bill by grand jury; sheriff, who by state statute was custodian of jail detainees, liable for failing to adopt procedures "for ensuring that the orders for a prisoner's release that were sent to the central jail records office were ... entered onto a prisoner's jail card, which document is determinative of a prisoner's status in Harris County jail").

[5] Alabama law establishes that Johnson and Riddle, as members of the BOPP, did not have legal custody over Fleming, and there is no evidence that Johnson and Riddle have any control or authority over a warden who is employed by the Department of Corrections. Fleming has not pointed to any state statute or other law, nor has the court found any, which would make Johnson and Riddle answerable for the legality of the custody of a warden's prisoners so as vest policymaking authority in them per-

taining to such matters.

### (iii) Fourth Amendment claim predicated on Dowdell's false arrest of Fleming for a parole violation

[6] Fleming also alleges an unlawful arrest claim against Dowdell. (Doc. No. 19 at 1-2.) Unlawful arrest claims are analyzed under the Fourth Amendment.[FN13] *See Berg v. County of Allegheny,* 219 F.3d *1153 261, 269 (3rd Cir.2000) ("the constitutionality of arrests by state officials is governed by the Fourth Amendment rather than due process analysis").

> FN13. To the extent that Fleming claims he possessed a Fourteenth Amendment due process interest in not being arrested, the claim essentially is a re-characterization of his Fourth Amendment claim and is cognizable only under that amendment. *See Dorsey v. Wallace,* 134 F.Supp.2d 1364, 1373-74 (N.D.Ga.2000) (dismissing plaintiffs' Fourteenth Amendment claim under § 1983 as "redundant of the rights guaranteed by the more specific Fourth Amendment") (citing *Albright,* 510 U.S. at 273-74, 114 S.Ct. 807).

[7] Fleming's unlawful arrest claim is based on the fact that a federal court invalidated the underlying judgment of conviction from which the alleged parole violations arose, thereby divesting Dowdell of legal jurisdiction to arrest Fleming for a supposed parole violation.[FN14] (*Id.*) Again, though, there is no evidence that, when he secured an arrest warrant for Fleming on charges of parole violations, Dowdell had either actual or constructive knowledge that Fleming's underlying judgment of conviction had been invalidated by a federal court on a writ of habeas corpus. (2nd Am.Compl.¶ 16.)

> FN14. The court observes what Fleming says he is *not* claiming. In his Response, Fleming emphasizes that he does not base his constitutional claims against Dowdell on allegations pertaining to procedural in-

adequacies in the parole revocation process. For instance, Fleming states that he does not seek to hold Dowdell liable for his actions in "reporting alleged parole violations," for his conduct "as a witness in parole court proceedings," or for Dowdell's supervision of Fleming while Fleming was on parole. (Doc. No. 19 at 1-2.) Nor does Fleming base his claim on allegations that Dowdell "failed to afford [Fleming] due process after charging him with parole violations." (*Id.* at 2.) Indeed, for purposes of this lawsuit, Fleming has not disputed that he committed the acts of which he was charged, i.e., positive drug test and non-payment of restitution.

The issue is whether a Fourth Amendment claim can lie for actions which are neither knowing nor deliberate, but, at best, border on negligent. Whether negligence can establish a Fourth Amendment violation was addressed in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), albeit in the context of a motion to suppress. There, the criminal defendant challenged the veracity of statements police officers made in the affidavit in support of a search warrant. The Supreme Court held that a criminal defendant could challenge a search warrant under the Fourth Amendment if he or she could prove by a preponderance of the evidence that the affiant had included a material false statement in the warrant application knowingly and intentionally, or with reckless disregard of the truth. *See id.* at 155-56, 98 S.Ct. 2674. The court emphasized, though, that only allegations of deliberate falsehood or of reckless disregard for the truth could support a challenge to the validity of a facially valid warrant: Allegations of "negligence or innocent mistake" would be insufficient to mount a successful Fourth Amendment attack on the warrant and subsequent search. *Id.* at 171, 98 S.Ct. 2674.

Although the Fourth Amendment issue in *Franks* was decided in the context of a criminal suppression hearing, the Eleventh Circuit has extended the *Franks* holding to § 1983 damages claims.

434 F.Supp.2d 1138
**(Cite as: 434 F.Supp.2d 1138)**

*See Maughon v. Bibb County,* 160 F.3d 658 (11th Cir.1998). In *Maughon,* ruling that officers did not violate the Fourth Amendment in executing a search warrant, the Eleventh Circuit held that "[n]egligent or innocent mistakes do not violate the Fourth Amendment." *Id.* at 660 (citing *Franks,* 438 U.S. at 171, 98 S.Ct. 2674). "To invalidate a warrant based on incorrect information provided in a supporting affidavit one must show that officers intentionally or recklessly included false information or omitted necessary true information." *Id.* (citing *Franks,* 438 U.S. at 171, 98 S.Ct. 2674); *see also Kelly v. Curtis,* 21 F.3d 1544, 1554 (11th Cir.1994) (recognizing that the holding in *Franks* "does not apply to *negligent* **\*1154** misrepresentations or omissions"); *Ansley v. Heinrich,* 925 F.2d 1339, 1344 (11th Cir.1991) (holding that negligence, alone, absent any intentional government conduct, cannot form the basis of a claim under § 1983 premised on the Fourth Amendment).

It follows from the foregoing cases that some showing of deliberate or intentional misconduct is required to state a Fourth Amendment claim against a parole officer who wrongfully, without jurisdiction, secures a parole violation warrant and arrests a citizen who is no longer a parolee. For the same reasons discussed in the preceding section, there is no evidence from which the court can imply any deliberate misconduct on the part of Dowdell. It is undisputed that Dowdell did not know that Fleming was no longer a parolee by virtue of the vacated judgment of conviction. There is no evidence that Dowdell received information that the validity of the facially-valid judgment of conviction was in doubt. The court finds that Dowdell's lack of knowledge precludes a finding that he acted deliberately or intentionally. Fleming, therefore, cannot prevail as a matter of law on his § 1983 Fourth Amendment false arrest claim against Dowdell.

### (c) Quasi-Judicial Immunity

Because Fleming has failed to establish the existence of a constitutional violation under either the Fourth or Fourteenth amendments, the court need not examine the immunity defenses raised by the BOPP Defendants. Nonetheless, to clarify some of Fleming's misconceptions, the court does so. For the reasons to follow, even assuming that a Fourth Amendment or Fourteenth Amendment claim could be extracted from the evidence, the court finds that Johnson, Parker, Riddle and White would be entitled to quasi-judicial immunity. Because the analyses are slightly different, the court discusses the application of quasi-judicial immunity, first, as to Johnson, Riddle and White and, second, as to Parker.

#### (i) Johnson, Riddle and White

In suits brought under 42 U.S.C. § 1983, "[i]t is well-established that judges are immune from liability for damages for acts committed within their judicial jurisdiction." *Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1507 (11th Cir.1990) (citing *Cleavinger v. Saxner,* 474 U.S. 193, 199, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), and *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)). The Supreme Court of the United States has extended judicial immunity to certain executive and administrative personnel whose duties are "classically adjudicatory." *Id.* (quoting *Cleavinger,* 474 U.S. at 201-04, 106 S.Ct. 496).

[8] To determine whether Johnson, Riddle and White are entitled to quasi-judicial immunity, the court turns to the principles delineated in *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), the seminal case regarding the scope of judicial immunity as to lawsuits under § 1983. *See id.* at 360,98 S.Ct. 1099. Because judicial immunity is an immunity from suit, not just immunity from damages liability, "[a] judge will not be deprived of immunity because the action he [or she] took was in error, was done maliciously, or was in excess of his [or her] authority." *Id.* at 356-57, 98 S.Ct. 1099 (citation and internal quotations omitted); *see also Pierson,* 386 U.S. at 554, 87 S.Ct. 1213 ("[I]mmunity applies even when the judge is accused of acting maliciously and corruptly."). Rather, a judge will be **\*1155** deprived of judicial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

immunity in only two scenarios. First, a judge loses immunity for actions not taken in the judge's judicial capacity. *See Stump,* 435 U.S. at 360-63, 98 S.Ct. 1099. Second, a judge is not immune, even when he or she performs judicial actions, if he or she "has acted in the clear absence of all jurisdiction." *Id.* at 356-57, 98 S.Ct. 1099.

[9] Fleming does not dispute that Johnson, Riddle and White acted in a quasi-judicial, adjudicatory capacity when they made factual and legal findings that he engaged in the conduct for which he was charged, and for good reason.[FN15] Rather, Fleming focuses on the fact that, in revoking Fleming's parole, they acted on an underlying judgment which had been vacated. Because the underlying judgment had been invalidated, Fleming asserts that Johnson, Riddle and White acted "without lawful authority" (Doc. No. 30 at 6; Doc. No. 68 at 3), and, thus, "in the clear absence of all jurisdiction." *Stump,* 435 U.S. at 356-67, 98 S.Ct. 1099.

> FN15. Parole board members are entitled to judicial immunity when they perform adjudicatory functions in connection with granting, denying or revoking parole. *See Sultenfuss v. Snow,* 894 F.2d 1277, 1279 (11th Cir.1990) (per curiam) ("[W]e have long recognized that parole board members are entitled to quasi-judicial immunity from suits requesting damages based upon the decision to grant or withhold parole.") (citing *Fuller v. Georgia State Bd. of Pardons and Paroles,* 851 F.2d 1307, 1310 (11th Cir.1988)); *Cruz v. Skelton,* 502 F.2d 1101, 1101-02 (5th Cir.1974) (holding that a state's board of pardons and paroles is entitled to absolute immunity in refusing parole to a prisoner because the board performs adjudicatory roles which are the functional equivalent of judges); *see also Walrath v. United States,* 35 F.3d 277 (7th Cir.1994) ("Most federal courts ... have consistently held that parole board members are absolutely immune from suit for their decisions to grant, deny, or revoke parole.").

Johnson, Riddle and White, on the other hand, disagree with Fleming's interpretation of the phrase "in the clear absence of all jurisdiction." They do not dispute that they lacked personal jurisdiction over Fleming to revoke his parole once the federal district court granted Fleming's writ of habeas corpus and vacated Fleming's underlying judgment of conviction. Johnson, Riddle and White, though, assert that, because they were unaware of the facts divesting them of personal jurisdiction and, further, because they otherwise acted within their subject matter jurisdiction, they did not act "in the clear absence of all jurisdiction." (Doc. No. 57 at 8-9.) For the reasons to follow, the court agrees with Johnson, Riddle and White.

For purposes of judicial immunity, there is a distinction between an "excess of jurisdiction" and a "clear absence of all jurisdiction." There also is a distinction between the clear absence of personal jurisdiction and the clear absence of subject matter jurisdiction. Only judicial acts performed in the clear absence of all jurisdiction over the subject matter are not protected by judicial immunity. *Stump, supra,* and *Dykes v. Hosemann,* 776 F.2d 942, 943-45 (11th Cir.1985), illustrate the distinctions.

*Stump* considered the immunity defense raised by Harold D. Stump, a circuit court judge in the state of Indiana. Judge Stump ordered a "somewhat retarded" child to undergo a tubal ligation at the request of her mother. 435 U.S. at 351, 98 S.Ct. 1099. The court of appeals' held that Judge Stump "did not have jurisdiction over the petition authorizing [the child's] sterilization," and, thus, acted in the clear absence of all jurisdiction. *Id.* at 357, 98 **\*1156** S.Ct. 1099. The Supreme Court reversed. It stated, though, that the court of appeals "correctly" identified the issue as "whether at the time he [Judge Stump] took the challenged action he had jurisdiction over the subject matter before him." *Id.* at 357, 98 S.Ct. 1099. The Supreme Court held that, even though Judge Stump's ruling may have been contrary to the common law of the state and in violation of due process, the judge had not exceeded the general jurisdiction of the court. "A judge is ab-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

solutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." *Id.* at 359, 98 S.Ct. 1099. Quoting precedent, the Court reiterated:

"Where there is clearly no jurisdiction over the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But where jurisdiction over the subject-matter is invested by law in the judge, or in the court which he holds, the manner and extent in which the jurisdiction shall be exercised are generally as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgments may depend."

*Stump,* 435 U.S. at 356 n. 6, 98 S.Ct. 1099 (quoting *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 351, 20 L.Ed. 646 (1871)).

Borrowing examples from *Bradley,* the court explained that a probate judge who presides over a criminal trial acts in the clear absence of all jurisdiction, but a judge of a criminal court who convicts a defendant for a non-existent crime acts only in excess of jurisdiction and is protected by judicial immunity. *See Stump,* 435 U.S. at 357 n. 7, 98 S.Ct. 1099 (citing *Bradley,* 80 U.S. at 352); *see also Duty v. City of Springdale,* 42 F.3d 460, 462 (8th Cir.1994) (quotations omitted) ("a judge acts in excess of jurisdiction if the act complained of is within his general power of jurisdiction but is not authorized because of certain circumstances," whereas there "is a clear absence of jurisdiction when a court of limited jurisdiction attempts to adjudicate a case outside of its jurisdiction").

Moreover, in *Dykes,* a mother alleged that her ex-husband and two Florida state court judges conspired to deprive her of custody of her child without due process. *See* 776 F.2d at 943-45. One of the judges, Judge Hosemann, signed a petition which falsely declared the child to be a "dependent child." Judge Hosemann then awarded the father

with temporary custody of the child. The plaintiff-mother did not receive notice of the dependency and temporary custody proceedings, as required by statute. *See id.* at 943-44 & 948 n. 19.

After rejecting the plaintiff-mother's argument that the judge acted in the clear absence of all subject matter jurisdiction, *see id.* at 947, the court turned to the plaintiff-mother's assertion that Judge Hosemann "acted in 'the clear absence of all jurisdiction' because he lacked ... jurisdiction over [her] person[ ]."*Id.* at 946. The Eleventh Circuit disagreed, concluding that *Stump's* and *Bradley's* references to a "clear absence of all jurisdiction" only pertained to the clear absence of *subject matter* jurisdiction:

Although the [*Stump* ] Court referred to jurisdiction in general terms, the context of the statement indicates that the Court was referring to a complete absence of **\*1157** subject matter jurisdiction. The passage itself cited to a footnote in which the Court presented an example of a lack of subject matter jurisdiction. More importantly, the language in *Bradley* from which *Stump* quotes, more fully reads "clear absence of all jurisdiction over the subject matter." *Bradley v. Fisher,* 80 U.S. (13 Wall.) at 351 (emphasis added).

*Dykes,* 776 F.2d at 947-48 (citing *Stump,* 435 U.S. at 356-57, 98 S.Ct. 1099) (internal footnote omitted).

The *en banc* court in *Dykes* then held that, where a judge does not clearly lack subject matter jurisdiction, the absence of personal jurisdiction over the complaining party does not deprive the judge of immunity. *See id.* at 948-49. "[T]o require a judge to defend a charge that he knowingly entered an order adversely affecting a party over whom the court had not acquired personal jurisdiction would be to ignore the still valid policy considerations articulated by the Supreme Court in *Bradley v. Fisher,*" *supra. Id.* at 950; *see also Ashelman v. Pope,* 793 F.2d 1072, 1076 (9th Cir.1986) (judicial immunity may not be pierced for lack of personal jurisdiction).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

434 F.Supp.2d 1138
**(Cite as: 434 F.Supp.2d 1138)**

[10] Applying these principles, the court finds that Johnson, Riddle and White acted within their general subject matter jurisdiction. They are statutorily vested with the authority to conduct parole revocation hearings and to revoke parole. *See* Ala.Code § 15-22-24(a) (1975) (BOPP's duties, among others, include "determining whether violation of parole ... conditions exist in specific cases, deciding, in the case of parolees, what action should be taken with reference thereto."); *see also* Ala.Code § 15-22-32(a) (1975) (authorizing a single member of BOPP to conduct a parole violation hearing "to determine guilt or innocence of the charges" to "recommend to the board revocation ... of parole").

It is true that at the time Johnson, Riddle and White acted Fleming was no longer a parolee based on the grant of his habeas corpus writ. The court finds that the fact Fleming's judgment had been vacated meant that these Defendants did not have authority over Fleming's person when they acted. In other words, Johnson, Riddle and White were divested of personal jurisdiction over Fleming. Under *Dykes, supra,* the absence of personal jurisdiction, however, does not preclude the application of judicial immunity.

The court's analysis is not complete, though. Alternatively, to the extent that an argument could be made that Johnson, Riddle and White committed more than a "purely procedural" error in revoking Fleming's parole when, in fact, Fleming was no longer a parolee, so as to categorize their actions as depriving them of subject matter jurisdiction, *Dykes,* 776 F.2d at 947 n. 17, the court finds that they nonetheless would be entitled to absolute judicial immunity.

To explain, in a portion of the panel decision in *Dykes* which remains undisturbed by the *en banc* court, the Eleventh Circuit held that to deprive a judicial officer of absolute immunity, he or she must *know* facts which place him or her on notice of the clear absence of subject matter jurisdiction: "[I]mmunity for judicial acts in the clear absence of jurisdiction is lost only if the judge knows that

he lacks jurisdiction." *Dykes v. Hosemann,* 743 F.2d 1488, 1497 (11th Cir.1984); *see also Bradley,* 80 U.S. at 351 ("Where there is clearly no jurisdiction over the subject-**1158** matter any authority exercised is a usurped authority, and for the exercise of such authority, *when the want of jurisdiction is known to the judge,* no excuse is permissible.") (emphasis added); *Tucker v. Outwater,* 118 F.3d 930, 934 (2d Cir.1997) ("A judge will be denied immunity for damages where he (i) acts in the clear absence of all jurisdiction; and (ii) knew or must have known that he was acting in such a manner.") (quoting *Maestri v. Jutkofsky,* 860 F.2d 50, 53 (2d Cir.1988)).

Neither Johnson, Riddle nor White was enlightened to the fact that Fleming's conviction had been invalidated. They had no knowledge, either actual or constructive, and had received no information placing on them a duty to investigate the judgment's validity. They acted unknowingly. Thus, whether the absence of jurisdiction is categorized as a clear lack of personal jurisdiction or a clear lack of subject matter jurisdiction, Johnson, Riddle and White are entitled to absolute quasi-judicial immunity and, therefore, are not liable to Fleming on the § 1983 constitutional claims.

### (ii) Parker

As stated, Parker also invokes quasi-judicial immunity. (Doc. No. 37 ¶ 2; Doc. No. 57 at 7.) Although Parker's role in Fleming's revocation proceedings differs from that of Johnson, Riddle and White, the court finds that Parker is protected by the same quasi-judicial immunity. Namely, for the reasons to follow, the court finds that Parker's involvement in Fleming's parole revocation was "classically adjudicatory" in nature, *Stewart,* 908 F.2d at 1507, and that Parker did not act "in the clear absence of all jurisdiction." *Stump,* 435 U.S. at 356-57, 98 S.Ct. 1099.

[11] First, the court finds that Parker's determination that there existed reasonable cause to believe that Fleming violated the conditions of his parole so as to support the issuance of a warrant

434 F.Supp.2d 1138
**(Cite as: 434 F.Supp.2d 1138)**

places Parker in a position akin to a judicial or magisterial role. *See, e.g.,*Fed.R.Crim.P. 41(b)(1) & (d)(1) (authorizing a magistrate judge to issue a search warrant "for search of property or for a person within the district" where probable cause exists). A magistrate judge performs a judicial act when he or she makes decisions pertaining to issuing search warrants. *See Pressly v. Gregory,* 831 F.2d 514, 517 (4th Cir.1987) ("As judicial officers, magistrates are entitled to absolute immunity for acts performed in their judicial capacity."); *Vaillancourt v. Bentsen,* 1994 WL 243489, *1 (D.Ariz.1994) (finding that a magistrate judge's issuance of search warrant was a judicial act for which magistrate judge was immune from suit under doctrine of absolute judicial immunity) (citing *Stump,* 435 U.S. at 349, 98 S.Ct. 1099). The court finds that Parker engaged in a similar judicial act when he exercised his statutory duty and determined that there was "reasonable cause to believe" that Fleming had violated the conditions of his parole. *See*Ala.Code § 15-22-31(a) (1975) ("If ... any member of the [BOPP] shall have reasonable cause to believe that such prisoner ... has violated the conditions of his parole in an important respect, such ... board member shall report such fact to the Department of Corrections, which shall thereupon issue a warrant for the retaking of such prisoner....").

This court is not the first to analogize the job of a non-judicial officer's role in assessing legal grounds for the issuance of a warrant to that of a judicial officer for purposes of determining the applicability of absolute quasi-judicial immunity. In *Nesmith v. Alford,* 318 F.2d 110, 127 (5th Cir.1963), cited by Parker (Doc. No. 70 at **1159 11), the Fifth Circuit held that the role of a police desk captain in reviewing an experienced police officer's affidavit to determine whether legal grounds existed to issue an arrest warrant was comparable to that of a magistrate: "Captain Eiland was acting in the role of a Magistrate" because "[h]is function was to determine whether legal grounds existed for an arrest and prosecution." *Id.* As such, the police desk captain was entitled to quasi-judicial immunity. *Id.* Similarly, because Parker made an as-

sessment of "reasonable cause," a role analogous to the job of a magistrate, the court finds that Parker engaged in a judicial function.

Second, because Parker is statutorily authorized to make "reasonable cause" determinations concerning violations of parole, Ala.Code § 15-22-31 (1975)(a), the court finds that Parker acted within his general subject matter jurisdiction. Finally, for the reasons discussed in the preceding section, the court finds that Parker's undisputed lack of either actual or constructive knowledge that Fleming's underlying judgment of conviction had been vacated mandates a finding that Parker did not act "in the clear absence of all jurisdiction." *Stump,* 435 U.S. at 356-57, 98 S.Ct. 1099. Parker, therefore, having satisfied the *Stump* requirements, is entitled to absolute quasi-judicial immunity on the § 1983 claims against him.

### (d) Qualified Immunity: Dowdell

Dowdell asserts that quasi-judicial immunity and qualified immunity protect him from individual liability as to Fleming's § 1983 constitutional claims. For the reasons to follow, the court finds that summary judgment is appropriate, not only on the merits as discussed, *supra,* but also on the basis of qualified immunity.[FN16]

> FN16. The court declines to decide whether Dowdell is entitled to quasi-judicial immunity. The court notes, though, that Fifth Circuit's decision in *Spaulding v. Nielsen,* 599 F.2d 728, 729 (5th Cir.1979), as interpreted by *Galvan v. Garmon,* 710 F.2d 214, 215 (5th Cir.1983), and the Alabama Civil Court of Appeals' decision in *McCammon v. Youngblood,* 853 So.2d 249, 252-53 (Ala.Civ.App.2002), appears to undermine Dowdell's assertion of absolute immunity. *See, e.g., McCammon,* 853 So.2d at 252-53 (declining to extend absolute immunity to parole officer who was sued under § 1983 lawsuit for allegedly causing prisoner to be illegally jailed by charging him with using illegal drugs

434 F.Supp.2d 1138
**(Cite as: 434 F.Supp.2d 1138)**

without first conducting a drug screen on the ground that the Eleventh Circuit had not extended absolute immunity for parole officers to fact situations other than submission of a presentence report); *see also A.M. v. Grant,* 889 F.Supp. 1495, 1504 (M.D.Ala.1995), aff'd, 68 F.3d 486 (11th Cir.1995) (concluding that *Spaulding* and *Galvan* preclude grant of absolute immunity in § 1983 lawsuit to any actions of a probation officer which do not involve the filing of a petition).

Government officials may raise qualified immunity as an affirmative defense to a § 1983 individual-capacity lawsuit. *See Wilson v. Strong,* 156 F.3d 1131, 1135 (11th Cir.1998); *see also Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1184 n. 16 (11th Cir.1994). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988).

The test for whether a governmental defendant is entitled to qualified immunity involves a two-step analysis. The first inquiry concerns whether the government official was engaged in a "discretionary **\*1160** function." *Madiwale,* 117 F.3d at 1324. It is undisputed, and in fact alleged by Fleming, that Dowdell at all relevant times was acting within the scope of his employment as a state parole officer. Accordingly, the court finds that Dowdell "was acting within the scope of his discretionary authority" when the alleged unconstitutional acts occurred. *Zeigler v. Jackson,* 716 F.2d 847, 849 (11th Cir.1983).

Under the second inquiry, the burden shifts to Fleming. First, as a "threshold question," the court asks, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show

[the government official's] conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Second, if under Fleming's version of the facts, his constitutional rights would have been violated, the court must determine whether those rights were "clearly established." *Id.* This inquiry focuses on whether the "state of the law" at the time of the alleged violation provided the government officials with "fair warning that their alleged treatment of the [plaintiff] was unconstitutional." *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

As stated, Fleming cannot demonstrate that Dowdell violated Fleming's Fourth Amendment or Fourteenth Amendment rights because Dowdell did not possess the requisite state of mind to impose liability. In short, Dowdell did not have actual or constructive knowledge that Fleming's underlying judgment of conviction had been vacated. Nor was Dowdell apprized of facts giving rise to a duty to investigate the validity of Fleming's judgment. Dowdell, therefore, did not act knowingly, intentionally or with deliberate indifference so as to impose liability under either the Fourth or Fourteenth amendments. At this point, the court observes that, in each case it found where summary judgment was denied to state officials who retained inmates in spite of court orders mandating their release, the offending state official knew of the court order, yet refused to comply with it.[FN17] These decisions, cited in the margin, further demonstrate that Dowdell did not violate the Constitution and that his unknowing mistake that he lacked jurisdiction over Fleming entitles him to qualified immunity. In other words, because Fleming's parole conditions and incarceration were not wrongly extended based on a knowing and deliberate refusal to obey a court order, Dowdell is qualifiedly immune from a damages suit in his individual capacity.

FN17. *See, e.g., Slone v. Herman,* 983 F.2d 107, 109-10 (8th Cir.1993) (holding that state department of correction employees deprived the prisoner of his liberty interest in violation of the due process clause of

the Fourteenth Amendment and were not entitled to qualified immunity, when they *intentionally* refused to comply with a court order on the basis that they believed that the state court had erroneously interpreted a statute in ordering the prisoner's release); *Tasker v. Moore,* 738 F.Supp. 1005, 1010 (S.D.W.Va.1990) ("It is peradventure that officials who *willfully, intentionally or recklessly* keep an inmate in prison past the date he was ordered released are liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") (emphasis added); *Arce v. Miles,* 1991 WL 123952, *9 (S.D.N.Y.1991) ("[A] state official's *knowing* refusal to obey a state court order affecting a prisoner's rights would make the official 'liable under § 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.'") (emphasis added).

[12] Assuming, though, the existence of a constitutional violation, the court finds **\*1161** that the parameters of the law were not sufficiently defined during the relevant time period so as to provide "fair warning" to Dowdell that he had an obligation to verify the validity of Fleming's underlying judgment of conviction where he was unaware of the federal court's order or that Fleming had even challenged the validity of the judgment of conviction in a habeas corpus proceeding. *Hope,* 536 U.S. at 741, 122 S.Ct. 2508; *cf. Kelly,* 21 F.3d at 1551 (holding that there was no law clearly establishing that "an officer has an affirmative obligation to seek out exculpatory information of which the officer is *not aware* ").

(e) 42 U.S.C. § 1983 and the Statute of Limitations

Dowdell, Johnson, Parker, Riddle and White also raise the statute of limitations as a defense to Fleming's § 1983 claims. (Doc. No. 15 at 5; Doc.

No. 24 at 5; Doc. No. 35 at 5; Doc. No. 37 at 5.) Fleming counters that equitable tolling applies to his otherwise untimely claims. (Doc. No. 19 at 7-9.) For the reasons to follow, the court agrees with these Defendants that the untimeliness of Fleming's § 1983 claims provides yet another ground for the entry of summary judgment in favor of Defendants.

[13] The statute of limitations for a § 1983 claim arising out of events occurring in Alabama is two years. *See Lufkin v. McCallum,* 956 F.2d 1104, 1106 (11th Cir.1992). The last act committed by Dowdell occurred on January 12, 2000, the date Dowdell arrested Fleming for violating the conditions of his parole. The last act committed by Parker occurred in January or February 2000 when Parker reviewed Dowdell's report charging Fleming with violating conditions of parole. (Parker Aff. at 1 (Ex. to Doc. No. 37).) The last act by White was on or about January 26, 2000, the date she, acting as a parole court hearing officer, conducted a fact-finding hearing on Fleming's alleged parole violation and recommended to the BOPP that Fleming's parole be revoked. (*See* form titled, "Action of the Board Subsequent to Parole Court" (Doc. No. 59, Ex. 10).) The last act by Riddle and Johnson occurred on March 8, 2000, when they revoked Fleming's parole upon White's recommendation. (Doc. No. 59, Ex. 10.)

Each act recited above occurred during the year 2000. More than two years passed between 2000, and the filing of Fleming's Complaint in this case on November 24, 2003. The two-year statute of limitations, therefore, has run on Fleming's § 1983 claims against these Defendants.

Moreover, the court finds that equitable tolling cannot save Fleming's claims. Fleming relies on his lack of actual notice that his habeas petition had been granted and his judgment of conviction vacated. Fleming avers that the statute of limitations should not begin to accrue, or should be tolled, until August 13, 2003. (*See, e.g.,* Doc. No. 19 at 5-9.) August 13, 2003, is the date the United States District Court in the Northern District of Alabama answered Fleming's inquiry about the status of his

habeas corpus petition by ordering that Fleming "be RELEASED FORTHWITH from incarceration." (Ex. to Compl., Aug. 12, 2003 Order at 1.)

[14][15] Although Fleming did not have actual notice of the federal court's judgment vacating his judgment of conviction, he is charged with constructive knowledge of the district court's final judgment because he was a party to those proceedings. *1162 *See Salahuddin,* 781 F.2d at 27. Equitable tolling is not warranted in cases where the plaintiff has constructive notice. *See Pedraza v. United Guar. Corp.,* 114 F.Supp.2d 1347, 1354 (S.D.Ga.2000) (setting forth factors plaintiff must satisfy to qualify for protection of equitable tolling).

Additionally, Fleming has not presented any evidence that he acted diligently in ascertaining the status of his habeas corpus case. Without evidence of diligence on the part of Fleming, equitable tolling cannot save his claims. *Cf. Drew v. Dept. of Corr.,* 297 F.3d 1278, 1288 (11th Cir.2002) ("A lengthy delay between the issuance of a necessary order and an inmate's receipt of it might provide a basis for equitable tolling if the petitioner has diligently attempted to ascertain the status of that order and if the delay prevented the inmate from filing a timely federal habeas corpus petition."); *Woodward v. Williams,* 263 F.3d 1135, 1143 (10th Cir.2001) ("[A] prisoner's lack of knowledge that the state courts have reached a final resolution of his case can provide grounds for equitable tolling if the prisoner has acted diligently in the matter.").

[16] Fleming failed to keep the district court in the Northern District of Alabama apprized of his current address. The court records in Fleming's habeas corpus case reflect that the last change of address Fleming provided was in March 1997.[FN18] (Pl. Not. Change of Address (Doc. No. 54, Ex. 3).) After that date, Fleming did not have any contact with the court or make any effort until July 27, 2003, to inquire about the status of his § 2255 petition. A six-year lapse does not equate due diligence. The court, therefore, finds that the two-year statute of limitations is a bar to Fleming's 42 U.S.C.

§ 1983 constitutional claims against the BOPP Defendants.

> FN18. Plaintiff's self-serving, conclusory speculation that he notified the court of his change of address when he was paroled (Pl. Dep. at 31 (Doc. No. 54)) does not dictate a contrary finding. *See Douglass v. United Serv. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) ( "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden."); *Bennett v. Parker,* 898 F.2d 1530, 1533-34 (11th Cir.1990) (A "conclusory allegation" cannot defeat summary judgment.).

*2. State Law Claims for False Imprisonment*

(a) Dowdell, Johnson, Parker, Riddle and White

Counts 2 and 4 allege state law claims for false imprisonment against Dowdell, Parker, Johnson, Riddle and White. The BOPP Defendants move for summary judgment on Counts 2 and 4 on the basis of State-agent immunity. (Doc. No. 58 at 2, 11.) Pointing to the exceptions to State-agent immunity outlined in *Ex parte Cranman,* 792 So.2d 392 (Ala.2000), Fleming contends that the BOPP Defendants cannot seek the shelter of State-agent immunity because they acted beyond legal authority and in violation of the United States Constitution when they revoked Fleming's non-existent parole. *Id.* at 405.

In *Ex parte Cranman,* 792 So.2d 392 (Ala.2000), a plurality opinion which was later adopted by a majority of the Supreme Court of Alabama in *Ex parte Butts,* 775 So.2d 173 (Ala.2000), the Supreme Court "restate[d] the rule governing State-agent immunity." *Cranman,* 792 So.2d at 405. It held:

A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis *1163 of the claim against the agent is based upon the agent's

(1) formulating plans, policies, or designs; or

(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:

(a) making administrative adjudications;

(b) allocating resources;

(c) negotiating contracts;

(d) hiring, firing, transferring, assigning, or supervising personnel; or

(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or

(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

*Id.* (emphasis in original). After setting forth the type of conduct which entitles a state official to immunity, the court set out the exceptions to State-agent immunity as follows:Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Id.* (emphasis in original).

When a defendant raises State-agent immunity, courts apply the *Cranman* rule through a two-part burden-shifting analysis. *See Giambrone v. Douglas,* 874 So.2d 1046, 1052 (Ala.2003). "In or-

der to claim State-agent immunity, [the BOPP Defendants] bear the burden of demonstrating that [Fleming's] claims arise from a function that would entitle them to immunity." *Id.* If the BOPP Defendants satisfy their burden, "the burden then shifts to [Fleming], who, in order to deny the [BOPP Defendants] immunity from suit, must establish that [they] acted willfully, maliciously, fraudulently, in bad faith, [ ] beyond their authority," contrary to the requirements of the United States Constitution, *id.* or that they were " 'not exercising [their] ... judgment in the manner set forth in the examples in *Cranman.*' " *Quinlan v. Jones,* 922 So.2d 899, 907 (Ala.Civ.App.2004) (citation omitted).

Applying the two-part analysis, the court first examines whether the conduct forming the basis of Fleming's false imprisonment claim fits within one of the categories of the *Cranman* standard. Defendants Dowdell, Johnson, Parker, Riddle and White assert that, within the meaning of *Cranman,* they were exercising their **\*1164** judgment in making "administration adjudications" and were "discharging duties imposed on [their] agency by statute." (Doc. No. 58 at 11, citing subsections (2)(a) and (3) of the *Cranman* rule.) Because subsections (2) and (3) of *Cranman* require the court to ascertain whether the BOPP Defendants exercised judgment, "cases applying the discretionary/ministerial dichotomy are helpful."*Swan v. City of Hueytown,* 2004 WL 2488342, at \*3 (Ala.2004). The Supreme Court of Alabama "has defined discretionary functions as 'those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances.' " *Id.* (quoting *Wright v. Wynn,* 682 So.2d 1, 2 (Ala.1996)).

[17] Fleming does not take issue with the general statutory authority of the BOPP Defendants to effectuate an arrest of a parolee for parole violations, to render decisions concerning guilt or innocence on those charges, or to revoke parole. In that regard, Fleming does not dispute that each of the BOPP Defendants discharged his or her statutory

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

duties and exercised his or her judgment in determining whether grounds existed to believe that Fleming had violated the conditions of his parole. Instead, as stated, Fleming relies on the *Cranman* exceptions to liability.

First, Fleming claims that the BOPP Defendants acted "beyond their authority" because the underlying judgment of conviction from which the parole violations stemmed had been vacated. Because Fleming was no longer a parolee, by virtue of the vacated judgment of conviction, the BOPP Defendants did not have jurisdiction over Fleming's person and, therefore, Fleming argues that, within the meaning of *Cranman, supra,* they acted beyond their lawful authority in subjecting him to the parole revocation procedures.[FN19] (Doc. No. 62 at 8-9 (citing *Ex parte Phelps,* 612 So.2d 1177, 1181 (Ala.1992), in which the Supreme Court of Alabama observed that "all of the general duties enumerated in the general provision outlining the duties of the Board, Ala.Code 1975, § 15-22-24, *presuppose a conviction.*").) Furthermore, Fleming contends that the BOPP Defendants' erroneous belief that they had jurisdiction over Fleming does not shelter them from a finding that they acted "beyond their authority" in restricting his liberty through supervision on parole and incarcerating him on parole violations. (*Id.* at 10-11.) For the reasons to follow, the court disagrees with Fleming.[FN20]

FN19. Again, Fleming does not dispute that neither Dowdell, Johnson, Parker, Riddle nor White knew that the judgment of conviction had been vacated. Presumably, for that reason, Fleming has not argued that the BOPP Defendants acted "willfully, maliciously, fraudulently" or "in bad faith." *Cranman,* 792 So.2d at 405.

FN20. The court takes the opportunity to correct a related misconception by Fleming. Fleming is correct that the BOPP Defendants' lack of knowledge of the existence of the district court's final judgment, which in effect divested them of jurisdiction over Fleming's person, does not prevent Fleming from stating a cause of action for false imprisonment. As codified by the Code of Alabama, the tort of false imprisonment "consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala.Code § 6-5-170 (1993). To satisfy the statutory requirements for false imprisonment, one only need allege (1) a detention (2) which is unlawful. *See id.* "The lack of malice, the presence of good faith, or the presence of probable cause do not affect the existence of wrong, for purposes of a false imprisonment cause, when the detention is unlawful." *Nesmith v. Alford,* 318 F.2d 110, 119 (5 th Cir.1963) (applying Alabama law); *see also R.J.D. v. Vaughan Clinic, P.C.,* 572 So.2d 1225, 1230 (Ala.1990) (Adams, J., dissenting). Seizing on the language in *Nesmith* (*see, e.g.,* Doc. No. 44 at 5), Fleming argues that the BOPP Defendants' lack of knowledge is not a defense. Fleming, however, confuses what is required to state a cause of action with the elements of the affirmative defense of State-agent immunity. Immunity was not at issue in *Nesmith. See Norton v. McShane,* 332 F.2d 855, 860 n. 6 (5th Cir.1964) ("In *Nesmith* immunity was not raised as a defense except as to one quasi-judicial officer, who was in fact held to be immune."). Whether the BOPP Defendants are entitled to State-agent immunity is a separate inquiry. *See e.g., Lightfoot v. Floyd,* 667 So.2d 56 (Ala.1995) (police investigator detaining plaintiff for questioning was exercising a discretionary function and, therefore, immune from liability on false imprisonment claim). *See, e.g., Rose v. Town of Jackson's Gap,* 952 F.Supp. 757, 766-67 (M.D.Ala.1996) (police officer entitled to substantive immunity on state law false imprisonment claim when he responded in uniform to domestic dispute call and arrested one of arguing parties for disorderly

conduct).

**\*1165** *Howard v. City of Atmore,* 887 So.2d 201 (Ala.2003), is instructive on the issue of whether the BOPP Defendants acted outside the scope of their authority. In Howard, a wrongful-death action, an inmate in the custody of a city police department, committed suicide. *See* 887 So.2d at 202. The administratrix of the decedent's estate alleged that the jailer who was on duty when the inmate died " 'failed to implement reasonable precautionary measures' " to prevent the death. *See id.* at 203.

Turning to the *Cranman* exceptions to State-agent immunity, the *Howard* court stated that "[a] State agent acts beyond authority and is therefore not immune when he or she 'fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.' " *Id.* at 208 (quoting *Giambrone,* 874 So.2d at 1052); *see Atmore,* 887 So.2d at 208 (same). The jailer violated an administrative order which mandated that the jailer check on all inmates "at least twice an hour" and maintain "constant" observation of the inmates via a "monitor camera." *Id.* at 207-08. The administrative order in question did "not turn on the subjective observations or assessments of individual inmates or contemplate the exercise of judgment by individual jailers," but rather applied to all inmates regardless of whether or not they were "at-risk." *Id.* at 207-08. It "left no room for the exercise of judgment as to the manner in which or the frequency with which [the jailer] should be monitored." *Id.* at 208-09. The court, therefore, held that the jailer acted beyond his authority because he failed to "monitor" the inmate "in the manner prescribed in" the administrative order on the day in question; thus, he was not entitled to State-agent immunity. *Id.*

[18] Under *Howard,* a state official acts "beyond his or her authority" when there exists a binding rule, regulation or statute which contains unambiguous and specific directives with which a state official must comply. Such explicit directives take away a state official's exercise of discretion and the failure of a state official strictly to abide by the directives results in a finding that the state offi-

cial acted beyond his or her authority. Other Alabama cases have applied the "beyond his or her authority" exception to State-agent immunity in the same manner as *Howard. See Giambrone,* 874 So.2d at 1049 (high school wrestling coach acted beyond his authority and, thus, was not entitled to State-agent immunity when, he violated detailed guidelines prescribing weight classes and permissible wrestling moves for wrestling matches); *see also Ex parte Hayles,* 852 **\*1166** So.2d 117, 121-22 (Ala.2002); *Ala. Dept. of Corrections v. Thompson,* 855 So.2d 1016, 1020-21 (Ala.2003) (warden not entitled to State-agent immunity because he acted beyond his authority in violating an administrative regulation).

The court finds that, contrary to Fleming's argument, the fact that his final judgment of conviction had been vacated, in and of itself, does not equate a finding that the BOPP Defendants acted beyond their authority. To deny the BOPP Defendants State-agent immunity, Fleming must point to a statute, rule or regulation which imposes a non-discretionary duty upon the BOPP Defendants to inquire about the validity of the judgment of conviction prior to initiating parole revocation proceedings. Fleming has failed to do so. The statutes which set forth the BOPP Defendants' responsibilities contain no requirement that a BOPP employee investigate the validity of an otherwise facially-valid underlying judgment of conviction, and no internal policy was in place to that effect.[FN21] (Parker Aff. at 1-2 (Ex. to Doc. No. 37); White Dep. at 90 (Ex. to Doc. No. 59).) Absent any facts that the BOPP Defendants were on notice that the facially-valid judgment of conviction may have been invalid, and absent any statute, rule or regulation which required them to inquire, the court finds that they are entitled to State-agent immunity.

> FN21. To the extent that Fleming argues that Johnson and Riddle, as BOPP policy-makers, should have implemented such a policy, subsection (2) of the *Cranman* formula expressly encompasses this scenario and, thus, bestows them with immunity. *See Howard,* 887 So.2d at 210.

**(Cite as: 434 F.Supp.2d 1138)**

Fleming also contends that the BOPP Defendants are not entitled to State-agent immunity because the United States Constitution, in particular the Fourth and Fourteenth amendments, "requires otherwise." (Doc. No. 62 at 7-10.) As outlined in this memorandum opinion and order, the acts of the BOPP Defendants violated neither the Fourth Amendment nor the Fourteenth Amendment. The court, therefore, finds that they are not deprived of State-agent immunity under the *Cranman* exception which denies immunity to state officials when the United States Constitution "requires otherwise." *Cranman,* 792 So.2d at 405. Because the BOPP Defendants are entitled to State-agent immunity on Fleming's false imprisonment claim, summary judgment is due to be entered in their favor on the state law claim.

B. *Poe's Motion For Summary Judgment*

1. *42 U.S.C. § 1983 Claims and Absolute Prosecutorial Immunity*

Under 42 U.S.C. § 1983, Fleming brings constitutional causes of action against Poe alleging that, while acting under color of law, she subjected him to cruel and unusual punishment and deprived him of liberty without due process of law, in violation of the Eighth and Fourteenth amendments, respectively. (2nd Am.Compl.¶¶ 25-26.) Poe moves for summary judgment based on absolute prosecutorial immunity and, alternatively, qualified immunity.

The court's first task is to ascertain the factual and legal parameters of Fleming's claims against Poe. Initially, the court observes that, unlike the Defendants employed by the BOPP, Poe was a litigant in Fleming's habeas corpus proceedings. There is no dispute that, as counsel of record in that litigation, she received service**1167** of the district court's final judgment and had actual knowledge that Fleming's judgment of conviction had been vacated. Poe also knew that the copy of the recommendation of the magistrate judge which the court

served on Fleming was "returned to sender."

Against this factual background, Fleming predicates his claim "upon [Poe's] failure to communicate th[e] order and its invalidation ... to the appropriate officials of [Poe's] own client, the State of Alabama." (Doc. No. 64 at 4.) Fleming's theory is that Poe had an obligation "to communicate to the appropriate persons within state government," for example, persons within the Department of Corrections and the BOPP, the fact that as a result of the May 5, 1998 federal court order "no agent of her client, the State of Alabama, had any authority or right to detain or interfere with the liberty of [Fleming]." [FN22] (*Id.; see also* Doc. No. 44 at 2-3; Doc. No. 67 at 3-4.) In other words, Fleming's claim is that Poe caused Fleming to remain under the conditions of his parole and ultimately to have his parole revoked through her failure, as the State's legal representative in the habeas corpus litigation, to ensure, through notification to an "appropriate" state official, that Fleming's judgment of conviction had been vacated.

> FN22. One state official whom Poe apparently did not notify was a named respondent, i.e., the warden who had custody over Fleming. Presumably, the warden is one of the individuals whom Fleming is saying would have been an "appropriate" state official. (*See* Doc. No. 64 at 3-4.) The court notes that the other named respondent, the Attorney General of the State of Alabama, was served with a copy of the district court's final judgment vacating Fleming's judgment of conviction. (Final Judgment (Doc. No. 59, Ex. 4).)

In defense of Fleming's claim, Poe raises absolute prosecutorial immunity. Poe contends that her selection of individuals with whom she discussed the court's order was a decision within her prosecutorial discretion and was intimately intertwined with the advocacy decision of whether to file an objection to the recommendation of the magistrate judge or to appeal the federal district court's judgment.[FN23] For instance, Poe points out that the

434 F.Supp.2d 1138
**(Cite as: 434 F.Supp.2d 1138)**

district court's order directed that the State had to retry Fleming, if at all, within 120 days and, that, therefore, she deemed it imperative that she communicate with the district attorney as he was "the only person with the authority to decide whether to re-file the charges against the Fleming within the 120 days allotted by the district court's order." (Doc. No. 66 at 4.)

> FN23. Poe says that "[i]t is not disputed that [her] post-judgment actions consisted of discussing the granting of the habeas petition with her supervisor[,] researching the viability of appealing from the order granting the habeas[,] discussing the granting of the habeas with the district attorney who had prosecuted the underlying case[,] and corresponding with the district attorney by mail." (Doc. No. 66 at 1-2.)

Fleming counters that Poe's failure to notify "the appropriate persons within state government" of the district court's final judgment was purely an administrative failure and that, therefore, Poe is not entitled to absolute prosecutorial immunity. (*See* Doc. No. 67 at 16.) Because Poe's and Fleming's briefs focus primarily on this immunity defense, the court does too, and, for the reasons to follow, the court disagrees with Fleming.

[19][20] "[A] prosecutor enjoys absolute immunity from § 1983 suits for damages when he [or she] acts within the scope of his [or her] prosecutorial duties." *Imbler v. Pachtman,* 424 U.S. 409, 420, 96 **\*1168** S.Ct. 984, 47 L.Ed.2d 128 (1976). The Supreme Court has taken a functional approach to the question of whether prosecutors are absolutely immune from liability under § 1983, explaining that "conduct in 'initiating a prosecution and in presenting the State's case,'... insofar as that conduct is 'intimately associated with the judicial phase of the criminal process' " is entitled to such immunity. *Burns v. Reed,* 500 U.S. 478, 486, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (quoting *Imbler,* 424 U.S. at 430-431, 96 S.Ct. 984); *see also Mullinax v. McElhenney,* 817 F.2d 711, 714-715 (11th Cir.1987) ("prosecutors are entitled to abso-

lute immunity from damages under Section 1983 for all acts 'intimately associated with the judicial phase of the criminal process' ") (quoting *Imbler,* 424 U.S. at 430, 96 S.Ct. 984). Moreover, absolute prosecutorial immunity also extends to a prosecutor's advocacy role in the post-conviction case, *see Bruce v. Wade,* 537 F.2d 850, 852 (5th Cir.1976), and "is not defeated by a showing that a prosecutor acted wrongfully or even maliciously." *Grant v. Hollenbach,* 870 F.2d 1135, 1138 (6th Cir.1989).

[21] On the other hand, absolute immunity does not extend to a prosecutor engaged in essentially investigative or administrative functions. *See Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) ("A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity."); *Burns,* 500 U.S. at 489-90, 111 S.Ct. 1934 (denying absolute immunity to prosecutor who gave legal advice to law enforcement officials in connection with investigative techniques). Thus, when a prosecutor functions as an administrator rather than as an officer of the court, the prosecutor is only entitled to qualified immunity. *See id.; see also Mullinax,* 817 F.2d at 715.

In *Buckley,* the court drew a bright-line rule that prosecutors are not absolutely protected from functions performed before probable cause exists; thus, it held that prosecutors perform investigative functions, and, do not act as advocates so as to entitle them to absolute immunity, for allegedly making false statements at press conferences and purportedly fabricating evidence during a grand jury investigation, prior to any finding of probable cause. *See Buckley,* 509 U.S. at 272-78, 113 S.Ct. 2606. *Buckley,* though, did not provide guidance for determining what investigative and administrative functions are absolutely protected after probable cause is established, although the court recognized that, even after a finding of probable cause, a prosecutor can perform functions that would be investigative or administrative and, thus, not absolutely protected. *See id.* at 274 n. 5, 113 S.Ct. 2606.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

434 F.Supp.2d 1138
**(Cite as: 434 F.Supp.2d 1138)**

While it is clear based on the Supreme Court's "function test" articulated in *Imbler, Burns* and *Buckley* that a prosecutor is not entitled to absolute immunity simply because of his or her status as a prosecutor, *see, e.g., Buckley,* 509 U.S. at 273, 113 S.Ct. 2606, it is not always clear when a prosecutor's post-probable cause actions are not those of a prosecutor, but those of an administrator. The Supreme Court itself has recognized that "[a]t some point ... the prosecutor no doubt functions as an administrator rather than as an officer of the court" and that "[d]rawing a proper line between these functions may present difficult questions." *Id.* at 276 n. 7, 113 S.Ct. 2606.

Neither party has cited any cases where a court either granted or denied absolute **\*1169** immunity for a prosecutor under similar circumstances. The court, though, through its independent research, found three cases where courts found that prosecutors were entitled to prosecutorial immunity for failing to provide notice of court orders to affected parties. Although the decisions are not squarely on point or binding, they are instructive. *See Brooks v. George County,* 84 F.3d 157 (5th Cir.1996); *Pusey v. City of Youngstown,* 11 F.3d 652 (6th Cir.1993); *Holsey v. Hind,* 189 Ga.App. 656, 377 S.E.2d 200 (1988).

In *Brooks,* a pretrial detainee remained incarcerated in a county jail for eight months after the charges against him had been dismissed. *See*84 F.3d at 160. Unbeknownst to the pretrial detainee, the district attorney orally moved for dismissal of the charges pursuant to a *nolle prosequi* order, and the court granted the motion. *See id.* at 161. The pretrial detainee did not learn of the order until eight months after its entry at which time he was released. *See id.* The pretrial detainee alleged that the district attorney in charge of the prosecution deprived him of liberty, in violation of the Fourteenth Amendment, by failing to notify the pretrial detainee's attorney of the *nolle prosequi* motion, allegedly in violation of state procedural rules. *See id.* at 167.

The Fifth Circuit, held that assuming *arguendo* that the district attorney violated the state procedur-

al rule, the prosecutor was absolutely immune from liability in his individual capacity. *See id.* at 168. The court reasoned that the prosecutor's actions "of requesting that the court enter an order of *nolle prosequi* of [the pretrial detainee's] criminal charges, of having an order prepared for the court that memorialized the same, and the forwarding of such order to the clerk for filing are all prosecutorial activities 'intimately associated with the judicial phase of the criminal process.' " *Id.* (quoting *Imbler,* 424 U.S. at 430, 96 S.Ct. 984).

In *Pusey,* which involved, among other claims, a § 1983 Fourteenth Amendment substantive due process claim, the plaintiff, as a crime victim, alleged that the prosecutor failed to notify her of a hearing date and of the fact that the defendant's charge could be reduced at that hearing. *See*11 F.3d at 656. The plaintiff contended that the prosecutor was not absolutely immune "for failing to give notice to her because the duty to notify was an investigative or administrative duty." *Id.* at 658. The court rejected her contention, holding that the prosecutor's failure to inform the plaintiff of the hearing was "within the prosecutor's function as an advocate for the state as it is intimately associated with the judicial phase of the criminal process." *Id.* The court continued:

The court hearing where the charge was reduced ... involved a judicial act. Furthermore, the prosecutor's determination to notify or failure to notify is intimately associated with the hearing and is simply a litigation-related duty. Giving notice to witnesses, victims or defendants is certainly one of those core prosecutorial functions which is protected by absolute immunity. Indeed, plaintiff's desire to attend the reduction hearing arose because she wanted to object to the plea arrangement and persuade the prosecutor and the judge to bind defendant ... over to the grand jury. Her very desire in attending the hearing illustrates that the prosecutor's duty, as related to giving her notification for the reduction hearing, involved duties where the prosecutor functioned as an advocate of the state and duties which are intimately**\*1170** associated with the criminal process.

Thus, the District Court correctly determined

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

434 F.Supp.2d 1138
**(Cite as: 434 F.Supp.2d 1138)**

that [the prosecutor] is entitled to absolute immunity from suit in her personal capacity and we affirm the order dismissing all claims against [the prosecutor] in her personal capacity.

*Id.* at 658-59. The Sixth Circuit held that the prosecutor was entitled to absolute immunity from suit in her individual capacity on all § 1983 claims. *See id.* at 659.

Finally, in *Holsey,* an arrestee was held in jail for 40 days without cause because the district attorney's office failed to serve the arrestee or his counsel with a copy of the written motion and order which dismissed the charges for insufficient evidence. *See*377 S.E.2d at 200. The arrestee brought an action for damages against the district attorney, alleging that it was the district attorney's custom and practice not to comply with a statutory duty which required the district attorney to notify a defendant or his lawyer of such dismissal orders. *See id.* at 200-01.

Holding that the district attorney was entitled to absolute immunity under state law, the court relied on the teachings of the Supreme Court's decision in *Imbler, supra.* The court held that the prosecutor's conduct was intimately associated with the judicial phase of the criminal process and was, therefore, within the scope of absolute prosecutorial immunity. The court reasoned:

This issue cannot be resolved merely by inquiry into whether the alleged breach of duty involved an exercise of judgment or discretion on the part of the appellee or his assistants. No one, for example, would seriously contend that a decision by a prosecutor on such a matter as hiring or firing a secretary would be anything other than administrative, although such a decision would obviously involve an exercise of judgment or discretion connected with the duties of his office. The determining factor instead appears to be whether the act or omission is " 'intimately associated with the judicial phase of the criminal process.' " *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), citing *Imbler v. Pachtman, supra,* 424 U.S. at 430-431, 96 S.Ct. at 995-96.

Pursuant to this rationale, we conclude that although the failure to serve the appellant or his counsel with a copy of the motion and order resulting in the dead-docketing of the charges may not have involved the exercise of any prosecutorial discretion or judgment, such conduct, being intimately associated with the judicial phase of the criminal process, was nevertheless within the scope of the appellee" absolute prosecutorial immunity.

*Id.* at 657.

In *Brooks* and *Holsey,* the district attorneys arguably violated state rules in failing to notify pretrial detainees that the charges against them had been dismissed. As a result, each detainee remained in jail much longer than legally required. *Pusey* involved a prosecutor's failure to notify a crime victim of a court hearing where the offender's charges were reduced. In each case, the prosecutor was entitled to judicial immunity because the alleged failures to give proper notice were closely related to the judicial phase of the criminal proceedings.

Here, similarly, Fleming complains of Poe's failure to give proper notice. As stated, Fleming complains that Poe failed **\*1171** to "communicate" to an "appropriate" state official that, based on the federal district court's final judgment, Fleming must be released from the attendants of his underlying judgment of conviction, including his parole restrictions and incarceration. (Doc. No. 64 at 4.)

[22] Assuming *arguendo* that Poe's failure to notify an "appropriate" state official breached Poe's duties as an attorney for the State of Alabama or even violated a state rule or regulation, the court finds that Poe's alleged misconduct was inextricably intertwined with her prosecutorial role in the post-conviction proceedings and, in particular, with her assessment of whether to appeal. Poe's conduct in examining the recommendation of the magistrate judge, discussing the implications of its directives with the district attorney, and researching whether the law supported the magistrate judge's conclusion are prosecutorial activities "intimately associated with the judicial phase of the [post-conviction] pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

434 F.Supp.2d 1138
**(Cite as: 434 F.Supp.2d 1138)**

cess." *Burns,* 500 U.S. at 486, 111 S.Ct. 1934 (quoting *Imbler,* 424 U.S. at 430-431, 96 S.Ct. 984). The failure to serve cannot be separated from Poe's prosecutorial decisions as an advocate of the state and, thus, cannot be characterized as merely an administrative act. The court, therefore, finds that Poe is entitled to prosecutorial immunity on Fleming's 42 U.S.C. § 1983 claims against her.FN24

> FN24. Alternatively, the court finds that Poe is entitled to qualified immunity, as Fleming has not demonstrated that Poe's conduct violated clearly established constitutional rights of which a reasonable person should have known. *See Harlow,* 457 U.S. at 818, 102 S.Ct. 2727; *see also Rich,* 841 F.2d at 1563.

#### 2. State Law Claim for False Imprisonment and State-agent Immunity

[23] The court finds that Poe also is entitled to absolute immunity under state law. Immunity for prosecutors under state law "is at least as broad as the immunity under a § 1983 action." *Bogle v. Galanos,* 503 So.2d 1217, 1219 (Ala.1987). Alternatively, the court finds that Poe is entitled to State-agent immunity on the false imprisonment claim. (Doc. No. 53 at 15-20; Doc. No. 66 at 6.) Poe was "exercising judgment in the enforcement of the criminal laws of the State" during her representation of the respondents in Fleming's habeas corpus litigation, *Cranman,* 792 So.2d at 405, and Fleming has not demonstrated that any of the exceptions to State-agent immunity apply in this case. Accordingly, summary judgment is due to be entered in Poe's favor on the false imprisonment claim.

### VI. ORDER

For the foregoing reasons, it is CONSIDERED and ORDERED that the motion for summary judgment (Doc. No. 57) filed by Defendants Eddie Dowdell, Johnnie Johnson, Donald Parker, Gladys Riddle and Martha White be and the same is hereby GRANTED.

It is further CONSIDERED and ORDERED that the motion for summary judgment (Doc. No. 52) filed by Defendant Beth Poe be and the same is hereby GRANTED.

M.D.Ala.,2005.
Fleming v. Dowdell
434 F.Supp.2d 1138

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

883 F.Supp. 618
**(Cite as: 883 F.Supp. 618)**

**C**

Browning v. City of Wedowee, Ala.
M.D.Ala.,1995.

United States District Court,M.D. Alabama,Eastern
Division.
Marva Jo BROWNING, et al., Plaintiffs,
v.
CITY OF WEDOWEE, ALABAMA, et al., De-
fendants.
**Civ. A. No. 93-D-1406-E.**

March 6, 1995.

Homeowners brought § 1983 action against city
and county law enforcement officers for conducting
search of home to allegedly "stop all those blacks
coming up here to the house." The District Court,
De Ment, J., held that: (1) sheriff and deputies had
immunity from claims against them in their official
capacities; (2) there was triable issue as to whether
officials could be held personally liable for conduct
stemming from their official actions; and (3)
homeowners had adequate postdeprivation remedy
for their claim that continued retention of weapon
confiscated during search violated § 1983.

Motions to dismiss granted in part and denied in
part.

West Headnotes

**[1] Federal Civil Procedure 170A ⟨⟩1835**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1827 Determination
                    170Ak1835 k. Matters Deemed Ad-
mitted. Most Cited Cases
When ruling on motion to dismiss for failure to
state claim, court must assume that factual allega-
tions in complaint are true. Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⟨⟩1773**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)3 Pleading, Defects In, in Gen-
eral
                170Ak1773 k. Clear or Certain Nature
of Insufficiency. Most Cited Cases
Assuming that facts are true, complaint may be dis-
missed for failure to state claim only if it is clear
that no relief could be granted under any set of facts
that could be proved consistent with allegations.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Federal Courts 170B ⟨⟩265**

170B Federal Courts
    170BIV Citizenship, Residence or Character of
Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk264 Suits Against States
                170Bk265 k. Eleventh Amendment in
General; Immunity. Most Cited Cases

**Federal Courts 170B ⟨⟩266.1**

170B Federal Courts
    170BIV Citizenship, Residence or Character of
Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk266 Waiver of Immunity
                170Bk266.1 k. In General. Most Cited
Cases
Suit against state by citizens of that state for money
damages is barred under Eleventh Amendment un-
less state has specifically waived its immunity from
tort. U.S.C.A. Const.Amend. 11.

**[4] Civil Rights 78 ⟨⟩1376(3)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-

ficers

78k1376(3) k. States and Territories and Their Officers and Agencies. Most Cited Cases
(Formerly 78k214(3))

Section 1983 will not override state's sovereign immunity, and, thus citizens of state may not seek money damages from that state under § 1983. 42 U.S.C.A. § 1983.

## [5] Federal Courts 170B ⬤⟶269

170B Federal Courts
170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
170BIV(A) In General
170Bk268 What Are Suits Against States
170Bk269 k. State Officers or Agencies, Actions Against. Most Cited Cases

## Sheriffs and Constables 353 ⬤⟶97

353 Sheriffs and Constables
353III Powers, Duties, and Liabilities
353k97 k. Liabilities for Official Acts in General. Most Cited Cases

Under Alabama law, sheriff is executive officer of state and is thus entitled to immunity under Eleventh Amendment and Alabama Constitution. Ala. Const. Art. 1, § 14; U.S.C.A. Const.Amend. 11.

## [6] Civil Rights 78 ⬤⟶1354

78 Civil Rights
78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1354 k. In General. Most Cited Cases
(Formerly 78k207(1))

Plaintiff in § 1983 action may seek injunctive relief against state official in his or her official capacity. 42 U.S.C.A. § 1983.

## [7] Civil Rights 78 ⬤⟶1354

78 Civil Rights
78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1354 k. In General. Most Cited Cases
(Formerly 78k207(1))

State official may be held personally liable in § 1983 action for conduct ensuing from his or her official capacity. 42 U.S.C.A. § 1983.

## [8] Civil Rights 78 ⬤⟶1304

78 Civil Rights
78III Federal Remedies in General
78k1304 k. Nature and Elements of Civil Actions. Most Cited Cases
(Formerly 78k192)

To establish cognizable claim under § 1983, plaintiff must establish that he or she suffered deprivation of rights, privileges or immunities secured by constitution and laws of United States and that person acting under color of law caused deprivation, either by act or omission. 42 U.S.C.A. § 1983.

## [9] Civil Rights 78 ⬤⟶1088(3)

78 Civil Rights
78I Rights Protected and Discrimination Prohibited in General
78k1088 Police, Investigative, or Law Enforcement Activities
78k1088(3) k. Searches and Seizures. Most Cited Cases
(Formerly 78k132.1)

Claims that sheriff and deputy sheriffs violated constitutional rights of white homeowners by conducting harassing search to stop "blacks coming up here to the house" stated an actionable claim under § 1983 for which the sheriff and deputies could be held liable merely because of their positions as such. U.S.C.A. Const.Amends. 4, 5, 14; 42 U.S.C.A. § 1983.

## [10] Civil Rights 78 ⬤⟶1358

78 Civil Rights
78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases
(Formerly 78k207(2))

Law enforcement officer may be liable for his nonfeasance even though doctrine of respondeat superi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or is inapplicable to hold supervisor liable for acts of subordinates. 42 U.S.C.A. § 1983.

**[11] Constitutional Law 92 ⚖4460**

92 Constitutional Law
   92XXVII Due Process
       92XXVII(G) Particular Issues and Applications
         92XXVII(G)23 Search, Seizure, and Confiscation
           92k4460 k. In General. Most Cited Cases
   (Formerly 92k319.5(1))

**Searches and Seizures 349 ⚖84**

349 Searches and Seizures
   349I In General
       349k84 k. Disposition of Property Seized. Most Cited Cases
In light of Alabama statute providing tort remedy for unlawful deprivation or interference with owner's possession of personalty, there was no procedural due process violation in officers' continued retention of weapon seized from homeowners' during allegedly illegal search. Ala.Code 1975, §§ 6-5-260, 41-9-60; U.S.C.A. Const.Amends. 4, 5, 14.

**\*619** Marcus W. Reid, Anniston, AL, for plaintiffs. Roianne H. Frith, Montgomery, AL, guardian ad litem.
C. David Stubbs, Anniston, AL, for defendants City of Wedowee and Ed Hay.
Daryl L. Masters, Lynn H. Durham, Montgomery, AL, for defendants Collins, Dillard, Surrett and Randolph County.

*MEMORANDUM OPINION AND ORDER*

DE MENT, District Judge.

   Before the court is Sheriff Larry Collins and Deputy Sheriffs William Dillard and Tim Surrett's motion to dismiss filed January 18, 1994. The plaintiffs filed a response on February 9, 1994. After careful consideration of **\*620** the arguments of counsel, the caselaw and the record as a whole,

the court finds that the defendants' motion is due to be granted in part and denied in part.

JURISDICTION

   The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343 (civil rights jurisdiction) and 28 U.S.C. § 1331 (federal question jurisdiction). This court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the plaintiffs' state law claims. The parties do not contest personal jurisdiction or venue.

STANDARD OF REVIEW

   [1][2] When ruling on a motion to dismiss for failure to state a claim, the court must assume that the factual allegations in the complaint are true. *Neitzke v. Williams,* 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); Fed.R.Civ.P. 12(b)(6). Assuming that the facts are true, a complaint may be dismissed under Fed.R.Civ.P. 12(b)(6) only "if it is clear that no relief could be granted" under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

PARTIES

   (1) Plaintiffs Marva Jo Browning and Rhonda Sue Baird are citizens of Randolph County, Alabama.

   (2) Plaintiff Reshawnda Maria Baird is a minor child, who was five years old on the day in question and sues by and through her mother, Rhonda Sue Baird.

   (3) Defendant City of Wedowee is a municipal corporation lawfully organized under the laws of the State of Alabama.

   (4) Defendants Randolph County Sheriff Larry Collins and Randolph County Deputy Sheriffs William Dillard and Tim Surrett are citizens of Randolph County, Alabama.[FN1]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

883 F.Supp. 618
**(Cite as: 883 F.Supp. 618)**

FN1. The complaint also names Randolph County as a defendant in this action. The court, however, dismissed this defendant in its order filed January 26, 1994.

(5) Defendant Ed Hay [FN2], the Chief of Police of the City of Wedowee Police, is a citizen of Randolph County, Alabama.

FN2. Ed Hay's name is misspelled in the original complaint. The plaintiffs corrected this error in an amendment filed March 22, 1994.

FACTS

Construing all the allegations of the complaint as true, the court finds the following facts controlling in this action:

On November 29, 1991, law enforcement officers from the City of Wedowee and Randolph County [FN3], Alabama entered the plaintiffs' home in Wedowee, Alabama to execute a search warrant. Pl.'s Compl. at ¶ 3. The complaint charges that the law enforcement officers conducted the search and "prosecution" because the plaintiffs, "who are white, associate with black members of the community." Pl.'s Compl. at ¶ 4. Specifically, the plaintiffs allege that Chief of Police Ed Hay told the plaintiffs that he was " 'going to stop all those blacks coming up here [to the house].' " *Id.* In executing the search warrant, the law enforcement officers allegedly used "excessive force in entering the plaintiffs' home, and caused unnecessary physical damage to said home in effecting entry." *Id.*

FN3. Randolph County encompasses the City of Wedowee.

Moreover, the complaint alleges that Deputy Sheriff William Dillard pointed a weapon in the minor plaintiff's face, "causing her great mental anguish, anxiety and emotional and distress...." *Id.* at ¶ 5. The plaintiffs contend that the deputy sheriff, who is black, pointed the weapon at the child because she is biracial. Pursuant to the search, the law enforcement officers confiscated a .25 caliber

weapon, "without just or legal cause, and refused to return same to the plaintiffs upon request." *Id.* at ¶ 6.

Count I of the complaint alleges the following violations of the United States Constitution, as enforced by 42 U.S.C. § 1983: (1) deprivation of due process of law and equal protection under the fifth and fourteenth amendments of the United States Constitution; (2) unreasonable search and seizure in violation of the Fourth Amendment; (3) excessive **621** force under the Fourth Amendment.FN4 The plaintiffs also raise pendent state law claims of the tort of conversion (Count II), the tort of outrage (Count III), invasion of privacy (Count IV), civil assault (Count V), false arrest (Count VI) and abuse of process (Count VII).

FN4. Count I alleges a violation of due process and equal protection, "as well as other rights secured" under the United States Constitution. Pl.'s Compl. at ¶ 8. While not specifically mentioned in Count I, the language of the complaint clearly indicates that the plaintiffs also seek vindication for excessive force and an unreasonable search and seizure.

**DISCUSSION**

The defendants challenge the allegations in the complaint, asserting that (1) the Eleventh Amendment prohibits § 1983 actions for monetary relief against state officials sued in their official capacities; (2) that the defendants are not subject to a personal-capacity lawsuit because their alleged actions were taken in their official capacities as sheriff and deputy sheriffs; (3) that under § 1983 the sheriff (Larry Collins) may not be held vicariously liable for the acts of the deputy sheriffs; (4) and that an action for continued detention of property in violation of procedural due process is not actionable because the State of Alabama affords an adequate postdeprivation remedy.

*I. Eleventh Amendment Immunity*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[3] In determining whether a plaintiff has stated a claim, a court must determine whether it has jurisdiction to award the relief demanded. The Eleventh Amendment to the United States Constitution defines the initial parameters of the court's jurisdiction to entertain the plaintiff's claim for relief. The Eleventh Amendment [FN5] bars suits for money damages against a state by the citizens of that state, unless the state has specifically waived its immunity from tort. *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 98-100, 104 S.Ct. 900, 906-07, 79 L.Ed.2d 67 (1984).

> FN5. The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The protection afforded under the Eleventh Amendment also extends to actions brought by a state's own citizens in federal court. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

[4][5][6] Because § 1983 does not override a state's sovereign immunity, the plaintiffs may not seek money damages from the State of Alabama. The Supreme Court of Alabama has held that a sheriff is an executive officer of the state and, thus, is entitled to immunity under the Eleventh Amendment and the Alabama Constitution, Art. 1, § 14. *Parker v. Amerson,* 519 So.2d 442 (Ala.1987). This immunity extends to deputy sheriffs because of their "traditional function under Alabama law as the Sheriff's alter ego." *Carr v. City of Florence,* 916 F.2d 1521, 1527 (11th Cir.1990). While a plaintiff may seek injunctive relief against a state official in his or her official capacity, the plaintiffs in this case do not seek such relief. *See generally Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Accordingly, the motion to dismiss is due to be granted as to the plaintiffs' § 1983 claims against Sheriff Larry Collins and Deputy Sheriffs William Dillard and Tim Surrett in their official capacities.

## II. *Personal Liability*

The caption of the complaint indicates that the plaintiffs are suing the defendants in both their official and individual capacities. The defendants argue that all actions referred to in the complaint arise out of actions taken by the defendants "by virtue of their offices" as sheriff and deputy sheriffs. Mot. to Dismiss at ¶¶ 3, 7. Hence, the defendants argue that the complaint's allegations are tantamount to a suit against them only in their official capacities, thereby giving rise to eleventh amendment immunity.

[7] In *Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), the appellant unsuccessfully proposed the same argument to the Supreme Court of the United States:

Hafer seeks to overcome the distinction between official-and personal-capacity suits by arguing that § 1983 liability turns not on the capacity in which state officials are *622 sued, but on the capacity in which they acted when injuring the plaintiff. Under *Will,* [FN6] she asserts, state officials may not be held liable in their personal capacity for actions they take in their official capacity. Although one Court of Appeals has endorsed this view, see *Cowan v. University of Louisville School of Medicine,* 900 F.2d 936, 942-943 (CA6 1990), we find it both unpersuasive as an interpretation of § 1983 and foreclosed by our prior decisions.

> FN6. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

Through § 1983, Congress sought "to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position." *Monroe v. Pape,* 365 U.S. 167, 172, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961). Accordingly, it authorized suits to redress deprivations of civil rights by persons acting "under color of any [state] statute, ordinance, regulation, custom, or usage." 42 U.S.C. § 1983. The requirement of action under color of state law means that Hafer may be liable for discharging respondents precisely because

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of her authority as Auditor General. We cannot accept the novel proposition that this same official authority insulates Hafer from suit.

*Id.* at 27-28,112 S.Ct. at 363 (emphasis in original) (footnote added). Accordingly, the court finds that a state official may be held personally liable for conduct ensuing from his or her official capacity.

[8] Moreover, the court finds that if established as true, the factual allegations could lead to liability under 42 U.S.C. § 1983, precluding the granting of the motion to dismiss. To establish a cognizable claim under § 1983, the plaintiff must establish two elements: (1) that he or she suffered a deprivation of "rights, privileges or immunities secured by the Constitution and laws" of the United States, and (2) that a person "acting under color of law" caused the deprivation, either by an act or omission. *Wideman v. Shallowford Community Hosp., Inc.,* 826 F.2d 1030, 1031 (11th Cir.1987) (citations omitted).

[9] Here, the complaint charges that defendants at all times "... act[ed] as agents, servants or employees of Randolph County and within the line and scope of their duties as such officers," Pl.s' Compl. at ¶ 3. Hence, just as in *Hafer,* the defendants Larry Collins, William Dillard and Tim Surrett may be held liable merely because of their positions as sheriff and deputy sheriffs. The plaintiffs' complaint further provides that these defendants violated their constitutional rights, as safeguarded by the fourth, fifth and fourteenth amendments. Accordingly, the court finds that if at trial, the plaintiffs prove that the defendants were acting under color of state law and violated the plaintiffs' constitutional rights, then liability under § 1983 would attach.

The defendants, however, also have raised the defense of qualified immunity, a personal defense which protects public officials from liability in the performance of their discretionary duties. Mot. to Dismiss at ¶ 8. The court will reserve ruling on the issue of qualified immunity in order to allow the parties to present briefs in support of their respective positions.

## III. *Respondeat Superior*

[10] In addition, the defendants assert that contrary to the allegations set forth in the complaint, Sheriff Larry Collins, as a supervisor, cannot be held liable for the acts of his employees solely on the basis of respondeat superior (i.e., vicarious liability). *McLaughlin v. City of LaGrange,* 662 F.2d 1385, 1388 (11th Cir.1981), *cert. denied,* 456 U.S. 979, 102 S.Ct. 2249, 72 L.Ed.2d 856 (1982). While the court agrees that the doctrine of respondeat superior is inapplicable to hold a supervisor liable for the acts of subordinates, a law enforcement officer may be liable for his or her nonfeasance. *See Fundiller v. City of Cooper City,* 777 F.2d 1436, 1441-42 (11th Cir.1985) ("It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983. Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of **\*623** another officer's use of excessive force, can be held liable for his nonfeasance.") FN7

> FN7. The second circuit recently revisited the concept of passive participation in *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994), holding: "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens for infringement by other law enforcement officers in their presence.... An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used ...; (2) that a citizen has been unjustifiably arrested ...; or (3) that any constitutional violation has been committed by a law enforcement official...."

## IV. *Continued Detention of Property*

Finally, the defendants contend that the plaintiffs may not seek relief under § 1983 for the continued retention of the .25 caliber weapon con-

fiscated on the day in question. In *Lindsey v. Storey,* 936 F.2d 554 (11th Cir.1991)[FN8], the Eleventh Circuit held that no procedural due process violation occurs "... as long as *some* adequate postdeprivation remedy is available." *Id.* at 561 (emphasis in original). In that case, the substantive law of the State of Georgia governed. The Eleventh Circuit found that Georgia's civil cause of action for wrongful conversion of personal property was an adequate postdeprivation remedy, thus holding that law enforcement officers' prolonged retention of the confiscated money and jewelry did not violate the appellants' procedural due process rights.

> FN8. The defendants cite this case as supporting authority.

[11] Likewise, the Alabama legislature has created a statute providing a tort remedy for the unlawful deprivation or interference with an owner's possession of personalty. Ala.Code § 6-5-260 (1975). Moreover, an aggrieved person may file a claim with the state Board of Adjustment to recover damages to property caused by the state of Alabama or any of its agencies. Ala.Code § 41-9-60 (1975). Therefore, under the authority of *Lindsey,* the court finds that the plaintiffs have access to adequate post-deprivation remedies and could not under any set of facts succeed on a claim that the continued retention of the .25 caliber pistol violates their procedural due process rights.

## CONCLUSION

Accordingly, it is CONSIDERED and ORDERED as follows:

(1) that as to the plaintiffs' § 1983 claims against the defendants-Sheriff Larry Collins, Deputy Sheriffs William Dillard and Tim Surrett-in their official capacities, the defendants' motion to dismiss be and the same is hereby GRANTED.

(2) that as to the defendants' assertion that the plaintiffs' § 1983 claims against them in their personal capacities is not cognizable, the defendants' motion to dismiss be and the same is hereby DENIED.

(3)(a) that the defendants-Sheriff Larry Collins, Deputy Sheriffs William Dillard and Tim Surrett-are to file briefs in support of their defense of qualified immunity on or before March 20, 1995;

(b) that the plaintiffs are to file any reply briefs on or before March 31, 1995;

(4) that as to the plaintiffs' claim that the continued retention of their property constitutes a violation of procedural due process, the defendants' motion to dismiss be and the same is hereby GRANTED;

(5) that the guardian ad litem, Ms. Roianne Frith, previously appointed by the court to represent the interests of the minor child involved, actively participate with the attorney for the plaintiffs in the future preparation of this case.

M.D.Ala.,1995.
Browning v. City of Wedowee, Ala.
883 F.Supp. 618

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

936 F.2d 554                                                                 Page 1
936 F.2d 554
**(Cite as: 936 F.2d 554)**

**C**

Lindsey v. Storey
C.A.11 (Ga.),1991.

United States Court of Appeals,Eleventh Circuit.
Brenda LINDSEY, Melvyn Williams, Plaintiffs-
Appellants,
v.
Larry STOREY, Indiv. and as a member of the
Georgia State Patrol, Marty Smith, Ind. and as an
investigator for the Sheriff of Monroe County, GA,
Does I, II and III, Indiv. and as law enforcement of-
ficials of Monroe County, GA and elsewhere, De-
fendants-Appellees, Third-Party Plaintiffs,
United States of America, Third-Party Defendant.
**Nos. 90-8692, 90-8777.**

July 23, 1991.

Car passengers and owner brought action against
patrol officer and sheriff's lieutenant for wrongful
seizure and retention of property, false arrest, and
wrongful detention. The United States District
Court for the Middle District of Georgia, No. CIV-
88-322-01-MAC(WDO), Wilbur D. Owens, Jr.,
Chief Judge, entered summary judgment in favor of
officer and lieutenant. Owner and passengers ap-
pealed. The Court of Appeals, Edmondson, Circuit
Judge, held that: (1) patrol officer was entitled to
qualified immunity from liability for seizing car
and cash, but did not show right to qualified im-
munity from liability for seizing passenger's jew-
elry; (2) civil action for wrongful conversion of
personal property was adequate postdeprivation
remedy, and, thus, no procedural due process viola-
tion occurred; and (3) lieutenant was entitled to
qualified immunity from liability for false arrest.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Automobiles 48A ☞349.5(12)**

48A Automobiles
    48AVII Offenses

48AVII(B) Prosecution
    48Ak349.5 Search or Seizure Consequent
to Arrest, Stop or Inquiry
        48Ak349.5(5) Object, Product, Scope,
and Conduct of Search or Inspection
            48Ak349.5(12) k. Time and Place;
Impoundment, Inventory, or Booking Search. Most
Cited Cases
Car could be seized and impounded after arrest of
driver, where passengers had no proof of insurance,
and where one passenger had no driver's license.
U.S.C.A. Const.Amend. 4.

**[2] Automobiles 48A ☞349.5(10)**

48A Automobiles
    48AVII Offenses
        48AVII(B) Prosecution
    48Ak349.5 Search or Seizure Consequent
to Arrest, Stop or Inquiry
        48Ak349.5(5) Object, Product, Scope,
and Conduct of Search or Inspection
            48Ak349.5(10) k. Weapons; Pro-
tective Searches; Pat-Down. Most Cited Cases
Driver's statement that occupants of other car in-
volved in accident offered driver approximately
$2,500 in cash not to report accident to police gave
patrol officer reasonable suspicion of illegal activ-
ity and justified brief pat down of passenger for
weapons. U.S.C.A. Const.Amend. 4; O.C.G.A. §
40-6-274.

**[3] Searches and Seizures 349 ☞178**

349 Searches and Seizures
    349V Waiver and Consent
        349k173 Persons Giving Consent
            349k178 k. Family Members. Most Cited
Cases
Driver had apparent authority to permit search of
his sister's car. U.S.C.A. Const.Amend. 4.

**[4] Automobiles 48A ☞349(17)**

48A Automobiles
    48AVII Offenses

48AVII(B) Prosecution
    48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
      48Ak349(14) Conduct of Arrest, Stop, or Inquiry
        48Ak349(17) k. Detention, and Length and Character Thereof. Most Cited Cases
Investigative detention for several minutes to search car was sufficiently brief to be justifiable on basis of reasonable suspicion, rather than probable cause, following statement of other motorist that occupants of the car had offered him $2,500 not to report accident and search of one passenger produced $2,600. U.S.C.A. Const.Amend. 4.

**[5] Civil Rights 78 ⚖1376(6)**

78 Civil Rights
    78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
        78k1376 Government Agencies and Officers
          78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
    (Formerly 78k214(6))
Qualified immunity shields law enforcement officers performing discretionary functions from suit for all violations except those of clearly established law. 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 ⚖1376(6)**

78 Civil Rights
    78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
        78k1376 Government Agencies and Officers
          78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
    (Formerly 78k214(6))
Patrol officer had arguably reasonable suspicion to search car after being informed of occupants' offer of approximately $2,500 in cash not to report accident to police and after finding $2,600 in cash on one passenger, and, thus, patrol officer was entitled

to qualified immunity from liability for seizing money found in car; no one claimed the cash, and it was accompanied by handwritten receipts strikingly similar to receipt accompanying cash found in passenger's pocket. 42 U.S.C.A. § 1983; U.S.C.A. Const.Amend. 4; O.C.G.A. § 40-6-274.

**[7] Civil Rights 78 ⚖1376(6)**

78 Civil Rights
    78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
        78k1376 Government Agencies and Officers
          78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
    (Formerly 78k214(6))
Qualified immunity of patrol officer and sheriff's lieutenant from liability in § 1983 suit did not relieve officer and lieutenant of liability in official capacity. 42 U.S.C.A. § 1983.

**[8] Automobiles 48A ⚖349.5(5.1)**

48A Automobiles
    48AVII Offenses
      48AVII(B) Prosecution
        48Ak349.5 Search or Seizure Consequent to Arrest, Stop or Inquiry
          48Ak349.5(5) Object, Product, Scope, and Conduct of Search or Inspection
            48Ak349.5(5.1) k. In General. Most Cited Cases
    (Formerly 48Ak349.5(5))
Patrol officer's knowledge that car occupants had offered approximately $2,500 in cash to driver not to report accident to police and that occupants had conflicting stories about their ultimate destination did not provide reasonable suspicion to seize one passenger's jewelry; the jewelry had no apparent connection to suspected drug activity or attempted payoff of other driver. U.S.C.A. Const.Amend. 4; O.C.G.A. § 40-6-274.

**[9] Federal Courts 170B ⚖949.1**

170B Federal Courts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

936 F.2d 554

936 F.2d 554

**(Cite as: 936 F.2d 554)**

170BVIII Courts of Appeals
170BVIII(L) Determination and Disposition of Cause
170Bk949 Mandate and Effect of Decision in Lower Court
170Bk949.1 k. In General. Most Cited Cases
(Formerly 170Bk949)
Court of Appeals' conclusion that patrol officer inadequately justified seizure of car passenger's jewelry and was not entitled to summary judgment did not preclude officer from offering further evidence on remand-through motion or at trial-that would support finding of reasonable suspicion justifying seizure of jewelry. U.S.C.A. Const.Amend. 4.

**[10] Constitutional Law 92 ⟶4460**

92 Constitutional Law
92XXVII Due Process
92XXVII(G) Particular Issues and Applications
92XXVII(G)23 Search, Seizure, and Confiscation
92k4460 k. In General. Most Cited Cases
(Formerly 92k319.5(1))
Civil action for wrongful conversion of personal property was adequate, postdeprivation remedy for owner to recover car seized by patrol officer and for passengers to recover cash and jewelry seized by patrol officer, and, thus, no procedural due process violation occurred, whether or not forfeiture proceedings were ever initiated. O.C.G.A. § 51-10-1; U.S.C.A. Const.Amends. 5, 14.

**[11] Constitutional Law 92 ⟶4078**

92 Constitutional Law
92XXVII Due Process
92XXVII(G) Particular Issues and Applications
92XXVII(G)3 Property in General
92k4078 k. Forfeitures and Proceedings Therefor. Most Cited Cases
(Formerly 92k303)
Drug Enforcement Administration's (DEA's) for-

feiture proceedings provided postdeprivation avenue for recovery of cash and jewelry seized by patrol officer, and, thus, no procedural due process violation occurred. U.S.C.A. Const.Amends. 5, 14.

**[12] Civil Rights 78 ⟶1319**

78 Civil Rights
78III Federal Remedies in General
78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
78k1319 k. Criminal Law Enforcement; Prisons. Most Cited Cases
(Formerly 78k209)
Availability of postdeprivation remedy did not negate claim that patrol officer's seizure of property violated Fourth Amendment. U.S.C.A. Const.Amend. 4.

**[13] Civil Rights 78 ⟶1376(6)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
(Formerly 78k214(6))
Sheriff's lieutenant had reasonable belief that he had probable cause for arrest of car passenger and, therefore, was entitled to qualified immunity from § 1983 liability for false arrest, where passenger denied knowledge or ownership of more than $2,500 in cash offered to driver of other car if driver agreed not to report accident to police, where about $2,600 in cash was found in passenger's pocket, where passenger's answers about purpose of trip conflicted with answers given by another passenger and driver, where lieutenant was instructed by drug enforcement agents to hold cash and jewelry seized from passenger for formal forfeiture proceedings, where lieutenant discovered that passenger was actually reputed member of narcotics operation, and where lieutenant determined that $50,000 in cash in trunk of car was bundled in fash-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

936 F.2d 554
**(Cite as: 936 F.2d 554)**

ion typical in drug operations. 42 U.S.C.A. § 1983; U.S.C.A. Const.Amend. 4; O.C.G.A. § 40-6-274.

**[14] Federal Civil Procedure 170A ⬤══2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
Plaintiff's bare supposition that sheriff's lieutenant was responsible for detention of plaintiff in alleged violation of Fourth Amendment was insufficient to defeat lieutenant's motion for summary judgment of plaintiff's wrongful detention claim. U.S.C.A. Const.Amend. 4.

**\*556** Herbert Shafer, Atlanta, Ga., for plaintiffs-appellants.
Neal B. Childers, Asst. Atty. Gen., Atlanta, Ga., for Storey.
W. Franklin Freeman, Jr., James A. Vaughn, Mills Freeman Vaughn & Sosebee, Forsyth, Ga., for Smith.
Frank L. Butler, III, Asst. U.S. Atty., Macon, Ga., Ricky E. Jones, Warner Robins, Ga., for U.S.

Appeal from the United States District Court for the Middle District of Georgia.

Before FAY and EDMONDSON, Circuit Judges, and GARZA [FN*], Senior Circuit Judge.

      FN* Honorable Reynaldo G. Garza, Senior U.S. Circuit Judge for the Fifth Circuit Court, sitting by designation.

EDMONDSON, Circuit Judge:
    In this section 1983 civil rights case, plaintiffs appeal the grant of summary judgment in favor of defendants, two law enforcement officers investigating the circumstances surrounding a traffic accident involving plaintiffs. Defendants are accused of wrongful seizure and retention of personal property, false arrest, and wrongful detention, in violation of the Fourth and Fourteenth Amendments to the Con-

stitution. We affirm in part, reverse in part, and remand.

## I. FACTS

    This case arises out of a traffic accident involving plaintiff Brenda Lindsey's automobile, though Lindsey was not present at the scene. The automobile was driven by Jeffrey Sutton, Lindsey's brother, and carried plaintiffs Melvyn Williams and Rodney McClaine as passengers. Defendant Larry Storey, a Georgia state patrolman, responded with another patrolman to the scene of the accident.

    Patrolman Storey conducted a routine driver's license check on Sutton and learned that Sutton's license was suspended. Storey arrested Sutton for driving too fast for conditions, for having no proof of insurance, and for driving with a suspended license. Storey then learned from the driver of the other automobile that the occupants of plaintiff Lindsey's automobile had offered this other driver approximately $2,500 in cash not to report the accident to the police. Storey questioned the occupants of plaintiff Lindsey's car about the purpose of their trip and received contradictory responses. All three denied knowledge or ownership of money offered to the other driver and claimed they knew of no money hidden in plaintiff Lindsey's automobile.

    **\*557** Storey obtained Sutton's consent to search the car. Before conducting the car search, Storey searched plaintiffs Williams and McClaine briefly for weapons in their possession and placed them in the squad car while he conducted the car search. The pat-down unearthed more than $2,600 in cash in plaintiff Williams' possession. Patrolman Storey seized the cash along with jewelry worn by Williams worth more than $1,300. Storey also seized $457 in cash and more than $89,000 worth of jewelry he found in plaintiff McClaine's possession. In his search of the automobile's trunk, Storey discovered a compartment with such a large amount of cash that the money was visible without opening the compartment. Patrolman Storey seized more than $50,000 in cash from the trunk of the automobile. Storey also discovered some handwritten

notes that he believed were in a narcotics-related code.

Storey then transported all three occupants of plaintiff Lindsey's car to the Monroe County sheriff's office. Only Sutton was under arrest, and plaintiff Williams has conceded that he accompanied Patrolman Storey voluntarily. Storey arranged for plaintiff Lindsey's vehicle to be towed from the scene. Storey's involvement in plaintiffs' case ended once Sutton, McClaine, and Williams were taken to the sheriff's office.

Defendant Marty Smith, a lieutenant with the Upson County Sheriff's Department and an investigator for a narcotics task force covering an area that includes Monroe County, was brought into the case after the arrival of Sutton, Williams, and McClaine at the station. Plaintiffs Williams and McClaine were left in a waiting area and were not placed under arrest. Lieutenant Smith claims that he matched plaintiff McClaine's driver's license photograph with a photograph in a booklet provided by the Georgia Intelligence Network on the "Miami Boys in Georgia." The pamphlet detailed a drug operation based in Miami and identified plaintiff McClaine as Melvin Shinholster, a.k.a. Melvin McClaine. Smith also obtained a background report on plaintiff McClaine indicating that McClaine was also known as Melvin Shinholster and that McClaine had the same FBI fingerprint number as Melvin McClaine.

Lieutenant Smith retained the cash and jewelry, seized by Patrolman Storey, after several agents of the Drug Enforcement Administration (DEA) said they planned to initiate forfeiture proceedings against the property. Those forfeiture proceedings were consolidated with this action. Smith also impounded plaintiff Lindsey's car for more than nine months, eventually releasing it to a finance company holding a lien on the automobile.

Plaintiffs McClaine and Williams were arrested several hours after their arrival at the station. The parties dispute how long the two men were incarcerated. Plaintiff Williams testified at his depos-

ition that he was held for three nights. Lieutenant Smith claims that Williams was released after forty-eight hours. No formal charges were filed against either man, and no judicial determination of probable cause was made until plaintiffs filed a habeas corpus petition two or three days after their arrest.

All section 1983 claims brought by plaintiff McClaine were dismissed after the parties were unable to locate him. The district court granted a motion to dismiss all claims against three unknown Monroe County deputies, referred to as John Does I, II, and III,[FN1] and a motion to dismiss some of the claims against Lieutenant Smith. The district court later granted summary judgment motions by Patrolman Storey and Lieutenant Smith on all remaining claims facing them. After entry of judgment in defendants' favor, plaintiffs appealed.[FN2]

> FN1. Plaintiffs purport to appeal the district court's order dismissing all claims against the "John Doe" defendants but offer no specific arguments challenging the district court's ruling. We affirm that dismissal.

> FN2. The procedural posture of this appeal is somewhat complicated. The district court first granted Patrolman Storey's motion for summary judgment, and then later granted Lieutenant Smith's motion for summary judgment on all claims remaining against him. Plaintiffs then brought appeal no. 90-8692. We initially questioned our jurisdiction to hear this appeal because the district court had not yet entered a final judgment pursuant to F.R.C.P. 54(b). The district court later entered final judgment, thereby curing plaintiff's premature notice of appeal. *Kramer v. Unitas,* 831 F.2d 994, 997 (11th Cir.1987). Nonetheless, plaintiffs appealed this entry of final judgment as well, and that appeal (no. 90-8777) was consolidated with the earlier appeal for ease of decision.

**\*558 II. DISCUSSION**

936 F.2d 554
**(Cite as: 936 F.2d 554)**

Plaintiffs challenge the district court's grant of summary judgment to defendants Storey and Smith on four claims: (1) wrongful seizure of personal property claimed by plaintiffs Williams and Lindsey, (2) wrongful retention of the same property, (3) false arrest of plaintiff Williams, and (4) wrongful detention of plaintiff Williams.

*A. Wrongful Seizure and Continued Retention of Personal Property*

*1. Wrongful Seizure*

[1] Patrolman Storey admits to confiscating cash and jewelry he found in plaintiff Williams' possession at the time of his pat-down search for weapons. Storey also admits confiscating more than $50,000 in cash he found in the trunk of plaintiff Lindsey's automobile. Williams and Lindsey claim that the seizure of cash and jewelry violated the Fourth and Fourteenth Amendments to the Constitution.[FN3] Defendant Storey has asserted qualified immunity from suit on these claims, arguing that he seized the property for "safekeeping" and because he suspected the cash had been used in the attempt to pay the other driver not to report the accident to the police.

> FN3. Plaintiff Lindsey also claims that her automobile was wrongfully seized; this claim is meritless. Patrolman Storey impounded the vehicle because its only authorized driver, Sutton, had been driving under a suspended license and was under arrest. The remaining passengers, plaintiffs Williams and McClaine, had no proof of insurance, and plaintiff Williams had no driver's license. Patrolman Storey had no good choice but to have the automobile towed.

[2][3] That the seizures were the result of lawful searches is clear. The search of plaintiff Williams was a brief pat-down for weapons and was supported by reasonable suspicion of illegal activity aroused by reports of the attempted pay-off of the other driver not to report the accident to the police.

*See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Sutton consented to the search of Lindsey's automobile; and as the driver, Sutton had apparent authority to permit the search. *See United States v. Dunkley,* 911 F.2d 522, 526 (11th Cir.1990), *cert. denied,* 498 U.S. 1096, 111 S.Ct. 987, 112 L.Ed.2d 1071 (1991).

With respect to the seizures themselves, the Supreme Court held in *United States v. Place,* 462 U.S. 696, 707-09, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983), that the seizure of personal property, even to facilitate an investigation of suspicious surrounding circumstances, must generally be accompanied by probable cause. If, however, the seizure is brief and minimally intrusive, then only the "reasonable suspicion" outlined in *Terry* is required to justify the seizure as "reasonable" under the Fourth Amendment.

[4] The Court has declined, however, to adopt an outside time limitation for a seizure before the heightened suspicion of probable cause is required to make it reasonable for Fourth Amendment purposes. In *Place,* the Court acknowledged the "desirability of providing law enforcement authorities with a clear rule to guide their conduct" in this area, but "question[ed] the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation." *Id.* at 709 n. 10, 103 S.Ct. at 2646 n. 10. In a case applying *Terry* to the seizure of a person, the Court similarly explained:

[W]e have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. Much as a 'bright line' rule would be desirable in evaluating whether an investigative detention is unreasonable [based upon the time of detention], common sense and ordinary human experience must govern over rigid criteria.

**\*559** *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

[5] This purposefully ambiguous standard for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

936 F.2d 554
**(Cite as: 936 F.2d 554)**

when a seizure is protracted enough to require probable cause makes it inappropriate for us to analyze the reasonableness of Patrolman Storey's seizure under the higher, probable cause requirement. Storey has asserted qualified immunity from these unreasonable seizure claims. Qualified immunity shields law enforcement officers performing discretionary functions from suit for all violations except those of clearly established law. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Barts v. Joyner,* 865 F.2d 1187 (11th Cir.1989). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Where the Supreme Court has chosen to facilitate effective law enforcement by explicitly rejecting a "bright-line rule" about when a seizure is so lengthy as to require probable cause to be reasonable, we are extremely wary of requiring law enforcement officers to justify a seizure with probable cause unless the length of detention was so prolonged that it falls well outside the range of seizures found permissible under *Terry* and *Place.*

This case presents no such quandary. Patrolman Storey conducted the brief, pat-down search of Williams in preparation for his planned search of Lindsey's automobile. The time required to complete that automobile search, and thereby determine whether or not there was probable cause to arrest Williams and seize the property, was brief-probably a matter of minutes. Plaintiff has presented no evidence about how long the car search took; but, even considering the outside range of time necessary to complete the car search and to determine whether or not there was probable cause to suspect Williams of illegal activity, the length of detention does not clearly fall outside the time found permissible under *Terry, Place,* and their progeny. *See, e.g., Place,* 462 U.S. at 710, 103 S.Ct. at 2646 (ninety-minute detention required probable cause); *Barts v. Joyner,* 865 F.2d 1187 (11th Cir.1989) (person seized without probable cause for length of time necessary to transport to police station);

*Daniel v. Taylor,* 808 F.2d 1401 (11th Cir.1986) (person seized without probable cause for two hours and forty-five minutes).

[6] Because Storey cannot be held to the heightened requirement of probable cause, the seizures in question must be supported by the reasonable suspicion required in *Terry*-type seizures. But, again, Storey is entitled to qualified immunity unless he *clearly* lacked the reasonable suspicion necessary to justify the search. As a result, more is required than a mere hindsight determination of whether reasonable suspicion actually existed at the time of the seizure; defendant Storey is protected by qualified immunity unless there was *clearly* no reasonable suspicion to seize the property. Along these same lines, the Supreme Court has held that even a warrantless search unsupported by probable cause may not give rise to section 1983 liability: "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials-like other officials who act in ways they reasonably believe to be lawful-should not be held personally liable." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039-40, 97 L.Ed.2d 523 (1987). In the same way, it is inevitable that law enforcement officers will sometimes reasonably but mistakenly conclude that reasonable suspicion is present, and these officers are protected by qualified immunity. As a result, Patrolman Storey is entitled to qualified immunity if the facts known to him at the time of the seizure at least *arguably* created a reasonable suspicion "associat[ing] the property with criminal activity." *Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980).

The seizures of the cash found in the pat-down search of plaintiff Williams and in the trunk of plaintiff Lindsey's automobile were supported by enough evidence to **\*560** establish arguable reasonable suspicion. At the time plaintiff Williams was searched, Patrolman Storey had been told by the other driver that a roll of more than $2,500 in cash was offered by the occupants of Lindsey's automobile not to report the accident to the police. Not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

936 F.2d 554
**(Cite as: 936 F.2d 554)**

only would such a failure to report have violated Georgia law, *see* O.C.G.A. § 40-6-274 (1982) (accidents with at least $250 in damage must be reported to police), but the attempted pay-off was a legitimate basis for Patrolman Storey's suspicion that the occupants of Lindsey's car might be involved in illegal activity. The discovery of about $2,600 in cash-almost the exact amount offered the other driver-established the requisite level of suspicion that plaintiff Williams was involved in the attempted pay-off and that the roll of cash found in his pocket was the cash actually offered to the other driver.

[7] As for the cash seized from the trunk, Sutton, McClaine, and Williams had previously denied there was money in the car. Storey's search of the trunk revealed more than $50,000 in cash, unclaimed by the occupants. Also, the cash was accompanied by handwritten receipts strikingly similar to a receipt that accompanied the cash found in plaintiff Williams' pocket. Whether or not these facts were sufficient to establish *actual* reasonable suspicion at the time of both of the cash seizures, the facts are supportive enough that we are not forced to conclude that there was *clearly* no reasonable suspicion. Defendant Storey is therefore entitled to qualified immunity; summary judgment was properly granted on this claim.[FN4]

> FN4. Plaintiffs have sued defendant Storey in both his official and individual capacities. Our conclusion that defendant Storey is entitled to qualified immunity from suit on plaintiffs' claim of wrongful seizure of money does not relieve Storey of liability in his official capacity on this claim. *Kentucky v. Graham,* 473 U.S. 159, 166-67, 105 S.Ct. 3099, 3105-06, 87 L.Ed.2d 114 (1985). To assert successfully official-capacity liability, plaintiffs must demonstrate that "the entity itself is a 'moving force' behind the deprivation; thus, in an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law." *Id.* at 166, 105 S.Ct. at 3105. Because plaintiffs have presented no evid-

ence tying the seizure of cash to any official "policy or custom," summary judgment was properly granted on this official capacity claim as well.

[8][9] We cannot reach the same conclusion about the gold jewelry seized by Patrolman Storey from plaintiff Williams. Williams claims that the jewelry was seized at the same time as his cash-*before* the search of the automobile. At the time of the seizure, then, Storey knew only that $2,500 in cash had been offered to the other driver not to call the police and that the occupants of Lindsey's car had conflicting stories about their ultimate destination. Though Patrolman Storey claims in a conclusory way that he immediately suspected the occupants of Lindsey's car were involved in some narcotics-related activity, mere suspicion of drug-dealing was not particularized enough to justify the seizure of property with *no* apparent connection to such drug activity or the attempted pay-off of the other driver involved in the collision. Storey has advanced no arguments-either in his appellate brief or at oral argument-supporting a reasonable belief that there was particularized suspicion at the time Storey seized the jewelry to connect Williams' gold jewelry to illegal conduct.[FN5] As the story has been presented to us, Patrolman Storey's suspicion of drug-dealing-not yet heightened by the discovery of more cash in the trunk of the automobile-*clearly* failed to establish the reasonable suspicion necessary to seize Williams' jewelry.[FN6] As a result, we cannot say that **561** Patrolman Storey is entitled to qualified immunity on this claim; summary judgment was improperly granted.[FN7]

> FN5. In his brief, defendant Storey says that the Monroe County Sheriff's Department was responsible for the seizure of plaintiff's jewelry but offers no facts supporting this assertion.
>
> FN6. We note that the facts justifying the seizure of Williams' cash might very well have established arguable probable cause to arrest Williams for the unlawful attempt to bribe the other driver not to report the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

936 F.2d 554
**(Cite as: 936 F.2d 554)**

accident to the police. If Storey had arrested Williams, the jewelry could have been properly seized as part of the administrative processing before incarceration. But, Storey has testified that Williams was not under arrest at the time of the seizure, and absent *any* argument supporting a reasonable suspicion that Williams' jewelry was connected with illegal activity, the seizure was clearly unreasonable.

FN7. Our conclusion that defendant Storey has inadequately justified his seizure of plaintiff's gold jewelry does not preclude defendant from offering further evidence on remand-through a motion or at trial-that would support a finding of reasonable suspicion. And, because our conclusion that Storey's seizure of plaintiff's property was clearly unreasonable is based upon *plaintiff's* factual allegations, defendant Storey may still rebut those allegations in subsequent proceedings.

*2. Continued Retention*

[10] Plaintiffs also claim that the continued retention of their personal property-the car, cash, and jewelry-violates their procedural due process rights. Even assuming the continued retention of plaintiffs' personal property is wrongful, no procedural due process violation has occurred "if a meaningful postdeprivation remedy for the loss is available." *See Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3204, 82 L.Ed.2d 393 (1984) (extending the holding in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), to cover intentional deprivations of property by state employees acting under color of state law). Though defendants admit retaining plaintiffs' personal property, "the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy." *See id.*

Plaintiff Lindsey argues that she was deprived of such a postdeprivation remedy because no forfeiture proceedings were ever initiated against her automobile. In support, she cites our decision in *Jonas v. City of Atlanta,* 647 F.2d 580, 585 (5th Cir. Unit B 1981),[FN8] in which we held that a section 1983 claim for damages could be maintained against law enforcement officials for unlawful conversion of an automobile if the officers refused to release the automobile and failed to initiate forfeiture proceedings.

FN8. In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of Unit B of the former Fifth Circuit Court of Appeals.

The decision in *Jonas,* however, predates the Supreme Court's holding in *Hudson v. Palmer,* and the particular holding in *Jonas* relied upon by plaintiff did not survive the *Hudson* decision. *Hudson* made clear that as long as *some* adequate postdeprivation remedy is available, no due process violation has occurred. *See*468 U.S. at 533, 104 S.Ct. at 3204. The state of Georgia has created a civil cause of action for the wrongful conversion of personal property. *See*O.C.G.A. § 51-10-1 (1982). "This statutory provision covers the unauthorized seizure of personal property by police officers. Therefore, the state has provided an adequate postdeprivation remedy when a plaintiff claims that the state has retained his property without due process of law." *Byrd v. Stewart,* 811 F.2d 554, 555 n. 1 (11th Cir.1987) (citing *Norred v. Dispain,* 119 Ga.App. 29, 166 S.E.2d 38 (1969) (trover action may be brought against police chief for seizure and retention of automobile)). Because plaintiff Lindsey has had access to an adequate postdeprivation remedy, no procedural due process violation has occurred, whether or not defendant Smith ever initiated forfeiture proceedings on the automobile.

[11][12] This same statutory remedy and the DEA forfeiture proceedings have provided alternate postdeprivation avenues for recovery of the cash and jewelry seized by Patrolman Storey at the scene of the accident and later retained by Lieutenant Smith. As a result, summary judgment was properly

granted to defendants Storey and Smith on these claims as well.[FN9]

> FN9. The availability of a postdeprivation remedy, while negating any procedural due process claims, cannot defeat plaintiffs' claim that the seizure itself by defendant Storey was violative of the Fourth Amendment. *See Byrd v. Stewart,* 811 F.2d 554, 555 (11th Cir.1987) (citing *Gilmere v. City of Atlanta,* 774 F.2d 1495 (11th Cir.1985) (en banc)). As a result, we address this substantive claim separately. *See supra,* section II(A)(1).

**B. False Arrest and Wrongful Detention**

Plaintiff Williams claims that defendant Smith arrested him without probable cause **\*562** and held him in detention for several days without any formal charges or judicial determination of probable cause, violating the Fourth and Fourteenth Amendments to the Constitution.[FN10]

> FN10. Plaintiff Williams also asserts false arrest and wrongful detention claims against defendant Storey; we reject them as meritless. Williams admitted in deposition testimony that he voluntarily accompanied Patrolman Storey to the sheriff's office and did not consider himself under arrest.

In addition, given our conclusion that Patrolman Storey arguably had probable cause to seize the $2,600 he found in Williams' pocket, the same facts, together with the subsequent discovery of more than $50,000 in cash in the trunk of the automobile, were more than enough for "a reasonable officer" to "believe[ ] that as a matter of law he could detain [plaintiff] awhile." *See Barts v. Joyner,* 865 F.2d 1187, 1194 (11th Cir.1989).

*1. False Arrest*

[13] Plaintiff Williams argues that because there are factual disputes about his arrest, summary judgment should have been denied. But, Lieutenant Smith has asserted qualified immunity from suit on this false arrest claim, and an appellate court re-

viewing a claim of qualified immunity "need not consider the correctness of the plaintiff's version of the facts." *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). Instead, the "issue is a purely legal one: whether the facts alleged by the plaintiff ... support a claim of violation of clearly established law." *Id.* at 528 n. 9, 105 S.Ct. at 2816 n. 9.

We have held that a "warrantless arrest without probable cause violates the Constitution and forms the basis for a section 1983 claim." *Marx v. Gumbinner,* 905 F.2d 1503, 1505 (11th Cir.1990) (citing *Reeves v. City of Jackson, Miss.,* 608 F.2d 644, 651 (5th Cir.1979)). "The existence of probable cause, however, is an absolute bar to a section 1983 action for false arrest." *Id.* at 1505-06 (citing *Howell v. Tanner,* 650 F.2d 610, 614 (5th Cir. Unit B 1981)).

As was the case in our determination of probable cause to seize plaintiffs' personal property, more is required than a mere hindsight determination of whether probable cause actually existed at the time of plaintiff Williams' arrest. "In determining whether qualified immunity exists, the issue is not probable cause in fact but 'arguable' probable cause. Actual probable cause is not necessary for an arrest to be objectively reasonable." *Von Stein v. Brescher,* 904 F.2d 572, 579 (11th Cir.1990) (citations omitted). As a result, Lieutenant Smith is entitled to qualified immunity if the facts that plaintiff has conceded were known to Smith at the time of the arrest were *arguably* "sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *See Marx,* 905 F.2d at 1506.

We think the facts known to Lieutenant Smith at the time of plaintiff's arrest were enough to establish a reasonable belief that there was probable cause. Williams admits to having denied knowledge or ownership of the more than $2,500 in cash offered the driver of the other automobile if the driver agreed not to report the accident to the police as was required by law. *See* O.C.G.A. § 40-6-274 (1982) (accidents with at least $250 in damage

936 F.2d 554
**(Cite as: 936 F.2d 554)**

must be reported to police). When Williams was briefly searched at the scene, about $2,600 in cash, almost exactly the amount offered the other driver, was found in his pocket. When questioned later about the purpose of his trip to south Georgia with Sutton and McClaine, Williams offered answers that not only conflicted with answers given by Sutton and McClaine, but with his own answers as well.

In addition, Lieutenant Smith was instructed by DEA agents to hold the cash and jewelry seized from Williams for formal forfeiture proceedings, further adding to Smith's suspicion that Williams and McClaine were engaged in some type of illegal drug activity. This suspicion was further heightened by Smith's discovery that McClaine was actually Melvin Shinholster, a reputed member of the "Miami Boys" narcotics operation. At his deposition, Lieutenant Smith testified that he believed from the surrounding circumstances that plaintiff Williams and the other occupants **563** of plaintiff Lindsey's automobile were participating in a "drug run" to purchase cocaine. Smith testified that the $50,000 in cash found in the trunk was bundled in a fashion typical in drug operations, and the bundles were accompanied by handwritten notes that Smith believed were coded to reflect cash transactions for narcotics. Moreover, the money found in plaintiff Williams' pocket was accompanied by the same type of handwritten notes.

Again, we need not conclude that the facts outlined above establish actual probable cause at the time of plaintiff's arrest. The facts are supportive enough that we are not forced to conclude that there was *clearly* no probable cause to arrest. Because the facts support a reasonable belief that there was probable cause, the district court properly granted Lieutenant Smith's motion for summary judgment on the false arrest claim.[FN11]

> FN11. Plaintiffs have sued defendant Smith in both his official and individual capacities. Our conclusion that defendant Smith is entitled to qualified immunity from suit on plaintiff Williams' claim of

false arrest does not relieve Smith of liability in his official capacity on this claim, however. *See supra* note 4. Plaintiffs sued defendant Smith in his official capacity as "an investigator for the Sheriff of Monroe County, Georgia." To escape summary judgment, therefore, plaintiff was required to present some evidence that the alleged deprivations were the result of an official "policy or custom" of the Monroe County Sheriff's Department. *See id.* The record indicates that defendant Smith is a lieutenant with the narcotics task force covering an area that includes Monroe County, and that Smith is in fact employed by the Upson County Sheriff's Department. Because plaintiff has failed to sue the entity that actually employs defendant Smith and has failed to offer any evidence implicating any official "policy or custom" of the Monroe County Sheriff's Department, we affirm the dismissal of the official-capacity claims as well.

*2. Wrongful Detention*

[14] Plaintiff Williams also complains that he was detained for several days without the filing of any charges and without any judicial determination of probable cause, violating his rights under the Fourth and Fourteenth Amendments. Plaintiff has produced no evidence, however, that defendant Smith, who is a lieutenant in the Upson County Sheriff's Department, was responsible for his continued detention in the Monroe County jail. For example, plaintiff has produced no evidence that defendant Smith was responsible for ensuring that inmates at the Monroe County jail be promptly charged and arraigned. The Supreme Court has made clear that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to survive summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Even assuming the extended detention of plaintiff Williams viol-

ated his Fourth Amendment rights,[FN12] plaintiff's bare supposition that defendant Smith is responsible for such a violation is insufficient to defeat Smith's motion for summary judgment.

> FN12. *See generally County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (judicial determination of probable cause must be made within forty-eight hours of arrest); *Gerstein v. Pugh,* 420 U.S. 103, 123-25, 95 S.Ct. 854, 868-69, 43 L.Ed.2d 54 (1975) (judicial determination of probable cause must be made "either before or promptly after arrest"); *Llaguno v. Mingey,* 763 F.2d 1560, 1568 (7th Cir.1985) (delay unjustified where individual subjected to "imprisonment [based] on suspicion, while the police look for evidence to confirm their suspicion").

### III.

For the foregoing reasons, the district court's order granting summary judgment and final judgment to defendant Smith is AFFIRMED. The court's order granting summary judgment to defendant Storey is AFFIRMED in part, REVERSED as to plaintiff Williams' claim of wrongful seizure of jewelry, and REMANDED for further proceedings.

C.A.11 (Ga.),1991.
Lindsey v. Storey
936 F.2d 554

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1571                                                                                      Page 1
475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806
**(Cite as: 475 U.S. 796, 106 S.Ct. 1571)**

▷
City of Los Angeles v. Heller
U.S.Cal.,1986.

Supreme Court of the United States
CITY OF LOS ANGELES et al.
v.
Ronald HELLER.
**No. 85-531.**

April 21, 1986.

Plaintiff brought civil rights action against city, members of city police commission, and two city police officers. He claimed damages by reason of having been arrested without probable cause and having been the victim of excessive force in the making of the arrest. One of the police officers was granted summary judgment. After the jury returned a general verdict for the remaining police officer, the United States District Court for the Central District of California dismissed the action against the city and members of the police commission, and plaintiff appealed. The Court of Appeals, 759 F.2d 1371, reversed and remanded. Certiorari was granted. The Supreme Court held that the jury's finding that the police officer inflicted no constitutional injury on the plaintiff removed any basis for liability against the city and members of police commission.

Reversed and remanded.

Justice Marshall dissented from the summary disposition.

Justice Stevens dissented and filed an opinion in which Justice Marshall joined.

West Headnotes

**[1] Federal Civil Procedure 170A ☞2181**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(G) Instructions
            170Ak2181 k. Construction and Operation in General. Most Cited Cases

**Federal Courts 170B ☞799**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk799 k. Verdict. Most Cited Cases
Theory under which jury instructions are given by trial courts and reviewed on appeal is that juries act in accordance with instructions given them and that they do not consider and base their decisions on legal questions with respect to which they are not charged.

**[2] Civil Rights 78 ☞1424**

78 Civil Rights
    78III Federal Remedies in General
        78k1424 k. Trial in General. Most Cited Cases
        (Formerly 78k243.1, 78k243, 78k13.14)
Jury's verdict for city police officer and against civil rights plaintiff who claimed he was the victim of excessive force during course of an arrest removed any basis for liability on part of city and members of its police commission; jury's finding that officer inflicted no constitutional injury on plaintiff was not only conclusive as to officer, but also as to city and its police commission.

**[3] Civil Rights 78 ☞1348**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1348 k. Criminal Law Enforcement; Prisons. Most Cited Cases
        (Formerly 78k206(2.1), 78k206(2), 78k13.7)
An award of damages against a municipal corporation based on actions of one of its police officers is not authorized when jury has concluded that officer inflicted no constitutional harm; moreover, if a plaintiff has suffered no constitutional injury at hands of the officer, fact that departmental regula-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806
**(Cite as: 475 U.S. 796, 106 S.Ct. 1571)**

tions might have authorized use of constitutionally excessive force is beside the point.

**\*797 \*\*1572 PER CURIAM.**

Respondent Ronald Heller sued petitioners, city of Los Angeles, and individual members of the Los Angeles Police Commission, and two Los Angeles police officers in the United States District Court for the Central District of California under the provisions of 42 U.S.C. § 1983. He claimed damages by reason of having been arrested without probable cause and having been the victim of excessive force in the making of the arrest. The incident arose as a result of the two Los Angeles police officers stopping him because of a suspicion that he was driving while intoxicated. In the words of the Court of Appeals for the Ninth Circuit:

"The officers administered a series of field sobriety tests. Apparently dissatisfied with the results, the officers decided to take Heller to the station to undergo a breath test. When notified that he was under arrest, however, Heller became belligerent. One of the defendants, Officer Bushey, attempted to handcuff him. An altercation ensued. In the course of the struggle, Heller fell through a plate glass window." *Heller v. Bushey,* 759 F.2d 1371, 1372-1373 (CA9 1985).

The District Court held a bifurcated trial, and first heard respondent's claims against one of the individual police officers.FN* The jury was instructed that Heller would make out his constitutional claim if he were arrested without reasonable cause, or if he were arrested with "unreasonable force" that exceeded the force necessary under the circumstances to effect arrest. *Id.,* at 1374. The jury was not instructed on any affirmative defenses that might have been asserted by **\*798** the individual police officer. Tr. in No. 80-2643 (CD Cal.), pp. 803-822, 843. The jury returned a verdict for the defendant police officer and against respondent. The District Court then dismissed the action against petitioners, concluding that if the police officer had been exonerated by the jury there could be no basis for assertion of liability against the city or the persons constituting its Police Commission.

FN* The second of the two police officers named as defendants was granted summary judgment by the District Court.

Respondent appealed to the Court of Appeals for the Ninth Circuit, and that court reversed the judgment of the District Court dismissing respondent's case against petitioners even though it did not disturb the verdict for the defendant police officer. Respondent urged, and the Court of Appeals apparently agreed, that "the jury could have believed that Bushey, having followed Police Department regulations, was entitled in substance to a defense of good faith. Such a belief would not negate the existence of a constitutional injury" (footnote omitted). 759 F.2d, at 1373-1374.

[1][2] The difficulty with this position is that the jury was not charged on any affirmative**\*\*1573** defense such as good faith which might have been availed of by the individual police officer. Respondent contends in his brief in opposition to certiorari that even though no issue of qualified immunity was presented to the jury, the jury might nonetheless have considered evidence which would have supported a finding of such immunity. But the theory under which jury instructions are given by trial courts and reviewed on appeal is that juries act in accordance with the instructions given them, see *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 604, 105 S.Ct. 2847, 2858, 86 L.Ed.2d 467 (1985), and that they do not consider and base their decisions on legal questions with respect to which they are not charged. We think that the Court of Appeals' search for ambiguity in the verdict was unavailing; as that court itself noted later in its opinion, "[b]ecause the instructions required a verdict for [respondent] if *either* the due process *or* the excessive force claim was found, the jury's **\*799** verdict for the defendant required a negative finding on both claims." 759 F.2d, at 1374, n. 3. This negative, it seems to us, was conclusive not only as to Officer Bushey, but also as to the city and its Police Commission. They were sued only because they were thought legally responsible for Bushey's actions; if the latter inflicted no constitutional injury on respondent, it is inconceivable that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806
**(Cite as: 475 U.S. 796, 106 S.Ct. 1571)**

petitioners could be liable to respondent.

[3] The Court of Appeals also stated:

"We must conclude that the general verdict does not foreclose a finding that Heller suffered a constitutional deprivation. Heller's *Monell* claim survived the general verdict.... The jury verdict, of course, conclusively determined that there was probable cause to arrest Heller. On the other hand, it is equally clear that whether the application of force in accordance with Police Department regulations in this case exceeded constitutional limits has not been determined." *Id.,* at 1374-1375.

But this was an action for damages, and neither *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.

The petition for certiorari is granted, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**\*800** Justice BRENNAN took no part in the consideration or decision of this case.

Justice MARSHALL dissents from this summary disposition, which has been ordered without affording the parties prior notice or an opportunity to file briefs on the merits. See *Cuyahoga Valley R. Co. v. Transportation Union,* 474 U.S. 3, 8, 106 S.Ct. 286, ----,88 L.Ed.2d 2 (1985) (MARSHALL, J., dissenting); *Maggio v. Fulford,* 462 U.S. 111, 120-121, 103 S.Ct. 2261, 2265-2266, 76 L.Ed.2d 794 (1983) (MARSHALL, J., dissenting).

Justice STEVENS, with whom Justice MARSHALL joins, dissenting.

Whenever the Court decides a case without the benefit of briefs or argument on the merits, there is a danger that it will issue an opinion without the careful deliberation and explication that the issues require. Today's "*per curiam* " opinion is a fair illustration of the problem. The two important issues presented in this case are not even identified in that document. The District Court's decision to dismiss the action against the city, the Police Department, and the Police Commissioners necessarily rested on two assumptions: (1) there **\*\*1574** was an inherent inconsistency between the jury verdict in favor of Officer Bushey and a possible verdict against the municipal defendants and (2) that inconsistency required the dismissal of the action against the municipal defendants. Far from specifically addressing those issues, however, the District Court dismissed the action against the city on the ground that it had "become moot." FN1 In a similar vein, this **\*801** Court rests its summary decision on the maxim that "juries act in accordance with the instructions given them." *Ante,* at 1573. In my view, neither of the necessary assumptions for the District Court's action-and for this Court's reinstatement of its decision-is remotely present in this case.

FN1. See 8 Record 844 ("With respect to the Monell cause of action, which was bifurcated from the initial trial, the Court is now convinced that has become moot by reason of the verdict in favor of the defendant and the Court is ordering dismissal of that cause of action at this time"); 2 *id.,* Doc. No. 209, dismissal order ("the plaintiff's theory of liability against the defendants, CITY OF LOS ANGELES, LOS ANGELES BOARD OF POLICE COMMISSIONERS and LOS ANGELES POLICE DEPARTMENT, based on the case of *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658 [98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ] ... is moot").

I

The first necessary assumption is that there would be an inevitable inconsistency between the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1571

475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806

**(Cite as: 475 U.S. 796, 106 S.Ct. 1571)**

jury verdict of no liability for Officer Bushey and a possible verdict of liability against the municipal entities; in the absence of such an inconsistency, the District Court's decision, and this Court's reinstatement of it, are simply inexplicable.

It is undisputed that Ronald Heller crashed through a plate-glass window after some kind of an altercation with Officer Bushey. He had been stopped on suspicion of driving while intoxicated and given sobriety tests.[FN2] In his claim against the municipal entities, Heller contended that the city and the Police Department had adopted a policy of condoning excessive force in making arrests, that the policy was unlawful, and that he had been injured by the application of that policy at the time of his arrest. In his claim against Officer Bushey, Heller contended that his constitutional rights were violated because Officer Bushey had employed "unreasonable force" in arresting him.

> FN2. After the altercation, Heller was given an alcohol level test, and was found to have one-tenth the level of alcohol in his body necessary for a finding of driving while intoxicated under California law. 5 *id.,* at 134-136. Heller was never charged with driving while intoxicated. *Ibid.*

On the day before trial, the District Judge bifurcated the trial into two phases–the first against Officer Bushey and the second against the municipal entities. The record contains no explanation for this decision, but it does reveal that Heller's counsel opposed bifurcation.[FN3]

> FN3. See 5 *id.,* Doc. No. 203, minutes of chambers conference (Oct. 18, 1982) ("Court confers with Counsel re: Pretrial order, Jury trial on 10/19/82, Jury Instructions, Defendant's amended witness list and bifurcation of case. Plaintiff counsel opposes Bifurcation. Defendant does not oppose bifurcation").

**\*802** In the proceeding against Officer Bushey, considerable evidence of the Los Angeles Police Department's policy and custom on the use of force

was introduced. An expert witness testified regarding Los Angeles' officially sanctioned use of "escalating force," culminating in the use of the notorious "chokehold."[FN4] Officer Bushey **\*1575** himself testified that Heller's flight through the window resulted from his attempt to impose a chokehold, and that he was carefully following official Police Department policy.[FN5] Officer Bushey's superior, Sergeant Shrader, also testified that Officer Bushey's actions were in complete compliance with official Police Department policy.FN6 Finally, Officer Bushey's attorney repeatedly **\*803** emphasized that his client's actions were entirely consistent with established Department policy.[FN7]

> FN4. See 5, *id.,* at 157-158 (testimony of James Fyfe) ("The Los Angeles Police Department employs a scale of escalation in the use of force.... [T]he Los Angeles Police Department varies from every other major police department I know of. The Los Angeles Police Department says that if that compliance hold fails to work the next degree of force to be used is a chokehold or, as the police department calls them, a carotid control hold and modified carotid hold and bar arm control holds"). Cf. *Los Angeles v. Lyons,* 461 U.S. 95, 97, n. 1, 103 S.Ct. 1660, 1663, n. 1, 75 L.Ed.2d 675 (1983) (describing chokehold); *id.,* at 114-119, 103 S.Ct. at 1671-1674 (MARSHALL, J., dissenting) (reviewing Los Angeles Police Department's use of chokeholds and noting that 16 deaths had resulted from chokeholds since 1975). At the time of Heller's trial, *Lyons* was pending before this Court.

> FN5. 5 Record 99-100 ("As he began his two steps forward I applied-I put my left arm around his-the portion I tried to get was the front part of his throat. You use the blade of your wrist on the person's throat. As we are supposed to when we are trying to take someone into custody use verbal commands of first asking verbally

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806
**(Cite as: 475 U.S. 796, 106 S.Ct. 1571)**

and then demanding verbally. If that does not work we use what is called a pain compliance, which is trying to twist someone's wrist where the pain hurts them and they'll comply with your request.... I tried to get the blade of my wrist around to his throat to apply pressure to his throat, which is also a pain compliance hold").

FN6. See 6 *id.,* at 279-281 (testimony of Sergeant Shrader) (describing Police Department's "accelerated force theory" and concluding that Officer Bushey's use of a chokehold would have been "within the policy").

FN7. See, *e.g.,* 5 *id.,* at 170 ("[T]he carotid hold was a hold that was being taught to the Los Angeles Police Department"); 6 *id.,* at 279 (referring to "the accelerated force theory that the police department has"); *id.,* at 281 (referring to "the policy of what police department officers do"). See also Officer Bushey's counsel's closing argument, 7 *id.,* at 699 ("In this case it's not the City that's the defendant. It's Officer Bushey"); *id.,* at 706 (citing "testimony concerning our own policies and procedures as to the Los Angeles Police Department"); *ibid.* ("[T]he procedures which Officer Bushey followed are exactly what he's taught and the reasons he's taught to do it"); *id.,* at 716 ("It's Officer Bushey who's the defendant"); *id.,* at 718 ("Officer Bushey was trying to do his job").

In submitting the claim against Officer Bushey to the jury, the trial judge gave an instruction that simply stated that whether or not the force used in making an arrest is unreasonable "is an issue to be determined in the light of all the surrounding circumstances." [FN8] After deliberating several hours, the jury returned a general verdict in favor of the officer.

FN8. "Whether or not the force used in

making an arrest, preventing an escape, or overcoming resistance was expressive [*sic*], unreasonable or violent is an issue to be determined in the light of all the surrounding circumstances." 8 *id.,* at 815-816.

Thus, despite the majority's summary assertion to the contrary, it is perfectly obvious that the general verdict rejecting the excessive force claim against Officer Bushey did not necessarily determine the constitutionality of the city's "escalating force" policy-a subject on which the jury had received no instructions at all. The verdict merely determined that the officer's action was not unreasonable "in the light of all the surrounding circumstances"-which, of course, included the evidence that Officer Bushey was merely obeying orders and following established Police Department policy.

As a result, there was no necessary inconsistency between the verdict for Officer Bushey and a possible verdict of liability**804** against the municipal defendants. On that basis alone, the District Court plainly erred in dismissing as "moot" the suit against the municipal defendants, and the Court of Appeals was plainly correct to reverse the dismissal.[FN9]

FN9. The Court of Appeals concluded:
"The jury, in substance, was instructed that Heller was deprived of liberty without due process if he was arrested without reasonable cause. The jurors were further instructed that Heller's constitutional rights were violated if he was arrested with "unreasonable force" that exceeded the force necessary under the circumstances to effect arrest. The jury's verdict for the defendant therefore embodies a finding that Heller was arrested for reasonable cause *and* that the amount of force used was not unreasonable or excessive. The difficulty is that the conclusion that the force was reasonable could have been derived either from Police Department regulations, which incorporate a theory of 'escalating force,' or from a constitutional standard entirely independent of such regulations. We cannot say which with assurance." *Heller v. Bushey,* 759 F.2d 1371, 1374 (CA9 1985) (footnote omitted).

475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806
**(Cite as: 475 U.S. 796, 106 S.Ct. 1571)**

**\*\*1576** II

In view of the fact that the Court of Appeals correctly concluded that there was no necessary inconsistency between a verdict exonerating Officer Bushey and a verdict holding the city and Police Department liable for the "escalating force" policy, it did not have to consider the appropriate response to a possible inconsistency in the context of a bifurcated trial.

Inconsistent verdicts are, of course, a familiar phenomenon. In a criminal case, a jury's apparently inconsistent verdict is allowed to stand.^FN10 In a civil case, the rule is less **\*805** clear.^FN11 Nevertheless, in contrast to the Court's blithe assumption today, it is far from certain that the District Court's action-the dismissal-was an appropriate response, even if somehow a verdict against the municipal entities might have created an inconsistency. First, the Court ignores the **\*806** fact that, in certain circumstances, a court retains the authority, even in a civil case, to allow an apparently inconsistent verdict to stand.^FN12 Second, the Court ignores the fact that, when faced with an apparently inconsistent verdict, a court has a duty to attempt to read the verdict in a manner that will resolve inconsistencies.^FN13 Third, the Court ignores the **\*\*1577** fact that, upon receiving an apparently inconsistent verdict, the trial judge has the responsibility, not to retain half of the verdict, but to resubmit the question to the jury.^FN14 Finally, the Court ignores the fact that, if verdicts are genuinely inconsistent and if the evidence might support either of the "inconsistent" verdicts, the appropriate remedy is ordinarily, not simply to accept one verdict and dismiss the other, but to order an entirely new trial.^FN15

FN10. See *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (reaffirming general rule that inconsistent verdicts can stand); *Harris v. Rivera,* 454 U.S. 339, 345, 102 S.Ct. 460, 464, 70 L.Ed.2d 530 (1981) ("Inconsistency in a verdict is not a sufficient reason for setting it aside"); *Hoag v. New Jersey,* 356 U.S. 464, 472, 78 S.Ct.

829, 835, 2 L.Ed.2d 913 (1958) ("[J]ury verdicts are sometimes inconsistent or irrational"); *United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 135, 88 L.Ed. 48 (1943) ("Whether the jury's verdict was the result of carelessness or compromise or a belief that the responsible individual should suffer the penalty instead of merely increasing, as it were, the cost of running the business of the corporation, is immaterial. Juries may indulge in precisely such motives or vagaries"); *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932) ( "Consistency in the verdict is not necessary"). Cf. *Ulster County Court v. Allen,* 442 U.S. 140, 168, 99 S.Ct. 2213, 2230, 60 L.Ed.2d 777 (1979) (BURGER, C.J., concurring) ("Courts have long held that in the practical business of deciding cases the factfinders, not unlike negotiators, are permitted the luxury of verdicts reached by compromise").

FN11. See, *e.g.,* Bickel, Judge and Jury-Inconsistent Verdicts in the Federal Courts, 63 Harv.L.Rev. 649, 654 (1950) ("[T]here is not in a civil case the equivalent of a precedent such as *Dunn* [*v. United States, supra* ] to overrule in upsetting inconsistent verdicts. The argument outlined against extending the *Dunn* rule to civil cases is thus quite a plausible one. But it is not unanswerable") (footnote omitted).

FN12. Indeed, in explaining why an apparently inconsistent verdict in a civil case should not be disturbed, Justice Brandeis cited the leading case on the permissibility of inconsistent verdicts in a criminal context. See *Fairmount Glass Works v. Cub Fork Coal Co.,* 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439 (1933) (citing *Dunn v. United States* ). See also F. James & G. Hazard, Civil Procedure 384 (3d ed. 1985) ("[T]he refusal of a trial court to set aside a verdict obviously representing a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806
**(Cite as: 475 U.S. 796, 106 S.Ct. 1571)**

compromise has frequently, and quite properly, been upheld"); *id.,* at 394 ("One of the great values of jury trial ... is its ability to reflect the community sense of over-all fairness, and this may not in all cases coincide with the written law and the instructions which the court must give"); *Karcesky v. Laria,* 382 Pa. 227, 235, 114 A.2d 150, 154 (1955) ("Where the evidence of negligence, or contributory negligence, or both, is conflicting or not free from doubt, a trial judge has the power to uphold the time-honored right of a jury to render a compromise verdict, and to sustain a verdict which is substantial"); *Jayne v. Mason & Dixon Lines, Inc.,* 124 F.2d 317, 319 (CA2 1941) (L. Hand) ("We do not mean to imply however that we should have thought it fatal to the wife's recovery if no rational reconciliation of the verdicts was possible. *Dunn v. United States,* 284 U.S. 390 [52 S.Ct. 189, 76 L.Ed. 356 (1932) ]"). Cf. Note, Inconsistent Verdicts in Civil Trials, 45 Harv.L.Rev. 1230, 1234 (1932) (observing that, in some jurisdictions, "a master can not complain solely because the servant was exonerated at the same trial. If the evidence is sufficient to support the verdict against the master, his appeal will be denied") (footnote omitted).

FN13. See *Gallick v. Baltimore & Ohio R. Co.,* 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963) (In considering jury answers to questions in a special verdict, "it is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them.... We therefore must attempt to reconcile the jury's findings, by exegesis if necessary, ... before we are free to disregard the jury's special verdict and remand the case for a new trial"); *Atlantic & Gulf Stevedores, Inc., v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special inter-

rogatories consistent, they must be resolved that way"); *Affolder v. New York, Chi. & St. L. R. Co.,* 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683 (1950); *Fairmount Glass Works,* 287 U.S., at 485, 53 S.Ct., at 255 (Brandeis, J.) ("Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct"); *Union Pacific R. Co. v. Hadley,* 246 U.S. 330, 334, 38 S.Ct. 318, 319, 62 L.Ed. 751 (1918) (Holmes, J.) ("[S]ince the [jury] finding was possible on the evidence it cannot be attributed to disregard of duty.... Beyond the question of attributing misconduct to the jury we are not concerned to inquire whether its reasons were right or wrong").

FN14. See, *e.g., Dickerson v. Pritchard,* 706 F.2d 256, 259 (CA7 1983) ("[T]he trial court properly resubmitted the inconsistent verdicts to the jury for reconsideration"); *University Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518, 547 (CA5 1974) ("[I]f the jury returns two inconsistent verdicts, the trial court may resubmit the issue to them for clarification"); *Hopkins v. Coen,* 431 F.2d 1055, 1059 (CA6 1970) (upon receipt of inconsistent verdicts, trial court could have sent jury "back to the jury room to further deliberate with appropriate instructions to bring back consistent verdicts"); *Alston v. West,* 340 F.2d 856, 858 (CA7 1965) (when jury returned an inconsistent verdict, "the court properly exercised its discretion in resubmitting the case to the jury").

FN15. See, *e.g., Malley-Duff & Associates v. Crown Life Ins. Co.,* 734 F.2d 133, 145 (CA3) ("We conclude that the answers to Questions 1, 2(A), and 2(B) may be considered inconsistent.... We will vacate the $900,000 verdict in the state law claims and order a new trial"), cert. denied, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505

(1984); *Global Van Lines, Inc. v. Nebeker,* 541 F.2d 865, 868 (CA10 1976) (citing "the rule which says that inconsistencies which show jury confusion serve to mandate a new trial"); *Wood v. Holiday Inns, Inc.,* 508 F.2d 167, 175 (CA5 1975) ("Where verdicts in the same case are inconsistent on their faces indicating that the jury was confused, a new trial is certainly appropriate and may even be required"). Cf. Fed.Rule Civ.Proc. 49(b) (appropriate remedy for inconsistent special verdicts and general verdict is resubmission to the jury, or a new trial).

**\*807** Although the Court fails to address it, the question this case raises (if, in fact, the initial view of inevitable inconsistency is accepted) is whether a different set of principles should apply in a bifurcated trial-more narrowly, in a trial that was bifurcated over the objection of the plaintiff. Because the question has not been argued, I do not foreclose the possibility that bifurcation should make a difference, but it is not immediately apparent to me why it should. In this case, the same jury would have passed on the municipal entities' liability, and would have relied on the evidence adduced in the first phase of the trial as well as that presented in the second phase. At the very least, it is unclear to me why the normal devices for addressing an apparently inconsistent verdict-construing the verdict in a manner that resolves the inconsistency; resubmitting the case to the jury for *it* to resolve the inconsistency; or even ordering a new trial-should be unavailable in a bifurcated context.

If the Court's unprecedented, ill-considered, and far-reaching decision happens to be correct, defendants as a class have been presented with a tactical weapon of great value. By persuading trial judges to bifurcate trials in which both the principal and its agents are named as defendants, and to require the jury to bring in its verdict on the individual claim first, they may obtain the benefit of whatever intangible factors have prompted juries to bring in a multitude of inconsistent verdicts in past years; defendants will no longer have to abide the

mechanisms that courts have used to mitigate **\*808** and resolve apparent inconsistencies.[FN16] Perhaps that is an appropriate**\*\*1578** response to the current widespread concern about the potential liabilities of our municipalities, but I doubt it. Cf. *Oklahoma City v. Tuttle,* 471 U.S. 808, 843-844, 105 S.Ct. 2427, 2446-2447, 85 L.Ed.2d 791 (1985) (STEVENS, J., dissenting).

> FN16. Cf. *Alston v. West, supra* (in negligence suit against flower shop and driver for automobile accident, jury initially returned verdict of liability for flower shop and no liability for driver; after case was resubmitted, jury returned liability verdicts against both employer and driver).

### III

The Court today reverses an interlocutory decision in a constitutional rights case on the basis of assumptions that dramatically conflict with the record and with settled legal principles. The Court mistakenly assumes that there was a necessary inconsistency between the verdict of no liability against the individual officer and a possible verdict against the municipal defendants; it then mistakenly assumes that dismissal was an appropriate response to the perceived inconsistency. Perhaps not coincidentally, the Court achieves these results without the aid of briefs or argument, and relies on an anonymous author to explain what it has done.

I respectfully dissent.

U.S.Cal.,1986.
City of Los Angeles v. Heller
475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392                                                                              Page 1
792 So.2d 392
**(Cite as: 792 So.2d 392)**

▷

Ex parte Cranman
Ala.,2000.

Supreme Court of Alabama.
Ex parte Paul J. CRANMAN, as executor of the es-
tate of Matthew Cranman, deceased.
(In re Paul J. Cranman, as executor of the estate of
Matthew Cranman, deceased
v.
David Maxwell, M.D., et al.)
**1971903.**

June 16, 2000.
Opinion Modified on Denial of Rehearing Nov. 22,
2000.

University student brought medical malpractice ac-
tion against physicians who worked at university's
health center, among others. The Tuscaloosa Cir-
cuit Court, No. CV-96-1014,John H. England, Jr.,
J., entered summary judgment for physicians. After
student died and his father was substituted as
plaintiff, father appealed. The Court of Civil Ap-
peals, 792 So.2d 386, affirmed. Father filed petition
for certiorari review. On rehearing, the Supreme
Court, Lyons, J., held that physicians were not en-
titled to State-agent immunity.

Reversed and remanded.

Johnstone, J., concurred specially and filed opinion.

Cook, J., concurred in part and concurred in the
judgment and filed opinion.

Brown, J., concurred in the judgment and filed
opinion.

Maddox, J., and See, J., filed dissenting opinions.

On remand to, Ala.Civ.App., 792 So.2d 418.

West Headnotes

**[1] States 360 ⊄⊃191.2(1)**

360 States
    360VI Actions
        360k191 Liability and Consent of State to Be
Sued in General
            360k191.2 Power to Waive Immunity or
Consent to Suit
                360k191.2(1) k. In General. Most
Cited Cases
Neither the Alabama Legislature nor the Alabama
Supreme Court has the power to waive the State's
immunity from suit. (Per Lyons, J., with two
Justices concurring, one Justice concurring spe-
cially, one Justice concurring in part and concurring
in the judgment, and one Justice concurring in the
judgment.) Const. Art. 1, § 14.

**[2] Constitutional Law 92 ⊄⊃2455**

92 Constitutional Law
    92XX Separation of Powers
        92XX(C) Judicial Powers and Functions
            92XX(C)1 In General
                92k2455 k. Protection of Constitution-
al Rights. Most Cited Cases
    (Formerly 92k67)

**Constitutional Law 92 ⊄⊃2324**

92 Constitutional Law
    92XIX Rights to Open Courts, Remedies, and
Justice
        92k2324 k. Right to Appeal and Other Pro-
ceedings for Review. Most Cited Cases
    (Formerly 92k321)

**Courts 106 ⊄⊃210**

106 Courts
    106VI Courts of Appellate Jurisdiction
        106VI(B) Courts of Particular States
            106k210 k. Alabama. Most Cited Cases
    (Formerly 92k321)
If authority conferred upon Supreme Court pursuant
to Judicial Article of Constitution conflicts with
provision guaranteeing every person a remedy by
due process of law for any injury, Court must con-

792 So.2d 392
**(Cite as: 792 So.2d 392)**

strue remedy provision as dominant, subject to Court's obligation to observe separation of powers doctrine. (Per Lyons, J., with two Justices concurring, one Justice concurring specially, one Justice concurring in part and concurring in the judgment, and one Justice concurring in the judgment.) Const. Art. 1, § 13; Art. 3, § 43.

**[3] States 360 ⚏79**

360 States
    360II Government and Officers
        360k79 k. Liabilities of Officers for Negligence or Misconduct. Most Cited Cases
State-agent immunity is unavailable where the governmental agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law. (Per Lyons, J., with two Justices concurring, one Justice concurring specially, one Justice concurring in part and concurring in the judgment, and one Justice concurring in the judgment.)

**[4] States 360 ⚏78**

360 States
    360II Government and Officers
        360k78 k. Liabilities for Official Acts. Most Cited Cases
A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's (1) formulating plans, policies, or designs; or (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as making administrative adjudications, allocating resources, negotiating contracts, or hiring, firing, transferring, assigning, or supervising personnel; or (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or at-

tempting to arrest persons; or (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students. (Per Lyons, J., with two Justices concurring, one Justice concurring specially, one Justice concurring in part and concurring in the judgment, and one Justice concurring in the judgment.) Const. Art. 1, §§ 13, 14.

**[5] States 360 ⚏79**

360 States
    360II Government and Officers
        360k79 k. Liabilities of Officers for Negligence or Misconduct. Most Cited Cases
State agent shall not be immune from civil liability in his or her personal capacity (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law. (Per Lyons, J., with two Justices concurring, one Justice concurring specially, one Justice concurring in part and concurring in the judgment, and one Justice concurring in the judgment.) Const. Art. 1, §§ 13, 14.

**[6] States 360 ⚏79**

360 States
    360II Government and Officers
        360k79 k. Liabilities of Officers for Negligence or Misconduct. Most Cited Cases
Physicians employed by State university to work at student health center were not entitled to State-agent immunity in medical-malpractice action arising from their treatment of university student. (Per Lyons, J., with two Justices concurring, one Justice concurring specially, one Justice concurring in part and concurring in the judgment, and one Justice concurring in the judgment.) Const. Art. 1, §§ 13, 14.

**\*393** Marion F. Walker, Birmingham, for petition-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392
**(Cite as: 792 So.2d 392)**

er.

Michael A. Florie and Joseph S. Miller of Starnes & Atchison, L.L.P., Birmingham, for respondents Dr. David Maxwell, Dr. Patricia A. Hubbs, Dr. John Galaznik, and Dr. Joe Bethany (brief on 2d application for rehearing filed by W. Stancil Starnes, Michael A. Florie, and J. Will **\*394** Axon, Jr., of Starnes & Atchison, L.L.P., Birmingham).

David G. Wirtes, Jr., of Cunningham, Bounds, Yance, Crowder & Brown, L.L.C.; and S. Greg Burge of Heninger, Burge, Vargo & Davis, Birmingham, for amicus curiae Alabama Trial Lawyers Ass'n, in support of the plaintiff's application for rehearing.

*On Application for Rehearing*

LYONS, Justice.

The opinion of November 24, 1999, is withdrawn and the following is substituted therefor.

Paul J. Cranman, as executor of the estate of his son Matthew Cranman, deceased, was the plaintiff in a medical-malpractice action. He appealed from summary judgments entered in favor of the defendants David Maxwell, M.D.; Patricia A. Hubbs, M.D.; John Galaznik, M.D.; and Joe Bethany, M.D. (hereinafter sometimes referred to collectively as "the physicians"). The Court of Civil Appeals affirmed, holding that the physicians were entitled to discretionary-function immunity. *Cranman v. Maxwell,* 792 So.2d 386 (Ala.Civ.App.1998). We granted Paul Cranman's petition for certiorari review, and we reverse.

*I. Facts*

Matthew Cranman was a student at the University of Alabama in 1994. On September 12, 1994, he went to the Russell Student Health Center of the University of Alabama ("the student health center"), complaining of swelling and pressure in the area of his left testicle. Dr. Maxwell examined him, diagnosed epididymitis (an inflammation of the sperm-collecting tubes near the testicles), and prescribed antibiotics and sitz baths. Matthew returned on October 11, 1994, complaining of low-

back pain. Dr. Galaznik examined him, diagnosed muscle pain, and prescribed medication. On November 7, 1994, Matthew again went to the student health center, reporting that he had a possible prostate infection. Dr. Maxwell saw him and determined that he had a slightly tender mass effect in the left epididymis; however, a testicular examination was negative. Dr. Maxwell prescribed more antibiotics and instructed Matthew to return in two weeks. Matthew returned on November 29, 1994, reporting mild discomfort in his left testicle. Dr. Bethany examined him, noted a slight enlargement of the testicle, changed his medication, and recommended that he consult a urologist in his hometown during the semester break.

Matthew did not visit the student health center again until August 23, 1995. At that time he complained of a stabbing, burning pain in his left flank. Dr. Maxwell examined him, diagnosed left paralumbar pain, and prescribed medication and physical therapy. Two days later, when Matthew reported for physical therapy, he was examined by Dr. Hubbs, who noted that he was tender along the costal margin, in his left side, and in his flank. Dr. Hubbs thought Matthew had suffered a strain of the chest muscles; she prescribed additional medication, recommended that he try heat or ice, and instructed him to return in a week. When Matthew returned six days later, he reported that he was feeling better, and Dr. Hubbs gave him additional medication. On October 11, 1995, Matthew reported to the student health center with back pain and a flareup of his epididymitis. Dr. Hubbs noted that he had the symptoms of a hydrocele and that he had seen a urologist. She examined him, diagnosed recurrent epididymitis and a back strain, prescribed pain and antibiotic medication and back exercises, and instructed him to return in two weeks if he did not improve. **\*395** On November 9, 1995, Matthew went to the student health center complaining of nausea, vomiting, and diarrhea. Dr. Maxwell examined him, but Matthew reported no back or testicular pain. On November 17, 1995, Matthew returned, with recurring back pain, and reported that he had been under stress and had not slept for a week. Dr. Hubbs examined him and found that he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392
**(Cite as: 792 So.2d 392)**

was experiencing shoulder pain and tightness different from the earlier back pain. She diagnosed upper back and neck strain, prescribed heat and medication, and referred him to physical therapy.

In December 1995, Matthew was diagnosed with testicular cancer. Cancerous cells were found in his lungs and behind his kidneys. His left testicle was surgically removed, and he underwent chemotherapy, radiation, and other cancer treatments.

## II. Procedural History

In September 1996, Matthew sued Drs. Maxwell, Hubbs, and Galaznik; the student health center; and others. He alleged that the physicians had negligently or wantonly breached the applicable standard of care in treating him, thereby breaching an implied contract to render medical treatment. In their answer, the physicians asserted the defense of immunity because, they claimed, they were engaged in a discretionary function within the scope of their authority as employees of the University of Alabama. They then moved for a summary judgment on the basis of immunity. Matthew then amended his complaint to add Dr. Bethany as a defendant and to dismiss the student health center.

Matthew Cranman died on November 6, 1997.FN1 On December 31, 1997, the trial court entered a summary judgment in favor of Drs. Maxwell, Hubbs, and Galaznik, concluding that they were protected from liability by discretionary-function immunity. On January 8, 1998, Paul Cranman, Matthew's father and executor, was substituted as a plaintiff, pursuant to Rule 25(a), Ala. R. Civ. P. On January 20, 1998, the trial court entered a summary judgment in favor of Dr. Bethany, based upon immunity. The trial court certified the summary judgments as final, pursuant to Rule 54(b), Ala. R. Civ. P. Paul Cranman appealed to this Court, which transferred the case to the Court of Civil Appeals, pursuant to § 12-2-7(6), Ala.Code 1975. In affirming the summary judgments, the Court of Civil Appeals stated, in pertinent part:

FN1. The Court of Civil Appeals' opinion

states that the record does not indicate whether Matthew Cranman's death was caused by cancer, see 792 So.2d at 389, but the petitioner's brief states that Matthew "died from cancer."

"As Matthew did in the trial court, the executor principally argues on appeal that precedents from other states rejecting immunity for state-employed physicians are persuasive and should be followed by Alabama courts. The trial court, while stating that '[Matthew] made a very compelling argument that [the state physicians] should not be entitled to discretionary function immunity because the character of the discretion which they exercised was medical and not governmental,' concluded that 'under the current law of the State of Alabama a State-employed physician is entitled to immunity whether he's exercising "medical discretion" or "governmental discretion." ' We agree with the trial court that no Alabama opinion has made any distinction, for purposes of tort liability, among the various forms of discretion that may be afforded to public servants in this state. Indeed, *Kassen v. Hatley,* 887 S.W.2d 4 (Tex.1994), one of the authorities upon which the executor principally relies, describes Alabama as a state in which government medical personnel are immune from tort liability **\*396** arising from the exercise of discretion in both governmental and medical decisions. 887 S.W.2d at 11 (citing *Smith I* [*Smith v. Arnold,* 564 So.2d 873 (Ala.1990) ]).

"....

"In this case, the state physicians were employed to provide health care to the student population at a state university. Their diagnoses of Matthew's condition and their recommendations as to treatment of that condition called for no less 'professional judgment and discretion' than those made by the state-employed physicians in *Barnes [v. Dale,* 530 So.2d 770 (Ala.1988) ], *Smith I,* and *Harper [v. Gremmel,* 703 So.2d 346 (Ala.1997)], or the state-employed trainer in *Lennon [v. Petersen,* 624 So.2d 171 (Ala.1993) ], and it follows that they are entitled to the same discretionary function immunity that was afforded to the defendants in those cases. Thus, the trial court correctly entered the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392
**(Cite as: 792 So.2d 392)**

summary judgment in favor of the state physicians, and we affirm that judgment."

*Cranman v. Maxwell,* 792 So.2d at 391-92.

Paul Cranman petitioned this Court for certiorari review of the Court of Civil Appeals' decision. He frames the issue presented as "whether the physicians in the rendition of purely medical treatment to an individual are performing a discretionary act as contemplated by caselaw and are legally entitled to officer-agent immunity under the Constitution for the State of Alabama, Art. I, Section 14." The Court granted his petition and consolidated this case with three other cases for oral argument. All of the cases question the continuing validity of the doctrine of immunity for health-care providers in the State service. See *Wells v. Storey,* 792 So.2d 1034 (Ala.1999); *Ex parte Rizk,* [Ms. 1970493, Nov.24, 1999] (reh'g pending);[FN*] *Wimpee v. Stella,* [Ms. 1971774, Nov. 24, 1999] (reh'g pending).[FN**]

> FN* Note from the reporter of decisions: On June 30, 2000, the Supreme Court granted the application for rehearing, withdrew the November 24, 1999, opinion, and substituted a new opinion. The November 24, 1999, opinion carried the judgment line "WRIT GRANTED." The opinion substituted on June 30, 2000, was very different; it carried the judgment line "[REHEARING] APPLICATION GRANTED; OPINION OF NOVEMBER 24, 1999, WITHDRAWN; OPINION SUBSTITUTED; WRIT DENIED."

The substituted *Rizk* opinion of June 30, 2000, is published at 791 So.2d 911.

> FN** Note from the reporter of decisions: On September 1, 2000, the Alabama Supreme Court withdrew its no-opinion affirmance in *Wimpee* and issued an opinion. The opinion substituted on September 1, 2000, carried the judgment line "[REHEARING] APPLICATION GRANTED; MEMORANDUM OF NOVEMBER 24, 1999, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED."

The substituted *Wimpee* opinion of September 1, 2000, is published at 791 So.2d 915.

*III. Development of the Doctrine of Immunity*

We today reexamine the doctrine of immunity of officers, agents, and employees of the State for torts committed in the course of their performance of their duties.[FN2]

> FN2. We do not deal here with the absolute immunity of witnesses, judges, prosecutors, and legislators, nor do we overrule *Ex parte Purvis,* 689 So.2d 794 (Ala.1996). In *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court recognized the absolute immunity of the President of the United States and state and federal legislators and noted the common-law origins of that immunity. Noting that a cabinet official did not enjoy absolute immunity, because of the absence of built-in restraints that are applicable to judges and legislators, the Court wrote:
>
> "[M]ost of the officials who are entitled to absolute immunity from liability for damages are subject to other checks that help to prevent abuses of authority from going unredressed. Legislators are accountable to their constituents, and the judicial process is largely self-correcting: procedural rules, appeals, and the possibility of collateral challenges obviate the need for damages to prevent unjust results."
>
> 472 U.S. at 522, 105 S.Ct. 2806 (citation omitted).

We begin our discussion with a review of the doctrine of immunity where the issue **\*397** arises in the context of the immunity available to the State in an action against the State ("State immunity") as opposed to the immunity available to individual defendants sued for actions taken on behalf of the State ("State-agent immunity").[FN3] In *Hutchinson*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392
792 So.2d 392
**(Cite as: 792 So.2d 392)**

*v. Board of Trustees of University of Alabama,* 288 Ala. 20, 256 So.2d 281 (1971), this Court traced the history of State immunity in Alabama, using Copeland and Screws, *Governmental Responsibility for Tort in Alabama,* 13 Ala. L.Rev. 296 (1961), as a rich source of information. Our first Constitution required the Legislature to direct in what manner and in what courts actions could be brought against the State. Art. 6, § 9, Ala. Const. of 1819. The Legislature obliged in the following year with a statute allowing "any claim against the state" to be instituted by petition to the supreme court where two judges would "form a court for the trial of such suit," with provision for trial by jury on demand. Toulmin, *Digest of the Laws of Alabama,* tit. 61, ch. 28, §§ 8-10 (1823).

> FN3. We do not include in this opinion any discussion of actions against State officials for injunctive relief to compel performance of duties imposed by law or the Constitution. See *Aland v. Graham,* 287 Ala. 226, 250 So.2d 677 (1971), recognizing exceptions to Art. I, § 14, in such instances; see, also, *Williams v. Hank's Ambulance Serv., Inc.,* 699 So.2d 1230 (Ala.1997).

In the Constitution of 1865, a change in philosophy first surfaced when the privilege of suing the State was shifted from a matter of right to a matter within the discretion of the Legislature.[FN4] The 1820 legislation and successor provisions permitting actions against the State remained in effect until their repeal in 1875.[FN5] The Constitution of 1875 included, for the first time, a provision stating that "the state of Alabama shall never be made defendant in any court of law or equity." Art. I, § 15, Ala. Const. of 1875. Art. I, § 14, Ala. Const. of 1901, contains the same provision.

> FN4. Art. I, § 15, Ala. Const. of 1865, repeated in Art. I, § 16, Ala. Const. of 1868.

> FN5. Ala. Acts 1874-75, No. 200, p. 271. See, also, *Ex parte State,* 52 Ala. 231 (1875).

In the early years of statehood, this Court allowed a county to enjoy immunity from negligence or nonperformance of its duties except when a statute expressly provided otherwise. A city's liability turned on whether the city was performing a corporate, as opposed to a governmental, function.[FN6] The aforementioned constitutional prohibition of actions against the State dealt only with the State, not cities and counties. The law applicable to cities and counties was outside the sphere of constitutional regulation.[FN7] The decisional law underpinning immunity of cities was overturned in *Jackson v. City of Florence,* 294 Ala. 592, 320 So.2d 68 (1975), in face of dissents arguing in favor of deferring to the Legislature for change in the long-settled understanding of municipal liability.**398** 294 Ala. at 600-04, 320 So.2d at 75-79. This Court adopted a similar rule allowing actions against counties, in *Lorence v. Hospital Bd. of Morgan County,* 294 Ala. 614, 320 So.2d 631 (1975), and *Cook v. County of St. Clair,* 384 So.2d 1 (Ala.1980).

> FN6. Copeland & Screws at 308.

> FN7. *Id.;* see also *Ex parte Board of School Comm'rs,* 230 Ala. 304, 305, 161 So. 108, 109 (1935), noting that city and county boards of education enjoy immunity based "upon the broad principle of public policy," a policy declared by authorities not referring to § 14, but resting upon "the assumption that nothing in the Constitution stood in the way."

In *Hutchinson,* supra, this Court addressed whether the State, acting in its proprietary function, was entitled nonetheless to assert its immunity. Answering in the affirmative, the Court spoke as follows:

> "The wall of 'governmental immunity' is almost invincible, made so by the people through their Constitution as interpreted by this Court. Our cases are clear that the operation of a hospital is a 'governmental function,' but even if we should classify the operation of University Hospital as being a 'business function,' nevertheless, the State could not be sued."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

288 Ala. at 24, 256 So.2d at 284. Today we must decide whether agents of the State sued in their individual capacity are entitled under certain circumstances to similarly sweeping immunity, regardless of how we would classify the activity in which they are engaged.

No counterpart to Art. I, § 14, Ala. Const. of 1901, which declares the State immune from suit, appears in the Constitution of the United States. Also, the United States Constitution has no counterpart to Art. I, § 13, guaranteeing every person a remedy by due process of law for "any injury done ... in his lands, goods, person, or reputation." The immunity of the United States Government is based upon the decisional law of the federal courts, uninfluenced by the presence of provisions comparable to §§ 13 and 14 of the Alabama Constitution of 1901.

"The explanation for the initial acceptance in the United States of the feudal and monarchistic doctrine of sovereign immunity is obscure. In 1821, in *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 411, 412, 5 L.Ed. 257, Chief Justice Marshall declared that no suit could be commenced or prosecuted against the United States without its consent. On the basis of this and other early cases the rule of tort immunity became firmly established on the procedural ground that the Federal Government could not be sued without its consent. When justifications were offered, they were consistent with the form in which the rule was stated. The explanation most commonly quoted is that of Mr. Justice Holmes, in *Kawananakoa v. Polyblank,* (1907) 205 U.S. 349, 353, 27 S.Ct. 526, 51 L.Ed. 834: 'A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends.' A separate idea of substantive immunity, as distinct from the denial of the right to sue, also appeared in the federal decisions, and in *Gibbons v. United States,* (1868) 75 U.S. (8 Wall.) 269, 19 L.Ed. 453, it was held that the Government was immune from all liability in tort."

*Restatement (Second) of Torts* § 895A cmt. a

(1977). Over time, the United States Congress, unfettered by constitutional restraints on lawsuits against the United States and not subject to any constitutional guaranty that a person would have the right to a civil action to redress an injury, enacted statutes that allowed the United States Government to be sued in certain circumstances. For example, in 1855 Congress established the Court of Claims to hear contract cases; in 1887, the Tucker Act waived immunity from suit and conferred jurisdiction upon the Court of Claims and the United States district courts to hear claims against the United *399 States relating to the "taking" of property; in 1946, the Federal Tort Claims Act allowed actions against the United States for money damages for torts committed by Government employees and eliminated personal liability of those employees.

[1] Because the source of the immunity from suit enjoyed by the State of Alabama differs from the source of immunity of the United States Government in that the State's immunity is constitutionally based,[FN8] neither the Alabama Legislature nor this Court has the power to waive the State's immunity from suit.[FN9] Nor can the Legislature or this Court eliminate the right to a remedy by a civil action against an individual unless our constitution authorizes it to do so.

FN8. Art. I, § 14, Ala. Const. of 1901.

FN9. The only statutory basis presently existing for making compensation available to citizens of the State who have suffered injuries caused by the State or its agencies is found in §§ 41-9-60 to -74, Ala.Code 1975, wherein the Legislature established the Board of Adjustment, which functions outside the judicial system. The Legislature, in those Code sections, recognized a moral obligation where there is no legal obligation. *Hawkins v. State Board of Adjustment,* 242 Ala. 547, 7 So.2d 775 (1942). It extends a measure of compensation or relief when the rule of sovereign immunity exempts the State and its re-

spective agencies from suit. *State ex rel. McQueen v. Brandon,* 244 Ala. 62, 12 So.2d 319 (1943).

Copeland and Screws, in their 1961 article, supra, refer to State-agent immunity only in passing, when dealing with the separate concept of governmental immunity.[FN10] They conclude:

FN10. Copeland & Screws at 307.

"Sovereign immunity not only protects state agencies and corporations, but officers, agents or employees in their *official capacity* where the suits [involve] a state obligation. The problem of agency here is one of incongruity-the individual is not liable while acting for the state if the suit directly affects the state treasury, but the agent is liable for torts committed within his authority and cannot escape personal liability through the immunity shield. Since the state 'can do no wrong,' any tort committed by an employee is without authority and the employee cannot set up a defense to escape liability that he was acting within his authority."

Copeland & Screws at 307 (emphasis in original) (footnotes omitted).

In England, the doctrine that "the king can do no wrong" came to be accompanied by the concept that his ministers were personally responsible when they acted illegally. Under their authority to create a common law, courts have struggled over the years to develop a meaningful compromise between the two extremes.[FN11] *Restatement (Second) of Torts* § 895D, "Public Officers" (1974), codifies this compromise, with its dichotomy between discretionary functions, in regard to which the public officer or employee is immune, and ministerial functions, in regard to which the public officer or employee is personally liable.

FN11. *Restatement (Second) of Torts* § 895D, "Public Officers," cmt. a (1974).

In *Mitchell v. Forsyth,* 472 U.S. 511, 521, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court recognized the footings of the doctrine of immunity in considerations of the separation-

of-powers doctrine. Art. III, § 43, Ala. Const. of 1901, requires that each of the three separate co-equal branches confine its activities to its respective sphere. While we have not heretofore considered the separation-of-powers doctrine as part of the equation in determining issues of liability of State agents, other jurisdictions have traced the **\*400** doctrine of State-agent immunity back to the provisions of their respective constitutions mandating separation of powers. See, e.g., *Adams v. City of Tenakee Springs,* 963 P.2d 1047 (Alaska 1998); *Sutton v. Golden Gate Bridge, Highway & Transp. Dist.,* 68 Cal.App.4th 1149, 81 Cal.Rptr.2d 155 (1998); *Department of Health & Rehabilitative Servs. v. B.J.M.,* 656 So.2d 906 (Fla.1995); *Hiers v. City of Barwick,* 262 Ga. 129, 414 S.E.2d 647 (1992), *superseded by constitutional amendment,*as stated in*City of Thomaston v. Bridges,* 264 Ga. 4, 439 S.E.2d 906 (1994); *Ransom v. City of Garden City,* 113 Idaho 202, 743 P.2d 70 (1987); *Rumbold v. Town of Bureau,* 221 Ill.App.3d 222, 581 N.E.2d 809, 163 Ill.Dec. 655 (1991); *Wade v. Norfolk & Western Ry.,* 694 N.E.2d 298 (Ind.App.1998); *Goodman v. City of LeClaire,* 587 N.W.2d 232 (Iowa 1998); *Hardy v. Bowie,* 719 So.2d 1158 (La.App.1998); *Christensen v. Mower County,* 587 N.W.2d 305 (Minn.Ct.App.1998); *Mahan v. New Hampshire Dep't of Admin. Servs.,* 141 N.H. 747, 693 A.2d 79 (1997); *Broadway & 67th St. Corp. v. City of New York,* 116 Misc.2d 217, 455 N.Y.S.2d 347 (Sup.Ct.1982), *order rev'd,*100 A.D.2d 478, 475 N.Y.S.2d 1 (1984); *Moody v. Lane County,* 36 Or.App. 231, 584 P.2d 335 (1978); *City of Brownsville v. Alvarado,* 897 S.W.2d 750 (Tex.1995); *Hudson v. Town of East Montpelier,* 161 Vt. 168, 638 A.2d 561 (1993).

Soon after the Constitution of 1901 was adopted, this Court, in *Elmore v. Fields,* 153 Ala. 345, 45 So. 66 (1907), recognized the right of a citizen to sue a State employee for a tort committed in the line of duty. *Elmore* was the first Alabama case ever to deal with the issue of immunity for State agents sued in their individual capacity for the commission of a tort. The Court recognized no immunity, citing *State v. Hill,* 54 Ala. 67 (1875), wherein the Court had held that the State could not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392
**(Cite as: 792 So.2d 392)**

be liable under the doctrine of respondeat superior for the torts of its agents. The Court in *Elmore* also cited *United States v. Lee,* 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882), wherein the Supreme Court had quoted from Chief Justice Marshall's opinion in *Osborn v. Bank of United States,* 22 U.S. (9 Wheat.) 738, 842-43, 6 L.Ed. 204 (1824), as follows:

" '[B]ut if the person who is the real principal, the person who is the true source of the mischief, by whose power and for whose advantage it is done, be himself above the law, be exempt from all judicial process, it would be subversive of the best established principles to say that the laws could not afford the same remedies against the agent employed in doing the wrong which they would afford against him could his principal be joined in the suit.' "

106 U.S. at 213. Thus, because the State can do no wrong, its agents, when committing a tort, are not acting within their authority and, therefore, they do not act on behalf of the State. *Elmore,* 153 Ala. at 351, 45 So. at 67.

Section 13, with its guaranty of a right to a remedy, was applied in *J.B. McCrary Co. v. Phillips,* 222 Ala. 117, 130 So. 805 (1930), where a contractor argued that a statute granting Jefferson County the authority to build a sewer system also granted immunity to the county and that the county's immunity shielded it from liability. In rejecting this argument, this Court stated that such a construction of the statute would conflict with § 13 of the Constitution.

The Constitution and cases construing it require that we not ignore § 13 in order to protect State agents from suit. However, the vulnerability of State agents to suit, if not constrained, could lead to excessive judicial interference in the affairs of coequal branches of government, contrary to **\*401** § 43. In *Finnell v. Pitts,* 222 Ala. 290, 132 So. 2 (1930), a divided Court (4-3) allowed an action in tort to proceed against a State agent. The dissenting opinion of Justice Thomas invoked as an extreme example the problems that would be posed if the

majority's holding led to tort actions against the Governor. 222 Ala. at 303, 132 So. at 15.

We cannot ignore precedents such as *Elmore, J.B. McCrary Co.,* and *Finnell,* clearly recognizing an open door to lawsuits against State agents and written by Justices of this Court who lived, worked, and wrote in an era much closer to the drafting of the Constitution of 1901 than we do. Yet, at the same time, we cannot ignore the strong policy against judicial interference in the affairs of State government as articulated in § 14 and mandated by § 43. Although § 14 is, by its terms, restricted to prohibiting lawsuits against the State, we cannot disregard its impact upon our obligation to observe the constitutional separation of powers. However, we cannot give excessive deference to the authority of the legislative branch, grounded in the separation-of-powers doctrine stated in § 43, to eliminate entirely personal liability of State agents. The authority to exercise the judicial power in § 6.01 of Amendment No. 328 appears after Art. I, § 36.FN12 Section 36 erects a firewall between the Declaration of Rights that precedes it and the general powers of government, including the authority to exercise judicial power, that follow it. We must, as far as possible, construe §§ 13, 14, 36, and 43 and § 6.01 of Amendment No. 328"as a whole and in the light of [the] entire instrument and to harmonize with other provisions." *State Docks Comm'n v. State ex rel. Cummings,* 227 Ala. 414, 417, 150 So. 345, 346 (1933).

> FN12. "That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that *everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate.*" Art. I, § 36, Ala. Const. of 1901 (emphasis added).

[2] In light of the foregoing constitutional provisions, we conclude that while we have the constitutional power to decide cases-thereby applying the law in cases that come before us-if the authority

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392
**(Cite as: 792 So.2d 392)**

conferred upon this Court pursuant to the Judicial Article (Article VI) conflicts with the provisions of § 13, we must construe § 13 as dominant, subject to our obligation to observe the separation of powers established by § 43. In applying the doctrine of separation of powers, we must recognize § 14 as an expression of a strong public policy against the intrusion of the judiciary into the management of the State while, at the same time, acknowledging that it speaks only to a prohibition of lawsuits against the State and does not mention lawsuits against individuals. For this reason, the express provisions of § 13 establishing the right to a remedy through a lawsuit against an individual must, as to the issue before us, stand above the implications from § 14 in the hierarchy within the declaration of rights. In the final analysis, we cannot invoke merely the authority to declare "sound public policy" through case-law in order to find State agents immune from suit; in order to declare them immune, we must find the immunity in constitutional provisions. This constitutional backdrop enables us to articulate public policy through caselaw in this troublesome area, using constitutional principles, and not simply personal notions of good government, as our compass.

[3] Against this backdrop, we turn to the more recent cases dealing with State-**\*402** agent immunity. Seventy-five years after this Court first recognized in *Elmore* the open door to lawsuits against State agents, this Court decided *DeStafney v. University of Alabama,* 413 So.2d 391 (Ala.1981). In *DeStafney,* after recognizing that a claim alleging personal injury caused by the alleged negligent conduct [FN13] of a State employee, even when that conduct is committed in the line and scope of his employment, is not within the ambit of the constitutional prohibition against lawsuits against the State as expressed in § 14, this Court adopted a rule of qualified immunity derived from *Restatement (Second) of Torts* § 895D.[FN14] The adoption of that rule partially closed the door that had been opened in *Elmore.*

FN13. State-agent immunity is unavailable where the governmental agent acts willfully, maliciously, fraudulently, in bad

faith, beyond his or her authority, or under a mistaken interpretation of the law. See *Wright v. Wynn,* 682 So.2d 1 (Ala.1996); *Barnes v. Dale,* 530 So.2d 770 (Ala.1988); *Rigby v. Auburn Univ.,* 448 So.2d 345 (Ala.1984); *DeStafney,* 413 So.2d at 395; *Unzicker v. State,* 346 So.2d 931 (Ala.1977).

FN14. *DeStafney* refers to § 14 as a source of qualified immunity. 413 So.2d at 392. See also *Ex parte Kelley,* 739 So.2d 1095 (Ala.1999); *Pack v. Blankenship,* 612 So.2d 399, 403 (Ala.1992).

Over the years since this Court decided *DeStafney,* a case in which an injured child was allowed to sue an employee of a daycare center operated by the University of Alabama, based on the ministerial nature of the employee's duties, the doctrine of State-agent immunity has been applied in a variety of settings. A review of the cases in their factual context illuminates the line the courts of this State have drawn between conduct involved in planning or decision-making in the administration of government [FN15] and the conduct of those required to carry out the orders of others or to administer the law with little choice as to when, where, how, or under what circumstances their acts are to be done.[FN16] See the Appendix to this opinion for a compilation of cases from this Court and the Court of Civil Appeals applying the doctrine of State-agent immunity (792 So.2d at 417).

FN15. *Restatement (Second) of Torts* § 895D, "Public Officers," cmt. b (1974).

FN16. *Id.,* cmt. g.

The most difficult applications of the rule derived from the *Restatement* come in instances where the discretion being exercised has little, if any, bearing on the administration of an agency of government or the execution of duties imposed by law. We cannot insulate State employees acting outside that zone, without disregarding § 13. In *Taylor v. Shoemaker,* 605 So.2d 828 (Ala.1992), this Court again dealt with the question of qualified

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392
**(Cite as: 792 So.2d 392)**

immunity and noted the impact of *DeStafney* on earlier cases:

"The plaintiffs recognize that § 14 of the Constitution of Alabama of 1901 ('the State of Alabama shall never be made a defendant in any court of law or equity') extends immunity to state officers and employees acting within their official capacities, but contend that a tortious act by a state officer or employee removes such an officer or employee from this immunity. They cite *Finnell v. Pitts,* 222 Ala. 290, 132 So. 2 (1930). By a four-to-three vote, this Court held in that case:

" 'We also think that this suit does not violate the constitutional prohibition against suing the state. For though the state cannot be sued (section 14, Constitution), its immunity from suit does not relieve the officers of the state from their responsibility *403 for an illegal trespass or tort on the rights of an individual, even though they act pursuant to authority attempted to be conferred by the state. For when the state officers take private property though they apply it to a public use, a tort has been committed by them. Private property rights have been thereby unlawfully disturbed by them. We believe that the rule is universal that an agent is not excused from personal liability for a tort which he commits for and in the name of his principal, whether the principal is liable to suit or not.

" 'The decisions of this court and the authorities generally apply that principle to torts committed by state officers in the name of the state and on account of the state's public affairs. An individual cannot justify a tort on a contention that it is for the state, if the state had no such right. If the state had the right, then its officers, acting by its authority, were justified. The officers cannot be justified upon a mistaken notion of state authority. An inadvertent tort-feasor is such, though he may not be liable to the amount of damages as a willful tort-feasor would be. The question now being discussed is not the extent of liability, but the fact of liability vel non. If in the promotion of the state's business its officers without authority of law apply private property to the state's enterprises, they are guilty of the same nature of wrong, as if they were acting as agents of a private corporation. The wrong is that of

the officers personally as well as that of their principal. The officers are sued, not because the state has committed a wrong, but because they personally, though acting as officers, have done so. When a person commits a tort, it is wholly immaterial upon the question of his liability, whether he was acting officially or personally.'

"222 Ala. at 292-93, 132 So. at 4-5. (Citations omitted.)

"The holding by a majority of this Court in *Finnell v. Pitts* should be read in light of later cases decided by this Court involving the immunity of public officers. The law of this State is that there is immunity when the state officer or employee has not exceeded his or her authority, but has merely negligently performed a statutory duty while acting pursuant to statutory authority. *Gill v. Sewell,* 356 So.2d 1196 (Ala.1978). Likewise, consistent with *Restatement (Second) of Torts,* § 895D, "Public Officers" (1974), there is immunity when the state officer or employee commits a tort while engaged in the exercise of a discretionary function. *Sellers v. Thompson,* 452 So.2d 460 (Ala.1984). Consequently, any statements made in *Finnell v. Pitts,* supra, and *Elmore v. Fields,* 153 Ala. 345, 45 So. 66 (1907) (the only Alabama authority on which the majority of this Court relied in *Finnell* ), regarding the application of the qualified immunity defense should be considered in light of these later holdings."

605 So.2d at 829-30. This Court in *Taylor* noted that the sweep of *Finnell* had been restricted by *DeStafney.*

Our more recent cases dealing with the question when conduct constitutes the performance of a discretionary function as opposed to the performance of a ministerial function have used language that suggests a requirement that the actor be involved in "planning tasks" and "policy-level decision-making" in order to qualify for immunity. See *Defoor v. Evesque,* 694 So.2d 1302, 1305 (Ala.1997), followed in *Town of Loxley v. Coleman,* 720 So.2d 907 (Ala.1998). Recently, the Court of Civil Appeals referred to conduct that falls under*404 the heading of "ministerial functions" as

"characterized by operational tasks and minor decision-making." *Kassaw v. Minor,* 717 So.2d 382, 385 (Ala.Civ.App.1998). This language in these recent cases could be read as disallowing State-agent immunity in instances where the actor, even though he may be making a complex decision beyond the range of the lay person, is not involved at the time in decision-making that directly relates to the exercise of a governmental-policy judgment.[FN17]

> FN17. For an illustration of the concept of protecting "only governmental actions and decisions based on considerations of public policy," as that concept applies to the standards for liability under the Federal Tort Claims Act, see *Berkovitz v. United States,* 486 U.S. 531, 536-37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). Because all federal employees covered by the Federal Tort Claims Act are immune, the question whether the employee's action or decision is the kind of judgment "that the discretionary function exception was designed to shield" is asked for the purpose of determining the extent of the liability of the United States.

Under the most elementary elaboration of the *DeStafney* formulation, conduct related to policy and planning and involving the exercise of judgment carries immunity, while ministerial acts carrying out the commands of decision-makers do not. However, at least two primary problems arise in the application of this test drawn from the American Law Institute's appreciation of prevailing law from around the country.

First, as is the case with liability under the Federal Tort Claims Act, as discussed in *Berkovitz v. United States,* see note 17, cases from other jurisdictions often draw the line in the context of statutory remedies under which all agents enjoy immunity and therefore the point of demarcation relates only to the extent to which the public coffers will be open. These decisions arising in a context where all agents are immune do not have to reckon with the effect upon the rendition of governmental

services if agents are inclined to indecision rather than risk personal liability. However, because we are bound by the aforementioned constitutional provisions, we cannot allow such extraconstitutional considerations to control the outcome.

Second, as long as the agent has not disobeyed clear instructions, almost any challenged conduct can be reduced to the exercise of some degree of judgment or discretion. However, judicial deference to all conduct in which judgment or discretion is employed would exalt the immunity of § 14 over the right to a remedy preserved by § 13. As an example, there should be some recognizable difference in legal consequence between, on the one hand, a prison warden's decision not to fire or not to sanction the entity contracting with the State Department of Corrections to provide medical services and, on the other hand, a decision by the driver of a pickup truck on how to drive through or around potholes while transporting prisoners. Each situation involves judgment or discretion. Under our recent cases, the warden is immune[FN18] and the truck driver is not.[FN19]

> FN18. *Ex parte Davis,* 721 So.2d 685 (Ala.1998).

> FN19. *Town of Loxley v. Coleman,* 720 So.2d 907 (Ala.1998).

We cannot, in blind obedience to the doctrine of stare decisis, continue to accept an expansive application of caselaw characterizing as a discretionary function conduct remote from the execution of governmental policy; to do so would perpetuate an erroneous construction of the Constitution. *Ex parte Dan Tucker Auto Sales, Inc.,* 718 So.2d 33, 42 (Ala.1998) (Lyons, J., concurring specially) (citing *Gwin, White & Prince, Inc. v. Henneford,* 305 U.S. 434, **405** 454-55, 59 S.Ct. 325, 83 L.Ed. 272 (1939) (Black, J., dissenting)). The time has come to face the necessity of defining "injury," as that word is used in § 13, in lawsuits against State employees alleging torts committed in the line of duty, in a manner that neither violates § 13 nor prefers § 14 or § 6.01 of the Judicial Article over § 13. We

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392
**(Cite as: 792 So.2d 392)**

decline to label all discretionary acts by an agent of the State, or all acts by such an agent involving skill or judgment, as "immune" simply because the State has empowered the agent to act. Such an expansive view of the power of the State to act with immunity for its agents would be inconsistent with the rights secured by § 13.

### IV. Restatement of the Rule Governing State-agent Immunity

We therefore restate the rule governing State-agent immunity:

[4] A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's

(1) formulating plans, policies, or designs; or

(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
(a) making administrative adjudications;
(b) allocating resources;
(c) negotiating contracts;
(d) hiring, firing, transferring, assigning, or supervising personnel; or

(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or

(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

[5] Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

We today only modify *Elmore* and cases relying upon it so as to preserve the proper balance between §§ 13, 14, 43, and § 6.01 of the Judicial Article. Our decision today strikes a balance between constitutional provisions-between the right to a remedy guaranteed by § 13 and the immunity of the State provided for by § 14; this decision is informed by the wisdom of the doctrine of separation of powers, as considered in light of the presence of § 14, and this decision should prevent Justice Thomas's point made by exaggeration in his dissenting opinion in *Finnell* from becoming prophecy. The Legislature, should it see fit to do so, can create a mechanism for providing State employees with liability insurance or it can propose a constitutional amendment that would authorize statutory procedures to make the **\*406** State amenable to lawsuits for the torts of its agents while protecting State employees from lawsuits.

### V. Application of the Restated Rule of State-agent Immunity to the Physicians

[6] We now return to the question presented by this case: Whether physicians employed by the University of Alabama to work at the student health center, a facility funded by the State for the purpose of providing readily accessible medical care to students, are entitled to State-agent immunity. The physicians argue that decision-making exercised by a physician in treating a patient should be entitled to immunity because, they say, such decision-mak-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing inherently involves the utmost discretion, while the plaintiff Cranman argues that a physician's treatment of a patient is too remote from governmental policy to be entitled to immunity. In response, the physicians argue that governmental policy need not be material to the physician's decision-making because, they say, the business of government is whatever government chooses to do.

We determine the immunity issue pursuant to today's restatement of the rule governing State-agent immunity [FN20] in light of the constitutional provisions that guide our determination. The conduct of the physicians, in their treatment of Matthew Cranman, does not fit within any category of conduct recognized by the restated rule as immune. The physicians are therefore not entitled to State-agent immunity. Thus, we reverse the judgment of the Court of Civil Appeals and remand the case for further proceedings consistent with this opinion.

FN20. See Part IV, supra, 792 So.2d at 405.

APPLICATION GRANTED; OPINION OF NOVEMBER 24, 1999, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.

HOOPER, C.J., and HOUSTON, J., concur.
JOHNSTONE, J., concurs specially.
COOK, J., concurs in the judgment and concurs in part in the opinion.
BROWN, J., concurs in the judgment.
MADDOX and SEE, JJ., dissent.
ENGLAND, J., recuses himself.JOHNSTONE, Justice (concurring specially).

I concur, but with the reservation that the *Restatement (Second) of Torts* § 895D "Public Officers" (1974), and not § 14 or § 43 of the Alabama Constitution of 1901, seems to be the current basis for Alabama's doctrine of State-agent immunity, *DeStafney v. University of Alabama,* 413 So.2d 391, 393 (Ala.1981), although I recognize that some of our cases, including *DeStafney,* contain language to the effect that § 14 is, to some extent, the basis. The *Restatement of Torts* derives principally from the common law and from the public-

policy judgments of the legal scholars who have authored the *Restatement of Torts* in a private capacity and not in the capacity of public officials. This basis of common law and legal scholarship amply supports the *re*-restatement of the law of State-agent immunity in this *Cranman* decision, which is worded to provide a way to distinguish immune conduct from nonimmune conduct with consistent accuracy.

COOK, Justice (concurring in the judgment and concurring in part in the opinion).

I concur in the judgment. I would concur in the opinion but for two concerns. **\*407** First, because of the holding in this case, it is unnecessary to "restate the rule governing State-agent immunity"(792 So.2d at 405) in the broad, general terms the main opinion uses in its purported restatement. Specifically, that opinion states:

"A state agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's

"(1) formulating plans, policies, or designs; or

"(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:

"(a) making administrative adjudications;

"(b) allocating resources;

"(c) negotiating contracts;

"(d) hiring, firing, transferring, assigning, or supervising personnel; or

"(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or

"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students."

792 So.2d at 405 (emphasis in main opinion).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392
**(Cite as: 792 So.2d 392)**

Because none of these elements is involved in this case, I regard the statements regarding this "rule" as *dicta,* and I do not concur in them.

Second, I disagree with much of the discussion in Part III of the main opinion, regarding the "development of the doctrine of immunity." The discussion implies that Alabama's discretionary-function immunity arises out of Ala. Const.1901, § 14. That is not so.

Section 14 "prohibits the State and its *agencies* from being made defendants in any court of law." *Rutledge v. Baldwin County Comm'n,* 495 So.2d 49, 51 (Ala.1986) (emphasis added). This Court has "interpreted § 14 as affording absolute immunity to *some* State officials, as well as to the State itself." *DeStafney v. University of Alabama,* 413 So.2d 391, 392 (Ala.1981) (on rehearing) (emphasis added). Thus, where § 14 is applicable, it is an absolute defense to tort liability.

It has long been recognized, however, that not every person or agency infused with some aspect of governance qualifies for § 14 immunity. "State officers and employees, in their official capacities and individually, ... are absolutely immune from suit [only] when the action is, in effect, one against the State." *Phillips v. Thomas,* 555 So.2d 81, 83 (Ala.1989). "In determining whether an action against a state officer is barred by § 14, the Court considers the nature of the suit or the relief demanded, not the character of the office of the person against whom the suit is brought." *Ex parte Carter,* 395 So.2d 65, 67-68 (Ala.1980). An action is essentially one against the state "when a result favorable to the plaintiff would *directly affect* a contract or property right of the State." *Id.* at 68 (emphasis added). " '[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.' " *DeStafney,* 413 So.2d at 393 (quoting *Ford **\*408** Motor Co. v. Department of Treasury of Indiana,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945)).

The scope of § 14 is further limited by the fact that it extends only to "the protection of '*immediate and strict* governmental agencies of the State, as its State Board of Administration, State Docks Commission, ... the University of Alabama, the State Insane Hospital, and other mere governmental agencies.' " *City of Foley v. Terry,* 278 Ala. 30, 34, 175 So.2d 461, 465 (1965) (emphasis added) (quoting *Ex parte Board of School Comm'rs of Mobile County,* 230 Ala. 304, 305, 161 So. 108, 109 (1935), which concluded that § 14 does not apply to "county and city boards of education").

Where the action is *not* one against the State, however, this Court has adopted the discretionary-function analysis of the *Restatement (Second) of Torts* § 895D (1974). *DeStafney,* supra; *Grant v. Davis,* 537 So.2d 7 (Ala.1988) (citing *DeStafney* as the progenitor of Alabama cases applying the *Restatement* approach); *Crowe v. City of Athens,* 733 So.2d 447 (Ala.Civ.App.1999) (citing *Grant v. Davis* as the case adopting the *Restatement* approach). This Court said in *DeStafney:*

"Even absent the requisite identity between the State and the state official or employee defendant to invoke absolute immunity, the *Restatement's* doctrine of substantive immunity may yet be invoked if the official or employee 1) is engaged in the exercise of a discretionary function; 2) is privileged and does not exceed or abuse the privilege; or 3) is not negligent in the performance of his responsibility."

413 So.2d at 395.

Thus, where an action is against a public official and is not, in reality, one against the State, the immunity analysis involves the principles of the *Restatement*-not § 14. *Defoor v. Evesque,* 694 So.2d 1302, 1305 (Ala.1997) (*Restatement* principles apply "[w]hen a State employee is sued for negligence in an action that is not, in effect, an action against the State"). See also *Alabama State Docks v. Saxon,* 631 So.2d 943, 948 (Ala.1994) ( "employees of the State Docks are protected from individual liability only under the doctrine of discretionary function immunity"); *Nance v. Matthews,* 622 So.2d 297 (Ala.1993).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Admittedly, language in *some* of our cases suggests that even discretionary-function immunity proceeds from § 14. For example, *DeStafney* suggested that § 14 "extend[s] a *qualified* immunity" in such cases. 413 So.2d at 392 (emphasis added); see also *Ex parte Kelley,* 739 So.2d 1095 (Ala.1999); *Pack v. Blankenship,* 612 So.2d 399, 403 (Ala.1992) (stating that § 14 also contemplates "qualified immunity," but, nevertheless, using the analysis of the *Restatement* and the cases applying it). The statement in *DeStafney* was not followed by any citation of authority, however. Indeed, the contrary proposition was apparent in *Ex parte Board of School Commissioners, supra,* which directly rejected the contention of the Commissioners that they came "within the protection of section 14." 230 Ala. at 304, 161 So. at 109. In that case, this Court, discussing the immunity afforded to county and city boards of education "from liability for torts of [their] servants or agents," suggested that such immunity flowed from the "broad principle of public policy," rather than from § 14. 230 Ala. at 305, 161 So. at 109.

In fact, *DeStafney* itself went on to explain that the concept of "*qualified* immunity ... accords with the majority rule with respect to public officials and employees, *even in those states that have no comparable constitutional* immunity." 413 So.2d at 392 (emphasis added). The Court then proceeded to consider whether **\*409** the employee of a daycare facility operated by the University of Alabama was entitled to qualified immunity under the principles set forth in the *Restatement.* 413 So.2d at 393-96.

As a matter of pure logic, the distinction between § 14 and the *Restatement* is patent and fundamental. If § 14 applies, it matters not whether the challenged conduct of the defendant was discretionary or was ministerial. The official is *absolutely* immune. In such a case, there is nothing to "weigh" or to "balance." The result is not based on "policy," but on the express prohibition of Alabama's Constitution.

On the other hand, where the action is not one against the State, the immunity analysis is based on considerations of *public policy* and proceeds upon the general principles of the *Restatement.* In that case, the existence of immunity turns on whether the conduct of the defendant-official involved the exercise of discretion. Such actions involve a discretionary-function analysis not different in any respect from analyses applied in states that *do not have* a provision comparable to § 14. Thus, the analysis would be the same if the Alabama Constitution *did not contain* § 14. Because § 14 is *superfluous* in such cases, it is disingenuous to suggest that discretionary-function immunity is based on § 14. Although some are confused as to the difference between absolute (§ 14) immunity and discretionary-function (*Restatement* ) immunity, this Court must keep the distinction plainly in view.

In this case, no one contends that the physicians were acting pursuant to any statutory authority, or that they are "state officials" being sued in their official capacities. There is no means by which the University of Alabama, and by extension, the State of Alabama, could be charged with any judgment in favor of Cranman. Thus, § 14 is simply immaterial to this case. Instead, the case involves ordinary discretionary-function immunity, such as is extended to officials in a myriad of roles invested with a public interest. Thus, I disagree with any implication in the main opinion that discretionary-function immunity arises out of § 14.

I *agree,* however, with the premise of the main opinion that a physician's exercise of discretion in treating a patient at a state university's health clinic is not such conduct that to subject it to liability would violate the doctrine of separation of powers. During oral argument of this case, which was consolidated for oral argument and consideration with three other medical-malpractice actions against State-paid physicians, namely, *Wells v. Storey,* 792 So.2d 1034 (Ala.1999); *Ex parte Rizk,* [Ms. 1970493, Nov. 24, 1999]; [FN*] and *Wimpee v. Stella,* [Ms. 1971774, Nov. 24, 1999], [*] counsel for the plaintiff patients urged this Court to adopt a rule similar to the one set forth in *Kassen v. Hatley,* 887 S.W.2d 4, 11 (Tex.1994), which recognizes a distinction "between *governmental* [discretion] and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392
**(Cite as: 792 So.2d 392)**

*medical* discretion." (Emphasis added.)

> FN* Note from reporter of decisions: The *Rizk* and *Wimpee* opinions of November 24, 1999, were later withdrawn and new opinions were substituted. See reporter's notes to earlier citations to these cases in the main opinion, 792 So.2d at 396.

The rule of *Kassen* is consistent with, if not identical to, the two-step approach adopted by the United States Supreme Court in *Berkovitz v. United States,* 486 U.S. 531, 539, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) (officials are immune "only [for] conduct that involves the permissible exercise of policy judgment"), *modified, United States v. Gaubert,* 499 U.S. 315, 325, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (immunity attaches only to those decisions that **\*410** are "susceptible to policy analysis"), and by a growing number of courts that have held that government-paid physicians are *not* entitled to immunity from actions alleging a breach of the duty to provide due care to their patients. See, e.g., *Lather v. Beadle County,* 879 F.2d 365 (8th Cir.1989); *Henderson v. Bluemink,* 511 F.2d 399 (D.C.Cir.1974); *Keenan v. Plouffe,* 267 Ga. 791, 482 S.E.2d 253 (1997); *Gould v. O'Bannon,* 770 S.W.2d 220 (Ky.1989); *Green v. Berrien Gen. Hosp. Auxiliary,* 437 Mich. 1, 464 N.W.2d 703 (1990); *Womble v. Singing River Hosp.,* 618 So.2d 1252 (Miss.1993); *Frank v. State,* 613 P.2d 517 (Utah 1980), *modified on other grounds, Hansen v. Salt Lake County,* 794 P.2d 838 (Utah 1990); *Cooper v. Bowers,* 706 S.W.2d 542 (Mo.Ct.App.1986); *Comley v. Emanuel Lutheran Charity Bd.,* 35 Or.App. 465, 582 P.2d 443 (1978); *Protic v. Castle Co.,* 132 Wis.2d 364, 392 N.W.2d 119 (Wis.App.1986); see also *Lee v. Bourgeois,* 252 Va. 328, 477 S.E.2d 495 (1996); but see *Lawhone v. Harlan,* 214 Va. 405, 200 S.E.2d 569 (1973) (*intern* was entitled to immunity).

On the other hand, "[t]he physicians argue that decision-making exercised by a physician in treating a patient should be entitled to immunity because, they say, such decision-making *inherently involves the utmost discretion.*"792 So.2d at 406

(emphasis added). The physicians' argument is, in other words, that *simply by virtue of their profession* they are immune from liability in the practice of that profession. In my view, it is the *failure to adopt* a *Kassen*-type rule that *would* violate the doctrine of separation of powers. Otherwise stated, it is the rule urged by the defendant *physicians* that would violate that doctrine.

As the main opinion points out, some courts have discussed the doctrine of qualified immunity within the context of the separation-of-powers doctrine. See 792 So.2d at 399-400 (citing cases).[FN21] The separation-of-powers rationale in the discretionary-function-immunity context is explained as follows:

> FN21. Notably, none of those cases involved the issue on which this case turns, namely, whether State-paid physicians are entitled to qualified immunity from liability for their alleged failure to exercise due care in treating a patient.

" 'The courts will refrain from second-guessing the legislative and executive branches on issues of basic policy. Under our system of separation of powers, such decisions are vested in the politically responsive coordinate branches. Thus, in applying the test for discretionary function immunity ... we will "isolate those decisions sufficiently sensitive so as to justify judicial abstention."

" 'In addition, courts must not intrude into realms of policy exceeding their institutional competence. The judicial branch lacks the fact-finding ability of the legislature, and the special expertise of the executive departments.... [Courts] should not attempt to balance the detailed and competing elements of legislative or executive decisions.' "

*Ransom v. City of Garden City,* 113 Idaho 202, 205, 743 P.2d 70, 73 (1987) (quoting *Industrial Indem. Co. v. State,* 669 P.2d 561, 563 (Alaska 1983)).

This rationale rests on two premises. First, there are certain "realms of policy" beyond the judiciary's sphere of "*institutional competence,*"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392
**(Cite as: 792 So.2d 392)**

realms into which "courts must not intrude." *Id.* (emphasis added). Second, the separation-of-powers principle requires deference to the policy-makers in the coordinate branches of government as to those matters that involve "issues of basic policy." *Id.* Neither of these premises supports the proposition \*411 that judicial abstention is required or appropriate in a case such as this one.

### A. Institutional Competence

As one justification for judicial deference to certain policy-makers, it is said that "[t]he judicial branch lacks the fact-finding ability of the legislature." *Ransom,* 113 Idaho at 205, 743 P.2d at 73; *Helton v. Knox County,* 922 S.W.2d 877, 885 (Tenn.1996); see also *Brooks v. Logan,* 127 Idaho 484, 903 P.2d 73 (1995). The truth of this assertion, however, is contextual. In some contexts-such as the one involved in this case-the *reverse is true.* The distinction was recognized in *Womble v. Singing River Hospital,* 618 So.2d 1252 (Miss.1993), where the application of this premise to "medical personnel ... making treatment decisions" was soundly rejected. 618 So.2d at 1262-63.

Specifically, the Supreme Court of Mississippi explained:

"[T]he judicial system is *perfectly capable of adjudicating the reasonableness of medical treatment decisions.* Our courts do it every day in medical malpractice actions heard across this state. The medical treatment decisions made by medical personnel at state health institutions are *no different from the private medical care decisions that are currently being judged.*"

*Id.* at 1264 (emphasis added).

Similarly, the judiciary of Alabama has "*special competence* to decide discrete cases and controversies involving particular parties and specific facts." *Alabama Power Co. v. Citizens of Alabama,* 740 So.2d 371, 381 (Ala.1999) (emphasis added). Within that sphere, the institutional competence of the judiciary is *supreme.*

The standard of care for medical treatment is the same whether the institution employing the treating physician is a public institution or a private one. In other words, physicians are, in either case, obligated-both legally and morally-to exercise *due care* in treating their patients. Determining whether that obligation was met in any given case is a matter *peculiarly within the prerogative of the judicial branch.* The matter is not, in any sense, legislative or executive. Indeed, the only branch with a legitimate role in issues involving a breach of the standard of care owed by a physician to a patient is the judicial branch, acting in its fact-finding role.

### B. Deference to Policy-makers

The second premise underlying the separation-of-powers rationale is that it requires deference to the policy-makers of the coordinate branches of government in matters involving the "issues of basic policy." *Ransom,* 113 Idaho at 205, 743 P.2d at 73. Here again, the legislative and executive branches are uninvolved. This is so, because "there is nothing inherently governmental about decisions regarding individual medical treatment. They do not involve the formulation of public policy in any respect. Therefore, the notion of promoting governmental decisions that are in the public good is completely inapplicable." *Womble,* 618 So.2d at 1263. Hence, the distinction "between *governmental* [discretion] and *medical* discretion." *Kassen v. Hatley,* 887 S.W.2d at 11 (emphasis added).

"[T]he exercise of medical discretion does not require the same protection as the exercise of governmental discretion. Without immunity, some government officials might hesitate to take actions for the public's protection that could subject them to individual liability." *Id.* "For example, a police officer might decide not to pursue a suspect. However, a doctor cannot avoid personal liability through inaction because physicians are under a duty to exercise ordinary care to treat patients." *Id.* (Citation\*412 omitted.) Thus, "the threat of suit will not discourage physicians from seeking and accepting government employment, because *they will face the exact*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392
**(Cite as: 792 So.2d 392)**

*same potential exposure to liability that they would as private physicians.*" *Womble,* 618 So.2d at 1264 (emphasis added). " 'The common law of malpractice, as normally applied to private doctors ..., already grants the leeway properly left for expert judgment in the relatively stringent requirements it imposes upon plaintiffs in medical negligence suits. No further leeway is required for the publicly employed doctor ... than for [that doctor's] private counterparts.' " *Henderson v. Bluemink,* 511 F.2d 399, 402 n. 19 (D.C.Cir.1974) (quoting *Spencer v. General Hosp. of District of Columbia,* 425 F.2d 479, 489 (D.C.Cir.1969)).

Under this distinction, physicians still enjoy immunity for the exercise of "governmental discretion," that is, decisions establishing governmental policy. Otherwise stated, immunity would attach to such decisions as "require governmental judgment." *Gleason v. Beesinger,* 708 F.Supp. 157, 159 (S.D.Tex.1989). Examples of such decisions would be those related to the questions "whether a patient is eligible for treatment and whether facilities are available to treat a patient,"*id.* at 162 (citing *Costley v. United States,* 181 F.2d 723, 724-26 (5th Cir.1950)); and whether "to provide health service, which and how many services to provide, and where and how to provide them." *Comley v. Emanuel Lutheran Charity Bd.,* 35 Or.App. 465, 478, 582 P.2d 443, 450 (1978).

In short, acts involving only "medical discretion" do not implicate the premises underlying the separation-of-powers rationale. I say once again, the only branch of government with a legitimate role in issues involving a breach of the standard of care owed by a physician to a patient is the judicial branch, acting in its constitutional, fact-finding, remedial role. The rule proposed by the plaintiff in this case and the patients in the cases orally argued with this one does not offend that principle; the rule proposed by the defendant physicians does.

This is so, because the separation-of-powers principle would be offended by a rule that established *absolute immunity* for State-paid physicians operating within the physician/patient relationship.

Such a rule would oust the judiciary of jurisdiction in matters precisely within the sphere of its constitutional prerogative. See *Alabama Power Co. v. Citizens of Alabama, supra,* 740 So.2d at 381 (judiciary has "special competence to decide discrete cases and controversies involving particular parties and specific facts"). If-as the defendant physicians urge us to hold-physician immunity includes acts of *medical-treatment* discretion, then, in *every conceivable medical-malpractice action* against a State-paid physician, once the physician invoked the defense of discretionary-function immunity, the court would have nothing to do but summarily dismiss the physician from the action. Indeed, during oral argument, counsel were unable to hypothesize any credibly foreseeable scenario under which a State-paid physician would *not* be immune under the immunity rule urged by the physicians in this case.

Simply stated, the rule would leave the judiciary nothing to do in a class of cases committed to it by the constitution. See *Ex parte Jenkins,* 723 So.2d 649 (Ala.1998); *Broadway v. State,* 257 Ala. 414, 60 So.2d 701 (1952) (separation-of-powers principle was violated by a statute that deprived the court of the right to act "judicially" in a certain class of cases); *Sanders v. Cabaniss,* 43 Ala. 173 (1869). This Court may not, under the guise of a separation-of-powers**\*413** argument, abdicate its constitutional duty to adjudicate disputes between physicians and their patients alleging medical malpractice. It goes without saying that neither the judicial branch nor either of the other two branches of government may voluntarily *abdicate* its respective constitutional role. *Millcreek Township School Dist. v. County of Erie,* 714 A.2d 1095, 1103-04 (Pa.Commw.Ct.1998); *Texas Boll Weevil Eradication Foundation, Inc. v. Lewellen,* 952 S.W.2d 454, 465 (Tex.1997); *Turpen v. Oklahoma Corp. Comm'n,* 769 P.2d 1309, 1368 (Okla.1988) (Wilson, J., dissenting). Therefore, this Court cannot, consistent with the separation-of-powers doctrine, declare that it will no longer hear a certain class of cases. Today, the Court quite properly declines the physicians' invitation to do that. Thus, I concur in the judgment and, except as to the two

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392
**(Cite as: 792 So.2d 392)**

matters discussed above, I agree with the main opinion.

BROWN, Justice (concurring in the judgment).

While the main opinion's attempt to restate generally the law in this area is a worthwhile endeavor, I can concur only in the judgment. I prefer to make at this time no determinations that would reach beyond the issues in the case before us.

MADDOX, Justice (dissenting).

In my opinion, the facts of this case do not require a conclusion different from that reached in *Hutchinson v. Board of Trustees of University of Alabama,* 288 Ala. 20, 256 So.2d 281 (1971). In that case, I discussed the doctrine of sovereign, or governmental, immunity and its applicability to state agencies and their employees, and wrote: "The wall of 'governmental immunity' is almost invincible, made so by the people through their Constitution as interpreted by this Court." *Hutchinson,* 288 Ala. at 24, 256 So.2d at 283. In my opinion, that statement accurately describes the law of sovereign immunity, which is derived from § 14 of the Alabama Constitution of 1901.

Sovereign immunity has a an undeniable constitutional dimension. For that reason, I wrote the following in *Hutchinson:*

"We must have a reasonable respect for the doctrine of stare decisis and the division of powers between the Executive, Legislative and Judicial branches of our government. Alabama may one day return to the rule of governmental responsibility with which we began as a State. The frequency of the appeals to this Court asking that the rule be changed is some evidence that the constitutional provision granting governmental immunity may have served whatever purpose it was intended to serve and maybe it should [now] be abandoned. But that is a question addressing itself to the Legislature in initiating and proposing an amendment to the Constitution."

288 Ala. at 24, 256 So.2d at 285. I believe now, as I did when this Court decided *Hutchinson,* that only a constitutional amendment can disas-

semble the wall erected by § 14.

My views have not changed since I wrote the opinion in *Hutchinson;* therefore, I must respectfully dissent.

SEE, Justice (dissenting).

I dissent from the grant of the application for rehearing, from the substituted opinion, and from the judgment. I believe that the defendant State-employed physicians were entitled to discretionary-function (or "State-agent") immunity.

Discretionary-function immunity requires a balancing of the competing policies*414 of the right to a remedy, Art. I, § 13, [FN22] Ala. Const. of 1901, and sovereign immunity, Art. I, § 14, [FN23] Ala. Const. of 1901, in light of the separation-of-powers principle of Art. III, § 43, [FN24] Ala. Const. of 1901.[FN25] Historically, this balancing was commonly accomplished by determining whether the State-agent's actions were "discretionary" or were "ministerial." See, e.g., *Taylor v. Shoemaker,* 605 So.2d 828 (Ala.1992); *Phillips v. Thomas,* 555 So.2d 81 (Ala.1989); *Bell v. Chisom,* 421 So.2d 1239 (Ala.1982); *DeStafney v. University of Alabama,* 413 So.2d 391 (Ala.1981). The discretionary/ministerial determination is an always significant, and usually dispositive, factor in the balancing test, because the separation-of-powers concerns of § 43 are unlikely to be meaningfully implicated where "ministerial" actions are at issue. That is, when an executive or administrative officer is under a constitutional, statutory, or regulatory duty to perform a specific and definite (that is, "ministerial") act, the judicial branch is not interfering with the executive or legislative power by directing the officer to do what the constitutional provision, statute, or rule plainly directs. In contrast, where the officer is expected to exercise judgment, this Court encroaches on executive or legislative powers when it imposes liability on that officer for his decision, thereby impermissibly affecting the decision-making of a coordinate branch of government. It is for this reason that the discretionary/ministerial determination will dictate whether discretionary-function immunity is avail-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

able to the State agent or not; that is, unless for some independent reason the interests of one of the two constitutional provisions-§ 13 (right to a remedy) or § 14 (sovereign immunity)-significantly outweighs the interests of the other.

FN22. Section 13 provides:

"That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay."

FN23. Section 14 provides:

"That the State of Alabama shall never be made a defendant in any court of law or equity."

FN24. Section 43 provides:

"In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."

FN25. This Court has recognized that the separation-of-powers principle is an appropriate consideration in determining the applicability of discretionary-function immunity. See, e.g., *Phillips v. Thomas,* 555 So.2d 81, 84 (Ala.1989) (recognizing that the factors set forth in comment f to *Restatement (Second) of Torts,* § 895D (1974), including "[t]he extent to which passing judgment on the exercise of discretion by the officer will amount necessarily to passing judgment on the conduct of a coordinate branch of government," should be considered in determining the applicability of discretionary-function immunity); *Barnes v. Dale,* 530 So.2d 770, 784 (Ala.1988) (same); *DeStafney v. University of Alabama,* 413 So.2d 391, 394-96

(Ala.1981) (adopting *Restatement (Second) of Torts,* § 895D (1974)).

The original per curiam opinion of November 24, 1999, which is today withdrawn, restated the rule concerning discretionary-function immunity as follows:

"Except where the Constitution or laws of the United States or the Constitution, laws, regulations, or rules of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or where the governmental agent acts **\*415** willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law, a governmental agent is immune from civil liability where the conduct made the basis of the claim against the agent is based upon the agent's formulation of plans, policies, or designs, or where the agent otherwise makes decisions such as those made in the context of the following activities:

"(1) making administrative adjudications;

"(2) allocating resources;

"(3) negotiating contracts;

"(4) hiring, firing, transferring, assigning, or supervising personnel;

"(5) activities of law-enforcement or correctional officers in arresting, attempting to arrest, or releasing persons;

"(6) all other instances where acts or decisions, including those concerning the safety, health, well-being, fitness, competence, development, or confinement of persons, cannot be challenged without imposing a burden arising from interference with a coequal branch of government that exceeds the benefit of the challenging party's right to a judicial remedy."

I concurred with this statement of the law. In the opinion substituted today on application for rehearing, the rule concerning discretionary-function immunity has been changed to read as follows:"A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's

"(1) formulating plans, policies, or designs; or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:

"(a) making administrative adjudications;

"(b) allocating resources;

"(c) negotiating contracts;

"(d) hiring, firing, transferring, assigning, or supervising personnel; or

"(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or

"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

"Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity

"(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

"(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."

I disagree with the significant and substantial change in the statement of the law given in the substituted opinion. First, the substituted opinion does not "restate" *416 the law of discretionary-function immunity. Instead, it overrules, in part, the law of discretionary-function immunity as it applies to State-employed physicians. The new statement of the law of immunity omits activities by State-employed physicians. This Court has consistently recognized that State-employed physicians and other State-employed health-care providers, in making

health-care decisions, typically are engaging in "discretionary" functions, and are therefore ordinarily entitled to immunity from legal liability in regard to those decisions. See *Smith v. Arnold,* 564 So.2d 873 (Ala.1990); *Smith v. King,* 615 So.2d 69 (Ala.1993). Indeed, as this Court stated in *King,* "In *Smith v. Arnold,*... we recognized that the mental health profession, by its very nature, necessarily involves discretion and difficult decision-making." 615 So.2d at 73. Second, the reasoning of the substituted opinion is circular. The substituted opinion omits the activities of State-employed physicians from those activities entitled to sovereign immunity; thus, the main opinion concludes, the defendant physicians are not entitled to State-agent immunity because they "[do] not fit within any category of conduct recognized by the restated rule as immune." 792 So.2d at 406. In the exercise of the judicial power to "say what the law is," *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), "to the end that [the government of this state] may be a government of laws and not of men," § 43, Ala. Const. of 1901, this Court's statement of the rule of State-agent immunity must either, based on precedent, include activities by State-employed physicians or demonstrate why that result is inconsistent with the Constitution of Alabama of 1901.

I would apply the rule as stated in the original per curiam opinion of November 24, 1999, because the balancing of the policies of §§ 13, 14, and 43 of the Constitution of Alabama of 1901 weighs in favor of applying discretionary-function immunity to the physicians in this case. The people of Alabama have chosen to provide opportunities for higher education for the benefit of Alabama citizens. See Ala. Const. of 1901, art. XIV, § 256, amended by amend. no. 111, and § 264, amended by amend. no. 399. To further this effort, the Legislature has authorized the University to provide health-care services for students.[FN26] See Ala.Code 1975, §§ 16-47-1 and 16-47-2. When State-employed physicians provide health-care services, they perform a public responsibility. The denial of discretionary-function immunity for the performance of these public responsibilities would increase the cost of provid-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing higher education-in the form of the payment of damages awards by the University on behalf of the physicians, or in the form of insurance-premium payments made by the University on behalf of the physicians, or in the form of higher salaries to enable the physicians to purchase their own insurance or to compensate the physicians for their risk of liability-or it would discourage the University from providing student health services, thereby discouraging students from attending the University. See *Taylor v. Shoemaker,* 605 So.2d 828, 832 (recognizing that the cost of insurance coverage is an appropriate factor to be considered in determining the applicability of official-function immunity) ("Whether such insurance coverage costs are borne by the officials or by the state, this could have serious ramifications in regard to state *417 budgets and the ability of the state to attract and keep employees.").

> FN26. Where the Legislature has expressed a view as to the proper balance between the policies of §§ 13 and 14, that determination is due deference; however, the Legislature has not expressed any view as to whether it favors the exercise of immunity in cases like the present one.

Thus, because the State-employed physicians were exercising a discretionary function and because it does not appear in this case that the burden on the plaintiff significantly outweighs the benefits of applying State-agent immunity to the defendant State-employed physicians, the balance of the § 13 and § 14 policies, in light of § 43, favors the application of discretionary-function immunity to these State-employed physicians in the performance of their University-related health-care responsibilities. Accordingly, I dissent from the conclusion of the substituted opinion that the trial court erred in entering the summary judgments in favor of the defendant State-employed physicians, and I dissent from the judgment reversing those summary judgments.

### APPENDIX TO MAIN OPINION

*A Listing of Alabama Cases Discussing the Doctrine of State-Agent Immunity*

*Bell v. Chisom,* 421 So.2d 1239, 1240 (Ala.1982) (State Docks worker could not sue a coemployee); *Tutwiler Drug Co. v. City of Birmingham,* 418 So.2d 102 (Ala.1982) (landowner could not sue city official over legislative matter); *Deal v. Tannehill Furnace & Foundry Comm'n,* 443 So.2d 1213 (Ala.1983) (swimmer injured while diving could not sue members of parks commission); *Barnes v. Dale,* 530 So.2d 770, 782-84 (Ala.1988) (victim of psychiatric patient could not sue official who allowed patient's release); *Grant v. Davis,* 537 So.2d 7 (Ala.1988) (person injured because of defect in road could not sue individual responsible for prioritization of road repairs); *Phillips v. Thomas,* 555 So.2d 81 (Ala.1989) (victim of swimming accident could sue individual who erroneously completed a checklist describing pool as fenced); *Smith v. Arnold,* 564 So.2d 873 (Ala.1990) (estate of psychiatric patient who committed suicide could not sue consultant); *White v. Birchfield,* 582 So.2d 1085 (Ala.1991) (victim of motor-vehicle collision could not sue deputy sheriff on basis of injuries caused by deputy's speeding to a crime scene); *Point Properties, Inc. v. Anderson,* 584 So.2d 1332 (Ala.1991) (landowner denied right to excavate could not sue official in individual capacity over attempt to rescind vacation of a road); *Taylor v. Shoemaker,* 605 So.2d 828 (Ala.1992) (automobile-accident victim could not sue individual responsible for decision on whether to apply resources to removal of embedded rails in road); *Pack v. Blankenship,* 612 So.2d 399 (Ala.1992) (applicant could not sue individual over denial of a sewer permit); *Smith v. King,* 615 So.2d 69 (Ala.1993) (estate of mental-health inmate who committed suicide could not sue individual who had made subjective assessments about inmate's condition); *Nance v. Matthews,* 622 So.2d 297 (Ala.1993) (victim of school aide's failure to catheterize recuperating student as she had been instructed to do could not sue the aide's supervisor); *Lennon v. Petersen,* 624 So.2d 171 (Ala.1993) (victim could not sue coach for failure to recognize an in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

792 So.2d 392
**(Cite as: 792 So.2d 392)**

jury soon enough); *Hayes v. Walters,* 628 So.2d 558 (Ala.1993) (victim of injury in gym class could not sue individual with indirect supervisory duties); *Patton v. Black,* 646 So.2d 8 (Ala.1994) (claim by student victim of tumbling accident presented jury question as to immunity of teacher); *Roden v. Wright,* 646 So.2d 605 (Ala.1994) (landowner claiming to be victim of tortious interference could not sue county commissioner over publication of official's opposition to proposed land usage); *Lightfoot v. Floyd,* 667 So.2d 56 (Ala.1995) (student claiming property improperly seized by Department of Public Safety investigator could sue investigator);**\*418** *Wright v. Wynn,* 682 So.2d 1 (Ala.1996) (bystander who attempted to apprehend driver pursued by police officer and was then himself forced to ground and handcuffed by officer could not maintain claim for false imprisonment, but could maintain claim for assault and battery); *Defoor v. Evesque,* 694 So.2d 1302 (Ala.1997) (employment applicant taking hydraulics test who slipped on floor at test site could sue employee who had inspected and cleaned the floor); *Couch v. City of Sheffield,* 708 So.2d 144 (Ala.1998) (arrestee could not sue police officer who arrested him for offense of which he later was acquitted, when officer believed he had probable cause for arrest); *Town of Loxley v. Coleman,* 720 So.2d 907 (Ala.1998) (inmate who fell from back of pickup truck could sue driver who was trying to avoid potholes in the road as she transported inmates from work site to prison); *Ex parte Davis,* 721 So.2d 685 (Ala.1998) (mother of inmate who died while in custody of Department of Corrections could not sue warden and assistant warden of prison who did not override treatment decisions of inmate's doctors); *Martin v. Harrelson,* 532 So.2d 1256 (Ala.Civ.App.1988) (prisoner could sue individual who released his property to third party); *McCluskey v. McCraw,* 672 So.2d 805 (Ala.Civ.App.1995) (estate of victim of unsafe bridge could not sue engineer and police officer for failure to report condition to county commission); *Marnon v. City of Dothan,* 677 So.2d 755 (Ala.Civ.App.1995) (terminated employee could not sue officers responsible for termination); *Cald-

well v. Brogden,* 678 So.2d 1148 (Ala.Civ.App.1996) (woman who claimed to have been mistakenly arrested could not maintain 42 U.S.C. § 1983 claim against deputy sheriffs who arrested her and dealt with her while she was in custody); *McDuffie v. Roscoe,* 679 So.2d 641 (Ala.1996) (estate of person killed as a result of defectively maintained road shoulder could not sue employees of Department of Transportation); *Tuscaloosa County v. Henderson,* 699 So.2d 1274 (Ala.Civ.App.1997) (arrestee could sue county license inspector who issued arrest warrants for persons whom he could not contact whose names were on list of those who had failed to renew business licenses); *Kassaw v. Minor,* 717 So.2d 382 (Ala.Civ.App.1998) (student who slipped on hallway floor could sue student employee of college maintenance department who had mopped the floor).

Ala.,2000.
Ex parte Cranman
792 So.2d 392

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

781 So.2d 936                                                                                    Page 1
781 So.2d 936
**(Cite as: 781 So.2d 936)**

**H**

Ex Parte City of Gadsden
Ala.,2000.

Supreme Court of Alabama.
Ex parte CITY OF GADSDEN.
(Re Shirley McDonough
v.
Margaret Denise Parker et al.)
**1981366.**

July 21, 2000.
Rehearing Denied Oct. 13, 2000.

Pedestrian brought personal injury action against city and others, after she became entangled in fence stretched across road as a result of an accident, alleging in part that police officer negligently left scene of accident without securing site. The Etowah Circuit Court, No. CV-98-555, William H. Rhea III, J., denied city's motion for summary judgment. City petitioned for writ of mandamus. The Supreme Court, Brown, J., held that officer's decision to pursue suspect being followed by a witness, instead of securing well-lit accident scene with no injuries, was a discretionary act entitled to qualified immunity.

Writ granted.

West Headnotes

**[1] Mandamus 250 ⟜51**

250 Mandamus
    250II Subjects and Purposes of Relief
        250II(A) Acts and Proceedings of Courts, Judges, and Judicial Officers
            250k51 k. Signing or Entry of Judgment or Order. Most Cited Cases
Denial of a motion for summary judgment based on a claim of immunity is reviewable by petition for writ of mandamus.

**[2] Mandamus 250 ⟜1**

250 Mandamus

250I Nature and Grounds in General
    250k1 k. Nature and Scope of Remedy in General. Most Cited Cases
The writ of mandamus is an extraordinary remedy and one petitioning for it must show (1) a clear legal right in the petitioner to the order sought, (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so, (3) the lack of another adequate remedy, and (4) properly invoked jurisdiction of the court.

**[3] Municipal Corporations 268 ⟜747(3)**

268 Municipal Corporations
    268XII Torts
        268XII(B) Acts or Omissions of Officers or Agents
            268k747 Particular Officers and Official Acts
                268k747(3) k. Police and Fire. Most Cited Cases
Police officer's decision to pursue a suspect being followed by a witness, instead of securing a well-lit accident scene with no injuries, was a discretionary act entitled to qualified immunity, as decision required an exercise in judgment and choice and involved what was just and proper under the circumstances. Code 1975, § 6-5-338(a).

**[4] Officers and Public Employees 283 ⟜114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases
Qualified immunity shields an employee from liability if the employee is engaged in a discretionary act, instead of a ministerial one, when the alleged tortious conduct occurs.

**[5] Officers and Public Employees 283 ⟜114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

781 So.2d 936
781 So.2d 936
**(Cite as: 781 So.2d 936)**

For purposes of qualified immunity, "discretionary acts" are those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances.

## [6] Officers and Public Employees 283 ⚖116

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k115 Liabilities for Negligence or Misconduct
          283k116 k. In General. Most Cited Cases
Acts taken willfully, maliciously, or in bad faith will not be considered discretionary for purposes of qualified immunity.

## [7] Officers and Public Employees 283 ⚖114

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases
"Ministerial acts" for purposes of qualified immunity are those acts done by officers and employees who are required to carry out the orders of others or to administer the law with little choice as to when, where, how, or under what circumstances their acts are to be done.

**\*937** Vann A. Spray of Ford & Howard, P.C., Gadsden, for petitioner.

Gary J. Bone, Gadsden, for respondent Shirley McDonough.

Curtis Wright of Dortch, Wright & Wright, Gadsden, for respondent Kandralyn S. Johnson.

BROWN, Justice.

    The City of Gadsden ("the City"), a defendant in an action pending in the Etowah Circuit Court, petitions for a writ of mandamus directing that court to vacate its order of May 4, 1999, denying the City's motion for a summary judgment and to grant that motion. The sole issue presented by this petition is whether the City is entitled to immunity under § 6-5-338(b), Ala.Code 1975. Because we conclude that it is, we grant the petition.

    At 2:20 a.m. on November 1, 1997, Margaret Denise Parker lost control of her vehicle on a residential street in Gadsden. Parker drove through the yard of Shirley McDonough, striking a chain-link fence and dragging it across the street into the yard of James Steward. Parker's vehicle finally came to rest in Steward's yard, but only after striking a second fence. Parker exited the vehicle and began walking toward her house, located a short distance from the accident scene. McDonough's son Gary informed Parker that he was telephoning the police on his cellular phone and then he began following her on foot.

    Darrell Arnold was the first police officer to arrive on the scene. McDonough and Steward gave their accounts of what had happened and told Officer Arnold that a witness was following the driver of the vehicle. Fearing the potential for danger because "he had a witness chasing a drunk," and knowing that a second unit was en route, Officer Arnold left the scene in pursuit of the driver and the witness. As Officer Arnold was about to leave, Ms. McDonough informed him that a fence was stretched across the road; Officer Arnold testified that he told McDonough "[D]on't go near it," and that he explained that another patrol unit was on its way to the scene. Steward testified that he asked Officer Arnold to leave his vehicle at the scene with the lights on, to protect the site. Officer Arnold later stated by deposition that he did not recall any such requests having been made.

    Arnold left the scene; he located Parker while she was attempting to enter her residence. Parker was arrested and was charged with DUI and resisting arrest. Shortly after Officer Arnold had left the scene, Kandralyn Johnson drove down Winona Avenue and struck the fence that was stretched across the road; as a result of Johnson's striking the fence, McDonough became entangled in the fence and sustained injuries to her right foot and ankle. She sued the City and several other defendants. McDonough alleged in her complaint that Officer Arnold had negligently left the scene of an accident without properly securing the site and that his negligence was the proximate cause of her injuries. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

781 So.2d 936
**(Cite as: 781 So.2d 936)**

City moved for a summary judgment, arguing that it was entitled to immunity and therefore could not be held liable on McDonough's claims. The trial court denied the motion for summary judgment. This petition followed.

[1][2] It is well settled that the denial of a motion for summary judgment based on a claim of immunity is reviewable by petition for writ of mandamus:

**\*938** "The writ of mandamus is an extraordinary remedy and one petitioning for it must show '(1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.' *Ex parte Alfab, Inc.,* 586 So.2d 889, 891 (Ala.1991). See *Ex parte Davis,* 721 So.2d 685, 689 (Ala.1998), where this Court stated that '[a] petition for a writ of mandamus is the proper means for achieving appellate review of a trial court's denial of absolute and discretionary-function immunity.' "

*Ex parte Kelley,* 739 So.2d 1095, 1096 (Ala.1999).

[3] The City argues that § 6-5-338(a), Ala.Code 1975, grants Officer Arnold immunity from tort liability arising out of his conduct in performance of any discretionary function within the line and scope of his official duties, and that § 6-5-338(b) extends that immunity to the City.

Section 6-5-338 provides, in pertinent part:

"(a) Every peace officer, ... whether appointed or employed as such peace officer by the state or a county or municipality thereof, ... shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

"(b) This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers."

In *Couch v. City of Sheffield,* 708 So.2d 144,

153 (Ala.1998), this Court stated that § 6-5-338 extended discretionary-function immunity to a municipal police officer "unless the officer's conduct is so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith."

[4] The City argues that in leaving the accident scene Officer Arnold was performing a discretionary act and that he is, therefore, immune from liability. "Qualified immunity shields [an] employee from liability if the employee is engaged in a discretionary act, instead of a ministerial one, when the alleged tortious conduct occurs." *Ex parte Alabama Dep't of Forensic Sciences,* 709 So.2d 455, 458 (Ala.1997). McDonough argues that Officer Arnold's failure to secure the accident scene in accordance with departmental regulations amounted to negligence in performing a ministerial act; therefore, she argues, Officer Arnold was not protected by the doctrine of discretionary-function immunity. Thus, we must first determine whether Officer Arnold was engaged in performing a discretionary function or a ministerial function.

[5][6][7] "Discretionary acts have been defined as those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Wright v. Wynn,* 682 So.2d 1, 2 (Ala.1996). However, acts taken willfully, maliciously, or in bad faith will not be considered discretionary. *Id.; Couch v. City of Sheffield,* 708 So.2d 144 (Ala.1998). "Ministerial acts," on the other hand, are those acts "done by officers and employees who are required to carry out the orders of others or to administer the law with little choice as to when, where, how, or under what circumstances their acts are to be done." *Carroll v. Hammett,* 744 So.2d 906, 910 (Ala.1999)(quoting earlier cases).

The Gadsden Police Department's "Policy and Procedure Manual" contains the following provisions:

**\*939** "61.1.5 UNIFORM TRAFFIC ENFORCEMENT

781 So.2d 936
**(Cite as: 781 So.2d 936)**

"....

"C. THESE ENFORCEMENT POLICIES DO NOT SUPPLANT OFFICER JUDGMENT, FOR IT IS IMPOSSIBLE TO FORESEE EVERY CONCEIVABLE SITUATION INVOLVING TRAFFIC VIOLATIONS. IN UNUSUAL CIRCUMSTANCES, *THE OFFICER MUST DECIDE WHAT ENFORCEMENT ACTION IS PROPER BASED ON A COMBINATION OF TRAINING, EXPERIENCE AND COMMON SENSE.*

"....

"61.2.3 FIRST OFFICER ON THE SCENE

"A. IMMEDIATELY UPON ARRIVAL, THE FIRST OFFICER AT THE SCENE WILL CHECK FOR INJURIES, FIRE HAZARDS, HAZARDOUS MATERIALS,[FN1] AND/OR HOT WIRES DOWN, AND WILL SUMMON APPROPRIATE FIRE/MEDICAL/UTILITY AND BACKUP FOR ASSISTANCE. THE OFFICER WILL PROVIDE EMERGENCY MEDICAL AID AND FIRE SUPPRESSION SERVICES UNTIL FIRE/MEDICAL PERSONNEL ARRIVE. THE OFFICER WILL ISOLATE THE HAZARD AREA, EVACUATE NON-ESSENTIAL PERSONNEL AND IDENTIFY THE VEHICLE AND CONTAINER PLACARDS.

> FN1. The policy manual defines a "hazardous material" as "any element, compound, or combinations thereof, which is flammable, corrosive, explosive, toxic, radioactive and oxidizer, or is highly reactive and which, because of handling, storing, processing and packaging, may have detrimental effects upon emergency personnel, the public, equipment and/or the environment."

"B. THE OFFICER WILL PARK THE PATROL VEHICLE IN SUCH A MANNER AS TO PROTECT THE SCENE, PRESERVE EVIDENCE AND PROTECT THE PUBLIC, ESTABLISH A SAFE TRAFFIC PATTERN AROUND THE SCENE, LOCATE WITNESSES AND RECORD ACCIDENT INFORMATION. OVERHEAD EMERGENCY LIGHTS WILL BE ACTIVATED WHILE THE ROADWAY IS BLOCKED AND A DANGER EXISTS.

"....

"61.4.2 HAZARDOUS ROADWAY CONDITIONS

"....

"C. THE FOLLOWING PROCEDURES WILL BE FOLLOWED IN IDENTIFYING, REPORTING AND CORRECTING HAZARDOUS ROADWAY, ROADSIDE, OR ENVIRONMENTAL CONDITIONS:

"1. WHEN A HAZARD IS IDENTIFIED AND *IN THE OFFICER'S OPINION SUCH HAZARD REQUIRES IMMEDIATE CORRECTION,...* HE WILL IMMEDIATELY INFORM COMMUNICATIONS OF THE SITUATION AND IDENTIFY THE ASSISTANCE OR SPECIAL EQUIPMENT REQUIRED. THE OFFICER WILL PROTECT THE SCENE AND BYSTANDERS AND DIRECT TRAFFIC OR TAKE ANY OTHER ACTION DEEMED NECESSARY TO CORRECT AND/OR PROTECT THE SITUATION UNTIL ASSISTANCE ARRIVES.

"2. WHEN A HAZARD IS DETECTED THAT REPRESENTS A POTENTIAL COLLISION SITUATION, BUT THE THREAT OF SUCH IS NOT IMMINENT, THE OFFICER WILL PASS THIS INFORMATION **\*940** ON TO COMMUNICATIONS FOR PROPER IDENTIFICATION. IF THE OFFICER CAN CORRECT THE SITUATION, THEY WILL TAKE APPROPRIATE ACTION."

(Capitalization original; other emphasis added.)

Officer Arnold was faced with a situation for which there was no hard and fast set of rules. He could have pursued a witness who was chasing a fleeing DUI suspect, or he could have remained at the scene and protected the site until the next patrol unit arrived. In response to questions about why he did not stay at the scene of the accident until the second police car arrived, Officer Arnold testified, "I felt like the danger to an innocent bystander or witness was more immediate than what I had at the traffic-accident scene at the time." He also stated that he felt the chances that a motor vehicle would

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

781 So.2d 936
**(Cite as: 781 So.2d 936)**

come down the road and hit the fence around 2:30 a.m. "were very slim."

Clearly, Officer Arnold's duties as a law-enforcement officer required him to make a difficult split-second decision under unusual circumstances. Because the officer's decision to pursue a suspect being followed by a witness, instead of securing a well-lit accident scene with no injuries, required "an exercise in judgment and choice and [involved] what [was] just and proper under the circumstances,"*Wright,* supra, we conclude that in making that decision Officer Arnold was performing a discretionary act and that § 6-5-338(a), Ala.Code 1975, gave him immunity from liability.FN2 The plain language of § 6-5-338(b), Ala.Code 1975, extends that discretionary-function immunity to the City. We therefore grant the petition for the writ of mandamus and direct the Etowah Circuit Court to enter a summary judgment in favor of the City.

> FN2. This holding is consistent with our recent decision in *Ex parte Cranman,* [Ms. 1971903, June 16, 2000] --- So.2d ---- (Ala.2000), in which we restated the rule governing State-agent immunity. See *Cranman,* Part IV, --- So.2d at ----.

WRIT GRANTED.

HOOPER, C.J., and HOUSTON, SEE, and ENGLAND, JJ., concur.
Ala.,2000.
Ex parte City of Gadsden
781 So.2d 936

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

145 F.3d 1231                                                                                        Page 1

145 F.3d 1231, 11 Fla. L. Weekly Fed. C 1580

**(Cite as: 145 F.3d 1231)**

Sheth v. Webster

C.A.11 (Ala.),1998.

United States Court of Appeals,Eleventh Circuit.
Sulata Umed SHETH, Plaintiff-Appellee,
v.
Jimmie WEBSTER, Officer, Defendant-Appellant.
Sulata Umed SHETH, Plaintiff-Appellee,
v.
Michael Tyrone WILLIAMS, Defendant-Appellant.
**Nos. 97-6063, 97-6064.**

April 2, 1998.
As Amended July 6, 1998.

Arrestee sued arresting officer and police sergeant, asserting state law claims for assault and battery, false arrest, malicious prosecution, and outrage, and federal law claims for use of excessive force, unlawful search and seizure, denial of due process, and denial of equal protection. Defendants moved for summary judgment. The United States District Court for the Southern District of Alabama, No. 96-0041-CB-C,Charles R. Butler, Jr., J., granted motions as to claims of outrage, denial of due process and equal protection, and claims of unlawful search and seizure and excessive force against sergeant, but denied motions as to remainder of claims. Defendants appealed. The Court of Appeals held that: (1) as matter of first impression, Court had jurisdiction to review on interlocutory appeal denial of discretionary function immunity provided for municipal officers under Alabama law; (2) arresting officer was not entitled to qualified immunity with regard to false arrest and excessive force claims; (3) under Alabama law, sergeant was entitled to discretionary immunity from arrestee's state law claims; and (4) material issue of fact precluded summary judgment for officer on claim of discretionary function immunity.

Affirmed in part, reversed and remanded in part.

Opinion, 137 F.3d 1447, superseded.

West Headnotes

**[1] Federal Courts 170B ⬤⟶574**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)2 Finality of Determination
                170Bk572 Interlocutory Orders Appealable
                    170Bk574 k. Other Particular Orders. Most Cited Cases
Court of Appeals had jurisdiction to consider police officer's interlocutory appeal from denial of qualified immunity; district court and officer relied on facts as alleged by plaintiff, and thus, there were no disputed facts for resolution.

**[2] Officers and Public Employees 283 ⬤⟶114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases
A qualified immunity ruling is a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case.

**[3] Federal Courts 170B ⬤⟶763.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Dependent on Nature of Decision Appealed from
                    170Bk763.1 k. In General. Most Cited Cases

**Federal Courts 170B ⬤⟶776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General

170Bk776 k. Trial De Novo. Most Cited Cases

**Federal Courts 170B ☞791**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)3 Presumptions
       170Bk791 k. Presumptions in General. Most Cited Cases
Court of Appeals reviews qualified immunity rulings de novo and resolves all issues of material fact in favor of plaintiff; it then answers legal question of whether defendants are entitled to qualified immunity under that version of facts.

**[4] Federal Courts 170B ☞574**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(C) Decisions Reviewable
      170BVIII(C)2 Finality of Determination
       170Bk572 Interlocutory Orders Appealable
        170Bk574 k. Other Particular Orders. Most Cited Cases
Court of Appeals had jurisdiction to review on interlocutory appeal from denial of discretionary function immunity provided for municipal officers under Alabama law. Ala.Code 1975, § 6-5-338(a).

**[5] Sheriffs and Constables 353 ☞97**

353 Sheriffs and Constables
   353III Powers, Duties, and Liabilities
     353k97 k. Liabilities for Official Acts in General. Most Cited Cases

**States 360 ☞78**

360 States
   360II Government and Officers
     360k78 k. Liabilities for Official Acts. Most Cited Cases
Constitutional officers of Alabama, such as sheriffs and deputies, are immune from suit under Alabama's Constitution. Ala.Const. Art. 1, § 14.

**[6] Federal Courts 170B ☞418**

170B Federal Courts
   170BVI State Laws as Rules of Decision
     170BVI(C) Application to Particular Matters
      170Bk418 k. Immunity from Suit. Most Cited Cases

**Federal Courts 170B ☞433**

170B Federal Courts
   170BVI State Laws as Rules of Decision
     170BVI(C) Application to Particular Matters
      170Bk433 k. Other Particular Matters. Most Cited Cases
While state law governs the applicability of immunity to state law claims against public officers, federal law determines the appealability of the district court's order denying summary judgment to those officers on immunity grounds.

**[7] Federal Courts 170B ☞571**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(C) Decisions Reviewable
      170BVIII(C)2 Finality of Determination
       170Bk571 k. Necessity in General. Most Cited Cases

**Federal Courts 170B ☞572.1**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(C) Decisions Reviewable
      170BVIII(C)2 Finality of Determination
       170Bk572 Interlocutory Orders Appealable
        170Bk572.1 k. In General. Most Cited Cases
While the Court of Appeals normally only has jurisdiction over appeals from final decisions of the district courts, there are some decisions, not final on the merits, that must be heard by the Court.

**[8] Federal Courts 170B ☞557**

170B Federal Courts
   170BVIII Courts of Appeals

170BVIII(C) Decisions Reviewable
170BVIII(C)1 In General
170Bk554 Nature, Scope and Effect of Decision
170Bk557 k. Dismissal, Nonsuit, Direction of Verdict or Summary Judgment. Most Cited Cases
A denial of summary judgment, based on the denial of qualified immunity for alleged federal constitutional deprivations, is immediately appealable.

**[9] Federal Civil Procedure 170A ⚖══2515**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2515 k. Tort Cases in General. Most Cited Cases
Police officer was not entitled to summary judgment on qualified immunity grounds with regard to false arrest claim, given absence of arguable probable cause to arrest under facts as alleged by arrestee-motel owner, who contended that officer became incensed and arrested her when she objected to officer's attempt to resolve dispute between herself and customer by dictating motel's refund policy and challenged officer's knowledge of the law. U.S.C.A. Const.Amend. 4.

**[10] False Imprisonment 168 ⚖══7(1)**

168 False Imprisonment
168I Civil Liability
168I(A) Acts Constituting False Imprisonment and Liability Therefor
168k1 Nature and Elements of False Imprisonment
168k7 Illegality of Arrest
168k7(1) k. In General. Most Cited Cases
Arrestee-motel owner who sued officer for false arrest did not unlawfully interfere with police officer's duties and commit crime by demanding that customer who was involved in dispute which resulted in officer's dispatch vacate premises if he wanted refund.

**[11] Civil Rights 78 ⚖══1376(6)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
(Formerly 78k214(6))
Officer was not entitled to qualified immunity on arrestee's excessive force claim, given arrestee's allegations that officer pushed her against soda machine, handcuffed her, and dragged her to police car, and given absence of evidence suggesting that arrestee posed danger to officer or others. U.S.C.A. Const.Amend. 4.

**[12] Municipal Corporations 268 ⚖══742(5)**

268 Municipal Corporations
268XII Torts
268XII(A) Exercise of Governmental and Corporate Powers in General
268k742 Actions
268k742(5) k. Evidence. Most Cited Cases

**Municipal Corporations 268 ⚖══747(3)**

268 Municipal Corporations
268XII Torts
268XII(B) Acts or Omissions of Officers or Agents
268k747 Particular Officers and Official Acts
268k747(3) k. Police and Fire. Most Cited Cases
Under Alabama law, police officers' acts in connection with arrest and prosecution of arrestee were discretionary acts, for purposes of determining officers' entitlement to discretionary function immunity to arrestee's state law tort claims; burden thus shifted to arrestee to show that officers acted in bad faith, with malice, or with willfulness and were not protected by immunity. Ala.Code 1975, § 6-5-338(a).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[13] Officers and Public Employees 283 ☞119**

283 Officers and Public Employees
   283III Rights, Powers, Duties, and Liabilities
       283k119 k. Actions by or Against Officers and Employees. Most Cited Cases
Under Alabama law, if official's acts were discretionary acts, as required for discretionary function immunity to apply, burden shifts to plaintiff to demonstrate that official acted in bad faith, with malice, or willfulness so as to deny immunity. Ala.Code 1975, § 6-5-338(a).

**[14] Assault and Battery 37 ☞18**

37 Assault and Battery
   37I Civil Liability
       37I(A) Acts Constituting Assault or Battery and Liability Therefor
         37k18 k. Persons Liable. Most Cited Cases

**False Imprisonment 168 ☞15(1)**

168 False Imprisonment
   168I Civil Liability
       168I(A) Acts Constituting False Imprisonment and Liability Therefor
        168k15 Persons Liable
         168k15(1) k. In General. Most Cited Cases

**Malicious Prosecution 249 ☞42**

249 Malicious Prosecution
   249V Actions
       249k42 k. Persons Liable. Most Cited Cases
Under Alabama law, police sergeant was entitled to discretionary function immunity from arrestee's state law claims for assault and battery, false arrest, and malicious prosecution, given that sergeant merely assisted arresting officer in handcuffing and placing arrestee in police car after arresting officer indicated that arrestee had resisted arrest. Ala.Code 1975, § 6-5-338(a).

**[15] Federal Courts 170B ☞583**

170B Federal Courts

170BVIII Courts of Appeals
   170BVIII(C) Decisions Reviewable
     170BVIII(C)2 Finality of Determination
       170Bk576 Particular Actions, Interlocutory Orders Appealable
        170Bk583 k. Tort Cases in General; Negligence. Most Cited Cases
Court of Appeals had jurisdiction over interlocutory appeal from denial of police sergeant's claim that he was entitled to discretionary function immunity, under Alabama law, against arrestee's tort claims; district court's ruling was based upon facts not in dispute, for purposes of sergeant's summary judgment motion, and Court could review legal issue of whether sergeant had or lost entitlement to immunity. Ala.Code 1975, § 6-5-338(a).

**[16] Federal Civil Procedure 170A ☞2515**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2515 k. Tort Cases in General. Most Cited Cases
Genuine issues of material fact, precluding summary judgment under Alabama law for defendant police officer on arrestee's claims for assault and battery, false arrest, and malicious prosecution, existed as to whether officer acted maliciously, willfully, or in bad faith with regard to his actions giving rise to arrestee's claims.

**[17] Federal Courts 170B ☞574**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(C) Decisions Reviewable
      170BVIII(C)2 Finality of Determination
       170Bk572 Interlocutory Orders Appealable
        170Bk574 k. Other Particular Orders. Most Cited Cases
Court of Appeals has interlocutory jurisdiction when denial of immunity is based even in part on disputed issue of law.

**\*1233** Michael E. Upchurch, W. Austin Mulherin,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(Cite as: 145 F.3d 1231)**

Frazer, Greene, Upchurch & Baker, LLC, Mobile, AL, for Webster.

Daniel L. McCleave, McCleave, Roberts & Shields, P.C., Mobile, AL, for Sheth.

James B. Rossler, Mobile, AL, for Williams.

Appeals from the United States District Court for the Southern District of Alabama.

Before TJOFLAT and BARKETT, Circuit Judges, and PROPST [FN*], Senior District Judge.

> FN* Honorable Robert B. Propst, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

## AMENDED OPINION

PER CURIAM:

Mobile Police Officer Jimmie Webster (Webster) and Mobile Police Sergeant Michael Tyrone Williams (Sergeant Williams) separately appeal from the rulings of the district court. The district court denied these defendants' motions for summary judgment based on assertions of discretionary function immunity from the state law torts of assault and battery, false arrest and malicious prosecution. The district court also denied Webster qualified immunity from some of the federal claims asserted against him. We affirm the denial of summary judgment on the federal and state law claims with respect to Officer Webster. We reverse the **\*1234** denial of summary judgment on the state law claims with respect to Sergeant Williams.

## I. FACTS [FN1]

> FN1. The facts are considered most favorably to plaintiff. We also accept the district court's determination on the relevant facts. *McMillian v. Johnson,* 88 F.3d 1554, 1563 (11th Cir.1996), *reh'g and reh'g en banc denied and modified,* 101 F.3d 1363 (11th Cir.1996), *cert. denied sub nom, MacMillian v. Tate,* 521 U.S. 1121, 117 S.Ct.

2514, 138 L.Ed.2d 1016 (1997).

Officer Webster originally arrived at the Beverly Motel, owned by plaintiff, at about 7:30 a.m. on October 28, 1994, to help settle a dispute between a disgruntled motel occupant, Avon Williams, and the motel manager, Kimberly Wetjen. Avon Williams was seeking a refund of a portion of the rent paid by his co-occupant of the room, Aquilla Thomas, and the manager had refused. Thomas had requested that the money not be refunded to Avon Williams. Webster suggested that the manager refund the rent, but told Avon Williams that, perhaps, the claim was a civil matter that he ought to pursue in court.

Ms. Sulata Umed Sheth, the owner of the motel, arrived at 10:00 a.m. Avon Williams approached Sheth and again requested that the motel refund the rent to him. Sheth refused, citing Thomas's instructions not to refund the rent to Avon Williams and the dishevelment of the room in which Avon Williams stayed. Officer Webster was once more dispatched to the scene. Avon Williams was loudly and combatively demanding that Ms. Sheth hand over *Aquilla Thomas's* money. Webster advised the plaintiff to refund the money. In reply, the plaintiff informed Webster that Thomas did not want the rent that she had paid to be refunded to Avon Williams and that Avon Williams had apparently damaged his room. Webster reiterated his belief that the matter was civil in nature and ought to be resolved in small claims court.

As the district court reported:

Despite Officer Webster's statements concerning the nature of the dispute, Officer Webster argued with her [Sheth] concerning Williams' entitlement to the money. The plaintiff eventually offered to charge Williams for the day and refund the balance if Williams removed his belongings from the room. The plaintiff overheard Williams say that he intended to leave his stuff in the room, and the plaintiff told Williams that he could not leave his items in the room and have his money refunded. Officer Webster responded that, because he was being evicted, Williams need not remove his belong-

145 F.3d 1231, 11 Fla. L. Weekly Fed. C 1580
**(Cite as: 145 F.3d 1231)**

ings from the room. The plaintiff told Officer Webster that she was not evicting Williams, but if Williams wanted a refund, then he must remove his belongings. The plaintiff further explained that she could not clean and relet the room with Williams' belongings in it.

Contradicted, Officer Webster stared at Sheth for a moment and then chided her that, being of Indian ethnicity, "[y]ou don't know our laws." The plaintiff verbally stood her ground, responding, "Police officers don't know all the laws, either, but I know some laws and my rights." At Sheth's reply, Officer Webster became enraged and violent. He shoved the plaintiff, who stumbled. He pushed again. The plaintiff cried to Webster that he was hurting her. He threw her back again. According to one witness, he kneed the plaintiff in the stomach. Sheth fell back against a Coke machine, five to twelve feet from where she stood.

Webster grabbed Sheth's arm and squeezed it. People around began to shout at Webster to stop, that he was hurting her. At least one witness told Webster that the plaintiff was sick. He twisted her arm around her back and locked handcuffs on her left wrist. Webster then dragged the plaintiff by the arm to his car. She "begged Officer Webster not to arrest her and place her in the car." She told him that she was claustrophobic and taking medication for an illness. Apparently, this was of no avail, because, with the help of Sergeant Williams, a latecomer on the scene, the plaintiff was shoved in the rear of the car.

Several minutes later, the plaintiff sought to use the restroom. Webster and Sergeant Williams initially declined to let her.[FN2] After **1235** thirty minutes, the officers permitted the plaintiff to use the restroom, but did not remove the plaintiff's handcuffs. As a consequence, a maid at the plaintiff's motel accompanied the plaintiff to the bathroom to remove the plaintiff's garments and to otherwise aid her. Soon after the plaintiff's return from the restroom, she was taken to the Metro Police Station to be "fingerprinted, photographed, and booked." She was acquitted of all charges.

FN2. Officer Williams' refusal was apparently based on Webster's false report that plaintiff had earlier attempted to resist arrest.

## II. PROCEDURAL BACKGROUND

### A. Plaintiff's Claims

Plaintiff filed her complaint in this action on December 22, 1995. She makes the following state law claims against both Webster and Sergeant Williams: assault and battery, false arrest, malicious prosecution and outrage. She also makes the following federal claims against both Webster and Sergeant Williams: excessive force and unlawful search and seizure in violation of the Fourth and Fourteenth Amendments, denial of due process in violation of the Fifth and Fourteenth Amendments and denial of equal ... protection in violation of the Fourth (sic) and Fourteenth Amendments.[FN3]

FN3. Plaintiff also makes claims against the City of Mobile. No issues directly related to that party are before this court.

### B. Defendants-Appellants' Motions For Summary Judgment and District Court Order

Each defendant-appellant filed a motion for summary judgment. The court will not repeat the well established standards applicable to the consideration of motions for summary judgment. The district court appropriately recited them. Our review is *de novo.*

The district court granted both defendants-appellants' motions for summary judgment on the merits as to the plaintiff's claim of outrage. With regard to the plaintiff's claims of assault and battery, false arrest, and malicious prosecution, the district court considered the defendants-appellants' assertions of discretionary function immunity under state law. The district court concluded that a reasonable jury could find that both Webster and Sergeant Williams acted willfully, maliciously and in bad faith with regard to their treatment of plaintiff. The dis-

145 F.3d 1231, 11 Fla. L. Weekly Fed. C 1580
**(Cite as: 145 F.3d 1231)**

trict court thus concluded that it was not necessary to attempt to precisely define the term "discretionary function" under state law because, in any event, Webster and Sergeant Williams had "forfeited" discretionary immunity because they had acted willfully, maliciously and in bad faith. The district court denied both the defendants-appellants' motions with regard to the claims of assault and battery, false arrest and malicious prosecution.

The district court granted both defendants-appellants' motions as to the federal claims of denial of due process and equal protection. The district court denied Webster's motion as to unlawful search and seizure and excessive force. The district court granted Sergeant Williams' motion as to unlawful search and seizure and excessive force based upon qualified immunity.

C. Issues On Appeal

Sergeant Williams appeals from the district court's denial of state law discretionary function immunity on the state law claims against him. Webster appeals from the district court's denial of qualified immunity as to federal law claims against him and from the district court's denial of discretionary function immunity as to the state law claims against him. The following issues are presented for appeal: (1) Does this court have jurisdiction to consider Webster's interlocutory appeal of denial of qualified immunity under federal law? (2) Is Webster entitled to such immunity? (3) Does this court have jurisdiction to consider an interlocutory appeal of a denial of discretionary function immunity under Alabama law? (4) Are Webster and Sergeant Williams entitled to such immunity?

III. COURT'S ANALYSIS

A. Jurisdiction of Appeal

1. Qualified Immunity

[1][2][3] Since both the district court and the defendants rely on the facts as alleged by *1236 the plaintiff, there are, at this stage, no disputed facts. We thus conclude that we have jurisdiction to consider Webster's appeal of denial of qualified immunity with regard to the federal claims against him. *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). This is not a case such as is addressed in *Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) where the court "resolved a *fact* related dispute." *Id.* at 307, 115 S.Ct. 2151. In *Johnson,* the defendants contended that "we didn't do it." *Id.* at 308, 115 S.Ct. at 2154. The issues appealed here concern "not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of 'clearly established' law." *Id.* at 311, 115 S.Ct. at 2155, citing *Mitchell.* "[A] qualified immunity ruling ... is ... a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case." *Id.* at 313, 115 S.Ct. at 2156, quoting *Mitchell.* "We review such orders *de novo,* and resolve all issues of material fact in favor of the plaintiff.... We then answer the legal question of whether the defendants are entitled to qualified immunity under that version of the facts." *Thornton v. City of Macon,* 132 F.3d 1395 (11th Cir.1998). See also *Foy v. Holston,* 94 F.3d 1528 (11th Cir.1996).

2. Discretionary Function Immunity

[4][5] The issue of whether interlocutory appeals can be taken from the denial of "discretionary function" immunity under Alabama law is one of first impression in this circuit. Alabama law recognizes at least two types of immunity from suit or liability for the individual executive acts of public officers. Not applicable here is the absolute "sovereign" immunity, except for injunctive relief, afforded to certain state constitutional officers, including sheriffs and deputy sheriffs. See *Tinney v. Shores,* 77 F.3d 378 (11th Cir.1996). This constitutional officer sovereign immunity is pursuant to Article I, Section 14 of the Alabama Constitution of 1901. Alabama law also extends a form of immunity, not absolute, to state, as opposed to muni-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(Cite as: 145 F.3d 1231)**

cipal and county, executive officers who do not hold constitutional offices. This form of immunity is described as "discretionary function" immunity. *Taylor v. Shoemaker,* 605 So.2d 828 (Ala.1992).

Apparently recognizing that certain state police officers are entitled to absolute immunity as constitutional officers and that other state police officers are entitled to discretionary function immunity, but that county and municipal police officers arguably had no immunity, the Alabama Legislature adopted § 6-5-338(a), Code of Alabama 1975. This provision became effective on April 26, 1994. *Crouch v. Whatley,* 900 F.Supp. 1567, 1572 (M.D.Ala.1995). It provides as follows:

Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

[6][7][8] In initially determining whether this court has appellate jurisdiction over the denial of immunity from state law claims, we are guided by the approach and analysis used in *Griesel v. B.D. Hamlin,* 963 F.2d 338, 340 (11th Cir.1992). According to *Griesel,* while state law governs the applicability of immunity to state law claims, "federal law determines the appealability of the district

court's order denying summary judgment." *Id.* (citing*1237 *Napolitano v. Flynn,* 949 F.2d 617, 621 (2nd Cir.1991)). While this court normally only has jurisdiction over appeals from final decisions of the district courts, there are some decisions, not final on the merits, that must be heard by this court. The Supreme Court, in *Cohen v. Beneficial Industrial Loan Corp.,* described "that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949). The Supreme Court has identified at least one type of case that fits this appealable class. In *Mitchell v. Forsyth, supra,* the Court held that a denial of summary judgment, based on the denial of qualified immunity for alleged federal constitutional deprivations, is immediately appealable.

In *Tinney v. Shores,* this court concluded that, under Alabama law, a claim of state "sovereign" immunity (Article I Section 14) by state constitutional officers is an immunity from suit. 77 F.3d at 383. The court held, following the precedent set forth in *Griesel,* that a denial of summary judgment based on such immunity was properly before the court on interlocutory appeal. *Id.* The court relied, in part, on the language found in Section 14 of the Alabama Constitution. ("The State of Alabama shall never be made a defendant in any court of law or equity.") Constitutional officers of the state, such as sheriffs and deputies, are immune from suit under Section 14. *See Drain v. Odom,* 631 So.2d 971, 972 (Ala.1994); *Parker v. Amerson,* 519 So.2d 442, 443 (Ala.1987); *Parker v. Williams,* 862 F.2d 1471, 1475 (11th Cir.1989). Since this is not a "sovereign" immunity case, *Tinney* is not directly applicable here.

Municipal peace officers performing discretionary functions, "shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary func-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

145 F.3d 1231, 11 Fla. L. Weekly Fed. C 1580

**(Cite as: 145 F.3d 1231)**

tion within the line and scope of his or her law enforcement duties." § 6-5-338(a), Code of Alabama 1975. The Alabama legislature enveloped municipal peace officers under the same cloak of immunity as state troopers and other state police officials who are not constitutional officers. *Griesel* emphasizes that the "crucial issue ... is whether the ... immunity ... is an immunity from suit rather than simply a defense to substantive liability." 963 F.2d at 340. In *Taylor v. Shoemaker,* involving state law claims against state officers, who were not constitutional officers, in their individual capacities, the court stated that "The specific issue presented in this case is whether [the defendants] are *immune from suit* because they were engaged in a discretionary function." (emphasis added) 605 So.2d at 830. The court considered "the 'threat of vexatious suit[s], with the attendant ... possible need of testifying as to the basis on which the decision was made'...." *Id.* at 832. The court further stated "to *permit such suits* as this would, without question, affect those officials in the exercise of their discretion." (emphasis added) *Id.* at 832. The court concluded, "Therefore, discretionary function immunity should be afforded to these defendants...." *Id.* at 833. The court affirmed a summary judgment dismissal of the claims against the individual defendants. *Id. See also Ex Parte City of B'ham,* 624 So.2d 1018 (Ala.1993) and *Marnon v. City of Dothan,* 677 So.2d 755 (Ala.1995). In both of the latter cases, the court referred to "qualified or discretionary immunity" as if "qualified" and "discretionary function" immunity are one and the same ("Thus as a general rule, city officials are *immune from suit* unless they violate clearly established law"). *Ex Parte City of B'ham* at 1021 and *Marnon* at 761.[FN4] In *Phillips v. *1238 Thomas,* 555 So.2d 81, 86 (Ala.1989), the court stated:

> FN4. We recognize that these cases also refer to immunity from "tort liability" but we conclude that the Alabama Supreme Court intends the immunity to be immunity from suit, not merely a defense. The Supreme Court has referred to "shielding from liability" in discussing qualified immunity under federal law. *See Harlow v.*

*Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) and *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

The summary judgment stage, then, becomes the step at which the court must determine whether the case should proceed forward, and at which the defendant must meet his burden of showing that the alleged negligence arose out of a discretionary or non-ministerial act, in order to avail himself of qualified immunity *from suit* (emphasis added).

Pursuant to § 6-5-338(a), Webster and Sergeant Williams, as municipal police officers, are entitled to the same discretionary function immunity as are state officers who are not constitutional officers.

We further note that the immunity afforded to Alabama municipal police officers is very similar, if not the same, as the immunity afforded the officials under Georgia law in *Griesel.* Both involve "authority", "discretion" and the absence of willful conduct. The *Griesel* court noted that the immunity at issue "is akin to qualified immunity." *Id.* at 341. We find no reasonable basis for allowing an interlocutory appeal in *Griesel* and denying it here.[FN5] We conclude that we have jurisdiction to review the denial of discretionary function immunity provided for under Alabama law.

> FN5. We note that both the district court and the appellate court in *Griesel* referred to the applicable immunity as "sovereign" immunity. We note that in *Hennessy v. Webb,* 245 Ga. 329, 332, 264 S.E.2d 878, 881 (1980), the court referred to discretionary immunity as "governmental" immunity. In *Hemak v. Houston County School District,* 220 Ga.App. 110, 469 S.E.2d 679, 681 (1996) discretionary immunity is distinguished from "sovereign or governmental immunity" and is called "official" immunity. In any event it involves, under Georgia law, "discretionary acts undertaken in the course of their duties and without willfulness, malice or cor-

145 F.3d 1231, 11 Fla. L. Weekly Fed. C 1580

**(Cite as: 145 F.3d 1231)**

ruption." *Hemak* at 681. There is no significant difference between the immunity involved in *Griesel* under Georgia law and discretionary function immunity under Alabama law.

## B. Entitlement to Immunity

### 1. Qualified Immunity

[9][10] We affirm the denial of qualified immunity to Webster on plaintiff's false arrest and excessive force claims. The district court correctly concluded that the facts alleged by plaintiff, as they relate to Webster, established a violation of clearly established law. The facts are distinguishable from those in *Gold v. City of Miami*, 121 F.3d 1442 (11th Cir.1997), *Jones v. City of Dothan*, 121 F.3d 1456 (11th Cir.1997), and *Post v. Ft. Lauderdale*, 7 F.3d 1552 (11th Cir.1993). The facts are more akin to those in *Ortega v. Schramm*, 922 F.2d 684 (11th Cir.1991), *Williamson v. Mills*, 65 F.3d 155 (11th Cir.1995), and *Thornton v. City of Macon*, 132 F.3d 1395 (11th Cir.1998). Viewing the facts in the light most favorable to plaintiff, Webster lacked even the arguable probable cause necessary to succeed on a qualified immunity defense. *Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir.1997). We cannot conclude that a reasonable police officer could have believed that probable cause existed to arrest plaintiff. When plaintiff objected to Webster's attempt to dictate the motel's refund policy and challenged his knowledge of the law, Webster became incensed and placed her under arrest. We reject Webster's claim that plaintiff unlawfully interfered with his duties and committed a crime by demanding that Williams vacate the premises if he wanted a refund.

[11] The district court was likewise correct in holding that Webster was not entitled to qualified immunity on plaintiff's excessive force claim. Under plaintiff's allegations, Webster pushed her against a soda machine, handcuffed her, and dragged her to the police car. There is no evidence in the record to suggest that plaintiff posed a danger to the officer or others. Accordingly, because of the

absence of any justification for Webster's use of force, application of the Fourth Amendment reasonableness standard "would inevitably lead every reasonable officer ... to conclude that the force was unlawful." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir.1993). *See also Thornton v. City of Macon, supra.*

### 2. Discretionary Function Immunity.

[12][13] The court next determines whether the defendants were engaged in the performance of discretionary functions at the time the alleged torts occurred. If their acts **\*1239** were discretionary acts, the burden shifts to the plaintiff to demonstrate that the defendants acted in bad faith, with malice or willfulness in order to deny them immunity. "Acts of such nature are not considered by Alabama law to be discretionary." *Wright v. Wynn*, 682 So.2d 1, 2 (Ala.1996). Discretionary acts have been defined as "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Id.* at 2. *See also L.S.B. v. Howard*, 659 So.2d 43, 44 (Ala.1995). The defendants' alleged acts and/or omissions were discretionary.[FN6]

> FN6. The district court found that the plaintiff conceded that the defendants acted within the scope of their discretionary authority.

[14] The evidence before the court does not support claims of willfulness, bad faith or malice on the part of Sergeant Williams, as it pertains to the specific claims of assault and battery, false arrest and malicious prosecution. Sergeant Williams did not make the decision to arrest the plaintiff. There is no evidence that he knew that the arrest was unlawful, or that he knew that the use of force in subduing and handcuffing the plaintiff was unreasonable, or that he had any hand in the prosecution of the plaintiff. Sergeant Williams merely assisted Officer Webster. The district court found that "Officer Webster told Sergeant Williams that the

© 2008 Thomson/West. No Claim to Orig. U.S. Works.

145 F.3d 1231, 11 Fla. L. Weekly Fed. C 1580
**(Cite as: 145 F.3d 1231)**

plaintiff was resisting arrest." The district court further found,

> While the court finds that Officer Webster's conduct violated clearly established law, the court cannot make the same determination with respect to Sergeant Williams. When Sergeant Williams arrived on the scene, Officer Webster had already determined, albeit erroneously, that probable cause existed to make an arrest and employed the aforementioned force against the plaintiff. Officer Webster and the plaintiff were standing beside officer Webster's police car, and when Sergeant Williams approached them, Officer Webster allegedly informed Sergeant Williams that the plaintiff was resisting arrest. At that point, Sergeant Williams assisted officer Webster in placing the remaining handcuff on the plaintiff and putting the plaintiff in the back of the police car. Sergeant Williams appears to have played little, if any, role in making the initial determination as to the existence of probable cause and the appropriate amount of force to use in arresting the plaintiff. Sergeant Williams assisted Officer Webster when Officer Webster allegedly claimed that plaintiff was resisting arrest. Based upon these facts and Sergeant Williams' more limited role in this incident, the court cannot conclude that Sergeant Williams violated clearly established law.

[15] For the same reasons earlier discussed, we conclude that the holding in *Johnson v. Jones, supra,* does not defeat our jurisdiction of this state law appeal. Again, the district court's ruling was based upon facts which are not now disputed. Under both Alabama law and federal law, the core issue is whether a defendant violated clearly established law. See *Ex Parte City of Birmingham and Marnon, supra.* In any event, we can review the legal issue of whether a defendant can lose his entitlement to discretionary function immunity for malice, willfulness or bad faith which does not cause or lead to the alleged acts of assault and battery, false arrest and malicious prosecution. It is certainly not clear that Sergeant Williams should have known that his actions violated the state laws he is accused of violating. We have jurisdiction to address this core issue. *See Dolihite v. Maughon,* 74

F.3d 1027 (11th Cir.1996) and *Walker v. Schwalbe,* 112 F.3d 1127 (11th Cir.1997).[FN7]

> FN7. The Alabama law is certainly not clearly established that such conduct can result in liability for assault and battery, false arrest or malicious prosecution. We have interlocutory jurisdiction where the denial of immunity is based even in part on a disputed issue of law. *Behrens v. Pelletier,* 516 U.S. 299, 312-14, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996).

[16][17] We affirm the district court's denial of discretionary function immunity as to Webster. There is an issue of fact as to **\*1240** whether he acted maliciously, willfully or in bad faith with regard to the very acts leading to assault and battery, false arrest and malicious prosecution. We reverse the court's ruling denying discretionary function immunity to Sergeant Williams. *Cf. Gold v. City of Miami,* 121 F.3d 1442 (11th Cir.1997) and *Jones v. City of Dothan, Alabama,* 121 F.3d 1456 (11th Cir.1997). The same facts which establish Sergeant Williams' entitlement to qualified immunity establish that his acts were not willful, malicious or in bad faith. The Alabama Supreme Court has equated qualified immunity with discretionary function immunity.[FN8]

> FN8. We do not suggest that entitlement to qualified immunity under federal law will always entitle a defendant to discretionary function immunity. Qualified immunity under federal law would not necessarily be defeated by willfulness, malice or bad faith.

### IV. CONCLUSION

We AFFIRM the rulings of the district court as they relate to Webster. We REVERSE the district court's denial of summary judgment as to Sergeant Williams. We REMAND for further proceedings as to Webster and dismissal of the action, with prejudice, as to Sergeant Williams.

C.A.11 (Ala.),1998.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

145 F.3d 1231    Page 12
145 F.3d 1231, 11 Fla. L. Weekly Fed. C 1580
**(Cite as: 145 F.3d 1231)**

Sheth v. Webster
145 F.3d 1231, 11 Fla. L. Weekly Fed. C 1580

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

451 So.2d 257
**(Cite as: 451 So.2d 257)**

**C**

Barrett v. Farmers & Merchants Bank of Piedmont
Ala.,1984.

Supreme Court of Alabama.
Joyce BARRETT, Administratrix of the Estate of
Lois Williams, Deceased, et al.
v.
FARMERS & MERCHANTS BANK OF PIED-
MONT, et al.
**82-962.**

April 6, 1984.
Rehearing Denied May 25, 1984.

Action against defendant bank and its vice-
president was instituted to recover for alleged neg-
ligence, wantonness, outrage, fraud and conversion
in connection with payment of a check representing
proceeds of a life policy on plaintiffs' decedent. The
Circuit Court, Calhoun County, Malcolm Street, Jr.,
J., entered summary judgment for defendant bank
and its vice-president, and plaintiffs appealed. The
Supreme Court, Maddox, J., held that: (1) issues on
appeal with respect to negligence were waived; (2)
tort of outrage was not established in absence of
evidence that the defendant bank and its vice-
president behaved in a manner toward the plaintiffs
which would not be tolerated in a civilized society;
(3) a question of fact precluding summary judgment
was raised with respect to whether the defendant
bank and its vice-president were guilty of fraud in
failing to inform the plaintiffs of the necessity of an
administration and the planned use of the check to
collect debts of the estate; and (4) an issue of fact
precluding summary judgment was also raised with
respect to whether the defendant bank and its vice-
president were guilty of conversion because they
took the check and, after reissuing it in bank's
name, notified the plaintiffs that they could not get
the proceeds until the indetbedness was paid.

Affirmed in part, reversed in part, and remanded.

Torbert, C.J., concurred specially and filed reasons.

West Headnotes

**[1] Appeal and Error 30 ☞1078(1)**

30 Appeal and Error
   30XVI Review
     30XVI(K) Error Waived in Appellate Court
       30k1078 Failure to Urge Objections
         30k1078(1) k. In General. Most Cited
Cases
Where plaintiffs did not appeal from summary
judgment as it related to negligence against defend-
ant bank and its vice-president in connection with
payment of a check representing proceeds of a life
policy on plaintiffs' decedent, issues in respect to
negligence were waived and, hence, would not be
considered on appeal.

**[2] Judgment 228 ☞185(5)**

228 Judgment
   228V On Motion or Summary Proceeding
     228k182 Motion or Other Application
       228k185 Evidence in General
         228k185(5) k. Weight and Sufficiency.
Most Cited Cases
The summary judgment rule must be read in the
context of the "scintilla evidence" rule to preclude
the granting of a summary judgment if there is a
scintilla of evidence supporting the position of the
party against whom the motion is made. Rules
Civ.Proc., Rule 56 comment.

**[3] Judgment 228 ☞186**

228 Judgment
   228V On Motion or Summary Proceeding
     228k182 Motion or Other Application
       228k186 k. Hearing and Determination.
Most Cited Cases
The trial court cannot try issues of fact on a motion
for summary judgment, but can only decide if there
are issues which should go to a jury. Rules
Civ.Proc., Rule 56 comment.

**[4] Damages 115 ☞57.22**

451 So.2d 257
**(Cite as: 451 So.2d 257)**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
            115III(A)2 Mental Suffering and Emotional Distress
            115k57.19 Intentional or Reckless Infliction of Emotional Distress; Outrage
            115k57.22 k. Nature of Conduct. Most Cited Cases
    (Formerly 115k50.10)
To establish the tort of outrage the behavior of a defendant must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community.

**[5] Damages 115 ⟶57.43**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
            115III(A)2 Mental Suffering and Emotional Distress
            115k57.41 Breach of Contract or Warranty
            115k57.43 k. Particular Cases. Most Cited Cases
    (Formerly 115k50.10)
Defendant bank and its vice-president did not behave in a manner toward the plaintiffs which would not be tolerated in a civilized society and, hence, could not be found liable for the tort of outrage in connection with withholding payment on a check representing proceeds of a life policy on plaintiffs' decedent where the most which could be said from the evidence was that the behavior of the defendant bank and its vice-president was extended to mere insults, indignities, threats or annoyances for which they could not be held liable in tort.

**[6] Judgment 228 ⟶181(17)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
            228k181(17) k. Banks, Cases Involving. Most Cited Cases
Whether defendant bank and its vice-president, in withholding payment of a check representing proceeds of a life policy on plaintiffs' decedent, were guilty of fraud because they knew that an administration of the estate would be necessary before any creditors could collect on any debts of the estate and failed to inform plaintiffs of the necessity of an administration and the planned "use" of the check to collect the debts was a question of fact precluding summary judgment. Code 1975, §§ 6-5-101 to 6-5-103.

**[7] Judgment 228 ⟶181(17)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
            228k181(17) k. Banks, Cases Involving. Most Cited Cases
Whether defendant bank and its vice-president converted check representing proceeds of a life policy on plaintiffs' decedent because they took check and, after reissuing it in bank's name, notified plaintiffs that they could not get proceeds until the indebtedness was paid was a question of fact precluding summary judgment. Code 1975, § 7-3-419.

**\*259** Ronald L. Allen of Merrill, Merrill, Mathews & Allen, Anniston, for appellants.
Ralph D. Porch of Merrill, Porch, Doster & Dillon, Anniston, for appellees.MADDOX, Justice.

I

    The issue before the Court is whether the trial court correctly granted a summary judgment for the defendants in a suit with counts of negligence, wantonness, outrage, fraud and conversion of a check. The trial court granted the defendants' motion for summary judgment on all counts of the amended complaint. We affirm in part, reverse in part, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

451 So.2d 257
**(Cite as: 451 So.2d 257)**

remand for further proceedings.

The plaintiffs' decedent, Lois Williams, died intestate on May 19, 1982, and was survived by five daughters. Joyce Barrett and Brenda Smith are two of the surviving daughters. At the time of Lois Williams's death, National Home Life Assurance Company (hereinafter insurer) had in effect a policy of life insurance in the amount of $5,000. Lois Williams's husband was the named beneficiary, but he had predeceased her. Plaintiffs timely filed a claim for the insurance proceeds. The insurer issued a check on July 12, 1982, for $5,033.57 payable to "The Estate of Lois Williams, Rt. 5, Box 10, Piedmont, Alabama 36272" and mailed the check to Debra Danford, a sister of the plaintiff, who resided at this address. The endorsements of the five daughters were purportedly made by only two of the daughters. Debra Danford signed the names of three daughters on the check; her own and those of Brenda Smith and Bobby Jo Williams, who was a minor at the time of the signing. The check was endorsed personally by Joyce Barrett and Billie Pogue. No guardianship for this minor child had been established, nor had probate proceedings for the intestate's estate been instituted at the time of these endorsements.

The plaintiffs' evidence tended to show that the check was presented to Farmers & Merchants Bank of Piedmont (hereinafter Bank) to be cashed, on July 22, 1982. The teller obtained permission to send the check to the "issuing" bank for clearance. Brenda Smith alleged, in an affidavit, that Latta, a vice president of Bank, telephoned Smith on August 12, 1982, and informed her the check had been cleared for payment, but that before Bank would cash the check, two notes held by Bank, which Lois Williams had signed as guarantor, would have to be paid. This affidavit further stated that the family had relied on this information.

Defendants' evidence,[FN1] consisting of answers to the plaintiffs' interrogatories, tended to show that:

FN1. The only evidence before this Court

of what the defendants allege occurred is contained in Bank's answers to the plaintiffs' interrogatories. The plaintiffs filed, and the trial court granted, a motion to supplement the record with the plaintiffs' deposition and the interrogatories and answers of Bank. See Rule 10, Ala.R.App.P. The defendants make numerous references in their brief to a deposition by Latta, but this deposition was not included in the record on appeal.

"On or about July 22, 1982, one of Lois Williams's daughters brought in a check payable to the estate of Lois Williams. There were several signatures on the back of the check, none of which was in the name of administrator or administratrix of the estate of Lois Williams. The check was processed by the teller to the issuing [drawee] bank for clearance. An explanation was given to [plaintiffs] at that time that the check would be forwarded to see if it would be honored....

"Teller, Linda Morgan, referred them to [Franklin W. Latta, a vice-president] and [he] sent them to Ruby Gresham, vice-president, and Ms. Gresham sent the check off for collection (clearance) to issuing bank ... the same day.... Plaintiff [sic] asked bank to send check off for collection [clearance]." [Defendant's answers to plaintiff interrogatories.]

The defendants admitted "the check was returned from clearance payable to Farmers & Merchants Bank."

**\*260** Defendants' evidence also showed that the decedent Lois Williams had co-signed as guarantor on two notes made by Joyce Barrett and her husband, Jimmy Barrett, and that Bank had encountered some difficulty in the collection of installment payments on these two notes. No evidence is in the record as to whether any defaults had occurred on the notes nor what would constitute a default under each contract or note. Defendants' only evidence of the notes indicates that they had identical language, which stated:

"In the event of a default, the lender may (*when*

*and where legally permissible* ), without demand or notice of any kind, set-off all or any portion of this note against any balances, credits, deposits, accounts, monies or other property of the borrower at any time held by the lender." (Emphasis added.)

The evidence tended to show that on August 14, 1982, Joyce Barrett and her husband went to the defendant bank. Upon arrival, the Barretts informed defendant David Martin, a vice-president of the bank, that they had come to collect the proceeds of the policy and to 'clear up' the two notes with the bank. Joyce Barrett had borrowed over $1,100 and her husband had borrowed over $2,100 from the bank on April 24, 1981, and February 4, 1982, respectively. Joyce Barrett acknowledged, in her deposition taken on October 8, 1982, that the payments on the loans were at least one month behind. She also, in this deposition, stated that she told the defendant Martin to deduct the remainder owing on the smaller loan from the insurance proceeds and that she and her husband would bring the larger loan's payments up to date. She stated that Martin went to speak with Latta and then came back and told her and her husband they would have to meet with Latta. In her deposition, plaintiff Barrett related the substance of the Barretts' conversation with Latta:

"Well, we went in and told him about the note, that Mother's name was supposed to come off the note after the small note was paid and that he could take that payment out of the $5,000. He said, 'Well, we need the whole thing paid in full, both notes.' Jimmy told him we would get someone else to sign with us on the truck note because this is my money and they can't take the money that's not his and pay his note with it. He thought about that for a minute. My husband said, 'Well, what if I get Randy Smith to sign with me?' He thought about that for a minute and then he said, 'We're going to need the payment in full.' Then Jimmy said, 'Well, you can just have the truck back.' He said, 'We don't need the truck. We have the check.' Then Jimmy said, 'That's a bunch of stuff.' And then he said, 'Well, it might be that.' "

Barrett then informed her sisters of these

events, and she said in her deposition they were "very upset because everybody had been calling them and dunning them and threatening to put a lien on our house [Lois Williams's house] because we hadn't paid our bills [Lois Williams's personal debts]."

Joyce Barrett stated in her deposition that the decision to hire a lawyer came as a result of a conversation her sister Brenda Smith had later with Latta. Barrett, in her deposition, said, "he told her that if she didn't believe he could hold the check for the note that she could get a lawyer. So she called a lawyer."

A petition for letters of administration was filed with the probate court on August 17, 1982, and this lawsuit was filed on August 25, 1982. Joyce Barrett and her four sisters were named as plaintiffs, and the insurer, the bank, Martin, and Latta were named as defendants. The bank moved to interplead the insurance proceeds on August 31, 1982. Motions to dismiss made by the defendants were denied. A motion to strike all plaintiffs except Joyce Barrett, as administratrix, was granted on December 7, 1982.[FN2] Summary judgment **261** motions for all defendants were filed on December 20, 1982. The trial court granted summary judgment for the insurer and Martin on January 5, 1983. The plaintiffs amended their complaint in toto with counts of conversion, negligence and outrage, and two counts of fraud, and named Latta, Martin, the insurer, and the bank as defendants. The trial court, on motion of the defendants, dismissed Barrett and Smith as individual plaintiffs, dismissed the insurer as a party, and granted summary judgment on all counts for Martin, Latta, and the bank on June 3, 1983. Joyce Barrett, as administratrix, and individually, and Brenda Smith appeal.

> FN2. Although the trial court granted the motion to strike all plaintiffs other than Joyce Barrett, the case has been presented to us as one involving multiple plaintiffs, both at trial and on appeal. Hence, we refer throughout this opinion to "plaintiffs."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

451 So.2d 257
**(Cite as: 451 So.2d 257)**

## II

Appellants raise three issues on appeal:

"Was there a genuine issue of any material fact as to the plaintiffs' allegation of *conversion* relative to the defendants Franklin W. Latta and Farmers & Merchants Bank of Piedmont?

"Was there a genuine issue of any material fact as to the plaintiffs' allegation of *fraud* relative to the defendants Franklin W. Latta and Farmers & Merchants Bank of Piedmont?

"Was there a genuine issue of any material fact as to the plaintiffs' allegation of *outrageous conduct* relative to the defendants Franklin W. Latta and Farmers & Merchants Bank of Piedmont?" (Emphasis added.)

[1] We first make note that the appellants/plaintiffs do not appeal from the summary judgment as it related to the negligence count, nor as it related to the insurer. As those issues are not raised on appeal, they are considered waived and we will not review them. *See Dethlefs v. Etnire,* 387 So.2d 201 (Ala.1980); *Mullins v. Mullins,* 416 So.2d 1063 (Ala.Civ.App.1982).

The trial judge entered an order in which he made extensive findings of fact on disputed matters and conclusions of law. This order, in pertinent part, reads:

"1. Lois Williams, a resident of Piedmont, Calhoun County, Alabama, died on May 19, 1982 at Northeast Alabama Regional Medical Center in Anniston, being survived by five daughters, Bobbie Jo Williams, age 17, unmarried; Debra Jean Danford, age 26, married; Brenda Smith, age 24, married; Billie Pogue, of legal age, married; and the plaintiff, Joyce Barrett, of legal age and married. At the time of her death, National Home Life Assurance Company had in force and effect a policy of insurance on the life of Lois Williams in the amount of $5,000.00, being Policy No. 010LA35299.

" * * * *

"... The check, after endorsements, was presen-

ted to the defendant bank to be cashed and an unidentified lady at the bank obtained permission from the plaintiff, Joyce Barrett, to send the check to the issuing bank for clearance. There was no conference by the plaintiffs with any official of the bank at the time the check was sent for clearance.

"3. On or about the 14th day of August, 1982, the check returned from clearance payable to Farmers & Merchants Bank, and the bank, through its officer, Franklin W. Latta, called to state that the check had been returned and requested that the administration of the estate of Lois Williams be started and that an administrator or administratrix of the estate of Lois Williams be appointed. Plaintiff Joyce Barrett went to the office of an attorney and was told that it would be necessary to have someone appointed as administrator of the estate of Lois Williams and such appointment was obtained on August 18, 1982 through the Probate Court of Calhoun County, Alabama. After the appointment of Joyce Barrett as administratrix of said estate, no demand was made by her on the defendant bank or the individual defendants for the receipt of the proceeds of said check, either by telephone or by letter. The plaintiff simply employed a lawyer and filed suit for damages.

**\*262** "4. The defendant bank had requested the appointment of the administrator of the estate of Lois Williams in order that it could properly pay the proceeds of said check to a qualified person to receive same. The check, for the convenience of the plaintiff, was sent to the office of Thomas J. Knight, an Anniston attorney, and the plaintiffs were notified that the check could be picked up at his office. When the check was not picked up by the plaintiff, nor demand for the same received, the defendant bank interpleaded the proceeds of said check into this case following suit and the same now rests in the hands of the Clerk of this Court. The plaintiffs have steadfastly refused to accept said check and instead proceeded with its [sic] demand for damages in the amount of $800,000.00 in compensatory and punitive damages for the tortious conversion of the insurance proceeds and fraud and outrage.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

451 So.2d 257
**(Cite as: 451 So.2d 257)**

"5. This Court has previously rendered a verdict in favor of the defendant, National Home Life Assurance Company, on its Motion for Summary Judgment.

"6. The evidence fails to show that the defendant, Farmers & Merchants Bank of Piedmont, Franklin W. Latta or David Martin utilized the proceeds of the insurance check in the amount of $5,033.57 in any manner except to pay the proceeds of the same to the authorized administratrix of the estate of Lois Williams upon qualification. There is no evidence before the Court that any of the defendants deposited said money, collected any of said money for its [sic] purposes nor in any fashion attempted to profit from said transaction by the investment or withholding of said funds. It does appear that the estate of Lois Williams was indebted to the defendant bank at the time of the death, but there is no evidence before the Court that any of the proceeds of said check were applied to this indebtedness.

" * * * *

FINDINGS OF LAW

"1. The Alabama Supreme Court in the case of *American Road Service Co. v. Inmon,* 394 So.2d 361 (1980), recognizes the tort of outrage and stated that,

" 'The conduct be [sic] of such serious nature that it can only be characterized as extreme and outrageous. The conduct must be so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society.

" 'It has been stressed that this (tort of outrage) does not recognize recovery for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities".' *Restatement of Torts,* Section 46, (1965) [While in the form of a quotation, this appears to be a paraphrase of *Inmon.*]

"It is obvious to the Court that the conduct attributable to the defendants in this case could not be classified as outrageous and beyond all bounds of decency and conduct intolerable in a civilized society.

"Likewise, there appears to have been no fraud perpetrated on the plaintiffs by any of the defendants in that the funds were available to the plaintiffs upon the qualification of a proper administrator to receive said funds. Said person, having qualified, was bound to make demand on the defendants for the funds, but no such demand was made.

"2. The question remains whether or not there was a conversion of the proceeds of the life insurance check by the defendant bank or its officers named as individual defendants.

" 'Conversion consists either in appropriation of plaintiff's property to defendant's own use and beneficial enjoyment, or in its destruction, or in exercising dominion over it, in exclusion or defiance of plaintiff's rights, or in withholding possession from plaintiff, under claim of title inconsistent with his own.' *Kemp's Wrecker Service v. Grassland Sod Co., Inc.,* 404 So.2d 348.

" 'The bare possession of property, without some wrongful act in the acquisition of possession, or in its detention, and without illegal assumption of ownership, **\*263** or illegal user or misuser, is not a conversion.' *Bolling v. Kirby and Brother,* 90 Ala. 215 [7 So. 914].

" 'In order for there to be a conversion it must appear that a wrongful taking, detention or an illegal assumption of ownership or use of another's property has taken place.' *Ott v. Fox,* 362 So.2d 836 (Ala.1978).

" 'Where the original taker acquires possession of the property rightfully and has neither asserted legal title to it nor exercised dominion over it inconsistent with the rights of the owner, ordinarily a demand and refusal to deliver the property are necessary.' *Shriner v. Meyer,* 171 Ala. 112, 55 So. 156 (1911); *Citizens Bank of Enterprise v. Coffee County Bank,* [431 So.2d 1203 (Ala.1983) ].

"After examination of the Findings of Fact and the Law in the case the Court renders the following order:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"ORDER

"1. There remains only one party plaintiff in this cause, Joyce Barrett as administratrix of the estate of Lois Williams. All other parties plaintiff are hereby dismissed as well as defendant National Home Life Assurance Company.

"2. Defendants' Motion for Summary Judgment with respect to all allegations of the plaintiffs' complaint as last amended in this cause, is granted, as there is no genuine issue as to any material fact and the defendant Farmers & Merchants Bank of Piedmont, Franklin W. Latta and David Martin are entitled to judgment on said Motion for Summary Judgment as a matter of law."

III

The law in summary judgment cases is clear:

"In order for summary judgment to be proper, the pleadings and affidavits submitted by the movant must show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law. A.R.C.P. 56(c)."

*Bon Secour Fisheries, Inc. v. Barrantine,* 408 So.2d 490, 491-492 (Ala.1981); *see also Allen v. Whitehead,* 423 So.2d 835 (Ala.1982), and *Houston v. McClure,* 425 So.2d 1114 (Ala.1983).

[2] The summary judgment rule must be read in the context of the "scintilla evidence" rule. "Thus, if there is a scintilla of evidence supporting the position of the party against whom the motion is made, ... summary judgment cannot be granted." Ala.R.Civ.P. 56, comment. *See also, Bennett v. Cole,* 426 So.2d 832 (Ala.1982).

[3] Finally, on a motion for summary judgment, the trial court cannot try issues of fact; it can only decide if there are issues which should go to a jury. *Horton v. Northeast Ala. Regional Medical Center, Inc.,* 334 So.2d 885 (Ala.1976). *See also, Ingram v. Akwell Indus., Inc.,* 406 So.2d 897 (Ala.1981).

IV

THE OUTRAGE COUNT

[4] The law to be applied in a case involving the tort of outrage has been clearly stated: the behavior of a defendant must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Restatement (Second) of Torts* § 46, Comment (d) (1964). *See also, American Road Service Co. v. Inmon,* 394 So.2d 361 (Ala.1980), and *Bowen v. National Security Fire and Casualty Co.,* 447 So.2d 133 (Ala.1983).

[5] Was there a scintilla of evidence that the defendants behaved in a manner toward the plaintiffs which would not be tolerated in a civilized society? We think not. The most that can be said, viewing the evidence most favorably to the appellants, the non-moving parties, is that the defendants' behavior was extended to "mere insults, indignities, threats [or] annoyances"**\*264** for which the law will not hold one liable in tort. *Restatement (Second) of Torts* § 46, Comment (d) (1964).

THE FRAUD COUNT

In a fraud case, Code 1975, §§ 6-5-101, -102, and -103, give the law to be applied:

"Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud." Code 1975, § 6-5-101.

"Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." Code 1975, § 6-5-102.

"Willful misrepresentation of a material fact made to induce another to act, and upon which he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

does act to his injury, will give a right of action. Mere concealment of such a fact, unless done in such a manner as to deceive and mislead, will not support an action. In all cases of deceit, knowledge of a falsehood constitutes an essential element. A fraudulent or reckless representation of facts as true, which the party may not know to be false, if intended to deceive, is equivalent to a knowledge of the falsehood." Code 1975, § 6-5-103.

Was there a scintilla of evidence that the defendants committed a fraud upon the plaintiffs? Although this is a more difficult question, we think there was enough evidence to go to the jury to determine whether the bank misrepresented a material fact to the plaintiffs.

The defendants argue that the loans to the Barretts were in default, thereby giving Bank the legal *right* to withhold the proceeds of the insurance policy, as contracted for by the terms of the notes. The evidence before this Court of defaults on either loan is limited. The only evidence in this regard is Joyce Barrett's deposition in which she admitted the installment loan payments were not up to date at the time the check was first presented to Bank. Bank's answers to plaintiffs' interrogatories showed only that Bank had attempted to collect on the Barrett notes by "normal and usual payment, payment notices and collection procedures."

Although denied by defendants in brief, the plaintiffs' *evidence* tended to show that the insurance check was endorsed with the purported signatures of Lois Williams's heirs in reliance upon a conversation with Latta. In their brief, the defendants admitted they had certain knowledge at the time the check was presented that:

"Lois Williams was survived by a minor daughter, Bobbie Jo Williams, age 17, unmarried, and for whom no guardian was appointed. It knew and explained the necessity for the appointment of an administrator of the estate. It knew that three of the endorsements on the check were not made with apparent authority. It knew, through information from the appellant, that there were claims against the estate which had not been paid."

The defendants also admit in brief that the check was nevertheless returned to the "issuing" bank for "clearance" (collection) and that no funds were interpleaded until after suit was filed.

The plaintiffs' evidence also tended to show that because the proceeds were held by Bank, no funds were available to pay creditors of Lois Williams's estate, to pay burial expenses, or to pay for repairs on Lois Williams's house, and that the daughters used what funds they did have to try and pay off the two notes.

[6] We think the plaintiffs offered at least a scintilla of evidence to show the defendants knew an administration of the estate would be necessary before any creditors could collect on any debts of the estate, that Bank did not intend to pay the proceeds to the daughters upon endorsement and "clearance" by the "issuing" bank, that Bank failed to inform plaintiffs of the necessity of an administration and *265 the planned "use" of the check to collect the debts, and that plaintiffs relied upon defendants' representations as shown by the endorsements and consent to send the check to the "issuing bank" for clearance. We hold it was a fact question to be presented to a jury whether the defendants misrepresented to the plaintiffs a material fact, and whether they relied upon the misrepresentation to their detriment.

## THE CONVERSION COUNT

In an action for conversion of a check, the legislature has spoken:

"(1) An instrument is converted when:

(a) A drawee to whom it is delivered for acceptance refuses to return it on demand; or

(b) Any person to whom it is delivered for payment refuses on demand either to pay or to return it; or

(c) It is paid on a forged indorsement.

"(2) In an action against a drawee under subsection (1) the measure of the drawee's liability is the face amount of the instrument. In any other action under subsection (1) the measure of liability is presumed to be the face amount of the instrument.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"(3) Subject to the provisions of this title concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.

"(4) An intermediary bank or payor bank which is not a depositary bank is not liable in conversion solely by reason of the fact that proceeds of an item indorsed restrictively (sections 7-3-205 and 7-3-206) are not paid or applied consistently with the restrictive indorsement of an indorser other than its immediate transferor. (Acts 1965, No. 549, p. 811.)" Code 1975, § 7-3-419.

*See also, Ott v. Fox,* 362 So.2d 836 (Ala.1978).

Was there a scintilla of evidence that Bank, acting through its officers, converted the check? We think so. Defendants admitted in their brief certain knowledge at the time of presentment of the original check. (See discussion under "Fraud Count.")

Knowing these facts, Bank, rather than refusing the check, took the check and had it reissued in Bank's name, and there is some evidence that the defendants notified the plaintiffs that they could not get the proceeds until the indebtedness was paid.

We recognize that the evidence is in conflict on the *intent* of the defendants in taking the acts it took, but on summary judgment, we must review the evidence in a light most favorable to the non-moving party. *Ryan v. Charles Townsend Ford, Inc.,* 409 So.2d 784 (Ala.1980).

Defendants contend that it is undisputed that none of the proceeds of the check were ever applied to the Barrett notes and the record shows this is true, but we do not think this fact entitles the defendants to a judgment as a matter of law. *See, Ott v. Fox, supra.*

[7] We hold that there was at least a scintilla of evidence whether the defendants wrongfully exercised dominion over the property of the plaintiffs. We realize the defendants contend that the check was sent for clearance with the consent of the plaintiffs, but in view of the facts which the defendants admittedly knew at that time, it was a fact question whether their acts were done for the purpose of wrongfully exercising dominion over the property of the plaintiffs.

CONCLUSION

Applying the applicable law on the propriety of a summary judgment, we cannot hold that the defendants sustained their burden by showing that there was no genuine issue of material fact, and that the defendants were entitled to a judgment as **\*266** a matter of law on the fraud and conversion counts.

For the foregoing reasons, the summary judgment for the defendants Latta, Martin, and Bank on the outrage count is affirmed; the summary judgment in favor of Latta, Martin, and the bank on the counts of fraud and conversion is reversed, and the cause is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

JONES, SHORES and BEATTY, JJ., concur.
TORBERT, C.J., concurs specially.TORBERT, Chief Justice (concurring in the result).

I want to point out that the defendant bank's conduct in the taking of a check made payable to the defendant bank in settlement of the check sent to the drawee bank for "clearance" (collection) is not necessarily improper. Code 1975, § 7-4-211; see generally, H. Bailey, *Brady on Bank Checks,* § 11.2 (5th ed. 1979).

Ala.,1984.
Barrett v. Farmers & Merchants Bank of Piedmont
451 So.2d 257

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

508 So.2d 693                                                                                    Page 1
508 So.2d 693
**(Cite as: 508 So.2d 693)**

**C**

Archie v. Enterprise Hosp. and Nursing Home
Ala.,1987.

Supreme Court of Alabama.
Kathy A. ARCHIE
v.
ENTERPRISE HOSPITAL AND NURSING
HOME.
**85-469.**

June 5, 1987.

Mother brought action against hospital alleging that
hospital employees intentionally inflicted severe
emotional distress on mother by taking her newborn
baby from her and holding baby until hospital bill
was paid. The Circuit Court, Coffee County, Riley
P. Green, J., dismissed complaint, and mother ap-
pealed. The Supreme Court, Almon, J., held that
claim for intentional infliction of emotional distress
was not claim for trespass to the person, and two-
year personal injury statute of limitations, and not
six-year statute of limitations for trespass to the
person, applied.

Affirmed.

West Headnotes

**[1] Action 13 ⬭30**

13 Action
    13II Nature and Form
        13k29 Forms of Action at Common Law
            13k30 k. Distinctions as to Form. Most
Cited Cases
Test for whether complaint states cause of action
for trespass or for trespass on the case is whether
tort was committed by direct application of force or
was accomplished indirectly.

**[2] Limitation of Actions 241 ⬭31**

241 Limitation of Actions
    241I Statutes of Limitation
        241I(B) Limitations Applicable to Particular

Actions
            241k31 k. Injuries to the Person. Most
Cited Cases
Tort of outrage or intentional infliction of emotion-
al distress is governed by general personal injury
statute of limitations, and not statute of limitations
for trespass to the person. Code 1975, §§ 6-2-34,
6-2-38(*l* ); § 6-2-39(a)(5) (Repealed).

**[3] Pleading 302 ⬭370**

302 Pleading
    302XVII Issues, Proof, and Variance
        302k370 k. Nature and Requisites of Issue.
Most Cited Cases
Given set of facts may give rise to more than one
cause of action, and if plaintiff elects to pursue only
one cause of action, fact that unpursued cause of
action would have supported recovery will not bol-
ster cause of action which will not support recov-
ery.

**[4] Pleading 302 ⬭48**

302 Pleading
    302II Declaration, Complaint, Petition, or State-
ment
        302k48 k. Statement of Cause of Action in
General. Most Cited Cases
Pleading must give fair notice of claim against
which defendant is called to defend. Rules
Civ.Proc., Rule 8.

**[5] Limitation of Actions 241 ⬭31**

241 Limitation of Actions
    241I Statutes of Limitation
        241I(B) Limitations Applicable to Particular
Actions
            241k31 k. Injuries to the Person. Most
Cited Cases
Filing of complaint alleging that hospital employ-
ees intentionally inflicted severe emotional distress
on mother by taking her newborn baby from her
and holding baby until hospital bill was paid was
untimely, where complaint was filed five years

**(Cite as: 508 So.2d 693)**

after occurrence of alleged tortious conduct, and complaint did not seek damages for trespass to the person. Code 1975, § 6-2-34; § 6-2-39(a)(5) (Repealed); Rules Civ.Proc., Rule 8.

**\*694** Henry D. Binford of Nomberg & McCabe, Daleville, for appellant.
Fred W. Tyson of Rushton, Stakely, Johnston & Garrett, Montgomery, for appellees.
ALMON, Justice.

The question presented in this case is whether the trial court erred in granting a motion to dismiss the complaint on the ground that the statute of limitations had run. Almost five years after the occurrence of the alleged tortious conduct, Kathy A. Archie filed a two-count complaint against Enterprise Hospital and Nursing Home. The counts were styled "Intentional Infliction of Emotional Distress" and "Tort of Outrageous Conduct," but the underlying facts at least arguably constitute a trespass to her person.

The statute of limitations for trespass to the person is six years. Code 1975, § 6-2-34(1). Code 1975, § 6-2-38(*l*) (as amended, 1984-85 Alabama Acts, No. 85-39, 2d Special Session), provides: "All actions for any injury to the person or rights of another [FN1] not arising from contract and not specifically enumerated in this section [FN2] must be brought within two years."

FN1. The phrase "of another" does not make this provision applicable only to actions by third parties, such as an action by a guardian for injuries to a ward. Under such an interpretation, there would be no statute of limitations for trespass on the case and many other tort actions. The predecessor of this provision, § 6-2-39(a)(5), repealed by Act No. 85-39, was universally interpreted as applying to direct actions by the injured party. The phrase must be interpreted as meaning an injury to one other than the tort-feasor, even though this creates something of a tautology (that is, in the absence of these words, the statute would not be taken to mean an action for

injuries by the tort-feasor to his own person or rights; therefore, their inclusion adds nothing to the meaning).

FN2. This should be interpreted to read "article," because all personal injury actions enumerated in § 6-2-38 have a two-year statute of limitations, but personal injury actions enumerated elsewhere in article 2 of chapter 2 of title 6, such as those in § 6-2-34, would not have a two-year statute of limitations simply because they are not enumerated again in § 6-2-38.

This Court has recognized a cause of action against "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *American Road Service Co. v. Inmon,* 394 So.2d 361, 365 (Ala.1980). Because the tort of outrageous conduct is an adoption of the tort set forth in the American Law Institute's *Restatement (Second) of Torts* § 46 (1965), see *Inmon* at 362, and because that tort is often referred to as the intentional infliction of emotional distress, **\*695** the two counts of the complaint state the same cause of action, if they state a cause of action at all.

The question of the statute of limitations for this cause of action was not addressed in *Inmon,* nor has it been addressed in the cases appealed to this Court between then and now. Two writers on civil actions and limitations of actions in Alabama have expressed the opinion that this cause of action would be governed by § 6-2-38(*l*). G. McLeod, *Civil Actions at Law in Alabama* (1980), p. 169 (Supp.1986); T. Hoff, *Alabama Limitations of Actions and Notice Provisions* (1984), p. 13 (Supp.1986).

Most other jurisdictions have applied a catch-all "other personal injury actions" statute of limitations rather than one for specific torts such as assault. *Mays v. Three Rivers Rubber Corp.,* 135 Mich.App. 42, 352 N.W.2d 339 (1984); *Yeager v. Local Union 20, Teamsters, etc.,* 6 Ohio St.3d 369, 453 N.E.2d 666 (1983); and *Ford v. Hutson,* 276 S.C. 157, 276 S.E.2d 776 (1981). In *Williams v. Lee*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Way Motor Freight, Inc.,* 688 P.2d 1294 (Okla.1984), the court rejected the defendant's argument that "because *Dean [v. Chapman,* 556 P.2d 257 (Okla.1976), recognizing the tort] adopted the Restatement of Torts (Second) comment (d) of § 46, it should also adopt the rationale of comment (b) of that section which states that intentional infliction of emotional distress may be regarded as an extension of the tort of assault,"688 P.2d at 1296, and that therefore the statute of limitations for assault should govern. The court in *Williams* held that the catch-all statute of limitations applied.

In *Guthrie v. J.C. Penney Co.,* 803 F.2d 202 (5th Cir.1986), however, the court affirmed the district court's choice of Mississippi's one-year limitation for assault, battery, menace, and other specified torts over the six-year catch-all limitation, relying on a Mississippi case holding that the one-year period applied to actions of the type enumerated, and affirming the holding that intentional infliction of emotional distress is the same type of tort as menace.

[1] While these decisions are informative, they do not necessarily aid us in applying the statutes of limitations of this state. Rather than one list of specified torts and one catch-all provision, we have one statute of limitations for actions for "any trespass to person or liberty" and one that has consistently been held to apply to actions for trespass on the case and to other torts not elsewhere specified. The test for whether a complaint states a cause of action for trespass or for trespass on the case is whether the tort was committed by a direct application of force or was accomplished indirectly. *Lovell v. Acrea,* 500 So.2d 1082 (Ala.1986); *Teng v. Saha,* 477 So.2d 378 (Ala.1985); *Strozier v. Marchich,* 380 So.2d 804 (Ala.1980); and *Sasser v. Dixon,* 290 Ala. 17, 273 So.2d 182 (1973); see *Hoff, op. cit.*

Under this analysis, the tort of intentional infliction of emotional distress would come within the provisions of § 6-2-38(*l*), whether as a newly-recognized tort not elsewhere enumerated or as coming within the indirect trespass-on-the-case class of torts. The latter point can be clearly seen

from the fact that the impetus for recognition of the tort came from situations where there was neither physical injury (and thus, necessarily, not a battery or other direct, forcible trespass) nor even an assault threatening such injury, but the defendant's conduct was so outrageous and the emotional harm so severe that the common law tradition of allowing new causes of action came into play. See *Restatement (Second) of Torts* § 46 (1965), and W. Prosser, *The Law of Torts,* pp. 49-62 (4th ed. 1971).

[2] Thus, we hold that the tort of outrage or intentional infliction of emotional distress is governed by the two-year statute of limitations found in § 6-2-38(*l*) or, in cases-such as this one-arising before January 9, 1985, by the one-year limitation of former § 6-2-39(a)(5). See also *Eidson v. Johns-Ridout's Chapels, Inc.,* 508 So.2d 697 (Ala.1987). Therefore, Archie's argument, that a claim for intentional infliction of emotional distress is, as such, a claim for trespass to the person, must fail.

The question remains, however, whether the trial court erred in granting the motion **\*696** to dismiss the instant complaint because the facts alleged constitute a trespass. The complaint reads as follows:

"COUNT I

"(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

"(1) On or about December 8, 1980, the Plaintiff entered the Enterprise Hospital and Nursing Home to have her baby.

"(2) On or about December 9, 1980, Plaintiff gave birth to her baby, which she named Chanda.

"(3) On or about December 10, 1980, Chanda was brought to the Plaintiff. Plaintiff dressed her baby and prepared to leave the hospital. After approximately thirty minutes, an employee/employees of the Defendant, Enterprise Hospital and Nursing Home, whose name(s) is/are unknown at this time, but which will be substituted by amendment for De-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

508 So.2d 693
**(Cite as: 508 So.2d 693)**

fendant, L, M, N and O when ascertained, acting within the line and scope of her/their employment, physically took the baby from the Plaintiff's arms, stating words to the effect-I am not taking your baby for ransom, but I have my job to think about. Defendant L, M, N and O were directed by Defendants A, B, C and D, whose true and correct identities are unknown at this time but which will be substituted by amendment when ascertained, acting individually and within the line and scope of their employment with Defendant, Enterprise Hospital and Nursing Home, to seize Plaintiff's baby and hold her. Defendants, E, F, G, H, I, J and K, acting individually and within the line and scope of their employment with Defendant, Enterprise Hospital and Nursing Home, established a policy that newborn babies would be held, which includes Plaintiff's baby, until the hospital bill was paid.

"(4) Plaintiff has suffered severe emotional distress and continues to do so to this date. As recently as July of this year when Chanda was out of her sight for a few moments, Plaintiff passed out and remained severely distressed for some time thereafter.

"WHEREFORE, Plaintiff demands judgment against Defendants in the sum of One Million ($1,000,000.00) Dollars, plus costs. Plaintiff demands punitive damages.

"COUNT II

"(TORT OF OUTRAGEOUS CONDUCT)

"(1) Plaintiff realleges Count I as if repeated verbatim.

"(2) The conduct of Defendants, as more specifically stated in paragraph 3 of Count I, constitutes outrageous conduct as defined by the laws of Alabama.

"WHEREFORE, Plaintiff demands judgment against Defendant in the sum of One Million ($1,000,000.00) Dollars, plus costs. Plaintiff demands punitive damages."

[3][4] This complaint is so explicitly couched in terms of the tort of intentional infliction of emotional distress that we cannot say it states a cause of action for trespass to the person. A given set of facts may give rise to more than one cause of action, and if a plaintiff elects to pursue only one such cause of action, the fact that an unpursued cause of action would have supported recovery will not bolster a cause of action which will not support recovery. Although the Alabama Rules of Civil Procedure have established notice pleading, see Rule 8, a pleading must give fair notice of the claim against which the defendant is called to defend. See *Cutts v. American United Life Ins. Co.,* 505 So.2d 1211 (Ala.1987); *Simpson v. Jones,* 460 So.2d 1282 (Ala.1984); and *State Farm Fire & Casualty Co. v. Fincher,* 454 So.2d 936 (Ala.1984).

[5] Because both counts of the complaint stated a cause of action that was barred by the statute of limitations found in § 6-2-39(a)(5), and because the complaint did not seek damages for a cause of action, such as trespass to the person or assault and battery, governed by the six-year limitation of § 6-2-34, the trial court **697** did not err in granting the motion to dismiss. The judgment is therefore affirmed.

AFFIRMED.

All the Justices concur.
Ala.,1987.
Archie v. Enterprise Hosp. and Nursing Home
508 So.2d 693

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2018                                                                                            Page 1

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

▷

Monell v. Department of Social Services of City of New York

U.S.S.C., 1978.

Supreme Court of the United States
Jane MONELL et al., Petitioners,
v.
DEPARTMENT OF SOCIAL SERVICES OF the
CITY OF NEW YORK et al.
**No. 75-1914.**

Argued Nov. 2, 1977.
Decided June 6, 1978.

Female employees of the Department of Social Services and the Board of Education of the City of New York brought an action challenging the policies of those bodies in requiring pregnant employees to take unpaid leaves of absence before those leaves were required for medical reasons. The United States District Court for the Southern District of New York, 394 F.Supp. 853, found the practice unconstitutional but denied claims for back pay. The Court of Appeals, 532 F.2d 259, affirmed and certiorari was granted. The Supreme Court, Mr. Justice Brennan, held that: (1) local government units were "persons" for purposes of § 1983, the Civil Rights Act of 1871; (2) local governments could not be held liable under a theory of respondeat superior but rather could be held liable only when the constitutional deprivation arises from a governmental custom; (3) the Tenth Amendment did not impose any impediment to liability; (4) the Eleventh Amendment did not preclude imposition of liability except with respect to local government units which are part of the state for Eleventh Amendment purposes; (5) local government officials sued in their official capacity are "persons" under § 1983 in those cases in which local government is suable in its own name, and (6) the deprivation complained of in the instant case arose out of official policy.

Reversed.

Mr. Justice Powell filed a concurring opinion.

Mr. Justice Stevens filed an opinion concurring in part.

Mr. Justice Rehnquist filed a dissenting opinion in which Mr. Chief Justice Burger concurred.

West Headnotes

**[1] Civil Rights 78 ☞1343**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1343 k. In General. Most Cited Cases
      (Formerly 78k206(1), 78k13.7)
Municipalities and other local government units are included among those "persons" to whom the Civil Rights Act of 1871 applies; overruling *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492. 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 ☞1343**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1343 k. In General. Most Cited Cases
      (Formerly 78k206(1), 78k13.7)

**Civil Rights 78 ☞1344**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1344 k. States and Territories and Their Agencies and Instrumentalities, in General. Most Cited Cases
      (Formerly 78k206(1), 78k13.7)

**Federal Courts 170B ☞270**

170B Federal Courts

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
   170BIV(A) In General
      170Bk268 What Are Suits Against States
         170Bk270 k. Cities or Other Political Subdivisions, Actions Involving. Most Cited Cases
The Tenth Amendment does not impose any constitutional impediment to municipal liability for violation of a person's civil rights and the Eleventh Amendment is no bar to liability except for those local government units which are considered part of the state for the purposes of that Amendment. 42 U.S.C.A. § 1983; U.S.C.A.Const. Amends. 10, 11.

**[3] Civil Rights 78 &#x21cb;1354**

78 Civil Rights
   78III Federal Remedies in General
      78k1353 Liability of Public Officials
         78k1354 k. In General. Most Cited Cases
   (Formerly 78k207(1), 78k13.7)
Local government officials sued in their official capacities are "persons" for purposes of the Civil Rights Act of 1871 in those cases in which a local government would be suable in its own name. 42 U.S.C.A. § 1983.

**[4] Civil Rights 78 &#x21cb;1351(1)**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1351 Governmental Ordinance, Policy, Practice, or Custom
           78k1351(1) k. In General. Most Cited Cases
   (Formerly 78k206(3), 78k13.7)
Local governments may be sued for constitutional deprivations visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decision-making channels. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 &#x21cb;1345**

78 Civil Rights
   78III Federal Remedies in General

      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1345 k. Acts of Officers and Employees in General; Vicarious Liability and Respondeat Superior in General. Most Cited Cases
   (Formerly 78k206(2.1), 78k206(2), 78k13.7)
A municipality cannot be held liable for violation of civil rights solely because employee is a tortfeasor; a municipality cannot be held liable under the Civil Rights Act of 1871 on a respondeat superior theory. 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 &#x21cb;1351(5)**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1351 Governmental Ordinance, Policy, Practice, or Custom
           78k1351(5) k. Employment Practices. Most Cited Cases
   (Formerly 78k206(3), 78k13.7)
Alleged policy of a Department of Social Services and the Board of Education of the City of New York in requiring pregnant employees to take unpaid leaves of absence before those leaves are required for medical reasons involved official policy as the moving force of the alleged constitutional violation so that those bodies could be sued and held liable for the equitable relief of back pay under the Civil Rights Act of 1871. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 &#x21cb;1376(4)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
         78k1376 Government Agencies and Officers
           78k1376(4) k. Municipalities and Counties and Their Officers. Most Cited Cases
   (Formerly 78k214(4), 78k13.8(3))
Municipal body sued under the Civil Rights Act of 1871 cannot be entitled to an absolute immunity. 42 U.S.C.A. § 1983.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

**\*\*2019** *Syllabus* FN\*

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*658** Petitioners, female employees of the Department of Social Services and the Board of Education of the City of New York, brought this class action against the Department and its Commissioner, the Board and its Chancellor, and the city of New York and its Mayor under 42 U.S.C. § 1983, which provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party. In each case, the individual defendants were sued solely in their official capacities. The gravamen of the complaint was that the Board and the Department had as a matter of official policy compelled pregnant employees to take unpaid leaves of absence before such leaves were required for medical reasons. The District Court found that petitioners' constitutional rights had been violated, but held that petitioners' claims for injunctive relief were mooted by a supervening change in the official maternity leave policy. That court further held that *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, barred recovery of back pay from the Department, the Board, and the city. In addition, to avoid circumvention of the immunity conferred by *Monroe*, the District Court held that natural persons sued in their official capacities as officers of a local government also enjoy the immunity conferred on local governments by that decision. The Court of Appeals affirmed on a similar theory. *Held* :

1. In *Monroe v. Pape, supra*, after examining the legislative history of the Civil Rights Act of 1871, now codified as 42 U.S.C. § 1983, and particularly the rejection of the so-called Sherman amendment, the Court held that Congress in 1871

doubted its constitutional authority to impose civil liability on municipalities and therefore could not have intended to include municipal bodies within the class of "persons" subject to the Act. Re-examination of this legislative history compels the conclusion that Congress in 1871 would *not* have thought § 1983 constitutionally infirm if it applied to local governments. In addition, that history confirms that local governments were intended to be included **\*659** among the "persons" to which § 1983 applies. Accordingly, *Monroe v. Pape* is over-ruled insofar as it holds that local governments are wholly immune from suit under § 1983. Pp. 2022-2035.

2. Local governing bodies (and local officials sued in their official capacities) can, therefore, be sued directly under § 1983 for monetary, declaratory, and injunctive relief in those situations where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy. In addition, local governments, like every other § 1983 "person," may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such custom has not received formal approval through the government's official decision-making channels. Pp. 2035-2036.

3. On the other hand, the language and legislative history of § 1983 compel the conclusion that Congress did not intend a local government to be held liable solely because it employs a tort-feasor-in other words, a local government cannot be held liable under § 1983 on a *respondeat superior* theory. Pp. 2036-2038.

4. Considerations of *stare decisis* do not counsel against overruling *Monroe v. Pape* insofar as it is inconsistent with this opinion. Pp. 2038-2041.

**\*\*2020** (a) *Monroe v. Pape* departed from prior practice insofar as it completely immunized municipalities from suit under § 1983. Moreover, since the reasoning of *Monroe* does not allow a distinc-

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

tion to be drawn between municipalities and school boards, this Court's many cases holding school boards liable in § 1983 actions are inconsistent with *Monroe*, especially as the principle of that case was extended to suits for injunctive relief in *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109. Pp. 2038-2039.

(b) Similarly, extending absolute immunity to school boards would be inconsistent with several instances in which Congress has refused to immunize school boards from federal jurisdiction under § 1983. Pp. 2038-2040.

(c) In addition, municipalities cannot have arranged their affairs on an assumption that they can violate constitutional rights for an indefinite period; accordingly, municipalities have no reliance interest that would support an absolute immunity. Pp. 2040-2041.

(d) Finally, it appears beyond doubt from the legislative history of the Civil Rights Act of 1871 that *Monroe* misapprehended the meaning of the Act. Were § 1983 unconstitutional as to local governments, it would have been equally unconstitutional as to state or local officers, **\*660** yet the 1871 Congress clearly intended § 1983 to apply to such officers and all agreed that such officers could constitutionally be subjected to liability under § 1983. The Act also unquestionably was intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights. Therefore, without a clear statement in the legislative history, which is not present, there is no justification for excluding municipalities from the "persons" covered by § 1983. Pp. 2040-2041.

5. Local governments sued under § 1983 cannot be entitled to an absolute immunity, lest today's decision "be drained of meaning," *Scheuer v. Rhodes*, 416 U.S. 232, 248, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90. P. 2041.

532 F.2d 259, reversed.

Oscar G. Chase, Brooklyn, N. Y., for petitioners.
L. Kevin Sheridan, New York City, for respond-

ents.

Mr. Justice BRENNAN delivered the opinion of the Court.

Petitioners, a class of female employees of the Department of Social Services and of the Board of Education of the city of New York, commenced this action under 42 U.S.C. § 1983 in July 1971.FN1 The gravamen of the complaint was that the **\*661** Board and the Department had as a matter of official policy compelled pregnant employees to take unpaid leaves of absence before such leaves were required for medical reasons.FN2 Cf. *Cleveland Board of Education v. LaFleur,***\*2021** 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). The suit sought injunctive relief and backpay for periods of unlawful forced leave. Named as defendants in the action were the Department and its Commissioner, the Board and its Chancellor, and the city of New York and its Mayor. In each case, the individual defendants were sued solely in their official capacities.FN3

> FN1. The complaint was amended on September 14, 1972, to allege a claim under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e*et seq.* (1970 ed. and Supp. V). The District Court held that the 1972 amendments to Title VII did not apply retroactively to discrimination suffered prior to those amendments even when an action challenging such prior discrimination was pending on the date of the amendments. 394 F.Supp. 853, 856 (SDNY 1975). This holding was affirmed on appeal. 532 F.2d 259, 261-262 (CA2 1976). Although petitioners sought certiorari on the Title VII issue as well as the § 1983 claim, we restricted our grant of certiorari to the latter issue. 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789.

> FN2. The plaintiffs alleged that New York had a citywide policy of forcing women to take maternity leave after the fifth month of pregnancy unless a city physician and the head of an employee's agency allowed

98 S.Ct. 2018    Page 5

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

up to an additional two months of work. Amended Complaint ¶ 28, App. 13-14. The defendants did not deny this, but stated that this policy had been changed after suit was instituted. Answer ¶ 13, App. 32-33. The plaintiffs further alleged that the Board had a policy of requiring women to take maternity leave after the seventh month of pregnancy unless that month fell in the last month of the school year, in which case the teacher could remain through the end of the school term. Amended Complaint ¶¶ 39, 42, 45, App. 18-19, 21. This allegation was denied. Answer ¶¶ 18, 22, App. 35, 37.

FN3. Amended Complaint ¶ 24, App. 11-12.

On cross-motions for summary judgment, the District Court for the Southern District of New York held moot petitioners' claims for injunctive and declaratory relief since the City of New York and the Board, after the filing of the complaint, had changed their policies relating to maternity leaves so that no pregnant employee would have to take leave unless she was medically unable to continue to perform her job. 394 F.Supp. 853, 855 (1975). No one now challenges this conclusion.**662** The court did conclude, however, that the acts complained of were unconstitutional under *LaFleur, supra*. 394 F.Supp., at 855. Nonetheless plaintiffs' prayers for backpay were denied because any such damages would come ultimately from the City of New York and, therefore, to hold otherwise would be to "circumven[t]" the immunity conferred on municipalities by *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). See 394 F.Supp., at 855.

On appeal, petitioners renewed their arguments that the Board of Education [FN4] was not a "municipality" within the meaning of *Monroe v. Pape, supra,* and that, in any event, the District Court had erred in barring a damages award against the individual defendants. The Court of Appeals for the Second Circuit rejected both contentions. The

court first held that the Board of Education was not a "person" under § 1983 because "it performs a vital governmental function . . . , and, significantly, while it has the right to determine how the funds appropriated to it shall be spent . . . , it has no final say in deciding what its appropriations shall be." 532 F.2d 259, 263 (1976). The individual defendants, however, were "persons" under § 1983, even when sued solely in their official capacities. 532 F.2d, at 264. Yet, because a damages award would "have to be paid by a city that was held not to be amenable to such an action in *Monroe v. Pape,"* a damages action against officials sued in their official capacities could not proceed. *Id.,* at 265.

FN4. Petitioners conceded that the Department of Social Services enjoys the same status as New York City for *Monroe* purposes. See 532 F.2d, at 263.

We granted certiorari in this case, 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789, to consider

"Whether local governmental officials and/or local independent school boards are 'persons' within the meaning of 42 U.S.C. § 1983 when equitable relief in the nature of back pay is sought against them in their official capacities?" Pet. for Cert. 8.

**\*663** Although, after plenary consideration, we have decided the merits of over a score of cases brought under § 1983 in which the principal defendant was a school board [FN5]**\*\*2022** -and, indeed, in some of which § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343, provided the only basis for jurisdiction [FN6]-we indicated in *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 279, 97 S.Ct. 568, 573, 50 L.Ed.2d 471 (1977), last Term that the question presented here was open and would be decided "another day." That other day has come and we now overrule *Monroe v. Pape, supra,* insofar as it holds that local governments are wholly immune from suit under § 1983.[FN7]

FN5. *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *Dayton Board of Education v. Brinkman,* 433 U.S.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *Vorchheimer v. School District of Philadelphia,* 430 U.S. 703, 97 S.Ct. 1671, 51 L.Ed.2d 750 (1977); *East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976); *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Bradley v. School Board of City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Keyes v. School District No. 1, Denver, Colo.,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Northcross v. City of Memphis Board of Education,* 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970); *Carter v. West Feliciana Parish School Board,* 396 U.S. 226, 90 S.Ct. 467, 24 L.Ed.2d 382 (1969); *Alexander v. Holmes County Board of Education,* 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *Tinker v. Des Moines Independent School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Monroe v. Board of Comm'rs,* 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); *Raney v. Board of Education,* 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); *Green v. County School Board of New Kent County, Va.,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *School District of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Goss v. Board of Education,* 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963); *McNeese v. Board of Education,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622

(1963); *Orleans Parish School Board v. Bush,* 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806 (1961); *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

FN6. *Cleveland Board of Education v. LaFleur, supra,* 414 U.S., at 636, 94 S.Ct., at 792; App., in *Keyes v. School District No. 1, Denver Colo.,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548; App., in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554; Pet. for Cert. in *Northcross v. Memphis Board of Education,* 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246; *Tinker v. Des Moines Independent School District, supra,* 393 U.S., at 504, 89 S.Ct., at 735; *McNeese v. Board of Education, supra,* 373 U.S., at 671, 83 S.Ct., at 1435.

FN7. However, we do uphold *Monroe v. Pape,* insofar as it holds that the doctrine of *respondeat superior* is not a basis for rendering municipalities liable under § 1983 for the constitutional torts of their employees. See Part II, *infra.*

**\*664 I**

In *Monroe v. Pape,* we held that "Congress did not undertake to bring municipal corporations within the ambit of [§ 1983]." 365 U.S., at 187, 81 S.Ct. at 484. The sole basis for this conclusion was an inference drawn from Congress' rejection of the "Sherman amendment" to the bill which became the Civil Rights Act of 1871, 17 Stat. 13, the precursor of § 1983. The Amendment would have held a municipal corporation liable for damage done to the person or property of its inhabitants by *private* persons "riotously and tumultuously assembled." FN8 Cong. Globe, 42d Cong., 1st Sess., 749 (1871) (hereinafter Globe). Although the Sherman amendment did not seek to amend § 1 of the Act, which is now § 1983, and although the nature of the obligation created by that amendment was vastly different from that created by § 1, the Court nonetheless con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

cluded in *Monroe* that Congress must have meant to exclude municipal corporations from the coverage of § 1 because " 'the House [in voting against the Sherman amendment] had solemnly decided that in their judgment Congress had no constitutional power to impose any *obligation* upon county and town organizations, the mere instrumentality for the administration of state law.' " 365 U.S., at 190, 81 S.Ct. at 485 (emphasis added), quoting Globe 804 (Rep. Poland). This statement, we thought, showed that Congress doubted its "constitutional power . . . to impose *civil liability* on municipalities,"365 U.S., at 190, 81 S.Ct. at 486 (emphasis added), and that such doubt would have extended to any type of civil liability.[FN9]

> FN8. We expressly declined to consider "policy considerations" for or against municipal liability. See 365 U.S., at 191, 81 S.Ct., at 495.

> FN9. Mr. Justice Douglas, the author of *Monroe,* has suggested that the municipal exclusion might more properly rest on a theory that Congress sought to prevent the financial ruin that civil rights liability might impose on municipalities. See *City of Kenosha v. Bruno,* 412 U.S. 507, 517-520, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). However, this view has never been shared by the Court, see *Monroe v. Pape,* 365 U.S., at 190, 81 S.Ct., at 494; *Moor v. County of Alameda,* 411 U.S. 693, 708, 93 S.Ct. 1785, 1795, 36 L.Ed.2d 596 (1973), and the debates do not support this position.

**\*665** A fresh analysis of the debate on the Civil Rights Act of 1871, and particularly of the **\*\*2023** case law which each side mustered in its support, shows, however, that *Monroe* incorrectly equated the "obligation" of which Representative Poland spoke with "civil liability."

### A. An Overview

There are three distinct stages in the legislative

consideration of the bill which became the Civil Rights Act of 1871. On March 28, 1871, Representative Shellabarger, acting for a House select committee, reported H.R. 320, a bill "to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes." H.R. 320 contained four sections. Section 1, now codified as 42 U.S.C. § 1983, was the subject of only limited debate and was passed without amendment.[FN10] Sections 2 through 4 dealt primarily with the "other purpose" of suppressing Ku Klux Klan violence in the Southern States.[FN11] The wisdom and constitutionality of these sections-not § 1, now § 1983-were the subject of almost all congressional debate and each of these sections was amended. The House finished its initial debates on H.R. 320 on April 7, 1871, and one week later the Senate also voted out a bill.[FN12] Again, debate on § 1 of the bill was limited and that section was passed as introduced.

> FN10. Globe 522.

> FN11. Briefly, § 2 created certain federal crimes in addition to those defined in § 2 of the 1866 Civil Rights Act, 14 Stat. 27, each aimed primarily at the Ku Klux Klan. Section 3 provided that the President could send the militia into any State wracked with Klan violence. Finally, § 4 provided for suspension of the writ of habeas corpus in enumerated circumstances, again primarily those thought to obtain where Klan violence was rampant. See Cong. Globe, 42d Cong., 1st Sess., App. 335-336 (1871) (hereinafter Globe App.).

> FN12. Globe 709.

**\*666** Immediately prior to the vote on H.R. 320 in the Senate, Senator Sherman introduced his amendment.[FN13] This was *not* an amendment to § 1 of the bill, but was to be added as § 7 at the end of the bill. Under the Senate rules, no discussion of the amendment was allowed and, although attempts were made to amend the amendment, it was passed as introduced. In this form, the amendment did *not*

98 S.Ct. 2018
436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

place liability on municipal corporations, but made any inhabitant of a municipality liable for damage inflicted by persons "riotously and tumultuously assembled."[FN14]

> FN13. See *id.,* at 663, quoted in Appendix to this opinion, *infra,* at 2041-2042.

> FN14. *Ibid.* An action for recovery of damages was to be in the federal courts and denominated as a suit against the county, city, or parish in which the damage had occurred. *Ibid.* Execution of the judgment was not to run against the property of the government unit, however, but against the private property of any inhabitant. *Ibid.*

The House refused to acquiesce in a number of amendments made by the Senate, including the Sherman amendment, and the respective versions of H.R. 320 were therefore sent to a conference committee. Section 1 of the bill, however, was not a subject of this conference since, as noted, it was passed verbatim as introduced in both Houses of Congress.

On April 18, 1871, the first conference committee completed its work on H.R. 320. The main features of the conference committee draft of the Sherman amendment were these:[FN15] First, a cause of action was given to persons injured by

> FN15. See Globe 749 and 755, quoted in Appendix to this opinion, *infra,* at 2042.

"any persons riotously and tumultuously assembled together . . . with intent to deprive any person of any right conferred upon him by the Constitution and laws of the United States, or to deter him or punish him for exercising such right, or by reason of his race, color, or previous condition of servitude . . . ."

**\*667** Second, the bill provided that the action would be against the county, city, or parish in which the riot had occurred and that it could be maintained by either the person **\*\*2024** injured or his legal representative. Third, unlike the amendment as proposed, the conference substitute made

the government defendant liable on the judgment if it was not satisfied against individual defendants who had committed the violence. If a municipality were liable, the judgment against it could be collected

"by execution, attachment, mandamus, garnishment, or any other proceeding in aid of execution or applicable to the enforcement of judgments against municipal corporations; and such judgment [would become] a lien as well upon all moneys in the treasury of such county, city, or parish, as upon the other property thereof."

In the ensuing debate on the first conference report, which was the first debate of any kind on the Sherman amendment, Senator Sherman explained that the purpose of his amendment was to enlist the aid of persons of property in the enforcement of the civil rights laws by making their property "responsible" for Ku Klux Klan damage.[FN16] Statutes drafted on a similar theory, he stated, had long been in force in England and were in force in 1871 in a number of States.[FN17] **\*668** Nonetheless there were critical differences between the conference substitute and extant state and English statutes: The conference substitute, unlike most state riot statutes, lacked a short statute of limitations and imposed liability on the government defendant whether or not it had notice of the impending riot, whether or not the municipality was authorized to exercise a police power, whether or not it exerted all reasonable efforts to stop the riot, and whether or not the rioters were caught and punished.[FN18]

> FN16. "Let the people of property in the southern States understand that if they will not make the hue and cry and take the necessary steps to put down lawless violence in those States their property will be holden responsible, and the effect will be most wholesome." Globe 761.
> Senator Sherman was apparently unconcerned that the conference committee substitute, unlike the original amendment, did not place liability for riot damage directly on the property of the well-to-do, but instead placed it on the local government.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

Presumably he assumed that taxes would be levied against the property of the inhabitants to make the locality whole.

FN17. According to Senator Sherman, the law had originally been adopted in England immediately after the Norman Conquest and had most recently been promulgated as the law of 7 & 8 Geo. 4, ch. 31 (1827). See Globe 760. During the course of the debates, it appeared that Kentucky, Maryland, Massachusetts, and New York had similar laws. See *id.,* at 751 (Rep. Shellabarger); *id.,* at 762 (Sen. Stevenson); *id.,* at 771 (Sen. Thurman); *id.,* at 792 (Rep. Butler). Such a municipal liability was apparently common throughout New England. See *id.,* at 761 (Sen. Sherman).

FN18. In the Senate, opponents, including a number of Senators who had voted for § 1 of the bill, criticized the Sherman amendment as an imperfect and impolitic rendering of the state statutes. Moreover, as drafted, the conference substitute could be construed to protect rights that were not protected by the Constitution. A complete critique was given by Senator Thurman. See Globe 770-772.

The first conference substitute passed the Senate but was rejected by the House. House opponents, within whose ranks were some who had supported § 1, thought the Federal Government could not, consistent with the Constitution, obligate municipal corporations to keep the peace if those corporations were neither so obligated nor so authorized by their state charters. And, because of this constitutional objection, opponents of the Sherman amendment were unwilling to impose damages liability for nonperformance of a duty which Congress could not require municipalities to perform. This position is reflected in Representative Poland's statement that is quoted in *Monroe.*[FN19]

FN19. See 365 U.S., at 190, 81 S.Ct., at 494, quoted *supra,* at 2022-2023.

Because the House rejected the first conference report a second conference was called and it duly issued its report. The second conference substitute for the Sherman amendment abandoned municipal liability and, instead, made "any person**669** or persons having knowledge [that a conspiracy to violate civil rights was afoot], and having power to prevent or aid in preventing**2025** the same," who did not attempt to stop the same, liable to any person injured by the conspiracy.[FN20] The amendment in this form was adopted by both Houses of Congress and is not codified as 42 U.S.C. § 1986.

FN20. See Globe 804, quoted in Appendix to this opinion, *infra,* at 2042-2043.

The meaning of the legislative history sketched above can most readily be developed by first considering the debate on the report of the first conference committee. This debate shows conclusively that the constitutional objections raised against the Sherman amendment-on which our holding in *Monroe* was based, see *supra,* at 2022-2023-would not have prohibited congressional creation of a civil remedy against state municipal corporations that infringed federal rights. Because § 1 of the Civil Rights Act does not state expressly that municipal corporations come within its ambit, it is finally necessary to interpret § 1 to confirm that such corporations were indeed intended to be included within the "persons" to whom that section applies.

B. Debate on the First Conference Report

The style of argument adopted by both proponents and opponents of the Sherman amendment in both Houses of Congress was largely legal, with frequent references to cases decided by this Court and the Supreme Courts of the several States. Proponents of the Sherman amendment did not, however, discuss in detail the argument in favor of its constitutionality. Nonetheless, it is possible to piece together such an argument from the debates on the first conference report and those on § 2 of the civil rights bill, which, because it allowed the Federal Government to prosecute crimes "in the States," had also raised questions of federal power.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

The account of Representative Shellabarger, the House sponsor of H.R. 320, is the most complete.

**\*670** Shellabarger began his discussion of H.R. 320 by stating that "there is a domain of constitutional law involved in the right consideration of this measure which is wholly unexplored." Globe, App. 67. There were analogies, however. With respect to the meaning of § 1 of the Fourteenth Amendment, and particularly its Privileges or Immunities Clause, Shellabarger relied on the statement of Mr. Justice Washington in *Corfield v. Coryell,* 3 F.Cas. 230,4 Wash.C.C. 371 (CC ED Pa.1825), which defined the privileges protected by Art. IV:

" 'What these fundamental privileges are[,] it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: protection by the Government;'-

"*Mark that-*

" '*protection by the Government;* the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety . . . .' " Globe App. 69 (emphasis added), quoting 4 Wash.C.C., at 380-381.

Building on his conclusion that citizens were owed protection-a conclusion not disputed by opponents of the Sherman amendment FN21 - Shellabarger then considered Congress' role in providing that protection. Here again there were precedents:

FN21. See Globe 758 (Sen. Trumbull); *id.*, at 772 (Sen. Thurman); *id.*, at 791 (Rep. Willard). The Supreme Court of Indiana had so held in giving effect to the Civil Rights Act of 1866. See *Smith v. Moody,* 26 Ind. 299 (1866) (following *Coryell* ), one of three State Supreme Court cases referred to in Globe App. 68 (Rep. Shellabarger). Moreover, § 2 of the 1871 Act as passed, unlike § 1, prosecuted persons who violated federal rights whether or not that violation was under color of official authority, apparently on the theory that Ku

Klux Klan violence was infringing the right of protection defined by *Coryell*. Nonetheless, opponents argued that municipalities were not generally charged by the States with keeping the peace and hence did not have police forces, so that the duty to afford protection ought not devolve on the municipality, but on whatever agency of state government was charged by the State with keeping the peace. See *infra*, at 2027, and n. 30. In addition, they argued that Congress could not constitutionally add to the duties of municipalities. See *infra*, at 2027-2030.

**\*\*2026** "[Congress has always] assumed to enforce, as against **\*671** the States, and also persons, every one of the provisions of the Constitution. Most of the provisions of the Constitution which restrain and directly relate to the States, such as those in [Art. I, § 10,] relate to the divisions of the political powers of the State and General Governments. . . . These prohibitions upon political powers of the States are all of such nature that they can be, and even have been, . . . enforced by the courts of the United States declaring void all State acts of encroachment on Federal powers. Thus, and thus sufficiently, has the United States 'enforced' these provisions of the Constitution. But there are some that are not of this class. These are where the court secures the rights or the liabilities of persons within the States, as between such persons and the States.

"These three are: first, that as to fugitives from justice;[FN22] second, that as to fugitives from service, (or slaves;) [FN23] third, that declaring that the 'citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States.' [FN24]

FN22. U.S.Const., Art. IV, § 2, cl. 2:
"A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

having Jurisdiction of the Crime."

FN23. *Id.*, cl. 3:
"No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due."

FN24. *Id.*, cl. 1.

**\*672** "And, sir, every one of these-the only provisions where it was deemed that legislation was required to enforce the constitutional provisions-the only three where the rights or liabilities of persons in the States, as between these persons and the States, are directly provided for, Congress has by legislation affirmatively interfered to protect . . . such persons." Globe App. 69-70.

Of legislation mentioned by Shellabarger, the closest analog of the Sherman amendment, ironically, was the statute implementing the fugitives from justice and fugitive slave provisions of Art. IV-the Act of Feb. 12, 1793, 1 Stat. 302-the constitutionality of which had been sustained in 1842, in *Prigg v. Pennsylvania*, 16 Pet. 539, 10 L.Ed. 1060. There, Mr. Justice Story, writing for the Court, held that Art. IV gave slaveowners a federal right to the unhindered possession of their slaves in whatever State such slaves might be found. 16 Pet., at 612. Because state process for recovering runaway slaves might be inadequate or even hostile to the rights of the slaveowner, the right intended to be conferred could be negated if left to state implementation. *Id.*, at 614. Thus, since the Constitution guaranteed the right and this in turn required a remedy, Story held it to be a "natural inference" that Congress had the power itself to ensure an appropriate (in the Necessary and Proper Clause sense) remedy for the right. *Id.*, at 615.

Building on *Prigg*, Shellabarger argued that a remedy against municipalities and counties was an appropriate-and hence constitutional-method for ensuring the protection which the Fourteenth Amendment made every citizen's federal right.FN25 This much was clear from the adoption of such statutes by the several States as devices for suppressing riot.FN26 Thus, said Shellabarger, the only serious question remaining **\*673** was "whether, since a county is an integer or part of a State, the United States can impose upon it, as such, *any obligations to keep the peace* in obedience to United **\*\*2027** States laws."FN27 This he answered affirmatively, citing *Board of Comm'rs v. Aspinwall*, 24 How. 376, 16 L.Ed. 735 (1861), the first of many cases FN28 upholding the power of federal courts to enforce the Contract Clause against municipalities.FN29

FN25. See Globe 751. See also *id.*, at 760 (Sen. Sherman) ("If a State may . . . pass a law making a county . . . responsible for a riot in order to deter such crime, then we may pass the same remedies . . .").

FN26. *Id.*, at 751; see n. 17, *supra*.

FN27. Globe 751 (emphasis added). Compare this statement with Representative Poland's remark upon which our holding in *Monroe* was based. See *supra*, at 2022-2023.

FN28. See, *e. g., Gelpcke v. City of Dubuque*, 68 U.S. 175, 1 Wall. 175,17 L.Ed. 519 (1864); *Von Hoffman v. City of Quincy*, 71 U.S. 535, 4 W all. 535,18 L.Ed. 403 (1867); *Riggs v. Johnson County*, 73 U.S. 166, 6 Wall. 166,18 L.Ed. 768 (1868); *Weber v. Lee County*, 73 U.S. 210, 6 W all. 210,18 L.Ed. 781 (1868); *Supervisors v. Rogers*, 74 U.S. 175, 7 W all. 175,19 L.Ed. 162 (1869); *Benbow v. Iowa City*, 74 U.S. 313, 7 W all. 313,19 L.Ed. 79 (1869); *Supervisors v. Durant*, 76 U.S. 415, 9 W all. 415,19 L.Ed. 732 (1870). See generally 6 C. Fairman, History of the Supreme Court of the United States: Reconstruction and Reunion, 1864-1888, chs. 17-18 (1971).

FN29. See Globe 751-752.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

House opponents of the Sherman amendment-whose views are particularly important since only the House voted down the amendment-did not dispute Shellabarger's claim that the Fourteenth Amendment created a federal right to protection, see n. 21, *supra*, but they argued that the local units of government upon which the amendment fastened liability were not obligated to keep the peace at state law and further that the Federal Government could not constitutionally require local governments to create police forces, whether this requirement was levied directly, or indirectly by imposing damages for breach of the peace on municipalities. The most complete statement of this position is that of Representative Blair: FN30

FN30. Others taking a view similar to Representative Blair's included: Representative Willard, see *id.*, at 791; Representative Poland, see *id.*, at 794; Representative Burchard, see *id.*, at 795; Representative Farnsworth, see *id.*, at 799. Representative Willard also took a somewhat different position. He thought that the Constitution would not allow the Federal Government to dictate the manner in which a State fulfilled its obligation of protection. That is, he thought it a matter of state discretion whether it delegated the peacekeeping power to a municipal or county corporation, to a sheriff, etc. He did not doubt, however, that the Federal Government could impose on the *States* the obligation imposed by the Sherman amendment, and presumably he would have enforced the amendment against a municipal corporation to which the peacekeeping obligation had been delegated. See *id.*, at 791.

Opponents of the Sherman amendment in the Senate agreed with Blair that Congress had no power to pass the Sherman amendment because it fell outside limits on national power implicit in the federal structure of the Constitution and recognized in, *e. g., Collector v. Day*, 11 Wall. 113, 20 L.Ed. 122 (1871). However, the Senate opponents focused not on the amendment's attempt to obligate municipalities to keep the peace, but on the lien created by the amendment, which ran against *all* money and property of a defendant municipality, including property held for public purposes, such as jails or courthouses. Opponents argued that such a lien once entered would have the effect of making it impossible for the municipality to function, since no one would trade with it. See, *e. g.*, Globe 762 (Sen. Stevenson); *id.*, at 763 (Sen. Casserly). Moreover, everyone knew that sound policy prevented execution against public property since this, too, was needed if local government was to survive. See, *e. g., ibid.* See also *Meriwether v. Garrett*, 102 U.S. 472, 501, 513, 26 L.Ed. 197 (1880) (recognizing principle that public property of a municipality was not subject to execution); 2 J. Dillon, The Law of Municipal Corporations §§ 445-446 (1873 ed.) (same).

Although the arguments of the Senate opponents appear to be a correct analysis of then-controlling constitutional and common-law principles, their arguments are not relevant to an analysis of the constitutionality of § 1 of the Civil Rights Act since any judgment under that section, as in any civil suit in the federal courts in 1871, would have been enforced pursuant to *state* laws under the Process Acts of 1792 and 1828. See Act of May 8, 1792, ch. 36, 1 Stat. 275; Act of May 19, 1828, 4 Stat. 278.

"The proposition known as the Sherman amendment*674 . . . is entirely new. It is altogether without a precedent in this country. . . . That amendment claims the power in the General Government to go into the States of this Union and lay such obligations as it may please upon the municipalities, which are the creations of the States alone. . . .

**2028 ". . . [H]ere it is proposed, not to carry into effect an obligation which rests upon the municipality, but to *675 create that obligation, and that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

is the provision I am unable to assent to. The parallel of the hundred does not in the least meet the case. The power that laid the obligation upon the hundred first put the duty upon the hundred that it should perform in that regard, and failing to meet the obligation which had been laid upon it, it was very proper that it should suffer damage for its neglect. . . .

". . . [T]here are certain rights and duties that belong to the States, . . . there are certain powers that inhere in the State governments. They create these municipalities, they say what their powers shall be and what their obligations shall be. If the Government of the United States can step in and add to those obligations, may it not utterly destroy the municipality? If it can say that it shall be liable for damages occurring from a riot, . . . where [will] its power . . . stop and what obligations . . . might [it] not lay upon a municipality. . . .

"Now, only the other day, the Supreme Court . . . decided [in *Collector v. Day*, 11 Wall. 113, 20 L.Ed. 122 (1871)] that there is no power in the Government of the United States, under its authority to tax, to tax the salary of a State officer. Why? Simply because the power to tax involves the power to destroy, and it was not the intent to give the Government of the United States power to destroy the government of the States in any respect. It was held also in the case of *Prigg v. Pennsylvania*, 16 Pet. 539, 10 L.Ed. 1060 (1842) that it is not within the power of the Congress of the United States to lay duties upon a State officer; that we cannot command a State officer to do any duty whatever, as such; and I ask . . . the difference between that and commanding a municipality, which is equally the creature of the State, to perform a duty." Globe 795.

Any attempt to impute a unitary constitutional theory to opponents of the Sherman amendment is, of course, fraught **\*676** with difficulties, not the least of which is that most Members of Congress did not speak to the issue of the constitutionality of the amendment. Nonetheless, two considerations lead us to conclude that opponents of the Sherman amendment found it unconstitutional substantially because of the reasons stated by Representative

Blair: First, Blair's analysis is precisely that of Poland, whose views were quoted as authoritative in *Monroe*, see *supra*, at 2022-2023, and that analysis was shared in large part by all House opponents who addressed the constitutionality of the Sherman amendment.[FN31] Second, Blair's exegesis of the reigning constitutional theory of his day, as we shall explain, was clearly supported by precedent-albeit precedent that has not survived, see *Ex parte Virginia*, 100 U.S. 339, 347-348, 25 L.Ed. 676 (1880); *Graves v. New York ex rel. O'Keefe*, 306 U.S. 466, 486, 59 S.Ct. 595, 83 L.Ed. 927 (1939)-and no other constitutional formula was advanced by participants in the House debates.

FN31. See n. 30, *supra*.

*Collector v. Day*, cited by Blair, was the clearest and, at the time of the debates, the most recent pronouncement of a doctrine of coordinate sovereignty that, as Blair stated, placed limits on even the enumerated powers of the National Government in favor of protecting state prerogatives. There, the Court held that the United States could not tax the income of Day, a Massachusetts state judge, because the independence of the States within their legitimate spheres would be imperiled if the instrumentalities through which States executed their powers were "subject to the control of another and distinct government." 11 Wall., at 127. Although the Court in *Day* apparently rested this holding in part on the proposition that the taxing "power acknowledges no limits but the will of the legislative body imposing the tax,"*id.*, at 125-126; cf. **\*\*2029** *McCulloch v. Maryland*, 17 U.S. 316, 4 Wheat. 316,4 L.Ed. 579 (1819), the Court had in other cases limited other national powers in order to avoid interference with the States.[FN32]

FN32. In addition to the cases discussed in the text, see *Lane County v. Oregon*, 7 Wall. 71, 77, 81, 19 L.Ed. 101 (1869), in which the Court held that the federal Legal Tender Acts should not be construed to require the States to accept taxes tendered in United States notes since this might interfere with a legitimate state activity.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

**\*677** In *Prigg v. Pennsylvania,* for example, Mr. Justice Story, in addition to confirming a broad national power to legislate under the Fugitive Slave Clause, see *supra,* at 2026, held that Congress could not "insist that states . . . provide means to carry into effect the duties of the national government." 16 Pet., at 615-616.[FN33] And Mr. Justice McLean agreed that, "[a]s a general principle," it was true "that Congress had no power to impose duties on state officers, as provided in the [Act of Feb. 12, 1793]." Nonetheless he wondered whether Congress might not impose "positive" duties on state officers where a clause of the Constitution, like the Fugitive Slave Clause, seemed to require affirmative government assistance, rather than restraint of government, to secure federal rights. See *id.,* at 664-665.

> FN33. Mr. Chief Justice Taney agreed: "The state officers mentioned in the law [of 1793] are not bound to execute the duties imposed upon them by Congress, unless they choose to do so, or are required to do so by a law of the state; and the state legislature has the power, if it thinks proper, to prohibit them. The act of 1793, therefore, must depend altogether for its execution upon the officers of the United States named in it." 16 Pet., at 630 (concurring in part).

Had Mr. Justice McLean been correct in his suggestion that, where the Constitution envisioned affirmative government assistance, the States or their officers or instrumentalities could be required to provide it, there would have been little doubt that Congress could have insisted that municipalities afford by "positive" action the protection[FN34] owed individuals under § 1 of the Fourteenth Amendment whether or not municipalities were obligated by state law to keep the peace. However, any such argument, largely foreclosed by *Prigg,* was made **\*678** impossible by the Court's holding in *Kentucky v. Dennison,* 24 How. 66, 16 L.Ed. 717 (1861). There, the Court was asked to require Dennison, the Governor of Ohio, to hand over Lago, a fugitive from justice wanted in Kentucky, as required by § 1

of the Act of Feb. 12, 1793,[FN35] which implemented Art. IV, § 2, cl. 2, of the Constitution. Mr. Chief Justice Taney, writing for a unanimous Court, refused to enforce that section of the Act:

> FN34. See *supra,* at 2025-2026, and n. 21.

> FN35. "*Be it enacted* . . . That whenever the executive authority of any state in the Union . . . shall demand any person as a fugitive from justice . . . and shall moreover produce the copy of an indictment found . . . charging the person so demanded, with having committed treason, felony or other crime, certified as authentic by the governor or chief magistrate of the state . . . from whence the person so charged fled, it shall be the duty of the executive authority of the state or territory to which such person shall have fled, to cause him or her to be arrested and secured . . . and to cause the fugitive to be delivered to such agent [of the demanding State] when he shall appear . . . ." 1 Stat. 302.

"[W]e think it clear, that the Federal Government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it; for if it possessed this power, it might overload the officer with duties which would fill up all his time, and disable him from performing his obligations to the State, and might impose on him duties of a character incompatible with the rank and dignity to which he was elevated by the State." 24 How., at 107-108.

The rationale of *Dennison* -that the Nation could not impose duties on state officers since that might impede States in their legitimate activities-is obviously identical to that which animated the decision in *Collector v. Day.* See *supra,* at 2028-2029. And, as Blair indicated, municipalities as **\*\*2030** instrumentalities through which States executed their policies could be equally disabled from carrying out state policies if they were also obligated to carry out federally imposed duties. Although no one cited *Dennison* by name, the principle for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

which it **\*679** stands was well known to Members of Congress,[FN36] many of whom discussed *Day*[FN37] as well as a series of State Supreme Court cases[FN38] in the mid-1860's which had invalidated a federal tax on the process of state courts on the ground that the tax threatened the independence of a vital state function.[FN39] Thus, there was ample support for Blair's view that the Sherman amendment, by putting municipalities to the Hobson's choice of keeping the peace or paying civil damages, attempted to impose obligations on municipalities by indirection that could not be imposed directly, thereby threatening to "destroy the government of the States." Globe 795.

> FN36. "The Supreme Court of the United States has decided repeatedly that Congress can impose no duty on a State officer." Globe 799 (Rep. Farnsworth). See also *id.*, at 788-789 (Rep. Kerr).

> FN37. See, *e. g., id.*, at 764 (Sen. Davis); *ibid.*(Sen. Casserly); *id.*, at 772 (Sen. Thurman) (reciting logic of *Day* ); *id.*, at 777 (Sen. Frelinghuysen); *id.*, at 788-789 (Rep. Kerr) (reciting logic of *Day* ); *id.*, at 793 (Rep. Poland); *id.*, at 799 (Rep. Farnsworth) (also reciting logic of *Day* ).

> FN38. *Warren v. Paul*, 22 Ind. 276 (1864); *Jones v. Estate of Keep*, 19 Wis. 369 (1865); *Fifield v. Close*, 15 Mich. 505 (1867); *Union Bank v. Hill*, 43 Tenn. 325 (1866); *Smith v. Short*, 40 Ala. 385 (1867).

> FN39. See Globe 764 (Sen. Davis); *ibid.*(Sen. Casserly). See also T. Cooley, Constitutional Limitations \*483-\*484 (1871 ed.).

If municipal liability under § 1 of the Civil Rights Act of 1871 created a similar Hobson's choice, we might conclude, as *Monroe* did, that Congress could not have intended municipalities to be among the "persons" to which that section applied. But this is not the case.

First, opponents expressly distinguished

between imposing an obligation to keep the peace and merely imposing civil liability for damages on a municipality that was obligated by state law to keep the peace, but which had not in violation of the Fourteenth Amendment. Representative Poland, for example, reasoning from Contract Clause precedents, indicated that Congress could constitutionally confer jurisdiction on the federal courts to entertain suits seeking to hold municipalities **\*680** liable for using their authorized powers in violation of the Constitution-which is as far as § 1 of the Civil Rights Act went:

"I presume . . . that where a State had imposed a duty [to keep the peace] upon [a] municipality . . . an action would be allowed to be maintained against them in the courts of the United States under the ordinary restrictions as to jurisdiction. But the enforcing a liability, existing by their own contract, or by a State law, in the courts, is a very widely different thing from devolving a new duty or liability upon them by the national Government, which has no power either to create or destroy them, and no power or control over them whatever." Globe 794.

Representative Burchard agreed:

"[T]here is no duty imposed by the Constitution of the United States, or usually by State laws, upon a county to protect the people of that county against the commission of the offenses herein enumerated, such as the burning of buildings or any other injury to property or injury to person. Police powers are not conferred upon counties as corporations; they are conferred upon cities that have qualified legislative power. And so far as cities are concerned, where the equal protection required to be afforded by a State is imposed upon a city by State laws, perhaps the United States courts could enforce its performance. But counties . . . do not have any control of the police . . . ." *Id.*, at 795.

See also the views of Rep. Willard, discussed at n.30, *supra*.

**\*\*2031** Second, the doctrine of dual sovereignty apparently put no limit on the power of federal courts to enforce the Constitution against mu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2018

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

nicipalities that violated it. Under the theory of dual sovereignty set out in *Prigg*, this is quite understandable. So long as federal courts were vindicating the Federal Constitution, they were providing the "positive" government action **\*681** required to protect federal constitutional rights and no question was raised of enlisting the States in "positive" action. The limits of the principles announced in *Dennison* and *Day* are not so well defined in logic, but are clear as a matter of history. It must be remembered that the same Court which rendered *Day* also vigorously enforced the Contract Clause against municipalities-an enforcement effort which included various forms of "positive" relief, such as ordering that taxes be levied and collected to discharge federal-court judgments, once a constitutional infraction was found.[FN40] Thus, federal judicial enforcement of the Constitution's express limits on state power, since it was done so frequently, must, notwithstanding anything said in *Dennison* or *Day*, have been permissible, at least so long as the interpretation of the Constitution was left in the hands of the judiciary. Since § 1 of the Civil Rights Act simply conferred jurisdiction on the federal courts to enforce § 1 of the Fourteenth Amendment-a situation precisely analogous to the grant of diversity jurisdiction under which the Contract Clause was enforced against municipaliiess**\*682** is no reason to suppose that opponents of the Sherman amendment would have found any constitutional barrier to § 1 suits against municipalities.

> FN40. See cases cited in n. 28, *supra*. Since this Court granted unquestionably "positive" relief in Contract Clause cases, it appears that the distinction between the Sherman amendment and those cases was not that the former created a positive obligation whereas the latter imposed only a negative restraint. Instead, the distinction must have been that a violation of the Constitution was the predicate for "positive" relief in the Contract Clause cases, whereas the Sherman amendment imposed damages without regard to whether a local government was in any way at fault for the

breach of the peace for which it was to be held for damages. See *supra*, at 2024. While no one stated this distinction expressly during the debates, the inference is strong that Congressmen in 1871 would have drawn this distinction since it explains why Representatives Poland, Burchard, and Willard, see *supra*, at 2030-2031, could oppose the amendment while at the same time saying that the Federal Government might impose damages on a local government that had defaulted in a state-imposed duty to keep the peace, and it also explains why everyone agreed that a state or municipal officer could constitutionally be held liable under § 1 for violations of the Constitution. See *infra*, at 2031-2032.

Finally, the very votes of those Members of Congress, who opposed the Sherman amendment but who had voted for § 1, confirm that the liability imposed by § 1 was something very different from that imposed by the amendment. Section 1 without question could be used to obtain a damages judgment against state or municipal *officials* who violated federal constitutional rights while acting under color of law.[FN41] However, for *Prigg-Dennison-Day* purposes, as Blair and others recognized,[FN42] there was no distinction of constitutional magnitude between officers and agents-including corporate agents-of the State: Both were state instrumentalities and the State could be impeded no matter over which sort of instrumentality the Federal Government sought to assert its power. *Dennison* and *Day*, after all, were not suits against municipalities but against *officers*, and Blair was quite conscious that he was extending these cases by applying them to **\*\*2032** municipal corporations.[FN43] Nonetheless, Senator Thurman, who gave the most exhaustive critique of § 1-*inter alia*, complaining that it would be applied to state officers, see Globe App. 217-and who opposed both § 1 and the Sherman amendment, the latter on*Prigg* grounds, agreed unequivocally that § 1 was constitutional.**\*683** [FN44] Those who voted for § 1 must similarly have believed in its constitutionality despite *Prigg, Dennison,* and *Day*.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

FN41. See, *e. g.*, Globe 334 (Rep. Hoar); *id.*, at 365 (Rep. Arthur); *id.*, at 367-368 (Rep. Sheldon); *id.*, at 385 (Rep. Lewis); Globe App. 217 (Sen. Thurman). In addition, officers were included among those who could be sued under the second conference substitute for the Sherman amendment. See Globe 805 (exchange between Rep. Willard and Rep. Shellabarger). There were no constitutional objections to the second report.

FN42. See *id.*, at 795 (Rep. Blair); *id.*, at 788 (Rep. Kerr); *id.*, at 795 (Rep. Burchard); *id.*, at 799 (Rep. Farnsworth).

FN43. "[W]e cannot command a State officer to do any duty whatever, as such; and I ask . . . the difference between that and commanding a municipality . . . ." *Id.*, at 795.

FN44. See Globe App. 216-217, quoted in n.45, *infra*. In 1880, moreover, when the question of the limits of the *Prigg* principle was squarely presented in *Ex parte Virginia*, 100 U.S. 339, 25 L.Ed. 676, this Court held that *Dennison* and *Day* and the principle of federalism for which they stand did not prohibit federal enforcement of § 5 of the Fourteenth Amendment through suits directed to state officers. See 100 U.S., at 345-348.

C. Debate on § 1 of the Civil Rights Bill

From the foregoing discussion, it is readily apparent that nothing said in debate on the Sherman amendment would have prevented holding a municipality liable under § 1 of the Civil Rights Act for its own violations of the Fourteenth Amendment. The question remains, however, whether the general language describing those to be liable under § 1-"any person"-covers more than natural persons. An examination of the debate on § 1 and application of appropriate rules of construction show unequivocally that § 1 was intended to cover legal as well as natural persons.

Representative Shellabarger was the first to explain the function of § 1:

"[Section 1] not only provides a civil remedy for persons whose former condition may have been that of slaves, but also to all people where, under color of State law, they or any of them may be deprived of rights to which they are entitled under the Constitution by reason and virtue of their national citizenship." Globe App. 68.

By extending a remedy to all people, including whites, § 1 went beyond the mischief to which the remaining sections of the 1871 Act were addressed. Representative Shellabarger also stated without reservation that the constitutionality of § 2 of the Civil Rights Act of 1866 controlled the constitutionality of § 1 of the 1871 Act, and that the former had been ***684** approved by "the supreme courts of at least three States of this Union" and by Mr. Justice Swayne, sitting on circuit, who had concluded: " 'We have no doubt of the constitutionality of every provision of this act.' " Globe App. 68. Representative Shellabarger then went on to describe how the courts would and should interpret § 1: "This act is remedial, and in aid of the preservation of human liberty and human rights. All statutes and constitutional provisions authorizing such statutes are liberally and beneficently construed. It would be most strange and, in civilized law, monstrous were this not the rule of interpretation. As has been again and again decided by your own Supreme Court of the United States, and everywhere else where there is wise judicial interpretation, the largest latitude consistent with the words employed is uniformly given in construing such statutes and constitutional provisions as are meant to protect and defend and give remedies for their wrongs to all the people. . . . Chief Justice Jay and also Story say:

" 'Where a power is remedial in its nature there is much reason to contend that it ought to be construed liberally, and it is generally adopted in the interpretation of laws.'-1 *Story on Constitution,* sec. 429." Globe App., at 68.

The sentiments expressed in Representative Shellabarger's opening speech were echoed by Sen-

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

ator Edmunds, the manager of H.R. 320 in the Senate:

"The first section is one that I believe nobody objects to, as defining the rights **2033 secured by the Constitution of the United States when they are assailed by any State law or under color of any State law, and it is merely carrying out the principles of the civil rights bill [of 1866], which have since become a part of the Constitution." Globe 568.

*685 "[Section 1 is] so very simple and really reënact[s] the Constitution." *Id.,* at 569.

And he agreed that the bill "secure[d] the rights of white men as much as of colored men." *Id.,* at 696.

In both Houses, statements of the supporters of § 1 corroborated that Congress, in enacting § 1, intended to give a broad remedy for violations of federally protected civil rights.FN45 Moreover, since municipalities through their official *686 acts could, equally with natural persons, create the harms intended to be remedied by § 1, and, further, since Congress intended § 1 to be broadly construed, there is no reason to suppose that municipal corporations would have been excluded from the sweep of § 1. Cf., *e. g., Ex parte Virginia,* 100 U.S. 339, 346-347, 25 L.Ed. 676 (1880); *Home Tel. & Tel. Co. v. Los Angeles,* 227 U.S. 278, 286-287, 294-296, 33 S.Ct. 312, 57 L.Ed. 510 (1913). One need not rely on this inference alone, however, for the debates show that Members of Congress understood "persons" to include municipal corporations.

FN45. Representative Bingham, the author of § 1 of the Fourteenth Amendment, for example, declared the bill's purpose to be "the enforcement . . . of the Constitution on behalf of every individual citizen of the Republic . . . to the extent of the rights guarantied to him by the Constitution." Globe App. 81. He continued:

"The States never had the right, though they had the power, to inflict wrongs upon free citizens by a denial of the full protection of the laws . . . [And] the States did deny to citizens the equal protection of the laws, they did deny the rights of citizens under the Constitution, and except to the extent of the express limitations upon the States, as I have shown, the citizen had no remedy. . . . They took property without compensation, and he had no remedy. They restricted the freedom of the press, and he had no remedy. They restricted the freedom of speech, and he had no remedy. They restricted the rights of conscience, and he had no remedy. . . . Who dare say, now that the Constitution has been amended, that the nation cannot by law provide against all such abuses and denials of right as these in the States and by States, or combinations of persons?" *Id.,* at 85.

Representative Perry, commenting on Congress' action in passing the civil rights bill also stated:

"Now, by our action on this bill we have asserted as fully as we can assert the mischief intended to be remedied. We have asserted as clearly as we can assert our belief that it is the duty of Congress to redress that mischief. We have also asserted as fully as we can assert the constitutional right of Congress to legislate." Globe 800.

See also *id.,* at 376 (Rep. Lowe); *id.,* at 428-429 (Rep. Beatty); *id.,* at 448 (Rep. Butler); *id.,* at 475-477 (Rep. Dawes); *id.,* at 578-579 (Sen. Trumbull); *id.,* at 609 (Sen. Pool); Globe App. 182 (Rep. Mercur).

Other supporters were quite clear that § 1 of the Act extended a remedy not only where a State had passed an unconstitutional statute, but also where officers of the State were deliberately indifferent to the rights of black citizens:

"But the chief complaint is . . . [that] by a systematic maladministration of [state law], or a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under them. Whenever such a state of facts is clearly

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

made out, I believe [§ 5 of the Fourteenth Amendment] empowers Congress to step in and provide for doing justice to those persons who are thus denied equal protection." *Id.,* at 153 (Rep. Garfield). See also *Monroe v. Pape,* 365 U.S., at 171-187, 81 S.Ct., at 475-484.

Importantly for our inquiry, even the opponents of § 1 agreed that it was constitutional and, further, that it swept very broadly. Thus, Senator Thurman, who gave the most exhaustive critique of § 1, said:

"This section relates wholly to civil suits. . . . Its whole effect is to give to the Federal Judiciary that which now does not belong to it-*a jurisdiction that may be constitutionally conferred upon it, I grant,* but that has never yet been conferred upon it. It authorizes any person who is deprived of any right, privilege, or immunity secured to him by the Constitution of the United States, to bring an action against the wrong-doer in the Federal courts, and that without any limit whatsoever as to the amount in controversy. . . .

*"[T]here is no limitation whatsoever upon the terms that are employed [in the bill], and they are as comprehensive as can be used."* Globe App. 216-217 (emphasis added).

Representative Bingham, for example, in discussing § 1 of the bill, explained that he **2034 had drafted § 1 of the Fourteenth Amendment with the case of *Barron v. Mayor of Baltimore,* 7 Pet. 243, 8 L.Ed. 672 (1833), especially in mind. "In [that] case the *687 city* had taken private property for public use, without COMPENSATION . . . , AND THERE WAS NO REDRESS FOR THE wrong . . . ." globe App. 84 (emphasis added). Bingham's further remarks clearly indicate his view that such takings by cities, as had occurred in *Barron,* would be redressable under § 1 of the bill. See Globe App. 85. More generally, as Bingham's remarks confirm, § 1 of the bill would logically be the vehicle by which Congress provided redress for takings, since that section provided the only civil

remedy for Fourteenth Amendment violations and that Amendment unequivocally prohibited uncompensated takings.[FN46] Given this purpose, it beggars reason to suppose that Congress would have exempted municipalities from suit, insisting instead that compensation for a taking come from an officer in his individual capacity rather than from the government unit that had the benefit of the property taken.[FN47]

> FN46. See 2 J. Story, Commentaries on the Constitution of the United States § 1956 (T. Cooley ed. 1873).

> FN47. Indeed the federal courts found no obstacle to awards of damages against municipalities for common-law takings. See *Sumner v. Philadelphia,* 23 F.Cas. 392 (No. 13,611) (CC ED Pa.1873) (awarding damages of $2,273.36 and costs of $346.35 against the city of Philadelphia).

In addition, by 1871, it was well understood that corporations should be treated as natural persons for virtually all purposes of constitutional and statutory analysis. This had not always been so. When this Court first considered the question of the status of corporations, Mr. Chief Justice Marshall, writing for the Court, denied that corporations "as such" were persons as that term was used in Art. III and the Judiciary Act of 1789. See *Bank of the United States v. Deveaux,* 5 Cranch 61, 86, 3 L.Ed. 38 (1809).[FN48] By 1844, however, the *Deveaux* doctrine was unhesitatingly abandoned:

> FN48. Nonetheless, suits could be brought in federal court if the natural persons who were members of the corporation were of diverse citizenship from the other parties to the litigation. See 5 Cranch, at 91.

"[A] corporation created by and doing business in a particularstate, *688 is to be deemed *to all intents and purposes as a person,* although an artificial person, . . . capable of being treated as a citizen of that state, as much as a natural person." *Louisville R. Co. v. Letson,* 2 How. 497, 558, 11 L.Ed. 353 (1844) (emphasis added), discussed in Globe

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

752.

And only two years before the debates on the Civil Rights Act, in *Cowles v. Mercer County,* 7 Wall. 118, 121, 19 L.Ed. 86 (1869), the *Letson* principle was automatically and without discussion extended to municipal corporations. Under this doctrine, municipal corporations were routinely sued in the federal courts [FN49] and this fact was well known to Members of Congress. [FN50]

FN49. See n. 28, *supra.*

FN50. See, *e. g.,* Globe 777 (Sen. Sherman); *id.,* at 752 (Rep. Shellabarger) ("[C]ounties, cities, and corporations of all sorts, after years of judicial conflict, have become thoroughly established to be an individual or person or entity of the personal existence, of which, as a citizen, individual, or inhabitant, the United States Constitution does take note and endow with faculty to sue and be sued in the courts of the United States").

That the "usual" meaning of the word "person" would extend to municipal corporations is also evidenced by an Act of Congress which had been passed only months before the Civil Rights Act was passed. This Act provided that

"in all acts hereafter passed . . . the word 'person' may extend and be applied to bodies politic and corporate . . . unless the context shows that such words were intended to be used in a more limited sense." Act of Feb. 25, 1871, § 2, 16 Stat. 431.

Municipal corporations in 1871 were included within the phrase "bodies politic and **2035** corporate" [FN51] and, accordingly, the *689 "plain meaning" of § 1 is that local government bodies were to be included within the ambit of the persons who could be sued under § 1 of the Civil Rights Act. Indeed, a Circuit Judge, writing in 1873 in what is apparently the first reported case under § 1, read the Dictionary Act in precisely this way in a case involving a corporate plaintiff and a municipal defendant. [FN52] See *Northwestern Fertilizing Co. v. Hyde Park,* 18 F.Cas. 393, 394 (No. 10,336) (CC ND Ill.1873). [FN53]

FN51. See *Northwestern Fertilizing Co. v. Hyde Park,* 18 Fed.Cas. pp. 393, 394 (No. 10,336) (CC ND Ill.1873); 2 J. Kent, Commentaries on American Law 2 *278-*279 (12th O. W. Holmes ed. 1873). See also *United States v. Maurice,* 26 Fed.Cas.No. 15,747,2 Brock. 96, 109 (CC Va.1823) (Marshall, C. J.) ("The United States is a government, and, consequently, a body politic and corporate"); Apps. D and E to Brief for Petitioners in *Monroe v. Pape,* O.T. 1960, No. 39 (collecting state statutes which, in 1871, defined municipal corporations as bodies politic and corporate).

FN52. The court also noted that there was no discernible reason why persons injured by municipal corporations should not be able to recover. See 18 F., at 394.

FN53. In considering the effect of the Act of Feb. 25, 1871, in *Monroe,* however, Mr. Justice Douglas, apparently focusing on the word "may," stated: "[T]his definition [of person] is merely an allowable, not a mandatory, one." 365 U.S., at 191, 81 S.Ct., at 486. A review of the legislative history of the Dictionary Act shows this conclusion to be incorrect.

There is no express reference in the legislative history to the definition of "person," but Senator Trumbull, the Act's sponsor, discussed the phrase "words importing the masculine gender *may* be applied to females," (emphasis added), which immediately precedes the definition of "person," and stated:

"The only object [of the Act] is to get rid of a great deal of verbosity in our statutes by providing that when the word 'he' is used it *shall* include females as well as males." Cong. Globe, 41st Cong., 3d Sess., 775 (1871) (emphasis added).

Thus, in Trumbull's view the word "may" meant "shall." Such a mandatory use of the

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

extended meanings of the words defined by the Act is also required for it to perform its intended function-to be a guide to "rules of construction" of Acts of Congress. See *ibid.*(remarks of Sen. Trumbull). Were the defined words "allowable, [but] not mandatory" constructions, as *Monroe* suggests, there would be no "rules" at all. Instead, Congress must have intended the definitions of the Act to apply across-the-board except where the Act by its terms called for a deviation from this practice-"[where] the context shows that [defined] words were to be used in a more limited sense." Certainly this is how the *Northwestern Fertilizing* court viewed the matter. Since there is nothing in the "context" of § 1 of the Civil Rights Act calling for a restricted interpretation of the word "person," the language of that section should prima facie be construed to include "bodies politic" among the entities that could be sued.

***690** II

[1][2][3][4] Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies.FN54 Local governing bodies,FN55 therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements***2036** or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional***691** deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels. As Mr. Justice Har-

lan, writing for the Court, said in *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 167-168, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970): "Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." FN56

FN54. There is certainly no constitutional impediment to municipal liability. "The Tenth Amendment's reservation of nondelegated powers to the States is not implicated by a federal-court judgment enforcing the express prohibitions of unlawful state conduct enacted by the Fourteenth Amendment." *Milliken v. Bradley,* 433 U.S. 267, 291, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977); see *Ex parte Virginia,* 100 U.S., at 347-348, 25 L.Ed. 676. For this reason, *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), is irrelevant to our consideration of this case. Nor is there any basis for concluding that the Eleventh Amendment is a bar to municipal liability. See, *e. g., Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Lincoln County v. Luning,* 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890). Our holding today is, of course, limited to local government units which are not considered part of the State for Eleventh Amendment purposes.

FN55. Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent-at least where Eleventh Amendment considerations do not control analysis-our holding today that local governments can be sued under § 1983 necessarily decides that local government officials sued in their official capacities are "persons" under § 1983 in those cases in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

which, as here, a local government would be suable in its own name.

FN56. See also Mr. Justice Frankfurter's statement for the Court in *Nashville, C. & St. L. R. Co. v. Browning,* 310 U.S. 362, 369, 60 S.Ct. 968, 972, 84 L.Ed. 1254 (1940):

"It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice . . . can establish what is state law. The Equal Protection Clause did not writ an empty formalism into the Constitution. Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text."

[5] On the other hand, the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

We begin with the language of § 1983 as originally passed:

"*[A]ny person who,* under color of any law, statute, ordinance, regulation, custom, or usage of any State, *shall subject, or cause to be subjected,* any person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such **\*692** law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress . . . ."
17 Stat. 13. (emphasis added).

The italicized language plainly imposes liability on a government that, under color of some official policy, "causes" an employee to violate another's constitutional rights. At the same time, that language cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor. Indeed, the fact that Congress did specifically provide that A's tort became B's liability if B "caused" A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent.[FN57] **\*\*2037** See *Rizzo v. Goode,* 423 U.S. 362, 370-371, 96 S.Ct. 598, 602, 46 L.Ed.2d 561 (1976).

FN57. Support for such a conclusion can be found in the legislative history. As we have indicated, there is virtually no discussion of § 1 of the Civil Rights Act. Again, however, Congress' treatment of the Sherman amendment gives a clue to whether it would have desired to impose *respondeat superior* liability.

The primary constitutional justification for the Sherman amendment was that it was a necessary and proper remedy for the failure of localities to protect citizens as the Privileges or Immunities Clause of the Fourteenth Amendment required. See *supra*, at 2025-2027. And according to Sherman, Shellabarger, and Edmunds, the amendment came into play only when a locality was at fault or had knowingly neglected its duty to provide protection. See Globe 761 (Sen. Sherman); *id.,* at 756 (Sen. Edmunds); *id.,* at 751-752 (Rep. Shellabarger). But other proponents of the amendment apparently viewed it as a form of vicarious liability for the unlawful acts of the citizens of the locality. See *id.,* at 792 (Rep. Butler). And whether intended or not, the amendment as drafted did impose a species of vicarious liability on municipalities since it could be construed to impose liability even if a municipality did not know of an impending or ensuing riot or did not have the wherewithal to do any-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

thing about it. Indeed, the amendment held a municipality liable even if it had done everything in its power to curb the riot. See *supra,* at 2024; Globe 761 (Sen. Stevenson); *id.,* at 771 (Sen. Thurman); *id.,* at 788 (Rep. Kerr); *id.,* at 791 (Rep. Willard). While the first conference substitute was rejected principally on constitutional grounds see *id.,* at 804 (Rep. Poland), it is plain from the text of the second conference substitute-which limited liability to those who, having the power to intervene against Ku Klux Klan violence, "neglect[ed] or refuse[d] so to do," see Appendix to this opinion, *infra,* at 2042, and which was enacted as § 6 of the 1871 Act and is now codified as 42 U.S.C. § 1986-that Congress also rejected those elements of vicarious liability contained in the first conference substitute even while accepting the basic principle that the inhabitants of a community were bound to provide protection against the Ku Klux Klan. Strictly speaking, of course, the fact that Congress refused to impose vicarious liability for the wrongs of a few private citizens does not conclusively establish that it would similarly have refused to impose vicarious liability for the torts of a municipality's employees. Nonetheless, when Congress' rejection of the only form of vicarious liability presented to it is combined with the absence of any language in § 1983 which can easily be construed to create *respondeat superior* liability, the inference that Congress did not intend to impose such liability is quite strong.

**\*693** Equally important, creation of a federal law of *respondeat superior* would have raised all the constitutional problems associated with the obligation to keep the peace, an obligation Congress chose not to impose because it thought imposition of such an obligation unconstitutional. To this day, there is disagreement about the basis for imposing liability on an employer for the torts of an employee when the sole nexus between the employer and the tort is the fact of the employer-employee relationship. See W. Prosser, Law of Torts § 69, p. 459 (4th ed. 1971). Nonetheless, two justifications tend to stand out. First is the common-sense notion that no matter how blameless an employer appears to be in an individual case, accidents might nonetheless be reduced if employers had to bear the cost of accidents. See, *e. g., ibid.;* 2 F. Harper & F. James, Law of Torts, § 26.3, pp. 1368-1369 (1956). Second is the argument that the cost of accidents should be **\*694** spread to the community as a whole on an insurance theory. See, *e. g., id.,* § 26.5; Prosser, *supra,* at 459.[FN58]

> FN58. A third justification, often cited but which on examination is apparently insufficient to justify the doctrine of *respondeat superior,* see, *e. g.,* 2 F. Harper & F. James, § 26.3, is that liability follows the right to control the actions of a tortfeasor. By our decision in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), we would appear to have decided that the mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability. See 423 U.S., at 370-371, 96 S.Ct., at 602.

The first justification is of the same sort that was offered for statutes like the Sherman amendment: "The obligation to make compensation for injury resulting from riot is, by arbitrary enactment of statutes, affirmatory law, and the reason of passing the statute is to secure a more perfect police regulation." Globe 777 (Sen. Frelinghuysen). This justification was obviously insufficient to sustain the amendment against perceived constitutional difficulties and there is no reason to suppose that a more general liability imposed for a similar reason would have been thought less constitutionally objectionable. The second justification was similarly put forward as a justification for the Sherman amendment: "we do not look upon [the Sherman amendment] as a punishment . . . . It is a mutual insurance." *Id.,* at 792 (Rep. Butler). Again, this justification was insufficient to sustain the amendment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

[6] We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent**2038** official policy, inflicts the injury that the government as an entity is responsible under § 1983. Since this case unquestionably involves official policy as the moving force of the constitutional violation found by the District Court, see *supra*, at 2020-2021, *695 and n. 2, we must reverse the judgment below. In so doing, we have no occasion to address, and do not address, what the full contours of municipal liability under § 1983 may be. We have attempted only to sketch so much of the § 1983 cause of action against a local government as is apparent from the history of the 1871 Act and our prior cases, and we expressly leave further development of this action to another day.

III

Although we have stated that *stare decisis* has more force in statutory analysis than in constitutional adjudication because, in the former situation, Congress can correct our mistakes through legislation, see, *e. g., Edelman v. Jordan*, 415 U.S. 651, 671, and n. 14, 94 S.Ct. 1347, 1365, 39 L.Ed.2d 662 (1974), we have never applied *stare decisis* mechanically to prohibit overruling our earlier decisions determining the meaning of statutes. See, *e. g., Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 47-49, 97 S.Ct. 2549, 2559, 53 L.Ed.2d 568 (1977); *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406 n. 1, 52 S.Ct. 443, 454,76 L.Ed. 815 (1932) (Brandeis, J., dissenting) (collecting cases). Nor is this a case where we should "place on the shoulders of Congress the burden of the Court's own error." *Girouard v. United States*, 328 U.S. 61, 70, 66 S.Ct. 826, 830, 90 L.Ed. 1084 (1946).

First, *Monroe v. Pape,* insofar as it completely immunizes municipalities from suit under § 1983, was a departure from prior practice. See, *e. g.,*

*Northwestern Fertilizing Co. v. Hyde Park*, 18 Fed.Cas. 393 (No. 10,336) (CC ND Ill.1873); *City of Manchester v. Leiby*, 117 F.2d 661 (CA1 1941); *Hannan v. City of Haverhill*, 120 F.2d 87 (CA1 1941); *Douglas v. City of Jeannette*, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); *Holmes v. City of Atlanta*, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776 (1955), in each of which municipalities were defendants in § 1983 suits.[FN59] Moreover, the constitutional defect*696 that led to the rejection of the Sherman amendment would not have distinguished between municipalities and school boards, each of which is an instrumentality of state administration. See *supra*, at 2027-2032. For this reason, our cases-decided both before and after *Monroe*, see n. 5, *supra* -holding school boards liable in § 1983 actions are inconsistent with *Monroe*, especially as *Monroe* 's immunizing principle was extended to suits for injunctive relief in *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973).[FN60] And although in many of these cases jurisdiction was not questioned, we ought not "disregard the implications of an exercise of judicial authority assumed to be proper for [100] years." *Brown Shoe Co. v. United States*, 370 U.S. 294, 307, 82 S.Ct. 1502, 1514, 8 L.Ed.2d 510 (1962); see *Bank of the United States v. Deveaux*, 5 Cranch, at 88 (Marshall, C. J.) ("Those decisions are not cited as authority . . . but they have much weight as they show that this point neither occurred to the bar or the bench"). Thus, while we have reaffirmed *Monroe* without further examination on three occasions,[FN61] it can scarcely be said that *Monroe***2039** is so consistent with the warp and woof of civil rights law as to be beyond question.

FN59. Each case cited by *Monroe*, see 365 U.S., at 191 n. 50, 81 S.Ct. 495 as consistent with the position that local governments were not § 1983 "persons" reached its conclusion by assuming that state-law immunities overrode the § 1983 cause of action. This has never been the law.

FN60. Although many suits against school boards also include private individuals as parties, the "principal defendant is usually

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

the local board of education or school board." *Milliken v. Bradley*, 433 U.S., at 292-293, 97 S.Ct. at 2763 (Powell, J., concurring in judgment).

FN61. *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).

Second, the principle of blanket immunity established in *Monroe* cannot be cabined short of school boards. Yet such an extension would itself be inconsistent with recent expressions of congressional intent. In the wake of our decisions, Congress not only has shown no hostility to federal-court decisions against school boards, but it has indeed rejected efforts to strip the federal courts of jurisdiction over school boards.[FN62] Moreover, recognizing that school boards are often **\*697** defendants in school desegregation suits, which have almost without exception been § 1983 suits, Congress has twice passed legislation authorizing grants to school boards to assist them in complying with federal-court decrees.[FN63] Finally, in **\*698** regard to **\*\*2040** the Civil Rights Attorney's Fees Awards Act of 1976, 90 Stat. 2641, 42 U.S.C. § 1988 (1976 ed.), which allows prevailing parties (in the discretion of the court) in § 1983 suits **\*699** to obtain attorney's fees from the losing parties, the Senate stated:

FN62. During the heyday of the furor over busing, both the House and the Senate refused to adopt bills that would have removed from the federal courts jurisdiction "to make any decision, enter any judgment, or issue any order requiring any *school board* to make any change in the racial composition of the student body at any public school or in any class at any public school to which students are assigned in conformity with a freedom of choice system, or requiring any *school board* to transport any students from one public

school to another public school or from one place to another place or from one school district to another school district in order to effect a change in the racial composition of the student body at any school or place or in any school district, or denying to any student the right or privilege of attending any public school or class at any public school chosen by the parent of such student in conformity with a freedom of choice system, or requiring any *school board* to close any school and transfer the students from the closed school to any other school for the purpose of altering the racial composition of the student body at any public school, or precluding any *school board* from carrying into effect any provision of any contract between it and any member of the faculty of any public school it operates specifying the public school where the member of the faculty is to perform his or her duties under the contract." S. 1737, 93d Cong., 1st Sess., § 1207 (1973) (emphasis added).

Other bills designed either completely to remove the federal courts from the school desegregation controversy, S. 287, 93d Cong., 1st Sess. (1973), or to limit the ability of federal courts to subject school boards to remedial orders in desegregation cases, S. 619, 93d Cong., 1st Sess. (1973); S. 179, 93d Cong., 1st Sess., § 2(a) (1973); H.R. 13534, 92d Cong., 2d Sess., § 1 (1972), have similarly failed.

FN63. In 1972, spurred by a finding "that the process of eliminating or preventing minority group isolation and improving the quality of education for all children often involves the expenditure of additional funds to which local educational agencies do not have access," 86 Stat. 354, 20 U.S.C. § 1601(a) (1976 ed.), Congress passed the Emergency School Aid Act. Section 706(a)(1)(A)(i) of that Act, 20 U.S.C. § 1605(a)(1)(A)(i) (1976 ed.), authorizes the Assistant Secretary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2018
436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

"to make a grant to, or a contract with, *a local educational agency [w]hich is implementing a plan . . . which has been undertaken pursuant to a final order issued by a court of the United States* . . . which requires the desegregation of minority group segregated children or faculty in the elementary and secondary schools of such agency, or otherwise requires the elimination or reduction of minority group isolation in such schools." (Emphasis added.)

A "local educational agency" is defined by 20 U.S.C. § 1619(8) (1976 ed.) as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or a federally recognized Indian reservation, or such combination of school districts, or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools, or a combination of local educational agencies . . . ." Congress thus clearly recognized that school boards were often parties to federal school desegregation suits. In § 718 of the Act, 86 Stat. 369, 20 U.S.C. § 1617 (1976 ed.), Congress gave its explicit approval to the institution of federal desegregation suits against school boards-presumably under § 1983. Section 718 provides:

"Upon the entry of a final order *by a court of the United States against a local educational agency* . . . for discrimination on the basis of race, color, or national origin in violation of . . . the fourteenth amendment to the Constitution of the United States . . . the court . . . may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." (Emphasis added.)

Two years later in the Equal Educational Opportunities Act of 1974, Congress found that "the implementation of desegregation plans that require extensive student transportation has, in many cases, required *local educational agencies* to expend large amounts of funds, thereby depleting their financial resources . . . ." 20 U.S.C. § 1702(a)(3) (1976 ed.). (Emphasis added.) Congress did not respond by declaring that school boards were not subject to suit under § 1983 or any other federal statute, "but simply [legislated] revised evidentiary standards and remedial priorities to be employed by the courts in deciding such cases." Brief for National Education Assn., et al. as *Amici Curiae* 15-16. Indeed, Congress expressly reiterated that a cause of action, cognizable in the federal courts, exists for discrimination in the public school context. 20 U.S.C. §§ 1703, 1706, 1708, 1710, 1718 (1976 ed.). The Act assumes that school boards will usually be the defendants in such suits. For example, § 211 of the Act, 88 Stat. 516, as set forth in 20 U.S.C. § 1710 (1976 ed.), provides:

"The Attorney General shall not institute a civil action under section 1706 of this title [which allows for suit by both private parties and the Attorney General to redress discrimination in public education] before he-

"(a) gives to the appropriate educational agency notice of the condition or conditions which, in his judgment, constitute a violation of part 2 [the prohibitions against discrimination in public education]." Section 219 of the Act, 20 U.S.C. § 1718 (1976 ed.), provides for the termination of court-ordered busing "if the court finds the defendant educational agency has satisfied the requirements of the fifth or fourteenth amendments to the Constitution, whichever is applicable, and will continue to be in compliance with the requirements thereof."

"[D]efendants in these cases are often State or local *bodies* or State or local officials. In such cases it is intended that the attorneys' fees, like other

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

items of costs, will be collected either directly from the official, *in his official capacity*, from funds of his agency or under his control, or *from the State or local government (whether or not the agency or government is a named party)*." S.Rep.No.94-1011, p. 5 (1976); U.S.Code Cong. & Admin.News 1976, pp. 5908, 5913 (emphasis added; footnotes omitted).

Far from showing that Congress has relied on *Monroe*, therefore, events since 1961 show that Congress has refused to extend the benefits of *Monroe* to school boards and has attempted to allow awards of attorney's fees against local governments even though *Monroe, City of Kenosha v. Bruno*, and *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), have made the joinder of such governments impossible.[FN64]

> FN64. Whether Congress' attempt is in fact effective is the subject of *Hutto v. Finney*, O.T.1977, No. 76-1660, cert. granted, 434 U.S. 901, 98 S.Ct. 295, 54 L.Ed.2d 187, and therefore we express no view on it here.

Third, municipalities can assert no reliance claim which can **\*700** support an absolute immunity. As Mr. Justice Frankfurter said in *Monroe*,"[t]his is not an area of commercial law in which, presumably, individuals may have arranged their affairs in reliance on the expected stability of decision." 365 U.S., at 221-222, 81 S.Ct., at 503 (dissenting in part). Indeed, municipalities simply cannot "arrange their affairs" on an assumption that they can violate constitutional rights indefinitely since injunctive suits against local officials under § 1983 would prohibit any such arrangement. And it scarcely need be mentioned that nothing in *Monroe* encourages municipalities to violate constitutional rights or even suggests that such violations are anything other than completely wrong.

Finally, even under the most stringent test for the propriety of overruling a statutory decision proposed by Mr. Justice Harlan in *Monroe*[FN65]-"that it appear beyond doubt from the legislative history of the 1871 statute that [*Monroe* ] misapprehended

the meaning of the [section],"365 U.S., at 192, 81 S.Ct., at 487 (concurring opinion)-the overruling of *Monroe* insofar as it holds that local governments are not "persons" **\*\*2041** who may be defendants in § 1983 suits is clearly proper. It is simply beyond doubt that, under the 1871 Congress' view of the law, were § 1983 liability unconstitutional as to local governments, it would have been equally unconstitutional as to state officers. Yet everyone-proponents and opponents alike-knew § 1983 would be applied to state officers and nonetheless stated that § 1983 was constitutional. See*supra*, at 2030-2032. And, moreover, there can be no doubt that § 1 of the Civil Rights Act was intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected **\*701** rights. Therefore, absent a clear statement in the legislative history supporting the conclusion that § 1 was not to apply to the official acts of a municipal corporation-which simply is not present-there is no justification for excluding municipalities from the "persons" covered by § 1.

> FN65. We note, however, that Mr. Justice Harlan's test has not been expressly adopted by this Court. Moreover, that test is based on two factors: *stare decisis* and "indications of congressional acceptance of this Court's earlier interpretation [of the statute in question]." 365 U.S., at 192, 81 S.Ct., at 487. As we have explained, the second consideration is not present in this case.

For reasons stated above, therefore, we hold that *stare decisis* does not bar our overruling of *Monroe* insofar as it is inconsistent with Parts I and II of this opinion.[FN66]

> FN66. No useful purpose would be served by an attempt at this late date to determine whether *Monroe* was correct on its facts. Similarly, since this case clearly involves official policy and does not involve *respondeat superior*, we do not assay a view on how our cases which have relied on that aspect of *Monroe* that is overruled

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2018

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

*Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); and *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976)-should have been decided on a correct view of § 1983. Nothing we say today affects the conclusion reached in *Moor*, see 411 U.S., at 703-704, 93 S.Ct. 1785, that 42 U.S.C. § 1988 cannot be used to create a federal cause of action where § 1983 does not otherwise provide one, or the conclusion reached in *City of Kenosha*, see 412 U.S., at 513, 93 S.Ct., at 2226 that "nothing . . . suggest[s] that the generic word 'person' in § 1983 was intended to have a bifurcated application to municipal corporations depending on the nature of the relief sought against them."

IV

[7] Since the question whether local government bodies should be afforded some form of official immunity was not presented as a question to be decided on this petition and was not briefed by the parties or addressed by the courts below, we express no views on the scope of any municipal immunity beyond holding that municipal bodies sued under § 1983 cannot be entitled to an absolute immunity, lest our decision that such bodies are subject to suit under § 1983 "be drained of meaning," *Scheuer v. Rhodes*, 416 U.S. 232, 248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Cf. *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 397-398, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

**\*702** V

For the reasons stated above, the judgment of the Court of Appeals is

*Reversed.*

APPENDIX TO OPINION OF THE COURT

As proposed, the Sherman amendment was as follows:

"That if any house, tenement, cabin, shop, building, barn, or granary shall be unlawfully or feloniously demolished, pulled down, burned, or destroyed, wholly or in part, by any persons riotously and tumultuously assembled together; or if any person shall unlawfully and with force and violence be whipped, scourged, wounded, or killed by any persons riotously and tumultuously assembled together; and if such offense was committed to deprive any person of any right conferred upon him by the Constitution and laws of the United States, or to deter him or punish him for exercising such right, or by reason of his race, color, or previous condition of servitude, in every such case the inhabitants of the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense if living, or to his widow or legal representative**\*\*2042** if dead; and such compensation may be recovered by such person or his representative by a suit in any court of the United States of competent jurisdiction in the district in which the offense was committed, to be in the name of the person injured, or his legal representative, and against said county, city, or parish. And execution may be issued on a judgment rendered in such suit and may be levied upon any property, real or personal, of any person in said county, city, or parish, and the said county, city, or parish may recover the full amount of such judgment, costs and interest, **\*703** from any person or persons engaged as principal or accessory in such riot in an action in any court of competent jurisdiction." Globe 663.

The complete text of the first conference substitute for the Sherman amendment is:

"That if any house, tenement, cabin, shop, building, barn, or granary shall be unlawfully or feloniously demolished, pulled down, burned, or destroyed, wholly or in part, by any persons riotously and tumultuously assembled together; or if any person shall unlawfully and with force and violence be whipped, scourged, wounded, or killed by any persons riotously and tumultuously assembled

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

together, with intent to deprive any person of any right conferred upon him by the Constitution and laws of the United States, or to deter him or punish him for exercising such right, or by reason of his race, color, or previous condition of servitude, in every such case the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense, if living, or to his widow or legal representative if dead; and such compensation may be recovered in an action on the case by such person or his representative in any court of the United States of competent jurisdiction in the district in which the offense was committed, such action to be in the name of the person injured, or his legal representative, and against said county, city, or parish, and in which action any of the parties committing such acts may be joined as defendants. And any payment of any judgment, or part thereof unsatisfied, recovered by the plaintiff in such action, may, if not satisfied by the individual defendant therein within two months next after the recovery of such judgment upon execution duly issued against such individual defendant in such judgment, and returned unsatisfied, in whole or in part, be enforced **\*704** against such county, city, or parish, by execution, attachment, mandamus, garnishment, or any other proceeding in aid of execution or applicable to the enforcement of judgments against municipal corporations; and such judgment shall be a lien as well upon all moneys in the treasury of such county, city, or parish, as upon the other property thereof. And the court in any such action may on motion cause additional parties to be made therein prior to issue joined, to the end that justice may be done. And the said county, city, or parish may recover the full amount of such judgment, by it paid, with costs and interest, from any person or persons engaged as principal or accessory in such riot, in an action in any court of competent jurisdiction. And such county, city, or parish, so paying, shall also be subrogated to all the plaintiff's rights under such judgment." *Id.*, at 749, 755.

The relevant text of the second conference substitute for the Sherman amendment is as follows:

"[A]ny person or persons having knowledge

that any of the wrongs conspired to be done and mentioned in the second section of this act are about to be committed, and having power to prevent or aid in preventing the same, *shall neglect or refuse so to do*, and such wrongful act shall be committed, such person or persons shall be liable to the person injured, or his legal representatives." *Id.*, at 804 (emphasis added).

**\*\*2043** Mr. Justice POWELL, concurring.

I join the opinion of the Court, and express these additional views.

Few cases in the history of the Court have been cited more frequently than *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), decided less than two decades ago. Focusing new light on 42 U.S.C. § 1983, that decision widened access to the federal courts and permitted expansive interpretations of the reach of **\*705** the 1871 measure. But *Monroe* exempted local governments from liability at the same time it opened wide the courthouse door to suits against officers and employees of those entities-even when they act pursuant to express authorization. The oddness of this result, and the weakness of the historical evidence relied on by the *Monroe* Court in support of it, are well demonstrated by the Court's opinion today. Yet the gravity of overruling a part of so important a decision prompts me to write.

I

In addressing a complaint alleging unconstitutional police conduct that probably was unauthorized and actionable under state law,[FN1] the *Monroe* Court treated the 42d Congress' rejection of the Sherman amendment as conclusive evidence of an intention to immunize local governments from all liability under the statute for constitutional injury. That reading, in light of today's thorough canvass of the legislative history, clearly "misapprehended the meaning of the controlling provision,"*Monroe, supra,* at 192, 81 S.Ct. at 487 (Harlan, J., concurring). In this case, involving formal, written policies of the Department of Social Services and the Board of Education of the city of New York

98 S.Ct. 2018    Page 580

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

that are alleged to conflict *706 with the command of the Due Process Clause, cf. *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), the Court decides "not to reject [wisdom] merely because it comes late,"*Henslee v. Union Planters Bank,* 335 U.S. 595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259 (1949) (Frankfurter, J., dissenting).

> FN1. The gravamen of the complaint in *Monroe* was that Chicago police officers acting "under color of" state law had conducted a warrantless, early morning raid and ransacking of a private home. Although at least one of the allegations in the complaint could have been construed to charge a custom or usage of the Police Department of the city of Chicago that did not violate state law, see 365 U.S., at 258-259, 81 S.Ct. 473 (Frankfurter, J., dissenting in part), and there is a hint of such a theory in Brief for Petitioners, O.T.1960, No. 39, pp. 41-42, that feature of the case was not highlighted in this Court. The dispute that divided the Court was over whether a complaint alleging police misconduct in violation of state law, for which state judicial remedies were available, stated a § 1983 claim in light of the statutory requirement that the conduct working injury be "under color of" state law. Compare 365 U.S., at 172-183, 81 S.Ct. 473 (opinion of the Court), and *id.,* at 193-202, 81 S.Ct. 473 (Harlan, J., concurring), with *id.,* at 202-259, 81 S.Ct. 473 (Frankfurter, J., dissenting in part).

As the Court demonstrates, the Sherman amendment presented an extreme example of "riot act" legislation that sought to impose vicarious liability on government subdivisions for the consequences of private lawlessness. As such, it implicated concerns that are of marginal pertinence to the operative principle of § 1 of the 1871 legislation-now § 1983-that "any person" acting "under color of" state law may be held liable for affirmative conduct that "subjects, or causes to be subjec-

ted, any person . . . to the deprivation of any" federal constitutional or statutory right. Of the many reasons for the defeat of the Sherman proposal, none supports *Monroe* 's observation that the 42d Congress was fundamentally "antagonistic," 365 U.S., at 191, 81 S.Ct. 473, to the proposition that government entities and natural persons alike should be held accountable for the consequences of conduct directly working a constitutional violation. Opponents in the Senate appear to have been troubled primarily by the proposal's unprecedented lien provision, which would have exposed even property held for public purposes to the demands of § 1983 judgment lienors. *Ante,* at 2027, 2028, n. 30. The opposition in the House of Representatives focused largely **2044 on the Sherman amendment's attempt to impose a peacekeeping obligation on municipalities when the Constitution itself imposed no such affirmative duty and when many municipalities were not even empowered under state law to maintain police forces. *Ante,* at 2027-2028, 2030-2032.FN2

> FN2. If in the view of House opponents, such as Representatives Poland, Burchard, and Willard, see *ante,* at 2030-2032, a municipality obligated by state law to keep the peace could be held liable for a failure to provide equal protection against private violence, it seems improbable that they would have opposed imposition of liability on a municipality for the affirmative implementation of policies promulgated within its proper sphere of operation under state law. Such liability is promised not on a failure to take affirmative action in an area outside the contemplation of the state-law charter-the sort of liability that would have been imposed by the Sherman amendment-but on the consequences of activities actually undertaken within the scope of the powers conferred by state law.

*707 The Court correctly rejects a view of the legislative history that would produce the anomalous result of immunizing local government units from monetary liability for action directly causing a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

constitutional deprivation, even though such actions may be fully consistent with, and thus not remediable under, state law. No conduct of government comes more clearly within the "under color of" state law language of § 1983. It is most unlikely that Congress intended public officials acting under the command or the specific authorization of the government employer to be *exclusively* liable for resulting constitutional injury.[FN3]

> FN3. The view taken today is consistent with the understanding of the 42d Congress that unless the context revealed a more limited definition, "the word 'person' may extend and be applied to bodies politic and corporate . . . ." Act of Feb. 25, 1871, § 2, 16 Stat. 431. It also accords with the interpretation given the same word when it was used by Senator Sherman in the antitrust legislation of 1890 bearing his name. See *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (plurality opinion); *Chattanooga Foundry v. Atlanta,* 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906); cf. *Pfizer, Inc. v. Government of India,* 434 U.S. 308, 98 S.Ct. 585, 54 L.Ed.2d 563 (1978).

As elaborated in Part II of today's opinion, the rejection of the Sherman amendment can best be understood not as evidence of Congress' acceptance of a rule of absolute municipal immunity but as a limitation of the statutory ambit to actual wrongdoers, *i. e.,* a rejection of *respondeat superior* or any other principle of vicarious liability. Cf. Levin, The Section 1983 Municipal Immunity Doctrine, 65 Geo.L.J. 1483, 1531-1535 (1977). Thus, it has been clear that a public official may be held liable in damages when his actions are found to violate a constitutional right and there is no qualified immunity, see *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 922, 43 L.Ed.2d 214 (1975); *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). Today the Court recognizes **\*708** that this principle also applies to a local government when implementation of its official policies or established customs inflicts the constitutional injury.

## II

This Court traditionally has been hesitant to overrule prior constructions of statutes or interpretations of common-law rules. "*Stare decisis* is usually the wise policy," *Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 406, 52 S.Ct. 443, 447, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting), but this cautionary principle must give way to countervailing considerations in appropriate circumstances.[FN4] I concur in the Court's view that this is not a case where we should "place on the shoulders of Congress the burden of the Court's own error." *Girouard* **\*\*2045** *v. United States,* 328 U.S. 61, 70, 66 S.Ct. 826, 830, 90 L.Ed. 1084 (1946).

> FN4. See, *e. g., Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Machinists v. Wisconsin Emp. Rel. Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976); *Braden v. 30th Judicial Circuit Court of Ky.,* 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973); *Griffin v. Breckenridge,* 91 S.Ct. 1790, 29 L.Ed.2d 338, 403 U.S. 88 (1971); *Boys Markets, Inc. v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 406-407, n. 1, 52 S.Ct. 443, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting).

Nor is this the usual case in which the Court is asked to overrule a precedent. Here considerations of *stare decisis* cut in both directions. On the one hand, we have a series of rulings that municipalities and counties are not "persons" for purposes of § 1983. On the other hand, many decisions of this Court have been premised on the amenability of school boards and similar entities to § 1983 suits.

In *Monroe* and its progeny, we have answered a question that was never actually briefed or argued in this Court-whether a municipality is liable in

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

damages for injuries that are the direct result of its official policies. "The theory of the complaint [in *Monroe* was] that under the circumstances [t]here alleged the City [was] liable for the acts of its police officers, by virtue of *respondeat superior.*" Brief for Petitioners,**\*709** O.T.1960, No. 39, p. 21.FN5 Respondents answered that adoption of petitioners' position would expose "Chicago and every other municipality in the United States . . . to Civil Rights Act liability through no action of its own and based on action contrary to its own ordinances and the laws of the state it is a part of." Brief for Respondents, O.T.1960, No. 39, p. 26. Thus the ground of decision in *Monroe* was not advanced by either party and was broader than necessary to resolve the contentions made in that case.FN6

> FN5. The District Court in *Monroe* ruled in the municipality's favor, stating: "[S]ince the liability of the City of Chicago is based on the doctrine of *respondeat superior,* and since I have already held that the complaint fails to state a claim for relief against the agents of the city, there is no claim for relief against the city itself." Record, O.T.1960, No. 39, p. 30. The Court of Appeals affirmed for the same reason. 272 F.2d 365-366 (CA7 1959). Petitioners in this Court also offered an alternative argument that the city of Chicago was a "person" for purposes of § 1983, Brief for Petitioners, O.T.1960, No. 39, p. 25, but the underlying theory of municipal liability remained one of *respondeat superior.*

> FN6. The doctrine of *stare decisis* advances two important values of a rational system of law: (i) the certainty of legal principles and (ii) the wisdom of the conservative vision that existing rules should be presumed rational and not subject to modification "at any time a new thought seems appealing," dissenting opinion of Mr. Justice REHNQUIST, *post,* at 2050; cf. O. Holmes, The Common Law 36 (1881). But, at the same time, the law has

recognized the necessity of change, lest rules "simply persis[t] from blind imitation of the past." Holmes, The Path of the Law, 10 Harv.L.Rev. 457, 469 (1897). Any overruling of prior precedent, whether of a constitutional decision or otherwise, disserves to some extent the value of certainty. But I think we owe somewhat less deference to a decision that was rendered without benefit of a full airing of all the relevant considerations. That is the premise of the canon of interpretation that language in a decision not necessary to the holding may be accorded less weight in subsequent cases. I also would recognize the fact that until this case the Court has not had to confront squarely the consequences of holding § 1983 inapplicable to official municipal policies.

Of course, the mere fact that an issue was not argued or briefed does not undermine the precedential force of a considered holding. *Marbury v. Madison,* 5 U.S. 137, 1 Cranch 137,2 L.Ed. 60 (1803), cited by the dissent, *post,* at 2049-2050, is a case in point. But the Court's recognition of its power to invalidate legislation not in conformity with constitutional command was essential to its judgment in *Marbury.* And on numerous subsequent occasions, the Court has been required to apply the full breadth of the *Marbury* holding. In *Monroe,* on the other hand, the Court's rationale was broader than necessary to meet the contentions of the parties and to decide the case in a principled manner. The language in *Monroe* cannot be dismissed as dicta, but we may take account of the fact that the Court simply was not confronted with the implications of holding § 1983 inapplicable to official municipal policies. It is an appreciation of those implications that has prompted today's re-examination of the legislative history of the 1871 measure.

**\*710** Similarly, in *Moor v. County of Alameda,*

98 S.Ct. 2018
Page 35

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), petitioners asserted that "the County was vicariously liable for the acts of its deputies and sheriff," *id.,* at 696, 93 S.Ct. at 1789, under 42 U.S.C. § 1988. In rejecting this vicarious-liability claim, 411 U.S., at 710, and n. 27, 93 S.Ct., at 1796, and n. 27, we reaffirmed *Monroe* 's reading of the statute, but there was no challenge in that case to "the holding in *Monroe* concerning the status under § 1983 of public entities **\*\*2046** such as the County," 411 U.S., at 700, 93 S.Ct., at 1790; Brief for Petitioners, O.T.1972, No. 72-10, p. 9.

Only in *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), did the Court confront a § 1983 claim based on conduct that was both authorized under state law and the direct cause of the claimed constitutional injury. In *Kenosha,* however, we raised the issue of the city's amenability to suit under § 1983 on our own initiative.[FN7]

> FN7. In *Aldinger v. Howard,* 427 U.S. 1, 16, 96 S.Ct. 2413, 2421, 49 L.Ed.2d 276 (1976), we reaffirmed *Monroe,* but petitioner did not contest the proposition that counties were excluded from the reach of § 1983 under *Monroe,* and the question before us concerned the scope of pendent-party jurisdiction with respect to a state-law claim. Similarly, the parties in *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), did not seek a re-examination of our ruling in *Monroe.*

This line of cases-from *Monroe* to *Kenosha* -is difficult to reconcile on a principled basis with a parallel series of cases **\*711** in which the Court has assumed *sub silentio* that some local government entities could be sued under § 1983. If now, after full consideration of the question, we continued to adhere to *Monroe,* grave doubt would be cast upon the Court's exercise of § 1983 jurisdiction over school boards. See *ante,* at 2022 n. 5. Since "the principle of blanket immunity established in *Monroe%i* cannot be cabined short of school

ante, *at 2039, the conflict is squarely presented. Al-though there was an independent basis of jurisdic-tion in many of the school board cases because of the inclusion of individual public officials as nom-inal parties, the opinions of this Court make expli-cit reference to the school board party, particularly in discussions of the relief to be awarded, see,* e. g., Green v. County School Board, *391 U.S. 430, 437-439, 441-442, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968);* Milliken v. Bradley, *433 U.S. 267, 292-293, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Powell, J., concurring in judgment). And, as the Court points out,* ante, *at 2038-2039, and nn. 62, 63, Congress has focused specifically on this Court's school board decisions in several statutes. Thus the exercise of § 1983 jurisdiction over school boards, while perhaps not premised on considered holdings, has been longstanding. Indeed, it pred-ated* Monroe.

Even if one attempts to explain away the school board decisions as involving suits which "may be maintained against board members in their official capacities for injunctive relief under either § 1983 or *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)," *post,* at 2049, n. 2, some difficulty remains in rationalizing the relevant body of precedents. At least two of the school board cases involved claims for monetary relief. *Cohen v. Chesterfield County School Board,* 326 F.Supp. 1159, 1161 (ED Va.1971), rev'd, 474 F.2d 395 (CA4 1973), rev'd and remanded, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Tinker v. Des Moines School Dist.,* 393 U.S. 503, 504, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). See also *Vlandis v. Kline,* 412 U.S. 441, 445, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973). Although the point was not squarely presented in this Court, these claims **\*712** for damages could not have been maintained in of-ficial-capacity suits if the government entity were not itself suable. Cf. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).[FN8] Moreover the rationale of *Kenosha* would have to be disturbed to avoid closing all avenues under § 1983 to injunctive relief against constitutional viol-ations by local government. The Court of Appeals in this case suggested that we import, by analogy,

98 S.Ct. 2018
436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

the Eleventh Amendment fiction of *Ex parte Young* into § 1983, 532 F.2d 259, 264-266 (CA2 1976). That approach, however, would create tension with *Kenosha* because it would require "a bifurcated application"**2047 of "the generic word 'person' in § 1983" to public officials "depending on the nature of the relief sought against them." 412 U.S., at 513, 93 S.Ct. at 2226. A public official sued in his official capacity for carrying out official policy would be a "person" for purposes of injunctive relief, but a non-"person" in an action for damages. The Court's holding avoids this difficulty. See *ante,* at 2036 n. 55.

> FN8. To the extent that the complaints in those cases asserted claims against the individual defendants in their personal capacity, as well as official capacity, the court would have had authority to award the relief requested. There is no suggestion in the opinions, however, that the practices at issue were anything other than official, duly authorized policies.

Finally, if we continued to adhere to a rule of absolute municipal immunity under § 1983, we could not long avoid the question whether "we should, by analogy to our decision in *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), imply a cause of action directly from the Fourteenth Amendment which would not be subject to the limitations contained in § 1983 . . . ." *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 278, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977). One aspect of that inquiry would be whether there are any "special factors counselling hesitation in the absence of affirmative action by Congress,"*Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 396, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971), such as an "explicit congressional declaration *713 that persons injured by a [municipality] may not recover money damages . . . , but must instead be remitted to another remedy, equally effective in the view of Congress,"*id.,* at 397, 91 S.Ct. at 2005. In light of the Court's persuasive re-examination in today's decision of the 1871 debates, I would have difficulty

inferring from § 1983 "an explicit congressional declaration" against municipal liability for the implementation of official policies in violation of the Constitution. Rather than constitutionalize a cause of action against local government that Congress intended to create in 1871, the better course is to confess error and set the record straight, as the Court does today.FN9

> FN9. Mr. Justice REHNQUIST's dissent makes a strong argument that "[s]ince *Monroe,* municipalities *have* had the right to expect that they would not be held liable retroactively for their officers' failure to predict this Court's recognition of new constitutional rights." *Post,* at 2049. But it reasonably may be assumed that most municipalities already indemnify officials sued for conduct within the scope of their authority, a policy that furthers the important interest of attracting and retaining competent officers, board members, and employees. In any event, the possibility of a qualified immunity, as to which the Court reserves decision, may remove some of the harshness of liability for good-faith failure to predict the often uncertain course of constitutional adjudication.

### III

Difficult questions nevertheless remain for another day. There are substantial line-drawing problems in determining "when execution of a government's policy or custom" can be said to inflict constitutional injury such that "government as an entity is responsible under § 1983." *Ante,* at 2038. This case, however, involves formal, written policies of a municipal department and school board; it is the clear case. The Court also reserves decision on the availability of a qualified municipal immunity. *Ante,* at 2041. Initial resolution of the question whether the protection available at common law for municipal corporations, see *post,* at 2051, or other principles support a *714 qualified municipal immunity in the context of the § 1983 damages action, is left to the lower federal courts.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

Mr. Justice STEVENS, concurring in part.

Since Parts II and IV of the opinion of the Court are merely advisory and are not necessary to explain the Court's decision, I join only Parts I, III, and V.

Mr. Justice REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

Seventeen years ago, in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), this Court held that the 42d Congress did not intend to subject a municipal corporation to liability as a "person" within the meaning of 42 U.S.C. § 1983. Since then, the Congress has remained silent, but this Court has reaffirmed that holding on at **2048 least three separate occasions. *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). See also *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 277-279, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Today, the Court abandons this long and consistent line of precedents, offering in justification only an elaborate canvass of the same legislative history which was before the Court in 1961. Because I cannot agree that this Court is "free to disregard these precedents," which have been "considered maturely and recently" by this Court, *Runyon v. McCrary,* 427 U.S. 160, 186, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (Powell, J., concurring), I am compelled to dissent.

I

As this Court has repeatedly recognized, *id.,* at 175 n. 12, 96 S.Ct., at 2596; *Edelman v. Jordan,* 415 U.S. 651, 671 n. 14, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), considerations of *stare decisis* are at their strongest when this Court confronts its previous constructions of legislation. In all cases, private parties shape their conduct according to this Court's settled construction of the law, but the Congress is at **715 liberty to correct our mistakes of statutory construction, unlike our constitutional interpretations, whenever it sees fit. The controlling prin-

ciples were best stated by Mr. Justice Brandeis:

"*Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right. . . . This is commonly true even where the error is a matter of serious concern, provided correction can be had by legislation. But in cases involving the Federal Constitution, where correction through legislative action is practically impossible, this court has often overruled its earlier decisions." *Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 406-407, 52 S.Ct. 443, 447, 76 L.Ed. 815 (1932) (dissenting opinion) (footnotes omitted).

Only the most compelling circumstances can justify this Court's abandonment of such firmly established statutory precedents. The best exposition of the proper burden of persuasion was delivered by Mr. Justice Harlan in *Monroe* itself: "From my point of view, the policy of *stare decisis,* as it should be applied in matters of statutory construction, and, to a lesser extent, the indications of congressional acceptance of this Court's earlier interpretation, require that it appear *beyond doubt* from the legislative history of the 1871 statute that [*United States v.*] *Classic,* [313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)] and *Screws* [*v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945)] misapprehended the meaning of the controlling provision, before a departure from what was decided in those cases would be justified." 365 U.S., at 192, 81 S.Ct., at 487 (concurring opinion) (footnote omitted; emphasis added).

The Court does not demonstrate that any exception to this general rule is properly applicable here. The Court's first assertion, that *Monroe* "was a departure from prior practice," *ante,* at 2038, is patently erroneous. Neither in *Douglas v. City of Jeannette,* 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943), nor in *Holmes v. Atlanta,* *716 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776 (1955), nor in any of the school board cases cited by the Court, *ante,* at 2022 n. 5, was the question now before us raised by any of the litigants or addressed by this Court. As recently as four Terms ago, we said in *Hagans v. Lavine,* 415 U.S. 528, 535 n. 5, 94 S.Ct. 1372,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

1378 n. 5, 39 L.Ed.2d 577 (1974):

"Moreover, when questions of jurisdiction have been passed on in prior decisions *sub silentio,* this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us."

The source of this doctrine that jurisdictional issues decided *sub silentio* are not binding in other cases seems to be Mr. Chief Justice **2049** Marshall's remark in *United States v. More,* 3 Cranch 159, 172, 2 L.Ed. 397 (1805).[FN1] While the Chief Justice also said that such decisions may "have much weight, as they show that this point neither occurred to the bar or to the bench,"*Bank of the United States v. Deveaux,* 5 Cranch 61, 88, 3 L.Ed. 38 (1809), unconsidered assumptions of jurisdiction simply cannot outweigh four consistent decisions of this Court, explicitly considering and rejecting that jurisdiction.

> FN1. As we pointed out in *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 278-279, 97 S.Ct. 568, 571-572, 50 L.Ed.2d 471 (1977), the existence of a claim for relief under § 1983 is "jurisdictional" for purposes of invoking 28 U.S.C. § 1343, even though the existence of a meritorious constitutional claim is not similarly required in order to invoke jurisdiction under 28 U.S.C. § 1331. See *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

Nor is there any indication that any later Congress has ever approved suit against any municipal corporation under § 1983. Of all its recent enactments, only the Civil Rights Attorney's Fees Awards Act of 1976, § 2, 90 Stat. 2641, 42 U.S.C. § 1988 (1976 ed.), explicitly deals with the Civil Rights Act of 1871.[FN2] The 1976 Act provides that attorney's fees may be awarded *717 to the prevailing party "[i]n any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title." There is plainly no language in the 1976 Act which would enlarge the parties suable under those substantive sections; it simply

provides that parties who are already suable may be made liable for attorney's fees. As the Court admits, *ante,* at 2040, the language in the Senate Report stating that liability may be imposed "whether or not the agency or government is a named party,"S.Rep.No. 94-1011, p. 5 (1976); U.S.Code Cong. & Admin.News 1976, pp. 5908, 5912, suggests that Congress did not view its purpose as being in any way inconsistent with the well-known holding of *Monroe.*

> FN2. The other statutes cited by the Court, *ante,* at 2039-2040, n. 63, make no mention of § 1983, but refer generally to suits against "a local educational agency." As noted by the Court of Appeals, 532 F.2d 259, 264-266, such suits may be maintained against board members in their official capacities for injunctive relief under either § 1983 or *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Congress did not stop to consider the technically proper avenue of relief, but merely responded to the fact that relief was being granted. The practical result of choosing the avenue suggested by petitioners would be the subjection of school corporations to liability in damages. Nothing in recent congressional history even remotely supports such a result.

The Court's assertion that municipalities have no right to act "on an assumption that they can violate constitutional rights indefinitely,"*ante,* at 2040, is simply beside the point. Since *Monroe,* municipalities *have* had the right to expect that they would not be held liable retroactively for their officers' failure to predict this Court's recognition of new constitutional rights. No doubt innumerable municipal insurance policies and indemnity ordinances have been founded on this assumption, which is wholly justifiable under established principles of *stare decisis.* To obliterate those legitimate expectations without more compelling justifications than those advanced by the Court is a significant departure from our prior practice.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

I cannot agree with Mr. Justice POWELL's view that "[w]e owe somewhat less deference to a decision that was rendered without benefit of a full airing of all the relevant considerations." *Ante,* at 2045 n. 6. Private parties must be able to rely upon explicitly stated holdings of this Court without be-**\*718** obliged to peruse the briefs of the litigants to predict the likelihood that this Court might change its mind. To cast such doubt upon each of our cases, from *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803), forward, in which the explicit ground of decision "was never actually briefed or argued,"*ante,* at 2044 (POWELL, J., concurring), would introduce intolerable uncertainty into the law. Indeed, in *Marbury* itself, the argument of Charles Lee on behalf of the applicants-which, un-like the arguments in *Monroe,* is reproduced in the Reports of this Court where anyone **\*\*2050** can see it-devotes not a word to the question of whether this Court has the power to invalidate a statute duly enacted by the Congress. Neither this ground of decision nor any other was advanced by Secretary of State Madison, who evidently made no appearance. 1 Cranch, at 153-154. More recent landmark decisions of this Court would appear to be likewise vulnerable under my Brother POWELL's analysis. In *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), none of the parties requested the Court to overrule *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); it did so only at the request of an *amicus curiae.* 367 U.S., at 646 n. 3, 81 S.Ct. 1684. That *Marbury, Mapp,* and countless other decisions retain their vitality despite their obvious flaws is a necessary by-product of the adversary system, in which both judges and the general public rely upon litigants to present "all the relevant considerations." *Ante,* at 2045 n. 6 (POWELL, J., concurring). While it undoubtedly has more latitude in the field of constitutional interpretation, this Court is surely not free to abandon settled statutory interpretation at any time a new thought seems appealing.FN3

FN3. I find it somewhat ironic that, in abandoning the supposedly ill-considered holding of *Monroe,* my Brother Powell relies heavily upon cases involving school

boards, although he admits that "the exercise of § 1983 jurisdiction . . . [was] perhaps not premised on considered holdings." *Ante,* at 2046.

Thus, our only task is to discern the intent of the 42d Congress. That intent was first expounded in *Monroe,* and it **\*719** has been followed consistently ever since. This is not some esoteric branch of the law in which congressional silence might reasonably be equated with congressional indifference. Indeed, this very year, the Senate has been holding hearings on a bill, S. 35, 95th Cong., 1st Sess. (1977), which would remove the municipal immunity recognized by *Monroe.* 124 Cong.Rec. D117 (daily ed. Feb. 8, 1978). In these circumstances, it cannot be disputed that established principles of *stare decisis* require this Court to pay the highest degree of deference to its prior holdings. *Monroe* may not be overruled unless it has been demonstrated "beyond doubt from the legislative history of the 1871 statute that [*Monroe* ] misapprehended the meaning of the controlling provision." *Monroe*, 365 U.S., at 192, 81 S.Ct., at 487 (Harlan, J., concurring). The Court must show not only that Congress, in rejecting the Sherman amendment, concluded that municipal liability was not unconstitutional, but also that, in enacting § 1, it intended to impose that liability. I am satisfied that no such showing has been made.

II

Any analysis of the meaning of the word "person" in § 1983, which was originally enacted as § 1 of the Ku Klux Klan Act of April 20, 1871, 17 Stat. 13, must begin, not with the Sherman amendment, but with the Dictionary Act. The latter Act, which supplied rules of construction for all legislation, provided:

"That in all acts hereafter passed . . . the word 'person' may extend and be applied to bodies politic and corporate . . . unless the context shows that such words were intended to be used in a more limited sense . . . ." Act of Feb. 25, 1871, § 2, 16 Stat. 431.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

The Act expressly provided that corporations need not be included within the scope of the word "person" where the context suggests a more limited reach. Not a word in the legislative history of the Act gives any indication of the contexts **\*720** in which Congress felt it appropriate to include a corporation as a person. Indeed, the chief cause of concern was that the Act's provision that "words importing the masculine gender may be applied to females," might lead to an inadvertent extension of the suffrage to women. Cong. Globe, 41st Cong., 3d Sess., 777 (1871) (remarks of Sen. Sawyer).

There are other factors, however, which suggest that the Congress which enacted § 1983 may well have intended the word **\*\*2051** "person" "to be used in a more limited sense," as *Monroe* concluded. It is true that this Court had held that both commercial corporations, *Louisville R. Co. v. Letson,* 2 How. 497, 558, 11 L.Ed. 353 (1844), and municipal corporations, *Cowles v. Mercer County,* 7 Wall. 118, 121, 19 L.Ed. 86 (1869), were "citizens" of a State within the meaning of the jurisdictional provisions of Art. III. Congress, however, also knew that this label did not apply in all contexts, since this Court in *Paul v. Virginia,* 8 Wall. 168, 19 L.Ed. 357 (1869), had held commercial corporations not to be "citizens" within the meaning of the Privileges and Immunities Clause, U.S.Const., Art. IV, § 2. Thus, the Congress surely knew that, for constitutional purposes, corporations generally enjoyed a different status in different contexts. Indeed, it may be presumed that Congress intended that a corporation should enjoy the same status under the Ku Klux Klan Act as it did under the Fourteenth Amendment, since it had been assured that § 1"was so very simple and really reënact[ed] the Constitution." Cong. Globe, 42d Cong., 1st Sess., 569 (1871) (remarks of Sen. Edmunds). At the time § 1983 was enacted the only federal case to consider the status of corporations under the Fourteenth Amendment had concluded, with impeccable logic, that a corporation was neither a "citizen" nor a "person." *Insurance Co. v. New Orleans,* 13 Fed.Cas. 67 (No. 7,052) (CC La.1870).

Furthermore, the state courts did not speak with a single voice with regard to the tort liability of municipal corporations. Although many Members of Congress represented **\*721** States which had retained absolute municipal tort immunity, see, *e. g., Irvine v. Town of Greenwood,* 89 S.C. 511, 72 S.E. 228 (1911) (collecting earlier cases), other States had adopted the currently predominant distinction imposing liability for proprietary acts, see generally 2 F. Harper & F. James, Law of Torts § 29.6 (1956), as early as 1842, *Bailey v. Mayor of City of New York,* 3 Hill 531 (N.Y.1842). Nevertheless, no state court had ever held that municipal corporations were always liable in tort in precisely the same manner as other persons.

The general remarks from the floor on the liberal purposes of § 1 offer no explicit guidance as to the parties against whom the remedy could be enforced. As the Court concedes, only Representative Bingham raised a concern which could be satisfied only by relief against governmental bodies. Yet he never directly related this concern to § 1 of the Act. Indeed, Bingham stated at the outset, "I do not propose now to discuss the provisions of the bill in detail," Cong. Globe, 42d Cong., 1st Sess., App. 82 (1871), and, true to his word, he launched into an extended discourse on the beneficent purposes of the Fourteenth Amendment. While Bingham clearly stated that Congress could "provide that no citizen in any State shall be deprived of his property by State law or the judgment of a State court without just compensation therefor,"*id.,* at 85, he never suggested that such a power was exercised in § 1.[FN4] **\*722** Finally, while Bingham has often been advanced as the chief expositor of the Fourteenth Amendment, *Duncan v. Louisiana,* 391 U.S. 145, 165, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (Black, J., concurring); *Adamson v. California,* 332 U.S. 46, 73-74, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947) (Black, J., dissenting), there is nothing**\*\*2052** to indicate that his colleagues placed any greater credence in his theories than has this Court. See *Duncan, supra,* at 174-176, 88 S.Ct. 1444 (Harlan, J., dissenting); *Adamson, supra,* at 64, 67 S.Ct. 1672 (Frankfurter, J., concurring).

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611
**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

FN4. It has not been generally thought, before today, that § 1983 provided an avenue of relief from unconstitutional takings. Those federal courts which have granted compensation against state and local governments have resorted to an implied right of action under the Fifth and Fourteenth Amendments. *Richmond Elks Hall Assn. v. Richmond Redevelopment Agency,* 561 F.2d 1327 (CA9 1977), aff'g389 F.Supp. 486 (N.D.Cal.1975); *Foster v. City of Detroit,* 405 F.2d 138, 140 (CA6 1968). Since the Court today abandons the holding of *Monroe* chiefly on the strength of Bingham's arguments, it is indeed anomalous that § 1983 will provide relief only when a local government, not the State itself, seizes private property. See *ante,* at 2035 n. 54; *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Edelman v. Jordan,* 415 U.S. 651, 674-677, 94 S.Ct. 1347, 1361-1363, 39 L.Ed.2d 662 (1974).

Thus, it ought not lightly to be presumed, as the Court does today, *ante,* at 2035 n. 53 that § 1983"should prima facie be construed to include 'bodies politic' among the entities that could be sued." Neither the Dictionary Act, the ambivalent state of judicial decisions, nor the floor debate on § 1 of the Act gives any indication that any Member of Congress had any inkling that § 1 could be used to impose liability on municipalities. Although Senator Thurman, as the Court emphasizes, *ante,* at 2033 n. 45, expressed his belief that the terms of § 1"are as comprehensive as can be used," Cong. Globe, 42d Cong., 1st Sess., App. 217 (1871), an examination of his lengthy remarks demonstrates that it never occurred to him that § 1 did impose or could have imposed any liability upon municipal corporations. In an extended parade of horribles, this "old Roman," who was one of the Act's most implacable opponents, suggested that state legislatures, Members of Congress, and state judges might be held liable under the Act. *Ibid.* If, at that point in the debate, he had any idea that § 1 was designed to impose tort liability upon cities and counties, he would surely have raised an additional outraged objection. Only once was that possibility placed squarely before the Congress-in its consideration of the Sherman amendment-and the Congress squarely rejected it.

The Court is probably correct that the rejection of the Sherman amendment does not lead ineluctably to the conclusion that Congress intended municipalities to be immune from liability under all circumstances. Nevertheless, it cannot be **\*723** denied that the debate on that amendment, the only explicit consideration of municipal tort liability, sheds considerable light on the Congress' understanding of the status of municipal corporations in that context. Opponents of the amendment were well aware that municipalities had been subjected to the jurisdiction of the federal courts in the context of suits to enforce their contracts, Cong. Globe, 42d Cong., 1st Sess., 789 (1871) (remarks of Rep. Kerr), but they expressed their skepticism that such jurisdiction should be exercised in cases sounding in tort:

"Suppose a judgment obtained under this section, and no property can be found to levy upon except the courthouse, can we levy on the courthouse and sell it? So this section provides, and that too in an action of tort, in an action *ex delicto,* where the county has never entered into any contract, where the State has never authorized the county to assume any liability of the sort or imposed any liability upon it. It is in my opinion simply absurd." *Id.,* at 799 (remarks of Rep. Farnsworth).

Whatever the merits of the constitutional arguments raised against it, the fact remains that Congress rejected the concept of municipal tort liability on the only occasion in which the question was explicitly presented. Admittedly this fact is not conclusive as to whether Congress intended § 1 to embrace a municipal corporation within the meaning of "person," and thus the reasoning of *Monroe* on this point is subject to challenge. The meaning of § 1 of the Act of 1871 has been subjected in this case to a more searching and careful analysis than it was in *Monroe,* and it may well be that on the basis of this closer analysis of the legislative debates a conclusion contrary to the *Monroe* holding could have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P 8345, 56 L.Ed.2d 611

**(Cite as: 436 U.S. 658, 98 S.Ct. 2018)**

been reached when that case was decided 17 years ago. But the rejection of the Sherman amendment remains instructive in that here alone did the legislative debates squarely focus on the liability of municipal corporations, and that liability was rejected. **\*724** Any inference which might be drawn from the Dictionary Act or from general expressions of benevolence in the debate on § 1 that the word "person" was intended to include municipal corporations falls far short of showing "beyond doubt" that this Court in *Monroe***\*\*2053** "misapprehended the meaning of the controlling provision." Errors such as the Court may have fallen into in *Monroe* do not end the inquiry as to *stare decisis* ; they merely begin it. I would adhere to the holding of *Monroe* as to the liability of a municipal corporation under § 1983.

### III

The decision in *Monroe v. Pape* was the fountainhead of the torrent of civil rights litigation of the last 17 years. Using § 1983 as a vehicle, the courts have articulated new and previously unforeseeable interpretations of the Fourteenth Amendment. At the same time, the doctrine of municipal immunity enunciated in *Monroe* has protected municipalities and their limited treasuries from the consequences of their officials' failure to predict the course of this Court's constitutional jurisprudence. None of the Members of this Court can foresee the practical consequences of today's removal of that protection. Only the Congress, which has the benefit of the advice of every segment of this diverse Nation, is equipped to consider the results of such a drastic change in the law. It seems all but inevitable that it will find it necessary to do so after today's decision.

I would affirm the judgment of the Court of Appeals.

U.S.S.C., 1978.
Monell v. Department of Social Services of City of New York
436 U.S. 658, 98 S.Ct. 2018, 17 Fair Empl.Prac.Cas. (BNA) 873, 16 Empl. Prac. Dec. P

8345, 56 L.Ed.2d 611

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

783 F.2d 1002                                                                                                Page 1
783 F.2d 1002
**(Cite as: 783 F.2d 1002)**



Byrd v. Clark
C.A.11 (Ga.),1986.

United States Court of Appeals,Eleventh Circuit.
Sun Cha BYRD, Plaintiff-Appellant,
v.
Tommy CLARK, Clifford Black, Larry Collins,
Joey Whitley, Drew Solomon, and the City of
Fitzgerald, Georgia, Defendants-Appellees.
**No. 84-8175.**

March 3, 1986.

Plaintiff brought suit against city, its chief of police
and several officers alleging civil rights violations
in her arrest, release and subsequent rearrest. The
United States District Court for the Middle District
of Georgia, J. Robert Elliot, J., entered summary
judgment as to original arrest incident, and dis-
missed complaint against one officer, and she ap-
pealed. The Court of Appeals, Pittman, Senior Dis-
trict Judge, sitting by designation, held that: (1) po-
lice were justified in stopping plaintiff's vehicle on
suspicion of driving under the influence; (2) ques-
tion of fact as to excessive force used in plaintiff's
rearrest precluded summary judgment; (3) question
of fact as to whether an officer should have inter-
vened in unprovoked beating of plaintiff by another
officer precluded summary judgment; and (4)
neither city nor police chief were liable.

Affirmed in part; vacated and remanded in part.

West Headnotes

**[1] Conspiracy 91 ⟡7.5(1)**

91 Conspiracy
    91I Civil Liability
        91I(A) Acts Constituting Conspiracy and Li-
ability Therefor
            91k7.5 Conspiracy to Interfere with Civil
Rights
                91k7.5(1) k. In General. Most Cited
Cases

(Formerly 91k7.5)
Police officers were justified in stopping plaintiff's
vehicle on suspicion of driving under the influence
of alcohol, and in bringing plaintiff into police sta-
tion for breath test, thereby supporting conclusion
that officers did not commit a conspiracy to deprive
plaintiff of her civil rights by discriminating against
her on basis of her Korean origin. 42 U.S.C.A. §
1981 et seq.

**[2] Civil Rights 78 ⟡1034**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1030 Acts or Conduct Causing Depriva-
tion
            78k1034 k. Common Law or State Law
Torts. Most Cited Cases
    (Formerly 78k112, 78k13.4(1))
Some state-inflicted injury is so minor as to occa-
sion a tort claim, rather than a constitutional viola-
tion.

**[3] Civil Rights 78 ⟡1035**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1030 Acts or Conduct Causing Depriva-
tion
            78k1035 k. Assault and Battery; Personal
Injury and Use of Force. Most Cited Cases
    (Formerly 78k113, 78k13.4(1))
While severity of an injury is not the determinative
factor in assessing whether or not a constitutional
violation has occurred, it is probative of amount of
force used.

**[4] Federal Civil Procedure 170A ⟡2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil Rights Cases in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

783 F.2d 1002
**(Cite as: 783 F.2d 1002)**

General. Most Cited Cases

Question of fact as to whether police officer used excessive force in arresting plaintiff precluded summary judgment in his favor in § 1983 suit against him. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ☞1358**

78 Civil Rights
    78III Federal Remedies in General
      78k1353 Liability of Public Officials
         78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases
    (Formerly 78k207(1), 78k13.7)

If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under § 1983. 42 U.S.C.A. § 1983.

**[6] Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
          170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases

Question of fact as to whether first officer failed to intervene in second's unprovoked beating of plaintiff precluded summary judgment in first officer's favor in suit under § 1983. 42 U.S.C.A. § 1983.

**[7] Conspiracy 91 ☞7.5(1)**

91 Conspiracy
    91I Civil Liability
      91I(A) Acts Constituting Conspiracy and Liability Therefor
        91k7.5 Conspiracy to Interfere with Civil Rights
          91k7.5(1) k. In General. Most Cited Cases
    (Formerly 91k7.5)

Language of § 1985 which requires an intent to deprive one of equal protection or equal privileges and immunities means that there must be some ra-

cial or otherwise class-based invidiously discriminatory animus behind the conspirator's action. 42 U.S.C.A. § 1985.

**[8] Conspiracy 91 ☞19**

91 Conspiracy
    91I Civil Liability
      91I(B) Actions
        91k19 k. Evidence. Most Cited Cases

Plaintiff failed to establish that police officers conspired against her on account of her Korean national origin within meaning of § 1985; officers set forth by deposition that none of them knew plaintiff prior to incident in which she was arrested and released on suspicion of driving under the influence, and there was no evidence of concerted action, nor were there any facts from which a conspiracy could be inferred. 42 U.S.C.A. §§ 1985, 1985(3).

**[9] Civil Rights 78 ☞1351(4)**

78 Civil Rights
    78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
        78k1351 Governmental Ordinance, Policy, Practice, or Custom
          78k1351(4) k. Criminal Law Enforcement; Prisons. Most Cited Cases
    (Formerly 78k206(3), 78k13.7)

In absence of evidence of any city ordinance, policy, practice or custom, either express or implied, which contributed to alleged violation by police of plaintiff's constitutional rights in incident in which she was arrested, released, and rearrested, city was not liable to plaintiff under § 1983. 42 U.S.C.A. § 1983.

**[10] Conspiracy 91 ☞19**

91 Conspiracy
    91I Civil Liability
      91I(B) Actions
        91k19 k. Evidence. Most Cited Cases

City police chief was not liable to plaintiff for actions of officers in arresting, releasing and subsequently rearresting plaintiff, as there was no evid-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

783 F.2d 1002
**(Cite as: 783 F.2d 1002)**

ence that he entered into any conspiracy with any of the other defendants or with anyone else to deprive plaintiff of any constitutional rights.

**\*1003** G.G. Joseph Kunes, Jr., Tifton, Ga., for plaintiff-appellant.

James V. Davis, Richard D. Hall, Albany, Ga., Robert E. Sherrell, Fitzgerald, Ga., for defendants-appellees.

Appeal from the United States District Court for the Middle District of Georgia.

**\*1004** Before VANCE and ANDERSON, Circuit Judges, and PITTMAN [FN*], Senior District Judge.

FN* Honorable Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

PITTMAN, Senior District Judge:

Plaintiff Sun Cha Byrd, an American citizen of Korean origin, brought this action against several officers of the City of Fitzgerald, Georgia, its Chief of Police and the City of Fitzgerald, itself, pursuant to the Civil Rights Acts, 42 U.S.C. 1981 *et seq.* She alleges constitutional deprivations at the hands of these officers, committed pursuant to a conspiracy to deprive her of her civil rights. It is also alleged that the City failed to properly train or supervise these officers. The district court granted motions for summary judgment of the defendants except that of Officer Black. The motion of Officer Black was granted in part and denied in part. The motion was granted insofar as plaintiff's complaint was based on events occurring on January 8, 1982, and denied insofar as the complaint was based upon events occurring on January 9, 1982. The court then dismissed the complaint against Black, without prejudice to her right to file her complaint in an appropriate state forum, stating "this is simply a tort action for which an adequate common-law remedy is fully available ... in the state courts." Record at 219. Plaintiff Byrd filed a tort action against Black in the Superior Court of Ben Hill County, Georgia. She appeals the entry of summary judgment in favor of all defendants concerning the January 8 in-

cident, and the dismissal of her complaint against defendant Black.

Byrd raises these issues on appeal: (1) whether the district court erred in granting summary judgment in favor of all defendants concerning the January 8 incident, and (2) whether the district court erred in dismissing plaintiff's complaint against defendant Black, without prejudice to her right to file her complaint against him in an appropriate state forum.

BACKGROUND

This appeal arises out of two separate, but related encounters between the plaintiff and officers of the Fitzgerald, Georgia Police Department.

In the late afternoon of January 8, 1982, Drew Solomon, Chief of Police of the City of Fitzgerald, was returning to Fitzgerald by automobile from a trip to a nearby town. As he approached Fitzgerald he observed an automobile weaving in the highway in front of him to such an extent that he was unable to pass it. When he reached a point about a half mile or so from the city limits, he radioed the police station in Fitzgerald and instructed that the automobile be investigated. He continued to observe the erratic driving of the automobile.

When the call was received at headquarters, Clifford Black, a patrolman, and Larry Collins, a patrolman accompanying Black, responded to the call. They had been given a description of the automobile and, based on that description, Black and Collins intercepted the automobile. They, too, observed it to be driven in an erratic manner. The plaintiff was asked to enter the police car to be taken to the police station for a breath test. Black then drove the plaintiff to the station in the police vehicle and Collins drove her car to the station. Black delivered the plaintiff into the custody of Captain Clark, a police officer, and since it was the end of Black's shift, he did not see her again that day.

Captain Clark administered the breath test to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

783 F.2d 1002
**(Cite as: 783 F.2d 1002)**

the plaintiff and when the test proved to be negative, the plaintiff was released.

Plaintiff complains that the defendants lacked probable cause to stop and detain her, and that her car and handbag were illegally searched. She further contends that this was done pursuant to a conspiracy wherein her civil rights were denied because of her Korean national origin. The defendants respond that there was ample evidence to support a finding that they **\*1005** were entitled to stop plaintiff's vehicle and to investigate whether she was driving under the influence. Each defendant denies that he participated in any search of plaintiff's vehicle or effects. Each also denies that he knew the plaintiff before this incident and argues that this negates any allegation of conspiracy by them. The January 8 incident was the only contact between the plaintiff and defendants Clark, Collins, and Solomon.

On the next day, Saturday, January 9, plaintiff returned to the police station and had a conversation with Officer Black. That conversation became heated and ultimately resulted in plaintiff's arrest and incarceration by Officer Black for the offenses of disorderly conduct and resisting arrest.

As a result of the scuffle with Black, plaintiff alleges that she suffered injuries to her hip and shoulder. The shoulder injury required surgery to repair.

Plaintiff complains that this arrest by Black was without probable cause and was effectuated by the use of excessive force. She seeks damages from Black based upon alleged violations of the fourth and fourteenth amendments arising out of the arrest. She also seeks damages from Officer Joey Whitley for his failure to intervene in the alleged beating at the hands of Officer Black. She further alleges that the alleged beating would not have occurred but for Chief Solomon's failure to properly train and supervise his subordinate officers, and that Solomon's failure to train and supervise the officers is a custom or policy under which the City can be held liable under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The defendants respond that Black's use of force was reasonable under the circumstances, thereby shielding both Black and Whitley from Section 1983 liability.

JANUARY 8, 1982

[1] A review of the record amply supports the conclusion that Officers Black and Collins were justified in stopping plaintiff's vehicle on the afternoon of January 8, 1982. Black, Collins and Chief Solomon all testified in their depositions that they observed plaintiff's vehicle weaving on the highway. The plaintiff, herself, admits driving erratically, though she says that she was trying to locate a noise in her car. That evidence establishes sufficient cause under the Georgia Implied Consent Law for the officers to bring the plaintiff in for a breath test. Given the finding of probable cause to stop and detain plaintiff Byrd, we find that the officers would have been justified in conducting a search under either the "search incident to arrest" or inventory search exceptions to the general requirement of having a search warrant to conduct a search. *See United States v. Richards,* 638 F.2d 765, 770 (5th Cir.)*reh'g denied,*646 F.2d 962,*cert. denied,*454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981).

There was no evidence to support the conspiracy allegation.

The plaintiff complains of no mistreatment on this occasion. The district court properly entered summary judgment in favor of all defendants to the extent that plaintiff's complaint is based on the January 8 incident.

JANUARY 9, 1982

The January 9 incident stands on a different footing. The district court properly noted the existence of a triable issue of fact on the question of the use of excessive force by Officer Black in effectuating plaintiff's arrest, and properly denied Black's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

motion for summary judgment. The district court's dismissal of plaintiff's complaint based on the existence of an adequate state remedy conflicts with this court's decision in *Gilmere v. City of Atlanta,* 774 F.2d 1495 (11th Cir.1985) (en banc).

In *Gilmere,* this court addressed the question of whether the existence of a parallel state law tort remedy precludes all Section 1983 actions based on the alleged use of excessive force by a police officer. After reviewing the legislative history of **1006** Section 1983, the Supreme Court's pronouncements in other cases, as well as the limits set by the Court in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the en banc court concluded that the existence of a parallel tort remedy does not automatically preclude a plaintiff from asserting substantive due process violations directly in federal court under Section 1983. *Gilmere,* 774 F.2d, at 1498.

In order to sustain the district court's dismissal of plaintiff's claim, this court must find, as a matter of law, that the defendant's conduct did not rise to the level of a constitutional tort.

[2] The district court certainly was correct in recognizing that not every injury inflicted by a law enforcement official constitutes a violation of the fourteenth amendment. "Not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.)*cert. denied,*414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Some state-inflicted injury is so minor as to occasion a tort claim, rather than a constitutional violation. In order to recover under Section 1983, a plaintiff must show that the injury inflicted rose to the level of a constitutional tort, i.e., that the conduct complained of was so egregious as to exceed the boundaries of wrongful injuries redressable under tort law and which deprived the victim of a fourteenth amendment liberty interest without due process of law. *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir.1981) (Unit A).

The test in this circuit is that first enunciated in *Johnson v. Glick,* 481 F.2d at 1033. *Gilmere v. City of Atlanta,* 774 F.2d at 1501; *Williams v. Kelley,* 624 F.2d 695, 697 (5th Cir.1980).

In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

481 F.2d at 1033.

[3] This case comes to us in a summary judgment posture. In reviewing a decision granting or denying summary judgment, this court applies the same legal standards as those which control the district court in determining whether summary judgment is appropriate. *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1030 (5th Cir.1982) (Former Fifth Circuit case). The party seeking summary judgment bears the exacting burden of demonstrating that there is no actual dispute as to any material fact in the case. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 147, 90 S.Ct. 1598, 1602, 26 L.Ed.2d 142 (1970). In assessing whether the movant has met his burden, the court should view the evidence in the light most favorable to the party opposed to summary judgment, and all reasonable inferences should be resolved in his favor. *Impossible Electronics,* 669 F.2d at 1031. Put another way, as against the defendant's Rule 56 motion, plaintiff's evidence is not without material dispute and with that standard in mind, we find that the district court erred in dismissing plaintiff's complaint. Plaintiff's evidence shows that while there may have been justification for the defendant's use of force against her, she places this in dispute. There is a dispute as to whether the force was applied after she ceased to resist the officer. There is evidence that plaintiff suffered injuries sufficiently serious to warrant surgery on her shoulder. While the severity of an injury is not the determinative factor in assessing whether or not a constitutional violation has oc-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

curred, it is certainly probative of the amount of force used. *Norris v. District of Columbia,* 737 F.2d 1148, 1157 (D.C.Cir.1984) (Doyle, D.J. concurring).

[4] From the severity of an injury, it would be permissible for a jury to infer **\*1007** that substantial force was applied to the plaintiff. Whether that force was constitutionally excessive under these facts, is for the jury to determine.

We hold therefore that the district court erred in dismissing plaintiff's complaint against Officer Black concerning the use of excessive force by that defendant against the plaintiff on January 9, 1982. We reverse and remand to the district court with instructions to reinstate that portion of plaintiff's complaint which alleges the use of excessive force against the plaintiff on January 9, 1982.

### LIABILITY FOR NON-INTERVENTION

One issue raised by the plaintiff which was not directly addressed by the trial court is the question of Officer Whitley's liability, *vel non,* for his failure to intervene in the encounter between the plaintiff and Officer Black. In granting Whitley's motion for summary judgment, the lower court failed to consider this potential source of liability for this defendant.

[5] If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983. *Bruner v. Dunaway,* 684 F.2d 422, 426 (6th Cir.1982), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983); *Putman v. Gerloff,* 639 F.2d 415, 423 (8th Cir.1981); *Harris v. Chanclor,* 537 F.2d 203, 206 (5th Cir.1976). In the leading case on the duty to intervene, *Byrd v. Brishke,* 466 F.2d 6 (7th Cir.1972), the Seventh Circuit stated:

We believe it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge. That responsibility obviously obtains when the nonfeasor is a supervisory officer to whose direction the misfeasor officers are committed. So, too, the same responsibility must exist as to nonsupervisory officers who are present at the scene of such summary punishment, for to hold otherwise would be to insulate nonsupervisory officers from liability for reasonably foreseeable consequences of the neglect of their duty to enforce the laws and preserve the peace.

*Id.* at 11.

[6] There is evidence that Officer Whitley was present during the encounter between the plaintiff and defendant Black. We vacate the entry of summary judgment in favor of defendant Whitley and instruct the district court, if upon remand, should it determine that Officer Black violated plaintiff's constitutional rights by inflicting an unprovoked beating upon her, the district court should determine whether or not Officer Whitley was in a position to intervene in such a beating.

### THE SECTION 1985 CONSPIRACY CLAIM

Plaintiff contends that the defendants conspired against her on account of her Korean national origin. In support of this allegation, plaintiff states that there was a significant amount of interaction among all the defendants concerning the plaintiff, that her appearance and speech easily reflect her background, and that none of the defendants are of Korean national origin.

[7] In order to recover under 42 U.S.C. Section 1985(3), the plaintiff must allege and prove (1) a conspiracy; (2) for the purpose of depriving, directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws; (3) an overt act in furtherance of the object of the conspiracy; and (4) that the plaintiff (a) was injured in her person or property, or (b) was deprived of having and exercising any right or privilege of a United States citizen. *Griffin v. Breckenridge,* 403 U.S. 88,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

783 F.2d 1002
**(Cite as: 783 F.2d 1002)**

102-03, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). The language of Section 1985 which requires an intent to deprive one of equal protection or equal privileges and immunities means that there must be some **\*1008** racial or otherwise class-based invidiously discriminatory animus behind the conspirators' action. *Id.* at 102,91 S.Ct. at 1798.

[8] The record before the court shows that plaintiff sufficiently alleges a cause of action under Section 1985(3). However, once the defendants moved for summary judgment, the plaintiff may not rest upon the allegations of her complaint, but rather must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56.

Here the defendants set forth by deposition that none of them knew the plaintiff prior to these occurrences, and deny being involved in any conspiracy against her. Plaintiff does not seriously dispute these facts and admitted in her deposition that she does not contend that there was an actual conspiracy. Byrd deposition, pp 23, 53-54. There is no evidence of concerted action, nor are there any facts from which a conspiracy can be inferred.

Neither does the record reflect any racial or class-based animus against the plaintiff. The mere fact that the defendants acted knowing of plaintiff's Korean national origin does not alone suffice to prove racial bias.

Given the lack of evidence on these two elements of plaintiff's Section 1985 claim, we hold that summary judgment was properly entered in favor of all defendants on that claim.

## DEFENDANTS SOLOMON AND CITY OF FITZGERALD

[9] Plaintiff's action against these defendants will prevail only if a causal link is established between an official policy or custom and the plaintiff's injury. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). There can be no liability on the part of these defendants based on the theory of respondeat

superior. *Id.*

The record shows no evidence of any city ordinance, policy, practice or custom, either express or implied, in the City of Fitzgerald which contributed to any alleged violation of plaintiff's constitutional rights. There is no evidence that the City participated, had knowledge of, or breached any legal duty in any way with regard to any actions which may have been taken by the Chief of Police or by the officers under his command.

[10] Likewise, as to Chief Solomon, there is no evidence that he entered into any conspiracy with any of the other defendants or with anyone else to deprive the plaintiff of any constitutional right. There is no showing but that he requested or ordered that plaintiff be stopped and checked for driving under the influence after he observed her weaving in the road. There is also no showing that Solomon as a supervisory police officer either participated in or had knowledge of or was negligent with regard to any of the actions of his men. For those reasons, the judgment of the district court as to these defendants is affirmed.

## CONCLUSION

The district court erred in dismissing plaintiff's complaint inasmuch as it is based on allegations of the use of excessive force by defendant Black. The case is REMANDED with instructions to reinstate plaintiff's complaint against Black. Entry of summary judgment in favor of defendant Whitley is VACATED and REMANDED with instructions to determine whether Whitley was present and failed to intervene in a constitutional violation. The remainder of the district court's decision is AFFIRMED.

C.A.11 (Ga.),1986.
Byrd v. Clark
783 F.2d 1002

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 So.2d 755                                                                                                    Page 1
834 So.2d 755
**(Cite as: 834 So.2d 755)**

H

City of Birmingham v. Sutherland
Ala.,2002.

Supreme Court of Alabama.
CITY OF BIRMINGHAM
v.
John Charles SUTHERLAND.
John Charles Sutherland
v.
City of Birmingham.
**1001327 and 1001458.**

March 29, 2002.
Rehearing Denied May 17, 2002.

Bank patron brought action against city, alleging negligence, false imprisonment, defamation, and assault and battery, in connection with his arrest at bank by a city police officer for allegedly passing counterfeit checks. The Jefferson Circuit Court, No. CV-98-7553,Tennant M. Smallwood, Jr., J., entered judgment as a matter of law for city as to all claims except negligence and assault and battery and entered judgment on jury verdict for patron, awarding $65,000 in damages. City appealed, and patron cross-appealed. The Supreme Court, Harwood, J., held that officer had probable cause to make a warrantless arrest of bank patron for a felony, and, thus, was performing a discretionary function, such that city was entitled to discretionary-function immunity from liability.

Appeal-Reversed and remanded.

Cross-Appeal-Affirmed.

West Headnotes

**[1] Appeal and Error 30 ⚷═863**

30 Appeal and Error
  30XVI Review
    30XVI(A) Scope, Standards, and Extent, in General
      30k862 Extent of Review Dependent on Nature of Decision Appealed from
        30k863 k. In General. Most Cited Cases

**Appeal and Error 30 ⚷═866(3)**

30 Appeal and Error
  30XVI Review
    30XVI(A) Scope, Standards, and Extent, in General
      30k862 Extent of Review Dependent on Nature of Decision Appealed from
        30k866 On Appeal from Decision on Motion for Dismissal or Nonsuit or Direction of Verdict
          30k866(3) k. Appeal from Ruling on Motion to Direct Verdict. Most Cited Cases

**Appeal and Error 30 ⚷═927(7)**

30 Appeal and Error
  30XVI Review
    30XVI(G) Presumptions
      30k927 Dismissal, Nonsuit, Demurrer to Evidence, or Direction of Verdict
        30k927(7) k. Effect of Evidence and Inferences Therefrom on Direction of Verdict. Most Cited Cases

**Appeal and Error 30 ⚷═934(1)**

30 Appeal and Error
  30XVI Review
    30XVI(G) Presumptions
      30k934 Judgment
        30k934(1) k. In General. Most Cited Cases
When reviewing a trial court's ruling on either a preverdict or postverdict motion for judgment as a matter of law, the appellate court determines whether there was sufficient evidence to produce a conflict warranting jury consideration, and, like the trial court, it must view any evidence most favorably to the non-movant.

**[2] Municipal Corporations 268 ⚷═747(3)**

834 So.2d 755
**(Cite as: 834 So.2d 755)**

268 Municipal Corporations
    268XII Torts
        268XII(B) Acts or Omissions of Officers or Agents
            268k747 Particular Officers and Official Acts
                268k747(3) k. Police and Fire. Most Cited Cases

City police officer had probable cause to make a warrantless arrest of bank patron for a felony, and, thus, was performing a discretionary function when he arrested patron and when he chose the manner in which he would effect the arrest, such that city was entitled to discretionary-function immunity from liability for false imprisonment, negligence, and assault and battery arising out of officer's actions, absent any evidence that such actions were taken in bad faith or were willful or malicious, where officer responded to police dispatch that there was a forgery suspect at bank, and the bank manager identified patron to officer as the suspect. Code 1975, §§ 6-5-338, 13A-9-3, 15-10-3(a); Rules Crim.Proc., Rule 4.1(a).

**[3] Municipal Corporations 268 ⚬⚬747(3)**

268 Municipal Corporations
    268XII Torts
        268XII(B) Acts or Omissions of Officers or Agents
            268k747 Particular Officers and Official Acts
                268k747(3) k. Police and Fire. Most Cited Cases

Allegations of negligence are not sufficient to remove the immunity a city is provided for city police officer's performance of a discretionary function. Code 1975, § 6-5-338.

**\*756** James D. Love and John M. Edens, asst. city attys., for appellant/cross-appellee City of Birmingham.

Linda L. Cole and Carey W. Spencer, Jr., Birmingham, for appellee/cross-appellant John Charles Sutherland.

HARWOOD, Justice.

The City of Birmingham (hereinafter referred to as "the City") appeals the trial court's denial of its preverdict and postverdict motions for judgments as a matter of law as to certain claims that had been asserted against it by John Charles Sutherland. Sutherland cross-appeals the trial court's judgment as a matter of law in favor of the City on other claims that he asserted. We reverse and remand as to the City's appeal and affirm as to Sutherland's cross-appeal.

On December 22, 1998, Sutherland sued the City, seeking to recover damages on claims of false imprisonment, "public ridicule" and defamation, and assault and battery arising from a June 27, 1997, incident at a Colonial Bank (hereinafter referred to as "the bank") located in Birmingham, in which Sutherland was accused by the bank's manager, Mark Renda, of passing two counterfeit checks. After an initial confrontation with Renda, Sutherland left the bank; he returned soon thereafter to discuss the accusation with Renda. When Sutherland returned, Renda was reporting to the University of Alabama at Birmingham ("UAB") Police Department, by telephone, his suspicion that Sutherland had passed counterfeit checks. The UAB Police Department then sent a radio dispatch to the Birmingham Police Department stating that there was a forgery suspect at the bank.

A "plain-clothes" police officer, Michael Wooten, was the first officer to arrive at the bank. When he arrived, Renda was still in his office and Sutherland was standing outside the office. Officer Wooten went to Renda's office, and Renda identified Sutherland as the suspect. Officer Wooten then arrested Sutherland by drawing his handgun, pointing it at Sutherland, and instructing him not to move. When additional officers arrived, Sutherland was handcuffed and seated in the bank lobby. He was later taken to the Birmingham Police administration building, where he was questioned and released within an hour; no charges were ever filed against him as a result of the arrest.

On January 20, 1999, the City filed an answer that asserted numerous defenses to Sutherland's complaint, including immunity under §§ 6-5-338

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 So.2d 755
(Cite as: 834 So.2d 755)

and 11-47-190, Ala.Code 1975. The City also asserted that there was no basis for liability on its part because, it argued, Wooten had probable cause to arrest Sutherland. Following discovery and court-ordered mediation, the City filed a motion for a summary judgment on August 11, 2000, with a supporting brief and exhibits. On August 29, 2000, Sutherland filed a response and a memorandum in opposition to the City's motion for a summary judgment, with attached exhibits. On October 31, 2000, the trial court entered an order on its case action summary that stated, in pertinent part:

"The City['s] ... motion for summary judgment is granted as to all claims except those set out in *Alabama Code* Section 11-47-190 for neglect, carelessness**757** or unskillfulness. Section 6-5-338, supra, establishes immunity for (a) police officers and (b) their governmental unit for discretionary functions. Insufficient facts are before the Court to establish discretionary immunity. While [Sutherland's] case may be subject to a judgment as a matter of law, [the City's] motion for summary judgment is overruled as to negligence claims."

On November 6, 2000, the City filed a motion requesting that the trial court reconsider its motion for a summary judgment; on January 8, 2001, it filed what it termed a "supplemental reply" to its motion to reconsider. On January 17, 2001, the City filed a motion to stay the trial of the case, which was set for January 22, 2001, to await a ruling by this Court on a writ of mandamus the City had also filed on January 17, 2001, in regard to the trial court's denial of a summary judgment to the City on all of Sutherland's claims. On January 22, 2001, this Court entered an order denying the City's petition for writ of mandamus.

The trial of the case began on January 22, 2001. At the close of Sutherland's case-in-chief, the City filed a motion for a judgment as a matter of law; the trial court denied that motion. The trial transcript shows that the City again made a motion for a judgment as a matter of law at the close of all evidence, and the trial judge granted it as to Sutherland's false-imprisonment claim, stating, in pertinent part:

"The Court is going to find as a matter of law that ... Officer Wooten had probable cause and acted within his authority to make the arrest; therefore, the temporary detention was also justified. I find as a matter of law and a matter of fact that you can do something legally but do it in an illegal way.

"So I find that they can proceed to the jury on negligence, assault and battery, and the subpart, excessive use of force, which is part of that assault and battery."

On January 25, 2001, the jury returned a verdict for Sutherland in the amount of $115,000. Those damages were reduced by $50,000, the amount of a pro tanto settlement paid by Colonial Bank and Renda. (See footnote one of this opinion.) On February 23, 2001, the trial court entered a judgment against the City in the amount of $65,000. On that same day, the City filed a renewed motion for a judgment as a matter of law, or in the alternative, a motion to vacate the verdict, or a motion for a new trial; on March 9, 2001, the City amended its postjudgment motions to include additional grounds supporting its argument that it was entitled to a judgment as a matter of law based on the defenses of probable cause and discretionary immunity, and to include additional grounds supporting its argument that it was entitled to a new trial. On March 27, 2001, the trial court denied the City's renewed motion for a judgment as a matter of law and other postjudgment motions. On April 23, 2001, the City filed a notice of appeal; Sutherland filed a notice of cross-appeal on May 7, 2001.

In its appeal, the City argues that the trial court erred by not entering a summary judgment for it on all claims and by not granting its preverdict or postverdict motions for a judgment as a matter of law, on the grounds (1) that § 6-5-338, Ala.Code 1975, provides immunity to the City for what, it says, was Officer Wooten's exercise of a discretionary function; (2) that § 11-47-190, Ala.Code 1975, provides the City substantive immunity because, it says, Officer Wooten did not act negligently; (3) that the defense of probable cause is a defense to its liability, citing *Couch v. *758 Sheffield,* 708 So.2d 144 (Ala.1998); and (4) that *Couch v. Sheffield,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*supra,* provides the City with immunity against the intentional acts of Officer Wooten that constitute willful or malicious conduct or acts taken in bad faith.

Sutherland cross-appeals the trial court's judgment as a matter of law for the City on his claim of false imprisonment. Sutherland argues that the trial court erred because, he says, the evidence concerning Officer Wooten's actions in making the arrest was in dispute.

[1] Our review of the trial court's rulings on the City's preverdict and postverdict motions for a judgment as a matter of law is dispositive of this case. See *Superskate, Inc. v. Nolen,* 641 So.2d 231, 233 (Ala.1994)( "Ordinarily, any issue as to the denial of [a] summary judgment motion would be moot, because the sufficiency of the evidence at trial would be the significant question on appeal."). Our review of the grant or denial of a motion for a judgment as a matter of law is governed by the following standard:

" 'The standard of review applicable to a motion for directed verdict or judgment notwithstanding the verdict [now referred to as preverdict and postverdict motions for a judgment as a matter of law] is identical to the standard used by the trial court in granting or denying the motions initially. Thus, when reviewing the trial court's ruling on either motion, we determine whether there was sufficient evidence to produce a conflict warranting jury consideration. And, like the trial court, we must view any evidence most favorably to the non-movant.' "

*Glenlakes Realty Co. v. Norwood,* 721 So.2d 174, 177 (Ala.1998) (quoting *Bussey v. John Deere Co.,* 531 So.2d 860, 863 (Ala.1988)).

The City first argues that § 6-5-338, Ala.Code 1975, provides it immunity for what, it says, was Officer Wooten's exercise of a discretionary function in arresting Sutherland. Section 6-5-338 states, in pertinent part:

"(a) Every peace officer, except constables, who is employed or appointed pursuant to the Con-

stitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and *who is empowered by the laws of this state* to execute warrants, *to arrest* and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such *shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.*

"(b) This section is intended to extend immunity only to peace officers *and governmental units or agencies authorized to appoint peace officers.* No immunity is extended hereby to any private non-governmental person or entity, including any private employer of a peace officer during that officer's off-duty hours."

(Emphasis added.) This Court has stated that "subsection (b) makes it clear that **\*759** this immunity is extended to 'governmental units or agencies authorized to appoint [law-enforcement] officers.' " *Telfare v. City of Huntsville,* [Ms. 1000357, January 18, 2002] --- So.2d ----, ---- (Ala.2002).

In *Telfare, supra,* this Court further observed:

"In *Ex parte City of Gadsden,* 781 So.2d 936 (Ala.2000), we squarely addressed the issue of a municipality's liability for a police officer's conduct. In *Ex parte City of Gadsden* we stated: '[W]e must first determine whether [the officer] was engaged in performing a discretionary function.' 781 So.2d at 938. Discretionary functions are those as to which 'there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and

choice involving what is just and proper under the circumstances.' *Wright v. Wynn,* 682 So.2d 1, 2 (Ala.1996). Generally, arrests and attempted arrests are classified as discretionary functions.

" 'A State agent *shall* be immune from civil liability in his or her capacity when the conduct made the basis of the claim against the agent is based upon the agent's

" '....

" '(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, *law-enforcement officers' arresting or attempting to arrest persons....*'

"*Ex parte Cranman,* 792 So.2d 392, 405 (Ala.2000)(second emphasis added)."

841 So.2d at ----. "This Court has also held, however, that acts taken in bad faith, or willful or malicious conduct, will not be considered discretionary in nature." *Ex parte City of Montgomery,* 758 So.2d 565, 569 (Ala.1999)(citing *Couch v. City of Sheffield,* 708 So.2d 144, 153 (Ala.1998); see *Wright v. Wynn,* 682 So.2d 1 (Ala.1996); *Barnes v. Dale,* 530 So.2d 770 (Ala.1988); *DeStafney v. University of Alabama,* 413 So.2d 391 (Ala.1981)).

As a law-enforcement officer, Officer Wooten's power to arrest is governed by the laws of this State. This power is recognized in § 6-5-338(a), and the laws of this State provide reasonably well-defined rules governing when an officer may make a warrantless arrest-such as Officer Wooten's arrest of Sutherland. Rule 4.1(a), Ala. R.Crim. P., and § 15-10-3, Ala.Code 1975, provide the limited circumstances under which an officer may make a warrantless arrest. Rule 4.1(a) states:

"(a) Arrest by a Law Enforcement Officer.

"(1) A law enforcement officer *may* arrest a person without a warrant if:

"(i) The law enforcement officer has probable cause to believe that *a felony* has been committed, or is being committed, and that the person to be arrested committed it, or

"(ii) Any offense has been committed *in the law enforcement officer's presence or view,* or

"(iii) The arrest is otherwise authorized by statute, such as Ala.Code 1975, §§ 32-5-171,

32-5A-191, 15-10-3.

"(2) The law enforcement officer shall inform the person arrested of the officer's authority and the cause of the arrest, except when the person is arrested in the actual commission of the offense or during pursuit immediately thereafter."

(Emphasis added.) Similarly, § 15-10-3(a), Ala.Code 1975, states:"(a) An officer *may* arrest a person without a warrant, on any day and at any time in any of the following instances:

**\*760** "(1) If a public offense has been committed or a breach of the peace threatened *in the presence of the officer.*

"(2) When *a felony* has been committed, though not in the presence of the officer, by the person arrested.

"(3) When *a felony* has been committed and the officer has reasonable cause to believe that the person arrested committed the felony.

"(4) When the officer has reasonable cause to believe that the person arrested has committed *a felony,* although it may afterwards appear that a felony had not in fact been committed.

"(5) When a charge has been made, upon reasonable cause, that the person arrested has committed *a felony.*

"(6) When the officer has actual knowledge that a warrant for the person's arrest for the commission of a felony or misdemeanor has been issued, provided the warrant was issued in accordance with this chapter. However, upon request the officer shall show the warrant to the arrested person as soon as possible. If the officer does not have the warrant in his or her possession at the time of arrest the officer shall inform the defendant of the offense charged and of the fact that a warrant has been issued.

"(7) When the officer has reasonable cause to believe that a felony or misdemeanor has been committed by the person arrested in violation of a protection order issued by a court of competent jurisdiction.

"(8) When an offense involves domestic violence as defined by this section, and the arrest is based on probable cause, regardless of whether the offense is a felony or a misdemeanor."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 So.2d 755
**(Cite as: 834 So.2d 755)**

(Emphasis added.)

[2] We, therefore, apply these rules to our initial determination of whether Officer Wooten had the discretion to make a warrantless arrest of Sutherland. We note that these rules do not afford an opportunity to exercise discretion under certain circumstances (i.e., no probable cause to believe that a felony has been committed and that the person arrested committed it, or if no offense has been committed in the officer's presence). If the initial criteria for making a warrantless arrest were satisfied in this case, we would conclude that Officer Wooten's choices as to whether to make a warrantless arrest, and how to effect that arrest, represent discretionary functions. Accordingly, we consider whether Officer Wooten had probable cause to make a warrantless arrest of Sutherland.

Section 15-10-3(a) provides guidance in determining whether Officer Wooten had probable cause to arrest Sutherland. We note that our consideration of probable cause is also critical to Sutherland's cross-appeal, because the trial court's finding that Officer Wooten had probable cause for the arrest was the basis of its judgment as a matter of law for the City on Sutherland's claim of false imprisonment. Therefore, we will address both the discretionary-immunity subpart of the City's argument on appeal and Sutherland's cross-appeal.

The Court of Criminal Appeals, in *Owen v. State,* 418 So.2d 214 (Ala.Crim.App.1982), equated the term "probable cause" with "reasonable cause," as that latter term is used in § 15-10-3. In *Owen,* the Court of Criminal Appeals observed:

" 'An officer may arrest without a warrant when "a felony has been committed and he has reasonable cause to believe **\*761** that the person arrested committed it." Section 15-10-3, Code of Alabama 1975. The rule of reasonable or probable cause is a "practical, nontechnical conception." *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). As defined in *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959):

" ' "Probable cause exists where 'the facts and circumstances within their (the arresting officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been committed...." (Citations omitted)

" 'In determining whether there is probable cause to arrest, it is not necessary that the officer have before him evidence that would support a conviction for the offense. He need only have facts and circumstances within his knowledge which are reasonably trustworthy and which would lead a prudent man to believe that the accused committed or was committing an offense.' "

418 So.2d at 220 (quoting *Tice v. State,* 386 So.2d 1180, 1183 (Ala.Crim.App.1980)). See also *Ex parte City of Montgomery,* 758 So.2d at 570.

The record in this case shows that Officer Wooten went to the bank as a result of a dispatch sent out by the UAB Police Department. At trial, Rose Marie Sanders, the communications supervisor at the UAB Police Department who was the custodian of the department's radio logs and audiotapes, testified as follows concerning the dispatch sent out to the Birmingham Police Department to which Officer Wooten was responding when he arrived at the bank:

"Q. When you picked up the tape for the ladies and gentlemen of the jury, after they had cut it off, when you picked it up from me, didn't the tape start out saying they want some more information?

"A. Just now, it started out they were asking for further description information.

"Q. Further information. And people started talking about forgery; right?

"A. Yes, sir.

"Q. Felony; correct?

"A. Yes, sir.

"Q. And you contacted the City of Birmingham; correct?

"A. Yes, sir.

"Q. To the best of your knowledge, we went there; correct?

"A. Yes, sir."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Officer Wooten further testified as follows at trial, after a recording of the dispatch tape had been played:"Q. Officer Wooten, were you in car 346 that day?

"A. Yes, sir, that was my number.

"Q. And that was your voice on that tape?

"A. Yes.

"Q. And did you hear on your dispatch 'Suspects at Colonial Bank suspected of a forgery ring.'

"A. Yes, sir.

"Q. And you responded to that?

"A. Yes, sir.

"Q. Did you believe that was a felony?

"A. Yes, sir.

"Q. And you were responding to that felony?

"A. Yes, sir."

Renda, the manager of the bank, also testified at one point that Officer Wooten, when he arrived at Renda's office, identified himself to Renda as a police officer, but later testified that Officer Wooten did **762 not identify himself as a police officer, but that Renda assumed he was. In any event, it is undisputed that Renda then identified Sutherland to Officer Wooten as the suspect.

[3] Under these circumstances, we conclude that Officer Wooten had probable cause to believe that a felony had been committed and that Sutherland had committed it.FN1 Thus, he was performing a discretionary function when he chose to make a warrantless arrest and a discretionary function when he chose the manner in which he would effect the arrest. *Cranman, supra.* Sutherland further failed to specifically allege, or to present any evidence tending to prove, that Officer Wooten's actions were taken in bad faith, or that his conduct was willful or malicious. The gist of the allegations made by Sutherland was that Officer Wooten negligently had exceeded his authority in effecting the arrest. Allegations of negligence are not sufficient to remove the immunity the City is provided for Officer Wooten's performance of a discretionary function. *City of Montgomery, supra.*

FN1. Under § 13A-9-3, Ala.Code 1975,

passing a counterfeit check constitutes the crime of forgery in the second degree. Section 13A-9-3 states, in pertinent part:

"(a) A person commits the crime of forgery in the second degree if, with intent to defraud, he falsely makes, completes or alters a written instrument which is or purports to be, or which is calculated to become or to represent if completed:

"(1) A deed, will, codicil, contract, assignment or a *check,* draft, note or other commercial instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status; ...

"....

"(b) Forgery in the second degree is a *Class C felony.*"

(Emphasis added.)

Thus, the trial court erred in not finding that the City had discretionary-function immunity, i.e., immunity from tort liability arising out of Officer Wooten's conduct in the performance of a discretionary function within the line and scope of his law-enforcement duties in accordance with § 6-5-338, Ala.Code 1975, as a matter of law. The judgment of the trial court is therefore reversed, and the cause is remanded for the trial court to enter a judgment as a matter of law for the City on Sutherland's negligence and assault-and-battery claims. As to Sutherland's cross-appeal, we affirm the trial court's judgment as a matter of law for the City on Sutherland's false-imprisonment claim based on its finding, supported by the record, that Officer Wooten had probable cause to arrest Sutherland.

1001327-REVERSED AND REMANDED.

1001458-AFFIRMED.

MOORE, C.J., and SEE, BROWN, and STUART, JJ., concur.
Ala.,2002.
City of Birmingham v. Sutherland
834 So.2d 755

END OF DOCUMENT

925 So.2d 944                                                                                    Page 1

925 So.2d 944

**(Cite as: 925 So.2d 944)**

City of Crossville v. Haynes

Ala.,2005.

Supreme Court of Alabama.

CITY OF CROSSVILLE

v.

Donna HAYNES, as administratrix of the estate of

Phillip Corley, deceased.

**1040126.**

Aug. 12, 2005.

Rehearing Denied Oct. 14, 2005.

**Background:** Administratrix filed a wrongful-death and negligence action against city, police chief, officers, and dispatchers after inmate committed suicide in city jail. The Circuit Court, DeKalb County, No. CV-03-284,Randall L. Cole, J., granted police chief and officers' summary-judgment motion, denied dispatchers' summary-judgment motion, and remitted jury verdict to award administratrix $100,000. City appealed.

**Holdings:** The Supreme Court, Stuart, J., held that:

(1) evidence was insufficient to establish that inmate had manifested suicidal proclivities in the presence of city police officers and dispatchers, which would establish that city could have or should have reasonably foreseen that inmate presented a threat to himself;

(2) city was immune from any liability arising out of decisions made by police chief for city regarding the intake, evaluation, and monitoring procedures of city police department; and

(3) administratrix failed to establish that dispatchers' alleged failure to check on inmate in accordance with jail policies and procedures resulted in inmate being allowed to commit suicide in city jail cell.

Reversed and remanded with directions.

West Headnotes

**[1] Municipal Corporations 268 747(3)**

268 Municipal Corporations

   268XII Torts

      268XII(B) Acts or Omissions of Officers or Agents

         268k747 Particular Officers and Official Acts

            268k747(3) k. Police and Fire. Most Cited Cases

Evidence was insufficient to establish that inmate had manifested suicidal proclivities in the presence of city police officers and dispatchers, which would establish that city could have or should have reasonably foreseen that inmate presented a threat to himself; inmate was arrested on a worthless-check warrant, inmate's fiancée did not report to officers that she observed inmate pacing, babbling, and tapping his head while in jail cell, there was no evidence that officers or dispatchers observed similar behavior from inmate, family members who knew that inmate had been treated for drug addiction and mental illness failed to report that information to city or officers, fiancée failed to report that inmate was taking antidepressant medication, and inmate never made an actual or implied threat to harm himself.

**[2] Negligence 272 213**

272 Negligence

   272II Necessity and Existence of Duty

      272k213 k. Foreseeability. Most Cited Cases

Unless the resulting injury was reasonably foreseeable, no legal duty to prevent that injury exists and no liability results from failing to prevent the injury.

**[3] Municipal Corporations 268 747(3)**

268 Municipal Corporations

   268XII Torts

      268XII(B) Acts or Omissions of Officers or Agents

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

268k747 Particular Officers and Official Acts

268k747(3) k. Police and Fire. Most Cited Cases

City was immune from any liability arising out of decisions made by police chief for city regarding the intake, evaluation, and monitoring procedures of city police department, for the purpose of administratrix's claim that city negligently or wantonly failed to train its employees to perform booking or intake evaluation on arrestees and prisoners and negligently or wantonly failing to train its employees to properly supervise, evaluate, and monitor arrestees and prisoners; police chief was immune from liability for acts or omissions dealing with the establishment of policies or procedures under State-agent immunity provisions, and, thus, city that employed chief was also immune. Code 1975, §§ 6-5-338(a, b), 11-47-190.

**[4] Municipal Corporations 268 ⟨⟨⟨⟩⟩⟩745**

268 Municipal Corporations
    268XII Torts
        268XII(B) Acts or Omissions of Officers or Agents
            268k745 k. Application of Principle of Agency to Municipalities. Most Cited Cases

**States 360 ⟨⟨⟨⟩⟩⟩112.1(1)**

360 States
    360III Property, Contracts, and Liabilities
        360k112 Torts
            360k112.1 Acts or Omissions of Officers, Agents, or Employees
                360k112.1(1) k. In General. Most Cited Cases

If a state actor is immune from liability for a particular act or omission, the state or municipality is also immune from liability for the same act or omission.

**[5] Municipal Corporations 268 ⟨⟨⟨⟩⟩⟩747(3)**

268 Municipal Corporations
    268XII Torts
        268XII(B) Acts or Omissions of Officers or

Agents
            268k747 Particular Officers and Official Acts
                268k747(3) k. Police and Fire. Most Cited Cases

Administratrix failed to establish that police dispatchers' alleged failure to check on inmate in accordance with jail policies and procedures resulted in inmate being allowed to commit suicide in city jail cell, for the purpose of wrongful-death claim; evidence was insufficient to establish that inmate had manifested suicidal proclivities in the presence of city police officers and dispatchers, which would establish that city could have or should have reasonably foreseen that inmate presented a threat to himself.

**[6] Municipal Corporations 268 ⟨⟨⟨⟩⟩⟩747(3)**

268 Municipal Corporations
    268XII Torts
        268XII(B) Acts or Omissions of Officers or Agents
            268k747 Particular Officers and Official Acts
                268k747(3) k. Police and Fire. Most Cited Cases

Administratrix failed to establish that city was vicariously liable for the alleged neglect, carelessness, or unskillfulness of some agent, officer, or employee, for the purpose of wrongful-death claim against city after inmate committed suicide in city jail cell; jury found that no agent, officer, or employee of city acted neglectfully, carelessly, or unskillfully. Code 1975, § 11-47-190.

**\*945** H. Edgar Howard of Ford, Howard & Cornett, P.C., Gadsden, for appellant.
Keith Jackson and Robert R. Riley, Jr., of Riley & Jackson, P.C., Birmingham, for appellee.
STUART, Justice.

The City of Crossville appeals from a judgment entered by the DeKalb Circuit Court awarding Donna Haynes, as the administratrix of the estate of the Phillip Corley, deceased, $100,000 on her claim alleging that as a result of the City of Crossville's failure to train its employees in proper intake and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

925 So.2d 944
925 So.2d 944
**(Cite as: 925 So.2d 944)**

monitoring procedures Phillip Corley committed suicide while he was an inmate in the Crossville city jail. We reverse and remand.

*Facts*

In late 2001, the City of Crossville issued a warrant for the arrest of Phillip Corley based on his alleged issuance of a worthless check. Corley was arrested by the Cherokee County Sheriff's Department on January 23, 2002. In processing the arrest, the Cherokee County Sheriff's Department completed a "Cherokee County Detention Center Booking Sheet." In response to the questions on this booking sheet, Corley revealed to the officers of the sheriff's department that he had been treated for drug addiction and for mental illness. Corley also revealed to the officers that he had been in "rehab 2 months ago." FN1 Immediately below this information **\*946** was the question: "Does officer feel arrestee is suicidal?" The arresting officer checked the box that indicated that he did not feel Corley was suicidal.

> FN1. Out to the side of this notation, the words "Mountain View" were written. Mountain View is apparently a rehabilitation facility. It is unclear from the record whether the facility treats drug addiction, mental illness, or both.

A City of Crossville police officer, Officer Chris West, picked Corley up from the Cherokee County Sheriff's Department later that same day. The City of Crossville had no policy or procedure in place requiring officers to ask prisoners or arrestees questions regarding their medical and mental-health background, and Officer West did not obtain a copy of the booking sheet prepared by the Cherokee County Sheriff's Department. Neither Officer West nor anyone else employed with the City of Crossville questioned Corley about his medical or mental-health background before placing him in the Crossville city jail. Therefore, neither Officer West nor anyone employed by the City of Crossville learned that Corley had been treated for drug addiction or for mental illness; neither Officer West

nor anyone else employed by the City of Crossville learned that Corley had been in rehabilitation two months before his arrest. Corley did not volunteer this information.

Once he was returned to Crossville, Corley was placed in a cell. Before he was placed in a cell, Corley was allowed to telephone his mother, Donna Haynes, to notify her that he was in the Crossville city jail. While in the cell, Corley was observed regularly by Kristie Towns and Peggy McLendon, police dispatchers for the City of Crossville. When Corley wanted to leave his cell to smoke, either officer Jacky Clayton or Chuck Priest, the acting chief of police for the City of Crossville, accompanied Corley outside. While Corley was incarcerated at the Crossville city jail, Donna Haynes and Misty Shankles, Corley's fiancée, visited Corley. He remained at the jail while his mother and Shankles attempted to arrange his bail.

On January 28, 2002, at approximately 5:45 p.m., during one of her routine checks, dispatcher McLendon discovered that Corley had committed suicide in his jail cell by hanging himself. McLendon had last checked on Corley at 4:30 p.m. FN2

> FN2. Based on the 4:30 p.m. observation time, McLendon should have checked on Corley no later than 5:30 p.m. on January 28. However, McLendon testified that at 5:31 p.m. she received a radio call from Officer Jacky Clayton, indicating that he was leaving his police car on a call. She further testified that she was supposed to stay by the radio whenever an officer was "out of his car" on a call until the officer checked back in with her. Therefore, she stated, she could not perform the 5:30 p.m. check on Corley, but as soon as Officer Clayton checked in, McLendon checked on Corley.

Donna Haynes was appointed as the administratrix of Corley's estate. She sued the City of Crossville, Chief Priest, Officer Clayton, Officer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

West, and dispatchers Towns and McLendon. In her complaint, Haynes asserted a claim of wrongful death against all of the defendants; she also asserted a claim of negligence or wantonness against the individual defendants and against the City of Crossville, under a theory of respondeat superior, based on Chief Priest's alleged failure to train and supervise the employees of the police department and the jail in the proper intake, evaluation, and monitoring procedures for arrestees and prisoners. Haynes also purported to assert a negligence claim directly against the City of Crossville under § 11-47-190, Ala.Code 1975, for failing to remedy a defect and for failing to train its employees in the proper intake, evaluation, and monitoring procedures for arrestees and prisoners.

**\*947** The defendants filed a motion for a summary judgment.[FN3] Haynes opposed the motion for a summary judgment, arguing, as to the City of Crossville, that the City of Crossville failed to provide its employees with the training required to properly evaluate, monitor, or supervise its arrestees and prisoners and failed to provide its employees with the means to determine if the arrestees or prisoners presented a risk of harm to themselves. Haynes presented expert testimony by affidavit to the effect that the City of Crossville should have used a booking sheet or an intake sheet to enable the booking officers to determine the medical and mental-health background of persons being taken into custody, to determine whether those persons presented a risk of harm to themselves or to others, and to determine whether those persons suffered from mental illness or drug addiction. Haynes also presented evidence indicating that the dispatchers, Towns and McLendon, had not checked on Corley in accordance with the written policies and procedures of the Crossville city jail. Haynes also presented evidence indicating that a camera monitor installed at the Crossville city jail to allow the dispatcher to observe the prisoners while they were in their jail cells was not functioning on the day of Corley's suicide. Haynes argued that evidence that the camera monitor was not functioning was evidence of the City of Crossville's negligence or wantonness.

FN3. Although the record contains a narrative statement of the facts, it does not contain a brief in support of this motion. However, the trial court indicated in its order that the motion was the subject of a hearing and that briefs and evidentiary materials were submitted in support of the motion.

Haynes also opposed the defendants' claim in their summary-judgment motion that Haynes had not established that the defendants had a duty to prevent the suicide, i.e., that Corley had not manifested suicidal proclivities in the presence of the individual defendants. Haynes presented evidence indicating that while Corley was incarcerated at the Crossville city jail, he requested on at least three occasions that the dispatcher/jailer contact his mother to obtain his medication. Although Haynes admitted that the dispatchers did contact Haynes to inform her that her son was requesting his medication, Haynes asserted that no one employed with the City of Crossville ever followed up with Corley to determine that the medication he was requesting was an antidepressant. Haynes also presented evidence indicating that Corley had soiled his pants while he was incarcerated at the jail and required a change of clothes, which, she asserted, should have alerted the defendants that Corley had a mental-health problem. Haynes also presented evidence indicating that, when Officer Clayton took Corley outside to smoke a cigarette, Corley revealed during their conversation that he had recently suffered a nervous breakdown and that a tornado had recently destroyed his business; Haynes asserts that these statements also should have alerted the employees of the City of Crossville Police Department that Corley had a mental-health problem. Haynes presented testimony from Shankles indicating that on one occasion when she visited Corley at the jail Corley was pacing and he appeared agitated.

Haynes argued that this evidence sufficiently established that Corley manifested suicidal proclivities in the presence of the individual defendants and that they should have reasonably foreseen that Corley would attempt to harm himself. Further,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

925 So.2d 944
(Cite as: 925 So.2d 944)

Haynes argued that if it was not foreseeable to the individual defendants that Corley**948** would attempt to harm himself, this lack of foreseeability was a result of the defendants' negligence or wantonness in failing to have in place a training program, failing to have an intake system in place for incoming arrestees and prisoners, and failing to have a working camera monitoring system in place in the jail.

On January 28, 2004, the trial court entered summary judgments in favor of Chief Priest, Officer Chris West, and Officer Jacky Clayton. The trial court concluded that these defendants were protected by police-officer immunity under § 6-5-338(a), Ala.Code 1975, and/or State-agent immunity under *Ex parte Cranman,* 792 So.2d 392 (Ala.2000). The trial court stated that at the time of Corley's suicide Chief Priest, Officer West, and Officer Clayton were (1) police officers, (2) performing law-enforcement-related duties (3) that required the exercise of judgment, and (4) their conduct did not depart from any statute, rule, regulation, or procedure adopted by the City of Crossville, and (5) that Haynes had not presented any evidence to establish that Chief Priest, Officer West, or Officer Clayton had acted willfully, maliciously, fraudulently, or in bad faith.

However, the trial court denied the summary-judgment motion as to the dispatchers, McLendon and Towns. The trial court found that Towns and McLendon were not peace officers and that they, thus, were not entitled to the immunity granted under § 6-5-338(a), Ala.Code 1975. Cf. *Swan v. City of Hueytown,* 920 So.2d 1075 (Ala.2005) (concluding, for purposes of that appeal and, on the basis that the appellant did not dispute the issue, that a police dispatcher was a "peace officer" as contemplated by § 6-5-338(a), Ala.Code 1975). Further, the trial court held that even if a police dispatcher could seek peace-officer immunity under § 6-5-338(a) Towns and McLendon would not be entitled to such immunity because substantial evidence had been presented indicating that McLendon and Towns had failed to comply with written policies and procedures for the Crossville city jail,

which required dispatchers to visually check on the prisoners in their cells at least once every hour. The trial court held that under *Howard v. City of Atmore,* 887 So.2d 201 (Ala.2003) (holding that when a State agent fails to discharge duties that are set pursuant to detailed rules or regulations, State-agent immunity does not apply), McLendon and Towns were not entitled to State-agent immunity. The trial court also held that as to the claims asserted against the City of Crossville under a theory of respondeat superior, the City of Crossville was entitled to immunity based on the claims asserted against Chief Priest, Officer West, and Officer Clayton but was not entitled to immunity based on the claims asserted against McLendon and Towns.

The trial court also addressed the claim asserted by Haynes directly against the City of Crossville under § 11-47-190, Ala.Code 1975, alleging neglect, carelessness, or unskillfulness, or the failure to remedy some defect after the defect has been called to the city's attention or after the defect had existed for such unreasonable length of time as to raise a presumption of knowledge of the defect. The trial court addressed Haynes's claim that the failure of the camera monitor contributed to Corley's death. The trial court held that Haynes had failed to present substantial evidence to support this direct claim against the City of Crossville, and it entered a summary judgment on that claim for the City of Crossville.

Finally, the trial court addressed the foreseeability of Corley's suicide. Relying on *Popham v. City of Talladega,* 582 So.2d 541 (Ala.1991), the trial court held that ***949** sufficient evidence had been presented to create a genuine issue of material fact on the issue whether Corley manifested suicidal proclivities in the presence of one or more of the individual defendants. Therefore, the trial court held that the issue whether the individual defendants, and vicariously the City of Crossville, should have foreseen an excessive risk of self-inflicted harm by Corley was a question of fact for the jury.

Haynes subsequently moved the trial court to vacate part of its summary judgment. Haynes ar-

gued that the City of Crossville was liable for negligently or wantonly failing to train the officers and employees of the police department in how to supervise, evaluate, and monitor its arrestees and prisoners and that the claim could proceed directly against the City of Crossville under § 11-47-190, Ala.Code 1975, even though Chief Priest was protected by immunity under § 6-5-338(a), Ala.Code 1975. The trial court, relying on *Couch v. City of Sheffield,* 708 So.2d 144 (Ala.1998), agreed and, on June 1, 2004, vacated its summary judgment as to the "direct" claim against the City of Crossville. The trial court allowed Haynes to proceed with her claim that the City of Crossville was liable for the neglect, carelessness, or unskillfulness of some agent, officer, or employee.

In August 2004, Haynes's claims against Towns, McLendon, and the City of Crossville went to trial. At the conclusion of the evidence, the City of Crossville, Towns, and McLendon moved for a judgment as a matter of law. The defendants argued that Haynes failed to establish as to any of the remaining defendants a duty, a breach, and causation. Additionally, the defendants argued that Chief Priest was responsible for making administrative decisions for the police department, including training the employees of the department in supervising, evaluating, and monitoring arrestees and prisoners. The City of Crossville argued that because Chief Priest was shielded by police-officer immunity for his decisions in that regard, the City of Crossville was also immune from liability for those decisions. The trial court denied the motion and submitted the claims to the jury.

The jury returned a verdict in favor of Towns and McLendon, finding that they had not acted negligently or wantonly. However, the jury returned a verdict against the City of Crossville on Haynes's claim of failure to train.[FN4] The jury awarded damages in the amount of $550,000.

> FN4. Haynes has not appealed from the judgments entered in favor of Towns and McLendon. Therefore, those judgments are not before this Court.

The City of Crossville filed a motion to remit the jury verdict to $100,000, pursuant to § 11-93-2, Ala.Code 1975. The City of Crossville also renewed its motion for a judgment as a matter of law, and, in the alternative, moved to alter, amend, or vacate the judgment or for a new trial. On September 13, 2004, the trial court entered an order remitting the judgment from $550,000 to $100,000, pursuant to § 11-93-2, Ala.Code 1975.

The City of Crossville appeals, raising the following issues:

"1. Whether the trial court erred in allowing the negligent training claim to go forward against the City, where plaintiff failed to show sufficiently that the deceased had manifested suicidal proclivities in the presence of any of the [individual] defendants, and thus failed to sufficiently show that [Corley's] suicide was foreseeable under Alabama law.

"2. Whether the trial court erred in denying the City the immunity provided under Alabama Code § 6-5-338(b).

**\*950** "3. Whether the trial court erred in denying defendant's Rule 59 [, Ala. R. Civ. P.,] motion where the jury found that the jailers/dispatchers had used reasonable care toward [Corley], thus eliminating the causation between any negligence on the part of the City and the death of the decedent.

"4. Whether the trial court erred to reversal in allowing [Haynes] to ask an officer about any training received after the death of the decedent, where the answer (none) was irrelevant and highly prejudicial, and where the answer should have been excluded as analogous to a subsequent remedial measure."

*Analysis*

[1] The City of Crossville first asserts that the negligent-training claim asserted against it should not have been submitted to the jury. In *Waddell & Reed, Inc. v. United Investors Life Insurance Co.,* 875 So.2d 1143 (Ala.2003), this Court stated the standard of review applicable to a trial court's ruling on a motion for a judgment as a matter of law ("JML"):

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

925 So.2d 944
(Cite as: 925 So.2d 944)

"When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling."

875 So.2d at 1152 (citations omitted).

The City of Crossville asserts that the requirements of *Popham,* supra, and its progeny, addressing suicides of inmates, were not met in this case. More specifically, the City of Crossville argues that it could not have foreseen Corley's suicide because (1) he had no history of suicidal proclivities, (2) he did not manifest suicidal proclivities in the presence of the defendants, and (3) he was not admitted to the facility because of a suicide attempt. The City of Crossville, relying on *Popham,* supra; *Smith v. King,* 615 So.2d 69 (Ala.1993); *Tittle v. Giattina Fisher & Co., Architects,* 597 So.2d 679 (Ala.1992); and *Williams v. Lee County,* 78 F.3d 491 (11th Cir.1996), argues that the evidence presented in this case was not sufficient to give rise to a fact question on the issue of foreseeability.

"We have held that proof of the existence of a duty owing from the defendant to the injured party is a prerequisite for proving negligence or wantonness, *Alabama Power Co. v. Laney,* 428 So.2d 21 (Ala.1983), and that the question of whether a legal duty exists is essentially a question of law for the court, *Rose v. Miller & Co., Inc.,* 432 So.2d 1237 (Ala.1983), to be resolved by determining whether the injury was foreseeable."

*Keebler v. Winfield Carraway Hosp.,* 531 So.2d 841, 844 (Ala.1988).

[2] As this Court recognized in *Keebler,* supra, unless the resulting injury was reasonably foreseeable, no legal duty to prevent that injury exists and no liability results from failing to prevent the injury. **\*951** Additionally, in *Popham,* 582 So.2d at 543, this Court stated:

"The controlling factor in determining whether there may be a recovery for a failure to prevent a suicide is whether the defendants reasonably should have anticipated that the deceased would attempt to harm himself. Annot., 11 A.L.R.2d 751, 782-92 (1950). In *Keebler v. Winfield Carraway Hospital,* 531 So.2d 841 (Ala.1988), this Court held 'that foreseeability of a decedent's suicide is legally sufficient only if the deceased had a history of suicidal proclivities, or manifested suicidal proclivities in the presence of the defendant, or was admitted to the facility of the defendant because of a suicide attempt.' "

This test of foreseeability remains the law applicable today in determining whether a duty to prevent a suicide exists. We must conclude that the evidence presented in this case does not rise to the level necessary to establish that the defendants could have or should have reasonably foreseen that Corley presented a threat to himself.

For example, in *Popham,* supra, Popham was arrested for public intoxication. He violently resisted arrest, fought with the police officers, spat at them, and screamed at them to come back and fight him. Once the officers successfully placed Popham in the jail cell, he began to cry or whimper. As part of the intake procedures, the officers removed Popham's belt, his shoes and shoelaces, and the contents of his pockets. The jailer observed Popham on the jail-cell monitor for a while, but when he was no longer visible on the monitor, the jailer assumed he was sleeping off his intoxication on the cot in the cell, which was not within the range of the monitor. The next morning the jailer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 8

discovered Popham had hanged himself beside the shower stall. This area was outside the range of the monitor.

Evidence was introduced indicating that Popham had been suicidal before his arrest. He had attempted suicide one week before his arrest. His family members were aware of these facts. However, neither Popham nor Popham's wife, who had visited the jail on the night of Popham's arrest, informed the officers of this fact. Popham never mentioned suicide to the officers during his arrest or threatened to commit suicide. None of the officers or employees of the City of Talladega had knowledge of Popham's previous suicide attempt or of his suicidal tendencies.

The *Popham* Court held that this evidence was insufficient to establish that Popham had manifested suicidal proclivities in the presence of the defendants. Because the plaintiff had failed to establish that the deceased (1) had a history of suicidal proclivities (known to the defendant), or (2) had manifested suicidal proclivities in the presence of the defendant, or (3) had been admitted to the facility of the defendant because of a suicide attempt, the *Popham* Court held that no fact issue had been presented on the question of foreseeability. If it is not foreseeable that a person will attempt suicide, a defendant has no duty to attempt to prevent the suicide. Therefore, the *Popham* Court affirmed the summary judgment in favor of the defendants.

In another suicide case, *Smith v. King,* 615 So.2d 69 (Ala.1993), this Court concluded that the evidence presented did not establish that the defendants could have or should have foreseen that the decedent, Smith, would take his own life. Smith had been admitted to a State-owned mental-health facility. Smith had made previous oral threats to harm himself, but he had not actually attempted to do so. Smith had admitted that he had previously made such oral threats in an attempt to manipulate his parents and the staff at the mental-health**952 facility. Upon making those threats, Smith had been placed in seclusion for his own protection and to allow him to calm down.

On November 15, 1981, Smith became upset after speaking with his mother by telephone. He began making threats that he would harm himself, and, in accordance with the policies of the mental-health facility, he was placed in seclusion. Also in accordance with the policies of the facility, the staff at the facility made periodic checks on Smith. Shortly after Smith was placed in seclusion, the staff discovered that he had hanged himself.

Although the Court affirmed the summary judgment for the defendants on the basis of State-agent immunity, the Court also stated:

"Even if that defense [of State-agent immunity] was not available, we note that there is no evidence in the record that these defendants either should have or could have foreseen that Derryl Smith would take his own life. ... The trial court correctly concluded, based on all the pleadings and evidence, that, at the time and place it occurred, Derryl Smith's suicide was not reasonably foreseeable by these defendants."

*Smith v. King,* 615 So.2d at 73.

In *Williams v. Lee County,* 78 F.3d 491 (11th Cir.1996), the United States Court of Appeals for the Eleventh Circuit held that the evidence presented was legally insufficient to establish that Williams, the decedent, had manifested suicidal proclivities in the presence of the defendants. Williams had admitted himself to East Alabama Medical Center ("EAMC") for detoxification and treatment for drug abuse; however, he left that facility without medical authorization. On March 8, 1989, the Lee County Sheriff's Department took Williams into custody on the order of the probate court; that court had ordered Williams committed to the State Department of Mental Health for treatment. Pending transfer to a State mental-health facility, Williams was being held at the Lee County jail.

The Lee County Sheriff's Department had information from the probate court commitment order that Williams was "mentally ill; ... he poses a real and present threat of substantial harm to himself and to others." *Williams,* 78 F.3d at 492. The form

also indicated that "Mr. Williams left the hospital without authorization and has homicidal intentions." *Id.*

Based on this information, the sheriff's office kept Williams under constant observation for two days in the booking area of the sheriff's office. At that time he was moved to a cell where he was checked every 15 to 20 minutes. On the afternoon of March 10, between 4:30 and 5:00, an officer checked on Williams in his cell. Williams said to the officer, " 'I'm not going to make it. If I don't do it myself, somebody else will.' " *Williams,* 78 F.3d at 492. The officer left the area of the cells, thought about the statement for several minutes, and concluded that Williams was presenting a threat to himself. When the officer returned to Williams's cell, he discovered Williams hanging by a sheet from a sprinkler head in the ceiling. Williams was pronounced dead at the scene.

Williams's father brought a wrongful-death action against Lee County and various individual defendants under Alabama law and a federal claim under 42 U.S.C. § 1983. The trial court entered a summary judgment for the defendants. In affirming the summary judgment on the state-law claim, the Eleventh Circuit Court of Appeals stated that "there was insufficient evidence offered to permit a jury to find that Williams'[s] suicide was foreseeable,**\*953** based on any notice to the sheriff's officers or any manifestation of suicidal tendencies in the presence of defendants." *Williams,* 78 F.3d at 493-94.

In *Tittle v. Giattina, Fisher & Co., Architects,* supra, this Court again found that the plaintiff had presented insufficient evidence to establish a duty to prevent the decedent's suicide. In *Tittle,* the Court noted that the decedent, Tittle, had not been admitted to the Jefferson County jail because of a suicide attempt. He had expressly denied a history of emotional or mental problems. The officers stated that during the booking process, Tittle did not appear to be suicidal. The Court stated that it was undisputed that Tittle did not manifest suicidal proclivities in the presence of the defendants during his three-day stay at the Jefferson County jail.

Based on that evidence, this Court affirmed the summary judgment in favor of the defendants.

Comparing the evidence presented in the instant case to that presented in *Popham, Smith, Williams,* and *Tittle,* supra, we agree with the City of Crossville that Haynes failed to present sufficient evidence to withstand the City of Crossville's motion for a judgment as a matter of law on the issue of the foreseeability of Corley's suicide. From the record, it is apparent that the City of Crossville knew only the following about Corley: (1) that he had been arrested on a worthless-check warrant; (2) that he had been picked up in Cherokee County and then transferred to DeKalb County; (3) that he had become irate on one occasion when he wanted to go outside to smoke and he later apologized for his behavior; (4) that he had mentioned to one of the officers that he had had a nervous breakdown and that a tornado had destroyed his business; (5) that he had soiled his pants when he first came to the Crossville city jail; (6) that he had asked on more than one occasion for some unidentified medication; and (7) that he had asked to speak with a Cherokee County drug-enforcement agent.

Corley's fiancée claimed to have observed Corley pacing, babbling, or tapping his head, but she did not report it to anyone employed with the City of Crossville. Haynes did not present any evidence to indicate that anyone employed with the City of Crossville ever observed such behavior in Corley. Additionally, Corley's family members knew that Corley had been treated for drug addiction and mental illness; however, that information was not provided to the City of Crossville. Further, Corley's fiancée knew that Corley was asking for an antidepressant although one had not been prescribed for him. However, again, that information was not conveyed to the City of Crossville. The employees of the Crossville city jail knew only that Corley was requesting some unidentified medication. Additionally, the Cherokee County Sheriff's Department was aware of Corley's treatment for drug addiction and mental-health problems by virtue of its booking sheet on Corley. However, no one employed with the City of Crossville obtained this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

925 So.2d 944
**(Cite as: 925 So.2d 944)**

FN5

       FN5. We acknowledge Haynes's assertion that Chief Priest and the City of Crossville acted negligently in not obtaining this information from Corley. We address that assertion later in this opinion.

    Thus, the evidence in this case does not rise even to the level of that presented in *Smith,* supra, and *Williams,* supra, because, in those cases, the jailers or officials were aware of the decedents' mental illnesses. Further, Corley never made any actual or implied threat to harm himself, as did the decedents in *Smith,* supra, and *Williams,* supra. If the evidence proffered**954** in *Smith* and *Williams* did not establish foreseeability on the part of the defendants, the evidence presented in this case cannot, as a matter of law, establish the necessary foreseeability. Without foreseeability that the decedent would attempt suicide, there can be no recognized legal duty to prevent a suicide attempt and, thus, no right of recovery.

    [3] Next, Haynes argues that if the necessary foreseeability has not been established, it is only because the City of Crossville negligently or wantonly failed to train its employees to perform a booking or intake evaluation on arrestees and prisoners and negligently or wantonly failed to train its employees to properly supervise, evaluate, and monitor arrestees and prisoners. This assertion was also the basis of the claim asserted against the City of Crossville under § 11-47-190, Ala.Code 1975. However, this argument fails to support the submission of Haynes's claims to the jury for two reasons.

    First, Chief Priest was charged with the responsibility of establishing the policies and procedures of the police department and the Crossville city jail, including the manner in which the employees of the police department were trained to supervise, evaluate, and monitor arrestees and prisoners. The establishment of such policies and procedures is within the exercise of the chief of police's judgment in the administration of the department. Acts or omissions dealing with the establishment of such

policies or procedures fall within the State-agent-immunity protections discussed in *Ex parte Cranman,* 792 So.2d 392 (Ala.2000). See *Howard v. City of Atmore,* 887 So.2d 201, 210 (Ala.2003). The trial court recognized that Chief Priest was protected by immunity and entered a summary judgment in his favor.

    [4] However, as recognized in *Howard,* if a state actor is immune from liability for a particular act or omission, the state or municipality is also immune from liability for the same act or omission. In *Howard,* this Court addressed a situation almost identical to the one presented here. Howard's sister committed suicide while she was an inmate in the Atmore city jail. Howard sued, among others, the Atmore chief of police, Chief McKinley, asserting that the police chief had negligently failed to train his staff and had negligently failed to implement proper intake and monitoring procedures that would have allowed the jailers and officers to detect her sister's suicidal nature. Howard asserted that Chief McKinley and, thus, the City of Atmore, were liable for the wrongful death of her sister. The trial court entered a summary judgment in favor of Chief McKinley and the City of Atmore. Howard appealed.

    The Court held that Chief McKinley was entitled to State-agent immunity under *Ex parte Cranman,* 792 So.2d 392 (Ala.2000), and peace-officer immunity under § 6-5-338, Ala.Code 1975. The *Howard* Court stated:

    "Howard directs us to no statute, rule, or regulation *binding on Chief McKinley* that purports to direct him in a particular manner as to the 'administration of [his] department,' or to the training and supervision of its personnel. She merely contends that Chief McKinley's department has failed 'to implement modern penalogical practices such as intake screening forms or processes, removal of potentially lethal means of suicide such as shoe strings and belts (even after recommendations by the [Alabama Bureau of Investigation] ),' and, in this respect, has 'lagged behind evolving standards of detention and incarceration.' ...These allegations are based, however, on statistics regarding annual

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

suicide rates from general publications,**\*955** such as, National Institute of Corrections, U.S. Dep't of Justice, *Prison Suicide: An Overview and Guide to Prevention* (1995).

"Thus, there is a conspicuous absence of binding authority as to how to identify and handle a potential suicide risk and what precautions to take in any particular case. In the final analysis, the responsibility falls upon Chief McKinley to formulate suicide-prevention rules for his department, based on a myriad of factors, including the availability of resources and personnel. Category (2) of the *Cranman* formula expressly contemplates this scenario."

887 So.2d at 210. Thus, the Court in *Howard* held that the police chief was protected by State-agent immunity for his failure to implement intake and monitoring procedures that might have detected Howard's sister's suicidal tendencies.[FN6]

> FN6. The expert testimony offered by Haynes in this case is similar to that offered in *Howard.* Additionally, although we need not do so to resolve this case, we would decline to adopt the opinion of Haynes's expert that caring for an arrestee or prisoner requires the same level of care provided to "a new child."

Further, in addressing the claim asserted against the City of Atmore, the *Howard* Court stated:

"Howard contends that the City is 'vicariously liable for the neglect, carelessness and unskillfulness' of Chief McKinley and Officer Bryars. It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune. Section 6-5-338(b) provides: 'This section is intended to extend immunity only to peace officers *and governmental units* or agencies authorized to appoint peace officers.' (Emphasis added.) See *Ex parte City of Gadsden,* 781 So.2d 936, 940 (Ala.2000). On the other hand, if the statute does not shield the officer, it does not shield the city. *Borders v. City of Huntsville,* 875 So.2d 1168, 1183 (Ala.2003).

"In this case, § 6-5-338 shields the City from liability for the alleged 'neglect, carelessness and unskillfulness' of Chief McKinley. Thus, the trial court correctly entered a summary judgment for the City with respect to the claims against Chief McKinley. However, the statute does *not* shield the City from liability for the alleged 'neglect, carelessness and unskillfulness' of Officer Bryars, based on evidence indicating that he failed to comply with paragraph 7 of the order. Insofar as the summary judgment for the City was entered with respect to those claims, the trial court erred."

*Howard,* 887 So.2d at 211.

It is significant to note that the plaintiff in *Howard* alleged that the City of Atmore was liable for Chief McKinley's "neglect, carelessness or unskillfulness." This is the pivotal language from § 11-47-190, Ala.Code 1975, the statute under which Haynes premised her "direct" claim against the City of Crossville. However, as stated in *Howard,* "if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune." 887 So.2d at 211. It cannot be disputed that the *Howard* Court was applying the immunity granted a municipality under § 6-5-338(b) to an action asserted under § 11-47-190, Ala.Code 1975, against the city based upon the acts or omissions of its police chief.

Based on *Howard,* we conclude that the City of Crossville is immune from any liability arising out of the decisions made **\*956** by the police chief for the City of Crossville regarding the intake, evaluation, and monitoring procedures of the Crossville Police Department at issue in this case. Because the police chief is immune from liability for those acts or omissions, the City of Crossville is also immune from liability for those acts or omissions. Because Chief Priest is the person charged with the administrative duty of implementing training programs and procedures for the police department and jail employees of the City of Crossville, there is no other agent, officer, or employee of the City of Crossville on whom liability for that failure to train can be predicated. Therefore, Haynes was not entitled to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

assert a "direct" claim against the City of Crossville under § 11-47-190, Ala.Code 1975. The trial court improperly reversed itself on the claim asserted "directly" against the City of Crossville.

[5][6] Finally, we acknowledge that the claims Haynes asserted the dispatchers individually were allowed to stand and to proceed to trial because, the trial court concluded, Towns and McLendon were not protected by peace-officer immunity and the evidence indicated that they had failed to follow a detailed regulation. However, based on our resolution of the issue of foreseeability, a judgment as a matter of law should have been entered for Towns and McLendon on those claims before the trial. Therefore, the trial court erred in submitting those claims to the jury. However, even if those claims had been properly submitted to the jury, the jury found in favor of the dispatchers. Thus, at the conclusion of the trial, the only verdict was against the City of Crossville on the claim that Crossville was vicariously liable for the "neglect, carelessness or unskillfulness or some agent, officer or employee" pursuant to § 11-47-190, Ala.Code 1975. However, because the jury found that no agent, officer, or employee of the City of Crossville had acted neglectfully, carelessly, or unskillfully, the element of causation is lacking. The verdict against the City of Crossville cannot stand.

We reverse the judgment against the City of Crossville and remand the cause to the trial court for entry of a judgment as a matter of law in favor of the City of Crossville.

REVERSED AND REMANDED WITH DIRECTIONS.

NABERS, C.J., and SEE, HARWOOD, and BOLIN, JJ., concur.
Ala.,2005.
City of Crossville v. Haynes
925 So.2d 944

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

445 F.3d 1323                                                                          Page 1
445 F.3d 1323, 19 Fla. L. Weekly Fed. C 444
**(Cite as: 445 F.3d 1323)**

Bashir v. Rockdale County, Ga.
C.A.11 (Ga.),2006.

United States Court of Appeals,Eleventh Circuit.
Saleem BASHIR, Plaintiff-Appellant,
v.
ROCKDALE COUNTY, GEORGIA, a Political
Subdivision of the State of Georgia, Jeff Wigington, Individually and in his Official Capacity as
Sheriff of Rockdale County, et al., Defendants-Appellees.
No. 05-12020.

April 14, 2006.

**Background:** Arrestee brought action against
county and members of sheriff's department, alleging false arrest and excessive force in violation
of the Fourth Amendment and various state torts.
The United States District Court for the Northern
District of Georgia, No.
03-02933-CV-CAP-1,Charles A. Pannell, Jr., J.,
granted summary judgment in favor of the defendants, and arrestee appealed.

**Holdings:** The Court of Appeals, Black, Circuit Judge, held that:

(1) deputies were not entitled to qualified immunity on claim arising from warrantless entry and
arrest of plaintiff;

(2) excessive force claim was subsumed within,
the unlawful arrest claim; and

(3) deputies were entitled to immunity under
Georgia law on claims of intentional and negligent
infliction of emotional distress, false light, assault,
battery, malicious prosecution, false imprisonment,
and negligence per se.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Arrest 35 ☞68(10)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(6) Intrusion or Entry
                35k68(10) k. Entry Without Warrant
Impermissible. Most Cited Cases

**Arrest 35 ☞68(13)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(6) Intrusion or Entry
                35k68(13) k. Consent. Most Cited
Cases
A warrantless arrest in a home violates the Fourth
Amendment unless the arresting officer had probable cause to make the arrest and either consent to
enter or exigent circumstances demanding that the
officer enter the home without a warrant. U.S.C.A.
Const.Amend. 4.

**[2] Arrest 35 ☞68(9)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(6) Intrusion or Entry
                35k68(9) k. Entry Without Warrant
Permissible. Most Cited Cases
Existence of probable cause does not by itself validate a warrantless home arrest. U.S.C.A.
Const.Amend. 4.

**[3] Arrest 35 ☞68(9)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(6) Intrusion or Entry
                35k68(9) k. Entry Without Warrant
Permissible. Most Cited Cases
Situations in which exigent circumstances exist justifying warrantless home arrest include: danger of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit. U.S.C.A. Const.Amend. 4.

**[4] Arrest 35 ⚷═68(13)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(6) Intrusion or Entry
                35k68(13) k. Consent. Most Cited Cases
Consent for deputy's warrantless entry into plaintiff's home could not reasonably be inferred from plaintiff's simple act of disengaging from conversation with law officer and walking into the house nor could consent reasonably be inferred from plaintiff's conduct once deputy, who never asked for permission but simply followed plaintiff into the house, was already inside. U.S.C.A. Const.Amend. 4.

**[5] Arrest 35 ⚷═68(9)**

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(6) Intrusion or Entry
                35k68(9) k. Entry Without Warrant Permissible. Most Cited Cases
Even if deputy's initial warrantless entry into home to arrest plaintiff's wife was lawful under the "hot pursuit" exception to the warrant requirement, deputy's reentry at least 20 minutes later, which was unrelated to any investigation of plaintiff's wife's arrest, could not be justified as a lawful extension of his initial entry. U.S.C.A. Const.Amend. 4.

**[6] Civil Rights 78 ⚷═1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers

                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
Fair and clear notice to government officials is the cornerstone of qualified immunity under § 1983. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ⚷═1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Deputies were not entitled to qualified immunity on § 1983 claim arising from warrantless entry and arrest of plaintiff; under the law existing at the time, a reasonable law enforcement officer faced with identical circumstances would have known he could not enter the home and arrest plaintiff without a warrant, exigent circumstances, or consent. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[8] Civil Rights 78 ⚷═1088(4)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities
            78k1088(4) k. Arrest and Detention. Most Cited Cases
Where an excessive force claim is predicated solely on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 ⚷═1462**

78 Civil Rights
    78III Federal Remedies in General
        78k1458 Monetary Relief in General
            78k1462 k. Grounds and Subjects; Com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pensatory Damages. Most Cited Cases

**False Imprisonment 168 ⇒34**

168 False Imprisonment
    168I Civil Liability
        168I(B) Actions
            168k32 Damages
                168k34 k. Elements of Compensation. Most Cited Cases
Damages recoverable on an unlawful arrest claim include damages suffered because of the use of force in effecting the arrest. 42 U.S.C.A. § 1983.

**[10] False Imprisonment 168 ⇒15(1)**

168 False Imprisonment
    168I Civil Liability
        168I(A) Acts Constituting False Imprisonment and Liability Therefor
            168k15 Persons Liable
                168k15(1) k. In General. Most Cited Cases

**Malicious Prosecution 249 ⇒42**

249 Malicious Prosecution
    249V Actions
        249k42 k. Persons Liable. Most Cited Cases

**Sheriffs and Constables 353 ⇒100**

353 Sheriffs and Constables
    353III Powers, Duties, and Liabilities
        353k100 k. Liabilities for Acts or Omissions of Deputies or Assistants. Most Cited Cases
Although sheriff's deputies acted unreasonably and violated plaintiff's Fourth Amendment rights in arresting plaintiff after warrantless entry into his home, deputies were entitled to immunity under Georgia law on claims of intentional and negligent infliction of emotional distress, false light, assault, battery, malicious prosecution, false imprisonment, and negligence per se since plaintiff failed to demonstrate that the deputies possessed a deliberate intention to do wrong sufficient to satisfy the actual malice standard. West's Ga.Const. Art. 1, § 2(9)(d).

**\*1324** Robert Cape Buck, Schlueter, Buck &

Childers, Brett Arthur Schroyer, Childers, Buck & Schlueter, LLP, Atlanta, GA, for Bashir.
Gary Kevin Morris, Terry E. Willimas & Assoc., Lawrenceville, GA, for Defendants-Appellees.

Appeal from the United States District Court for the Northern District of Georgia.

Before BLACK, HULL and FARRIS[FN*], Circuit Judges.

> FN* Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

BLACK, Circuit Judge:

Appellant Saleem Bashir initiated this action pursuant to 42 U.S.C. § 1983 and Georgia law against Rockdale County, Georgia, and members of the Rockdale County Sheriff's Department, alleging Sheriff Deputy Edell Davis and several unnamed Rockdale County Deputies violated the Fourth Amendment and Georgia law when they entered his home without a warrant and arrested him. The district court granted summary judgment in favor of the defendants, concluding, inter alia, the deputies had probable cause to make the arrest, did not employ excessive force, and were entitled to immunity from suit. Bashir appeals from the grant of summary judgment. After oral argument and review of the record, we conclude Deputy Davis and the unnamed deputies are not entitled to qualified immunity for the warrantless arrest of Bashir in his home and reverse the judgment in that respect. We affirm the judgment on Bashir's excessive force and state law tort claims.

## I. BACKGROUND

We view the facts in the light most favorable to Bashir, drawing all reasonable **\*1325** inferences in his favor. *Lee v. Ferraro,* 284 F.3d 1188, 1190 (11th Cir.2002). The series of events culminating in Bashir's arrest began October 3, 2001, at around 11:30 p.m., when Rockdale County Sheriff Deputy Daniel Ricks responded to a call from Bashir's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

neighbor stating her juvenile son had run away. The neighbor spoke with Deputy Ricks about the incident and pointed to the Bashir's home, indicating her son might have gone there. Following the lead, Ricks pulled his police cruiser to the curb in front of the Bashir residence and saw two men seated on the trunk of a car parked in the carport at the end of the driveway. Deputy Ricks approached the two men, who were Bashir's two teenage sons, Akinsheye and Jabari, and began questioning them. Akinsheye and Jabari felt Deputy Ricks became abusive in his questioning. Akinsheye, the older of the two youths, told Jabari that he did not have to answer Ricks' questions and told Ricks he should talk with their mother.[FN1] At various times during the exchange, Akinsheye went in and out of the house through a doorway in the carport to awaken his sleeping mother. Saleem Bashir was not yet home from work.

> FN1. According to Deputy Ricks' version of the encounter, Akinsheye was much more belligerent. Ricks says Akinsheye "bowed up," demanded that he leave the property, cursed loudly, interrupted his attempts to question Jabari, and told Jabari not to answer any questions.

Deputy Ricks called for assistance, and Deputy Rene Shirley responded. Moments after Deputy Shirley arrived, Akinsheye exited the house and returned to the carport. He told the deputies his mother was coming out to talk to them and instructed Jabari to come inside the house. Deputy Shirley told Akinsheye not to move and then grabbed him.[FN2] Deputy Shirley and Akinsheye began to struggle in the carport. Jabari saw the struggle and jumped off the trunk of the car where he was seated, prompting Deputy Ricks to grab him, throw him into the grass in the front yard, and spray him in the face with O.C. ("pepper") spray.

> FN2. Deputy Shirley testified Akinsheye approached him in an aggressive manner.

As the two officers wrestled with the youths, Brenda Bashir, their mother, emerged from the doorway into the carport and saw Deputy Shirley struggling with Akinsheye. She screamed and grabbed Akinsheye's arm. Deputy Shirley sprayed Akinsheye with pepper spray, and the struggle moved into the residence through the doorway. Deputy Shirley pinned Akinsheye on the living room couch, while Mrs. Bashir continued to pull on Akinsheye's arm. Shirley handcuffed Akinsheye, escorted him outside, and placed him in his police car. He then assisted Deputy Ricks in arresting Jabari. Once this was accomplished, the deputies turned to Mrs. Bashir, who was standing in the driveway, and told her she was also under arrest. Mrs. Bashir then ran back inside, and the deputies, joined by Deputy Edell Davis, chased her into the house and arrested her.

Saleem Bashir arrived home from work at least 20 minutes after his wife was arrested. As he approached the house, he saw several police cars and an ambulance parked out front. He walked up his driveway, identified himself, and asked Deputy Davis who was in charge. Davis directed him to Sergeant Reed. Sergeant Reed, who was not present for any of the arrests, told Bashir his sons had been arrested for fighting with another juvenile. Reed also informed Bashir his wife had been arrested, but said Bashir was not allowed to speak with her. Bashir did not understand why his family had been arrested **\*1326** and was not satisfied with Sergeant Reed's explanation.

As he spoke with Sergeant Reed, Bashir noticed his seven-year-old son, Taajwar, crying and walking around unattended in the carport. He called out to his son and then "stopped talking to the officer and just went over there and picked [Taajwar] up." As he explained, "I just went over there and picked him up and I never said anything to anybody anymore other than until I got in the house there." Bashir carried his son into the house through the carport door. He sat down at the kitchen table, placed his son on his lap, and began to comfort the crying child. Deputy Davis followed Bashir through the doorway and into the kitchen. Davis had no warrant and did not ask permission to enter the residence. When Bashir saw Davis standing in the kit-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

chen, he asked him to explain what had happened. Davis's explanation was also unsatisfactory to Bashir, and while still seated at the kitchen table with his son on his lap, Bashir said: "[I]f y'all didn't do this thing right I am suing the hell out of everybody down here." Davis responded, "[Y]ou fixing to go to jail." Suddenly, several officers rushed into the kitchen through the carport door. Deputy Davis grabbed Bashir's arm as someone snatched Taajwar from his lap. Deputy Davis attempted to spray Bashir with pepper spray, but the canister did not discharge. Bashir was thrown to the floor and handcuffed.

Bashir spent October 4, 2001, in jail and was released the following day. He was charged with misdemeanor obstruction of an officer and disorderly conduct. *See* O.C.G.A. §§ 16-10-24(a), 16-11-39(a). Akinsheye and Jabari were also jailed for the night. Mrs. Bashir was released at the scene so she could watch Taajwar; Deputy Shirley returned the next day with a warrant and arrested her again. Jabari pled guilty to misdemeanor obstruction, and all other charges against the Bashirs were dropped.

The Bashirs filed suit in the Northern District of Georgia, alleging false arrest and excessive force in violation of the Fourth Amendment and various state torts.[FN3] The district court granted summary judgment in favor of the deputies, concluding probable cause existed to support the arrests and the deputies were entitled to immunity from suit. Only Saleem Bashir has appealed. He contends the district court erred in granting summary judgment in favor of Deputy Davis and the unnamed deputies, arguing (1) his arrest inside his home was unlawful because the deputies did not have a warrant, exigent circumstances, or consent to enter, and the unlawfulness of their conduct was clearly established such that they are not entitled to qualified immunity; (2) the deputies used excessive force in making the arrest because any force used in an unlawful arrest is excessive; and (3) the facts and circumstances of his arrest are sufficient to create a triable issue with respect to whether the deputies acted with actual malice such that official immunity

would not bar litigation of the state tort claims.

> FN3. The complaint named Rockdale County, Sheriff Jeff Wigington and Lieutenant Tommy Eaton in their official capacities, and deputies Ricks, Shirley, Davis, and unnamed deputies in their individual and official capacities. After discovery, the district court granted judgment on the pleadings in favor of Rockdale County, Sheriff Wigington, and Eaton on the basis of Eleventh Amendment immunity.

## II. STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment based on qualified immunity and apply the same legal standards as the district court. *Durruthy v. Pastor,* 351 F.3d 1080, 1084 (11th *1327 Cir.2003). "We resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts." *Id.*

## III. DISCUSSION

### A. *Section 1983 Qualified Immunity*

We have often stated that "[q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee,* 284 F.3d at 1193-94 (quotations omitted). This immunity "allow[s] government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation," *id.* at 1194, and protects "all but the plainly incompetent or one who is knowingly violating the federal law," *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

The Supreme Court has established a two-part test for evaluating a claim of qualified immunity.[FN4] First, we must address the

"threshold question" of whether the facts presented, taken in the light most favorable to Bashir, show the deputies' conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). If Bashir is successful on this score, we must then determine whether the right was "clearly established" such that "a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) (quotations omitted).

> FN4. Before reaching this two-part test, the public official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.' " *Lee,* 284 F.3d at 1194 (quoting *Courson v. McMillian,* 939 F.2d 1479, 1487 (11th Cir.1991)). Here, there is no question Deputy Davis and the unnamed deputies were acting within the scope of their discretionary authority when they arrested Bashir. The burden then shifts to the plaintiff to show that qualified immunity is not appropriate. *Id.*

B. *Warrantless Arrest*

Bashir contends his Fourth Amendment rights were violated when Deputy Davis and the unnamed deputies unlawfully entered his house and arrested him. He argues this right was clearly established at the time, such that a reasonable police officer in the deputies' position would have known what they were doing offended the Constitution. We agree.

1. *Constitutional Violation.*

[1] It is a " 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980).FN5 This basic principle is founded on "the very core" of the Fourth Amendment: "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Id.* at 590, 100 S.Ct.

at 1382 (quoting *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961)). The sanctity of the home is afforded special protection under the Fourth Amendment, such that "the reasons for upholding warrantless arrests in a public place do not apply to warrantless invasions of the privacy of the home." *Id.* at 576, 100 S.Ct. at 1375. "[T]he Fourth Amendment has drawn a firm line **\*1328** at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590, 100 S.Ct. at 1382. "As *Payton* makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." *Kirk v. Louisiana,* 536 U.S. 635, 638, 122 S.Ct. 2458, 2459, 153 L.Ed.2d 599 (2002). Additionally, the prohibition on warrantless in-home arrests does not apply to situations where voluntary consent to enter has been obtained. *See Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990); *Holmes v. Kucynda,* 321 F.3d 1069, 1078-79 (11th Cir.2003). As the foregoing makes clear, a warrantless arrest in a home violates the Fourth Amendment unless the arresting officer had probable cause to make the arrest *and* either consent to enter or exigent circumstances demanding that the officer enter the home without a warrant.

> FN5. The Fourth Amendment to the United States Constitution reads, in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...."

[2] It is undisputed Deputy Davis and the unnamed deputies did not have a warrant prior to entering Bashir's home and effecting his arrest. The warrantless arrest inside the home was, therefore, presumptively unreasonable. Although the district court ruled the officers had probable cause to arrest Bashir for disorderly conduct, a ruling Bashir has not challenged on appeal, the existence of probable cause does not by itself validate a warrantless home arrest. *Payton,* 445 U.S. at 588-89, 100 S.Ct. at 1381 (quoting with approval *United States v. Reed,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

572 F.2d 412, 423 (2d Cir.1978)); *see also Kirk,* 536 U.S. at 637, 122 S.Ct. at 2459 (reversing state court ruling that warrantless entry, arrest, and search did not violate the Fourth Amendment because there had been probable cause to arrest); *Minnesota v. Olson,* 495 U.S. 91, 95, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990) ("It was held in *Payton*... that a suspect should not be arrested in his house without an arrest warrant, even though there is probable cause to arrest him."); *United States v. Edmondson,* 791 F.2d 1512, 1515 (11th Cir.1986) ("A finding of probable cause alone ... does not justify a warrantless arrest at a suspect's home."). The deputies must show their presence in the home was justified, either by exigent circumstances or consent.

[3] The exigent circumstances exception to the warrant requirement recognizes a " 'warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant.' " *United States v. Holloway,* 290 F.3d 1331, 1334 (11th Cir.2002) (quoting *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978)). Situations in which exigent circumstances exist include: "danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." *Id.* None of these exigencies existed at the time of Bashir's arrest. According to Deputy Davis's own deposition testimony, Bashir was not disorderly prior to entering the home and did not commit a crime outside. Once inside and seated at the kitchen table with his son on his lap, Bashir might have raised his voice to Deputy Davis, but he did not rise up out of his chair or physically threaten Davis in any way.[FN6] Thus, the record evidence reveals a complete absence of exigent circumstances attendant to the deputies' entry into the home and Bashir's arrest.

> FN6. Thus, this is not a situation where exigent circumstances arose after an unlawful entry.

[4] Deputy Davis argues his presence in the home was lawful because Bashir consented to it. He concedes, however, he never asked Bashir for permission to enter the house and Bashir never expressly invited**\*1329** him inside. He nonetheless contends Bashir "effectively invited" him into the house for him to explain what had happened. According to Davis, Bashir's invitation can be implied from the fact Bashir spoke to him as he walked into the house and asked him questions once they were inside.

Davis's implied consent argument fails because it is belied by the record evidence and because it is contrary to circuit precedent. The record shows the only time Bashir spoke with Deputy Davis outside was when Bashir asked to speak with the officer in charge. Davis directed Bashir to Sergeant Reed and did not participate in Bashir's conversation with Reed. When Bashir abruptly quit the conversation, he picked up his child and, in his words, "never said anything to anybody anymore other than until I got in the house there." Deputy Davis's deposition testimony confirms Bashir said nothing to him as he walked into the house.[FN7]

> FN7. Deputy Davis's deposition transcript contains the following exchange:
>
> Q: Okay. And you directed him to your supervisor, Mr. Reed?
>
> A: Yes, sir.
>
> Q: Okay. Now, did you have any other conversation with Mr. Bashir outside?
>
> A: Not that I can recall.
>
> ....
>
> Q: Okay. Now, is it fair then to say that you spoke to him and said, you need to talk with my supervisor; he then said something which you don't recall; he then went into his residence; and you had no further conversation or contact with him until you followed him into his residence?
>
> A: That's true.

Bashir's actions fall far short of the conduct we have previously held sufficient to imply voluntary consent. In *United States v. Ramirez-Chilel,* 289 F.3d 744, 752 (11th Cir.2002), we found consent could be implied from the defendant's body lan-

445 F.3d 1323, 19 Fla. L. Weekly Fed. C 444
**(Cite as: 445 F.3d 1323)**

guage when, in response to the officers' requests for admittance, the defendant "yield[ed] the right-of-way" to the officers. Conversely, there is no evidence in the record Bashir yielded the right-of-way in response to a request for permission to enter. Deputy Davis never asked for permission but simply followed Bashir into the house. These facts are materially similar to those of *United States v. Gonzalez,* 71 F.3d 819, 830 (11th Cir.1996), where we found consent to enter could not be inferred. In *Gonzalez,* a woman refused an officer permission to enter and search her home, and the officer simply followed her inside as she went to get a glass of water. *Id.* at 829. We held the warrantless entry was presumptively unreasonable and "reject[ed] the government's argument that [her] failure to 'bar' [the officer's] follow-on entry when she went into her house to get a drink of water can be viewed as an adequate implied consent to that warrantless intrusion." *Id.* We also rejected the notion that "failure to object to a search equals consent to the search." *Id.* at 829-30 (internal quotations omitted). To permit the government to show consent to enter from the lack of an objection to the entry "would be to justify entry by consent and consent by entry. This will not do." *Id.* at 830 (quoting *United States v. Shaibu,* 920 F.2d 1423, 1426 (9th Cir.1990) (internal quotations omitted)). Thus, consent cannot reasonably be inferred from Bashir's simple act of disengaging from conversation with Sergeant Reed and walking into the house. Nor can consent reasonably be inferred from Bashir's conduct once Davis was already inside.

[5] Unable to show exigent circumstances or consent, Deputy Davis advances a final argument to justify his warrantless intrusion. He contends his presence in the home at the time of Bashir's arrest was a lawful extension of his earlier entry when he assisted in arresting Mrs. Bashir. We will assume for the purposes of discussion **\*1330** that Davis's initial entry to arrest Mrs. Bashir was lawful under the "hot pursuit" exception to the warrant requirement. *See generally United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (discussing the "hot pursuit" exception). It does not follow, however, that Davis's reentry 20 minutes

later should similarly be excused.

Davis does not argue the exigent circumstances surrounding Mrs. Bashir's arrest continued to exist after the arrest was completed. *See Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (stating a warrantless entry must be "strictly circumscribed by the exigencies which justify its initiation") (quotation omitted). Instead, Deputy Davis posits something different: since the initial entry to arrest Mrs. Bashir was lawful, police investigating the arrest could lawfully enter and reenter the home for some period of time thereafter, and thus, his presence in the home at the time of Bashir's arrest was lawful. Davis cites no case law supporting his position.[FN8] But we need not consider whether he is correct on the law because he is wrong on the facts. At oral argument, Davis conceded his reentry was unrelated to any investigation of Mrs. Bashir's arrest. Indeed, the record is silent as to whether there was any investigation underway that required the presence of officers in the home. There were no officers inside when Bashir arrived at least 20 minutes after Mrs. Bashir's arrest. Although officers and medical personnel were still on the scene, all were outside either providing medical treatment, standing around the front yard, or talking with each other. Davis himself was "standing still" and "saying nothing" for 20 minutes before Bashir arrived. Thus, under these facts, Davis's reentry cannot reasonably be explained as a lawful extension of his initial entry.

> FN8. None of the cases Davis cites support his lawful reentry argument. Most of the cases he cites are in the line following *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), in which the Supreme Court recognized an exception to the warrant requirement when firemen enter a structure to put out a fire. Those cases recognize the exigencies attendant to a fire do not end "with the dousing of the last flame," but continue for a reasonable time to justify the warrantless entry and reentry of officials investigating the blaze. *Id.* at 510, 98 S.Ct. at 1950. *Tyler* and its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

progeny are inapposite to this case. The exigency relied upon to justify the initial warrantless entry and arrest of Mrs. Bashir expired the moment of her arrest.

In sum, Bashir's warrantless arrest in his home is presumptively unreasonable under the Fourth Amendment and the record taken in the light most favorable to Bashir does not establish the existence of any exception to the warrant requirement. Thus, Bashir has satisfied the first prong of the qualified immunity analysis by demonstrating that his warrantless arrest was unlawful.

2. *Clearly Established Law.*

[6] The next question we address in the qualified immunity analysis is whether the constitutional right was "clearly established" at the time of the violation. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* We look to case law to see whether "the right the official is alleged to have violated [has] been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This *1331 is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citation omitted); *see also Hope,* 536 U.S. at 741, 122 S.Ct. at 2516 ("[T]he salient question ... is whether the state of the law ... gave [the officers] fair warning that their alleged treatment of [the plaintiff] was unconstitutional."). Thus, "*fair and clear notice* to government officials is the cornerstone of qualified immunity." *Vinyard v. Wilson,*

311 F.3d 1340, 1350 (11th Cir.2002) (quoting *Marsh v. Butler County,* 268 F.3d 1014, 1031 (11th Cir.2001) (en banc)).

We have stated the requisite "fair and clear notice" may be given in various ways. *Id.* In rare cases, "the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful." *Id.* More frequently, however, we must look to case law existing at the time of the violation to see if the right was clearly established. *Id.* at 1351. "While 'some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts,' more often, the facts are so material to the violation at issue that such generalized principles are insufficient, and we must look to precedent that is factually similar to the case at hand." *Williams v. Consol. City of Jacksonville,* 341 F.3d 1261, 1270 (11th Cir.2003) (quoting *Vinyard,* 311 F.3d at 1351).[FN9]

> FN9. "When case law is needed to 'clearly establish' the law applicable to the pertinent circumstances, we look to decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state." *Marsh,* 268 F.3d at 1032-33 n. 10.

[7] We conclude that, under the law existing at the time, it was clearly established the deputies' conduct violated the Fourth Amendment. A reasonable law enforcement officer faced with these circumstances would have known he could not enter the home and arrest Bashir without a warrant, exigent circumstances, or consent. That doing so would offend the Fourth Amendment was clearly established by the precedent recounted above, including *Payton,* 445 U.S. at 586, 100 S.Ct. at 1380, which sets forth the law with "obvious clarity," *Vinyard,* 311 F.3d at 1351. Moreover, *Gonzalez, supra,* is not "distinguishable in a fair way" from the facts of this case. *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2157. *Gonzalez* clearly established a reas-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

onable officer in Deputy Davis's position could not infer consent from Bashir's conduct.

Accordingly, Deputy Davis and the unnamed deputies are not entitled to qualified immunity, and the district court erred in granting summary judgment in their favor on Bashir's unlawful arrest claim.

## C. *Excessive Force*

We next consider whether summary judgment was appropriate as to Bashir's excessive force claim. The district court concluded Bashir failed to show the deputies used unreasonable force in effecting his arrest. Bashir does not challenge this conclusion on appeal. Instead, he argues Davis applied "excessive force" because any force used in an illegal arrest is necessarily excessive.

[8] "Under this Circuit's law ... a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Jackson v. Sauls,* 206 F.3d 1156, 1171 (11th Cir.2000) (citing *Williamson v. Mills,* 65 F.3d 155, *1332 158-59 (11th Cir.1995)). The right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1871-72, 104 L.Ed.2d 443 (1989). It follows, then, if an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest. This is the premise of Bashir's "excessive force" claim; but this is not what is meant by "excessive force." An excessive force claim evokes the Fourth Amendment's protection against the use of an unreasonable quantum of force (i.e., non-de minimis force unreasonably disproportionate to the need) in effecting an otherwise lawful arrest. When properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest. A claim like Bashir's-that the deputies used excessive force in the arrest because they lacked the

right to make the arrest-is not a discrete constitutional violation; it is dependent upon and inseparable from his unlawful arrest claim. *Jackson,* 206 F.3d at 1171. We reiterate, where an excessive force claim is predicated solely on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim. *Id.; Williamson,* 65 F.3d at 158-59. Bashir does not present a discrete excessive force claim and, therefore, his excessive force claim fails as a matter of law.

[9] This is not to say that Bashir cannot recover damages for the force used in his arrest. To the contrary, the damages recoverable on an unlawful arrest claim "include damages suffered because of the use of force in effecting the arrest." *Williamson,* 65 F.3d at 158-59; *Motes v. Myers,* 810 F.2d 1055, 1059 (11th Cir.1987) (stating that "[i]t is obvious that if the jury finds the arrest unconstitutional, the use of force and the search were unconstitutional and they become elements of damages for the § 1983 violation"). But, to permit a jury to award damages on Bashir's excessive force and unlawful arrest claims individually "would allow [him] to receive double the award for essentially the same claims." *Cortez v. McCauley,* 438 F.3d 980, 996 (10th Cir.2006).

Bashir asserts *Thornton v. City of Macon,* 132 F.3d 1395 (11th Cir.1998), stands for the proposition that any force used in an unlawful arrest is excessive force sufficient to give rise to a discrete Fourth Amendment claim. In *Thornton,* we concluded the district court did not err in denying the police officers' motion for summary judgment on the plaintiffs' false arrest and excessive force claims. We first found no reasonable police officer would have believed probable cause existed to arrest the plaintiffs. *Id.* at 1399-1400. Turning to the excessive force claims, we applied the factors articulated in *Graham,* 490 U.S. at 394, 109 S.Ct. at 1871, to assess the reasonableness of the force used, and noted the plaintiffs were not suspected of committing a serious crime, did not pose an immediate threat to anyone, and did not resist arrest. *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

445 F.3d 1323, 19 Fla. L. Weekly Fed. C 444
**(Cite as: 445 F.3d 1323)**

at 1400.[FN10] Yet, the officers "used force" in arresting the plaintiffs, wrestling one to the ground and throwing the other on the **\*1333** hood of a patrol car. *Id.* "Under these circumstances," we held, "the officers were not justified in using *any* force, and a reasonable officer thus would have recognized that the force use was excessive." *Id.*

> FN10. In *Graham,* the Supreme Court held whether the force used in an arrest is reasonable turns on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872.

*Thornton* does not stand for the proposition that an independent excessive force claim may be predicated solely on the lack of power to make the arrest. There is no indication the plaintiffs in *Thornton* made such a claim. Instead, based on the court's analysis of *Graham,* it appears the excessive force claim in *Thornton* was predicated on the unreasonableness of the quantum of force used under the circumstances. Therefore, the excessive force claim was independent of the power to arrest, and *Thornton* had no occasion to discuss a claim such as the one Bashir presents, which is inseparable from his unlawful arrest claim. Thus, Bashir's reliance on *Thornton* is misplaced. *See also Jackson,* 206 F.3d at 1171 n. 20 (distinguishing *Thornton*).

We therefore conclude the district court did not err in granting summary judgment on Bashir's excessive force claim, and we affirm the judgment on that claim.

## D. *State Law Official Immunity*

[10] The Georgia Constitution provides that state officers and employees "may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions." Ga. Const., art. I, §

2, ¶ IX(d). Bashir does not dispute Davis and the unnamed deputies were acting in the performance of their discretionary duties as state officials. Thus, to pierce the deputies' official immunity, Bashir must demonstrate they acted with actual malice. *Adams v. Hazelwood,* 271 Ga. 414, 520 S.E.2d 896, 898 (1999). The Supreme Court of Georgia explained that " 'actual malice' requires a deliberate intention to do wrong and denotes 'express malice or malice in fact.' " *Id.* (quoting *Merrow v. Hawkins,* 266 Ga. 390, 467 S.E.2d 336, 338 (1996)) (citation omitted).

The district court entered summary judgment in favor of the deputies on Bashir's state law claims, finding they were entitled to official immunity because the existence of probable cause for the arrest vitiated any claim of actual malice.[FN11] On appeal, Bashir does not challenge the district court's ruling as to probable cause to arrest. Instead, he contends actual malice may be inferred from the facts of his warrantless arrest. We disagree. Although, as we have said, the record supports the conclusion the deputies acted unreasonably and violated Bashir's Fourth Amendment rights, Bashir has not sustained his burden of demonstrating the existence of a genuine issue of fact that the deputies possessed "a deliberate intention to do wrong" sufficient to satisfy the actual malice standard. Thus, the district court did not err in granting summary judgment on Bashir's state law claims.

> FN11. Bashir asserted state tort claims of intentional and negligent infliction of emotional distress, false light, assault, battery, malicious prosecution, false imprisonment, and negligence per se.

### IV. CONCLUSION

For the foregoing reasons, we affirm the district court's entry of summary judgment in favor of Deputy Davis and the unnamed deputies with respect to Bashir's excessive force and state law tort claims, but reverse the entry of summary judgment on his unlawful arrest claim.

AFFIRMED IN PART, REVERSED IN PART,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

445 F.3d 1323, 19 Fla. L. Weekly Fed. C 444
**(Cite as: 445 F.3d 1323)**


AND REMANDED.

C.A.11 (Ga.),2006.
Bashir v. Rockdale County, Ga.
445 F.3d 1323, 19 Fla. L. Weekly Fed. C 444

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2006 NOV 27  P 4 26

TERANCE DAWSON,.                            )
                                           )
        Plaintiff,                         )
                                           )
vs.                                        )    CIVIL ACTION NO. 2:06-CV-1057-WKW
                                           )    (JURY DEMAND)
CITY OF MONTGOMERY;                        )
GUINN TIMMERMAN                            )
individually, and in his official capacity as  )
an officer, agent, or employee of the City )
of Montgomery, Alabama                     )
                                           )
        Defendants.                        )

## COMPLAINT

### I. INTRODUCTION

1.      The complaint seeks to recover damages, secure equitable and other relief, and to redress the

deprivation of rights and privileges of a citizen of the United States. This action arises under the United

States Constitution, particularly, the Fourth and Fourteenth Amendments, and under the laws of the

United States.  The Plaintiff seeks pendant jurisdiction of his state tort claims.

### II. JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, in that the action arises under the

laws of the United States and pursuant to 28 U.S.C. § 1343, in that the action seeks to redress the

deprivations of rights via 42 U.S.C. § 1983.

3.      Venue is proper in that the claims arose in this judicial district; the Plaintiff and

Defendant Timmerman reside in and the City of Montgomery is located in this judicial district.

### III. PARTIES

4.      Plaintiff TERANCE DAWSON (hereinafter Dawson), is a citizen of the United States of

America, and a resident of the County of Montgomery and the City of Montgomery, Alabama.

5.      GuinnTimmerman (hereinafter Timmerman), is now, and at all times mentioned, duly

appointed, employed police officer of the City of Montgomery, Alabama. He is sued in his individual and official capacities as a police officer for the City of Montgomery.

6.    The City of Montgomery (hereinafter City) is, and at all times mentioned, a municipal corporation, organized and existing under the laws of Alabama, and is located in the County of Montgomery, Alabama. It is the employer of Defendant Timmerman. Timmerman performed all the acts complained of in the name of the City.

<u>IV. FACTS</u>

7.    On November 27, 2004, around 9:00 P.M., in the City of Montgomery, Plaintiff was driving his automobile, when suddenly another vehicle—unmarked and unidentified as a police vehicle— driven by Defendant Timmerman, pulled up alongside Plaintiff, and Timmerman yelled for Plaintiff to pull his car to the side. Timmerman was not in uniform.

8.    At that time, Plaintiff did not know who Timmerman was or that Timmerman was a police officer, so he did not stop. Defendant Timmerman began pointing his finger at Plaintiff and start yelling, "Pull that car over."

9.    Then, Defendant Timmerman held up something appearing to be a badge. At that point, because he did not know if the person driving the other vehicle was indeed a police or just a person heckling him, Plaintiff drove his vehicle to a lighted area at Kentucky Fried Chicken, located just a few yards away. Defendant Timmerman followed him.

10.    Plaintiff opened his vehicle door, attempted to exit the vehicle to go and use the bathroom; however, without identifying himself as a police officer, Defendant Timmerman ordered Plaintiff to get back into the car and place his hands on the steering wheel. Simultaneously, Plaintiff's cellular telephone began ringing, and Plaintiff attempted to answer it. But Defendant Timmerman stated, "You better not answer that phone." He told Plaintiff that if Plaintiff removed his hands from the steering wheel, exited the vehicle, or answered the phone, he would arrest him.

11.    Even though Plaintiff desperately needed to used the bathroom and wanted to answer his phone

he obeyed Timmerman because Timmerman's actions frightened him and believe that Defendant Timmerman would physically harm him or would arrest him if, indeed, he was a police officer.

12.    Believing that Timmerman was indeed a police officer, Plaintiff asked Timmerman what had he done for Timmerman to stop him. Timmerman screamed in the presence of several people that Plaintiff was drunk, on dope, on crack and that Plaintiff looked as if he was full of crack. In the presence of several people, Timmerman continued accusing Plaintiff of being a crack addict.

13.    Without charging Plaintiff or informing him of any violation that Plaintiff had allegedly committed, Timmerman refused to allow Plaintiff to exit his vehicle or to leave. After detaining Plaintiff for about15 minutes, Timmerman called the "DTOC" unit of the City's Police Department.

14.    Shortly, two uniformed officers from the Montgomery Police Department came to the area; they took from the car a one-little bottle of soft drink; they smelled the bottle and gave it back to the Plaintiff. At that time, the officers advised the Plaintiff that because Timmerman, a non-uniformed officer, had called for the unit to come to test him for drugs, it was the policy of the Police Department that they perform a sobriety test; therefore, they were required to perform a sobriety test, despite the fact they did not smell alcohol or drugs or could not see the physical presence of alcohol or drugs.

15.    Therefore, on the orders of these two police officers, the Plaintiff exited his vehicle; the officers searched him, going through his pockets; however, they found no drugs. Thereafter, they asked for a drivers' license, which the Plaintiff produced. At that point, they asked Plaintiff to do a field sobriety test; he complied and passed the test.

16.    Despite the fact that the officers saw no drugs, smelled no alcohol or drugs, found no drugs on Plaintiff; they searched the Plaintiff's vehicle; their search produced no drugs or an evidence of drugs.

17.    After the police officers had (1) examined Plaintiff, (2) viewed and smelled the soft drink (3) given him a field sobriety test, which he passed; (4) searched him (5) searched his vehicle, and (6) reviewed a drivers' license, they determined there was no reason for Plaintiff to be detained an longer.

3

18.    The Plaintiff attempted to get into his vehicle and leave. Timmerman detained him and told him that he could not drive the vehicle and ordered him to "park" it; confiscated Plaintiff's drivers' license, and told Plaintiff that if he drove the vehicle, he would arrest him for being intoxicated.

19.    Plaintiff asked the other officers if he could drive the vehicle; they told him that it was the policy of the City's Police Department that because Timmerman had made the "stop," they could not interfere with his decision; therefore, he should comply with Timmerman's order. Because he feared he would be arrested, Plaintiff left his vehicle at Kentucky Fried Chicken.

20.    Plaintiff was not, at the time of the events alleged in this complaint, or any other time, committing any offense against the ordinances of the City or against the statutes of the State of Alabama. Plaintiff had not ingested alcohol or drugs; he does not ingest alcohol or illegal drugs.

21.    The above described actions by Timmerman was malicious and without reasonable or probable cause, and was instituted by Timmerman, and maintained and ratified by the City to cover up and justify defendant Timmerman's offensive and malicious acts and conduct in illegally arresting, seizing, imprisoning, punishing, harassing, annoying, and oppressing Plaintiff Dawson. Timmerman's conduct was intentional or reckless; extreme and outrageous; and caused emotional distress and mental anguish, so severe that no reasonable person could be expected to endure it.

**Federal Claim**
Count I Illegal Seizure, Imprisonment

22.    Defendant Timmerman willfully, knowingly, and with specific intent, deprived Dawson of his rights to freedom from illegal searches and seizure of his persons and effects, and of his rights to freedom from unlawful detention and imprisonment, both of which rights are secured to the persons by the Fourth and Fourteenth Amendments to the Constitution of the United States.

23.    By reason of the defendants' acts, Plaintiff Dawson was improperly imprisoned or seized, and deprived of his freedom and liberty.

24.    Defendant Timmerman's actions injured to suffer humiliation and mental anguish.

4

25.    Defendant Timmerman acted maliciously and without probable cause, and his action

deprived plaintiff of his constitutional rights, and he retaliated against Plaintiff.

### Count II Denial of Substantive and Procedure Due Process

26.    Timmerman's action denied Plaintiff of his due process rights.

**Pendant State Claims**
Count III Conversion

27.    Defendant Timmerman converted Plaintiff's vehicle in that their actions amount to an illegal

misuse of Plaintiff's vehicle; and a wrongful detention of the vehicle or interference with  Plaintiff's

use and enjoyment of the vehicle.

### Count IV Invasion of Privacy

28.    Defendant Timmerman invaded the privacy the Plaintiff by publishing false information about

the Plaintiff which he knew or should have known would have reached the general public. He called

Plaintiff a drug addict and crack addict in the presence several persons.

### Count V Slander

29.    Defendant Timmerman's statement that Plaintiff was a drug addict and a crack addict did not

have any factual basis; he knew those facts to be false, and he published these statement to embarrass

or to annoy the Plaintiff; indeed, Plaintiff was embarrassed and cumulated by these false statements.

### Count VI
Tort of Outrage/Intentional Infliction of Emotional Distress

30.    Defendant Timmerman's conduct was intentional or reckless; extreme and outrageous; and

caused emotional distress so severe that no reasonable person could be expected to endure it.

### **Relief**

31.    The Plaintiff repeats and re-alleges paragraphs 1 through 29 as if expressly set forth here at

length, and the Plaintiff therefore requests against defendants the following;

   (A)  A declaratory judgment, holding that the actions of the defendants violated the

Plaintiff's rights:

(1) to due process;

(2) to be free from punishment without due process of law, and

(B)  Compensatory damages against each defendant on each claim;

(C)   Punitive damages against Defendant Timmerman in the amount of $500,000.00;

(D)  Cost of suit; including attorney fees;

(E)  Pendant jurisdiction to consider state claims; and compensatory against the defendants and

punitive damages against Defendant Timmerman; and

(F)  The Plaintiff requests other and further relief as the Court deems just and proper.

## JURY DEMAND

PLAINTIFF HEREBY DEMANDS TRIAL BY JURY.

Done this 27th day of November, 2006.

Terance Dawson, Pro Se
P.O. Box 6050
Montgomery, AL  36106
(334) 561-4011

6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| **TERANCE DAWSON,** )<br>    Plaintiff, )<br> )<br>v. )<br> )<br>**CITY OF MONTGOMERY,** and )<br>**GUINN TIMMERMAN,** individually, )<br>    Defendants. ) | Case No. **2:06-CV-1057-WKW** |

## AFFIDAVIT OF DETECTIVE GUINN TIMMERMAN

**STATE OF ALABAMA** )

**COUNTY OF MONTGOMERY** )

Before me, a Notary Public in and for said State and County, personally appeared Guinn Timmerman and, after first being duly sworn by me, did depose and state as follows:

My name is Guinn Timmerman and I am over nineteen (19) years of age. I am currently employed as a Detective with the Montgomery Police Department ("MPD"). I made the attached statement to MPD Internal Affairs on July 6, 2005, and certify that it is true and correct to the best of my knowledge.

On November 26, 2004, at approximately 8:00 p.m., I was returning to MPD Headquarters in my City vehicle when I observed a champagne colored Cadillac improperly turning off of Ann Street into the oncoming traffic lanes of Atlanta Highway. I then radioed MPD Dispatch for assistance with a possible Code 32 (Intoxicated Driver).

The Cadillac then turned left onto Mt. Meigs Road while traveling at an extremely slow rate of speed. As it traveled westbound on Mt. Meigs Road, the Cadillac made several erratic movements and at one time swerved halfway into the oncoming traffic lane on Mt. Meigs Road before being corrected.

At this point I had probable cause to believe the driver of this vehicle might be under the influence or intoxicated somehow based on my observations of him driving on the wrong side of the road, the erratic movements and the slow speed at which he was going. After first checking to make sure there were no oncoming cars and that it was safe, I pulled up next to the driver's side of the slow moving vehicle, identified myself as a police officer and displayed my badge to the driver and asked the driver to pull over. The driver then pulled off the road into the parking lot of Kentucky Fried Chicken.

I again radioed for a patrol unit to respond to the scene, and asked the driver to remain in his car with his hands on the steering wheel until the patrol officers arrived. Unit 203 arrived shortly thereafter. I explained to the patrol officer what had happened up to that point and they ordered the driver out of the Cadillac. The patrol officers asked to see the driver's license and showed it to me. The license identified the driver as former City of Montgomery Councilman Terance Dawson.

Several field sobriety tests were conducted, which Dawson successfully passed. The patrol officers asked Dawson for permission to search his car and Dawson agreed. The patrol officers searched Dawson's car, but no alcoholic beverages were found. Several prescription drug bottles were found in the vehicle, all of which appeared to be made out to Dawson.

Dawson stated that he was in the area to pick up his girlfriend, Angler Trawick, and that he was driving erratically because he was arguing on his cell phone with Trawick and had made a driving mistake. Dawson's vehicle had two license plates displayed. One was a handicapped tag in the license plate holder, which Dawson admitted was not his and said belonged to the original owner from whom he had just bought the vehicle. The patrol officers installed Dawson's proper license plate in the license plate holder and impounded the handicapped tag that belonged to the previous owner.

Although he passed the field sobriety tests, because there were prescription bottles in the car and based on how he was driving before the stop, we felt that something was affecting Dawson's ability to drive and that he was not capable of safely driving home. At that point, I briefly conferred with the patrol officers and they suggested to Dawson that he find another ride home, to which Dawson agreed. Dawson then apparently changed his mind and stated that he would rather walk home. The patrol officers offered Dawson a ride home, but Dawson declined. At that point, I left the scene, where Dawson was still talking to the patrol officers.

I could have given Dawson citations for reckless driving, improper tag or for driving on the wrong side of the road, but I did not. At no point was Dawson physically restrained or handcuffed. Dawson was only detained long enough to investigate whether he was capable of safely driving a car, which in my professional opinion he was not.

I have read the above and foregoing affidavit consisting in total of three (3) pages and state that it is true and correct to my present knowledge and information.

Further Affiant saith not.

_____
Detective Guinn Timmerman
Affiant

**SWORN to and SUBSCRIBED before me this the** 25th **day of October, 2007.**

_____
Notary Public
My commission expires ___10/16/09___

COPY

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4

5    TERANCE DAWSON,

6         Plaintiff,

7    Vs.                                    CIVIL ACTION NO.
                                            2:06-CV-1057-WKW
8    CITY OF MONTGOMERY, GUINN
     TIMMERMAN, Individually and in
9    His Official Capacity as an Officer,
     Agent or Employee of the City of
10   Montgomery, Alabama,

11        Defendant.

12

13              * * * * * * * * * * * * *

14

15        DEPOSITION OF TERANCE DAWSON, taken pursuant

16   to stipulation and agreement before Lisa J. Green,

17   CCR, ACCR # 334, Registered Professional Reporter and

18   Commissioner for the State of Alabama at Large, in the

19   City Council Conference Room, City Hall, 103 North

20   Perry Street, Montgomery, Alabama on Thursday, January

21   3, 2008, commencing at approximately 9:25 a.m.

22

23              * * * * * * * * * * * * *

2

1                          APPEARANCES

2

3      FOR THE PLAINTIFF:

4      Mr. Terance Dawson (Pro se)
       Post Office Box 6050
5      Montgomery, AL  36106

6

       FOR THE DEFENDANT:
7
       Ms. Allison Highley
8      Attorney at Law
       Office of the City Attorney
9      City Hall
       103 North Perry Street
10     Montgomery, Alabama

11     ALSO PRESENT:

12     Detective G. R. Timmerman

13                  * * * * * * * * * * * *

14                  EXAMINATION INDEX

15

16     TERANCE DAWSON
            BY MS. HIGHLEY                          4

17

18                  EXHIBIT INDEX

19                                                 MAR
       DEFENDANT'S EXHIBIT
20     1       Verified Claim of Terance Dawson Against    59
               the City of Montgomery, Alabama
21
       2       Press Release                               73
22

23

              HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
                            (334) 263-4455

3

1                          STIPULATION

2            It is hereby stipulated and agreed by and

3    between counsel representing the parties that the

4    deposition of TERANCE DAWSON is taken pursuant to the

5    Federal Rules of Civil Procedure and that said

6    deposition may be taken before Lisa J. Green,

7    Registered Professional Reporter and Commissioner for

8    the State of Alabama at Large, without the formality

9    of a commission, that objections to questions other

10   than objections as to the form of the question need

11   not be made at this time but may be reserved for a

12   ruling at such time as the said deposition may be

13   offered in evidence or used for any other purpose by

14   either party provided for by the Statute.

15           It is further stipulated and agreed by and

16   between counsel representing the parties in this case

17   that the filing of said deposition is hereby waived

18   and may be introduced at the trial of this case or

19   used in any other manner by either party hereto

20   provided for by the Statute regardless of the waiving

21   of the filing of the same.

22           It is further stipulated and agreed by and

23   between the parties hereto and the witness that the

4

1   signature of the witness to this deposition is hereby

2   not waived.

3

4                  * * * * * * * * * * * *

5

6                  TERANCE DAWSON

7          The witness, after having first been duly

8   sworn to speak the truth, the whole truth and nothing

9   but the truth testified as follows:

10                  EXAMINATION

11  BY MS. HIGHLEY:

12  Q.    Mr. Dawson, I'm Allison Highley, and I

13        represent the City of Montgomery.  And with me

14        is Defendant Detective Timmerman.

15            In going forward today, I'd like to make

16        sure that you know if I ever ask you a

17        question and you don't quite understand what

18        I'm asking you, if you could stop me and say I

19        don't understand your question, and I'll be

20        happy to rephrase.

21            Also, if you have to take a break for any

22        reason, as long as a question isn't pending

23        we'll go ahead and take a break.  If you need

5

1       a glass of water or you need to go to the rest

2       room or something, just let me know.

3              Mr. Dawson, do you understand that you're

4       under oath today?

5    A.  Yes, I do.

6    Q.  Can you please state your full name for the

7       record.

8    A.  Terance Duane Dawson.

9    Q.  And that's T-E-R-A-N-C-E?

10   A.  Correct.

11   Q.  Can you please state your date of birth.

12   A.  7-15-60.

13   Q.  1960?

14   A.  Yes.

15   Q.  Can you please tell me if you have any

16      relatives living in the Middle District of

17      Alabama.

18   A.  Yes.

19   Q.  Can you tell me what their names are?

20   A.  Some of them I don't even know.  Some of them

21      I don't even know their real name, full name.

22   Q.  If you could --

23   A.  I can provide you a list later.

| | | |
|---|---|---|
| 1 | Q. | Okay. Why don't you do that if you could. |
| 2 | | And then what I'll do is I'll send you a |
| 3 | | letter that lists the counties that are |
| 4 | | encompassed by the Middle District. |
| 5 | A. | Okay. |
| 6 | Q. | What is your current occupation? |
| 7 | A. | I'm a data processing specialist with the |
| 8 | | State of Alabama. |
| 9 | Q. | And what is -- what does that mean? |
| 10 | A. | I do analytical work, programming work, system |
| 11 | | design and analysis. |
| 12 | Q. | And what is your annual salary? |
| 13 | A. | Probably from the State, maybe 82, 83,000. |
| 14 | Q. | And when you say from the State, does that |
| 15 | | mean you have additional income? |
| 16 | A. | Rental property. |
| 17 | Q. | And where is that rental property located? |
| 18 | A. | In Mobile County. |
| 19 | Q. | Are those all the sources of your income? |
| 20 | A. | Yes. |
| 21 | Q. | And how much income do you generally get from |
| 22 | | that rental property? |
| 23 | A. | It depends on whether they pay their rent or |

1     not.

2  Q.   If they were to pay their rent all year, how

3     much would you get annually?

4  A.   Probably about 25.

5  Q.   And what position -- How long have you been in

6     your data processing specialist position?

7  A.   Since January of 1983.

8  Q.   Continuously?

9  A.   Uh-huh.  (Positive response.)

10  Q.   And what did you do before that?

11  A.   I worked for the Department of Defense, Gunter

12     Air Force Design Center.

13  Q.   And what did you do there?

14  A.   Basically computer work.

15  Q.   Okay.  So similar to what --

16  A.   Similar.

17  Q.   And what was your pay there?

18  A.   I was a little peon then, so ... I don't

19     know.  Talking about a thousand, 1500 a month.

20  Q.   A month?  And did you have a job before you

21     worked for the Department of Defense?

22  A.   I was in college.

23  Q.   Where did you go to college?

8

```
1    A.    Alabama State University.

2    Q.    And what years were you attending college

3          there?

4    A.    1978 to 1982.

5    Q.    And did you get a degree?

6    A.    Business administration with a concentration

7          in computer information systems.

8    Q.    Do you have any other formal training?

9    A.    I have some course work toward a master's of

10         divinity and have a lot of specialized

11         computer training.

12   Q.    Like certifications?

13   A.    Uh-huh.   (Positive response.)

14   Q.    Where did you go to high school?

15   A.    Blount High School in Mobile County.

16   Q.    And what years did you attend?

17   A.    1974 to 1978.

18   Q.    What are your parents' names?

19   A.    My father is deceased.

20   Q.    What was his name?

21   A.    Ray L. Dawson.

22   Q.    R-A-Y?

23   A.    Uh-huh.   (Positive response.)
```

```
 1    Q.    And what's your mother's name?

 2    A.    Elma Jean Jones -- Dawson Jones.

 3    Q.    So her current name is Jones?

 4    A.    Uh-huh.  (Positive response.)

 5    Q.    Does she live here in the Montgomery area?

 6    A.    Mobile County.

 7    Q.    Do you have any brothers or sisters?

 8    A.    Yes.

 9    Q.    What are their names?

10    A.    Kimberly McConnell, Mount Clemens, Michigan.

11    Q.    So the second one is your brother?

12          Were you saying that Kimberly lives in

13          Michigan?

14    A.    Right.

15    Q.    Okay.

16    A.    Kimberly McConnell, she lives in Mount

17          Clemens, Michigan.

18    Q.    And do you have any other brothers or sisters?

19    A.    Yes.  Anthony Dawson, he lives in

20          Indianapolis.  And Katrina Williams, Houston,

21          Texas.

22    Q.    So all over.

23    A.    Yes.  She's on the police force.
```

10

| | | |
|---|---|---|
| 1 | Q. | And so is it just the four of you? |
| 2 | A. | Yeah. |
| 3 | Q. | If I could turn your attention to November |
| 4 | | 27th, 2004. Can you recall -- Well, maybe we |
| 5 | | could just get started with your account of |
| 6 | | what happened on that day as it relates to |
| 7 | | this case. |
| 8 | A. | Well, I was coming down Ann Street, and I made |
| 9 | | a left-hand turn onto Mt. Meigs Road. And |
| 10 | | coming down Mt. Meigs Road, Detective |
| 11 | | Timmerman pulled up on the side of me and |
| 12 | | basically -- in an unmarked car, and I didn't |
| 13 | | know who he was, trying to get my attention. |
| 14 | | And at some point, I ended up stopping in the |
| 15 | | KFC parking lot. |
| 16 | Q. | Where were you coming from? |
| 17 | A. | Huh? |
| 18 | Q. | Where were you coming from? |
| 19 | A. | Down Ann Street. |
| 20 | Q. | But where had you left? |
| 21 | A. | I don't remember at this point. |
| 22 | Q. | Do you remember where you were going? |
| 23 | A. | Huh? |

11

| | | |
|---|---|---|
| 1 | Q. | Do you remember where you were going? |
| 2 | A. | At that point, I was going to either KFC or |
| 3 | | McDonald's. |
| 4 | Q. | What time of day was that? |
| 5 | A. | It was night. |
| 6 | Q. | Can you guess what time of day that might have |
| 7 | | been? |
| 8 | A. | I would say between 6:00 and 9:00 p.m. or 7:00 |
| 9 | | and 9:00 p.m. |
| 10 | Q. | Was it dark? |
| 11 | A. | Oh, yes. |
| 12 | Q. | Were your windows up? |
| 13 | A. | Huh? |
| 14 | Q. | Were your windows open? |
| 15 | A. | I don't recall. |
| 16 | Q. | You're saying it was between 6:00 and |
| 17 | | 9:00 p.m.? |
| 18 | A. | I think they close -- I think McDonald's |
| 19 | | closes around 10:00 or 11:00.  I think KFC may |
| 20 | | close around 10:00 ... 10:00, 10:30. |
| 21 | Q. | So it was right before Kentucky Fried Chicken |
| 22 | | was about to close? |
| 23 | A. | Or McDonald's one. |

12

| | | |
|---|---|---|
| 1 | Q. | Had you eaten anything else that day? |
| 2 | A. | I'm sure I probably ate at lunchtime. |
| 3 | Q. | What time do you think you might have had |
| 4 | | lunch? |
| 5 | A. | Probably anywhere, as a standard, between |
| 6 | | 12:00 and 1:30. |
| 7 | Q. | But you don't recall what time you ate on that |
| 8 | | day? |
| 9 | A. | Oh, no, not exactly. |
| 10 | Q. | What time do you think you might have woken up |
| 11 | | that day? |
| 12 | A. | Well, I have to be at work at 8:15, so I'm |
| 13 | | sure I was -- awoke somewhere between 6:00, |
| 14 | | 6:30. |
| 15 | Q. | And when you say you had to be at work, it was |
| 16 | | at the State that you're talking about? |
| 17 | A. | Uh-huh.  (Positive response.)  The State was |
| 18 | | where I worked at.  If I recall ... |
| 19 | Q. | So you went to work that day? |
| 20 | A. | I don't -- What day of the week was the 27th? |
| 21 | Q. | I don't know. |
| 22 | A. | If it was a workday ... |
| 23 | Q. | But you recall you probably went to work that |

1            day?

2    A.    If it was a workday, that would be a normal,

3            standard time for me to be up.

4    Q.    Let's say it was a workday and it was between

5            6:00 and 9:00 p.m.  Where did you go after

6            work?

7    A.    After work?  It depends on what day of the

8            week it was.

9    Q.    Okay.  Do you recall where you were right

10           before you decided to go eat?

11    A.    I don't know if I left with the intentions of

12           eating.  I think in the midst of my traveling,

13           I ended up going in that direction.

14    Q.    And do you recall any of the places you were

15           before you turned off of Ann Street that day?

16    A.    Not at this point, I don't.

17    Q.    And when you turned off of Ann Street, were

18           you the driver of the vehicle?

19    A.    I was.

20    Q.    And was anyone else with you?

21    A.    No.

22    Q.    And what kind of vehicle was it?

23    A.    It was a Cadillac Sedan DeVille.

14

1   Q.   What color was it?

2   A.   Brown, brownish-gold looking color,

3         brownish-tan, brownish-tan.

4   Q.   What year was it?

5   A.   I don't remember.  It was a late model.

6   Q.   Okay.  How long had you had that car?

7   A.   Probably less than a year.

8   Q.   And who did you buy it from?

9   A.   I bought it from someone out in Spring Valley.

10  Q.   What was the license plate number?

11  A.   I don't remember that.

12  Q.   Was it registered here in Montgomery County?

13  A.   Yes.

14  Q.   Going back to driving the car.  You were

15        alone.  Do you recall about how fast you were

16        going down Ann Street?

17  A.   Whatever the traffic is.

18  Q.   I mean, how fast do you think you were going?

19  A.   30, 35.

20  Q.   And then when you turned, did you slow down?

21  A.   I can't -- I can't say, turning left on Ann

22        Street -- off of Ann onto Madison Avenue.

23  Q.   Can you explain exactly how the turn

1        occurred?  Is there a light there?

2   A.   There was a turn signal.

3   Q.   What lane were you in on Ann Street

4        approaching the intersection?

5   A.   On the turning lane, and then I turned to the

6        inside lane on Madison Avenue.

7   Q.   By that, what do you mean?

8   A.   As you take a left from Ann onto Madison, the

9        inside lane basically flows into Mt. Meigs

10       Road.

11  Q.   I'm sorry.  I still don't understand.  So you

12       were turning left?

13  A.   Uh-huh.  (Positive response.)

14  Q.   And you --

15  A.   Into the left lane.

16  Q.   Into as you're looking down Mt. Meigs the lane

17       that's on the left?

18  A.   It's a divider --

19  Q.   Okay.

20  A.   -- at Mt. Meigs Road.  So you take a left on

21       the right side of the divider of the road in

22       the left-hand lane that flows into Mt. Meigs

23       Road.

16

1   Q.   Which side of the divider were you on?

2   A.   On the right side.

3   Q.   But you were on the left lane of those lanes?

4   A.   Correct.

5   Q.   Okay.  And then from there -- Is Kentucky

6        Fried Chicken out on Mt. Meigs?

7   A.   Right.  The front of it is on Mt. Meigs -- I

8        mean the back is on Mt. Meigs.  The front is

9        on Madison, as well as McDonald's.

10  Q.   Did you have your lights on?

11  A.   Sure.

12  Q.   Are you sure?

13  A.   Uh-huh.  (Positive response.)

14  Q.   And as you turned left -- When along this --

15       from Ann Street to Mt. Meigs to the Kentucky

16       Fried Chicken did you come in contact with

17       Detective Timmerman?

18  A.   Probably midway in the not-so-well-lit area at

19       that point.

20  Q.   What do you mean by that?

21  A.   As you approach -- leaving the corner, I don't

22       know if that's Panama, whatever street that is

23       at the fork of Mt. Meigs and Madison coming

1    off Ann, it's kind of lit there.  But then

2    when you start driving down Mt. Meigs before

3    you get to the fast food places, then there's

4    a lot of light around the drive-up -- drive-up

5    at that point, so it's a lot more lit at that

6    point.  So in between those two stops, you

7    know, might be a little area that's not so

8    well lit.

9    Q.   What brought your attention to Detective

10        Timmerman?

11   A.   Well, he pulled on the side of me.

12   Q.   Which side of you?

13   A.   He was on -- He would be on my left side.

14   Q.   How did he do that?  Was he driving on the

15        median?

16   A.   I can't remember what he was driving on.  I

17        just know he was on my left side.

18   Q.   So was his car facing the same direction as

19        your car?

20   A.   It was.

21   Q.   So how did he speak to you?

22   A.   He was very -- screaming, you know, to pull

23        over.

18

| | | |
|---|---|---|
| 1 | Q. | I'm sorry.  Let me rephrase.  Did he have -- |
| 2 | | Was he speaking to you through his passenger |
| 3 | | window? |
| 4 | A. | He was. |
| 5 | Q. | And this was on Mt. Meigs Road? |
| 6 | A. | Correct. |
| 7 | Q. | And he was on your left? |
| 8 | A. | Yes. |
| 9 | Q. | And his car was facing the same direction as |
| 10 | | yours? |
| 11 | A. | Correct. |
| 12 | Q. | And what did his car look like? |
| 13 | A. | I don't remember.  It was an unmarked car. |
| 14 | Q. | Can you describe it? |
| 15 | A. | I don't remember the color now. |
| 16 | Q. | Can you describe anything about it? |
| 17 | A. | May have been a Chevrolet, a Caprice. |
| 18 | Q. | And you say you don't know what color it was? |
| 19 | A. | I don't remember the color. |
| 20 | Q. | Was Officer Timmerman's window open? |
| 21 | A. | It was at that point. |
| 22 | Q. | Was your window open? |
| 23 | A. | At that point, I -- initially, it wasn't.  I |

19

```
 1              think I let it down because I didn't know who
 2              he was.
 3     Q.       But how did he get your attention initially?
 4     A.       Because he was -- he was pulling over on the
 5              side of me, and he had something he was
 6              holding up, you know.  And finally I slowed
 7              down to see who he was, and after I slowed
 8              down, he starts screaming that he was a police
 9              officer and that -- there again, at that
10              point, you know, I didn't stop immediately.  I
11              pulled into the KFC parking lot because he was
12              in an unmarked car.
13     Q.       About how far did you drive before you pulled
14              into the KFC?
15     A.       Well, like I say, I think we were midway
16              between the KFC parking lot and the entry into
17              Mt. Meigs Road, so whatever that distance is,
18              it was midway.
19     Q.       Can you guess, maybe, how long that distance
20              would be?
21     A.       Probably ...
22     Q.       Was it longer than a football field?
23     A.       Oh, sure, it was way less than that, no more
```

20

1        than a couple hundred --

2   Q.   So when you --

3   A.   Not more than -- not more than 500 for sure.

4   Q.   So you're saying that Officer Timmerman where

5        he was positioned was approximately, would you

6        say, ten feet from you, where you were

7        positioned?

8            I mean, if your cars were facing the same

9        direction and he was to your left and he was

10       talking to you through his passenger side

11       window and into your driver's side window --

12  A.   I would say between -- I would say three to

13       ten.  I would say between three --

14  Q.   His head was three feet from your head?

15  A.   I'm talking about his car.

16  Q.   How far was his face from your ear?  I mean,

17       if you're saying that his car was three feet

18       from your car and his car is five feet wide --

19  A.   Just say within one and a half car lengths

20       width-wise.

21  Q.   And how fast were you going on Mt. Meigs

22       before Officer Timmerman got your attention?

23  A.   I would say between 30, 35.

21

| | | |
|---|---|---|
| 1 | Q. | Were you wearing a seat belt? |
| 2 | A. | More than likely, I was. |
| 3 | Q. | Do you sometimes drive without a seat belt? |
| 4 | A. | I can't say in the last 30 something years of |
| 5 | | driving that I haven't forgot to put it on at |
| 6 | | one time or another. |
| 7 | Q. | You're saying sometimes you didn't wear a seat |
| 8 | | belt? |
| 9 | A. | I didn't say that.  You asked me whether or |
| 10 | | not I had it on that night. |
| 11 | Q. | Are you saying you've never driven without a |
| 12 | | seat belt? |
| 13 | A. | I didn't say ever. |
| 14 | Q. | You're saying sometimes you drive without a |
| 15 | | seat belt? |
| 16 | A. | I think that particular night I was wearing my |
| 17 | | seat belt. |
| 18 | Q. | That's not my question now.  My question is |
| 19 | | whether or not you're telling me today you |
| 20 | | never drive without a seat belt. |
| 21 | A. | It depends.  If the car is stationary, there's |
| 22 | | no reason to have a seat belt on. |
| 23 | Q. | On November 27th, 2004, what prescriptions |

22

1           were you on?

2    A.    On that night?

3    Q.    Just in that time frame.

4    A.    I can't particularly recall on that particular

5           night.

6    Q.    Well, in 2004, what prescriptions were you on?

7    A.    You'd have to look at the records.

8    Q.    So do you take all of your prescriptions as

9           prescribed?

10   A.    Yes.

11   Q.    So if a doctor prescribed you Xanax three

12          times a day, then you take it three times a

13          day?

14   A.    I've never been fortunate enough to get Xanax,

15          so --

16   Q.    I'm just saying hypothetically.

17   A.    Whatever the prescription is and the

18          recommended usage is I take it, with the

19          exception if I have a cold and they recommend

20          I take a tablet three times a day for seven

21          consecutive days, if I feel better after the

22          third day, then there could be a substantial

23          possibility that I may not finish that

23

| | | |
|---|---|---|
| 1 | | particular prescription. |
| 2 | Q. | So if you have a cold -- |
| 3 | A. | Right. |
| 4 | Q. | So you cannot recall any prescriptions you |
| 5 | | were on in November of 2004? |
| 6 | A. | You requested the medical records.  You can |
| 7 | | look through the records and see. |
| 8 | Q. | But you don't recall being on any |
| 9 | | prescriptions? |
| 10 | A. | I mean, you have the record. |
| 11 | Q. | I'm just asking you if you recall. |
| 12 | A. | You have the record. |
| 13 | Q. | You're not answering my question. |
| 14 | A. | You requested the records.  You have them in |
| 15 | | your possession. |
| 16 | Q. | Do you recall if you were on any |
| 17 | | prescriptions -- |
| 18 | A. | I would say refer to the medical records that |
| 19 | | you requested. |
| 20 | Q. | I'm asking if you remember. |
| 21 | A. | I could not tell you on the specific date of |
| 22 | | November -- |
| 23 | Q. | So you don't recall? |

24

1    A.    Check the medical records.

2    Q.    And that's fine if you don't recall.  I'm just

3          asking if you recall whether you were on any

4          prescriptions in November of 2004.

5    A.    Only thing I could say on that particular day,

6          check the medical records.  You requested it,

7          and you have it in your possession.

8    Q.    Where do you fill prescriptions?

9    A.    Adams Drugs during that time period.  During

10         that time period, mainly Adams Drugs and --

11   Q.    What's the address for Adams Drugs?

12   A.    It's on Mt. Meigs Road.

13   Q.    Do you know their phone number?

14   A.    No.

15   Q.    Then who else do you use?

16   A.    Hunt's Pharmacy.

17   Q.    Where are they?

18   A.    In Mobile, Alabama.

19   Q.    Is there anywhere else that you fill

20         prescriptions?

21   A.    During that time period, that was primarily

22         the main sources.  May have been CV -- Rite

23         Aid in Mobile on Dauphin Street.

| | | |
|---|---|---|
| 1 | Q. | On Dauphin Street.  Do you know on what street |
| 2 | | the Hunt's Pharmacy is in Mobile? |
| 3 | A. | St. Stephens Road. |
| 4 | Q. | Is that S-T-E-P-H-E-N-S? |
| 5 | A. | Correct. |
| 6 | Q. | In the last five years, have you used any |
| 7 | | other pharmacies? |
| 8 | A. | Those would be primarily the main ones that |
| 9 | | I've used. |
| 10 | Q. | Can you recall ever going to another pharmacy? |
| 11 | A. | If I did, it was a CVS on the corner of |
| 12 | | Fairview and Rosa Parks. |
| 13 | Q. | And that would be it? |
| 14 | A. | Uh-huh.  (Positive response.) |
| 15 | Q. | Did you ever get any prescriptions filled at a |
| 16 | | doctor or a hospital? |
| 17 | A. | No. |
| 18 | Q. | You always took them to a pharmacy? |
| 19 | A. | Correct. |
| 20 | Q. | Have you ever taken any illegal drugs? |
| 21 | A. | No. |
| 22 | Q. | Have you ever done crack? |
| 23 | A. | No. |

| | | |
|---|---|---|
| 1 | Q. | Have you ever done heroin? |
| 2 | A. | No. |
| 3 | Q. | Have you ever done marijuana? |
| 4 | A. | No. |
| 5 | Q. | Have you ever tried any mild-altering |
| 6 | | substance? |
| 7 | A. | No. |
| 8 | Q. | When you were driving on Ann Street and then |
| 9 | | into Mt. Meigs, do you recall being distracted |
| 10 | | by anything? |
| 11 | A. | Yes. |
| 12 | Q. | What were you distracted by? |
| 13 | A. | Detective Timmerman. |
| 14 | Q. | Other than Detective Timmerman. |
| 15 | A. | No. |
| 16 | Q. | Were you on the phone? |
| 17 | A. | That could have been a possibility. |
| 18 | Q. | So other than Detective Timmerman, you might |
| 19 | | have been on the phone? |
| 20 | A. | Could have. |
| 21 | Q. | Could have or you were? |
| 22 | A. | I could have.  I have a very high phone usage. |
| 23 | Q. | But you don't recall any particular -- being |

27

1      on the phone at that time?

2    A.   No.

3    Q.   Were you on the phone with your girlfriend?

4    A.   Unfortunately, I don't have one.

5    Q.   At the time.  You didn't have a girlfriend at

6         the time?

7    A.   No.

8    Q.   You weren't fighting with your girlfriend on

9         the phone while you were driving?

10   A.   No.

11   Q.   Have you ever been arrested?

12   A.   Yes.

13   Q.   For what?

14   A.   Domestic violence.

15   Q.   Against who?

16   A.   Angler Trawick.

17   Q.   Who's that?

18   A.   She's an ex-female associate of mine.

19   Q.   What do you mean an ex-female associate?

20   A.   I think because it was a DV case and -- at

21        that point, we had had a dating relationship.

22   Q.   So she's your ex-girlfriend?

23   A.   I would say an associate.  The laws of Alabama

28

1          defines what a relationship is.

2    Q.   So she was a girl you had dated?

3    A.   Yes.

4    Q.   Have you ever been arrested for anything else?

5    A.   No.

6    Q.   What was the disposition of that domestic

7          violence case?

8    A.   Dismissed, nol-processed, pistol permit

9          reinstated.

10   Q.   Do you have any firearms?

11   A.   Yes.

12   Q.   Will you tell me about them.

13   A.   12-gauge.

14   Q.   One?  Just one of them?

15   A.   Yes.  Pump.

16   Q.   Is it registered in your name?

17   A.   Shotguns are not registered.

18   Q.   Do you have any other firearms?

19   A.   No.  I had one.  My ex-wife took it.

20   Q.   What's your ex-wife's name?

21   A.   Attorney Darlett Lucy.

22   Q.   Could you spell that for me?

23   A.   D-A-R-L-E-T-T.

29

```
 1   Q.   D-A-R-L-E-T-T.  What's the last name?

 2   A.   Lucy.

 3   Q.   L --

 4   A.   L-U-C-Y.  I Love Lucy.

 5   Q.   And when did you get divorced?

 6   A.   I think it was April 2000 -- April 2004 my

 7        decree was finalized.

 8   Q.   Did you file or did she file?

 9   A.   She filed.

10   Q.   And when did she file for divorce?

11   A.   I don't know.  We did a settlement agreement.

12   Q.   Does she live here in the Montgomery area?

13   A.   No.

14   Q.   Where does she live?

15   A.   Mobile County.

16   Q.   Did she move there after the divorce?

17   A.   No.

18   Q.   Did she live there during the marriage?

19   A.   Correct.

20   Q.   How long have you lived in Montgomery?

21   A.   Where do you want me to start?  Practically

22        pretty much --

23   Q.   Your wife lived in Mobile and you lived here.
```

1         Is that what you're saying?

2    A.   I at some time maintained a dual residence.

3    Q.   Can you explain that a little bit.

4    A.   I was born in Montgomery, and my dad went to

5         Mobile as a minister.  My mom came back to

6         Montgomery and went to Alabama State.  We came

7         back to Montgomery.  My mom went back to

8         Mobile.  I came back to Montgomery to go to

9         Alabama State.

10            After college, I went back to Mobile.

11        Then I came back to Montgomery and have pretty

12        much been here working since 1983.

13   Q.   So all of that back and forth happened before

14        you started working for the State in 1983?

15   A.   Oh, sure.

16   Q.   When did you get married?

17   A.   November 1995.

18   Q.   So between 1995 and 2004, were there times

19        where you and your wife lived in different

20        places?

21   A.   We never lived together.  We always maintained

22        dual -- separate residences.

23   Q.   Do you recall what Detective Timmerman was

31

1           wearing when you first saw him?

2     A.    I won't say what color of pants and I won't

3           say what color of jacket, and I'm not going to

4           say whether the shoe was a boot or not.

5     Q.    Can you generally describe it, though?

6           Light?  Dark?  Baggy type?

7     A.    No, I think more of a pair of, you know, knit

8           slacks and a jacket, you know, regular jacket.

9     Q.    Was it chilly?

10    A.    I don't --

11    Q.    What was the weather like?

12    A.    I can't recall it being chilly.

13    Q.    What were you wearing?

14    A.    I couldn't tell you specifically today.

15    Q.    So once you pulled into the parking lot, tell

16          me what happened.

17    A.    Well, we pulled into the parking lot, and

18          Detective Timmerman came over to my vehicle.

19    Q.    On foot?

20    A.    Yes, he was on foot.

21    Q.    Where was his car?

22    A.    Maybe parallel the entrance drive-up --

23          parallel to the drive-up of McDonald's and the

32

| | | |
|---|---|---|
| 1 | | KFC parking lot, and I pulled into the -- in a |
| 2 | | little parking area in the KFC lot. |
| 3 | Q. | Did you pull in a spot? |
| 4 | A. | Huh? |
| 5 | Q. | Did you pull into a parking spot? |
| 6 | A. | Yes, I did. |
| 7 | Q. | Forward into a parking spot? |
| 8 | A. | Yes. |
| 9 | Q. | And then did you -- Was your car on or was it |
| 10 | | off at that point? |
| 11 | A. | I don't recall whether it was on or off at |
| 12 | | that point. |
| 13 | Q. | Did you put it into park? |
| 14 | A. | Oh, sure. |
| 15 | Q. | And you're saying that Officer Timmerman |
| 16 | | pulled into a different spot? |
| 17 | A. | Yes, he did. He didn't pull behind me or next |
| 18 | | to me. He pulled a little bit farther back |
| 19 | | and over, paralleling the people that were |
| 20 | | driving up in the McDonald's parking lot. |
| 21 | Q. | And so after -- |
| 22 | A. | But he was in the KFC lot. |
| 23 | Q. | And then after he walked up, what happened? |

33

| | | |
|---|---|---|
| 1 | A. | Basically, he walked up and he made some |
| 2 | | assertions whether or not I had been drinking, |
| 3 | | whether or not I was high, whether or not I |
| 4 | | was intoxicated. |
| 5 | Q. | Were you drinking? |
| 6 | A. | No. |
| 7 | Q. | Were you high? |
| 8 | A. | No. |
| 9 | Q. | Were you intoxicated? |
| 10 | A. | No. |
| 11 | Q. | Were you taking any prescription medicines? |
| 12 | A. | No, I was drinking.  I apologize.  I was |
| 13 | | drinking. |
| 14 | Q. | What were you drinking? |
| 15 | A. | Coca-Cola. |
| 16 | Q. | So how did this all happen?  He walked up to |
| 17 | | you.  He walked up to your car.  Where are you |
| 18 | | at this time? |
| 19 | A. | I was still sitting in my car, and he walked |
| 20 | | up and I opened my door.  And when I opened my |
| 21 | | door to my vehicle, you know, he told me to |
| 22 | | step back in the -- to step back in the car, |
| 23 | | to not move my hand -- put my hands on the |

34

1      steering wheel and to not remove my hand off

2      the steering wheel.

3           My telephone rung, and I went to answer

4      my phone and he told me to not answer my phone

5      and that if I took my hands off of the

6      steering wheel that he would arrest me.

7  Q.   Why do you think he made those assertions that

8      you said he made?

9  A.   I would say that Detective Timmerman made

10     those assertions --

11 Q.   In your opinion.

12 A.   -- in my opinion as an officer to keep my

13     hands on the steering wheel to maintain his

14     safety inasmuch as he stopped me in a traffic

15     stop and didn't, you know, know me, so ...

16 Q.   Was Officer Timmerman the only officer at the

17     scene?

18 A.   At that point -- He was at that point.

19 Q.   Did that change at some point?

20 A.   Yes.  I did ask him if I could go to the rest

21     room because I do have an overactive bladder.

22 Q.   Is that a diagnosed medical condition?

23 A.   I've actually gone to Dr. Shashy, Peter Shashy

35

1          about it.

2    Q.    What is the diagnosis?

3    A.    I have an overactive bladder sometimes.

4    Q.    What does that mean?

5    A.    Sometimes I've got to go, I've got to go use

6          the rest room, urinate.

7    Q.    Okay.

8    A.    I guess that's just a man thing.

9    Q.    And how long have you had that problem?

10   A.    I've had it off and on for a few years.

11   Q.    Are there things that exacerbate that problem?

12   A.    Yeah.  I drink a lot of liquids.

13   Q.    Does caffeine aggravate that problem?

14   A.    Well, I can't say that it does.  He just told

15         me that the drinking of an abundance of

16         liquid -- I am a very avid drinker of tea and

17         Coke.

18   Q.    Does drinking alcohol aggravate that problem?

19   A.    I don't drink.

20   Q.    So you were saying that there were other

21         officers or not?

22   A.    After he detained me in my car and refused to

23         let me go to the rest room after my many

36

1       requests to go, he called for a detox unit.

2   Q.  What is that?

3   A.  I guess he wanted to be in a position to give

4       you a ...

5   Q.  What's your understanding of what that means?

6   A.  A person who would actually come out and do a

7       field sobriety test and a breathalyzer to

8       determine whether or not you were intoxicated.

9   Q.  And --

10  A.  Well, let me say intoxicated and/or under the

11      influence of something.

12  Q.  So why do you make that distinction?

13  A.  Because I think, you know, under the influence

14      would cover drugs, alcohol, or any other type

15      of things that you previously mentioned.

16  Q.  So you're saying it's not always just

17      alcohol?  It's for other things that they test

18      for?

19  A.  Oh, yeah, if you're under the influence -- you

20      could be under the influence of anything.

21  Q.  Like what?

22  A.  I think you just mentioned different types of

23      controlled substances, alcohol and drugs or

37

1        whatever, so ...

2   Q.   Why would they test that?

3   A.   He can call for a test because he's -- I mean,

4        he's a sworn officer.  If he felt during the

5        stop that, you know, that's something that he

6        wanted to do, I had no control over that.

7   Q.   If he felt during the stop what?  I'm sorry.

8   A.   I mean, that was his stop, so he, you know,

9        basically was the controlling officer at the

10       scene.  But I will note that prior to the

11       sobriety test, after the two officers came on

12       the scene --

13   Q.   So you're saying two officers did arrive?

14   A.   Two officers did arrive on the scene.  There

15       was one black officer and one white officer.

16   Q.   Do you know their names?

17   A.   I don't know the black officer's name, but I

18       think he's kin -- he's either the son or the

19       grandson of a friend of mine's.

20   Q.   What's your friend's name?

21   A.   Andrea Bolding.

22   Q.   Can you spell that?

23   A.   I think it's A-N-D-R-E-A, B-O, I think,

38

1              L-D-I-N-G I think is how you spell it.

2     Q.    I-N-G?

3     A.    Yes.

4     Q.    So you think that the black officer who

5            arrived at the scene might be related to your

6            friend, Andrea Bolding?

7     A.    Andrea Bolding, yeah.  He's either his son or

8            his grandson or somewhere that close.

9     Q.    What makes you think that?

10    A.    Because I think I've seen him before.

11    Q.    And you don't know the white officer --

12    A.    I think I remember seeing him somewhere down

13           the line.  I mean, having been on the city

14           council, I met quite a few police officers.

15    Q.    Then about how long was it before they arrived

16           on the scene?

17    A.    I can't give you an exact estimate of minutes,

18           but it was some time period that passed.

19    Q.    Would you say five minutes?

20    A.    Five, ten, 15 minutes passed, and during that

21           time period --

22    Q.    When they arrived, did they administer a

23           sobriety test?

1   A.   No.  When they arrived, they talked with

2        Detective Timmerman first.  And after they

3        talked to Detective Timmerman, the black

4        officer came over to the car and he -- I guess

5        with Detective Timmerman indicating that I was

6        drunk, under the influence of something, he

7        indicated --

8   Q.   How did you know that?

9   A.   Huh.

10   Q.   How did you know?  Did you say the black

11        officer told you that?  Where did you get that

12        information?

13   A.   He came over to -- Well, he indicated to

14        Detective Timmerman that he did not smell

15        alcohol.

16   Q.   Who did?  I'm sorry.  You're saying he, and

17        they're all men, so ...

18   A.   The black officer, you know, he indicated to

19        Detective Timmerman and to his fellow officer

20        that he did not smell any alcohol on me.

21   Q.   Did you hear that?

22   A.   Oh, yes, I heard that, yeah, and he also took

23        my Coke bottle.

40

```
 1   Q.   So before he told them that, he came and --
 2        did he speak to you?  How did he know that
 3        there was no alcohol?
 4   A.   He came over to my car.  He got the Coca-Cola
 5        bottle.
 6   Q.   Did he ask you to hand it to him?
 7   A.   I think he grabbed it.  He may have grabbed
 8        it.
 9   Q.   Where was the Coke bottle in your car?
10   A.   Right there in my little console.
11   Q.   Okay.
12   A.   Right there by me.  And he indicated that he
13        did not smell alcohol on me, and he took the
14        Coca-Cola bottle and just, you know, kind of
15        stroked it across his nose, you know, to
16        make --
17   Q.   Did he touch it to his nose?  Is that what
18        you're saying?
19   A.   He smelled it.
20   Q.   Okay.  He smelled it?
21   A.   Right, and he indicated that there was nothing
22        in the bottle but Coke.
23   Q.   And then what happened?
```

41

1  A.  After then, I went back -- they had me -- I

2      got out of the car.  I got out of the car.

3      They asked me for my driver's license.  I gave

4      them my driver's license.  They basically

5      carried me to the back of the vehicle.

6  Q.  What does that mean?  I'm sorry.

7  A.  They had me to walk to the back of my vehicle,

8      and I think I -- they had me to put my hands

9      on the trunk of my vehicle.

10 Q.  You laid your hands flat on the trunk of your

11     own vehicle?

12 A.  Right, and then they searched my person.

13 Q.  How did they do that?

14 A.  They just actually put their hands in my

15     pockets, actually, you know, patted my legs

16     down, I guess, to see if I had any weapons on

17     me.

18 Q.  So they patted you down?

19 A.  Right, and then they took everything out of my

20     pockets.

21 Q.  What was in your pockets?

22 A.  Probably keys or money, cash.

23 Q.  Do you remember what was in your pockets?  You

42

| | | |
|---|---|---|
| 1 | | said probably. |
| 2 | A. | I can't tell you specifically. |
| 3 | Q. | What happened to the stuff they took out of |
| 4 | | your pockets? |
| 5 | A. | They just gave it back to me.  I think at that |
| 6 | | point they had made some drug allegations. |
| 7 | Q. | I'm sorry.  Who? |
| 8 | A. | Detective Timmerman. |
| 9 | Q. | And then what happened? |
| 10 | A. | And then at that point after they searched me, |
| 11 | | then they had me to stand up straight.  And |
| 12 | | then that's when they had me to do a field |
| 13 | | sobriety test. |
| 14 | Q. | What did they ask you to do? |
| 15 | A. | They asked me to count backwards on my fingers |
| 16 | | and count -- and they also asked me to hold my |
| 17 | | right foot up about six inches and they wanted |
| 18 | | me to count and hold my feet up, you know, at |
| 19 | | the same time. |
| 20 | Q. | Okay.  And how did you do? |
| 21 | A. | Fine. |
| 22 | Q. | Did they ask you to do anything else? |
| 23 | A. | No, they didn't.  After the drug allegations, |

1    the white officer went and searched my vehicle

2    to look for drugs after Detective Timmerman's

3    allegations.

4  Q.  Did you say anything to them about that?

5  A.  I encouraged it.

6  Q.  Okay.

7  A.  They asked to search the vehicle.  I gave them

8    full permission.  As a matter of fact, I said,

9    check the hood, trunk, tires, rims, the

10   vehicle.

11  Q.  What about with the pat-down search?  Did they

12    ask you if that would be okay?

13  A.  Yeah.

14  Q.  And you said?

15  A.  I did not object to anything.

16  Q.  Did they ask if they could smell your Coke?

17    Did the black officer ask if he could smell

18    your beverage?

19  A.  I don't necessarily say at this point that he

20    asked me to smell it.  I guess he wanted to

21    make sure of what I was drinking since

22    Detective Timmerman had made the allegations

23    of my being drunk or on drugs.

44

1    Q.    So there was a little meeting with Officer

2          Timmerman and the two officers that showed up?

3    A.    Correct.

4    Q.    What kind of car were they driving?

5    A.    They were in a patrol car.  They were in a

6          black and white.

7    Q.    They parked and met with Officer Timmerman.

8          At that point, the black officer came over to

9          your car?

10   A.    Correct.

11   Q.    And he smelled your Coke?

12   A.    Correct.

13   Q.    And then there was a pat-down search?

14   A.    Correct.

15   Q.    And then you had said it would be fine, go

16         ahead.

17   A.    Yeah.

18   Q.    They asked if they could please search your

19         vehicle, and you said go ahead?

20   A.    Yeah.

21   Q.    Okay.

22   A.    Also, let me make sure that I note at this

23         point that the officer even made reference --

| | | |
|---|---|---|
| 1 | | noted to Detective Timmerman that -- |
| 2 | Q. | I'm sorry.  Which officer? |
| 3 | A. | The black officer noted that, you know, |
| 4 | | basically he should have been able to look at |
| 5 | | me and tell I wasn't drunk or high. |
| 6 | Q. | So you're saying the black officer told |
| 7 | | Officer Timmerman what? |
| 8 | A. | That he should have been able to tell. |
| 9 | Q. | And you know this because you -- how do you |
| 10 | | know -- |
| 11 | A. | I was there.  I was outside. |
| 12 | Q. | So you heard it? |
| 13 | A. | Yeah.  He could tell that I hadn't been |
| 14 | | drinking and I wasn't -- |
| 15 | Q. | You said you hadn't been drinking? |
| 16 | A. | Yeah, that I wasn't drinking. |
| 17 | Q. | Was there anything on your seats of your car? |
| 18 | A. | Not that I recall. |
| 19 | Q. | You don't recall anything on the seats of your |
| 20 | | car? |
| 21 | A. | No. |
| 22 | Q. | Do you recall anything on the seats of your |
| 23 | | floor -- I mean on the floor of your car? |

1    A.   I mean, not that I recall.

2    Q.   Do you recall anything unusual about the

3         license plate that was on your car?

4    A.   Well, the -- the license plate on the vehicle

5         after I bought it was still on the vehicle.

6         They had not expired.  And I had gone and

7         bought a new license plate, and at that point

8         it had not been swapped out and ...

9    Q.   So when you say the license plate on your

10        vehicle, do you mean -- where was it on your

11        vehicle?

12    A.   It was still on the back of the vehicle.

13    Q.   Where a license plate goes?

14    A.   Right.

15    Q.   And was there any other license plate that was

16        visible?

17    A.   Mine may have been in the back, in the back

18        left-hand corner of the car.

19    Q.   So you're saying that the vehicle license

20        plate that was displayed where license plates

21        go had not expired?

22    A.   No.  And the one that I had purchased was in

23        the left window of the vehicle.

47

1   Q.   And when did you purchase your new license

2        plate?

3   A.   I can't remember, you know.  Go to the probate

4        office and check that date.

5   Q.   Was there anything about your license plate

6        that was on the car -- anything unusual about

7        that license plate?

8   A.   Not mine, no.

9   Q.   No, the one that was displayed on your car.

10  A.   Not mine, no.

11  Q.   Well, the one that was -- the license plate

12       that was in the license plate holder on your

13       car, was that a handicapped license plate?

14  A.   It was.

15  Q.   Are you handicapped?

16  A.   No.

17  Q.   And why were you -- why were you still

18       displaying a handicapped license plate on the

19       car?

20  A.   I just basically had put the valid tag under

21       my name in the left-hand window, which is

22       permissible.

23                (Brief interruption.)

```
1   Q.   Was anything seized from you --

2   A.   No.

3   Q.   -- during this --

4   A.   Absolutely not.

5   Q.   Nothing at all?

6   A.   No.  No tickets, no violations.

7   Q.   So nothing was taken away?

8   A.   No.

9   Q.   Then what happened afterward?

10  A.   Afterwards, after the officer determined that

11       I wasn't under any influence of anything, that

12       I wasn't drunk --

13  Q.   Again, the black officer?

14  A.   Both officers.

15  Q.   I'm sorry.  It's difficult because --

16  A.   Okay.  I understand.  For the record, let me

17       state this.  Detective Timmerman made his

18       assertions and basically let the two patrol

19       officers who came to the scene basically take

20       the responsibility of seeing whether or not I

21       was intoxicated, doing the field sobriety

22       test, the checking of the vehicle for drugs,

23       you know, seeing if I was -- you know, had
```

49

```
 1            alcohol on me.  Detective Timmerman did

 2            nothing basically after the two patrol

 3            officers in uniform came on the scene.

 4     Q.     So you're saying that after the initial stop,

 5            everything that happened afterward was the --

 6            by the other two officers, the uniformed

 7            officers?

 8     A.     Correct.

 9     Q.     So they did the field sobriety test?

10     A.     Yes.

11     Q.     And then nothing was seized?

12     A.     No.

13     Q.     And then what happened?

14     A.     So basically after they concluded that I

15            wasn't intoxicated, drunk, high, or any of

16            that, they basically told me I can go.  So

17            when I got ready to start my vehicle up to

18            back out, Detective Timmerman made me stop.

19     Q.     When did you get back into your vehicle?

20            Because you were outside of your vehicle,

21            right?

22     A.     Correct.

23     Q.     Then what happened?  How did you get inside?
```

50

1       When did you get inside?

2  A.   Well, I really wasn't more than probably five,

3       ten feet at any point anyway away from my

4       vehicle.  So once they determined that I

5       wasn't high, drunk, or under the influence of

6       anything, they basically said I can go.

7          And I proceeded to get back into my

8       vehicle, and I started my vehicle up and put

9       it in reverse, and Detective Timmerman stopped

10      me again and basically told me that I could

11      not drive the car.

12  Q.   How did he do that?  I mean, did he -- how did

13      he stop your car?

14  A.   Verbal -- just verbally, you know, shouted

15      out, you know, to not move the vehicle.

16  Q.   Was your window open?

17  A.   At that point, the window -- yeah, probably so

18      at that point, yeah.

19  Q.   And you're saying that he said stop?

20  A.   Yeah, stop, you know, and turn the vehicle --

21      to turn the vehicle off.

22  Q.   Then what happened?

23  A.   I put it back in park.

51

| | | |
|---|---|---|
| 1 | Q. | Did you turn off the vehicle? |
| 2 | A. | I turned off the vehicle -- I let the window |
| 3 | | back up, turned the vehicle off, and he told |
| 4 | | me that I could not drive the vehicle. |
| 5 | Q. | Okay. |
| 6 | A. | And I went to the two officers in the patrol |
| 7 | | car and said, why can't I drive my vehicle? |
| 8 | | And they indicated to me at that point that it |
| 9 | | was not their stop, that Detective Timmerman |
| 10 | | had control over the stop at that point. |
| 11 | Q. | And then what happened? |
| 12 | A. | Locked the vehicle, started walking. |
| 13 | Q. | Where did you walk to? |
| 14 | A. | Probably down toward Wal-Mart. |
| 15 | Q. | Where?  Which Wal-Mart? |
| 16 | A. | Down toward Wal-Mart. |
| 17 | Q. | Was the Wal-Mart there? |
| 18 | A. | In that direction. |
| 19 | Q. | Oh, toward where the Wal-Mart is now? |
| 20 | A. | Uh-huh.  (Positive response.) |
| 21 | Q. | What's down there that you would be walking |
| 22 | | toward? |
| 23 | A. | Service station. |

52

| | | |
|---|---|---|
| 1 | Q. | And what were you going to do at a service |
| 2 | | station? |
| 3 | A. | Call somebody to come get me. |
| 4 | Q. | What happened to your phone? |
| 5 | A. | Huh? |
| 6 | Q. | Didn't you have a phone? |
| 7 | A. | I don't know if it was dead at that point or |
| 8 | | not. |
| 9 | Q. | Okay. |
| 10 | A. | I mean, it didn't matter. Let me just say, he |
| 11 | | told me I couldn't drive the vehicle, so I had |
| 12 | | to walk. |
| 13 | Q. | Why didn't you just call someone from that |
| 14 | | parking lot and wait -- |
| 15 | A. | I did call somebody. |
| 16 | Q. | So you did have a phone? |
| 17 | A. | Actually, I did call somebody. |
| 18 | Q. | Who did you call? |
| 19 | A. | Montgomery Police Department. |
| 20 | Q. | But you didn't call -- |
| 21 | A. | And I called Sheriff D. T. Marshall, and I |
| 22 | | called Deputy Sheriff Cunningham, Derrick |
| 23 | | Cunningham. |

53

1   Q.   But you didn't call anybody for a ride?

2   A.   At that point, no.

3   Q.   So you just started walking?

4   A.   No.  At that point, I called the MPD, the

5       sheriff, and the deputy sheriff basically

6       asking that somebody come and do a field

7       sobriety test on me, to do a breathalyzer on

8       me.

9   Q.   What happened next?

10   A.   MPD refused.

11   Q.   What about anybody else?

12   A.   The sheriff's department -- sheriff said that

13       they would leave that up to MPD.

14   Q.   So Timmerman said you can't drive, and then

15       you just said okay and left?

16   A.   Well, I questioned that decision.

17   Q.   When you say you questioned it --

18   A.   To the other two officers that were present.

19   Q.   Did you ever speak directly to Officer

20       Timmerman?

21   A.   No.

22   Q.   So you didn't speak to Officer Timmerman

23       alone?

1  A.  No.

2  Q.  So after the initial stop, you didn't speak

3      with Officer Timmerman after that?

4  A.  No.  I really -- after the initial stop, the

5      outrageous conduct publicly displayed --

6  Q.  What do you mean by that?

7  A.  Detective Timmerman was very belligerent.  He

8      was very loud.  He was basically making a lot

9      of assertions about African-Americans.

10 Q.  What do you mean?  Be specific.

11 A.  He made comments about you people.  He made

12     comments about my having -- I was driving at

13     night, you know, what we do, making drug

14     assertions.

15 Q.  What does that mean, what we do?

16 A.  As if I -- he may have even made a comment --

17 Q.  No.  I mean, don't guess.  I mean, tell me

18     what he said.

19 A.  He made a lot of negative comments during his

20     stop.

21 Q.  You mean after you had already parked your

22     car?

23 A.  Yes.  Yes.  Detective Timmerman basically drew

1       a crowd between the KFC parking lot and the

2       McDonald's drive-up people who were

3       onlookers.  As a matter of fact, there were a

4       few people in the Calhoun's Super Foods

5       parking lot on Mt. Meigs Road --

6   Q.   Can you maybe focus on how this has affected

7       you after that?

8           I mean, so you walked -- you walked to a

9       service station?

10  A.   No.  No, you're talking about -- you're

11      talking about beginning and end.  In the

12      beginning --

13  Q.   No.  But, I mean, like after -- after it was

14      all over, you left.  The two officers left.

15      Officer Timmerman -- Everybody just left?

16  A.   Uh-huh.  (Positive response.)

17  Q.   And so it was over?

18  A.   But we need to make sure that we note --

19  Q.   And you said there were no citations?

20  A.   No, no citations.  But let's note --

21  Q.   I'm asking the questions.  You'll have a

22      chance to testify at trial.  I'm just trying

23      to focus -- this is information gathering.

```
 1                    So at the end, everyone just left?

 2    A.    Correct.

 3    Q.    And you didn't have any words with Officer

 4          Timmerman at the end of this stop?

 5    A.    No.

 6    Q.    You spoke with the two officers, and they said

 7          this is Timmerman's stop so we can't help you?

 8    A.    Correct.

 9    Q.    And then you walked away?

10    A.    Correct.

11    Q.    Can you tell me how this has affected your

12          life?

13    A.    To have a police officer stop you and to

14          insult you and humiliate you publicly and to

15          basically demean you and basically belittle

16          you by words and to allow you to urinate on

17          yourself ...

18    Q.    Did you urinate on yourself?

19    A.    Yes, I did.

20    Q.    At what point in the evening did you urinate

21          on yourself?

22    A.    When I asked him could I go to the rest room,

23          he ordered me to stay in my vehicle.
```

```
 1   Q.   So at the very beginning of the stop, you
 2        urinated on yourself?
 3   A.   I asked him if I could go to the rest room.
 4   Q.   But did you urinate on yourself?
 5   A.   He said no.
 6            I did.
 7   Q.   And when during the stop did this happen?
 8   A.   During the initial process.
 9   Q.   So it was right at the beginning?
10   A.   Yes.
11   Q.   So by the time you were being patted down, you
12        had already urinated on yourself?
13   A.   I had.
14   Q.   And when you say you urinated on yourself, was
15        it a little bit?  Like how much would you
16        estimate?
17   A.   Oh, it was a little.
18   Q.   So it was a little bit?
19   A.   It was a little.
20   Q.   You urinated on yourself a little bit?
21   A.   A little.
22   Q.   Just a little.  Was it visible --
23   A.   I had dark clothes on.
```

1   Q.   So if I looked at you, could I see that you

2        had urinated on yourself?

3   A.   No.

4   Q.   Have you ever urinated on yourself before?

5   A.   I would stop the car and get out anywhere.

6   Q.   So you've never gotten to the point where you

7        urinated on yourself, but you've been close?

8   A.   I've been close.

9   Q.   Have you ever filed another claim against the

10       City?

11   A.   Oh, I have.

12   Q.   What for?

13   A.   Prior to this one?

14   Q.   Yes.

15   A.   Prior to this one, no, I don't think so prior

16       to this one.  I had one with Officer Gentry,

17       but I think Gentry preceded -- preceded -- was

18       after this one.

19   Q.   Well, okay.  So have you ever filed another

20       claim against the City?

21   A.   I think that's irrelevant.

22   Q.   Why --

23   A.   After this date, it would be irrelevant.

59

| | | |
|---|---|---|
| 1 | Q. | You still have to answer my question. |
| 2 | A. | I don't think there's any relevance to it. |
| 3 | | MS. HIGHLEY:  I'm going to mark this |
| 4 | | as Defendant's Exhibit 1. |
| 5 | | (Defendant's Exhibit 1 was marked for |
| 6 | | identification.) |
| 7 | Q. | Show this to you.  Do you recognize this |
| 8 | | document? |
| 9 | A. | I do. |
| 10 | Q. | What is that? |
| 11 | A. | It's a verified claim. |
| 12 | Q. | It's a verified claim made by whom? |
| 13 | A. | By myself. |
| 14 | Q. | Against whom? |
| 15 | A. | Officer Gentry. |
| 16 | Q. | And who is Officer Gentry? |
| 17 | A. | He's employed with the Montgomery Police |
| 18 | | Department. |
| 19 | Q. | Can you explain what happened briefly in that |
| 20 | | case? |
| 21 | A. | I don't recall all the elements. |
| 22 | Q. | But you have filed a claim because of the |
| 23 | | actions of another police officer? |

1    A.    Correct.

2    Q.    Okay.

3    A.    But they were after this one, so I don't see

4          the relevance in it.

5    Q.    Well, the relevance isn't really going to come

6          into play until trial, so you still have to

7          answer my questions.

8          What are you asking for in this lawsuit?

9    A.    I think that a message needs to be clearly

10         sent to the Montgomery Police Department that

11         citizens have a right to ride on the streets

12         of Montgomery without being harassed by them.

13         And having been on the city council and

14         part of those 11 officers who were terminated

15         for trumping up charges on citizens and

16         violating, you know, their rights, whether or

17         not those 11 officers were friends of

18         Timmerman, I don't know, but I know many

19         officers were not pleased with me and my

20         assertion in helping in the termination of

21         them.

22   Q.    So when you say you want to send a message,

23         how do you propose that would occur?

61

| | | |
|---|---|---|
| 1 | A. | Well -- |
| 2 | Q. | I mean, practically, what are you talking |
| 3 | | about? |
| 4 | A. | The Todd Road incident and the Whitehurst |
| 5 | | case -- |
| 6 | Q. | No, I'm talking about your case.  I'm talking |
| 7 | | about this case.  You said you want to send a |
| 8 | | message.  How are you going to do that |
| 9 | | specifically in this case? |
| 10 | A. | I have not defined it. |
| 11 | Q. | Well, define it. |
| 12 | A. | I haven't. |
| 13 | Q. | You won't? |
| 14 | A. | At this point, I haven't clearly, totally |
| 15 | | defined it. |
| 16 | Q. | What are you expecting to get out of this |
| 17 | | lawsuit?  What are you asking for? |
| 18 | A. | I think a clear message -- |
| 19 | Q. | Okay.  We got the clear message part. |
| 20 | A. | -- needs to be sent -- |
| 21 | Q. | We have the clear massage part.  What are you |
| 22 | | asking -- |
| 23 | A. | -- that this foolishness should not be |

62

1          tolerated.

2     Q.   So you're asking --

3     A.   Citizens are harassed too much by policemen.

4     Q.   You're not responding to my question.  You

5          haven't answered my question.

6               All right.  So you want a clear message.

7          How do you expect that will occur?  What do

8          you want?

9     A.   I have not defined it at this point.

10    Q.   When do you plan to define it?

11    A.   Before trial is over.

12    Q.   You are the plaintiff in this case; is that

13         correct?

14    A.   Correct.

15    Q.   And so you have sued the City of Montgomery

16         and Mr. Timmerman here.  When you sue someone,

17         you're asking for something.  What are you

18         asking for?

19    A.   I think -- I think, you know, every aspect and

20         element of a -- of a quest doesn't have to be

21         defined at this point.

22    Q.   In a lawsuit, it does.

23    A.   But in the element of my asking that -- and

63

```
 1            making sure that a clear message is sent that
 2            citizens should not be harassed, you know, and
 3            basically, you know --
 4      Q.    I mean, are you saying --
 5      A.    -- falsely accused and stopped in the city of
 6            Montgomery --
 7      Q.    I'm going to stop you for a second.  Do I
 8            understand it correctly that you want to send
 9            a clear message, and that all you're asking is
10            that the police officers of Montgomery don't
11            harass people?
12      A.    I have not clearly --
13      Q.    Because that's all you're telling me.
14      A.    I have not at this point --
15      Q.    If that's all you're asking for, that's what I
16            need to know.  I need to know if you are
17            asking for a clear message that the police
18            department should not harass people and that's
19            all you want, then say it.
20      A.    I'm going to defer that question till trial.
21      Q.    No.  You have to answer my question.
22      A.    I'll say it -- I'll define it at some later
23            date.
```

64

1  Q.   You have to answer my question.  What do you

2       want?

3  A.   I can't answer it.

4  Q.   Because you don't know?

5  A.   No.  You told my attorney because he didn't

6       give notice --

7  Q.   You don't have an attorney.

8  A.   The one I was going to use for today --

9  Q.   You can't use an attorney just for part of

10      your lawsuit.  You have to have an attorney

11      or --

12 A.   Since we didn't discuss it prior to -- I mean,

13      my answer is what it is at this point.

14 Q.   You are the plaintiff, and you are proceeding

15      pro se, which means for yourself.

16 A.   Correct.

17 Q.   You are representing yourself.

18 A.   Correct.

19 Q.   You are the client.  You are the plaintiff, so

20      I need to know what you want.

21 A.   I haven't defined it.

22 Q.   That's not an answer.

23 A.   That's my statement.

65

| | | |
|---|---|---|
| 1 | Q. | So you're saying there's nothing else that you |
| 2 | | want? |
| 3 | A. | I have not clearly defined at this point what |
| 4 | | it is -- |
| 5 | Q. | No, you have to tell me -- |
| 6 | A. | -- except the element of a clear message being |
| 7 | | sent as part of what I want. |
| 8 | Q. | So you're saying there might be other things? |
| 9 | A. | Oh, sure. |
| 10 | Q. | What do you want? |
| 11 | A. | I can't define it at this point. |
| 12 | Q. | Tell me. |
| 13 | A. | I don't know. |
| 14 | Q. | No, just tell me. |
| 15 | A. | I can't tell you at this point. |
| 16 | Q. | Why? |
| 17 | A. | I will at a later date. |
| 18 | Q. | No, that's not good enough. |
| 19 | A. | That's what it is.  It is what it is now. |
| 20 | Q. | The only thing you are asking for today is a |
| 21 | | clear message to the MPD? |
| 22 | A. | And other elements of what I'm asking will be |
| 23 | | defined at a later date. |

| | | |
|---|---|---|
| 1 | Q. | What are the other elements? |
| 2 | A. | I can't answer that today. |
| 3 | Q. | Because you don't know?  What is your reason? |
| 4 | | Are you objecting to the question? |
| 5 | A. | I think the reason has already been stated. |
| 6 | Q. | No, actually, it hasn't.  When I've asked you, |
| 7 | | you say I'm declining to define it at this |
| 8 | | point. |
| 9 | A. | No, you said -- |
| 10 | Q. | I can have her read it back. |
| 11 | A. | I don't think -- You used the term objecting. |
| 12 | | I don't think I've ever used the term |
| 13 | | objecting to anything.  My terminology to you |
| 14 | | was that a clear message be sent, and that's |
| 15 | | it, along with some possible other elements |
| 16 | | added by trial time. |
| 17 | Q. | That's the problem I have.  You're saying you |
| 18 | | definitely want a clear message.  That's what |
| 19 | | I want.  What else do you want? |
| 20 | A. | I will further define it before trial time. |
| 21 | Q. | Can you please tell me the names of any |
| 22 | | witnesses you intend to call at trial? |
| 23 | A. | Do you have to have that now? |

67

1    Q.    Yes.

2    A.    I can't call you back?

3    Q.    No.

4    A.    State Representative Alvin Holmes.

5    Q.    And what is he going to testify about?

6    A.    About whether or not he's ever seen me drunk

7          or intoxicated.

8                Councilman Willie Cook.

9    Q.    What's he going to testify about?

10   A.    The same thing.

11               Councilman David Burkette.   Councilman

12         Tracy Larkin.

13   Q.    And what is David Burkette going to testify

14         about?

15   A.    Whether or not he's ever seen me drunk or

16         intoxicated.

17               Mayor Bobby Bright.

18   Q.    Go back.   After David Burkette, who was it?

19   A.    Councilman Tracy Larkin.

20   Q.    And what's Tracy Larkin going to testify

21         about?

22   A.    The same thing.

23   Q.    And you said Bobby Bright.

1    A.    Mayor Bobby Bright.

2    Q.    And what's he going to testify about?

3    A.    The same thing.

4          Senator Quinton Ross.

5    Q.    What's he going to testify about?

6    A.    The same thing.

7    Q.    Who else?

8    A.    Senator Bobby Singleton.

9    Q.    What's he going to testify about?

10   A.    The same thing.

11   Q.    Okay.  Who else?

12   A.    Circuit Judge Johnny Hardwick.

13   Q.    What's Judge Hardwick going to testify about?

14   A.    The same thing.

15   Q.    Who else?

16   A.    Circuit Judge Charlie Price.

17   Q.    What's Judge Price going to testify about?

18   A.    The same thing.

19   Q.    Who else?

20   A.    State Representative Thad McClammy.

21   Q.    What's he going to testify about?

22   A.    The same thing.

23   Q.    Who else?

| 1 | A. | Dr. Joe L. Reed. |
|---|----|------------------|

1   A.   Dr. Joe L. Reed.

2   Q.   And what's he going to testify about?

3   A.   Same thing.

4   Q.   Okay.

5   A.   City prosecutor Joe M. Reed.

6   Q.   Prosecutor --

7   A.   Yes.

8   Q.   -- or public defender?

9   A.   Public defender, I think.

10   Q.   I believe it's public defender.  Jr.?

11   A.   Well, he's not a junior.  His daddy is L.

12       He's an M.

13   Q.   I think he goes by junior.

14   A.   He'd better not.  His daddy is going to ...

15   Q.   I'll check his letterhead.

16       So what's Joe Reed going to testify to?

17   A.   The same thing about public intoxication.

18       Judge Troy Massey.

19   Q.   Okay.  And what's Judge Massey going to

20       testify about?

21   A.   About public intoxication.

22   Q.   Okay.

23   A.   State Representative Yvonne Kennedy.

```
 1    Q.    Is that with a Y?

 2    A.    Yes.

 3    Q.    What's she going to testify about?

 4    A.    Same thing.

 5                State Representative James Buskey,

 6          B-U-S-K-E-Y, the same thing.

 7    Q.    Who else?

 8    A.    Mayor Ron Davis.

 9    Q.    What's Mr. Davis going to testify about?

10    A.    Whether or not he's ever seen me drunk or

11          intoxicated.

12                State Representative James Gordon.  The

13          owner of Rose Supper Club, Squirrel Thomas.

14    Q.    What's Representative Gordon going to testify

15          about?

16    A.    The same thing about public intoxication,

17          drunk.

18                Rose Supper Club, Richard Thomas,

19          Squirrel -- Richard "Squirrel" Thomas.

20    Q.    And what's he going to testify about?

21    A.    Same thing.  He would know definitely whether

22          or not I drink or not.

23    Q.    So these people are all going to testify that
```

| | | |
|---|---|---|
| 1 | | you don't drink alcohol? |
| 2 | A. | Yeah.  They'll tell you whether or not they've |
| 3 | | ever seen me intoxicated, under the influence |
| 4 | | of anything. |
| 5 | Q. | That's what you're going to bring them to |
| 6 | | testify about? |
| 7 | A. | I mean, you said who would possibly be |
| 8 | | witnesses. |
| 9 | Q. | Right.  I'm asking who you intend to bring as |
| 10 | | witnesses. |
| 11 | A. | I'm intending to ... |
| 12 | Q. | Okay. |
| 13 | A. | Diamond's Club, Kent Crenshaw. |
| 14 | Q. | I'm sorry? |
| 15 | A. | Kent Crenshaw. |
| 16 | Q. | Okay. |
| 17 | A. | I do not know Lucy's last name at Ikonz. |
| 18 | | Ikonz, Lucy.  I don't know Lucy's last name. |
| 19 | Q. | So there's someone who works at Ikonz named |
| 20 | | Lucy? |
| 21 | A. | He's the owner.  I can't think of his last |
| 22 | | name right now. |
| 23 | | Main Event, Greg Thomas. |

72

| | | |
|---|---|---|
| 1 | Q. | Okay. What's he going to testify about? |
| 2 | A. | About my drinking, ever under the influence. |
| 3 | | Willie Caffey, bartender. |
| 4 | Q. | What's he going to testify about? |
| 5 | A. | Whether or not in the last 20 years he's known |
| 6 | | me, has he ever seen me drunk or intoxicated, |
| 7 | | under the influence. |
| 8 | Q. | How many more witnesses do you think you have |
| 9 | | on your list? |
| 10 | A. | Well, I had a whole list. I didn't know we |
| 11 | | needed it today. |
| 12 | Q. | It was on the deposition notice. |
| 13 | A. | I put some -- but those are -- |
| 14 | Q. | So those are your witnesses that you intend to |
| 15 | | call at trial? |
| 16 | A. | I think there are some more that I had on my |
| 17 | | list. |
| 18 | Q. | Okay. |
| 19 | A. | I can give you my -- |
| 20 | Q. | Are all of your witnesses going to testify as |
| 21 | | to whether or not they've seen you drunk or |
| 22 | | drink alcohol? |
| 23 | A. | Oh, yeah. That's what that would be. |

1   Q.   And that would be the purpose of their

2        testimony?

3   A.   Correct.

4   Q.   And they're not testifying about anything

5        else?

6   A.   No.

7   Q.   Do you know what exhibits you're going to be

8        presenting at trial?

9   A.   Not at this point, I don't.

10  Q.   Do you have any idea what you might be

11       presenting at trial?

12  A.   Not at this point.

13                  (Defendant's Exhibit 2 was marked for

14                   identification.)

15  Q.   I'm going to show you something that I've

16       marked as Defendant's Exhibit 2.  Do you

17       recognize that document?

18  A.   Uh-huh.  (Positive response.)

19  Q.   What is that?  You can keep it.  I have one

20       over here, so you can look at it if you need

21       to.

22            What is it?

23  A.   It's a news release.

74

1   Q.   It's a news release?

2   A.   Uh-huh.  (Positive response.)

3   Q.   And who prepared that news release?

4   A.   Who actually typed it?

5   Q.   Both.  Who all was involved in --

6   A.   I was involved in it.

7   Q.   You were?

8   A.   Uh-huh.  (Positive response.)

9   Q.   So would you say that it was prepared at your

10       direction?

11  A.   Oh, sure.

12  Q.   So who did you ask to help you put it

13       together?

14  A.   I can't recall today.

15  Q.   Was it someone you worked with or was it a

16       friend?

17  A.   I can't recall.

18  Q.   And was that news release, in fact, released?

19  A.   It was.

20            MS. HIGHLEY:  That's all I have --

21  Q.   Well, is there anything else you think I

22       should know?

23  A.   Remember, you told me you didn't want me to

75

1          ask any questions.

2                    (Brief interruption.)

3    Q.    Normally, you have a right to see the

4          transcript before it's officially published as

5          the final transcript of your deposition.  You

6          have the right to read it and correct any

7          changes or spelling errors of names and that

8          sort of thing.

9               A lot of times people waive that right,

10         but you have the choice either way.  You can

11         ask to see the transcript before it becomes an

12         official transcript and sign it to approve

13         that you've read, it or you can say right now

14         that you approve it however it gets typed up.

15   A.    I want to see it.

16                    MS. HIGHLEY:  I'm done.

17                    (Deposition concluded at 10:45 a.m.)

18

19

20

21          *  *  *  *  *  *  *  *  *  *  *  *

22              FURTHER DEPONENT SAITH NOT

23          *  *  *  *  *  *  *  *  *  *  *  *

76

REPORTER'S CERTIFICATE

STATE OF ALABAMA:

MONTGOMERY COUNTY:

I, Lisa J. Green, CCR, Registered Professional Reporter, and Commissioner for the State of Alabama at Large, do hereby certify that I reported the deposition of:

TERANCE DAWSON

who was first duly sworn by me to speak the truth, the whole truth and nothing but the truth, in the matter of:

TERANCE DAWSON,

Plaintiff,

Vs.

CITY OF MONTGOMERY, GUINN TIMMERMAN,

Individually and in His Official

Capacity as an Officer, Agent or

Employee of the City of Montgomery,

Alabama,

Defendant.

In The U.S. District Court

For the Middle District of Alabama

Northern Division

77

1                    Case Number 2:06-CV-1057-WKW

2      on Thursday, January 3, 2007.

3              The foregoing 76 computer printed pages

4      contain a true and correct transcript of the

5      examination of said witness by counsel for the parties

6      set out herein.   The reading and signing of same is

7      hereby not waived.

8              I further certify that I am neither of kin

9      nor of counsel to the parties to said cause nor in any

10     manner interested in the results thereof.

11             This 10th day of January 2008.

12

13

14     _____
       Lisa J. Green, ACCR #334
15     Expiration Date:  9-30-2008
       Registered Professional Reporter
16     and Commissioner for the State
       of Alabama at Large

17

18

19

20

21

22

23

78

1

2

3       I, Terance Dawson, hereby certify that I have

4   read the foregoing transcript of my deposition given

5   on Thursday, January 3, 2008, and it is a true and

6   correct transcript of the testimony given by me at the

7   time and place stated with the corrections, if any,

8   and the reasons therefor noted on a separate sheet of

9   paper and attached hereto.

10

11

12

13                              _____

14                              Terance Dawson

15

16

17       SWORN TO AND SUBSCRIBED before me this

18   _____ day of _____, 20__.

19

20

21                              _____

22                              NOTARY PUBLIC

23

COPY

1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3      NORTHERN DIVISION

4

5   TERANCE DAWSON,

6         Plaintiff,

7   Vs.                              CIVIL ACTION NO.
                                     2:06-CV-1057-WKW
8   CITY OF MONTGOMERY, GUINN
    TIMMERMAN, Individually and in
9   His Official Capacity as an Officer,
    Agent or Employee of the City of
10  Montgomery, Alabama,

11        Defendant.

12

13              * * * * * * * * * * * *

14

15         DEPOSITION OF G. R. TIMMERMAN, taken pursuant

16  to stipulation and agreement before Lisa J. Green,

17  CCR, ACCR # 334, Registered Professional Reporter and

18  Commissioner for the State of Alabama at Large, in the

19  City Council Conference Room, City Hall, 103 North

20  Perry Street, Montgomery, Alabama on Thursday, January

21  3, 2008, commencing at approximately 11:00 a.m.

22

23              * * * * * * * * * * * *

2

1                              APPEARANCES

2

3     FOR THE PLAINTIFF:

4     Mr. Terance Dawson (Pro se)
      Post Office Box 6050
5     Montgomery, AL  36106

6

      FOR THE DEFENDANT:
7
      Ms. Allison Highley
8     Attorney at Law
      Office of the City Attorney
9     City Hall
      103 North Perry Street
10    Montgomery, Alabama

11

12

13

14                    * * * * * * * * * * * *

15                     EXAMINATION INDEX

16

      G. R. TIMMERMAN
17        BY MR. DAWSON                              4
          BY MS. HIGHLEY                            25
18

19

20         (No exhibits were marked to this deposition.)

21

22

23

3

STIPULATION

1
2          It is hereby stipulated and agreed by and

3    between counsel representing the parties that the

4    deposition of G. R. TIMMERMAN is taken pursuant to the

5    Federal Rules of Civil Procedure and that said

6    deposition may be taken before Lisa J. Green,

7    Registered Professional Reporter and Commissioner for

8    the State of Alabama at Large, without the formality

9    of a commission, that objections to questions other

10   than objections as to the form of the question need

11   not be made at this time but may be reserved for a

12   ruling at such time as the said deposition may be

13   offered in evidence or used for any other purpose by

14   either party provided for by the Statute.

15          It is further stipulated and agreed by and

16   between counsel representing the parties in this case

17   that the filing of said deposition is hereby waived

18   and may be introduced at the trial of this case or

19   used in any other manner by either party hereto

20   provided for by the Statute regardless of the waiving

21   of the filing of the same.

22          It is further stipulated and agreed by and

23   between the parties hereto and the witness that the

4

1  signature of the witness to this deposition is hereby

2  waived.

3

4                  * * * * * * * * * * * *

5

6                      G. R. TIMMERMAN

7          The witness, after having first been duly

8  sworn to speak the truth, the whole truth and nothing

9  but the truth testified as follows:

10                      EXAMINATION

11  BY MR. DAWSON:

12  Q.    State your name for the record.

13  A.    Detective G. R. Timmerman.

14                  MR. DAWSON:  And let me say for the

15                      record that Attorney Fred Bell

16                      is not here because he did not

17                      give notice and that he --

18                  MS. HIGHLEY:  Object as to the

19                      form.

20                      Could we go off the record?

21                  MR. DAWSON:  No, I don't want to do

22                      anything off the record.

23                      I want -- All of this is on the

1                record.

2          MS. HIGHLEY:  We'll leave it on the

3                record.

4                    I was just going to explain

5                that sometimes I'm going to

6                object, but Officer Timmerman

7                knows that my objection is for

8                later in front of the judge and

9                it's just preserved on the

10              record, and he understands he

11              should still answer.

12                  But I get to object just so

13              it's preserved.  That's what

14              that meant.

15  Q.   How long have you been with MPD?

16  A.   Since April of 1999.

17  Q.   And what positions have you held since you've

18      been with MPD?

19  A.   I have been a patrol officer, a juvenile

20      detective, and at the present I am a crime

21      scene investigator.

22  Q.   What's your family background?

23  A.   In what respect?

6

1    Q.    Marital status.

2    A.    I'm married.

3    Q.    Children?

4    A.    One daughter.

5    Q.    Parents?

6    A.    I have two.

7    Q.    Do any of your relatives live in the Middle

8          District?

9    A.    I'm not sure what the Middle District is.   My

10         wife lives here in Montgomery.   My daughter

11         lives in Birmingham.   Everybody else lives in

12         Texas.

13   Q.    Where is your home state?

14   A.    South Carolina.

15   Q.    How long have you been in Alabama?

16   A.    Since the summer of 1993, I believe.   Yes,

17         that's right.

18   Q.    You've had an opportunity to sit in through my

19         deposition.   You understand the process?

20   A.    I do.

21   Q.    Are you familiar with the Uniform Traffic Code

22         of Alabama?

23   A.    Yes, I am.

7

1    Q.    Do you understand the difference between the

2          city traffic codes and the Title 32?

3    A.    I do.

4    Q.    Did you at any time place me under arrest

5          during my stop?

6    A.    Are you referring to the stop on November 27,

7          2004?

8    Q.    I am.

9    A.    I never physically placed you under arrest,

10         no.

11   Q.    Why did you order the onlookers to disband and

12         to leave the scene?

13   A.    There were no onlookers on the scene to my

14         recollection.

15   Q.    Are you farsighted or nearsighted?

16   A.    I think I'm --

17                    MS. HIGHLEY:   Object to the form.

18   A.    -- a little of both.

19   Q.    You called for a detox unit, correct?

20   A.    No, I did not.  We don't have detox units in

21         the Montgomery Police Department.

22   Q.    What did you do when you called for the two

23         officers who responded --

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

8

1   A.   I called for a patrol unit to back me up.

2   Q.   When you called for a patrol unit to back you

3        up, why did the patrol unit come prepared to

4        do a sobriety check?

5   A.   To my recollection, they didn't come prepared

6        to do a sobriety check.  They are trained to

7        administer field sobriety tests in their

8        duties as patrol officers.

9   Q.   So you are saying that you did not ask the --

10       you did not call for a detox unit?

11  A.   No, I did not.

12  Q.   Okay.  What's your mobile link number?  What's

13       your cell number?

14            MS. HIGHLEY:  Object to the question.

15  A.   My cell phone?

16  Q.   What's your radio number?

17  A.   Right now I'm Unit 451.  Are you talking about

18       back then?

19  Q.   Yeah.

20  A.   I was Unit 525 if I remember right.

21  Q.   When you called in to the police station, do

22       you know what channel you was on?

23  A.   I believe it was channel one.

9

1   Q.   What was the name of the two officers that

2        responded to the scene?

3   A.   I have no idea.

4   Q.   Can you tell me what law you referenced in

5        your orders for me not to answer my cell phone

6        while being detained by you?

7               MS. HIGHLEY:  Object to the form of

8                   the question.  It's a little bit

9                   confusing.

10   Q.   Well, my cell phone rung.  You ordered me not

11        to use it.  What City or State law did you

12        rely upon for me not to use my phone?

13   A.   I relied on my discretion as a police officer

14        not to allow an individual to use a cellular

15        phone while I'm in the middle of a traffic

16        stop of that individual.

17   Q.   After many minutes passed, I asked you if I

18        could go to the rest room --

19               MS. HIGHLEY:  Object to the form of

20                   the question.  You can't -- I'm

21                   sorry, Mr. Dawson.  You can't

22                   sort of tell a long story and

23                   then say what do you think of

10

1      that.  It has to be non-leading

2      questions.

3     MR. DAWSON:  All right.

4 Q. What was your reason for denial after I

5   indicated to you that I had to go to the rest

6   room?

7 A. My own safety.

8 Q. Do you remember the outcome of my field

9   sobriety test?

10 A. Yes.

11 Q. What was it?

12 A. As far as I can recall, you passed both of

13   them.

14 Q. And when you say both of them, what were they?

15 A. I don't recall the exact tests that were

16   administered.

17 Q. Since I was not arrested, ticketed, or cited

18   for intoxication, what was your reason for

19   ordering me not to drive my car?

20     MS. HIGHLEY:  Object to the form of

21     the question.  Compound.  It was

22     two questions.

23 Q. If there were no citations filed against me,

11

1       why did you order me to walk after I passed my

2       field sobriety test?

3  A.   Well, in the first place, I didn't order you

4       to walk, Mr. Dawson.  After I conferred with

5       the responding patrol officers, we felt that

6       it was best that you try and find another ride

7       home, which you agreed to do.

8  Q.   Who have you discussed this case with?

9  A.   The attorney that's present.

10  Q.   What documents did you receive in preparation

11       for this deposition?

12               THE WITNESS:  What did you send me?

13                  The affidavit that I filed, the

14                  complaint that he filed?

15               MS. HIGHLEY:  That's right.

16  A.   A newspaper story that you released.  I can't

17       recall any others.

18  Q.   When did you first spot my vehicle?

19  A.   You were at the intersection of Ann and

20       Madison there near Lee High School sitting in

21       the left-hand lane, apparently waiting to

22       turn.

23  Q.   Did you make any notes of that night when you

12

1          detained me?

2     A.   Personal notes?  No.  I did make a daily entry

3          on the juvenile data report.

4     Q.   Do you have those notes with you?

5     A.   I do.

6     Q.   Can you provide those notes?

7     A.   Certainly.

8                    THE WITNESS:  Do we need to make

9                    copies of them?

10                   MS. HIGHLEY:  What we can do is mark

11                   them as an exhibit and then I'll

12                   make a copy at the end for you

13                   to take with you.

14                   THE WITNESS:  The only thing I'm

15                   concerned about, the way this is

16                   set up, there are two other

17                   cases on here.

18                        I don't know whether this

19                   individual was privy to any of

20                   this information or not.

21                   MS. HIGHLEY:  I think we have to

22                   redact it because this is

23                   juvenile --

1    THE WITNESS:  I do, too.  So from

2       here down where it says contact

3       with former city councilman and

4       then on this second page, and

5       then -- they did not keep the

6       other part.  There's only the

7       end of a sentence here.

8          I remember what it said

9       vaguely, and I can supply that

10      if you need to.  But I don't

11      think he has any need for those

12      two things.

13   MS. HIGHLEY:  Mr. Dawson, if it

14      would be okay, if you would like

15      to look at this now, I can go

16      ahead and redact it and bring

17      back a copy, or if you want it

18      provided to you later --

19   MR. DAWSON:  Get me a copy.

20   MS. HIGHLEY:  I'll make sure you get

21      a copy after it's redacted.

22  Q.   Detective Timmerman, why did your attitude

23   change publicly of me when the two officers

14

1    arrived on the scene and informed you that I

2    was a former city councilman?

3              MS. HIGHLEY:  Objection as to the

4                   form of the question.  It's

5                   leading.

6    Q.   Why did your attitude change after two

7         officers conversated with you after they

8         arrived on the scene?

9    A.   Mr. Dawson, my attitude did not change in

10        regards to you from the time I stopped you

11        until the time we -- or until I left the

12        scene.

13   Q.   Did you know me when you stopped me?

14   A.   I had no idea who you were.

15   Q.   Are you denying the fact today that you called

16        for a detox unit?

17   A.   Mr. Dawson, I called for a patrol unit.

18        You're using the term detox unit.  We don't

19        have a detox unit on MPD's duty roster.  If

20        you would like to say did I call a patrol

21        unit, yes, I did.  I called Unit 203 -- at

22        least that's the unit that responded.

23             When I stopped you, immediately before

15

1    asking you to pull over, I radioed the
2    dispatcher.  And I'll tell you exactly what I
3    said:  I had a possible 32, which is a
4    possible drunk driver due to the erratic
5    manner in which you were driving.  I then
6    immediately requested a unit to back me up.
7  Q.   Have you ever been disciplined since you've
8    been an employee with MPD?
9              THE WITNESS:  Is that something I
10                 can answer?  If it is -- I have
11                 no problem answering it.  I just
12                 don't know if that's relevant to
13                 this or not.
14              MS. HIGHLEY:  You can.
15 A.   No, I have not.
16 Q.   Do you have any other professional
17    certificates and/or licenses?
18 A.   No, I don't think so.
19 Q.   Do you have a military background?
20 A.   I do.
21 Q.   What's your rank?
22 A.   I retired as a lieutenant colonel from the Air
23    Force in 1999.

16

Q.   Why did you take my driver's license?

A.   I did not take your driver's license,
Mr. Dawson.  The driver's license was handed
to me by one of the responding officers.

Q.   What evidence did you rely upon to form your
opinion of me when you accused me of being
under the influence?

A.   Well, as you'll recall, I hope, you were
sitting at the intersection of Ann Street and
Madison.  When you turned left onto Madison,
you turned into oncoming traffic.

In other words, you turned into, I
believe it was, the westbound lane of Madison
Avenue with the median separating the east and
westbound lanes on your right side, not on
your left side; in other words, you were
driving in the wrong lane of traffic.

You then turned left onto Mt. Meigs Road,
again partially in the oncoming lane.  You
were driving extremely slowly.  And the
instant that you turned into the oncoming
traffic on Madison is when I suspected I may
have an impaired driver in front of me.

1          At that time, I called dispatch and
2      requested a backup unit because I was going to
3      attempt to stop you.
4  Q.   Did I resist at any time the searching of my
5      person or my vehicle?
6  A.   No.  You were quite cooperative.
7  Q.   What was the result of the drug search of my
8      vehicle?
9  A.   There were prescription medications found in
10     your vehicle.
11 Q.   On my person?
12 A.   I don't believe anything was found on your
13     person that we had to worry about.
14 Q.   Did you find any illegal substance, controlled
15     substance in my vehicle or on my person?
16              MS. HIGHLEY:  Object as to form.
17              Controlled substance and illegal
18              substance are two different
19              things.
20 Q.   Did you find any illegal substance?
21 A.   I didn't conduct the search of your vehicle or
22     your person.  My understanding is the officers
23     found nothing except the prescription drugs.

18

| | | |
|---|---|---|
| 1 | Q. | What about the officers' response to you about |
| 2 | | my being intoxicated? |
| 3 | A. | I don't recall exactly what they said to me, |
| 4 | | Mr. Dawson. |
| 5 | Q. | You muttered and mumbled many obscenities -- |
| 6 | | MS. HIGHLEY:  Object to the |
| 7 | | question. |
| 8 | Q. | Do you feel that African-Americans -- |
| 9 | | MS. HIGHLEY:  Object -- Well, go |
| 10 | | ahead.  I haven't heard the |
| 11 | | whole question. |
| 12 | Q. | Do you label African-Americans as drug dealers |
| 13 | | and dope dealers that drive Cadillacs -- |
| 14 | A. | No. |
| 15 | Q. | -- in Montgomery at night? |
| 16 | A. | I do not. |
| 17 | Q. | When you used the term that night you people |
| 18 | | and your kind, what did you mean? |
| 19 | | MS. HIGHLEY:  Object as to the form |
| 20 | | of the question. |
| 21 | | THE WITNESS:  May I answer that? |
| 22 | | MS. HIGHLEY:  You may. |
| 23 | A. | Mr. Dawson, I never referred to you as you |

19

1   people or your kind, and I will unequivocally

2   object to your making an accusation of that

3   nature to me.

4   Q.   I think I'm the one asking the questions here

5        today.

6            Have you accused any other

7   African-Americans driving on the streets of

8   Montgomery as being drug dealers?

9                MS. HIGHLEY:  I object as to the

10                   form of the question.  That's

11                   pretty vague.

12               MR. DAWSON:  Well, if he -- if you

13                   have an officer who stops people

14                   and draws conclusions prior to

15                   any investigation --

16               MS. HIGHLEY:  That wasn't the

17                   question.

18  Q.   Have you ever --

19               MS. HIGHLEY:  Maybe you could

20                   rephrase your question, break

21                   it --

22  Q.   Have you ever drawn a conclusion of

23   African-Americans prior to even investigating

20

1       them?

2   A.   I hope not.

3   Q.   Are you familiar with the policies of the

4       Montgomery Police Department as it relates to

5       stopping a citizen in an unmarked car?

6   A.   I don't think we have a policy that applies to

7       unmarked cars per se.

8   Q.   Are you familiar with the code of conduct of a

9       public employee?

10   A.   Yes, I am.

11   Q.   What's your understanding of that?

12   A.   Well, basically, it comes down to what you're

13       asking here, that police officers and other

14       public employees don't harass the citizens.  I

15       think in a nutshell that's about it.

16   Q.   Did you at any point during the detainment of

17       me from beginning to end feel that you may

18       have made a mistake in your assessment of my

19       being under the influence?

20   A.   No, I do not.

21   Q.   If two patrol officers who responded to the

22       scene -- Unit 203 -- did a field sobriety test

23       on me and determined that what I was drinking

21

1    was truly Coca-Cola --

2                    MS. HIGHLEY:  Mr. Dawson, you're

3                        going to have to establish those

4                        facts with smaller questions,

5                        break that down into smaller

6                        questions that are not leading.

7                        You can't just say a bunch of

8                        stuff and say, what do you think

9                        about that.

10                    MR. DAWSON:  For the record, I

11                        probably need Attorney Fred

12                        Bell.

13   Q.   If Officers A and B determined that I wasn't

14        intoxicated, why would you not think that I --

15        why would you think I was?

16   A.   Mr. Dawson, I didn't necessarily think you

17        were intoxicated.  I felt that there was

18        something affecting your ability to safely

19        operate a vehicle.

20   Q.   If two officers determined that after checking

21        my alcohol -- the bottle that I wasn't

22        drinking and did a field sobriety and

23        determined that I --

22

| | |
|---|---|
| 1 | MS. HIGHLEY:  Mr. Dawson, I'm going |
| 2 | to object to the form of the |
| 3 | question because it's sounding a |
| 4 | lot like a hypothetical. |
| 5 | MR. DAWSON:  It's not hypothetical. |
| 6 | MS. HIGHLEY:  Well, you have to |
| 7 | establish -- you're going to |
| 8 | have to start off at the |
| 9 | beginning and sort of walk him |
| 10 | through it with your questions. |
| 11 | Q.   Unit 203 responded to the scene, correct? |
| 12 | A.   Yes. |
| 13 | Q.   Two officers were in the unit, correct? |
| 14 | A.   Yes. |
| 15 | MS. HIGHLEY:  Also, you're still |
| 16 | leading, so -- I mean, you know |
| 17 | the difference between a |
| 18 | question where I say the answer |
| 19 | versus a question where I'm |
| 20 | asking you a question? |
| 21 | Q.   I was checked by both officers at some point, |
| 22 | correct? |
| 23 | MS. HIGHLEY:  That's still leading. |

23

1    Q.    The officers determined that I wasn't drunk,

2          correct?

3                    MS. HIGHLEY:  I mean, you can --

4    A.    I'll answer it.

5                    MS. HIGHLEY:  You can answer the

6                    question.

7    A.    Mr. Dawson, we've already established you

8          passed the field sobriety test.

9    Q.    There were no drugs in my vehicle, correct?

10   A.    There were prescription medications in your

11         vehicle, and to my understanding, a

12         prescription medication is a drug.

13   Q.    Well, it's prescribed, so ...

14               Do you think it was dangerous to tell an

15         individual to park their car at that time of

16         the night and walk?

17   A.    At which time?  Are you telling me when I made

18         the stop or after you agreed to look for a

19         ride home?

20   Q.    At the end of your sobriety test.

21   A.    Let's see.  It was eight o'clock at night.  It

22         was a well-lit area.  You had a cellular

23         phone.

24

1  Q.  Just answer the question.

2  A.  No, I assumed that you were going to have a

3      phone conversation with someone and get a ride

4      home.

5  Q.  Do you think that it's dangerous to release a

6      citizen that time of the night --

7              MS. HIGHLEY:  Mr. Dawson, he's

8                  answered your question.

9  Q.  -- to walk?

10              MS. HIGHLEY:  Mr. Dawson, he just

11                  answered your question.

12 Q.  Do you have a habit of putting black folks out

13     of their cars at night?

14              MS. HIGHLEY:  Object to the form of

15                  the question.

16              THE WITNESS:  May I answer it?

17              MS. HIGHLEY:  You may.

18 A.  Only if I arrest them, Mr. Dawson, and I feel

19     like they're a danger to themselves or

20     somebody else.

21 Q.  Have you ever been arrested?

22 A.  No.

23 Q.  Have you ever had a complaint filed against

1      you with MPD?

2  A.   Oh, several.

3  Q.   What was the nature of the complaints?

4  A.   Let's see. I've been sued once for false

5      arrest. I have been -- in fact, I think that

6      might be the only one I can remember. Other

7      than that, I don't think there's been any

8      formal complaints made against me.

9            MR. DAWSON: I think that's all.

10           MS. HIGHLEY: I have a few

11             questions.

12             EXAMINATION

13 BY MS. HIGHLEY:

14  Q.   When you testified that Mr. Dawson was

15      cooperative, did he consent to the search of

16      his person?

17  A.   As far as I know, yes. I did not ask him to

18      do that. It's our standard procedure when we

19      remove an individual from a vehicle for

20      personal safety to conduct a pat-down. And I

21      think he did, but I don't believe that the

22      officers were required to get his permission

23      in that case.

26

| | | |
|---|---|---|
| 1 | Q. | Do you happen to know if he consented to the |
| 2 | | search of his car? |
| 3 | A. | I think he did, yes. |
| 4 | Q. | Did you observe anything else about |
| 5 | | Mr. Dawson's driving other than what you've |
| 6 | | already testified, that he turned into the |
| 7 | | wrong lane of traffic, that seemed unusual? |
| 8 | A. | When he turned into Mt. Meigs Road off of |
| 9 | | Madison, again, he turned partially into the |
| 10 | | oncoming lane. Then he was weaving just a |
| 11 | | little bit, but he was driving awfully slow, |
| 12 | | very, very slow. |
| 13 | Q. | Based on your observations, in your |
| 14 | | professional opinion as a sworn police |
| 15 | | officer, would that sort of driving be |
| 16 | | consistent with an impaired driver? |
| 17 | A. | In my experience, yes. |
| 18 | Q. | At the time, in your professional opinion was |
| 19 | | it safe for Mr. Dawson to operate the motor |
| 20 | | vehicle? |
| 21 | A. | At that time, I felt it was not. |
| 22 | | MS. HIGHLEY:  That's all I have. |
| 23 | | (Deposition concluded at 11:24 a.m.) |

```
1                    * * * * * * * * * * * *

2              FURTHER DEPONENT SAITH NOT

3                    * * * * * * * * * * * *

4

5              REPORTER'S CERTIFICATE

6    STATE OF ALABAMA:

7    MONTGOMERY COUNTY:

8         I, Lisa J. Green, CCR, Registered

9    Professional Reporter, and Commissioner for the State

10   of Alabama at Large, do hereby certify that I reported

11   the deposition of:

12                    G. R. TIMMERMAN

13   who was first duly sworn by me to speak the truth, the

14   whole truth and nothing but the truth, in the matter

15   of:

16              TERANCE DAWSON,

17              Plaintiff,

18              Vs.

19              CITY OF MONTGOMERY, GUINN TIMMERMAN,

20              Individually and in His Official

21              Capacity as an Officer, Agent or

22              Employee of the City of Montgomery,

23              Alabama,
```

28

1          Defendant.

2          In The U.S. District Court

3          For the Middle District of Alabama

4          Northern Division

5          Case Number 2:06-CV-1057-WKW

6   on Thursday, January 3, 2007.

7          The foregoing 27 computer printed pages

8   contain a true and correct transcript of the

9   examination of said witness by counsel for the parties

10  set out herein.  The reading and signing of same is

11  hereby not waived.

12          I further certify that I am neither of kin

13  nor of counsel to the parties to said cause nor in any

14  manner interested in the results thereof.

15          This 10th day of January 2008.

16

17

18  _____
    Lisa J. Green, ACCR #334

19  Expiration Date:  9-30-2008
    Registered Professional Reporter

20  and Commissioner for the State
    of Alabama at Large

21

22

23

*Copy to Legal ??? [signature]*

# FOR IMMEDIATE RELEASE

**Terance Dawson – 334-657-9149**
**May 27, 2005**
**Claim Against City of Montgomery**

A verified claim against the City of Montgomery will be filed by former councilman Terance Dawson by 2:00 pm, Friday May 27, 2005.

On or about November 27, 2004, Detective Timmberman stopped me in an unmarked car on Mt. Megis road around 9:30 pm.

Officer Timmberman's conduct was not warranted, there was no probable cause for his detaining me and restraining my freedom.

His accusations were slanderous, malicious and were embarrassing and done to humiliate me.

Despite the fact the officers did not smell alcohol, or drugs, or could not see the physical presence of alcohol or drugs. He caused a public scene, and because of his yelling, he drew attention of many persons at KFC and McDonald's. His humiliation of me continued for along period of time in front of many on-lookers.

Because of Officer Timmberman's outrageous, malicious, and unconstitutional conduct I am requesting $100,000.00 in damages.

1.320    LAW ENFORCEMENT CODE OF ETHICS:

The Law Enforcement Code of Ethics is adopted as a general standard of conduct for members of the Montgomery Police Department:


## LAW ENFORCEMENT CODE OF ETHICS

"As a law enforcement officer, my fundamental duty is to serve mankind; to safeguard lives and property, to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the constitutional rights of all men to liberty, equality, and justice.

"I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my Department. Whatever, I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

"I will never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

"I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession...law enforcement."

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TERANCE DAWSON,             )
                                )
     Plaintiff,          )
                                )
vs.                       )    Case No.: 2:06-CV-1057-WKW
                                )
CITY OF MONTGOMERY, and   )
GUINN TIMMERMAN, individually,  )
                                )
     Defendants.       )

## DEFENDANTS' FIRST SET OF INTERROGATORIES
## AND REQUESTS FOR PRODUCTION OF DOCUMENTS

**COME NOW** the Defendants, City of Montgomery and Guinn Timmerman, pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure and request the Plaintiff to respond within thirty (30) days to the following interrogatories and requests for production of documents.

**Interrogatory 1.** Please state the name and address of your cellular telephone provider as of November 27, 2004, along with your account number with them.

**Request for Production 1.** Please produce a copy of your cellular telephone records that include an itemization of calls made and received on November 27, 2004.

**Interrogatory 2.** Please state the name, phone number and address of all witnesses present in the Kentucky Fried Chicken parking lot on November 27, 2004, who witnessed the alleged incident that is the subject matter of this lawsuit.

**Interrogatory 3.** Please state the name, phone number and address of the owner of the vehicle in which you were allegedly stopped on November 27, 2004.

**Request for Production 2**. Please produce a copy of the title and registration for this vehicle.

**Interrogatory 4**. Please list all motor vehicle violations for which you have been charged in the last 5 years and state the disposition of each charge.

**Request for Production 3**. Please produce a copy of your drivers license.

**Interrogatory 5**. Please state whether you have ever been arrested and, if so, for each arrest please describe the circumstances and state the outcome (i.e. you were released, you faced formal charges, etc.).

**Interrogatory 6**. Please state whether you have ever been convicted of a crime and, if so, for each conviction please name the trial court, state the date of the conviction and the nature of the charges against you.

**Interrogatory 7**. Please state whether, prior to this case, you have ever been a party to a lawsuit and, if so, for each lawsuit please name the trial court, describe the nature of the case, and state its outcome.

**Interrogatory 8**. Please identify each medical, dental, mental health professional, or hospital by whom you have been seen in the last 5 years, and state the phone number and address for each.

**Request for Production 4**. For each provider listed in response to Interrogatory 8 above, please produce a copy of all medical records, bills, notes and all documents related to you and your treatment.

**Interrogatory 9**. Please identify each and every drug you have been prescribed in the last 5 years, regardless of whether you filled the prescription, along with the prescribing person's name, phone number and address.

**Interrogatory 10**. Please state your social security number and date of birth.

**Interrogatory 11**. Please state your basis for the money damages you claim, explaining how you calculated the amounts demanded.

**Request for Production 5**. Please submit all documents you intend to use to prove your damages at trial.

**Interrogatory 12**. Please list the name, address and phone number of each witness you intend to use at trial, to include any expert witness, along with a brief statement of the testimony you expect to illicit.

**Request for Production 6**. Please produce any documents or other evidence you intend to use at trial, to include affidavits and audio or video recordings.

Respectfully submitted this 25th day of September, 2007.

_____
Allison H. Highley (HIG024)
Attorney for Defendants

**OF COUNSEL:**
CITY OF MONTGOMERY
Legal Department
Post Office Box 1111
Montgomery, AL 36101-1111
(334) 241-2050 Telephone
(334) 241-2310 Facsimile

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 25, 2007, I sent a copy of the foregoing to the Plaintiff via U.S. mail, first-class postage pre-paid to: Terance Dawson, Post Office Box 6050, Montgomery, Alabama 36106.

_____
Of Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TERANCE DAWSON,.                        )
      Plaintiff,                        )
                                       )
                                       )
vs.                                    )     CIVIL ACTION NO. 2:06-CV-01057-WKW
                                       )
CITY OF MONTGOMERY and;                )
GUINN TIMMERMAN                        )
                                       )
      Defendants.                       )

RECEIVED
DEC – 3 2007
CITY ATTORNEY'S
OFFICE

## PLAINTIFF'S RESPONSES TO
## DEFNDANT'S DISCOVERY REQUESTS

The Plaintiff makes the following responses to the Defendant's discovery requests.

1. Interrogatory # 1:     RESPONSE:.     Nextel

Sprint                                   Cingular

2. Interrogatory # 2:     RESOPNSE:
Defendant Zimmerman and the two police officers who responded on the scene.  I do not have the phone numbers and addresses of these witnesses.

3. Interrogatory # 3:     RESPONSE:     Terrance Dawson, P.O. Box 6050, Montgomery, AL  36106.

4. Interrogatory # 4:     RESPONSE:     Speeding-dismissed, Improper turn-pled guilty, Speeding-dismissed;   Running stop sigh-dismissed; Running red light-guilt.

5. Interrogatory # 5:     RESPONSE:     Three charges of domestic violence—dismissed, menacing-dismissed.

6. Interrogatory # 6:     RESPONSE:     Municipal Court of Montgomery" Violation of family protection order-pled guilty. 2003 or 2004.  This information is in the possession and custody of the City of Montgomery.

7. Interrogatory # 7:     RESPONSE:     NONE

8. Interrogatory # 8:    RESPONSE:    Jackson Hospital, Montgomery, Alabama; Baptist South, Montgomery, Alabama;  Dr. Albert Lester, Montgomery, Alabama; Dr. Peter Shashy and Dr. Peter Shashy, Montgomery, Alabama; Dr. Daniel Ward, Montgomery, Alabama; Dr. Leroy Russell, Montgomery, Alabama; Dr. Barry Brown, Montgomery, Alabama; Mobile Eye, Ears, and Throat Center, Mobile Alabama;  Montgomery;  Dr. Teressa Brown, Montgomery, Alabama; Dr. Joe Jackson, Montgomery, Alabama.

9. Interrogatory # 9:    RESPONSE:    Viagra-Dr. Shashy and Dr. Lester; Cialis-Dr. Shashy and Dr. Lester; Breathing machine-          ,

10. Interrogatory # 10:   RESPONSE:   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; DOB 7-16-60.

11. Interrogatory # 9:    RESPONSE:  I have not claimed a specific amount for money damages. I have sought damages for constitutional violations, and I have sought damages for mental anguish and emotion distress.

12. Interrogatory # 9:    RESPONSE:  The Plaintiff, Officer Timmerman, the defendant, and the two police officers who were summoned to aid Officer Timmerman.

13. Request for Production #1:    RESPONSE:  I am not in possession of  such document: I will authorize the Defendant to access this information.

14. Request for Production #2:    RESPONSE:  I am not in possession of such document.

15. Request for Production #3:    RESPONSE:   Ready to produce when given a time and place to do so.

16. Request for Production #4:    RESPONSE:  I do not have such documents in my possession; however, I will sign the proper release authorizing the Defendant to have the same produced from the provider:

17. Request for Production #5:    RESPONSE:  I have no such documents at this time; however, when I obtain the same, I will provide these documents.

18.  Request for Production #6:    RESPONSE:  I have no such documents at this time; however, when I obtain the same, I will provide these document.

I certify that the foregoing responses are true to the best of my knowledge.

Terrance Dawson

Done this  30thday of November 2007.

2

STATE OF ALABAMA        }
COUNTY OF MONTGOMERY    }

      I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that Terrance Day who being by me first duly sworn, states that the statements are true and correct to the best of her knowledge and that she executed the same voluntarily on the day the same bears date.

      Given under my hand and official seal this 30thday of November  2007.

_Yolanda Y. Lipon_
Notary Public

My Commission Expires: _11-17-2010_


P.O. Box 6050
Montgomery, AL  36106
(334) 561-4011
senddawsonback@aol.com


<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that I have this 30thh day of November, 2007  filed a forwarded a copy  of this document  to the Defendant by placing the same in the U.S. Mail, postage prepaid, and addressed as follows:

Allison H. Highley, Esq.
City of Montgomery
Legal Department
P.O. Box 1111
Montgomery, AL  3601-1111


_Terance Dawson_
Terance Dawson

3