RECEIVED
IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
2008 FEB -8  P II: 3NORTHERN DIVISION

TERANCE DAWSON,                           )
      Plaintiff,                         )
                                           )
v.                                         )   Case No. 2:06-CV-1057-WKW-WC
                                           )
CITY OF MONTGOMERY, and                    )
GUINN TIMMERMAN, individually,             )
      Defendants,

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Comes now the Plaintiff in the above captioned action, and hereby respond to Plaintiff's motion for summary judgment as follows:

## STATEMENT OF FACTS

Defendants, City of Montgomery and Guinn Timmerman ("Defendants") have filed with this Court a document entitled "Defendant's Motion for Summary Judgment" ("Defendant's Motion"), citing as authority Rule 56 of the Federal Rules of Civil Procedure. Defendant's Motion should be denied, summary judgment is a drastic remedy and is only available upon a showing that there are no genuine issues of material fact for trial as required by Rule 56 (c) of the Federal Rules of Civil Procedure, Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala. 2004). Moreover, a summary judgment is "appropriate only when the facts before the court so conclusively preclude recovery by one party that judgment in favor of the other is the only possible result." *Spickler v. Greenberg*, 586 A.2d 1232, 1234 (Me. 1991).

The Defendant's motion regarding summary judgment is supported and based on Defendants' reliance on misplaced statements and allegations found in affidavits, interrogatories, a press statement, ethical statement and alleged depositions. These documents (Press statement and ethical statement) contain hearsay and unsupported and unsubstantiated propositions. Although it is alleged that the depositions are apart of the Defendant's evidence they are not incorporated. Any statement made by the Defendant regarding depositions by the Defendant or the Plaintiff, is objected to and should be stricken. The Defendant's motion is replete of data alleging what the two Uniform officers did yet there is no proof in and as to the same.

Defendant's motion for summary judgment misstates Plaintiffs' claims, the evidence concerning them, and the applicable law. Seemingly, despite the clear assertion of Plaintiff's claim, the Defendants' would rather overlook the obvious and simply ignore clear and convincing evidence contrary to the Plaintiff's factual assertions, even when it is contained in the same document, affidavits, and deposition on which Defendant's seeks to rely. For purposes of its summary judgment motion, the Defendants do not dispute that the Plaintiff was pulled over by the Defendant, Guinn Timmerman who was not in uniform and in an un-marked vehicle.

The Defendant, Guinn Timmerman's Affidavit is composed of inaccurate information and inconsistent statements. Much of the information presented assumes facts not in evidence, Plaintiff objects to the same.

2

Plaintiff, Terance Dawson, a legally licensed driver by the State of Alabama
Department of Public Safety was driving his vehicle on Montgomery Highway
approximately 9:00 p.m. til around 9:30 p.m. at night in the City of Montgomery on
November 26, 2004. The Plaintiff on the date in question noticed an un-marked vehicle
riding on the side of the Plaintiff's vehicle. The vehicle driven by the Defendant
continued to ride along side the Plaintiff, at some point thereafter the person (Defendant)
in the un-marked vehicle began yelling something at the Plaintiff. The Plaintiff had no
idea who the individual (Defendant) was. Although not at first, the individual
(Defendant) flashed something at the Plaintiff and screamed at the Plaintiff to pull over.
The individual in this car (Defendant) stated that he was a Police Officer. Uncertain as to
whom the individual was, but desirous of doing the right thing, the Plaintiff fearfully
pulled over to Kentucky Fried Chicken. The individual in the unmarked vehicle
(Defendant) proceeded to pull into Kentucky Fried Chicken on the side of the outgoing
traffic and (creating the potential for an accident) and pulled his vehicle a distance away
from the Plaintiff's vehicle. The Plaintiff later determined the Defendant was Guinn
Timmerman. The Defendant approached the Plaintiff's vehicle and yelled at the Plaintiff
to keep his hands on the steering wheel and not to get out of the car. The Defendant who
was riding in the unmarked vehicle, who was not wearing a uniform yelled to the Plaintiff
that he (Defendant) was a Police Officer. The Plaintiff's phone run and the Plaintiff was
in the process of answering it, when the Defendant told the Plaintiff he could not answer
the phone. The Plaintiff indicated to the Defendant that he had to use the restroom; the
Defendant told the Plaintiff that he could not use the restroom. The (Defendant) turned
his back to the Plaintiff and radioed into headquarters. The Plaintiff attempted to

3

ascertain from the Defendant what if anything he (Plaintiff) had done. Several individuals were coming in and out of Kentucky Fried Chicken. The Defendant yelled loudly that the Plaintiff looked like somebody who got high; he looked like somebody who smoked crack cocaine. Customers were able to hear the Police tirade. The Defendant requested that the customers leave because it was Police business.

After a period of time, two Uniformed Police Officers appeared on the scene. There was a 2 liter Coca Cola in the Plaintiff's vehicle. One of the officers, Officer Lewis, asked the Plaintiff to pass him the Coca Cola bottle. He took a whiff of it and returned it to him. Officer Lewis stated this man is just drinking Coca Cola there is *no smell of alcohol* in the car or on him. Officer Lewis then asked the Plaintiff to step out of the car. The Plaintiff was asked for his driver's license and told to place his hand on the trunk of Plaintiff's vehicle. Officer Lewis proceeded to pat the Plaintiff down and searched his pockets. The Uniformed Police Officers began to administer a field sobriety test. The Plaintiff passed the test. The Plaintiff then was asked if the interior of his vehicle could be searched. No alcohol or drugs were found in the Plaintiff's vehicle. No prescriptions were found in the Plaintiff's vehicles or bottles of prescriptions. The Plaintiff was never asked if he had taken or was on any medication. There was nothing to suggest that the Plaintiff was high, drugged or on any medication, drugs or alcohol.

The Plaintiff never engaged in a conversation with either of the two Uniformed Officers nor the Defendant about Angler Trawick. The Plaintiff has not and does not refer to Ms. Trawick by this name. Ms. Trawick and the Plaintiff were acquainted.

4

The Defendant is not sure where he first encountered the Plaintiff (Defendant's Brief, pg. 2, para. 5) places the Plaintiff in the vicinity of Ann Street and Mt. Meigs Road. On the otherhand, the Defendant places the Plaintiff improperly turning off of Ann Street into the oncoming traffic lanes of Atlanta Highway. (Defendant's Affidavit, pg.1) Further alone in the Defendant's brief, the Defendant states when asked by the Plaintiff what evidence did he rely upon to form your opinion of me when you accused me of under the influence, " I hope, you were sitting at the intersection of Ann Street and Madison, in other words, you turned into, *I believe* it was, the westbound lane of Madision Avenue with the median separating the east and westbound lanes on your right side, not on your left side; (Defendant's Brief, Page 6). The Defendant is again inconsistent as to what he purports that the Plaintiff did. The Defendant states the Cadillac driven by the Plaintiff made several erratic movements at one time swerved halfway into the oncoming traffic lane on Mt. Meigs Road before being corrected (Defendant's Affidavit, Page 1). On Page 6, of the Defendant brief, he states that the Cadillac was observed improperly turning off of Ann Street into the oncoming traffic lanes. The Defendant vacillates from swerving halfway to driving into the oncoming traffic lane. When you turn left off of Ann Street onto Madison Avenue there is a divider between the east and west bound traffic on Madison Avenue. When the Plaintiff turned left from Ann Street onto Madison Avenue, the Plaintiff turned into the inside lane which is on the right side of the divider. Traffic is extremely heavy during 8:00 p.m. and 9:30 p.m. on this street. If the Plaintiff had been swerving as the Defendant indicates the Plaintiff would have hit the Defendant's vehicle. The Defendant's vehicle was facing the oncoming traffic; it was across the double line. The Defendant was on the driver side of

5

on this street. If the Plaintiff had been swerving as the Defendant indicates the Plaintiff would have hit the Defendant's vehicle. The Defendant's vehicle was facing the oncoming traffic; it was across the double line. The Defendant was on the driver side of the Plaintiff's vehicle which places him facing oncoming traffic on Mt. Meig Road. (Defendant's Brief, pg. 2). When it is suitable, the Defendant does not remember things, such as recalling onlooker, (pg. 8 Defendant's brief,)

The Defendant, a Montgomery City Police Officer pulled alongside the Plaintiff, told him to pull over and detained the Plaintiff. The Plaintiff was not allowed to use the restroom, use his phone, nor get out of his vehicle. When a driver has produced a valid license and proof of entitlement to operate the vehicle, an officer may issue a citation, but then usually must allow the driver to proceed without further delay or questioning. United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998). Two exceptions to this general rule exist however. An officer may question the driver further if (1) the officer has an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity, or (2) the driver voluntarily consents to further questioning. Id. Neither the Officers nor the Defendant had a reasonable or articulate suspicion of illegal activity when they continued to question the Plaintiff and the Defendant did not consent to the questioning. The Plaintiff's license was confiscated by the Defendant and not returned. In determining the scope of a defendant's interaction with the Defendant, we must ascertain what a reasonable person would have understood by the exchange between the Plaintiff and the Defendant. Would a reasonable person have felt that he was detained by

6

the Defendant, that his vehicle was seized, that his privacy had been violated, and whether there was a conversion? The brief and supporting evidence suggest yes.

The day following the seizure of the Plaintiff's license and conversion of his car, the Plaintiff contacted the police station and requested the seized items be returned to him. His request was refused. Plaintiff had to pay to retrieve a duplicate license and pay someone to take him to retrieve his vehicle.

### OBJECTION TO CLAIM FOR QUALIFIED IMMUNITY OBJECTION

Timmerman alleges that he feared for his safety, as such Dawson who was not placed under arrest was not allowed to leave his vehicle, forced to keep his hands on the steering wheel, was not allowed to answer his telephone or use the restroom.

#### *§ 1983. Civil action for deprivation of rights provides that:*

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

The qualified immunity test requires a two-part analysis: "(1) Was the law governing the official's conduct clearly established? (2) Under that law, could a reasonable officer have believed the conduct was lawful?" 988 F.2d at 871; Tribble v. Gardner, 860 F.2d 321, 324 (9th Cir. 1988), cert. denied, 490 U.S. 1075 (1989). Timmerman's action was not reasonable. It is only later in his deposition taken two years later that he (Timmerman) attempts to align his actions with rules and regulation within the Police Department, even so Timmerman falls short. Hence, the qualified immunity doctrine protects government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

In determining whether Timmerman is entitled to qualified immunity, (1) identify the specific right allegedly violated; (2) determine whether the right was "clearly established;" and (3) determine whether a reasonable officer could have believed that his or her conduct was lawful. Alexander v. City and County of San Francisco, 29 F.3d 1355, 1363-64 (9th Cir. 1994)

In part, the Defendant seeks to obtain summary judgment on the ground of qualified immunity. A qualified immunity defense must be considered in proper sequence, Supreme Court of the United States Saucier v. Katz et al. 533 U.S. 194 (2001) 194 F.3d 962, reversed and remanded. In Saucier the court held: qualified immunity is an entitlement not to stand trial, not a defense from liability. *Mitchell* v. *Forsyth, 472 U.S. 511.* The initial inquiry is whether a constitutional right would have been violated on the

8

facts alleged, for if no right would have been violated, there is no need for further inquiry into immunity. Timmerman alleges that no rights were violated of the Plaintiff (Dawson).

In the summary judgment, the Defendant does not, dispute the fact that the Plaintiff was required by the Defendant to remain in his vehicle, not allowed to use the restroom or his phone, was frisked, patted down, given a sobriety test, despite any observable indications that the Plaintiff had engaged in or used alcohols or drugs or that they were on his person or in his vehicle. The Defendant does not dispute the fact in his Motion for Summary Judgment that neither of the Uniformed Officers found anything to suggest that the Plaintiff had been driving, or had used drugs. The Uniformed Officers allowed the Plaintiff to leave, the Defendant Timmerman without having reasonable cause to do so would not allow the Plaintiff to drive his vehicle away from the restaurant. The Defendant's Motion for Summary Judgment not dispute that the Defendant, Timmerman never cited the Plaintiff, gave his a warning, had the vehicle towed or anything of that nature. Yet, the Defendant, refused to allow the Plaintiff to drive his vehicle away from the scene. The Defendant's Motion for Summary Judgment does not dispute that a Police Officer, in the Juvenile Division, driving an un-marked vehicle pulls on the side of the Defendant, flashing metal yelling for him to pull over, which threatened the Plaintiff's person causing him to fear for his safety. Thus, the Defendant's summary judgment motion invites this Court to rule, *as a matter of law*, that because of the privilege of Defendant as a Police Officer in the City of Montgomery, he is allowed to engage in this broad series of acts at the core of his objection. Much of the evidence that Defendant ignores comes from its own documents. The

9

Defendant's approach in depositions and in its motion for summary judgment is to deny
what its contemporaneous documents plainly say -- and to claim a privilege.    The
Plaintiff objects to the defects in the substance of the Defendant's proof.  Plaintiff objects
to Defendant's Exhibit E, F – Press Release, Law Enforcement Code of Ethics.

CONSTITUTIONAL VIOLATIONS

Plaintiff asserts Defendants violated his constitutional Fourth, and
Fourteenth Amendment rights by wrongfully seizing his vehicle, and license without
probable cause, and by later retaining his license and refusing to allow him to drive his
vehicle without procedural due process in that a meaningful post-deprivation remedy for
the loss was never made available to Plaintiff.  Plaintiff further asserts Defendant is liable
because it failed to adequately train its police officers as to lawful seizures and the
retention of personal property, and that the deficiency in training actually caused the
violation of Plaintiff's constitutional rights.  The Plaintiff has a right under the 4th and
14th Amendment to be protected from the egregious actions of the Defendant who used
his position as a police officer to engage in inappropriate stop, and unbecoming conduct
with a citizen.

The inadequacy of police training may serve as the basis for Section 1983 liability
where the failure to train in a relevant respect amounts to deliberate indifference to the
constitutional rights of persons with whom the police come into contact.    Canton v.
Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).  The Court further states
that failure to train may fairly be said to represent a policy for which the  government

10

entity is responsible, and for which it may be held liable where the injury results, if, in the light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the government entity's policymakers can reasonably be said to have been deliberately indifferent to the need. Canton, supra.

The Defendants actions were not based on probable cause. The Defendant alleges that the Plaintiff was driving extremely slow swerving. It is legally possible to do so. The Defendant further alleges that the Plaintiff was swerving or driving on the wrong side of the road, the defendant acknowledges that he pulled onside of the Plaintiff. It was the Defendant not the Plaintiff who was driving in the direction of on-coming traffic. Although, the Defendant indicates that he did not know who the Plaintiff was it is difficult at best, in lieu of the alleged circumstances to believe that the Defendant had not called in to check who owned the car that the Plaintiff was driving.

In the instant case, Plaintiff vehicle was his sole means of transportation. Plaintiff had to get back and forth to work. Plaintiff also needed his vehicle to get around. It is illegal to drive in the State of Alabama without a valid license. The Plaintiff could not drive his vehicle until he was able to procure a license. Plaintiff had to seek alternative mean of getting around. Defendant has asserted no evidence to indicate the Plaintiff's vehicle was used for an unlawful purpose or that illegal substances were found in the vehicle. Though no probable cause existed to seize the vehicle, and the Plaintiff's license, the Defendant instructed the Plaintiff to leave his vehicle and find alternative means of getting home clearly without Plaintiff's consent. In United States v. Place, 462

11

U.S. 696, 707-09, 103 S. Ct. 2637, 2645, 77 L. Ed. 2d 110 (1983), the Supreme Court states the seizure of personal property, even to facilitate an investigation of suspicious surrounding circumstances, must generally be accompanied by probable cause. If, however, the seizure is brief and minimally intrusive, then only reasonable suspicion is required to justify the seizure as reasonable under the Fourth Amendment. In the instant case, the seizure of the vehicle was not brief and minimally intrusive. To seize the vehicle, the Defendant ordered the Plaintiff to pull off the road, made him undergo a series of test and then after the Plaintiff passed the test refused to allow the Plaintiff to take his vehicle home. Moreover, the Plaintiff driver's license was taken from him and not given back. The Plaintiff was not able to get the vehicle until a valid license was procured. This was done over the Plaintiff's objection. It was not until three days later that Plaintiff was able to retrieve his license and drive after having to pay a fee for a duplicate license. Considering the foregoing, the seizure of the vehicle was not based on probable cause, and was not justified on the basis of reasonable suspicion. In light of the duties assigned to the police officers that seized Plaintiff's vehicle, said officers' training should have made them cognizant as to the legal requisites for a lawful seizure. The manner in which the officers conducted the seizure indicates their need for more or different training is so obvious, and the inadequacy of which is so likely to result in the violation of constitutional rights, that the government entity's policymakers can reasonably be said to have been deliberately indifferent to the need. Canton, supra.

Plaintiff asserts that Defendant's continued retention of his license and vehicle, without providing him a suitable post-deprivation remedy, violated his procedural due process rights. Plaintiff was forced to urinate on himself. He was not allowed to leave

nor retain his vehicle to leave timely leave the place of his detention. Plaintiff asserts he was deprived of a post-deprivation remedy because no forfeiture proceedings were ever initiated against his vehicle, and no meaningful post-deprivation remedy for the loss sustained by the Plaintiff was made available to him.  Hudson v. Palmer, 468 U.S. 517, 533, 104 S. Ct. 3194, 3204, 82 L. Ed. 2d 393 (1984), (extending the holding in Parratt v. Taylor, 451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981), to cover intentional deprivations of property by state employees acting under color of state law).

       A government entity is subject to liability under 42 U.S.C. Section 1983 for violating another person's federally protected rights where the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.  Monell v. New York City Dept. of Social Serv., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Governmental entities may be sued for constitutional deprivations inflicted pursuant to governmental custom even though such a custom has not received formal approval through the body's official decision making channels.  Monell, supra.  Accordingly, it is when the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under 42 U.S.C. Section 1983. Monell, supra; Canton, supra. In the instant case, the Defendant instructed the Plaintiff to leave his vehicle, and the Uniformed Police Officers in conjunction with the Defendant took the Plaintiff's license. The Uniformed police officers although initially indicating that the Plaintiff could drive away complied with the Defendant's order that the Plaintiff could not drive away in his vehicle.  It can be fairly said that the Defendnat represents

13

official policy or custom, and that the act of the Defendant in executing the order for the
Plaintiff to leave his vehicle violated Plaintiff's constitutional rights and the Defendant as
a government entity is responsible under 42 U.S.C. Section 1983.

## CONTESTED AND DISPUTED FACTS

In Section 3 of Defendants Brief Paragraph 5, the Defendant misquotes facts. The
Defendant contends that it is an uncontested fact that the Defendant pulled along side the
Plaintiff while he was in the vicinity of Ann Street and Mt. Meigs Road this is not true
and the Plaintiff objects to the same. The Defendant drove on the side of the Plaintiff for
a period prior to requesting that the Plaintiff pull over.

In Section 3 Paragraph 6 of the Defendant's Brief, the Defendant again attempts
to present information that has not been proven and is inaccurate to which the Plaintiff
objects. The Defendant attempts to assert the role of a Psychologist of which he has not
laid a proper foundation to show that he is qualified as such by seeking to indicate the
mindset of the Plaintiff in stating that it is an uncontested fact that the Plaintiff
"understands that the Defendant Timmerman's request that Plaintiff keep his hands on
the wheel and not answer his phone were for the officer's safety. The Plaintiff (Dawson)
asserts that at no time was the Defendant Timmerman in fear of his safety and that his
actions of pulling on side of him, turning his back while radioing for back-up are but two
instances of this. (Defendant's Brief, Para 6). Approaching Plaintiff's vehicle and
engaging in dialog with him before the Uniformed Patrol Officers were present also attest
to this matter. The information cited by the Plaintiff regarding safety was uttered by the
Defendant not information believed by the Plaintiff. Interestingly, neither of the

14

Uniformed Officers attested to being in fear for their safety because of the Plaintiff's demeanor or presence. The Defendant acknowledges in his deposition that the Plaintiff was very cooperative (Defendant's Affidavit, Para. 5, Brief, Para ). The Defendant acknowledges that his car was parked away from the Plaintiff and that he (Defendant) had to walk over to the Plaintiff's vehicle (Paragraph 6 of Defendant's brief). Protocol would indicate that the proper procedure was for the Defendant, Timmerman to simply wait for back-up if he (Timmerman) felt threatened. Defendant, Timmerman never indicates what was done or caused him to feel threatened. At no time did the Defendant pull out a weapon, if the Defendant was in fear why did he (Defendant) not wait until back up (Defendant admits that he had called back) arrived and without the assistance of back-up approach the driver. The Plaintiff pulled over as requested, initiated no efforts to flee (Defendant's affidavit, Para. 5). At no point did the Defendant ask if the Plaintiff had a weapon, or attempt to pat him down. How fearful could the Defendant have been to have approached the Plaintiff's vehicle without doing any of these things (Paragraph 6 of Defendant's Brief, Ex. C. p. 34, II. 12-15). The Defendant (Timmerman) again misstates the evidence when he indicates that the Plaintiff's license was revealed to him (Timmerman) and that it identified the driver as former City of Montgomery Councilman Terance Dawson (Affidavit, Para. 5). Although this is not a significant factor it serves to illustrate the number of instances when the Defendant (Timmerman) misstates information. Nothing on the Plaintiff's license suggest that he is or was former City of Montgomery Councilman, Terance Dawson.

At no time did the Plaintiff have a conversation with either the Defendant (Timmerman) or the Uniformed Officers that he was in the area to pick up his girlfriend,

Angler Trawick (Defendant's Affidavit, 8). This name was never mentioned and this
conversation never occurred. Plaintiff objects to the same and would ask that it be
stricken. The Plaintiff was not in a relationship with Ms. Trawick at this time and would
suggest that the Defendant (Timmerman) gathered information from the media and from
Mobile Police Records regarding an incident that occurred a year or two later.

Timmerman indicates (Affidavit, Para. 9) that because there was prescription
bottles in the car and based on how he was driving …., we felt that something was
affecting Dawson's ability to drive and that he was not capable of safely driving home.
This is clearly untrue, the Plaintiff objects to assertions of the same, request that it be
stricken and not included as evidence supporting the Motion. The Defendant's Brief and
Deposition is devoid of any information suggesting that the Plaintiff was asked at
anytime if he (Plaintiff) had taken any medication, prescribed or otherwise, or that the
Uniformed Officers had located during their search of the interior of the vehicle any
prescription bottles. There is no evidence that any of the alleged bottles had any
medications in them. Although the two Uniformed Officers told the Plaintiff that he
(Plaintiff) could leave, it was Timmerman (Defendant's Affidavit, Para. 9) who briefly
conferred with the patrol officers and ultimately would not allow the Plaintiff to leave.
The Plaintiff's indicated this. The Defendant indicates that he did not do anything after
the two patrol officers came on the scene, (Pg. 5) this is untrue The Defendant
(Timmerman) confiscated the Plaintiff's drivers' license (Plaintiff's Complaint, Para. 18).
Nothing was initially seized from the Plaintiff. It Uniformed police officer indicates to
the Plaintiff that he could leave.

16

The allegation in Defendant's Brief (Para. 8) states that Defendant's Timmerman's involvement was limited to the initial stop. This is untrue and the Plaintiff vehemently objects to the same.    Once the Uniformed Officers had smelled a bottle of coca cola in Plaintiff's vehicle, ordered the Plaintiff get out of the vehicle, reviewed his driver's license, completed the sobriety test, patted the Plaintiff down, checked his pocket, searched the interior of the Plaintiff's vehicle, changed the license plate, impounded the prior license plate and told the Plaintiff he could leave, the Plaintiff got in his vehicle cranked it up and placed it in reverse, Timmerman told the Plaintiff to park his vehicle (Defendant's Brief, Paragraph 9).    The Uniformed police officers were still present. After allowing the Plaintiff to get in his vehicle not once did the Uniformed Police Officers say drive carefully and never was the Plaintiff warned. Timmerman ordered the Plaintiff to get out of the vehicle, park it and turn the engine off.    The Uniform Officers indicated to the Plaintiff that because it was Timmerman's stop they were not the controlling officer of the stop. The Defendant incorrectly states in his brief (Para. 9) that the Officers suggested that the Plaintiff find another ride home, and the Plaintiff agreed. This occurred, after Timmerman stated that the Plaintiff could not drive his vehicle.

It was only after, the Plaintiff attempted to leave that the seizure took place. The plaintiff was forced to leave his vehicle and forced to purchase a replacement license. After being told by the Uniformed Officer that he could leave, and then being ordered by Timmerman to stop the vehicle, park it and get out, the Plaintiff feared that he would be arrested; the Plaintiff had no choice but to leave his vehicle (Plaintiff's Complaint, Para.

17

19).  The Defendant artfully lays out information from the deposition that favors his position; the deposition itself however is not included.

Timmerman goes from indicating that the Plaintiff was driving slow and at once point was about to move into the other lane, to stating that he (Timmerman) could have given the Plaintiff a citation for reckless driving, improper tag or driving on the wrong side of the road (Affidavit, Para. 10).  There is no evidence to substantiate any of this.  If Timmerman legitimately thought that the Plaintiff was doing this wasn't it his duty as an officer of the law to uphold it.

Timmerman alleges that the Plaintiff was not restrained but it was Timmerman who refrained from allowing the Plaintiff (Dawson) to use the restroom.  The Defendant's Affidavit and Brief has been doctored up to substantiate inappropriate actions by the Defendant.  Restrain takes place when an individual is not free to leave. Plaintiff was informed by Timmerman that if he answered his phone, removed his hands from the steering wheel, exited the vehicle; he would arrest him (Plaintiff's Complaint, Para. 7).  Plaintiff was frightened and felt that physical harm would come to him by Timmerman (Plaintiff's Complaint, Para. 11).  Prior to the Uniformed Officers arriving on the scene, Timmerman in a loud voice stated in response to the Plaintiff attempting to ascertain what he had done, that the Plaintiff was drunk, on dope, on crack and the Plaintiff looked as if he was full of crack (Plaintiff's Complaint, Para. 12).  The Plaintiff was detained by the Defendant approximately fifteen (15) minutes prior to calling for dispatch once on the scene (Plaintiff's Complaint, Para. 13).

18

The Uniformed Officers indicated that Timmerman had called in to have them to test the Plaintiff for drugs, despite the fact that they did not smell alcohol or drugs and saw no physical presence of alcohol or drugs. Nothing was mentioned regarding the Plaintiff allegedly driving erratic at this point. Defendant alleges continually that Plaintiff consented; the consent came after the Plaintiff was not allowed to leave and made to stay in place in an uncomfortable position. Plaintiff had already indicated that he had to use the restroom (Plaintiff's Complaint, Para. 11). Plaintiff at no point was told that he did not have to consent or given the impression that he would be allowed to leave if he refused. As such, as a law abiding citizen the Plaintiff consented. The Defendant admits on Page four of his brief that the pat-down search had begun and then the Plaintiff gave his permission.

The fact that the Defendant never gave the Plaintiff a ticket or citation suggests that the stop was bogus and unwarranted. The Defendant attempted to justify his actions and make them fit in line with legal, authorized behavior by suggesting that the Plaintiff was driving slowly and at one point attempted to drive into the other lane. It is not reasonable under any circumstances for un-uniformed, Police Officer riding in un-marked vehicles stop citizens on whims with out legitimate, reasonable cause it creates harm and jeopardizes citizens welfare, and creates an environment of ill will, public distrust and creates fear.

The Defendant acknowledges (Defendant's Brief, Para. 7) that the patrol officers took an open Coca Cola container from the Plaintiff's vehicle and smelled it, but indicated there was no alcohol in it. There was no slurred speech, no smell and no

19

indication that the Plaintiff appeared to be under the influence of alcohol or any narcotics yet the Plaintiff is told to get out of his vehicle. Without any probable cause, the Plaintiff was told to get out of his vehicle, provide his driver's license for review and to walk to he back of his vehicle and place his hands on the trunk (Defendant's Brief, Para 7, Ex. C, p. 41, II. 7-11).

The Plaintiff passed the sobriety test, his pockets were searched and the officer proceeds to search the Plaintiff vehicle (Defendant's Brief, Para. 7). At this point there is no probable cause to search the Plaintiff's vehicle. The Defendant alludes to the fact that the Plaintiff consents, but the consent comes after the Defendant and the other Officers take the Plaintiff through a barrage of test (field sobriety, pat down) and after the Plaintiff is not allowed to leave despite no evidence indicating drugs or indication of alcohol.

The Defendant fills this brief with a host of irrelevant information in an effort to by-past the fact that the Plaintiff's rights were violated. There were no weapons found, no alcohol or illegal drugs found on the Plaintiff or in his vehicle (Defendant's brief pg. 4).

The Fourth Amendment to the U.S. Constitution reads as follows:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Defendant Timmerman willfully, knowingly and with specific intent, deprived the

20

Plaintiff of his rights to freedom from illegal searches and seizures of his person and effects, and of his rights to freedom from unlawful detention and imprisonment, both of which rights are secured by the Fourth and Fourteenth Amendment to the Constitution of the United States. The Plaintiff was made to suffer humiliation and mental anguish, the initiation of the Defendant's action was in the presence of others (Plaintiff's Complaint, Para. 12).

The Defendant substantiates probable cause for him stopping the Plaintiff based on the following:

a)   First observing the Defendant on Ann Street and Madison waiting to turn (Pg. 6, Defendant's Brief);

b)   Defendant's statement I hope you were sitting at the intersection of Ann Street and Madison (Pg. 6, Defendant's Brief) {was the Plaintiff sitting at this spot or not the Defendants response does not indicate that the Defendant is sure};

c)   Defendant's response "I believe it was the westbound lane of Madison Avenue.

These allegations are not accurate and do not provide probable cause.

Plaintiff object to the inclusion of the Press Release, Law Enforcement Code of Ethics, Defendants' indication that he has included exhibits from the Deposition of The Plaintiff and the Defendant which has not been included but merely hinted at when convenient to do so, as evidence it has not been presented pursuant to the Rules of

21

Evidence, a proper chain has not been established. Plaintiff hereby request that all matters objected to be stricken and not included as a part of the evidence.

In Paragraph 4 of the Defendants' Affidavit, he indicated that the Plaintiff, (Dawson) at one time swerved halfway into the oncoming traffic lane on Mt. Meig Road before being corrected. Timmerman later alleges that the Plaintiff was driving on the wrong side of the road (Timmerman Affidavit, Paragraph 5). This testimony is inconsistent, Plaintiff objects to the same and request that it be stricken. Timmerman also allege that he observed the Plaintiff (Dawson) making an improper turn off of Ann Street into the oncoming traffic lanes of Atlanta Highway (Timmerman Affidavit Paragraph 3). If the Plaintiff (Dawson) as alleged by Timmerman turned off of Ann Street into the oncoming traffic lanes of Atlanta Highway this would mean that the Plaintiff turned into five lanes of traffic. Although Timmerman alleges that these alleged actions prompted him to radio in twice (Timmerman Affidavit, Paragraph 3 & 6), he never once cited the Plaintiff (Dawson) for a violation of any City or State ordinance, law or statute. Timmerman indicated that after checking to ensure that it was safe, he pulled up next to the driver's side of the slow moving vehicle (Timmerman Affidavit, Paragraph 5), Timmerman acknowledges here in his Affidavit that it was him (Timmerman) who crossed the double line placing him (not Dawson) on the wrong side of the road.

## CONCLUSION

Considering the foregoing, and all matters related thereto, there exists material issues of fact which are to be resolved by trial. Accordingly, Defendant's motion for summary judgment is due to be denied.

To the extent permitted by the Court, Plaintiff reserved the right to supplement this response if necessary.

Respectfully submitted, this 8th day of February, 2008.

Terance Dawson, Pro se
P. O. Box 6050
Montgomery, AL 36106
(334) 561-4011

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 8th day of February, 2008, sent a copy of the foregoing to the Defendant via U.S. mail, first-class postage pre-paid to: Allison H. Highley, Counsel for City of Montgomery, Legal Department Post Office Box 1111, Montgomery, AL 36101-1111f.

Terance Dawson

RECEIVED IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
2008 FEB -8  P 11: 35 NORTHERN DIVISION

TERANCE DAWSON,                        )
    Plaintiff,                         )
                                       )
v.                                     )    Case No. 2:06-CV-1057-WKW-WC
                                       )
CITY OF MONTGOMERY, and                )
GUINN TIMMERMAN, individually,         )
    Defendants,

## AFFIDAVIT OF TERANCE DAWSON

State of Alabama)

County of Mobile)

    Before me, a Notary Public in and for said State and County, personally appeared

Terance Dawson, and after first being duly sworn by me, did depose and state as follows:

    My name is Terance Dawson, and I am over the age of nineteen (19) years of age.

I am currently employed as a Data Processing Specialist for the State of Alabama

Department of Human Resources. I certify that the information contained herein is true to

the best of my knowledge and belief.

    I am a legally licensed driver by the State of Alabama Department of Public

Safety. Approximately 9:00 p.m. til 9:30 p.m. at night in the City of Montgomery on

November 26, 2004, I was driving on the Montgomery City Street.  On the date in

question, I noticed an un-marked vehicle riding on the side of my vehicle. The vehicle

driving on the side of my vehicle continued to ride alongside my vehicle, at some point

thereafter this person in the un-marked vehicle began yelling something at me.  I had no

idea who the individual was.   Although not at first, the individual flashed something at

me and screamed for me to pull over.  The individual in the un-marked car stated that he

was a Police Officer. Uncertain as to whom the individual was, but desirous of doing the right thing, I fearfully pulled over to Kentucky Fried Chicken. The individual in the unmarked vehicle proceeded to pull into Kentucky Fried Chicken on the side of the outgoing traffic (creating the potential for an accident) and pulled his vehicle a distance away from my vehicle. I later determined that the individual was Guinn Timmerman. Timmerman approached my vehicle and yelled for me to keep my hands on the steering wheel and not to get out of the car. Timmerman who was riding in the unmarked vehicle, was not wearing a uniform yelled out to me that he was a Police Officer. My phone run and I was in the process of answering it, when Timmerman told me not to answer the phone. I indicated to Timmerman that I had to use the restroom; Timmerman told me that I could not use the restroom. As I waited in the car, attempting to hold my bladder, Timmerman turned his back to me and radioed into headquarters. I attempted to ascertain from Timmerman what if anything I had done. Several individuals were coming in and out of Kentucky Fried Chicken. Timmerman yelled loudly that I looked like somebody who got high; like somebody who smoked crack cocaine. Customers were able to hear Timmerman's tirade. Because of the accusation and the volume of Timmerman's voice individuals were hanging nearby, Timmerman requested that these individuals leave because it was Police business. I informed Timmerman that I had to use the restroom and that I had an overactive bladder. Timmerman refused resulting in me being totally humiliated in that due to the length of this ordeal, I urinated publicly on myself.

2

After a period of time, two Uniformed Police Officers appeared on the scene. There was a 2 liter Coca Cola in my vehicle. One of the officers, Officer Lewis, asked me to pass him the Coca Cola bottle. Officer Lewis took a whiff of it and returned it to me. Officer Lewis stated "this man is just drinking Coca Cola there is *no smell of alcohol* in the car or on him." After conversation between the parties, Officer Lewis asked me to step out of the car. I did. I was asked for my driver's license and told to place my hands on the trunk of my vehicle. Officer Lewis proceeded to pat me down and searched my pockets. Together, the Uniformed Police Officers began to administer a field sobriety test on me. I passed the test. I then was asked if the interior of my vehicle could be searched. No alcohol or drugs were found in my vehicle. I had not been drinking, smoking, and was not using narcotics or any illegal substances. No prescriptions were found in my vehicles or bottles of prescriptions. I was never asked if I had taken or was on any medication. I had not. There was nothing to suggest that I was high, drugged or on any medication, drugs or alcohol.

I never engaged in a conversation with either of the two Uniformed Officers nor the Defendant about Angler Trawick. I have not and do not refer to Ms. Trawick by this name. Ms. Trawick and I were acquainted briefly a year or so prior to incident in question and were not been dating in 2004 nor seeing one another.

When you turn left off of Ann Street onto Madison Avenue there is a divider between the east and west bound traffic on Madison Avenue. When I turned left from Ann Street onto Madison Avenue, I turned into the inside lane which is on the right side

3

of the divider. Traffic is extremely heavy during 8:00 p.m. and 9:30 p.m. hour on this street. I had not been swerving nor driving on the wrong side of the road. If I had been driving on the wrong side of the road, I would have hit the Timmerman's vehicle. Timmerman's vehicle was facing the oncoming traffic; it was across the double yellow line. Timmerman was on the driver side of my vehicle which placed him facing oncoming traffic on Mt. Meig Road.

I never engaged in any activity that would cause Timmerman to be in fear of his safety. I was fearful because of the way that I was pulled over. Throughout this grueling process, I was cooperative. Timmerman never gave me a citation for reckless driving, improper tag or driving on the wrong side of the road. Even after I was allowed to go, I was not given a warning by Timmerman or either of the Uniform Police Officers.

During the course of this ordeal, I was administered a field sobriety test, patted down, pockets checked, my drink was checked for the smell of alcohol, and the interior portion of my vehicle was searched. There were no drugs nor alcohol found on me nor in my vehicle. It was stated even before the sobriety test that I did not smell like alcohol and I was not slurring. There was nothing to indicate from my person that I had consumed alcohol or drugs. Nevertheless, I was not allowed to use the restroom, nor drive my vehicle away from the sight. My vehicle was not impounded. I simply was not allowed to drive it.

The Uniformed Police Officer indicated I was free to leave. My driver's license was never returned. I had to replace my driver's license on November 29, 2004 after

4

attempting to get them back the following day from the Police Department. After I got in my vehicle, cranked it up and put it in reverse, the Defendant (Guinn Timmerman) ordered me to get the vehicle out of reverse, park it and get out. When I got out of the car, I approached the two Uniformed Officers indicated that it was Timmerman's call. It was not their stop and that Timmerman was the controlling officer on the scene.

It was clear that the other Officers were not in agreement with Timmerman's call throughout this ordeal but as stated because he was the controlling officer allow things to continue and proceed in the direction dictated by Timmerman. Timmerman restrained me in my car, refused to allow me to use the restroom, and would not allow me to get my license back and out of frustration after not finding anything refused to allow me to drive my vehicle home. I had sought other means of getting home. An offer was made but, I did not feel comfortable after the ordeal, I had endured with the offer to allow the Officers to take me home. Timmerman had no valid reason for not allowing me to drive home. His actions for not doing appeared purely willful and malicious. The two other seasoned Uniformed Officers had indicated that I could drive my vehicle. These were the same Officers who administered the test, the pat down, inspected my car, noted my voice was void of slur and smelled my beverage.

I have read the above and foregoing affidavit consisting of a total of six (6) pages and state that it is true and correct to the best of my present knowledge, information and belief.

Terance Dawson, Affiant

SWORN to and SUBSRCIBED before me this $\emptyset$ day of February, 2008.

_____

Notary Public

My Commission expires: _May 26 2008_