IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TERANCE DAWSON,                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )        Case No. 2:06-cv-1057-WKW [wo]
                                   )
CITY OF MONTGOMERY, *et al.*,      )
                                   )
        Defendants.                )

## <u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the court on a Motion for Summary Judgment (Doc. # 29) filed by Defendants City of Montgomery ("City") and Guinn Timmerman ("Timmerman"). For the reasons set forth below, the defendants' summary judgment motion is due to be granted in part and denied in part.

## I.  PROCEDURAL HISTORY

Plaintiff Terance Dawson ("Dawson") filed a six-count *pro se* complaint against the defendants on November 27, 2006. (Compl.) Through 42 U.S.C. § 1983, Count One seeks to redress the deprivation of his Fourth and Fourteenth Amendment rights to be free from illegal searches and seizures and unlawful detention and imprisonment. (*Id.* ¶¶ 22-25.) Count Two alleges that his substantive and procedural due process rights were violated. (*Id.* ¶ 26.) The remaining four counts are state law tort claims for conversion, invasion of privacy, slander, and outrage. (*Id.* ¶¶ 27-30.)

On May 29, 2007, a scheduling order was issued by the Magistrate Judge that, among

other things, established deadlines for discovery and dispositive motions based on an assumed trial date of February 25, 2008. (Doc. # 16.) On the same day, the Magistrate Judge also issued a briefing order warning that the dispositive motion deadline would not be extended "[a]bsent a showing of exceptional circumstances" and that "the court will not automatically deem a party's failure to conduct needed discovery . . . to be [a] valid bas[is] for extending the dispositive motion deadline." (Doc. # 17.)

Almost seven months later and after the discovery and dispositive motion deadlines had passed, the defendants filed a motion to continue the trial because they had not been able to obtain needed discovery from Dawson. (Doc. # 19.) Based on the previous warnings and the defendants' failure to seek court intervention prior to the expiration of the deadlines, the court denied the motion to continue and set a trial date for March 24, 2008. (Doc. # 20.) Despite denying the motion to continue, the court set new deadlines for filing motions to compel and stated that it expected the parties to abide by their Rule 26 discovery obligations. (*Id.*)

After Dawson was finally deposed a few weeks later, the defendants filed a motion seeking an enlargement of the dispositive motion filing period and proposing an expedited dispositive motion briefing schedule that would not affect the trial date. (Doc. # 22.) The court reluctantly granted the motion "not in sympathy with defendants, but to test the merits of the case at the summary judgment stage." (Doc. # 23.) New deadlines were set allowing the defendants to file a dispositive motion and giving the plaintiff time to respond. (*Id.*) The

defendants were not allowed to reply. (*Id.*) On January 18, 2008, the defendants filed their summary judgment motion (Doc. # 29), and the plaintiff responded (Doc. # 38) in opposition on February 8, 2008.

## II. FACTS

Dawson is employed as a data processing specialist with the State of Alabama. (Dawson Dep. 6:6-8, Jan. 3, 2008.) Prior to that, he performed similar work for the Department of Defense at Gunter Air Force Design Center. (*Id.* at 7:11-14.) He has a degree in business administration from Alabama State University, (*id.* at 8:1-7), and is a former member of the Montgomery City Council. (*Id.* at 60:13.) While he was on the city council, he played a supportive role in helping terminate some police officers "for trumping up charges on citizens and violating . . . their rights." (*Id.* at 60:13-21.) Dawson implies this may have provided motive for the event that forms the basis of his claims. (*Id.* at 60:16-21.)

On the night of November 26, 2004, Dawson was driving a Cadillac Sedan DeVille in the vicinity of the intersection of Ann Street, Atlanta Highway, and Mt. Meigs Road in Montgomery, Alabama. (*Id.* at 10:8-15, 13:22-23.) According to Timmerman, who is a detective with the Montgomery Police Department ("MPD"), he observed Dawson's vehicle make an improper left turn from Ann Street into the oncoming traffic lanes of Atlanta Highway. (Timmerman Aff. 1.) After radioing MPD to report a possible intoxicated driver and to request assistance, he observed Dawson's car take the next left from Atlanta Highway

onto Mt. Meigs Road "at an extremely slow rate of speed."[1]   (*Id.*)   He next observed Dawson's vehicle make "several erratic movements," including once swerving into the oncoming traffic lane of Mt. Meigs Road.[2]   (*Id.*)

Timmerman, who was driving an unmarked police vehicle and not wearing a police uniform, pulled up next to Dawson, flashed his badge, identified himself as a police officer and ordered him to pull over.  (*Id.* at 2; Pl.'s Resp. Br. 3.)  Dawson pulled over into a parking spot at a nearby Kentucky Fried Chicken. (Dawson Dep. 19:10-12.)  Timmerman pulled into a different parking spot, ordered Dawson to remain in his vehicle with his hands on the steering wheel and again radioed MPD for a patrol unit to assist him.  (Pl.'s Resp. Br. 3; Dawson Dep. 32:13-20.)

During the five to fifteen minutes it took for the uniformed patrol officers to arrive, Dawson's cell phone rang and Timmerman did not let him answer it.  (Dawson Dep. 34:3-6;

---

[1]  The court takes judicial notice that Mt. Meigs Road intersects Atlanta Highway at an angle of  approximately forty-five degrees and less than four hundred feet west of where Ann Street intersects Atlanta Highway.  *See Weaver v. United States*, 298 F.2d 496, 498-99 (5th Cir. 1962) (explaining courts may properly take judicial notice of the location of streets).  Additionally, Atlanta Highway becomes Madison Avenue near the Mt. Meigs Road intersection.

[2]  Dawson thinks it is possible he could have been on his cell phone at this time, (Dawson Dep. 26:8-22), but he disputes Timmerman's assertion that he turned into oncoming traffic lanes and that he swerved onto the wrong side of the road.  (*See* Dawson Aff. 3.)  Dawson claims that when he turned left onto Madison Avenue/Atlanta Highway from Ann Street, he turned into the inside lane of the westbound lanes of traffic, which would properly place the median to his left.  (Pl.'s Resp. Br. 5.)  Timmerman's testimony is in direct contradiction to this.  He states that Dawson "turned into, I believe it was, the westbound lane of Madison Avenue with the median separating the east and westbound lanes on your right side, not on your left side."  (Timmerman Dep. 16:12-17.)  The court is mindful that it must view the facts, and all reasonable inferences therefrom, in the light most favorable to Dawson at this stage of the proceedings.  *Peterson v. Baker*, 504 F.3d 1331, 1336 (11th Cir. 2007).

38:19-21.) Dawson also requested that he be allowed to use the restroom, but Timmerman did not let him do so. (*Id.* at 56:22-23.) Dawson claims this led him to urinate on himself "[j]ust a little." (*Id.* at 57:14-22.) According to Dawson, Timmerman was loud and belligerent and made offensive comments in front of people in the restaurant parking lot. (*Id.* at 54:4-23.) Dawson testified that the offensive comments were generalizations of drug use directed at "you people," which he took to mean black people. (*Id.*) In his brief, Dawson claims Timmerman also said he "looked like somebody who got high" and "somebody who smoked crack cocaine." (Pl.'s Resp. Br. 4.) Timmerman strongly denies making statements of this nature. (Timmerman Dep. 18:17-19:3, Jan. 3, 2008.)

Once the uniformed patrol officers arrived on the scene, they took over the administration of the traffic stop. (Dawson Dep. 48:17-49:8.) One of the patrol officers took a Coca-Cola bottle from Dawson's vehicle. (*Id.* at 40:4-22.) The officer smelled the bottle and indicated it did not contain alcohol. (*Id.*) The officers had Dawson exit his vehicle and asked for his driver's license, which he gave to them. (*Id.* at 41:1-5.) The officers asked Dawson if they could conduct a pat-down search and he agreed to it. (*Id.* at 43:11-15.) While Dawson's hands were placed on the trunk of his car, the officers proceeded to pat him down and search his pockets. (*Id.* at 41:7-20.) The only things found in his pockets were keys and cash. (*Id.* at 41:21-22.)

The officers then administered "several field sobriety tests" on Dawson, (Timmerman Aff. 2), which required him to count backwards on his fingers while standing on one foot.

(Dawson Dep. 42:15-19.)   The defendants admit Dawson successfully passed all field sobriety tests.  (Timmerman Aff. 2.)  Despite passing the sobriety tests, the officers asked to search his vehicle – supposedly because of Timmerman's allegations of drug use.  (Dawson Dep. 43:1-10.)  Dawson agreed to a search of his vehicle and gave them "full permission" to "check the hood, trunk, tires, rims, the vehicle."  (*Id.* at 43:7-10.)  No alcohol or illegal drugs were found on Dawson or in his vehicle.  (Defs.' Mot. Summ. J. Br. 4.)  The officers noticed that Dawson's vehicle displayed two license plates, one of which was a handicapped license plate that belonged to the vehicle's previous owner.  (Dawson Dep. 46:4-47:22.)  The officers installed the license plate registered to Dawson and then confiscated the handicapped tag.  (Timmerman Aff. 2.)

A key factual dispute exists over whether there were prescription drugs or prescription drug bottles found in Dawson's vehicle.  Timmerman asserts there were "several prescription drug bottles" in the vehicle that were made out to Dawson.  (Timmerman Aff. 2; Timmerman Dep. 17:7-10.)  The defendants provide no information as to the kind of medication or whether the bottles actually contained any medication.  Dawson flat out denies this assertion and states, "No prescriptions were found in the Plaintiff's vehicles [sic] or bottles of prescriptions."  (Pl.'s Resp. Br. 4.)  In his deposition he claimed he could not recall what medications were prescribed to him on the night of the traffic stop and referred the defendants to his medical records.[3]  (Dawson Dep. 21:23-24:7.)  Regardless of what may or

---

[3]  When asked to list all the drugs prescribed to him over the past five years in an interrogatory, Dawson only listed Viagra, Cialis, and a breathing machine.  (Doc. # 30-9, at 5.)

6

may not have been prescribed to him, he denies that he was taking any prescription medicines at the time of the traffic stop. (*Id.* at 33:11-12; Dawson Aff. 3.)

After smelling his beverage, conducting a pat-down search, conducting field sobriety tests, and searching his vehicle, the two uniformed patrol officers appeared ready to let Dawson go. (Dawson Dep. 50:4-6; Pl.'s Resp. Br. 16.) Dawson was not arrested, ticketed, or cited for anything. (Defs.' Mot. Summ. J. Br. 9.) Dawson got back in his vehicle, started the engine, and put it in reverse. (Dawson Dep. 50:7-23.) Before he had a chance to leave, Timmerman stopped him, told him he could not go anywhere, and ordered him to turn his vehicle off. (*Id.*) After Dawson turned his vehicle off, Timmerman allegedly told him he was not allowed to drive. (*Id.* at 51:2-4.) Dawson asked the two patrol officers why he was not allowed to drive his vehicle. (*Id.* at 51:6-10.) They allegedly told him it was Timmerman's traffic stop, and, therefore, as the controlling officer, it was his decision to make. (*Id.*; Dawson Aff. 5.)

After denying him the use of his vehicle, the officers suggested Dawson find another ride home, and he initially agreed to do so.[4] (Pl.'s Resp. Br. 17; Timmerman Aff. 3.) For reasons unclear to the court, Dawson either did not find another ride or changed his mind. (Timmerman Aff. 3.) When finding another ride did not pan out, the patrol officers offered to give him a ride home, but Dawson declined because he "did not feel comfortable after the ordeal [he] had endured." (Dawson Aff. 5.) Ultimately, Dawson left his vehicle parked at

---

[4] Dawson states that he "had sought other means of getting home." (Dawson Aff. 5.)

the restaurant and walked away. (Dawson Dep. 51:12.) His driver's license was never returned. (Dawson Aff. 4.)

Dawson contacted the police department the day after his traffic stop. (Pl.'s Resp. Br. 7.) He requested they return his driver's license but his "request was refused." (*Id.*) Ultimately, he never got his license back and he had to pay a fee in order to acquire a duplicate license. (*Id.*) Finally, after getting his duplicate license three days later, he retrieved his vehicle after having to pay someone to take him there. (*Id.* at 7, 12.)

### III. JURISDICTION

Because this case arises under 42 U.S.C. § 1983, the court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). The court exercises supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations supporting both.

### IV. STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he court must view all evidence and make all reasonable inferences in favor of

8

the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex Corp.*, 477 U.S. at 322-23.

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A genuine factual dispute exists if a "'reasonable jury could return a verdict for the non-moving party.'" *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## V. DISCUSSION

### A.    *Count One - Illegal Search and Seizure*

In Count One, Dawson alleges four violations of his Fourth Amendment rights: illegal

search of his person, illegal search of his vehicle, illegal seizure of his person, and illegal seizure of his effects. (Compl. ¶¶ 22-23.) The Fourth Amendment states, in relevant part, that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. It is made applicable to the States by way of the Fourteenth Amendment. *Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992).

### 1.    **Illegal Seizure of His Person**

The temporary detention of an individual by law enforcement officers during a traffic stop "constitutes a seizure of persons" under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996) (internal quotation marks omitted). Therefore, by the very terms of the Fourth Amendment, the seizure of a driver during a traffic stop must not be unreasonable under the circumstances. *Id.* at 810. "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.*

By statute, driving while under the influence of alcohol or "any substance which impairs the mental or physical faculties" is a traffic offense in Alabama. Ala. Code § 32-5A-191(a) (1975). Timmerman asserts that he observed Dawson's vehicle turning into the wrong lane at an extremely slow rate of speed, and then making erratic movements, including swerving into oncoming traffic lanes. (Timmerman Aff. 1.) These actions, if established, are consistent with those of intoxicated drivers and are sufficient to establish probable cause

10

to initiate a traffic stop. *See, e.g.*, *United States v. Woods*, 216 Fed. Appx. 931, 934 (11th Cir. 2007) (weaving is sufficient to establish probable cause because it indicates that the driver may be under the influence of alcohol); *United States v. Strickland*, 902 F.2d 937, 940-41 (11th Cir. 1990) (same). In fact, even without a suspicion of intoxication, Dawson's alleged driving likely constituted traffic violations in themselves sufficient to establish probable cause. *See* Ala. Code § 32-5A-174 (setting minimum speed restrictions).

Dawson argues Timmerman did not have probable cause to initiate the traffic stop and provides a detailed account of his left turn that directly contradicts Timmerman's account. (Pl.'s Resp. Br. 11.) Therefore, at this stage of the proceedings, his alleged driving actions cannot establish probable cause, or even reasonable suspicion, for Timmerman's traffic stop because Dawson has raised a genuine issue of material fact of whether he actually drove in that manner. (Dawson Aff. 3-4.) Because it is clearly established that a police officer must have *some* legitimate reason – whether it be probable cause or reasonable suspicion – to initiate a traffic stop, Timmerman is not entitled to qualified immunity, and his summary judgment motion is due to be denied with respect to this claim. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003) (stating "a traffic stop is a constitutional detention if it is justified by reasonable suspicion under *Terry* or probable cause to believe a traffic violation has occurred under *Whren*").

Unlike Timmerman, the City is entitled to summary judgment. Municipalities are not liable for § 1983 claims under a theory of respondeat superior. *Gold v. City of Miami*, 151

11

F.3d 1346, 1350 (11th Cir. 1998). "[A] municipality may be held liable for the actions of a police officer only when municipal 'official policy' causes a constitutional violation." *Id.* Because Dawson has failed to identify a municipal official policy or custom, his § 1983 claim against the City fails, and the City is entitled to summary judgment on all of Dawson's § 1983 claims.

### 2.    Illegal Search of His Person and Vehicle

The defendants argue that Dawson's claims alleging illegal searches of his person and his vehicle must fail because he consented to the searches. A voluntarily consensual search is constitutional. *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001). Determining whether consent is voluntary is a factual inquiry and is examined under the totality of the circumstances. *United States v. Simms*, 385 F.3d 1347, 1355 (11th Cir. 2004). Among the factors courts use to make this determination are "the presence of coercive police procedures, the extent of the [suspect]'s cooperation with the officer, the [suspect]'s awareness of his right to refuse consent, the [suspect]'s education and intelligence, and the [suspect]'s belief that no incriminating evidence will be found." *Id.* (quoting *Purcell*, 236 F.3d at 1281).

Dawson admits that the officers asked, and that he gave, his consent to conduct both the vehicle and pat-down search. (Dawson Dep. 43:7-15.) There is no indication the officers browbeat a coercion out of Dawson or used any other type of coercive police procedure. Dawson was not restrained in any way or placed in the patrol car. The extent of Dawson's

cooperation could not have been more broad.  He invited and "encouraged" the officers to conduct a search in order to prove to them he had no alcohol or illegal drugs.  (*Id.*)  In his own words, he gave them "full permission" to search his vehicle and challenged them to "check the hood, trunk, tires, rims, the vehicle."  (*Id.* at 43:8-10.)  It is clear that Dawson believed – correctly as it turned out – that no incriminating evidence would be discovered and therefore welcomed the search.  In light of the totality of the circumstances, Dawson voluntarily consented to the search of his person and his vehicle and the searches did not violate his Fourth Amendment rights.

### 3.    Illegal Seizure of His Effects

Even after the patrol officers smelled Dawson's drink, searched his pockets and his vehicle, and subjected him to sobriety tests, they were unable to find evidence of alcohol or illegal drug use.  Dawson claims that at this time, he attempted to drive away in his vehicle but was stopped by Timmerman, who told him he was not allowed to drive.  (Dawson Dep. 50:7-23.)  It was Timmerman's professional opinion that, based on the erratic driving and presence of prescription medicine bottles, Dawson was incapable of driving safely.  (Timmerman Aff. 3.)   Dawson was forced to abandon his vehicle in the parking lot of a restaurant and was unable to retrieve it for three days.  There is no doubt Timmerman's refusal to allow Dawson to drive his vehicle interfered with his property in a meaningful way and thereby constitutes a seizure, as does the taking of Dawson's driver's license.  *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007) ("A seizure occurs when there is a

meaningful interference with a person's property.").

Unless "brief and minimally intrusive," the seizure of personal property must be accompanied by probable cause. *Lindsey v. Storey*, 936 F.2d 554, 558 (11th Cir. 1991); *see also Virden*, 488 F.3d at 1321 ("Ordinarily, the seizure of personal property is *per se* unreasonable unless the seizure is pursuant to a warrant issued upon probable cause."). The standard for determining when a seizure is protracted enough to require probable cause is ambiguous and courts are reluctant to require probable cause "unless the length of detention was so prolonged that it falls well outside the range" of permissible seizures. *Lindsey*, 936 F.2d at 559. The seminal Supreme Court case on the seizure of personal property deemed a ninety-minute detention to require probable cause. *United States v. Place*, 462 U.S. 696, 709-10 (1983).

Even if the seizure of Dawson's vehicle were to be considered brief and minimally intrusive – which is unlikely given the three-day seizure – at this stage Timmerman cannot establish even the lesser standard of reasonable suspicion, let alone probable cause. In *Lindsey*, a police officer seized gold jewelry from a passenger in a vehicle who had not yet been arrested. *Lindsey*, 936 F.2d at 557. The vehicle had been in an accident and the officer received information that the passenger had attempted to pay the other party $2,500 in cash so they would not report the accident to the police. *Id.* Upon investigating the attempted cover-up of the accident, the officer discovered $2,600 in cash along with gold jewelry worn by the passenger. *Id.* While affirming the legality of the seizure of the cash because it

related to a violation of the state's accident reporting law, the Eleventh Circuit held that "*mere suspicion* of drug-dealing was not particularized enough to justify the seizure" of the gold jewelry. *Id.* at 560 (emphasis added). Furthermore, this suspicion "*clearly* failed to establish the reasonable suspicion necessary to seize [the] jewelry," and, therefore, the officer was not entitled to qualified immunity. *Id.*

Timmerman provides two bases for his seizure – the erratic driving and the presence of prescription medicine – and Dawson denies them both. (Dawson Aff. 3-4.) Without these bases, Timmerman would have no other basis other than "mere suspicion" that Dawson was incapable of driving and required a vehicle seizure.[5] Consequently, regardless of whether Timmerman is required to establish probable cause or the lesser standard of reasonable suspicion, a genuine issue of material fact exists as to whether Timmerman had *any* basis for seizing Dawson's vehicle and driver's license in order to prevent him from driving.[6] If Dawson's version of the facts is true, which the court must accept as such for the purposes of summary judgment, then Timmerman would have no basis for seizing Dawson's vehicle

---

[5] Timmerman arguably relied on mere suspicion anyway. In his deposition he tells Dawson that, "I didn't necessarily think you were intoxicated. I *felt* that there was something affecting your ability to safely operate a vehicle." (Timmerman Dep. 21:16-19 (emphasis added).) This was after a thorough search of his vehicle revealed no alcohol or illegal drugs and after Dawson had passed field sobriety tests.

[6] The defendants do not identify any other possible authority under which Timmerman seized Dawson's vehicle, such as Alabama's impoundment statute, Ala. Code § 32-5A-139, or the police officer community caretaking function. *Riley v. State*, 583 So. 2d 1353, 1355 (Ala. Crim. App. 1991). Therefore, the court declines to consider these potential sources of authority.

and is not entitled to qualified immunity at this stage of the proceedings.[7]

**B.      Count Two - Procedural and Substantive Due Process**

Dawson argues that his procedural due process rights were violated by the defendants
"because no forfeiture proceedings were ever initiated against his vehicle, and no meaningful
post-deprivation remedy for the loss sustained by the Plaintiff was made available to him."
(Pl.'s Resp. Br. 13.)  The Eleventh Circuit has already rejected this very argument, however.
In *Lindsey*, the Eleventh Circuit held that a statute creating a civil cause of action for the
wrongful conversion of personal property provides "'an adequate postdeprivation remedy
when a plaintiff claims that the state has retained his property without due process of law.'"
*Lindsey*, 936 F.2d at 561 (quoting *Byrd v. Stewart*, 811 F.2d 554, 555 n.1 (11th Cir. 1987)).
All a state must provide is "*some* adequate postdeprivation remedy," and a conversion statute
provides such.  *Id.*

Alabama has provided this type of statute, Ala. Code § 6-5-260, and Dawson even
invoked the tort of conversion in this action.  (Compl. ¶ 27.)  Therefore, the plaintiff
undoubtedly has access to an adequate post-deprivation remedy and cannot under any set of
facts succeed on a claim that the seizure of his vehicle by a law enforcement officer violated
his procedural due process rights.  *See, e.g.*, *Browning v. City of Wedowee, Ala.*, 883 F. Supp.
618, 623 (M.D. Ala. 1995) (finding no procedural due process violation for law enforcement

---

[7] This finding does not preclude the defendants from offering evidence at trial to rebut
the plaintiff's allegations or later moving for judgment as a matter of law.  *See Lindsey*, 936 F.2d
at 561 n.7.

officers' detention of the plaintiff's gun because Alabama's tort of conversion provides an adequate post-deprivation remedy). The defendants' summary judgment motion is due to be granted against Dawson's procedural due process claim.

Likewise, Dawson's substantive due process claim fails because "'the constitutionality of arrests by state officials is governed by the Fourth Amendment rather than due process analysis.'" *Fleming v. Dowdell*, 434 F. Supp. 2d 1138, 1152-53 (M.D. Ala. 2005) (quoting *Berg v. County of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000)). Therefore, Dawson's substantive due process claim is duplicative and the defendants' summary judgment motion is due to be granted with respect to it.

**C.    *Counts Three through Six - State Law Tort Claims***

In their brief in support of summary judgment, the defendants addressed Counts Three through Six and pled various immunities and defenses. (Doc. # 30.) In his response to the defendants' summary judgment motion, Dawson filed a twenty-three page brief supported by his own affidavit. (Doc. # 38.) Dawson's response brief extensively, and almost exclusively, rebuts the defendants' arguments with respect to his illegal search and seizure claim of Count One. One paragraph of the brief is devoted to the procedural due process violation of Count Two. (Pl.'s Resp. Br. 12-13.) Dawson fails to address the defendants' arguments with respect to any of his other counts, however.

Rule 56 of the Federal Rules of Civil Procedure provides that a party opposing summary judgment "may not rely merely on allegations or denials in its own pleading."

17

Fed. R. Civ. P. 56(e)(2). "[T]he non-moving party . . . bears the burden of coming forward with sufficient evidence on *each element* that must be proved." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). If a party opposing summary judgment does not set out specific facts showing a genuine issue for trial, "summary judgment should, if appropriate, be entered against that party." *Id.* "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). However, summary judgment is only proper when "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). With this in mind, the court now addresses the claims Dawson failed to support in his response to the defendants' summary judgment motion.

### 1.     Count Three: Conversion

During discovery, the defendants requested Dawson produce a copy of the title and registration to the Cadillac he was driving the night of the traffic stop. (Doc. # 30-9, at 2.) Dawson responded that he was not in possession of these documents. (*Id.* at 5.) Alabama law provides that "[t]he owner of personalty is entitled to possession thereof" and that "[a]ny unlawful deprivation of or interference with such possession is a tort for which an action lies." Ala. Code § 6-5-260. Based on this statute, the defendants argue that because Dawson has not proven that title and registration for the Cadillac are in his name, his action for conversion must fail.

18

Defendants overlook the very next code section, however, which provides that "[m]ere possession of a chattel . . . will give a right of action for any interference therewith, except as against the true owner or the person wrongfully deprived of possession." Ala. Code § 6-5-261. Relying on this statute, the Alabama Supreme Court has held that plaintiffs with only a possessory interest in a vehicle can maintain an action for conversion "against another who is not the true owner or who has not wrongfully been deprived of possession." *Ex parte Anderson*, 867 So. 2d 1125, 1131-32 (Ala. 2003). The defendants do not assert they are the true owners of the Cadillac or that they were wrongfully deprived of possessing it. Therefore, Dawson's failure to prove legal title is not fatal to his conversion claim.

In order to establish the tort of conversion, Dawson "'must present proof of a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or *a wrongful detention or interference with another's property*.'" *SouthTrust Bank v. Donely*, 925 So. 2d 934, 935 (Ala. 2005) (quoting *Riscorp, Inc. v. Norman*, 915 So. 2d 1142, 1152 (Ala. 2005) (emphasis added)). It has long been established in Alabama that a plaintiff in a conversion action need not "prove a defendant appropriated the property to his own use." *Russell-Vaughn Ford, Inc. v. Rouse*, 206 So. 2d 371, 373 (Ala. 1968). In *Rouse*, the Alabama Supreme Court upheld a jury verdict of conversion when an automotive dealer refused to return a car owner's keys to him because it prevented the owner from using his car. *Id.* Under Dawson's alleged facts, Timmerman accomplished the same feat, except instead of taking the car keys, he took his driver's license and ordered him not to drive.

19

Unless this was an authorized seizure under the Fourth Amendment, the court finds no difference between the actions of Timmerman and the car dealer in *Rouse*.  Therefore, Dawson has established that genuine issues of material fact exist as to his claim of conversion of the vehicle and driver's license, and summary judgment for Timmerman is due to be denied.

The defendants argue that even if Dawson can establish a *prima facie* claim of conversion, they are entitled to discretionary function immunity.  (Defs.' Mot. Summ. J. Br. 20-23.)  Discretionary function immunity for peace officers is established by statute. Ala. Code § 6-5-338.  The City's immunity is dependant on whether Timmerman is entitled to discretionary function immunity.  *Howard v. City of Atmore*, 887 So. 2d 201, 211 (Ala. 2003) ("It is well established that, if a municipal peace officer is immune pursuant to [Ala. Code] § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune.").

Immunity is extended to police officers when a tort claim is based on "exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons." *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).  The police officer bears this burden of demonstrating the plaintiff's claims arise from a function that would entitle him to immunity.  *Ex parte Randall*, 971 So. 2d 652, 662-63 (Ala. 2007).  Once the police officer has shown this, the burden shifts to the plaintiff, who may rebut the immunity if he shows the police officer "act[ed]

willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.*

Timmerman meets his burden because investigating or arresting a person for driving under the influence of alcohol is an exercise of judgment in the enforcement of the criminal laws of the State. *Eubanks v. Brook*, 197 Fed. Appx. 819, 821 (11th Cir. 2006); *Ex parte City of Montgomery*, 758 So. 2d 565, 570 (Ala. 1999), *abrogated on other grounds by Cranman*, 792 So. 2d at 404. Dawson has the burden to rebut Timmerman's immunity by showing he acted willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law. Dawson's complaint alleges Timmerman's actions "amount[ed] to an illegal misuse" of his vehicle and constituted a "wrongful detention." (Comp. ¶ 27.) Although Dawson makes no argument with regard to conversion in his brief in opposition to summary judgment, he does allege facts supported by his affidavit that, if true, could establish Timmerman acted in a willful or malicious manner. Therefore, a genuine issue of material fact exists and, at this time, Timmerman is not entitled to discretionary function immunity for Dawson's claim of conversion.

Under any scenario, however, the City would be entitled to summary judgment on Dawson's tort claim of conversion. If Timmerman were found to have merely acted in a negligent manner, he would be entitled to peace officer immunity, which would concomitantly entitle the City to the immunity as well. *Howard*, 887 So. 2d at 211. If Timmerman were found to have acted in a willful or malicious manner, he would not be

entitled to peace officer immunity, and neither would the City.  The City would, however, still be entitled to immunity under Alabama Code section 11-47-190, which "absolves a municipality from liability for the intentional torts of its agents." *Altmayer v. City of Daphne*, 613 So. 2d 366, 369 (Ala. 1993).  Therefore, under either scenario, the City would be immune from liability as to Dawson's conversion claim.

### 2.    Count Four: Invasion of Privacy

Dawson brings a false light invasion of privacy claim based on Timmerman calling him a crack addict and a drug addict in front of other people in the restaurant parking lot. (Compl. ¶ 28.)  A false light claim consists of "putting the plaintiff in a false, but not necessarily defamatory, position in the public eye." *Johnston v. Fuller*, 706 So. 2d 700, 701 (Ala. 1997).

> In the context of a false-light claim, giving publicity is making a matter . . . public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.  Publicity is a concept more difficult to prove than [mere] publication, which is an element of a defamation claim. The "publicity" element is not satisfied by the communicat[ion of] a fact . . . to a single person *or even to a small group of persons*.

*Regions Bank v. Plott*, 897 So. 2d 239, 245 (Ala. 2004) (internal quotations and citations omitted) (emphasis added).  Here Dawson alleges at best that only a small group of persons heard Timmerman's alleged remarks.  Therefore, he cannot prove the "giving publicity" element of his false light claim, and summary judgment is due to be granted for both defendants with respect to this claim.

3.    **Count Five: Slander**

Dawson accuses Timmerman of calling him a drug addict in front of people in the restaurant parking lot.  (Compl. ¶ 29; Dawson Dep. 54:4-23.)  Specifically, he claims Timmerman said he "looked like somebody who got high" and "somebody who smoked crack cocaine."  (Pl.'s Resp. Br. 4.)  Dawson asserts that "[c]ustomers were able to hear Timmerman's tirade."  (Dawson Aff. 2.)  He claims Timmerman knew the statements to be untrue yet published the statements in order to embarrass or annoy Dawson.  (Compl. ¶ 29.)

Regardless of whether Dawson is a public figure or private individual, he must still establish a *prima facie* claim of slander, which requires him to show: "[1] that the defendant was at least negligent, [2] in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)."  *Delta Health Group, Inc. v. Stafford*, 887 So. 2d 887, 895 (Ala. 2004).

Based on the plaintiff's version of the events, Timmerman was at least negligent in allowing other people to hear the derogatory and unsupported comments of Dawson's illegal drug use.  If it turns out that Timmerman never had probable cause to initiate the stop, or that Timmerman did in fact know Dawson to be a former city councilman unpopular with the City's police department, then Dawson may also be able to show the comments were made in a malicious or willful manner that were said in order to cause damage to Dawson's

political career or reputation in his community.  Therefore, a genuine issue of material fact exists as to the first element of slander.

Dawson has also created a genuine issue of material fact as to the publication element. This element is usually satisfied "by proof of communication of the defamatory matter to someone other than himself."  *Id.* (quoting *K-Mart Corp. v. Pendergrass*, 494 So. 2d 600, 602 (Ala. 1986)).  Although Timmerman denies making the statements, Dawson alleges otherwise and, importantly for the purposes of this element, that customers in the parking lot "were able to hear" the comments.  (Dawson Aff. 2.)  Although there is no evidence the customers did in fact hear the comments, Dawson has proffered supporting circumstantial evidence.  In his affidavit, Dawson states that Timmerman's comments were so loud they attracted customers to the scene and that Timmerman had to disperse the crowd.  (*Id.*)  If customers were attracted to the scene by Timmerman's voice, this reaction indicates the comments were heard and communicated to someone other than Timmerman.

If the comments were made, and the court must assume they were at this stage of the proceedings, there is no doubt they concerned Dawson because they allegedly identified him as an illegal drug user.  The defendants do not contest that the alleged comments, if made, were false and defamatory.  There is absolutely no evidence that Dawson has ever used illegal drugs, much less on the night in question.

As for the last element, in order to constitute slander that is actionable per se, and therefore relieve the plaintiff from having to prove special harm, the defamatory statement

24

must contain an imputation "of an indictable offense involving infamy or moral turpitude." *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1091 (Ala. 1988). While the distribution of cocaine or marijuana is a crime of moral turpitude, mere possession for one's personal use is not. *Ex parte Hall*, 681 So. 2d 642, 644 (Ala. 1996). Timmerman's alleged comments only refer to personal use, therefore they do not constitute slander that is actionable per se.

In order to establish slander per quod, a plaintiff must prove special damages, which "'are the material harms that are the intended result or natural consequence of the slanderous statement.'" *Butler v. Town of Argo*, 871 So. 2d 1, 18 (Ala. 2003) (quoting *Shook v. St. Bede Sch.*, 74 F. Supp. 2d 1172, 1180 (M.D. Ala. 1999)). The general rule concerning special damages is "'that they are limited to material loss capable of being measured in money.'" *Id.* (quoting *Shook*, 74 F. Supp. 2d at 1180 (internal quotation marks omitted)). Even if a plaintiff "suffered mentally and emotionally as a result of the untrue statements," he must "produce substantial evidence of special damage." *Id.* Dawson has produced no evidence indicating he suffered a material harm capable of being measured in money damages, and therefore he cannot establish the fifth element of his slander claim, and the defendants' summary judgment motion is due to be granted accordingly. *See, e.g.*, *Casey v. McConnell*, __ So. 2d __, No. 2060324, 2007 WL 1575569, at *4-5 (Ala. Civ. App. June 1, 2007).

4.    **Count Six: Outrage**

Dawson claims Timmerman's conduct was extreme, outrageous and caused severe emotional distress.  (Compl. ¶ 30.)  In Alabama, the tort of outrage is only recognized in three areas: "(1) wrongful conduct within the context of family burials; (2) an insurance agent's coercing an insured into settling an insurance claim; and (3) egregious sexual harassment."  *Stabler v. City of Mobile*, 844 So. 2d 555, 560 (Ala. 2002).  None of these situations is remotely applicable to the situation at hand, and, therefore, Dawson cannot establish a claim of outrage.  The defendants' summary judgment motion is due to be granted accordingly.

## VI.  CONCLUSION

For the reasons set forth above, it is ORDERED that the defendants' summary judgment motion (Doc. # 29) is GRANTED in part and DENIED in part as follows:

1.    GRANTED with respect to Dawson's claims for denial of due process (Count Two), invasion of privacy (Count Four), slander (Count Five), and outrage (Count Six) for both defendants;

2.    GRANTED with respect to Dawson's claims of illegal seizure of his person and illegal searches of his vehicle and person under Count One for both defendants;

3.    DENIED with respect to Dawson's claim for illegal seizure of his

vehicle and driver's license under Count One for Defendant Timmerman;

4.      GRANTED with respect to Dawson's claim for illegal seizure of his vehicle and driver's license under Count One for Defendant City of Montgomery;

5.      DENIED with respect to Dawson's claim for conversion (Count Three) against Defendant Timmerman;

6.      GRANTED with respect to Dawson's claim for conversion (Count Three) against Defendant City of Montgomery.

Therefore, it is ORDERED that Defendant City of Montgomery is DISMISSED as a party to this action.  The portion of Count One against Defendant Timmerman pertaining to the seizure of Dawson's vehicle and driver's license and the conversion claim against Timmerman are the only remaining claims, and the parties shall prepare for trial accordingly.

DONE this 6th day of March, 2008.

          /s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

1.  **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

    (a)  **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

    (b)  **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

    (c)  **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

    (d)  **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

    (e)  **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

Rev.: 4/04

2.    <u>**Time for Filing**</u>: The timely filing of a notice of appeal is mandatory and jurisdictional. <u>Rinaldo v. Corbett</u>, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

(a)    **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

(b)    **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

(c)    **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

(d)    **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

(e)    **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.    <u>**Format of the notice of appeal:**</u> Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. <u>See</u> <u>also</u> Fed.R.App.P. 3(c). A <u>pro se</u> notice of appeal must be signed by the appellant.

4.    <u>**Effect of a notice of appeal:**</u> A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).